No. 24-5376

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

—————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MICHAEL LACEY, *et al.*,

*Defendant-Appellant.*

—————————

On Appeal from the United States District Court for the District of
Arizona, The Honorable Diane J. Humetewa, Presiding.
CR No. 2:18-cr-00422-DJH

—————————

**APPELLANT'S MOTION FOR BAIL PENDING APPEAL PURSUANT TO
FEDERAL RULE OF APPELLATE PROCEDURE 9, CIRCUIT RULE 9-
1.2; 18 U.S.C. § 3143; AND DECLARATION OF COUNSEL AND
EXHIBITS**

—————————

Paul J. Cambria
Erin McCampbell Paris
LIPSITZ GREEN SCIME CAMBRIA, LLP
*42 Delaware Ave.*
*Buffalo, NY 14202*
*(716) 849-1333*
*pcambria@lglaw.com*
*eparis@lglaw.com*

*Attorneys for Michael Lacey*

Pursuant to 18 U.S.C. § 3143(b), Federal Rule of Appellate Procedure 9(a), and Circuit Rule 9-1.2(a), Defendant-Appellant Michael Lacey respectfully requests that the Court grant bail pending appeal. The district court denied bail pending appeal. Lacey self-surrendered on September 11, 2024 to begin serving his 60-month sentence. As discussed below, Lacey easily satisfies all factors for bail pending appeal. This motion is based upon the attached memorandum of law, declaration of counsel, exhibits, and any further briefing the Court may request. To avoid unnecessary repetition of issues, pursuant to F.R.A.P. 28(i), Lacey hereby joins in the arguments made in favor of bail as stated on pages 13-46 of Co-defendants/Appellants John Brunst and Scott Spear's Bail Motion (Doc. 27, Case No. 24-5374). The government opposes relief.

## **<u>TABLE OF CONTENTS</u>**

Page

Introduction ................................................................................. 1

Factual Background ...................................................................... 4

    I.     Lacey was a "layer away" from the origins and operations of
Backpage ........................................................................... 4

    II.    Two attorneys recommend the creation of a foreign trust to
stabilize Lacey's banking and benefit his sons ..................... 6

Procedural History ....................................................................... 8

Legal Standard for Bail Pending Appeal ................................... 10

Argument .................................................................................... 11

    I.     There is no risk of flight or danger to the community or any
person.................................................................................. 11

    II.    The appeal is not taken for delay......................................... 11

    III.   There are numerous substantial issues on appeal ................. 12

            A. The District Court previously found "substantial issues" .......... 12

            B. The government agreed there are substantial issues ................. 13

            C. The record demonstrates there are substantial issues ............... 13

                  1. There was no concealment ......................................... 13

i

2. The District Court misapplied the law in finding intent to conceal…………………………………15

3. There are no proceeds for any money laundering counts………………………………………17

4. Lacey had no knowledge of proceeds……………...20

5. An error in Guidelines calculations should result in a sentence of less time than the course of an appeal…………………………………………21

6. Additional factors weigh in favor of bail…………..22

Conclusion…………………………………………………………...22

# TABLE OF AUTHORITIES

**Cases** **Page**

*A.L.D.F. v. U.S.D.A.,*
933 F.3d 1088 (9th Cir. 2019)……………………………………...............17

*Backpage.com v. Dart,*
807 F.3d 229 (7th Cir. 2015)…………………………………………...5, 6, 19

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012).................................................5

*Backpage.com, LLC v. Cooper,*
939 F. Supp. 2d 805 (M.D. Tenn. 2013).................................................5

*Backpage.com, LLC v. Hoffman,*
2013 WL 4502097 (D.N.J. Aug. 20, 2013) .............................................5

*Bursey v. United States,*
466 F.2d 1059 (9th Cir. 1972)…………………………………………3, 17-18

*Cuellar v. United States,*
553 U.S. 550 (2008)……………………………………………………*passim*

*Free Speech Coal., Inc. v. Rokita*, ___ F. Supp. 3d ___, 2024 U.S. Dist LEXIS
114208 (S.D. Ind. June 28, 2024)……………………………………..18

*United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007)…………………...14-15

*United States v. Armstead,*
552 F.3d 769 (9th Cir. 2008)……………………………………………..21

*United States v. Enbry*, 644 F. App'x 565 (6th Cir. 2016)………………………..15

*United States v. Esterman*, 324 F.3d 565 (7th Cir. 2003)………………………15

*United States v. Garcia,*
340 F.3d 1013 (9th Cir. 2003)……………………………………………10

*United States v. Handy,*
761 F.2d 1279 (9th Cir. 1985)……………………………………………………11

*United States v. Lichtenberg,*
309 F. App'x 107 (9th Cir. 2009)………………………………………………20

*United States v. Wilkes,*
662 F.3d 524 (9th Cir. 2011)……………………………………………………...16

*United States v. Wetselaar*, 2017 WL 6514650 (9th Cir. Nov. 7, 2017)…………22

**Statutes**

18 U.S.C. § 1957………………………………………………………………10

18 U.S.C. § 3143………………………………………………………………10

18 U.S.C. § 1956(a)(2)(B)(i)…………………………………………………...15

**Other Authorities**

U.S.S.C. Guideline §2S1.1(a)(2)………………………………………………21

## **INTRODUCTION**

This appeal arises out of the government's unprecedented indictment of former employees and owners of a website, www.backpage.com ("Backpage"), based on the activities of website users after the website users created and posted their facially lawful content to the website in the form of classified ads. This appeal will demonstrate there was no crime here and the prosecution violated the First Amendment every step of the way. In the meantime, Lacey, an award-winning journalist who had nothing to do with Backpage's day-to-day operations, is incarcerated on a spurious money-laundering conviction based on an international transfer of funds generated from Backpage.

Lacey presents a compelling case for bail pending appeal. The record demonstrates the government grossly overreached in charging Lacey. Lacey was charged in 86 counts, including: conspiracy to facilitate Travel Act violations; Travel Act violations; conspiracy to money launder; and money laundering. The jury acquitted him of one money laundering count, convicted him of one count of international concealment money laundering, and reached ***no verdict*** as to 84 of the charges. Subsequently, the District Court acquitted him of 50 of those unresolved counts, and ruled that the only bases for keeping the remaining 18 Travel Act charges against Lacey (and by extension, the Travel Act conspiracy charge) were the actions of others under the theory of *Pinkerton* liability because Lacey had no involvement

with or knowledge of the purported business practices at issue in the prosecution—content moderation, ad aggregation, and marketing strategies. This record, alone, should give this Court pause as to the validity of the case against Lacey.

Moreover, the record demonstrates the government overreached in charging Lacey even with respect to his sole count of conviction—international concealment money laundering. This case is the only known instance of a defendant being charged with **concealment** money laundering despite having **disclosed** the transfer of funds and **revealed** the attributes of those funds to the federal government in timely disclosure reports, after having expressed an intent to both pay all taxes and file all necessary disclosure reports with the federal government, both before and after the transaction at issue (which was executed by two attorneys). Among other errors, in denying acquittal, the District Court misapplied the Supreme Court's seminal case on international concealment money laundering, *Cuellar v. United States*, 553 U.S. 550 (2008).

But even if consideration of this extraordinary fact pattern—and its incompatibility with *Cuellar*—is taken off the table until full merits briefing, there are two independent reasons why this conviction must be reversed. First, there was no proof Lacey knew the funds at issue were proceeds. Indeed, even the District

2

Court acknowledged at sentencing that Lacey had a "***bona fide held belief that what [he was] doing was not illegal***."  (Ex. A at 222 (emphasis added).)[1]

Second, the government defaulted on its burden to demonstrate the funds at issue—which derived from revenue earned from the publication of third-party speech—were, in fact, the proceeds of crime.  Under the First Amendment, all speech is presumptively protected.  *See Bursey v. United States*, 466 F.2d 1059, 1081-82 (9th Cir. 1972).  To overcome this presumption, the government had the burden to establish the funds at issue in each purported laundering transaction were derived from specific instances of third-party speech constituting Travel Act violations.  *See id.* ("[T]he burden rests on the Government to establish that the ***particular expressions*** [of speech]… are outside [the] reach" of the First Amendment.  (emphasis added)).  At trial, the government did no tracing of any funds from any alleged money laundering transactions back to Travel Act violations.  On this basis, alone, all money laundering convictions for all three defendants, including Lacey's sole count of conviction, must be vacated.

---

[1]     All exhibits cited herein are attached to the Declaration of Erin McCampbell Paris.

# FACTUAL BACKGROUND

## I. Lacey was a "layer away" from the origins and operations of Backpage.

The origins and operations of Backpage are addressed in greater detail in the Co-defendants' Motion. As relevant to Lacey, Backpage was a subsidiary of a media organization, Village Voice Media Holdings, LLC ("VVMH"). (Ex. B.) Lacey's role at VVMH was to oversee the writing and editing of articles published in VVMH's newspapers. (*Id*.) Lacey and the journalists won more than 3,800 national awards, including a Pulitzer. (Ex. C at 6.) Critically, Lacey (and all the other journalists and editors at VVMH) were prohibited from being involved with the business side of the company, which was responsible for generating revenue, to prevent financial concerns from interfering with journalistic integrity. (*Id*. at 5.) Within the media industry, this division is commonly referred to as "separation of church and state." (*Id.*)

The subject of this prosecution—the operation of Backpage—fell on the business side of the organization. (Ex. B.) As a result, Lacey was not involved in any of the day-to-day business operations or practices of the website at issue in this prosecution, such as Backpage's policies on content moderation, ad aggregation, or marketing. (*Id*.) The evidence at trial reflected the church-and-state division. There was no evidence that Lacey was involved in these businesses practices or policies or Backpage's financial issues. To the contrary, Carl Ferrer, the government's main

4

witness, who was Backpage's creator and top manager, testified Lacey was a "layer away" from Backpage's operations. (Ex. D at 11.) The other former Backpage executive testified he *never* met Lacey even though he worked at Backpage for nearly the entire period of the alleged conspiracy. (Ex. E at 112.)

Because Lacey was not involved in business operations, Lacey relied on his long-term business partner, the late James Larkin, who oversaw all business-side operations of VVMH, as well as Ferrer, who directly oversaw Backpage, to properly operate Backpage. (Ex. F at 2-3.) Both Larkin and Ferrer assured Lacey Backpage was operating properly, notwithstanding accusations from politicians, religious leaders, and non-profits and their demands that Backpage discontinue adult advertising. Larkin assured Lacey Backpage had hired the best First Amendment, Section 230, and internet safety lawyers in the country and the website operated lawfully. (*Id*.) Lacey's reliance on them was reinforced by federal court decisions holding the First Amendment protected Backpage's publication of third-party adult advertising, notwithstanding claims that numerous Backpage ads were associated with unlawful activities, including prostitution. *Backpage.com v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268, 1282 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *9-11 (D.N.J. Aug. 20, 2013).

5

On April 22, 2015, the media conglomerate sold Backpage to entities controlled by Ferrer, Backpage's long-time C.E.O, in a seller-financed sale. (Ex. G at 77-78.) Ferrer made monthly loan payments to Cereus Properties, LLC, an entity controlled by defendants.

After the sale, Backpage continued to be pressured to discontinue all adult advertising. Around this time, federal agents began visiting Lacey's banks, suggesting and even demanding that the banks close his accounts, even though no charges were pending against him. (Ex. H at 67, 131.)[2] As a result, Lacey's banking became unstable. (*Id.*)

## II. Two attorneys recommend the creation of a foreign trust to stabilize Lacey's banking and benefit his sons.

In 2016, at a meeting on an unrelated matter with his long-time trust and estates counsel, John Becker, Lacey spoke about his banking instability. (*Id*. at 67-68.) Lacey had five grantor trusts with distributions due to be made to him, but, because his bank accounts were being closed after federal agents visited his banks, he had no stable domestic bank account where he could deposit and maintain the funds for any period of time. (*Id*. at 70.) Becker suggested foreign banks would not

---

[2] Similarly, Cook County, Illinois Sheriff Thomas Dart pressured VISA and Mastercard to terminate their relationships with Backpage. After Backpage sued Dart, Judge Posner, writing for a unanimous Seventh Circuit, unequivocally held that Dart's threatening of VISA/Mastercard to cause them to terminate their relationships with Backpage violated the First Amendment. *Dart*, 807 F.3d at 229.

6

be ruffled by visits from federal agents and that Lacey consult a lawyer who specialized in foreign trusts to lawfully create such an account. (*Id*. at 67-68.) Lacey and Becker subsequently travelled to California to consult with such a lawyer, who advised foreign trusts were lawful and could be set up with banks within the European Union, and that foreign accounts must be reported annually to the federal government. (*Id*. at 68-70.) Lacey authorized the lawyers to form an offshore trust benefitting his sons, as long as all rules, including reporting requirements, were satisfied. (*Id*.)

The trust was formed and Becker—who had control of the funds at issue—transferred the funds from the United States to a Hungarian bank on January 3, 2017. (*Id*. at 78, 132.) The funds at issue derived entirely from loan payments Ferrer made to Cereus Properties after he purchased Backpage, a portion of which subsequently were distributed to Lacey. (Ex. I.)

Shortly after the trust was formed, Lacey emailed Becker asking whether Becker or the California lawyer would "do the ***reporting to govt (sic) on money that was moved***?" by filing the required "Report of Foreign Bank and Financial Accounts," commonly referred to as an "FBAR." (Ex. J.) Becker confirmed Lacey's accountants would file the FBAR using information provided by counsel. (*Id*.) Lacey's accountant timely filed an FBAR each year. (*E.g.*, Ex. K.) The government's main witness on

money laundering, Quoc Thai, testified people file FBARs "[t]o **report** the existence of a foreign bank account" to the federal government. (Ex. L at 63 (emphasis added).)

In addition to that damaging testimony, Thai conceded he did not trace any of the funds Becker transferred to Hungary on Lacey's behalf to revenue earned from any specific ads posted to Backpage. (*Id*. at 54-55.) He admitted he did not review the content of any Backpage ads (*id*. at 45) and, thus, had no idea whether any Backpage ads proposed unlawful transactions. He also did not know whether the funds at issue for any of the money laundering counts could be linked to practices the government claimed were associated with prostitution: content moderation, ad aggregation, ad marketing strategies, or reciprocal links or advertising with other adult websites. (*Id*. at 45-47.) Finally, Thai had no information about the purpose for any wire transfers associated with the money laundering counts. (*Id.* at 32.)

## PROCEDURAL HISTORY

The superseding indictment charged Lacey with conspiracy to violate the Travel Act, substantive Travel Act violations, conspiracy to commit money laundering, and money laundering. (Ex. M.) The defense filed numerous dispositive motions, seeking dismissal of the indictment on constitutional and statutory grounds, all of which were denied, and will be addressed on this appeal.

The parties proceeded to trial in August 2021, but within three weeks the then-presiding district judge declared a mistrial because the government repeatedly

8

violated the Court's limitations on introduction of evidence of child-sex-trafficking, highly prejudicial evidence concerning charges no defendant faced.

The parties proceeded to trial a second time in August 2023. There were numerous reversible errors at trial, some of which are discussed in the Co-defendants/Appellants' bail motion, including: jury instructions in violation of the First Amendment; preclusion of evidence of defendants' good faith; *Brady/Jencks* violations; and precluding defendants from crossing the government's lead witness with past contradictory statements on issues going to the core of the prosecution, to name a few.

Following a three-month trial, the jury reached no verdict as to Lacey on 84 counts, acquitted him of one count of money laundering, and convicted him of Count 100—international concealment money laundering—a count based on Becker's wire transfer of funds to Hungary to establish the offshore trust. The jury convicted two of Lacey's co-defendants on some charges and acquitted two on all charges.

Lacey moved for acquittal of Count 100 under Rule 29 and joined in the Rule 29 motions of his Co-defendants, which highlighted the many problems with the second trial common to the three defendants who were not acquitted. Additionally, the defendants moved for a new trial under Rule 33.

The District Court granted, in part, and denied, in part, the Rule 29 motions. The Court acquitted Lacey of all Travel Act violations premised on ads published

after the sale to Ferrer (Counts 19-51), ruling the purported conspiracy ended at the sale to Ferrer and there was no proof of Travel Act violations thereafter.  (Ex. N at 40-41.)  The Court acquitted Lacey of all money laundering counts charged under 18 U.S.C. § 1957 (Counts 69-70, 81, 83-84, 86, 88-92, 94-99).  (*Id*. at 55-57.) Critically, the Court acquitted the exact same funds at issue in Count 100 ***twice*** in its acquittals of Counts 94-99, which were transactional money laundering charges involving exactly the same funds.  Nonetheless, the Court affirmed the conviction for Count 100.

At sentencing, the Court imposed a term of incarceration of 60 months, denied bail, and ordered Lacey to self-surrender by September 11, 2024.  (Ex. A.)

## <u>LEGAL STANDARD FOR BAIL PENDING APPEAL</u>

Bail pending appeal should be granted when there is "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" and if "the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in— []reversal, [] an order for a new trial, [] a sentence that does not include a term of imprisonment, or [] a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143; *United States v. Garcia*, 340 F.3d 1013, 1015 (9th Cir. 2003).  A "substantial issue"

10

is one that is "fairly debatable." *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985).

## ARGUMENT

This Court should grant bail pending appeal. The District Court found every factor in favor of bail pending appeal, except for the presentation of substantial issues. To the contrary, there are so many substantial issues on appeal in this unprecedented prosecution that it is not possible to address them all here. Moreover, this Court should give no deference to the District Court's finding because, just a few months earlier, the District Court stated several times that this appeal ***would present*** "substantial issues," a finding with which the government agreed.

## I. There is no risk of flight or danger to the community or any person.

The District Court's finding of no risk of flight or danger to the community or any person (Ex. A at 242-44) is well supported. Probation found no risk of flight, or danger to community or others. (Ex. O at 57 (filed under seal).) Indeed, Lacey was on pretrial release for more than six years, during which time he never missed a court appearance and committed no crimes. (Ex. P at 2-4.)

## II. The appeal is not taken for delay.

This factor is not contested and the District Court's determination that the appeal is not for delay (Ex. A at 242) is well supported.

11

## III. There are numerous substantial issues on appeal.

There are numerous substantial issues going to the core of this prosecution that will result in reversals or retrial, as set forth in the Co-defendants/Appellant's Motion, and incorporated by reference herein.

With respect to Lacey's sole count of conviction—international concealment money laundering—the government's proof—fully credited—failed to establish: (1) concealment; (2) intent to conceal; (3) knowledge of proceeds; or (4) proceeds. In the face of this lack of evidence, the District Court, in denying Lacey's Rule 29 motion, ruled on a statutory interpretation issue of first impression in violation of this Court's canons of construction. The District Court also misapplied a ruling from this Court on domestic money laundering in a manner incompatible with the Supreme Court's ruling in *Cuellar*. In addition to these substantial issues, the District Court misapplied the applicable sentencing Guideline, sentencing Lacey under an erroneous Guidelines range of 188-235 months, when the Guidelines range should have been 6-12 months.

### A. The District Court previously found "substantial issues."

Long before sentencing, the District Court repeatedly said the anticipated appeals of Appellants would present "substantial issues." At a January 29, 2024 status conference, the District Court said "[t]here are ***substantial issues*** that have to be considered by the Ninth Circuit," which "may change the complexity or [] what

the government may or may not be able to pursue with regard to retrial of the . . . remaining counts against Lacey." (Ex. Q at 9 (emphasis added).) Subsequently, the Court reiterated "the post sentencing appeals" to be filed by "Spear and Brunst[] could inform all the parties, including Lacey, going forward. ***So it may be that on appeal several of those convictions are set aside or remanded back***." (Ex. R at 15-16.) The District Court's statements were not made in the context of a bail motion, but the Court unequivocally said the issues to be raised on appeal could result in reversal or retrial—the essence of what makes an issue substantial for bail.

**B.      The government agreed there are substantial issues.**

When addressing Lacey's retrial, the government conceded there are substantial issues. (*Id*. at 9 ("[I]t would be more efficient to have the Ninth Circuit rule on these issues before any retrial."); 10 ("If we had a trial" on Lacey's outstanding counts, "and then there was an appeal, there could be something in that appeal that would require yet another trial.").

**C.      The record demonstrates there are substantial issues.**

Lacey's appeal will raise numerous substantive issues, any one of which will result in reversal of his conviction.

**1.      There was no concealment.**

This charge presents a nationwide issue of first impression:  Can a taxpayer who discloses to the federal government that he has transferred funds internationally and also

13

reveals the attributes of those funds to the federal government, by filing all required disclosures and tax returns, be found to have "concealed" those same funds from the federal government?

What sets this conviction apart from other money laundering cases is the government's own proof demonstrating the government had the ***same information*** about the funds ***before*** the transfer at issue as it did ***afterwards***. (Ex. I.) No information about the funds was concealed through the act of the international transfer. Moreover, Lacey timely filed forms each year ***disclosing*** the attributes of the funds to the federal government. (*E.g.*, Ex. K.) Indeed, the government's own witness testified the purpose for the disclosure forms Lacey filed were to "***report*** the existence of a foreign bank account" to the federal government. (Ex. L at 63 (emphasis added).)

Critically, in *Cuellar*, the Supreme Court held the international concealment money laundering statute "encompasses only ***substantial*** efforts at concealment." *Cuellar*, 553 U.S. at 563 (emphasis in original). Here, there were no efforts at concealment. Funds were transferred from one account associated with Lacey to another account associated with Lacey (after which the new account, the transferred funds, and the trust were timely reported to the federal government in disclosure forms and tax returns). Other Circuits have already recognized that, when accounts are held in the proper name of a defendant and the defendant's relationship to the account is transparent, as it was here, concealment is absent as a matter of law. *See United States*

14

*v. Adefehinti*, 510 F.3d 319, 323 (D.C. Cir. 2007) (vacating concealment money laundering conviction and recognizing that "simple transactions that can be followed with relative ease" do not involve concealment); *United States v. Esterman*, 324 F.3d 565, 571 (7th Cir. 2003) (concluding the "government's proof" of concealment "fell short" because all the defendant did was "simply ma[ke] deposits into other bank accounts that were correctly identified"); *see also United States v. Enbry*, 644 F. App'x 565, 570 (6th Cir. 2016) (recognizing there was no proof of "a ploy to disguise the nature, location, source, ownership, or control of the proceeds" when the defendant's "name was on the account" at issue).

### 2. The District Court misapplied the law in finding intent to conceal.

The District Court misapplied the law in two ways in upholding this conviction. First, in denying Lacey's Rule 29 Motion, the Court ruled the jury could have found an intent to conceal based on Lacey's expressed intent in preventing the government from "accessing" his banking and disrupting his banking relationships (Ex. N at 52), but there is no authority permitting the word "conceal," as used in 18 U.S.C. § 1956(a)(2)(B)(i), to be interpreted to mean "access." Section 1956 does not define the term "conceal;" as such, courts should "give the phrase its ordinary meaning" and "consult[] common dictionary definitions." *A.L.D.F. v. U.S.D.A.*, 933 F.3d 1088, 1093 (9th Cir. 2019). Just as the dictionary definition of "individual" could not mean "animal" in *A.L.D.F.*; the dictionary definition of "conceal" does not mean

15

"access" here, and the District Court clearly erred ruling otherwise in denying Lacey's Rule 29 motion.[3]  Whether "conceal" can mean "access" is an issue of first impression.

Second, the District Court found sufficient proof of intent to conceal because "Lacey's transfer to Hungary was the last transfer in a series of unusual transactions that had the effect of distancing the funds from Backpage proceeds," relying on *United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011).  (Ex. N at 52.)  Putting aside the testimony of Lacey's lawyer explaining why the series of domestic transfers was not "unusual," the reasons for the series of transfers have no relevance here, as *Wilkes* addressed **domestic** concealment money laundering, not **international** concealment money laundering.  That difference matters because in *Cuellar* the Supreme Court limited the proof that may be considered when assessing intent in **international** concealment money laundering:

> **[T]he critical transportation was not the transportation**
> **of the funds within this country on the way to the border.**
> Instead, … what the Government had to prove was that
> **petitioner knew that taking the funds to [another**
> **country] was "designed," at least in part, to conceal or**

---

[3]  The District Court's definition for Rule 29 also was inconsistent with its jury instruction, wherein the Court defined "concealment" as "the act of preventing disclosure or refraining from disclosing." (Ex. S at 4.)  The abandonment of the jury instruction definition to provide a basis to deny Lacey's Rule 29 motion was clear error, creating an independent due process violation.

> *disguise their "nature," "location," "source," "ownership," or "control."*

*Cuellar*, 553 U.S. at 562 (emphasis added). Thus, the District Court's stated basis for upholding Lacey's conviction—a series of transfers within the United States prior to the international transfer—is not relevant to a determination about whether Becker's international wire was designed or intended to conceal the attributes of the funds. *See id.* at 568 (vacating international concealment money laundering conviction premised on efforts to conceal the funds while moving domestically within the United States).

### 3.    There are no proceeds for any money laundering counts.

There are four reasons why there are no proceeds to support any money laundering count. First, the government conceded it did not trace *any* of the funds transferred in *any* of the money laundering counts to *any* specific Backpage ads. (Ex. L at 45-55.) Instead, the government improperly told the jury it could assume all ads on Backpage were unprotected and published unlawfully and, therefore, assume all Backpage's revenues were criminal proceeds. Upholding money laundering convictions under this theory turns the First Amendment on its head. As this Court held in *Bursey*, "[a]ll speech, press, and associational relationships are presumptively protected by the First Amendment; the burden rests on the Government to establish that *the particular expressions* or relationships are outside

17

its reach." *Bursey*, 466 F.2d at 1081-82 (emphasis added). The government clearly failed to meet its burden here because there was no proof in the record tying the financial transaction associated with each money laundering charge to the proceeds of publishing any "particular expressions" falling outside the protections of the First Amendment. The government can no more declare a website unprotected by the First Amendment than it can declare all the books in a bookstore unprotected—both require proof on an item by item basis. *Id.*; *Free Speech Coal., Inc. v. Rokita*, __ F.Supp.3d __, 2024 U.S. Dist. LEXIS 114208, at *32-33 (S.D. Ind. June 28, 2024) ("The website is a publisher…not an obscene material like a magazine….The website itself cannot be obscene…Instead, the materials (*i.e,* the videos and images on the website…) are the focus of the analysis.").

Notably, the evidence at trial established the fifty charged ads (including the thirty-three ultimately acquitted ads) generated just $302.00 of gross revenue for Backpage. The Government failed to trace *any* of that $302.00 to any of the $99,852,027.60 of financial transactions at issue in Counts 53-100, so the jury had no basis to conclude the charged financial transactions underlying the money laundering convictions involved unlawful proceeds. (Ex. L at 45-55.) Additionally, the jury was obligated to assume the millions of adult ads Backpage published which the jury did not see at the trial (and all revenues from publishing those ads) were protected by the First Amendment and, therefore, not proceeds—but plainly did not.

18

Second, even if the First Amendment and its presumption did not exist, the government's own proof demonstrated that no less than 6% of the website's revenues were generated from unquestionably lawful non-adult ads like rentals, jobs, and automobiles (Ex. T), which were not proceeds. Further, the government presented no proof that adult ads involving activities such as phone sex and stripping were associated with unlawful activities, which means that there is no proof to support the government's specious claim that every adult ad was a prostitution ad. *E.g.*, *Dart*, 807 F.3d at 234 ("Fetishism? Phone sex? Performances by striptease artists?… It's not obvious that such conduct … violates any laws, including laws against prostitution."). Consequently, the District Court erred allowing the jury to convict on money laundering counts absent tracing because the government failed to prove the funds at issue in any particular money laundering count actually were proceeds, rather than revenues from ads that were associated with lawful activity.

Third, there were no proceeds for any money laundering count based on transactions occurring after April 30, 2015 when the defendants sold Backpage to Ferrer, and the Count 100 funds originated solely from Backpage's post-sale revenue. (Ex. I.) The jury acquitted four of the defendants of every post-sale Travel Act count. In dismissing the unresolved counts against Lacey, the District Court ruled the conspiracy to violate the Travel Act ended at the sale to Ferrer, and there was no proof of Travel Act violations thereafter. (Ex. N at 40-41; Ex. U at 14.)

19

Consequently, there can be no proceeds for any money laundering transactions occurring after the sale to Ferrer because there were no Travel Act violations proven or possible.

Fourth, there were no proceeds for Count 100 because the District Court acquitted the very funds at issue in Count 100–*twice*–in dismissing Counts 94-99.

For all these reasons, there is no proof the funds at issue were "in fact" proceeds, as required under Section 1956, and the conviction must be vacated. *See United States v. Lichtenberg*, 309 F. App'x 107, 109 (9th Cir. 2009).

### 4. Lacey had no knowledge of proceeds.

There also was no basis for the conviction because there was no proof Lacey knew the funds transferred in any money laundering count were proceeds. As Co-defendants/Appellants' Motion explains, the government failed to meet its burdens under the First Amendment and failed to establish any defendant knew anything about the persons associated with any of the 50 charged ads, their activities, or the 50 charged ads. At the same time, defendants were precluded from presenting their good faith defense, even when such evidence consisted of federal court opinions upholding Backpage's First Amendment right to publish third-party adult advertising in the face of allegations that website users misused the site to engage in prostitution.

Further, there was no proof that Lacey had knowledge of the business practices and policies at issue—ad aggregation, content moderation policies, marketing

strategies, or reciprocal link agreements with other websites. His distance from these activities was noted by the government's witnesses. He was a "layer away" from Backpage, working with editors and journalists, and was so uninvolved with Backpage that he did not even know one of the top managers. Indeed, even the District Court acknowledged Lacey had a "bona fide held belief that what [he was] doing was not illegal" (Ex. A at 222), which is inconsistent with the knowledge and scienter necessary to obtain this conviction.

### 5. An error in Guidelines calculations should result in a sentence of less time than the course of an appeal.

The District Court's incorrect Guidelines calculation of 188-235 months is reversible error. Under Guideline §2S1.1(a)(2), the District Court correctly selected the loss table method for calculating this money laundering conviction. (Ex. U at 57.) But the District Court erred in applying that method. The Court used the funds at issue—$16,500,000—to increase the base offense level from 8 to 28 on the loss table. (*Id.*) However, as explained above, there are no proceeds here, which means the base offense level was erroneously increased from 8 to 28 on the loss table. This miscalculation of the Guidelines, which dramatically increased Lacey's range from 6-12 months to 188-235 months, was reversible error, *see United States v. Armstead*, 552 F.3d 769, 783 (9th Cir. 2008) (vacating sentence due to erroneous victim enhancement as "significant procedural error"), and also means a sentence within his correct range (6-12 months) will be completed during this appeal, which provides another basis for bail.

21

### IV.   Additional factors weigh in favor of bail.

Lacey's advanced age and his related health issues are additional, exceptional circumstances weighing in favor of bail pending appeal, *see United States v. Wetselaar*, 2017 WL 6514650, at *1 (9th Cir. Nov. 7, 2017) (granting bail and noting the defendant's illness and deterioration of health presented additional, "exceptional" circumstances in favor of bail), particularly because he is exposed to violence on a regular basis and fearful of how he would fare if attacked.

### <u>CONCLUSION</u>

For all these reasons, Lacey respectfully requests that this Court grant the motion.

Dated:  October 3, 2024          **LIPSITZ GREEN SCIME CAMBRIA, LLP**

By:       */s/ Erin McCampbell Paris*
               Erin McCampbell Paris

               *Attorneys for Michael Lacey*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 27(d)(2)(A) and Ninth Circuit Rule 27-1(1)(d), I certify that this motion brief is proportionally spaced, has a typeface of 14 points, contains approximately 5171 words.

Dated: October 3, 2024                    **LIPSITZ GREEN SCIME CAMBRIA, LLP**


By:    */s/ Erin McCampbell Paris*
        Erin McCampbell Paris
        Attorneys for Michael G. Lacey

No. 24-5376

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MICHAEL LACEY, *et al.*,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court for the District of
Arizona, The Honorable Diane J. Humetewa, Presiding.
CR No. 2:18-cr-00422-DJH

———————————

**DECLARATION OF COUNSEL AND EXHIBITS IN SUPPORT OF
APPELLANT'S MOTION FOR BAIL PENDING APPEAL**

———————————

Paul J. Cambria
Erin McCampbell Paris
LIPSITZ GREEN SCIME CAMBRIA, LLP
*42 Delaware Ave.*
*Buffalo, NY 14202*
*(716) 849-1333*
*pcambria@lglaw.com*
*eparis@lglaw.com*


*Attorneys for Michael G. Lacey*

## DECLARATION OF ERIN MCCAMPBELL PARIS

I, Erin M. Paris, hereby declare and state as follows:

1.     I am an attorney at law, licensed to practice in the State of New York and admitted to practice before this Court.  I am counsel of record for Michael Lacey in the above-captioned appeal.  Unless otherwise stated, I have personal knowledge of the matters in this declaration.

2.     I respectfully request bail pending appeal in this case.  The reasons for bail pending appeal are fully briefed in the contemporaneously filed Memorandum of Law.

3.     Attached hereto as **Exhibit A** is a true and correct copy of the certified reporter's transcript of the August 28, 2024 sentencing proceeding, filed on August 30, 2024 (ECF No. 2187).

4.     Attached hereto as **Exhibit B** is a true and correct copy of Trial Exhibit 6243, a Corporate Organization Chart, admitted at trial.

5.     Attached hereto as **Exhibit C** is a true and correct copy of Mr. Lacey's Sentencing Memorandum and Motion for a Downward Departure, filed on August 19, 2124 (ECF No. 2133).

6.     Attached hereto as **Exhibit D** is a true and correct copy of the certified reporter's September 27, 2023 A.M. transcript.

1

7. Attached hereto as **Exhibit E** is a true and correct copy of the certified reporter's October 19, 2023 transcript.

8. Attached hereto as **Exhibit F** is a true and correct copy of Lacey's Joinder in Defendant John Brunst's Motion to Seek Admission of Evidence of Good Faith Re: State of Mind, filed on October 22, 2023 (ECF No. 1886).

9. Attached hereto as **Exhibit G** is a true and correct copy of the certified reporter's transcript of the September 12, 2023 transcript.

10. Attached hereto as **Exhibit H** is a true and correct copy of the certified reporter's October 24, 2023 P.M. transcript.

11. Attached hereto as **Exhibit I** is a true and correct copy of the final page of Trial Exhibit 1479, which was admitted at trial.

12. Attached hereto as **Exhibit J** is a true and correct copy of Trial Exhibit 6264, which was admitted at trial.

13. Attached hereto as **Exhibit K** is a true and correct copy of Trial Exhibit 5541, which was admitted at trial.

14. Attached hereto as **Exhibit L** is a true and correct copy of the certified reporters October 17, 2023 A.M. transcript.

15. Attached hereto as **Exhibit M** is a true correct copy of the Superseding Indictment, filed on July 25, 2018 (ECF No. 230).

2

16.     Attached hereto as **Exhibit N** is a true correct copy of the District Court's Order, filed on April 23, 2024 (ECF No. 2063).

17.     Attached hereto as **Exhibit O** (to be filed under seal) is a true and correct copy of the Presentence Investigation Report, filed on August 26, 2024 (ECF No. 2167).

18.     Attached hereto as **Exhibit P** is a true and correct copy of Mr. Lacey's Motion for Bail Pending Appeal, filed on August 23, 2024 (ECF No. 2156).

19.     Attached hereto as **Exhibit Q** is a true and correct copy of the certified reporter's January 29, 2024 transcript.

20.     Attached hereto as **Exhibit R** is a true and correct copy of the certified reporter's May 13, 2024 transcript.

21.     Attached hereto as **Exhibit S** is a true and correct copy of the Final Jury Instructions, filed on November 16, 2024 (ECF No. 1998).

22.     Attached hereto as **Exhibit T** is a true and correct copy of Trial Exhibit 1480, which was admitted at trial.

23.     Attached hereto as **Exhibit U** August 27, 2024 sentencing proceeding, filed on August 29, 2024 (ECF No. 2186).

24.     Counsel for Co-defendant/Appellant Scott Spear conferred with counsel for the United States on behalf of all Appellants.  Government counsel indicated that the government opposes the relief sought.

3

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 3rd day of October, 2024, at Buffalo, New York.

*/s/ Erin McCampbell Paris*
Erin McCampbell Paris

# EXHIBIT A

# EXHIBIT A

1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 28, 2024 |
| Michael Lacey, et al. | ) | 9:34 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SENTENCING - DAY 2**

**PAGES 130-249**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

    For the Government:
3        UNITED STATES ATTORNEY'S OFFICE
         By:  **Mr. Kevin M. Rapp, Esq.**
4              **Mr. Peter S. Kozinets, Esq.**
               **Mr. Andrew C. Stone, Esq.**
5              **Ms. Margaret Wu Perlmeter, Esq.**
               **Mr. Joseph Franklin Bozdech, Esq.**
6        40 North Central Avenue, Suite 1200
         Phoenix, Arizona 85004
7        kevin.rapp@usdoj.gov
         peter.kozinets@usdoj.gov
8        andrew.stone@usdoj.gov
         margaret.perlmeter@usdoj.gov
9
    For the Government:
10       UNITED STATES DEPARTMENT OF JUSTICE
         By:  **Mr. Austin Berry, Esq.**
11       1301 New York Avenue, NW, 11th Floor
         Washington, DC 20005
12       austin.berry2@usdoj.gov

13  For the Defendant Michael Lacey:
         LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
14       By:  **Mr. Paul J. Cambria, Jr., Esq.**
         42 Delaware Avenue, Suite 120
15       Buffalo, NY 14202
         pcambria@lglaw.com
16
    For the Defendant Scott Spear:
17       FEDER LAW OFFICE, P.A.
         By:  **Mr. Bruce S. Feder, Esq.**
18       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
19       bf@federlawpa.com
         - and -
20       KESSLER LAW OFFICE
         By:  **Mr. Eric Walter Kessler, Esq.**
21       6720 N. Scottsdale Road, Suite 210
         Scottsdale, AZ 85253
22       eric.kesslerlaw@gmail.com

23

24

25

**APPEARANCES CONTINUED**

For the Defendant John Brunst:
      BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
      LINCENBERG & RHOW, P.C.
      By:  **Mr. Gopi K. Panchapakesan, Esq.**
           **Mr. Gary S. Lincenberg, Esq.**
      1875 Century Park E, Suite 2300
      Los Angeles, CA 90067
      gpanchapakesan@birdmarella.com
      glincenberg@birdmarella.com

133

**P R O C E E D I N G S**

1

2

3    (Proceedings commence at 9:34 a.m.)

4         THE COURT:  All right.  Please be seated.

5         COURTROOM DEPUTY:  We're on the record in CR 18-422,          09:34:18

6    United States of America vs. Michael Lacey, Scott Spear and

7    John Brunst, before the Court for sentencing.

8         MR. RAPP:  Good morning.  Kevin Rapp, Austin Berry,

9    Peter Kozinets and Joe Bozdech and Margaret Perlmeter on behalf

10   of the United States.                                            09:34:41

11        THE COURT:  Good morning.

12        MR. CAMBRIA:  Paul Cambria, Erin Paris on behalf of

13   Mr. Lacey.

14        THE COURT:  Good morning.

15        MR. LINCENBERG:  Good morning, Your Honor,               09:34:48

16   Gary Lincenberg and Gopi Panchapakesan on behalf of Mr. Brunst,

17   who is present in court.

18        THE COURT:  Good morning.

19        MR. KESSLER:  Good morning, Your Honor, Eric Kessler

20   and Bruce Feder for Mr. Spear.  Mr. Spear is sitting in front    09:34:58

21   of the bar.

22        THE COURT:  And good morning, counsel.  We will

23   proceed.  Is the government ready to go forward?

24        MR. RAPP:  Yes, Your Honor.  Your Honor, counsel,

25   first, I want to express the same sentiments I think some of     09:35:19

UNITED STATES DISTRICT COURT

1    counsel made yesterday in thanking the Court for their patience

2    and their attention to detail over this very lengthy case.  In

3    particular, I want to thank the staff.  Often the public

4    doesn't see the late hours and the early mornings it takes to

5    manage such a large case like this.                              09:35:41

6           Last, I want to thank the probation office.  This case

7    is a bit of an anomaly.  It took a lot of work for them to get

8    it right and, of course, probation is not part of the executive

9    branch.  It's not part of us, but it's part of the judiciary,

10   so they work very hard in speaking with the Sentencing          09:36:00

11   Commission and working diligently on the presentence reports.

12          In terms of how we intend to proceed today, I will

13   focus my arguments on the points raised by Mr. Cambria and

14   Mr. Lincenberg on behalf of their clients, Mr. Lacey and

15   Mr. Brunst, and my colleague Mr. Berry will address the points  09:36:21

16   Mr. Feder made on behalf of his client Mr. Spear, and also

17   address issues related to surrender and to release pending

18   appeal.

19          In terms of some of the points that Mr. Cambria made,

20   I believe when he started out, and this was just after a number 09:36:45

21   of the victims addressed the Court, he made a statement to the

22   effect of:  Well, we don't really know what the background of

23   these people were and what led them.  I took it to mean what

24   led them to be involved in a life of prostitution.

25          Unfortunately, many of the victims in this case were     09:37:14

1   led into prostitution because of a variety of factors,

2   socioeconomics, drug addiction, broken families.  But with

3   respect to Ms. Ambrose and Ms. Svengard, they are something of

4   an exception.  They have been a voice for their daughters from

5   the very beginning.  And of course, Ms. Ambrose has been the          09:37:45

6   voice of her daughter who is no longer here since literally

7   Christmas of 2016, and Ms. Svengard shared with you all the

8   times that she has been there advocating for her daughter who

9   was trafficked on Backpage at the age of 15, and, of course,

10  remember that she testified.                                          09:38:11

11         So the sad truth about Backpage is that it was sort of

12  a de facto business model that they relied upon pimps having

13  the opportunity to prey upon victims so that they could post

14  multiple times a day.  And these were children in many respects

15  who were runaways and who came from broken homes and, again,          09:38:43

16  lower socioeconomics across the spectrum and across the 450

17  cities that Backpage had a presence in.

18         And not only that, there was evidence at trial and, of

19  course, we heard this from Polaris, that there was not only

20  domestic trafficking, but there was an element of trafficking         09:39:05

21  from other countries into the United States.  And we heard that

22  in terms of deplorable conditions in the Asian massage parlors

23  in the New York area, and so that's just the sad reality, and

24  that's what Backpage was built on, people who could take $4 and

25  post an ad for people who could otherwise not defend                  09:39:30

UNITED STATES DISTRICT COURT

1    themselves.

2          And Mr. Lacey in particular was made aware of this at

3    NCMEC.  He was told by numerous law enforcement agencies and

4    the Seattle P.D. in particular.

5          The next point Mr. Cambria made was that, and I think         09:39:50

6    that he stated that he, he himself, has six children and many

7    daughters, and that he expressed that the defendants felt

8    empathy and sympathy for them.  You know, that seems to be at

9    odds with a lot of the evidence in this case.  There doesn't

10   seem to be a lot of e-mails from Mr. Lacey in particular where    09:40:26

11   he's expressing a great deal of sympathy for many of these

12   victims.

13         One that sticks in my mind, and it's in our papers,

14   and certainly was during trial, was Exhibit 1911, and this was

15   an e-mail exchange, I believe, with a woman by the name of        09:40:45

16   Kathleen Ferris that was identified was his ex-wife.  And this

17   is the one, if you remember, this is where he sort of says:

18   Look, Jim and I are in favor of legal prostitution.  But this

19   is within -- this particular e-mail was in the context in

20   responding to one of Nicolas Kristof's many articles              09:41:08

21   criticizing Backpage in the New York Times about their -- the

22   proliferation of child sex trafficking, and just sex

23   trafficking in general on Backpage.

24         And for whatever reason, Mr. Lacey and the rest of the

25   management focused in on this one story of a woman who            09:41:29

1    Mr. Kristof wrote about.  And not only there was a broadcast

2    with her and Mr. Kristof, and they were walking through parts

3    of Manhattan and she was pointing out where she had been

4    trafficked.

5           The one thing that is distinct about this woman is          09:41:49

6    that she had a distinctive scar on her face, and what she

7    related was that a pimp gouged out her face with a potato

8    peeler when they got into an argument on her being resistant to

9    engaging in tricks on a particular occasion.  But in that

10   e-mail, Mr. Lacey refers to this young woman as a hooker.  And   09:42:12

11   so I have to tell you, I really have a hard time believing that

12   Mr. Lacey -- what Mr. Cambria is saying about Mr. Lacey is at

13   odds with a lot of the facts.

14          In terms of the instances of underage trafficking,

15   Mr. Lacey was relentlessly confronted with this by law           09:42:41

16   enforcement, by politicians, and there was always this sort of

17   underlying argument that because of his investigative

18   journalism he sort of pushed back on these powers with

19   politicians on law enforcement, and that he was going to go his

20   own way in this.                                                 09:43:10

21          But there was one instance where a particular

22   organization confronted him, and I think the Court remembers

23   this, this was the Auburn Theological Seminary, the witness was

24   Isaac Luria, and he recounted these meetings they had with

25   Mr. Lacey and the other Backpage management.  And if you         09:43:29

```
 1    recall, you may not know that much about this particular
 2    organization because I'm not sure how much it was fleshed out
 3    at trial.  I know Mr. Luria talked a little bit about it.  It
 4    was a 205-year-old institution, ecumenical group, with leaders
 5    of all faiths, Jewish, Christian, Catholic, Episcopalian,          09:43:56
 6    Muslim and they had a particular mission to build a community
 7    to bridge divides to pursue justice, and in their words, "heal
 8    the world."  And they were the ones that identified and, of
 9    course, they are based in New York at Columbia University, and
10    they are the ones that identified the fact that there was child    09:44:20
11    sex trafficking proliferating on this site.
12           And if you recall, they posted in the New York Times a
13    letter, open letter, asking Backpage to shut down their site,
14    and part of that letter and the opening of the letter, and this
15    was Exhibit 689 during trial, that it was a basic moral fact of    09:44:46
16    the universe that children should not be sold for sex.  And
17    they asked that Backpage shutter the site.  And then they met
18    with Mr. Lacey and got his views on it.  And by the way, just
19    like NCMEC, this wasn't a situation where they demanded these
20    leaders of all these diverse faiths.  They didn't demand to        09:45:10
21    meet with Mr. Lacey.  Mr. Lacey demanded to meet with them, and
22    they did, and they listened to him and they listened to their
23    rationale.
24           And if you recall what Carl Ferrer said, we showed
25    them this PowerPoint.  This PowerPoint was misleading in that      09:45:30
```

1    it didn't include any of our internal prostitution marketing

2    strategies that had built Backpage, but after that meeting

3    where there was no introspection by Mr. Lacey and his

4    management, no thoughts of perhaps maybe we should shutter this

5    site, they sent him a letter.  And they said to Mr. Lacey in          09:45:55

6    particular:  Child sex trafficking is not just an issue for us,

7    but a matter of basic justice.  We feel we need give voice to

8    the voiceless, and we are taking action on behalf of human

9    beings, our children.

10           And so this voice to the voiceless sort of resonated          09:46:16

11   with me in particular because I know that Mr. Lacey has spoken

12   publicly about this case in a number of different forums.  He

13   was in an article by a magazine named Reason.  Another magazine

14   by the name of Wired where he would assert his defense to this

15   case.  And then recently he was in a podcast that was produced        09:46:43

16   by two of his own writers that not only chronicled his rise in

17   the alternative newspaper industry, but also this case.  And

18   Mr. Lacey's public defense of this case, among others, is that

19   he was giving a voice to the people who didn't have a voice,

20   and what he meant was sex workers.                                    09:47:08

21           And when I listened and went back and read, I tried to

22   square what he was trying to say with what the Auburn

23   Theological Seminary, the point they were trying to make to him

24   in that they were trying to give a voice to the voiceless,

25   which were child sex trafficking victims.  They went on to say:       09:47:27

UNITED STATES DISTRICT COURT

1    Our commitment is rooted in a belief that all children are our

2    children, and that person that appears in a Backpage ad could

3    be any one of our daughters or sons.

4         They go on to tell Mr. Lacey and the other management

5    of Backpage, that there is very little moral wiggle room when          09:47:48

6    one is aware of the real possibility that a terrible crime may

7    occur.

8         And so even then in 2012 there was a series of

9    terrible crimes that implicated Backpage.  And Backpage,

10   because they provided a platform that facilitated prostitution,       09:48:13

11   that they built that platform with internal prostitution

12   marketing strategies.  They are the proximate cause of those

13   crimes.

14        We heard yesterday from Yvonne Ambrose who talked

15   about her own daughter, Desiree Robinson.                              09:48:32

16        But within the four corners of the superseding

17   indictment is Crystal MacMartin, who was murdered posting on

18   Backpage in Scottsdale.

19        Alexus Garcia in Dallas, who was murdered not too far

20   from the headquarters of Backpage in Dallas.                           09:48:48

21        In Louisiana, Jasilas Wright.

22        And importantly, and we laid this out in our papers,

23   is the four women in Detroit during Christmas of 2011.  And so

24   their names are, for the record, Natascha Curtis, Demesha Hunt,

25   Renisha Landers, Vernithea McCrary.  They all four were killed        09:49:13

UNITED STATES DISTRICT COURT

1   within 72 hours by the same john which demonstrates the scale

2   that Backpage had achieved by 2011 in that somebody could order

3   four women off the website as if they were ordering a pizza to

4   their house, and he was able to kill them.

5          And we know, the Backpage management hired a public        09:49:42

6   relations team to try to spin the story on this.  And we know

7   that Mr. Spear e-mailed after Detroit to Mr. Ferrer saying:

8   Hey, there is a lot of pent-up demand after Detroit, which just

9   goes to show you in journalist parlance that no publicity is

10  bad publicity, and that even a publicity of a quadruple murder    09:50:10

11  would draw people to this site.

12         So those are the crimes that the Auburn Theological

13  Seminary was trying to impress upon Mr. Lacey in 2012, and 2011

14  with the open statement, the open letter of the New York Times,

15  and then with the meeting and then the follow-up letter, but      09:50:35

16  nothing.  No change.

17         And in 2015, within the four corners of our

18  indictment, Cynthia Worthy was killed in Detroit.

19         So what voice I would ask -- what voice did Mr. Lacey

20  give to these people by running this site?                        09:50:53

21         The Auburn Theological Seminary, and this is

22  important, says, and this is directly focused on Mr. Lacey:  We

23  understand from your statements that you made in our meeting

24  that your company takes it as a given that a certain number of

25  teens and children will be trafficked for sex in spite of the     09:51:18

1    safeguards that you put in place by those who pay your website

2    a fee, and that is unacceptable to us.

3          Now, this letter comes in 2012, but we know in

4    March 1st of 2011 Mr. Lacey sits in a room with the National

5    Center of Exploited and Missing Children and representatives    09:51:51

6    and he's shown a PowerPoint, a 23-slide PowerPoint, that

7    mentions "children" or "child" 22 times.  And in that

8    PowerPoint they say:  Look, there is this prostitution review

9    site that you have a relationship, or that you, unbeknownst to

10    you, is using your site called The Erotic Review.    09:52:17

11          And they knew full well that they had this strategic

12    relationship.  What the Auburn Theological Seminary had

13    identified in 2012 that we for sure identified once we received

14    all the e-mails and, of course, once we sat down with the CEO,

15    is that it was a collateral damage that they had to deal with.    09:52:41

16    It was unfortunate collateral damage that was unavoidable, it

17    was uncomfortable, but in the end it was an acceptable cost of

18    doing business that made Mr. Lacey and his compatriots,

19    Mr. Spear and Mr. Brunst, millions.

20          As we know during this time period, the time period of    09:53:07

21    many of these murders and many of these instances of child sex

22    trafficking on his site, he made, between 2012 and 2014, $100

23    million.

24          Now, does Mr. Lacey know about this even though Auburn

25    Theological Seminary confronted him about this?  Well, he says    09:53:31

143

1    in his e-mail Exhibit 912 to Mr. Ferrer and Mr. Larkin for that

2    matter, even taking their new number, and this is referring to

3    child sex trafficking victims on the site, of 80 in 2010.  If

4    you ran that out to America's 40 biggest cities, 40 times 80,

5    you have 3200 victims; not 100,000 or 300,000.  It's a problem;        09:53:52

6    not an epidemic.

7         You know, they point out in this letter that Jewish

8    tradition teaches if you can save a single life, it's as if you

9    saved the whole world.  And Mr. Lacey's response to this was,

10   and they call him out in this, is that the clergy's moral           09:54:21

11   commitment to our children amounts, in your words, Mr. Lacey,

12   to a simple bumper sticker.  This position, in their words, is

13   at odds with Backpage's public statement.

14        And so when Mr. Cambria says on behalf of Mr. Lacey

15   that he feels some sorrow or some empathy for these, his          09:54:43

16   statements in his e-mails do not support that.

17        And with respect to the other defendants, and of

18   course, Mr. Lacey, there is, we received a lot of letters and

19   from family members, and many of them describing what a great

20   father and what a great inspiration day, and I don't dispute        09:55:11

21   them.  They have highlighted their family in their character.

22   But so what the Auburn Theological Seminary says to Mr. Lacey

23   in this letter, that they would ask him to consider an ethical

24   test, and this is what they say:  One of my colleagues has a

25   simple ethical test.  Ask yourself, how would you feel telling     09:55:39

144

1   your family what happens on your website?  What would you tell

2   your mother or your child about the 15 and 16-year-olds in

3   Memphis, Tennessee who were lured under the pretext of going to

4   a water park, but instead were sold for sex by pimps who placed

5   ads on Backpage.com?                                              09:56:01

6           And what would they say about the mentally handicapped

7   high school student in Camp Washington who was sold for sex

8   because she wanted to receive a Thanksgiving meal, or about the

9   13-year-old in Brooklyn, New York who was beaten, advertised

10  with photos on Backpage, and forced into prostitution who, when  09:56:18

11  she tried to escape, was tracked down and thrown down a flight

12  of stairs?

13          Well, what is Mr. Lacey's public response to the

14  urging of the Auburn Theological Seminary to their efforts to

15  try to get him to see the better nature of his angels?  This is  09:56:45

16  his response.  This is Exhibit 692b on October 30th of 2011,

17  quoted in the New York Times in an article entitled "Fighting

18  Over Online Sex Ads."  "I'm beginning to like our odds," says

19  Mr. Lacey.  "We have all these practicing politicians and

20  concerned clergy after us.  We must be doing something right."    09:57:14

21  What did Mr. Lacey think that he was doing right?

22          Now, Mr. Cambria today and in previous hearings and at

23  trial makes the point that Mr. Lacey was a longtime journalist

24  and he was a journalist to the end, a defender of the First

25  Amendment, and for most of his career, but that actually isn't   09:57:45

UNITED STATES DISTRICT COURT

1    entirely true because Mr. Lacey stopped being a journalist in

2    2012.  And so Mr. Brunst and Mr. Spear were never really

3    journalists, but they gave up managing newspapers for Backpage.

4            And so I will tell you when we interviewed across the

5    country, the prosecution team interviewed many of the victims          09:58:18

6    in this case to try to get our handle around how they were

7    posted, and I will tell you that these interviews didn't take

8    place on the upper east side or in Beverly Hills or in Lake

9    Shore.  They were in places where there wasn't a lot of

10   opportunity, and many of these people were forced into this           09:58:40

11   life.  But the one thing they could tell us is they knew the

12   exact moment their life changed, and that moment was when they

13   were posted on Backpage.com.  They knew that.  They could

14   isolate that moment.  From there they knew they were posted.

15   All they knew was the phone rang and that they were in an             09:58:58

16   unending, and unspeakable site pool of sex, and if they were

17   underage, with men decades older, sometimes four or five times

18   a day.  They could isolate that second.

19           And so as I started thinking about this case, I

20   wondered if Mr. Lacey, as he sits here before a federal court        09:59:17

21   on the other side of a guilty verdict, when did his life

22   change?  Well, it changed in 2012 for sure.  And his own

23   writers, people who in large part owed their careers to him,

24   they call him out on this.  And one of those writers was a

25   woman by the name of Jana Bommersbach, and we cite a quote from     09:59:42

1    her in our pleadings, but you should know that she was a

2    partner with Mr. Lacey and Mr. Larkin as well in 1990.  She was

3    a writer, and she was a partner in the New Times, and she left

4    the New Times and she went out and she became a well-regarded

5    writer writing books predominantly on events that occur in the        10:00:08

6    State of Arizona.  Her last book was called The Dead Girl in

7    the Vacant Lot, and it's a bit of a cautionary tale to her

8    friend Mr. Larkin -- Mr. Lacey.

9            In that book, and unfortunately Ms. Bommersbach passed

10   away this year, but she says in this book about Mr. Lacey, and       10:00:39

11   this book, the girl in the -- The Dead Girl in the Vacant Lot

12   is about a sex trafficking victim who was trafficked on

13   Backpage, and I think by the title you can tell how it ends up

14   for her, not unlike -- it was probably a composite of many of

15   the stories of real people that we talked about, but she says:       10:01:02

16   I was just naive about Backpage, and I was appalled to discover

17   that the men who had been my business partners, the men that I

18   admired, had become so reviled.  Mike took a no holds bar to

19   journalism to other states until they owned the largest

20   alternative newspaper chain in the nation, including the             10:01:24

21   venerable Village Voice.

22           But in 2004 they started Backpage, and she notes that

23   the Village Voice conglomerate of papers start losing money

24   because of the protest of advertisers, and we heard some of

25   that during trial.                                                   10:01:41

1    But instead of closing it down, Michael Lacey got out

2 of journalism.  They sold the papers to their staff, they kept

3 Backpage, the money pot, for themselves.  And the same

4 sentiment was expressed by John Dougherty, a writer who

5 seemingly was testifying for Mr. Lacey during trial and has

6 submitted a character letter for the Court to consider, but if

7 you recall Exhibit 3000 during his testimony where he says in

8 his Facebook post:  Once upon a time they ran a great newspaper

9 chain, but the arrest of Lacey -- with the arrest of Lacey they

10 traded the legacy for a chase for gold derived from

11 prostitution.

12    I talked about this, you know, not surprising with

13 everything these days, there's a podcast on this case called,

14 not surprising, Hold Fast, and these are two writers,

15 Trevor Aaronson and Sam Eifling, and they also, two writers,

16 they, I think they would admit, they owe in part their careers

17 to Mr. Lacey, but they call him out on this.  And they say in

18 the conclusion in part four of this podcast:  Lacey fell victim

19 to Backpage's success.  By the time he fought the government,

20 he was no longer a journalist.  When he chose to split from

21 Backpage from Village Voice, he could have remained with the

22 newspapers.  He could have remained a newspaper man, but he

23 chose Backpage.  He chose the money, millions and millions, and

24 at that point he didn't have the public's goodwill.

25    That's what his own writers have said about the change

10:02:05

10:02:28

10:02:45

10:03:10

10:03:31

1    that Mr. Lacey made.  And Mr. Lacey wasn't a journalist from
2    2012.  Mr. Lacey was the head of a criminal organization that
3    was a prostitution website.  End of story.
4           Mr. Cambria and I like to call these the greatest
5    hits, but they are really sort of these one-hit wonders that          10:04:01
6    quickly go to the basement.  One is the false equivalencies.
7    This is an oldie but a goodie.  Hey, Backpage is no different
8    than Fed-Ex, the phone or the Yellow Pages.  Then Mr. Lacey
9    says this in some of his e-mails:  Hey, we are just like
10   Fed-Ex.  People are taking -- people are taking advantage of us     10:04:23
11   just like they could take, a drug dealer, I guess, could take
12   advantage of Fed-Ex or the phone.
13          Here's the problem with that argument.  Backpage was
14   singly focused on prostitution revenue.  And they can sit and
15   say, well, we had these other categories.  We had home               10:04:43
16   furnishings and jobs and real estate.  That was all nonsense.
17   That was just a veneer because you they didn't even charge in
18   many of those categories.  The one category that made Mr. Lacey
19   a multi multimillionaire was the female escort section.  That's
20   where the money came from.                                           10:05:08
21          None of these, none of these false equivalencies
22   Fed-Ex, the phone, Yellow Pages, none of them that I know of,
23   and I am old enough to remember Yellow Pages, but I don't
24   remember it having a strategic relationship with a prostitution
25   review site.  It just didn't happen.                                 10:05:28

1        And he even underscores -- Mr. Lacey himself

2    underscores his false equivalency in Exhibit 1714a.  Of course

3    kids get through the system, comparing to underage teenagers

4    using fake I.D.s to get into bars, as if an underage

5    trafficking victim who is being forced into prostitution, and      10:05:53

6    we heard all the stories how the pimps would take pictures of

7    them and post them on Backpage, and the phone would ring, as if

8    that is equivalent to a 17-year-old getting ahold of a fake

9    I.D. and getting into a bar to have a beer.  So the false

10   equivalencies do not stand up.                                     10:06:15

11        Here's another oldie but goodie, the cooperation with

12   law enforcement.  Here's the bottom line on that.  Law

13   enforcement didn't know that they had these internal

14   prostitution marketing strategies.  They just didn't know that.

15   They didn't know about the relationship with The Erotic Review     10:06:34

16   and all these other things.  They didn't know that moderation

17   was a sham and was designed to increase prostitution postings

18   and not deter them.  And the Senate subcommittee didn't know

19   that and the United States DOJ didn't know that.  In fact, no

20   one knew about these internal strategies until the CEO came in     10:06:55

21   in April of 2018, and in a very lengthy session laid it out,

22   and in subsequent sessions was able to say:  Here are the

23   e-mails that show what we were doing.  No one knew.  So they

24   weren't cooperating.

25        And neither, not these attorneys, the attorneys before        10:07:15

1     they were indicted, either they knew or they didn't know.  It

2     doesn't matter.  Law enforcement didn't know.  This one is just

3     easily dispensed of.  Well, Mr. Ferrer says, "We don't have

4     prostitution."  Of course they had prostitution.  Mr. Lacey

5     knows that they have prostitution.  He's being confronted on a    10:07:42

6     daily basis, so you can't even take that sort of throwaway even

7     seriously.

8         Even their own person that supposedly they rely upon,

9     Mr. Moon, who meets with the Washington Attorney General, says,

10    "We are not going to deny the undeniable when confronted with    10:08:02

11    prostitution postings."  Did they donate to charity and support

12    political candidates and some of the things that Mr. Cambria

13    was saying to show their good works?  Well, yes, they were

14    making hundreds of millions of dollars running a criminal

15    enterprise called Backpage.  So some of the money they doled    10:08:21

16    out was, you know, kind of a drop in the bucket, so they know,

17    and we know that many of these organizations gave them back,

18    gave the money back because of the taint to Backpage, or sent

19    it to trafficking shelters.

20         Well, the First Amendment, this is -- you talk about    10:08:40

21    ad nauseam, which the Judge, this court aptly characterizes

22    some of the arguments that seem to be just rehashed and

23    recycled over and over, and this one is particularly recycled.

24    Here's the bottom line.  They were running a criminal

25    enterprise.  Mr. Lacey is no different than the don of a    10:09:12

1   criminal family.  He's no different than somebody who is at the

2   very top of a financial, vast financial fraud, or even a drug

3   kingpin.  This was a criminal enterprise.  Backpage was an

4   enterprise, it was criminal, and he was the primary financial

5   beneficiary of it.  He didn't have a First Amendment right.        10:09:44

6   They keep making this argument.  It is the definition, I think,

7   of legal insanity, not legal insanity to defense, to make the

8   same argument, citing the same cases on the same set of facts

9   and expecting some judge, and now we're on the fourth judge, if

10  you include Judge Campbell, where they made the same arguments    10:10:06

11  in the Grand Jury context.  Nothing has changed.

12        The money wired to Hungary.  Well, it puts a lot of

13  emphasis on this John Becker, who also testified that Mr. Lacey

14  withheld information from him, and this is the -- this is the

15  lawyer who didn't want to be hassled on Tuesdays, and that if     10:10:31

16  he had known some of these, he wouldn't have participated in

17  it.

18        Here's the bottom line.  A jury convicted him of this,

19  and he was hiding that money overseas for two reasons.  One, as

20  we said yesterday, he didn't want the government to get it.  As   10:10:48

21  things would turn out, the government has seized quite a bit of

22  his money that is proceeds from Backpage, dirty money.  And

23  importantly, he didn't want litigious parties to get that

24  money, and those litigious monies are the scores of underage

25  trafficking victims who have been suing him or who will be        10:11:10

1    testifying against him.  And on January 3rd of 2017, as I noted

2    yesterday, he was spiraling towards trial in just one of those

3    cases.

4         Mr. Brunst.  Mr. Brunst's attorney says there is only

5    one witness that testified against him.  Mr. Ferrer.  It turns          10:11:35

6    out that was all we needed because the best witness against

7    Mr. Brunst was Mr. Brunst in the scores of e-mails.  You know,

8    it's just an objective fact that Mr. Brunst was convicted of

9    more counts, and this is the way the jury saw it, was convicted

10   of more counts than any of the defendants sitting over there.          10:12:05

11   That's the way they saw it.

12        Now, I know that changed slightly after the Court

13   reviewed the transactional money laundering counts, but the

14   jury, based on one witness and his scores of e-mails saw him as

15   more guilty in terms of the number of counts than Mr. Spear or          10:12:28

16   Mr. Lacey.

17        There is probably a lot of reasons for that too

18   because they viewed the CFO more so than perhaps anybody else

19   in an organization, they see the CFO as somebody who is

20   safeguarding the financial well-being and the integrity of the          10:12:50

21   enterprise they serve, and when they violate that trust they

22   are convicted by a jury.  And so Mr. Brunst, he just joins a

23   long line of CFOs who violated their oath like Andrew Fastow,

24   the CFO of Enron; Allen Weisselberg, the CFO of a prominent

25   real estate company in New York; Frank DiPascali, the CFO of          10:13:14

1   Madoff's company.  They didn't buy the fact that Mr. Brunst

2   didn't know what was going on.  And you remember that we used

3   an analogy of the baseball team, and Mr. Brunst continues even

4   today to persist in this see no evil hear no evil mantra that

5   as by analogy, if he was the CFO of a baseball team he would          10:13:41

6   just sit in his office and look down and see this -- this green

7   field below and not know really what the players were doing

8   down there, or what that ball had to do with the ball they were

9   throwing around had to do or hitting, hitting the ball or

10  20,000 people showing up.  He didn't know any of that.                10:14:04

11          But you know, Mr. Brunst, just like Mr. Spear for that

12  matter, they fall into the same category.  Even today they make

13  this silly claim, "But why wouldn't the CFO on Backpage?"  Well

14  come on, your own public PowerPoint, Exhibit 20, Management

15  Ownership, CFO of Backpage, they even continue with this              10:14:29

16  argument.  But here's the bottom line.  Mr. Brunst had the same

17  decision, he had the same life choice that Mr. Lacey had in

18  2012.  He could have said, "You know what, I don't like what

19  I'm hearing about this.  All I'm hearing is murders and child

20  sex trafficking in the New York Times, on CNN, on Anderson            10:14:50

21  Cooper, Nicholas Kristof, no thanks.  I am going to stay with

22  the newspapers."  But Mr. Brunst, he goes with Mr. Lacey and

23  Mr. Spear and becomes the CFO, the ultimate manager where the

24  buck stops of Backpage -- of Backpage.

25          Even before the sale of the alternatives he was the          10:15:19

154

1   ultimate decider at budget meetings in his capacity as the CFO.

2   He was alerted to the relationship of The Erotic Review.  There

3   were decisions made regarding the commissions for super

4   posters.  They knew about aggregation and they knew that they

5   were hiring scores of moderators in the U.S., India and the   10:15:43

6   Philippines all encouraging prostitution, all making sure that

7   thing were coded, but not deterring.

8        Well, Mr. -- the defense claims he is -- he shouldn't

9   be sentenced as a sex trafficker.  Well, he should be sentenced

10   as to what he is.  Mr. Brunst's legacy is being sentenced as   10:16:06

11   the minority owner of a website that promoted prostitution in

12   450 cities in the United States, and that prostitution included

13   child sex trafficking, and it resulted in a score of murders

14   and violent crimes.  And from that, Mr. Brunst made between

15   2012 and 2014, $20 million.   10:16:30

16        And so he, more than Mr. Spear and Brunst, had a lot

17   of very meaningful letters from his family members saying that

18   he was a great father.  I do not dispute that.  And this court

19   and myself have any number of cases from violent crimes to drug

20   trafficking, to financial fraud, and people come in and say, my   10:16:56

21   father, or my mother, they were a good parent, they were there

22   for me, and I don't think it's mutually exclusive that you can

23   be the CFO of a criminal organization and not be a good father.

24        But here's what I would suggest.  That during this

25   time period in particular 2012 to 2018 when Mr. Brunst was   10:17:18

1  coordinating the international and domestic money laundering,

2  that the money goes for the same for Mr. Spear and Mr. Lacey,

3  the money that he was doling out to his family, Christmas gifts

4  and trips, college tuition, down payments, whatever it is, they

5  should know that that money came from people like Yvonne          10:17:47

6  Ambrose's daughter, the pimp, and Nacole Svengard, and the pimp

7  that posted.  They should know that that was the source of the

8  money.

9          But Mr. Brunst cannot really plausibly say that he

10  didn't, and the jury found as much, that he didn't watch        10:18:07

11  Selling The Girl Next Door; that he didn't read the Kristof

12  series of articles; that he didn't watch Anderson Cooper

13  interview their attorney on AC 360 about the Detroit murder;

14  that he didn't read the Senate subcommittee report; that he

15  can't really plausibly say that, and that he didn't watch the    10:18:30

16  movie on Netflix, I Am Jane Doe, that featured some of the same

17  victims who testified in this trial.

18          And he was coordinating the payments for legal fees

19  with these plaintiffs in defense of these cases where underage

20  plaintiffs had sued Backpage, and in particular the J.S. case    10:18:54

21  which was Jessika at 15 and the two other plaintiffs were 13.

22          He also makes the point, well, he wasn't originally

23  charged in the first indictment, and then he was thrown into

24  the Travel Act conspiracy in the substantive counts in the

25  superseding indictment.  We didn't lay eyes on Mr. Ferrer until  10:19:16

1    April of 2018 after the first indictment.  It is only then that

2    he explained and was able to show us the e-mails, what they

3    were up to, not only, you know, facilitating prostitution

4    through these internal strategies, but also the very

5    complicated and layered money laundering.                    10:19:40

6         Mr. Brunst, through his attorney, says in his

7    Sentencing Memorandum that he's highly ethical, and that people

8    viewed him as ethical.  I am not sure who is saying that,

9    actually.  It just seems to be coming from him.  There was

10   never anybody in business with him who came forward either     10:20:03

11   during trial or at sentencing and said he was some paragon of

12   ethics.  But I just have to ask you, what about all these

13   e-mails?  Like Exhibit 173, "beginning this month, September,

14   Chase was no longer accepting transactions from Backpage.com

15   due to their involvement in human trafficking."  What ethics    10:20:28

16   would it take when he was copied on that?  Would that not

17   suggest something to him?  And obviously he as the CFO,

18   Exhibit 23, where they talk about the strategic relation with

19   The Erotic Review, it makes you wonder about the ethics.

20        In Exhibit 500 where it talks about the upgrade           10:20:50

21   features of auto report, and move to the top, which was the

22   only way they could make money at one point, and this was in

23   the female escort section, and he knew that.  What about the

24   ethics there?

25        In Exhibit 792 where he says to Ferrer:  Didn't we go     10:21:08

UNITED STATES DISTRICT COURT

1   down the Mauritius path once the banks had the same problems

2   with our content?  Which suggests that he knew what the content

3   was.  What about his ethics?

4        2042, Exhibit 2042, "the Backpage pressure has reached

5   red hot" in 2012 in the wake of the Detroit murders, in NCMEC,        10:21:27

6   and the Auburn Theological Seminary, all of that pressure, what

7   about his ethics?

8        Exhibit 120, it's an oldie but goodie, the plausible

9   deniability, that we have plausible deniability about the

10  content on our site.  What about all the other things that Mr.        10:21:48

11  Brunst did to make sure that Backpage had the life blood to

12  keep it going and changing the descriptors to Payment Solutions

13  and Classified Solutions so banking wouldn't know that this

14  money was going, being processed for Backpage, or coming up

15  with Website Technology to fool the banks, and the use of gift        10:22:20

16  cards and cash and Bitcoins.

17       The bottom line with Mr. Brunst is he's guilty and the

18  jury found him that, and that ship has sailed.

19       So with respect to all three of these defendants, it

20  is a fantasy.  It is magical thinking to believe that they           10:22:42

21  could run a prostitution website which would, by definition,

22  would be illegal, that prostitution would occur in private

23  places by two consenting adults in some type of cocoon of

24  safety and there never would be this predictable collateral

25  damage.  There would never be homicidal johns or violent pimps       10:23:08

158

1    or child sex trafficking where unspeakable force and coercion,

2    and the social cost of that for every one of these communities

3    where they were a presence.  It's just delusion.  And the most

4    powerful delusion is self-delusion, and that's what these

5    defendants have had.  But the jury has spoken.        10:23:36

6           And Mr. Berry will take up the issue of whether they

7    should be allowed to self-surrender, but what I will say is

8    they had no right to flout the law or make up their own law,

9    and these victims who have submitted victim impact statements,

10    who have testified at trial, who have appeared here today and    10:24:01

11    who appeared by phone, they have waited a long time.  And to

12    quote Martin Luther King when he was actually in custody

13    waiting for the resolution of justice, "Justice too long

14    delayed is justice denied."  And these people are entitled to

15    justice.  They are entitled to leave this courthouse and leave    10:24:24

16    the phone call and get back to their lives, but these

17    defendants deserve to go to prison, not next week, not next

18    month, not next year, but today.  Thank you.

19           THE COURT:  Thank you, Mr. Rapp.

20           Mr. Berry.    10:24:52

21           MR. BERRY:  Thank you, Your Honor.  It's been a few

22    months.  Good to see you.  I want to echo what Mr. Rapp said.

23    A lot of what he said applies to Mr. Spear as well.  I'm not

24    going to re-till that soil.  I want to focus on a few specific

25    things that were raised in declarations attached to their    10:25:15

```
 1   sentencing memo, and they emphasized in oral argument
 2   yesterday.
 3          I am sensitive to the fact that every federal Judge I
 4   have ever talked to says a day like today is the most
 5   challenging one where you have to decide how much time a person   10:25:32
 6   is going to spend in prison.  And so when they bring up things
 7   like life expectancy is going to be reduced by one year for
 8   every two years that you put them in prison, that's alarming.
 9   That is a shocking number, and it's startling enough that I
10   thought, well, I think we need to address it.                     10:25:51
11          And so what I want to point out about that is it's
12   just not true.  The article that they cite, if Your Honor has
13   not had an opportunity to look at what they cited, is an
14   article from 2013, and it is by an author who looked at
15   administrative data from New York State parolees, and what she    10:26:12
16   looked at is was there, what she refers to as a dose-response
17   time.  For however many years they spend in prison, did it
18   reduce or increase their mortality rate after they got out of
19   prison?  She only looked at them on parole.
20          So this notion that if he spends two years in prison       10:26:34
21   he is going to die a year early and, therefore, with his life
22   expectancy, he is only going to live four years in prison is
23   just a complete false and misleading statement.  That is not
24   what this research article says at all.
25          The author took data on this New York State parolees,      10:26:51
```

```
 1    not federal inmates, and it was from 1989 to 2003 is the data
 2    that she was looking at, and what she learned was -- and it's
 3    kind of unsurprising, this is not news, that they have a high
 4    risk of death in their first year on parole.  Well, that's
 5    really unsurprising when you think about the individuals coming    10:27:15
 6    out of a New York State Prison and where they are ending up, so
 7    you're going to have a high number of drug defendants either
 8    traffickers or users that have been sentenced, you're going to
 9    have a high number of violent offenders, and they are being
10    released into a community where they don't have a lot of           10:27:33
11    support sometimes; right?  That is not these people; right?
12    These people have a ton of support look at this courtroom.
13    It's packed with support for these defendants.  These are not
14    people without means, abilities and resources to sustain
15    themselves when they get out of prison.                            10:27:53
16          But even more interesting is what they also don't
17    mention about what that article says or what that research
18    says.  Of course, it says that the findings regarding
19    socioeconomic status went in the expected direction.  Those who
20    were high school graduates had lower odds of death than did        10:28:09
21    those with less than a high school education.  All of these
22    guys are educated, sophisticated individuals.  It also showed
23    that whites had a lower death rate than other races.  All of
24    these men are white.  This is not news.
25          But what is really interesting is that study showed is       10:28:30
```

1  called a time to recovery, meaning that after a certain period

2  of time on parole a person's life expectancy returned to

3  normal; in other words, there was a discrete time period

4  immediately after release while on parole with certain types of

5  offenders where, yes, they are at risk of higher death, but          10:28:51

6  that does not mean that Your Honor putting these people in

7  prison for a certain number of years is going to cut their life

8  expectancy by a year for every two years.  That is a grossly

9  misleading representation of that article.

10         And so I think what is a better thing to focus on          10:29:08

11  about that is there was a December 2021 report by the Bureau of

12  Justice Statistics that is available online, and it talks about

13  federal inmates and the mortality rates for federal inmates.

14  And what it pointed out and what it ultimately concluded, and I

15  won't get super into the weeds about this, it looked at the          10:29:34

16  U.S. adult population, every one of us out here in the free

17  world in the U.S. that are above the age of 18, and it bases

18  numbers on per 100,000, so instead of giving a percentage I

19  will give a per 100,000.

20         What they said is in the United States in 2019, that          10:29:50

21  was the most recent data, and this covered mortality rates from

22  2001 to 2019, in prison, state and federal, and in the U.S.

23  population and what they found was that in 2019 there were 1100

24  deaths in the United States per 100,000.  Okay.  So just keep

25  that number in mind.  1100 per 100,000.                              10:30:12

UNITED STATES DISTRICT COURT

162

1          And what they found is in federal prison there is 259

2   deaths per 100,000.  Now, that is less, substantially less.  In

3   fact, you are four times -- going to have a four times higher

4   mortality rate on the outside of a federal prison than you are

5   on the inside of a federal prison.  This idea that this life          10:30:35

6   expectancy is going to go down dramatically by being in prison

7   is just false.

8          Now, if you're really, really clever and you really

9   understand statistics really well, wait a minute, Mr. Berry,

10  there is a whole lot of ways that you can die in the free world      10:30:50

11  that you can't die in prison.  Car accidents, for example.  So

12  the justice report takes that into consideration and says:  All

13  right, we are going to adjust that number.  Let's make sure we

14  are comparing apples to apples and not apples to oranges.  What

15  they find, then, is if you adjust it and you take away those          10:31:07

16  certain type of things, then you find that the death rate in

17  the U.S. adult population adjusted so that it looks like the

18  same demographics of federal inmates is 435 per 100,000.  So

19  that's substantially less.  But remember, in prison it's 259.

20  So you still have a 60 percent higher chance -- 59 percent --         10:31:26

21  let me not engage in too much hyperbole -- 59 percent higher

22  chance of a mortality on the outside of prison than the inside

23  of prison.

24          Now, when we turn to the quality of the health care in

25  prison, so that was another issue that they brought up that           10:31:45

1    they are very concerned about, reasonable to be concerned about

2    the health care of that.  There is an article in the National

3    Academy of Elder Law Journals in 2001 by Stacy Gavin called

4    "What Happens to the Correctional System When a Right to Health

5    care Meets Sentencing Reform?"  That's seven, and the journal          10:32:04

6    name NAELA, stands for National Academy of Elder Law Attorneys,

7    journal, 249 pincite 256, fall of 2011.

8         And what that article says is, quote, "Surprisingly,

9    the growth in geriatric prisoners is also due to the health

10   care received behind bars.  And note, prisoners are the only         10:32:31

11   population in the United States with a constitutionally

12   guaranteed right to medical care."  Now, that comes from a 1976

13   Supreme Court case of *Estelle vs. Gamble* that established that.

14   They are the only population that is guaranteed that medical

15   care, and it is because of that guarantee and because of the          10:32:54

16   medical care that they are receiving in the Bureau of Prisons,

17   we are not talking about New York State Prison, we are not

18   talking about rough-and-tumble state prisons in other places,

19   the Bureau of Prisons, they are receiving very good medical

20   care to the degree that geriatric prisoners are becoming an           10:33:10

21   issue for the Bureau of Prisons because they are living so

22   long.

23         Similarly, there was an article in 2007 by Timothy

24   Curtin in the Elder Law Journal, citation is 15 Elder Law

25   Journal 473 pincite 476 in 2007, and it was titled "The               10:33:29

164

```
 1   Continuing Problem of America's Aging Prison Population and the
 2   Search for Cost-Effective and Socially Acceptable Means of
 3   Addressing it."  And he says, quote, "The success of prison
 4   health care programs in reducing prison mortality," which is
 5   the rates we just talked about, "has led to longer inmate        10:33:51
 6   lifespans and ever higher health care costs."  The prisons are
 7   paying for that and it is happening.  This notion that he is
 8   going to have zero medical care and they are completely
 9   incapable of taking care of different patients, different
10   inmates with different medical ailments is just false.           10:34:10
11        If you've talked to any U.S. Marshals in the recent
12   time, they can tell you time and again how many people they see
13   and get brought into prison that have way worse conditions than
14   any of these guys are talking about.
15        Next I want to turn my attention to this notion of the     10:34:27
16   sex offender status.  That was something that was brought up
17   and that they are deeply concerned about being labeled as a sex
18   offender.  First and foremost, I don't think that this Court
19   has the authority to label them a sex offender or not a sex
20   offender.  States determine whether certain crimes qualify for   10:34:52
21   sex offender registration, SORNA is the federal law that it
22   implements that we decide that by.  That is not to say Your
23   Honor couldn't make any kind of recommendation that you want
24   regarding that.
25        But here's what I would like to emphasize:  In the         10:35:07
```

UNITED STATES DISTRICT COURT

1    Bureau of Prisons there are two programs that sometimes get

2    mixed together.  One is the Sex Offender Management Program and

3    one is the Sex Offender Treatment Program.  The Sex Offender

4    Treatment Program is for inmates who choose to be part of that

5    program.  They want to receive some kind of treatment.  The Sex        10:35:25

6    Offender Management Program is something decided by folks at

7    the Bureau of Prisons and the designation and computation

8    center in Grand Prairie, Texas and individually at prison when

9    they are reevaluated annually.

10          As Your Honor knows, these are the kinds of cases I          10:35:43

11   do.  The only defendants I have are sex offenders, so I am

12   familiar with this issue very well.

13          And the Sex Offender Management Program is something

14   that they look at and they decide whether an inmate should go

15   into that program, and it has nothing to do with the specific       10:35:56

16   offense for which they were convicted.  So, for example,

17   someone could be convicted of a money laundering offense sent

18   to federal prison but they had a sex offense 10 years before,

19   they might get put into the Sex Offender Management Program

20   just because the Court has decided, or the Bureau of Prisons       10:36:12

21   has decided for their safety and protection they need to be.

22          But here's the important point.  The Sex Offender

23   Management Program facilities, which there is about eight to 10

24   of those around the country, I think, they all maintain a

25   40 percent population of sex offenders.  This is in BOP policy       10:36:30

166

1   guidelines that explain this about SOMP facilities.  They have

2   found, of course, that if you maintain a certain critical mass

3   of sex offenders in a particular facility, that they are all

4   protected.  It creates a protective factor kind of like a

5   strength in numbers idea so that they don't have to be isolated    10:36:53

6   in a shoe, as they alluded to.  The only way he is going to be

7   able to make it through prison is to be stuck in a shoe

8   somewhere.  Again, these are all management decisions that the

9   Bureau of Prisons should be doing.  And frankly, I don't think

10  it's something that we should be spending a lot of time talking    10:37:08

11  about for purposes of deciding a sentence.  That's why the

12  Bureau of Prisons is there.

13          But I want to give these facts to you because I am

14  sensitive to the fact that everyone in here is a human and

15  you're concerned about the weight of this decision and what       10:37:22

16  does that really mean.  And I just want you to understand what

17  they are saying and what they are trying to scare you into

18  about this is just simply not true.  The Sex Offender

19  Management Program is designed to protect people who might be

20  decided -- be determined to fit into that category.               10:37:38

21          So even if Your Honor were to say, "I recommend that

22  they not be labeled a sex offender," they have gladly courted

23  the media on this case, have had podcasts, have people

24  following them around giving interviews.  And as they say,

25  somebody can Google their name and figure out what they are in    10:37:57

1    for separate and apart from any recommendation you make and

2    separate and apart from any judgement or their indictment or

3    their PSR for that matter.

4         And so there is a risk if you're the BOP looking at

5    them to say, well, maybe they should be in a Sex Offender          10:38:15

6    Management Program for that reason.  And so I question the

7    reason, the logic behind saying to make sure he is not labeled

8    as such so that he doesn't get into a Sex Offender Management

9    Program.  I actually would argue that it might be better for

10   them.  But again, that's not really our place right now.  That    10:38:31

11   is for BOP to decide.

12        Next I want to talk about, Mr. Feder argued that a

13   sentence of 10 years would result in him not being eligible for

14   a camp, which is really called low security -- minimum

15   security, excuse me, and automatically being designated to a      10:38:52

16   low security prison.  Now, this is one of those that has a

17   kernel of truth, but it's still very misleading.  So BOP policy

18   Statement 5100.08, which is available online, talks about in

19   Chapter 4, page 6, how they calculate an inmate's months to

20   release.  That's the way they calculate it; right?  So if Your    10:39:22

21   Honor sentences someone to 120 months, when they walk into

22   prison, let's say they didn't spend three days in jail

23   initially, but they were just on bond the entire time.  So

24   let's deal with it in that scenario.  Even though the day they

25   turn themselves into the marshals they get credit for one day.    10:39:41

1    Mr. Spear is going to get credit for three days.  Let's just

2    say it's zero days.  You sentence someone to 120 months, they

3    don't have 120 months left on their sentence the day they walk

4    into prison.  They have 120 months less 15 percent.  That's the

5    way the BOP calculates it.  So the months to release is                10:39:57

6    calculated by automatically subtracting 15 percent.

7         So saying if you sentence him to 10 years he will

8    automatically go to a low.  That's not true.  It's just simply

9    not true.

10        In fact, you could sentence these defendants to                   10:40:10

11   282 months, and 15 percent off of that would put them under 240

12   and would keep them in a low security classification, low

13   security prison classification.  You could sentence them to

14   140 months and their months to release would automatically be

15   119 and they would be eligible for a minimum security.                 10:40:30

16        So I just give those facts to you because it's

17   important to make sure that they were not misleading the Court,

18   which I feel like has been done a little bit here.

19        Similarly, the affidavit that they submitted by

20   Ms. Purdue attempted to place these defendants, or Mr. Spear at        10:40:46

21   least, in a high, like the highest security classification.

22   And that's, again, looking at that policy statement, that's not

23   correct.  These are property offenses that are over 250,000, so

24   it was moderate security classification most likely, but that

25   doesn't mean they go to a medium security prison.  That's why          10:41:11

1   we leave that to the BOP, and we shouldn't be spending a ton of

2   time dealing with that.

3         Finally, as to sentencing specifically, before I turn

4   my attention to detention, what I think is most galling is that

5   Mr. Spear's attorney has asked this Court to give grace to him    10:41:31

6   because he's physically frail and something bad might happen to

7   him in the future.  But Mr. Spear and these other defendants

8   gave exactly zero grace to the young women and girls being

9   trafficked dozens of times a day on Backpage who were in fact

10   suffering real harms far worse than anything that might happen    10:41:57

11   to these defendants in a controlled prison environment.  They

12   used the terms "violence," "aggression" and "drug use" that

13   they are worried about being exposed to in prison.  That was

14   the words, I think, of Ms. Purdue.  He's worried about being

15   exposed to, quote, "violence," "aggression" and "drug use" in    10:42:19

16   prison.  Those are all the things that the victims of his

17   website were actually exposed to multiple times per day.  And

18   he was aware of that actual harm occurring, not just the risk

19   of it, and they all laughed all the way to the bank.

20         For 14 years, as Mr. Rapp pointed out, NCMEC, the    10:42:40

21   Attorneys General, Polaris, Auburn Theological Seminary, and

22   countless others were begging these men to have compassion,

23   compassion for the plight of young women and girls who were

24   constantly being trafficked because they provided, the

25   defendants provided the most convenient marketplace for flesh    10:43:04

1    peddlers that buyers to gather.

2          Your Honor, I have no doubt, has more compassion than

3    these men.  I am not asking you to abandon that compassionate

4    tendency in a situation like this.  I'm asking you to direct it

5    at the victims, the survivors, and their family members.  Show          10:43:23

6    them the compassion that these men refused by sentencing them

7    to a significant term of imprisonment.

8          Now, that compassion argument dovetails with our

9    detention argument, with our release pending bail.  All of the

10   defendants have asked, obviously, for probationary sentences,          10:43:45

11   but if they are sentenced to prison they have asked for to be

12   able to be out.  On the one end of the spectrum they want to be

13   out for the entirety of their appeal, on sort of a middle path

14   is that they want to be able to self-surrender.  And, of

15   course, we are asking that they be remanded today.          10:44:06

16         All of the defendants have continued to enjoy all of

17   the freedoms of people who were not convicted of felonies, and

18   they have continued to enjoy that even after they have been

19   convicted.  That was nine months ago.

20         As we pointed out, we did not ask for the remand at          10:44:29

21   that time because there were several motions pending before

22   Your Honor that we thought were more appropriate to make sure

23   that those are resolved.  They have been resolved.  The time

24   has come.  The risk of flight at this stage after all these

25   years of litigation is too great.  There are huge financial          10:44:45

1    incentives to avoiding the entry of judgement here.

2         Typically a sentencing court, and I don't know exactly

3    how Your Honor does it, but the judgment doesn't get entered

4    for sometimes a few days, and that gives these defendants an

5    opportunity to remain on bond, and if they leave or God forbid          10:45:05

6    they commit suicide, that judgment goes away and they are no

7    longer adjudged guilty.  And that changes a huge number of

8    things, as we saw with Mr. Larkin.

9         All human life is valuable, Your Honor, and silence

10   upon self is just as much a danger to the community as to             10:45:27

11   another.  We certainly don't want to see that.  These folks

12   have a tremendous incentive.  It's not a speculative thing to

13   say given the fact that one of the defendants did precisely

14   that in this case.  And that, of course, is the ultimate risk

15   of nonappearance.  And this is not just me postulating here.           10:45:48

16   The Tenth Circuit has held that in *United States vs. Workman*,

17   680 F. Appendix 699, Tenth Circuit 2017, recognizing the risk

18   of flight by suicide is a proper consideration by the Court in

19   assessing the defendants' risk of nonappearance.

20        The Sixth Circuit has said something similar               10:46:08

21   recognizing that it is logical to extend rules that treat

22   suicide as a form of flight.  It's *United States vs. Cody,* 498

23   F.3d 582, pincite 591, Sixth Circuit 2007.

24        When thinking about detention or release under 3142,

25   the history and characteristics of the person, including their        10:46:32

172

1  mental condition, is important.  Mr. Spear has had several

2  mental issues.  I believe there was an ex parte letter that was

3  provided to the Court.  I only became aware of it because it

4  was obliquely referenced in their response to our Sentencing

5  Memorandum.  I have no idea if Your Honor has received more          10:46:58

6  than that one ex parte communication from the defense.  I asked

7  Mr. Spear's attorneys for access to that because I believed

8  that that's not something that the Court should be considering

9  without our opportunity to review that, and ultimately

10 Mr. Feder brought it over to me yesterday and I have had a          10:47:18

11 chance to review that one ex parte letter.  If there is more, I

12 don't know.

13        But in it, of course, we see things that give us

14 concern about Mr. Spear.  And without going into too much

15 detail about those, because Your Honor has it and it's filed      10:47:37

16 under ex parte, and I haven't been told I could say something,

17 otherwise I would just point Your Honor to that and note that

18 there are psychiatric conditions that give us concern about

19 whether he is a good candidate to remain out or for

20 self-surrender.                                                    10:47:56

21        So the same is similar, something similar for Mr.

22 Lacey who has expressed depressive episodes and has refused

23 medication.

24        All of the defendants are risk of flight in that

25 regard.  They all have substantial means.  The PSR makes clear     10:48:12

173

 1   that they all still have quite a bit of money and access to

 2   money at this time, and that is of deep concern to us as well

 3   as the danger to the community in terms of the way that I spoke

 4   about it just a moment ago.

 5          So finally, to the extent that this Court is          10:48:31

 6   disinclined to remand them today, we would ask that ankle

 7   monitors be put back on them for the ones that have already had

 8   it.  And for the ones that haven't, put it on for the first

 9   instance for precisely all the same reasons, to ensure that

10   these victims who have waited six and a half long years are not   10:48:54

11   denied the justice that they are owed at this point.

12          And for all those reasons, we ask that you sentence

13   these defendants to a significant term of imprisonment and that

14   they be remanded into custody today.  Thank you.

15          THE COURT:  Thank you.  The Court will be on recess     10:49:13

16   for approximately 20 minutes.

17          (Recess was taken at 10:49 a.m.)

18      (Proceedings reconvened at 11:18 a.m.)

19          COURTROOM DEPUTY:  Judge is going to recess until

20   12:30.                                                          11:18:45

21          (A recess was taken at 11:20 a.m.)

22      (Proceedings reconvened at 12:33 p.m.)

23          COURTROOM DEPUTY:  We're back on the record in CR

24   18-422, United States of America vs. Michael Lacey, Scott Spear

25   and John Brunst, before the Court for sentencing.              12:33:56

1        THE COURT:  All right.  I intend to proceed in the

2   following way:  Each individual is entitled to an individual

3   sentence pronouncement.  They are entitled to understand the

4   considerations of the Court, and so I will proceed in the

5   following way.  I will proceed to the sentencing of Mr. Spear.        12:34:25

6   I will then move to Mr. Brunst, and finally Mr. Lacey.

7        It is true, I think one counsel or two or more

8   indicate that these are difficult responsibilities of a judge,

9   the balancing and weighing the arguments, looking at the case

10  law, and I think it is, in my circumstance, extraordinarily        12:35:00

11  difficult because the case has been so long.  I have not before

12  presided over a criminal trial proceeding that lasted the

13  entirety of a season, nor do I ever hope to.

14       And so I will also remind counsel that I'm not the

15  first judge on this case.  I think at least one judge on this        12:35:41

16  floor and two judges on the floor below me have handled issues

17  related to this.  I have had colleagues who could not get near

18  the case because of Mr. Lacey's and others long status here in

19  Arizona.  But nonetheless, the obligation falls to me, and I do

20  not impose sentence lightly.        12:36:32

21       As I stated at the outset, these are very difficult

22  statutes and they are unique circumstances.  The circumstances

23  have to fit into the application of the statute, and this Court

24  has done the best it can to guide the process.

25       But here, what makes this more heavy is that we need        12:37:10

175

1   not lose sight of the jurors who were selected, specifically by

2   counsel and their clients and the government and who sat

3   through that season-long trial.  I have to pay deference to

4   their findings by way of their verdicts.

5       I saw how diligently they worked everyday.  At the end      12:37:56

6   of trial what you did not see was the emotional toll it took on

7   every single one of them, every one.  It was as though they

8   didn't know what to do with their lives.  And I think we in

9   this room need to recognize their work, the care and attention

10  that they took to sifting through the arguments, sifting         12:38:47

11  through the testimony, looking at the exhibits, listening to

12  your arguments, observing you and your clients in court.  It is

13  our process, and so my responsibility is to follow what they

14  did.

15      With that, Mr. Spear, please come forward.  Mr. Spear,       12:39:16

16  as we have discussed yesterday, there was --

17      MR. FEDER:  Could I interrupt you for one moment?  Is

18  the Court not going to hear -- your clerk indicated before we

19  took the recess, not hear further argument on release pending

20  appeal.                                                          12:40:00

21      THE COURT:  After my imposition was my instruction to

22  everyone.

23      MR. FEDER:  Sure.

24      THE COURT:  And I caution counsel, I don't want to

25  hear reiteration of argument made yesterday.  I don't want to    12:40:12

1    hear reiteration of argument made in responsive or original

2    pleadings as to the issue.  I've read that all.  If there's

3    something in reply to what Mr. Berry stated, you can be heard

4    on the record, but I think these matters have been fully

5    briefed.                                                          12:40:37

6            MR. FEDER:  Thank you.

7            THE COURT:  Mr. Spear, you have been convicted by a

8    trial jury of conspiracy to commit Travel Act violations in

9    Count 1 of the indictment; Counts 2 through 18, which are

10   specific Travel Act violations; Count 52, which charges you     12:40:57

11   with conspiracy to commit money laundering; and Count 53

12   through 62, concealment money laundering.

13           There was, as we have been discussing, a Presentence

14   Investigation Report that was prepared in your case.  The

15   presentence report writer is here and present.  Did you read   12:41:23

16   the entire presentence report, including the sentencing

17   recommendations made in it?

18           MR. SPEAR:  I did.

19           THE COURT:  Did you review the entirety of the report

20   with your counsel?                                              12:41:39

21           MR. SPEAR:  I don't know the entirety, but we reviewed

22   it.

23           THE COURT:  Your counsel, either Mr. Kessler or

24   Mr. Spear [sic], answered all of your questions about what is

25   written and recommended in that report; is that correct?       12:41:53

1          MR. SPEAR:  That's right.

2          THE COURT:  Now, having resolved all of the objections

3     in your presentence report, and upon jury's verdicts of guilt,

4     I must now impose sentence upon you on those counts of

5     conviction.                                                        12:42:14

6          Now, as to -- let me just say that with regard to your

7     background and character, I'm going to at least refer generally

8     to all of the sentencing consideration that the Court must

9     review in imposing a sentence.  I do this with every individual

10    that comes before me.  They are the factors outlined in Title    12:42:40

11    18 United States Code Section 3553(a).  Those factors include

12    the nature and circumstances of your convictions, your

13    background and character, if there's a sentence in need for

14    deterrence purposes, for rehabilitation purposes, if there's a

15    sentence necessary to promote respect for the law, and what      12:43:04

16    type of sentence would be sufficient but not greater than

17    necessary to achieve all of the sentencing factors in your

18    particular case.

19         Well, having reviewed your presentence report, I know

20    that you are about 73 years of age.  I know that you have a       12:43:23

21    higher degree in sociology and anthropology.  You arrived in

22    Arizona roughly about 1959, and you've lived here for the

23    duration thereafter.  You have no prior criminal history.  In

24    fact, I don't recall reading that you had any sort of

25    infraction with the law.                                         12:43:54

1    I note that you deny having any substance abuse

2 issues, and so the Court finds there is no need to impose a

3 sentence for rehabilitation purposes.

4    I have read the reports that your counsel have

5 attached to your Sentencing Memorandum.  And as noted in your    12:44:14

6 presentence report, I do note all of the health conditions that

7 you have.  I understand that these conditions are not only

8 mental health conditions, but you have physical health

9 conditions as well.

10    I also do not find, one of the other factors I have to    12:44:37

11 consider as to whether or not you present a danger to others,

12 and I do not find, based on all of the information before me,

13 that you impose a danger to others.

14    With respect to the nature and circumstances of the

15 offense, I do need to take some time to make -- make clear what    12:45:01

16 the basis of my sentence relies upon.  And as I mentioned, this

17 is related to the jury verdict.  As to Count 1, the conspiracy

18 to violate the Travel Act, in violation of Title 18 United

19 States Code Section 371, here, it relates to the specific

20 Travel Act postings on Backpage.    12:45:37

21    The government was charged and the jury necessarily

22 found that you used Backpage.com with the intent to facilitate

23 the promotion of a prostitution businesses, and that there was

24 an overt act in furtherance of that unlawful activity.  For

25 example, by publishing the prostitution ad or editing the ad to    12:46:08

UNITED STATES DISTRICT COURT

1     make it look less like an ad for prostitution.

2           Your role was that of the executive vice president of

3     Backpage's parent company Village Voice Media.  There was

4     testimony that you were the immediate supervisor of your

5     codefendant, Mr. Ferrer, and he operated as the project manager          12:46:36

6     and sales marketer or director of Backpage.

7           There was ample evidence about your role in the

8     aggregation strategy.  You directed the rollout of Backpage's

9     content aggregation; that is, you required staff to identify an

10    adult escort ad on Craigslist, this is at the beginning, and          12:47:14

11    repost it on Backpage in hopes that the original poster and any

12    user would start paying to post ads on Backpage instead of

13    Craigslist.

14          You obtained budget approval from Mr. Brunst, and then

15    you directed Mr. Ferrer to use the content aggregation strategy          12:47:36

16    in every metro market in the United States.  That was the

17    testimony.

18          You also were involved with the relationship developed

19    with The Erotic Review.  We heard ample testimony that the The

20    Erotic Review was a prostitution review site, rating site, if          12:48:05

21    you would.

22          You were the author of a 2008 budget plan that was

23    presented then to Mr. Brunst and Mr. Larkin outlining that TER

24    relationship.  And in that plan it noted that Backpage had,

25    quote, "struck a deal with TheEroticReview.com, TER, with          12:48:34

1  reciprocal links.  It created huge brand awareness in this

2  industry, and increased pageviews from TER by 120,000 per day."

3  You signed the checks for these payments, you closely tracked

4  the relationship with TER, and Mr. Ferrer testified that you

5  understood that the traffic from TER was very, very important          12:49:11

6  to Backpage's success.

7          You ignored recommendations to completely remove ads

8  visited from TER.  This was even after the Amber Lyon CNN story

9  about Backpage offering a 12-year-old girl for sex.  You

10  allowed TER identification numbers to remain on the site, but          12:49:49

11  you just removed the links to TER.  That was an important

12  partner to Backpage's success.

13          Mr. Ferrer also testified that you and Mr. Brunst

14  regularly received those Google analytic reports showing that

15  TER was the number one source of non-search engine referrals to       12:50:17

16  Backpage.

17          You sent Mr. Ferrer, you and Mr. Larkin, to New York

18  to meet with bulk prostitution advertisers in person and

19  coordinate efforts to give what is known as super posters

20  preferential treatment on Backpage.                                    12:50:47

21          You also were involved deeply in the moderation

22  efforts.  You prepared a PowerPoint that aimed at getting rid

23  of ad images depicting sex acts like a woman giving a man oral

24  sex.  And according to Mr. Ferrer, you coined a standard of

25  between Hustler and Playboy, which meant sex act pictures need         12:51:19

1  to go, and you could still have full nudity but you couldn't

2  have extreme close-up of genitalia.

3          You directed Mr. Ferrer to scrub ads, to edit and

4  remove sex act images and sex act language.  You wanted the ads

5  to be less escort-ish, meaning that if the ads looked like          12:51:50

6  prostitution, excuse me, less like prostitution then it could

7  maintain some credibility.

8          You are also responsible for Backpage's Terms of Use,

9  which continually changed, and we had ample evidence of that.

10 There was frustration growing at the time as the evidence and     12:52:23

11 testimony reflected that advertisers were being kicked off and

12 so there was an effort made to identify certain terms that need

13 to be thrown out only to have those advertisers modify that

14 language.  You changed terms like "hooker" to "female escort."

15 You decided it was appropriate or okay to use the term "roses"    12:53:07

16 instead of "cash," and you were necessarily alerted to all of

17 this because you were Mr. Ferrer's boss, and you were the

18 person Mr. Ferrer went to to resolve conflicts when people

19 would raise concerns about being kicked off the page.

20         You decided to higher El Camino to assist with the        12:53:53

21 cleanup efforts.  You also rejected Internet safety expert

22 suggestions to screen the ads purchased with prepaid cards

23 because they were concerned this was an indication of potential

24 trafficking and because it was identified and testified to that

25 up to 70 percent of your transactions came from prepaid cards,    12:54:21

```
 1    so you didn't want to lose that business.

 2         It was also testified to that you were involved in

 3    what was described as the slow dance with the Attorney

 4    Generals, and that essentially what that meant was, comply with

 5    the subpoena requests, but don't change anything that we're        12:54:49

 6    doing to make it look like we're helping law enforcement.

 7    There was a directive not to throw the baby out with the bath

 8    water, and make these changes gradually so that the revenue

 9    loss would not be so great.

10         So essentially you and your direction and your             12:55:20

11    necessary approval, structured Backpage in a way to ensure that

12    the majority of its revenue that was derived from prostitution

13    ads would not cease.

14         As to each of the Travel Act counts that you have been

15    convicted of, Counts 2 through 18, Count 2 involves the          12:55:49

16    testimony that we heard from Sergeant Griffith of the North

17    Borough Police Department.  He was alerted to, if you will

18    recall, the suspicious activity that was occurring in a near

19    motel room.  There were two women that were seen loitering

20    around the area.  Someone was concerned for them.  Well, after   12:56:21

21    he watched the motel for a period of time, he decided to go on

22    Backpage.com and he found an ad that showed one of the

23    individuals that he had spotted outside of that motel.  He

24    called the ad number, made an appointment, went to that motel

25    room.  When he got there, much to his surprise, there was        12:56:59
```

183

1    another quote/unquote, john who was just leaving.  This was

2    prostitution that had been illegal, made illegal in the state

3    of Massachusetts.

4            With regard to Counts 3, 6 through 11 and 18, these

5    are Travel Act violations, in violation of Washington state law    12:57:30

6    involving Ms. Robinson.  And we heard the testimony that

7    Ms. Robinson used Backpage.com as her prostitution web page,

8    her advertisement page.  She began to become concerned and

9    reached out to Mr. Ferrer because she was getting kicked off

10   the page, and she was concerned because she needed money.    12:58:07

11           So the multiple ways that Mr. Ferrer and the

12   aggregation and the moderation that was done to facilitate this

13   enabled Ms. Robinson to continue to advertise on Backpage over

14   and over and over again.  Counts 3, 6 through 11 and 18 bear

15   that out.    12:58:51

16           Counts 4 and 5, again, relate to postings in

17   Massachusetts.  In particular, we heard through government

18   counsel this victim's statement.  She testified that she became

19   familiar with Backpage.com because she saw her pimp posting her

20   ads on that page.  She testified that she would not create    12:59:30

21   these ad, but he would, and her testimony was, quote, she

22   understood that she was advertised for sex acts for money

23   because, quote, "so my pimps could make money off of me."  She

24   also testified that she saw her pimps using vanilla cards from

25   a convenience store in order to post her ads.    13:00:00

UNITED STATES DISTRICT COURT

1        There were multiple exhibits that came in through

2   Ms. Figueroa.  We know the impact that these postings have had

3   on her.

4        Counts 12, 13, 14 and 15, are postings in California

5   and Arizona.  The postings of Ms. Cervantes.  And here          13:00:31

6   Ms. Cervantes, in her own words, said that she was being

7   trafficked -- being trafficked by a man she referred to as

8   L.G., and he, along with another woman, would post, create and

9   post her ads.  They would buy her clothing, put her in certain

10  positions, and then post her ads.                               13:01:13

11        She also testified that they decided to come here to

12  Arizona because of the Super Bowl, and perhaps, perhaps that

13  was to her benefit because when she was posted here in Arizona

14  the person she met responding to her ad was an undercover

15  officer, and at least at the time of trial she testified that   13:01:53

16  she didn't post -- she wasn't posted on Backpage thereafter.

17        Count 16 and 18 relate to ads posted in Colorado by

18  Ms. Leery.  And here, though you may disagree with the jury

19  finding, the jury was given a particular instruction that said

20  that because of your knowledge or the knowledge of others and   13:02:38

21  the acts of others to develop Backpage in this way, you are

22  liable.

23        With regard to Count 52, the conspiracy to commit

24  money laundering, and all of this relates to around 2012, and

25  the evidence will show around that time this is when there was   13:03:06

1  pressure upon you and Mr. Lacey and Mr. Brunst and Mr. Larkin

2  and Mr. Ferrer from law enforcement and others, and so the

3  financial institutions began dropping Backpage business, and so

4  you had to find ways for users to continue to pay for ads.

5  There was testimony that Mr. Brunst and you and Mr. Larkin          13:03:41

6  worked closely to secure credit card processing from Europe,

7  you began identifying, identifying using Net Cash, cyberspace

8  credit cards.  Mr. Ferrer exchanged e-mails with Mr. Brunst on

9  which you were copied about getting cc bill contract signed,

10  and there was some discussions about using JetPay.  And in       13:04:16

11  November of 2013 Mr. Ferrer sent an e-mail on which you and

12  Mr. Brunst were copied relating to credit card transactions,

13  and those recommendations included using names, Internet

14  addresses and billing descriptions that would not include the

15  name Backpage.                                                    13:04:53

16        At that time -- at the time that you decide to sell,

17  you and others decide to sell to Mr. Ferrer Backpage, from 2014

18  to 2015, it was yielding anywhere from 150 to $160 million, and

19  the amount it cost to posted a single ad was sometimes $4.  You

20  only need to do the math, then, to think about the volume of     13:05:39

21  ads it took to generate that amount of income, and those Google

22  ads do not show furniture, automobiles, contributing this

23  amount to Backpage.com.

24        The money laundering counts really relate to what

25  occurs with the sale of Backpage.  You and Mr. Brunst,           13:06:16

1   Mr. Lacey sold Backpage to Mr. Ferrer for $6 million, and that

2   sale consisted of two loan agreements.  One the U.S. portion of

3   Backpage and a smaller loan was the foreign portion of

4   Backpage.  Now, Cereus Properties, which is the company owned

5   by Mr. Lacey, Mr. Brunst and you, collected the interest and          13:06:53

6   the debt payments from that $6 million loan, and Mr. Ferrer

7   testified that the source of the money went to Cereus

8   Properties was the prostitution ads posted on Backpage.  It was

9   all generated from that.

10          The transactional money laundering counts under              13:07:21

11   section 1956(a), which are Counts 53 through 62, were all

12   transfers made from Website Technologies bank account to branch

13   banking and trust to a bank account held by Cereus Properties.

14   And really, the requirements for this, these set of convictions

15   Counts 53 through 62 were that you knew that the proceeds             13:08:03

16   derived from unlawful activity, and that the proceeds in fact

17   derived from unlawful activity.

18          All of the information related to the conspiracy

19   supports this verdict.  Indeed, by its verdict the jury found

20   that following the 2015 sale, the ultimate source of the monies      13:08:33

21   that were paid to Cereus Properties from Website Technologies

22   was the prostitution ads posted in Backpage.  Those are the

23   nature and circumstances of the offense of conviction.

24          I have already iterated to you the statutory terms --

25   terms of imprisonment that apply, and you are aware of your          13:09:07

1   sentencing guideline calculation.  I find the nature and

2   circumstances of the offense to be extremely serious.  In

3   considering Mr. Spear, Mr. Brunst and Mr. Lacey, I've also

4   reviewed the multiple victim impact statements that have been

5   provided to the Court.  I think that what we heard yesterday in   13:09:37

6   many ways encapsulates many of those statements, and many of

7   those statements include loss of home life, they include

8   suicidal ideation, they include depression, they include

9   anxiety, they include numerous visits to counselors,

10  psychologists.  I reviewed letters from psychologists and   13:10:21

11  counselors who have provided services to those individuals who,

12  many of whom, and I will suggest the majority of whom did not

13  voluntarily do this.  There were others that were involved.

14         Here, I think Ms. Ambrose's words resonated and serve

15  as a reminder of really what this was about.  I will attempt to   13:10:59

16  quote from her, "Backpage and the owners continued teaching

17  pimps how to advertise these women."  And I think, Mr. Spear,

18  the evidence bears that out.

19         With regard to deterrence, I'm troubled in one

20  respect.  It appears that you refused to inform your probation   13:11:36

21  officer of your source of income today.  I do note that you

22  were last employed as an executive vice president of Cereus

23  Properties up through 2018, and in 2013 you were earning

24  something in the neighborhood of $30,000 per month, and at the

25  end of that 2018 period your W-2 showed that you earned   13:12:08

1   somewhere in the neighborhood of $80,000 to $2 million

2   annually.

3          With regard to promoting respect for the law, there's

4   ample evidence to show that there is a sentence necessary for

5   that.  You and your codefendants were routinely put on notice          13:12:45

6   that Backpage was being used to post sex-for-money ads, in

7   violation of state prostitution laws.  You received letters

8   from law enforcement officials, state Attorneys General, and

9   you were called before Congress to explain these activities,

10  and you knew of these allegations.                                      13:13:18

11         The testimony that also resonated with me, Mr. Spear,

12  is you were described at one point as a hands-on supervisor or

13  a micromanager on all aspects of the business from approving

14  payments to approving staffing, and so I find all these aspects

15  must be balanced and weighed.                                          13:13:56

16         I have considered all of the factors in 18 U.S.C.

17  3553(a), is there any legal cause as to why sentence should not

18  now be imposed, Mr. Rapp?

19         MR. RAPP:  Not that the United States knows of.

20         THE COURT:  Mr. Whoever --                                      13:14:23

21         MR. FEDER:  No.

22         THE COURT:  Pursuant to the Sentencing Reform Act of

23  1984, it is the judgement of the Court that Scott Spear is

24  hereby committed to the Bureau of Prisons for a term of

25  imprisonment of 120 months.                                            13:14:39

189

1    This consists of 60 months on Count 1, conspiracy to

2    commit Travel Act offenses, 60 months on each Count 2 through

3    18, the Travel Act offenses.  Those counts are to run

4    concurrently to Count 1.  And 60 months on Count 52 to run

5    concurrently with a 60-month term on each count, 53 through 62,    13:15:09

6    which are the concealment money laundering counts, and which

7    are to run consecutively to Count 1 through 18.

8    You shall pay a special assessment fee of $2,900 which

9    is due immediately.  The Court finds that you do not have an

10   ability to pay a fine and orders that the fine be waived.    13:15:39

11   You shall pay your criminal monetary penalties during

12   imprisonment at a rate of not less than $25 per quarter, and

13   payment shall be made through the Bureau of Prisons' Inmate

14   Financial Responsibility Program, and the Court does waive the

15   imposition of interest and penalties on any unpaid balance.    13:16:01

16   Now, on release from custody you shall be placed on

17   supervised release for 36 months, and this term consists of

18   36 months on Count 1 through 18, 52 through 62, 71 through 78.

19   That is an error.  On all counts of conviction you will serve a

20   36-month term of supervised release, and those terms are to run    13:16:53

21   concurrently.  Let's modify the language in that.

22   Now, while on supervised release, you shall comply

23   with the mandatory and standard conditions of supervision

24   adopted by this court this General Order 17-18.  And of

25   particular importance, you shall not commit another federal,    13:17:12

UNITED STATES DISTRICT COURT

190

1    state or local crime during the term of supervised release, and

2    the mandatory drug testing provision is suspended.

3         Within 72 hours of being released from custody, you

4    shall report in person to the probation office in the district

5    in which you are released.                                    13:17:32

6         Mr. Feder, have you reviewed the mandatory and

7    standard conditions of supervision with your client?

8         MR. FEDER:  I don't know, Judge, but I will, but I

9    can -- I can't tell you that I have or haven't.

10        THE COURT:  Mr. Kessler, have you?                       13:17:47

11        MR. KESSLER:  We have gone through them, yes.

12        THE COURT:  Mr. Spear, do you recall reviewing the

13   mandatory and standard conditions of supervised release?

14        MR. SPEAR:  Only in general terms.  I don't remember

15   any of the specifics.                                         13:18:03

16        THE COURT:  You will comply with the mandatory

17   conditions of supervised release as follows:  You must not

18   commit another federal, state or local crime.

19        You must not unlawfully possess a controlled

20   substance.  The use or possession of marijuana, even with a   13:18:17

21   physician certification, is not permitted.

22        You must refrain from any unlawful use of controlled

23   substances.  Unless suspended by the Court, you must submit to

24   one drug test within 15 days from release from imprisonment and

25   at least two periodic drug tests thereafter as determined by   13:18:39

1    the Court.

2         You must comply with the following standard

3    conditions:  You must report to the probation office in the

4    federal judicial district where you are authorized to reside

5    within 72 hours of sentencing or your release from imprisonment          13:18:53

6    unless the probation officer instructs you to report to a

7    different probation office or within a different time frame.

8         After initially reporting to the probation office, you

9    will receive instructions from the Court or the probation

10   officer about how and when you must report to the probation            13:19:15

11   officer, and you must report to the probation officer as

12   instructed.

13        You must not knowingly leave the federal judicial

14   district where you are authorized to reside without first

15   getting permission from the Court or the probation officer.            13:19:28

16        You must answer truthfully the questions asked by your

17   probation officer.

18        You must live at a place approved by the probation

19   officer.  If you plan to change where you live or anything

20   about your living arrangements such as the people you live            13:19:43

21   with, you must notify the probation officer at least 10 days

22   before the change.  If notifying the probation officer in

23   advance is not possible due to the unanticipated circumstances,

24   you must notify the probation officer within 72 hours of being

25   aware of a change or expected change.                                  13:20:02

1    You must allow the probation officer to visit you at

2 any time at your home or elsewhere, and you must permit the

3 probation officer to take any items prohibited by the

4 conditions of your supervision that he or she observes in plain

5 view.                                                    13:20:22

6    You must work full-time at least 30 hours a week.  Let

7 me change that because, and I will change that as to each

8 defendant that it applies to, because they are all retired.

9 You must not interact with someone that you know is engaged in

10 criminal activity.  If you know someone has been convicted of a    13:20:46

11 felony, you must not knowingly communicate or interact with

12 that person without first getting the permission of the

13 probation officer.

14    If you are arrested or questioned by a law enforcement

15 officer, you must notify the probation officer within 72 hours.    13:20:59

16    You must not own, possess or have any access to a

17 firearm, ammunition, destructive device or dangerous weapon.

18    You must not act or make any agreement with a law

19 enforcement agency to act as a confidential human source or

20 informant without first getting the permission of the court.    13:21:21

21    If the probation officer determines that you pose a

22 risk to another person, including an organization, the

23 probation officer may require you to notify the person about

24 the risk, and you must comply with that instruction.  The

25 probation officer may contact the person and confirm that you    13:21:40

1  have notified the person about the risk.

2        You must follow the instructions of the probation

3  officer related to the conditions of supervision.  You must

4  abide by the following special conditions:  You must submit

5  your person, property, house, residence, vehicle, papers or        13:21:59

6  office to a search conducted by a probation officer.  Your

7  failure to submit to a search may be grounds for revocation of

8  your release, and you must warn any other occupant that the

9  premises may be subject to search under these conditions.

10       You must submit your computers as defined in 18 U.S.C.    13:22:16

11  1030(e)(1) or other electronic communication or data storage

12  device or media to a search.

13       You must warn any other people who use these computers

14  or devices capable of accessing the Internet that the devices

15  may be subject to search pursuant to this condition.  Failure    13:22:38

16  to submit to a search may be grounds for revoking your release.

17  A probation officer may conduct a search pursuant to this

18  condition only when reasonable suspicion exists that there is a

19  violation of condition of supervision, and that the computer or

20  device contains evidence of this violation.                      13:22:57

21       You must consent to and cooperate with the seizure and

22  removal of any hardware and/or data storage media for further

23  analysis by law enforcement or the probation officer with

24  reasonable suspicion concerning a violation of a condition of

25  supervision or unlawful conduct.  Any search will be conducted    13:23:16

UNITED STATES DISTRICT COURT

194

```
 1   at a reasonable time and in a reasonable manner.
 2          You must provide the probation officer with access to
 3   any requested financial information and authorize the release
 4   of any financial information, and the probation officer may
 5   share that financial information with the U.S. Attorney's        13:23:35
 6   Office.
 7          You are prohibited from making major purchases,
 8   incurring new financial obligations, or entering into any
 9   financial contracts over $500 without the prior approval of the
10   probation officer.                                               13:23:50
11          You must participate in a mental health assessment and
12   participate in outpatient mental health treatment as determined
13   to be necessary by a medical or mental health professional, and
14   follow any treatment direction by the treatment provider.
15          You must take medicine as prescribed by a medical         13:24:06
16   professional providing mental health treatment, unless you
17   object, in which event you must immediately notify the
18   probation officer.
19          You must contribute to the cost of treatment in an
20   amount to be determined by the probation officer.                13:24:20
21          You must not communicate or otherwise interact with
22   any of the co-conspirators without first obtaining approval
23   from the probation officer.
24          You must cooperate in the collection of DNA as
25   directed by the probation officer.                               13:24:38
```

UNITED STATES DISTRICT COURT

1    You must notify the Court of any material change in

2    your economic circumstance that might affect your ability to

3    pay restitution, fines or special assessments.

4    You must make restitution in accordance with 18 U.S.C.

5    Sections 2248, 2259, 2264, 2327, 3663, 3663A and 3664.  The          13:24:57

6    Court has not at this juncture ordered restitution be paid, but

7    that matter will continue to be pending.

8    You must consent, at the direction of the probation

9    officer, to having installed on your computer, as defined at 18

10   U.S.C. 1030(e)(1), including Internet capable devices at your        13:25:28

11   own expense any hardware or software system to monitor your

12   computer use.

13   Now, Mr. Spear, having been convicted by a jury, you

14   do retain all of your rights of appeal.  Now, that is with

15   regard to the jury's verdict and now with regard to the Court's     13:25:53

16   sentencing.  However, if you do intend to appeal, you only have

17   14 days in which to notify the Court of your intention to do

18   so, and your counsel can advise you with regard to that.

19   You may resume your seats, and we will take up the

20   issue of release pending appeal upon the completion of the          13:26:16

21   sentence.

22   MR. FEDER:  Would you like me to ask this Court right

23   now for the recommendation to the Bureau of Prisons that we

24   discussed earlier?

25   THE COURT:  Well, I have reviewed a number of                       13:26:30

196

1    statements that I asked the U.S. Probation Office to look at,

2    that coupled with Mr. Berry's statements, and as I inform every

3    individual that comes before me who is ordered to the Bureau of

4    Prisons custody, I will frankly tell Mr. Spear that I will make

5    a recommendation as to your placement here in Arizona.  I will          13:27:00

6    make a recommendation that you be housed in a low level or less

7    than medium, if there is, secure facility; however, it is,

8    under the law, up to the discretion of the Bureau of Prisons to

9    determine, number one, where they have the facility that meets

10   all of your criteria based on the counts of conviction, as well        13:27:30

11   as other considerations.  So while I may make the

12   recommendation, it ultimately will be their decision.

13          MR. FEDER:  There are several other recommendations we

14   would ask, though.  I am sorry.

15          THE COURT:  I wanted to, before I forget, Mr. Spear, I          13:27:49

16   want to make sure that, I know that you asked yesterday that a

17   particular letter accompany the judgement and commitment order,

18   and I didn't recall, was that the letter of Dr. Bernstein or

19   somebody else?

20          MR. FEDER:  The one that was filed under seal.                  13:28:07

21          THE COURT:  Yes, Mr. Spear, was there anything

22   further?

23          MR. FEDER:  Yes.  I am sorry.  Mr. Feder, actually.

24   You said Mr. --

25          THE COURT:  I'm sorry, Mr. Feder.                               13:28:27

UNITED STATES DISTRICT COURT

197

```
1              MR. FEDER:  Forget it.

2              THE COURT:  Mr. Feder.

3              MR. FEDER:  Number one, that you recommend that this

4     is not to be deemed a sex offense in the order, but that's

5     something the government agreed to.                              13:28:40

6              THE COURT:  Well --

7              MR. RAPP:  To be clear, we don't object to it.

8              MR. FEDER:  Sorry, they don't object to it.  As the

9     Court knows from reading Ms. Purdue's declaration, it would be

10    extremely helpful regarding Mr. Spear's service in the Bureau   13:28:54

11    of Prisons.

12             THE COURT:  I hesitate to do so only because I feel

13    that it will call attention on any document to the issue.  And

14    if it calls attention to the issue -- but if that's your

15    request -- and the problem becomes, I don't know where these    13:29:18

16    documents go or where they end up during an incarceration

17    period.  And perhaps it raises a question in some fellow

18    inmate's mind, they start digging through the papers, I don't

19    know.  But if you request it and there's no objection to it, I

20    can put it in the JNC.                                          13:29:46

21             MR. FEDER:  If you would, please.

22             Second, judges are allowed to recommend specific

23    institutions in Arizona.  And typically, as the Court knows,

24    the Bureau of Prisons tries to house people as close as

25    possible to their residence.  The places in Arizona I would ask 13:30:05
```

198

```
1    the Court to recommend is the prison camp in Phoenix, second in
2    line would be the prison camp in Tucson, and third in line
3    would be the minimum security facility in Safford.
4             THE COURT:  I decline to do that.  I have already
5    stated that I will make a recommendation that he remain here in        13:30:30
6    Arizona.  That's what I will do.
7             MR. FEDER:  I think those are the recommendations,
8    Judge.
9             THE COURT:  All right.  You may be seated.
10            MR. BERRY:  Your Honor, if I could, I believe during          13:31:01
11   your explanation of some of the facts of the case you referred
12   to the sale of Backpage as a $6 million sale on two occasions.
13   We just wanted to correct that record that that was a
14   $600 million sale.
15            THE COURT:  You're correct.  I misread my notes.             13:31:40
16            Mr. Brunst, please come forward.
17            Now, Mr. Brunst, the jury has convicted you of Count
18   1, conspiracy to commit Travel Act violations, in violation of
19   Title 18 United States Code Section 371.  The jury also
20   convicted you of Count 2, conspiracy to commit money              13:32:29
21   laundering --
22            MR. LINCENBERG:  Count 52.
23            THE COURT:  Count 2, conspiracy -- I'm sorry, yes, I
24   keep leaving off the five.  Count 52, conspiracy to commit
25   money laundering, in violation of Title 18 United States Code     13:32:46
```

UNITED STATES DISTRICT COURT

Section 1956, and that relates to the money laundering counts

of which you were also convicted in Counts 53 through 62

charging you with concealment money laundering, in violation of

Title 18 United States Code Sections 1956(a)(1)(B)(i).

          And you were also convicted of the counts listed in 64

through 68 involving international promotional money

laundering, in violation of Title 18 United States Code

Sections 1965(a)(2)(a).

          Now, have you reviewed the Presentence Investigation

Report which includes the sentencing recommendations made in

it?

          MR. BRUNST:  Yes, Your Honor.

          THE COURT:  Did you go through the report with your

counsel?

          MR. BRUNST:  Yes, Your Honor.

          THE COURT:  Did they answer all of your questions

about what is written and recommended in that report?

          MR. BRUNST:  Yes.

          THE COURT:  And are you so far satisfied with the

services of your counsel?

          MR. BRUNST:  Yes.

          THE COURT:  Now, having resolved all the objections in

your presentence report, and upon the jury's verdicts of guilt,

I do now impose sentence on you.

          As I have for Mr. Spear, I must consider each of the

1    18 U.S.C. 3553(a) sentencing factors.  As mentioned, they

2    include the nature and circumstances of your convictions, your

3    background and character, if you're in need of a sentence to

4    deter you from future criminal conduct, if you are in need of a

5    sentence for rehabilitation purposes, if there's a sentence to          13:34:42

6    address whether you present a danger to others, if there's a

7    sentence necessary to promote respect for the law, and what is

8    a sufficient but not greater than necessary sentence to achieve

9    all of these factors.

10          Here I know that you're 72 years old and that you have        13:35:06

11   achieved a bachelor's degree as your highest level of

12   education.

13          Though you do not have any dependents, you obviously

14   have a very strong and large family who are present here today.

15   The information also indicates that you retired from Cereus           13:35:32

16   Properties as the Chief Financial Officer, and that you were

17   receiving a salary before you left at approximately $500,000

18   per year.

19          With regard to your health, you don't have any real

20   urgent health issues, and I do know that you have a routine           13:35:57

21   checkup related to a prior issue of health.

22          I have read that you have no substance abuse issues.

23   The Court finds that you do not need a sentence for

24   rehabilitation purposes.

25          Other factors that I've considered are that it               13:36:19

```
1    appears, at least at present time, that you have a net worth of
2    over $4 million.  Now, I also find that you do not present a
3    danger to others.
4              Now, as to the nature and circumstances of your
5    conviction, with regard to the conspiracy to commit Travel Act    13:36:48
6    violations, you were the Chief Financial Officer of Village
7    Voice Media.  You also supervised Mr. Ferrer, according to his
8    testimony.  You also approved staffing and other budget issues
9    to execute the content aggregation strategy in the early years
10   of Backpage.  There was evidence of you on an e-mail discussing    13:37:26
11   the plan to, quote, seed the site, the female escorts category,
12   with 200 independent escorts.
13             You were also aware of The Erotic Review relationship
14   and the importance of that relationship and the traffic between
15   the The Erotic Review and Backpage.  There was ample testimony    13:38:00
16   about that.
17             With regard to the content moderation, you did approve
18   budget increases that were needed to bring on content
19   moderators.  You reviewed the comparison and growth
20   presentation toward the end of 2012 that showed huge profit       13:38:22
21   growth in adult sections compared to the other sections on
22   Backpage.com.  And this, Mr. Ferrer testified, attributed to
23   the Backpage's moderation strategy.
24             Contrary to what I heard yesterday from your counsel,
25   I find it very difficult to believe that you were in some         13:38:55
```

1    bubble as a CFO approving these decisions because you were on

2    notice of the allegations toward Backpage.com.  You approved

3    the budget to hire staff to respond to the subpoenas from law

4    enforcement, after all.  You were a participant in trying to

5    stop the rebroadcast of the Amber Lyon story.                    13:39:30

6         You participated in the conspiracy by helping

7    structure Backpage to maintain its longevity and to maximize

8    profits from the sale of illegal prostitution ads.

9         As to Count 52, the conspiracy to commit money

10   laundering, again, here, when those financial institutions      13:40:03

11   started shutting down their business with Backpage because of

12   its reputation, you did -- you opened up a holding company with

13   those innocuous names like Classified Solutions, Payment

14   Solutions, general sounding business company names that did not

15   refer to that, did not reference Backpage.com.  And Posting      13:40:36

16   Solutions, it was testified, was another shell company not

17   unlike Website Technologies, and you created Website

18   Technologies as a shell company for the purpose of opening bank

19   accounts under a name that was not affiliated with

20   Backpage.com.                                                    13:41:06

21        There was testimony and evidence produced at trial,

22   and the testimony was of Mr. Ferrer, and he said:  We need a

23   name other than Backpage, so Mr. Brunst asked me for names and

24   I suggested Website Technologies, and that's the name we ended

25   up using.  And the testimony was that you set up Website         13:41:36

1    Technologies to handle the payroll, the 401(k) and to provide

2    for leases.  And the whole idea here was to ensure that its

3    reputation was protected so that it would not show to be

4    affiliated with Backpage.

5         Now, when U.S. banks started giving notice in about                  13:42:17

6    April of 2014 that they were starting to drop Backpage because

7    of all of these notices and the reputational risk, you informed

8    Mr. Spear and Mr. Ferrer that you would be moving all of your

9    banking under Website Technologies at BMO.  You created the

10   PowerPoint presentation for potential buyers before you-all         13:42:48

11   decided to sell Backpage to Mr. Ferrer.

12        The PowerPoint included statements that stated, quote,

13   "Maintaining a vibrant general purpose classified site

14   strengthens Backpage's defensible market position in the adult

15   category, creates mainstream environment for site                        13:43:17

16   participation, and allows," quote, "plausible deniability for

17   exposure."  And there was indeed a discussion amongst you-all

18   to not share that information of prostitution ad marketing

19   activities with any potential buyer.

20        You were also deeply involved in that $600 million               13:43:45

21   sale of Backpage in 2015 to Mr. Ferrer, and there was testimony

22   it was done to distance you and the other owners from

23   Backpage's business of selling prostitution ads.

24        And I mention there were those two loan agreements

25   that you helped to structure.  And some of that money, again,     13:44:14

204

flowing through Cereus Properties and these other shell

accounts, were owned by Mr. Lacey, Mr. Spear and you, and all

of the money that Cereus Properties account collected the

interest and the debt payments for that 600 million dollar

loan, and Mr. Ferrer testified indeed that the source of the          13:44:47

money that went to Cereus Properties was the prostitution ads

posted on Backpage.

     You stayed involved with the -- with Mr. Ferrer and

Backpage following the sale.  There was evidence that

Mr. Ferrer or the CFO of Backpage contacted you, and the              13:45:19

testimony was at a minimum a few times a week after July 2015

going forward, and that you were involved in the financial

problems that the company was having, and you wanted to

understand the revenue that was coming in and what the options

were for banking, and how to bring in revenues from other             13:45:49

credit card processors.

     You helped to find alternative methods for receiving

money from posters on Backpage, including receiving funds from

cryptocurrency.  There is evidence that shows back in

January 2015 the revenues from cryptocurrency amounted to over        13:46:19

$35 million.

     With regard to the transactional concealment money

laundering counts, Counts 53 through 62, each of the transfers

were made from Website Technologies at Branch Banking and Trust

to the bank account held by Cereus Properties.                        13:46:56

205

1        And the requirements under the Counts 53 through 62

2   were only that you knew the proceeds derived from unlawful

3   activity, and the proceeds in fact derived from unlawful

4   activity, and clearly the jury found that the proceeds derived

5   from unlawful activity.                                          13:47:35

6        You approved the budgeting.  You helped structure the

7   ways the money left Backpage to avoid its detection.  You were

8   also a part owner of it.  In fact, there was a government

9   witness, along with Mr. Ferrer, that testified that Cereus

10  Properties collected the interest and debt payments from the    13:48:12

11  $600 million loan from that sale, and that indeed you and

12  Mr. Spear and others were the owners of Cereus Properties.  At

13  bottom, the source of the money paid to Cereus Properties from

14  Website Technology were derived from the prostitution ads on

15  Backpage.                                                        13:48:48

16       As to the international promotional money laundering

17  under subsection 1956(a)(2)(A), here the jury was tasked with

18  determining whether there was an intent to promote the carrying

19  on of the specified unlawful activity, and they so found

20  because at trial it was also established that Ad Tech BV made    13:49:14

21  these transfers from the Netherlands bank account to Cereus

22  Properties in Arizona, and that those transfers totalled

23  approximately $11.3 million.

24       And Ad Tech BV received revenue from Backpage

25  following the April 2015 sale of Backpage to Ferrer.            13:49:43

UNITED STATES DISTRICT COURT

1    So the transfers that show Ad Tech BV sending funds to

2    Cereus Property funds that were almost immediately then

3    distributed to you and others supports the jury's

4    determination.

5    Now, I do find, Mr. Brunst, that as to deterrence, I    13:50:16

6    think, as to you, Mr. Brunst, your statement I found to be

7    sincere.  And I do believe facing this day you have some

8    remorse.  But I have to consider the totality of these

9    circumstances that led to the jury's determination.  And I want

10   to say that the evidence and the jury's determination is wholly    13:50:58

11   contradictory to your Sentencing Memorandum or your counsel's

12   statement yesterday.  I know they are advocating in your best

13   interest.  All of the evidence shows that you knew and

14   participated in helping Backpage.com continue its operation.

15   You were aware of the allegations that minors were    13:51:28

16   being advertised for sex on that page.  You were aware of

17   Mr. Larkin and Lacey's appearances before the NGOs, NCMEC, the

18   Auburn Theological Seminary, the U.S. Congress, and you knew

19   about the Amber Lyon expose', yet you and the others did

20   nothing to stop it.  You did everything to protect it.  You    13:52:10

21   found creative ways to enable it to survive and continue its

22   operation because it was what was lining your pockets and those

23   of your codefendants.

24   The jury could not have found that you were shielded

25   from all of this activity, and I don't find that.  It's    13:52:42

1  implausible the number of times that you were on those e-mails,

2  the number of times you approved and developed financing, you

3  were deeply involved.

4       I have considered the entirety of the record, I have

5  considered counsel's statements, Mr. Brunst's statement, I have   13:53:16

6  also considered the multiple victim impact statements and the

7  oral statements made here yesterday, is there any legal cause

8  as to why sentence should not now be imposed?

9       MR. LINCENBERG:  No, Your Honor.

10       MR. RAPP:  Not that the United States knows of.   13:53:38

11       THE COURT:  Pursuant to the Sentencing Reform Act of

12  1984, it is the judgement of the Court that John Brunst is

13  hereby committed to the Bureau of Prisons for a term of

14  120 months.  This consists of 60 months on Count 1, the

15  conspiracy to commit Travel Act offenses; 60 months on Count   13:53:56

16  52, the conspiracy to commit money laundering offenses;

17  60 months each on Count 53 through 62, concealment money

18  laundering; 60 months each on Counts 24 through 68,

19  international promotional money laundering, and the sentences

20  for Counts 52, 53 through 62, and 64 through 68 are to run   13:54:26

21  concurrently, but they shall run consecutively to Count 1.

22       You shall pay a special assessment fee of $1,700.  You

23  shall pay a fine of $50,000, which in total you will pay a

24  total fine of $51,700 in criminal monetary penalties, and your

25  payment of criminal monetary penalties is due during   13:55:04

1   imprisonment at a rate of not less than $25 per quarter, and

2   payment shall be made through the Bureau of Prisons' Inmate

3   Financial Responsibility Program, and the Court does waive the

4   imposition of interest and penalties on any unpaid balance.

5         On release from custody, you shall be placed on                13:55:22

6   supervised release for 36 months, and that term consists of

7   36 months on Counts 1, 52 through 62, 64 through 68, and all

8   such terms shall run concurrently.

9         While on supervised release, you shall comply with the

10  mandatory and standard conditions of supervision adopted by        13:55:48

11  this court in General Order 17-18.

12        And of particular importance, you shall not commit

13  another federal, state or local crime during the term of

14  supervision.  The mandatory drug testing provision is

15  suspended.                                                         13:56:06

16        Within 72 hours of being released from custody, you

17  shall report in person to the probation office in the district

18  in which you are released, and you shall comply with the

19  following conditions.

20        Mr. Lincenberg, have you reviewed the mandatory and          13:56:21

21  standard conditions of supervision with your client?

22        MR. LINCENBERG:  Yes, we have, Your Honor.  There was

23  the one change that the Court indicated with regard to work.

24        THE COURT:  Do you waive reading?

25        MR. LINCENBERG:  Yes.                                        13:56:37

UNITED STATES DISTRICT COURT

209

1          THE COURT:  Mr. Brunst, do you agree to waive reading?

2          MR. BRUNST:  Yes.

3          THE COURT:  You must follow the -- in addition to the

4    mandatory and standard conditions of supervision, you must

5    comply with the following special conditions:  You must          13:56:50

6    cooperate in the collection of DNA as directed by the probation

7    officer.

8          You must submit your computer as defined in 18 U.S.C.

9    1030(e)(1) or other electronic communications or data storage

10   devices or media to a search, you must warn any other people     13:57:07

11   who use these computers or devices that are capable of

12   accessing the Internet that the device may be subject to search

13   under this condition.

14         Failure to submit to a search may be grounds for

15   revoking your release, and a probation officer may conduct a     13:57:24

16   search pursuant to this condition only when reasonable

17   suspicion exists that there is a violation of a condition of

18   supervision and that the computer or device contains evidence

19   of this violation.

20         You must consent to and cooperate with the seizure and     13:57:42

21   removal of any hardware and/or data storage media for further

22   analysis by law enforcement or the probation officer with

23   reasonable suspicion concerning a violation of a condition of

24   supervision or unlawful conduct.  Any search will be conducted

25   at a reasonable time and in a reasonable manner.                 13:58:02

1        You must submit your person, property, house,

2   residence, vehicle, papers or office to a search conducted by a

3   probation officer.  Your failure to submit to a search may be

4   grounds for revoking your release.

5        You must warn any other occupant that the premises may          13:58:19

6   be subject to search under this condition.

7        You must provide the probation officer with access to

8   any requested financial information, and authorize the release

9   of any financial information.

10       The probation office may share financial information          13:58:35

11  with the U.S. Attorney's Office.

12       You are prohibited from making major purchases over

13  $500, incurring new financial obligations, or entering into any

14  financial contracts without the prior approval of the probation

15  officer.                                                            13:58:56

16       You must notify the Court of any material change in

17  your economic circumstances that might affect your ability to

18  pay restitution, fines or special assessment.

19       You must make restitution in accordance with Title 18

20  United States Code Sections 2248, 2259, 2264, 2327, 3663, 3663A    13:59:10

21  and 3664.  And as indicated previously, a restitution hearing

22  will be held to determine what amount is owed.

23       You must not communicate or otherwise interact with

24  any of the co-conspirators without first obtaining permission

25  of the U.S. Probation Office.                                       13:59:43

UNITED STATES DISTRICT COURT

1          And the Court, as indicated for Mr. Spear with regard

2     to the standard conditions, will remove standard condition

3     number seven requiring your employment.

4          Now, Mr. Brunst, here too, because you were convicted

5     by a jury, you do keep all of your appeal rights both with          14:00:12

6     regard to the jury's convictions and now with regard to the

7     Court's imposition of sentence.  However, if you do intend to

8     appeal either of those two matters, you only have 14 days in

9     which to notify the Court of your intention to do so, and your

10    counsel can advise you with regard to that.          14:00:31

11         As I have done with Mr. Spear, unless you seek

12    otherwise, I will make a recommendation that he be housed in a

13    facility here in Arizona.  I will also make the same

14    recommendation that he be housed in a facility that is not

15    deemed higher than medium security.          14:00:55

16         Were there any other particular requests?

17         MR. LINCENBERG:  Your Honor, can I have just a moment?

18    Your Honor, I believe I just conferred with Mr. Feder, I

19    believe the Court's recommendation was not deemed higher than

20    minimum; in other words, below medium.          14:01:24

21         THE COURT:  I don't recall saying that.  I thought I

22    said no higher than medium.  Well, nevertheless, that's what my

23    intention is, and I see Mr. Berry nodding in agreement.

24         MR. BERRY:  My recollection of what you said is

25    nothing higher than medium security designation at BOP.          14:01:48

212

1    MR. LINCENBERG:  Mr. Feder and I heard it differently.

2  The Court -- I guess I would ask the Court for a recommendation

3  of a prison camp here in Arizona.  Sounds like the Court would

4  decline that, but at least no higher than minimum, Your Honor.

5    THE COURT:  Well, I will maintain the same                    14:02:07

6  recommendation as I did for Mr. Spear, not higher than medium.

7    MR. LINCENBERG:  Okay.  Second we would request the

8  same language that Mr. Feder requested about this not being

9  declared a sex offense.

10    THE COURT:  I would suggest, because you're making          14:02:26

11  that specific recommendation, that you-all gather together and

12  come up with whatever that language is that you wish me to

13  include in the judgement and commitment order.

14    MR. LINCENBERG:  Very well.

15    And then the verdict is -- we would request an order        14:02:40

16  that the Bureau of Prisons accept Mr. Brunst's medication, and

17  I can state for the record what his medication is.

18    THE COURT:  I am not going to make that recommendation

19  in my judgement and commitment order.  If you, similar to

20  Mr. Feder, can provide a letter from a physician as to required  14:03:01

21  medication, I suggest you get that to the Court right away, and

22  I can attach that to the judgement and commitment order.

23    MR. LINCENBERG:  Okay.

24    THE COURT:  Is there anything further?

25    MR. LINCENBERG:  No, Your Honor.  Thank you.                 14:03:18

1          THE COURT:  You may be seated.

2          Mr. Lacey, will you come forward with your counsel.

3          Mr. Lacey, the jury returned a guilty verdict as to

4     Count 100, which alleges a violation of international

5     concealment money laundering, in violation of Title 18 United                    14:04:22

6     States Code Sections 1956(a)(2)(b)(1).

7          It is now my responsibility to impose sentence upon

8     you as to that jury's verdict.  Have you reviewed the

9     Presentence Investigation Report which includes the sentencing

10    recommendations that are made in it?                                             14:04:47

11         MR. LACEY:  I have.

12         THE COURT:  Did you go through that report with your

13    counsel?

14         MR. LACEY:  I did.

15         THE COURT:  Did they answer all of your questions                           14:04:55

16    about what is written and recommended in that report?

17         MR. LACEY:  Yes, Your Honor.

18         THE COURT:  Are you so far satisfied with the services

19    of your counsel?

20         MR. LACEY:  Enormously.                                                     14:05:04

21         THE COURT:  Now, as I have done previously, I have

22    also considered the individual 3553(a) factors as to you,

23    Mr. Lacey.  I have considered the nature and circumstances of

24    the offense of which you are convicted.  I have also considered

25    your background and character.  I have considered whether or                     14:05:32

1    not you're in need of a sentence for rehabilitation purposes,

2    whether you present as a danger to others, if there's a

3    sentence that's necessary for promotion and respect for the

4    law.

5         And with regard to your personal circumstances, I do          14:06:00

6    know that you're 76 years of age.  You do also have a number of

7    health-related issues that Mr. Cambria discussed yesterday, as

8    well as are written in paragraphs in the presentence report,

9    but you otherwise appear to be a healthy individual.

10        I read where you require swimming, bike riding to           14:06:28

11   manage your weight in order to address some of your health

12   issues.

13        Though, you have in the last five years indicated

14   using marijuana on occasion, and you do have a prior driving

15   under the influence incident, I don't find the necessity to        14:06:49

16   impose a sentence related to rehabilitation for any sort of

17   substance abuse issues.

18        With regard to your employment status, you at least

19   until this morning I had an idea that you were fully retired,

20   but it sounds as though you are still engaged in some form of       14:07:15

21   journalism, podcast, if that can be called journalism.  I don't

22   know what journalism is anymore.  And your presentence report

23   and indeed the multiple letters that I've reviewed that have

24   been written on your behalf outline the additional background

25   of your employment and the various roles that you played not        14:07:43

UNITED STATES DISTRICT COURT

1   only with Village Voice, but also New Times here.  So in some

2   respects I guess I consider you semiretired.

3          I don't find that you present as a danger to others.

4   That's given your personal circumstance, in particular your age

5   and your health concerns.                                    14:08:11

6          As to the nature of conviction, and here, Mr. Lacey,

7   you have vigorous advocates on your side and they have ably

8   argued on your behalf, but this count of conviction,

9   international concealment, money laundering, prohibits the

10  transporting of funds internationally that are intended to    14:08:44

11  conceal the source of illegal proceeds.  And here, the jury was

12  instructed to go back and look at the source of funds, and you

13  have sat through the trial and you sat here in my pronouncement

14  of sentence to your colleagues, Mr. Brunst and Mr. Spear.  And

15  the jury found, and I agree with the determination, that the   14:09:19

16  funds derived from Backpage.com, which was launched back in

17  2004.

18         You owned Backpage, whether it was through Village

19  Voice or otherwise, you were a bona fide owner, along with

20  Mr. Larkin, Mr. Spear, Mr. Brunst, from its inception up       14:09:45

21  through the sale in 2015.  You were the Chief Editorial Officer

22  in Village Voice Media, which was Backpage's parent company,

23  and you knew that Backpage published ads for illegal

24  prostitution.  Indeed, you were shown Backpage ads from the

25  adult escort section that contained links to TER, and those    14:10:23

1   were presented to you, as indicated this morning by

2   government's counsel, in meetings with the National Center for

3   Missing and Exploited Children.

4        The testimony reflected that there was an exchange

5   between you and Mr. Spear where you asked whether there was    14:10:54

6   evidence of child trafficking on the site, and he essentially

7   replied, not in a direct way, but he essentially said, "We have

8   had subpoenas that deal with this exact issue.  We get tons of

9   subpoenas that we comply with on a daily basis," meaning, yes,

10   we have been accused of having minors posted for sex ads on    14:11:29

11   Backpage.  You had notice.

12        You wrote articles about Backpage, its business,

13   practices.  You wrote, quote, "The oldest profession in the

14   world with transparency."  That is what Backpage is providing.

15   And in that you also made a public statement that you believed    14:12:04

16   in legalized prostitution.  I want to, again, because it

17   relates specifically to you, that you, Mr. Spear and Brunst,

18   the three of you, you tried to stop the redistribution of that

19   Amber Lyon story on CNN.  And that story, again, specifically

20   spoke about a 12-year-old girl who was sold for sex on    14:12:35

21   Backpage.  You watched it and you discussed it as early as

22   2011.

23        And you had knowledge that the majority of Backpage's

24   revenue came from the sale of these sex-for-money ads.  Again,

25   the revenue just from 2014 through 2015 was around $160    14:13:06

1   million, and that sale to Mr. Ferrer after there were too many

2   inquiries, too many people accusing you of hosting this

3   platform, you finally sold it again for $600 million to

4   Mr. Ferrer.  That was apparently your collective idea of the

5   value of Backpage, $600 million.                           14:13:42

6          With regard to the funds, I talked about the

7   structures of different accounts Mr. Brunst had a hand in, but

8   here on receiving your share of the loan payments that went to

9   Cereus Properties, you put your funds into five two-year

10  annuity trusts that you controlled.  We've heard and I listened  14:14:19

11  to the testimony of Mr. Becker reluctantly here, and you asked

12  Mr. Becker in 2016 about whether or not he knew an attorney who

13  had expertise in offshore.  And the letter stated, quote, "To

14  revisit for just a moment, I'm not interested in any tax

15  avoidance.  I just want to put some assets in place where      14:14:54

16  litigious parties, including government parties, cannot access

17  my accounts."  That supports the jury's verdict.

18         Sometime in around November of 2016 you met with

19  witness Lin Howard one time.  I recall this testimony --

20  testimony vividly, because I never had a witness so short on   14:15:23

21  the witness stand with such powerful testimony.  And in her

22  short testimony, she said she only met you the one time and

23  that meeting was extraordinarily uncomfortable for her because

24  you made it very clear that you wanted to move your assets

25  offshore to protect them from government seizure.             14:15:52

218

1          Now, the evidence showed that there were these five

2    wire transfers made on January the 29th of 2016, each in the

3    amount of $3.3 million from your five annuity trust accounts at

4    Arizona Bank & Trust to an IOLTA account held by your

5    attorney's firm.  And then on January 3rd of 2017, through your          14:16:23

6    counsel, you transferred -- not these counsel -- you

7    transferred $16.5 million from the IOLTA account to a Primus

8    trust account, Primus Trust Company in Hungary for the benefit

9    of you, and that forms the basis of Count 1.

10         The jury needed to find that this transfer was          14:16:56

11   designed in whole or in part, in whole or in part to conceal.

12   And the other element of the statute is that it had to be

13   illegal proceeds.  I've already run through the illegality of

14   the proceeds.  All of those Travel Act violations that your

15   colleagues were convicted of were in violation of a number of          14:17:37

16   state prostitution laws, including Arizona.

17         And we've heard ample evidence about your attitudes

18   toward prostitution.  And to be fair, during the jury selection

19   process there were several individuals that shared your view.

20   But what about the minors?          14:18:16

21         I -- Mr. Cambria has been probably one of the most

22   eloquent oratory lawyers that have come before me.  And as I

23   mentioned, he has ably, more than ably, represented you, but I

24   have to take disagreement with him in his presentment to me

25   because, as argued in your Sentencing Memorandum, I don't agree          14:18:52

1    that you have been punished because you were only recently

2    convicted.  Maybe the stress of being indicted, I certainly

3    think that would wear on anybody, and the seizure of your

4    assets contributes to your belief that you've been punished.

5         I don't think Ms. Ortiz, Ms. Svengard and her mother,     14:19:28

6    I don't think Ms. Ambrose or Ms. Figueroa or the others think

7    that there has been a reckoning or a punishment, and I have to

8    take into consideration their views because of the link, the

9    money.

10        I've read all of the letters.  There were mounds of     14:20:08

11   letters.  I have read through the letters of the people who you

12   mentored, who you tutored.  There was one letter from a family

13   member, and I know it has taken its toll on them, it stated,

14   "I'd like to acknowledge just how truly devastating this whole

15   process has been for multiple families, not just our own, and     14:20:40

16   for some families this devastation has become irreversible."

17   And I do hope that she was referring to those individuals that

18   were posted on Backpage not of their own free will.

19        There's many people who wrote about your goodwill and

20   there are individuals who talked about how you came to their     14:21:12

21   aid when they needed someone.  You donated money, as

22   Mr. Cambria indicated, to multiple causes.  But I find somewhat

23   of an irony in some of those letters, unfortunately from your

24   own kin and friends, one of which states:  Mr. Lacey wrote

25   stories about injustice inflicted on people no one knew about     14:21:46

UNITED STATES DISTRICT COURT

1    until he told us about them in the papers.  His story, I think,

2    made a difference.  Because of Mr. Lacey's work, it became

3    harder for those in power to afflict the powerless.  Harder for

4    those in power to afflict the powerless.

5           The powerless were those many, many individuals who          14:22:33

6    were posted on Backpage.com.

7           Mr. Lacey, to be sure, no one can take away your

8    legacy of journalism in the early days Village Voice, the New

9    Times, the fact that you hired, mentored, tutored multiple

10   writers, journalists.  And I will tell you, you are fortunate     14:23:05

11   to have continuous, as Mr. Brunst is, family support.  It is

12   true on a weekly basis I sentence individuals who are convicted

13   of homicides, of sex offenses, and they are often accompanied

14   by family.  It is what we expect, unconditional love, and it is

15   something that you should be very happy to have at this            14:23:41

16   juncture.

17          They attest to your character, but here during this

18   process, during this trial, I think the other part of Mr. Lacey

19   has to be considered because one of those who thought so highly

20   of you, who you also mentored and tutored, appeared in this        14:24:10

21   courthouse and they testified, again, uncomfortably.  They

22   didn't want to be here.  That gentleman.  And what stood out

23   with me is this unguarded moment of truth that he had when he

24   heard news that Mr. Ferrer had agreed to cooperate with the

25   government.  He sent an e-mail, and he acknowledged sending        14:24:49

UNITED STATES DISTRICT COURT

1    this e-mail in open court, and it says, "After finding out that

2    Backpage insider flips on Lacey and Larkin, bad news for this

3    duo who once ran a great newspaper chain that broke countless

4    stories.  They traded that legacy in for a chase for gold

5    derived from prostitution."                                   14:25:23

6          It's concerning to me when I heard the testimony that

7    around 2016, after the sale had gone through, this same

8    individual and others, multiple others, I don't know how many,

9    then suddenly began receiving checks from you, $5,000.  And

10   simply put, these individuals had been so far removed from    14:25:57

11   working for New Times for years and suddenly they were

12   receiving thank you checks for a job well done.

13         The Court finds it difficult, Mr. Lacey, to impose a

14   sentence for deterrence.  And while it is true that a person is

15   entitled to maintain their innocence, I think that you have    14:26:21

16   shown an inability to at least acknowledge what this is all

17   about.  And had there perhaps been an instance of

18   acknowledgment of what Backpage was contributing to, perhaps we

19   wouldn't be here.

20         And what I mean by that, is that you too were on         14:27:00

21   notice.  There was a draft letter that was introduced where you

22   write to the mayor of Seattle, Mayor McGinn, who became aware,

23   and you write:  That he became aware of Backpage.com because of

24   this Twitter campaign this celebrity had developed.

25         And you write here:  The mayor has since made the odd    14:27:43

1  claim that Backpage is, quote, accelerant for underage

2  prostitution.  He has pulled the City's advertising from

3  Seattle Weekly, and he has said he will hold these funds

4  hostage unless Backpage, quote, steps up to the plate, unquote,

5  and works harder to prevent people from posting ads that might          14:28:07

6  involve underage prostitution.

7          You were put on notice.  You were put on notice as

8  early as 2010 when multiple state Attorney Generals wrote to

9  you, multiple state Attorney Generals.  And in that letter they

10 say, "We recognize that Backpage may lose the considerable              14:28:39

11 revenue generated by the adult services ads.  Still, no amount

12 of money can justify the scourge of illegal prostitution and

13 the misery of the women and children who will continue to be

14 victimized in the marketplace provided by Backpage.  We

15 sincerely hope Backpage, like Craigslist, will finally hear the         14:29:03

16 voices of the victims, women and children, who plead with it to

17 make this important change."

18         The point here, Mr. Lacey, is you did nothing in the

19 face of all of this.  You held fast.  You didn't do a thing.

20 There was not a week that you called a meeting of everyone and          14:29:40

21 said, "Hey, let's shut down for a week.  Figure out what's

22 going on here."  You didn't do it.

23         And so I don't think there's a sentence that can be

24 imposed to deter you with regard to your bona fide held belief

25 that what you were doing was not illegal, but the jury's               14:30:17

1    conclusion is otherwise.

2         And I have considered, then, all of these sentencing

3    factors.  Again, I considered the statements that were made

4    here yesterday.  Interestingly, I think Ms. Svengard has been

5    trying to find a way to address these illegalities just as long        14:30:57

6    as you've been in it.  I have considered all of the factors in

7    18 U.S.C. 3553(a), is there any legal cause as to why sentence

8    shall not be imposed?

9         MR. RAPP:  Not that the United States knows.

10        MR. CAMBRIA:  No, Your Honor.        14:31:25

11        THE COURT:  Pursuant to the Sentencing Reform Act of

12   1984, it is the judgement of the Court that Michael Lacey is

13   hereby committed to the Bureau of Prisons for a term of

14   60 months.  You shall pay a special assessment fee of $100

15   which is due immediately.  And the Court finds that you -- the        14:31:40

16   Court orders you pay a fine of $3 million.

17        Your payment of criminal monetary penalties is due

18   during imprisonment at a rate of not less than $25 per quarter,

19   and the Court does waive the imposition of interest and

20   penalties on any unpaid balance.        14:32:08

21        Now, on release from custody, you shall be placed on

22   supervised release for 36 months.  And while on supervised

23   release, you shall comply with the mandatory and standard

24   conditions of supervision adopted by this court in General

25   Order 17-18.        14:32:25

224

1          And of particular importance, you shall not commit

2     another federal, state or local crime during the term of

3     supervision.

4          Within 72 hours of being released from custody of the

5     Bureau of Prisons, you shall report in person to the U.S.            14:32:39

6     Probation Office in the district in which you will be released.

7          Mr. Cambria, have you reviewed the mandatory and

8     standard conditions of supervision with your client?

9          MR. CAMBRIA:  Yes.  Ms. Paris did, Your Honor.

10          THE COURT:  Do you waive reading?                              14:32:57

11          MR. CAMBRIA:  I do.

12          THE COURT:  In addition to the mandatory and standard

13     conditions of supervision, with the exception of standard

14     condition number seven, you shall comply with the following

15     special condition:  You must cooperate in the collection of DNA     14:33:11

16     as directed by your probation officer.

17          You must submit your person, property, house,

18     residence, vehicle, papers or office to a search conducted by a

19     probation officer.  Your failure to submit to a search may be

20     grounds for revoking your release, and you must warn any other      14:33:28

21     occupant that the premises may be subject to search under this

22     condition.

23          You must submit your computer as defined in 18 U.S.C.

24     1030(e)(1), or other electronic communication or data storage

25     device or media to a search.                                       14:33:44

UNITED STATES DISTRICT COURT

1    You must warn any other people who use these computers
2 or devices capable of accessing the Internet that the device
3 may be subject to search under this condition.  Your failure to
4 submit to a search may be grounds for revoking your release.

5    A probation officer may conduct a search pursuant to    `14:34:04`
6 this condition only when reasonable suspicion exists and that
7 there is a violation of a condition of supervision, and that
8 the computer or device contains evidence of this violation.

9    You must consent to and cooperate with the seizure and
10 removal of any hardware and/or data storage media for further    `14:34:25`
11 analysis by law enforcement or the probation officer with
12 reasonable suspicion concerning a violation of a condition of
13 supervision or unlawful conduct.  Any search will be conducted
14 in a reasonable time and in a reasonable manner.

15    You must provide the probation officer with access to    `14:34:51`
16 any requested financial information and authorize the release
17 of any financial information.  The probation officer may share
18 financial information with the U.S. Attorney's Office.

19    You are prohibited from making major purchases,
20 incurring new financial obligations, or entering into any    `14:35:09`
21 financial contracts over $1,000 without the prior approval of
22 the probation officer.

23    You must notify the Court of any material change in
24 your economic circumstances that might affect your ability to
25 pay restitution, fines or special assessment.    `14:35:30`

UNITED STATES DISTRICT COURT

1       You must not communicate or otherwise interact with

2    any of the indicted codefendants and co-conspirators without

3    first obtaining the permission of the probation office.

4       I have withheld imposing the special condition that

5    Mr. Lacey make restitution.  I want to research that issue    14:35:49

6    further, and I will do that and make a final determination at

7    the, well, before any restitution hearing takes place.

8       PROBATION OFFICER:  Your Honor, I apologize for

9    interrupting.  Rochelle Collins with probation.  Because the

10   sentence imposed is outside the guideline range, I just want to  14:36:09

11   make sure I correctly document the factors used to support that

12   sentence in the SOR, could you please restate them for the

13   record?

14       THE COURT:  Want me to reiterate those?  It's with

15   regard to his lack of deterrence.                   14:36:46

16       Well, I think the observation that there is no

17   deterrence, and because of the gravity of harm related to the

18   proceeds, how the proceeds were derived from Backpage, the

19   nature and circumstances of the origination of the fees; in

20   particular, the knowledge Mr. Lacey had, the repeated and years  14:37:17

21   long knowledge he had as to the allegations that minors were

22   being offered on those advertisements, are egregious so as to

23   warrant an upward variance.

24       All right.  Well, Mr. Lacey, because you were

25   convicted by a jury, you do retain all of your rights of appeal  14:37:49

1    both with regard to the jury's conviction and now with regard

2    to my imposition of sentence.  If you do intend to appeal

3    either of those two matters, you only have 14 days in which to

4    notify the Court of your intention to do so, and Mr. Cambria

5    can advise you further as to that.                          14:38:10

6           With regard to the recommendations to the Bureau of

7    Prisons, is it going to be the same as for Mr. Brunst and

8    Mr. Spear.

9           MR. CAMBRIA:  Yes, Your Honor, it was, but they

10   recommend Terminal Island, Lompoc or Safford.              14:38:33

11          THE COURT:  Well, I am not going to, as I did not do

12   for Mr. Spear or Brunst, I am not going to make a

13   recommendation to a specific facility.  I will only make a

14   recommendation that he be housed in something below a medium

15   security facility.                                         14:38:59

16          MR. CAMBRIA:  Fine, Your Honor.  One other thing,

17   though, with regard -- do you want to take it?  She knows more

18   than I do about that in Arizona.

19          MS. PARIS:  We would ask for the same designation.  We

20   would like to confer, as you mentioned earlier, counsel to come  14:39:11

21   up with that sentence about him not being designated a sex

22   offense here.

23          THE COURT:  If that is your request, if you come up

24   with some agreed upon language and provide it to me by the end

25   of today, I will insert it into the judgement and commitment  14:39:26

1    order.

2         MS. PARIS:  Thank you, Your Honor.  The next issue,

3    and this is very minor, you did mention at one point in time

4    that this is Count 1, and it's Count 100.  I wanted to clarify

5    it for the record.                                              14:39:41

6         Finally, it's our understanding that the financial

7    settlement in the civil forfeiture action in the Central

8    District of California, the government agreed not to seek fines

9    either here or in the retrial of Mr. Lacey, and in probation

10   assessment they indicated that he did not have the funds for    14:39:57

11   fines.  So we just wanted to have an understanding if that had

12   been changed in the PSR or --

13        THE COURT:  It's my consideration, and I guess I

14   should have made it very clear on the record, that there is a

15   hierarchy of how funds get distributed generally starting with  14:40:17

16   restitution if it's found that an individual is owing

17   restitution, special assessment, then fines.  This particular

18   case against Mr. Lacey, as I did in terms of identifying a lack

19   of deterrence, and I should add promoting respect for the law,

20   Mr. Lacey has evidenced that his actions are also driven by     14:40:57

21   what is in his wallet, and so the imposition of the fine is

22   structured, in my view, as a punitive measure.

23        There have been years worth of investigations into

24   where all of this hundreds of millions of dollars annually have

25   gone, and I want to ensure that he does not have the benefit of  14:41:32

229

1    the illegally-gotten gains.  That is the reason for my

2    imposition of that fine.  Whatever agreement he has with the

3    government will continue to stand.  This is, and you can make a

4    motion later on, to show he doesn't have the resources, and I

5    can always revisit it.  So that is -- that was my intent.  It          14:42:03

6    was not an error, and those are the reasons for it.

7              MS. PARIS:  Is Your Honor amenable to hearing a

8    request from us to have that fund or have that fine be paid out

9    of the funds that have been forfeited?

10             THE COURT:  I am not.  You can ask the government, but        14:42:25

11   it's my imposition of fines.

12             MS. PARIS:  Thank you, Your Honor.

13             MR. RAPP:  Judge, can I interject for a moment?  Can I

14   have just a minute with the probation officer?  Can we hit

15   pause for a minute, 'cause I think she's asking you something          14:42:43

16   that, I think you're talking by each other, and I would just

17   like to talk to her for a second.

18             THE COURT:  Well, let's take a 15-minute recess.  I

19   will permit you to do so.

20             (Recess was taken at 2:43 p.m.)                              14:44:32

21        (Proceedings reconvened at 3:00 p.m.)

22             THE COURT:  Please be seated.  We are back on the

23   record.  The record will reflect the presence of counsel, the

24   defendants.  Let me just make a couple of clarifying remarks.

25   I did not impose the government's requested sentence as to            15:00:36

230

1    Mr. Spear, Brunst, and the reason for that is, as the

2    government knows, there would be the potential for unwarranted

3    disparity in terms of the multiple money laundering

4    convictions.  Though I did not consult with the sentencing

5    information that was provided, I do find it useful in making          15:01:18

6    those determinations and necessarily my determination that they

7    are not a danger; that there is no rehabilitation necessary.

8    And considering the statutory term of the conspiracy to commit

9    Travel Act, and the maximum statutory term for the individual

10   Travel Act offenses, I did find a downward variance is                15:01:48

11   necessary.

12           Likewise with Mr. Lacey, I misspoke.  I imposed a

13   substantial downward variance.  And in my mind, that was

14   warranted because he is not convicted of a Travel Act offense

15   or a conspiracy to commit Travel Act.  And so that is the            15:02:08

16   reason for my imposition of sentence that was significantly a

17   downward variance as to each defendant, in particular

18   Mr. Lacey, because he's not convicted of those Counts 1 through

19   18.

20           I see Mr. Lacey's counsel standing present, is there         15:02:32

21   something with regard to sentencing you wish to be heard on?

22           MR. CAMBRIA:  Yes, Your Honor.  I just wanted to

23   correct, well, to supplement something that I said.  When I

24   asked you to make recommendations as to facilities, I wanted to

25   put on the record the reason for that.  I have recommended -- I      15:02:56

UNITED STATES DISTRICT COURT

1    asked you to recommend Terminal Island and Lompock as they are

2    both in California, and that's where my client's sons reside,

3    so that was the reason for that, Your Honor.

4          THE COURT:  I will make that recommendation in my

5    judgment and commitment that he be housed in a facility in          15:03:14

6    California.

7          MR. CAMBRIA:  Thank you so much.

8          THE COURT:  All right.

9          There were -- Mr. Berry has already spoken on behalf

10   of the government.  Again, the matter has been already fully       15:03:28

11   briefed with regard to detention or release pending appeal, and

12   so who wishes to be heard in terms of a reply?  Again, I don't

13   want a reiteration of the memorandum.  I don't want a

14   reiteration of any oral statement that was made to me

15   yesterday.  You may simply reply to Mr. Berry's argument.         15:03:58

16         MR. CAMBRIA:  Thank you, Your Honor.  First off, I

17   cite the Court to U.S. v -- trying to read the handwriting --

18   P-L-A-N-Y, and it's criminal 2012-1606, in that case Mr. Rapp

19   was the prosecutor, from what I understand, and there was a

20   failure to grant bail at the district level, but the Ninth         15:04:36

21   Circuit granted release pending appeal after it was an initial

22   denial, and then he was released per Judge Bolton.

23         With regard to release, our position is that as far as

24   bail pending appeal, I think we have checked all the boxes, if

25   you will.  First of all, with regard to Mr. Lacey, there is        15:05:06

1   certainly no risk of flight or danger to the community.  And

2   probation, from my recollection, even indicated that

3   self-surrender was an option for him.  He's been out for over

4   six years, has made every appearance.  The Court has even

5   decreased his conditions of release ordering removal of the        15:05:31

6   bracelet.  He's been out post conviction for nine months.  He's

7   been authorized to travel outside the state many times, most

8   recently for several weeks.  And none of this would be

9   appropriate, of course, if he was a risk of, a flight risk.

10         There isn't any evidence here of any kind of             15:05:55

11  self-harm, suicide or anything like that with regard to him.

12  As far as we feel, the sentence that's been imposed is not

13  something that would cause him to flee the jurisdiction, if you

14  will, not at all.

15         The other things that are important to bail pending      15:06:19

16  appeal, if you will, are are there substantial issues for the

17  Ninth Circuit to resolve, would it make a difference?  Well,

18  the answer to that is clear.  I mean, the Court has pointed

19  some out in connection with the comments the Court has made

20  over the various proceedings that we've had.  The government    15:06:38

21  has even conceded that there were substantial issues.

22         Our bail motion focused on a number of these.  As

23  particularly as to my client in Count 100, there is no known

24  case that we could discover where there was an FBAR, for

25  example, filed which revealed as opposed to concealed offshore   15:07:03

1    investments that there was a finding of a violation of this

2    statute.  Certainly there are a number of issues that were

3    raised during the course of the case involving the First

4    Amendment, invasion of the privilege, scope of the conspiracy.

5           So I think that when we look at the Ninth Circuit                15:07:28

6    cases with regard to bail pending appeal, we look for

7    substantial issues, and then we look for those issues so that

8    somebody couldn't say this is just some ruse to delay.  It's

9    not that at all.  We do have substantial issues.  If they are

10   decided in our favor, it would make a huge difference in what      15:07:54

11   the outcome of the case would be.

12          So I think that we checked all the boxes, if you will,

13   Your Honor, as far as Ninth Circuit granting bail pending

14   appeal.  For the prosecution to say there shouldn't be any bail

15   sort of cuts out the second stage of any criminal case, which     15:08:14

16   is an appeal, and says, well, let's just -- we're ahead so far

17   at the District Court level, so let's stop here, and it doesn't

18   really work that way.

19          There's a second leg that's not discretionary but

20   mandatory for somebody to have it all reviewed, and it seems to    15:08:36

21   me that since there is substantial issues, there is no evidence

22   here of any kind of fleeing by any of the defendants, that that

23   second leg should be meaningful.  And certainly if we think

24   about it over the years how many Ninth Circuit cases have

25   changed what happens at the District Court level, if it only      15:09:00

1   stopped with the District Court, a lot of people would have

2   gone to jail that shouldn't have.

3       So it seems to me that we have, again, checked all of

4   those boxes and we're entitled to bail pending appeal.  And

5   frankly, in all the cases that I've handled, when you can show   15:09:17

6   that there was a real issue and that there was no other indicia

7   of flight, stays of execution were granted.  And so most

8   respectfully, we ask that they be granted here.

9       MR. LINCENBERG:  Your Honor, I am not going to repeat

10   the issues we laid out in the papers between other counsel and   15:09:53

11   us.  I think the Court is well aware of them.  The Court has

12   openly recognized that there's tough calls the Court had to

13   make throughout the trial, and the Court did the Court's best

14   to do so.

15       The only thing I would add in light more of Mr. Rapp's   15:10:09

16   argument than Mr. Berry's, because there seems to be no dispute

17   that there is no danger.  There seems to be no dispute that

18   there's substantial issues.  And so if the Court is considering

19   the flight risk, the argument seems to simply be there's a

20   lengthy sentence and we're at this stage, and so people might   15:10:30

21   have an incentive to flee and so forth.

22       Probation analyzed these issues.  And although they

23   gave a report that was fairly harsh for my client, they

24   nevertheless found that he's not a flight risk.  He is not a

25   flight risk.  The 25 or so people who are here, his community,   15:10:52

1   his family, are the very reason why he's fighting this.  We

2   certainly recognized during trial when I lost some of my

3   arguments and Mr. Cambria lost some of the First Amendment

4   arguments we made, that there was a good chance this was going

5   to go to appeal.  We knew that would be an important part of   15:11:13

6   the process for us.

7        I would highlight two things for the Court that came

8   up today.  One was, you know, I had made the argument that

9   there was only one witness.  There was also an argument I made

10   at my closing.  It had some success and it didn't have success   15:11:31

11   perhaps with regard to the various verdicts against Mr. Brunst.

12   But it is relevant to the importance of these issues because,

13   for example, one of the issues we raised was when we had sought

14   to introduce certain impeachment evidence that the Court ruled

15   against us on, that with regard to Mr. Ferrer, were the Court   15:11:53

16   of Appeals to differ with Your Honor's view on that, that's the

17   one witness who, the only witness, who really testified about

18   Mr. Brunst.  Didn't try to give some contest even to the

19   various e-mails that were consistent with the prosecution's

20   theory.   15:12:13

21        And so you know, it threads its way through a number

22   of those issues in addition to the invasion of the privilege

23   issue and the like where it's critically important and clear

24   that if we're able to prevail on those issues, that it's not

25   going to be harmless error.  These are -- these are large   15:12:34

236

```
1    monumental issues.
2            The second thing I would bring to the Court's
3    attention in looking back at the six years of litigation is
4    that the Court noted that there were a number of different
5    judges who handled this, and in our view there were differences    15:12:48
6    in the gist of the rulings between some judges.  One of them
7    was before Your Honor came to the case where we feel that when
8    Judge Logan ruled that the government could not invade the
9    privilege, that Mr. Ferrer could not waive certain aspects of
10   the privilege, and that at the same time the government was      15:13:10
11   invading that privilege in its interviews with Mr. Ferrer, we
12   feel Judge Logan and Judge Brnovich's rulings were very
13   different in their outcome.
14           And I raise that not just because I am here to argue,
15   again, that, you know, one is right and one is wrong, but it    15:13:26
16   just shows how tough these issues and certainly how fairly
17   debatable they are.
18           I believe that with regard to the sex trafficking
19   evidence, you know, we had a mistrial on the first trial.  It's
20   certainly the defenses' view that the evidence that was allowed  15:13:48
21   in in the trial before Your Honor was akin to the evidence that
22   resulted in the mistrial --
23           THE COURT:  I don't view it as that.
24           MR. LINCENBERG:  I know.  I know.  It's -- we have a
25   difference of view, but I think it's certainly -- it was a      15:14:08
```

UNITED STATES DISTRICT COURT

237

```
1   significant enough issue that resulted in a mistrial, and it's
2   certainly something that we want to present to the Court of
3   Appeals.
4           There were seem to be differences in, you know,
5   whether this was tried as a conspiracy for just the 50 ads or      15:14:24
6   whether it was broader, and what was permissible and not, all
7   calls that the Court -- the Court, you know, acted as referee,
8   made the calls --
9           THE COURT:  And I think, Mr. Lincenberg, I have a 4:00
10  o'clock hearing.  This has been fully briefed.  I asked you to     15:14:40
11  reply to Mr. Berry.
12          MR. LINCENBERG:  Okay.
13          THE COURT:  So I don't want to have new argument that
14  you should have put into your pleading.
15          MR. LINCENBERG:  Well --                                   15:14:54
16          THE COURT:  Move forward.
17          MR. LINCENBERG:  Only relating it to some of the
18  arguments that came up at the sentencing and the arguments from
19  counsel.
20          But I guess what I would really focus on, Your Honor,      15:15:02
21  is that the strength of these issues, the amount of the number
22  of fairly debatable important issues, also negates the idea of
23  any flight risk because certainly all three of the defense
24  counsel in this case have had extensive discussions with our
25  client where we feel that we have very strong issues on appeal.    15:15:23
```

UNITED STATES DISTRICT COURT

1    We had a financial settlement in this case for the, you know,

2    one of the big reasons why it was so that there would be money

3    freed up so that we could fight this on appeal.  That is

4    Mr. Brunst's, his intention.  And given that he's satisfied

5    every condition, he is not a flight risk.  He would never do          15:15:47

6    that to his family, and his entire intention is to fight this

7    on appeal.  We think that there's no flight risk here.

8            The last thing I would say, Your Honor, is that

9    Mr. Berry mentioned other things that the Court could do to

10   address some of their concerns, such as an ankle bracelet.  And       15:16:10

11   to the extent that the government is of the view that the

12   current condition are insufficient, and we believe they are

13   sufficient, but that's obviously an option for the Court that

14   is imposed in cases to deal with the issue of any flight risk.

15           So given that there is no danger, there is no flight          15:16:31

16   risk, there are substantial issues, we would -- we would really

17   respectfully urge Your Honor to allow our client to be free to

18   assist us with dealing with the next stage of this case.

19           THE COURT:  Thank you.

20           MR. LINCENBERG:  Thank you.                                    15:16:50

21           MR. FEDER:  Mr. Spear joins in the arguments already

22   made.  I have to say Mr. Berry's discussion about suicide is

23   one of the most bizarre I have heard in 40-plus years of being

24   a lawyer.  As the Court knows from the doctor's letter, that

25   was given to the Court under seal, and Mr. Berry too.  The only       15:17:14

1    concern about suicide with Mr. Spear is if he doesn't get his

2    medication.  And the only reason he's not going to get his

3    medication is if he is incarcerated pending appeal.

4         We submitted -- in Ms. Purdue's report she talked

5    about some various things.  Mr. Berry brings up new studies          15:17:38

6    that for some reason they didn't put in their sentencing

7    response our Sentencing Memorandum, but the Inspector General

8    of the Department of Justice has talked about suicide being the

9    number one reason for death in prison.  They've also, and this

10   is in 2024, they had hearings where a senator was castigating       15:18:00

11   the Department of Justice and the Bureau of Prisons for the

12   lack of improvement over at least 12 years of the Bureau of

13   Prisons because it's underfunded, overcrowded.  I will read it

14   to you, Judge, it's from the -- it's from the declaration of

15   Ms. Purdue:  I.G. Horowitz, Inspector General of the Department    15:18:29

16   of Justice, opening statement February 28, 20 --

17        MR. BERRY:  Your Honor, I am going to object to this.

18   He is literally reading from a document that's before Your

19   Honor that Your Honor has just asked that we not do.  He is

20   rehashing the arguments that are already briefed.                   15:18:49

21        MR. FEDER:  Mr. Berry argued to the contrary with

22   reports in cases that we haven't even been provided, Judge, but

23   here it is in Ms. Purdue's --

24        THE COURT:  I don't want you to read to me an entire

25   document.  Can you summarize it, Mr. Feder?                         15:19:05

240

```
 1          MR. FEDER:  Deficiencies are understaffing, staffing
 2     issues in health services departments directly impacts the
 3     medical care and treatment of inmates, inappropriate mental
 4     health designations, et cetera.
 5          The only reason of a concern for suicide for Mr. Spear        15:19:26
 6     is if he's incarcerated.  That's number one.
 7          Number two, Judge, you mentioned something during
 8     sentencing, and I just want to clarify it, she recommended
 9     self-surrender in her latest PSR and the other PSR that was
10     filed earlier in August.  The idea that we didn't give her        15:19:58
11     financial information, I just want to make sure it's
12     understood.  We didn't give it -- I mean, it was the lawyers'
13     decision, not Mr. Spear's, because of the information that we
14     had filed under seal with this Court in order for me to become
15     Knapp Counsel and Mr. Kessler to become appointed.  That was      15:20:17
16     the stuff that we didn't want to give or given it was under
17     seal.  We did ultimately give her that information and she
18     changed her recommendation from the original PSR that he was a
19     flight risk only because of not giving her financial
20     information to one where she said she was satisfied and that he    15:20:37
21     is not a flight risk.
22          As the Court knows, Mr. Spear has spent the
23     substantial majority of his life in Arizona.  He has every
24     intention of appealing this to the highest level that he can.
25     He's retained appellate counsel.  And I don't know, is the        15:20:51
```

UNITED STATES DISTRICT COURT

1    Court considering flight risk or is the Court considering that

2    there are not substantial issues?  Maybe I can address myself

3    specifically and quickly to those issues.

4           THE COURT:  Substantial issues.

5           MR. FEDER:  Well, obviously number one, Judge, is the     15:21:09

6    First Amendment.  And as the Court knows, even though you

7    weren't the judge at that time, there was a Motion to Dismiss

8    based on the indictment violating the First Amendment.  Many of

9    the First Amendment organizations in the country filed an

10   amicus brief at that time, the ACLU, Reason, et cetera.  So      15:21:28

11   it's not an insubstantial issue when some of the biggest First

12   Amendment organizations in this country have lent at least

13   their authority to the fact that there has been a violation of

14   the First Amendment.

15          Obviously if there has been, the indictment is           15:21:46

16   dismissed, the case is reversed and everything goes away.

17   That's in the moving papers of myself and, I think,

18   Mr. Cambria.

19          So I mean, there's a number of other issues in there,

20   the list could go on and on and on.  As the Court knows, this    15:22:02

21   has been, as you commented, a lengthy proceeding.  There have

22   been many, many substantial issues that have been argued that

23   all of which, if reversed, would result in either a new trial

24   or dismissal of the charges, so I would ask the Court to

25   release these gentlemen on appeal.  Failing at that, at the      15:22:21

UNITED STATES DISTRICT COURT

242

1    very least, to allow them to self-surrender.

2          One other issue, Judge, if for some reason the Court

3    denies those requests, I would ask the Court to allow us to

4    give the marshals Mr. Spear's substantial medications.  I have

5    talked to one of the marshals at the break and they indicated          15:22:48

6    if the Court ordered them to take it they would, as opposed to

7    putting him in a position where he's without medication.  Thank

8    you.

9          THE COURT:  Thank you.  Thank you, counsel, for

10   briefing the issue that I asked you to brief.  It has been a          15:23:04

11   question in my mind that I knew I would have to address on this

12   day.  The factors that the statute requires a court to consider

13   under 3143(B) are whether each defendant has demonstrated by

14   clear and convincing evidence that he is not likely to flee or

15   pose a danger to the safety of others.  I have already found in          15:23:32

16   my sentencing pronouncement that I find none of the defendants

17   pose a danger to self or others.  I didn't necessarily make a

18   finding as to self, but it is nevertheless my finding that they

19   do not pose a danger.

20         The second factor is whether the appeal is not for          15:23:54

21   purposes of delay.  I don't find that any appeal in this matter

22   would be for purposes of delay.

23         The two remaining factors are what caused the Court to

24   have to carefully consider the arguments of release pending

25   appeal.  The third is whether the appeal raises a substantial          15:24:19

1    question of law or fact, and the other is if that substantial

2    question is determined favorably to the defendant on appeal

3    that the decision is likely to result in reversal or an order

4    for a new trial on all counts.

5         The substantial question has been also parsed out by a          15:24:46

6    number of various cases in not just the Ninth, but others.  The

7    Ninth Circuit has held that a substantial question is one that

8    may be fairly debatable or fairly doubtful.  And the other

9    guidance is for the court to determine whether there's a

10   likelihood of reversal or new trial, and that goes to the type    15:25:22

11   of question that's raised.

12        The Court must also find whether the question

13   presented to be, quote, so integral to the merits of the

14   conviction on which the defendant is to be imprisoned that a

15   contrary appellate holding is likely to require reversal of the   15:25:49

16   conviction or new trial.

17        I have focused in on with respect to Mr. Spear and

18   Mr. Brunst that they have been convicted of a conspiracy to

19   commit Travel Act violation.  The Court is also mindful that

20   these were jury verdicts.  The Court is mindful that the          15:26:20

21   circuit has an applicable review process in which a jury

22   conviction is viewed with deference.  And having presided over

23   this trial, at a bare minimum, I don't think there is a fairly

24   debatable question as to those verdicts.

25        I also find that there is ample factual development of       15:26:55

1    the record to show as to the money laundering counts and the

2    concealment money laundering counts, that the proceeds are

3    traceable to the illegal conspiracy conduct.  And in that way,

4    because of the multiple convictions, and in my view I don't

5    think that, at least with regard to the conspiracy conviction,          15:27:32

6    the conspiracy to commit money laundering, which necessarily

7    ties into Backpage's operation as a predominantly sex-for-money

8    operation, that Count 52 also in my view is firm.

9           And at least with respect to Mr. Brunst and Spear, in

10   my view the statute at least creates attention, but the burden          15:28:26

11   is on the defendant, and I don't think you make the -- you

12   don't meet the burden.

13          As to Mr. Lacey, there too, Count 100 was a jury-

14   rendered verdict.  And as I mentioned in my sentencing, I don't

15   find Mr. Lacey a danger to others or to self.  I don't know             15:29:01

16   what he meant when he talked to probation about his intent to

17   travel after the close of this case.  That has a question mark

18   in my mind.  It raised a flag.  But here too, the statute

19   essentially reads, "making the transfer in whole or in part to

20   conceal."  And in my view, the record evidence, the exhibits,          15:29:34

21   the testimony, all support the jury conviction.

22          And again, I don't think there is a fairly debatable

23   question there.  And though I find that he does not appear as a

24   flight risk or a danger, well, I hesitate with regard to flight

25   risk, I don't find that he would be filing his appeal for               15:30:11

1  purposes of delay, but nevertheless, I am going to deny the

2  request as to each defendant for those reasons.

3        I will, however, order that each defendant turn

4  himself in to the U.S. Marshals Office in this building two

5  weeks from today.  I am going to order -- I am going to          15:30:38

6  order -- well, I guess, Mr. Cambria, with respect to Mr. Lacey,

7  I can order that he turn himself in to the U.S. Marshals Office

8  in, what would be the appropriate District Court with the U.S.

9  Marshals Office in his vicinity?

10       MS. PARIS:  Are you talking about in California?          15:31:03

11       THE COURT:  Yes.

12       MS. PARIS:  I am not sure, but we can get you an

13 answer to that one.

14       MR. CAMBRIA:  One comment, Your Honor.

15       THE COURT:  Well, I am not finished.                     15:31:14

16       In any event, I will order that they turn themselves

17 in to a U.S. Marshals Office if not in this building by noon

18 two weeks from today.

19       Then I will have you, Ms. Paris, inform me by close of

20 business today, the Bureau of Prisons, excuse me, the U.S.     15:31:41

21 Marshals Office that would be most accessible to Mr. Lacey, and

22 I will have him turn himself in there.

23       I will, however, order in the interim period that they

24 be held on ankle monitoring devices.

25       PROBATION OFFICER:  Your Honor, Rochelle Collins.        15:32:09

UNITED STATES DISTRICT COURT

246

1    There is a pretrial officer in the courtroom if you have

2    questions.

3            THE COURT:  The Court will order that the location

4    monitoring devices be affixed to the defendants before they

5    leave the building.  And because I'm ordering that for the            15:32:36

6    period that you are on the location monitoring device, each

7    defendant shall participate in abiding by all of the program

8    requirements.

9            You shall pay all or part of the cost of the

10   participation in the Location Monitoring Program as directed by       15:32:57

11   the Pretrial Services office.

12           You are restricted to your residence as directed by

13   the Pretrial Services officer.

14           The defendants will be restricted to their homes

15   except for attending court proceedings, medical appointments or       15:33:27

16   religious services.

17           You shall submit to the location monitoring technology

18   at the officer's discretion.

19           Is there anything further from the government?

20           MR. BERRY:  No, Your Honor.  Thank you.                       15:33:57

21           THE COURT:  Anything further from you Mr. Cambria?

22   Ms. Paris.

23           MR. CAMBRIA:  Both of us.

24           MS. PARIS:  Your Honor, I wanted to clarify, you

25   expressed a concern with respect to the topic of travel in            15:34:09

UNITED STATES DISTRICT COURT

247

1    Mr. Lacey's PSR report, and that came up in the context of, and

2    please, if I am misstating this, she asked a question like:

3    What are your plans when this is all done, all resolved, you

4    know, post having served a sentence, like what are you

5    interested in doing?  And he basically said:  I have always          15:34:30

6    enjoyed travel, and I would probably want to travel again with

7    my sons.

8           So that was the context of the comment.  I wanted to

9    clarify that for the record.

10          THE COURT:  Thank you, Mr. Lincenberg.  Sorry,               15:34:41

11   Mr. Cambria, were you going to say something?

12          MR. CAMBRIA:  What I wanted to say, Your Honor, when

13   you discussed a lack of substantial issue to be reviewed, in my

14   case of Count 100, the question is, in a case where multiple

15   FBARs have been filed, can there be concealment?  That is a          15:35:05

16   discrete issue that we can find no case on, and it is a very

17   substantial issue because if we win on that issue, there is no

18   conviction.  And here we have unrefuted evidence 'cause there

19   are in evidence FBARs filed by the attorneys with all the

20   details.                                                             15:35:31

21          THE COURT:  I understand, and that was in your moving

22   papers, so I considered the argument already.

23          MR. CAMBRIA:  Well, I ask you to reconsider.

24          THE COURT:  I am not going to super consider anything.

25          MR. CAMBRIA:  I never knew "super consider."  I like         15:35:42

UNITED STATES DISTRICT COURT

248

1   that.

2        THE COURT:  Well, it's beyond a motion, a response or

3   reply.  I don't know what to call it after.

4        MR. CAMBRIA:  Anyway, I think that satisfies the

5   element that you found lacking, with all due respect.     15:35:53

6        THE COURT:  We agree to disagree.

7        Mr. Lincenberg.

8        MR. LINCENBERG:  Your Honor, we have nothing further

9   today.

10        THE COURT:  Mr. Feder.     15:36:03

11        MR. FEDER:  Judge, would the Court entertain a little

12   bit of a discussion to extend the self-surrender date --

13        THE COURT:  No, I will not.

14        MR. FEDER:  Okay.

15        THE COURT:  Thank you.  This matter is adjourned.     15:36:13

16     (Proceedings concluded at 3:36 p.m.)

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2

3                    **C E R T I F I C A T E**

4

5          I, HILDA E. LOPEZ, do hereby certify that I am duly

6   appointed and qualified to act as Official Court Reporter for

7   the United States District Court for the District of Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 30th day of August,

14  2024.

15

16

17                              s/Hilda E. Lopez_____

18                              HILDA E. LOPEZ, RMR, FCRR

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

# EXHIBIT B

# EXHIBIT B



# Corporate Structure

# EXHIBIT C

EXHIBIT C

Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-DJH |
| Plaintiff, | **DEFENDANT MICHAEL LACEY'S SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD DEPARTURE** |
| vs. | |
| Michael Lacey, *et al.*, | |
| Defendants. | (Oral argument requested) |

Defendant Michael Lacey, by and through his undersigned counsel, files the instant Sentencing Memorandum and Motion for a Downward Departure.

**PRELIMINARY STATEMENT**

This case has not been an ordinary case and Michael Lacey, known as Mike or just Lacey, is not an ordinary defendant. Michael's s sole felony conviction was incurred at age 75 – for a financial crime that he purportedly committed upon the idea and advice of two credentialed lawyers, wherein all reporting rules were followed. Michael is incredibly principled, courageous, and generous. Above

all else, he has, through his actions and words, demonstrated an unflinching commitment and drive to do what is right when others have taken the easy or safe road.  It you look at the crime of conviction – he made sure everyone knew that he wanted to pay taxes and avoid tax shelters of any kind if he pursued the foreign trust.  That strict adherence to doing what is right has been part of his life, at every stage, as detailed below.  He has written stories that put his life and liberty in jeopardy because he believed the public had the right to know about those stories.  He spent a lifetime fighting for First Amendment rights because he knows that the suppression of speech leads to the erosion of other fundamental liberties.  He has never turned a blind eye to a friend, family member, or cause in need of his support.  He was a leader and mentor to young writers across the country, hiring, teaching, and inspiring writers from all walks of life.  He got married and raised two sons who have grown into exemplary young adults.  He did all of this and more, having overcome a childhood that no one would wish upon anyone.

There is a strong basis for leniency here as discussed in greater detail below.  The people who Michael has helped and stood by over the years – family, friends, former writers and editors, community leaders – ask this Court to impose a sentence that reflects the person they know.

<u>**MICHAEL'S HISTORY AND CHARACTERISTICS**</u>

**I.    Michael's history is one of triumph over adversity.**

**A.    Michael's childhood was traumatizing.**

Michael was born into a working-class family that frequently relocated, even during the school year.  His father, Bernard, was a construction worker.  His mother, Helen, was a house cleaner and then became a nurse.  He has two younger siblings, a brother, Edward, and a sister, Mary.  His family lived in trailer parks and other temporary housing, ultimately settling in Newark, New Jersey around age 10.  (Lacey Childhood Photographs, **Ex. A**.)  Michael's parents were alcoholics and likely had undiagnosed mental illness.  They drank every night and as the drinking wore on, became violent, with each other, and towards their children.  Police were regularly called to their home.  Sometimes a parent would be arrested and taken away.  Once, his mother showed up drunk to his

2

school, a Catholic school, got into a fight with the headmaster, and was arrested and taken away in handcuffs. As a result, he was asked to find a new school.

The earliest memory Mr. Lacey has of his father hitting him is also one of the saddest. When Michael was five, he was beat up at school by a third-grader, nearly double his size. When his father found out that he lost a fight, he flew into a fit of rage, beat Michael with a belt, and tossed him outside their trailer. As a child, Michael did not understand that the trauma he suffered was unusual. He went about life doing his best to avoid triggering violence from his parents, even though just about anything could provoke them.

He had a grandmother who tried to provide him and his siblings with support. She lived in the projects, herself, and money was tight, but she sent them clothing. Michael can still remember opening the box and being disappointed with the clothing she had selected for him. He began working odd jobs at a young age, such as shoveling snow and running errands for a caterer. One of his favorite jobs was delivering newspapers. He tried to save the money he earned, but his parents frequently took his money for their bills.

## B. Michael was a bright, creative, and hard-working student.

Notwithstanding the physical, mental, and emotional abuse he suffered at home, Michael was a great student. From a young age, he enjoyed writing and would write plays in his spare time. In high school, he was a National Merit Finalist – the only one in his school. He was courted by Princeton. When he went for a visit, he could not believe the beauty of the campus – he had never seen such a place. Upon return, his father told him to "get over himself." There was no money for college. He would join his father in construction and they would likely move to Arizona where construction jobs were plentiful. Michael did not know any better, and stopped thinking about Princeton or any other college. By chance, a college counselor at his high school sought him out towards the end of his senior year to congratulate him on becoming a National Merit Finalist and to find out which college he had picked. When he explained that there was no money for school, she was taken aback. She did some research, submitted an application to Arizona State University for him, and he was admitted.

3

When it became time to move to Arizona to begin college, his parents decided to stay in Newark, which meant he would be on his own.  He packed a bag and took a plane by himself from Newark to Phoenix.  His only contact in Arizona was a friend of his grandmother's.  He arrived with her name and address on a scrap of paper, and nothing more.

### C. Michael's early adulthood was traumatizing.

Michael's parents died in a murder-suicide when he was in his twenties.  The police determined that one of his parents had turned on the gas in their trailer, they fell asleep, and froze to death.  As the oldest child, the funeral arrangements fell to him.  He had so little money that the funeral director told him that his parents would need to be buried in cardboard coffins.  The funeral director reassured him that no one would notice because the funeral home could drape decorative fabric over the coffins to disguise the cardboard during the funeral.  Michael buried his parents and did his best to make peace with his childhood.  Decades later, in an effort to make peace with the memory of his father, Michael had the words "HOLD FAST" tattooed on his fingers, just like his father.  It means, "you can count on me, I'm steady."  Through one obstacle after another, Michael has been steady for his family, friends, colleagues, and community.

### D. Michael built a first-class media organization in Arizona from nothing.

In 1970, Michael left college to begin an alternative newspaper in Phoenix called the *New Times* with fellow Arizona State University students.  The newspaper began by covering Vietnam War protesters, a topic that no mainstream media organizations had covered.  On one of his first assignments, he witnessed one of his subjects, a counter-protestor, walk up to a protestor, and punch the protestor in the face, dropping him to the ground.  The counter-protester then returned to Michael to finish his interview, as if nothing happened.  Michael realized that investigating and covering topics and people ignored by mainstream media would give his readers colorful stories that needed to be told, and provide voices to the marginalized.

Michael and his colleagues had no professional training or experience but believed they could change the world, one story at a time, through long-form (magazine style) investigative journalism.  They offered their newspaper for free to ensure that anyone could read it, regardless of financial

status.  Shortly after inception, James Larkin joined the newspaper.  (*See* Photograph, **Ex. B**.)  At that time, it was published weekly, but was unprofitable.  During the early years, Jim Larkin kept a night job at the Nantucket Lobster Trap restaurant and Michael donated blood twice a week to raise funds for the newspaper.  As a former movie critic, Francine Hardaway, Ph.D., noted in her letter, the newspaper initially paid her only in movie tickets, which it received for free from theaters.  The newspaper had no organizational structure and barely scraped by.   After significant and unsustainable financial strain, both Lacey and Larkin left the newspaper.  Michael's blood donations were not a business plan.

E.     **"Separation of church and state" allowed the newspaper to thrive.**

Years later, Michael and Jim met and discussed the importance of publishing hard-hitting stories and the positive reform that investigative journalism could bring.  They decided to return to the newspaper, but to run it in a more formal manner, with predefined roles.  Larkin would oversee the business side of the company, and Michael would oversee the writers and editors.  This made sense to Michael because writing had always been one of his strengths, whereas organization skills and business plans were not.  The guy who tried to fund a newspaper by donating blood was free to focus on what he was good at – writing and editing.  This divide between business and editorial is common in media organizations, and is referred to as the "separation of church and state."  Within this structure, Michael could not tell Larkin how to generate revenue, or how to manage the company's finances, litigation, intellectual property, real estate acquisitions, payroll expenses, etc.  Conversely, Larkin could not tell Michael what the newspapers would (or would not) publish.  Michael had complete journalistic freedom in the newspapers, and Larkin had complete freedom to run the business, including all advertising.  Numerous former writers and editors have submitted letters indicating that this separation was impenetrable and that the journalists flourished under this arrangement.

Over time, their newspaper began breaking national stories.  The *New Times* made national headlines based on its participation in the investigation and reporting on the car-bomb killing of an *Arizona Republic* reporter, Don Bolles – reporting the *Arizona Republic* declined to publish (likely due

to concerns over attacking Arizona's power brokers).  Michael's willingness to cut against the current in the name of truth-telling became a *New Times* staple.

By the 1980s, the newspapers began winning national journalism awards.  They expanded beyond Phoenix, acquiring newspapers in sixteen other cities, including New York's Village Voice.  All told, Michael's newspapers won over 3800 journalism awards, including one Pulitzer, five Pulitzer finalists, 39 Livingston Awards, 67 James Beard Foundation Journalism Awards, 39 Investigative Writers and Editors Awards, and numerous H.L. Mencken Awards.  Michael personally received dozens of awards for articles he had authored or co-authored.[1]  A summary of the articles and awards from the period 2006-2011 demonstrates their commitment to covering people and events to engage society in important discussions.  (*See* Awards Summary, **Ex. C**.)

Although this record is impressive, it is the positive impact that Lacey's and Larkin's journalism had on the communities where they published that is their true achievement, as detailed in letter after letter.  As discussed more fully below, former writers and community leaders have talked about the impact the newspapers have had on racial injustices, on dismantling public corruption, and on abusive tactics of the powerful, such as a law firm illegally obtaining litigants' personal information.  In many instances, the *New Times* was ahead of its time, and its stories resulted in the beginnings of national dialogues on important topics.[2]

---

[1]  For example, he received the H.L. Mencken Award in 1987 for his article entitled, *Braving the Border*, which brought attention to the dangers that immigrants face when attempting to cross the border.  A 2010 series entitled, *Amongst U.S.*, detailing the struggles and contributions of Latino immigrants won the Aronson Award for Social Justice Journalism.  In 2011, he won a Clarion Award for an article entitled, *What's Mom Worth?*, having uncovered information about the death of an insulin-dependent diabetic mother who died a painful death while held in the Maricopa County prison.  She was repeatedly denied her requests for insulin because prison staff carelessly dismissed her pleas as those of a drug addict.

[2]  In 1991, an article entitled *Bush's Crack War:  The Arizona Illusion*, showed that the "war on crack" actually ended up targeting low-level pot users, and this article began a dialogue on the flaws of the "War on Drugs," which has since led to sentencing amendments, among other much needed reforms.  In the 1990s, *New Times* writer John Dougherty's extensive coverage of Arizona Governor J. Fife Symington's questionable behavior predated his prosecution and resignation.  In 2003, the newspapers broke the story of sexual assaults of female cadets at the Air Force Academy.  This story

Moreover, the journalists that Michael trained have continued to effect positive change. In using the investigation and writing techniques he learned from Michael, former writer Ben Westhoff was the first journalist to infiltrate a Chinese fentanyl laboratory, breaking such a significant story that he has gone on to become an advisor to Congress and the White House on the opioid crisis. Laura Miller, a former writer, states that Michael had "spent his entire lifetime holding politicians, police, bureaucrats, business icons and assorted fraudsters accountable for their actions, and he made it clear to all of us who worked for him the importance of doing so." She "learned that lesson so well that it prompted me to run for elected office," serving two terms on the Dallas City Council and two terms as the Mayor of Dallas.

### D. Michael empowered his employees.

Every former writer and editor who has submitted a letter has expressed admiration for Michael, their former boss. He had a hands-on approach to management, flying around the country to meet with them regularly. He taught them to investigate, write, and edit. No topic or person was off limits. He instilled in them the confidence to investigate and write about powerful people, and backed them up when the powerful people came after them, as they frequently did. As Susan Goldsmith, a writer he hired in 1996 wrote: "Mike advocated for women and minority journalists in a way I have never experienced anywhere else and he pushed us to do great work because he believed in us, as journalists, and we felt it, every day."

In addition to his time and mentoring, the newspapers invested in their writers financially. The writers had salaries and benefits. They were able to buy homes, use their healthcare to cover unforeseen medical expenses, and send their children to college. As Pete Kotz explained, this was in contrast with the norm for newspapers at the time, where editors were seeking to make a 30% profit, and set employee salaries artificially low to make that profit.

---

began a national dialogue about cadet safety and led to increased scrutiny of sex-assaults in military academies. In 2006, the newspaper ran a groundbreaking story about sexual abuse in polygamist compounds, which spurned national media coverage, movies, and books. In 2008, the newspaper revealed that a serial killer was operating in Los Angeles and the police had withheld that information from the public. These stories are just examples.

E.     **Michael has a loving and close relationship with his family.**

Michael has a loving and close relationship with his family.  In 1980, Michael married Kathleen Ferris, an Arizona lawyer, and then-Director of the Arizona Department of Water Resources.  Although they are divorced, they have remained close friends.  They have two sons, Colin and Roarke, whom they raised in Arizona.  (*See* Family Photograph, **Ex. D**.)  Michael was a hands on dad.  Some of their favorite memories are cooking pozole from scratch together, going to museums, and traveling.  He supported them in their academic endeavors and was a role model for them.  Michael sees them regularly and understands the impact that his conviction and sentence will have on them.  Both boys have attended numerous hearings over the years as well as portions of his trial.  Even though they are divorced, Mrs. Ferris described Michael as a devoted father, a generous man who gave freely to others, and a highly principled person.

Additionally, Michael is close with his brother and sister.  His brother, Edward, lives in Arizona, and his sister, Mary, lives in New York.  They regularly speak and visit.  Both his brother and his sister attended his trial to support him.

II.    **Michael's personal characteristics demonstrate he is a man of integrity.**

A.     **The newspapers were borne out of the desire to uncover wrongdoing and inform the public about important issues and events not otherwise covered to bring systemic change through transparency.**

The *New Times* began as a collective of college students who were eager to give voices to the unheard.  They covered the Vietnam War protesters, who previously had not received media coverage and whose views had been silenced by lack of coverage.  Vietnam veteran and former Arizona Senate majority leader Alfredo Gutierrez noted in his letter that, over time, Michael's coverage led to mainstream media coverage, and mainstream media coverage led to elected officials beginning a dialogue on whether a perpetual war in Viet Nam was in the Nation's best interest.  Mr. Gutierrez saw what Michael knew, that giving voices to the unheard could change society for the better.  Michael and his staff used the skills they gained from

8

covering the protesters to investigate public corruption, corporate malfeasance, and racial injustices, such as the mistreatment of migrants in Arizona, among other things.

**B.      Michael's life is one of self-sacrifice for preservation of free speech.**

Michael is a principled person who has fought one First Amendment battle after another to publish hard-hitting investigative stories, even when powerful people wanted him silenced.   Both at trial and in letters of support, Michael has been described as a "First Amendment warrior."   An overview of the battles Michael fought alongside his writers is best summarized by writer John Dougherty, who joined Michael's staff in 1993:

> I wrote hundreds of stories ranging from complex investigations into government corruption, public subsidies in stadium construction projects, child rape in polygamous communities, malfeasance in public universities, a murder committed by a college football star and brutal police abuse that resulted in multiple deaths of inmates.  The foundation for my stories always relied on the First Amendment and the Arizona Public Records Law.  I filed hundreds of requests for public records under these laws.  Extracting this information was not an easy task.  It took time, money and most of all commitment to find the truth no matter the cost.

> Mike Lacey provided unflinching support to do this work. . . . This can be a lonely fight.  Under Mike's leadership, we embraced the seminal publisher Joseph Pulitzer's call to arms:   "A newspaper should have no friends."

> Which means a newspaper like Phoenix New Times had plenty of enemies.  Our targets responded with force. Threats, litigation, intimidation, unfounded police investigations, smear campaigns, and refusal to abide by the federal and state public records law were routine.  And we stared them down, no matter the financial cost to the paper, or the threat of retribution from those who could call on law enforcement and prosecutors to retaliate for stories those in power would rather keep quiet.

> At no time did Mike Lacey ever consider surrendering to strong-arm tactics.  Never.  And neither did I and many other reporters and editors who had the opportunity, privilege and responsibility to work with Mike.  Our overarching goal was to serve the public interest.  Period.

> Mike will never flinch from his commitment to the First
> Amendment. He is a man of integrity. His determination is
> etched into his knuckles: "Hold Fast."

Indeed, threats, retribution, lawsuits, and grand jury investigations were the normal response from the subjects of their articles, as told by writer after writer. Most notably, Lacey and Larkin were arrested in the middle of the night and jailed for publishing an article about Sheriff Arpaio. Michael understood that they were in the crosshairs of law enforcement, but he refused to back down when threatened with prosecution because he believed the article at issue was protected expression, important for the public discourse, and the newspaper had the right to publish it. In an *en banc* ruling, the Ninth Circuit recognized that Maricopa County had violated the First Amendment, *see Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (en banc). Michael's courageous stand against corruption and emphatic defense of First Amendment rights received national media coverage. *See* Carr, D., New York Times, *A Knock in the Night in the Arizona* (May 12, 2008), available at: https://www.nytimes.com/2008/05/12/business/media/12carr.html. True to his character, Michael used this unsettling event as a learning lesson with his sons. As his son Colin writes:

> He was arrested by Arpaio in 2007 for a story he wrote and
> published about the rights of his readers being violated. After
> the arrest, he pulled me aside to explain the importance of his
> actions. My dad told me that he had to stand up for what was
> right; he had to stand up for his readers. He knew he was going
> to be arrested for what he published and he did not run.

## C.   Michael has made Arizona a better place through visionary journalism.

As told in numerous letters of support, Michael's form of journalism had a positive impact on every city where they published. As writer Bruce Rushton, wrote: "Because of Mr. Lacey's work, it became harder for those in power to afflict the powerless, more difficult to excuse the inexcusable. He took great risks for righteous causes, particularly when writing about the Maricopa County sheriff's office." Similarly, the Rev. Oscar S. Tillman, a former President of the N.A.A.C.P. in Phoenix wrote about the impact Michael's journalism had on racial injustices, indicating that, during his leadership of the N.A.A.C.P.:

> [T]he city of Phoenix and Maricopa County were riddled with gang violence, racial violence and allegations of police brutality. We were blocked in all our efforts to address these problems by the sheriff, the police chief and other officials. We even had numerous complaints about the care being received by veterans at the VA facility in Phoenix. Despite marches and demonstrations, no one wanted to talk, until Mr. Lacey and the New Times investigative reporters started exposing what was going on and their work was picked up by the national press. Despite death threats, bombing attempts to Mr. Lacey and myself, Mr. Lacey stood with the NAACP and continued to print the truth. Eventually with intervention by the Justice Department and Mr. Lacey's continued involvement, slowly things began to change. The VA Director was replaced, and veterans received better care.

Patrick Cantelme, Sr., a retired Captain of the Phoenix Fire Department and former head of the Phoenix Firefighters Union explained that it was Michael's influential coverage of the proposal to change the election for Phoenix City Council seats from at-large to district-based that finally resulted in election by popular vote in Phoenix. In the almost 50 years that Mr. Cantelme has known Michael, he notes that, "[w]hether it was a fight against racism, anti-union practices, support for women's rights or against 'gay bashing' Lacey and the New Times led the fight." This impact occurred everywhere that Michael had writers.

**D.    Michael is a person of character.**

In one letter after another, people who have known Michael for decades have said they could and would testify to his solid character. His immediate subordinate, Andy Van De Voorde, has stated that "in my 40 years of knowing the man, and standing next to him through many difficult circumstances, I never saw him do a wrong thing." Others have found it impossible to believe that he was convicted of anything because of his steadfast commitment to doing what is right. Mrs. Ferris, his ex-wife has said that:

> Michael is courageous. Where others might crumble, he stands up to injustice, to unfairness, and for what is right. From the early days of the *New Times,* when he covered and wrote about the protests following the killings of four students at Kent State, he has never wavered in his defense of the basic freedoms our country guarantees.

11

**E.    Michael is not motivated by money or greed and never has been.**

Michael is not motivated by money or greed and never has been.  Although he earned substantial wealth from his ownership share in the newspaper business, his financial success was somewhat by happenstance.  In the early days, when Michael was donating blood to help fund the *New Times*, the arrival of Larkin and his business acumen shifted the newspapers from a fledgling Arizona newspaper to a profitable national conglomerate.  As Ms. Ferris has indicated, Michael could not balance a check book.  If financial success accompanied Michael's journalism, so be it, but wealth was not his focus then or now.

As a young man in his early twenties, he chose to live in a near state of poverty to begin and build a newspaper because he believed in the importance of investigative journalism and felt sacrifice on his part was worth it.  He supported the newspaper by donating blood.  At first, he was only allowed to donate blood once per week; however, due to a breakthrough in blood collection technology, he was eventually able to donate twice per week, which gave his struggling newspaper twice the lifeline.  He could have pursued any number of other jobs which would have afforded him the ability to pay bills without donating blood twice a week, but he chose journalism because he believed that exposing corruption, bringing light to unheard voices, and holding powerful people accountable was his calling.

The newspapers were offered to the public for free because they did not want anyone to be unable to read their stories based on their financial status.  To make their papers available to the widest possible readership, they earned revenue through selling advertising space, including classified ads.  As the newspapers became more and more successful, they continued to choose journalism over financial concerns.  Michael published articles that drove away Fortune 500 companies and their large advertising budgets because he would not compromise on principle.  If a story was newsworthy, the newspapers would publish it regardless of any impact on the company's bottom line. As Laura Miller, a former writer has indicated, Michael even authorized her to write an article about a man who was scamming women who responded

12

to his dating ads – ads that had been published on the back pages of the newspaper in Dallas – knowing full well that the story would reflect poorly on their classified ads section. No one, not even the company itself, was safe from its journalists.

Michael was generous with his self-built wealth. He donated to organizations dedicated to fighting injustice, such as the Arizona A.C.L.U. He created and funded a program to encourage minority college students to pursue careers in journalism. When he and Larkin obtained a $3.75 million settlement from Maricopa County after their illegal arrest and detention, they donated the money from the settlement to an organization they created, called the Frontera Fund, to help marginalized minority populations overcome poverty and racial injustice. These mentions are only a handful of the many charitable and generous donations Michael made over the years. He bought homes for friends. He paid for college for his siblings' children and daycare for their children. He paid for college for other people he encountered who showed promise, but did not have the means to pay on their own. He is known for helping any employee or friend who had fallen on hard times.

**F.    Michael is elderly and has medical issues.**

Michael is of advanced age. He is 76. He has high blood pressure, high cholesterol, coronary artery disease, and obstructive sleep apnea. He takes medication for these illnesses. He must swim or ride a stationary bicycle to keep his weight and medical issues in balance.

**18 U.S.C. § 3553(a) SUPPORTS SUBSTANTIAL LENIENCE FOR MICHAEL**

**I.    The nature and circumstances of the offense strongly support leniency.**

The context for the international concealment money laundering conviction is critical. This is not a case where the defendant went off on his own to hide an asset. Instead, in the years that preceded the international wire transfer at issue, federal law enforcement officers had visited his banks and suggested to those banks that it would be bad for their reputation to have him as a client, which then resulted in the banks terminating their relationship with him. This occurred when there were no charges pending. While visiting his long-time trusts-and-estates lawyer, John Becker, on an unrelated matter, Michael mentioned his inability to

maintain banking. In response, Becker suggested that a foreign bank might stabilize his banking, and suggested that they meet with another lawyer who specialized in offshore assets. That lawyer suggested a bank in Hungary and the creation of a trust for the benefit of his sons. This history of the origins of the wire transfer is critical to an assessment of his culpability.

The entire transaction was papered and executed by counsel. Michael did not hide anything from his counsel, explaining to them that the funds at issue were from the sale of Backpage. As his counsel, Becker, explained at trial, he believed and still believes the transaction to be fully lawful. There was no intent to conceal, and no actual concealment, but rather, an intent to disclose and actual disclosure. (*See* Docs. 2004, 2033, 2101.) Furthermore, there is no proof that Michael "knew . . . represented the proceeds of some form of unlawful activity," *Cuellar v. United States*, 553 U.S. 550, 561 (2008), as required for such a conviction, when this Court has already acquitted those same funds twice, and also ruled that the conspiracy to violate the Travel Act ended with the sale of Backpage to Ferrer, and that there was no proof to sustain direct or *Pinkerton* liability for anyone, Ferrer included, after the sale, for Travel Act violations. (Doc. 2063 at 40-41, 55-57.)

The conduct pertaining to the unresolved counts should not be considered because if Michael's sentence for Count 100 is increased based on that conduct and, if there should be any convictions pertaining to that conduct at a third trial, he would be punished twice for the same conduct, in violation of the Double Jeopardy Clause. *See North Carolina v. Pearce*, 395 U.S. 711, 719 (1969) (recognizing that the Double Jeopardy Clause protects "against multiple punishments for the same offense"). But even if that conduct were considered, at best, Michael is guilty of being misled into believing that Backpage operated lawfully – which is not a crime – but instead a defense to the unresolved charges. In good faith, Michael relied on the advice of others. Backpage's business was the sale of classified advertising space and was created on the business side of the company, over which Michael had no control or involvement. As this Court has already found, his involvement with Backpage was

14

"attenuated" and he was only occasionally approached by people on the business side of the company about business matters.  (Doc. 2063.)

Because he was not involved with Backpage, he did not have any first-hand knowledge and needed to ask questions.  When he had questions about Backpage, he raised his concerns with Jim Larkin, who repeatedly assured him that Backpage had retained the best lawyers on internet free speech and safety and Backpage was following that advice.  Michael had no reason to doubt Larkin because Larkin had managed the business-side of the newspaper company for decades, never once doing a dishonest thing.  Michael also asked questions of Carl Ferrer and others involved with Backpage, all of whom assured him that everything was being done properly, that they were assisting law enforcement to catch the people misusing the website, and that they had processes in place to prevent misuse of the website.  On several occasions, Ferrer testified under oath as a witness for the federal government – testifying that the classified ads website did everything it could to prevent misuse, that the website prohibited ads for illegal services and had computer programs and employees to prevent the posting of such ads, that he had no way of knowing whether anything posted in any ad was true, that website users sometimes lie in ads, and that he could make no assumptions about a website user based on the user's email address (even if the address is "youngpimpin86@gmail.com").

As has been discussed in other submissions (Docs. 1803, 1879, 1886 (incorporated herein by reference)), Michael was comforted in his reliance on Larkin and Ferrer because Backpage won one judicial victory after another, and counsel for Backpage wrote letters to various third parties, staking out the position that Backpage had the right to publish adult advertising and its users had the right to post that advertising, based both on the First Amendment and Section 230.  He also knew that sitting DOJ officials said it would only be a crime for a website to allow users to post ads if the website was actively conspiring with website users – something Ferrer had testified, under oath, that Backpage did not do.  He knew that a sitting-Attorney General informed the former head of NCMEC that the DOJ

could not prosecute Backpage because it would be impossible to establish the heightened level of specific intent necessary for prosecution.

Indeed, this view was so well-established that Congress twice passed legislative "fixes" aimed at giving prosecutors a statute with a *lesser* mens rea than required under existing laws (such as the Travel Act) to allow them to prosecute Backpage. The indictment here issued shortly before the enactment of the second law, which the Ninth Circuit now has interpreted as requiring a mens rea well *above* what the government advocated for under the Travel Act.[3]

Michael knew from his decades as a publisher that advocacy groups and even law enforcement would target the publishers of unwanted speech, regardless of its protection by the First Amendment. The attention Backpage's adult content attracted appeared to be no different. Michael was walled off from the business side of the newspaper company, but had repeatedly received assurances from his long-term partner that, after seeking advice from top-tier lawyers from reputable national law firms, the company was operating in conformance with the law. He also knew the person in charge of Backpage (Ferrer) had been testifying under oath as a witness for federal prosecutors and had received commendation after commendation from law enforcement thanking him for his assistance, including from the F.B.I. Director. In that light, his decisions were rational and principled. In the end, if all of this proved to be wrong, if Ferrer was hiding misdeeds from Larkin, if Larkin's assurances to Michael were premised on information later found to be faulty, and, if, on top of that, the advice of dozens of internet safety and free speech attorneys was wrong, Michael could not have known because he had no independent involvement with Backpage such that he could

---

[3]     *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1145 (9th Cir. 2022) ("[T]he defendant must have actually 'engaged in some aspect of the sex trafficking.' The statute does not target those that merely 'turn a blind eye to the source of their [revenue].' And knowingly benefitting from participation in such a venture requires actual knowledge and 'a causal relationship between affirmative conduct furthering the sex trafficking venture and receipt of a benefit.'"). Likewise, the district court in D.C. held that the *mens rea* under the first "fix" would require the publication of an ad with "actual knowledge" that was for trafficking. *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 109 (D.D.C. 2016).

have uncovered any of these variances from what he was told.  As Dr. Hardaway noted, Michael barely understood the internet, and is so disconnected from the modern world that he rarely carries a cell phone.

**II.     Michael's personal history and characteristics strongly support leniency.**

At 76 years old, Michael is a first-time felony offender.  He comes before this Court as an exceptional defendant.  Rather than a life of crime, Michael has led a life dedicated to fighting for First Amendment rights, bettering his community, and mentoring and helping others.  He had a profoundly positive impact on his employees, as indicated in letter after letter.  His employees have gone on to impact their communities through investigative journalism that forces change.  He is not someone who got arrested and suddenly decided to do good deeds to have something positive to discuss at sentencing.  He is a principled person who has spent his lifetime unearthing wrong-doing, and writing about it, even if doing so placed him at risk for harassment, arrest, civil suits, or death threats.  (Lacey Office Photo, **Ex. E**.)  He is a self-made millionaire who has generously given to people and causes.  He has taken financial hits to stay true to his principles.  He has gone to jail to stay true to his principles.  It makes no sense that he would intentionally involve himself in criminality at this late stage in his life.  Each of these things supports leniency.

Moreover, his age and the impact that his B.O.P. classification would have on his health and life expectancy support leniency.  As Jan Perdue, a former high-level B.O.P. official has indicated, he is unlikely to be sent to a federal prison camp even though his crime of conviction is solely a financial crime because the PSR incessantly discusses child-sex trafficking.  (*See* J. Perdue Aff., **Ex. F**.)  He will be classified as a sex offender which will place him at risk within the general population.  In light of his age and lack of experience in prison, he would be the target for exploitation.  (*Id.* ¶ 16.)  Whether kept in general population or in solitary confinement, he is not expected to live even four years.  (*Id.* at ¶ 35.)  As a result, any sentence of incarceration, other than at a half-way home or home confinement, would be a death sentence for Michael.

17

**III.    Michael has been punished.**

Michael has lived under a federal indictment since April 2018.  For much of this time period, he wore an electronic ankle monitor.  Because nearly all of his funds and assets were seized regardless of origins, even though he had earned substantial wealth prior to creation of Backpage, he has struggled to pay bills the entire time this case has been pending.  His financial instability is detailed in his PSR and has been an immense strain on him.  His sons have lived with the stress of a parent under indictment, as have all of Michael's family and friends.  The stress of the indictment contributed to the end of his current marriage.

But none of this matters in comparison to the loss of his dearest friend, Jim Larkin, who could no longer handle the stress of this case and killed himself.  Then, and now, Michael continues to mourn the loss of his 50-plus-year friend and partner.  Days after the funeral, this trial began.  For the first time in his career, Michael was in a courtroom without Jim.  In one First Amendment battle after another, they had been side-by-side.  This time, Michael was alone.  Although the sudden and tragic loss of his friend made it difficult to be present and focused at trial, he was comforted by what Jim said to him the day before he killed himself – a fact that was borne out by the proof at trial – "Mike, you'll be ok.  You didn't have anything to do with Backpage."

**IV.    Incarceration is not necessary to afford adequate deterrence or to protect the public.**

Incarceration is not necessary to protect the public.  There was no victim of the financial crime for which Michael was convicted.  But even if the Court considers the unresolved conduct, which it should not, the thing that made him a purported threat to public safety – the Backpage website – was taken down more than six years ago.  As a result, incarceration is not needed to protect the public from him.  In fact, he has been considered such a low threat to public safety that he has been out on bail for more than six years.  He has been authorized to travel outside Arizona many times, including after his conviction, for weeks at a time.  He has not committed any crimes, he followed the rules, and he passed his drug tests.  Indeed, this Court decreased his pretrial conditions by ordering the removal of his electronic ankle monitor more than a year ago.

Incarceration is not necessary to afford adequate deterrence. This is Michael's first felony conviction and the proof at trial demonstrated that he did not intend to commit a crime, but, instead, followed the advice of counsel so as to provide him with banking stability.

**V.     Section 3553(a)(6) supports a downward variance from the Guidelines.**

As Mr. Allenbaugh, a lawyer who previously worked for the Sentencing Commission and currently holds the title of Chief Research Officer for SentencingStats.com, Inc., has indicated, Probation's recommended sentence would result in a gross disparity between Mr. Lacey and comparable defendants. (*See* M. Allenbaugh Aff., **Ex. G**.) His base offense level should be calculated as no greater than 10, which yields an advisory Guidelines range of 6-12 months. Of comparable defendants (offense level 10, primary Guideline § 2S1.1), only 23% were given a sentence of incarceration (with 77% receiving a sentence other than incarceration) and, of those defendants, the average length of the sentence imposed was ten months. (*Id.* at ¶¶ 7-13.)

**VI.    Just punishment and respect for the law are not served by a lengthy term of incarceration.**

In letter after letter, former writers and editors, family and friends have asked this Court for mercy for Michael. Given all of the circumstances discussed herein, a lengthy term of incarceration would not foster respect for the law or serve as just punishment.

## <u>DEFENSE RECOMMENDATION</u>

For all these reasons, Michael Lacey respectfully requests a sentence of probation. First, as discussed in his Objections to the PSR (Doc. 2101, 2124), incorporated herein by reference, Michael's base offense level is no greater than 10. A base offense level of 10 leads to a Guidelines range of 6-12 months, with 77% of the defendants with this conviction and offense level receiving a non-custodial sentence.

Second, this Court should not include acquitted or unresolved conduct in sentencing Michael, for all the reasons stated herein and in the PSR Objections (Docs. 2101, 2124.)

19

Third, even if this Court were to consider the unresolved conduct, this Court has already recognized that Michael's involvement with Backpage (and for that matter, the entire business side of the newspaper company) was "attenuated" at best, with Ferrer testifying that Michael was a "layer away" from Backpage.  Payments made to Michael reflect his ownership interest in a company where his role was to oversee the writers and his pay was comparable to the amount received by Larkin and his sons (both of whom had minor interests).

Fourth, Michael is a remarkable person who overcame a traumatic childhood and has lived a principled life.  He moved across the country by himself at 18.  A few years later he started a newspaper that ultimately grew into a nationwide conglomerate breaking one story after another.  It should be clear to this Court that his journalism and his training of his writers has had a positive impact on Arizona and elsewhere.

Probation is requested.  If probation is declined, he requests house arrest.  If house arrest is declined, he requests a term of incarceration at a halfway house.  If his request for a halfway house is declined, he requests that this Court impose a term of incarceration with the recommendation to place him in a camp.  To do so, this Court will need to make that recommendation on the record and state on the record that he was convicted of a financial crime and not a sex crime.  Otherwise, Michael is likely to be classified as a sex offender and be housed at a federal low or medium security facility, at great risk to his personal safety and health.  At Michael's age, with a life expectancy of no more than four years, and the serious risk to safety he faces in custody, a sentence of incarceration essentially would be a death sentence based on this first felony conviction.

RESPECTFULLY SUBMITTED this 19th day of August, 2024,

Paul J. Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME CAMBRIA LLP

By:     /s/ Paul J. Cambria, Jr.
        Paul J. Cambria, Jr.
        Attorneys for Michael Lacey

On August 19, 2024, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Austin Maxwell Berry, austin.berry2@usdoj.gov

# EXHIBIT D

# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               ) No. 2:18-cr-00422-DJH
                   Plaintiff,  )
                               )
           vs.                 )
                               ) Phoenix, Arizona
Michael Lacey, et al.,         ) September 27, 2023
                               ) 8:53 a.m.
                  Defendants.  )
_____)


**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**


<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**JURY TRIAL - DAY 13**</u>

<u>**(A.M. SESSION)**</u>


Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

**A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
        **Mr. Andrew C. Stone, Esq.**
        **Mr. Peter Shawn Kozinets, Esq.**
        **Ms. Margaret Wu Perlmeter, Esq.**
        **Mr. Daniel G. Boyle, Esq.**
    40 North Central Avenue, Suite 1800
    Phoenix, Arizona  85004-4408
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov
    - and -
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue NW, 11th Floor
    Washington, DC  20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPTSITZ GREEN SCIME CAMBRIA, LLP
    By:  **Mr. Paul J. Cambria, Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, New York  14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    KESSLER LAW OFFICE
    By: **Mr. Eric Walter Kessler, Esq.**
    6720 North Scottsdale Road, Suite 210
    Scottsdale, Arizona  85253
    eric.kesslerlaw@gmail.com
    - and -
    FEDER LAW OFFICE, PA
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, Arizona  85016
    bf@federlawpa.com

**A P P E A R A N C E S (Cont'd)**

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
         **Mr. Gary S. Lincenberg, Esq.**
         **Mr. Ariel A. Neuman, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, California  90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com
    aneuman@birdmarella.com

For the Defendant Andrew Padilla:
    DAVID EISENBERG, PLC
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, Arizona  85012
    david@deisenbergplc.com

For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ, LLC
    By:  **Ms. Joy Malby Bertrand, Esq**
    P.O. Box 2734
    Scottsdale, Arizona  85252-2734
    Joy@joybertrandlaw.com

4

1                                   **I N D E X**

2    <u>WITNESSES FOR THE GOVERNMENT:</u>                              <u>PAGE</u>

3    Carl Ferrer
             Cross-Examination (Cont'd) by Mr. Cambria          9
4            Cross-Examination by Mr. Lincenberg                86

5


6                                   <u>EXHIBITS</u>

7    <u>NO.</u>        <u>DESCRIPTION</u>                                  <u>REC'D</u>

8    662        Email from Ferrer to Larkin and Lacey,         20
                "Sgt Byron Fassett", 07/06/2011,
9               DOJ-BP-0002114645 - DOJ-BP-0002114646

10

11   668        Email from Ferrer to Lacey, "RE: Age           35
                verification ID", 07/15/2011,
12              DOJ-BP-0001127479 - DOJ-BP-0001127481

13   669        Emails between Spear, Larkin, Ferrer, and       44
                Lacey, "stats…more info", 07/15/2011,
14              DOJ-BP-0001127482 - DOJ-BP-0001127483

15   6243       Jan. 2006 VVM Corporate Structure              73
                DOJ-BP-0004602110-017

16

17

18

19

20

21

22

23

24

25

                          UNITED STATES DISTRICT COURT

5

1          **P R O C E E D I N G S**

2          (Defendants are present and out of custody.)

3          (Court was called to order by the courtroom deputy.)

4          (Proceedings reconvene at 8:53 a.m.)

5          (Jury not present at 8:53 a.m.)                    08:53:35

6          THE COURT:  All right.  Please be seated.

7          Good morning, everyone.  We have a juror who is under

8     the weather somewhat.  She's explained a particular health

9     issue that she does not feel safe in driving in.  She's got

10    a -- quite a long commute.  We've conveyed to her a couple   08:54:08

11    options, including the -- being reimbursed for ride share.  And

12    she lives quite a distance away that she didn't think that that

13    would be feasible she would be able to get a Uber or a Lyft

14    from the distance that she drives.

15         The Alternative B is we're checking with our           08:54:37

16    technological department to see, and she's willing and capable,

17    of viewing the proceedings through a video.  And we're looking

18    into that in terms of how long it will take us to set that up

19    and to test it.

20         And so while that is being done, I ask you to meet and  08:55:02

21    confer with your respective clients and determine whether or

22    not that is something you wish to do.  And if that is not

23    something that you think that you are going to be agreeable to,

24    we can make a record on that.  And then you have, I think, a

25    decision to make, which would be to postpone for today or to   08:55:30

1    release the juror.

2          And so while Liliana checks with our IT folks on how

3    to establish that link and bring in the equipment to do that,

4    I'll leave you to meet and confer, and then I'll check back in.

5          MR. RAPP:  Your Honor?                        08:55:54

6          MR. CAMBRIA:  Can we know who it is?

7          THE COURT:  It's Juror Number 9.

8          MR. FEDER:  Thank you, Your Honor.

9          THE COURTROOM DEPUTY:  All rise.

10          (Recess from 8:56 a.m. to 9:17 a.m.)        08:56:11

11          THE COURTROOM DEPUTY:  All rise.

12          THE COURT:  All right.  Please be seated.

13          And so has there been any agreement with regard to

14    Juror Number 9 from the government's perspective?

15          What is your position?                   09:17:36

16          MS. PERLMETER:  Good morning.  The government has no

17    objection to Juror Number 9 appearing telephonically or through

18    videoconferencing, as the Court suggested.  We think that this

19    would be a good alternative to her being live in court given

20    that she is healthy enough and able to participate in the   09:17:55

21    continued proceedings.

22          We very much do not want to delay this trial any

23    further, so we ask that the Court allow her to do that.

24          THE COURT:  All right.  Mr. Cambria?

25          MR. CAMBRIA:  Your Honor, our position is that she  09:18:09

1    should be excused.  There's just too much, let's say, lack of

2    any kind of control, and so on, with somebody being remote.

3    That's just not acceptable to us.  We think that she should be

4    excused.

5           THE COURT:  Ms. Bertrand?                       09:18:29

6           MS. BERTRAND:  I join in my colleague's

7    recommendation.  I would ask that this juror be excused.

8           THE COURT:  Mr. Lincenberg?

9           MR. LINCENBERG:  Yes, Your Honor.  We join.

10          THE COURT:  Mr. Feder?                       09:18:38

11          MR. FEDER:  We do not agree to having her remotely.

12    We do agree to her being removed or excused.

13          THE COURT:  Mr. Eisenberg?

14          MR. EISENBERG:  The same, Your Honor.

15          THE COURT:  All right.                    09:18:49

16          Well, that poses a different question, then, to the

17    government with regard to excusing the jury -- juror from

18    service.

19           THE COURT REPORTER:  I'm sorry.  I can't hear you.

20          MS. PERLMETER:  While we do prefer that she continue    09:19:06

21    participation in this trial, if the Court decides that it is in

22    the interest of keeping the trial moving, we have no objection

23    to letting her go.

24          THE COURT:  All right.  Well, I think because there is

25    no agreement with regard to her appearing remotely for the    09:19:23

8

```
 1   purposes of keeping us on track, then I believe it is in the
 2   interest of the parties to release Juror Number 9.
 3          And so all of our jurors are present.  And so we will
 4   proceed without Juror Number 9.  Liliana and our juror
 5   administrate -- okay -- our jury administrative office will      09:19:49
 6   inform her that she's excused from further duty.
 7          And so with that, let's go ahead and check on the jury
 8   and have them in.
 9          Mr. Cambria, are you prepared to proceed?
10          MR. CAMBRIA:  Yes, Your Honor.                            09:20:08
11          THE COURT:  All right.  Let's have our witness in.
12          All rise for the jury.
13          (Jury present at 9:21 a.m.)
14          THE COURT:  All right.  Please be seated.
15          Members of the jury, not quite the early start that I     09:21:53
16   had anticipated.  The best laid plans apparently do not work
17   well for me.  So, in any event, due to circumstances, and you
18   need not concern yourself with the details, we have determined
19   that it best to proceed without Juror Number 9.  And so Juror
20   Number 9 has been excused from service -- further service.  So   09:22:22
21   I just wanted to update you on all on that.
22          And so we are ready to proceed.  The witness is
23   present.
24          And, Mr. Cambria, you may continue.
25          MR. CAMBRIA:  Thank you, Your Honor.                      09:22:34
```

UNITED STATES DISTRICT COURT

```
 1                    CROSS-EXAMINATION (Cont'd)

 2   BY MR. CAMBRIA:

 3   Q.  Good morning, Mr. Ferrer.

 4   A.  Good morning.

 5   Q.  In your various interviews with people from the government,   09:22:42

 6   you were asked some questions, and you made some statements

 7   with regard to Mr. Lacey.

 8            Do you recall that?

 9   A.  Yes.

10   Q.  All right.  And, for example, you characterized Mr. Lacey   09:22:59

11   as a journalist.  Is that fair?

12   A.  Yes.

13   Q.  All right.  And, as a matter of fact, there were -- at one

14   time was it 19 or so various newspapers?

15   A.  With this number, it was 11.  Then it went up to 16, so --   09:23:22

16   Q.  16's the highest number you recall?

17   A.  That's the highest number that I recall.

18   Q.  Okay.  And Lacey was the overall editor of those papers.

19   Is that fair to say?

20   A.  Yes.                                                         09:23:38

21   Q.  And -- but the individual papers had editors as well, did

22   they not?

23   A.  Yes, they did.

24   Q.  Yeah.  And then he would supervise those individuals?

25   A.  That was my understanding.                                   09:23:51
```

UNITED STATES DISTRICT COURT

 1   Q.  Okay.  And that's all we can ask you for.

 2          That some of the things that he did was -- or he wrote

 3   editorials; true?

 4   A.  Yes.  I think so.

 5   Q.  Okay.  And wrote articles.  Not necessarily editorials, but          09:24:10

 6   articles?

 7          MR. RAPP:  Objection.  Foundation.

 8   BY MR. CAMBRIA:

 9   Q.  Well --

10          THE COURT:  Well --

11   BY MR. CAMBRIA:

12   Q.  -- if you know.

13          THE COURT:  -- just -- just lay a little foundation

14   for the question, Mr. Cambria.

15          MR. CAMBRIA:  Ooh.  Let me put this on.                            09:24:26

16   BY MR. CAMBRIA:

17   Q.  Well, you -- you were familiar with the newspapers, were

18   you not?

19   A.  Yes, I was.

20   Q.  All right.  And so I said, he also wrote articles, did he            09:24:33

21   not?

22          MR. RAPP:  Again, objection.  Foundation.  When?

23   Where?

24          THE COURT:  Yes.  I guess --

25          MR. CAMBRIA:  Okay.                                               09:24:45

1          THE COURT:  -- if you could be a little bit more

2     precise and --

3     BY MR. CAMBRIA:

4     Q.  All the time that you were associated with Village Voice

5     Media, Backpage, et cetera, were you able to observe whether or          09:24:51

6     not Mr. Lacey worked with the newspapers in writing articles?

7     A.  Yes, he did.

8     Q.  Okay.

9          MR. CAMBRIA:  Is that good?

10    BY MR. CAMBRIA:          09:25:06

11    Q.  Next.  You described Mr. Lacey as being a layer away from

12    Backpage?

13          Do you recall that?

14    A.  I did say that, yes.

15    Q.  Okay.  And you also said, did you not, that you did not          09:25:21

16    act -- interact very much with Mr. Lacey; true?

17    A.  Yes, but it was different at different times.

18    Q.  Okay.  And in addition to that, you also stated that Lacey

19    was more or less in the background; true?

20    A.  It depends on the time.  There's some times that he was          09:25:45

21    very much in the forefront.

22    Q.  Okay.  With regard --

23    A.  Not so much.

24    Q.  We were -- you at some time had mentioned so-called

25    quarterly meetings or banking meetings.          09:26:00

CARL FERRER - CROSS-EXAMINATION (Cont'd)

12

1        You indicated Lacey did not attend those; correct?

2   A.  That's correct.

3   Q.  Now, I wanted to talk about the operation of Backpage.  I

4   mean, you were the -- basically the CEO there of Backpage, were

5   you not?                                                        09:26:21

6   A.  I -- I don't understand by that term, because I always

7   think of a CEO as somebody who has some ownership stake or owns

8   a percentage of the company.

9   Q.  All right.  How about operating Backpage?  You were the

10  chief operator, were you not?                                   09:26:39

11  A.  I would use the term a director, yes.

12  Q.  Director/operator.  What I'm talking about is the

13  day-to-day business of Backpage.

14        You were the person in charge of that, were you not?

15  A.  I was the overall supervisor that reported to Scott Spear.  09:26:58

16  Q.  Okay.  And, now, with regard to -- there were a number of

17  terms that the moderators would look for and take out of ads;

18  is that correct?

19  A.  Correct.

20  Q.  And that was at -- that was their job, one of their jobs,   09:27:20

21  was it not?

22  A.  It was.

23  Q.  All right.  And we see, for example, other platforms.

24  Let's talk about, like, Facebook.

25        MR. RAPP:  Objection.                                     09:27:36

UNITED STATES DISTRICT COURT

1    BY MR. CAMBRIA:

2    Q.   There are times --

3            MR. RAPP:  Objection.  Relevance.

4            THE COURT:  Overruled.

5    BY MR. CAMBRIA:                                          09:27:40

6    Q.   There are times when the people who run Facebook take

7    certain things out or prohibit certain things; correct?

8            MR. RAPP:  Same objection.  And foundation.

9            THE COURT:  Well, it -- if he knows based on his own

10   knowledge, he can answer.                                09:27:58

11   BY MR. CAMBRIA:

12   Q.   You're familiar with that, aren't you?

13   A.   Yeah, but I have a different impression.

14   Q.   Well, my question is, are you familiar with that and do

15   they do that?                                            09:28:07

16   A.   I believe they do something different.

17   Q.   All right.  Well -- all right.  How about this:  You talked

18   about -- you used a few terms, BBJ.  You talked about Greek and

19   all these other things.

20           Do you recall that?                              09:28:28

21   A.   Yes.

22   Q.   All right.  Now, in a situation where somebody launches an

23   ad, the idea is that some other person will respond to that ad;

24   correct?

25   A.   Yes.                                                09:28:44

CARL FERRER - CROSS-EXAMINATION (Cont'd)

14

```
1    Q.  All right.  The ad is sort of an offer, and they're looking
2    for a customer?
3    A.  Yes.
4    Q.  All right.  So, now, if I am somebody -- you talked about
5    the term "Greek."  All right.  And you said -- I think you said      09:28:59
6    Greek was -- that some people interpreted that word to mean
7    anal sex; true?
8    A.  It's -- Greek is a common term for anal sex --
9    Q.  Okay.
10   A.  -- in the adult industry.                                        09:29:17
11   Q.  All right.  So if I were someone who was perusing ads and I
12   was interested in engaging in that kind of conduct, I would
13   look for that word, would I not?
14   A.  That could happen, yes.
15   Q.  Well, it makes sense, doesn't it?                                09:29:42
16   A.  Well, I suppose if you're looking for anal sex in the
17   female escorts category that you could search for that term,
18   Greek --
19   Q.  Well --
20   A.  -- and then those ads would come up.                            09:29:59
21   Q.  Okay.  But wasn't -- wasn't that the point you were trying
22   to make, that maybe there are people that associate that term
23   with that kind of conduct; right?
24   A.  Some, it's not a really accurate term if you're browsing
25   the female escorts category.  It would be many or most.             09:30:20
```

CARL FERRER - CROSS-EXAMINATION (Cont'd)

15

1   Q.  Well, you can't speak for people you never met before, can

2   you?

3   A.  Well, I -- I can tell you that we --

4   Q.  No.  That wasn't my question.

5           Can you speak for people you never met before?        09:30:33

6           MR. RAPP:  Objection as to vague.

7           MR. CAMBRIA:  Well, Your Honor --

8           MR. RAPP:  And speculation.

9           MR. CAMBRIA:  -- that wasn't my question.

10          THE COURT:  Sustained.                                09:30:42

11  BY MR. CAMBRIA:

12  Q.  Okay.  Can you speak for people who you have never met

13  before?

14          MR. RAPP:  Same.

15  BY MR. CAMBRIA:                                               09:30:49

16  Q.  Do you understand?

17          MR. RAPP:  Objection.

18          THE COURT:  Sustained.

19          MR. CAMBRIA:  Okay.

20  BY MR. CAMBRIA:                                               09:30:53

21  Q.  In any event, if that word would indicate to someone who

22  was looking for that kind of conduct that perhaps it was

23  available in that ad, you would need to have that word in the

24  ad, would you not?

25          MR. RAPP:  Objection.  Speculation.  Foundation.      09:31:12

UNITED STATES DISTRICT COURT

1          THE COURT:  Well, overruled.

2    BY MR. CAMBRIA:

3    Q.  Do you understand my question?

4    A.  No.

5    Q.  Okay.  Let's assume that --                          09:31:24

6          MR. CAMBRIA:  Sorry.

7    BY MR. CAMBRIA:

8    Q.  Let's assume that I'm someone looking for that kind of

9    activity and that I would associate that word with that

10   activity.                                                 09:31:42

11         If I reviewed an ad that had that word in it, then

12   perhaps I would respond to it for that activity; correct?

13   A.  Correct.

14   Q.  All right.  Now the word's gone.  It's not in the ad

15   anymore.                                                  09:31:58

16         Why would I respond to the ad --

17   A.  Because.

18   Q.  -- if I was looking for that conduct and that word was

19   gone?

20   A.  Because you would look for the misspelling.  You would look  09:32:10

21   for Greek spelled with -- instead of two Es, two 3s.

22   Q.  Okay.  Now, let's assume that wasn't there either.  There

23   was no Greek, no 3s, no 6s, no 12s.  No Greek.

24         That's not an ad that would catch my attention, don't

25   you agree, if I was looking for that conduct and looking for  09:32:33

1   those words if they were gone?

2   A.  You're -- you're really speaking about a hypothetical here,

3   because you could just call her and ask.

4   Q.  You could.  And then you would have a conversation.

5   Somebody would make an offer.  You would have an acceptance;    09:32:52

6   correct?

7   A.  Correct.

8   Q.  All right.  I'm talking about just reading an ad.  Reading

9   an ad doesn't have that connection with the individual, does

10  it?                                                            09:33:05

11  A.  It's not as transparent, if that's what you mean.

12  Q.  What I mean is --

13  A.  Not as convenient.

14  Q.  -- if you read an ad and the word's not there and you

15  haven't talked to the individual, then you're going to have no 09:33:19

16  connection with that person for that activity, are you?

17          MR. RAPP:  Objection.  Asked and answered.

18          THE COURT:  Sustained.

19          MR. CAMBRIA:  All right.  I guess they agree with me

20  then.                                                          09:33:33

21          MR. RAPP:  Objection.  Move to strike that and

22  admonish counsel not to editorialize.

23          THE COURT:  Sustained, Mr. Cambria.

24          MR. CAMBRIA:  All right.  Could we show the witness

25  Exhibit 662, which I believe is in evidence.                   09:34:18

```
 1   BY MR. CAMBRIA:
 2   Q.  Do you see that, Mr. Ferrer?
 3   A.  I do.
 4   Q.  All right.  And I think that you had identified that
 5   earlier as a -- an email from you to Mr. Larkin, Mr. Lacey, and    09:34:42
 6   it's with regard to a meeting you had with a Byron Fassett.
 7            Who's Byron Fassett?
 8   A.  So he's a police officer for prostitution investigations
 9   involving juveniles in Dallas, Texas.
10            MR. CAMBRIA:  Okay.  And before we go on, could we      09:35:14
11   just publish this, please.
12            MR. BERRY:  It's not in evidence.
13            MR. CAMBRIA:  It's in evidence.
14            MR. RAPP:  It's not in evidence.  It's not in
15   evidence.  662b is in evidence.                                  09:35:27
16            MR. CAMBRIA:  All right.
17   BY MR. CAMBRIA:
18   Q.  Mr. Ferrer, I call your attention to 662.
19            Is that something that you wrote?
20   A.  Yes, it is.                                                  09:35:44
21   Q.  And you send it to Jim Larkin, Mike Lacey, and it was with
22   regard to Byron Fassett; is that correct?
23   A.  I sent it to them because they requested that.
24   Q.  I didn't ask you that.  I asked you if you sent it to them.
25   A.  I did.                                                       09:35:59
```

1    Q.  All right.

2            MR. CAMBRIA:  And I offer it in evidence.

3            THE WITNESS:  I'm sorry?  I did not -- I didn't hear

4    that.  Oh.

5            THE COURT:  I'm sorry?                              09:36:11

6            MR. CAMBRIA:  I offer it into evidence.

7            THE COURT:  You're moving to admit?

8            MR. CAMBRIA:  I'm sorry.

9            THE COURT:  Are you moving to admit?

10           MR. CAMBRIA:  Yes.                                  09:36:18

11           THE COURT:  Oh, okay.

12           Is there an objection?

13           MR. RAPP:  Judge, I need a second because this is not

14   the version of the exhibit that -- so I need to see the second

15   page.                                                      09:36:29

16           THE COURT:  Oh, are there multiple pages, Mr. Cambria?

17           MR. CAMBRIA:  Your Honor, I thought this one was in

18   evidence.  He says there's a 662a apparently.

19           MR. RAPP:  B.

20           THE COURT:  B.                                      09:36:41

21           MR. CAMBRIA:  B.

22           MR. RAPP:  If -- if counsel wants this in, it can be

23   published and admitted.

24           THE COURT:  This is Government's 662, is that correct,

25   Mr. Cambria?                                               09:37:10

```
 1              MR. CAMBRIA:  Yes, Your Honor.

 2              THE COURT:  It may be admitted, and it may be

 3    published.

 4              MR. CAMBRIA:  Thank you.

 5              (Exhibit 662 admitted into evidence.)              09:37:17

 6    BY MR. CAMBRIA:

 7    Q.  Mr. Ferrer, would you read this, please.

 8              MR. RAPP:  Well, the --

 9              THE WITNESS:  The entire --

10              MR. RAPP:  Hold it.                                09:37:23

11              It's a lengthy -- it's a lengthy email here.  The

12    entirety of it?

13              MR. CAMBRIA:  Well, sections at a time here.

14              Could we have him read it, please.

15              THE COURT:  Well, how are you going to have him read  09:37:36

16    it?  From the top up or from the top down?

17              MR. CAMBRIA:  From the top down.

18              THE COURT:  Okay.  And I'm assuming that you don't

19    need him to read the email addresses.

20              MR. CAMBRIA:  No.                                  09:37:49

21              THE COURT:  Okay.

22              You may -- you may read the email, Mr. Ferrer.

23              THE WITNESS:  "I had a meeting with Sergeant Byron

24    Fassett.  He heads up the High Risk Victims and Trafficking

25    Unit.  My thought is to get to know the guy who is very well  09:38:03
```

1    known and liked at the Crimes Against Children Conference in

2    Dallas.

3          "He had been quoted in several articles by our papers

4    in the past.  Including the Super Bowl article" -- and then I

5    have a link to the Super Bowl article with the title Super Bowl    09:38:17

6    Prostitution, 100,000 Hookers Didn't Show but America's Latest

7    Political Scam did.

8          "I expect a low key meeting with Byron.  I ended up in

9    a meeting with 8 well-prepared people.  Sergeant Fassett and

10   Sergeant Nunez (head of vice), a Lieutenant on the vice squad,    09:38:37

11   an ICAC member, Joe Ullman of the FBI, Sally Lannon Lieutenant

12   PD, Lisa Miller AUSA, Brooke Grona-Robb, ADA, and another

13   sergeant who pulled records but did not have a card.

14         "I told them I was not a reporter.  I run the web site

15   and want to work with them.  Our priorities are deter, remove,    09:39:03

16   and report bad postings and help prosecute any child

17   exploitation or human trafficking cases.

18         "Sergeant Fassett recalled speaking with the Village

19   Voice reporter last week.  He indicated the arrest records are

20   problematic way to qualify the prostitution" -- "child           09:39:22

21   prostitution issue.  However, he felt to exaggerate statistics

22   were not helpful.  If we say there are around a thousand child

23   prostitute victims, he says it means there are 10,000.  This is

24   because so many cases involving child exploitation may get

25   charged for a different crime.                                    09:39:47

CARL FERRER - CROSS-EXAMINATION (Cont'd)

22

1          "They only use 1 percent of the NCMEC reports we send

2    them.  There are several reasons for this:  Backpage needs to

3    do a better job.  We are reporting pics where the user is

4    clearly not underaged.  Even if the pic looks under aged, they

5    still have to set up a meeting with the user and often they do          09:40:05

6    not get a call back when they leave a voicemail," [as read].

7    BY MR. CAMBRIA:

8    Q.  Let me stop you there for a second.

9          So he at this meeting said that even if the pic looks

10   under aged, they still have to set up a meeting with the user;          09:40:22

11   is that correct?

12   A.  That's what it says.

13   Q.  Under- -- do you understand that to mean at the time by him

14   that simply looking at the picture itself, or the ad, was not

15   sufficient?  You had to actually meet?          09:40:38

16   A.  That's how I understood it.

17   Q.  Okay.  Continue, please.

18   A.  "Most of their successful cases are achieved through other

19   means than our" -- "than one of our NCMEC reports.  Even

20   reports from other users often turn out to be competitors just          09:40:54

21   trying to get someone's ad taken down."

22   Q.  Let me stop you there.

23          That last statement that sometimes reports turn out to

24   be competitors, are you familiar with that generally aside from

25   what he said?          09:41:19

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION (Cont'd)

23

```
 1   A.  Yes, I am.
 2   Q.  All right.  And that from time to time people will call in
 3   and report a particular ad and say that it -- you know, it's
 4   inappropriate, or what have you, and they're really trying to
 5   get that ad taken down because that's one of their competitors;   09:41:41
 6   true?
 7   A.  We did see that happen on occasion.
 8   Q.  Okay.  And so sometimes a statement, whether it be a report
 9   or a claim or so on, isn't reliable?
10        MR. RAPP:  Objection.  Foundation.                           09:42:02
11   BY MR. CAMBRIA:
12   Q.  From your experience?
13        THE COURT:  Sustained.
14   BY MR. CAMBRIA:
15   Q.  Based on your observations and your experience?               09:42:10
16        MR. RAPP:  Same.  Same objection.  When?  Where?
17   What?
18        THE COURT:  Sustained.
19   BY MR. CAMBRIA:
20   Q.  All right.  Does it matter when, where, or what as a -- as    09:42:18
21   to whether that occurs?
22        Would it matter if it happened in March versus
23   December?
24   A.  It -- it -- no.  It matters more on the IP tracking and the
25   tools that we put in place to ignore those type of reports.       09:42:40
```

CARL FERRER - CROSS-EXAMINATION (Cont'd)

24

```
 1   Q.  Let me give you another example.  If you, for example, had
 2   a complaint about a particular ad, let's say, and then it turns
 3   out that you had complaints about a number of ads but they all
 4   came from the same place, that would be something you'd look
 5   at; correct?                                                    09:43:04
 6   A.  Correct.  That's how you could identify somebody who -- who
 7   may be -- the report is not genuine.
 8   Q.  Yeah.  So, in other words, one IP address is reporting 50
 9   other ads as being inappropriate.  That usually is somebody
10   who's a competitor trying to get somebody else taken down;       09:43:24
11   right?
12   A.  Sometimes.  Sometimes it's a NGO or an anti-human
13   trafficking group that's just flagging every ad in the
14   category.
15   Q.  And there would be no way for you to tell just by looking    09:43:37
16   at it?
17   A.  Well, there is a way.  I mean, we -- you'd look at the
18   number of reports by IP and if it's all in one particular city,
19   then we question the -- whether that report is genuine and
20   whether we should send a report to NCMEC or not.                 09:43:53
21   Q.  Right.  And so you'd find, however, in situations like that
22   that frequently the reports are not genuine?
23   A.  No.  It's more like the minority of the reports.  I mean,
24   frequently they're -- the reports are -- appear to be genuine.
25   Q.  Okay.  And so the problem is, however, that you don't know   09:44:12
```

UNITED STATES DISTRICT COURT

1   the genuine from the not accurate?

2   A.  I think that's why we enjoyed sending those reports to

3   NCMEC and let them send it to the police department to let them

4   investigate.

5   Q.  So is your answer to my question yes?                          09:44:33

6   A.  Well, could you -- can I -- could you say that question

7   again?

8   Q.  Oh.

9   A.  I'm sorry.

10  Q.  Yeah.  No.  What I said was, you can't tell the difference    09:44:42

11  between a genuine and a non-genuine?

12          And did you not say, we just send them on to NCMEC and

13  let them figure it out?

14  A.  Well --

15          MR. RAPP:  Objection.  Objection.  Confusing and vague    09:44:53

16  and --

17  BY MR. CAMBRIA:

18  Q.  Are you confused by that?

19          THE COURT:  Well, no.  Let -- let me -- Mr. Cambria,

20  when there's an objection, let me make a ruling.                  09:45:00

21          MR. CAMBRIA:  I'm sorry.  Sure, Your Honor.

22          THE COURT:  Okay.  So I will sustain the objection.

23          And you can rephrase or --

24          MR. CAMBRIA:  Okay.

25          THE COURT:  -- ask a new question.                        09:45:09

1    BY MR. CAMBRIA:

2    Q.  All right.  In any event, you told us, didn't you, that in

3    situations like that you'd send those to NCMEC and let them

4    figure it out?

5    A.  In situations where we felt that the report was genuine, we          09:45:18

6    would send them to NCMEC.

7    Q.  All right.  Well, if -- if you felt that it wasn't genuine,

8    would you still send them to NCMEC so that they could figure

9    out for sure if it was genuine?

10   A.  We would err on the side of sending the report to NCMEC.          09:45:37

11   Q.  So -- so you would send it?  Either way, you would send it

12   to be safe?

13   A.  If you had asked me earlier about the reports being

14   genuine, some reports appeared to be very genuine if they

15   involved a family member.          09:45:59

16          So there's just degrees of authenticity of these

17   reports.  You know, I can't paint the -- a broad brush on every

18   report that we have from the user.

19   Q.  Okay.  Back to where we were reading.  Do you recall where

20   we were here?          09:46:16

21   A.  I don't.

22   Q.  All right.  Let's start with the part where it says,

23   "Dallas focuses on run aways."

24   A.  I got it.

25          "Dallas focuses on run aways and this they feel is          09:46:30

1   much more successful.  They have 9,000 run aways per year.  Any

2   child who runs aways 4 times or more they believe is at risk of

3   child exploitation.  They end up creating a list of 207 high

4   risk children.  These high risk children profiles are shared

5   with law enforcement.  About 94 high risk children end up          09:46:55

6   involved in prostitution.

7            "They would like backpage to do the following:  Build

8   a tool where law enforcement can access and do a search by

9   phone number all cities; build an image hash so we can find and

10  remove images where a child is exploited and/or assist law         09:47:18

11  enforcement; include the backpage user name that made the NCMEC

12  report; ask the backpage person to provide more detail on why

13  they think someone is under age; include a PSA on the site

14  explaining the consequences of statutory rape (run this in the

15  listing or at the bottom of every ad); include a time date and     09:47:47

16  time zone info with the IP address; as was the case in Chicago,

17  they also think they should be able to get info without a

18  subpoena if we added this to our disclaimer or Terms of use.

19  (I said my attorneys continue to review this request but it's

20  problematic).                                                      09:48:07

21           "Sergeant Nunez asked if I would remove ads from known

22  prostitutes.  I said, email me the posting and I would be happy

23  to do so.

24           "We also talked about user reporting.  Do we continue

25  to assume anonymous reports or do get their email address and      09:48:24

1   share it with law enforcement?

2        "I said user reporting was under review, that I will

3   share any info they need with a subpoena (or the promise of a

4   subpoena) for exigent circumstance.  Carl," [as read].

5   Q.  So the last part of that, there were a number of things          09:48:43

6   that they asked Backpage to do to assist them; correct?

7   A.  Yes.

8   Q.  All right.  So they were asking to continue to work with

9   Backpage, were they not?

10  A.  I don't know if they'd describe it work with us.  That's        09:49:01

11  implying some kind of partnership.  But they do have a to-do

12  list they'd like us to consider.

13  Q.  Well, if they ask you to do something and then you do that

14  for them, you're working with them, aren't you?

15       MR. RAPP:  Objection.  Asked and answered.                     09:49:18

16       THE COURT:  Overruled.

17       You can answer, if you can.

18       THE WITNESS:  We're following through on some of their

19  suggestions but some we did not do.

20  BY MR. CAMBRIA:                                                     09:49:32

21  Q.  All right.  So the ones you're following through on, then,

22  you're working with them because you are accepting their

23  request; true?

24  A.  Part of my reason to visit them was to create the

25  impression that we're working with them.                           09:49:49

1   Q.  Do you remember my question?

2   A.  I just did.

3   Q.  I said, if they asked you to do something, you agreed to do

4   it, you were working with them, were you not?

5       That's a yes or a no.                                    09:50:03

6   A.  Well, what if they asked me not to --

7   Q.  That's a yes or no.

8   A.  There's things that I'm not doing, so I'm not working with

9   them on those things.

10  Q.  So it's no?                                              09:50:17

11  A.  No.  I just wouldn't characterize it as working with them.

12  I just think that that implies a partnership.  As I said

13  earlier, I was there for a PR --

14  Q.  If the police asked you to do something and you agreed to

15  do it, you consider that working with them?                 09:50:34

16      MR. RAPP:  Objection.  Asked and answered.

17      MR. CAMBRIA:  Well, he hasn't answered it.  I've asked

18  for a yes or no.

19      MR. RAPP:  He's answered it.

20      MR. CAMBRIA:  No, he's not.                              09:50:47

21      THE COURT:  All right.  There's an objection, and I'm

22  going to sustain it.

23      MR. CAMBRIA:  Okay.

24      THE COURT:  Let's move on, Mr. Cambria.

25      ///

1   BY MR. CAMBRIA:

2   Q.  Are you familiar with the USC Annenberg study?

3   A.  I am.

4        MR. CAMBRIA:  And could we pull up PCCF 20, please.

5        THE COURT:  What did you say?                        09:51:44

6        MR. CAMBRIA:  PCCF 20.

7   BY MR. CAMBRIA:

8   Q.  Mr. Ferrer, do you recall writing this email?

9   A.  I do.

10  Q.  Okay.  And did you send this particular email to Mr. Larkin   09:52:21

11  with a copy to a Don Bennett Moon, Michael Lacey --

12  A.  I did.

13  Q.  -- and --

14        MR. CAMBRIA:  I'd offer this in evidence.

15        MR. RAPP:  Objection.  Hearsay.  And, in particular,   09:52:41

16  the lower email.

17        THE COURT:  Sustained.

18  BY MR. CAMBRIA:

19  Q.  Well, my question is, did you report this information to

20  the individuals you sent it to?                          09:52:54

21  A.  Are you referring to the Annenberg study?

22  Q.  I'm referring to this email that you sent to these

23  individuals.

24        MR. CAMBRIA:  I'm offering it, Your Honor, not for the

25  truth but for the fact that it was reported.             09:53:12

```
 1              THE COURT:  You can ask him about that.
 2    BY MR. CAMBRIA:
 3    Q.  This email you wrote; correct?
 4    A.  I wrote it.
 5    Q.  And you sent it to these individuals; true?        09:53:23
 6    A.  I did, but I would like a moment to read it --
 7    Q.  Certainly.
 8    A.  -- just to confirm that, because this is the first time I'm
 9    seeing this email, and it's 2011, 12 years ago.
10              THE COURT:  Is the -- is that the full exhibit?   09:53:41
11              MR. CAMBRIA:  It's all I have, Your Honor.
12              MR. RAPP:  Do you have a hard copy available of this?
13              THE COURTROOM DEPUTY:  Counsel should have it.
14              MR. RAPP:  Do you have a hard copy available?
15              MR. CAMBRIA:  Mine.                             09:54:02
16              THE COURT:  Did you provide copies to the Court,
17    Mr. Cambria?
18              MR. CAMBRIA:  Pardon me, Your Honor?
19              THE COURT:  Did you provide copies of that exhibit to
20    the Court?                                               09:54:11
21              MR. CAMBRIA:  All of the exhibits that we've referred
22    to we've provided.  I'm told.  I didn't physically do it
23    myself.
24              (The Court and the courtroom deputy confer.)
25              THE COURT:  They're not here.  Your exhibits are  09:54:23
```

UNITED STATES DISTRICT COURT

1  not -- that exhibit in particular's not here, and we don't

2  have -- I don't have a copy of it.

3       MR. CAMBRIA:  It was filed by the paralegals, Your

4  Honor.  I didn't file the exhibits.

5       MS. BERTRAND:  Your Honor, may I step out and get the      09:54:43

6  paralegals?

7       THE COURT:  Yes.

8       MS. BERTRAND:  They're in the workroom.  I'll be right

9  back.

10       MR. CAMBRIA:  Pardon me?      09:54:49

11       THE COURT:  Well, we don't have your exhibit, but,

12  nevertheless, it's on the screen in front of the witness, so

13  you can move forward.

14       MR. CAMBRIA:  Oh, thank you.

15  BY MR. CAMBRIA:      09:54:58

16  Q.  All right.  I was asking you, did you send this on

17  December 8th, 2011, to the individuals I've indicated; Larkin,

18  Lacey, Moon?

19  A.  Yes, I did.

20  Q.  All right.      09:55:10

21       MR. CAMBRIA:  And I'd offer this in evidence, Your

22  Honor.

23       MR. RAPP:  Right.  Same objection.  It's hearsay.

24       MR. CAMBRIA:  Well, it's being offered for conveying

25  this information to those individuals, as the government has      09:55:21

1  done with a number of exhibits.

2          MR. RAPP:  No.  The door doesn't swing both ways.

3          MR. CAMBRIA:  It should.

4          MR. RAPP:  This is -- it doesn't.  This is hearsay.

5          THE COURT:  Okay.  Sustained as to hearsay.        09:55:35

6          MR. CAMBRIA:  Okay.  Could I have Exhibit 668, please?

7          THE COURT:  Just confirming.  You said 668?

8          MR. CAMBRIA:  I did.

9  BY MR. CAMBRIA:

10 Q.  All right.  668.                                       09:56:37

11         Do you see that, sir?

12 A.  I do.

13 Q.  And do you recall that is an email that you wrote to

14 Mr. Lacey July 15th, 2011?

15 A.  Yes.                                                   09:56:49

16         MR. CAMBRIA:  Offer that in evidence, Your Honor:

17         MR. RAPP:  Objection.  Hearsay.

18         MR. CAMBRIA:  This is what he's telling Mr. Lacey.

19 He's available here to cross-examine.

20         MR. RAPP:  You can ask him about that, but it contains  09:57:21

21 other emails.  It's an email thread.

22         THE COURT:  Does it?  I -- is this the only page?  Oh,

23 okay.  All right.

24         MR. CAMBRIA:  I'm offering it up to where it says

25 "Carl."  That's the first email.                          09:57:38

CARL FERRER - CROSS-EXAMINATION (Cont'd)

34

 1          THE COURT:  Well, the problem, though, is that it's

 2   not been redacted to that point, Mr. Cambria.

 3          MR. CAMBRIA:  Well, we can supply that, Your Honor.

 4   At this point I would only ask him about the part that goes up

 5   to the end that he wrote.                                    09:58:02

 6          THE COURT:  Yet -- well --

 7          MR. CAMBRIA:  Pardon?

 8          THE COURT:  Okay.  All right.  It has been redacted,

 9   and so --

10          MR. CAMBRIA:  Oh, good.  Thank you.  I appreciate     09:58:19

11   that.

12   BY MR. CAMBRIA:

13   Q.  All right.

14   A.  Is it --

15          THE COURT:  Well, hold on.                            09:58:25

16          Did the government have an objection with regard to

17   the redacted version?

18          MR. RAPP:  So the -- I -- now that it's redacted,

19   it's -- it's -- the other part is still hearsay.  He's still

20   offering it for the truth.                                   09:58:39

21          MR. CAMBRIA:  Your Honor, I'm --

22          THE COURT:  Well --

23          MR. CAMBRIA:  Speaker is --

24          THE COURT:  Well, let me make a ruling.

25          MR. CAMBRIA:  Yeah.                                   09:58:50

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION (Cont'd)

35

```
 1              THE COURT:  I'm going to overrule the objection with
 2   regard to the redacted version.  And so this redacted version
 3   that is on your screen is admitted.
 4              MR. CAMBRIA:  Thank you.
 5              (Exhibit 668 admitted into evidence.)          09:59:02
 6              MR. CAMBRIA:  May I publish it, please.
 7              THE COURT:  Yes.
 8              MR. CAMBRIA:  May I have the witness read it?
 9   BY MR. CAMBRIA:
10   Q.  Would you read it, please, up to where it says "Carl."   09:59:07
11              THE COURT:  Oh, I'm sorry.  Are you asking the
12   witness?
13              MR. CAMBRIA:  I'm asking the witness to read it, yes.
14              THE WITNESS:  Oh --
15              THE COURT:  Yeah.                               09:59:22
16              THE WITNESS:  -- I'm sorry.
17   BY MR. CAMBRIA:
18   Q.  I'm sorry, sir.  Go ahead.
19   A.  From the top?
20   Q.  Yes, please.                                          09:59:28
21   A.  "I just want to make sure you have thoughts on this photo
22   ID.  Regarding age" --
23              MR. RAPP:  I'm sorry.  That was -- you -- you
24   misstated that.  Objection.
25              THE COURT:  I can't hear you, Mr. Rapp.        09:59:43
```

UNITED STATES DISTRICT COURT

1    MR. RAPP:  My apologies.  He misstated that sentence.

2    He just missed a word.  If he could read it again.

3    MR. CAMBRIA:  I think he left out "my thoughts."

4    THE WITNESS:  Oh, I apologize.

5    Starting again.  "I just want to make sure you have my

6    thoughts on this photo ID.  Regarding Age verification ID.

7    Response:  There's always an adult involved in child

8    exploitation.  According to Sergeant Byron Fassett, Dallas

9    Police Department's Crimes Against Children unit, the adult

10   places the ad, the adult rents the motel room, and the adult

11   provides the transportation.  The majority of the cases

12   involved" -- "involve a homeless run away with limited

13   resources.  Our own experience at backpage.com has been that in

14   virtually every case of posting involving a child exploitation,

15   the post was from someone over the age of 18 and using a valid

16   credit card.

17   "Credit cards:  We capture full credit card numbers,

18   the users name and address with every transaction.  We also use

19   AVS (address verification system) to further authenticate the

20   user.  We do not take cash or money orders.  We provide the

21   full credit card number with a subpoena and it has aided law

22   enforcement in their prosecution.  Retaining this personally

23   identifiable data and credit card number requires a great deal

24   of expense in terms of security.  Many sites simply choose to

25   not retain this information and avoid the expense.

09:59:55
10:00:22
10:00:43
10:01:05
10:01:27

1    "Some clients do not use" -- or, excuse me.  "Some

2  clients do use prepaid debit cards, someone else's credit card

3  with or without the card holder permission.  Our experience has

4  been the vast majority of users eventually post with their

5  credit card and provide valuable personally identifiable          10:01:50

6  information.

7    "Photo IDs are impractical for e-Commerce sites.

8  Other sites like Match.Com, AdultFriendFinder, Plenty of Fish

9  and Craigslist do not require a photo ID to post.  Requiring a

10 credit card is the most widely acceptable method of user          10:02:09

11 verification.  Very few people have the capability to scan

12 their ID or fax.

13   "Images on dating and classified sites are often not

14 valid.  It is widely known among law enforcement that the image

15 used on Internet postings will not off" -- "will often not be    10:02:27

16 real.  Images are often borrowed from other ads or other

17 websites.

18   "Regarding Eros.com.  They have a policy that if you

19 look under the age" -- "that if you look under the age of 25

20 they may request a fax of their ID.  Their ID requirement is     10:02:47

21 enforced selectively.  Many vice detectives consider Eros's ID

22 requirement as a way to make it impossible for their vice

23 department to post a sting ad.

24   "User education and age verification.  We have notices

25 throughout the site to not post in adult or personals if you     10:03:12

1  are under 18.  The posting form requires you to enter an age.

2  You are told you cannot post in this site if you enter any age

3  under 18.  Our moderators aggressively report to law

4  enforcement postings that may have a pic or language in the ad

5  suggestive of someone who appears to be under the age of 18.          **10:03:34**

6  In addition, users browsing the site also send us reports of

7  any ads in violation of our terms.

8        "Law enforcement has not complained about the quality

9  or quantity of the information we provide.  They are more

10  focused on getting the information quickly.  For example, they   **10:03:54**

11  sometimes need information at 3 am where a subpoena will be

12  forthcoming.  Backpage staff has been focused on turning around

13  requests for information expeditiously as possible often within

14  the hour or same day.  I have been told we respond

15  significantly faster than the cell phone carriers, internet       **10:04:16**

16  service providers and email service providers which can take a

17  week or longer.  Carl," [as read].

18  BY MR. CAMBRIA:

19  Q.  And, as I say, you sent this email to Mr. Lacey in July of

20  2011; correct?                                                    **10:04:36**

21  A.  I did.

22  Q.  All right.  And one of the things that you said in there

23  and that you had learned is that photographs that appear in ads

24  are all -- not always genuinely the person posting the ad;

25  correct?                                                          **10:04:56**

1    A.  Correct.

2    Q.  Sometimes people will use photographs of younger-looking

3    people; true?

4    A.  Yes, that could be true.

5    Q.  And, in addition, they may use just stock photographs that        10:05:10

6    they find on the Internet?

7    A.  That also could be true.

8    Q.  So a picture isn't necessarily a depiction of the person

9    who is posting the ad.

10           Is that fair to say?  You knew that?                          10:05:37

11   A.  That could be true.

12   Q.  All right.  And, also, the information that's in the ad,

13   the platform, if you will, like Backpage or Facebook or

14   whatever, the -- it isn't the practice to verify all of those

15   statements that people put into ads?                                  10:05:58

16           MR. RAPP:  Objection.  Relevance and foundation.

17           THE COURT:  Sustained.

18   BY MR. CAMBRIA:

19   Q.  Well, with regard to a -- with regard to a particular ad,

20   there isn't -- there isn't anything -- in other words, when         10:06:22

21   somebody places an ad, they don't come down personally -- or

22   they don't have to come down personally and verify their age

23   and their identity and their picture and so on; is that

24   correct?

25   A.  That's correct.                                                   10:06:42

```
 1   Q.  And that's how it goes for most things, that, for example,
 2   your background of newspapers, when people posted ads in
 3   newspapers?
 4           MR. RAPP:  Objection.  Relevance.  Foundation.
 5           MR. CAMBRIA:  Your Honor, it is relevant.                  10:06:57
 6           THE COURT:  Well --
 7           MR. CAMBRIA:  It is the practice.
 8           THE COURT:  Well, he can answer the question.  I'll
 9   overrule the objection.
10           MR. CAMBRIA:  Okay.  Thank you.                            10:07:08
11   BY MR. CAMBRIA:
12   Q.  So, in other words, when you were in the newspaper
13   business, you didn't verify the information that somebody
14   called in on an ad, did you?
15   A.  It was pretty rare, but sometimes.                            10:07:19
16   Q.  That's a yes or no.
17   A.  Well, I can't answer a yes or no because --
18   Q.  All right.  I'll withdraw the question.
19           At its peak, how many ads a week would be posted on
20   Backpage?                                                         10:07:42
21           MR. RAPP:  Objection as to foundation.  When?  Where?
22           MR. CAMBRIA:  At its peak.
23           THE COURT:  Well, I think it's confusing.  Maybe you
24   can ask him what he considers to be the peak.
25           MR. CAMBRIA:  All right.  I adopt that question.          10:07:58
```

1          MR. RAPP:  Well, I still have an objection as to the

2     market.  And Backpage was many places.

3     BY MR. CAMBRIA:

4     Q.  Let's say all the markets.  How many ads -- because, for

5     example, the moderators would review the words for all the          10:08:16

6     markets, didn't they, except -- all the United States markets;

7     correct?

8     A.  You're speaking of just the U.S. markets?

9     Q.  That's the United States.

10    A.  What was the question?                                            10:08:35

11    Q.  The question was, the moderators would review all of the

12    ads for the United States, would they not?

13    A.  No.

14    Q.  No?  Okay.

15         Was there a particular state left out?                           10:08:46

16    A.  No.  There's categories --

17    Q.  Oh, okay.

18    A.  -- with --

19    Q.  Let's take the adult category.  Okay?

20         How many at its peak, meaning the most, adult ads were           10:09:00

21    published in a week?

22         Best estimate.  Thousands?  Hundreds?  Millions?

23         MR. RAPP:  I still have a foundational question.

24         THE COURT:  Yeah.

25         MR. RAPP:  Can we establish what the peak is and in --           10:09:19

1    in all cities?

2              MR. CAMBRIA:  All cities.

3              THE COURT:  Sustained.

4    BY MR. CAMBRIA:

5    Q.  Yeah, the peak -- do you understand peak to mean the    10:09:30

6    highest number?

7    A.  I do.

8    Q.  Okay.  And so I'm asking you, in any given week, what was

9    the highest number of ads that were submitted to Backpage in

10   the United States?    10:09:44

11   A.  So this is a more complicated answer than you think.

12   Q.  Okay.

13   A.  Okay?  And I -- I want a chance to explain.

14   Q.  All I'm asking you is for numbers.  Is it --

15   A.  Well --    10:10:00

16   Q.  -- hundreds -- hang on one second.

17            Is it thousands?  Is it millions?  How many?

18   A.  I've got to qualify my answer.

19   Q.  Go ahead.

20   A.  So are we talking about new ads that are posted?  Are we    10:10:09

21   talking about ads that had been moved to the top?

22   Q.  All right.  Let's --

23   A.  Do you want to count an ad that's moved to the top as a new

24   ad that -- are we talking ads that day that are new?

25   Q.  Let's start with new ads in a week.    10:10:25

CARL FERRER - CROSS-EXAMINATION (Cont'd)

43

1  A.  I'm going to say maybe 5- to 10,000.

2  Q.  5- to 10,000 ads in a week?

3  A.  The majority of the ads, once posted, users would move to

4  the top.  And so a significantly greater number.

5  Q.  Okay.  Well, whether or not hundreds of thousands of ads          10:10:49

6  posted on Backpage, let's say, in a month --

7  A.  Are -- are we talking adult again?

8  Q.  Well, let's start with all ads first, and then we'll break

9  it down.

10  A.  Once again, I've got to qualify my answer.                        10:11:08

11  Q.  I'm not surprised.

12          Go ahead.

13  A.  Okay.  Are we talking about just user-generated content?

14  Q.  Yes.

15  A.  Are we talking about feeds coming in from, you know,             10:11:21

16  websites?

17  Q.  We're --

18  A.  Take XML feeds.

19  Q.  We're talking about all ads that the moderators would

20  review.                                                              10:11:33

21  A.  Okay.  So that would be user-generated content across all

22  categories.

23  Q.  Yes.

24  A.  Hundreds of thousands.

25  Q.  A week?                                                          10:11:43

UNITED STATES DISTRICT COURT

1  A.  No.  I -- I was thinking of a month.

2  Q.  A month.  Hundreds of thousands?

3  A.  Yes.

4  Q.  Okay.

5  A.  And I want to qualify that by just saying it's an estimate.  `10:12:05`

6  There's reports that can give you an exact number.

7  Q.  All right.

8       MR. CAMBRIA:  Could we pull up 669, please.

9  BY MR. CAMBRIA:

10 Q.  On the screen you see Exhibit 669.  `10:12:25`

11      Is -- do you recognize this as an email from you to

12 Michael Lacey, Jim Larkin in 2011?

13 A.  Yes, I do.

14 Q.  All right.  And do you recall this?

15 A.  I do.  `10:12:45`

16 Q.  All right.

17      MR. CAMBRIA:  Offer this in evidence.

18      MR. RAPP:  No objection.

19      THE COURT:  It may be admitted.

20      MR. CAMBRIA:  Thank you.

21      (Exhibit 669 admitted into evidence.)

22      THE COURT:  And published.

23      MR. CAMBRIA:  Thank you.

24 BY MR. CAMBRIA:

25 Q.  Could you read this, please.  `10:13:08`

```
 1   A.  "We sent 19 NCMEC reports to date in 2011 for Seattle

 2   specific postings.  This does not include Tacoma, etc.

 3            "You probably remember these stats:  Approximately

 4   21,143 banned terms (terms added on a daily basis); 96,350

 5   banned users; 4,323 banned IPs; 493,516 ghosted postings all       10:13:32

 6   sections (although most people would not know what ghosting

 7   means)."

 8   Q.  All right.  Let's hold one moment there.

 9            What is a ghosting posting?

10   A.  So this is an automated process that when people are           10:13:53

11   posting spam ads and jobs it appears that their ad is live, but

12   it's actually not going to appear in the listings.  So it won't

13   interfere with the user experience.

14   Q.  And were -- did you do any ghosting -- ghosted postings in

15   connection with law enforcement?                                   10:14:22

16   A.  Did we ghost any postings in connection with law

17   enforcement?  Why?

18   Q.  I'm just asking you if you did.

19   A.  Yeah.  I can't think of any reason why --

20   Q.  Now --                                                         10:14:40

21   A.  -- we'd do that.

22   Q.  -- there came a time, did there not, when law enforcement

23   would put up a sting ad; is that true?

24   A.  Yes.

25   Q.  And what is a sting ad?                                        10:14:55
```

1   A.  So a sting ad is when law enforcement posts an ad in order

2   to get Johns to respond and then they are arrested.

3   Q.  So, in other words, the law enforcement officers would make

4   an arrangement with Backpage that they would post an ad where

5   they were trying to catch people who were trying to break the          10:15:24

6   law?

7   A.  There was no arrangement.

8   Q.  Well --

9   A.  We did it -- we didn't even want to tell them.

10  Q.  Well, you said there was no arrangement.  You answered my          10:15:38

11  question.

12          Next question.

13  A.  That's -- there's no arrangement.

14  Q.  Okay.

15  A.  They do it anonymously.                                           10:15:44

16  Q.  Next --

17  A.  We don't know.

18  Q.  Next question.  Did you not have cases where they posted a

19  sting ad and your moderators took it down?

20          MR. RAPP:  Objection as to foundation.  When?  Where?         10:15:57

21  BY MR. CAMBRIA:

22  Q.  Anytime during the operation of Backpage when you worked

23  there, whether situations where they posted a sting ad and your

24  moderators took it down because it had a word in it that on

25  your list of words wasn't prohibited.                                 10:16:14

CARL FERRER - CROSS-EXAMINATION (Cont'd)

47

```
 1              THE COURT:  All right.

 2              MR. CAMBRIA:  Was prohibited.

 3              THE COURT:  Mr. Cambria, I will overrule the objection

 4   given that you've clarified the question.

 5              MR. CAMBRIA:  Thank you.  I'm sorry, Your Honor.        10:16:26

 6   Thank you.

 7   BY MR. CAMBRIA:

 8   Q.  Do you -- do you follow me?

 9   A.  Yes.  Moderators did remove ads, but they wouldn't know

10   that they were sting ads.                                         10:16:35

11   Q.  Okay.  But here's my question:  The police put up a sting

12   ad, which basically is a fake ad, and they're trying to get

13   somebody to respond to it so that they can arrest them.

14              Isn't that a fact?  Isn't that true?

15   A.  That's -- that's what I understand.                           10:16:51

16   Q.  Okay.  And at some time what happened is they put up one of

17   these sting ads, and your moderators took it down because it

18   had a term in it that was not permitted --

19              MR. RAPP:  Objection.

20   BY MR. CAMBRIA:                                                   10:17:07

21   Q.  -- correct?

22              MR. RAPP:  Asked and answered.

23   BY MR. CAMBRIA:

24   Q.  Well, is that true?

25              THE COURT:  Overruled.                                 10:17:12
```

CARL FERRER - CROSS-EXAMINATION (Cont'd)

48

```
 1              THE WITNESS:  It did happen.
 2   BY MR. CAMBRIA:
 3   Q.  All right.  And then the police would call you and say,
 4   hey, don't take my ad down, it's a sting ad; correct?
 5   A.  Yes.  They wouldn't use the word "sting," though.  They'd    10:17:21
 6   say prostitution investigation.
 7   Q.  Okay.  You understood it to be a sting ad; correct?
 8   A.  I did.
 9   Q.  All right.  And prostitution investigation was simply a way
10   of trapping people to -- who were looking to break the law;      10:17:41
11   correct?
12   A.  That's my understanding.
13   Q.  All right.  But what my point is, that the -- they would
14   post this.  Your moderators wouldn't know it was a police ad,
15   but because it had prohibited terms in it, they'd take it down.  10:17:59
16   And then the police would call you and say, hey, put that back
17   up, it's a sting ad; correct?
18              MR. RAPP:  Objection.  Asked and answered.
19              THE COURT:  Sustained.
20              MR. CAMBRIA:  All right.                               10:18:10
21   BY MR. CAMBRIA:
22   Q.  And so in that circumstance, where you put the ad back up,
23   you were facilitating the police, were you not?
24   A.  Our policy was not --
25   Q.  That's not the question.                                     10:18:29
```

UNITED STATES DISTRICT COURT

1     Were you facilitating the police?  Were you helping

2 them?

3 A.  You asked --

4 Q.  The last question is, were you facilitating the police?

5     MR. RAPP:  Objection.  It's confusing.          10:18:41

6     MR. CAMBRIA:  Okay.  I withdraw the question.

7 BY MR. CAMBRIA:

8 Q.  Were you helping the police by putting their sting ad back

9 up?

10 A.  That statement is completely false --          10:18:51

11 Q.  False?

12 A.  -- because we did not put the sting ads up -- back up, to

13 my recollection.  We told them:  Post again.  Follow the

14 posting rules.

15 Q.  Okay.  You didn't put the same ad back up?          10:19:06

16 A.  It's a big difference.

17 Q.  You let them post the same ad again.  Is that fair?

18 A.  We don't want to know it's a sting ad.

19 Q.  Okay.  Here's the question:  You let them post the sting ad

20 again.          10:19:22

21     Is that how you did it?

22 A.  Yes.

23 Q.  Okay.  So what happens is they post a sting ad, your

24 moderators took it down, they contacted you, and you had them

25 repost a sting ad; correct?          10:19:37

```
 1   A.  We didn't have -- we -- we didn't let them.  They would
 2   post again.
 3   Q.  You didn't let them?
 4   A.  Do you understand?  Your statement was just not accurate.
 5   Q.  Okay.  Let's see if we can make it accurate.          10:19:53
 6       They'd post a sting ad.  Your moderators take it down.
 7       Are we okay so far?
 8   A.  We are.
 9   Q.  All right.  They then repost another ad that is a sting ad;
10   correct?                                                  10:20:12
11   A.  We don't know.
12   Q.  Well, if they contact you and say, hey, you took my sting
13   ad down, you know, don't you?
14   A.  Yes.  Then for that ad we do know.
15   Q.  All right.  And that happened, didn't it?             10:20:28
16   A.  It did.
17   Q.  That was easy, wasn't it?
18           THE COURT:  Mr. Cambria.
19           MR. RAPP:  Judge, I'm going to object.
20           THE COURT:  Yes.  Sustained.                      10:20:37
21           MR. CAMBRIA:  Could we have 669 up?  669.  Oh, here we
22   go.
23   BY MR. CAMBRIA:
24   Q.  All right.  Do you see 669 on your screen?  It's a -- a --
25   it appears to be an email from you to Mr. Lacey, Mr. Larkin?  10:21:25
```

1   A.  Yes, I do.

2   Q.  And do you recall this?

3   A.  It looks like I sent it, and I would just need some time to

4   read it to fully understand this email.

5   Q.  Would you -- would you do that, please.                    10:21:44

6   A.  Isn't this the same email?

7   Q.  Yeah, I -- I've lost track now whether I had you read this

8   or not to publish it to the jurors.

9           THE COURT:  It was admitted, and it was previously

10  published, Mr. Cambria.                                        10:22:12

11          MR. CAMBRIA:  Oh, all right.  Thank you.

12          Would you put up 637, please.

13  BY MR. CAMBRIA:

14  Q.  All right.  I'm showing you what's been marked as 637.

15          Do you recognize this as an email from you to Mike      10:22:49

16  Lacey, Bill Jensen, Scott Spear?

17  A.  Yes, I do.

18          MR. CAMBRIA:  And I'd offer this in evidence.

19          MR. RAPP:  I believe it's in, and no objection to it

20  being published.                                               10:23:08

21          THE COURT:  It is.  It's already been admitted a

22  couple of weeks back, Mr. Cambria, and it can be published.

23          MR. CAMBRIA:  All right.

24  BY MR. CAMBRIA:

25  Q.  Would you read this, sir.                                  10:23:16

1          MR. RAPP:  Could I ask that he -- if he's going to

2     read it, he reads the entire one.  And it starts on the second

3     page.

4          THE WITNESS:  Start from where?

5     BY MR. CAMBRIA:                                              10:23:28

6     Q.  It starts where it says, "We would not have reported

7     Amber's ads to NCMEC."

8     A.  "We would not have reported Amber's ads to NCMEC.  We had

9     made reports when the following happens:  A user reports it,

10    i.e., 'I saw this girl and she is not 18' or 'I see this pic    10:23:46

11    and I think she is too young'.  We aggressively ask users to

12    report child exploitation.  We get several reports a day.

13          "Our moderators will see pics where the pic might be

14    too young or the text is suggestive of child exploitation.

15          "Once a report goes to NCMEC, they vet it and send it    10:24:10

16    to local law enforcement.  I think they look to make sure it is

17    a possible exploitation:  Pic too young, text saying things

18    like 'first time to the rodeo', 'fresh', '1st timer',

19    et cetera.

20          "The NCMEC people have been quite helpful," [as read].   10:24:30

21          Then below, "Carl, why would we isolate this ad?  What

22    would NCMEC do with this ad?  What do they look for?  What is

23    being guarded against?  Lacey."

24          Then I write, "A senior VP staff member can click a

25    link while in admin view called 'Report this ad to the NCMEC'.  10:24:58

1    A 4-color pdf is automatically emailed of the posting to NCMEC

2    and includes an IP email address, comments from our staff, and

3    FAQ explaining data and how to contact us.

4           "NCMEC then emails us acknowledging receipt of the

5    report," [as read].                                                    10:25:19

6           Then Scott Spear writes, "Carl, you are better

7    equipped than I to explain the nuances of the NCMEC reporting

8    than I.  Please shoot them the basics without a lot of tech

9    talk.  Thanks, Scott Spear, Executive Vice President, Village

10   Voice Media Holdings, LLC," then his phone number.                     10:25:43

11          And you really want me to read the disclaimer that he

12   has at the bottom?

13   Q.  No.  You don't have to read that.

14   A.  Then I'll just finish with from Michael Lacey to Scott

15   Spear, "Will you send to Jensen Andy and me a few sentences to         10:25:59

16   describe how we forward to Ernie Allen questionable ads for his

17   review, Lacey."

18   q.  Did there come a time when you developed a response manual,

19   if you will, for the law enforcement individuals?

20   A.  Yes.                                                               10:26:30

21   Q.  And it was a law enforcement guide.

22          Is that what it was?

23   A.  It was.

24   Q.  And what -- who developed it?

25   A.  I believe I contributed the most to that guide.                    10:26:43

1    Q.  Okay.  And what did the guide do?

2    A.  Well, it answered questions so that law enforcement

3    wouldn't have to ask us in support.  We wanted to reduce the

4    amount of communication between support and law enforcement

5    because we had so many subpoenas.                              10:27:13

6    Q.  So this was designed to assist law enforcement individuals

7    in pursuing cases against people who violated the law?

8    A.  But it -- once again, it was designed for two reasons.

9    Q.  First question.  Can you answer my question?

10   A.  That's one of the reasons.                                 10:27:38

11   Q.  Okay.  And these -- this law enforcement guide was

12   distributed to members of law enforcement, was it?

13   A.  With a valid subpoena.

14   Q.  And basically what it would do is it would help them obtain

15   the information they were looking for; correct?               10:28:04

16   A.  No.  They already have the information.

17   Q.  Well, they were asking you for information, were they not?

18   A.  Yeah, but you said obtain.  What they needed that guide for

19   was really to kind of understand the information so that they

20   wouldn't have to email us in support.                         10:28:26

21   Q.  Right.  And wasn't my question so that that guide would

22   help them obtain the information they were looking for?

23   A.  Well, I wouldn't say it that way, but we sent the guide

24   with the information to help them understand it.

25   Q.  Okay.  And facilitate their getting the information that   10:28:44

```
 1    they were trying to get?

 2    A.   Yeah, I don't really understand that word "facilitate."  It

 3    sounds like a legal term, but, yes.

 4    Q.   You think facilitate's a legal term?

 5    A.   Well, I don't use it very much.  I help --          10:28:59

 6    Q.   Do you understand --

 7    A.   We wanted to help them.

 8    Q.   Do you understand what it means?  What's it mean to you?

 9    A.   I think it means to assist.

10    Q.   Okay.  You got it.  So let's use it the way you understand  10:29:10

11    it.

12         That law enforcement guide assisted the police in

13    gathering the information they were looking for; correct?

14    A.   Once again, it did help law enforcement understand the

15    information.                                              10:29:30

16    Q.   And that would be assistance, wouldn't it?

17    A.   It is.

18    Q.   Okay.  Now, you had --

19         MR. CAMBRIA:  I'll stay over here.

20    BY MR. CAMBRIA:                                           10:29:42

21    Q.   You had -- a number of subpoenas would come in, and law

22    enforcement individuals would ask you for certain types of

23    information to help them build cases.

24         Is that fair to say?

25    A.   That's correct.                                     10:29:59
```

1    Q.  All right.  And by supplying that information, you were

2    assisting the law enforcement people, were you not?

3    A.  Yes.

4    Q.  And you were not in any way assisting or facilitating the

5    potential law violators, were you?                                    10:30:17

6    A.  We weren't, but we had no choice with the subpoena.

7    Q.  Answer --

8    A.  You have to send the information.

9    Q.  That wasn't my question.

10          My question was, by giving that information to the            10:30:28

11   police, you were assisting the police; correct?

12   A.  We are assisting, but, once again, we have no choice.  We

13   have to give them this information.

14   Q.  Whether you have a choice or not, that's what you were

15   doing, assisting them, weren't you?                                  10:30:43

16   A.  I do think it's assistance providing the records.

17   Q.  Okay.  And by assisting the police, you weren't helping the

18   people they were trying to arrest, were you?

19          MR. RAPP:  Objection.  Asked and answered.

20          THE COURT:  Overruled.                                        10:30:58

21          THE WITNESS:  No.

22   BY MR. CAMBRIA:

23   Q.  All right.

24   A.  We would not do that.

25   Q.  All right.  So -- and we've mentioned a -- a number of           10:31:04

```
 1   times that there were -- well, strike that.

 2           How many different law enforcement agencies do you

 3   believe you supplied records to?  Can you give us a -- an

 4   estimate?  Is it hundreds?

 5   A.  I can tell you that we had 20,000 subpoenas from 2004 to      10:31:24

 6   2018, and there were many different law enforcement

 7   departments.

 8   Q.  Over 50?

 9   A.  Yes.

10   Q.  Over a hundred?                                               10:31:40

11   A.  Yes.

12   Q.  Both state and federal?

13   A.  Yes.

14   Q.  Okay.  And you -- there was an expense involved, wasn't

15   there, in maintaining the records that you knew the law          10:31:56

16   enforcement wanted to have access to?

17   A.  The main expense is providing --

18   Q.  That's a yes or no.

19           There's an expense involved, was there not?

20   A.  Yes.                                                         10:32:14

21   Q.  Okay.  And Backpage paid that expense to maintain those

22   records, did it not?

23   A.  We did.

24   Q.  Okay.  And -- and that expense was because you were trying

25   to be in a position to respond to these subpoenas; true?        10:32:29
```

1   A.   Yes.

2   Q.   Okay.  That included computer storage, did it not?

3   A.   Data storage, yes.

4   Q.   And it -- and it included people, employees; correct?

5   A.   Yes, it did.                                          10:32:57

6   Q.   All right.  And so at Backpage's expense you had the people

7   and the equipment necessary to store information that you knew

8   law enforcement individuals were going to access?

9   A.   The information's already on our servers.  There's really

10  no additional expense in storing it.  The expense is in pulling  10:33:24

11  the records, responding to law enforcement.

12  Q.   Okay.  Did you have additional storage so that you could

13  maintain records that eventually went to the police?

14  A.   The records are on the servers.  The -- the data is already

15  there.  So we didn't really have any significant storage         10:33:47

16  expense other than people needed computers.

17  Q.   Okay.  So when the police would send you a subpoena and

18  let's say it asked -- it mentioned a specific web address,

19  would you have your individuals search your database to see if

20  that web address turned up anyplace else?                        10:34:14

21  A.   You're talking about web address?

22  Q.   Well, and I --

23  A.   I'm confused.

24  Q.   Computer ID.  Your address.  A computer address.  IP

25  address.                                                         10:34:35

 1  A.  I'm sorry.  I still don't follow the question.

 2  Q.  All right.  Every computer has a -- an address, if you

 3  will; correct?

 4  A.  There's an IP address when they access the Internet.

 5  Q.  And so that means that it can be traced back to the unit        10:34:50

 6  that sent the message; correct?

 7  A.  Only if you subpoena the ISP.

 8  Q.  I'm talking about, technically speaking, you can -- you can

 9  go back and find out which computer sent an address -- sent a

10  message on a certain day; correct?                                  10:35:15

11  A.  I'm just telling you that we don't have that information.

12  We have the IP address.  They would need to go through an

13  Internet service provider to find the location of that IP

14  address.

15  Q.  Well, did you have situations where law enforcement would       10:35:27

16  ask you about a particular individual and you would determine

17  that that individual was not only where they were looking, but

18  identified in other sites as well?

19  A.  Correct.  We did do that.

20  Q.  And you volunteered that information to law enforcement,        10:35:48

21  didn't you?

22  A.  They re- -- they demand all ads posted by a particular

23  user, which means email address.  And if they're posting in

24  five different cities, they get all of the ads.

25  Q.  I'm talking about posting on other -- other platforms          10:36:06

```
 1    besides Backpage.
 2          If you knew -- did you not give them, the law
 3    enforcement people --
 4    A.  So --
 5    Q.  -- information that not only did they post on us, but they      10:36:19
 6    posted on others, and you told them which ones they were?
 7    A.  So this is a significantly different area that you're going
 8    into.  This is a public relations area that the subpoena
 9    compliance department handled.
10    Q.  All I'm asking you is, did you do that?                         10:36:38
11          I didn't ask your motivation or what you today are
12    going to say the motivation was.  I asked you whether you did
13    it.
14          MR. RAPP:  I'm going to object to that question.  It's
15    argumentative.                                                      10:36:51
16          MR. CAMBRIA:  Wait.  There's nothing argumentative
17    about my question.
18          THE COURT:  Well, let -- I've, frankly, lost track of
19    the question.
20          MR. CAMBRIA:  Okay.                                           10:37:00
21    BY MR. CAMBRIA:
22    Q.  Here's the question --
23          THE COURT:  I'm going to --
24          MR. CAMBRIA:  Oh.
25          THE COURT:  -- sustain the objection.                        10:37:03
```

1          So you can rephrase or ask a new question.

2          MR. CAMBRIA:  I will.  Thank you.

3    BY MR. CAMBRIA:

4    Q.  So if they -- if law enforcement asks you for particular

5    information about a particular individual or computer and you          10:37:14

6    found out that that computer or individual was used on other

7    sites and you had that information, would you not supply that

8    to law enforcement even though they didn't ask for it?

9    A.  I don't know why you're referencing computers.  That just

10   doesn't make any sense.                                                 10:37:38

11   Q.  Okay.

12   A.  You want to say that if we saw an ad with a phone number

13   running on other sites?

14   Q.  Yes.  There you go.

15   A.  Okay.  Good.                                                        10:37:46

16   Q.  I adopt your question.

17   A.  Okay.  So that we would compile a list of sites that had

18   scraped Backpage ads and put them on different web addresses,

19   and we would provide that list.

20   Q.  So that was actually bonus.  They'd ask for one thing.             10:38:02

21   You'd give them what they asked for, and then you'd give them

22   other information that was helpful?

23   A.  It's not a bonus.  It's more of a misdirection.

24   Q.  Well, whatever your motive is, you gave them additional

25   information where that other person had posted an ad --                 10:38:20

1  A.  No.

2  Q.  -- correct?

3        No?

4  A.  No.  This is information where that ad had reappeared.  And

5  like we had discussed earlier in my testimony about scraping,        10:38:30

6  many sites would scrape ads from Backpage and then repurpose

7  them on different domains.  So a good portion of that list of

8  links and other ads was ads Backpage ads repurposes on domains

9  not owned by Backpage --

10  Q.  Okay.                                                           10:38:48

11  A.  -- with the exception there were a couple of legitimate

12  sites that would be included in that list.

13  Q.  And you gave that information to law enforcement?

14  A.  We did.

15  Q.  Okay.  Did Backpage from time to time post public service       10:38:59

16  announcements?

17  A.  We did.

18  Q.  And what were they?

19  A.  There was a PSA, I believe, in Denver that we posted in the

20  Denver Backpage site at the request of law enforcement.             10:39:41

21  Q.  No.  I'm asking, what was the public service announcement?

22  A.  Time?  When?  What PSA are you talking about?

23  Q.  I'm asking you which ones were posted whenever on the site.

24  Public service announcement.

25        Call this number if you're in trouble, whatever.             10:40:03

1    Things like that.

2    A.   Oh.  So we did have user safety guide information where you

3    post on some other sites or some NGO's contact information.

4    Q.   Well, let's -- let's -- let's get down to what they were.

5    In other words, what public service announcement did you have          10:40:22

6    on the website that somebody could report something that was

7    wrong?

8         How about that?

9    A.   Yeah.  It's just an unusual way to describe it, as a public

10   service announcement.                                                  10:40:37

11        You mean did -- we had ways that users could report

12   problematic ads.

13   Q.   Yes.  Well, not only that, but, for example, didn't you

14   have a public service announcement that said that it would say

15   to youths, if you're in an issue or you have a problem, you            10:40:55

16   could call this number?  That sort of thing.

17   A.   We donated an ad to an organization who ran.

18   Q.   What was it?

19   A.   The add text or the name --

20   Q.   Both.                                                             10:41:16

21   A.   -- of the organization?

22   Q.   Both.

23   A.   The name of the organization is Children of the Night, and

24   the ad text is:  Tired of turning tricks.  Your pimp doesn't

25   care.  Call this number.                                              10:41:28

1  Q.  And you posted that on the Backpage website?

2  A.  We donated that ad.  Yes.

3  Q.  At your -- at the expense of Backpage?

4  A.  Yes.

5  Q.  And so basically that ad was telling people who may have                    10:41:40

6  been victimized by others where they could get help; right?

7  A.  Correct.

8  Q.  And any other ads like that?

9  A.  During the history of Backpage?

10 Q.  Yes.                                                                        10:42:03

11 A.  As I said earlier, there was some crime in Denver, and so

12 we posted an ad in Denver to see --

13 Q.  How about this?  Did you post something where you basically

14 said XYZ is against the law and will be reported?

15 A.  Yes.                                                                        10:42:31

16 Q.  And what was that?

17 A.  We could -- wouldn't call it a PSA.  It's a --

18 Q.  Whatever.  What was the --

19 A.  The posting rules of the site.  When you -- when you go to

20 look at a category, you'll see the rules.  When you go to post          10:42:45

21 in a category, you'll get some rules.

22 Q.  Okay.  Do you recall that you made a presentation at Crimes

23 Against Children Conference?

24 A.  Yes, I do.

25 Q.  And that presentation was basically what law enforcement              10:43:16

1  needed to do to get information from Backpage about ads?

2  A.  That's correct.

3  Q.  And were there not occasions when you were called by

4  prosecutors to come and actually testify at trials to help law

5  enforcement convict individuals who violated the law?          10:43:43

6  A.  Yes, that happened.

7  Q.  And --

8       THE COURT:  Mr. Cambria, can I ask you to move closer

9  to a microphone.

10       MR. CAMBRIA:  Oh, I'm very sorry --                       10:43:52

11       THE COURT:  Thank you.

12       MR. CAMBRIA:  -- Your Honor.  I apologize.  I'm a

13  wanderer.

14  BY MR. CAMBRIA:

15  Q.  There were situations where you would be called by the    10:44:00

16  prosecution, both state and federal; correct?

17  A.  Are you talking about me personally or the company?

18  Q.  Yeah, you personally to be a witness.

19  A.  None -- no state.  All federal.

20  Q.  All federal.  Okay.                                        10:44:18

21       But, in any event, you were called as a prosecution

22  witness; correct?

23  A.  I was called as a custodian of record to authenticate the

24  records.

25  Q.  By the prosecution; correct?                               10:44:30

```
 1   A.  Yes.

 2   Q.  To help their case; true?

 3   A.  I presume so.

 4   Q.  To convict somebody else; right?

 5   A.  I presume so.                                    10:44:40

 6   Q.  And some people were convicted; true?

 7   A.  True.

 8   Q.  And you were a witness for the prosecution in those cases?

 9   A.  I was a witness providing custodian of record

10   authentication.                                      10:44:58

11   Q.  For the prosecution?

12   A.  Yes.

13   Q.  Okay.  And you provided records and identified records in

14   those proceedings, too, did you not?

15   A.  I did.                                            10:45:09

16   Q.  Okay.

17          THE COURT:  Mr. Cambria, I think at this point we

18   should take our morning break.

19          And so, members of the jury, just remember the

20   admonition.  We'll be on our usual 20-minute break.  So that   10:45:26

21   puts us at about five minutes after the hour.  We'll go short

22   this morning because I know you've been here early.  And so

23   we'll aim to break right at the noon hour for our 45-minute

24   lunch because I think you've been here for a while.  And so

25   just remember the admonition.                        10:45:45
```

UNITED STATES DISTRICT COURT

1          And please all rise for the jury.

2          (Jury not present at 10:45 a.m.)

3          THE COURT:  All right.  We will stand at recess.

4          And can you make sure that we have defense exhibits

5     here and ready for Liliana.                                    10:46:17

6          (Recess from 10:46 a.m. to 11:06 a.m.)

7          THE COURT:  All right.  Let's bring the jury in.

8          All rise for the jury.

9          (Jury present at 11:07 a.m.)

10          THE COURT:  All right.  The record will reflect the     11:08:04

11     presence of our jury.

12          Mr. Cambria, you may proceed.

13          MR. CAMBRIA:  Thank you, Your Honor.

14     BY MR. CAMBRIA:

15     Q.  Mr. Ferrer, do you recall in one of your interviews with  11:08:13

16     various agents or attorneys for the government that you

17     indicated that Dollar Bill's ads did not contain offers of sex

18     for money?

19          Do you remember making that statement?

20     A.  I believe I -- I do recall making that statement.         11:08:33

21     Q.  Okay.  You bought Backpage what, in 2015?

22     A.  Yes.

23     Q.  Okay.

24          MR. CAMBRIA:  Could we pull up 19 --

25          THE COURT REPORTER:  19 what?  I'm sorry.                11:09:00

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION (Cont'd)

68

```
 1              MR. CAMBRIA:  1928.

 2              MR. FEDER:  1928?

 3              MR. CAMBRIA:  1928.

 4              THE COURTROOM DEPUTY:  That's been admitted.

 5              MR. CAMBRIA:  There we go.                    11:09:17

 6   BY MR. CAMBRIA:

 7   Q.  Do you see that on the screen?

 8   A.  Yes, I do.

 9   Q.  Okay.  And is this a -- an email from Mr. Padilla to you?

10   A.  Yes, it is.                                          11:09:34

11   Q.  And does it -- does it deal with the term GFE/PSE?

12   A.  Yes, it does.

13   Q.  Now, before you told us GFE meant girlfriend experience?

14   A.  Yes.

15   Q.  Must have some different girlfriends.               11:09:53

16              So -- and the other was porn star experience?

17   A.  Yes.

18   Q.  All right.  And basically what's happening here is that --

19   well, you tell me.  What's happening here?  What -- what's

20   happening in this email to you?                         11:10:17

21   A.  Well, can I start from the bottom working up?

22   Q.  Well, all right.  Let's make it easier.

23              Is this a situation where Padilla's talking about

24   pulling the terms GFE and PSE?

25   A.  Yes, it is.                                          11:10:36
```

UNITED STATES DISTRICT COURT

```
 1    Q.  And you say that those terms will be stripped out but, to

 2    you, begrudgingly?

 3    A.  Yes.

 4    Q.  Okay.  So those terms were stripped out then.

 5         Is that fair to say?                              11:10:54

 6    A.  Yes.

 7    Q.  And this is in 2010?

 8    A.  Yes, it is.

 9    Q.  Now, you took over in 2015?  You bought Backpage; correct?

10    A.  I became the nominal owner in April of 2015.        11:11:07

11    Q.  All right.  You say "nominal owner."  Aren't you the one

12    who told us as part of your plea bargain that you gave Backpage

13    to the prosecution to shut down?

14         Is that what you did?

15    A.  I wanted to shut down the site.                     11:11:26

16    Q.  No.  That's not the question.

17         Did you give Backpage to the prosecution to shut down

18    as part of your plea agreement -- plea agreement?

19    A.  I wouldn't use the word "give," but --

20    Q.  Well --                                             11:11:41

21    A.  Okay.

22    Q.  -- turned it over to them?

23    A.  Yes.

24    Q.  Okay.  So you must have had control over it to be able to

25    turn it over to them, didn't you?                       11:11:48
```

1   A.  I knew all the developers.

2   Q.  That's a yes or no.

3   A.  I had the access to do it.

4   Q.  Okay.  So now when 2015 came around and you had this

5   access, didn't you reinstate the term GFE?                    11:12:05

6   A.  There was a time --

7   Q.  Yes or no?

8   A.  Yeah, there was a time GFE was added to the site.

9   Q.  While you owned it?

10  A.  During the period of time, yes.                           11:12:16

11  Q.  Okay.  So you put it back in?

12  A.  I don't recall the why it came back in.

13  Q.  I didn't ask you that.  I asked you whether you're the one

14  that put it back in.

15  A.  I don't know that.                                        11:12:30

16  Q.  I'm sorry?

17  A.  I don't know that.

18  Q.  You don't know whether you put the term back in?

19  A.  I don't know whether I did it or whether it was just Andrew

20  and I deciding together that let's take it out -- let's stop  11:12:44

21  banning it, because we really need to focus on other things --

22  Q.  Well, you can't --

23  A.  -- with --

24  Q.  You can't say that he did it.

25      You're the one that had control over it then; correct?  11:12:56

CARL FERRER - CROSS-EXAMINATION (Cont'd)

71

```
 1    A.  Yes, I had --

 2    Q.  Right.

 3    A.  -- control --

 4    Q.  That would be --

 5    A.  -- but what I'm saying --                              11:13:03

 6    Q.  That would be -- I'm sorry.

 7    A.  What I --

 8    Q.  That would be your decision; correct?

 9    A.  What I'm saying is it would be helpful if you had an email,

10    because we're talking about 2000 -- sometime after 2015 to    11:13:09

11    today.

12    Q.  Have you recalled a number of things about 2015 for the

13    government?

14    A.  If there's an email or an --

15            MR. RAPP:  Objection.                               11:13:25

16            THE WITNESS:  -- exhibit, I find --

17            MR. RAPP:  Objection.  Vague.  Confusing.

18            THE COURT:  Sustained.

19    BY MR. CAMBRIA:

20    Q.  Well, here.                                             11:13:31

21            THE COURT:  Sustained as to that last question.

22    BY MR. CAMBRIA:

23    Q.  Let's -- let's do it this way:  In 2015, as you indicated,

24    you had the access to control the website; correct?

25    A.  Yes.                                                    11:13:40
```

UNITED STATES DISTRICT COURT

1  Q.  All right.  And it turns out that that term got back in in

2  2015, didn't it?

3  A.  It did.

4  Q.  All right.  Now, how about porn star experience?  Did that

5  get back in, too?                                                    11:13:53

6  A.  I don't know.

7  Q.  Okay.  By the way, have you ever typed in the letters GFE

8  into Backpage to see what you get?

9          I'm sorry.  Not Backpage.  Facebook --

10         MR. RAPP:  Objection.  Relevance.                            11:14:21

11  BY MR. CAMBRIA:

12  Q.  -- to see what you get?

13         MR. RAPP:  Objection.  Relevance.  Foundation.

14         THE COURT:  Sustained.

15         MR. CAMBRIA:  Just asked if he's done it.                    11:14:27

16         MR. RAPP:  Same objection.

17         MR. CAMBRIA:  I didn't hear you, Your Honor.

18         THE COURT:  Sustained, Mr. Cambria.

19         MR. CAMBRIA:  Hang on.

20         MR. FEDER:  Is this --                                       11:14:37

21         THE COURT:  Sustained.

22         MR. FEDER:  -- exhibit in?

23         THE COURT:  Sustained.

24         MR. CAMBRIA:  Oh, thank you.  Okay.

25         ///

1    BY MR. CAMBRIA:

2    Q.  Did you ever type in GFE into TikTok?

3            MR. RAPP:  Same objection.  Foundation and relevance.

4            THE COURT:  Sustained.

5            MR. CAMBRIA:  Okay.  Could we pull up Defense 6243,          11:15:01

6    please.

7            THE COURT:  This is --

8    BY MR. CAMBRIA:

9    Q.  All right.  Do you see this on your screen?

10   A.  I do.                                                           11:15:15

11   Q.  Do you recall what this is?

12   A.  This is the corporate structure for Village Voice Media.

13   Q.  Okay.

14           MR. CAMBRIA:  I offer this in evidence.

15           MR. RAPP:  No objection.                                    11:15:32

16           MR. CAMBRIA:  Okay.

17           THE COURT:  Wait.  Is the -- I'm sorry.  What exhibit

18   number is it again, Mr. Cambria?

19           MR. CAMBRIA:  Your Honor, it is 6243.

20           THE COURT:  Yes, it may be admitted --                      11:15:44

21           MR. CAMBRIA:  Thank you.

22           THE COURT:  -- and published.

23           (Exhibit 6243 admitted into evidence.)

24           MR. CAMBRIA:  Could we have Exhibit 23 on the screen,

25   please.  Page 8.                                                    11:15:53

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION (Cont'd)

74

 1          THE COURT:  Oh, we're talking about a different

 2   exhibit now?

 3          MR. CAMBRIA:  Now we are, yeah.

 4          THE COURT:  20 -- 23?

 5          MR. CAMBRIA:  23.

 6          THE COURT:  Government's 23?

 7          MR. CAMBRIA:  Yes.  Page 8.

 8   BY MR. CAMBRIA:

 9   Q.  Do you see this on your screen?

10   A.  I do see it.                                            11:16:13

11   Q.  Okay.  The last paragraph, there's a reference there --

12          MR. CAMBRIA:  This is in evidence, I believe.

13          MR. RAPP:  Yes.

14          MR. CAMBRIA:  All right.

15   BY MR. CAMBRIA:                                             11:16:29

16   Q.  -- which says, "Larkin and Lacey arrested by Arpaio."

17          Do you recall that?

18   A.  I'm sorry.  I don't recall this exhibit.  Could I see the

19   other pages?

20   Q.  Well, no.  What I'm asking you is, do you recall when Lacey  11:16:39

21   and Larkin got arrested by Arpaio?

22          MR. RAPP:  Objection.  Relevance.  Move to strike.

23          THE COURT:  Sustained.

24          MR. CAMBRIA:  Your Honor, I believe that it is

25   relevant as to motivation.                                 11:16:51

```
 1            THE COURT:  Well, with regard to the question, it's
 2   sustained.
 3            MR. CAMBRIA:  All right.
 4            (Microphone noise.)
 5            MR. CAMBRIA:  I'm sorry about that.                    11:17:20
 6   BY MR. CAMBRIA:
 7   Q.  Now, do you recall in the past indicating that the reason
 8   that there's a charge for adult ads is to help ensure that the
 9   content is legal?
10            MR. RAPP:  Objection.  Foundation.                    11:17:43
11            MR. CAMBRIA:  Did he say it?
12            THE COURT:  Well, let me -- let me review the question
13   once more, Mr. Cambria.
14            Overruled.
15            You can answer.                                       11:18:03
16   BY MR. CAMBRIA:
17   Q.  Do you recall the question?
18   A.  Yes, I do.
19   Q.  Okay.  And the answer?
20   A.  Yes, that was the company narrative.                       11:18:08
21   Q.  All right.  Well, that's what you said the reason for
22   charging for ads was; correct?
23   A.  That's what I said --
24   Q.  Yeah.
25   A.  -- but you need to --                                      11:18:25
```

CARL FERRER - CROSS-EXAMINATION (Cont'd)

76

```
 1   Q.  You said that, didn't you?
 2           MR. RAPP:  Well, I'm going to -- I'm going to object
 3   as the foundation for the -- the answer.  Where?
 4   BY MR. CAMBRIA:
 5   Q.  Do you remember --                                    11:18:39
 6           MR. RAPP:  And --
 7           MR. CAMBRIA:  I'll handle it.
 8   BY MR. CAMBRIA:
 9   Q.  Do you remember testifying in a case called United
10   States vs. Fuentes?                                       11:18:47
11   A.  Yes.
12   Q.  And do you recall in that case you said, "We do charge for
13   adult ads to help ensure that the content is legal"?
14           Did you make that statement under oath in that case?
15   A.  I did.                                                11:18:58
16   Q.  Okay.  Was it a lie?
17   A.  It turned out that --
18   Q.  No, no.  Was it a lie?
19   A.  I later learned --
20   Q.  Was it a lie?                                         11:19:08
21   A.  Well, I later learned different information --
22   Q.  No.
23   A.  -- that it --
24   Q.  At the time you stated it, was it -- was it -- did you
25   believe it was true?                                      11:19:14
```

UNITED STATES DISTRICT COURT

1    A.  At the time I stated it, I did believe it to be true.

2    Q.  All right.  Now, did you also state that you forbid any

3    posting that is a sex act for money exchange or any explicit

4    pictures of genitalia?

5    A.  Yes.                                                    11:19:34

6    Q.  And did you also testify on a case called *United States vs.*

7    *Chappell*?

8    A.  I did.

9    Q.  By the way, in the first case, Fuentes, you were testifying

10   for the prosecution, were you not?                          11:20:19

11   A.  Once again, custodian of record.

12   Q.  You were testifying for the prosecution, were you not?

13   A.  And, yes, I was called by the prosecution.

14   Q.  I didn't ask you that.  I just asked you if you were

15   testifying for the prosecution?  Yes?                       11:20:35

16   A.  I just said yes.

17   Q.  No?

18        Okay.  And the same thing in *U.S. v. Chappell.*  You

19   were testifying for the prosecution; correct?

20   A.  Yes, but I think it's important to clarify that I'm      11:20:49

21   testifying specifically about the records.  I don't know the

22   defendant.

23   Q.  Mr. Ferrer, it's a simple question.

24        You were called by the prosecution to testify, were

25   you not?                                                    11:21:04

1    A.  I was.

2    Q.  All right.  And do you recall testifying in that case that

3    Backpage does not intentionally post illegal activity?

4    A.  What does it say exactly?

5    Q.  The question was, "Backpage does not intentionally post          11:21:25

6    illegal activity; true?"

7            And your answer was, "Correct."

8            Do you recall that question and that answer?

9    A.  I do recall the question and the answer.

10   Q.  Was it true?                                                     11:21:40

11   A.  Other users --

12   Q.  Was it a true statement?

13   A.  Because they're saying --

14   Q.  Was it a true statement?

15   A.  I've got to give you some context because you --               11:21:48

16   Q.  How about first answering my question?

17   A.  Well --

18   Q.  Was it a true statement?

19   A.  Backpage doesn't post --

20           MR. CAMBRIA:  Your Honor --                                 11:21:56

21           THE WITNESS:  -- ads.

22           MR. CAMBRIA:  -- would you indicate to the witness to

23   answer my question, please, "Was it a true statement?"

24           Simple.

25           THE COURT:  If you can answer yes or no, please do so.      11:22:03

| | |
|---|---|
| 1 | I'm certain Mr. Rapp will permit you to clarify any issues, but |
| 2 | don't get into a debate or argument.  Just if you can answer, |
| 3 | answer yes or no. |
| 4 | BY MR. CAMBRIA: |
| 5 | Q.  Was it a true statement? | 11:22:18 |
| 6 | A.  It's a true statement. |
| 7 | Q.  Okay.  Did you also testify that Backpage doesn't encourage |
| 8 | illegal activity? |
| 9 | A.  I did. |
| 10 | Q.  Okay.  Do you recall testifying in a case called *United* | 11:22:39 |
| 11 | *States vs. Townsend*? |
| 12 | A.  Yes. |
| 13 | Q.  And, again, in that case you were called by the prosecution |
| 14 | as their witness; correct? |
| 15 | A.  Yes. | 11:23:00 |
| 16 | Q.  Okay.  And you said -- do you recall saying that Backpage |
| 17 | had about a hundred employees? |
| 18 | A.  Could you say that again? |
| 19 | Q.  That Backpage had about a hundred employees? |
| 20 | A.  Don't have it in front of me but -- | 11:23:21 |
| 21 | Q.  Well, I'm -- does that -- do you recall making that |
| 22 | statement? |
| 23 | A.  Well, I -- that sounds about right. |
| 24 | Q.  Okay.  And that there was an -- an adult jobs section, |
| 25 | strip clubs, porn jobs, drivers, things like that? | 11:23:41 |

CARL FERRER - CROSS-EXAMINATION (Cont'd)

80

```
 1   A.  That sounds right.
 2   Q.  Okay.  That in April of 2012, Backpage website users posted
 3   3.3 million ads?
 4        Did you make that statement?
 5   A.  I did make that statement.                            11:24:02
 6   Q.  Okay.  And that charging for ads and requiring payment by
 7   credit cards discourages abusive posting and helps identify and
 8   track users who misuse the site.
 9        Do you recall saying that?
10   A.  Yes.                                                   11:24:30
11   Q.  And that Backpage.com prohibits illegal content and
12   activity on its service, and especially condemns all forms of
13   human trafficking and child exploitation.
14        "We take many steps to prevent such abuse and misuse
15   on the site."                                              11:24:54
16        Did you say that?
17   A.  Yes.  Once -- once again, though, is this --
18   Q.  The question is, did you say that?
19   A.  Yes.
20   Q.  All right.  Next.  Let's see here.                     11:25:00
21        Do you recall making a statement that it's impossible
22   to determine what is an implicit offer for commercial sex?
23   A.  Can you -- can I see the document?
24   Q.  Yeah.  I have -- let's see.  Exhibit 6180.  Exhibit 6180,
25   page 9.  It should be paragraph 19.                        11:25:55
```

UNITED STATES DISTRICT COURT

1          MR. RAPP:  Right.  I'd move to object, Judge.  This is

2   based on the Court's previous order.

3          MR. CAMBRIA:  I'm just asking if he made this

4   statement.

5          THE COURT:  6180, dash, what?                          11:26:16

6          MR. CAMBRIA:  6180, page 9.  Oh, yeah, page 9,

7   paragraph 19.

8          I'm simply asking about a statement not a case.

9          MR. RAPP:  It's within the context of a case.

10         MR. CAMBRIA:  It's not relevant.  It's a free-standing   11:26:34

11   statement.

12         THE COURT:  Wait.  There's a pending objection.  Let

13   me look at the exhibit.

14         I'm -- I must state that I'm confused, because I

15   thought the prior line of questions was related to his      11:27:13

16   testimony in Townsend, Fuentes, and so forth --

17         MR. CAMBRIA:  And it was.

18         THE COURT:  -- and you were posing his testimony with

19   regard to that.  This doesn't look like testimony in a case.

20         So I think you --                                      11:27:32

21         MR. CAMBRIA:  This -- this is --

22         THE COURT:  I somehow have overlooked where your

23   transition occurred.

24         So with regard to this exhibit --

25         MR. CAMBRIA:  This is a declaration.                   11:27:40

1          THE COURT:  -- what was the -- well, you phrased it as

2     testimony.  So I think you need to --

3          MR. CAMBRIA:  Okay.

4          THE COURT:  -- rephrase the question and the -- the --

5          MR. CAMBRIA:  Okay.                               11:27:54

6          THE COURT:  -- that the witness may look at the

7     exhibit.  But you need to rephrase the question first.

8          MR. CAMBRIA:  Okay.

9     BY MR. CAMBRIA:

10    Q.  Do you recall making a declaration under oath where you    11:28:08

11    said "because it is impossible to determine" -- "to determine

12    what is an 'implicit' offer for commercial sex"?

13         MR. RAPP:  Objection.

14    BY MR. CAMBRIA:

15    Q.  Do you recall making that statement in a declaration under  11:28:24

16    oath?

17         MR. RAPP:  Objection.  Court's previous order.  It's

18    within the context of a different case.

19         MR. CAMBRIA:  I'm not referring to the case at all,

20    just the statement.                                      11:28:36

21         THE COURT:  Well, I -- I'm going to sustain the

22    objection because it's not the -- it's not the full statement.

23    You only read a part of it.

24         And he can say whether or not he remembers making that

25    statement.                                               11:28:50

1          MR. CAMBRIA:  Okay.  Can we have the -- can we put the

2   full affidavit on the screen, please, starting at the first

3   paragraph.  And it's -- the statement I'm talking about's in

4   the 19th paragraph.

5          He can read it all, Your Honor, and see.                    11:29:07

6   BY MR. CAMBRIA:

7   Q.  Does it start off, "I, Carl Ferrer, declare and state" --

8          THE COURT:  No.

9          MR. CAMBRIA:  -- "as" --

10          THE COURT:  No.                                            11:29:18

11          MR. CAMBRIA:  -- "follows"?

12          THE COURT:  No, no, no.  The paragraph 19 is what you

13   were focused on.

14          MR. CAMBRIA:  Yes.

15          THE COURT:  There was a sentence, but you only read       11:29:23

16   half of it.  That's -- that is the difficulty with the way that

17   you presented it.

18          MR. CAMBRIA:  Okay.

19          THE COURT:  So --

20          MR. CAMBRIA:  Would you show him paragraph 19, please.    11:29:35

21          THE COURT:  You can read the full sentence and ask him

22   if he recalls making that statement.

23          MR. CAMBRIA:  Okay.

24   BY MR. CAMBRIA:

25   Q.  "Alternatively" -- "Alternatively, because it is impossible  11:29:44

1   to determine what is an 'implicit'" -- in quotes -- "offer for

2   commercial sex, online service providers could require

3   identification from all users who submit postings containing a

4   person's photograph (and retain copies of the identification

5   apparently indefinitely).  I expect that most online users        11:30:04

6   would be unwilling to comply with such requirement because of

7   the burden and/or because of privacy concerns."

8           So my question is, did you --

9           MR. CAMBRIA:  The first part of that, which is a

10  declaration, "because it is impossible to determine what is an    11:30:19

11  'implicit' offer for commercial sex," I'm asking him if he made

12  that statement in this declaration under oath.

13          MR. RAPP:  Objection.  It goes to a Court's private --

14  previous order.  Move to strike the question.

15          THE COURT:  Well, again, that's a different question      11:30:40

16  that you asked than previously.  The prior question, as I

17  recall it, was, "Do you recall making that statement?"

18          And he can testify as to whether or not he recalls

19  making the statement.

20          THE WITNESS:  I don't recall this specific paragraph,     11:30:59

21  because I didn't --

22  BY MR. CAMBRIA.

23  Q.  No.

24  A.  -- write these.

25          MR. CAMBRIA:  Please, Your Honor.  Can you --             11:31:06

1          THE COURT:  He said he did not recall.

2          MR. CAMBRIA:  All right.  Thank you.

3          THE COURT:  So ask your next question.

4    BY MR. CAMBRIA:

5    Q.  So now when you look at this, do you recall that you          11:31:13

6    submitted a sworn declaration which you have in front of you?

7    A.  I was asked to sign a declaration by my supervisors.

8    Q.  And you signed it under oath; correct?

9    A.  Yes.

10   Q.  All right.  And it included this paragraph 19; correct?     11:31:33

11   A.  It appears to be it's included.

12   Q.  Okay.  And paragraph 19 starts off with the words

13   "alternatively, because it is impossible to" --

14          MR. RAPP:  Objection.  Asked and answered.

15          THE COURT:  Sustained.                                    11:31:52

16          MR. CAMBRIA:  Okay.

17   BY MR. CAMBRIA:

18   Q.  And it -- all right.  So you did submit this declaration

19   under oath containing those words; correct?

20   A.  It appears so.                                               11:32:03

21   Q.  All right.  Is it true that on the website there are --

22   website, the Backpage website, there are messages about

23   exploitation and how to report it throughout the website?

24   A.  It's in a couple different locations.

25   Q.  All right.  So it's there; correct?                         11:32:36

```
 1   A.  It is there.

 2   Q.  All right.  When -- all right.  Bear with me a second here.

 3        6243.

 4        And did you also in your interviews with the various

 5   government officials say that cooperating with law enforcement    11:33:51

 6   was one of your favorite parts of employment at Backpage?

 7   A.  I did say that.

 8            MR. CAMBRIA:  That's all I have, Your Honor.

 9            THE COURT:  All right.  Who is coming forward?

10            MR. EISENBERG:  May we split -- switch places with        11:34:16

11   counsel so that they --

12            THE COURT:  Your seating?  Yes.  Yes.

13            MR. EISENBERG:  Thank you.

14            MR. LINCENBERG:  Liliana, can I get that microphone?

15            How's that?                                                11:34:53

16                        CROSS-EXAMINATION

17   BY MR. LINCENBERG:

18   Q.  Mr. Ferrer, my name's Gary Lincenberg.  I represent

19   Mr. Brunst.

20            THE COURT:  You're going to have to speak up.             11:36:03

21            MR. LINCENBERG:  Can everybody hear me?  Is it loud

22   enough?

23            Let me try putting it on my tie.  Is that better?

24            THE COURT:  Better.

25            MR. RAPP:  Yes.                                            11:36:14
```

```
 1   BY MR. LINCENBERG:
 2   Q.  Mr. Brunst, before we talk about -- is that too loud?
 3            THE COURT:  Well, Mr. Ferrer.
 4            THE COURTROOM DEPUTY:  I'll bring it down.
 5            THE COURT:  You called him Mr. Brunst.            11:36:24
 6            MR. LINCENBERG:  Is that too loud?
 7            THE COURT:  No.  That's fine.
 8   BY MR. LINCENBERG:
 9   Q.  Mr. Ferrer --
10            THE COURT:  Thank you.
11   BY MR. LINCENBERG:
12   Q.  -- before we discuss a lot of the testimony you had about
13   credit card processing and banking relationships with regard to
14   Mr. Brunst, I'd like to go over some of the other areas just to
15   see if there's anything that we need to pursue in those areas?  11:36:42
16            So, first, you had testified about conversations with
17   Mr. Larkin back in 2003-2004 about the founding of Backpage.
18            Do you recall that topic?
19   A.  Yeah, 2003.
20   Q.  Okay.  Was Mr. Brunst involved in those conversations that  11:37:04
21   you were referring to back in 2003?  Do you recall?
22   A.  He was not.
23   Q.  Okay.  And you had a lot of testimony about the marketing
24   of the adult section.
25            Was Mr. Brunst ever a part of the marketing department  11:37:21
```

1   at Backpage?

2   A.  Was he ever a part of the marketing department?

3   Q.  Yes.  Was he in the marketing department of Backpage?

4   A.  No.  He's part of the budget process.

5   Q.  Okay.  So my -- we're going to discuss the budget process.                11:37:37

6   If you can try --

7   A.  Yeah.

8   Q.  -- to answer my question.  I promise that whatever else --

9   A.  Okay.

10  Q.  -- you want to say Mr. Rapp will ask you or I'll follow up                11:37:47

11  later.  We'll do it one point at a time.

12          Was he a part of the marketing department?

13  A.  He was not --

14  Q.  Okay.

15  A.  -- a part of the marketing department.                                    11:37:57

16  Q.  And in the marketing department, I believe your testimony

17  was that there was money spent on marketing, non-adult

18  advertisements, but money wasn't spent in marketing adult

19  advertisements; is that correct?

20  A.  Could you say that one more time --                                       11:38:18

21  Q.  Sure.

22  A.  -- please?

23  Q.  Let me break it down.

24          Is it your testimony that with regard to marketing

25  expenses that money was spent to help market some of the                      11:38:29

1   non-adult sections?

2   A.  A nominal amount, yes.

3   Q.  Okay.  And money was not spent -- perhaps it wasn't needed,

4   but money was not spent marketing the adult section.  Is that

5   accurate?                                                        11:38:51

6   A.  No, that's not accurate.

7   Q.  Okay.  And you testified about The Erotic Review at length

8   and your dealings with people at The Erotic Review, including

9   Mr. Elms.

10          To your recollection, was Mr. Brunst ever a part of     11:39:10

11  your conversations with Mr. Elms?

12  A.  Was he ever a part of my conversation with Mr. Elms?

13  Q.  Yes.

14  A.  He was not.

15  Q.  Okay.  Do you know whether Mr. Brunst ever had any          11:39:26

16  conversations with Mr. Elms?

17  A.  I thought that was the question.  He did not.

18  Q.  Okay.  And with regard to ad moderation, was Mr. Brunst a

19  part of the compliance department that dealt with ad

20  moderation?                                                     11:39:50

21  A.  He wasn't -- he wasn't affiliated or a part of the

22  moderation department.

23  Q.  Okay.  With regard to aggregation, do you have any

24  knowledge of Mr. Brunst ever communicating with any

25  aggregators?                                                    11:40:13

CARL FERRER - CROSS-EXAMINATION

90

```
 1   A.  I'm sorry?
 2   Q.  Yes.  Do you have any knowledge of Mr. Brunst having ever
 3   communicated with any aggregators?
 4   A.  With any advertisers?
 5   Q.  Aggregators.                                              11:40:27
 6   A.  Ag- --
 7   Q.  Aggregators.
 8   A.  Aggregators.  Oh, okay.  I don't, other than hiring them.
 9   But, no, I don't believe he ever communicated directly with
10   them.                                                         11:40:49
11   Q.  Okay.  With regard to advertisers, people who advertised on
12   Backpage, do you have any knowledge of Mr. Brunst ever having
13   any communication with anybody who advertised on Backpage?
14   A.  I don't believe he did.
15   Q.  Okay.  With regard to reviewing ads -- you testified about  11:41:12
16   numerous ads.  A number of ads were introduced as exhibits
17   during your direct examination.
18        Do you have any knowledge of whether Mr. Brunst ever
19   reviewed any of the ads that you testified about during your
20   direct examination?                                          11:41:36
21   A.  I don't know.
22   Q.  Okay.  With regard to super posters -- I believe Mr. Mersey
23   was somebody you identified as a super poster; is that right?
24   A.  Yes.
25   Q.  Okay.  Do you have any knowledge of Mr. Brunst ever having  11:41:56
```

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION

91

```
 1    any conversation with Mr. Mersey?

 2    A.  I don't believe he did.

 3    Q.  Okay.  Did you ever include Mr. Brunst on any email that

 4    you had with Mr. Mersey, to your recollection?

 5    A.  No.                                                    11:42:21

 6    Q.  One of the topics that you testified to was dealings you

 7    had with NCMEC.

 8            Do you recall that?

 9    A.  Yes.

10    Q.  And was Mr. Brunst, to your memory, ever a part of any   11:42:30

11    meetings you had with anybody from NCMEC?

12    A.  No, he was not.

13    Q.  Okay.  To your memory, was Mr. Brunst ever a part of any

14    phone calls or emails that you had with people from NCMEC?

15    A.  I don't recall any.                                    11:42:49

16    Q.  Okay.  With regard to your testimony about going to

17    Washington involving the Senate proceedings, was Mr. Brunst

18    with -- present in Washington, D.C.?

19    A.  He was not.

20    Q.  Okay.  You had testified, I believe, that -- I think you  11:43:08

21    said Mr. Lacey and Mr. Larkin and others were there; is that

22    right?

23    A.  Correct.

24    Q.  Who were the others who were there?

25    A.  PR firms.                                              11:43:20
```

1    Q.  Okay.  Was Mr. Moon there?

2           Mr. Moon, was he there?

3    A.  I don't know.

4    Q.  All right.  But when you say "others," just so the record's

5    clear, you're not referring to Mr. Brunst; correct?                    11:43:36

6    A.  Correct.

7    Q.  All right.  With regard to responding to subpoenas, from

8    your recollection, was Mr. Brunst ever a part of the effort to

9    respond to law enforcement subpoenas or subpoenas in any piece

10   of litigation or investigation?                                        11:43:59

11   A.  Generally funding the people in subpoena compliance, but I

12   don't believe he ever had any individual interactions --

13   Q.  Okay.

14   A.  -- fulfilling the subpoena.

15   Q.  Just so we're clear, when you say "generally funding,"            11:44:14

16   you're saying -- and you testified that at times there'd be a

17   budget that would be presented to him and ownership for

18   approval.

19          Is that what you're referring to?

20   A.  Correct.                                                          11:44:25

21   Q.  Okay.  There was testimony about correspondence from

22   Attorneys Generals, different State Attorneys Generals.

23          Do you recall testifying -- several different

24   interactions that you had with Attorneys Generals?

25          Do you recall that?                                            11:44:46

1    A.  Yes.

2    Q.  With regard to any of the back and forth with any of those

3    Attorneys Generals, did you ever, to your memory, consult with

4    Mr. Brunst about how you should respond?

5    A.  No.                                                          11:45:02

6    Q.  All right.  There was a little bit of testimony about press

7    and press inquiries.

8         Did you ever consult with Mr. Brunst about how to

9    respond to press inquiries?

10   A.  I don't recall any.                                          11:45:24

11   Q.  Okay.  There was some testimony about dealing with

12   legislative bodies or mayors in the case of the State of

13   Washington.

14        Do you ever recall speaking with Mr. Brunst about how

15   to respond to any political officials?                           11:45:43

16   A.  No.

17   Q.  Okay.  With regard to dealing with outside lawyers

18   regarding non-transactional matters -- do you know what I mean

19   by non-transactional matters?

20   A.  I think.  Can you give me an example?                        11:46:05

21   Q.  Sure.  So let's put aside, for example, if there were

22   lawyers involved in buying or selling a business, helping

23   execute a transaction.

24        And just talking about lawyers who may have been

25   advising in connection with compliance or litigation --          11:46:21

1          MR. RAPP:  Objection.

2    BY MR. LINCENBERG:

3    Q.  -- was --

4          MR. RAPP:  It was --

5          MR. LINCENBERG:  I haven't finish the question.    11:46:28

6          MR. RAPP:  Objection.  Move to strike the question.

7          THE COURT:  Sustained.

8    BY MR. LINCENBERG:

9    Q.  Were -- did you ever discuss with Mr. Brunst or was he a

10   part of any of your conversations with non-transactional      11:46:41

11   attorneys?

12         MR. RAPP:  Same objection.

13   BY MR. LINCENBERG:

14   Q.  Do you recall?

15         MR. RAPP:  Move to strike and admonish counsel.    11:46:46

16         THE COURT:  Sustained.

17   BY MR. LINCENBERG:

18   Q.  Now, one part of your testimony was that the moderation

19   department, I think at one point you said some of their work

20   was just a veneer.                                            11:47:08

21         Do you recall that testimony?

22   A.  Yes.

23   Q.  Did you ever have any emails where you said, Jed, I'd like

24   you to know that the work we're doing in the moderation

25   department is a veneer?                                       11:47:22

CARL FERRER - CROSS-EXAMINATION

95

 1    A.  It's in the budgets, which were emailed.

 2    Q.  So in the budgets -- which we're going to look at some of

 3    those exhibits -- were -- are you saying we're going to find in

 4    those budget proposals your statement that the ad moderation

 5    efforts are a veneer?                                          11:47:44

 6    A.  It's not going to use the word veneer.

 7    Q.  Okay.  And I believe you said that in your testimony.  I

 8    believe you -- you testified that you were facilitating

 9    prostitution.

10         Is that the gist of your testimony?  Some of your        11:48:04

11    testimony?

12    A.  Promoting.

13    Q.  Okay.  Did you ever send any emails or presentations for

14    budget review or anything to Mr. Brunst where you indicated

15    that you were promoting prostitution?                         11:48:25

16    A.  I -- I wouldn't do that.

17    Q.  Okay.  So the answer is you never did that; correct?

18    A.  No, I didn't.  I wouldn't want to be fired.

19    Q.  Okay.

20         MR. LINCENBERG:  I move to strike the last part after    11:48:45

21    the word "No."

22         THE COURT:  Okay.  The jury will disregard after, "No,

23    I didn't."

24    BY MR. LINCENBERG:

25    Q.  I know you want to make certain points, and you'll have an 11:48:57

UNITED STATES DISTRICT COURT

1    opportunity on redirect.  Just try to answer my questions.

2            Now, prior to your purchase of Backpage in 2015 --

3    well, let's go even further back.

4            Did you understand that at one point in time

5    Mr. Brunst was the chief financial officer of a company called          11:49:25

6    New Times?

7    A.  Yes.

8    Q.  And is it your understanding that he was the CFO of a

9    company called New Times until there were certain corporate

10   purchases and sales and then the holding company became Village       11:49:43

11   Voice Media Holdings?

12   A.  That's correct.

13   Q.  All right.  And when -- was that around 2012?

14   A.  When it became Village Voice --

15   Q.  Yeah.                                                              11:50:05

16   A.  -- Media?

17            No.  I think 2006.

18   Q.  2006?  Okay.

19   A.  It was with the acquisition of the Village Voice.

20   Q.  Okay.  And was it your understanding that at one point            11:50:14

21   the -- the holding company -- I'm going to refer to it as the

22   holding company since at times it's New Times and at times

23   Village Voice Media Holding Company.

24            Do you understand that at some point the holding

25   company held approximately 18 different business units,               11:50:36

1    different companies?

2    A.  Approximately.

3    Q.  Okay.  And so, for example, let's focus, and just to pick a

4    time period for the moment, 2006 to 2012.

5         Did you understand that the -- that Mr. Brunst was          11:50:56

6    listed as the CFO for all of those holding companies for

7    purposes of corporate documentation?

8    A.  I understood he was the corporate CFO.

9    Q.  And during that time period -- in fact, at any time period,

10   was Mr. Brunst on Backpage's payroll?                            11:51:31

11   A.  During what time period?

12   Q.  Any time period.  Was Mr. Brunst ever on Backpage's

13   payroll?

14   A.  After the transaction I had to pay a loan origination fee

15   that I thought was covering Jed Brunst's expenses to maintain    11:51:52

16   the loan, to collect on the loan.

17        MR. LINCENBERG:  Your Honor, I move to strike the

18   answer as nonresponsive.  My question is not about loan

19   payments to a -- to a company.  It's about whether or not

20   Mr. Ferrer ever understood that Mr. Brunst was on Backpage's     11:52:07

21   payroll.

22        MR. RAPP:  Objection as to foundation.  When?  Where?

23        THE COURT:  Well --

24        MR. LINCENBERG:  Ever.

25        THE COURT:  -- I think the question was ever, so            11:52:19

```
 1  overruled as to that.
 2         He can answer it if he -- if he can, if he knows.
 3         THE WITNESS:  So Backpage made payments that I
 4  understood was going to Brunst, some part of it.  Not the loan
 5  payment.  It was like a loan maintenance fee.                    11:52:37
 6  BY MR. LINCENBERG:
 7  Q.  Sir, do you understand what the word payroll means?
 8  A.  I do.
 9  Q.  And what does the word payroll mean to you?
10  A.  Payroll means that you are getting a paycheck.               11:52:49
11  Q.  Okay.  And when somebody got a paycheck from Backpage, for
12  example, was it a normal -- in the normal course of business
13  activity?
14         Did Backpage issue a W-2 for its employee?
15  A.  Yes.                                                          11:53:11
16  Q.  And as the senior officer of Backpage, however you want to
17  describe yourself, do you know whether or not a W-2 was ever
18  issued to Mr. Brunst --
19  A.  We didn't --
20  Q.  -- at Backpage ever?                                          11:53:28
21  A.  No.
22  Q.  Yes or no?
23         No.
24         And so then in response to the question of whether he
25  was ever on Backpage's payroll, using your understanding of      11:53:36
```

CARL FERRER - CROSS-EXAMINATION

99

```
 1   payroll, is the answer, likewise, no, he was never on
 2   Backpage's payroll?
 3   A.  He wasn't on his payroll --
 4   Q.  Thank you.
 5   A.  -- to receive a W-4.  Or was it W-2?                    11:53:47
 6   Q.  If you want to discuss W-4s and what that means, feel free
 7   to do it on redirect.  For right now, please answer my question
 8   about payroll.  Okay?
 9         Now, was -- to your knowledge, did Mr. Brunst ever
10   hold an operational position at Backpage?                   11:54:11
11         You know that he was listed on documents as a CFO.
12   Did he ever act as an operating CFO at Backpage?
13   A.  Can I have a time frame, because his role changed?
14   Q.  Well, my question is ever, and my question is about
15   operational.  We're going to look at documents where he was  11:54:39
16   listed as an ultimate business owner.  And when he signed, it
17   was CFO of Backpage or other newspapers.
18         My question, if you can focus on it, is, did he ever
19   hold an operational position at Backpage?
20         MR. RAPP:  Objection.  Foundation.                    11:54:58
21         THE COURT:  Overruled.
22         THE WITNESS:  Yes, he did.
23   BY MR. LINCENBERG:
24   Q.  Okay.  We'll explore that later.  We'll explore that answer
25   later.                                                      11:55:12
```

1    Did Backpage -- let's just for foundation pick a time

2  frame.  Let's talk about prior to 2013.

3    Did Backpage have an in-house controller?

4  A.  What date again was that?

5  Q.  Prior to 2013.                                            11:55:36

6  A.  We had an accountant.

7  Q.  Okay.  Who was that accountant?

8  A.  Their time -- which time frame?  They were --

9  Q.  Prior to 2013.  If it'll help you, prior to Nathan Kopecky

10  being hired in 2013, my question is, who was in -- who was in   11:55:58

11  charge of accounting, controller actions at Backpage?

12    MR. RAPP:  I'm going to object as to foundation.

13  Prior to 2013 when?

14    THE COURT:  Yeah.  Perhaps just confine that --

15    MR. LINCENBERG:  Let's just use the --              11:56:19

16    THE COURT:  Okay.  Can I finish --

17    MR. LINCENBERG:  Yeah.

18    THE COURT:  -- what I'm saying?

19    MR. LINCENBERG:  Yeah.

20    THE COURT:  Can you just confine whatever the time    11:56:23

21  period is --

22    MR. LINCENBERG:  Sure.

23    THE COURT:  -- in your question, please.

24    MR. LINCENBERG:  Yes, Your Honor.

25    THE COURT:  Thank you.                              11:56:29

BY MR. LINCENBERG:

Q.  Let's take 2011.  In 2011, who was the person who was doing the accounting at Backpage?

A.  I can't be sure.  There were at least three separate accountants that I could recall.                              11:56:43

Q.  Okay.  What names do you recall?

A.  Jess Adams.  There was an Adrianna.  And then there was another individual.  I just can't -- his name doesn't come to mind right now.

Q.  Okay.  Jess Adams was a name we heard before.  I think you    11:57:00
identified him as a person who reported to Mr. Spear; is that right?

A.  It was my understanding that he reported to Mr. Spear and Mr. Brunst.

Q.  Okay.  And when you were interviewed by the government       11:57:13
multiple times, did you ever review an interview report in which you stated that Mr. Adams reported to Mr. Brunst?

A.  Did I --

Q.  Let me rephrase it.

A.  Yes.                                                         11:57:35

Q.  Let me rephrase it.

        Prior to your testimony in this trial, did you ever tell these prosecutors in your 30-plus interviews that Mr. Adams reported to Mr. Brunst?

A.  I'm not sure.  I would have said that he -- the primary       11:57:49

1    report would be Scott Spear.

2    Q.  Okay.  As to anything else, you're just not sure.

3         Is that your testimony?

4    A.  No the -- my experience was in talking to Jess Adams.

5    Q.  Wait, wait, wait.  My question is, and you're not sure                    11:58:04

6    whether you said anything else in your prior reports, in your

7    prior interviews?

8    A.  Are we talking about the prior reports?

9    Q.  Yeah.

10   A.  Yes.  I --                                                               11:58:12

11   Q.  Okay.

12   A.  I don't have that in front of me.

13   Q.  Fair enough.

14        Do you know of -- let's just focus on --

15        MR. LINCENBERG:  Well, let's -- let's put up                           11:58:21

16   Exhibit 6243, which is in evidence.

17        I ask for permission to publish.  This was a -- I

18   think an organizational chart that Mr. Cambria used.

19        THE COURT:  Yes.  And once you're done with this, we

20   can take our lunch recess.                                                  11:58:38

21        MR. LINCENBERG:  Okay.  It's kind of difficult to

22   read.  Let's, if we can, first, maybe blow up the middle of

23   this organizational chart.  A little more so it includes

24   everything under Mr. Larkin.  Oh, it does include everything.

25   Okay.  I'm sorry.  Go ahead and -- there we go.                             11:59:04

 1  BY MR. LINCENBERG:

 2  Q.  All right.  I believe that Mr. Cambria showed you this

 3  organizational chart.  And this organizational chart notes

 4  Mr. Larkin is the CFO -- CEO; Mr. Spear is the -- a vice

 5  president; Scott Tobias, Ruxton Group and Backpage.          11:59:25

 6          And was it your understanding that in this time period

 7  Backpage reported up through Mr. Spear ultimately to the CE- --

 8  CEO, Jim Larkin?

 9          MR. RAPP:  Objection.  Foundation as to which time

10  period this is.                                              11:59:43

11          MR. LINCENBERG:  I believe I --

12  BY MR. LINCENBERG:

13  Q.  Do you recognize this as an organization --

14          THE COURT:  Well, let me -- let me rule on the

15  objection.                                                   11:59:47

16          MR. LINCENBERG:  I'm sorry, Your Honor.

17          THE COURT:  Sustained.

18          MR. LINCENBERG:  Okay.  I'm sorry.

19          THE COURT:  One more question, and then we'll take our

20  lunch break.                                                 11:59:53

21          MR. LINCENBERG:  Okay.

22  BY MR. LINCENBERG:

23  Q.  Do you -- do you recognize this as the organizational chart

24  in the 2011 time period?

25  A.  It looks like an organization chart.  I just don't think   12:00:03

1    I've seen it before.

2            THE COURT:  All right.

3            MR. LINCENBERG:  Thank you, Your Honor.

4            THE COURT:  Members of the jury, we will take our

5    45-minute lunch break at this time.  Again, just remember the          **12:00:12**

6    admonition.  And be prepared to come back into court at quarter

7    till the hour.

8            So with that, please all rise for the jury.

9            (Jury not present at 12:00 p.m.) can.

10           THE COURT:  All right.  Please be seated.                        **12:00:51**

11    And let me just make one inquiry with counsel.  Last

12    evening I received a -- by email an exhibit -- Defense

13    Exhibit 6250 and a redacted version, 6013.

14           Did the government receive those exhibits?

15           MR. RAPP:  We did, Your Honor?  Yes.                             **12:01:17**

16           THE COURT:  Okay.  I just wanted to make sure.

17           All right.  We'll stand in recess.

18           THE COURTROOM DEPUTY:  All rise.

19           (Proceedings recessed at 12:01 p.m.)

20                          ---oOo---

21

22

23

24

25

1

2

3

4

5                    **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 27th day of

16   September, 2023.

17

18

19                          /s/ Cathy J. Taylor
20                          _____
                            Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

**'** [1]

**'1st** [1] - 52:18
**'first** [1] - 52:18
**'fresh'** [1] - 52:18
**'implicit'** [3] - 82:12, 84:1, 84:11
**'Report** [1] - 52:25

## /

**/s/Cathy** [1] - 105:19

## 0

**07/06/2011** [1] - 4:8
**07/15/2011** [2] - 4:11, 4:13

## 1

**1** [1] - 22:1
**10,000** [3] - 21:23, 43:1, 43:2
**100,000** [1] - 21:6
**10:45** [1] - 67:2
**10:46** [1] - 67:6
**11** [1] - 9:15
**1155** [1] - 3:9
**11:06** [1] - 67:6
**11:07** [1] - 67:9
**11th** [1] - 2:10
**12** [1] - 31:9
**120** [1] - 2:13
**12:00** [1] - 104:9
**12:01** [1] - 104:19
**12s** [1] - 16:23
**13** [1] - 1:14
**1301** [1] - 2:10
**14202** [1] - 2:14
**15th** [1] - 33:14
**16** [1] - 9:15
**16's** [1] - 9:16
**160** [1] - 2:20
**18** [6] - 36:15, 38:1, 38:3, 38:5, 52:10, 96:25
**1800** [1] - 2:5
**1875** [1] - 3:4
**19** [10] - 9:14, 45:1, 67:24, 67:25, 80:25, 81:7, 83:12, 83:20, 85:10, 85:12
**1928** [3] - 68:1, 68:2, 68:3
**19th** [1] - 83:4

## 2

**20** [4] - 4:8, 30:4, 30:6,

**74:4**
**20,000** [1] - 57:5
**20-minute** [1] - 66:20
**2000** [1] - 71:10
**20005** [1] - 2:10
**2003** [2] - 87:19, 87:21
**2003-2004** [1] - 87:17
**2004** [1] - 57:5
**2006** [4] - 4:14, 96:17, 96:18, 97:4
**2010** [1] - 69:7
**2011** [9] - 31:9, 32:17, 33:14, 38:20, 44:12, 45:1, 101:2, 103:24
**2012** [3] - 80:2, 96:13, 97:4
**2013** [5] - 100:2, 100:5, 100:9, 100:10, 100:13
**2015** [9] - 67:21, 69:9, 69:10, 70:4, 71:10, 71:12, 71:23, 72:2, 96:2
**2018** [1] - 57:6
**2023** [2] - 1:8, 105:16
**207** [1] - 27:3
**21,143** [1] - 45:4
**210** [1] - 2:17
**23** [4] - 73:24, 74:4, 74:5, 74:6
**2300** [1] - 3:4
**25** [1] - 37:19
**27** [1] - 1:8
**2734** [1] - 3:12
**27th** [1] - 105:15
**2930** [1] - 2:17
**2:18-cr-00422-DJH** [1] - 1:5

## 3

**3** [1] - 38:11
**3.3** [1] - 80:3
**30-plus** [1] - 101:23
**31** [1] - 1:22
**312** [1] - 1:21
**322-7249** [1] - 1:23
**35** [1] - 4:10
**3550** [1] - 3:9
**3s** [2] - 16:21, 16:23

## 4

**4** [1] - 27:2
**4,323** [1] - 45:5
**4-color** [1] - 53:1
**40** [1] - 2:5
**401** [1] - 1:22
**42** [1] - 2:13
**44** [1] - 4:12

**45-minute** [2] - 66:23, 104:5
**493,516** [1] - 45:5

## 5

**5** [2] - 43:1, 43:2
**50** [2] - 24:8, 57:8

## 6

**6013** [1] - 104:13
**602** [1] - 1:23
**6180** [4] - 80:24, 81:5, 81:6
**6243** [6] - 4:14, 73:5, 73:19, 73:23, 86:3, 102:16
**6250** [1] - 104:13
**637** [2] - 51:12, 51:14
**662** [5] - 4:8, 17:25, 18:18, 19:24, 20:5
**662a** [1] - 19:18
**662b** [1] - 18:15
**668** [5] - 4:10, 33:6, 33:7, 33:10, 35:5
**669** [7] - 4:12, 44:8, 44:10, 44:21, 50:21, 50:24
**6720** [1] - 2:17
**6s** [1] - 16:23

## 7

**73** [1] - 4:14

## 8

**8** [3] - 21:9, 73:25, 74:7
**85003-2151** [1] - 1:22
**85004-4408** [1] - 2:6
**85012** [1] - 3:9
**85016** [1] - 2:20
**85252-2734** [1] - 3:13
**85253** [1] - 2:17
**86** [1] - 4:4
**8:53** [3] - 1:8, 5:4, 5:5
**8:56** [1] - 6:10
**8th** [1] - 32:17

## 9

**9** [11] - 4:3, 6:7, 6:14, 6:17, 8:2, 8:4, 8:19, 8:20, 80:25, 81:6
**9,000** [1] - 27:1
**90067** [1] - 3:5
**94** [1] - 27:5
**96,350** [1] - 45:4

**9:17** [1] - 6:10
**9:21** [1] - 8:13

## A

**a.m** [10] - 1:8, 5:4, 5:5, 6:10, 8:13, 67:2, 67:6, 67:9
**A.M** [1] - 1:15
**able** [5] - 5:13, 6:20, 11:5, 27:17, 69:24
**about's** [1] - 83:3
**above-entitled** [1] - 105:12
**abuse** [1] - 80:14
**abusive** [1] - 80:7
**acceptable** [2] - 7:3, 37:10
**acceptance** [1] - 17:5
**accepting** [1] - 28:22
**access** [7] - 27:8, 57:16, 58:8, 59:4, 70:3, 70:5, 71:24
**according** [1] - 36:8
**accountant** [2] - 100:6, 100:7
**accountants** [1] - 101:5
**accounting** [2] - 100:11, 101:3
**accurate** [7] - 14:24, 25:1, 50:4, 50:5, 89:5, 89:6, 105:11
**achieved** [1] - 22:18
**acknowledging** [1] - 53:4
**acquisition** [1] - 96:19
**act** [4] - 11:16, 77:3, 99:12, 105:8
**actions** [1] - 100:11
**activity** [9] - 16:9, 16:10, 16:12, 17:16, 78:3, 78:6, 79:8, 80:12, 98:13
**ad** [72] - 13:23, 14:1, 15:23, 15:24, 16:11, 16:14, 16:16, 16:24, 17:8, 17:9, 17:14, 22:14, 22:21, 23:3, 23:5, 24:2, 24:13, 27:15, 36:10, 37:23, 38:4, 38:24, 39:9, 39:12, 39:19, 39:21, 40:14, 42:23, 42:24, 45:11, 45:23, 45:25, 46:1, 46:4, 46:19, 46:23, 47:12, 48:4, 48:7, 48:14, 48:17, 48:22, 49:8, 49:15, 49:17, 49:18, 49:19,

**49:23, 49:25, 50:6,**
50:9, 50:13, 50:14, 52:21, 52:22, 52:25, 61:12, 61:25, 62:4, 63:17, 63:24, 64:2, 64:5, 64:12, 89:18, 89:19, 95:4
**ADA** [1] - 21:12
**Adams** [5] - 101:7, 101:10, 101:17, 101:24, 102:4
**add** [1] - 63:19
**added** [3] - 27:18, 45:4, 70:8
**addition** [3] - 11:18, 38:6, 39:5
**additional** [3] - 58:10, 58:12, 61:24
**address** [18] - 24:8, 27:16, 27:25, 36:18, 36:19, 53:2, 58:18, 58:20, 58:21, 58:24, 58:25, 59:2, 59:4, 59:9, 59:12, 59:14, 59:23
**addresses** [2] - 20:19, 61:18
**admin** [1] - 52:25
**administrate** [1] - 8:5
**administrative** [1] - 8:5
**admit** [2] - 19:7, 19:9
**admitted** [12] - 19:23, 20:2, 20:5, 35:3, 35:5, 44:19, 44:21, 51:9, 51:21, 68:4, 73:20, 73:23
**admonish** [2] - 17:22, 94:15
**admonition** [3] - 66:20, 66:25, 104:6
**adopt** [2] - 40:25, 61:16
**Adrianna** [1] - 101:7
**ads** [54] - 12:17, 14:11, 14:20, 24:3, 24:9, 27:21, 37:16, 38:7, 38:23, 39:15, 40:2, 40:19, 41:4, 41:12, 41:20, 42:9, 42:20, 42:21, 42:24, 42:25, 43:2, 43:3, 43:5, 43:8, 43:19, 45:11, 47:9, 47:10, 47:17, 49:12, 52:7, 52:8, 53:16, 59:22, 59:24, 61:18, 62:6, 62:8, 63:12, 64:8, 65:1, 67:17, 75:8, 75:22, 76:13, 78:21,

80:3, 80:6, 90:15, 90:16, 90:19
**adult** [17] - 14:10, 36:7, 36:9, 36:10, 37:25, 41:19, 41:20, 43:7, 75:8, 76:13, 79:24, 87:24, 88:17, 88:18, 89:1, 89:4
**AdultFriendFinder** [1] - 37:8
**advertised** [2] - 90:11, 90:13
**advertisements** [2] - 88:18, 88:19
**advertisers** [2] - 90:4, 90:11
**advising** [1] - 93:25
**affidavit** [1] - 83:2
**affiliated** [1] - 89:21
**ag** [1] - 90:6
**age** [10] - 27:13, 35:22, 36:15, 37:19, 37:24, 38:1, 38:2, 38:5, 39:22
**Age** [2] - 4:10, 36:6
**aged** [2] - 22:4, 22:10
**agencies** [1] - 57:2
**agents** [1] - 67:16
**aggregation** [1] - 89:23
**aggregators** [5] - 89:25, 90:3, 90:5, 90:7, 90:8
**aggressively** [2] - 38:3, 52:11
**ago** [1] - 31:9
**agree** [4] - 7:11, 7:12, 16:25, 17:19
**agreeable** [1] - 5:23
**agreed** [2] - 29:3, 29:14
**agreement** [4] - 6:13, 7:25, 69:18
**ahead** [5] - 8:7, 35:18, 42:19, 43:12, 102:25
**aided** [1] - 36:21
**Aided** [1] - 1:24
**aim** [1] - 66:23
**al** [1] - 1:8
**Allen** [1] - 53:16
**allow** [1] - 6:23
**Alternative** [1] - 5:15
**alternative** [1] - 6:19
**alternatively** [2] - 83:25, 85:13
**Alternatively** [1] - 83:25
**Amber's** [2] - 52:7, 52:8
**America** [1] - 1:5

**America's** [1] - 21:6
**amount** [2] - 54:4, 89:2
**anal** [3] - 14:7, 14:8, 14:16
**Andrew** [3] - 2:3, 3:7, 70:19
**andrew.stone@ usdoj.gov** [1] - 2:7
**Andy** [1] - 53:15
**aneuman@ birdmarella.com** [1] - 3:6
**Angeles** [1] - 3:5
**Annenberg** [2] - 30:2, 30:21
**announcement** [5] - 62:21, 62:24, 63:5, 63:10, 63:14
**announcements** [1] - 62:16
**anonymous** [1] - 27:25
**anonymously** [1] - 46:15
**answer** [28] - 13:10, 25:5, 28:17, 40:8, 40:17, 42:11, 42:18, 43:10, 54:9, 56:7, 75:15, 75:19, 76:3, 78:7, 78:8, 78:9, 78:23, 78:25, 79:2, 79:3, 88:8, 95:17, 96:1, 97:18, 98:2, 99:1, 99:7, 99:24
**answered** [1] - 17:17, 28:15, 29:16, 29:17, 29:19, 46:10, 47:22, 48:18, 54:2, 56:19, 85:14
**answering** [1] - 78:16
**anti** [1] - 24:12
**anti-human** [1] - 24:12
**anticipated** [1] - 8:16
**anyplace** [1] - 58:20
**anytime** [1] - 46:22
**apologies** [1] - 36:1
**apologize** [2] - 36:4, 65:12
**appear** [3] - 24:24, 38:23, 45:12
**appeared** [1] - 26:14
**appearing** [2] - 6:17, 7:25
**appointed** [1] - 105:8
**appreciate** [1] - 34:10
**approval** [1] - 92:18
**April** [2] - 69:10, 80:2
**area** [2] - 60:7, 60:8
**areas** [2] - 87:14,

87:15
**argument** [1] - 79:2
**argumentative** [2] - 60:15, 60:16
**Ariel** [1] - 3:4
**ARIZONA** [1] - 1:2
**Arizona** [9] - 1:7, 1:22, 2:6, 2:17, 2:20, 3:9, 3:13, 105:9, 105:15
**Arpaio** [2] - 74:16, 74:21
**arrangement** [4] - 46:4, 46:7, 46:10, 46:13
**arrest** [3] - 21:19, 47:13, 56:18
**arrested** [3] - 46:2, 74:16, 74:21
**article** [2] - 21:4, 21:5
**articles** [5] - 10:5, 10:6, 10:20, 11:6, 21:3
**aside** [2] - 22:24, 93:21
**assist** [4] - 27:10, 28:6, 54:6, 55:9
**assistance** [2] - 55:16, 56:16
**assisted** [1] - 55:12
**assisting** [6] - 56:2, 56:4, 56:11, 56:12, 56:15, 56:17
**associate** [2] - 14:22, 16:9
**associated** [1] - 11:4
**assume** [4] - 16:5, 16:8, 16:22, 27:25
**assuming** [1] - 20:18
**attend** [1] - 12:1
**attention** [2] - 16:24, 18:18
**ATTORNEY'S** [1] - 2:2
**Attorneys** [4] - 92:22, 92:24, 93:3
**attorneys** [3] - 27:19, 67:16, 94:11
**AUSA** [1] - 21:12
**Austin** [1] - 2:9
**austin.berry2@ usdoj.gov** [1] - 2:11
**authenticate** [2] - 36:19, 65:23
**authentication** [1] - 66:10
**authenticity** [1] - 26:16
**automated** [1] - 45:10
**automatically** [1] - 53:1
**available** [4] - 15:23,

31:12, 31:14, 33:19
**Avenue** [4] - 2:5, 2:10, 2:13, 3:9
**avoid** [1] - 36:25
**AVS** [1] - 36:19
**aways** [4] - 26:23, 26:25, 27:1, 27:2

## B

**background** [2] - 11:19, 40:2
**backpage** [3] - 27:7, 27:11, 27:12
**Backpage** [65] - 11:5, 11:12, 12:3, 12:4, 12:9, 12:13, 22:2, 28:6, 28:9, 38:12, 39:13, 40:20, 41:2, 42:9, 43:6, 46:4, 46:22, 57:21, 60:1, 61:18, 62:6, 62:8, 62:9, 62:15, 62:20, 64:1, 64:3, 64:9, 65:1, 67:21, 69:9, 69:12, 69:17, 72:8, 72:9, 78:3, 78:5, 78:19, 79:7, 79:16, 79:19, 80:2, 85:22, 86:6, 87:17, 88:1, 88:3, 90:12, 90:13, 96:2, 98:3, 98:11, 98:14, 98:16, 98:20, 99:10, 99:12, 99:17, 99:19, 100:1, 100:3, 100:11, 101:3, 103:5, 103:7
**Backpage's** [6] - 58:6, 97:10, 97:12, 97:20, 98:25, 99:2
**Backpage.com** [1] - 80:11
**backpage.com** [1] - 36:13
**bad** [1] - 21:16
**banking** [2] - 11:25, 87:13
**banned** [3] - 45:4, 45:5
**banning** [1] - 70:21
**bargain** [1] - 69:12
**based** [3] - 13:9, 23:15, 81:2
**basics** [1] - 53:8
**basis** [1] - 45:4
**BBJ** [1] - 13:18
**bear** [1] - 86:2
**became** [3] - 69:10, 96:10, 96:14
**BEFORE** [1] - 1:12

**begrudgingly** [1] - 69:2
**below** [1] - 52:21
**Bennett** [1] - 30:11
**BERRY** [1] - 18:12
**Berry** [1] - 2:9
**BERTRAND** [4] - 3:11, 7:6, 32:5, 32:8
**Bertrand** [2] - 3:12, 7:5
**best** [3] - 8:16, 8:19, 41:22
**better** [4] - 22:3, 53:6, 86:23, 86:24
**between** [3] - 4:12, 25:11, 54:4
**bf@federlawpa.com** [1] - 2:21
**big** [1] - 49:16
**Bill** [1] - 51:16
**Bill's** [1] - 67:17
**BIRD** [1] - 3:2
**bit** [2] - 11:1, 93:6
**blow** [1] - 102:22
**bodies** [1] - 93:12
**bonus** [2] - 61:20, 61:23
**borrowed** [1] - 37:16
**bottom** [3] - 27:15, 53:12, 68:21
**bought** [2] - 67:21, 69:9
**Bowl** [3] - 21:4, 21:5
**Box** [1] - 3:12
**BOXER** [1] - 3:2
**Boyle** [1] - 2:5
**break** [9] - 43:8, 46:5, 48:10, 66:18, 66:20, 66:23, 88:23, 103:20, 104:5
**bring** [3] - 6:3, 67:7, 87:4
**broad** [1] - 26:17
**Brooke** [1] - 21:12
**browsing** [2] - 14:24, 38:6
**Bruce** [1] - 2:19
**Brunst** [37] - 3:2, 86:19, 87:2, 87:5, 87:14, 87:20, 87:25, 89:10, 89:15, 89:18, 89:24, 90:2, 90:12, 90:18, 90:25, 91:3, 91:10, 91:13, 91:17, 92:5, 92:8, 93:4, 93:8, 93:14, 94:9, 95:14, 96:5, 97:5, 97:10, 97:12, 97:20, 98:4, 98:18, 99:9, 101:14, 101:17,

3

101:24
**Brunst's** [1] - 97:15
**brush** [1] - 26:17
**budget** [5] - 88:4, 88:5, 92:17, 95:4, 95:14
**budgets** [2] - 95:1, 95:2
**Buffalo** [1] - 2:14
**build** [3] - 27:7, 27:9, 55:23
**burden** [1] - 84:7
**business** [6] - 12:13, 40:13, 93:22, 96:25, 98:12, 99:16
**buying** [1] - 93:22
**BY** [92] - 9:2, 10:8, 10:11, 10:16, 11:3, 11:10, 13:1, 13:5, 13:11, 15:11, 15:15, 15:20, 16:2, 16:7, 18:1, 18:17, 20:6, 22:7, 23:11, 23:14, 23:19, 25:17, 26:1, 28:20, 30:1, 30:7, 30:18, 31:2, 32:15, 33:9, 34:12, 35:9, 35:17, 38:18, 39:18, 40:11, 41:3, 42:4, 44:9, 44:24, 46:21, 47:7, 47:20, 47:23, 48:2, 48:21, 49:7, 50:23, 51:13, 51:24, 52:5, 55:20, 56:22, 60:21, 61:3, 65:14, 67:14, 68:6, 71:19, 71:22, 72:11, 73:1, 73:8, 74:8, 74:15, 75:6, 75:16, 76:4, 76:8, 79:4, 82:9, 82:14, 83:6, 83:24, 84:22, 85:4, 85:17, 86:17, 87:1, 87:8, 87:11, 94:2, 94:8, 94:13, 94:17, 95:24, 98:6, 99:23, 101:1, 103:1, 103:12, 103:22
**Byron** [7] - 4:8, 18:6, 18:7, 18:22, 20:23, 21:8, 36:8

## C

**California** [1] - 3:5
**CAMBRIA** [214] - 2:12, 6:6, 6:25, 8:10, 8:25, 9:2, 10:8, 10:11, 10:15, 10:16, 10:25, 11:3, 11:9, 11:10,

13:1, 13:5, 13:11, 15:7, 15:9, 15:11, 15:15, 15:19, 15:20, 16:2, 16:6, 16:7, 17:19, 17:24, 18:1, 18:10, 18:13, 18:16, 18:17, 19:2, 19:6, 19:8, 19:10, 19:17, 19:21, 20:1, 20:4, 20:6, 20:13, 20:17, 20:20, 22:7, 23:11, 23:14, 23:19, 25:17, 25:21, 25:24, 26:1, 28:20, 29:17, 29:20, 29:23, 30:1, 30:4, 30:6, 30:7, 30:14, 30:18, 30:24, 31:2, 31:11, 31:15, 31:18, 31:21, 32:3, 32:10, 32:14, 32:15, 32:21, 32:24, 33:3, 33:6, 33:8, 33:9, 33:16, 33:18, 33:24, 34:3, 34:7, 34:10, 34:12, 34:21, 34:23, 34:25, 35:4, 35:6, 35:8, 35:9, 35:13, 35:17, 36:3, 38:18, 39:18, 40:5, 40:7, 40:10, 40:11, 40:22, 40:25, 41:3, 42:2, 42:4, 44:8, 44:9, 44:17, 44:20, 44:23, 44:24, 46:21, 47:2, 47:5, 47:7, 47:20, 47:23, 48:2, 48:20, 48:21, 49:6, 49:7, 50:21, 50:23, 51:11, 51:13, 51:18, 51:23, 51:24, 52:5, 55:19, 55:20, 56:22, 60:16, 60:20, 60:21, 60:24, 61:2, 61:3, 65:10, 65:12, 65:14, 67:13, 67:14, 67:24, 68:1, 68:3, 68:5, 68:6, 71:19, 71:22, 72:11, 72:15, 72:17, 72:19, 72:24, 73:1, 73:5, 73:8, 73:14, 73:16, 73:19, 73:21, 73:24, 74:3, 74:5, 74:7, 74:8, 74:12, 74:14, 74:15, 74:24, 75:3, 75:5, 75:6, 75:11, 75:16, 76:4, 76:7, 76:8, 78:20, 78:22, 79:4, 81:3, 81:6, 81:10, 81:17, 81:21, 81:25, 82:3, 82:5, 82:8, 82:9, 82:14, 82:19,

83:1, 83:6, 83:9, 83:11, 83:14, 83:18, 83:20, 83:23, 83:24, 84:9, 84:22, 84:25, 85:2, 85:4, 85:16, 85:17, 86:8
**Cambria** [25] - 2:13, 4:3, 6:24, 8:9, 8:24, 10:14, 17:23, 19:16, 19:25, 25:19, 29:24, 31:17, 34:2, 47:3, 50:18, 51:10, 51:22, 65:8, 66:17, 67:12, 72:18, 73:18, 75:13, 102:18, 103:2
**Camelback** [1] - 2:20
**cannot** [1] - 38:2
**capability** [1] - 37:11
**capable** [1] - 5:16
**capture** [1] - 36:17
**card** [10] - 21:13, 36:16, 36:17, 36:21, 36:23, 37:2, 37:3, 37:5, 37:10, 87:13
**cards** [3] - 36:17, 37:2, 80:7
**care** [1] - 63:25
**Carl** [8] - 4:3, 28:4, 33:25, 35:10, 38:17, 52:21, 53:6, 83:7
**carriers** [1] - 38:15
**case** [17] - 27:16, 36:14, 66:2, 76:9, 76:12, 76:14, 77:6, 77:9, 78:2, 79:10, 79:13, 81:8, 81:9, 81:19, 82:18, 82:19, 93:12
**cases** [8] - 21:17, 21:24, 22:18, 36:11, 46:18, 54:7, 55:23, 66:8
**cash** [1] - 36:20
**catch** [2] - 16:24, 46:5
**categories** [2] - 41:16, 43:22
**category** [6] - 14:17, 14:25, 24:14, 41:19, 64:20, 64:21
**Cathy** [2] - 1:21, 105:20
**CATHY** [1] - 105:7
**CE** [1] - 103:7
**cell** [1] - 38:15
**Central** [2] - 2:5, 3:9
**Century** [1] - 3:4
**CEO** [4] - 12:4, 12:7, 103:4, 103:8
**certain** [7] - 13:7, 55:22, 59:10, 79:1,

95:25, 96:9
**certainly** [1] - 31:7
**certify** [1] - 105:7
**CERTIFY** [1] - 105:10
**cetera** [2] - 11:5, 52:19
**CFO** [7] - 96:8, 97:6, 97:8, 99:11, 99:12, 99:17, 103:4
**chance** [1] - 42:13
**changed** [1] - 99:13
**Chappell** [2] - 77:7, 77:18
**characterize** [1] - 29:11
**characterized** [1] - 9:10
**charge** [4] - 12:14, 75:8, 76:12, 100:11
**charged** [1] - 21:25
**charging** [2] - 75:22, 80:6
**chart** [6] - 102:18, 102:23, 103:3, 103:23, 103:25
**check** [2] - 6:4, 8:7
**checking** [1] - 5:15
**checks** [1] - 6:2
**Chicago** [1] - 27:16
**chief** [2] - 12:10, 96:5
**child** [12] - 21:16, 21:20, 21:22, 21:24, 27:2, 27:3, 27:10, 36:7, 36:14, 52:12, 52:14, 80:13
**Children** [4] - 21:1, 36:9, 63:23, 64:23
**children** [3] - 27:4, 27:5
**choice** [3] - 56:6, 56:12, 56:14
**choose** [1] - 36:24
**circumstance** [2] - 28:4, 48:22
**circumstances** [1] - 8:17
**cities** [4] - 27:9, 42:1, 42:2, 59:24
**city** [1] - 24:18
**claim** [1] - 23:9
**clarified** [1] - 47:4
**clarify** [2] - 77:20, 79:1
**classified** [1] - 37:13
**clear** [2] - 92:5, 92:15
**clearly** [1] - 22:4
**click** [1] - 52:24
**clients** [3] - 5:21, 37:1, 37:2
**closer** [1] - 65:8
**clubs** [1] - 79:25
**colleague's** [1] - 7:6

**collect** [1] - 97:16
**coming** [2] - 43:15, 86:9
**comments** [1] - 53:2
**Commerce** [1] - 37:7
**commercial** [4] - 80:22, 82:12, 84:2, 84:11
**common** [1] - 14:8
**communicated** [2] - 90:3, 90:9
**communicating** [1] - 89:24
**communication** [2] - 54:4, 90:13
**commute** [1] - 5:10
**companies** [2] - 97:1, 97:6
**company** [10] - 12:8, 65:17, 75:20, 96:5, 96:9, 96:10, 96:21, 96:22, 96:25, 97:19
**Company** [1] - 96:23
**competitor** [1] - 24:10
**competitors** [3] - 22:20, 22:24, 23:5
**compile** [1] - 61:17
**complained** [1] - 38:8
**complaint** [1] - 24:2
**complaints** [1] - 24:3
**completely** [1] - 49:10
**compliance** [4] - 60:9, 89:19, 92:11, 93:25
**complicated** [1] - 42:11
**comply** [1] - 84:6
**Computer** [1] - 1:24
**computer** [7] - 58:2, 58:24, 59:2, 59:9, 61:5, 61:6
**Computer-Aided** [1] - 1:24
**computers** [2] - 58:16, 61:9
**concern** [1] - 8:18
**concerns** [1] - 84:7
**condemns** [1] - 80:12
**conduct** [5] - 14:12, 14:23, 15:22, 16:18, 16:25
**confer** [3] - 5:21, 6:4, 31:24
**Conference** [2] - 21:1, 64:23
**confine** [2] - 100:14, 100:20
**confirm** [1] - 31:8
**confirming** [1] - 33:7
**confused** [2] - 25:18, 58:23, 81:14

**confusing** [4] - 25:15, 40:23, 49:5, 71:17
**connection** [5] - 17:9, 17:16, 45:15, 45:16, 93:25
**consequences** [1] - 27:14
**consider** [3] - 28:12, 29:15, 37:21
**considers** [1] - 40:24
**constitute** [1] - 105:10
**consult** [2] - 93:3, 93:8
**Cont'd** [3] - 3:1, 4:3, 9:1
**contact** [3] - 50:12, 53:3, 63:3
**contacted** [1] - 49:24
**contain** [1] - 67:17
**contained** [1] - 105:12
**containing** [2] - 84:3, 85:19
**contains** [1] - 33:20
**content** [5] - 43:13, 43:21, 75:9, 76:13, 80:11
**context** [3] - 78:15, 81:9, 82:18
**continue** [6] - 7:20, 8:24, 22:17, 27:19, 27:24, 28:8
**continued** [1] - 6:21
**contributed** [1] - 53:25
**control** [6] - 7:2, 69:24, 70:25, 71:3, 71:24, 105:14
**controller** [2] - 100:3, 100:11
**convenient** [1] - 17:13
**conversation** [3] - 17:4, 89:12, 91:1
**conversations** [5] - 87:16, 87:20, 89:11, 89:16, 94:10
**conveyed** [1] - 5:10
**conveying** [1] - 32:24
**convict** [2] - 65:5, 66:4
**convicted** [1] - 66:6
**cooperating** [1] - 86:5
**copies** [3] - 31:16, 31:19, 84:4
**copy** [4] - 30:11, 31:12, 31:14, 32:2
**Corporate** [1] - 4:14
**corporate** [4] - 73:12, 96:9, 97:7, 97:8
**correct** [63] - 12:1, 12:2, 12:18, 12:19,

13:7, 13:24, 16:12, 16:13, 17:6, 17:7, 18:22, 19:24, 22:11, 24:5, 24:6, 28:6, 31:3, 38:20, 38:25, 39:1, 39:24, 39:25, 41:7, 47:21, 48:4, 48:7, 48:11, 48:17, 49:25, 50:10, 54:15, 55:13, 55:25, 56:11, 58:4, 59:3, 59:6, 59:10, 59:19, 62:2, 64:7, 65:2, 65:16, 65:22, 65:25, 69:9, 70:25, 71:8, 71:24, 75:22, 77:19, 79:14, 85:8, 85:10, 85:19, 85:25, 88:19, 91:23, 92:5, 92:6, 92:20, 95:17, 96:12
**Correct** [1] - 78:7
**correspondence** [1] - 92:21
**counsel** [6] - 17:22, 19:22, 31:13, 86:11, 94:15, 104:11
**count** [1] - 42:23
**couple** [4] - 5:10, 51:22, 62:11, 85:24
**course** [1] - 98:12
**court** [2] - 6:19, 104:6
**COURT** [158] - 1:1, 5:6, 6:7, 6:12, 6:24, 7:5, 7:8, 7:10, 7:13, 7:15, 7:19, 7:24, 8:11, 8:14, 10:10, 10:13, 10:24, 11:1, 13:4, 13:9, 15:10, 15:18, 16:1, 17:18, 17:23, 19:5, 19:7, 19:9, 19:11, 19:16, 19:20, 19:24, 20:2, 20:15, 20:18, 20:21, 23:13, 23:18, 25:19, 25:22, 25:25, 28:16, 29:21, 29:24, 30:5, 30:17, 31:1, 31:10, 31:16, 31:19, 31:25, 32:7, 32:11, 33:5, 33:7, 33:22, 34:1, 34:6, 34:8, 34:15, 34:22, 34:24, 35:1, 35:7, 35:11, 35:15, 35:25, 39:17, 40:6, 40:8, 40:23, 41:24, 42:3, 44:19, 44:22, 47:1, 47:3, 47:25, 48:19, 50:18, 50:20, 51:9, 51:21, 56:20, 60:18, 60:23, 60:25,

65:8, 65:11, 66:17, 67:3, 67:7, 67:10, 67:25, 71:18, 71:21, 72:14, 72:18, 72:21, 72:23, 73:4, 73:7, 73:17, 73:20, 73:22, 74:1, 74:4, 74:6, 74:23, 75:1, 75:12, 78:25, 81:5, 81:12, 81:18, 81:22, 82:1, 82:4, 82:6, 82:21, 83:8, 83:10, 83:12, 83:15, 83:19, 83:21, 84:15, 85:1, 85:3, 85:15, 86:9, 86:12, 86:20, 86:24, 87:3, 87:5, 87:7, 87:10, 94:7, 94:16, 95:22, 97:23, 97:25, 99:21, 100:14, 100:16, 100:18, 100:20, 100:23, 100:25, 102:19, 103:14, 103:17, 103:19, 104:2, 104:4, 104:10, 104:16
**Court** [11] - 1:20, 1:24, 5:3, 6:18, 6:23, 7:21, 31:16, 31:20, 31:24, 105:8, 105:9
**Court's** [3] - 81:2, 82:17, 84:13
**Courthouse** [1] - 1:21
**COURTROOM** [6] - 6:9, 6:11, 31:13, 68:4, 87:4, 104:18
**courtroom** [2] - 5:3, 31:24
**covering** [1] - 97:15
**Craigslist** [1] - 37:9
**CRC** [2] - 1:21, 105:20
**create** [1] - 28:24
**creating** [1] - 27:3
**credit** [10] - 36:16, 36:17, 36:21, 36:23, 37:2, 37:5, 37:10, 80:7, 87:13
**crime** [2] - 21:25, 64:11
**Crimes** [3] - 21:1, 36:9, 64:22
**Cross** [2] - 4:3, 4:4
**CROSS** [2] - 9:1, 86:16
**cross** [1] - 33:19
**Cross-Examination** [2] - 4:3, 4:4
**CROSS-EXAMINATION** [2] - 9:1, 86:16

**cross-examine** [1] - 33:19
**CRR** [2] - 1:21, 105:20
**custodian** [3] - 65:23, 66:9, 77:11
**custody** [1] - 5:2
**customer** [1] - 14:2

# D

**D.C** [1] - 91:18
**daily** [1] - 45:4
**Dallas** [5] - 18:9, 21:2, 26:23, 26:25, 36:8
**Daniel** [1] - 2:5
**dash** [1] - 81:5
**data** [4] - 36:23, 53:3, 58:3, 58:14
**database** [1] - 58:19
**date** [4] - 27:15, 45:1, 100:4, 105:13
**DATED** [1] - 105:15
**dating** [1] - 37:13
**DAVID** [1] - 3:8
**David** [1] - 3:8
**david@ deisenbergplc.com** [1] - 3:10
**DAY** [1] - 1:14
**day-to-day** [1] - 12:13
**DC** [1] - 2:10
**deal** [2] - 36:23, 68:11
**dealing** [2] - 93:11, 93:17
**dealings** [2] - 89:8, 91:6
**dealt** [1] - 89:19
**debate** [1] - 79:2
**debit** [1] - 37:2
**December** [2] - 23:23, 32:17
**decides** [1] - 7:21
**deciding** [1] - 70:20
**decision** [2] - 5:25, 71:8
**declaration** [8] - 81:25, 82:10, 82:15, 84:10, 84:12, 85:6, 85:7, 85:18
**declare** [1] - 83:7
**Defendant** [5] - 2:12, 2:15, 3:2, 3:7, 3:11
**defendant** [1] - 77:22
**Defendants** [2] - 1:9, 5:2
**defense** [1] - 67:4
**Defense** [2] - 73:5, 104:12
**degrees** [1] - 26:16
**Delaware** [1] - 2:13

**delay** [1] - 6:22
**demand** [1] - 59:22
**Denver** [4] - 62:19, 62:20, 64:11, 64:12
**department** [14] - 5:16, 25:3, 37:23, 60:9, 87:25, 88:2, 88:3, 88:12, 88:15, 88:16, 89:19, 89:22, 94:19, 94:25
**DEPARTMENT** [1] - 2:9
**Department's** [1] - 36:9
**departments** [1] - 57:7
**depiction** [1] - 39:8
**deputy** [2] - 5:3, 31:24
**DEPUTY** [6] - 6:9, 6:11, 31:13, 68:4, 87:4, 104:18
**describe** [4] - 28:10, 53:16, 63:9, 98:17
**described** [1] - 11:11
**DESCRIPTION** [1] - 4:7
**designed** [2] - 54:6, 54:8
**detail** [1] - 27:12
**details** [1] - 8:18
**detectives** [1] - 37:21
**deter** [1] - 21:15
**determine** [7] - 5:21, 59:16, 80:22, 82:11, 84:1, 84:10
**determined** [1] - 8:18
**developed** [2] - 53:18, 53:24
**developers** [1] - 70:1
**DIANE** [1] - 1:12
**difference** [2] - 25:10, 49:16
**different** [22] - 7:16, 11:17, 13:13, 13:16, 21:25, 57:2, 57:6, 59:24, 60:7, 61:18, 62:7, 68:15, 74:1, 76:21, 82:18, 84:15, 85:24, 92:22, 92:23, 96:25, 97:1
**difficult** [1] - 102:21
**difficulty** [1] - 83:16
**direct** [2] - 90:17, 90:20
**direction** [1] - 105:14
**directly** [1] - 90:9
**director** [1] - 12:11
**director/operator** [1] - 12:12
**disclaimer** [2] - 27:18, 53:11

**discourages** [1] - 80:7
**discuss** [4] - 87:12, 88:5, 94:9, 99:6
**discussed** [1] - 62:5
**disregard** [1] - 95:22
**distance** [2] - 5:12, 5:14
**distributed** [1] - 54:12
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 105:9
**document** [1] - 80:23
**documentation** [1] - 97:7
**documents** [2] - 99:11, 99:15
**DOJ-BP-0001127479** [1] - 4:11
**DOJ-BP-0001127481** [1] - 4:11
**DOJ-BP-0001127482** [1] - 4:13
**DOJ-BP-0001127483** [1] - 4:13
**DOJ-BP-0002114645** [1] - 4:9
**DOJ-BP-0002114646** [1] - 4:9
**DOJ-BP-0004602110 -017** [1] - 4:15
**Dollar** [1] - 67:17
**domains** [2] - 62:7, 62:8
**Don** [1] - 30:11
**donated** [2] - 63:17, 64:2
**done** [4] - 5:20, 33:1, 72:15, 102:19
**door** [1] - 33:2
**down** [22] - 20:16, 20:17, 22:21, 23:5, 24:10, 39:21, 39:22, 43:9, 46:19, 46:24, 47:17, 48:4, 48:15, 49:24, 50:6, 50:13, 63:4, 69:13, 69:15, 69:17, 87:4, 88:23
**drivers** [1] - 79:25
**drives** [1] - 5:9
**driving** [1] - 5:9
**DROOKS** [1] - 3:2
**due** [1] - 8:17
**duly** [1] - 105:7
**during** [7] - 46:22, 64:9, 70:10, 90:17, 90:19, 97:9, 97:11
**duty** [1] - 8:6

**E**

**e-Commerce** [1] -

37:7
**early** [2] - 8:15, 66:22
**easier** [1] - 68:22
**East** [1] - 2:20
**easy** [1] - 50:17
**editor** [1] - 9:18
**editorialize** [1] - 17:22
**editorials** [2] - 10:3, 10:5
**editors** [1] - 9:21
**education** [1] - 37:24
**effort** [1] - 92:8
**efforts** [1] - 95:5
**EISENBERG** [4] - 3:8, 7:14, 86:10, 86:13
**Eisenberg** [2] - 3:8, 7:13
**either** [2] - 16:22, 26:11
**elms** [4] - 89:9, 89:11, 89:12, 89:16
**email** [31] - 18:5, 20:11, 20:19, 20:22, 27:22, 27:25, 30:8, 30:10, 30:16, 30:22, 31:3, 31:9, 33:13, 33:21, 33:25, 38:16, 38:19, 44:11, 50:25, 51:4, 51:6, 51:15, 53:2, 54:20, 59:23, 68:9, 68:20, 71:9, 71:14, 91:3, 104:12
**Email** [2] - 4:8, 4:10
**emailed** [1] - 53:1, 95:1
**emails** [5] - 33:21, 53:4, 91:14, 94:23, 95:13
**Emails** [1] - 4:12
**employee** [1] - 98:14
**employees** [3] - 58:4, 79:17, 79:19
**employment** [1] - 86:6
**encourage** [1] - 79:7
**end** [3] - 27:3, 27:5, 34:5
**ended** [1] - 21:8
**enforced** [1] - 37:21
**enforcement** [41] - 27:5, 27:8, 27:11, 28:1, 36:22, 37:14, 38:4, 38:8, 45:15, 45:17, 45:22, 46:1, 46:3, 52:16, 53:19, 53:21, 54:2, 54:4, 54:6, 54:11, 54:12, 55:12, 55:14, 55:22, 56:2, 57:2, 57:6, 57:16, 58:8, 58:11, 59:15, 59:20, 60:3,

61:4, 61:8, 62:13, 62:20, 64:25, 65:5, 86:5, 92:9
**engaging** [1] - 14:12
**enjoyed** [1] - 25:2
**ensure** [2] - 75:8, 76:13
**enter** [2] - 38:1, 38:2
**entire** [2] - 20:9, 52:2
**entirety** [1] - 20:12
**entitled** [1] - 105:12
**equipment** [2] - 6:3, 58:7
**equipped** [1] - 53:7
**Eric** [1] - 2:16
**eric.kesslerlaw@ gmail.com** [1] - 2:18
**Ernie** [1] - 53:16
**Eros's** [1] - 37:21
**Eros.com** [1] - 37:18
**Erotic** [2] - 89:7, 89:8
**err** [1] - 26:10
**Es** [1] - 16:21
**escorts** [2] - 14:17, 14:25
**especially** [1] - 80:12
**ESQ** [1] - 3:11
**Esq** [14] - 2:3, 2:3, 2:4, 2:4, 2:5, 2:9, 2:13, 2:16, 2:19, 3:3, 3:3, 3:4, 3:8, 3:12
**establish** [2] - 6:3, 41:25
**estimate** [3] - 41:22, 44:5, 57:4
**et** [3] - 1:8, 11:5, 52:19
**etc** [1] - 45:2
**evening** [1] - 104:12
**event** [4] - 8:17, 15:21, 26:2, 65:21
**eventually** [2] - 37:4, 58:13
**evidence** [21] - 17:25, 18:12, 18:13, 18:14, 18:15, 19:2, 19:6, 19:18, 20:5, 30:14, 32:21, 33:16, 35:5, 44:17, 44:21, 51:18, 73:14, 73:23, 74:12, 102:16
**exact** [1] - 44:6
**exactly** [1] - 78:4
**exaggerate** [1] - 21:21
**EXAMINATION** [2] - 9:1, 86:16
**examination** [2] - 90:17, 90:20
**Examination** [2] - 4:3, 4:4
**examine** [1] - 33:19

**example** [12] - 9:10, 12:23, 24:1, 38:10, 40:1, 41:5, 63:13, 93:20, 93:21, 97:3, 98:12
**except** [1] - 41:6
**exception** [1] - 62:11
**exchange** [1] - 77:3
**excuse** [1] - 37:1
**excused** [6] - 7:1, 7:4, 7:7, 7:12, 8:6, 8:20
**excusing** [1] - 7:17
**execute** [1] - 93:23
**Executive** [1] - 53:9
**Exhibit** [12] - 17:25, 20:5, 33:6, 35:5, 44:10, 44:21, 73:23, 73:24, 80:24, 102:16, 104:13
**exhibit** [14] - 19:14, 31:10, 31:19, 32:1, 32:11, 71:16, 72:22, 73:17, 74:2, 74:18, 81:13, 81:24, 82:7, 104:12
**EXHIBITS** [1] - 4:6
**exhibits** [8] - 31:21, 31:25, 32:4, 33:1, 67:4, 90:16, 95:3, 104:14
**exigent** [1] - 28:4
**expect** [2] - 21:8, 84:5
**expeditiously** [1] - 38:13
**expense** [12] - 36:24, 36:25, 57:14, 57:17, 57:19, 57:21, 57:24, 58:6, 58:10, 58:16, 64:3
**expenses** [2] - 88:25, 97:15
**experience** [9] - 23:12, 23:15, 36:13, 37:3, 45:13, 68:13, 68:16, 72:4, 102:4
**explain** [2] - 42:13, 53:7
**explained** [1] - 5:8
**explaining** [2] - 27:14, 53:3
**explicit** [1] - 77:3
**exploitation** [10] - 21:17, 21:24, 27:3, 36:8, 36:14, 52:12, 52:14, 52:17, 80:13, 85:23
**exploited** [1] - 27:10
**explore** [2] - 99:24

**F**

**Facebook** [4] - 12:24, 13:6, 39:13, 72:9
**facilitate** [2] - 54:25, 55:2
**facilitate's** [1] - 55:4
**facilitating** [5] - 48:23, 49:1, 49:4, 56:4, 95:8
**fact** [4] - 9:13, 30:25, 47:14, 97:9
**fair** [7] - 9:11, 9:19, 39:10, 49:17, 55:24, 69:5, 102:13
**fake** [1] - 47:12
**false** [2] - 49:10, 49:11
**familiar** [5] - 10:17, 13:12, 13:14, 22:24, 30:2
**family** [1] - 26:15
**FAQ** [1] - 53:3
**far** [1] - 50:7
**Fassett** [8] - 4:8, 18:6, 18:7, 18:22, 20:24, 21:9, 21:18, 36:8
**faster** [1] - 38:15
**favorite** [1] - 86:6
**fax** [2] - 37:12, 37:20
**FBI** [1] - 21:11
**feasible** [1] - 5:13
**FEDER** [6] - 2:19, 6:8, 7:11, 68:2, 72:20, 72:22
**Feder** [2] - 2:19, 7:10
**federal** [4] - 57:12, 65:16, 65:19, 65:20
**fee** [2] - 97:14, 98:5
**feeds** [2] - 43:15, 43:18
**felt** [3] - 21:21, 26:5, 26:7
**female** [2] - 14:17, 14:25
**Ferrer** [17] - 4:3, 4:8, 4:10, 4:12, 9:3, 18:2, 18:18, 20:7, 20:22, 30:8, 67:15, 77:23, 83:7, 86:18, 87:3, 87:9, 97:20
**few** [3] - 13:18, 37:11, 53:15
**figure** [3] - 25:13, 26:4, 26:8
**file** [1] - 32:4
**filed** [1] - 32:3
**financial** [1] - 96:5
**fine** [1] - 87:7
**finish** [3] - 53:14, 94:5, 100:16

**fired** [1] - 95:18
**firms** [1] - 91:25
**first** [11] - 31:8, 33:25, 43:8, 54:9, 77:9, 78:16, 82:7, 83:2, 84:9, 87:16, 102:22
**Fish** [1] - 37:8
**five** [2] - 59:24, 66:21
**flagging** [1] - 24:13
**Floor** [1] - 2:10
**focus** [4] - 70:21, 97:3, 99:18, 102:14
**focused** [3] - 38:10, 38:12, 83:13
**focuses** [2] - 26:23, 26:25
**folks** [1] - 6:2
**follow** [4] - 47:8, 49:13, 59:1, 88:10
**following** [4] - 27:7, 28:18, 28:21, 52:9
**follows** [1] - 83:11
**FOR** [2] - 1:2, 4:2
**forbid** [1] - 77:2
**forefront** [1] - 11:21
**foregoing** [1] - 105:10
**form** [1] - 38:1
**forms** [1] - 80:12
**forth** [2] - 81:16, 93:2
**forthcoming** [1] - 38:12
**forward** [3] - 32:13, 53:16, 86:9
**foundation** [19] - 10:7, 10:13, 10:22, 13:8, 15:25, 23:10, 39:16, 40:4, 40:21, 46:20, 72:13, 73:3, 75:10, 76:3, 97:22, 99:20, 100:1, 100:12, 103:9
**foundational** [1] - 41:23
**founding** [1] - 87:17
**frame** [3] - 99:13, 100:2, 100:8
**frankly** [1] - 60:18
**free** [2] - 81:10, 99:6
**free-standing** [1] - 81:10
**frequently** [2] - 24:22, 24:24
**front** [4] - 32:12, 79:20, 85:6, 102:12
**Fuentes** [3] - 76:10, 77:9, 81:16
**fulfilling** [1] - 92:14
**full** [7] - 31:10, 36:17, 36:21, 82:22, 83:2, 83:21, 105:11
**fully** [1] - 51:4

**funding** [2] - 92:11, 92:15
**FURTHER** [1] - 105:10

## G

**Gary** [2] - 3:3, 86:18
**gathering** [1] - 55:13
**generally** [3] - 22:24, 92:11, 92:15
**Generals** [4] - 92:22, 92:24, 93:3
**generated** [2] - 43:13, 43:21
**genitalia** [1] - 77:4
**genuine** [12] - 24:7, 24:19, 24:22, 24:24, 25:1, 25:11, 26:5, 26:7, 26:9, 26:14
**genuinely** [1] - 38:24
**GFE** [6] - 68:13, 68:24, 70:5, 70:8, 72:7, 73:2
**GFE/PSE** [1] - 68:11
**ghost** [1] - 45:16
**ghosted** [2] - 45:5, 45:14
**ghosting** [3] - 45:6, 45:9, 45:14
**girl** [1] - 52:10
**girlfriend** [1] - 68:13
**girlfriends** [1] - 68:15
**gist** [1] - 95:10
**given** [3] - 6:19, 42:8, 47:4
**glincenberg@ birdmarella.com** [1] - 3:6
**Gopi** [1] - 3:3
**GOVERNMENT** [1] - 4:2
**Government** [1] - 2:2
**government** [10] - 6:16, 7:17, 9:5, 32:25, 34:16, 67:16, 71:13, 86:5, 101:15, 104:14
**Government's** [1] - 19:24
**government's** [2] - 6:14, 74:6
**gpanchapakesan@ birdmarella.com** [1] - 3:5
**great** [1] - 36:23
**greater** [1] - 43:4
**Greek** [8] - 13:18, 14:5, 14:6, 14:8, 14:18, 16:21, 16:23
**GREEN** [1] - 2:12

**Grona** [1] - 21:12
**Grona-Robb** [1] - 21:12
**Group** [1] - 103:5
**group** [1] - 24:13
**guarded** [1] - 52:23
**guess** [2] - 10:24, 17:19
**guide** [9] - 53:21, 53:25, 54:1, 54:11, 54:18, 54:21, 54:23, 55:12, 63:2
**guy** [1] - 20:25

## H

**half** [1] - 83:16
**handle** [1] - 76:7
**handled** [1] - 60:9
**hang** [2] - 42:16, 72:19
**happy** [1] - 27:22
**hard** [2] - 31:12, 31:14
**hash** [1] - 27:9
**head** [1] - 21:10
**heads** [1] - 20:24
**health** [1] - 5:8
**healthy** [1] - 6:20
**hear** [5] - 7:19, 19:3, 35:25, 72:17, 86:21
**heard** [1] - 101:10
**hearsay** [6] - 30:15, 32:23, 33:4, 33:5, 33:17, 34:19
**held** [1] - 96:25
**help** [15] - 21:16, 54:14, 54:22, 54:24, 55:5, 55:7, 55:14, 55:23, 64:6, 65:4, 66:2, 75:8, 76:13, 88:25, 100:9
**helpful** [1] - 21:22, 52:20, 61:22, 71:9
**helping** [4] - 49:1, 49:8, 56:17, 93:22
**helps** [1] - 80:7
**hereby** [1] - 105:7
**herein** [1] - 105:12
**high** [3] - 27:3, 27:4, 27:5
**High** [1] - 20:24
**highest** [4] - 9:16, 9:17, 42:6, 42:9
**hired** [1] - 100:10
**hiring** [1] - 90:8
**history** [1] - 64:9
**hold** [5] - 20:10, 34:15, 45:8, 99:10, 99:19
**holder** [1] - 37:3

**holding** [5] - 96:10, 96:21, 96:22, 96:24, 97:6
**Holding** [1] - 96:23
**Holdings** [2] - 53:10, 96:11
**homeless** [1] - 36:12
**Honor** [36] - 6:5, 6:8, 6:25, 7:9, 7:14, 8:10, 8:25, 15:7, 19:17, 20:1, 25:21, 30:24, 31:11, 31:18, 32:4, 32:5, 32:22, 33:16, 34:3, 34:21, 40:5, 47:5, 65:12, 67:13, 72:17, 73:19, 74:24, 78:20, 83:5, 84:25, 86:8, 97:17, 100:24, 103:16, 104:3, 104:15
**HONORABLE** [1] - 1:12
**Hookers** [1] - 21:6
**hour** [4] - 38:14, 66:21, 66:23, 104:7
**house** [1] - 100:3
**human** [3] - 21:17, 24:12, 80:13
**HUMETEWA** [1] - 1:12
**hundred** [3] - 57:10, 79:17, 79:19
**hundreds** [6] - 41:22, 42:16, 43:5, 43:24, 44:2, 57:4
**hypothetical** [1] - 17:2

## I

**i.e** [1] - 52:10
**ICAC** [1] - 21:11
**ID** [10] - 4:11, 35:22, 36:6, 37:9, 37:12, 37:20, 37:21, 58:24
**idea** [1] - 13:23
**identifiable** [2] - 36:23, 37:5
**identification** [2] - 84:3, 84:4
**identified** [5] - 18:4, 59:18, 66:13, 90:23, 101:11
**identify** [2] - 24:6, 80:7
**identity** [1] - 39:23
**IDs** [1] - 37:7
**ignore** [1] - 23:25
**illegal** [4] - 78:3, 78:6, 79:8, 80:11
**image** [2] - 27:9, 37:14
**images** [3] - 27:10,

37:13, 37:16
**implicit** [1] - 80:22
**implies** [1] - 29:12
**implying** [1] - 28:11
**important** [1] - 77:20
**impossible** [6] - 37:22, 80:21, 82:11, 83:25, 84:10, 85:13
**impractical** [1] - 37:7
**impression** [2] - 13:13, 28:25
**in-house** [1] - 100:3
**inappropriate** [2] - 23:4, 24:9
**include** [6] - 27:11, 27:13, 27:15, 45:2, 91:3, 102:24
**included** [5] - 58:2, 58:4, 62:12, 85:10, 85:11
**includes** [2] - 53:2, 102:23
**including** [5] - 5:11, 21:4, 89:8
**indefinitely)** [1] - 84:5
**indicate** [2] - 15:21, 78:22
**indicated** [6] - 12:1, 21:19, 32:17, 67:17, 71:23, 95:14
**indicating** [1] - 75:7
**individual** [9] - 9:21, 17:9, 17:15, 59:16, 59:17, 61:5, 61:6, 92:12, 101:8
**individuals** [12] - 9:24, 30:20, 30:23, 31:5, 32:17, 32:25, 53:19, 54:6, 55:22, 58:8, 58:19, 65:5
**industry** [1] - 14:10
**info** [4] - 4:13, 27:16, 27:17, 28:3
**inform** [1] - 8:6
**information** [38] - 30:19, 32:25, 36:25, 37:6, 38:9, 38:10, 38:11, 38:13, 39:12, 40:13, 54:15, 54:16, 54:17, 54:19, 54:22, 54:24, 54:25, 55:13, 55:15, 55:23, 56:1, 56:8, 56:10, 56:13, 58:7, 59:11, 59:20, 60:5, 61:5, 61:7, 61:22, 61:25, 62:4, 62:13, 63:2, 63:3, 65:1, 76:21
**information's** [1] - 58:9

inquiries [2] - 93:7, 93:9
inquiry [1] - 104:11
instead [1] - 16:21
intentionally [2] - 78:3, 78:5
interact [1] - 11:16
interactions [2] - 92:12, 92:24
interest [2] - 7:22, 8:2
interested [1] - 14:12
interfere [1] - 45:13
internet [1] - 38:15
Internet [4] - 37:15, 39:6, 59:4, 59:13
interpreted [1] - 14:6
interview [1] - 101:16
interviewed [1] - 101:15
interviews [5] - 9:5, 67:15, 86:4, 101:23, 102:7
introduced [1] - 90:16
investigate [1] - 25:4
investigation [3] - 48:6, 48:9, 92:10
investigations [1] - 18:8
involve [1] - 36:12
involved [8] - 26:15, 27:6, 36:7, 36:12, 57:14, 57:19, 87:20, 93:22
involving [4] - 18:9, 21:24, 36:14, 91:17
IP [9] - 23:24, 24:8, 24:18, 27:16, 53:2, 58:24, 59:4, 59:12, 59:13
IPs [1] - 45:5
isolate [1] - 52:21
ISP [1] - 59:7
issue [4] - 5:9, 21:21, 63:15, 98:14
issued [1] - 98:18
issues [1] - 79:1
IT [1] - 6:2
it'll [1] - 100:9
itself [1] - 22:14

J

Jan [1] - 4:14
Jed [2] - 94:23, 97:15
Jensen [2] - 51:16, 53:15
Jess [3] - 101:7, 101:10, 102:4
Jim [3] - 18:21, 44:12, 103:8

job [2] - 12:20, 22:3
jobs [4] - 12:20, 45:11, 79:24, 79:25
Joe [1] - 21:11
John [1] - 3:2
Johns [1] - 46:2
join [2] - 7:6, 7:9
journalist [1] - 9:11
JOY [1] - 3:11
Joy [1] - 3:12
joy@joybertrandlaw. com [1] - 3:13
Joye [1] - 3:11
JUDGE [1] - 1:12
Judge [1] - 81:1
judge [2] - 19:13, 50:19
July [2] - 33:14, 38:19
Juror [7] - 6:7, 6:14, 6:17, 8:2, 8:4, 8:19
juror [5] - 5:7, 6:1, 7:7, 7:17, 8:4
jurors [2] - 8:3, 51:8
JURY [1] - 1:14
jury [13] - 7:17, 8:5, 8:7, 8:12, 8:15, 66:19, 67:1, 67:7, 67:8, 67:11, 95:22, 104:4, 104:8
Jury [5] - 5:5, 8:13, 67:2, 67:9, 104:9
JUSTICE [1] - 2:9
juveniles [1] - 18:9

K

keeping [2] - 7:22, 8:1
Kessler [1] - 2:16
KESSLER [1] - 2:16
Kevin [1] - 2:3
kevin.rapp@usdoj. gov [1] - 2:6
key [1] - 21:8
kind [8] - 7:2, 14:12, 14:23, 15:22, 16:8, 28:11, 54:19, 102:21
knowledge [7] - 13:10, 89:24, 90:2, 90:12, 90:18, 90:25, 99:9
known [3] - 21:1, 27:21, 37:14
knows [2] - 13:9, 98:2
Kopecky [1] - 100:9
Kozinets [1] - 2:4

L

Lacey [29] - 1:8, 2:12, 4:8, 4:10, 4:13, 9:7,

9:10, 9:18, 11:6, 11:11, 11:16, 11:18, 12:1, 18:5, 18:21, 30:11, 32:18, 33:14, 33:18, 38:19, 44:12, 50:25, 51:16, 52:23, 53:14, 53:17, 74:16, 74:20, 91:21
lack [1] - 7:1
laid [1] - 8:16
language [1] - 38:4
Lannon [1] - 21:11
Larkin [15] - 4:8, 4:12, 18:5, 18:21, 30:10, 32:17, 44:12, 50:25, 74:16, 74:21, 87:17, 91:21, 102:24, 103:4, 103:8
last [8] - 21:19, 22:23, 28:5, 49:4, 71:21, 74:11, 95:20, 104:11
Latest [1] - 21:6
launches [1] - 13:22
LAW [2] - 2:16, 2:19
law [47] - 27:5, 27:8, 27:10, 28:1, 36:21, 37:14, 38:3, 38:8, 45:15, 45:16, 45:22, 46:1, 46:3, 46:6, 48:10, 52:16, 53:19, 53:21, 54:2, 54:4, 54:6, 54:7, 54:11, 54:12, 55:12, 55:14, 55:21, 56:2, 56:5, 57:2, 57:6, 57:15, 58:8, 58:11, 59:15, 59:20, 60:2, 61:4, 61:8, 62:13, 64:20, 64:14, 64:25, 65:4, 65:5, 86:5, 92:9
lawyers [3] - 93:17, 93:22, 93:24
lay [1] - 10:13
layer [1] - 11:11
learned [3] - 38:23, 76:19, 76:21
least [1] - 101:4
leave [2] - 6:4, 22:6
left [2] - 36:3, 41:15
legal [4] - 55:3, 55:4, 75:9, 76:13
legislative [1] - 93:12
legitimate [1] - 62:11
length [1] - 89:7
lengthy [2] - 20:11
less [1] - 11:19
letters [1] - 72:7
letting [1] - 7:23
lie [3] - 76:16, 76:18, 76:20

Lieutenant [2] - 21:10, 21:11
likewise [1] - 99:1
Liliana [4] - 6:2, 8:4, 67:5, 86:14
limited [1] - 36:12
Lincenberg [4] - 3:3, 4:4, 7:8, 86:18
LINCENBERG [35] - 7:9, 86:14, 86:17, 86:21, 87:1, 87:6, 87:8, 87:11, 94:2, 94:5, 94:8, 94:13, 94:17, 95:20, 95:24, 97:17, 97:24, 98:6, 99:23, 100:15, 100:17, 100:19, 100:22, 100:24, 101:1, 102:15, 102:21, 103:1, 103:11, 103:12, 103:16, 103:18, 103:21, 103:22, 104:3
line [2] - 81:15
link [3] - 6:3, 21:5, 52:25
links [1] - 62:8
LIPTSITZ [1] - 2:12
Lisa [1] - 21:12
list [7] - 27:3, 28:12, 46:25, 61:17, 61:19, 62:7, 62:12
listed [3] - 97:6, 99:11, 99:16
listing [1] - 27:15
listings [1] - 45:12
litigation [2] - 92:10, 93:25
live [2] - 6:19, 45:11
lives [1] - 5:12
LLC [2] - 3:11, 53:10
LLP [1] - 2:12
loan [6] - 97:14, 97:16, 97:18, 98:4, 98:5
local [1] - 52:16
location [1] - 59:13
locations [1] - 85:24
look [17] - 12:17, 14:13, 16:20, 24:4, 24:17, 37:19, 52:16, 52:22, 64:20, 81:13, 81:19, 82:6, 85:5, 95:2, 99:15
looking [16] - 5:17, 14:1, 14:16, 15:22, 16:8, 16:18, 16:25, 22:14, 24:15, 39:2, 48:10, 54:15, 54:22, 55:13, 59:17

looks [4] - 22:4, 22:9, 51:3, 103:25
Los [2] - 1:3:5
lost [2] - 51:7, 60:18
loud [3] - 86:21, 87:2, 87:6
low [1] - 21:8
lower [1] - 30:16
lunch [4] - 66:24, 102:20, 103:20, 104:5
Lyft [1] - 5:13

M

main [1] - 57:17
maintain [3] - 57:21, 58:13, 97:15
maintaining [1] - 57:15
maintenance [1] - 98:5
majority [3] - 36:11, 37:4, 43:3
Malby [1] - 3:12
manual [1] - 53:18
March [1] - 23:22
MARELLA [1] - 3:2
Margaret [1] - 2:4
margaret.perlmeter @usdoj.gov [1] - 2:8
marked [1] - 51:14
market [2] - 41:2, 88:25
marketing [11] - 87:23, 87:25, 88:2, 88:3, 88:12, 88:15, 88:16, 88:17, 88:18, 88:24, 89:4
markets [4] - 41:4, 41:6, 41:8
Match.Com [1] - 37:8
matter [3] - 9:13, 23:20, 23:22
matters [3] - 23:24, 93:18, 93:19
mayors [1] - 93:12
mean [12] - 12:4, 14:6, 17:11, 17:12, 22:13, 24:17, 24:23, 42:5, 55:8, 63:11, 93:18, 98:9
meaning [1] - 41:20
means [9] - 21:23, 22:19, 55:8, 55:9, 59:5, 59:23, 98:7, 98:10, 99:6
means) [1] - 45:7
meant [1] - 68:13
Media [6] - 11:5,

53:10, 73:12, 96:11, 96:16, 96:23
**meet** [3] - 5:20, 6:4, 22:15
**meeting** [7] - 18:6, 20:23, 21:8, 21:9, 22:5, 22:9, 22:10
**meetings** [3] - 11:25, 91:11
**member** [3] - 21:11, 26:15, 52:24
**members** [4] - 8:15, 54:12, 66:19, 104:4
**memory** [3] - 91:10, 91:13, 93:3
**mentioned** [3] - 11:24, 56:25, 58:18
**Mersey** [3] - 90:22, 91:1, 91:4
**message** [2] - 59:6, 59:10
**messages** [1] - 85:22
**met** [3] - 15:1, 15:5, 15:12
**method** [1] - 37:10
**Michael** [5] - 1:8, 2:12, 30:11, 44:12, 53:14
**microphone** [2] - 65:9, 86:14
**Microphone** [1] - 75:4
**middle** [1] - 102:22
**might** [1] - 52:13
**Mike** [2] - 18:21, 51:15
**Miller** [1] - 21:12
**million** [1] - 80:3
**millions** [2] - 41:22, 42:17
**mind** [1] - 101:9
**mine** [1] - 31:15
**minority** [1] - 24:23
**minutes** [1] - 66:21
**misdirection** [1] - 61:23
**missed** [1] - 36:2
**misspelling** [1] - 16:20
**misstated** [2] - 35:24, 36:1
**misuse** [2] - 80:8, 80:14
**moderation** [6] - 89:18, 89:20, 89:22, 94:18, 94:24, 95:4
**moderators** [13] - 12:17, 38:3, 41:5, 41:11, 43:19, 46:19, 46:24, 47:9, 47:17, 48:14, 49:24, 50:6, 52:13
**moment** [1] - 31:6,

45:8, 97:4
**money** [8] - 36:20, 67:18, 77:3, 88:17, 88:18, 88:25, 89:3, 89:4
**month** [3] - 43:6, 44:1, 44:2
**moon** [2] - 92:1, 92:2
**Moon** [2] - 30:11, 32:18
**morning** [6] - 5:7, 6:16, 9:3, 9:4, 66:18, 66:22
**most** [8] - 14:25, 22:18, 37:10, 40:1, 41:20, 45:6, 53:25, 84:5
**motel** [1] - 36:10
**motivation** [3] - 60:11, 60:12, 74:25
**motive** [1] - 61:24
**move** [12] - 17:21, 29:24, 32:13, 43:3, 65:8, 74:22, 81:1, 84:14, 94:6, 94:15, 95:20, 97:17
**moved** [2] - 42:21, 42:23
**moving** [3] - 7:22, 19:7, 19:9
**MR** [339] - 6:5, 6:6, 6:8, 6:25, 7:9, 7:11, 7:14, 8:10, 8:25, 9:2, 10:7, 10:8, 10:11, 10:15, 10:16, 10:22, 10:25, 11:3, 11:9, 11:10, 12:25, 13:1, 13:3, 13:5, 13:8, 13:11, 15:6, 15:7, 15:8, 15:9, 15:11, 15:14, 15:15, 15:17, 15:19, 15:20, 15:25, 16:2, 16:6, 16:7, 17:17, 17:19, 17:21, 17:24, 18:1, 18:10, 18:12, 18:13, 18:14, 18:16, 18:17, 19:2, 19:6, 19:8, 19:10, 19:13, 19:17, 19:19, 19:21, 19:22, 20:1, 20:4, 20:6, 20:8, 20:10, 20:13, 20:17, 20:20, 22:7, 23:10, 23:11, 23:14, 23:16, 23:19, 25:15, 25:17, 25:21, 25:24, 26:1, 28:15, 28:20, 29:16, 29:17, 29:19, 29:20, 29:23, 30:1, 30:4, 30:6, 30:7, 30:14,

30:15, 30:18, 30:24, 31:2, 31:11, 31:12, 31:14, 31:15, 31:18, 31:21, 32:3, 32:10, 32:14, 32:15, 32:21, 32:23, 32:24, 33:2, 33:3, 33:4, 33:6, 33:8, 33:9, 33:16, 33:17, 33:18, 33:20, 33:24, 34:3, 34:7, 34:10, 34:12, 34:18, 34:21, 34:23, 34:25, 35:4, 35:6, 35:8, 35:9, 35:13, 35:17, 35:23, 36:1, 36:3, 38:18, 39:16, 39:18, 40:4, 40:5, 40:7, 40:10, 40:11, 40:21, 40:22, 40:25, 41:1, 41:3, 41:23, 41:25, 42:2, 42:4, 44:8, 44:9, 44:17, 44:18, 44:20, 44:23, 44:24, 46:20, 46:21, 47:2, 47:5, 47:7, 47:19, 47:20, 47:22, 47:23, 48:2, 48:18, 48:20, 48:21, 49:5, 49:6, 49:7, 50:19, 50:21, 50:23, 51:11, 51:13, 51:18, 51:19, 51:23, 51:24, 52:1, 52:5, 55:19, 55:20, 56:19, 56:22, 60:14, 60:16, 60:20, 60:21, 60:24, 61:2, 61:3, 65:10, 65:12, 65:14, 67:13, 67:14, 67:24, 68:1, 68:2, 68:3, 68:5, 68:6, 71:15, 71:17, 71:19, 71:22, 72:10, 72:11, 72:13, 72:15, 72:16, 72:17, 72:19, 72:20, 72:22, 72:24, 73:1, 73:3, 73:5, 73:8, 73:14, 73:15, 73:16, 73:19, 73:21, 73:24, 74:3, 74:5, 74:7, 74:8, 74:12, 74:13, 74:14, 74:15, 74:22, 74:24, 75:3, 75:5, 75:6, 75:10, 75:11, 75:16, 76:2, 76:4, 76:6, 76:7, 76:8, 78:20, 78:22, 79:4, 81:1, 81:3, 81:6, 81:9, 81:10, 81:17, 81:21, 81:25, 82:3, 82:5, 82:8, 82:9, 82:13, 82:14, 82:17, 82:19, 83:1,

83:6, 83:9, 83:11, 83:14, 83:18, 83:20, 83:23, 83:24, 84:9, 84:13, 84:22, 84:25, 85:2, 85:4, 85:14, 85:16, 85:17, 86:8, 86:10, 86:13, 86:14, 86:17, 86:21, 86:25, 87:1, 87:6, 87:8, 87:11, 94:1, 94:2, 94:4, 94:5, 94:6, 94:8, 94:12, 94:13, 94:15, 94:17, 95:20, 95:24, 97:17, 97:22, 97:24, 98:6, 99:20, 99:23, 100:12, 100:15, 100:17, 100:19, 100:22, 100:24, 101:1, 102:15, 102:21, 103:1, 103:9, 103:11, 103:12, 103:16, 103:18, 103:21, 103:22, 104:3, 104:15
**MS** [5] - 6:16, 7:6, 7:20, 32:5, 32:8
**multiple** [2] - 19:16, 101:16
**must** [3] - 68:15, 69:24, 81:14

**N**

**name** [6] - 27:11, 36:18, 63:19, 63:23, 101:8, 101:10
**name's** [1] - 86:18
**names** [1] - 101:6
**narrative** [1] - 75:20
**Nathan** [1] - 100:9
**NCMEC** [22] - 22:1, 22:19, 24:20, 25:3, 25:12, 26:3, 26:6, 26:8, 26:10, 27:11, 45:1, 52:7, 52:8, 52:15, 52:20, 52:22, 53:1, 53:4, 53:7, 91:7, 91:11, 91:14
**NCMEC'** [1] - 52:25
**necessarily** [2] - 10:5, 39:8
**necessary** [1] - 58:7
**need** [14] - 8:18, 15:23, 19:13, 19:14, 20:19, 28:3, 38:11, 51:3, 59:12, 70:21, 75:25, 82:2, 82:7, 87:15
**needed** [4] - 54:18,

58:16, 65:1, 89:3
**needs** [1] - 22:2
**NESSIM** [1] - 3:2
**Neuman** [1] - 3:4
**never** [5] - 15:1, 15:5, 15:12, 95:17, 99:1
**nevertheless** [1] - 32:12
**new** [6] - 25:25, 42:20, 42:23, 42:24, 42:25, 61:1
**New** [5] - 2:10, 2:14, 96:6, 96:9, 96:22
**newspaper** [1] - 40:12
**newspapers** [6] - 9:14, 10:17, 11:6, 40:2, 40:3, 99:17
**next** [6] - 11:11, 46:12, 46:16, 46:18, 80:20, 85:3
**NGO** [1] - 24:12
**NGO's** [1] - 63:3
**Night** [1] - 63:23
**NO** [1] - 4:7
**noise** [1] - 75:4
**nominal** [3] - 69:10, 69:11, 89:2
**non** [6] - 25:11, 88:17, 89:1, 93:18, 93:19, 94:10
**non-adult** [2] - 88:17, 89:1
**non-genuine** [1] - 25:11
**non-transactional** [3] - 93:18, 93:19, 94:10
**none** [1] - 65:19
**nonresponsive** [1] - 97:18
**noon** [1] - 66:23
**normal** [2] - 98:12
**North** [3] - 2:5, 2:17, 3:9
**notes** [1] - 103:3
**nothing** [1] - 60:16
**notices** [1] - 37:24
**nuances** [1] - 53:7
**Number** [7] - 6:7, 6:14, 6:17, 8:2, 8:4, 8:19, 8:20
**number** [25] - 9:15, 9:16, 9:17, 12:16, 24:3, 24:18, 27:9, 28:5, 33:1, 36:21, 36:23, 42:6, 42:9, 43:4, 44:6, 53:10, 55:21, 56:25, 61:12, 62:25, 63:16, 63:25, 71:12, 73:18, 90:16
**numbers** [2] - 36:17,

42:14
**numerous** [1] - 90:16
**Nunez** [2] - 21:10, 27:21
**NW** [1] - 2:10

## O

**O'Connor** [1] - 1:21
**oath** [6] - 76:14, 82:10, 82:16, 84:12, 85:8, 85:19
**object** [5] - 50:19, 60:14, 76:2, 81:1, 100:12
**objection** [63] - 6:17, 7:22, 10:7, 10:22, 12:25, 13:3, 13:8, 15:6, 15:17, 15:25, 17:17, 17:21, 19:12, 23:10, 23:16, 25:15, 25:20, 25:22, 28:15, 29:16, 29:21, 30:15, 32:23, 33:17, 34:16, 35:1, 35:24, 39:16, 40:4, 40:9, 40:21, 41:1, 44:18, 46:20, 47:3, 47:19, 48:18, 49:5, 51:19, 56:19, 60:25, 71:15, 71:17, 72:13, 72:16, 73:3, 73:15, 74:22, 75:10, 81:12, 82:13, 82:17, 82:22, 84:13, 85:14, 94:1, 94:6, 94:12, 97:22, 99:20, 103:9, 103:15
**Objection** [1] - 72:10
**observations** [1] - 23:15
**observe** [1] - 11:5
**obtain** [3] - 54:14, 54:18, 54:22
**occasion** [1] - 23:7
**occasions** [1] - 65:3
**occurred** [1] - 81:23
**occurs** [1] - 23:21
**OF** [3] - 1:2, 1:13, 2:9
**offer** [14] - 14:1, 17:5, 19:2, 19:6, 30:14, 32:21, 33:16, 44:17, 51:18, 73:14, 80:22, 82:12, 84:1, 84:11
**offered** [1] - 32:24
**offering** [3] - 30:24, 33:24, 34:20
**offers** [1] - 67:17
**OFFICE** [3] - 2:2, 2:16, 2:19
**office** [1] - 8:5

**officer** [3] - 18:8, 96:5, 98:16
**officers** [1] - 46:3
**Official** [2] - 1:20, 105:8
**officials** [2] - 86:5, 93:15
**often** [6] - 22:5, 22:20, 37:13, 37:15, 37:16, 38:13
**once** [11] - 43:3, 43:10, 52:15, 54:8, 55:14, 56:12, 75:13, 77:11, 80:17, 102:19
**one** [28] - 9:13, 12:20, 19:17, 22:19, 23:5, 24:8, 24:18, 38:22, 42:16, 45:8, 47:16, 52:2, 54:10, 61:20, 67:15, 69:11, 70:13, 70:25, 86:6, 88:11, 88:20, 91:6, 94:18, 94:19, 96:4, 96:20, 103:19, 104:11
**ones** [3] - 28:21, 60:6, 62:23
**online** [2] - 84:2, 84:5
**ooh** [1] - 10:15
**oOo** [1] - 104:20
**operating** [2] - 12:9, 99:12
**operation** [2] - 12:3, 46:22
**operational** [3] - 99:10, 99:15, 99:19
**operator** [1] - 12:10
**opportunity** [1] - 96:1
**options** [1] - 5:11
**order** [5] - 5:3, 46:1, 81:2, 82:17, 84:14
**orders** [1] - 36:20
**organization** [5] - 63:17, 63:21, 63:23, 103:13, 103:25
**organizational** [5] - 102:18, 102:23, 103:3, 103:23
**origination** [1] - 97:14
**outside** [1] - 93:17
**overall** [2] - 9:18, 12:15
**overlooked** [1] - 81:22
**overrule** [3] - 35:1, 40:9, 47:3
**overruled** [8] - 13:4, 16:1, 28:16, 47:25, 56:20, 75:14, 98:1, 99:21
**own** [2] - 13:9, 36:13
**owned** [2] - 62:9, 70:9

**owner** [3] - 69:10, 69:11, 99:16
**ownership** [2] - 12:7, 92:17
**owns** [1] - 12:7

## P

**p.m** [2] - 104:9, 104:19
**P.O** [1] - 3:12
**PA** [1] - 2:19
**Padilla** [2] - 3:7, 68:9
**Padilla's** [1] - 68:23
**page** [8] - 19:15, 33:22, 52:3, 73:25, 74:7, 80:25, 81:6
**PAGE** [1] - 4:2
**pages** [3] - 19:16, 74:19, 105:10
**paid** [1] - 57:21
**paint** [1] - 26:17
**Panchapakesan** [1] - 3:3
**papers** [3] - 9:18, 9:21, 21:3
**paragraph** [6] - 74:11, 80:25, 81:7, 83:3, 83:4, 83:12, 83:20, 84:20, 85:10, 85:12
**paralegals** [2] - 32:3, 32:6
**pardon** [3] - 31:18, 32:10, 34:7
**Park** [1] - 3:4
**part** [25] - 26:22, 28:5, 28:24, 34:4, 34:19, 69:12, 69:18, 82:23, 84:9, 87:25, 88:2, 88:4, 88:12, 88:15, 89:10, 89:12, 89:19, 89:21, 91:10, 91:13, 92:8, 94:10, 94:18, 95:20, 98:4
**participate** [1] - 6:20
**participation** [1] - 7:21
**particular** [12] - 5:8, 23:3, 24:2, 24:18, 30:10, 30:15, 39:19, 41:15, 59:16, 59:22, 61:4, 61:5
**particular's** [1] - 32:1
**parties** [1] - 8:2
**partnership** [2] - 28:11, 29:12
**parts** [1] - 86:6
**past** [2] - 21:4, 75:7
**Paul** [1] - 2:13
**pay** [1] - 97:14

**paycheck** [2] - 98:10, 98:11
**payment** [2] - 80:6, 98:5
**payments** [2] - 97:19, 98:3
**payroll** [11] - 97:10, 97:13, 97:21, 98:7, 98:9, 98:10, 98:25, 99:1, 99:2, 99:3, 99:8
**pcambria@lglaw. com** [1] - 2:14
**PCCF** [2] - 30:4, 30:6
**PD** [1] - 21:12
**pdf** [1] - 53:1
**peak** [7] - 40:19, 40:22, 40:24, 41:20, 41:25, 42:5
**pending** [1] - 81:12
**people** [32] - 9:5, 13:6, 14:6, 14:22, 15:1, 15:5, 15:12, 21:9, 23:2, 37:11, 39:2, 39:3, 39:15, 40:2, 45:6, 45:10, 46:5, 48:10, 52:20, 54:7, 56:2, 56:18, 58:4, 58:6, 58:16, 60:3, 64:5, 66:6, 89:8, 90:11, 91:14, 92:11
**per** [1] - 27:1
**percent** [1] - 22:1
**percentage** [1] - 12:8
**perhaps** [4] - 15:22, 16:12, 89:3, 100:14
**period** [10] - 70:10, 97:4, 97:9, 97:11, 97:12, 100:21, 103:6, 103:10, 103:24
**PERLMETER** [2] - 6:16, 7:20
**Perlmeter** [1] - 2:4
**permission** [2] - 37:3, 102:17
**permit** [1] - 79:1
**permitted** [1] - 47:18
**person** [9] - 12:14, 13:23, 17:16, 27:12, 38:24, 39:8, 61:25, 101:2, 101:11
**person's** [1] - 84:4
**personally** [6] - 36:22, 37:5, 39:21, 39:22, 65:17, 65:18
**personals** [1] - 37:25
**perspective** [1] - 6:14
**perusing** [1] - 14:11
**Peter** [1] - 2:4

**peter.kozinets@ usdoj.gov** [1] - 2:7
**Phoenix** [6] - 1:7, 1:22, 2:6, 2:20, 3:9, 105:15
**phone** [5] - 27:9, 38:15, 53:10, 61:12, 91:14
**photo** [4] - 35:21, 36:6, 37:7, 37:9
**photograph** [1] - 84:4
**photographs** [3] - 38:23, 39:2, 39:5
**phrased** [1] - 82:1
**physically** [1] - 31:22
**pic** [6] - 22:4, 22:9, 38:4, 52:10, 52:13, 52:17
**pick** [2] - 97:3, 100:1
**pics** [2] - 22:3, 52:13
**picture** [2] - 22:14, 39:8, 39:23
**pictures** [1] - 77:4
**piece** [1] - 92:9
**pimp** [1] - 63:24
**place** [2] - 23:25, 24:4
**places** [4] - 36:10, 39:21, 41:2, 86:10
**Plaintiff** [1] - 1:6
**plans** [1] - 8:16
**platform** [1] - 39:13
**platforms** [2] - 12:23, 59:25
**PLC** [1] - 3:8
**plea** [3] - 69:12, 69:18
**Plenty** [1] - 37:8
**point** [10] - 14:21, 34:2, 34:4, 48:13, 66:17, 88:11, 94:19, 96:4, 96:20, 96:24
**points** [1] - 95:25
**police** [17] - 18:8, 25:3, 29:14, 47:11, 48:3, 48:14, 48:16, 48:23, 49:1, 49:4, 49:8, 55:12, 56:11, 56:17, 58:13, 58:17
**Police** [1] - 36:9
**policy** [2] - 37:18, 48:24
**Political** [1] - 21:7
**political** [1] - 93:15
**porn** [3] - 68:16, 72:4, 79:25
**portion** [2] - 62:7, 105:11
**poses** [1] - 7:16
**posing** [1] - 81:18
**position** [5] - 6:15, 6:25, 57:25, 99:10,

99:19
**possible** [2] - 38:13, 52:17
**post** [22] - 36:15, 37:4, 37:9, 37:23, 37:25, 38:2, 46:4, 48:14, 49:13, 49:17, 49:19, 49:23, 50:2, 50:6, 60:5, 62:15, 63:3, 64:13, 64:20, 78:3, 78:5, 78:19
**posted** [15] - 40:2, 40:19, 42:20, 43:3, 43:6, 46:18, 46:23, 59:22, 60:6, 61:25, 62:19, 62:23, 64:1, 64:12, 80:2
**poster** [1] - 90:23
**posters** [1] - 90:22
**posting** [14] - 27:22, 36:14, 38:1, 38:24, 39:9, 45:9, 45:11, 49:14, 53:1, 59:23, 59:25, 64:19, 77:3, 80:7
**postings** [8] - 21:16, 37:15, 38:4, 45:2, 45:5, 45:14, 45:16, 84:3
**postpone** [1] - 5:25
**posts** [1] - 46:1
**potential** [1] - 56:5
**PR** [2] - 29:13, 91:25
**practice** [2] - 39:14, 40:7
**precise** [1] - 11:2
**prefer** [1] - 7:20
**prepaid** [1] - 37:2
**prepared** [4] - 8:9, 21:9, 104:6, 105:14
**Prepared** [1] - 1:24
**presence** [1] - 67:11
**present** [9] - 5:2, 5:5, 8:3, 8:13, 8:23, 67:2, 67:9, 91:18, 104:9
**presentation** [2] - 64:22, 64:25
**presentations** [1] - 95:13
**presented** [2] - 83:17, 92:17
**President** [1] - 53:9
**president** [1] - 103:5
**press** [3] - 93:6, 93:7, 93:9
**presume** [2] - 66:3, 66:5
**pretty** [1] - 40:15
**prevent** [1] - 80:14
**previous** [3] - 81:2,

82:17, 84:14
**previously** [2] - 51:9, 84:16
**primary** [1] - 101:25
**priorities** [1] - 21:15
**privacy** [1] - 84:7
**private** [1] - 84:13
**problem** [3] - 24:25, 34:1, 63:15
**problematic** [2] - 21:20, 63:12
**problematic)** [1] - 27:20
**proceed** [5] - 8:4, 8:9, 8:19, 8:22, 67:12
**PROCEEDINGS** [1] - 1:13
**proceedings** [5] - 5:17, 6:21, 66:14, 91:17, 105:12
**Proceedings** [3] - 1:24, 5:4, 104:19
**process** [3] - 45:10, 88:4, 88:5
**processing** [1] - 87:13
**profiles** [1] - 27:4
**prohibit** [1] - 13:7
**prohibited** [3] - 46:25, 47:2, 48:15
**prohibits** [1] - 80:11
**promise** [2] - 28:3, 88:8
**promoting** [2] - 95:12, 95:15
**proposals** [1] - 95:4
**prosecute** [1] - 21:16
**prosecution** [15] - 36:22, 65:16, 65:21, 65:25, 66:8, 66:11, 69:13, 69:17, 77:10, 77:12, 77:13, 77:15, 77:19, 77:24, 79:13
**prosecutors** [2] - 65:4, 101:23
**prostitute** [1] - 21:23
**prostitutes** [1] - 27:22
**prostitution** [8] - 18:8, 21:20, 21:21, 27:6, 48:6, 48:9, 95:9, 95:15
**Prostitution** [1] - 21:6
**provide** [7] - 27:12, 31:16, 31:19, 36:20, 37:5, 38:9, 61:19
**provided** [2] - 31:22, 66:13
**provider** [1] - 59:13
**providers** [3] - 38:16, 84:2
**provides** [1] - 36:11

**providing** [3] - 56:16, 57:17, 66:9
**PSA** [4] - 27:13, 62:19, 62:22, 64:17
**PSE** [1] - 68:24
**public** [7] - 60:8, 62:15, 62:21, 62:24, 63:5, 63:9, 63:14
**publish** [4] - 18:11, 35:6, 51:8, 102:17
**published** [8] - 19:23, 20:3, 41:21, 44:22, 51:10, 51:20, 51:22, 73:22
**pull** [4] - 30:4, 44:8, 67:24, 73:5
**pulled** [1] - 21:13
**pulling** [2] - 58:10, 68:24
**purchase** [1] - 96:2
**purchases** [1] - 96:10
**purposes** [2] - 8:1, 97:7
**pursue** [1] - 87:15
**pursuing** [1] - 54:7
**put** [18] - 10:15, 13:25, 39:15, 45:23, 47:11, 47:16, 48:16, 48:22, 49:12, 49:15, 51:12, 61:18, 70:11, 70:14, 70:18, 83:1, 93:21, 102:15
**puts** [1] - 66:21
**putting** [2] - 49:8, 86:23

## Q

**qualified** [1] - 105:8
**qualify** [4] - 21:20, 42:18, 43:10, 44:5
**quality** [1] - 38:8
**quantity** [1] - 38:9
**quarter** [1] - 104:6
**quarterly** [1] - 11:25
**questionable** [1] - 53:16
**questions** [4] - 9:6, 54:2, 81:15, 96:1
**quickly** [1] - 38:10
**quite** [4] - 5:10, 5:12, 8:15, 52:20
**quoted** [1] - 21:3
**quotes** [1] - 84:1

## R

**ran** [1] - 63:17
**rape** [1] - 27:14
**RAPP** [82] - 6:5, 10:7,

10:22, 12:25, 13:3, 13:8, 15:6, 15:8, 15:14, 15:17, 15:25, 17:17, 17:21, 18:14, 19:13, 19:19, 19:22, 20:8, 20:10, 23:10, 23:16, 25:15, 28:15, 29:16, 29:19, 30:15, 31:12, 31:14, 32:23, 33:2, 33:4, 33:17, 33:20, 34:18, 35:23, 36:1, 39:16, 40:4, 40:21, 41:1, 41:23, 41:25, 44:18, 46:20, 47:19, 47:22, 48:18, 49:5, 50:19, 51:19, 52:1, 56:19, 60:14, 71:15, 71:17, 72:10, 72:13, 72:16, 73:3, 73:15, 74:13, 74:22, 75:10, 76:2, 76:6, 81:1, 81:9, 82:13, 82:17, 84:13, 85:14, 86:25, 94:1, 94:4, 94:6, 94:12, 94:15, 97:22, 99:20, 100:12, 103:9, 104:15
**Rapp** [4] - 2:3, 35:25, 79:1, 88:10
**rare** [1] - 40:15
**RE** [1] - 4:10
**re** [1] - 59:22
**read** [23] - 17:14, 20:7, 20:14, 20:15, 20:19, 20:22, 31:6, 35:8, 35:10, 35:13, 36:2, 44:25, 51:4, 51:7, 51:25, 52:2, 53:11, 53:13, 82:23, 83:5, 83:15, 83:21, 102:22
**read]** [5] - 22:6, 28:4, 38:17, 52:20, 53:5
**reading** [3] - 17:8, 26:19
**reads** [1] - 52:2
**ready** [2] - 8:22, 67:5
**real** [1] - 37:16
**really** [9] - 14:24, 17:2, 23:4, 53:11, 54:19, 55:2, 58:9, 58:15, 70:21
**reappeared** [1] - 62:4
**reason** [4] - 28:24, 45:19, 75:7, 75:21
**reasons** [3] - 22:2, 54:8, 54:10
**REC'D** [1] - 4:7
**recalled** [2] - 21:18, 71:12

**receipt** [1] - 53:4
**receive** [2] - 99:5, 104:14
**received** [1] - 104:12
**Recess** [2] - 6:10, 67:6
**recess** [3] - 67:3, 102:20, 104:17
**recessed** [1] - 104:19
**recognize** [4] - 44:11, 51:15, 103:13, 103:23
**recollection** [4] - 49:13, 89:10, 91:4, 92:8
**recommendation** [1] - 7:7
**reconvene** [1] - 5:4
**record** [5] - 5:24, 65:23, 66:9, 67:10, 77:11
**record's** [1] - 92:4
**records** [13] - 21:13, 21:19, 56:16, 57:3, 57:15, 57:22, 58:11, 58:13, 58:14, 65:24, 66:13, 77:21
**redacted** [7] - 34:2, 34:8, 34:17, 34:18, 35:2, 104:13
**redirect** [2] - 96:1, 99:7
**reduce** [1] - 54:3
**refer** [1] - 96:21
**reference** [1] - 74:11
**referencing** [1] - 61:9
**referred** [1] - 31:21
**referring** [6] - 30:21, 30:22, 82:19, 87:21, 92:5, 92:19
**reflect** [1] - 67:10
**regard** [26] - 6:13, 7:17, 7:25, 9:7, 11:22, 12:16, 18:6, 18:22, 34:16, 35:2, 39:19, 75:1, 81:19, 81:24, 87:13, 88:24, 89:18, 89:23, 90:11, 90:15, 90:22, 91:16, 92:7, 93:2, 93:17
**regarding** [4] - 35:22, 36:6, 37:18, 93:18
**reimbursed** [1] - 5:11
**reinstate** [1] - 70:5
**related** [1] - 81:15
**relations** [1] - 60:8
**relationships** [1] - 87:13
**release** [2] - 6:1, 8:2
**relevance** [6] - 13:3, 39:16, 40:4, 72:13,

73:3, 74:22
**Relevance** [1] - 72:10
**relevant** [3] - 40:5, 74:25, 81:10
**reliable** [1] - 23:9
**remember** [8] - 29:1, 45:3, 66:19, 66:25, 67:19, 76:5, 76:9, 104:5
**remembers** [1] - 82:24
**remote** [1] - 7:2
**remotely** [2] - 7:11, 7:25
**remove** [4] - 21:15, 27:10, 27:21, 47:9
**removed** [1] - 7:12
**rents** [1] - 36:10
**rephrase** [6] - 25:23, 61:1, 82:4, 82:7, 101:19, 101:21
**report** [20] - 21:16, 23:3, 23:8, 24:7, 24:19, 24:20, 26:5, 26:10, 26:18, 27:12, 30:19, 38:3, 52:12, 52:15, 53:5, 63:6, 63:11, 85:23, 101:16, 102:1
**Reported** [1] - 1:24
**reported** [10] - 12:15, 30:25, 52:6, 52:8, 64:14, 101:11, 101:13, 101:17, 101:24, 103:7
**REPORTER** [2] - 7:19, 67:25
**reporter** [2] - 21:14, 21:19
**Reporter** [3] - 1:20, 1:24, 105:8
**REPORTER'S** [1] - 1:13
**reporting** [5] - 22:3, 24:8, 27:24, 28:2, 53:7
**reports** [22] - 22:1, 22:19, 22:20, 22:23, 23:25, 24:18, 24:22, 24:23, 24:24, 25:2, 26:13, 26:14, 26:17, 27:25, 38:6, 44:6, 45:1, 52:9, 52:12, 102:6, 102:8
**repost** [2] - 49:25, 50:9
**represent** [1] - 86:18
**repurpose** [1] - 62:6
**repurposes** [1] - 62:8
**request** [4] - 27:19, 28:23, 37:20, 62:20

**requested** [1] - 18:23
**requests** [1] - 38:13
**require** [2] - 37:9, 84:2
**requirement** [3] - 37:20, 37:22, 84:6
**requires** [2] - 36:23, 38:1
**requiring** [2] - 37:9, 80:6
**resources** [1] - 36:13
**respective** [1] - 5:21
**respond** [11] - 13:23, 16:12, 16:16, 38:14, 46:2, 47:13, 57:25, 92:9, 93:4, 93:9, 93:15
**responding** [2] - 58:11, 92:7
**response** [3] - 36:7, 53:18, 98:24
**retain** [2] - 36:25, 84:4
**retaining** [1] - 36:22
**review** [9] - 27:19, 28:2, 41:5, 41:11, 43:20, 53:17, 75:12, 95:14, 101:16
**Review** [2] - 89:7, 89:8
**reviewed** [2] - 16:11, 90:19
**reviewing** [1] - 90:15
**ride** [1] - 5:11
**rise** [7] - 6:9, 6:11, 8:12, 67:1, 67:8, 104:8, 104:18
**Risk** [1] - 20:24
**risk** [4] - 27:2, 27:4, 27:5
**RMR** [2] - 1:21, 105:20
**Road** [2] - 2:17, 2:20
**Robb** [1] - 21:12
**rodeo'** [1] - 52:18
**role** [1] - 99:13
**room** [1] - 36:10
**rule** [1] - 103:14
**rules** [4] - 49:14, 64:19, 64:20, 64:21
**ruling** [2] - 25:20, 34:24
**run** [7] - 13:6, 21:14, 26:23, 26:25, 27:1, 27:14, 36:12
**running** [1] - 61:13
**runs** [1] - 27:2
**Ruxton** [1] - 103:5

**S**

**safe** [2] - 5:9, 26:12
**safety** [1] - 63:2
**sales** [1] - 96:10

**Sally** [1] - 21:11
**Sandra** [1] - 1:21
**saw** [2] - 52:10, 61:12
**Scam** [1] - 21:7
**scan** [1] - 37:11
**SCIME** [1] - 2:12
**Scott** [8] - 2:15, 12:15, 51:16, 53:6, 53:9, 53:14, 102:1, 103:5
**Scottsdale** [3] - 2:17, 2:17, 3:13
**scrape** [1] - 62:6
**scraped** [1] - 61:18
**scraping** [1] - 62:5
**screen** [9] - 32:12, 35:3, 44:10, 50:24, 68:7, 73:9, 73:24, 74:9, 83:2
**search** [3] - 14:17, 27:8, 58:19
**seated** [4] - 5:6, 6:12, 8:14, 104:10
**seating** [1] - 86:12
**Seattle** [1] - 45:1
**second** [6] - 19:13, 19:14, 22:8, 42:16, 52:2, 86:2
**section** [3] - 79:24, 87:24, 89:4
**sections** [3] - 20:13, 45:6, 89:1
**security** [1] - 36:24
**see** [26] - 5:16, 12:23, 18:2, 19:14, 23:7, 33:11, 44:10, 50:5, 50:24, 52:10, 52:13, 58:19, 64:12, 64:20, 68:7, 72:8, 72:12, 73:9, 74:9, 74:10, 74:18, 80:20, 80:23, 80:24, 83:5, 87:15
**seeing** [1] - 31:9
**selectively** [1] - 37:21
**selling** [1] - 93:22
**Senate** [1] - 91:17
**send** [18] - 18:21, 22:1, 24:20, 25:3, 25:12, 26:3, 26:6, 26:8, 26:11, 30:10, 32:16, 38:6, 52:15, 53:15, 56:8, 58:17, 95:13
**sending** [2] - 25:2, 26:10
**senior** [2] - 52:24, 98:16
**sense** [2] - 14:15, 61:10
**sent** [12] - 18:23, 18:24, 30:20, 30:22,

31:5, 38:19, 45:1, 51:3, 54:23, 59:6, 59:9
**sentence** [3] - 36:1, 83:15, 83:21
**sentences** [1] - 53:15
**separate** [1] - 101:4
**September** [2] - 1:8, 105:16
**sergeant** [4] - 21:9, 21:13, 21:18, 27:21
**Sergeant** [2] - 20:23, 21:10, 36:8
**servers** [2] - 58:9, 58:14
**service** [14] - 7:18, 8:20, 38:16, 59:13, 62:15, 62:21, 62:24, 63:5, 63:10, 63:14, 80:12, 84:2
**SESSION** [1] - 1:15
**set** [3] - 5:18, 22:5, 22:10
**several** [4] - 21:3, 22:2, 52:12, 92:23
**sex** [9] - 14:7, 14:8, 14:16, 67:17, 77:3, 80:22, 82:12, 84:2, 84:11
**Sgt** [1] - 4:8
**share** [3] - 5:11, 28:1, 28:3
**shared** [1] - 27:4
**Shawn** [1] - 2:4
**shoot** [1] - 53:8
**short** [1] - 66:21
**show** [2] - 17:24, 83:20
**Show** [1] - 21:6
**showed** [1] - 103:2
**showing** [1] - 51:14
**shut** [3] - 69:13, 69:15, 69:17
**side** [1] - 26:10
**sign** [1] - 85:7
**signed** [2] - 85:8, 99:16
**significant** [1] - 58:15
**significantly** [3] - 38:15, 43:4, 60:7
**simple** [2] - 77:23, 78:24
**simply** [4] - 22:14, 36:24, 48:9, 81:8
**site** [12] - 21:14, 27:13, 37:25, 38:2, 38:6, 62:20, 62:23, 64:19, 69:15, 70:8, 80:8, 80:15
**sites** [11] - 36:24,

37:7, 37:8, 37:13, 59:18, 61:7, 61:13, 61:17, 62:6, 62:12, 63:3
**situation** [2] - 13:22, 68:23
**situations** [6] - 24:21, 26:3, 26:5, 46:23, 59:15, 65:15
**so-called** [1] - 11:24
**someone** [7] - 14:11, 15:21, 16:8, 27:13, 36:15, 37:2, 38:5
**sometime** [1] - 71:10
**sometimes** [7] - 22:23, 23:8, 24:12, 38:11, 39:2, 40:15
**somewhat** [1] - 5:8
**sorry** [25] - 7:19, 16:6, 19:3, 19:5, 19:8, 25:9, 25:21, 35:11, 35:16, 35:18, 35:23, 47:5, 59:1, 65:10, 67:25, 70:16, 71:6, 72:9, 73:17, 74:18, 75:5, 90:1, 102:25, 103:16, 103:18
**sort** [2] - 14:1, 63:16
**sounds** [3] - 55:3, 79:23, 80:1
**spam** [1] - 45:11
**Spc** [1] - 1:22
**speaker** [1] - 34:23
**speaking** [5] - 17:2, 21:18, 41:8, 59:8, 93:14
**Spear** [12] - 2:15, 4:12, 12:15, 51:16, 53:6, 53:9, 53:15, 101:11, 101:13, 102:1, 103:4, 103:7
**specific** [2] - 45:2, 58:18, 84:20
**specifically** [1] - 77:21
**specified** [1] - 105:13
**speculation** [2] - 15:8, 15:25
**spelled** [1] - 16:21
**spent** [5] - 88:17, 88:18, 88:25, 89:3, 89:4
**split** [1] - 86:10
**squad** [1] - 21:10
**staff** [3] - 38:12, 52:24, 53:2
**stake** [1] - 12:7
**stand** [2] - 67:3, 104:17
**standing** [1] - 81:10
**star** [2] - 68:16, 72:4

**start** [7] - 8:15, 26:22, 42:25, 43:8, 52:4, 68:21, 83:7
**starting** [2] - 36:5, 83:2
**starts** [3] - 52:2, 52:6, 85:12
**State** [2] - 92:22, 93:12
**state** [7] - 41:15, 57:12, 65:16, 65:19, 77:2, 81:14, 83:7
**statement** [30] - 22:23, 23:8, 49:10, 50:4, 67:19, 67:20, 76:14, 78:12, 78:14, 78:18, 78:23, 79:5, 79:6, 79:22, 80:4, 80:5, 80:21, 81:4, 81:8, 81:11, 82:15, 82:20, 82:22, 82:25, 83:3, 83:22, 84:12, 84:17, 84:19, 95:4
**statements** [2] - 9:6, 39:15
**STATES** [3] - 1:1, 2:2, 2:9
**States** [9] - 1:5, 41:6, 41:9, 41:12, 42:10, 76:10, 77:6, 79:11, 105:9
**statistics** [1] - 21:21
**stats** [1] - 45:3
**stats...more** [1] - 4:13
**statutory** [1] - 27:14
**stay** [1] - 55:19
**Stenographic** [1] - 1:24
**step** [1] - 32:5
**steps** [1] - 80:14
**still** [8] - 22:5, 22:10, 26:8, 34:19, 41:1, 41:23, 59:1
**sting** [22] - 37:23, 45:23, 45:25, 46:1, 46:19, 46:23, 47:10, 47:11, 47:17, 48:4, 48:5, 48:7, 48:17, 49:8, 49:12, 49:18, 49:19, 49:23, 49:25, 50:6, 50:9, 50:12
**stock** [1] - 39:5
**Stone** [1] - 2:3
**stop** [3] - 22:8, 22:22, 70:20
**storage** [4] - 58:2, 58:3, 58:12, 58:15
**store** [1] - 58:7
**storing** [1] - 58:10
**Street** [1] - 1:22

**strike** [8] - 17:21, 57:1, 74:22, 84:14, 94:6, 94:15, 95:20, 97:17
**strip** [1] - 79:25
**stripped** [2] - 69:1, 69:4
**Structure** [1] - 4:14
**structure** [1] - 73:12
**study** [2] - 30:2, 30:21
**submit** [2] - 84:3, 85:18
**submitted** [1] - 42:9, 85:6
**subpoena** [12] - 27:18, 28:3, 28:4, 36:21, 38:11, 54:13, 56:6, 58:17, 59:7, 60:8, 92:11, 92:14
**subpoenas** [7] - 54:5, 55:21, 57:5, 57:25, 92:7, 92:9
**successful** [2] - 22:18, 27:1
**sufficient** [1] - 22:15
**suggested** [1] - 6:18
**suggestions** [1] - 28:19
**suggestive** [2] - 38:5, 52:14
**Suite** [7] - 1:21, 2:5, 2:13, 2:17, 2:20, 3:4, 3:9
**Super** [3] - 21:4, 21:5
**super** [2] - 90:22, 90:23
**supervise** [1] - 9:24
**supervisor** [1] - 12:15
**supervisors** [1] - 85:7
**supplied** [1] - 57:3
**supply** [2] - 34:3, 61:7
**supplying** [1] - 56:1
**support** [3] - 54:3, 54:4, 54:20
**suppose** [1] - 14:16
**surprised** [1] - 43:11
**sustain** [4] - 25:22, 29:22, 60:25, 82:21
**sustained** [25] - 15:10, 15:18, 17:18, 17:23, 23:13, 23:18, 30:17, 33:5, 39:17, 42:3, 48:19, 50:20, 71:18, 71:21, 72:14, 72:18, 72:21, 72:23, 73:4, 74:23, 75:2, 85:15, 94:7, 94:16, 103:17
**swing** [1] - 33:2
**switch** [1] - 86:10
**sworn** [1] - 85:6

**system** [1] - 36:19

**T**

**Tacoma** [1] - 45:2
**Taylor** [3] - 1:21, 105:19, 105:20
**TAYLOR** [1] - 105:7
**tech** [1] - 53:8
**technically** [1] - 59:8
**technological** [1] - 5:16
**telephonically** [1] - 6:17
**term** [14] - 12:6, 12:11, 14:5, 14:8, 14:17, 14:22, 14:24, 47:18, 55:3, 55:4, 68:11, 70:5, 70:18, 72:1
**Terms** [1] - 27:18
**terms** [11] - 5:18, 12:17, 13:18, 36:24, 38:7, 45:4, 48:15, 68:24, 69:1, 69:4
**test** [1] - 5:19
**testified** [8] - 87:16, 89:7, 90:15, 90:19, 91:6, 91:20, 92:16, 95:8
**testify** [5] - 65:4, 77:6, 77:24, 79:7, 84:18
**testifying** [9] - 76:9, 77:9, 77:12, 77:15, 77:19, 77:21, 78:2, 79:10, 92:23
**testimony** [20] - 62:5, 81:16, 81:18, 81:19, 82:2, 87:12, 87:23, 88:16, 88:24, 91:16, 92:21, 93:6, 93:11, 94:18, 94:21, 95:7, 95:10, 95:11, 101:22, 102:3
**Texas** [1] - 18:9
**text** [4] - 52:14, 52:17, 63:19, 63:24
**there'd** [1] - 92:16
**therein** [1] - 105:13
**thinking** [1] - 44:1
**thoughts** [3] - 35:21, 36:3, 36:6
**thousand** [1] - 21:22
**thousands** [5] - 41:22, 42:17, 43:5, 43:24, 44:2
**thread** [1] - 33:21
**three** [1] - 101:4
**throughout** [2] - 37:25, 85:23
**tie** [1] - 86:23

**TikTok** [1] - 73:2
**timer** [1] - 52:18
**Tired** [1] - 63:24
**title** [1] - 21:5
**to-do** [1] - 28:11
**Tobias** [1] - 103:5
**today** [3] - 5:25, 60:11, 71:11
**together** [1] - 70:20
**took** [6] - 46:19, 46:24, 47:17, 49:24, 50:12, 69:9
**tool** [1] - 27:8
**tools** [1] - 23:25
**top** [7] - 20:16, 20:17, 35:19, 42:21, 42:23, 43:4
**topic** [1] - 87:18
**topics** [1] - 91:6
**Townsend** [2] - 79:11, 81:16
**traced** [1] - 59:5
**track** [4] - 8:1, 51:7, 60:18, 80:8
**tracking** [1] - 23:24
**trafficking** [3] - 21:17, 24:13, 80:13
**Trafficking** [1] - 20:24
**transaction** [3] - 36:18, 93:23, 97:14
**transactional** [3] - 93:18, 93:19, 94:10
**Transcript** [1] - 1:24
**transcript** [2] - 105:11, 105:13
**TRANSCRIPT** [1] - 1:13
**Transcription** [1] - 1:24
**transition** [1] - 81:23
**transparent** [1] - 17:11
**transportation** [1] - 36:11
**trapping** [1] - 48:10
**trial** [4] - 6:22, 7:21, 7:22, 101:22
**TRIAL** [1] - 1:14
**trials** [1] - 65:4
**tricks** [1] - 63:24
**trouble** [1] - 62:25
**true** [30] - 10:3, 11:16, 11:19, 14:7, 23:6, 28:23, 31:5, 39:3, 39:4, 39:7, 39:11, 45:23, 47:14, 47:24, 57:25, 66:2, 66:6, 66:7, 76:25, 77:1, 78:6, 78:10, 78:12, 78:14, 78:18, 78:23,

79:5, 79:6, 85:21, 105:11
**truth** [2] - 30:25, 34:20
**try** [3] - 86:23, 88:6, 96:1
**trying** [10] - 14:21, 22:21, 23:4, 24:10, 46:5, 47:12, 55:1, 56:18, 57:24
**turn** [3] - 22:20, 22:23, 69:25
**turned** [3] - 58:20, 69:22, 76:17
**turning** [2] - 38:12, 63:24
**turns** [2] - 24:2, 72:1
**two** [3] - 16:21, 54:8
**type** [2] - 23:25, 73:2
**typed** [1] - 72:7
**types** [1] - 55:22

**U**

**U.S** [3] - 1:21, 41:8, 77:18
**Uber** [1] - 5:13
**Ullman** [1] - 21:11
**ultimate** [1] - 99:16
**ultimately** [1] - 103:7
**under** [19] - 5:7, 22:4, 22:10, 22:13, 27:13, 28:2, 37:19, 38:1, 38:3, 38:5, 76:14, 82:10, 82:15, 84:12, 85:8, 85:19, 102:24, 105:14
**underaged** [1] - 22:4
**understood** [5] - 22:16, 48:7, 97:8, 97:20, 98:4
**unit** [2] - 36:9, 59:5
**Unit** [1] - 20:25
**UNITED** [3] - 1:1, 2:2, 2:9
**United** [9] - 1:5, 41:6, 41:9, 41:12, 42:10, 76:9, 77:6, 79:10, 105:9
**units** [1] - 96:25
**unusual** [1] - 63:9
**unwilling** [1] - 84:6
**up** [35] - 5:18, 9:15, 14:20, 20:16, 20:24, 21:8, 22:5, 22:10, 27:3, 27:5, 30:4, 33:24, 34:4, 35:10, 44:8, 45:23, 47:11, 47:16, 48:17, 48:22, 49:9, 49:12, 49:15, 50:21, 51:12, 58:20,

67:24, 68:21, 73:5, 86:20, 88:10, 102:15, 102:22, 103:7

**update** [1] - 8:21

**USC** [1] - 30:2

**user** [16] - 22:3, 22:5, 22:10, 26:18, 27:11, 27:24, 28:2, 36:20, 37:10, 37:24, 43:13, 43:21, 45:13, 52:9, 59:23, 63:2

**user-generated** [2] - 43:13, 43:21

**users** [13] - 22:20, 36:18, 37:4, 38:6, 43:3, 45:5, 52:11, 63:11, 78:11, 80:2, 80:8, 84:3, 84:5

**usual** [1] - 66:20

## V

**vague** [3] - 15:6, 25:15, 71:17

**valid** [3] - 36:15, 37:14, 54:13

**valuable** [1] - 37:5

**various** [4] - 9:5, 9:14, 67:16, 86:4

**vast** [1] - 37:4

**Vaught** [1] - 3:11

**veneer** [4] - 94:20, 94:25, 95:5, 95:6

**verification** [5] - 4:11, 36:6, 36:19, 37:11, 37:24

**verify** [3] - 39:14, 39:22, 40:13

**version** [5] - 19:14, 34:17, 35:2, 104:13

**versus** [1] - 23:22

**vet** [1] - 52:15

**vice** [5] - 21:10, 37:21, 37:22, 103:4

**Vice** [1] - 53:9

**victimized** [1] - 64:6

**victims** [1] - 21:23

**Victims** [1] - 20:24

**video** [1] - 5:17

**videoconferencing** [1] - 6:18

**view** [1] - 52:25

**viewing** [1] - 5:17

**Village** [8] - 11:4, 21:18, 53:9, 73:12, 96:10, 96:14, 96:19, 96:23

**violated** [2] - 54:7, 65:5

**violation** [1] - 38:7

**violators** [1] - 56:5

**virtually** [1] - 36:14

**visit** [1] - 28:24

**Voice** [8] - 11:4, 21:19, 53:10, 73:12, 96:11, 96:14, 96:19, 96:23

**voicemail** [1] - 22:6

**volunteered** [1] - 59:20

**VP** [1] - 52:24

**vs** [4] - 1:7, 76:10, 77:6, 79:11

**VVM** [1] - 4:14

## W

**W-2** [3] - 98:14, 98:17, 99:5

**W-4** [1] - 99:5

**W-4s** [1] - 99:6

**wait** [6] - 60:16, 73:17, 81:12, 102:5

**Walter** [1] - 2:16

**wanderer** [1] - 65:13

**wants** [1] - 19:22

**Washington** [5] - 1:22, 2:10, 91:17, 91:18, 93:13

**ways** [2] - 33:2, 63:11

**weather** [1] - 5:8

**web** [5] - 21:14, 58:18, 58:20, 58:21, 61:18

**website** [8] - 63:6, 64:1, 71:24, 80:2, 85:21, 85:22, 85:23

**websites** [2] - 37:17, 43:16

**week** [8] - 21:19, 38:17, 40:19, 41:21, 42:8, 42:25, 43:2, 43:25

**weeks** [1] - 51:22

**well-prepared** [1] - 21:9

**West** [1] - 1:22

**widely** [2] - 37:10, 37:14

**willing** [1] - 5:16

**wish** [1] - 5:22

**withdraw** [2] - 40:18, 49:6

**WITNESS** [15] - 19:3, 20:9, 20:23, 28:18, 35:14, 35:16, 36:4, 48:1, 52:4, 56:21, 71:16, 78:21, 84:20, 98:3, 99:22

**witness** [14] - 8:11,

8:22, 17:24, 32:12, 35:8, 35:12, 35:13, 65:18, 65:22, 66:8, 66:9, 78:22, 79:14, 82:6

**WITNESSES** [1] - 4:2

**WOLPERT** [1] - 3:2

**word** [16] - 14:6, 14:13, 15:21, 15:23, 16:9, 16:11, 16:18, 36:2, 46:24, 48:5, 55:2, 69:19, 95:6, 95:21, 98:7, 98:9

**word's** [2] - 16:14, 17:14

**words** [10] - 17:1, 24:8, 39:20, 40:12, 41:5, 46:3, 46:25, 63:5, 85:12, 85:19

**workroom** [1] - 32:8

**write** [2] - 52:24, 84:24

**writes** [1] - 53:6

**writing** [2] - 11:6, 30:8

**wrote** [8] - 10:2, 10:5, 10:20, 18:19, 31:3, 31:4, 33:13, 34:5

**Wu** [1] - 2:4

## X

**XML** [1] - 43:18

**XYZ** [1] - 64:14

## Y

**year** [1] - 27:1

**years** [1] - 31:9

**York** [2] - 2:10, 2:14

**young** [2] - 52:14, 52:17

**young'** [1] - 52:11

**younger** [1] - 39:2

**younger-looking** [1] - 39:2

**yourself** [2] - 8:18, 98:17

**youths** [1] - 63:15

## Z

**zone** [1] - 27:16

# EXHIBIT E

# EXHIBIT E

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 19, 2023 |
| Michael Lacey, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 21**

**P.M. SESSION**

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   FOR THE GOVERNMENT

 3           U.S. ATTORNEY'S OFFICE
             By:  Mr. Kevin M. Rapp, Esq.
 4                Mr. Andrew C. Stone, Esq.
                  Ms. Margaret Wu Perlmeter, Esq.
 5                Mr. Peter S. Kozinets, Esq.
             40 North Central Avenue, Suite 1800
 6           Phoenix, Arizona 85004

 7           U.S. DEPARTMENT OF JUSTICE
             By:  Mr. Austin M. Berry, Esq.
 8           1301 New York Ave. NW, 11th Fl.
             Washington, D.C.  20005

 9

10   FOR THE DEFENDANT MICHAEL LACEY:

11           LIPSITZ GREEN SCIME CAMBRIA
             By:  Mr. Paul John Cambria, Jr., Esq.
12           42 Delaware Avenue, Suite 120
             Buffalo, New York 14202

13

14   FOR THE DEFENDANT SCOTT SPEAR:

15           KESSLER LAW OFFICE
             By:  Mr. Eric W. Kessler, Esq.
16           6720 North Scottsdale, Road, Suite 210
             Scottsdale, Arizona 85253
17           - and -
             FEDER LAW OFFICE, PA
18           By:  Mr. Bruce S. Feder, Esq.
             2930 East Camelback Road, Suite 160
19           Phoenix, Arizona 85016

20

21   FOR THE DEFENDANT JOHN BRUNST:

22           BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
             LINCENBERG & RHOW, PC
             By:  Mr. Gary S. Lincenberg, Esq.
23                Mr. Gopi K. Panchapakesan, Esq.
             1875 Century Park E, Suite 2300
24           Los Angeles, California 90067

25
```

1          **A P P E A R A N C E S**

2     FOR THE DEFENDANT ANDREW PADILLA:

3              DAVID EISENBERG, PLC
              By:  **Mr. David S. Eisenberg, Esq.**
4              3550 North Central Avenue, Suite 1155
              Phoenix, Arizona 85012

5

6     FOR THE DEFENDANT JOYE VAUGHT:

7              JOY BERTRAND, ESQ, LLC
              By:  **Ms. Joy M. Bertrand, Esq.**
8              P.O. Box 2734
              Scottsdale, Arizona 85252-2734

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

4

1                **I N D E X**

2   **GOVERNMENT WITNESS:**                    **PAGE:**

3   DANIEL HYER
      Continued Cross-Examination by Mr. Feder     5
4       Cross-Examination by Mr. Eisenberg        51
      Cross-Examination by Ms. Bertrand         92
5       Cross-Examination by Mr. Cambria          111

6   MEGAN LUNDSTROM
      Direct Examination by Ms. Perlmeter       113

7              **E X H I B I T S**

8   **EXHIBIT**                       **RECEIVED**

9   <u>NO.</u>     <u>DESCRIPTION</u>
10

11   90      Email from Ferrer to Hyer and
      Padilla, 01/13/2011
      DOJ-BP-0000004683- DOJ-BP-0000004684    82
12

13   5934    09.02.10 Email from D. Hyer to C.
      Ferrer re: "Guide to Posting Escort Ads"
      DEFENSE 021281                 47

14

15

16

17

18

19

20

21

22

23

24

25

**<u>P R O C E E D I N G S</u>**

1

2    (Whereupon, the proceedings began at 1:02 p.m.)

3              COURTROOM DEPUTY:  All rise.  Court is now is session.

4              THE COURT:  All right.  Let's have the jury in, and

5    let's have the witness in as well.  Thank you.                    00:00

6              (The jury entered the courtroom, 1:03 p.m.)             00:01

7              THE COURT:  All right.  Please be seated.               00:01

8              And the record will reflect the presence of the jury.  00:01

9    The witness is on the witness stand.                              00:01

10             Mr. Feder, you may continue.                            00:01

11             MR. FEDER:  Thank you.                                  00:01

12                        DANIEL HYER,

13   called as a witness herein, having been previously duly sworn,

14   resumed the stand and continued to testify as follows:

15                   CROSS-EXAMINATION (Continued)

16   BY MR. FEDER:

17   Q.  Mr. Hyer, we were testing our mathematical abilities before  00:02

18   we left for lunch, so let me ask you a question.                 00:02

19             Were any of the meetings that you had with the         00:02

20   prosecutors and agents tape recorded by you, your lawyer, or     00:02

21   them?                                                            00:02

22   A.  No.                                                          00:02

23   Q.  Do you know why that was?                                    00:02

24             MR. STONE:  Objection.  Calls for speculation.         00:02

25             THE COURT:  Sustained.                                 00:02

| | | |
|---|---|---|
| 1 | MR. FEDER:  He can speak as to himself. | 00:02 |
| 2 | THE COURT:  Well, I guess he can answer if he knows | 00:02 |
| 3 | why that was. | 00:02 |
| 4 | BY MR. FEDER: | 00:02 |
| 5 | Q.  Did you tape record it? | 00:02 |
| 6 | THE COURT:  Well, he can answer the question you just | 00:02 |
| 7 | last asked. | 00:02 |
| 8 | MR. FEDER:  Oh, I'm sorry.  Good. | 00:02 |
| 9 | THE COURT:  The question -- the question -- why don't | 00:02 |
| 10 | you repeat that original question and we'll see if he can | 00:02 |
| 11 | answer. | 00:02 |
| 12 | BY MR. FEDER: | 00:02 |
| 13 | Q.  You did not tape record it, right? | 00:02 |
| 14 | A.  No. | 00:02 |
| 15 | Q.  To your knowledge, no one else did, right? | 00:02 |
| 16 | A.  To my knowledge, no one else tape recorded it. | 00:02 |
| 17 | Q.  You have not heard any recordings or read any transcripts | 00:02 |
| 18 | of recordings of those meetings, both when there were 302s | 00:03 |
| 19 | available from those meetings, and after when there were no | 00:03 |
| 20 | writings, correct? | 00:03 |
| 21 | It's kind of a long question, right? | 00:03 |
| 22 | A.  It was.  I just want to make sure I answer it accurately. | 00:03 |
| 23 | Q.  Let me try it again. | 00:03 |
| 24 | You have not read any -- you have not listened to any | 00:03 |
| 25 | tape recordings of your conversations with the prosecutors? | 00:03 |

1   A.  No.                                                              00:03

2   Q.  You have not read any transcripts of those conversations?       00:03

3   A.  No.                                                              00:03

4   Q.  When was the last time you talked to Carl Ferrer?               00:03

5   A.  April 4th, probably, April 3rd of 2018.                         00:03

6   Q.  You don't keep in touch?                                        00:03

7   A.  Part of the condition -- no.  Part of the conditions of my      00:03

8   release are not to communicate with anybody that could be a        00:03

9   defendant or a witness.                                            00:04

10  Q.  And, Mr. Hyer, are you aware of -- you were indicted in        00:04

11  April of 2018, right?                                             00:04

12  A.  Yes.                                                            00:04

13  Q.  Are you aware of the penalties that you faced had you not      00:04

14  made an agreement with the government?                            00:04

15  A.  Yes.                                                            00:04

16  Q.  What were they?                                                 00:04

17  A.  There were 59 to 69 -- 59 to 60 counts of money laundering.    00:04

18  Q.  Plus the 50-plus travel act --                                 00:04

19  A.  Yes.                                                            00:04

20  Q.  -- charges, right?                                             00:04

21  A.  Yes.                                                            00:04

22  Q.  Totaling about 96 or so?                                       00:04

23  A.  My math as a liberal arts major, it's not as good as yours,   00:04

24  but I remember it was around 59 to 63, I think.                   00:04

25  Q.  I was a liberal arts major too, so we're in the same boat?    00:04

| | | |
|---|---|---|
| 1 | A.  I should have been a lawyer. | 00:04 |
| 2 | Q.  That's why I became a lawyer. | 00:05 |
| 3 | A.  That's why I became a musician. | 00:05 |
| 4 | Q.  No talent. | 00:05 |
| 5 | So what were you facing? | 00:05 |
| 6 | A.  I'm not sure what you mean.  The penalty for those crimes? | 00:05 |
| 7 | Q.  Yes, I'm sorry. | 00:05 |
| 8 | A.  I know it was 10 to 20 years, I think, is per count for | 00:05 |
| 9 | money laundering, so I looked at it as though it was, you know, | 00:05 |
| 10 | 100-plus years. | 00:05 |
| 11 | Q.  Conceivably, you could be in prison for the rest of your | 00:05 |
| 12 | life? | 00:05 |
| 13 | A.  Conceivably. | 00:05 |
| 14 | Q.  Your hope for your cooperation is that you get probation, | 00:05 |
| 15 | right? | 00:05 |
| 16 | A.  Yes. | 00:05 |
| 17 | Q.  Has there been any discussion with the prosecutors about | 00:05 |
| 18 | probation, to your knowledge? | 00:05 |
| 19 | A.  No. | 00:05 |
| 20 | Q.  Your agreement requires you to cooperate, correct? | 00:05 |
| 21 | A.  Yes. | 00:06 |
| 22 | Q.  And what's your understanding of the discretion that the | 00:06 |
| 23 | prosecutors have to bring to the attention of the sentencing | 00:06 |
| 24 | court your cooperation? | 00:06 |
| 25 | MR. STONE:  Objection.  Compound and speculation. | 00:06 |

1          THE COURT:  I would sustain as to form of the                00:06

2   question, it's a bit disjointed, as well as speculation.            00:06

3          You can rephrase the question.                               00:06

4          MR. FEDER:  I did use, what's your understanding, but        00:06

5   I'll try something again.  Okay?                                    00:06

6          THE COURT:  Yes.                                             00:06

7   BY MR. FEDER:                                                       00:06

8   Q.  You testified on direct that the prosecutors are going to       00:06

9   bring to the attention of the sentencing court the extent of       00:06

10  your cooperation, right, and value I think was their word,          00:06

11  right?                                                              00:06

12  A.  I don't remember the word value, but I definitely remember      00:06

13  the word -- or the -- that they were going to communicate my        00:07

14  cooperation to the Court.                                           00:07

15  Q.  And what they communicate to the Court is strictly in their    00:07

16  discretion, true?                                                   00:07

17  A.  Yes.                                                            00:07

18  Q.  You don't have any say so, right?                               00:07

19  A.  No.                                                             00:07

20  Q.  So if they like what you say, they can say good things          00:07

21  about you, right?                                                   00:07

22  A.  Yes.                                                            00:07

23  Q.  And that's their discretion, right?                             00:07

24  A.  Yes.                                                            00:07

25  Q.  And if they don't like what you said, then they can either      00:07

```
 1   say nothing or not something so favorable, true?                  00:07
 2           MR. STONE:  Object to the form.  It's argumentative.      00:07
 3           THE COURT:  Overruled.                                    00:07
 4           THE WITNESS:  I don't mean to be obtuse, but I forgot     00:07
 5   what you just asked.  I want to make sure I answer it the         00:07
 6   correct way.                                                      00:07
 7   BY MR. FEDER:                                                     00:07
 8   Q.  As we get older, Mr. Hyer, you kind of forget what was       00:07
 9   asked?                                                            00:07
10           MR. FEDER:  Could you read that question back to him.     00:07
11           (The record was read back by the reporter.)              00:08
12           THE WITNESS:  Yes.                                        00:08
13   BY MR. FEDER:                                                     00:08
14   Q.  So even if you gave untruthful testimony, but the            00:08
15   government liked it, they could bring that to the attention of   00:08
16   the Court in a favorable way, right?                             00:08
17           MR. STONE:  Objection.  Argumentative.                   00:08
18           THE COURT:  Sustained.                                   00:08
19   BY MR. FEDER:                                                     00:08
20   Q.  Even if you were completely truthful but the government      00:08
21   didn't like it, then they wouldn't have to bring that to the     00:08
22   attention of the Court, right?                                   00:08
23           MR. STONE:  Same objection.                              00:08
24           THE COURT:  Sustained.                                   00:08
25                                                                    
```

| | |
|---|---|
| 1 | BY MR. FEDER: | 00:09 |
| 2 | Q.  Who has been representing you, Mr. Hyer, in regard to your | 00:09 |
| 3 | initial indictment and then to -- to come to an agreement with | 00:09 |
| 4 | the government? | 00:09 |
| 5 |         MR. STONE:  Objection.  Relevance. | 00:09 |
| 6 |         THE COURT:  Sustained. | 00:09 |
| 7 | BY MR. FEDER: | 00:09 |
| 8 | Q.  Who has been paying your -- your -- you have a lawyer and | 00:09 |
| 9 | she's being paid, right? | 00:09 |
| 10 | A.  I have a lawyer, yes. | 00:09 |
| 11 | Q.  And she's being paid, right? | 00:09 |
| 12 |         MR. STONE:  Objection.  Relevance. | 00:09 |
| 13 |         THE COURT:  Sustained. | 00:09 |
| 14 | BY MR. FEDER: | 00:09 |
| 15 | Q.  Is the money that's being used to pay your lawyer Backpage | 00:09 |
| 16 | funds or independent funds of yours? | 00:09 |
| 17 | A.  That was money that was paid prior to my indictment when | 00:09 |
| 18 | Backpage was still a website, so it was Backpage funds. | 00:09 |
| 19 | Q.  Do you have any idea how much your lawyer has been paid -- | 00:09 |
| 20 |         MR. STONE:  Objection. | 00:10 |
| 21 | BY MR. FEDER: | 00:10 |
| 22 | Q.  -- as we sit here today? | 00:10 |
| 23 |         MR. STONE:  Relevance. | 00:10 |
| 24 |         THE COURT:  Yes, what's the relevance, Mr. Feder? | 00:10 |
| 25 |         MR. FEDER:  I'm sorry, Judge? | 00:10 |

1              THE COURT:  I'll sustain.                              00:10

2              MR. FEDER:  Okay.  Could you bring up Exhibit 73, I    00:10

3     believe.                                                       00:10

4     BY MR. FEDER:                                                  00:11

5     Q.  You've testified on direct, Mr. Hyer, that, first, the     00:11

6     2005, '6, '7, '8 years were, I believe you said, the Wild Wild 00:11

7     West of the internet.  Does that sound right?                  00:11

8     A.  Sounds accurate.                                           00:11

9     Q.  That means the internet sites, not just Backpage, but all  00:11

10    of them, were kind of printing everything that they wanted to, 00:11

11    right?                                                         00:11

12    A.  What I meant was that the consumption of content that was   00:11

13    formerly print in any magazine or any -- the internet was not  00:11

14    the thing that it became.  So the Wild West was that there was 00:11

15    different attempts at business models that formerly were brick 00:11

16    and mortar, or physical things that you could touch, taste,    00:12

17    hold in your hands, which ultimately became an internet        00:12

18    product.                                                       00:12

19              So in reference to the Wild West, it was the early   00:12

20    days of the internet where the bandwidth, technology got       00:12

21    better, you could look at stuff on your phone in 2010 that in  00:12

22    2005 it wouldn't work.  So the Wild West comment was -- it was 00:12

23    the early days of the internet, not the beginning of it, but   00:12

24    the early days of it.                                          00:12

25    Q.  Well, that would -- in the early 2000s, that was when the  00:12

1    Facebooks and the Googles, I don't even remember when Twitter       00:12
2    began, but all of those big companies, and many, many small        00:12
3    ones, were starting up, right?                                     00:12
4    A.  I don't remember the founding day of -- of those sites.  I     00:12
5    think Myspace was probably more popular back then.  I can          00:12
6    remember Facebook being a thing, hearing about it from a kid       00:12
7    who had just graduated somewhere in the 2000s.  So I'd say,        00:12
8    yeah, I mean, the -- the exact dates of those things was murky,    00:13
9    but that was when sites and the internet use was growing, and      00:13
10   growing, and growing.  So there are a lot of things being tried    00:13
11   at that time that made it seem like it was the Wild West.          00:13
12   Q.  Okay.  We are in the west, right?                              00:13
13   A.  Yes.                                                           00:13
14   Q.  And then you've testified that, as time has gone on,           00:13
15   specific to Backpage, where -- strike that.                        00:13
16        You defined moderation during your direct examination,       00:13
17   right?                                                             00:13
18   A.  I don't know that I defined it, but I used the term.           00:12
19   Q.  And that's a fancy word for editing, right?                    00:13
20   A.  No, I wouldn't describe it as that.                            00:13
21   Q.  Well, moderation is to edit out either offensive or            00:13
22   improper, according to the websites, words from ads, right?        00:14
23   A.  No.                                                            00:14
24   Q.  No?                                                            00:14
25   A.  No.                                                            00:14

```
 1   Q.  How would you define it?                              00:14

 2   A.  Moderation would be defined as moderating, reviewing, 00:14

 3   evaluating, looking at.                                   00:14

 4   Q.  Editing?                                              00:14

 5   A.  I don't know that I would include editing in the word of 00:14

 6   moderation, not being in the moderation department, not being a 00:14

 7   moderator.  But if somebody was to say, what's your definition 00:14

 8   of moderation, my definition of moderation is you are     00:14

 9   evaluating, looking at, and reviewing ads.                00:14

10   Q.  And changing it as you -- as you want to, right?      00:14

11   A.  I wouldn't include that as part of the definition, no. 00:14

12   Q.  Moderation was encouraged, was it not?                00:14

13   A.  Yes, moderation was encouraged.                       00:14

14   Q.  Incentivized, one might say, right?                   00:14

15           MR. STONE:  Objection.  Vague and foundation.     00:15

16           THE COURT:  Sustained.                            00:15

17   BY MR. FEDER:                                             00:15

18   Q.  How would you define edit then?                       00:15

19   A.  Change.                                               00:15

20   Q.  And you've testified about how Backpage was in the 2007, 00:15

21   '8, '9 arena, and then in 2010 there was a big substantial 00:15

22   change in the ads on Backpage, right?                     00:15

23   A.  The volume, yes.                                      00:15

24   Q.  Where things that used to be allowed on Backpage were no 00:15

25   longer, at least they were not supposed to be, right?     00:15
```

| | | |
|---|---|---|
| 1 | A.  Yes. | 00:15 |
| 2 | Q.  Words were no -- certain words suggestive of sex were | 00:15 |
| 3 | take -- were no longer allowed, right? | 00:15 |
| 4 | A.  Yes. | 00:15 |
| 5 | Q.  And as 2010 ended and it went into 2011, 2012, and on, and | 00:15 |
| 6 | on, at least until 2015, Backpage became more and more rigid | 00:16 |
| 7 | about what could be on its site, true? | 00:16 |
| 8 | A.  Yes. | 00:16 |
| 9 | Q.  That list that you were shown, I'm going to show it to you | 00:16 |
| 10 | in a minute, where the prohibits words, one that needed to be | 00:16 |
| 11 | either banned, or -- what's the other phrase -- taken out, that | 00:16 |
| 12 | grew from 12 inches to multiple pages, right? | 00:16 |
| 13 | A.  Yes, the list grew. | 00:16 |
| 14 | Q.  Hundreds and even thousands of terms were no longer allowed | 00:16 |
| 15 | on Backpage, right? | 00:16 |
| 16 | A.  Yes. | 00:16 |
| 17 | Q.  And the way that Backpage improved their site was both by | 00:16 |
| 18 | human moderators who would look at the ads, right? | 00:16 |
| 19 | A.  You asked me the way that Backpage improved the site was | 00:17 |
| 20 | that human moderators looked at the ads? | 00:17 |
| 21 | Q.  The way that Backpage started to and continued | 00:17 |
| 22 | progressively to get rid of terms that they didn't want on | 00:17 |
| 23 | their site was -- was done by human moderators, right? | 00:17 |
| 24 | A.  Yes. | 00:17 |
| 25 | Q.  And by a computer that automatically took out words or | 00:17 |

1    phrases or ads, right?                                         00:17

2    A.  Yes.                                                       00:17

3    Q.  So they had at least a two-tiered, if not a three-tiered,  00:17

4    system of moderation, true?                                    00:17

5    A.  Yes.                                                       00:17

6    Q.  So, ad would come in, at some point when once -- strike    00:17

7    that.                                                          00:17

8            There was a company called DesertNet, right?          00:17

9    A.  Yes.                                                       00:17

10   Q.  And DesertNet was employed by Backpage to come up with an  00:17

11   automatic filter for the computers, right?                    00:18

12   A.  It was for the ads.                                        00:18

13   Q.  I'm sorry, I didn't say for the ads.  An automatic filter  00:18

14   for the ads, right?                                            00:18

15   A.  Yes.                                                       00:18

16   Q.  That happened around 2010, 2011, 2009?                     00:18

17   A.  I don't remember when Mantis started exactly or when       00:18

18   DesertNet started.  I don't remember exactly when that was.    00:18

19   Q.  Fair.  Mr. Will Gerken was the head of DesertNet, right, at 00:18

20   least from the technical standpoint?                           00:18

21   A.  Yes.                                                       00:18

22   Q.  And so Mr. Gerken and his people came up with a method     00:18

23   where they could have a computer that was fed the ads, right?  00:18

24   A.  It wasn't a computer.  It was a technology that happened on 00:18

25   God knows how many servers.  It was a program.  A computer     00:18

```
 1   would -- I kind of picture like --                        00:19
 2   Q.  Remember that I'm an old guy and not very technologically  00:19
 3   advanced.                                                  00:19
 4   A.  I'm just trying to be accurate, sir.                   00:19
 5   Q.  Forgive me for my terminology.  Please correct me if I'm  00:19
 6   going astray.  Okay?                                       00:19
 7   A.  I just want to be accurate.                            00:19
 8   Q.  Okay.  Somehow this computer technology would get the  00:19
 9   hundreds, thousands, tens of thousands, millions of ads that  00:19
10   were coming into Backpage, and would filter words, phrases, and  00:19
11   ads that Backpage did not want on its site, right?         00:19
12   A.  Yes.                                                   00:19
13   Q.  And it would -- if it was to filter out an ad -- I'm sorry,  00:19
14   filter out a word, it would just automatically take that word  00:19
15   out of the ad, right?                                      00:19
16   A.  That's not a yes or no question.                       00:19
17   Q.  Okay.  Please explain.                                 00:19
18   A.  So the filter had many types.  The filter could ban, it  00:20
19   could strip term from ad, it could ghost all future ads, it  00:20
20   could fraud alert term, it could flag as spam.             00:20
21   Q.  Whew.  Ban, strip, ghost, fraud?                       00:20
22   A.  Fraud alert.                                           00:20
23   Q.  Fraud alert.  What was the last one?                   00:20
24   A.  Flag as spam.                                          00:20
25   Q.  Fancy.                                                 00:20
```

1          What's the difference between ban and strip?          00:20

2    A.  So ban would prohibit, strip -- strip would extract.   00:20

3    Q.  Ban the word or ban the ad?                            00:20

4    A.  Ban would disallow the ad.                             00:20

5    Q.  So one of the things that this filter, this computer filter   00:20

6    did is it -- if there was something in that ad that Backpage's   00:20

7    rule makers decided, it would throw the ad out, right?     00:20

8    A.  It would prevent it from being posted.                 00:21

9    Q.  Okay.  The whole ad?                                   00:21

10   A.  Yes.                                                   00:21

11   Q.  And that happened from starting when until when?       00:21

12   A.  I don't know the start date.  The end date would have been   00:21

13   April 6, 2018.                                             00:21

14   Q.  Okay.  So banning was going on from whenever it started   00:21

15   sometime in the early 2000s until 2018?                    00:21

16   A.  Yes.                                                   00:21

17   Q.  What about stripping, when did that start?             00:21

18   A.  I don't know the start date.                           00:21

19   Q.  2010 sound about right?                                00:21

20   A.  Could be.                                              00:21

21   Q.  Okay.  Stripping just meant -- I'll give you an example.   00:21

22   Come put it in the hole for one hundred dollars.           00:21

23          Understand that?                                    00:21

24   A.  Yes.                                                   00:21

25   Q.  Let's say hole was one of those terms on the list that was   00:21

1   forbidden by Backpage, right?                                    00:21

2   A.  Okay.                                                        00:22

3   Q.  So to strip would take out the "hole" so all you would be    00:22

4   left with on that on that ad would be, put it in the blank for   00:22

5   a hundred dollars, right?                                        00:22

6   A.  It would actually say, come put it in the blank for a        00:22

7   hundred dollars.                                                 00:22

8   Q.  There we go, C-O-M-E not C-U-M, right?                       00:22

9   A.  Depends on how you spelled it.                               00:22

10  Q.  Well, if C-U-M was in there, that would be also stripped     00:22

11  out too, right?                                                  00:22

12  A.  Depends on when it was posted.                               00:22

13  Q.  So you could have, technically, that would have, blank in    00:22

14  the blank for a hundred dollars, right?                          00:22

15  A.  Yes.                                                         00:22

16  Q.  And that's what the customer would get for their five        00:22

17  bucks, right?                                                    00:22

18  A.  Yes.                                                         00:22

19  Q.  And the strip out could do not only a word but a phrase,     00:22

20  right?                                                           00:22

21  A.  Yes.                                                         00:22

22  Q.  Was this an automatic or was this something that had to be   00:22

23  operated by a human being?                                       00:23

24  A.  The filter was automatic.                                    00:23

25  Q.  And all ads from Backpage went into the filter, or only     00:23

1   some?                                                        00:23

2   A.  The filter could be set to only impact specific categories   00:23

3   or sections.                                                 00:23

4   Q.  But you -- I think you testified and were shown some     00:23

5   exhibits where some customers would try to post in a free part   00:23

6   of Backpage even though it should have been in a paid part of    00:23

7   Backpage, right?                                             00:23

8   A.  Yes.                                                     00:23

9   Q.  So the owners and executives and supervisors of Backpage   00:23

10  wanted to make sure that the words, phrases, and types of ads   00:23

11  that they didn't want on there got taken care of, right?     00:23

12  A.  The words, the phrases, yes.                             00:23

13  Q.  So they applied this filter pretty much across the board,   00:23

14  did they not?                                                00:24

15  A.  No, it wasn't across the board.                          00:24

16  Q.  All adult, yes?                                          00:24

17  A.  In some cases.                                           00:24

18  Q.  Okay.  Massage?                                          00:24

19  A.  In some cases.                                           00:24

20  Q.  Personals?                                               00:24

21  A.  Depending upon the filter.                              00:24

22  Q.  Now, what was ghosting?                                 00:24

23  A.  Ghosting would --                                       00:24

24  Q.  Actually, before you answer that question.              00:24

25          You said banning, whenever it started, continued    00:24

| | | |
|---|---|---|
| 1 | through the end of the site in 2018, right? | 00:24 |
| 2 | A.  Yes. | 00:24 |
| 3 | Q.  What about stripping? | 00:24 |
| 4 | A.  Strip term from ad continued through the end of the site, | 00:24 |
| 5 | April 6, 2018. | 00:24 |
| 6 | Q.  Okay.  Now let's talk about ghosting. | 00:24 |
| 7 | What's ghosting? | 00:24 |
| 8 | A.  Ghosting is a filter type in which if the term used in the | 00:24 |
| 9 | filter would say -- let's say Dan was used in the ad, and there | 00:25 |
| 10 | was a filtered term for Dan, and it was set as the action: | 00:25 |
| 11 | Ghost all future ads.  If a user tried to post an ad that said | 00:25 |
| 12 | Dan in it, it would ghost that ad and ghost all the future ads | 00:25 |
| 13 | of that user. | 00:25 |
| 14 | Q.  What does ghost mean, though?  Would the advertiser know | 00:25 |
| 15 | that that had happened to his ad? | 00:25 |
| 16 | A.  No. | 00:25 |
| 17 | Q.  Or her ad? | 00:25 |
| 18 | A.  They might detect it on their own, but they -- the user | 00:25 |
| 19 | account in which they could see their ads, it would look as | 00:25 |
| 20 | though their ad was live. | 00:25 |
| 21 | Q.  But it wouldn't be for anybody else? | 00:25 |
| 22 | A.  It wouldn't be live for them or anybody else. | 00:25 |
| 23 | Q.  Okay.  And then the fourth category was fraud? | 00:25 |
| 24 | A.  Yes. | 00:26 |
| 25 | Q.  What's that? | 00:26 |

| | | |
|---|---|---|
| 1 | A.  That was a filter type to apply to users who might have | 00:26 |
| 2 | committed credit card fraud.  I think there were instances in | 00:26 |
| 3 | which it was -- it was a filter for an elevated -- it -- the | 00:26 |
| 4 | intent of that filter was to create a higher sense of urgency | 00:26 |
| 5 | to look at what ad caused that filter to fire, or filter to | 00:26 |
| 6 | trigger. | 00:26 |
| 7 | Q.  Backpage didn't want people using stolen credit cards on | 00:26 |
| 8 | it, right? | 00:26 |
| 9 | A.  No. | 00:26 |
| 10 | Q.  They wanted to protect the credit card companies, right, | 00:26 |
| 11 | and the person that owned that former -- that former credit | 00:26 |
| 12 | card of theirs, right? | 00:26 |
| 13 | A.  Yes. | 00:26 |
| 14 | Q.  And the last one was -- and that -- I'm sorry, that went on | 00:26 |
| 15 | from whenever it started to 2018? | 00:26 |
| 16 | A.  Yes. | 00:27 |
| 17 | Q.  And then flag as spam, what does spam mean? | 00:27 |
| 18 | A.  For clarity, are you asking me what spam means or what that | 00:27 |
| 19 | filter did? | 00:27 |
| 20 | Q.  Let's start with what spam means, and then we'll go to that | 00:27 |
| 21 | next question. | 00:27 |
| 22 | A.  Okay.  So spam is -- spam is like the ads that I have in my | 00:27 |
| 23 | inbox at this very minute that get thrown into the junk filter | 00:27 |
| 24 | that are for Home Depot purchases that I didn't make, or for | 00:27 |
| 25 | sign up for this website, or a myriad of other things that I | 00:27 |

1    didn't ask for.  It's an advertisement that's usually sent by a    00:27

2    robot and it's sent over, and over, and over, and over again.    00:27

3    Q.  The kind of stuff that you hope that goes into your junk    00:27

4    mail on your e-mail account, right?    00:27

5    A.  Yes.    00:27

6    Q.  And Backpage didn't want that on their site either, right?    00:27

7    A.  No.    00:28

8    Q.  So this filter had a way of trying to get rid of that too,    00:28

9    right?    00:28

10    A.  Yes.    00:28

11    Q.  And that happened from whenever it started until 2018,    00:28

12    right?    00:28

13    A.  Yes.    00:28

14    Q.  And then on top of this auto filter, there were a number of    00:28

15    -- I mean, there were moderators, humans, that were hired by    00:28

16    Backpage in all of its places around the country to look at the    00:28

17    ads too?    00:28

18    A.  Yes.    00:28

19    Q.  To make sure that -- that if it had a word in it that    00:28

20    Backpage didn't want in it, that was either obnoxious or they    00:28

21    thought it suggested sex, they wanted it out, right?    00:28

22    A.  Specifically, sex for money.    00:28

23    Q.  Okay.  Well, they also had something called -- you ever    00:28

24    heard of the phrase "Playboy standard"?    00:28

25    A.  Yeah, I've heard of that.    00:28

**DANIEL HYER - CONT'D CROSS-EXAMINATION BY MR. FEDER**          24

| | | |
|---|---|---|
| 1 | Q.  There was a rule from the executives at Backpage that they | 00:28 |
| 2 | wanted their site not to look like Hustler Mag -- like the old | 00:29 |
| 3 | Hustler Magazine. | 00:29 |
| 4 | Do you know what the old Hustler Magazine is? | 00:29 |
| 5 | A.  I'm ashamed to say I am familiar with the publication. | 00:29 |
| 6 | Q.  You're old enough to remember that, right? | 00:29 |
| 7 | THE COURT:  Don't speak over one another, please. | 00:29 |
| 8 | MR. FEDER:  I'm sorry. | 00:29 |
| 9 | BY MR. FEDER: | |
| 10 | Q.  You're old enough to remember that one, right? | 00:29 |
| 11 | A.  Yes. | 00:29 |
| 12 | Q.  It's pretty raunchy, right? | 00:29 |
| 13 | A.  It ain't National Geographic. | 00:29 |
| 14 | Q.  And then there was a magazine, you remember Playboy, right? | 00:29 |
| 15 | A.  Yes. | 00:29 |
| 16 | Q.  Hugh Hefner, right? | 00:29 |
| 17 | A.  Yes. | 00:29 |
| 18 | Q.  That was quite a bit less raunchy, right? | 00:29 |
| 19 | A.  Yes. | 00:29 |
| 20 | Q.  Tasteful, but still nude women on its site and things like | 00:29 |
| 21 | that, right? | 00:29 |
| 22 | A.  I don't know if I -- | 00:29 |
| 23 | MR. STONE:  Object to the form. | 00:29 |
| 24 | THE COURT:  Sustained. | 00:29 |
| 25 | | |

| | |
|---|---|
| 1 | BY MR. FEDER: | 00:29 |
| 2 | Q.  The Backpage executives incorporated a Playboy started not | 00:29 |
| 3 | a Hustler standard, right? | 00:29 |
| 4 | A.  Yes. | 00:30 |
| 5 | Q.  So in addition to getting rid of words suggestive of sex, | 00:30 |
| 6 | not sex for money, but actually just suggestive words, they | 00:30 |
| 7 | also didn't want things that were Hustler kind of material on | 00:30 |
| 8 | their site, right? | 00:30 |
| 9 | A.  Yes. | 00:30 |
| 10 | Q.  So over the years -- you were shown some exhibits on direct | 00:30 |
| 11 | where at some point they allowed nudity, bare breasts, right? | 00:30 |
| 12 | A.  Yes. | 00:30 |
| 13 | Q.  But as the years went by and Backpage became more and more | 00:30 |
| 14 | rigid, more and more strict, breasts were out, right? | 00:30 |
| 15 | A.  Naked breasts, yes. | 00:30 |
| 16 | Q.  Butts were out, right? | 00:30 |
| 17 | A.  Yes. | 00:30 |
| 18 | Q.  So on the one hand from -- until summer of 2010, Backpage | 00:30 |
| 19 | is trying to grow its site by getting content, right? | 00:31 |
| 20 | A.  Yes. | 00:31 |
| 21 | Q.  All websites want content, right? | 00:31 |
| 22 | A.  Yes. | 00:31 |
| 23 |         MR. STONE:  Object to foundation. | 00:31 |
| 24 |         THE COURT:  Sustained. | 00:31 |
| 25 | | |

BY MR. FEDER:                                                    00:31

Q.  Do you know anything about the internet, Mr. Hyer?          00:31

A.  I used to think I knew a lot about it, but in the last five  00:31

years I have taken a bit of a departure about the internet --   00:32

or from the internet.  But, yeah, I know enough to --           00:32

Q.  How about from 2000 to 2018, you knew a lot about the       00:32

internet and social media sites, right?                        00:32

A.  Yes.                                                         00:32

Q.  That was your job?                                           00:32

A.  Yes.                                                         00:32

Q.  And in order to build a successful site, you need content,  00:32

right?                                                          00:32

A.  Yes.                                                         00:32

Q.  Isn't that called like SEO?                                00:32

A.  No.                                                          00:32

Q.  Search -- I know you'll be impressed -- search engine      00:32

optimization, right?                                           00:32

A.  I'm impressed that you knew what SEO stood for.            00:32

Q.  Lawyer ads that we hate.                                    00:32

        So what's the phrase for building content on a site,   00:33

if there is one?                                               00:33

A.  I don't know if there is -- I don't know of a technical     00:33

name for building content.  I guess maybe achieving content on  00:33

your site en masse would -- I know that -- I would think of the  00:33

term critical mass.                                            00:33

| | | |
|---|---|---|
| 1 | Q.  SEO is not one of them? | 00:33 |
| 2 | A.  For building content on your site, no. | 00:33 |
| 3 | Q.  To optimize the amount of content on your site? | 00:33 |
| 4 | A.  I'm sorry.  I'm not sure of that question. | 00:33 |
| 5 | Q.  Okay.  Anyhow, you want content because, I think you | 00:33 |
| 6 | testified this on direct, when people are out roaming the web, | 00:33 |
| 7 | or searching the web, whatever it's called, they're not going | 00:33 |
| 8 | to go to a site that doesn't look like it has much in it, | 00:33 |
| 9 | right? | 00:34 |
| 10 | A.  Yes. | 00:34 |
| 11 | Q.  That wouldn't be very interesting? | 00:34 |
| 12 | A.  No. | 00:34 |
| 13 | Q.  You want to go to a site that has a lot of stuff that might | 00:34 |
| 14 | be interesting, right? | 00:34 |
| 15 | A.  Yes. | 00:34 |
| 16 | Q.  And having adult, especially things like personals, is -- | 00:34 |
| 17 | whether nice or good -- interesting to a lot of people that are | 00:34 |
| 18 | searching the web, right? | 00:34 |
| 19 | A.  Yes. | 00:34 |
| 20 | Q.  Adult sites draw customers, correct? | 00:34 |
| 21 | A.  Yes. | 00:34 |
| 22 | Q.  And the hope of Backpage, and other sites like it, was that | 00:34 |
| 23 | if somebody came to that site to look at the personals, man | 00:34 |
| 24 | seeking man, woman seeking woman, et cetera, they'd also look | 00:34 |
| 25 | at the rest of the site and maybe buy a couch, right? | 00:34 |

1    MR. STONE:  Objection.  Foundation to all sites.    00:34

2    THE COURT:  Overruled.    00:34

3    THE WITNESS:  Man, I'm sorry, can you have her read it    00:34

4    again?    00:34

5    MR. FEDER:  There is not any way I'm going to be able    00:34

6    to do that again?    00:35

7    Madam Court Reporter, could you try to read that back.    00:35

8    (The record was read back by the reporter.)

9    THE WITNESS:  I would say that there is -- that they    00:35

10    would not buy accounts.  I mean, I don't know that we sold    00:35

11    accounts.    00:35

12    BY MR. FEDER:

13    Q.  I said couch, C-O-U-C-H, couch.    00:35

14    A.  Oh, I thought you said couch, and then I was going to say    00:35

15    no.    00:35

16    Q.  No couches on Backpage?    00:35

17    A.  We were never in the business of trying to sell couches on    00:35

18    Backpage.

19    Q.  Employment, you had employment ads on there, right?    00:35

20    A.  Yes.    00:36

21    Q.  Personals you had on there, right?    00:36

22    A.  Yes.    00:36

23    Q.  And personals were not supposed to be sex for money, but    00:36

24    just could be an ad for somebody to seek the companionship, or    00:36

25    more, from somebody else, right?    00:36

| | | |
|---|---|---|
| 1 | A.  Yes. | 00:36 |
| 2 | Q.  As long as there was not an exchange of money, right? | 00:36 |
| 3 | A.  Yes. | 00:36 |
| 4 | Q.  And that could be, speaking of Hustler, that could be | 00:36 |
| 5 | pretty graphic, right? | 00:36 |
| 6 | A.  Yes. | 00:36 |
| 7 | Q.  It could be all kinds of sex terms, just not sex for money, | 00:36 |
| 8 | right? | 00:36 |
| 9 | A.  Yes. | 00:36 |
| 10 | Q.  So you -- Backpage was trying to get content, right? | 00:36 |
| 11 | A.  Yes. | 00:36 |
| 12 | Q.  And there is absolutely nothing wrong with that, true, as | 00:36 |
| 13 | long as the ads are legal? | 00:36 |
| 14 | A.  Yeah, as long as the ads are legal. | 00:36 |
| 15 | Q.  Okay.  You've testified that Craigslist decides not to have | 00:36 |
| 16 | -- it closes its adult site in the summer of 2010, right? | 00:37 |
| 17 | A.  Yes. | 00:37 |
| 18 | Q.  But you also understand that a lot of that adult content | 00:37 |
| 19 | migrated to their personals section, right? | 00:37 |
| 20 | A.  Yeah, I don't remember focusing on that too much in 2010. | 00:37 |
| 21 | Q.  But you know that happened, right? | 00:37 |
| 22 | A.  I'd say, rather than say happened, I'd say happens.  I | 00:37 |
| 23 | don't know conclusively what went there.  I don't really | 00:37 |
| 24 | remember that part of it. | 00:37 |
| 25 | Q.  They were your main competitor, were they not? | 00:37 |

1   A.  Yes.                                                          00:38

2   Q.  So you and Mr. Ferrer especially were hyper focused on what   00:38

3   was going on at Craigslist, right?                               00:38

4   A.  Yes.                                                          00:38

5   Q.  And you know and you were -- complained about that it was    00:38

6   kind of a fake closure of their adult section, because a lot of  00:38

7   their adult ads migrated to the personals, right?               00:38

8           MR. STONE:  Objection.  Misstates testimony and          00:38

9   foundation.                                                      00:38

10          THE COURT:  Well, he can answer the question.            00:38

11          I'll overrule.                                           00:38

12          THE WITNESS:  I'd say yes, semi colon, also massage.     00:38

13  BY MR. FEDER:                                                    00:38

14  Q.  Okay.  So the escort parts of Craigslist migrated to         00:38

15  massage and personals, right?                                    00:38

16  A.  Yes.                                                         00:38

17  Q.  And that -- is that still going on, to your knowledge?       00:38

18          MR. STONE:  Objection.  Relevance.                       00:38

19          THE COURT:  Sustained.                                   00:38

20  BY MR. FEDER:                                                    00:39

21  Q.  So summer of 2010 Craigslist makes a big announcement that   00:39

22  they are -- they're closing their adult site, right?            00:39

23  A.  Yes.                                                         00:39

24  Q.  And they put on their website, censored, C-E-N-S-O-R-E-D,    00:39

25  right?                                                           00:39

| | | |
|---|---|---|
| 1 | A.  Yes. | 00:39 |
| 2 | Q.  Because they felt that they had been forced to do that, | 00:39 |
| 3 | right? | 00:39 |
| 4 | MR. STONE:  Objection.  Calls for speculation. | 00:39 |
| 5 | THE COURT:  Sustained. | 00:39 |
| 6 | BY MR. FEDER: | 00:39 |
| 7 | Q.  And in anticipation of some of their ads, many of their | 00:39 |
| 8 | ads, coming to Backpage, there is a real accelerated effort by | 00:39 |
| 9 | the folks at Backpage to make sure that their site is much more | 00:39 |
| 10 | rigid than it had been, true? | 00:39 |
| 11 | A.  Yes. | 00:39 |
| 12 | Q.  And that means implementing some of the moderation -- or, | 00:39 |
| 13 | actually, all of the moderation practices that we were just | 00:40 |
| 14 | talking about, right? | 00:40 |
| 15 | A.  Yes. | 00:40 |
| 16 | Q.  And -- and from that moment on, those moderation practices | 00:40 |
| 17 | became more and more rigid, right? | 00:40 |
| 18 | A.  Yes. | 00:40 |
| 19 | MR. FEDER:  Could we bring up 643. | 00:40 |
| 20 | BY MR. FEDER: | 00:40 |
| 21 | Q.  Do you remember this exhibit? | 00:40 |
| 22 | A.  Yes. | 00:40 |
| 23 | Q.  When there was an old ad on Backpage, it would go -- it | 00:40 |
| 24 | would be -- I'm going to use another term that I'm sure is not | 00:40 |
| 25 | right -- like storage, right? | 00:40 |

1    A.  Like what?                                                          00:40

2    Q.  It would go into like a storage, some kind of storage,             00:40

3    right?  Once it -- once it was no longer running.                      00:40

4    A.  It would become expired.                                           00:41

5    Q.  And then where would it be on the site, if anywhere?               00:41

6    A.  It would exist on our servers, but it would not be found in         00:41

7    the listings.                                                          00:41

8    Q.  But if -- if that advertiser wanted to reclaim their old           00:41

9    ad, could they?  Could they?                                           00:41

10   A.  Yes.                                                               00:41

11   Q.  And that ad had been moderated, right?                             00:41

12   A.  I mean, it's -- I mean, if -- it depends on the date of            00:41

13   what you're talking about.                                            00:41

14   Q.  Let's call it 2010 forward.                                        00:41

15   A.  Okay.                                                              00:41

16   Q.  This exhibit is in February of 2011, right?                        00:41

17   A.  Yes.                                                               00:41

18   Q.  And one of the purposes of this e-mail was to make sure           00:41

19   that there were no -- that -- that the new moderation practices        00:41

20   implemented in 2010 did not allow an old ad that had not been          00:41

21   moderated according to the new standards to get back up on your        00:42

22   site, right?                                                          00:42

23   A.  Yes.                                                               00:42

24   Q.  Because old ads that some old advertiser brings back up           00:42

25   might not get -- might -- might not get moderated the same way         00:42

| | | |
|---|---|---|
| 1 | it would presently, right? | 00:42 |
| 2 | A.  Yes. | 00:42 |
| 3 | Q.  So this Mantis e-mail, I guess I'll call it, was a way of | 00:42 |
| 4 | trying to make sure that, across the board, no formerly allowed | 00:42 |
| 5 | ad that would no longer be allowed got back on the site, right? | 00:42 |
| 6 | A.  Man, there was too many nos in that one. | 00:42 |
| 7 | Q.  I admit that was terrible.  Sorry. | 00:42 |
| 8 | A.  That's all right. | 00:42 |
| 9 | Q.  It's okay.  I'm trying hard. | 00:42 |
| 10 | A.  Me too. | 00:42 |
| 11 | Q.  The deep cleaning was to assure that old ads that were not | 00:43 |
| 12 | moderated according to the new moderation standards wouldn't | 00:43 |
| 13 | get back on the site? | 00:43 |
| 14 | A.  Yes. | 00:43 |
| 15 | Q.  So that across the board everyone hoped the new standards | 00:43 |
| 16 | would be implemented for all content on Backpage? | 00:43 |
| 17 | A.  Yes. | 00:43 |
| 18 | Q.  I'm not answering a phone, just looking for something. | 00:43 |
| 19 | Sorry. | 00:43 |
| 20 |         You've testified -- | 00:44 |
| 21 |         MR. FEDER:  Actually, could the witness be shown | 00:44 |
| 22 | Exhibit 600. | 00:44 |
| 23 |         And scroll, please. | 00:44 |
| 24 |         Isn't there another page? | 00:44 |
| 25 |         Not what I want. | 00:45 |

| | | |
|---|---|---|
| 1 | BY MR. FEDER: | 00:45 |
| 2 | Q. You've testified that basically right after Craigslist | 00:45 |
| 3 | closes their adult site, there was no longer a need for adult | 00:45 |
| 4 | aggregation, right? | 00:45 |
| 5 | A. No. | 00:45 |
| 6 | Q. No? | 00:45 |
| 7 | A. No. | 00:45 |
| 8 | Q. Okay. Did the -- the adult aggregation stop pretty much | 00:45 |
| 9 | after Craigslist stopped their adult site? | 00:45 |
| 10 | A. No. | 00:45 |
| 11 | Q. How long did it go on. | 00:45 |
| 12 | A. Through April 6th of 2018. | 00:45 |
| 13 | Q. For adult? | 00:45 |
| 14 | A. Yes, just not in the U.S. | 00:45 |
| 15 | Q. Ah, but not in the U.S.? | 00:45 |
| 16 | A. Correct. | 00:46 |
| 17 | Q. Okay. Because Backpage was now expanded into Europe and | 00:46 |
| 18 | other places in the country outside of the United States, | 00:46 |
| 19 | right? | 00:46 |
| 20 | A. Yes. | 00:46 |
| 21 | Q. But as to what was going on in the United States, there was | 00:46 |
| 22 | no further adult aggregation almost immediately after | 00:46 |
| 23 | Craigslist asserted that they were closing their adult site? | 00:46 |
| 24 | A. Yes. | 00:46 |
| 25 | Q. Right? | 00:46 |

1          Also, right in that same time frame of summer of 2010          00:46
2  going forward, the terms GFE, PSE, BBBJ, all those terms were          00:46
3  no longer allowed on the site, right?          00:46
4  A.  Yes.          00:46
5  Q.  As of that same time frame, TER was no longer allowed,          00:46
6  right?          00:46
7  A.  It was in that general --          00:46
8  Q.  No, that's a bad question.          00:46
9          There was an e-mail -- I think you were shown either          00:47
10  646 or 647.  Let's try 6 -- well, let's try 73 first.          00:47
11          So down at the bottom where it's on Number 9, as of          00:47
12  November 17 of 2010, TER links were no longer allowed after          00:47
13  January 1, right?          00:47
14  A.  Yes.          00:47
15  Q.  But after that -- did you ever meet a guy named Hemu Nigam?          00:47
16  A.  Did I what Hemu?          00:47
17  Q.  Did you ever meet a person named Hemu Nigam?          00:47
18  A.  Hemu, no.          00:47
19  Q.  No.          00:47
20          You were aware that Backpage hired a consultant to          00:48
21  help them modify their site, right?          00:48
22          MR. STONE:  Objection.  Foundation.          00:48
23          THE COURT:  Sustained.          00:48
24  BY MR. FEDER:          00:48
25  Q.  Were you aware that Backpage hired somebody named Hemu          00:48

1   Nigam, SSR Blue, to help them modify their site?                   00:48

2   A.  Yes.                                                           00:48

3   Q.  And he suggested -- I'm sorry, did you know, are you aware     00:48

4   that he suggested some further restrictions on TER?               00:48

5   A.  Yes.                                                           00:48

6   Q.  There was a time when not only could there not be TER         00:48

7   number blank, blank, blank on it, but they wanted to take out     00:48

8   the acronym TER, right?                                           00:48

9   A.  Yes.                                                           00:48

10  Q.  So that the only thing that could be on a site would be a     00:48

11  bunch of numbers, right?                                          00:48

12  A.  Yes.                                                           00:48

13  Q.  And the only way somebody would know that those are TER       00:48

14  numbers versus some other numbers would be they'd have to be      00:48

15  aware of TER, right?                                              00:49

16  A.  Yes.                                                           00:49

17  Q.  I mean, you had account numbers on your -- on your ads,       00:49

18  right, like internal numbers for Backpage?                        00:49

19  A.  I remember it being e-mails were used for accounts on         00:49

20  Backpage.                                                         00:49

21  Q.  You didn't have Backpage numbers on those accounts to be      00:49

22  able to -- like a reference?                                      00:49

23  A.  There is a thing called an oid option identifying            00:49

24  delineator that appeared at the end of ads that was a number.     00:49

25  Maybe that's what you're talking about.                           00:49

1        MR. FEDER:  Could the witness be shown 646.          00:49

2        No.  How about 647?                                  00:50

3        Is this in evidence?                                 00:50

4        MR. STONE:  Yes.                                      00:50

5        MR. FEDER:  Thanks.                                   00:50

6   BY MR. FEDER:                                             00:50

7   Q.  See this e-mail, Mr. Hyer?                            00:50

8   A.  Yes.                                                  00:50

9   Q.  This is already in evidence.                          00:50

10       February 18 of '11.  Are you on here somewhere?      00:50

11  A.  I don't think so.                                     00:50

12  Q.  Are you aware of this e-mail?                          00:50

13  A.  I'm aware of what they're talking about here.         00:50

14  Q.  You would have been told that -- that as of February 11 --  00:50

15  I'm sorry, February of 2011, that TER -- the abbreviation TER   00:51

16  was, as this one says, another term bites the dust, right?  00:51

17  A.  Yes.                                                  00:51

18  Q.  Leaving only a number on there, right?                00:51

19  A.  Yes.                                                  00:51

20  Q.  I think you testified on direct that the affiliate program  00:51

21  was gone too by, roughly, 2010, 2011, right?             00:51

22  A.  For accuracy sake, the affiliate program continued, but the  00:51

23  commissions paid for affiliates in escorts or adult was   00:51

24  eliminated.  I don't remember the exact time that it was  00:51

25  eliminated, but the affiliate program sustained, but paying  00:51

1   affiliates for adult revenues or commissions gained on adult        00:51
2   revenues ended.                                                     00:51
3   Q.  Because the revenues that were coming out of the Craigslist     00:51
4   migration were adequate and they didn't need the affiliates         00:52
5   anymore, right?                                                     00:52
6   A.  Yes.                                                            00:52
7   Q.  Is it fair to say that from the time that you joined            00:52
8   Backpage, at least until 2000 -- I'm sorry, April of 2015, that     00:52
9   the standards on Backpage in regard to content of adult ads got     00:52
10  stricter and stricter and stricter?                                 00:52
11  A.  I think you meant April of 2018, and answer is yes.             00:52
12  Q.  Well, I'm actually talking about April of 2015 when the         00:52
13  site was sold to Mr. Ferrer.                                        00:52
14          But, I mean, I'm okay with '18.  It got stricter and        00:52
15  stricter that whole time?                                           00:53
16  A.  Yes.                                                            00:53
17  Q.  Okay.  But after the sale, Mr. Ferrer allowed some of the       00:53
18  former abbreviations to get back on the site, right?               00:53
19          MR. STONE:  Objection.  Foundation.                         00:53
20          THE COURT:  Sustained.                                      00:53
21  BY MR. FEDER:                                                       00:53
22  Q.  After the sale to Mr. Ferrer in April of 2015, do you know      00:53
23  if Mr. Ferrer allowed some of the old abbreviations to get back     00:53
24  on the site?                                                        00:53
25  A.  The only thing I remember is some fluctuation with GFE, but     00:53

1   outside of that -- and I don't even remember what the timeline   00:53

2   was, the dates.  I don't remember when that was, if it was   00:53

3   pre-sale, post-sale.   00:53

4   Q.  Okay.  Fair to say that when it came to the stricter and   00:53

5   stricter, more and more rigid regulations in regard to content   00:53

6   on Backpage, that Mr. Spear was involved in that, setting those   00:54

7   standards?   00:54

8   A.  Yes.   00:54

9   Q.  You're aware that Mr. Spear, up until the sale of New Times   00:54

10  to the editors in 2012, that he was working both the paper and   00:54

11  the Backpage?   00:54

12  A.  I knew that he had a history with New Times and that he was   00:54

13  the -- my boss's boss with Backpage, but, you know, the   00:54

14  timeline or when those things crossed over or any of that   00:54

15  stuff, I don't remember any of that.   00:54

16  Q.  No problem.   00:54

17        Did you ever live in Phoenix or always in Dallas?   00:54

18  A.  Dallas in -- well, always --   00:54

19  Q.  I mean --   00:54

20  A.  Yeah.   00:54

21  Q.  -- when you moved there to work for the Observer until, I   00:54

22  guess today, you're living in Dallas, right?   00:54

23  A.  Yeah, from around '96, '97, to now.   00:54

24  Q.  In 2012, February, did anything happen in regard to who was   00:55

25  in control of moderation at Backpage?   00:55

| | |
|---|---|
| 1 | A.  If something happened, I don't know what you're talking | 00:55 |
| 2 | about. | 00:55 |
| 3 | Q.  You ever heard of Elizabeth McDougall? | 00:55 |
| 4 | A.  Yes. | 00:55 |
| 5 | Q.  Did you ever talk to her? | 00:55 |
| 6 | A.  Yes. | 00:55 |
| 7 | Q.  Ever have e-mails from her? | 00:55 |
| 8 | A.  If I got an e-mail from Liz, I don't remember it. | 00:55 |
| 9 | Q.  Okay.  Liz McDougall took over moderation and other parts | 00:55 |
| 10 | of the operation of Backpage in February of 2012, right? | 00:55 |
| 11 |         MR. STONE:  Objection.  Foundation. | 00:55 |
| 12 |         THE COURT:  Sustained. | 00:55 |
| 13 | BY MR. FEDER: | 00:55 |
| 14 | Q.  Do you know when Ms. McDougall took over the moderation, et | 00:55 |
| 15 | cetera, at Backpage? | 00:55 |
| 16 |         MR. STONE:  Same objection. | 00:56 |
| 17 |         THE COURT:  He can answer yes or no, if he knows. | 00:56 |
| 18 |         THE WITNESS:  Do I -- do I -- do I know that Liz took | 00:56 |
| 19 | over? | 00:56 |
| 20 | BY MR. FEDER: | 00:56 |
| 21 | Q.  Yes. | 00:56 |
| 22 | A.  I'd say no. | 00:56 |
| 23 | Q.  Okay. | 00:56 |
| 24 |         MR. FEDER:  Could the witness be shown 5961. | 00:56 |
| 25 |         We'll come back to that one. | 00:56 |

1          How about 5324?                                         00:56

2          Not right.                                              00:57

3   BY MR. FEDER:                                                  00:57

4   Q.  While I'm looking, do you recall when Ms. McDougall started  00:57

5   at Backpage?                                                   00:57

6   A.  I recall it was after Craigslist shuttered its section, but  00:57

7   the exact date of when I first heard her name, I don't         00:57

8   remember.                                                      00:57

9   Q.  And was she the person that you went to in regard to        00:57

10  questions about moderation, her or Mr. Ferrer?                 00:57

11  A.  I would have gone to Carl before I went to Liz.             00:57

12  Q.  Okay.  But you also went to Liz too, right?                00:57

13  A.  I don't ever remember going to Liz directly.  I may have,   00:57

14  but I don't ever remember doing that.                          00:58

15  Q.  Did you ever meet her in person?                           00:58

16  A.  Couple of times.                                           00:58

17  Q.  She came to Dallas, right, to talk to you and others there?  00:58

18  A.  I don't know if she came to specifically talk to me, but    00:58

19  she came to Dallas and I met her a couple of times.            00:58

20  Q.  What do you recall talking to her about, generally?        00:58

21  A.  I remember talking about the sporting equipment category.   00:58

22  Q.  Okay.  Anything else?                                      00:58

23  A.  I'm sure there were topics that were related to -- I didn't  00:58

24  talk to her but two or three times in person, maybe it was more  00:58

25  than that, but I don't really remember talking to her about     00:58

| | | |
|---|---|---|
| 1 | much. | 00:58 |
| 2 | Q.  If one of your ads said, put it in the hole, cum put it in | 00:58 |
| 3 | the hole, C-U-M, put it in the hole for a hundred dollars, is | 00:59 |
| 4 | that a prostitute ad? | 00:59 |
| 5 | MR. STONE:  Objection.  Foundation. | 00:59 |
| 6 | THE COURT:  Overruled. | 00:59 |
| 7 | THE WITNESS:  Yes. | 00:59 |
| 8 | BY MR. FEDER: | 00:59 |
| 9 | Q.  Could it also be a billiards tournament? | 00:59 |
| 10 | A.  Not on Backpage. | 00:59 |
| 11 | Q.  All right.  Okay.  So your testimony is by the very fact | 00:59 |
| 12 | that somebody puts an ad in the adult section on Backpage and | 00:59 |
| 13 | has any of the words that we've talked about, it becomes a | 00:59 |
| 14 | prostitution ad? | 00:59 |
| 15 | MR. STONE:  Object to the form. | 00:59 |
| 16 | THE COURT:  Sustained. | 00:59 |
| 17 | BY MR. FEDER: | 00:59 |
| 18 | Q.  You've used the word escort on a number of occasions during | 00:59 |
| 19 | the direct examination. | 00:59 |
| 20 | Do you recall that? | 00:59 |
| 21 | A.  Yes. | 00:59 |
| 22 | Q.  And then you changed it to prostitution ad, either -- | 00:59 |
| 23 | prostitution, either at the urging of Mr. Stone or on your own, | 00:59 |
| 24 | right? | 00:59 |
| 25 | MR. STONE:  Object to the form. | 01:00 |

```
 1              THE COURT:  Sustained.                          01:00
 2   BY MR. FEDER:                                             01:00
 3   Q.  Have you been practicing with the prosecutor to make the --  01:00
 4   the prosecutors over the years to make sure that when you say   01:00
 5   escort, you make it into prostitution?                    01:00
 6              MR. STONE:  Object to the form.                01:00
 7   BY MR. FEDER:                                             01:00
 8   Q.  Is that a no?                                         01:00
 9              THE COURT:  Well, let me rule on the objection.  01:00
10              MR. FEDER:  I'm sorry.                         01:00
11              THE COURT:  I'm going to sustain the objection.  01:00
12              MR. FEDER:  Okay.                              01:00
13   BY MR. FEDER:                                             01:00
14   Q.  Did you ever meet a person named Don Moon?            01:01
15   A.  I didn't catch the first part of that.                01:01
16   Q.  Don Moon.                                             01:01
17   A.  That's the second part.  What was the first part?     01:01
18   Q.  Did you ever meet Don Moon?                           01:01
19   A.  No.                                                   01:01
20   Q.  Did you ever talk to Don Moon?                        01:01
21   A.  No.                                                   01:01
22   Q.  Did you ever get an e-mail from Don Moon?             01:01
23   A.  Not that I recollect.                                 01:01
24   Q.  Okay.  To your knowledge, did Liz McDougall continue to  01:01
25   work with Backpage until 2018?                            01:01
```

```
 1   A.  Yes, to my knowledge, she worked through 2018.          01:01
 2           MR. FEDER:  Could the witness be shown 5894.  For his  01:02
 3   eyes only.                                                  01:02
 4   BY MR. FEDER:                                               01:02
 5   Q.  Mr. Hyer, you were getting paid pretty good money working  01:02
 6   for Backpage, right?                                        01:02
 7   A.  Depends on your definition of pretty good, but I was paid  01:02
 8   by Backpage, yes.                                           01:03
 9   Q.  I knew you were going to say that.                      01:03
10           THE COURT:  I'm sorry.  I didn't hear that.         01:03
11           MR. FEDER:  I said, I knew you were going to say that.  01:03
12           THE COURT:  No, don't comment on the answer,        01:03
13   Mr. Feder, please.                                          01:03
14           MR. FEDER:  Okay.                                   01:03
15   BY MR. FEDER:                                               01:03
16   Q.  At any time while you were working for Backpage -- strike  01:03
17   that.                                                       01:03
18           What was your title while you worked for Backpage   01:03
19   from, say, 2012 to 2000 -- to April of 2015?               01:03
20   A.  I remember it being sales and marketing director.      01:03
21   Q.  For the entirety of Backpage nationwide?               01:03
22   A.  Yes.                                                    01:03
23   Q.  Did you ever make any money outside of your salary from  01:03
24   Backpage?                                                   01:03
25   A.  Yes.                                                    01:03
```

| | |
|---|---|
| 1 | Q.  How much? | 01:03 |
| 2 | A.  Well, it depends.  I had a couple of side gigs.  One | 01:03 |
| 3 | venture that did not succeed was my band.  I'm still trying to | 01:03 |
| 4 | pay off the $10,000 investment that I had there.  I also had | 01:04 |
| 5 | affiliate marketing interests. | 01:04 |
| 6 | Q.  Affiliate marketing interests? | 01:04 |
| 7 | A.  Yes. | 01:04 |
| 8 | Q.  Is that what you said? | 01:04 |
| 9 |      Is this the affiliate marketing interest that you and | 01:04 |
| 10 | Mr. Ferrer participated in? | 01:04 |
| 11 | A.  Yes. | 01:04 |
| 12 | Q.  How much money did you make from the affiliate marketing | 01:04 |
| 13 | program? | 01:04 |
| 14 | A.  I don't remember the exact amount.  If I were to estimate | 01:04 |
| 15 | it, 7 -- about 350,000 over a five-year period, maybe a little | 01:04 |
| 16 | bit more than that. | 01:04 |
| 17 | Q.  Did you ever tell anybody at Backpage, at least the | 01:04 |
| 18 | executives, that you were posing as an affiliate for Backpage? | 01:04 |
| 19 | A.  I was not posing as an affiliate for Backpage, so I can't | 01:04 |
| 20 | answer that question with a yes or no question. | 01:05 |
| 21 | Q.  Okay.  To your knowledge, did any of the executives or | 01:05 |
| 22 | accountants or anything at Backpage know that you were making | 01:05 |
| 23 | money outside of what you were being paid as your salary for | 01:05 |
| 24 | your full-time employment at Backpage? | 01:05 |
| 25 | A.  Carl Ferrer. | 01:05 |

1    Q.  Anybody else?                                              01:05

2    A.  Not that I'm aware of.                                     01:05

3    Q.  But you and Carl Ferrer were participating together in this   01:05

4    affiliate program, right?                                     01:05

5    A.  Yes.                                                       01:05

6    Q.  There were times, were there not, when Mr. Spear or       01:05

7    somebody else in the executive part of Backpage would tell    01:06

8    Mr. Ferrer to do something and he would do something different,   01:06

9    right?                                                        01:06

10          MR. STONE:  Object to the foundation.                  01:06

11   BY MR. FEDER:                                                 01:06

12   Q.  If you know?                                              01:06

13          THE COURT:  Sustained.                                 01:06

14          And really as to the form of the question, Mr. Feder.   01:06

15          MR. FEDER:  Okay.                                      01:06

16          THE COURT:  It's very compound and confusing.         01:06

17          MR. FEDER:  Could the witness be shown 5934.           01:07

18   BY MR. FEDER:                                                 01:07

19   Q.  Do you recall this e-mail, Mr. Hyer?                      01:07

20   A.  I'm still reading it.                                     01:07

21   Q.  Okay.  Tell me when you're ready.                         01:07

22   A.  I say I don't recall it, but it looks like it came from me,   01:07

23   so I must have wrote it, or edited it.  I guess it says edits   01:07

24   or suggestions.                                               01:07

25          MR. FEDER:  Move to admit.                             01:08

1        MR. STONE:  Is there more than one page?          01:08

2        MR. FEDER:  Could you scroll down, please, so he can          01:08

3   see everything.          01:08

4        MR. STONE:  There is an indication that it's just one.          01:08

5        No objection.          01:08

6        THE COURT:  Yes, it may be admitted and it may be          01:08

7   published.          01:08

8        (Exhibit No. 5934 was admitted.)          01:08

9   BY MR. FEDER:          01:08

10  Q.  Do you recall Mr. Ferrer came up with some --          01:08

11       THE COURT:  Can you move to the microphone?  Can you          01:08

12  move to the microphone?          01:08

13       MR. FEDER:  Sorry.          01:08

14       THE COURT:  Thank you.          01:08

15  BY MR. FEDER:          01:08

16  Q.  -- went back to posting escort ads?          01:08

17  A.  Man, I'm sorry, that was so fragmented, I didn't hear you.          01:08

18  What did you say?          01:08

19  Q.  This e-mail is entitled, Guide to Posting Escort Ads,          01:08

20  right?          01:08

21  A.  The subject is re, which is a reply to an e-mail that was          01:08

22  sent, Guide for Posting Escort Ads.          01:08

23  Q.  And you -- is that from -- is that e-mail from you?          01:09

24  A.  I'm replying to an e-mail.          01:09

25       MR. FEDER:  Okay.  Could we be shown 5930 -- I'm          01:09

1    sorry, 5938.                                                        01:09

2          I'm sorry, 5938.                                             01:10

3    BY MR. FEDER:                                                       01:10

4    Q.  Have you seen this, Mr. Hyer?                                   01:10

5          MR. STONE:  Your Honor, this is just Exhibit 73.             01:10

6          MR. FEDER:  This is 73.                                      01:10

7          MR. STONE:  It's the same exhibit.                           01:10

8          MR. FEDER:  Okay.  No problem.  So we won't talk about       01:10

9    this since we've already talked about 73, haven't we?              01:10

10          MR. STONE:  Yes.                                            01:10

11          MR. FEDER:  Can we bring up 73, speaking of 73.             01:11

12          I'm sorry, 1830b.                                           01:12

13          THE COURT:  Can you restate the exhibit number again.      01:12

14          MR. FEDER:  1830b.                                          01:12

15          While I'm looking, could you bring back up                 01:13

16    Exhibit 311.                                                       01:13

17    BY MR. FEDER:                                                      01:13

18    Q.  Mr. Hyer, you were asked a number of questions about Google   01:13

19    Analytics documents, right?                                        01:13

20    A.  Yes.                                                           01:13

21    Q.  And that the Erotic Review was an important source for        01:13

22    Backpage during the time prior to, roughly, 2011, right?          01:14

23    A.  Yes.                                                           01:14

24    Q.  I'm looking at Exhibit 311.  There were 43,000 and change     01:14

25    visits from the Erotic Review, out of a million 730 and change,   01:14

1  right, on that particular exhibit?                          01:14

2  A.  Yes.                                                    01:14

3  Q.  And even though we're not math majors, what would you say  01:14

4  the percentages of the Erotic Review visits to the amount of  01:14

5  visits on that day, 43,000 to a million 730 and change?     01:14

6  A.  I couldn't calculate that in my head, sir.              01:14

7  Q.  Under five percent?                                     01:14

8  A.  I -- perhaps.  I would need a calculator, and then I    01:14

9  wouldn't know how to do it on a calculator.                 01:15

10 Q.  There we go.                                            01:15

11      MR. FEDER:  All right.  I'm sorry.  Bring back up --   01:15

12 or put up Exhibit 547.                                      01:15

13 BY MR. FEDER:                                               01:15

14 Q.  Do you remember this exhibit that you talked about on   01:15

15 direct?                                                     01:15

16 A.  Yes.                                                    01:15

17 Q.  First of all, if there is a banned word, let's just use  01:15

18 Greek as an example, even though we're not mathematics majors,  01:15

19 nor statisticians, there would probably be a thousand ways that  01:15

20 one could try to spell Greek with a bunch of letters, marks, et  01:15

21 cetera, right?                                              01:15

22 A.  Yes.                                                    01:15

23 Q.  It would be near impossible to get every permutation of  01:15

24 Greek, right?                                               01:15

25 A.  Maybe with AI you could do it.                          01:15

DANIEL HYER - CONT'D CROSS-EXAMINATION BY MR. FEDER          50

| | | |
|---|---|---|
| 1 | Q. Well, but AI wasn't in effect in -- before 2018, right? | 01:16 |
| 2 | A. Not in its present form, no. | 01:16 |
| 3 | Q. Okay. And looking at this exhibit, under escorts, the | 01:16 |
| 4 | first one was -- I think you identified, quote-unquote, sex | 01:16 |
| 5 | terms as Greek, Number 2, right? | 01:16 |
| 6 | A. Yes. | 01:16 |
| 7 | Q. GFE, Number 6? | 01:16 |
| 8 | A. Yes. | 01:16 |
| 9 | Q. Number 8, BBBJ, right? | 01:16 |
| 10 | A. Yes. | 01:16 |
| 11 | Q. What kind of sex term is Mesa, Number 4? | 01:16 |
| 12 | A. I'm not familiar with that being a sex term. | 01:16 |
| 13 | Q. How about Asian, Number 1? | 01:16 |
| 14 | A. That's not a sex term. | 01:16 |
| 15 | Q. How about Latina, Number 3? | 01:16 |
| 16 | A. No, that's not a text term. | 01:16 |
| 17 | Q. Number 7, couple? | 01:17 |
| 18 | A. I don't think I would consider that a sex term. | 01:17 |
| 19 | Q. Maybe Michelle, is that a sex term? | 01:17 |
| 20 | A. No. | 01:17 |
| 21 | Q. How about French, is that a sex term? | 01:17 |
| 22 | A. It might be in the context of classified ads and escorts in | 01:17 |
| 23 | 2010, but if it was, I don't remember what that meant. | 01:17 |
| 24 | Q. Well, there is a French kiss, right? | 01:17 |
| 25 | A. I don't think it was referring to that. | 01:17 |

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG          51

| | | |
|---|---|---|
| 1 | Q. Okay. Is that a sex term, in your opinion? | 01:17 |
| 2 | A. It is but I don't remember what it meant. | 01:17 |
| 3 | Q. A lot of women's names, right? | 01:17 |
| 4 | A. Yes. | 01:17 |
| 5 | Q. Any of those sex terms, in your opinion? | 01:17 |
| 6 | A. None of the ones that I see on the screen. | 01:17 |
| 7 | Q. How about Scottsdale, that's a sex term, right? | 01:18 |
| 8 | A. No. | 01:18 |
| 9 | MR. FEDER: I think that's about all I have. Thanks. | 01:18 |
| 10 | THE COURT: All right. Thank you, Mr. Feder. | 01:18 |
| 11 | Mr. Eisenberg. | 01:18 |
| 12 | MR. EISENBERG: Your Honor, may I use the mic? | 01:18 |
| 13 | THE COURT: Yes. | 01:18 |
| 14 | CROSS-EXAMINATION | 01:19 |
| 15 | BY MR. EISENBERG: | |
| 16 | Q. Just give me a moment, sir. | 01:19 |
| 17 | A. Thank you. | 01:19 |
| 18 | Q. Good afternoon, Mr. Hyer. | 01:19 |
| 19 | A. Good afternoon. | 01:19 |
| 20 | Q. I'm Dave Eisenberg. I represent Mr. Padilla. | 01:19 |
| 21 | A. Hi, Dave. | 01:19 |
| 22 | Q. Hi. How are you, sir? | 01:19 |
| 23 | A. Doing all right. | 01:19 |
| 24 | Q. Good. I just want to make sure that when you were talking | 01:19 |
| 25 | about moderation and the process, process of moderation -- | 01:19 |

1    well, let me start.  That's Mr. Padilla's job.  He was director    01:19
2    of operations, correct?    01:19
3    A.  Yes, operations -- chief operations officer and operations    01:19
4    manager, director of operations.    01:20
5    Q.  One of those terms?    01:20
6    A.  Yes.    01:20
7    Q.  Okay.  And, within that, one of the things he was    01:20
8    responsible for was moderation, right?    01:20
9    A.  Yes.    01:20
10   Q.  And, within moderation, the idea is, either through a    01:20
11   filter that's automatic or through a human, the ad, the    01:20
12   potential ad, or even one that had been posted, would be    01:20
13   reviewed, right?    01:20
14   A.  Yes.    01:20
15   Q.  And the idea was if there was a bad term -- my language --    01:20
16   but a term that needed to be taken out, the term was taken out,    01:20
17   right?    01:20
18   A.  I would say that's not a yes or no.  I couldn't answer that    01:20
19   with a yes or no.    01:20
20   Q.  Well, it would -- terms were stripped, right?    01:20
21   A.  That was one of the features of the filters.    01:20
22   Q.  And other features of the filters were, well, it could be    01:21
23   deleted, might be the same idea, right?    01:21
24   A.  I can't say that is the same idea.    01:21
25   Q.  Okay.  Well, what about photographs?  The idea is if a    01:21

1  photo is not -- doesn't pass the standard, then the photo would          01:21
2  be taken out, correct?                                                    01:21
3  A.  Yes.                                                                  01:21
4  Q.  All right.  So the idea, though, was not that a moderator            01:21
5  would add to an ad, put something in an ad?                              01:21
6  A.  Was the question the idea was not to add content to an ad?           01:21
7  Q.  Correct, they wouldn't add content?                                  01:21
8  A.  No.                                                                   01:21
9  Q.  Okay.  Now, sir, you were shown an Exhibit Number 27.               01:21
10        MR. EISENBERG:  Could we have that, please, up on the            01:21
11  monitor.                                                                 01:21
12  BY MR. EISENBERG:                                                        01:22
13  Q.  Sir, this is Exhibit Number 27.  And I think you've -- it's        01:22
14  already been identified.  It's in evidence, so -- all right.           01:22
15  There you go.                                                            01:22
16        So, if you look at this exhibit, I think your                    01:22
17  testimony was that it had to do with Mr. Ferrer trying to              01:22
18  maximize the reciprocal link to TER.  Did I say that correctly?       01:22
19  A.  Yeah, maximize the benefit from our reciprocal link               01:22
20  relationship with TER.                                                   01:22
21  Q.  Okay.  And I think you were shown, in fact, I'm sure you           01:22
22  were shown by the government that there were people who were --        01:22
23  actually, this is -- the e-mail itself is from you, and it's to       01:22
24  Mr. Ferrer; is that correct?                                            01:22
25  A.  Yes.                                                                 01:22

| | | |
|---|---|---|
| 1 | Q.  And then down at the bottom someone has written in awesome. | 01:22 |
| 2 | Let me just stop there.  Did Mr. Ferrer write that in | 01:23 |
| 3 | or did you? | 01:23 |
| 4 | A.  That's my word. | 01:23 |
| 5 | Q.  Okay.  And then Andy, Thomas, and I can attack this today. | 01:23 |
| 6 | Did I read that correctly? | 01:23 |
| 7 | A.  Yes. | 01:23 |
| 8 | Q.  That Andy is Andy Goldstein, isn't it? | 01:23 |
| 9 | A.  Yes. | 01:23 |
| 10 | Q.  Not Andy Padilla? | 01:23 |
| 11 | A.  No. | 01:23 |
| 12 | Q.  In fact, he was never known as Andy, was he? | 01:23 |
| 13 | A.  I didn't really know Andy Padilla, but I didn't know how | 01:23 |
| 14 | he -- how he was known. | 01:23 |
| 15 | Q.  Okay. | 01:23 |
| 16 | A.  Or the way that -- I didn't know if he was known as Andy or | 01:23 |
| 17 | Andrew.  I never met him. | 01:23 |
| 18 | Q.  You never met Mr. Padilla? | 01:23 |
| 19 | A.  Wait a second.  Andrew, Andrew, Andrew.  Sorry. | 01:23 |
| 20 | Q.  My client is Andrew Padilla. | 01:23 |
| 21 | A.  Yes, yes, yes, yes.  My apologies. | 01:23 |
| 22 | Q.  That's all right.  So he's known, first name known as | 01:23 |
| 23 | Andrew, right? | 01:23 |
| 24 | A.  Always, yes. | 01:23 |
| 25 | Q.  Okay.  So Andrew Padilla had nothing to do with, awesome, | 01:23 |

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG          55

```
 1   dot, dot, dot, Andy, Thomas, and so forth?                01:23

 2   A.  No.                                                   01:23

 3   Q.  Thank you.  Would --                                  01:23

 4        MR. EISENBERG:  Can we go to 1168, ma'am.  This is   01:24

 5   also in evidence.                                         01:24

 6   BY MR. EISENBERG:

 7   Q.  All right.  Do you see that, sir?                     01:24

 8   A.  Yes.                                                  01:24

 9   Q.  Now there are -- just to refresh, this is from Mr. Ferrer  01:24

10   on September the 9th of 2008, correct?                    01:24

11   A.  Yes.                                                  01:24

12   Q.  And it's at 12:06 in the morning, right?              01:24

13   A.  Yes.                                                  01:24

14   Q.  And then there are a number of people who are listed in the  01:24

15   to form there.  You are one of them; is that correct?     01:24

16   A.  Yes.                                                  01:24

17   Q.  Okay.  Now, the down -- let's go down to under the HTTP   01:24

18   designation where it starts, I restored it.               01:24

19        Okay.  Do you see that?                              01:24

20   A.  Yes.                                                  01:24

21   Q.  The guy is not a scam.  The next part is somebody community  01:24

22   removed it.  Let's just stop there.                       01:24

23        What does community removed mean?                    01:24

24   A.  Another way to say that would be delete.              01:25

25   Q.  Okay.  Somebody deleted this ad?                      01:25
```

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG          56

```
1    A.  Yes.                                                    01:25
2    Q.  And this doesn't say who it was, but, anyway, it got    01:25
3    deleted, correct?                                           01:25
4    A.  Yes.                                                    01:25
5    Q.  All right.  And let's go to -- well, before we move on with  01:25
6    that, that's the process of moderation, one form or another,  01:25
7    somebody deleted the ad, correct?                           01:25
8    A.  That's one of the tools or job functions of moderation,  01:25
9    yes.                                                        01:25
10   Q.  All right.  And Mr. Ferrer wants this to get reposted, if  01:25
11   you will?                                                   01:25
12   A.  Changed from status of community removed to status of live.  01:25
13   Q.  Live, meaning live is live, I guess.  You could see it,  01:25
14   right?                                                      01:25
15   A.  Yes.                                                    01:25
16   Q.  Okay.  Mr. Padilla didn't have anything to do with that,  01:25
17   though, did he?                                             01:25
18   A.  No.                                                     01:25
19        MR. EISENBERG:  Let's go to 579.                       01:26
20   BY MR. EISENBERG:                                           
21   Q.  Now -- and this is also admitted, sir.                  01:26
22        Correct me if I'm wrong, because sometimes these       01:26
23   e-mails, in their progression, are a little confusing.  Okay.  01:26
24        So if -- the way I'm reading this, if you go down to   01:26
25   the bottom, that's where it begins.  This is -- I believe this  01:26
```

UNITED STATES DISTRICT COURT

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG                57

1   is -- well, it's basically a one-page document.                01:26

2           So if we start at the bottom, my question is:  Does it  01:26

3   start with, from Google alerts, May 16th, 2009?                01:26

4   A.  Yes.                                                        01:26

5   Q.  Okay.  And then it is to Mr. Ferrer; is that correct?      01:26

6   A.  Yes.                                                        01:26

7   Q.  And then the part of it, I guess, that's most relevant here 01:26

8   is South Carolina eyes criminal investigation of Craigslist,   01:26

9   and so forth; is that correct?                                 01:27

10  A.  Yes.                                                        01:27

11  Q.  So then the next thing that appears to happen is if we go   01:27

12  up a little bit further, is this next part an e-mail from       01:27

13  Mr. Ferrer?                                                     01:27

14  A.  Yes.                                                        01:27

15  Q.  Okay.  And it's a -- well, just to give context, May 17,    01:27

16  2009, at 9:09 in the morning, right?                           01:27

17  A.  Yes.                                                        01:27

18  Q.  Now, this appears to be -- well, get ahead of myself.       01:27

19          What he is writing is we are probably -- probably       01:27

20  needing -- to start the process of cleaning up adult Monday     01:27

21  a.m.                                                            01:27

22          Did I read that correctly?                              01:27

23  A.  Yes.                                                        01:27

24  Q.  Okay.  And then there is some other parts to it, but it     01:27

25  appears as though it goes to Mr. Padilla; is that correct?      01:27

1    A.  Yes.                                                          01:27

2    Q.  And then -- okay.                                            01:28

3         And then Mr. Padilla says, right there at the top, on       01:28

4    Sunday, right, May 17, 2009, at 7:31 p.m., right?                01:28

5    A.  Yes.                                                          01:28

6    Q.  And he writes back to Mr. Ferrer and to you.                 01:28

7         So far, so good?                                            01:28

8    A.  Yes.                                                          01:28

9    Q.  Okay.  And what he says is, I started Martina and Amanda on  01:28

10   adult picture cleanup in all markets on Friday.                  01:28

11        Did I read that correctly?                                  01:28

12   A.  Yes.                                                          01:28

13   Q.  Fair to say, sir, what he is doing is responding to a        01:28

14   directive from Mr. Ferrer?                                       01:28

15   A.  Yes.                                                          01:28

16   Q.  And Mr. Ferrer is his boss, correct?                         01:28

17   A.  Yes.                                                          01:28

18   Q.  Okay.  Then he says, we'll continue this Monday.  Okay.      01:28

19   Zeke, Michael, and Amanda will be working on adult for as long   01:28

20   as we need to.                                                   01:28

21        And the interpretation there, sir, would you agree         01:28

22   with me, is he's assigned people who are going to clean up       01:28

23   whatever the problem is, and they will work on it as long as     01:29

24   it's necessary; is that correct?                                 01:29

25   A.  Yes.                                                          01:29

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| 1 | Q.  Okay.  The last -- well, next part is, will implement the | 01:29 |
| 2 | text and pic cleanup in South Carolina only on Monday as well. | 01:29 |
| 3 |         Did I read that correctly? | 01:29 |
| 4 | A.  Yes. | 01:29 |
| 5 | Q.  Okay.  So it appears to be -- well, words speak for | 01:29 |
| 6 | themselves. | 01:29 |
| 7 |         So he is trying to carry out, would you agree with me, | 01:29 |
| 8 | what he's been directed to do by his boss? | 01:29 |
| 9 | A.  Yes. | 01:29 |
| 10 | Q.  All right.  Sir, let's go to 49 now.  I think this is | 01:29 |
| 11 | also -- it is in evidence.  And this one is from Mr. Padilla to | 01:29 |
| 12 | you, correct? | 01:29 |
| 13 | A.  Yes. | 01:29 |
| 14 | Q.  And also cc'd to Mr. Ferrer, correct? | 01:29 |
| 15 | A.  Yes. | 01:29 |
| 16 | Q.  Title, New Moderation Rules, right? | 01:29 |
| 17 | A.  Yes. | 01:30 |
| 18 | Q.  The moderation rules were changing all the time; isn't that | 01:30 |
| 19 | true? | 01:30 |
| 20 | A.  Yes. | 01:30 |
| 21 | Q.  And the moderation rule changes came from, well, | 01:30 |
| 22 | Mr. Ferrer, right? | 01:30 |
| 23 | A.  Yeah, Ferrer and above. | 01:30 |
| 24 | Q.  And above.  But Mr. Ferrer also had consultation with other | 01:30 |
| 25 | people, you said from above, correct? | 01:30 |

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG                60

```
 1   A.  Yes.                                                    01:30

 2   Q.  And from above would be -- well, would consultation, I  01:30

 3   should say, would include people like Liz McDougall?        01:30

 4        MR. STONE:  Object to foundation.                      01:30

 5   BY MR. EISENBERG:

 6   Q.  Well, if you know?                                      01:30

 7        THE COURT:  Sustained.                                 01:30

 8        THE WITNESS:  Sustained, does that mean I -- sorry.    01:30

 9        THE COURT:  Sustained.                                 01:30

10        MR. STONE:  You don't have to answer.                  01:30

11        THE COURT:  Sustained.                                 01:30

12        MR. EISENBERG:  I'll ask it --                         01:30

13        THE COURT:  Okay.  Let me finish.  I sustained the     01:30

14   objection.  Now you can start.                              01:31

15        MR. EISENBERG:  Thank you, ma'am.                      01:31

16   BY MR. EISENBERG:                                           01:31

17   Q.  Was -- do you know who some of the people were that     01:31

18   Mr. Ferrer consulted with?                                  01:31

19   A.  Yes.                                                    01:31

20   Q.  Was one of them Ms. McDougall?                          01:31

21   A.  Yes.                                                    01:31

22   Q.  Do you know who -- let me revise that.  Okay.           01:31

23        To continue on with this e-mail, it's to you.  Hey,    01:31

24   Dan, right?                                                 01:31

25   A.  I'm Dan.  It's to me and Carl.                          01:31
```

```
 1   Q.  Yeah, okay.  But he's starting off with, hey, Dan?      01:31

 2   A.  Yes.                                                     01:31

 3   Q.  Okay.  And he says, Scott had a meeting with us today,  01:31

 4   right?                                                       01:31

 5   A.  Yes.                                                     01:31

 6   Q.  Do you know who the "us" is?                             01:31

 7   A.  Um, I know it would be Andrew, outside of who else, I'm not  01:31

 8   exactly sure.                                                01:32

 9   Q.  Okay.  Might Mr. -- well, I don't want you to speculate. 01:32

10         And he's pushing me hard to get the site as clean as  01:32

11   possible in the next seven days; is that correct?           01:32

12   A.  Yes.                                                     01:32

13   Q.  Fair to read this that what his -- what Scott is doing is 01:32

14   telling him, get the site cleaned up?                       01:32

15   A.  Yes.                                                     01:32

16   Q.  Okay.  And then he says, I'm empowering the Phoenix staff 01:32

17   to start deleting ads.  Let me just stop there.             01:32

18         Earlier on I -- I asked you about what it meant to    01:32

19   delete, and maybe I didn't get that right.  What -- what does 01:32

20   it mean here when he's saying to delete ads?                01:32

21   A.  I think, to clarify, so delete would be the process of  01:32

22   removing the ad, and the status of the ad would change from 01:32

23   live to community removed.                                   01:32

24   Q.  Okay.  It's taking the ad out?                           01:32

25   A.  Yes.                                                     01:33
```

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG                62

1    Q.  In effect.  All right.                                          01:33

2           When the violations are extreme and repeat offenses,         01:33

3    correct?                                                            01:33

4    A.  Yes.                                                            01:33

5    Q.  All right.  And when we delete ads, we're going to send an      01:33

6    e-mail, this says from sales.                                       01:33

7           You're in charge of sales, right?                            01:33

8    A.  Yes.                                                            01:33

9    Q.  So from sales indicates that an e-mail is going to come         01:33

10   from you, if I have this correct.  Is that -- so far, so good?      01:33

11   A.  Well, it says, we're going to, which I think would indicate     01:33

12   that it would come from -- I'm not sure.  We had sales at           01:33

13   Backpage.com as an e-mail, so I think I'm -- I'm confused as to     01:33

14   whether it would have been from sales at Backpage.com, or if        01:33

15   the sales department would send an e-mail.                          01:33

16   Q.  All right.                                                      01:33

17   A.  I'm not exactly sure of that process.  I don't know that we     01:33

18   ever decided on a process to notify users that their ads were       01:33

19   removed.                                                            01:34

20   Q.  But this appears to be what he's saying, that it would come     01:34

21   from sales, right?                                                  01:34

22   A.  He's specific -- yes, he says that.                             01:34

23   Q.  Okay.  And you're in charge of sales?                           01:34

24   A.  Yes.                                                            01:34

25   Q.  And then he says, when we ban a user, we need the ban to        01:34

1    stick for at least 30 days, correct?                              01:34

2    A.  Yes.                                                          01:34

3    Q.  All right.  That means when the -- well, what does that       01:34

4    mean when you ban a user?                                         01:34

5    A.  The filters that I previously testified on had a feature in   01:34

6    which you could set a date for the filter to expire.              01:34

7    Q.  Okay.  Then he says, when we delete from the queue, we will   01:34

8    use delete and notify.  Notify means what?                        01:34

9    A.  Let know.                                                     01:34

10   Q.  Let who know?                                                 01:34

11   A.  The person whose ad was deleted.                              01:34

12   Q.  Okay.  So, now this is as of September the 1st, 2010; is      01:34

13   that correct?                                                     01:34

14   A.  Yes.                                                          01:34

15   Q.  If we go to Exhibit 51 --                                     01:35

16          THE COURT:  Why don't we save that exhibit for after      01:35

17   our afternoon break, Mr. Eisenberg.                              01:35

18          And so, members of the jury, we will stand in our        01:35

19   20-minute afternoon break, and then resume for the remainder of  01:35

20   the day.  Just remember the admonition.  Be prepared to come in  01:35

21   in 20 minutes.                                                   01:35

22          Liliana or Christine will come and get you.               01:35

23          Please all rise for the jury.                             01:35

24          (The jury panel left the courtroom, 2:37 p.m.)            01:35

25          THE COURT:  All right.  We will stand in recess.          01:35

```
 1                 (Recess taken, 2:37 p.m. - 2:58 p.m.)        01:35

 2            THE COURT:  Please be seated.  And let's go ahead and   01:56

 3       check on the jury.                                      01:56

 4                 (The jury panel entered the courtroom, 3:00 p.m.)  01:58

 5            THE COURT:  Please be seated.                      01:58

 6            The record will reflect the presence of the jury.  We  01:58

 7       have the witness on the stand.                          01:58

 8            Mr. Eisenberg, you may continue.                   01:58

 9            MR. EISENBERG:  Thank you, Your Honor.             01:58

10            May the witness be shown Exhibit 51, which is in   01:58

11       evidence.                                               01:58

12       BY MR. EISENBERG:                                       01:58

13       Q.  So, let's see, there it is.                        01:58

14            Mr. Hyer, let's -- let's start from the top.  This is   01:59

15       an exhibit from -- I'm sorry, this is an e-mail from    01:59

16       Mr. Padilla to Mr. Ferrer, correct?                    01:59

17       A.  Yes.                                                01:59

18       Q.  And then you're courtesy copied on it, along with   01:59

19       Mr. Spear, right?                                       01:59

20       A.  Yes.                                                01:59

21       Q.  And the date of the e-mail, September the 6th, 2010.   01:59

22            So far, so good?                                   01:59

23       A.  Yes.                                                01:59

24       Q.  At 12:31 in the morning, right?                    01:59

25       A.  Yes.                                                01:59
```

1   Q.  Okay.  And then he's saying to Mr. Ferrer, my additions are          01:59

2   at the end of your list.  And I'll get to that in a minute,          01:59

3   but, I read that correctly, right?          01:59

4   A.  Yes.          01:59

5   Q.  Then he says, these additional terms are currently filtered          01:59

6   in their common forms and removed manually in their variations.          01:59

7   So let me stop.          01:59

8        I think you were talking before at the beginning of my          02:00

9   examination here, our discussion, the term filtered.  So what          02:00

10  he's saying here is these terms are filtered in their common          02:00

11  forms.          02:00

12       Okay.  What does that mean?          02:00

13  A.  Common spellings or common misspellings.          02:00

14  Q.  And filter --          02:00

15       MS. BERTRAND:  Mr. Eisenberg, can you speak up just a          02:00

16  little bit?  We're having a hard time hearing you.          02:00

17       MR. EISENBERG:  Me?

18       MS. BERTRAND:  Yes, please.

19       MR. EISENBERG:  Oh, me.  Okay.          02:00

20       THE COURT:  You don't have the microphone on, do you?          02:00

21       MR. EISENBERG:  I do, Judge.  I'll try to speak into          02:00

22  this.          02:00

23  BY MR. EISENBERG:

24  Q.  Can you hear me, sir?          02:00

25  A.  Yes, sir.

1  Q.  Okay.  And the filter there means it's automatically taken     02:00
2  out by whatever that filtration process is?                         02:00
3  A.  It would be automatically acted upon, be it ban, or strip       02:00
4  term from ad.                                                        02:00
5  Q.  Right.  And then, but there is another part that -- that        02:00
6  goes on.  It says, and remove manually in their variations.         02:00
7        Now, manually, by hand, right?                                02:01
8  A.  Yes.                                                            02:01
9  Q.  That would mean there would be a moderator actually looking     02:01
10 at the posted -- looking at the advertisement, right?              02:01
11 A.  Yes.                                                            02:01
12 Q.  And then when it says, in their variations, I think we've       02:01
13 talked -- you've talked about that.  Words are -- are spelled       02:01
14 differently, correct?                                               02:01
15 A.  Yes.                                                            02:01
16 Q.  And sometimes they have asterisks or characteristics in        02:01
17 between the letters, right?                                         02:01
18 A.  Yes.                                                            02:01
19 Q.  Okay.  So what he's saying is -- what he's saying is that      02:01
20 there are variations, and those are going to be removed by          02:01
21 somebody looking at the advertisement, right?                       02:01
22 A.  Yes.                                                            02:01
23 Q.  Okay.  And then, actually, I think that was preceded by        02:01
24 Mr. Ferrer's e-mail of September the 4th, in which he's tasking    02:01
25 Andrew, and he's saying, could you add to the banned terms on      02:02

1   the attached Word doc, right?                                    02:02

2   A.  Yes.                                                         02:02

3   Q.  Okay.  And then there is somebody -- well, Mr. Ferrer is     02:02

4   also referring to you, Number 2, Dan, right?                     02:02

5   A.  Yes.                                                         02:02

6   Q.  Tuesday, a.m. -- I'll say that's morning, would you agree?   02:02

7   A.  Yes.                                                         02:02

8   Q.  -- we'll pull all the staff off marketing and have them do   02:02

9   moderation.                                                      02:02

10         So -- and I read that correctly, right?                   02:02

11  A.  Yes.                                                         02:02

12  Q.  Now, apparently, what's happening here is part of your       02:02

13  staff is going to be taken from whatever they're doing for you   02:02

14  and they're going to be put into the moderation task force, if   02:02

15  you will.                                                        02:02

16  A.  Yes.                                                         02:02

17  Q.  And then he says, I will be there to train.  Let me just     02:02

18  stop there.                                                      02:02

19         Did you attend that training?                            02:02

20  A.  Yes.                                                         02:02

21  Q.  Do you know where -- what -- where it was?                   02:02

22  A.  It would have been at our office at 2501 Oak Lawn, in        02:03

23  Dallas.                                                          02:03

24  Q.  Okay.  At the Observer building?                             02:03

25  A.  Yes.                                                         02:03

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG                68

1   Q.  Do you remember how many people were there?                    02:03

2   A.  No, sir.                                                        02:03

3   Q.  Okay.  But you do remember the fact that some of your staff    02:03

4   was pulled off in order to aid in the moderation process?          02:03

5   A.  Yes.                                                            02:03

6   Q.  Okay.  And then he goes on to say, it will be a daily          02:03

7   routine for a while.                                                02:03

8       So do you know how long some of your staff were              02:03

9   seconded to the moderation staff?                                   02:03

10  A.  I don't remember the time frame that that happened.            02:03

11  Q.  Okay.  And then he says, the goal is to make sure we are       02:03

12  clean when the many new users check out our site, right?           02:03

13  A.  Yes.                                                            02:03

14  Q.  Okay.  And what does he mean by clean, or, at least, how       02:03

15  did you interpret that?                                             02:03

16  A.  I've used the word overt, so less overt, meeting our new       02:03

17  standards that were ever-changing.                                 02:04

18  Q.  Would be applied at that point in time?                        02:04

19  A.  Yes.                                                            02:04

20  Q.  Okay.  So, if you go to 51a, which was shown to you            02:04

21  earlier, I won't belabor all these words here, but I do want to    02:04

22  point -- I do want to ask you.                                     02:04

23      Do you know who wrote this inscription at the top, the       02:04

24  following terms and service codes, et cetera?                      02:04

25  A.  No, I don't know who wrote that.                               02:04

1    Q.  Okay.  But it's clear this came from an e-mail that was          02:04

2    sent as an attachment by Mr. Padilla; is that right?               02:04

3    A.  Yes.                                                           02:04

4    Q.  Okay.  The last second -- the second sentence, I'm not sure    02:04

5    if it was read earlier today, but I'll just point it out now.      02:04

6    And it says, post containing these terms will be removed,          02:04

7    right?                                                            02:04

8    A.  Yes.                                                           02:04

9    Q.  And continued use of these terms by a poster will result in    02:04

10   that person being banned from using the site.                      02:04

11          Did I read that correctly?                                  02:05

12   A.  Yes.                                                           02:05

13          MR. STONE:  No objection to have this published.            02:05

14          THE COURT:  Yes, it can be published.  It has been          02:05

15   admitted.                                                         02:05

16          MR. EISENBERG:  I'm sorry.  Thanks.                         02:05

17          THE COURT:  Yes.  And I think it would be helpful for       02:05

18   the jury.                                                         02:05

19          MR. EISENBERG:  Yes.  I'm sorry.                            02:05

20   BY MR. EISENBERG:                                                  02:05

21   Q.  So just, continued use of these terms by a poster will         02:05

22   result in that person being banned from using the site.           02:05

23          Did I read that correctly?                                  02:05

24   A.  Yes.                                                           02:05

25   Q.  And banned means they can't post?                             02:05

UNITED STATES DISTRICT COURT

1   A.  Yes.                                                        02:05

2   Q.  Then there is another page to this.  And you see there is   02:05

3   bold type on the second page?  It starts with note?            02:05

4   A.  Yes.                                                        02:05

5   Q.  And then, again, I'm going to ask you the same question,    02:05

6   but if you don't know, that's okay.  Do you know who wrote this 02:05

7   inscription up at the top?                                      02:05

8   A.  No.                                                         02:05

9   Q.  Okay.  Note, there are many creative spellings for the      02:05

10  terms above, which are too numerous to include in any list.    02:05

11  Let me just stop there.                                         02:05

12          That's true, isn't it?                                  02:05

13  A.  Yes.                                                        02:05

14  Q.  There could have been dozens, upon dozens of way to spell,  02:05

15  I think we've seen the word -- whatever the word is -- Greek,   02:06

16  for example, many variations on that, correct?                 02:06

17  A.  Yes.                                                        02:06

18  Q.  And then he goes -- this goes on to say, but these terms,   02:06

19  however they may be spelled, will be considered off limits, in  02:06

20  quotes.                                                         02:06

21          So off limits means you can't put that term in either,  02:06

22  right?                                                          02:06

23  A.  Yes.                                                        02:06

24  Q.  Now, this is something that I -- I believe has to be        02:06

25  determined, that is, the variation on the word, that has to be  02:06

1   determined by a human moderator sitting there looking at the          02:06

2   advertisement?          02:06

3   A.  Yes.          02:06

4   Q.  Okay.  Also this list may be amended from time to time and          02:06

5   is no way meant to be a limitation on what terms may be banned          02:06

6   or excluded by Backpage.com, right?          02:06

7   A.  Yes.          02:06

8   Q.  Now, this is an internal document, isn't it?          02:06

9   A.  Yes.          02:06

10  Q.  So we're not trying to impress the attorneys general, or          02:06

11  NCMEC, or anybody else.  This is an internal document, isn't          02:07

12  it?          02:07

13  A.  Yes.          02:07

14  Q.  All right.  And then the next part says, the following          02:07

15  services and terms are examples of terms that have been deemed          02:07

16  to be acceptable in the past in the adult section of Backpage,          02:07

17  and this list may be amended from time to time, and so on and          02:07

18  so forth.  And there is a list of terms, correct?          02:07

19  A.  Yes.          02:07

20          MR. EISENBERG:  Okay.  Let's go to Exhibit 58.          02:07

21          And I believe this is in evidence, Your Honor.          02:07

22          May it be published?          02:07

23          It is in evidence, yes.          02:07

24  BY MR. EISENBERG:          02:07

25  Q.  All right.  So here, Mr. Hyer, this is another e-mail from          02:07

1   Mr. Padilla, and it's -- it's to a lot of people, but then          02:07

2   you're cc'd and so is Mr. Ferrer; is that correct?                  02:07

3   A.  Yes.                                                            02:08

4   Q.  And would you agree with me that it was sent on Sunday at       02:08

5   12:11 a.m., on October 17, 2010?                                    02:08

6   A.  Yes.                                                            02:08

7   Q.  All right.  Now, there are lots of names in here, I haven't     02:08

8   counted them, but the point is do you recognize these people to     02:08

9   be moderators?                                                      02:08

10  A.  Yes.                                                            02:08

11  Q.  And then he -- he refers to a presentation by Gtalk.            02:08

12          Do you know what Gtalk is?                                  02:08

13  A.  Yes.                                                            02:08

14  Q.  What is it, sir?                                                02:08

15  A.  It's a way with which two computer users could communicate      02:08

16  in a chat.  It was a Google product, and it would be much like      02:08

17  SMSs that we used today where you send somebody a text, but it      02:08

18  would be on your computer and be instant.                          02:08

19  Q.  So is it fair to say that what he's saying here is that         02:09

20  there are things that were presented to the moderators by this      02:09

21  Gtalk system?                                                       02:09

22  A.  Yes.                                                            02:09

23  Q.  It's kind of like maybe Zoom or something like that?           02:09

24  A.  It's like e-mail but it pops up on your screen, so you see      02:09

25  it the second you get it.                                           02:09

1   Q.  Okay.  And then he says, for the slides that say fail, you        02:09

2   shouldn't actually use the fail button in the queue.  Whether        02:09

3   in the queue or in manual review, images that fit the fail           02:09

4   criteria should be removed from the ads.                             02:09

5         At the risk of saying the obvious, that -- based upon          02:09

6   that training that was in the slides that say fail, that stuff       02:09

7   comes out of the ad?                                                 02:09

8   A.  Yes.                                                             02:09

9   Q.  Okay.  And then he says, for images described as graphic         02:09

10  sex acts, the entire ad should be removed, right?                    02:10

11  A.  Yes.                                                             02:10

12  Q.  Now, how is that different than taking something and             02:10

13  removing it from the ad?                                             02:10

14        Well, let me -- let me --                                      02:10

15        Go ahead.                                                      02:10

16  A.  Well, it would -- it requires a manual action.                   02:10

17  Q.  And the ad goes off?                                             02:10

18  A.  In which a human being is looking at it and determining         02:10

19  that the image needs to be removed, or the ad itself needs to        02:10

20  be removed.                                                          02:10

21  Q.  Okay.  This talks about the language in ads that's really        02:10

22  killing us with the attorneys general, correct?                      02:10

23  A.  Yes.                                                             02:10

24  Q.  And then he's saying, I'm attaching this -- down at the          02:10

25  bottom -- I'm attaching a list of terms that are either banned       02:10

1   or stripped out automatically by filters.                    02:10

2          You should be looking for the misspellings that the   02:10

3   filters and bans are missing.                                02:10

4          So, I read that correctly, I believe, correct?        02:10

5   A.  Yes.                                                     02:10

6   Q.  All right.  So what he's doing is he's saying that, look, 02:10

7   there is going to be misspellings.  We've seen this before -- 02:10

8   I'm sorry.  There are going to be misspellings, take them out. 02:11

9   A.  Yes.                                                     02:11

10  Q.  And that's going to have to be done manually?           02:11

11  A.  Yes.                                                     02:11

12  Q.  If you go to 58b, there is a sheet of --                02:11

13         MR. EISENBERG:  And believe this is also in evidence. 02:11

14  It can be posted.                                            02:11

15  BY MR. EISENBERG:                                            02:11

16  Q.  Okay.  These are the -- can't really see that but these are 02:11

17  the terms?                                                   02:11

18  A.  Yes.                                                     02:11

19         MR. EISENBERG:  Let's go to Exhibit 201.             02:11

20  BY MR. EISENBERG:                                            02:11

21  Q.  So here, sir, this is from Mr. Ferrer, and you're courtesy 02:11

22  copied -- I'm sorry, to you and Mr. Padilla, right?        02:11

23  A.  Yes.                                                     02:11

24  Q.  Now we're in October of 2010, correct?                 02:11

25  A.  Yes.                                                     02:11

1    Q.  And even -- well, and this is at 4:30 in the morning,          02:12

2    right?          02:12

3    A.  Yes.          02:12

4    Q.  Now, so what he's saying is we need to have the guidelines          02:12

5    on the queue to help in training.  Okay.  Let me stop there.          02:12

6          Do you recall what training Mr. Ferrer is referring          02:12

7    to?          02:12

8    A.  Yes.  There were training to adhere to our ever-changing          02:12

9    standards was constant.          02:12

10   Q.  In other words, training -- training sessions would go on,          02:12

11   and on, and on, very repetitive?          02:12

12   A.  Yes.          02:12

13   Q.  Okay.  So it's the standard change, you had to do the          02:12

14   training, right?          02:12

15   A.  Yes.          02:12

16   Q.  Because you need to educate the moderators in what they          02:12

17   should be following, correct?          02:12

18   A.  Yes.          02:12

19   Q.  And they were taking direction from, in this case -- well,          02:12

20   whatever the training said, they were supposed to follow it,          02:12

21   correct?          02:12

22   A.  Yes.          02:12

23   Q.  And that would include Mr. Padilla?          02:12

24   A.  Yes.          02:13

25   Q.  All right.  And so where it says, under adult jobs not          02:13

1    allowed.  No escort type price menus.  We are keeping out          02:13

2    escorts.                                                            02:13

3             Okay.  Next part.  No sex act for money, right?           02:13

4    That's been a constant throughout all moderation, isn't it?        02:13

5    A.  Yes.                                                            02:13

6    Q.  You see that phrase, it comes out, right?                      02:13

7    A.  Yes.                                                            02:13

8    Q.  A user cannot say, I'll pay $50 for oral sex.  That's an       02:13

9    example of what has to come out?                                   02:13

10   A.  Yes.                                                            02:13

11   Q.  Okay.  Then there is stuff that is allowed.  And then it       02:13

12   goes down to -- let's go down to Number 3.  You see down there     02:13

13   at the bottom, not allowed?                                        02:13

14   A.  Yes.                                                            02:13

15   Q.  And it says no pics of, so forth, whatever, all these          02:13

16   terms, penis, labia, whatever.  That comes out.  That can't go     02:13

17   in -- well, it's not allowed, right?                               02:13

18   A.  Yes.                                                            02:14

19   Q.  Or simulated sex act, right?                                   02:14

20   A.  Yes.                                                            02:14

21   Q.  Okay.                                                          02:14

22             MR. EISENBERG:  Let's go to 62.  And this is in          02:14

23   evidence too, I believe.                                           02:14

24   BY MR. EISENBERG:                                                  02:14

25   Q.  Sir, you're going to have to help me out on these e-mails      02:14

```
 1   that seem to be in series.                                    02:14

 2          If you go to the second page where it starts, from     02:14

 3   Carl Ferrer to you and to Mr. Padilla.                        02:14

 4          Do you see that?                                       02:14

 5   A.  Yes.                                                      02:14

 6   Q.  Okay.  And do I have this correctly, what follows all the 02:14

 7   way down to the bottom is the content of this e-mail, correct? 02:14

 8   A.  Yes.                                                      02:14

 9   Q.  Okay.  And here's what he's saying.  Now, would you agree 02:14

10   with me this is -- strike that.                               02:14

11          What he's saying is we will not remove ads with        02:15

12   vaginas or penis showing, just the images, correct?           02:15

13   A.  Yes.                                                      02:15

14   Q.  So that means the ad less the image can go forward, but not 02:15

15   with the image in it?                                         02:15

16   A.  Yes.                                                      02:15

17   Q.  Okay.  Now, he says there, unless they are -- they -- they 02:15

18   are a frequent offender.                                      02:15

19          What's a frequent offender?                            02:15

20   A.  Somebody that violated our terms of use over, and over    02:15

21   again.                                                        02:15

22   Q.  So that person, what happens in that case?  Are they      02:15

23   totally banned?                                               02:15

24   A.  The way I read this is that the ad would be removed because 02:15

25   they kept posting the repeating image, the offending image, the 02:15
```

 1   violating image over, and over again.  So rather than remove   02:15

 2   the image, they would remove the ad.                           02:15

 3   Q.  Okay.  If you go down just above where it says any         02:15

 4   questions, just above it, do not post obscene images.  That is 02:16

 5   uncovered genitalia.                                           02:16

 6        Did I read that correctly?                                02:16

 7   A.  Yes.                                                       02:16

 8   Q.  That seems to be a repeat of what's just above.  You can't 02:16

 9   have this kind of image in an ad, right?                       02:16

10   A.  Yes.                                                       02:16

11   Q.  And then, do not post content which advertises an illegal  02:16

12   service, correct?                                              02:16

13   A.  Yes.                                                       02:16

14   Q.  Now, sir, this is an internal e-mail, right?               02:16

15   A.  Yes.                                                       02:16

16   Q.  And we're not showing -- we're not sending this e-mail out 02:16

17   to third parties.  This is within the context of people who    02:16

18   work at Backpage?                                              02:16

19   A.  Yes.                                                       02:16

20   Q.  Okay.  And down at the bottom he says, the hard part of    02:16

21   this job is the rules keep changing; is that right?            02:16

22   A.  Yes.                                                       02:16

23   Q.  I think you would agree with him, wouldn't you?            02:16

24   A.  Yes.                                                       02:16

25   Q.  So there is another -- there is an e-mail that follows on. 02:16

1  So if you go to the bottom of the first page, if I have this    02:17

2  right, it says, from Andrew Padilla, and it's October 26th.    02:17

3  Would you agree this is in response to what Mr. Ferrer has    02:17

4  posted?    02:17

5  A.  Yes.    02:17

6  Q.  And this is at 10:21 in the evening, right?    02:17

7  A.  Yes.    02:17

8  Q.  Okay.  And then he says -- if you flip it back over -- it    02:17

9  says, do not post obscene images, that is uncovered genitalia,    02:17

10 sex acts, erect penises, et cetera.  And then he asks a    02:17

11 question:  This means no nudity below the waist, right?    02:17

12 A.  Yes.    02:17

13 Q.  Okay.  I think we can just go up to the -- to the top where    02:17

14 it says, Andrew Padilla on October the 27th.  It's right    02:18

15 underneath the term cool.    02:18

16         Do you see that?    02:18

17 A.  Yes.    02:18

18 Q.  Okay.  And then he says, I told Monita she could start    02:18

19 enforcing the rules listed in the queues and my crew is going    02:18

20 to do the same.    02:18

21         Monita is Monita Mohan?    02:18

22 A.  Yes.    02:18

23 Q.  She's with El Camino?    02:18

24 A.  Yes.    02:18

25 Q.  And it's been referred to earlier, those are the moderators    02:18

1    that are in India, correct?                                    02:18

2    A.  Yes.                                                       02:18

3    Q.  Okay.  And then he says, as far as the ban on under an hour  02:18

4    and bare butts, I might start as earlier -- as early as after  02:18

5    lunch; is that correct?                                        02:18

6    A.  Yes.                                                       02:18

7         MR. EISENBERG:  All right.  Let's go to 73.  This is      02:18

8    also in evidence.                                              02:18

9    BY MR. EISENBERG:

10   Q.  And this one is an e-mail from Mr. Ferrer to you and       02:19

11   Mr. Padilla; is that right?                                    02:19

12   A.  Yes.                                                       02:19

13   Q.  Now, this is November 17 at 7:05 in the morning in 2010?   02:19

14   A.  Yes.                                                       02:19

15   Q.  Okay.  You may have answered this question previously, but  02:19

16   you see it says, the consensus is we took a big step in the    02:19

17   right direction.                                               02:19

18         Who is involved with the consensus, do you remember?     02:19

19   A.  I knew that to be people above Carl, so executives, you    02:19

20   know.                                                          02:19

21   Q.  Okay.                                                      02:19

22   A.  Principals.                                                02:19

23   Q.  Okay.  And, sir, did you agree that there was a big step in  02:19

24   the right direction?                                          02:19

25   A.  Yes.                                                       02:19

| | | |
|---|---|---|
| 1 | Q.  Okay.  And then down below it's items I agreed to | 02:19 |
| 2 | implement.  More banned terms, right? | 02:19 |
| 3 | A.  Yes. | 02:20 |
| 4 | Q.  Number 2 says, remove pregnant ads, right? | 02:20 |
| 5 | A.  Yes. | 02:20 |
| 6 | Q.  Number 3 has pricing about bad policy to have 30 minutes in | 02:20 |
| 7 | escorts, right? | 02:20 |
| 8 | A.  Yes. | 02:20 |
| 9 | Q.  Number 7 is move to 500 characters max.  That refers to the | 02:20 |
| 10 | ad can't any have anymore than, is it 500 letters, characters? | 02:20 |
| 11 | A.  Yeah, 500 characters, numbers, those, you know, pound sign. | 02:20 |
| 12 | Q.  Right.  The idea there was to try to eliminate as much as | 02:20 |
| 13 | possible obscenities, or things that are graphic, et cetera, | 02:20 |
| 14 | that kind of thing? | 02:20 |
| 15 | A.  I think the idea there was to try to give the moderators | 02:20 |
| 16 | less stuff that they had to moderate in an ad. | 02:20 |
| 17 | Q.  All right.  Exhibit 90 -- | 02:20 |
| 18 | MR. EISENBERG:  And I'm not sure this is admitted into | 02:20 |
| 19 | evidence.  I don't think it is. | 02:20 |
| 20 | THE COURT:  It is not. | 02:21 |
| 21 | MR. EISENBERG:  It is not? | 02:21 |
| 22 | THE COURT:  No, it is not. | 02:21 |
| 23 | MR. EISENBERG:  Thank you. | 02:21 |
| 24 | BY MR. EISENBERG: | 02:21 |
| 25 | Q.  Sir, just for your eyes only.  Could you look at this | 02:21 |

1    exhibit and tell us, is it from you?                          02:21

2    A.  It's an e-mail that I am responding to.                   02:21

3    Q.  Okay.                                                     02:21

4    A.  Because it says subject re, colon, and it's responding -- 02:21

5    I'm responding and I'm responding to Andrew and Carl Ferrer.  02:21

6    Q.  Okay.  And it has to do with something that involves a    02:21

7    meeting; is that right?                                       02:21

8    A.  Yes.                                                      02:21

9    Q.  Would you agree that's a meeting that has to do with      02:21

10   persons who are involved with moderation?                     02:21

11   A.  Yes.                                                      02:21

12   Q.  Okay.                                                     02:21

13        MR. EISENBERG:  I'd move the admission of Exhibit 90,    02:21

14   Your Honor.                                                   02:21

15        MR. STONE:  No objection.                                02:21

16        THE COURT:  Exhibit 90 may be admitted.  It may be       02:21

17   published.                                                    02:21

18        (Exhibit No. 90 was admitted.)                           02:21

19   BY MR. EISENBERG:                                             02:21

20   Q.  So in order to kind of cut to the chase on this.  If you  02:21

21   look down on this first page on January 14, 2011, at          02:21

22   12:02 p.m., Mr. Padilla writes, it looks good to me.  And he  02:22

23   says, I want to get the moderators started on the new image   02:22

24   policy as soon as possible, and so forth.                     02:22

25        Is he referring to what's underneath?  It looks to me    02:22

| | | |
|---|---|---|
| 1 | as though there are things that Mr. Ferrer has written with | 02:22 |
| 2 | respect to a new policy. | 02:22 |
| 3 | A.  Yes. | 02:22 |
| 4 | Q.  Okay.  And it's all listed on the second page, correct? | 02:22 |
| 5 | A.  Yeah, there is -- it looks like a couple on the first page, | 02:22 |
| 6 | 1 and 2, and then everything else is on the second page. | 02:22 |
| 7 | Q.  Right.  And not to belabor it, let's just go down to Number | 02:22 |
| 8 | 8 on the second page.  That talks about image standard changes. | 02:22 |
| 9 | More changing coming up, right? | 02:22 |
| 10 | A.  Yes. | 02:22 |
| 11 | Q.  And he talks about, we need to update moderation guidelines | 02:22 |
| 12 | and posting rules, right? | 02:23 |
| 13 | A.  Yes. | 02:23 |
| 14 | Q.  And he talks about things that you -- no for whatever it is | 02:23 |
| 15 | that's listed there, correct? | 02:23 |
| 16 | A.  Yes. | 02:23 |
| 17 | Q.  Those things cannot be put into an image; is that right? | 02:23 |
| 18 | A.  Yes. | 02:23 |
| 19 | MR. EISENBERG:  Let's go to 643.  And this one is in | 02:23 |
| 20 | evidence. | 02:23 |
| 21 | BY MR. EISENBERG: | 02:23 |
| 22 | Q.  And the only question I have for you, sir, is if you go to | 02:23 |
| 23 | page 4, you look down at the bottom -- yeah, look down at the | 02:23 |
| 24 | bottom.  It starts with, we have a script ready to go. | 02:23 |
| 25 | Do you see where I'm referring? | 02:23 |

```
1   A.  Yes.                                                    02:24
2   Q.  Okay.  The way -- does this come from Mr. Padilla?      02:24
3   A.  The, we have a script ready to go, comes from DesertNet. 02:24
4   Q.  Okay.  And is it going to Mr. Padilla?  It looks like it 02:24
5   is?                                                         02:24
6   A.  It's a forum, Mantis was a forum, so anybody who was -- I 02:24
7   think in this they're responding to Andrew.                 02:24
8   Q.  All right.  And he's saying -- or it's saying, our approach 02:24
9   is going to be a full scrub of every filtered term that should 02:24
10  be removed over every ad in these specific categories.      02:24
11          Did I read that right?                              02:24
12  A.  Yes.                                                    02:24
13  Q.  Okay.  And if you go back to page 3 and 2, those two pages 02:24
14  have a list of words, correct?                              02:25
15  A.  Yes.                                                    02:25
16  Q.  And then if you go to page 1, again, to try to get to the 02:25
17  bottom of this, what's being referred to here under deep clean, 02:25
18  it's about a third of the way down the page, deep clean      02:25
19  stripped out terms.                                         02:25
20          Did I read that right?                              02:25
21  A.  Yes.                                                    02:25
22  Q.  What does deep clean mean in this context?              02:25
23  A.  The way that I would interpret that in this context would 02:25
24  be thorough or complete.                                    02:25
25  Q.  And this refers to ads that were from every old ad in the 02:25
```

```
 1   database, right?                                              02:25

 2   A.  Yes.                                                      02:25

 3   Q.  That would be a Herculean task, I should think, wouldn't  02:25

 4   it?                                                           02:25

 5   A.  Yeah.  That's a good way to put it.                       02:25

 6          MR. EISENBERG:  Okay.  And let's go to 93.  This is in 02:25

 7   evidence.                                                     02:25

 8   BY MR. EISENBERG:

 9   Q.  And this is also a series of e-mails.  So if we go to     02:26

10   page 3 -- first of all -- well, we go to page 3.  This is from 02:26

11   Mr. Ferrer.  It has to do with the monicker, Licks Alot, right? 02:26

12   A.  Yes.                                                      02:26

13   Q.  And she's complaining here -- or whoever that person is is 02:26

14   complaining, I guess.  Is that a good way to put it?          02:26

15   A.  Yes.                                                      02:26

16   Q.  She says, hi there, Carl.  I'm Samantha and I'm an issue, 02:26

17   and I'm wondering, can you help me, please, help me solve it. 02:26

18   I have an ad under your escort section, and whenever I repost  02:26

19   it, someone from Backpage is always removing my butt pic, and, 02:26

20   truthfully, there is absolutely nothing wrong with it, right?  02:26

21   A.  Yes.                                                      02:26

22   Q.  Okay.  Then Mr. Ferrer says -- well, let me back up.      02:26

23          I guess what she's saying is she's trying to post      02:26

24   something and it keeps getting removed?                       02:27

25   A.  Yes.                                                      02:27
```

```
 1   Q.  And, apparently, it keeps getting removed because the      02:27
 2   picture?                                                        02:27
 3   A.  I think the picture keeps getting removed.                  02:27
 4   Q.  Okay.  Sorry.                                               02:27
 5           And then it's -- from Mr. Ferrer, it says, send me the  02:27
 6   pic, right?                                                     02:27
 7   A.  Yes.                                                        02:27
 8   Q.  Then, again, there is another e-mail from Mr. Ferrer.  This 02:27
 9   one is at 11:29 p.m. on February the 3rd, so I think it's the   02:27
10   same day, but it looks to me like, again, this is in response   02:27
11   to Licks Alot, right?                                           02:27
12   A.  Yes.                                                        02:27
13   Q.  And then what he's saying is the moderators are human,      02:27
14   correct?                                                        02:27
15   A.  Yes.                                                        02:27
16   Q.  And they are, aren't they?                                  02:27
17   A.  Yes.                                                        02:27
18   Q.  And they make mistakes all the time?                        02:27
19   A.  I don't know about all the time, but they do make mistakes. 02:27
20   Q.  Okay.  And that's because the standards are changing,       02:27
21   right?                                                          02:28
22   A.  Yes.                                                        02:28
23   Q.  And sometimes it's hard to implement standards with         02:28
24   respect, particularly, to pictures, right?                      02:28
25   A.  Yes.                                                        02:28
```

```
 1   Q.  They make mistakes, he says.  Our crazy internet safety    02:28
 2   experts -- let me stop there.                                  02:28
 3              Do you know who he's referring to there?            02:28
 4   A.  Yes.  I think the way that -- what we did is we used       02:28
 5   internet safety experts as a way to explain to try to help    02:28
 6   understand -- help our users understand all these changes.  So 02:28
 7   were there people whose titles were internet safety experts,   02:28
 8   no, not to my knowledge.                                       02:28
 9   Q.  Was one of the internet safety people SSRP Blue?           02:28
10   A.  That's a fair statement.                                   02:28
11   Q.  Okay.  And then he says, do not want any genitalia showing 02:28
12   up around the thong, right?                                    02:28
13   A.  Yes.                                                       02:29
14   Q.  Okay.  Then he says, my guess is the moderators are        02:29
15   catching that, right?                                          02:29
16   A.  Yes.                                                       02:29
17   Q.  And that seems to be consistent with what Licks Alot --    02:29
18   Licks Alot has sent to -- in a previous e-mail, right?         02:29
19   A.  Yes.                                                       02:29
20   Q.  Okay.  Then the next -- go to page 1.  Again, to try to get 02:29
21   to the bottom here.                                            02:29
22              This is from Licks Alot and it's to Mr. Ferrer?     02:29
23   A.  Yes.                                                       02:29
24   Q.  Down at the bottom.  Okay.  And she says, Mr. Ferrer and   02:29
25   Ms. Audrey and entire Backpage staff -- do you know who Audrey 02:29
```

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG          88

1   is?                                                          02:29

2   A.  No.                                                      02:29

3   Q.  Okay.  Can someone please explain to me exactly what is  02:29

4   wrong with your moderator staff?  I posted an ad under Fort  02:29

5   Worth escorts with four pics at 6:58, face pic, a body pic, and  02:30

6   two backside pics.  I just checked it and your staff has     02:30

7   removed all four pics.                                       02:30

8          Did I read that correctly?                            02:30

9   A.  Yes.                                                     02:30

10  Q.  Now, then there is something that goes to you, if I'm    02:30

11  reading this correctly, also on February the 9th.  And is it 02:30

12  from Mr. Ferrer, hey, Dan?                                   02:30

13  A.  Yes.                                                     02:30

14  Q.  It says, tomorrow a.m. check and see who moderated this ad; 02:30

15  is that correct?                                             02:30

16  A.  Yes.                                                     02:30

17  Q.  You can have someone call here from your department to calm 02:30

18  her down.                                                    02:30

19          Who is he referring to?  Is that Licks Alot?         02:30

20  A.  Yes.                                                     02:30

21  Q.  Okay.  And this is getting sent on to Monita and Andrew  02:30

22  Padilla?                                                     02:30

23  A.  Yes.                                                     02:30

24  Q.  And, finally, back at the top, looks like this is something 02:30

25  from you.  We probably would remove the second photo, her new 02:31

UNITED STATES DISTRICT COURT

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG                89

 1    ad attached.  We'll reach out to her this morning.                02:31
 2            This is from you; is that correct?                         02:31
 3    A.  Yes.                                                           02:31
 4    Q.  Then the last part here is, FYI, we get hundreds of e-mails    02:31
 5    and calls like this every week, correct?                          02:31
 6    A.  Yes.                                                           02:31
 7    Q.  That's people complaining about the fact that something in     02:31
 8    their ad, if not the entire ad itself, has been removed?          02:31
 9    A.  Yes.                                                           02:31
10            MR. EISENBERG:  Let's go to 146.                           02:31
11    BY MR. EISENBERG:                                                  02:31
12    Q.  So, again, to try to get the -- follow this.                   02:31
13            I think this one starts with Mr. Ferrer on the second     02:31
14    page and saying the ad was edited unnecessarily yesterday; is      02:31
15    that correct?                                                      02:32
16    A.  Yes.                                                           02:32
17    Q.  Okay.  And we fixed it.  Less than 12 hours later, it got      02:32
18    edited again.  Meaning something -- edited means what?            02:32
19    A.  Changed.                                                       02:32
20    Q.  And probably not to the liking of the person who posted it?    02:32
21    A.  Correct.                                                       02:32
22    Q.  And it says, by the safe staff member, correct?               02:32
23    A.  Yes.                                                           02:32
24    Q.  That AT19, that refers to somebody on Ms. Mohan's staff;       02:32
25    isn't that right?                                                  02:32

1    A.  Yes.                                                          02:32

2          MR. EISENBERG:  Okay.  So let's go to 1830.               02:32

3    BY MR. EISENBERG:                                                02:32

4    Q.  And on this one, this is from Dan at Backpage?              02:32

5    A.  Yes.                                                          02:32

6    Q.  Okay.  Is that you?  You're Dan --                          02:32

7    A.  Yes, sir.                                                     02:32

8    Q.  -- in this ad?  Okay.                                       02:32

9          This is in May of 2012.  And it talks about this one     02:33

10   had 160 hits, all for massage parlors and so forth, big shower  02:33

11   cleansing, et cetera.  I took it off the line for now and       02:33

12   having a user try it again.  May need to delete it altogether,  02:33

13   meaning just get rid of it; is that correct?                    02:33

14   A.  To remove that filter altogether, yes.                      02:33

15   Q.  And then the last part here up at the top, this is from     02:33

16   Mr. Padilla, May 11 at 11:00 o'clock in the evening?            02:33

17   A.  Yes.                                                          02:33

18   Q.  And it's to you -- I'm sorry, to Mr. Ferrer.  Sorry.        02:33

19   A.  Yes.                                                          02:33

20   Q.  Okay.  And what he's saying here is everything with a "b"   02:33

21   in the E column is banned and now contains a forbidden text     02:33

22   error, correct?                                                  02:33

23   A.  Yes.                                                          02:33

24   Q.  So, and I think you pointed this out, there are exhibits -- 02:33

25   sorry, not -- attachments to this exhibit that have a whole     02:33

```
 1   list of page of -- of banned terms, and at least the one I'm     02:34
 2   looking at has 24 pages of those terms.  That's -- I'm sorry,    02:34
 3   that's 1830a.                                                    02:34
 4         MR. EISENBERG:  Actually, let's do it this way.  May       02:34
 5   the witness be shown 1830b.  Might be easier.                    02:34
 6         And this is also in evidence.                              02:34
 7   BY MR. EISENBERG:
 8   Q.  Sir, I think you talked about this earlier on direct.        02:34
 9         Do you remember this?                                      02:34
10   A.  Yes.                                                         02:34
11   Q.  These are the banned terms, correct?                         02:34
12   A.  Yes.                                                         02:34
13   Q.  If you go to the last page of this exhibit, it will tell     02:34
14   us, I believe, because of the number, just exactly how many     02:35
15   terms this includes.                                            02:35
16         And if you go to page -- well, this one isn't              02:35
17   numbered.  But if you finally get to the last page, and it ends  02:35
18   with youthful, the word youthful, 606 terms, right?             02:35
19   A.  Yes.                                                         02:35
20   Q.  Okay.  So sufficed to say, there has been a lot of work      02:35
21   that's gone into this in terms of trying to moderate Backpage    02:35
22   throughout the period of time that moderation was part of what   02:35
23   Backpage did?                                                    02:35
24   A.  Yes.                                                         02:35
25   Q.  Okay.                                                        02:35
```

1     MR. EISENBERG:  Your Honor, may I have a second?          02:35

2     THE COURT:  Yes.          02:35

3     MR. EISENBERG:  Excuse me.          02:35

4     That's all I have, Your Honor.  Thank you.          02:36

5     THE COURT:  All right.  Thank you, Mr. Eisenberg.          02:36

6     Mr. Cambria.          02:36

7     MS. BERTRAND:  May I go next, Your Honor?          02:36

8     THE COURT:  Yes.          02:36

9     MS. BERTRAND:  Good afternoon.          02:36

10    May I proceed?          02:36

11    THE COURT:  Yes, please.          02:36

12    MS. BERTRAND:  Thank you.          02:36

13                 CROSS-EXAMINATION

14    BY MS. BERTRAND:

15    Q.  Good afternoon, Mr. Hyer.          02:36

16    A.  Good afternoon.          02:36

17    Q.  My name is Joy Bertrand and I represent Joye Vaught.          02:36

18    A.  Hi, Joy.          02:36

19    Q.  Makes it easy, right?          02:36

20        So you were part of the decision making regarding the          02:36

21    hiring of a whole batch of moderators in late 2009, 2010?          02:36

22    A.  I'm sorry, I didn't understand what -- did you ask me was I          02:36

23    part of the decision?          02:36

24    Q.  Yes.          02:36

25    A.  No.          02:36

```
1   Q.  But you're aware that a large number of moderators were      02:36
2   hired by Backpage?                                               02:37
3   A.  Yes.                                                         02:37
4   Q.  And that was to deal with what was coming from Craigslist,   02:37
5   right?                                                           02:37
6   A.  Yes.                                                         02:37
7   Q.  And Craigslist allowed, I think the word we've used is       02:37
8   raunchier content than Backpage was willing to allow.  Is that   02:37
9   fair?                                                            02:37
10             MR. STONE:  Object to foundation.                     02:37
11             THE COURT:  Sustained.                                02:37
12             THE WITNESS:  Yes.                                    02:37
13             THE COURT:  I sustained the objection, so don't       02:37
14  answer.                                                          02:37
15             It's okay.                                            02:37
16             MS. BERTRAND:  It's okay.  You're fine.  It's late.   02:37
17             THE WITNESS:  Yeah, sorry.                            02:37
18             THE COURT:  Ask a new question.                       02:37
19  BY MS. BERTRAND:                                                 02:37
20  Q.  Have you compared the content that was on Craigslist to      02:37
21  what was allowed on Backpage?                                    02:37
22  A.  Yes.                                                         02:37
23  Q.  And, in your opinion, was the content on Craigslist          02:37
24  raunchier than what was on -- allowed on Backpage?               02:37
25  A.  I would call it the same.                                    02:37
```

1   Q.  Well, Backpage had a different standard of -- the Playboy    02:38

2   standard, right?                                                 02:38

3   A.  Eventually.                                                  02:38

4   Q.  And one of the concerns was, as customers are moving from    02:38

5   Craigslist to Backpage, that Backpage didn't want to alienate    02:38

6   these incoming Craigslist customers.  Fair?                      02:38

7   A.  Yes.                                                         02:38

8   Q.  And moderation was set up, in large part, to moderate these  02:38

9   -- this onslaught of new ads coming in, correct?                 02:38

10  A.  Yes.                                                         02:38

11  Q.  Is it your understanding that moderation at Backpage was a   02:38

12  separate division from marketing at Backpage?                    02:38

13  A.  Yes.                                                         02:38

14  Q.  I noted in one of the e-mails there seems to be an all       02:39

15  hands on deck e-mail at one point where the marketing people     02:39

16  are going to come over and help with moderation, though, right?  02:39

17  A.  Yes.                                                         02:39

18  Q.  But that was just temporary until you could get the other    02:39

19  moderators up and running, right?                                02:39

20  A.  Yes.                                                         02:39

21  Q.  And then the marketing people, once the new moderation       02:39

22  staff came in, the marketing people went back to marketing.      02:39

23  Fair?                                                            02:39

24  A.  Yes.                                                         02:39

25  Q.  Are you familiar with how moderators at Backpage were        02:39

| | | |
|---|---|---|
| 1 | trained? | 02:39 |
| 2 | A.  In a general sense. | 02:39 |
| 3 | Q.  Okay.  Then, if you don't know, I'll ask the questions, and | 02:39 |
| 4 | if you don't know, just say you don't know.  Okay? | 02:39 |
| 5 | A.  Okay. | 02:39 |
| 6 | Q.  Do you know whether or not moderators were trained as part | 02:39 |
| 7 | of their jobs to click on links within the ads? | 02:39 |
| 8 | A.  Boy, there is a lot to unpack in that, because there could | 02:40 |
| 9 | be a lot of links in ads.  There could be links to other ads | 02:40 |
| 10 | from this user.  There could be links that go to offsite sites | 02:40 |
| 11 | and internet savvy.  At this time, you wouldn't just click any | 02:40 |
| 12 | link, because you might go to a virus site or something crazy. | 02:40 |
| 13 | Q.  Right.  So is it fair to say that if moderators were | 02:40 |
| 14 | required to also click on the links within these sites, they | 02:40 |
| 15 | would have, A, spent a lot of time doing just the links, right? | 02:40 |
| 16 | A.  Yes. | 02:40 |
| 17 | Q.  And they could have gone down all kinds of rabbit holes, | 02:40 |
| 18 | right? | 02:40 |
| 19 | A.  Yes. | 02:40 |
| 20 | Q.  Do you know whether or not moderators were trained to give | 02:40 |
| 21 | preference to super posters? | 02:40 |
| 22 | A.  I would say I know that they were trained not to give | 02:41 |
| 23 | preference to anybody. | 02:41 |
| 24 | Q.  Everybody got the same review by a moderator? | 02:41 |
| 25 | A.  Yes. | 02:41 |

DANIEL HYER - CROSS-EXAMINATION BY MS. BERTRAND        96

```
 1   Q.  Whether you were Bill Mersey or some escort in Boise,      02:41
 2   Idaho, everyone went through the same moderation practice,     02:41
 3   right?                                                         02:41
 4   A.  Yes.                                                       02:41
 5   Q.  And moderators were not trained to give preference to      02:41
 6   affiliate ads, right?                                          02:41
 7   A.  Can you clarify what you mean by affiliate ads?            02:41
 8   Q.  So I understood your testimony to be that there were kind  02:41
 9   of like the basic -- you get a basic escort ad, or you could   02:41
10   get a fancier one, and it would be in the margin on the side   02:41
11   and have more, I don't know, exposure -- it's kind of a --     02:41
12   probably the worst word to use in a case like this -- but      02:42
13   exposure to the reader, right?                                 02:42
14   A.  Yeah.  That would be called a sponsored ad.                02:42
15   Q.  Okay.  Thank you for that clarification.                   02:42
16          Were the moderators trained to give sponsored ads       02:42
17   special preference?                                            02:42
18   A.  No.                                                        02:42
19   Q.  So sponsored ads, even if they were more expensive, had to 02:42
20   go through the same moderation practice, right?                02:42
21   A.  Yes.                                                       02:42
22   Q.  Do you know whether or not moderators had a financial      02:42
23   incentive to allow an ad to get through?                       02:42
24   A.  I would say I know that they did not receive a financial   02:42
25   incentive to let an ad go through.                             02:42
```

UNITED STATES DISTRICT COURT

DANIEL HYER - CROSS-EXAMINATION BY MS. BERTRAND                97

| | | |
|---|---|---|
| 1 | Q.  They were just hourly workers, right? | 02:42 |
| 2 | A.  Yes. | 02:42 |
| 3 | Q.  And they weren't paid on how many ads posted that they | 02:42 |
| 4 | reviewed, right? | 02:42 |
| 5 | A.  No, I don't think so. | 02:42 |
| 6 | Q.  There were no quotas? | 02:42 |
| 7 | A.  I don't remember or know of any quotas that they were | 02:43 |
| 8 | given. | 02:43 |
| 9 | Q.  You mentioned -- | 02:43 |
| 10 | MS. BERTRAND:  And if we could please, Ms. Ellig, | 02:43 |
| 11 | bring up Exhibit 201. | 02:43 |
| 12 | I believe this has been admitted into evidence.  I | 02:43 |
| 13 | believe it was. | 02:43 |
| 14 | May we publish to the jury?  Thank you. | 02:43 |
| 15 | BY MS. BERTRAND: | |
| 16 | Q.  I believe it was in talking with Mr. Stone that you | 02:43 |
| 17 | mentioned that there were some optics concerns in the context | 02:43 |
| 18 | of this e-mail.  What -- what do you mean by optics concerns? | 02:43 |
| 19 | A.  Well, there is a lot related to the optics.  One of the | 02:43 |
| 20 | things was to disallow, which we did on -- in three months from | 02:43 |
| 21 | this e-mail, four months from this e-mail, disallow links going | 02:43 |
| 22 | to the Erotic Review.  We've talked a lot this afternoon about | 02:44 |
| 23 | making the content less overt.  So somebody going to the site | 02:44 |
| 24 | would see, using some of the defense terminology, of the | 02:44 |
| 25 | Playboy standard versus the Hustler standard. | 02:44 |

UNITED STATES DISTRICT COURT

DANIEL HYER - CROSS-EXAMINATION BY MS. BERTRAND          98

1    Q.  So optics, in your -- I just want to make sure we're          02:44
2    talking about the same thing.  Optics to you is the public       02:44
3    image of Backpage.  Fair?                                        02:44
4    A.  Yeah.                                                        02:44
5    Q.  And, with regard to the guidelines that are being discussed  02:44
6    in e-mails like this October 26, 2010, e-mail, those rules and   02:44
7    the trainings had input from people like Hemu Nigam, correct?    02:44
8    A.  Yes.                                                         02:45
9    Q.  And he was one of the people at SSRP Blue, right?            02:45
10   A.  Yes.                                                         02:45
11   Q.  He would have been one of those internet safety experts      02:45
12   that Carl Ferrer calls crazy in talking with Ms., I don't know,  02:45
13   I'll call her Ms. Alot, correct?                                 02:45
14   A.  Yes.                                                         02:45
15   Q.  And part of that training and this moderation, if you know,  02:45
16   was to ensure that Backpage was following the law, correct?      02:45
17            MR. STONE:  Objection.  Foundation.                     02:45
18            THE COURT:  Sustained.                                  02:45
19   BY MS. BERTRAND:                                                 02:45
20   Q.  Do you know if moderation was intended to ensure that        02:45
21   Backpage complied with the law?                                  02:45
22            MR. STONE:  Object to the form.                         02:45
23            THE COURT:  Sustained.                                  02:45
24   BY MS. BERTRAND:                                                 02:45
25   Q.  Were you present in any discussions, with people such as     02:45

1    Mr. Nigam, regarding moderation ensuring that Backpage did not      02:45

2    violate the law?                                                    02:46

3            MR. STONE:  Objection.  Compound and form.                  02:46

4            THE COURT:  Sustained.                                      02:46

5    BY MS. BERTRAND:                                                    02:46

6    Q.  Were you present at training where moderators were told        02:46

7    they had to be extremely careful with their work?                  02:46

8    A.  Yes.                                                            02:46

9    Q.  Do you know how much, on average, Backpage spent on            02:46

10   moderation in 2010?                                                 02:46

11   A.  I'd have to use my liberal arts math, say 40 K times 25.  I     02:46

12   don't know what that adds up to but --                             02:46

13   Q.  Okay.  About a million dollars?                                02:46

14   A.  I'd say that's a guesstimate.                                  02:46

15   Q.  Just paying moderators.  Fair?                                 02:47

16   A.  I'd say that's accurate.                                       02:47

17   Q.  And that was just the moderators here in the United States,    02:47

18   right?                                                             02:47

19   A.  Yes.                                                            02:47

20   Q.  And then what about when we added to that the moderators       02:47

21   offshore, do you know?                                             02:47

22   A.  They were a lot less than 40 K.  They were probably 12 K a     02:47

23   year, I think was the number, by --                               02:47

24   Q.  Per?                                                           02:47

25   A.  -- person.                                                     02:47

1   Q.  Okay.  Do you know how much you guys were paying?          02:47

2   A.  I don't remember how many from the El Camino team.  I don't          02:47

3   know how many members were on it.          02:47

4   Q.  So, but did the -- after 2010, did the number of moderators          02:47

5   ever go down?          02:47

6   A.  No.          02:47

7   Q.  Did the moderation budget ever go down after 2010?          02:47

8   A.  Not that I'm aware of, no.          02:47

9   Q.  In fact, it consistently increased, as far as you're aware?          02:47

10  A.  Yes.          02:48

11  Q.  By 2017, what would you estimate was the moderation budget          02:48

12  at Backpage?          02:48

13  A.  If I use marketing as a template, I'd say you could easily          02:48

14  put that number up around 100 of the -- at that time, we had          02:48

15  changed to the Filipino group known as Avion -- so call it 100          02:48

16  times 12,000, and then I would say at least, what, 50 people          02:48

17  in -- in -- that worked directly for Backpage involved with          02:48

18  moderation, maybe less than that, but certainly not less than          02:48

19  the million dollars we mentioned a minute ago.          02:48

20  Q.  Okay.  Let's back up.          02:48

21        For the -- for the Philippine offshore moderators in          02:48

22  2017, kind of the last full year, we have 100 -- 100 moderators          02:48

23  times 12,000 U.S., right?          02:49

24  A.  Yeah.  It's a guesstimate, but that's what I'd --          02:49

25  Q.  Okay.  I'm counting how many zeros that is.  That's five.          02:49

1           So just on the Philippine moderators, $1.2 million.    02:49

2  Fair?                                                           02:49

3  A.  That seems accurate.                                       02:49

4  Q.  And then what did you say for the U.S. based?              02:49

5  A.  It's tough to come up with that number, because while this 02:49

6  was a long ways before the pandemic, to give 24-hour          02:49

7  moderation, seven days a week, some staff worked from home,    02:49

8  some staff worked remotely.  So I think the number we used a   02:49

9  minute ago was 25 employees, so I'd think that's a reasonable, 02:49

10  conservative estimate.  And, with cost of living, they were   02:49

11  probably closer to, I don't know, 50 K instead of 40 K at that 02:50

12  time.                                                         02:50

13  Q.  So 25 people here in the United States times 50,000, that's 02:50

14  the U.S. based moderation crew?                               02:50

15  A.  Guesstimate.                                              02:50

16  Q.  Okay.  I have 25 times 50,000, 2.5 million.  Sound about  02:50

17  right?                                                        02:50

18  A.  Could be.                                                 02:50

19  Q.  So by 2017, per year, Backpage was spending $3.7 million a 02:50

20  year on moderation, correct?                                  02:50

21           MR. STONE:  Your Honor, I just -- I hate to do it, but 02:51

22  I want to object to the math.  I think Ms. Bertrand did the   02:51

23  math a little incorrect there.  I have it at 1.25 million.    02:51

24           THE COURT:  Well, as well, I heard the witness answer, 02:51

25  could be.                                                     02:51

```
 1              So rephrase your question.                          02:51

 2              MS. BERTRAND:  Okay.                                02:51

 3              THE COURT:  Recalculate it.  I didn't realize we would  02:51

 4    be taxed this afternoon with number crunching, but go ahead and  02:51

 5    you can rephrase or perhaps ask a clarifying question.       02:51

 6              MS. BERTRAND:  I have a math background so...       02:51

 7              THE COURT:  Well, you are very fortunate in that.  Let  02:51

 8    the rest of us catch up.                                     02:51

 9              MS. BERTRAND:  Let's go slow.  Okay.               02:51

10    BY MS. BERTRAND:                                             02:51

11    Q.  1.2 million to the Philippines, right?                   02:51

12    A.  Yes, approximately.                                      02:51

13    Q.  Then in the United States I have an additional 2.5 million,  02:51

14    that's 25 times 50,000?                                      02:51

15    A.  Yeah.                                                    02:51

16    Q.  Okay.  1.2 --                                            02:51

17              MR. STONE:  And, Your Honor, for the record, 25 times  02:52

18    50,000 is 1.25 million, just to be accurate.                02:52

19              MS. BERTRAND:  Oh, that's where the error is.  Thank  02:52

20    you.  Okay.                                                  02:52

21              MR. STONE:  I have a calculator.                   02:52

22              MS. BERTRAND:  Thank you.  Okay.  So that's where the  02:52

23    error was.                                                   02:52

24              Thank you very much, Mr. Stone.                    02:52

25    BY MS. BERTRAND:                                             02:52
```

| | |
|---|---|
| 1 | Q.  So we've got 1.2 in the Philippines and 1.25 in the states. | 02:52 |
| 2 | That gets us to 2.45, best estimate in 2017, right? | 02:52 |
| 3 | A.  That's a good estimate. | 02:52 |
| 4 | Q.  Okay. | 02:52 |
| 5 | MS. BERTRAND:  Thank you, Mr. Stone, for the assist. | 02:52 |
| 6 | BY MS. BERTRAND: | 02:52 |
| 7 | Q.  And that doesn't include training for the moderators, | 02:52 |
| 8 | correct? | 02:52 |
| 9 | A.  Yeah, that's a management concept that there are a lot of | 02:52 |
| 10 | man hours that you put in, and the managers that report to you | 02:53 |
| 11 | put in to help manage staff.  And that's a number that, as a | 02:53 |
| 12 | manager, you can see that you're just never going to try to | 02:53 |
| 13 | calculate it, because there is no way to -- I mean, how do you | 02:53 |
| 14 | calculate every waking moment that you're ready to train | 02:53 |
| 15 | somebody if you need to? | 02:53 |
| 16 | Q.  That's a big investment.  Fair? | 02:53 |
| 17 | A.  Yes. | 02:53 |
| 18 | MS. BERTRAND:  Ms. Ellig, would you please put up | 02:53 |
| 19 | Exhibit 40.  I believe this has been admitted into evidence. | 02:53 |
| 20 | And I'd ask that it be published. | 02:53 |
| 21 | BY MS. BERTRAND: | |
| 22 | Q.  It seems like, please correct me if I'm wrong, the | 02:54 |
| 23 | moderators did not have a lot of discretion in their work.  Is | 02:54 |
| 24 | that fair? | 02:54 |
| 25 | A.  I mean, it wasn't -- we -- we try tried to make it black | 02:54 |

DANIEL HYER - CROSS-EXAMINATION BY MS. BERTRAND                104

1    and white, the rules just kept changing.  So did they have          02:54
2    creative input on, oh, I think I'll let this one go through and      02:54
3    I won't let this one go through, no.  There was a line, but the      02:54
4    line was always moving.                                             02:54
5    Q.  It was a moving target for the moderators?                      02:54
6    A.  Yes.                                                            02:54
7    Q.  And I want to now change topics a little bit to talking         02:54
8    about the super posters.  Going back to that for a minute.         02:54
9         So, if I understand the super poster arrangement,            02:55
10   they -- because was it just surely volume, or could they           02:55
11   actually just pay to be a super poster?                            02:55
12   A.  It was volume.                                                 02:55
13   Q.  So if somebody posts a large volume of ads, at some point      02:55
14   they get special treatment, correct?                              02:55
15   A.  No.                                                            02:55
16   Q.  Not from moderators, right?                                    02:55
17   A.  No.                                                            02:55
18   Q.  But they had access to Mr. Ferrer?                             02:55
19   A.  No.  The super poster listed in Number 11, those              02:55
20   relationships happened on the adolescence part of our website.    02:55
21   Q.  Well, let's use the word adolescence very carefully here.      02:55
22   A.  I mentioned it before.  I don't mean any offense.             02:55
23   Q.  No, no, no.  I mean, adolescence, you mean just the age of     02:56
24   the website itself, not a section on the website?                 02:56
25   A.  That's correct.                                                02:56

UNITED STATES DISTRICT COURT

DANIEL HYER - CROSS-EXAMINATION BY MS. BERTRAND                105

1   Q.  Okay.  So when Backpage was developing?                    02:56

2   A.  Yes.                                                       02:56

3   Q.  Okay.  Is it fair to say that a super poster, if their ad  02:56

4   was blocked by a moderator, could contact Mr. Ferrer and he    02:56

5   could put the ad back up?                                      02:56

6   A.  Depending upon the super poster.                           02:56

7   Q.  Depending on the relationship?                             02:56

8   A.  No, depending upon the super poster.                       02:56

9   Q.  What do you mean by that difference?                       02:56

10  A.  There were people who spent millions of dollars that were  02:56

11  super posters that we had virtually no -- or had no            02:56

12  communication with.                                            02:56

13          When we were building the site up, developing the site 02:56

14  up, growing the site, we relied on super posters, such as      02:56

15  Somad, Bill, and New York Platinum who had -- they would call  02:57

16  us.  We would answer their questions, deal with their problems. 02:57

17  Once September of 2010 happened, it's not that they were       02:57

18  irrelevant, but we didn't need to provide them this white glove 02:57

19  customer service or support.                                   02:57

20  Q.  Okay.  Thank you for that clarification.                   02:57

21          So, in a way, September 2010 leveled the playing field 02:57

22  a little bit?                                                  02:57

23  A.  Yes.                                                       02:57

24  Q.  Now, when you said they'd call us up, if a poster called   02:57

25  and had a complaint about their ad being taken down, or their  02:57

1   photo being taken out, did they talk to someone in moderation        02:57

2   or did they talk to somebody in marketing?                           02:57

3   A.  It would have been somebody in marketing.                        02:57

4   Q.  And someone in marketing could access the system and put         02:57

5   the ad back up?                                                      02:58

6   A.  They could.                                                      02:58

7   Q.  And, in fact, I think we saw one example of where someone        02:58

8   kept posting, and someone kept taking it down, and back and          02:58

9   forth, correct?                                                      02:58

10  A.  Yes.                                                             02:58

11  Q.  In your opinion, based on your experience at Backpage, did       02:58

12  a tension develop between the moderation staff work and the          02:58

13  marketing staff's work?                                             02:58

14          MR. STONE:  Objection.  Relevance.                           02:58

15          THE WITNESS:  Overruled.                                     02:58

16  BY MS. BERTRAND:                                                    02:58

17  Q.  Go ahead.                                                        02:58

18  A.  I don't know that there were -- there was a tension between      02:58

19  specific staff members of moderation and their job task and         02:58

20  specific staff members of marketing.  I don't know that there        02:58

21  was acrimony, animosity, disdain for each other.  They were          02:59

22  certainly separate departments, much reflecting on the               02:59

23  difference between editorial and advertising from the print          02:59

24  days, those were separate departments.  Didn't mean we didn't        02:59

25  like, love, enjoy spending time with each other, but the job         02:59

1   functions were different.                                    02:59

2   Q.  And sometimes the moderators' decisions made your customers   02:59

3   angry, correct?                                              02:59

4   A.  Yes.                                                      02:59

5   Q.  And who then dealt with the angry customers, marketing or   02:59

6   moderation?                                                   02:59

7   A.  Marketing.                                                02:59

8   Q.  I thought I heard you say, when talking with Mr. Stone --   02:59

9   and I welcome you to correct me if I misunderstood you -- that   02:59

10  the higher up you moved in the company, the more bosses it felt   03:00

11  you had.                                                      03:00

12          Do you remember that?                                 03:00

13  A.  I remember that, yes.                                     03:00

14  Q.  Can you say a little bit more about that?                 03:00

15  A.  I think this is a -- while I'm a liberal arts major, I    03:00

16  think that's a business concept.  When you are an entry level   03:00

17  employee, like an account executive, you aren't talking to your   03:00

18  boss's boss's boss.                                          03:00

19          When you grow, you become a manager, well, then you're   03:00

20  talking to your boss, and perhaps you're talking to your boss's   03:00

21  boss.                                                        03:00

22          And then when you get to your boss's position, you're   03:00

23  talking to your boss, and your boss's boss, and sometimes your   03:00

24  boss's boss's boss.                                          03:00

25  Q.  Correct.  Sometimes you're talking to the C-Suite, right?   03:00

1   A.  Yes.                                                           03:00

2   Q.  So is it fair to say that at Backpage -- because you           03:00

3   started at a pretty, not, I'd say, entry level, but a pretty       03:00

4   lower level at Backpage, right?                                    03:00

5   A.  Yes.                                                           03:01

6   Q.  Did you feel like the lower down the level -- or the lower     03:01

7   on the ladder an employee was at Backpage, the less control       03:01

8   over their job they had?                                           03:01

9           MR. STONE:  Objection.  Vague.                            03:01

10          THE COURT:  Sustained.                                    03:01

11  BY MS. BERTRAND:                                                   03:01

12  Q.  Did you have more control over your job as you climbed the    03:01

13  ladder?                                                            03:01

14  A.  No.                                                           03:01

15  Q.  Did you have more input on policy making at Backpage as you   03:01

16  climbed the ladder?                                                03:01

17  A.  Managers would let you think that, but any good manager       03:01

18  knows how to employ employees who feel like they're being able   03:01

19  to collaborate, but are they influencing?  To a certain extent.  03:01

20  Q.  Do you know whether or not the moderators, the floor         03:02

21  moderators, we'll put the people offshore for -- to the side     03:02

22  for a moment, just the floor moderators here in the U.S., do     03:02

23  you know whether or not the moderators knew about the affiliate  03:02

24  arrangements you and Mr. Ferrer had?                             03:02

25  A.  No.                                                           03:02

```
 1   Q.  No, I don't know if they knew; or, no, they didn't know?    03:02
 2   A.  Do I know if they knew about the affiliate arrangement      03:02
 3   Mr. Ferrer and I had, and the answer to that question is no.    03:02
 4   Q.  You never told a moderator about these affiliate            03:02
 5   arrangements, correct?                                          03:02
 6   A.  No.                                                         03:02
 7   Q.  The moderation team that we're discussing that Backpage had 03:02
 8   a significant investment in was assigned to specific parts of   03:03
 9   Backpage, correct?                                              03:03
10   A.  Yes.                                                        03:03
11   Q.  They weren't assigned to automotive, right?                 03:03
12   A.  I don't know the answer to that.                            03:03
13   Q.  You don't know?                                             03:03
14   A.  I'm not sure.                                               03:03
15   Q.  Do you know whether or not they were primarily assigned to  03:03
16   adult -- the adult section?                                     03:03
17   A.  Primarily they were assigned to adult.                      03:03
18   Q.  It would be surprising to find out a moderator was assigned 03:03
19   to lost and found pets, right?                                  03:03
20   A.  Pets was a category rife with credit card fraud and         03:03
21   scamming people to try to buy imaginary puppies, so I know we   03:03
22   put some resources in pets.                                     03:03
23   Q.  Well, that's a fraud moderation, though, right?  That's a   03:03
24   slightly different moderation from the content moderation we're 03:03
25   talking about on an adult, right?                               03:03
```

| | | |
|---|---|---|
| 1 | A.  It's moderation. | 03:03 |
| 2 | Q.  Okay.  You see those two things as comparable? | 03:03 |
| 3 | A.  Yeah. | 03:04 |
| 4 | Q.  In your opinion, based on your experience at Backpage, was | 03:04 |
| 5 | being a moderator at Backpage an easy job? | 03:04 |
| 6 | MR. STONE:  Objection.  Vague. | 03:04 |
| 7 | THE COURT:  Sustained. | 03:04 |
| 8 | BY MS. BERTRAND: | 03:04 |
| 9 | Q.  In your opinion, was it a demanding job to be a moderator | 03:04 |
| 10 | at Backpage? | 03:04 |
| 11 | A.  Yes. | 03:04 |
| 12 | Q.  It required a great deal of attention, correct, to do it | 03:04 |
| 13 | right? | 03:04 |
| 14 | A.  Yes. | 03:04 |
| 15 | Q.  Attention to detail, right? | 03:04 |
| 16 | A.  Yes. | 03:04 |
| 17 | Q.  And you had to look at a lot of material day in and day | 03:04 |
| 18 | out, correct? | 03:05 |
| 19 | A.  Yes. | 03:05 |
| 20 | Q.  Did you ever hear moderators complain about the difficulty | 03:05 |
| 21 | of this work? | 03:05 |
| 22 | MR. STONE:  Objection.  Relevance.  And hearsay. | 03:05 |
| 23 | THE COURT:  Sustained. | 03:05 |
| 24 | MS. BERTRAND:  May I ask on what grounds so I can | 03:05 |
| 25 | correct my question, Your Honor. | 03:05 |

```
 1              THE COURT:  Hearsay.                        03:05

 2    BY MS. BERTRAND:                                      03:05

 3    Q.  Did you ever work as a moderator?                03:05

 4    A.  No.                                               03:05

 5    Q.  Never had to pitch in?                            03:05

 6    A.  I go back to the management comment I made.  I never sat  03:05

 7    down and said, okay, this day I'm going to moderate, but if I  03:05

 8    saw something that was violating our posting terms, I took  03:05

 9    action on it, yes.                                    03:05

10              MS. BERTRAND:  Thank you.  I have nothing further.  03:05

11              Thank you, Your Honor.                      03:05

12              THE COURT:  Mr. Lincenberg.                 03:05

13              MR. LINCENBERG:  No.  Thank you.            03:05

14              THE COURT:  I guess I'm left with Mr. Cambria.  03:06

15              MR. CAMBRIA:  Yes.                          03:06

16                          CROSS-EXAMINATION               03:06

17    BY MR. CAMBRIA:                                       03:06

18    Q.  Afternoon, Mr. Hyer.  I'm Paul Cambria and I represent  03:06

19    Mr. Lacey.                                            03:06

20    A.  Good afternoon.                                   03:06

21    Q.  You were asked by Mr. Feder about some interviews that you  03:06

22    did with the folks from the prosecution, correct?  He referred  03:06

23    to them as MOIs, remember that?                       03:06

24    A.  Yes.                                              03:06

25    Q.  Memorandum of interviews, is that what you understood that  03:06
```

DANIEL HYER - CROSS-EXAMINATION BY MR. CAMBRIA                112

1    to mean?                                                          03:06

2    A.  I forget the I, but yes.                                      03:06

3    Q.  Okay.  In any event, you had a chance, did you not, to        03:06

4    review those for accuracy?                                        03:06

5    A.  Yes.                                                          03:06

6    Q.  And if you found something that you felt was inaccurate,      03:06

7    you called it to their attention?                                 03:07

8    A.  Yes.                                                          03:07

9    Q.  All right.  Do you recall, sir, that -- telling the people    03:07

10   who interviewed you, that the first time that you met             03:07

11   Mr. Lacey, or encountered him, was when we first came here to     03:07

12   the courtroom?                                                    03:07

13   A.  Yes.                                                          03:07

14   Q.  And the -- and I guess you also said that you had no other    03:07

15   contact with him, ran into him or anything like that, true?       03:07

16   A.  True.                                                         03:07

17   Q.  And you said that you were a full-time employee at Backpage   03:07

18   for 12 years?                                                     03:07

19   A.  Yeah, I mean, I considered I worked for the company since     03:07

20   1998.                                                             03:07

21   Q.  Okay.  Very good.  Thank you.                                 03:08

22           THE COURT:  All right.  Mr. Stone.                        03:08

23           MR. STONE:  No redirect, Your Honor.                      03:08

24           THE COURT:  All right.  May the witness be released       03:08

25   from subpoena?                                                    03:08

| | | |
|---|---|---|
| 1 | MR. STONE:  Yes, Your Honor. | 03:08 |
| 2 | THE COURT:  Any objection from the defense? | 03:08 |
| 3 | (No response.) | 03:08 |
| 4 | THE COURT:  Hearing none. | 03:08 |
| 5 | Sir, you are released from your subpoena.  You may | 03:08 |
| 6 | step down.  Watch your step.  And thank you for your testimony. | 03:08 |
| 7 | Call your next witness. | 03:08 |
| 8 | MS. PERLMETER:  The United States calls Megan | 03:08 |
| 9 | Lundstrom. | 03:08 |
| 10 | THE COURT:  Ma'am, please come forward and let my | 03:09 |
| 11 | courtroom deputy swear you in. | 03:09 |
| 12 | MEGAN LUNDSTROM, | |
| 13 | called as a witness herein, having been first duly sworn, was | |
| 14 | examined and testified as follows: | 03:09 |
| 15 | THE COURT:  Whenever you are ready, Ms. Perlmeter. | 03:09 |
| 16 | MS. PERLMETER:  Thank you. | 03:09 |
| 17 | DIRECT EXAMINATION | 03:09 |
| 18 | BY MS. PERLMETER: | 03:09 |
| 19 | Q.  Good afternoon, ma'am. | 03:09 |
| 20 | A.  Hello. | 03:09 |
| 21 | Q.  Please introduce yourself to the jury, tell them your name, | 03:09 |
| 22 | then spell your first and your last, please. | 03:10 |
| 23 | A.  My name is Megan Lundstrom, M-E-G-A-N, L-U-N-D-S-T-R-O-M. | 03:10 |
| 24 | Q.  Ms. Lundstrom, where do you live? | 03:10 |
| 25 | A.  Washington, D.C. | 03:10 |

1   Q.  How long have you lived there?                          03:10

2   A.  I'm coming up on four months.                           03:10

3   Q.  Before you moved to D.C., where did you live?           03:10

4   A.  Colorado.                                               03:10

5   Q.  How long did you live in Colorado?                      03:10

6   A.  I was born and raised there.                            03:10

7   Q.  Okay.  I want to talk about your educational background.  03:10

8        Did you go to college?                                 03:10

9   A.  Yes, I did.                                             03:10

10  Q.  What did you study and when did you graduate?           03:10

11  A.  I studied finance for my undergraduate and I graduated in  03:10

12  2016.  And then I went on and pursued my master's degree in  03:10

13  applied sociology and graduated in 2020.                    03:10

14  Q.  And are you working currently?                          03:10

15  A.  Yes.                                                    03:10

16  Q.  Where do you work?                                      03:10

17  A.  Polaris.                                                03:10

18  Q.  And what is Polaris?                                    03:10

19  A.  It is an anti-trafficking organization.                 03:10

20  Q.  And what do you do for them specifically?               03:10

21  A.  My title is the director of the resilience fund, which is a  03:11

22  direct cash assistance program for survivors of human       03:11

23  trafficking.                                                03:11

24  Q.  And what did you do --                                  03:11

25       THE COURT:  Ms. Perlmeter, again, I'm going to ask you  03:11

1   just to slow your cadence down.  Thank you.                    03:11

2          MS. PERLMETER:  Yes.                                    03:11

3   BY MS. PERLMETER:                                              03:11

4   Q.  What did you do before you joined Polaris?                 03:11

5   A.  I founded and ran a nonprofit organization that provided   03:11

6   direct services to survivors of commercial sexual exploitation 03:11

7   and sex trafficking.                                           03:11

8   Q.  And what was that nonprofit called?                        03:11

9   A.  Originally, Free Our Girls, and then rebranded in 2020 as  03:11

10  The Avery Center.                                              03:11

11  Q.  And how long were you involved with the Free Our Girls, now 03:11

12  known as The Avery Center?                                     03:11

13  A.  Eight years.                                               03:11

14  Q.  Do you have any children?                                  03:11

15  A.  Yes.                                                       03:11

16  Q.  How many?                                                  03:11

17  A.  Three.                                                     03:11

18  Q.  And how old are you?                                       03:11

19  A.  38.                                                        03:11

20  Q.  Now, Ms. Lundstrom, was there -- are you familiar with the 03:11

21  website Backpage.com?                                          03:11

22  A.  Yes.                                                       03:12

23  Q.  And how are you familiar with it?                          03:12

24  A.  I sold sex on Backpage.                                    03:12

25  Q.  Were you advertised on Backpage for a number of years?     03:12

1    A.  Yes.                                                          03:12

2    Q.  Can you tell us what year or what range of years?            03:12

3    A.  2008 to 2012.                                                03:12

4    Q.  Okay.  Do you remember what section of Backpage you          03:12

5    advertised in?                                                   03:12

6    A.  I forget the exact name, but the adult services section      03:12

7    under the women who sold sex.                                    03:12

8    Q.  Let's talk about your advertisements.                        03:12

9          How were they created?  Did you create them yourself       03:12

10   or did you have assistance originally in the beginning?          03:12

11   A.  I was taught by my first pimp how to post the ads.           03:12

12   Q.  And then how did you create the ads?                         03:12

13   A.  Say that again.                                              03:12

14   Q.  With his assistance, or his instruction, what did your ads   03:12

15   look like in the beginning?                                      03:12

16   A.  So originally my ads were pretty informal, so a few          03:12

17   sentences that kind of described that I was available for        03:12

18   sexual services, combined with rates for different sexual        03:12

19   services, then increments of time, and then sexually explicit    03:13

20   photos?                                                          03:13

21   Q.  So between 2008 and 2013, how many cities -- or let's do it  03:13

22   this way.  How many states did you post advertisements on        03:13

23   Backpage.com in?                                                 03:13

24   A.  Twenty-three states.                                         03:13

25   Q.  Did you have a name that you used for your Backpage ads?     03:13

1  A.  I had a couple names.  The first name that I went by was          03:13
2  Marley, the second name that I went by was Adrielle Cordeaux,         03:13
3  and then my third name was Avery Day.                                 03:13
4  Q.  And when you were beginning to post, were you in the              03:13
5  Colorado area?                                                        03:13
6  A.  Yes.                                                              03:13
7  Q.  And, in the beginning, were your -- were the words that you       03:13
8  used in your advertisement different in the beginning and then        03:13
9  later on through the years?                                           03:13
10  A.  Yes, they changed over time.                                     03:13
11  Q.  Can you explain how you changed your advertisements over         03:14
12  the time -- over the years?                                          03:14
13  A.  Yeah.  So initially, like I said, it was less formal, a          03:14
14  little more graphic.  Over time I changed my wording and the         03:14
15  information that was available to attract a higher end               03:14
16  clientele and to evade, like getting those ads flagged,              03:14
17  essentially.                                                         03:14
18  Q.  Okay.  And what do you mean trying to attract -- changing        03:14
19  your ad to attract a different type of clientele?                    03:14
20  A.  Yeah.  So most of my clients were middle class, college          03:14
21  educated, gainfully employed, and often married men who were         03:14
22  very risk averse and wanted a lot of discretion.  And so I           03:14
23  wrote my ads and used photographs that appealed to that              03:14
24  demographic.                                                         03:14
25  Q.  So, at this point, what did your photographs look like?          03:14

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| 1 | A.  At that point, several of my regular customers were | 03:14 |
| 2 | professional photographers, and so I traded sessions for | 03:15 |
| 3 | photographs. | 03:15 |
| 4 | Q.  Are you familiar with Backpage ads in the adult and female | 03:15 |
| 5 | section over the years? | 03:15 |
| 6 | A.  Yes. | 03:15 |
| 7 | Q.  Are you familiar with the different types of words that are | 03:15 |
| 8 | used -- are you familiar with prostitution coded words? | 03:15 |
| 9 | A.  Yes. | 03:15 |
| 10 | Q.  And can you give us some examples? | 03:15 |
| 11 | A.  So, generally, there is like the acronyms, so PSE would be | 03:15 |
| 12 | porn star experience, FS is full service, BBBJ is a bareback | 03:15 |
| 13 | blow job.  Though those are common acronyms.  But then there is | 03:15 |
| 14 | other language like new in town, let's play, or let's party, as | 03:15 |
| 15 | well. | 03:15 |
| 16 | Q.  Did you use these types of words in your ads in the | 03:15 |
| 17 | beginning? | 03:15 |
| 18 | A.  I used a lot of the acronyms in the beginning. | 03:15 |
| 19 | Q.  And, as time moved on, as you developed your higher | 03:15 |
| 20 | clientele, did you continue to use these words? | 03:15 |
| 21 | A.  I didn't need to use them in my ads anymore. | 03:16 |
| 22 | Q.  So, as time moved on, what sorts of words did you use in | 03:16 |
| 23 | your ad to convey that it was a prostitution ad? | 03:16 |
| 24 | A.  So things like, let's get together; let's spend time | 03:16 |
| 25 | together; let's have fun; let's play.  Those types of | 03:16 |

 1    statements.                                                    03:16
 2    Q.  So when you posted advertisements with those fairly --    03:16
 3    slightly tamer words, did you still receive calls from men    03:16
 4    looking to have sex?                                          03:16
 5    A.  Yes.                                                      03:16
 6    Q.  Are you familiar with The Erotic Review?                  03:16
 7    A.  Yes.                                                      03:16
 8    Q.  What is that?                                             03:16
 9    A.  It's both a discussion forum and a review board for       03:16
10    commercial sex.                                               03:16
11    Q.  Did you have a profile on The Erotic Review?              03:16
12    A.  Yes, I did.                                               03:16
13    Q.  Did you include links from The Erotic Review on your      03:16
14    Backpage ads?                                                 03:16
15    A.  Yes, I did.                                               03:16
16    Q.  Let me talk -- ask you some questions about how you paid  03:16
17    for the ads.                                                  03:17
18         Can you explain to the jury how you paid for the ads     03:17
19    in the beginning, and if that changed over time?             03:17
20    A.  Yeah.  So originally my pimp would take my money and then I 03:17
21    would be given a certain amount of that to go deposit in my   03:17
22    bank account, and I would pay for my ads with my debt card and 03:17
23    my personal bank account.                                    03:17
24         And then over time, as I felt there was more risk at     03:17
25    being detected, I started using prepaid gift cards that, again, 03:17

1   my pimp would give me cash, and I would go to the store and        03:17
2   purchase those gift cards, and then pay for my ads with that.      03:17
3   Q.  Now, did your ads also include a phone number for sex          03:17
4   buyers to contact you?                                             03:17
5   A.  Yes.                                                           03:17
6   Q.  And what kind of phone did you use in the beginning, and if    03:17
7   -- what kind of phone did you use over time, if it changed?        03:17
8            MS. BERTRAND:  Objection.  Relevance.  Does not           03:17
9   pertain to any of the counts in the indictment.                    03:18
10           THE COURT:  Overruled.                                    03:18
11           THE WITNESS:  So initially, similar to my debit card,     03:18
12  I used a phone that was on my personal phone line.  And then,      03:18
13  again, over time, as I felt like it was becoming riskier, and I    03:18
14  didn't want the prostitution to be connected to me, I started      03:18
15  purchasing burner phones, or prepaid phones that you could just    03:18
16  buy at a grocery store, load minutes on it, and use the -- I       03:18
17  used that.                                                         03:18
18  BY MS. PERLMETER:                                                  03:18
19  Q.  Okay.  And then eventually did you stop working for your       03:18
20  pimp?                                                              03:18
21  A.  My first pimp, yes.                                            03:18
22  Q.  Okay.  You call him the -- so at some point did you stop       03:18
23  working for your first pimp?                                       03:18
24  A.  Yes.                                                           03:18
25  Q.  Later on did you start working for a second pimp?              03:18

1    A.  Yes.                                                            03:18

2    Q.  And is that when you moved from Colorado to the -- to Las       03:18

3    Vegas?                                                              03:19

4    A.  Yes.                                                            03:19

5    Q.  So for questions is it okay if I refer to the second pimp       03:19

6    as the Las Vegas pimp?                                              03:19

7    A.  Yes.                                                            03:19

8    Q.  Okay.  So when you moved to Las Vegas and began working for     03:19

9    the Las Vegas pimp, did you continue to post on Backpage and        03:19

10   continue having sex with men for money?                             03:19

11   A.  Yes.                                                            03:19

12   Q.  And how did it work now at this point?  Were you staying in     03:19

13   the Las Vegas area or traveling?                                    03:19

14   A.  Both.  So my pimp in Las Vegas would have us alternate          03:19

15   between working the casinos in Las Vegas and then traveling to      03:19

16   other cities and states.  And so, when we traveled, we posted      03:19

17   on Backpage.                                                        03:19

18   Q.  Okay.  So how did you decide what other cities or states to     03:19

19   travel to?                                                          03:19

20   A.  Some of it had been built up, again, from previous travel      03:19

21   where we knew that there were customers, there was demand for       03:19

22   commercial sex.  But also you could post an ad on Backpage like     03:19

23   a week in advance and see how many calls you got, and if that       03:19

24   area -- if you got a lot of phone calls from that area, then        03:19

25   you knew that you could start scheduling appointments and go        03:20

1   out there and work.                                          03:20

2   Q.  Did you and other girls that Las Vegas pimp was associated   03:20

3   with travel to North Dakota?                                 03:20

4   A.  Yes.                                                      03:20

5   Q.  Was there a market on Backpage in North Dakota?          03:20

6   A.  A huge one, yes.                                         03:20

7   Q.  Okay.  So explain what happened in North Dakota, how you   03:20

8   worked sexual activities there for money in that market.     03:20

9   A.  Yeah.  So, in North Dakota, I was sent there by my pimp to   03:20

10  work the oil fields.  And so the ratio of men to women in the   03:20

11  oil fields at that time was around 30 to 1.  And so the very   03:20

12  first night that we were there, we all posted ads, and       03:20

13  immediately the phone started ringing.  And we were making, on   03:20

14  average, about $30,000 a week, and bringing that back to Las   03:20

15  Vegas to our pimp.                                           03:20

16  Q.  So when you would come back -- back to Las Vegas, did you   03:20

17  -- what did you do with the $30,000?                         03:21

18  A.  We were expected to hand it over immediately when we got   03:21

19  off the plane.                                               03:21

20  Q.  Did Las Vegas pimp or first pimp have legitimate sources of   03:21

21  employment, as you were able to observe?                     03:21

22  A.  No.                                                      03:21

23  Q.  At some point did you stop working for Las Vegas pimp?   03:21

24  A.  Yes.                                                     03:21

25  Q.  Okay.  After you stopped working for Las Vegas pimp, did   03:21

1   you return back to Colorado?                                      03:21

2   A.  Yes.                                                          03:21

3   Q.  And when you returned back to Colorado, did you continue to   03:21

4   post ads on Backpage?                                             03:21

5   A.  Yes.                                                          03:21

6   Q.  At some point, did you develop like a working circuit using   03:21

7   Backpage?                                                         03:21

8   A.  Yes.                                                          03:21

9   Q.  Can you explain that to the jury.                             03:21

10  A.  Yeah.  So on Backpage if you would go to a certain state,     03:21

11  each state was typically broken down into smaller regions.  So    03:21

12  as an example, in Colorado you would have like the Western        03:21

13  Slope, Fort Collins, Denver, Colorado Springs, so different       03:22

14  regions like that.                                                03:22

15          And so when you would post in one region and be           03:22

16  advertising and selling sex in that region, you would get         03:22

17  messages from other regions of buyers asking if you could         03:22

18  please come to their region as well.  And so over time you        03:22

19  could develop a work circuit where you would have regulars in     03:22

20  these cities and you could pass through each of these regions.    03:22

21  And so I still advertised, but I also had a regular clientele     03:22

22  base at that point.                                               03:22

23  Q.  So I want to talk about -- now I want to move on to the       03:22

24  last -- one of the last Backpage ads that you posted.             03:22

25          So do you recall posting an ad in November of 2012 in     03:22

1   the Rockies section?                                        03:22

2   A.  Yes.                                                    03:22

3   Q.  And is Rockies Colorado?                                03:22

4   A.  Yes.                                                    03:22

5   Q.  Okay.  And did you make -- did you have an appointment with   03:22

6   a sex buyer?                                                03:22

7   A.  Yes.                                                    03:23

8   Q.  And what happened?                                      03:23

9   A.  It was not a sex buyer, it was an undercover officer.   03:23

10  Q.  Okay.  And was that the last time after that event that you   03:23

11  engaged in prostitution with men?                          03:23

12  A.  Yes.                                                    03:23

13          MS. PERLMETER:  Okay.  So I'm going to pull up 2036a,   03:23

14  which is not in evidence, so just for the witness's eyes only,   03:23

15  please.                                                    03:23

16  BY MS. PERLMETER:                                           

17  Q.  Ms. Lundstrom, do you see the exhibit?                  03:23

18  A.  Yes.                                                    03:23

19  Q.  Do you recognize it?                                    03:23

20  A.  Yes.                                                    03:23

21  Q.  What is it?                                             03:23

22  A.  That was the last prostitution ad that I ever posted for   03:23

23  myself.                                                    03:23

24          MS. PERLMETER:  The United States moves Exhibit 2036a   03:23

25  into evidence.                                             03:23

| | | |
|---|---|---|
| 1 | MS. BERTRAND:  Objection.  Relevance.  Doesn't pertain | 03:23 |
| 2 | to any of the counts of the indictment. | 03:23 |
| 3 | THE COURT:  Overruled. | 03:23 |
| 4 | MR. FEDER:  It also has handwriting on it. | 03:23 |
| 5 | THE COURT:  I'm sorry, what did you say, Mr. Feder, it | 03:24 |
| 6 | also has what? | 03:24 |
| 7 | MR. FEDER:  Handwriting, the one I'm looking at. | 03:24 |
| 8 | THE COURT:  Well, lay some foundation for the exhibit. | 03:24 |
| 9 | BY MS. PERLMETER: | 03:24 |
| 10 | Q.  Ms.  Lundstrom, is this your Backpage ad? | 03:24 |
| 11 | A.  Yes, it is. | 03:24 |
| 12 | Q.  Did you post this ad? | 03:24 |
| 13 | A.  Yes, I did. | 03:24 |
| 14 | Q.  Is this a Xerox copy of the ad? | 03:24 |
| 15 | A.  Yes. | 03:24 |
| 16 | Q.  Where did you get this copy from? | 03:24 |
| 17 | A.  It was in the evidence packet from my arrest. | 03:24 |
| 18 | Q.  So did you get it from the police station? | 03:24 |
| 19 | A.  Yes, I did. | 03:24 |
| 20 | Q.  Okay. | 03:24 |
| 21 | MS. PERLMETER:  Move to admit. | 03:24 |
| 22 | MR. FEDER:  Same objection.  There is handwriting all | 03:24 |
| 23 | over it. | 03:24 |
| 24 | MS. BERTRAND:  Same objection as to relevance. | 03:24 |
| 25 | THE COURT:  Why don't you discuss what it is that's | 03:24 |

1   written on the exhibit, where that comes from, if she knows.   03:24

2   BY MS. PERLMETER:                                              03:24

3   Q.  Ms. Lundstrom, do you see the handwriting on the bottom    03:24

4   half of the exhibit?                                           03:24

5   A.  Yes.                                                       03:24

6   Q.  Do you know what those writings are about?                 03:24

7   A.  Just from my memory of that evening, that was the officer's 03:24

8   taking notes when they had contacted me and were setting up the 03:24

9   sex transaction at their hotel.                                03:24

10  Q.  Okay.  So was -- were those -- was that a -- them taking    03:25

11  notes about the conversation you had with them setting up the  03:25

12  date?                                                          03:25

13  A.  Yes.                                                       03:25

14       MR. FEDER:  Objection.  This would all be hearsay and     03:25

15  foundation, since this is allegedly a police record that has   03:25

16  nothing at all on it about being a police record.              03:25

17       THE COURT:  All right.  We'll let that objection          03:25

18  stand.  We'll adjourn for the afternoon.  I'll review the      03:25

19  exhibit a little closer and make my determination when we      03:25

20  reconvene.                                                     03:25

21       Let me just again remind the members of the jury not      03:25

22  to come to any conclusions, not to discuss it amongst          03:25

23  yourselves, with anyone else, your family members, to conduct  03:25

24  any research or anything of the sort.  And we will expect you  03:25

25  here in the courtroom to be able to come in and promptly take  03:25

127

1    your seats at 9:00 a.m. tomorrow morning.            03:25

2        And, with that, please all rise for the jury.    03:25

3        (The jury panel left the courtroom, 4:28 p.m.)    03:25

4        THE COURT:  And, ma'am, you may step down.      03:26

5        Ms. Perlmeter, let me have a hard copy of that    03:26

6    exhibit.                                          03:26

7        And we are adjourned.                    03:26

8        (Proceedings concluded at 4:28 p.m.)         03:26

9                *        *        *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

128

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 19th day of October,

13   2023.

14

15

16                      /s/ Christine M. Coaly
17                      Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25

# EXHIBIT F

# EXHIBIT F

Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:  (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

United States of America,

    Plaintiff,

vs.

Michael Lacey, *et al.*,

    Defendants.

NO. CR-18-00422-PHX-SMB

**DEFENDANT MICHAEL LACEY'S JOINDER IN DEFENDANT JOHN BRUNST'S MOTION TO SEEK ADMISSION OF EVIDENCE OF GOOD FAITH RE: STATE OF MIND**

(Oral argument requested)

   Defendant Michael Lacey, by and through his undersigned attorneys, hereby joins in Defendant John Brunst's Motion to Seek Admission of Brunst's Testimony Re: State of Mind ("Motion") and incorporates all points raised in the Motion as if fully set forth herein.  Although this Court has previously precluded defense counsel from admitting evidence of good faith through cross examination of government witnesses, we do not understand that ruling to be a limitation on factual, non-privileged information to be admitted through defense witnesses, including evidence of

a lack of criminal intent and state of mind of a Defendant. In an abundance of caution, we provide the instant proffer of the testimony Michael Lacey would provide, as well as examples of the exhibits we would seek to admit through him in addition to those identified in the Motion, all of which he considered and relied upon in making his determination that Backpage was a lawful operation.

## I.        Good faith reliance on James Larkin

Lacey had nothing to do with the oversight or operation of Backpage. That fell on the publishing side of the newspaper conglomerate owned and operated by Lacey and Larkin, and Larkin was in charge of publishing. Lacey was the Editor-in-Chief and oversaw employees who created the content of the articles published in the newspapers, including the editors and writers. Because these two business divisions were separated, Lacey relied on Larkin. This division existed for decades before the creation of Backpage. Lacey had no reason to doubt Larkin because Larkin had demonstrated, over decades, that he was a highly ethical and thoughtful Chief Executive Officer.

On many occasions, Larkin advised Lacey that Backpage had retained some of the most prominent attorneys in the country on internet free speech and safety. In the face of public protests, negative media coverage, and communications from organizations like NCMEC, NAAG, Auburn Seminary, and Polaris, Larkin assured Lacey, as well as all other employees, that Backpage was a lawful platform for third-party speech as advised by each of these prominent attorneys. Among others, these attorneys included outside counsel James Grant and Robert Corn-Revere of Davis Wright Tremaine, LLP, Samuel Fifer, then a partner at Dentons, LLP, online safety expert and member of the Board of Directors of NCMEC, Hemanshu Nigam, of SSP Blue, and his colleague, Simrin Hooper, as well as General Counsel for Backpage, Elizabeth McDougall. In addition to the advice of these attorneys, Lacey knew that one of the members of the Board of Directors of Village Voice Media Holdings, Co., the parent company to Backpage, Donald Moon, was a well-regarded Arizona attorney who advised Larkin about Backpage's operations, and on some occasions, advised Lacey as well. The existence of these relationships with counsel, gave Lacey comfort that Larkin's assurances that Backpage was complaint with the law were correct. Because Lacey never doubted Larkin's operation of Backpage as a lawful enterprise, he did not believe he was facilitating a crime

of any kind. Larkin's assurances were vindicated over and over again with one judicial victory after another, as discussed below.

## II.    Good faith reliance on advice of counsel

It is our understanding that, even assuming the prerequisites to an advice-of-counsel defense were satisfied, the defense would be limited to advice concerning publication of the 50 ads that are the subject of the Travel Act Counts (Counts 2-51) and that Lacey would not be able to testify about any other advice obtained or received. This joinder seeks confirmation that this Court has limited the defense in that manner.

To be clear, Lacey is not aware of advice ever being sought pertaining to any specific ad. Instead, Backpage sought advice about its operating practices, moderation, the lawfulness of adult speech, Section 230 of the Communication Decency Act, the First Amendment's application to the publication of third-party speech, and other topics. On some occasions, even though Lacey was not involved with Backpage, he reviewed privileged and non-privileged materials prepared by attorneys, and sought and relied upon advice from Don Moon and other counsel as to the lawfulness of Backpage's operations. He would seek to admit Exhibits 5518, 5519, 5520, 5521, 5523, 5526, 5530.[1] His reliance on this advice, as well as the advice of courts through judicial opinions he had a good faith belief that he was not facilitating crime of any kind is documented in email he sent. He would seek to admit Exhibit 5529.

## III.    Good faith reliance on non-privileged attorney-related evidence

Lacey's steadfast belief in Backpage's lawful operation was founded upon non-privileged attorney communications, as discussed in the Motion and incorporated herein by reference, as well as his knowledge of the following additional non-privileged attorney communications:

---

[1]    Critically, he should not be required to waive privilege of any kind because, when denying the Motion to Dismiss for Invasion of Privilege (Dkt. 1168), this Court ruled that legal positions taken in public filings or disclosed to third-parties render any other communications between client and attorney about that legal position non-privileged. While Lacey disagrees with that ruling, it is the law the case.

- An April 4, 2012 Letter from Elizabeth McDougall (Ex. 1911A), that Lacey forwarded to Kathleen Ferris (admitted Ex. 1911B), indicating that Backpage was a lawful platform for classified ads and that it was committed to keeping illegal content off the website.

- A March 14, 2017 Letter from the First Amendment Lawyers Association to the California Attorney General asserting that the state prosecution of Ferrer, Lacey, and Larkin for crimes arising out of their publication of third-party speech, including conspiracy to pimp, and pimping, violated the First Amendment.  (Ex. 5538.)

- Amicus briefing submitted in support of Backpage during various litigation, including, as discussed here, amicus briefing in support of Backpage in the *Dart* case on appeal to the Seventh Circuit.  For example, in the amicus brief submitted on behalf of the CATO Institute, Reason Foundation, and DKT Liberty Project, Lacey learned that leading civil rights organizations believed that Backpage was a First Amendment protected platform for First Amendment protected speech, including advertisements for adult services, and further, that the First Amendment precluded any party from assuming or inferring from an ad that it relates to illegal conduct. (Ex. 5068.)  As the Motion makes clear, these parties supported Backpage even though the record included most, if not all, of the allegations at issue in this litigation, including, but not limited to, after-the-fact notice of the misuse of the website for prostitution and child-sex trafficking, affiliate ad links, including The Erotic Review, moderation/editing of ads, and the charging of fees for ads.

## IV.    Good faith reliance on judicial opinions

Lacey's steadfast belief in Backpage's lawful operation was founded upon his knowledge of and understanding that Backpage had prevailed in numerous federal proceedings.  For example, after a grand jury subpoena issued by a grand jury sitting in the Western District of Washington was quashed, and the United States Attorney declined to pursue any further charges, Lacey's belief in the lawful operation of Backpage was reinforced.  (Ex. 5531.)

As discussed in greater detail in the Motion, and incorporated herein by reference, Lacey relied on the recognition that Backpage was a First Amendment protected platform publishing First

Amendment protected speech, including the publication of ads for lawful adults services such as escorting, massage, and dominatrices as discussed in both *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012) and *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015). (Exs. 5902, and others.)

Moreover, the California Attorney General's Office brought two criminal complaints against Lacey, Larkin, and Ferrer alleging, among other things, pimping counts and conspiracy to engage in pimping, with all pimping-related charges dismissed. Although the opinions ultimately relied on Section 230, they also recognized that Backpage had First Amendment rights and that Section 230 was a statute designed to protect First Amendment rights. (Exs. 5025, 5324.) All of this reinforced his belief that Backpage was a lawful enterprise.

The same First Amendment that was discussed as controlling in these opinions is the same First Amendment that Lacey relied upon in making his determination that Backpage was a lawful operation. Indeed, there is only one First Amendment it either applies or it doesn't and Lacey had no reason to believe anything other than that Backpage was a First Amendment protected platform for First Amendment protected third-party speech.

## V.    Good faith reliance on public officials

Lacey's steadfast belief in Backpage's lawful operation was founded upon his knowledge of statements of public officials. Lacey was aware of statements of public officials indicating that website operators, like Backpage, could not be prosecuted with any federal crimes. For example, Lacey was aware of the following statements by public officials:

- Testimony of Francine Hakes, who was, in September 2010, the top DOJ prosecutor on cybercrime, before the House Subcommittee on Crime, Terrorism, and Homeland Security, wherein she testified that a website operator could not be prosecuted under federal law unless the operators "were . . . conspiring with those who were misusing their site, that is, knowingly conspiring to violate the law," and further, that "intentional neglect" of misuse of a website was insufficient as a matter of law. (Ex. 6247.)

- Statements by Ernie Allen, and top DOJ officials informing Ernie Allen, that Backpage and its owners and operators could not be prosecuted for any federal crime because the government could not establish the high level of mens rea necessary to obtain a conviction. Don Moon conveyed this statement to Lacey and Larkin. (Exs. 5519, 5520.)

- Ernie Allen, too, documented these statements from Eric Holder and the other top DOJ officials in several emails: "Two years ago I met with Attorney General Eric Holder on this. The sites [craigslist, Backpage, and others] were blatant. The young women in the ads were nude, there were graphic images of sex acts, and there was advertising and links to the so called "John Boards," like Erotic Review, which provide detailed reviews of the services provided by each young woman. . . . . The Attorney General sent some Criminal Division prosecutors over to meet with me. They concluded that the mens rea standard (the legal standard that requires an act to be knowing and intentional) could not be overcome for a site like Backpage which by that time had eliminated nudity in the ads, eliminated pornographic images, stopped links to the John Boards, and was making a good faith effort to screen, monitor, and report." (Ex. PC-EA-82.)

- In fact, the inability to prosecute Backpage federally was so well understood, that Congress enacted an amendment to Section 230 of the CDA, commonly referred to as SESTA/FOSTA in 2018. In the House Judiciary Report published on February 20, 2018, in advance of enactment of SESTA/FOSTA, the House found, among other things, that "current federal criminal law, which is unaffected by the CDA, presently lacks proper prosecutorial tools to combat these websites." (Ex. 6119 at 5.) This Report, known to Lacey, further strengthened his belief that the operation of Backpage was lawful.

- Moon advised Lacey and Larkin that, in his conversations with NCMEC Officer John Shehan, Shehan told him that there was not any website doing a more professional or better job than Backpage in child safety / site mitigation. (Ex. 5518).

- The Director of the FBI, Robert Mueller, presented a commendation to Ferrer recognizing Backpage's efforts at aiding prosecution of those who misused the website. Lacey's awareness of this praise from such a high level law enforcement officer, again, reinforced his belief that Backpage was not just a lawful operation, but actively providing assistance to law enforcement.

## **CONCLUSION**

For all these reasons, Lacey respectfully requests permission to testify in his own defense on his good faith, as set forth above.

RESPECTFULLY SUBMITTED this 22nd day of October, 2023,

Paul J. Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME CAMBRIA LLP

By:      /s/ Paul J. Cambria, Jr.
Paul J. Cambria, Jr.
Attorneys for Michael Lacey

On October 22, 2023, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
Daniel Boyle, daniel.boyle2@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Austin Maxwell Berry, austin.berry2@usdoj.gov

# EXHIBIT G

# EXHIBIT G

1

2:18-cr-00422-DJH, September 12, 2023 (Ferrer excerpt)

1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3                  _____

4

**United States of America**,          )
                                        )
5                          Plaintiff,   )
                                        )
6    vs.                                )
                                        )   2:18-cr-00422-DJH
7    **Michael Lacey, et al.,**          )
                                        )
8                          Defendants.  )
                                        )   September 12, 2023
9    _____     )
                                        )
10

11

12      **BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

13      **REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

14          **(Testimony of CARL FERRER)**

15

16

17

18

19

20

21   Official Court Reporter:
     **Elaine Cropper, RDR, CRR, CCP**
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 35
23   Phoenix, Arizona  85003-2151
     elaine_cropper@azd.uscourts.gov
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

              United States District Court

<u>**I N D E X**</u>

**TESTIMONY**

| WITNESS | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|

Government's Witnesses

CARL FERRER                    5

<u>**E X H I B I T S**</u>

| Number | | Ident | Rec'd |
|--------|--|-------|-------|
| 1056 | Email from Ferrer to Spear, "Backpage work plan", 11/21/2005 | 86 | 87 |
| 1056a | Attachment, "Backpage Work Plan", | 88 | 89 |
| 1057 | Emails form Spear and Ferrer, "adult changes", 05/08/2006, | 91 | 92 |
| 2030 | Demonstrative Exhibit Illustrating Backpage Aggregation Process, | 27 | 28 |
| 2031 | Demonstrative Exhibit Illustrating Backpage Reciprocal Link Program Process, | 33 | 34 |

<u>**RECESSES**</u>

| | Page | Line |
|--|------|------|
| (Recess at 2:30; resumed at 2:51.) | 37 | 16 |

United States District Court

2:18-cr-00422-DJH, September 12, 2023 (Ferrer excerpt)

1                    **A P P E A R A N C E S**

2

   For the Government:
3                  **KEVIN M. RAPP, ESQ.**
                   **PETER S. KOZINETS, ESQ.**
4                  **ANDREW C. STONE, ESQ.**
                   **MARGARET WU PERLMETER, ESQ.**
5                  U.S. Attorney's Office
                   40 N, Central Ave., Ste. 1800
6                  Phoenix, AZ  85004-4408
                   kevin.rapp@usdoj.gov
7                  peter.kozinets@usdoj.gov
                   andrew.stone@usdoj.gov
8                  margaret.perlmeter@usdoj.gov

9                  **AUSTIN M. BERRY, ESQ.**
                   U.S. Department of Justice
10                 Child Exploitation and Obscenity Section
                   1301 New York Ave., NW, 11th Fl.
11                 Washington, D.C.  20005
                   austin.berry2@usdoj.gov

12

13  For the Defendant Michael Lacey:
                   **PAUL J. CAMBRIA, JR., ESQ.**
14                 Lipsitz Green Scime Cambria, L.L.P.
                   42 Delaware Ave., Ste. 120
15                 Buffdalo, NY  14202
                   pcambria@lglaw.com

16

17  For the Defendant Scott Spear:
                   **BRUCE S. FEDER, ESQ.**
18                 Feder Law Office, P.A.
                   2390 E. Camelback Road, Ste. 160
19                 Phoenix, AZ  85016
                   bf@federlawpa.com

20

                   **ERIC W. KESSLER, ESQ.**
21                 Kessler Law Office
                   6720 N. Scottsdale Rd., Ste. 210
22                 Scottsdale, AZ  85253
                   eric.kesslerlaw@gmail.com

23

24

25

                   United States District Court

2:18-cr-00422-DJH, September 12, 2023 (Ferrer excerpt)

1           **A P P E A R A N C E S**   (Continued)

2

For the Defendant John Brunst:
3               **GOPI K.  PANCHAPAKESAN, ESQ.**
                Bird Marella Boxer Wolpert Nessim Drooks
4       Lincenberg & Rhow, P.C.
                1875 Century Park E. Ste. 2300
5               Los Angeles, CA  90067
                gpanchapakesan@birdmarella.com
6
For the Defendant Andrew Padilla:
7               **DAVID S. EISENBERG, ESQ.**
                David Eisenberg, P.C.
8               3550 N. Central Ave., Ste. 1155
                Phoenix, AZ  85012
9               david@deisenbergplc.com

10      For the Defendant Joye Vaught:
                **JOY MALBY BERTRAND, ESQ.**
11              Joy Bertrand, Esq., L.L.C.
                P.O. Box 2734
12              Scottsdale, AZ  85252-2734
                joy@joybertrandlaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25

                United States District Court

CARL FERRER - Direct

**P R O C E E D I N G**

2    (The following excerpt was separately transcribed.)

3    MR. RAPP:  The United States calls Carl Ferrer.

4    THE COURT:  Sir, please come forward here and be

5  sworn.        01:33:27

6    COURTROOM DEPUTY:  Please raise your right hand.

7    (CARL FERRER, a witness herein, was duly sworn or

8  affirmed.)

9    COURTROOM DEPUTY:  If you could please state and

10  spell your last name for the record.    01:33:45

11    THE WITNESS:  I do.  And Ferrer -- oh, first and last

12  name?

13    COURTROOM DEPUTY:  Spell the last name.

14    THE WITNESS:  Ferrer.  F-E-R-R-E-R.

15    COURTROOM DEPUTY:  Please proceed to the witness    01:33:58

16  stand.  There's water there and please use the microphone.

17    THE WITNESS:  Thank you.

18    MR. RAPP:  Thank you, Your Honor.

19              **DIRECT EXAMINATION**

20  BY MR. RAPP:    01:34:21

21  Q.   Sir, could you state your full name and spell your last

22  name for the record, please.

23  A.   Carl Allen Ferrer.  My last name is F-E-R-R-E-R.

24  Q.   Sir, what was your employment from 2004 to 2018?

25  A.   From 2004 through 2018, I was the project manager at    01:34:38

United States District Court

6

CARL FERRER - Direct

1    Backpage.com.                                                  01:34:44

2    Q.    When was the website Backpage.com created?

3    A.    We started building the site in 2003 and in 2004 we

4    launched in Phoenix, Arizona.

5    Q.    What type of website was Backpage.com?              01:35:01

6    A.    Backpage.com was a clone of Craigslist.

7    Q.    What type of -- when you say it was a clone of Craigslist,

8    what did the website offer?

9    A.    So it had want ads, we called them classified ads, for a

10   variety of sections and categories but the category that -- the   01:35:33

11   section that seemed to do the best was Adult.

12   Q.    All right.  And did you charge to post ads on

13   Backpage.com?

14   A.    We did.  We always charged -- almost always charged for

15   ads in the Adult section.                                    01:35:54

16   Q.    Were there categories within the Adult section on

17   Backpage.com?

18   A.    There were.  Those categories are Female Escorts, Male

19   Escorts, Transsexual Escorts, Body Rubs, Adult Jobs, Phone and

20   Web.                                                         01:36:20

21   Q.    During your employment from Backpage.com from 2004 to

22   2018, did you come to learn which category within the Adult

23   section generated the most revenue?

24   A.    The vast majority of revenue is generated in Female

25   Escorts.                                                     01:36:42

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   Was Backpage.com, did it have a site or a market here in | 01:36:47 |
| 2 | Phoenix, Arizona? | |
| 3 | A.   Yes.  It was our first market. | |
| 4 | Q.   How many markets was Backpage.com, how many markets did it | |
| 5 | exist in by the time -- by 2018? | 01:37:04 |
| 6 | A.   It was in hundreds of markets. | |
| 7 | Q.   In the Female Escort section of Backpage.com, can you | |
| 8 | describe the ads from about 2004 to 2009? | |
| 9 | A.   I'm sorry.  In 2004 through 2009? | |
| 10 | Q.   Yes.  Can you describe the nature of the ads that were | 01:37:36 |
| 11 | posted in the Female Escort section between that time period? | |
| 12 | A.   They are prostitution ads. | |
| 13 | Q.   When you say they were prostitution ads, sir, what do you | |
| 14 | base that on? | |
| 15 | A.   A number of factors.  They were numerous sex act pics, | 01:37:58 |
| 16 | there were numerous sex act terms.  We had a relationship with | |
| 17 | The Erotic Review and many of the ads had review IDs going to a | |
| 18 | prostitution review site. | |
| 19 | Q.   All right.  Let me just stop you there just so we | |
| 20 | understand what The Erotic Review is.  We'll ask you some more | 01:38:23 |
| 21 | questions about this later.  Can you describe for the jury what | |
| 22 | The Erotic Review was? | |
| 23 | A.   The Erotic Review is a Yelp for prostitution.  Much in the | |
| 24 | same way that clients in a restaurant will post reviews, Johns | |
| 25 | who frequent prostitutes will post reviews in The Erotic Review | 01:38:51 |

8

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | and it was the largest review site certainly in the U.S. if not | 01:38:56 |
| 2 | the world. | |
| 3 | Q.   Who was the user of the Female Escort category on | |
| 4 | Backpage.com?  Who would -- who did you come to learn would | |
| 5 | actually view the postings? | 01:39:15 |
| 6 | A.   Johns, those people who frequented prostitutes. | |
| 7 | Q.   Sir, do you know an individual by the name of Michael | |
| 8 | Lacey? | |
| 9 | A.   I do. | |
| 10 | Q.   How is it that you know Michael Lacey? | 01:39:30 |
| 11 | A.   He was one of the company's owners. | |
| 12 | Q.   When you say "the company," what company are we referring | |
| 13 | to? | |
| 14 | A.   It was New Times.  It later changed its name to Village | |
| 15 | Voice Media. | 01:39:50 |
| 16 | Q.   And what, if any, was Mr. Lacey's role at the New Times/ | |
| 17 | Village Voice Media? | |
| 18 | A.   Well, he was one of the owners and early on, he was -- | |
| 19 | well, I understood he was involved in the editorial side of the | |
| 20 | company and his other partner, Jim Larkin, ran more of the | 01:40:10 |
| 21 | sales and marketing. | |
| 22 | Q.   From 2004 to 2018 did you interact with Mr. Lacey? | |
| 23 | A.   Yes, I did. | |
| 24 | Q.   Did you exchange emails with him? | |
| 25 | A.   Yes. | 01:40:26 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q. Did you have meetings with him? | 01:40:27 |
| 2 | A. Yes. | |
| 3 | Q. Did you attend meetings outside of Backpage with him? | |
| 4 | A. Yes. | |
| 5 | Q. Do you know where Mr. Lacey resides, not his address but | 01:40:42 |
| 6 | city he resides in? | |
| 7 | A. Phoenix, Arizona. | |
| 8 | Q. And how do you know that, sir? | |
| 9 | A. I saw all the owners sort of lived in Paradise Valley or | |
| 10 | somewhere near there. | 01:41:01 |
| 11 | Q. Is that based on from 2004 to 2018 your interaction with | |
| 12 | some of these individuals? | |
| 13 | A. Yes. | |
| 14 | Q. Is Mr. Lacey seated in the courtroom today? | |
| 15 | A. Yes, he is. | 01:41:15 |
| 16 | Q. Could you please point to him and identify an article of | |
| 17 | clothing he's wearing? | |
| 18 | A. Yeah. He's directly behind you. He has a gray suit, | |
| 19 | white shirt. | |
| 20 | Q. Is he wearing a tie? | 01:41:27 |
| 21 | A. Yes. Cowboy tie. | |
| 22 | Q. Is that sometimes known as a Bolo tie? | |
| 23 | A. Bolo tie, yes. | |
| 24 | Q. Is he wearing glasses? | |
| 25 | A. Yes, black glasses. | 01:41:39 |

CARL FERRER - Direct

1       MR. RAPP:  May the record reflect an identification   01:41:41

2  of the defendant Michael Lacey?

3       THE COURT:  It may so reflect.

4  BY MR. RAPP:

5  Q.   Sir, do you know an individual by the name of Scott Spear?   01:41:45

6  A.   Yes, I do.

7  Q.   How, sir, do you know Scott Spear?

8  A.   Scott Spear was my supervisor for many years.

9  Q.   Did you interact with Mr. Spear?

10  A.   Mr. Spear and I, we worked on Backpage together very   01:42:07

11  closely and I -- we were joined at the hip.

12  Q.   All right.  Is that to suggest that you met with him on a

13  daily or weekly basis?

14  A.   Often three times a day.

15  Q.   Did you exchange emails with him?   01:42:26

16  A.   Yes, I did.

17  Q.   And what was his role at Backpage.com?

18  A.   He was my immediate supervisor so Scott set the budgets,

19  worked on strategy, helped expand it into other markets and

20  signed off of contracts with vendors.   01:42:54

21  Q.   All right.  Is Mr. Spear seated in the courtroom today?

22  A.   Yes.

23  Q.   Could you please point to him and describe an article of

24  clothing he's wearing?

25       MR. FEDER:  We'll stipulate that this is Mr. Spear.   01:43:20

CARL FERRER - Direct

1      THE COURT:  I'm sorry.  Mr. Feder, did you say          01:43:22

2  something?

3      MR. FEDER:  We'll stipulate that this is Mr. Spear.

4  BY MR. RAPP:

5  Q.   Is Mr. Spear wearing a mask?                           01:43:23

6  A.   Yes, he is.

7      MR. RAPP:  May the record reflect an identification

8  of Mr. Spear?

9      THE COURT:  It may so reflect.

10 BY MR. RAPP:                                                01:43:32

11 Q.   Do you know an individual by the name of John Jed Brunst?

12 A.   Yes, I do.

13 Q.   How do you know him?

14 A.   Well, I knew him as Jed and Jed was the CFO of the

15 company.                                                    01:43:48

16 Q.   All right.  And when you say he was the CFO of the

17 company, are we talking about Backpage.com?

18 A.   He was the CFO of the entire company but he approved and

19 helped with the budget for Backpage.com.

20 Q.   How do you know that?                                  01:44:08

21 A.   Because we had numerous budget meetings and budget

22 preparations with Jed present along with Jim Larkin.

23 Q.   All right.  Let me just back up to Mr. Spear just so the

24 record is clear here.  Did you come to learn at some point that

25 Mr. Spear had some type of an ownership interest in           01:44:24

United States District Court

CARL FERRER - Direct

1   Backpage.com?                                                      01:44:31

2   A.   Yes.

3   Q.   And similarly with Mr. Brunst, did he have an ownership

4   interest that you knew of in Backpage.com?

5   A.   Yes, I knew he was also an owner.                             01:44:41

6   Q.   Is Mr. Brunst seated in the courtroom today?

7   A.   Yes, he is.

8   Q.   Could you please identify him and describe an article of

9   clothing he's wearing?

10  A.   He's in the far corner over there with a blue suit, blue     01:44:58

11  striped tie, light blue shirt.

12  Q.   Is he wearing glasses, can you tell?

13  A.   Yes.  He's also wearing glasses.

14          MR. RAPP:  May the record reflect an identification

15  of defendant Jed Brunst?                                           01:45:13

16          THE COURT:  It may.

17  BY MR. RAPP:

18  Q.   Do you know an individual by the name of Andrew Padilla?

19  A.   Yes, I do.

20  Q.   How is it that you know him?                                  01:45:24

21  A.   Andrew Padilla was the supervisor of the Moderation

22  Department.

23  Q.   All right.  Do you know approximately -- and this is at

24  Backpage.com?

25  A.   Yes.                                                          01:45:34

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   Do you know approximately when he started with the | 01:45:35 |
| 2 | company? | |
| 3 | A.   I believe sometime 2006, 2007 he started.  I would say at | |
| 4 | least 2006. | |
| 5 | Q.   And when you say he was an operations manager of | 01:45:50 |
| 6 | moderation, what did that involve? | |
| 7 | A.   Well, he started with the company as a moderator and then | |
| 8 | he stood out as the manager, so he was able to hire additional | |
| 9 | moderators and give them direction and supervision. | |
| 10 | Q.   And who did he answer to? | 01:46:08 |
| 11 | A.   Well, he answered to me. | |
| 12 | Q.   And during the time period that he worked at Backpage.com | |
| 13 | did you exchange emails with him? | |
| 14 | A.   Yes, we did, frequently. | |
| 15 | Q.   Did you have meetings with him? | 01:46:25 |
| 16 | A.   Yes. | |
| 17 | Q.   Is he seated in the courtroom today? | |
| 18 | A.   Yes, he's in the front row, light blue shirt, dark suit, | |
| 19 | also wearing glasses. | |
| 20 |       MR. RAPP:  May the record reflect the identification | 01:46:43 |
| 21 | of the defendant Andrew Padilla? | |
| 22 |       THE COURT:  It may. | |
| 23 | BY MR. RAPP: | |
| 24 | Q.   Do you know an individual by the name of Joye Vaught? | |
| 25 | A.   Yes, I do. | 01:46:53 |

United States District Court

14

CARL FERRER - Direct

1  Q.   How is it that you know Ms. Vaught?                    01:46:54

2  A.   Joye Vaught started with the company as a moderator and

3  then was promoted to a supervisor and reported directly to

4  Andrew Padilla.

5  Q.   All right.  Did you have in-person meetings with        01:47:12

6  Ms. Vaught?

7  A.   Not very often.  I mean, some, yes.

8  Q.   All right.  Did you exchange emails with her?

9  A.   Some, yes.

10 Q.   All right.  Is she seated in the courtroom today?       01:47:27

11 A.   Yes, she is.

12 Q.   Can you please point to her and identify an article of

13 clothing she's wearing?

14 A.   She's on the second row, blonde hair, also wearing glasses

15 and a dark jacket.                                           01:47:46

16 Q.   Can you describe her shirt?

17        THE WITNESS:  Your Honor, may I did stand?

18        THE COURT:  You may.

19        THE WITNESS:  A black and white striped shirt.

20        MR. RAPP:  All right.  May the record reflect an      01:48:00

21 identification of defendant Joye Vaught?

22        THE COURT:  It may.

23 BY MR. RAPP:

24 Q.   I want to ask you about another individual.  Do you know

25 an individual named Dan Hyer?                                01:48:07

United States District Court

CARL FERRER - Direct

1    A.    Yes.                                                          01:48:10

2    Q.    And how is it that you know Mr. Hyer?

3    A.    Dan Hyer worked for Backpage.com as a sales and marketing

4    director.

5    Q.    How long have you known him?                                  01:48:21

6    A.    I've known Dan Hyer since I hired him when I was managing

7    a print publication department, the Inside Sales Department.  I

8    hired Dan Hyer then and later we promoted him to help market

9    Backpage.com.

10   Q.    And do you know an individual by the name of Jim Larkin?      01:48:47

11   A.    Yes, I do.

12   Q.    Did you know him during the time period that you worked

13   for Backpage.com?

14   A.    Yes.  We worked closely together.

15   Q.    All right.  And in what capacity did Mr. Larkin work in       01:48:59

16   Backpage.com?

17   A.    Mr. Larkin was the CEO of the company.  He was Scott

18   Spear's direct supervisor, but I often would work with both

19   Spear and Larkin on numerous activities around Backpage.com.

20   Q.    All right.  Now, I believe that you have testified that      01:49:25

21   your title at the inception of Backpage.com was that of a

22   project manager.  Is that correct?

23   A.    Yes.  It started as a project manager, yes.

24   Q.    All right.  Did that title and your role change from 2004

25   to 2018?                                                            01:49:48

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   The role didn't change.  The titles did change. | 01:49:51 |
| 2 | Q.   All right.  Can you tell the jury what titles you held | |
| 3 | with Backpage.com? | |
| 4 | A.   I started as a project manager and then became sales and | |
| 5 | marketing of Backpage and then went to VP of Backpage, | 01:50:10 |
| 6 | president of Backpage, and then CEO of Backpage. | |
| 7 | Q.   All right.  And when you say your role, despite the change | |
| 8 | in titles, didn't change, what basically was your role from | |
| 9 | 2004 to 2018? | |
| 10 | A.   My role for 2004 to 2018 was to run the site and to hit | 01:50:34 |
| 11 | budget and the budgets came down from Scott Spear, Jim Larkin, | |
| 12 | Jed Brunst. | |
| 13 | Q.   All right.  Where was Backpage based?  Where was it | |
| 14 | officed? | |
| 15 | A.   So it started in Phoenix, Arizona, and then later we added | 01:50:57 |
| 16 | a Marketing Division in Dallas. | |
| 17 | Q.   When you say it was based in Phoenix, Arizona, where in | |
| 18 | the Phoenix metropolitan area was Backpage based? | |
| 19 | A.   It was located at 1201 Jefferson. | |
| 20 | Q.   All right.  And, sir, did you report there?  Is that where | 01:51:22 |
| 21 | you worked out of? | |
| 22 | A.   Yes.  Yes. | |
| 23 | Q.   And the individuals that you have identified in court, | |
| 24 | where did they work? | |
| 25 | A.   They worked in the -- well, they worked at the same | 01:51:39 |

United States District Court

CARL FERRER - Direct

1    location.                                                              01:51:42

2    Q.    All right.  Did there come a time where that location

3    changed?

4    A.    Yes.

5    Q.    When did that happen?                                            01:51:48

6    A.    Around 2012 we vacated the -- that location on Jefferson

7    Street.  Phoenix employees started to work from home and more

8    of Backpage's operational control was in Dallas, Texas.

9    Q.    All right.  And did, for example, Mr. Lacey move to

10   Dallas?                                                                01:52:18

11   A.    No.

12   Q.    Did Mr. Spear move to Dallas?

13   A.    No.

14   Q.    Did Mr. Brunst move to Dallas?

15   A.    No, they did not.                                                01:52:28

16   Q.    Did those three individuals stay here to operate

17   Backpage.com?

18   A.    They did stay here.  I would have to come meet them here

19   often.

20   Q.    All right.  Did you relocate to Dallas?                          01:52:42

21   A.    Yes.

22   Q.    How about Mr. Padilla, did he remain here?

23   A.    Mr. Padilla, he relocated to Dallas along with Joye

24   Vaught.

25   Q.    All right.  Now, as a website, did you have things known         01:53:01

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | as servers? | 01:53:10 |
| 2 | A.   Yes. | |
| 3 | Q.   And can you explain to the jury what a server is? | |
| 4 | A.   A server is a computer storing data.  So we had numerous | |
| 5 | computers because Backpage had a lot of data. | 01:53:24 |
| 6 | Q.   Can you explain -- when you say it had a lot of data, what | |
| 7 | do you mean by that? | |
| 8 | A.   It had the text of the ads and the images along with the | |
| 9 | software to run the site. | |
| 10 | Q.   And I believe a few moments ago in your testimony you said | 01:53:46 |
| 11 | that Backpage had a presence in other cities other than | |
| 12 | Phoenix? | |
| 13 | A.   Yes. | |
| 14 | Q.   And would there be ads posted in each one of those markets | |
| 15 | or cities? | 01:54:01 |
| 16 | A.   I'm not sure I understand the question. | |
| 17 | Q.   Would people post ads in a given city? | |
| 18 | A.   Yes, they would go online to post ads in a given city. | |
| 19 | Q.   All right.  And approximately at Backpage, between 2004 | |
| 20 | and 2018, can you estimate how many postings there were on any | 01:54:24 |
| 21 | given day in certain city? | |
| 22 | A.   Well, tens of thousands of postings in some markets but | |
| 23 | certainly thousands of postings per day. | |
| 24 | Q.   All right.  And is it those postings that would be | |
| 25 | somewhere retained or would find themselves to these servers | 01:54:48 |

United States District Court

CARL FERRER - Direct

1   that you just described?                                          01:54:54

2   A.   Yes.

3   Q.   And the post -- I believe your testimony was the postings

4   made up of images and texts?

5   A.   That's right, the texts of the ads and the images of the    01:55:05

6   ads, later video.

7   Q.   And where were the servers that maintained those -- that

8   data as you say, where were those servers located?

9   A.   So we had multiple server locations but the vast majority

10  of time they were in Tucson, Arizona at a data center called     01:55:30

11  Login.  That's also where our backups were stored.

12  Q.   And were those -- did you have servers anywhere else?

13  A.   We did.  We also had servers at a Phoenix location called

14  PNAP, and we had servers in Dallas, Texas, holding data.  And,

15  finally we had servers in Amsterdam, the Netherlands.            01:56:04

16  Q.   Okay.  Now, I believe your testimony was that in the

17  female escort category, people would pay to post an ad or at

18  least that was one of the few categories where you would

19  actually pay to post an ad.  Is that fair?

20  A.   Yes.                                                        01:56:33

21          MS. BERTRAND:  Objection.  Leading.

22          THE COURT:  Overruled.

23  BY MR. RAPP:

24  Q.   So when somebody would post an ad and pay for it, how

25  would Backpage get paid?  Can you explain that to the jury?      01:56:45

CARL FERRER - Direct

1  A.   Yes.  The process is someone is online.  They put in their          01:56:48

2  ad text, their images, some personally identifiable information

3  like an email address.  They hit "submit" and then a credit

4  card form would pop up onto the screen.  There they can enter

5  their credit card number, their address, their name, CVV, which          01:57:11

6  is like a security code.

7  Q.   That little three-digit code on the back of your credit

8  card?

9  A.   Yes.  Then they hit "submit" and if the credit card works,

10  then the ad will be stored on Backpage's server.                        01:57:29

11  Q.   All right.  And then how is it that them using the credit

12  card, how is it that ultimately the charge on the credit card

13  ends up back at Backpage.com?

14  A.   Yes.  So now that the transaction has been captured by

15  what we call a credit card processor, they will gather the              01:57:54

16  money and then periodically send it to -- to Backpage.com's

17  bank accounts, so it's usually once every two weeks or once a

18  month.

19  Q.   Okay.  So can you explain the difference to the jury

20  between a merchant bank and a treasury bank?                            01:58:24

21  A.   So when you secure credit card processing for any commerce

22  site, we call that merchant banking, trying to find a processor

23  who will use a bank in order for you to take MasterCard and

24  VISA.

25  Q.   All right.  Let me stop you there for the merchant          01:58:50

CARL FERRER - Direct

1   banking.  For a website like Backpage.com, is the merchant   01:58:52

2   banking, is that an important part of the business model?

3   A.  Without merchant banking, you're dead.  I mean, just about

4   everyone wants to pay with a credit card.  It's very difficult

5   to conduct e-commerce without a merchant bank account.   01:59:15

6   Q.  And did you just say e-commerce?

7   A.  Yes.

8   Q.  And e-commerce, what does that mean?

9   A.  It means buying stuff online.

10   Q.  All right.  And then what is the import of treasury   01:59:28

11   banking for Backpage.com?  What's treasury banking?

12   A.  A treasury bank is where you make your payroll, pay your

13   bills.  It's also the bank where the merchant bank will deposit

14   the funds that they have collected from Backpage users.  They

15   will deposit it into a treasury bank.   01:59:59

16   Q.  All right.  Can you tell the jury what treasury banks, if

17   any, Backpage had at its very start and going forward?

18   A.  I recall -- well, for treasury banks, I know that they had

19   BMO, the company had --

20   Q.  Is there a BMO branch that was used by Backpage here in   02:00:24

21   the Phoenix area?

22   A.  Yes.  I believe they also had U.S. Bank.  They certainly

23   had U.S. Bank for a merchant bank but I'm not sure if it was a

24   treasury bank, too.

25   Q.  All right.  But for the merchant bank, the processing part   02:00:40

United States District Court

CARL FERRER - Direct

1  of it?                                                                    02:00:44

2  A.   We initially used U.S. Bank.

3  Q.   And was there a particular company that processed the

4  Backpage transactions?

5  A.   I became more deeply involved in the transactions when we    02:00:57

6  used Litle.   It's like little but only with one T, so

7  L-I-T-L-E.

8  Q.   And just so the jury understands, what was Litle?

9  A.   Litle a credit card processor who would help us secure

10  credit card processing.                                             02:01:27

11  Q.   My last question on this banking part, when you would post

12  an ad in the Female Escort section of Backpage.com, how much

13  would it cost to support an ad?

14  A.   Generally $5, sometimes less.   Smaller markets, $1, $3.

15  Q.   Did that change over time?                                    02:01:55

16  A.   It did.   As Backpage became more of a monopoly in the

17  prostitution category, prices went up.

18  Q.   Just to be clear, did you have other categories on

19  Backpage.com?

20  A.   We did.                                                       02:02:14

21  Q.   For example, if you wanted to sell a couch, did you have a

22  category?

23  A.   We had the category Furniture for Sale.

24  Q.   If I wanted to post an ad in the furnishings or the

25  furniture category, how much would that cost?                     02:02:31

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.    It was free.  With the rare exception that somebody might | 02:02:35 |
| 2 | choose to buy a print ad in the newspaper, but that doesn't | |
| 3 | happen much; and they could buy a sponsor ad, but it was always | |
| 4 | little or no revenue coming from those categories. | |
| 5 | Q.    All right.  Let's go back to the creation of Backpage.com. | 02:02:52 |
| 6 | Whose idea was it to create Backpage.com? | |
| 7 | A.    I believe it was both Jim Larkin and myself, but I | |
| 8 | definitely had a pretty strong lead in it.  Jim Larkin had sent | |
| 9 | me to San Francisco.  And I ended up finding out in San | |
| 10 | Francisco just how strong Craigslist was.  I then had meetings | 02:03:26 |
| 11 | with Larkin where we made the determination that I should take | |
| 12 | that project on. | |
| 13 | Q.    And just to be clear here, Mr. Larkin and Mr. Lacey, I | |
| 14 | believe you testified they were involved in a newspaper here in | |
| 15 | the Phoenix area called "The New Times"? | 02:03:49 |
| 16 | A.    Can. | |
| 17 | Q.    Can you tell the jury what "The New Times" is? | |
| 18 | A.    The "Phoenix New Times" is an alternative weekly.  It has | |
| 19 | long-form journalism, had a substantial classified section in | |
| 20 | the back of the book with a lot of adult massage ads. | 02:04:09 |
| 21 | Q.    All right.  Is that the only newspaper that Mr. Lacey and | |
| 22 | Mr. Larkin owned? | |
| 23 | A.    No.  There's -- there were at least ten more. | |
| 24 | Q.    And were they very similar to what you've just described, | |
| 25 | "New Times"? | 02:04:33 |

United States District Court

CARL FERRER - Direct

1  A.   Yes.                                                      02:04:34

2  Q.   And were they in other cities?

3  A.   Yes.  In fact, those would be the cities that we would

4  later launch in Backpage.

5  Q.   Is there a reason why you launched Backpage in the cities  02:04:46

6  where Mr. Lacey and Mr. Larkin had a -- I think what you called

7  an alternative newspaper?  Is there a reason why that was done,

8  if you know?

9  A.   When we launched in these cities because we wanted to stop

10 the hemorrhaging of revenue, the loss of revenue from the        02:05:05

11 Internet and sites like Craigslist.

12 Q.   All right.  And then going back to 2004, which you've

13 testified was the year that Backpage was created, do you

14 know -- in your capacity as a classified salesperson in that

15 area, do you know how the alternatives were doing in terms of    02:05:27

16 generating revenue?

17          MR. FEDER:  Hearsay.

18          THE COURT:  Yes, he can answer if he knows.  He can

19 answer "Yes" or "No."

20          THE WITNESS:  Yes.  I'm very familiar with it.         02:05:47

21 BY MR. RAPP:

22 Q.   Why are you familiar with it?

23 A.   Well, I was -- I was -- I moved to Phoenix to be on the

24 corporate staff so I was aware that revenue generated by

25 Backpage.  And I understood how much the papers relied on the    02:06:04

United States District Court

CARL FERRER - Direct

profitability of the classified sections and it was getting                                    02:06:10

more and more difficult as sites like Craigslist became

stronger.  So less of the papers -- the rest of the papers were

getting smaller.  They were losing page count.

Q.    All right.  And so when you say these were alternative                                    02:06:26

newspapers, are these newspapers that I would go -- somebody

would deliver to my house and then I would pay them on a

monthly basis or I would go to a machine and put in money,

these things we used to use called coins, and get the

newspaper?  How would they -- how would "The New Times," for                                    02:06:49

example, make money?

A.    Entirely from advertising.  The papers are distributed

free.  They are on racks at grocery stores, restaurants, and

racks around the city.

Q.    And so for them to make money, am I to understand your                                    02:07:13

testimony to be that they relied upon advertisements solely?

A.    Yes.  Well, I should correct that testimony.  There was

some event marketing going on that they would make money from,

some sponsorships of events, but the vast majority of the money

really depended on the number of pages in the newspaper and how                                02:07:37

many ads were sold.

Q.    So can you tell the jury what was the reason that

Backpage.com was started?

A.    It was started to directly compete with Craigslist that

was eroding into the revenue of our newspapers.                                                 02:08:00

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   All right.  And when you started Backpage.com, did you | 02:08:09 |
| 2 | implement any strategies that would allow Backpage.com to be | |
| 3 | competitive with Craigslist? | |
| 4 | A.   Yes. | |
| 5 | Q.   All right.  What was one of the strategies that you and | 02:08:28 |
| 6 | others implemented to try to compete with Craigslist? | |
| 7 | A.   Well, the first strategy is we need to generate revenue | |
| 8 | ourself, so we're going to charge for adult ads and go free | |
| 9 | everywhere else.  And in some markets Craig was charging for | |
| 10 | employment ads.  So we thought, well, we'll be free but we'll | 02:08:58 |
| 11 | always charge for categories like Female Escorts. | |
| 12 | Q.   All right.  And did you find at the very inception of | |
| 13 | Backpage that you were making any money from the Female Escort | |
| 14 | category? | |
| 15 | A.   Yes.  It was the only money, virtually. | 02:09:18 |
| 16 | Q.   All right.  In addition to charging, did you implement any | |
| 17 | other strategy that would allow you to grow the website? | |
| 18 | A.   We did.  We started a process called content aggregation | |
| 19 | which was internal code for stealing ads from Craigslist. | |
| 20 | Q.   All right.  And so what types of ads did you steal from | 02:09:48 |
| 21 | Craigslist? | |
| 22 | A.   We tried to take some job ads, rental ads.  But the ones | |
| 23 | that really worked, the ones that stayed on the site, were the | |
| 24 | ads that Craigslist had under their Erotic Services category. | |
| 25 | Q.   And when you say "steal the ads," can you just sort of -- | 02:10:14 |

CARL FERRER - Direct

1  in some detail explain how you went about actually stealing an          02:10:19
2  ad?
3  A.    We had staff hired to go to Craigslist, find an ad in
4  Phoenix, for example, and then take the ad from Craigslist and
5  just repost it on Backpage, take the images on Craigslist and        02:10:35
6  then just repost it on Backpage.  So we had to do this because
7  we had little or no content to start, so getting content online
8  was the first step.
9  Q.    All right.  But by stealing the ad, how would that wind up
10  generating revenue for you?                                          02:11:01
11  A.    Users or customers of those ads might respond to those ads
12  and then those users would then, in turn, or I should say
13  people would notice our ads on Backpage and maybe they will
14  start paying us.
15         MR. RAPP:  Madam Clerk, could I have the podium             02:11:26
16  please.
17  BY MR. RAPP:
18  Q.    So on your screen there, sir, is what's been marked as
19  United States 2030.  Do you see that there?
20  A.    Yes, I do.                                                    02:11:50
21  Q.    And have you seen this demonstrative exhibit in
22  preparation for your testimony?
23  A.    I have.
24  Q.    And what does it basically demonstrate?
25  A.    This -- this slide as it is right now shows that users        02:12:02

1  posting on Craigslist.                                      02:12:08

2  Q.   Let me just stop you for a minute.  Does this slide

3  demonstrate this process of aggregation?

4  A.   Yes.

5           MR. RAPP:  I would move to admit for demonstrative  02:12:18

6  purposes only United States 2030.

7           THE COURT:  It may be admitted.

8           (Exhibit Number 2030 was admitted into evidence.)

9  BY MR. RAPP:

10 Q.   All right.  And so you were about to explain -- before I 02:12:29

11 cut you off --

12          MR. RAPP:  Could that be published to the jury,

13 please?

14          THE COURT:  I'm sorry.  Mr. Rapp, what was that

15 exhibit number?                                             02:12:40

16          MR. RAPP:  2030.

17          THE COURT:  Yes.  You may publish.

18 BY MR. RAPP:

19 Q.   And now we're talking about aggregation so can you explain

20 to the jury what they are seeing in this first slide?        02:12:57

21          THE COURT:  Let me just make sure all of the jurors,

22 your monitors are working and you can see the slide?

23          Okay.  Thank you.

24          MR. RAPP:  That is somewhat important.

25 \\\

United States District Court

CARL FERRER - Direct

1    BY MR. RAPP:                                          02:13:10

2    Q.   So in this first slide, what does that show?

3    A.   It shows a consumer posting an ad on Craigslist.  That's

4    step one.

5    Q.   And then going to step two, what does that show?      02:13:27

6    A.   It shows a Backpage employee copying the ad content, which

7    is the text of the ad and the images, and posting it on

8    Backpage.

9    Q.   And then step three, what does that show?

10   A.   If we're able to find the email address of the user, we're  02:13:54

11   going to post the ad in their email address and then we're

12   going to send them another email with an ad repost offer.

13   Q.   All right.  And then showing you step four, what does that

14   demonstrate?

15   A.   If the user clicks a link in the email message that we've   02:14:18

16   sent them, we've now captured them as a user because now they

17   will be able to edit their ad through that link.

18   Q.   All right.  Once you did this, was at some point the

19   expectation that they would be a paying client or customer of

20   Backpage?                                              02:14:48

21   A.   Yes.

22   Q.   And did you implement this strategy in just Phoenix or

23   only one city?

24   A.   No.  We implemented it in every major metro market in the

25   U.S.                                                   02:15:08

United States District Court

CARL FERRER - Direct

| 1 | Q.   All right.  And who was basically in charge of this | 02:15:14 |
| 2 | strategy within Backpage? | |

A.   Well, of course me but Andrew Padilla supervised some of our marketing activities in Phoenix and then Dan Hyer took it over in Dallas and did it in an even larger scale.

Q.   All right.  Who directed you on the strategy, if anyone did?

A.   So this strategy is something that we had management meetings with Scott Spear.  Because we needed to hire staff, we would have to get approval from Jed Brunst and put these kind of things in the budget.  So we had a major marketing budget. We spent more on marketing than we did moderation.

Q.   All right.  Did aggregation, the stealing of ads from Craigslist -- was Craigslist the only classified website that you stole ads from?

A.   No.  There were others.  We often would go through The Erotic Review to find leaks.

Q.   Okay.  Let's come back to that.  Did aggregation remain as a strategy from 2004 to 2018?

A.   Let me think about that.  From 2004 to 2018 we didn't need to add content as much once Craigslist dropped the Adult section, so we were sort of becoming the monopoly.  So I would say that around 2010 it wasn't necessary.

Q.   All right.  Did you come to learn that some people were stealing ads from Backpage?

02:15:36
02:16:01
02:16:29
02:16:56
02:17:23

CARL FERRER - Direct

1   A.   Yes.  And we weren't happy about it but, you know, we had      02:17:26
2   started our own business by stealing ads from Craigslist.
3   Q.   All right.  So at the outset of your testimony, and just a
4   few seconds ago, you referenced The Erotic Review.  How -- if
5   it did, how did The Erotic Review -- well, strike that.            02:17:47
6         Was The Erotic Review also a strategy that was
7   implemented by Backpage to grow the site?
8   A.   It was.  It was the secret sauce.
9   Q.   All right.  When you say "secret sauce," what do you mean
10  by that?                                                           02:18:08
11  A.   You could steal content from Craigslist and put it on a
12  website; but if no one responds to those ads, you're not going
13  to turn them into paying customers.  So by having a
14  relationship with The Erotic Review, we could make those ads
15  that we stole from Craigslist, we could make their phone         02:18:27
16  numbers ring.
17  Q.   All right.  And who were you with -- this relationship
18  with The Erotic Review, who were you trying to attract to
19  Backpage.com as users or customers?
20  A.   We wanted those that would respond to prostitutes, the       02:18:51
21  Johns.
22  Q.   Okay.  And did you just come to learn about the existence
23  of The Erotic Review upon the creation of Backpage?
24  A.   No.  I was familiar with The Erotic Review.  They had run
25  ads in our Adult sections of our papers.                          02:19:17

United States District Court

CARL FERRER - Direct

1  Q.   All right.  When you say it was a prostitution review    02:19:21

2  site, if you went to The Erotic Review, what would you expect

3  to see on that site?

4  A.   The price of the services and a description of the sexual

5  services along with a description of the escort or, as they    02:19:48

6  called it on The Erotic Review, the provider.

7  Q.   So did there come a point where you developed a

8  relationship, a business relationship, with The Erotic Review?

9  A.   Yes.

10 Q.   And can you tell the jury how that relationship worked?    02:20:17

11 A.   The relationship worked in that The Erotic Review didn't

12 have pictures on their site so they had a URL called an ad URL

13 which is an ad website.

14 Q.   All right.  Wait a minute.

15 A.   The Web address.    02:20:43

16 Q.   Hang on.  What's a URL in layman's terms, plain English?

17 A.   It's uniform resource locator, I believe, but it's really

18 just a word for a long Web address that will take you to the

19 specific page.

20 Q.   All right.  And so you were telling the jury how this    02:21:03

21 relationship was established?

22 A.   Essentially we're going to exchange links.  The Erotic

23 Review is going to put a link for Backpage that's going to

24 point exactly to a Backpage ad and female escorts so that Johns

25 on The Erotic Review, when they click that link, will arrive on    02:21:22

United States District Court

CARL FERRER - Direct

1  Backpage.                                                    02:21:26

2          And Backpage will do the exact same thing with the

3  ads that are on Backpage.  We will add a link to The Erotic

4  Review for that particular prostitute that when you click, you

5  will go directly to the review on The Erotic Review.  So in a  02:21:42

6  way, Backpage could have prostitution reviews by just having

7  links.

8  Q.   All right.  And similar to aggregation, in preparation for

9  your testimony today, have you reviewed an exhibit that

10 demonstrates visually this relationship between Backpage and   02:22:02

11 The Erotic Review?

12 A.   I have.

13 Q.   And I'm showing you United States 2031 for demonstrative

14 purposes only and so -- and I would request permission -- so is

15 this 2031, is this the demonstrative exhibit that you reviewed  02:22:26

16 that demonstrates how visually this relationship worked?

17 A.   Yes, it does.

18          MR. RAPP:  Move to publish United States 2031.

19          THE COURT:  It may be published.

20          You're not moving for admission?                      02:22:54

21          MR. RAPP:  I'm moving for --

22          THE COURT:  It may be admitted for demonstrative

23 purposes, yes.

24          MR. RAPP:  Thank you.

25          (Exhibit Number 2031 was admitted into evidence.)     02:23:01

United States District Court

34

CARL FERRER - Direct

```
 1  BY MR. RAPP:                                              02:23:04
 2  Q.   All right.  Can you explain to the jury what this first
 3  page demonstrates or shows?
 4  A.   So this -- so on this page, you'll see that The Erotic
 5  Review has a link that on The Erotic Review prostitution review  02:23:22
 6  page for a particular prostitutes they have a link to an ad
 7  that's on Craigslist.
 8  Q.   All right.  And then looking at the next page, what does
 9  this show?
10  A.   This shows the step where Backpage steals the ad from     02:23:47
11  Craigslist or aggregates it.  We have a little vacuum here.
12  That's, essentially, what we would do on Craigslist, just a
13  team of people taking the ads from Craigslist.
14  Q.   All right.  And then let's look at the next slide of 2031.
15  Page three, what does this show?                            02:24:11
16  A.   So in this slide, we are now sending that ad that we took,
17  we're sending the Web address to The Erotic Review and we want
18  them to put the Backpage web address on the prostitute's review
19  page.
20  Q.   All right.  Then let's look at the next slide.  Does this  02:24:42
21  slide demonstrate the link being placed on Backpage?
22  A.   It does.  What it shows is that the user, the John that's
23  on The Erotic Review, will click that link and then they will
24  arrive on Backpage.com and that's what we call in the business
25  a referral.                                                  02:25:10
```

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   All right.  And so in business is referral or what is | 02:25:10 |
| 2 | known as referral traffic, is that important in any respect to | |
| 3 | the development of a website? | |
| 4 | A.   It's really -- it's used by Google to identify what kind | |
| 5 | of website you are based on who is linking to you. | 02:25:32 |
| 6 | Q.   All right.  And did it become important within Backpage to | |
| 7 | track this -- the referrals or referral traffic to Backpage? | |
| 8 | A.   Extremely important.  We identified the traffic coming | |
| 9 | from The Erotic Review.  We generated reports and shared those | |
| 10 | reports with my superiors. | 02:26:03 |
| 11 | Q.   And your superiors being? | |
| 12 | A.   Scott Spear, Jim Larkin, Jed Brunst. | |
| 13 | Q.   A few more questions about The Erotic Review.  Is there | |
| 14 | any point in time where money changed hands between The Erotic | |
| 15 | Review and Backpage for this relationship? | 02:26:28 |
| 16 | A.   Yes. | |
| 17 | Q.   Tell us about that. | |
| 18 | A.   This program was so successful and our budgets to increase | |
| 19 | revenue were very aggressive.  We knew if we could double down | |
| 20 | with a relationship with The Erotic Review that we would hit | 02:26:52 |
| 21 | our budgets in terms of revenue and ad count and page views. | |
| 22 |      So we offered the CEO of The Erotic Review $4,000 a | |
| 23 | month and did a banner ad exchange program with them with the | |
| 24 | hopes that he would send us a lot more referrals. | |
| 25 | Q.   All right.  And when you say "banner ad exchange," can you | 02:27:17 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | just explain that for the jury? | 02:27:21 |
| 2 | A.   A banner ads are, like, pictures, graphic ads, not text, | |
| 3 | and we had a banner ad on The Erotic Review; and in exchange, | |
| 4 | we gave The Erotic Review a sponsor ad on our page.   So | |
| 5 | essentially we reciprocated the banner ads but we still paid | 02:27:47 |
| 6 | them $4,000 a month. | |
| 7 | Q.   All right.   Let me see if I can ask some questions that | |
| 8 | explain this.   Are you saying that if you went during this time | |
| 9 | period -- can you give the jury, just so they have an | |
| 10 | orientation, what is the time period that you started this | 02:28:12 |
| 11 | relationship with The Erotic Review? | |
| 12 | A.   Early on.   We knew The Erotic Review was important as | |
| 13 | early as 2006.   We wanted to keep the referral traffic growing | |
| 14 | so we certainly -- in this time frame is 2007, 2008, 2009. | |
| 15 | Q.   All right.   And so if you went on -- during that time | 02:28:40 |
| 16 | frame, if you went on The Erotic Review, is it your testimony | |
| 17 | that you would see an ad for Backpage on The Erotic Review? | |
| 18 | A.   You would.   You would see it on the home page of The | |
| 19 | Erotic Review and you would see it on the individual reviews. | |
| 20 | It would say "Sponsored By" and then a Backpage logo and then | 02:29:05 |
| 21 | Find Escorts Here. | |
| 22 | Q.   All right.   So it would say Backpage.com, Find Escorts | |
| 23 | Here? | |
| 24 | A.   Yes. | |
| 25 | Q.   And the hope was by seeing that ad, people looking at The | 02:29:20 |

United States District Court

CARL FERRER - Direct

1   Erotic Review would go to Backpage.com?                    02:29:25

2   A.   That's what happened.

3   Q.   All right.

4          THE COURT:  Mr. Rapp I'm going to suggest that we

5   take our afternoon break at this time.                     02:29:35

6          MR. RAPP:  Certainly.

7          THE COURT:  Why don't we stand in a 20-minute recess.

8          And I'll just remind the jurors of an admonishment.

9   When you're at recess, again, do not come to any conclusions,

10  do not discuss the case amongst yourselves or anyone else.  02:29:48

11  Just simply try to enjoy your break and don't go far and we'll

12  resume in 20 minutes.

13          Please all rise for the jury.

14          (Jury departs at 2:30.)

15          THE COURT:  All right.  Thank you.                  02:30:29

16          (Recess at 2:30; resumed at 2:51.)

17          (Court was called to order by the courtroom deputy.)

18          THE COURT:  All right.  Please be seated.

19          Let's bring in the jury.

20          (Jury enters at 2:53.)                              02:53:22

21          THE COURT:  All right.  Please be seated.

22          Mr. Rapp, you may continue.

23          MR. RAPP:  Thank you, Your Honor.

24  BY MR. RAPP:

25  Q.   Mr. Ferrer, when we left, when we left for break we were  02:54:17

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | talking about ads that Backpage had put on The Erotic Review. | 02:54:20 |
| 2 | Do you remember that? | |
| 3 | A.   Yes.   Links.   Links to ads.   Sorry. | |
| 4 | Q.   Links to ads? | |
| 5 | A.   Yes.   Oh.   No, I'm sorry.   The banner ads. | 02:54:37 |
| 6 | Q.   I was talking more about the banner ads.   In the same | |
| 7 | respect, did you have advertisements for The Erotic Review on | |
| 8 | Backpage? | |
| 9 | A.   Yes, we did. | |
| 10 | Q.   Just to distinguish that from the link -- I'm talking | 02:54:58 |
| 11 | about an ad that says something to the effect of we're The | |
| 12 | Erotic Review.   Here's what we are.   That type an ad? | |
| 13 | A.   Yes.   We had that. | |
| 14 | Q.   And did you coordinate having those ads on Backpage.com | |
| 15 | for The Erotic Review, did you coordinate that with some point | 02:55:15 |
| 16 | of contact at The Erotic Review? | |
| 17 | A.   Yes, I did.   Mr. David Elms. | |
| 18 | Q.   And was David Elms the person that you coordinated this | |
| 19 | relationship with at The Erotic Review? | |
| 20 | A.   Yes.   He was the CEO of The Erotic Review. | 02:55:33 |
| 21 | Q.   And as this relationship started with The Erotic Review, | |
| 22 | did you have occasion to actually go on The Erotic Review and | |
| 23 | look at reviews of prostitutes? | |
| 24 | A.   Yes. | |
| 25 | Q.   And what was the purpose of you doing that? | 02:55:56 |

United States District Court

CARL FERRER - Direct

```
 1   A.   I wanted to understand the market and I was tasked with        02:55:57
 2   growing the Female Escorts category and they used The Erotic
 3   Review, very valuable.
 4   Q.   Did you ever see a review on The Erotic Review that was
 5   for something other than a paid-for sexual encounter?             02:56:15
 6              MS. BERTRAND:  Objection.
 7              THE COURT:  Overruled.
 8              THE WITNESS:  No.
 9   BY MR. RAPP:
10   Q.   How long did this relationship, in one form or another,       02:56:33
11   exist between Backpage and The Erotic Review?
12   A.   It certainly started as 2006, 2007 and then I believe
13   that -- it sort of -- we had a relationship with The Erotic
14   Review right up until the site's closing down in 2018 because
15   we continued to allow the review IDs on the ads.                   02:57:05
16   Q.   All right.  So just to be clear, we looked at this
17   demonstrative exhibit which talked in terms of a link.  Did
18   there come a time where you no longer included the actual URL
19   links in a Backpage posting?
20   A.   Yes.                                                          02:57:30
21   Q.   All right.  When did that occur?  Approximately?
22   A.   Approximately 2011 or 2012 I believe.  It's after we just
23   got so much pressure from outside groups to remove the link to
24   The Erotic Review.
25   Q.   I think you have talked in terms of a --                      02:57:59
```

CARL FERRER - Direct

1    THE COURT:  Mr. Rapp, I'm going to ask you to move        02:58:02

2    closer to the microphone, please.

3         MR. RAPP:  Yes, ma'am.

4  BY MR. RAPP:

5  Q.  I think you talked in terms of an identification number in    02:58:07

6  addition to the link.  Can you tell us about that?

7  A.  So we had links in the ads and then users would often just

8  cite the review ID.  They would say, "Check out my reviews,"

9  and then put in a number.  And Johns who used our site knew

10 that that is The Erotic Review ID number.                     02:58:37

11 Q.  All right.  And so did those ID numbers, even after you

12 removed the actual links being embedded in an ad or a posting,

13 did those ID numbers continue to remain in one form or another

14 in the postings until the site's closure in 2018?

15 A.  They remained on the site at least through 2017.  There    02:59:10

16 was a period of time, maybe a month or two before Backpage's

17 closure, that we just had phone numbers and photographs.  But

18 almost the entire life of the site, review IDs were in the

19 Female Escort ad pages, not all of them but a lot of them.

20 Q.  All right.  And I believe your testimony has been that the  02:59:38

21 referral traffic that was generated by The Erotic Review to

22 Backpage was important?

23 A.  It was the secret sauce.  It was one of the reasons why

24 Backpage became the default choice when Craigslist terminated

25 its Erotic Services and Adult Services section.               03:00:04

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.    Was the importance of that referral traffic from The | 03:00:07 |
| 2 | Erotic Review, was it discussed with anybody above you in | |
| 3 | management or ownership? | |
| 4 | A.    Yes. | |
| 5 | Q.    Who was that? | 03:00:25 |
| 6 | A.    Scott Spear and then in budget meetings with Jed Brunst | |
| 7 | and Jim Larkin. | |
| 8 | Q.    Now, in addition to the aggregation and the reciprocal | |
| 9 | link relationship, were there any other strategies that you | |
| 10 | pursued early on in the development of Backpage that expanded | 03:00:46 |
| 11 | the site? | |
| 12 | A.    Yes.  We started to cater to super posters, especially | |
| 13 | since we were focused on growing the market in New York City. | |
| 14 | Q.    And when you say "super poster," can you explain to the | |
| 15 | jury what you consider to be a super poster? | 03:01:15 |
| 16 | A.    So a super poster for Backpage would post thousands of ads | |
| 17 | whereas your average user might just post one or two ads. | |
| 18 | Super posters, they had thousands of prostitution ads that they | |
| 19 | could bring to the site. | |
| 20 | Q.    How did you first establish a relationship, a business | 03:01:44 |
| 21 | relationship, with a super poster? | |
| 22 | A.    When the company purchased "The Village Voice", Jim Larkin | |
| 23 | and Scott Spear sent me to New York City to develop a strategy | |
| 24 | to make Backpage successful.  And early on we identified | |
| 25 | reaching out to those posters who were already posting | 03:02:07 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | prostitution ads in the paper.  And so there were two of them | 03:02:12 |
| 2 | that come to mind that we immediately -- I went to see. | |
| 3 | Q.   All right.  And so when you say you went to see, you | |
| 4 | actually met with them in person? | |
| 5 | MR. FEDER:  Objection.  404(b). | 03:02:31 |
| 6 | THE COURT:  Overruled. | |
| 7 | THE WITNESS:  Yes. | |
| 8 | BY MR. RAPP: | |
| 9 | Q.   All right.  And when you -- where did you meet with them | |
| 10 | in person? | 03:02:40 |
| 11 | A.   So there was a company called Somad and I was taken by the | |
| 12 | classified director of "The Village Voice" to go meet with | |
| 13 | Somad with the goal of having them post ads on Backpage. | |
| 14 | Q.   And when you say you met with some other employee of "The | |
| 15 | Village Voice," is this based in New York? | 03:03:10 |
| 16 | A.   Yes. | |
| 17 | Q.   And who directed you, if anyone, to meet with this person | |
| 18 | that ultimately introduced you to this super poster that you | |
| 19 | have called Somad? | |
| 20 | A.   So this strategy of growing New York to meet the | 03:03:33 |
| 21 | advertisers that are in print and get them to also post online, | |
| 22 | that was a strategy from Larkin and Spear.  I should say Jim | |
| 23 | Larkin and Scott Spear. | |
| 24 | Q.   So who was the person that you met with from "The Village | |
| 25 | Voice" and then ultimately met with Somad? | 03:03:57 |

CARL FERRER - Direct

1    A.    Her name is Angie Alexander.                          03:04:01

2    Q.    And did Ms. Alexander take you to someplace to meet with

3    Somad?

4    A.    Yes.   We went to the Somad office during business hours

5    when they had numerous customers.                           03:04:12

6    Q.    Okay.   And what, if anything, did you observe at that

7    office that -- with Ms. Alexander when you went to meet with

8    Somad?   What did you observe?

9    A.    I observed that these customers were the perfect customers

10   to post in the Female Escort section of Backpage.           03:04:31

11   Q.    And why do you say that, sir?

12   A.    They appeared to be in the prostitution industry.

13            MR. EISENBERG:   Objection.   Foundation.

14            THE COURT:   Sustained.

15            MR. RAPP:   Okay.   Well, let's see if we can address   03:04:45

16   those concerns.

17   BY MR. RAPP:

18   Q.    What did you observe?   What about them made you think that

19   they were in the prostitution industry?

20            MR. CAMBRIA:   Think?                               03:04:54

21            THE WITNESS:   Well, they were there to post ads in

22   Craigslist Erotic Services.

23   BY MR. RAPP:

24   Q.    All right.

25   A.    They appeared to be dressed in a manner that was       03:05:05

CARL FERRER - Direct

```
 1   provocative.                                                    03:05:09
 2   Q.   Were they dressed in a way that was consistent with --
 3             MR. EISENBERG:  Objection.  Leading.
 4             MR. RAPP:  I haven't even finished the question.
 5             THE COURT:  Let him finish the question.          03:05:20
 6   BY MR. RAPP:
 7   Q.   Were they dressed in a way that was consistent with
 8   postings on Backpage.com?
 9             MR. EISENBERG:  Objection --
10             MS. BERTRAND:  Join.                               03:05:30
11             MR. EISENBERG:  -- foundation.
12             THE COURT:  Overruled.
13             He can answer the question.
14             THE WITNESS:  Yes.
15   BY MR. RAPP:                                                 03:05:37
16   Q.   All right.  Now Somad was one super poster you've
17   identified.  Can you identify other -- if there were others,
18   super posters that were cultivated by Backpage.com?
19   A.   Yes.  I later had a meeting with Dollar Bill, known --
20   that's how he's known but his real name, I believe, is William  03:05:57
21   Mersey.
22   Q.   William Mersey.  Okay.  And what -- what role, if any, did
23   this person you've identified as Dollar Bill, what role, if
24   any, did he have as a super poster with Backpage.com?
25   A.   Dollar Bill competed with Somad but he was more in the   03:06:24
```

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Asian massage parlor niche.  And he posted thousands of ads on | 03:06:27 |
| 2 | Craigslist in Erotic Services, so we wanted him to begin | |
| 3 | posting on Backpage, "we" meaning -- well, I did. | |
| 4 | Q.   All right.  When you say Asian massage parlor, how do you | |
| 5 | know that that involves prostitution? | 03:06:46 |
| 6 | A.   Well, if you went to Dollar Bill's blog, the Psycho | |
| 7 | Roundup, he talks about his advertisers, provides reviews. | |
| 8 | MS. BERTRAND:  Objection, Your Honor.  Hearsay. | |
| 9 | THE COURT:  Overruled. | |
| 10 | THE WITNESS:  And we would even later let Dollar Bill | 03:07:12 |
| 11 | advertise that blog. | |
| 12 | BY MR. RAPP: | |
| 13 | Q.   On Backpage.com? | |
| 14 | A.   On Backpage.  And very descriptive of sexual services. | |
| 15 | Q.   Did you also exchange emails with Dollar Bill during the | 03:07:25 |
| 16 | life of his relationship with Backpage.com as a super poster? | |
| 17 | A.   Yes. | |
| 18 | Q.   And have you look at those emails in preparation for your | |
| 19 | testimony today -- | |
| 20 | A.   I have. | 03:07:42 |
| 21 | Q.   -- and tomorrow? | |
| 22 | So a super poster, I think your testimony was a super | |
| 23 | poster would post thousands of ads on Backpage.com? | |
| 24 | A.   That's correct. | |
| 25 | Q.   How would anybody make money off of this relationship? | 03:08:07 |

United States District Court

CARL FERRER - Direct

1  Can you explain that to the jury?                           03:08:11

2  A.  Somad and Dollar Bill would collect a fee for posting ads

3  on sites like Craigslist or Backpage and the goal is to keep

4  the ad near the top of the listings, so it requires some effort

5  on the part of Somad and Dollar Bill to continually move ads to  03:08:36

6  the top or repost or post new ads.  Because ads that are at the

7  top of the listings of Female Escorts, they generate the phone

8  calls whereas if ads go to page two or page three, the phone

9  calls fall off.

10 Q.  All right.  How do you know all of that?                 03:09:01

11 A.  Well, just years -- I ran Backpage for many years and

12 competed with Craigslist for many, many years and we figured

13 out that move to the top was such a money-maker that we ran

14 reports and gave users the option to pay to move their ad to

15 the top and it was the vast majority of revenue.  People would  03:09:22

16 move their ad to the top sometimes twice a day.  We saw that in

17 users.

18       And I -- if they need to get phone calls, the

19 quickest way to do that is to move their ad to the top.

20 Q.  All right.  And did there come a time where -- did these  03:09:45

21 super posters receive, for lack of a better record, any type of

22 preferential treatment from Backpage.com?

23 A.  They had VIP treatment.  They were able to deal with

24 managers like myself or Dan Hyer.  We assigned personnel to

25 provide customer support to them and when incidents occurred    03:10:13

47

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | where ads were removed, they were given preferential treatment | 03:10:18 |
| 2 | in terms of advice on what's wrong with their postings and how | |
| 3 | they need to change it or if we made a mistake, to restore all | |
| 4 | of their ads. | |
| 5 | Q.   All right.  Did there come a time in the life of | 03:10:37 |
| 6 | Backpage.com where the website began to face pressure to make | |
| 7 | changes or even to close the website, to shutter the website? | |
| 8 | A.   Yes. | |
| 9 | Q.   When, approximately, did you learn that you were receiving | |
| 10 | pressure from some outside entities to either change the | 03:11:06 |
| 11 | business model or to close the website? | |
| 12 | A.   I believe in 2009 or 2010 we started to get letters from | |
| 13 | the Attorneys General. | |
| 14 | Q.   All right.  When you say letters from the Attorneys | |
| 15 | General, what were they asking you to do? | 03:11:27 |
| 16 |         MR. CAMBRIA:  Object to the hearsay. | |
| 17 |         MS. BERTRAND:  Join. | |
| 18 |         THE COURT:  Sustained. | |
| 19 | BY MR. RAPP: | |
| 20 | Q.   Well, did you receive a letter from -- did you receive a | 03:11:42 |
| 21 | letter from an organization of Attorneys General? | |
| 22 | A.   Yes.  We did.  In that letter they were calling for -- | |
| 23 |         MS. BERTRAND:  Objection. | |
| 24 |         MR. CAMBRIA:  Not responsive. | |
| 25 |         MS. BERTRAND:  Move to strike. | 03:11:59 |

United States District Court

CARL FERRER - Direct

1    THE COURT:  Mr. Ferrer, when Mr. Rapp asks the          03:12:05
2    question, finish the question, don't offer anything more.  And
3    let him ask the question.
4              I'll sustain the objection.
5              Mr. Rapp, ask your next question.               03:12:16
6    BY MR. RAPP:
7    Q.   Did they put you on notice that there were problems
8    with --
9              MR. KESSLER:  Object to the leading.
10             MS. BERTRAND:  Join.                            03:12:23
11             MR. FEDER:  Judge, before we go on, I am assuming an
12   objection by one is an objection by all?
13             THE COURT:  Yes.
14             MR. FEDER:  Thank you.
15             THE COURT:  All right.  Restart your question, Mr.   03:12:36
16   Rapp.
17   BY MR. RAPP:
18   Q.   Did you receive a letter from the Attorneys General?
19   A.   Yes.
20   Q.   How did you receive that letter?                     03:12:43
21   A.   I believe it was sent to us by email, fax.  I certainly
22   received a copy of it.
23   Q.   All right.  Did you come to learn that other people within
24   Backpage.com also received a copy of it?
25   A.   Yes.  It was a huge development for the company.     03:12:59

CARL FERRER - Direct

1  Q.   Okay.  Why do you say, in your words, it was a huge          03:13:03
2  development?
3            MR. KESSLER:  Objection, Judge.  It calls for
4  hearsay.
5            THE COURT:  Overruled.  As to his knowledge.          03:13:12
6  BY MR. RAPP:
7  Q.   What do you base your knowledge on that it was a huge
8  development?
9  A.   We watched Craigslist be attacked by the state Attorney
10  Generals and we were very concerned that we're next as a        03:13:30
11  company and that led to a lot of our moderation efforts in
12  terms of cleaning up some of the sex act pics.
13  Q.   So let's take a step back.  When you say "we," who are you
14  referring to as we?
15  A.   Jim Larkin, Scott Spear, certainly those two.              03:13:54
16  Q.   All right.  In addition to the Attorneys General, did you
17  also receive any direction from an organization by the name
18  that uses the acronym NCMEC?
19  A.   Yes.  We did.
20  Q.   And what, if any -- well, how did you receive notice by    03:14:14
21  NCMEC to make some changes to your --
22            MR. EISENBERG:  Objection.
23            THE COURT:  Sustained.
24            Rephrase the question.
25  \\\

United States District Court

CARL FERRER - Direct

1   BY MR. RAPP:                                  03:14:30

2   Q.   Well, how did you receive notice?  Did you receive it by a

3   letter --

4           MR. EISENBERG:  Objection as to the contents.

5   Notice.  I'm sorry, Your Honor.                  03:14:38

6           THE COURT:  How did you receive notice, Mr. Ferrer?

7   BY MR. RAPP:

8   Q.   How did you receive notice?

9   A.   Well, we hired an individual to represent the company in

10  its discussions with NCMEC, which is the National Center for   03:15:02

11  Missing and Exploited Children, and there were phone calls set

12  up between Jim Larkin and Ernie Allen of the National Center

13  for Missing and Exploited Children in which I was present on

14  those phone calls.

15  Q.   Okay.  And did you also meet in person with NCMEC?     03:15:20

16  A.   Yes, we did.

17  Q.   All right.  And during those meetings, did NCMEC notice

18  you of problems with your website?

19           MR. KESSLER:  Objection.  Hearsay, and also

20  foundation.  Time.                            03:15:43

21           THE COURT:  I think you can lay some foundation.

22  BY MR. RAPP:

23  Q.   Did you have a meeting with NCMEC?

24  A.   Yes, we did.

25  Q.   Did NCMEC ask to meet with you or did you ask to meet with  03:15:51

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | NCMEC? | 03:15:55 |
| 2 | A.   I believe we asked to meet with NCMEC. | |
| 3 | Q.   All right.  And during that meeting, did some | |
| 4 | representative from NCMEC tell you that there were issues with | |
| 5 | your website? | 03:16:13 |
| 6 | MR. CAMBRIA:  Object to the hearsay. | |
| 7 | MR. KESSLER:  As part of foundation, time. | |
| 8 | MR. CAMBRIA:  And hearsay. | |
| 9 | THE COURT:  And somebody is yelling, "Time." | |
| 10 | MR. KESSLER:  This is Eric Kessler. | 03:16:32 |
| 11 | BY MR. RAPP: | |
| 12 | Q.   When was this meeting? | |
| 13 | A.   I believe in 2010 or 2011. | |
| 14 | Q.   All right.  And did a representative from the National | |
| 15 | Center of Exploited and Missing Children, did they tell you | 03:16:46 |
| 16 | that there was prostitution on your website? | |
| 17 | MS. BERTRAND:  Objection. | |
| 18 | MR. KESSLER:  Objection, hearsay. | |
| 19 | THE COURT:  Sustained. | |
| 20 | MR. CAMBRIA:  Unbelievable. | 03:16:56 |
| 21 | BY MR. RAPP: | |
| 22 | Q.   Did they notify you and give you notice that there was | |
| 23 | prostitution -- | |
| 24 | MR. EISENBERG:  Objection.  Hearsay. | |
| 25 | MS. BERTRAND:  Objection. | 03:17:02 |

CARL FERRER - Direct

1          THE COURT:  Sustained.                              03:17:04

2          MR. CAMBRIA:  And leading.

3  BY MR. RAPP:

4  Q.   Did you meet with an organization by the name of Polaris?

5  A.   Yes.                                                   03:17:11

6  Q.   Do you remember when that meeting took place?

7  A.   It was shortly after the meeting with National Center for

8  Missing and Exploited Children.

9  Q.   And do you know what type of organization Polaris is?

10 A.   Yes.  They are an anti-human trafficking organization.   03:17:27

11 Q.   And did you ask to meet with Polaris or did Polaris ask to

12 meet with you, if you know?

13 A.   I believe the company requested to meet with Polaris.

14 Q.   And during that meeting with Polaris, did they notice you

15 that there was prostitution --                              03:17:54

16         MR. EISENBERG:  Objection.

17         MS. BERTRAND:  Objection.

18 BY MR. RAPP:

19 Q.   -- on the website?

20         MR. EISENBERG:  Hearsay.                            03:18:00

21         MR. CAMBRIA:  And leading.

22         THE COURT:  Sustained.

23 BY MR. RAPP:

24 Q.   Well, let's go back to NCMEC.  Who was at the meeting at

25 NCMEC?                                                      03:18:20

United States District Court

CARL FERRER - Direct

```
 1  A.   At the meeting with NCMEC, I recall myself, Jim Larkin,    03:18:21

 2  Michael Lacey and our user safety experts that we hired, a man

 3  that goes by the name Hemu Nigam and his assistant, Simrin

 4  Hooper I believe.

 5  Q.   And who from NCMEC was present, if you remember?          03:18:49

 6  A.   There were half a dozen members from NCMEC present with

 7  their CEO, Ernie Allen.

 8  Q.   What did Ernie Allen tell you, the members that you've

 9  identified from Backpage --

10          MS. BERTRAND:  Objection.                              03:19:18

11          MR. CAMBRIA:  Objection.  Hearsay.

12  BY MR. RAPP:

13  Q.   What did he tell you you should do with your website?

14          MS. BERTRAND:  Objection.

15          MR. CAMBRIA:  Objection.  Hearsay and leading.          03:19:25

16          THE COURT:  Sustained.

17  BY MR. RAPP:

18  Q.   Did you meet with anybody else other than NCMEC and

19  Polaris?

20  A.   Yes.                                                     03:19:35

21  Q.   All right.  And who else did you meet with?

22  A.   We met with Mayor McGinn and the Chief of Police and his

23  Chief of Staff.

24  Q.   All right.  And did you receive correspondence from Mayor

25  McGinn?                                                       03:20:01
```

United States District Court

54

CARL FERRER - Direct

1   A.   We did.   We received another letter.                      03:20:04

2   Q.   And in that letter did Mayor McGinn tell you --

3           MR. CAMBRIA:   Objection.   Hearsay.

4   BY MR. RAPP:

5   Q.   -- you should shut down your website?                      03:20:13

6           MS. BERTRAND:   Objection.

7           MR. CAMBRIA:   Objection.   Hearsay.   Rank hearsay.

8           MR. FEDER:   And leading.

9           MR. RAPP:   It's not offered for the truth.

10          MR. CAMBRIA:   Doesn't it?                               03:20:24

11      Your Honor, that is disingenuous a statement by him.

12  That's rank hearsay.

13          THE COURT:   Mr. Cambria, let me rule.   I'm going to

14  sustain the objection.   Mr. Feder had an objection.   I heard

15  you say something.                                              03:20:41

16          MR. RAPP:   Let me point out that there's two

17  attorneys.

18          MR. FEDER:   I want an objection for the entirety of

19  this line of questioning.   He is obviously trying to bring

20  out --                                                          03:20:58

21          THE COURT:   Mr. Feder, we're not going to have

22  sidebar conversation right now.   I can discuss your objection

23  when we end today.   You can put it on the record.

24      Let's continue forward, Mr. Rapp.

25  \\\

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 03:21:14 |
| 2 | Q.   Did you -- did there come a time where certain media | |
| 3 | outlets did stories on Backpage.com? | |
| 4 | A.   Yes, quite often. | |
| 5 | Q.   All right.  Can you identify the media outlets that did | 03:21:30 |
| 6 | stories on Backpage.com? | |
| 7 | A.   Perhaps the one that was most impactful was -- | |
| 8 |          MR. CAMBRIA:  Your Honor, I object.  It's not | |
| 9 | responsive. | |
| 10 |          THE COURT:  Overruled.  I didn't hear his answer yet | 03:21:45 |
| 11 | so I don't know if it was nonresponsive, Mr. Cambria, because | |
| 12 | you were speaking over him. | |
| 13 | BY MR. RAPP: | |
| 14 | Q.   I'll tell you what.  Why don't we break this down to | |
| 15 | broadcast media versus print media?  Were there stories in | 03:21:59 |
| 16 | broadcast media, television, that was critical of Backpage? | |
| 17 | A.   Yes.  There were. | |
| 18 | Q.   And what broadcast medial outlets did exposés on Backpage? | |
| 19 |          MR. EISENBERG:  Objection.  Leading. | |
| 20 |          MS. BERTRAND:  Objection.  Misstates the testimony. | 03:22:26 |
| 21 |          THE COURT:  Overruled as to both. | |
| 22 |          THE WITNESS:  CNN. | |
| 23 | BY MR. RAPP: | |
| 24 | Q.   All right.  And I believe you had actually answered this | |
| 25 | but let's go back over it.  On the print media, who did stories | 03:22:39 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | on Backpage.com that were critical of the website? | 03:22:43 |
| 2 |        MR. KESSLER:  Object to the form of the question. | |
| 3 |        THE COURT:  Sustained. | |
| 4 | BY MR. RAPP: | |
| 5 | Q.  Did anybody in print media write a story an Backpage.com? | 03:22:54 |
| 6 | A.  Yes.  The "New York Times". | |
| 7 | Q.  Was there a particular writer at the "New York Times"? | |
| 8 | A.  Nicholas Kristof, the columnist. | |
| 9 | Q.  All right.  In addition, did you receive notice of stories | |
| 10 | aside from just the "New York Times" but other stories, other | 03:23:21 |
| 11 | newspaper stories on Backpage.com, either hard print or | |
| 12 | digital? | |
| 13 | A.  Yes.  It was very frequent.  There were a loot of Google | |
| 14 | alerts. | |
| 15 | Q.  All right.  Can you explain to the jury what a Google | 03:23:37 |
| 16 | alert is? | |
| 17 | A.  So Google alerts are something that you set up to alert | |
| 18 | you -- well, what I did is I set up Backpage.com to send me an | |
| 19 | alert whenever it was in the news and I know others in the | |
| 20 | company did that, too. | 03:24:00 |
| 21 | Q.  Who else in the company do you know of that also had a | |
| 22 | Google alert for Backpage.com? | |
| 23 |        MS. BERTRAND:  Objection.  Foundation. | |
| 24 |        THE COURT:  I think he can answer the question who | |
| 25 | else does he know. | 03:24:14 |

United States District Court

57

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | THE WITNESS:  Scott Spear.  I'm sorry. | 03:24:17 |
| 2 | THE COURT:  Overruled. | |
| 3 | Go ahead.  You may answer. | |
| 4 | THE WITNESS:  Sorry if I jumped the gun. | |
| 5 | Scott Spear. | 03:24:25 |

BY MR. RAPP:

Q.    Anybody else?

A.    I'm not sure.

Q.    As a result of these meetings that you identified with
NCMEC and Polaris, and I believe you identified a Mayor for
Seattle, as a result of these meetings, did you make some
changes to what you would put on the website in terms of an ad
in the Female Escort section?

A.    Yes.  We sanitized the site.

Q.    When you say you sanitized the site, what do you mean by
that?

A.    It means we make it less obvious prostitution.

Q.    Do you know what the term "moderation" means?

A.    Yes.

Q.    All right.  What does moderation mean in the website
space?

A.    It means that the content is going to be reviewed by
either a human or a computer to conform to the terms of use.

Q.    All right.  And with respect to Backpage.com, what did you
implement -- did you implement some type of moderation?

United States District Court

CARL FERRER - Direct

1    A.    Yes, we did.                                                        03:26:00

2    Q.    Can you explain to the jury when you really started

3    implementing moderation?

4    A.    I believe it started as early as 2006 with Scott Spear's

5    PowerPoint to get rid of explicit nudity.                                03:26:21

6    Q.    All right.  And I think earlier on in your testimony you

7    described the postings from the inception up to approximately

8    2008, 2009 as having explicit nudity?

9    A.    Yes.  It was the wild, wild west in terms of content.

10   Just about anything was posted.  Full sex act pics.                      03:26:53

11   Q.    All right.  And then in -- did you implement -- I think

12   your term was sanitizing the website.  Can you explain to the

13   jury -- let's just start with images.  What, if anything, did

14   you do to sanitize the site when it came to images?

15   A.    So a standard was set earlier on between *Hustler* and            03:27:24

16   *Playboy* standard.  This was a term that Scott Spear coined and

17   so we started the team in that area.  That meant sex act pics

18   needed to go and you could still have full nudity but you

19   couldn't have extreme closeups of genitalia.  And then the

20   standards would continually be modified to where eventually no           03:27:46

21   more pictures of genitalia is allowed but topless is okay and

22   then the standards would change once again as the pressure

23   mounted to then eliminate topless.

24   Q.    Okay.  Starting in 2006, your testimony is that this

25   started in 2006 and Mr. Spear came up with the *Hustler* versus         03:28:14

United States District Court

CARL FERRER - Direct

```
 1   Playboy standard, going forward, how was that implemented to    03:28:18
 2   remove those types of images?  How logistically was that done?
 3   A.   So the images would just be removed.  Eventually, we would
 4   put it into queues and people would remove the image.  But the
 5   point to note here is the person who posted the ad, the whole    03:28:48
 6   ad is not going to be removed, just the image.
 7   Q.   Well, all right.  So I think your testimony was there were
 8   ads that had full-on sex acts.  If you remove the sex acts, did
 9   you continue to post the ad?
10            MR. KESSLER:  Object as to time.                        03:29:16
11            MR. PANCHAPAKESAN:  It also misstates testimony.
12            THE COURT:  Overruled as to misstating the testimony.
13        I guess, Mr. Rapp, there should be more foundation as
14   to the time frame.
15            MR. RAPP:  Right.  Thank you.                           03:29:29
16   BY MR. RAPP:
17   Q.   When did the removal of sex acts pics, when did that
18   start?
19   A.   2006 I believe, 2007.
20   Q.   All right.  And you had described, as time went on, that    03:29:43
21   certain images were even further removed based upon -- I
22   believe your testimony is based upon pressure that you
23   received?
24   A.   Yes.  And it was done in a graduated manner over a period
25   of years.                                                        03:30:08
```

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   Did you ever -- did you ever just block the ad entirely? | 03:30:10 |
| 2 | A.   No.  We didn't block users for posting sex act pics.  We | |
| 3 | blocked users if they have used a stolen credit card but not if | |
| 4 | they posted a sex act pic. | |
| 5 | Q.   All right.  And so if they weren't blocked, does that mean | 03:30:35 |
| 6 | that they could continue to post? | |
| 7 | A.   Yes.  They could just post again if they are not blocked. | |
| 8 | Q.   Now let's talk about text, words.  Did there come a time | |
| 9 | where you started sanitizing the sites of certain words? | |
| 10 | A.   Yes. | 03:31:06 |
| 11 | Q.   Why did you do that? | |
| 12 | MR. KESSLER:  Objection.  That's going to call for | |
| 13 | hearsay. | |
| 14 | THE COURT:  Overruled. | |
| 15 | THE WITNESS:  The rules or some terms made the ads | 03:31:22 |
| 16 | more obvious prostitution, especially when they referred to a | |
| 17 | sex act pic.  So we started removing those words from the ad | |
| 18 | but not deleting the ad.  If they were a frequent violator, we | |
| 19 | might delete the ad. | |
| 20 | BY MR. RAPP: | 03:31:47 |
| 21 | Q.   So we have talked about the volume that any given market | |
| 22 | was receiving and I believe your testimony is that sometimes | |
| 23 | you would receive, in any given market on a given day, | |
| 24 | thousands of postings; is that correct? | |
| 25 | A.   Correct. | 03:32:10 |

United States District Court

CARL FERRER - Direct

```
 1   Q.   And I believe your testimony is, if it was a large market,   03:32:11
 2   you could receive upwards of 10,000 ads on a given day?
 3   A.   Maybe several thousand might be more --
 4   Q.   More accurate?
 5   A.   More accurate, yeah.                                          03:32:29
 6   Q.   But in any event, how -- what type of a staff did you have
 7   to review these postings to sanitize them of these images and
 8   terms?
 9           THE COURT REPORTER:   I'm sorry.   Can you put your
10   hand up when you object?   I can't tell who is objecting.         03:32:42
11           MR. FEDER:   Feder objecting.
12           THE COURT:   And what was the objection?
13           MR. FEDER:   Foundation.   Time.   This is a progressive
14   issue, Judge.   We need to know what, when.
15           THE COURT:   And I would agree, Mr. Rapp, when you're     03:33:07
16   talking in generalities, it's not really helpful.   If you could
17   narrow down the time frame that you are -- and it may be
18   redundant but I think it's important.
19   BY MR. RAPP:
20   Q.   All right.   You had to have a staff to review these        03:33:22
21   postings to sanitize of images and texts?
22   A.   Yes.   Yes.   That's correct.
23   Q.   How were you able to -- how was the staff able to keep up
24   with the sanitation efforts given the volume of ads and let's
25   just start in, say, 2008?                                         03:33:46
```

CARL FERRER - Direct

1  A.  We needed technology's help.      03:33:53

2  Q.  And what type of technology did you implement to assist in

3  this?

4  A.  We had filter blocking that could either block an ad from

5  being posted if it used a forbidden term or it would strip that  03:34:09

6  term out if it used that term.

7  Q.  All right.  But if it would strip the term out, can you

8  give us an example of a term that you would strip out of the ad

9  and allow it to continue to be posted?

10         MR. FEDER:  Again, foundation as to time.     03:34:36

11         MR. RAPP:  2008.

12         THE COURT:  In 2008, yes.

13         THE WITNESS:  In 2008, if the term BBBJ appeared in

14  an ad, the user would -- may be able to type it in and the ad

15  would get submitted to our servers.  The ad would go live and  03:34:54

16  then a process would run that would just eliminate that term.

17  The ad would still go live but BBBJ would no longer be there in

18  the ad.

19  BY MR. RAPP:

20  Q.  Is that BBBJ, is that an acronym for a reference to a sex  03:35:09

21  act?

22  A.  Yes.

23  Q.  And then once the technology stripped that term out as of

24  2008 going forward, would the ad continue to be posted?

25  A.  Yes.                       03:35:31

63

CARL FERRER - Direct

```
 1   Q.   And who within Backpage would implement this removal of          03:35:36
 2   images and the stripping of terms on a daily basis?  Who was
 3   responsible for that?
 4              MS. BERTRAND:  Objection.
 5              MR. KESSLER:  Objection.  Foundation.  Time.              03:35:55
 6   BY MR. RAPP:
 7   Q.   2008 going forward.
 8              MR. KESSLER:  Well, "going forward" is a long time.
 9              MR. RAPP:  There's two attorneys over there objecting
10   for one defendant.                                                  03:36:05
11              THE COURT:  Yes.  I think --
12              MR. CAMBRIA:  What's wrong with that?
13              THE COURT:  Mr. Feder, you can make the objection.
14              Mr. Rapp, let's clarify.  We're in 2008.
15   BY MR. RAPP:                                                        03:36:18
16   Q.   I'm talking about 2008 going forward and implementing
17   sanitation efforts.
18              MS. BERTRAND:  Same objection.
19              THE COURT:  I think that you're going to get the
20   foundation objection because 2008 could mean 2008 to 2010,          03:36:27
21   2015, 2018.  So maybe just narrow it down in terms of time
22   frame, Mr. Rapp.
23   BY MR. RAPP:
24   Q.   All right.  Let's just take 2008 to 2010.
25   A.   The supervisor of the Moderation Department, Andrew            03:36:45
```

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Padilla. | 03:36:49 |
| 2 | Q. So when you had postings that had both images that | |
| 3 | contained sex acts and a term that was indicative of a sex act, | |
| 4 | why wouldn't you just block the entire ad? | |
| 5 | MR. FEDER: And we're talking about 2008. | 03:37:16 |
| 6 | MR. RAPP: I'm talking 2008 to 2010. | |
| 7 | THE COURT: I think he's clarified 2008 to 2010. So | |
| 8 | unless he states a different year -- | |
| 9 | Mr. Rapp, and you will clarify that? | |
| 10 | MR. RAPP: I will. | 03:37:31 |
| 11 | THE COURT: Reask the question. | |
| 12 | MR. EISENBERG: Your Honor, if I may. We haven't had | |
| 13 | a definition of an image of a sex act, so I'm not sure -- I'm | |
| 14 | sorry. I don't mean to go on about this but I don't think we | |
| 15 | have a basis for that, Your Honor. | 03:37:48 |
| 16 | THE COURT: Well, I guess, Mr. Rapp, you can ask the | |
| 17 | question. | |
| 18 | BY MR. RAPP: | |
| 19 | Q. Can you -- so you've described at various times starting | |
| 20 | in 2006 that there were images on the postings that were sex | 03:38:00 |
| 21 | acts? | |
| 22 | A. Yes. | |
| 23 | Q. Can you describe, to the best of your ability, during time | |
| 24 | frame before you implemented moderation efforts, can you | |
| 25 | describe what the sex act involved? | 03:38:25 |

CARL FERRER - Direct

1   A.   One example might be a woman giving a man oral sex.    03:38:30

2   Q.   All right.  Is there other variations of sex acts similar

3   to that that would be images on postings that you would

4   receive?

5            MS. BERTRAND:  Objection.  Vague.    03:38:49

6            THE COURT:  Overruled.

7            THE WITNESS:  Yes.

8   BY MR. RAPP:

9   Q.   Did the moderation efforts that you implemented, starting

10   in 2008 going forward, right up until the site was closed in    03:39:07

11   2018, did the moderation efforts in removing images or terms,

12   did they in any way impact the revenue for Backpage, if you

13   know?

14            MR. FEDER:  Objection.  Compound.  Over a 12-year

15   period?    03:39:37

16            THE COURT:  Overruled.

17            THE WITNESS:  I was responsible for the revenue.  I

18   worked on setting the budgets and despite our moderation

19   improvements, the budgets were always aggressive in terms of

20   growth and revenue, and I never saw any impact to the revenue    03:39:56

21   from our moderation efforts.

22   BY MR. RAPP:

23   Q.   All right.  Can you explain to the jury what a charge-back

24   is?

25   A.   A charge-back would be when a user files a complaint that    03:40:21

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | their card was -- a card holder files a complaint that their | 03:40:28 |
| 2 | card was used unauthorized. | |
| 3 | Q.   If you blocked a user -- let's just start in 2008 going | |
| 4 | forward, to 2018.  If you blocked a user based on -- based upon | |
| 5 | whatever image or term they included in a posting, would you | 03:40:58 |
| 6 | retain that poster as a customer going forward? | |
| 7 | A.   We didn't block the user if they posted sex act pics or | |
| 8 | put sex term language in their ads, but we would block them if | |
| 9 | they used a stolen -- if they used a credit card unauthorized | |
| 10 | and filed a charge-back.  That was a big deal.  Then we blocked | 03:41:27 |
| 11 | the credit card.  Then we blocked the email address, then we | |
| 12 | blocked the phone number from appearing in the ad.  A lot of | |
| 13 | efforts were given to prevent people from using credit cards | |
| 14 | unauthorized. | |
| 15 | Q.   All right.  And why was that the case?  Why, why was that | 03:41:47 |
| 16 | important, that credit card users who were using a fraudulent | |
| 17 | credit card, why were they blocked? | |
| 18 | A.   If you received too many charge-backs, like over half a | |
| 19 | percent, for example, you might go on probation with MasterCard | |
| 20 | and VISA; and the last thing the company wanted was any kind of | 03:42:12 |
| 21 | attention by MasterCard and VISA. | |
| 22 | Q.   Okay.  Well, let's talk about that.  Why did you not want | |
| 23 | to have this attention with these major credit card companies, | |
| 24 | MasterCard and VISA? | |
| 25 |            MR. FEDER:  Calls for hearsay and speculation. | 03:42:35 |

United States District Court

CARL FERRER - Direct

1    THE COURT:  He can give his understanding as to why.    03:42:37
2  The question was posed as why do you.  So overruled.
3    MR. FEDER:  But it implies what a credit card company
4  is doing, Judge.  Speculation, hearsay.
5    THE COURT:  The question was posed as to why it was    03:42:55
6  important to him.
7    Mr. Rapp, rephrase your question or reask it.
8  BY MR. RAPP:
9  Q.   Why was it important to you, working at Backpage.com, that
10  you didn't have a bunch of charge-backs?    03:43:09
11  A.   Because if we lose our merchant account, our ability to
12  take credit cards, we could go out of business so very
13  important -- that's a very important metric in this business,
14  to keep the charge-back rate lower.
15  Q.   And how do you know that if you had a high rate of    03:43:33
16  charge-backs, how do you know that would pose a problem with
17  your merchant bank, your credit card processor?
18    MR. FEDER:  Hearsay.  Speculation.
19    THE COURT:  Overruled.
20    THE WITNESS:  We had regular meetings with --    03:43:50
21    MR. RAPP:  Hold on.
22    I think there was an objection.
23    THE COURT:  There was earlier.  I overruled it.
24    MR. RAPP:  I'm sorry.  My apologies.  I thought I
25  heard some other objection.    03:44:03

United States District Court

CARL FERRER - Direct

```
 1   BY MR. RAPP:                                              03:44:06
 2   Q.   How would that create a problem with your merchant credit
 3   card processing, a high rate of charge-backs?
 4             MR. FEDER:  Objection.  Speculation.
 5             THE COURT:  Sustained.                           03:44:23
 6   BY MR. RAPP:
 7   Q.   How do you know this?  How do you know?  Did you deal with
 8   your merchant credit card processing bank on some regular
 9   basis?
10   A.   We did.  We had regular meetings with a company like   03:44:34
11   Litle, the credit card processor, who would inform us --
12             MR. FEDER:  Objection.  Hearsay.  Move to strike.
13   This appears to be an intentional kind of issue to let --
14             THE COURT:  Mr. Feder, let me rule on the objection.
15             MR. FEDER:  Mr. Ferrer is not responding to the   03:44:58
16   question.
17             THE COURT:  I'll sustain it and the portion as to
18   beginning that the credit card processor who would inform us,
19   that part is stricken.
20             You may reask the question.                       03:45:20
21   BY MR. RAPP:
22   Q.   That relationship with your merchant bank, was that
23   important to the success of Backpage?
24             MR. CAMBRIA:  Your Honor, he answered the question.
25   He said they would lose their credit card business.  He      03:45:38
```

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | answered the question. | 03:45:41 |
| 2 | THE COURT:  Reanswer the question. | |
| 3 | And let's move on, Mr. Rapp. | |
| 4 | THE WITNESS:  It's critical, yes. | |
| 5 | BY MR. RAPP: | 03:45:51 |
| 6 | Q.   Did there come a time where the credit card companies | |
| 7 | blocked the use of their cards for Backpage postings? | |
| 8 | A.   Yes. | |
| 9 | Q.   When did that happen? | |
| 10 | A.   That happened in July of 2015.  We lost MasterCard and | 03:46:14 |
| 11 | VISA. | |
| 12 | Q.   All right.  And when you lost those credit card companies, | |
| 13 | the ability for somebody to use the credit cards to post an ad, | |
| 14 | how -- how were you able to get paid for postings on | |
| 15 | Backpage.com? | 03:46:40 |
| 16 | A.   We initially just went free. | |
| 17 | Q.   All right.  Just taking a step back for just a minute.  We | |
| 18 | talked about the major credit card companies blocking the use | |
| 19 | of their cards in 2015 but was there -- and you've referred to | |
| 20 | this credit card processor by the name of Litle.  Did there | 03:47:07 |
| 21 | come a time where they stopped allowing you to process credit | |
| 22 | card transactions? | |
| 23 | A.   Yes.  Litle terminated us. | |
| 24 | Q.   All right.  And what year did they terminate you? | |
| 25 | A.   I believe around 2013, sometime in that year. | 03:47:33 |

United States District Court

CARL FERRER - Direct

1    Q.   All right.  And once you began to use -- lose this credit          03:47:39

2    card processing, let's start with the 2013, how did Backpage as

3    a company respond to that, the fact that Litle, that you've

4    identified as your merchant credit card processing bank, when

5    they discontinued allowing you to process, how did you -- how        03:48:02

6    did Backpage as a company respond to that?

7    A.   We engaged a consultant and then went looking for

8    processing in Europe.

9    Q.   All right.  And when you went to look for processing, as

10   you say, in Europe, who was involved in that within Backpage?       03:48:28

11   Was it you or who else?  Who in upper management, if any, was

12   involved in that?

13   A.   Certainly Scott Spear, who read the banking agreements,

14   myself, Jim Larkin, and Jed Brunst who had to open up companies

15   to secure European processing.                                      03:48:54

16   Q.   And when you say that you secured European processing, can

17   you explain to the jury why you had to go to Europe to obtain

18   this processing for the transactions here in the United States?

19   A.   Because U.S. banks did not want to do business with us.

20          MR. FEDER:  Calls for hearsay.  Speculation.                 03:49:23

21          THE COURT:  Overruled.

22          THE WITNESS:  Because U.S. banks did not want to do

23   business with Backpage.

24   BY MR. RAPP:

25   Q.   All right.  And when you went -- so can you explain to the     03:49:31

| | | |
|---|---|---|
| 1 | jury why -- were you able to secure processing in Europe? | 03:49:35 |
| 2 | A.   Yes.   We were able to secure banks by using a company in | |
| 3 | Bulgaria and finding a bank in Liechtenstein and the UK. | |
| 4 | Q.   All right.   And those banks that you found -- and this is | |
| 5 | in 2013.   This is before the July 2015, major credit card | 03:49:57 |
| 6 | companies like AMEX and MasterCard blocked the use, did the | |
| 7 | European banks from 2013 to 2015, did they not have the same | |
| 8 | problems with Backpage that the banks in the United States had? | |
| 9 | MR. FEDER:   Hearsay and speculation. | |
| 10 | THE COURT:   Sustained. | 03:50:29 |
| 11 | THE WITNESS:   They had -- | |
| 12 | BY MR. RAPP: | |
| 13 | Q.   Let me ask you another question. | |
| 14 | A.   Oh.   Sorry. | |
| 15 | Q.   Did you do anything to try to conceal the fact that | 03:50:38 |
| 16 | Backpage was the ultimate recipient of the credit card | |
| 17 | transactions, the revenue? | |
| 18 | MR. FEDER:   Objection.   Speculation. | |
| 19 | THE COURT:   Overruled. | |
| 20 | THE WITNESS:   Yes.   We created holding companies. | 03:50:59 |
| 21 | BY MR. RAPP: | |
| 22 | Q.   And can you explain to the jury first why did you create | |
| 23 | holding companies? | |
| 24 | A.   A European bank only wants to deal with a European company | |
| 25 | so you have to set up a European company, even though it's just | 03:51:14 |

CARL FERRER - Direct

1    a shell.                                                    03:51:18

2    Q.   All right.  And did that -- in so doing, did that allow

3    you to continue to receive credit card processing?

4    A.   It did.  Yes.

5    Q.   Now, you identified another point where the credit cards,   03:51:37

6    your credit cards were blocked from processing and you

7    identified that as July of 2015.  Your response in July -- in

8    2013 was to go overseas to Europe.  What did you do when the

9    major credit card companies blocked you in July of 2015?

10   A.   We attempted to secure processing that was even more high   03:52:17

11   risk in Asia.

12   Q.   All right.  And when you say "we," who -- was there

13   anybody who was either assisting you or giving you direction on

14   establishing these bank relationships in Asia?

15   A.   I had some assistance from Jed Brunst and representative   03:52:41

16   working for the sellers, Don Moon.

17   Q.   Okay.  And how is it that you were able to obtain this

18   processing?  This is now July -- post-July of 2015.  How were

19   you able to obtain this processing for credit cards?

20   A.   After 2015?                                              03:53:15

21   Q.   Yes.

22   A.   Well, we -- I signed agreements with the shakiest

23   companies in the world and they turned out to be, you know,

24   really some of them just thieves.  They didn't send us our

25   funds.  It was very difficult.  But later we were able to set   03:53:31

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | up partner companies in Europe using five separate holding | 03:53:37 |
| 2 | companies in Europe with different Web domains. | |
| 3 | Q.   All right.   And when you say using different Web domains, | |
| 4 | why did you do that? | |
| 5 | A.   To conceal the transactions so instead of Backpage.com, it | 03:54:03 |
| 6 | would be Ad Post 24. | |
| 7 | Q.   All right.   And why were you trying to conceal the fact | |
| 8 | that the transaction was being processed for a posting on | |
| 9 | Backpage.com? | |
| 10 | A.   So MasterCard and VISA wouldn't shut it down.   They would | 03:54:23 |
| 11 | have a hard time finding it. | |
| 12 | Q.   After July of 2015, were there other ways that Backpage | |
| 13 | implemented to get paid for an ad posted on the website? | |
| 14 | A.   Yes. | |
| 15 | Q.   What was that? | 03:54:52 |
| 16 | A.   There were money orders, which was very successful. | |
| 17 | Q.   Can you explain that to the jury, how money orders were | |
| 18 | utilized instead of credit card transactions on how that was | |
| 19 | successful? | |
| 20 | A.   So we -- we had a line of credit for our customers.   If | 03:55:14 |
| 21 | they were good customers, they could get credit of -- I can't | |
| 22 | recall the exact number, maybe $50, $100 worth of credit and | |
| 23 | then they could mail us a money order, and they often did. | |
| 24 | There were days that we had $70,000 worth of money orders come | |
| 25 | in on a single day. | 03:55:41 |

United States District Court

CARL FERRER - Direct

1    Q.   All right.  But when the major credit card companies          03:55:43

2    blocked their use of the cards for transactions and you had to

3    find these other avenues to pay, did you lose substantial

4    revenue?

5    A.   Initially, especially when the site went free.  But then      03:56:02

6    it started to build back up because we had money orders and

7    other alternative ways of payment.

8    Q.   What were the other alternative ways of payment?

9    A.   Gift cards like Starbucks gift cards.

10   Q.   So explain that to the jury.  How would you use, for          03:56:24

11   example, a Starbucks gift card to post an ad on Backpage.com?

12   A.   So you go to your user account and you buy credits and

13   when you buy credits, you're given different payment choices.

14   If you chose gift cards, there were select gift cards that we

15   would accept and they just put in the number, the gift card      03:56:54

16   number, and then submit.  We would then give them credits and

17   then take that gift card and then, through a third party, sell

18   it on the resell market.

19   Q.   All right.  And so can you give us an example of, say,

20   based upon your experience, if you've got a $50 gift card, how    03:57:20

21   were you able to make any money selling that on some type of

22   secondary market?

23   A.   A $100 gift card is easier for me.

24   Q.   All right.  You choose.

25   A.   So $100 gift card is accepted by Backpage.  We send it to    03:57:37

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | the secondary market.  They send us back -- they take a 35 | 03:57:42 |
| 2 | percent commission so then they send us back $65. | |
| 3 | Q.   Okay.  Do you know the term vanilla VISA? | |
| 4 | A.   Yes. | |
| 5 | Q.   And so can you explain to the jury what a vanilla VISA | 03:58:03 |
| 6 | card is? | |
| 7 | MR. FEDER:   Foundation as to time and then if this is | |
| 8 | after 2015, 401, 403. | |
| 9 | THE COURT:   Let him first answer the question of what | |
| 10 | a vanilla VISA is and then Mr. Rapp can ask the next question. | 03:58:22 |
| 11 | BY MR. RAPP: | |
| 12 | Q.   What is a vanilla VISA? | |
| 13 | A.   Vanilla VISA is sold in a store like 7-Eleven.  It's | |
| 14 | anonymous, you pay cash and get a card. | |
| 15 | Q.   Did there come a time in the life of Backpage.com where | 03:58:39 |
| 16 | you accepted vanilla VISAs to pay for postings? | |
| 17 | A.   Yes.  It was one of our top-producing cards. | |
| 18 | MR. FEDER:   Move to strike the final answer as | |
| 19 | nonresponsive. | |
| 20 | THE COURT:   Overruled. | 03:59:02 |
| 21 | Reask the question, Mr. Rapp. | |
| 22 | BY MR. RAPP: | |
| 23 | Q.   When did that start?  When did you start allowing posters | |
| 24 | to use vanilla VISA cards? | |
| 25 | A.   I think from the very beginning, but it was really brought | 03:59:15 |

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | to our attention with the relationship with Litle that vanilla | 03:59:18 |
| 2 | VISA was 70 percent of your credit card transactions. | |
| 3 | Q.   So Litle informed you of this fact? | |
| 4 | A.   They were shocked by it. | |
| 5 | Q.   Now, did there come a time in the life of Backpage.com | 03:59:38 |
| 6 | that there were efforts to sell the website? | |
| 7 | A.   Yes. | |
| 8 | Q.   I want to take you to 2011.  Was there any effort to sell | |
| 9 | the website in 2011? | |
| 10 | A.   Yes, there was. | 04:00:03 |
| 11 | Q.   And what, if anything, did you do in your capacity to | |
| 12 | assist in selling the website? | |
| 13 | A.   I worked with Jed Brunst to create the PowerPoint to sell | |
| 14 | the site and then I went on numerous presentations with | |
| 15 | investors, buyers. | 04:00:26 |
| 16 | Q.   Do you recall how much you were trying to sell the website | |
| 17 | for back in 2011? | |
| 18 | A.   I thought it was $100 million.  I believe. | |
| 19 | Q.   Okay.  And you've mentioned Mr. Brunst.  Can you explain | |
| 20 | what role, if any, he had with you in trying to sell the | 04:00:54 |
| 21 | website? | |
| 22 | A.   He worked closely with Duff Phipps in creating the | |
| 23 | PowerPoint and setting up the meetings that we would go to and | |
| 24 | we often would make presentations together. | |
| 25 | Q.   All right.  And when you made these presentations to those | 04:01:20 |

United States District Court

77

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | potential buyers, did you discuss with them the strategies that | 04:01:30 |
| 2 | we spoke about earlier, the aggregation and the reciprocal link | |
| 3 | relationship and the super poster relationship? | |
| 4 | A.   We did not share with them the prostitution ad marketing | |
| 5 | activities. | 04:01:54 |
| 6 | Q.   All right.  Did you have success selling the website in | |
| 7 | 2011? | |
| 8 | A.   We came close but then there was some bad news that came | |
| 9 | out in the media and the deal was canceled. | |
| 10 | Q.   Okay.  Then going forward, was the site sold in 2015? | 04:02:11 |
| 11 | A.   Yes, on paper. | |
| 12 | Q.   Who bought the website in 2015? | |
| 13 | A.   I became the owner on paper. | |
| 14 | Q.   All right.  When you say you became the owner on paper, | |
| 15 | what do you mean by that, Mr. Ferrer? | 04:02:49 |
| 16 | A.   My job description never really changed, only now I could | |
| 17 | sign the bank agreements. | |
| 18 | Q.   So how much -- how much did you pay for the website in | |
| 19 | 2015? | |
| 20 | A.   Over $600 million with another kicker that was valued at | 04:03:10 |
| 21 | 50 to 100 million if the site did well.  So it was over 600 | |
| 22 | million. | |
| 23 | Q.   Can you explain that term "kicker" for the jury? | |
| 24 | A.   Jim Larkin was concerned that he had sold the site too | |
| 25 | cheap; and so if the site continued to grow in revenue, that he | 04:03:32 |

CARL FERRER - Direct

1  wanted a kicker added to the agreement where they would get                04:03:35

2  more money.

3  Q.  Did you have $600 million?  Did you pay -- did you write

4  them a check for the website?

5  A.  I did not write them a check.  I did not have the money.              04:03:52

6  They were going to do it on an earn-out and just sweep the

7  cash.

8  Q.  All right.  And so you have got to explain that to the

9  jury.  When you say they were going to do it as an earn-out and

10  sweep the cash, what are you talking about?                               04:04:06

11  A.  Well, the funds that would go to the Backpage accounts

12  they would take as payments for principal and interest so

13  whatever money came in, they would find a way to get swept to

14  their accounts, their bank accounts.

15  Q.  And so this was -- am -- are we to understand that you               04:04:28

16  would make a certain amount of money per month running the

17  website and then that money, if I understand your terminology,

18  would be swept out of the accounts and then go to the sellers?

19  A.  You know, for the first three months, it wasn't so much

20  swept out as we made payments.  But after losing credit cards,          04:04:53

21  it just was messy and so they just wanted to get all of the --

22  any cash that was coming in and so that was payments.

23  Q.  And so who were the sellers?  Who sold the website to you?

24  Who were the people that sold it?

25  A.  So that would be the owners:  Michael Lacey, Jim Larkin,             04:05:21

United States District Court

CARL FERRER - Direct

1    Jed Brunst, and Scott Spear.                                    04:05:25

2    Q.   So this sale, from your testimony, happened in 2015;

3    right?

4    A.   Yes.

5    Q.   And then I believe your testimony a few moments ago,        04:05:39

6    something else happened in 2015 as well?

7    A.   Right.  At three months after the purchase of the site,

8    MasterCard and VISA terminated and so we went from showing a

9    profit to losing money -- losing money in the fourth month.  It

10   was going to be impossible to make payments without MasterCard   04:06:02

11   or VISA.

12   Q.   The months preceding -- let's just call it the credit card

13   block, how much were you sweeping out to pay Mr. Lacey,

14   Mr. Larkin, Mr. Brunst, and Mr. Spear?

15   A.   I recall those three months I believe we were making        04:06:24

16   payments of 14 million per month.

17   Q.   All right.  And once the credit card's blocked, I believe

18   your testimony is -- did you have some difficulty making those

19   monthly payments?

20   A.   We couldn't make the monthly payments.  We were even        04:06:46

21   concerned with whether we could make payroll.

22   Q.   All right.  And as a result of that, what, if anything,

23   did you do regarding staffing in the wake of this credit card

24   block?

25   A.   We terminated 70-some employees in Phoenix and some in      04:07:13

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Dallas. | 04:07:17 |
| 2 | Q.   And what type of -- what type of positions did you | |
| 3 | terminate because of your inability to make payroll? | |
| 4 | A.   It was mainly moderators. | |
| 5 | Q.   All right.  And once you, in your words, mainly -- am I to | 04:07:40 |
| 6 | understand that you let go the moderators? | |
| 7 | A.   Yes. | |
| 8 | Q.   Did that include Mr. Padilla and Ms. Vaught? | |
| 9 | A.   No.  They continued to remain with the company. | |
| 10 | Q.   By 2015 when you bought the website for 600 million, what | 04:08:10 |
| 11 | do you approximate the website making on an annual basis during | |
| 12 | that time frame.  Let's just say 2014 and then 2015? | |
| 13 | A.   Annual revenue was annualizing 150 million to 160 million. | |
| 14 | There were some days revenue was annualizing at 180,000 -- or | |
| 15 | 180 million.  What I mean by that is, you take the total | 04:08:48 |
| 16 | revenue and multiply it by 365 then would get your annual | |
| 17 | potential revenue. | |
| 18 | Q.   All right.  So when you -- you've discussed now, after the | |
| 19 | credit card block, that you had to come up with ways to get | |
| 20 | credit card processing? | 04:09:09 |
| 21 | A.   Yes. | |
| 22 | Q.   And I believe that you identified a name of one of these | |
| 23 | shell companies that I think your words were sort of concealed | |
| 24 | that Backpage was the ultimate recipient of the revenue; is | |
| 25 | that right? | 04:09:29 |

United States District Court

CARL FERRER - Direct

| | |
|---|---|
| 1 | A.   Could you state that again?  I'm sorry. | 04:09:31 |
| 2 | Q.   I will.  So when the credit card companies blocked the use |
| 3 | of the credit card company's credit cards to do transactions to |
| 4 | post ads, I believe your testimony is you had to go elsewhere, |
| 5 | overseas? | 04:09:49 |
| 6 | A.   Yes. |
| 7 | Q.   And who did you deal with from the sellers to assist in |
| 8 | trying to get credit card processing? |
| 9 | MR. PANCHAPAKESAN:  Objection.  Foundation. |
| 10 | THE COURT:  I'm going to overrule.  It's a confusing | 04:10:15 |
| 11 | question as well. |
| 12 | MR. RAPP:  I can make it easy. |
| 13 | BY MR. RAPP: |
| 14 | Q.   Is there somebody that you dealt with from the sellers on |
| 15 | the credit card processing -- on trying to establish banking? | 04:10:23 |
| 16 | A.   Yes.  Jed Brunst. |
| 17 | Q.   All right.  And what did you observe became Mr. Brunst's |
| 18 | role in that regard after the sale?  What was his role? |
| 19 | A.   Bill collector. |
| 20 | Q.   All right.  And when you say "bill collector," did he -- | 04:10:46 |
| 21 | did he serve any role in trying to assist in getting banking so |
| 22 | that you could process transactions? |
| 23 | A.   Yes.  He was involved in the financial problems the |
| 24 | company was having and wanted to understand the revenue that |
| 25 | was coming in and what our options were for banking and when we | 04:11:15 |

CARL FERRER - Direct

1  might, you know, get the reserves coming from these other          04:11:21

2  credit card processors that were -- that's what I mean by bill

3  collector.

4  Q.   All right.  And how frequently would you have contact with

5  him from July of 2015 going forward regarding bill collectors,    04:11:34

6  in your words?

7  A.   A minimum of a few times a week, either myself or the CFO

8  that we had we would have contact with him.

9  Q.   Now, in terms of the operation of the site from July of

10  2015 going forward, who was in control of the site?             04:12:04

11  A.   In terms of the operations of the site through what dates

12  again?

13  Q.   From July 5, 2015, through 2018.

14  A.   I am.  I guess I'm running the site but I'm having regular

15  meetings with the sellers.                                       04:12:29

16  Q.   All right.  And when you say you're having regular

17  meetings with the sellers, who from the sellers were you having

18  regular meetings with?

19  A.   Jim Larkin, Don Moon, Dan Quigley, another intermediary.

20  Q.   All right.  Now, Mr. Ferrer, let's talk about you.  Sir,    04:12:52

21  how old are you?

22  A.   62.

23  Q.   And are you married?

24  A.   I am.

25  Q.   Children?                                                    04:13:10

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A. Yes, three. | 04:13:11 |
| 2 | Q. Did you go to college? | |
| 3 | A. I did. I went to the University of Wisconsin. | |
| 4 | Q. And what did you study at the University of Wisconsin? | |
| 5 | A. Communication, English, and business. | 04:13:25 |
| 6 | Q. All right. And when you got out of college, did you serve | |
| 7 | in the military at all? | |
| 8 | A. I did. I joined the National Guard to pay my student | |
| 9 | loans and eventually even reenlisted. | |
| 10 | Q. All right. And then as some point, as an adult, did you | 04:13:43 |
| 11 | get into the classified sales arena? | |
| 12 | A. I did a few years after college. I started working for a | |
| 13 | shop or a want ad paper, so that's why I have a lot of | |
| 14 | expertise in the classified ad business. | |
| 15 | Q. And did you eventually go from -- and work at a couple of | 04:14:15 |
| 16 | newspapers? | |
| 17 | A. I did. I worked for "The Milwaukee Journal", a couple of | |
| 18 | their papers, and then decided to make a transition into the | |
| 19 | alternative weeklies. | |
| 20 | Q. All right. And what year was that approximately? | 04:14:30 |
| 21 | A. 1996 I met with Jim Larkin, had an interview. | |
| 22 | Q. And did you start working for one of his alternative | |
| 23 | newspapers? | |
| 24 | A. I did. I worked for him in Dallas, Texas, so in 1996. | |
| 25 | And I was a classified director managing a staff of 15 to 20 | 04:14:50 |

United States District Court

CARL FERRER - Direct

1  people.                                                          04:14:56

2  Q.   All right.  And how long did you do that before you were

3  involved in the creation of Backpage?

4  A.   So I did that and I joined the corporate staff after a

5  number of years, was sent around paper to paper to try to build   04:15:13

6  revenue.  So I was familiar with markets like San Francisco

7  where I became aware that Craigslist was just devastating the

8  company's revenue.

9            And then in 2003 is when I started to develop

10 Backpage with the company, hiring the developers.                04:15:37

11 Q.   Okay.  By the way, with respect to these alternative

12 newspapers, at the peak, based upon the time that you worked

13 there from 1996, let's just go to 2018, at the peak, how many

14 of these alternative newspapers did Mr. Larkin, Mr. Lacey,

15 Mr. Brunst and Mr. Spear have ownership over?                     04:16:16

16 A.   I know it's over -- approximately 12.  11 to 12, maybe

17 more.

18 Q.   And then at some point did they buy what is known as "The

19 Village Voice"?

20 A.   Yes.  They bought "The Village Voice" but that included     04:16:38

21 other markets like Minneapolis.

22 Q.   All right.  And just for the jury's edification, where is

23 "The Village Voice" located?

24 A.   In New York City.

25 Q.   Now, you've now testified that Backpage was created in      04:16:57

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | 2004.  By the time you get to 2011, when we just talked a few | 04:17:00 |
| 2 | minutes ago that it was the first effort to sell Backpage.com, | |
| 3 | how were these alternative newspapers doing, if you know, in | |
| 4 | terms of revenue? | |
| 5 | A.   They are not doing well.  They are shrinking in page size. | 04:17:23 |
| 6 | They are cutting back in staff.  I'm familiar because, you | |
| 7 | know, I know many of the people at the different newspapers. | |
| 8 | They are not doing very well.  In fact, a year later they would | |
| 9 | be sold.  2012. | |
| 10 | Q.   Mr. Lacey, Mr. Larkin, Mr. Spear, and Brunst sold their | 04:17:46 |
| 11 | interests in these alternative newspapers? | |
| 12 | A.   They did. | |
| 13 | Q.   So if you know, was the only asset that they had, was it | |
| 14 | Backpage.com that was generated revenue? | |
| 15 | A.   I remember that -- well, it was the only asset -- I can't | 04:18:15 |
| 16 | really speak to that.  I can say it's one of the assets that | |
| 17 | was continuing to grow revenue dramatically, like double-digit | |
| 18 | growth. | |
| 19 | MR. RAPP:  So Madam Clerk, if you could put so the | |
| 20 | witness can see the screen. | 04:18:43 |
| 21 | BY MR. RAPP: | |
| 22 | Q.   We talked earlier about content aggregation.  Do you | |
| 23 | remember that conversation we had earlier in your testimony? | |
| 24 | A.   Yes. | |
| 25 | Q.   So I'm showing you United States 1056.  Do you see on your | 04:19:02 |

United States District Court

CARL FERRER - Direct

1   screen?                                                         04:19:08

2   A.   Yes, I do.

3   Q.   And is this an email from you to Scott Spear?

4   A.   Yes, it is.  It's the Backpage work plan.

5   Q.   Is that attached to the email?                             04:19:29

6   A.   It is.

7   Q.   And did you starting in 2004 through approximately 2013,

8   did you exchange emails with Mr. Spear?

9   A.   We did a lot of email exchanges.

10  Q.   And is this the email address internal that you would have 04:19:53

11  Mr. Spear's name on it?

12  A.   Yes.

13  Q.   And in preparation for your testimony in this trial, have

14  you looked at a lot of email exchanges between you and

15  Mr. Spear?                                                      04:20:08

16  A.   I have.

17  Q.   And are those emails that you either authored and sent to

18  him or he sent to you?

19  A.   Yes, both.

20          MR. RAPP:  All right.  Move to admit United States      04:20:23

21  1056.

22          MR. FEDER:  401.  403.

23          MR. CAMBRIA:  There are prior objections, please.

24          THE COURT:  Overruled.

25          It may be admitted.                                     04:20:32

CARL FERRER - Direct

1        (Exhibit Number 1056 was admitted into evidence.)      04:20:33

2            MR. RAPP:  And request permission to publish, Your

3    Honor.

4            THE COURT:  It might be published.

5    BY MR. RAPP:                                                04:20:47

6    Q.   All right.  I think you were just testifying that this was

7    a work plan that you were sending to -- from you to Scott

8    Spear.  Why were you sending him this work plan?

9    A.   Scott Spear likes this level of detail.  I've organized

10   the things that we've discussed and I put it into, like, a     04:21:08

11   functional to-do list that we're going to be working on.  And

12   this is something that I would send to him regularly, these

13   kind of work plans and agendas.

14   Q.   All right.  And I think your testimony earlier was you

15   were joined at the hip with Mr. Spear?                          04:21:26

16   A.   I was in Mr. Spear's office all the time.

17   Q.   All right.  And just so the jury understands the layout of

18   the offices, was your office right next to Mr. Spear?

19   A.   No.  My office was in Building A but Building B had better

20   coffee so I would go over there first thing in the morning for  04:21:49

21   the good coffee and then say hello to Spear and Larkin and then

22   go over work plans with them and what we're going to be working

23   on.

24            And we were also together trying to sell licenses.

25   Q.   All right.  Can you explain that to the jury?  They are    04:22:11

United States District Court

CARL FERRER - Direct

1  selling licenses?                                                      04:22:14

2  A.   Scott Spear had a lot of connections with all weeklies all

3  over the country so he's well-known.

4  Q.   How do you know that?

5  A.   Well, because I saw him do it.  He knows the publishers of   04:22:27

6  all of these other papers that we're trying to sell licenses to

7  and I watched him -- he sold our first license.

8  Q.   All right.  But when you sell a license, what does that

9  mean?  What do you get out of selling a license?

10 A.   Well, early on we thought that we're going to make          04:22:45

11 Backpage a technology company and we're going to provide all

12 weeklies with this technology solution to compete with

13 Craigslist.  We learned fairly quick that this was a mistake

14 and we would stop doing that.  We didn't need newspapers to get

15 a website off the ground.                                         04:23:07

16        But at this time, in 2005, we're busy trying to sell

17 licenses.

18 Q.   All right.  And so this work plan, I'm now showing you

19 1056a, and is this the work plan that you were referencing

20 earlier a few minutes ago that you would frequently provide      04:23:33

21 him?

22 A.   Yes, it is.

23        MR. RAPP:  Move to admit 1056a as well.

24        MR. FEDER:  401.  403.  801.

25        THE COURT:  Overruled.  It maybe admitted.               04:23:49

United States District Court

89

CARL FERRER - Direct

```
 1              (Exhibit Number 1056a was admitted into evidence.)    04:23:50
 2   BY MR. RAPP:
 3   Q.   All right.  And we had talked earlier in your testimony
 4   about content aggregation.  Do you see that on your screen
 5   there?                                                           04:24:05
 6   A.   Yes, I do, in the middle of the page.
 7   Q.   All right.  And in that you have a reference to adult.  Do
 8   you see that there?
 9   A.   Yes.
10              MR. RAPP:  Judge, I'm sorry.  I meant to ask that     04:24:21
11   this be published.
12              THE COURT:  Yes, it may be published -- I'm sorry.
13   Are you asking now?
14              MR. RAPP:  Yes.
15              THE COURT:  Yes, it may be published.                 04:24:34
16              MR. RAPP:  It wasn't published on the jurors' screen.
17   BY MR. RAPP:
18   Q.   Just go back a little bit.  Do you see the highlighted
19   portion there?
20   A.   Yes.  I do.                                                 04:24:44
21   Q.   Okay.  And is this reference content aggregation that we
22   were talking about before?
23   A.   Yes, it does.
24   Q.   And on that 2, can you read the second -- the number 2
25   under content aggregation?                                       04:25:03
```

United States District Court

CARL FERRER - Direct

1  A.   Yes.  It says, number two:  Adult, list every independent          04:25:05
2  escort.  Secure 200 ads in every market.
3  Q.   And can you explain to the jury what the goal was that you
4  were trying to do?  What were you trying to communicate with
5  Mr. Spear with this?                                                    04:25:24
6  A.   That our intent is to seed the site, the Female Escorts
7  category, with 200 independent escorts.
8  Q.   Okay.  And what does 200 independent escorts mean?
9  A.   Meaning they should have different phone numbers and
10 different pictures so that it looks like it's a lot of content          04:25:42
11 that the consumer of those ads would enjoy going through.
12 Q.   All right.  You have testified that the Female Escort
13 section was the most profitable category in Adult?
14 A.   Yes.
15 Q.   Did you also have categories that were Personals?                  04:26:06
16 A.   We did.  We sometimes called it Dating, same thing.
17 Personals, Dating.
18 Q.   Did you come to learn -- oh, wait a minute.  Did you
19 charge -- if somebody wants or wanted to put a posting in the
20 Dating section, did you charge for that posting?                       04:26:29
21 A.   At what time timeline?
22 Q.   Well, let's start in 2005.
23 A.   In 2005 it was free to post in Personals.
24 Q.   All right.  Did you come to learn that the prostitutes
25 that posted in the Female Escort section, did you come to learn        04:26:57

CARL FERRER - Direct

1   that they were posting for free in the Personal section?          04:27:01

2          MR. FEDER:  Hearsay.

3          THE COURT:  Overruled.

4          THE WITNESS:  Yes, it was a problem.

5          MR. RAPP:  Madam Clerk, if you could publish that     04:27:16

6   again.  Thank you.

7   BY MR. RAPP:

8   Q.   And so drawing your attention to this section Sponsor and

9   Maintenance, do you see that there?

10  A.   Yes, I do.                                                04:27:34

11  Q.   And do you see under c, there is a reference to personal

12  ads.  Can you read that, what you tell Mr. Spear in that bullet

13  point under c?

14  A.   I write:  Personal ads are hooker-free and posted in the

15  appropriate categories.                                       04:27:57

16  Q.   What are you communicating to Mr. Spear in that -- in that

17  bullet point under c?

18  A.   I'm telling Spear, Mr. Scott Spear, that one of our tasks

19  that we will accomplish this quarter will be to take the hooker

20  ads, which are prostitution ads that have a price, and we're   04:28:22

21  going to get those ads out of there and move them to the

22  correct category which would be normally Female Escorts.

23  Q.   All right.  Moving on to Exhibit 1057, do you see this

24  email on your screen there, sir?

25  A.   Yes, I do.                                                04:28:58

CARL FERRER - Direct

```
 1   Q.   And is this an email exchange between you and Mr. Spear in    04:28:59
 2   2006?
 3   A.   Yes, it is.
 4        MR. RAPP:  Move to admit United States 1057 and
 5   request permission to publish.                                    04:29:17
 6        MR. FEDER:  401.  403, 801.
 7        THE COURT:  Overrule.  It maybe admitted.
 8        (Exhibit Number 1057 was admitted into evidence.)
 9        MR. FEDER:  And, I'm sorry, 106.
10        MS. BERTRAND:  Also, I'm not sure if the Government's        04:29:35
11   moving in simply the excerpt from the document that is
12   highlighted for the lawyers to see or the entire document and I
13   can't see the entire document behind it.
14        THE COURT:  Yes.  The entire document is blurred.  I
15   mean it's in the background, Mr. Rapp, if you look at the         04:29:52
16   screen.  Okay, because you can't see it.
17        MR. RAPP:  It's an email exchange.
18        THE COURT:  Okay.  Now I see it.
19        MR. RAPP:  Thank you.
20        THE COURT:  Well, let me finish.  It may be admitted.       04:30:12
21   Did you move to publish?
22        MR. RAPP:  Yes.  I request permission to publish.
23   BY MR. RAPP:
24   Q.   And so directing you to this portion there, do you see
25   that there?                                                       04:30:30
```

United States District Court

1   A.    Yes.                                                          04:30:30

2   Q.    And drawing your attention to the middle part of this, is

3   this an email from Mr. Spear to you?

4   A.    It is.

5   Q.    And could you read the highlighted portion there?  And        04:30:42

6   I'll ask you some questions on the other side of it.

7   A.    Yes.  Scott Spear writes:  Massage and personal services

8   in the Services Category Forums, (sex, gay, lesbian -- we need

9   to do some work here) personals, specifically MSM, which is --

10  Q.    Can I stop you?  What does that stand for?                     04:31:11

11  A.    Men seeking men.

12          -- and WSM, women seeking men, as they are loaded

13  with lewd and lascivious pics as well as escorts.

14  Q.    What did you understand lewd and lascivious pics to mean?

15              MR. FEDER:  Hearsay.  Speculation.                       04:31:37

16              THE COURT:  Overruled.

17              MR. CAMBRIA:  Relevance.

18              MS. BERTRAND:  Relevance.

19              THE COURT:  Overruled.

20              THE WITNESS:  That is extreme graphic close-ups of       04:31:42

21  genitalia or sex act pics.

22  BY MR. RAPP:

23  Q.    And then he also says:  As well as escorts.

24          What did you take that to mean that?

25  A.    The prostitutes are posting free ads in Dating and this is     04:32:03

United States District Court

CARL FERRER - Direct

```
 1   going to be a lot of work to try to convert them into paid      04:32:07
 2   customers in the Female Escorts category.
 3   Q.   All right.  Was that something of a concern?
 4   A.   It was a concern.  Scott Spear was invested in this
 5   project to build --                                             04:32:25
 6             MR. FEDER:  Move to strike.  Hearsay.  Speculation.
 7             THE COURT:  Sustained.  Sustained and I think we --
 8   are you done with this exhibit or are you going to move on?
 9             MR. RAPP:  I've got just a couple quick questions.
10             THE COURT:  The only reason I ask is, if we can      04:32:46
11   finish quickly, we should because we're at about 4:33 now and
12   so I promised our jurors we would break around this time.  But
13   if you have one question left . . .
14             MR. RAPP:  I'll tell you what.  How about we just
15   break and I'll -- we'll take it up tomorrow.                   04:33:03
16             THE COURT:  Okay.
17             Members of the jury, we are now at our afternoon
18   recess.  And, again, it's vitally important that you not make
19   up your minds.  We're at the very beginning stages of the case,
20   as you know.                                                   04:33:18
21             We took a week off, essentially, to enable some of
22   our participants to get better and, hopefully, I'm on the mend
23   here, too.  But in any event, I just ask that you, again, not
24   do any research, not talk to any of your co-workers or your
25   family members or your friends about what has transpired in the 04:33:37
```

United States District Court

CARL FERRER - Direct

 1   court.  Doing so will then kind of lead you down the rabbit          04:33:42

 2   hole of trying to make up your mind about what's going on and

 3   what's being said.

 4         We still have a long way to go so simply just keep an

 5   open mind.  Maybe do something more enjoyable tonight and get       04:33:54

 6   out there.  I think it's under 100 degrees today, thankfully.

 7         And so with that, we will stand in recess until

 8   sharply nine a.m. tomorrow.

 9         Please all rise for the jury.

10         (Jury departs at 4:34.)                                        04:34:09

11         THE COURT:  All right.  Please be seated and I ask

12   those who are in the courtroom to remain seated for a few

13   minutes to permit our jurors to leave uninterrupted.

14         Now, let me just clarify for the record, Mr. Rapp.  I

15   know that previously the prior Court and this Court did             04:34:54

16   indicate to you that the letters, the Attorney General letters

17   and so on were admissible; but the way in which you went about

18   seeking to admit, I thought that what you were going to do is

19   show Mr. Ferrer the letters.

20         MR. RAPP:  I am going to do that.                             04:35:26

21         THE COURT:  So in any event, I sustained the hearsay

22   objection because of the manner in which the testimony was

23   being elicited so I just wanted to clarify that so that you

24   understand.

25         MR. RAPP:  I do.                                              04:35:44

CARL FERRER - Direct

1    THE COURT:  And I will say that Mr. Feder's point is        04:35:45

2  a good one in terms of identifying the time frame in which

3  you're talking about because we've talked about a whole range

4  of time, from 2004 to 2018.

5    When you talk about so many activities occurring, it       04:36:03

6  would be very helpful for the jury to understand the time frame

7  because, as you know, some of the individuals here have claimed

8  that they weren't employed at the time at Backpage at the time

9  that certain things happened.

10    With that, we will resume --                              04:36:22

11    Oh, and I wanted to say, Mr. Cambria, although I

12  enjoy hearing from you and your objections, we need not

13  highlight the objection.  Hearsay objection is a hearsay

14  objection.  It doesn't necessarily have to be emphasized by

15  saying it's a rank hearsay objection, so just be mindful of    04:36:39

16  that.

17    MR. RAPP:  Can I just briefly, Judge.  You know, we

18  went through a huge process of going through these exhibits and

19  the defense made a very robust record on that.  I don't know if

20  we need to have them throw out all of the citations to the     04:36:57

21  Federal Rules of Evidence.  If they could just say "our

22  previous objections," I think that does it for the record.  I

23  only suggest this just in the interest of time.

24    The second part of this is a minor point is, once I

25  admit it, can we just automatically just publish it just so I   04:37:21

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | don't have to ask those additional, because I would have to do | 04:37:25 |
| 2 | that on 400 exhibits, so I'm just looking for ways to | |
| 3 | streamline this. | |
| 4 |      THE COURT:  So you're asking for an automatic | |
| 5 | publication after it's been admitted? | 04:37:36 |
| 6 |      MR. RAPP:  Yes. | |
| 7 |      THE COURT:  Is there an objection? | |
| 8 |      MS. BERTRAND:  I don't know because I don't know how | |
| 9 | it's going to come in. | |
| 10 |      THE COURT:  And I think that's the problem with | 04:37:46 |
| 11 | respect to some of the exhibits, because I think some of the | |
| 12 | exhibits, depending on how you're going to show them, either | |
| 13 | are going to be part of the email or not.  So let's just move | |
| 14 | forward in terms of the publication. | |
| 15 |      And with regard to the other objections, I did tell | 04:38:01 |
| 16 | counsel that in order to preserve the record at the appropriate | |
| 17 | time that the exhibit was being offered, that they were | |
| 18 | entitled to place their actual objections on the record.  And | |
| 19 | so we'll move forward in that way.  I think it's fine the way | |
| 20 | it's going in terms of citing the rule and not arguing the | 04:38:19 |
| 21 | objection. | |
| 22 |      So with that, let's stand in recess. | |
| 23 |      MR. EISENBERG:  Your Honor, I'm sorry.  Dave | |
| 24 | Eisenberg.  I do have a housekeeping question for you.  I | |
| 25 | believe -- I heard that this witness may be on the witness | 04:38:35 |

1  standard for several days, maybe weeks.  We have discussed          04:38:39

2  among ourselves when we should be letting the Government know

3  what exhibits we intend to use in cross-examination.  I'm not

4  sure, the way I read some of the trial orders, whether that --

5  is that a three-day?  So --                                          04:39:00

6          THE COURT:  Yes.  It is a three-day requirement.

7  So -- well, I think, you know, Mr. Rapp or part of his team can

8  kind of tell you or give you an idea how much further

9  Mr. Ferrer is going to go but you're talking about in

10  cross-examination?                                                  04:39:21

11          MR. EISENBERG:  Correct, Your Honor, yes.

12          THE COURT:  And I think they can alert you as to when

13  they are getting ready for him to finish his testimony.

14          And if you could be mindful of that, it would help

15  you in the long run in terms of receiving those exhibits that      04:39:33

16  will be used on cross-examination as well.

17          MR. EISENBERG:  It would be helpful.

18          THE COURT:  I mean it's unpredictable, we know, but

19  do the best that you can.

20          MR. RAPP:  Certainly.                                       04:39:46

21          THE COURT:  All right.  Have a good evening.

22          COURTROOM DEPUTY:  All rise.

23          (Whereupon, these proceedings recessed at 4:39 p.m.)

24                        *  *  *  *  *

25

United States District Court

1        C E R T I F I C A T E                          04:39:52

2

3        I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of      04:39:52

6   Arizona.

7

8        I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled    04:39:52

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15       DATED at Phoenix, Arizona, this 12th day of              04:39:52

16  September, 2023.

17

18

19

20                          s/Elaine M. Cropper                   04:39:52

21                          _____

22                          Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                04:39:52

                    United States District Court

EXHIBIT H

EXHIBIT H

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,     )
                                     ) No. 2:18-cr-00422-DJH
                Plaintiff, )
                                     )
        vs.                 )
                                     ) Phoenix, Arizona
Michael Lacey, et al.,      ) October 24, 2023
                                   ) 1:01 p.m.
               Defendants. )
_____)

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 23

(P.M. SESSION)

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    For the Government:
         UNITED STATES ATTORNEY'S OFFICE
3        By:  **Mr. Kevin M. Rapp, Esq.**
              **Mr. Andrew C. Stone, Esq.**
4             **Mr. Peter Shawn Kozinets, Esq.**
              **Ms. Margaret Wu Perlmeter, Esq.**
5        40 North Central Avenue, Suite 1800
         Phoenix, Arizona  85004-4408
6        kevin.rapp@usdoj.gov
         peter.kozinets@usdoj.gov
7        andrew.stone@usdoj.gov
         margaret.perlmeter@usdoj.gov
8        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
9        By:  **Mr. Austin Berry, Esq.**
         1301 New York Avenue NW, 11th Floor
10       Washington, DC  20005
         austin.berry2@usdoj.gov

11

12   For the Defendant Michael Lacey:
         LIPTSITZ GREEN SCIME CAMBRIA, LLP
         By:  **Mr. Paul J. Cambria, Esq.**
13       42 Delaware Avenue, Suite 120
         Buffalo, New York  14202
14       pcambria@lglaw.com

15   For the Defendant Scott Spear:
         KESSLER LAW OFFICE
16       By: **Mr. Eric Walter Kessler, Esq.**
         6720 North Scottsdale Road, Suite 210
17       Scottsdale, Arizona  85253
         eric.kesslerlaw@gmail.com
18       - and -
         FEDER LAW OFFICE, PA
19       By:  **Mr. Bruce S. Feder, Esq.**
         2930 East Camelback Road, Suite 160
20       Phoenix, Arizona  85016
         bf@federlawpa.com

21

22

23

24

25

**A P P E A R A N C E S (Cont'd)**

For the Defendant John Brunst:
     BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
     By:  **Mr. Gopi K. Panchapakesan, Esq.**
          **Mr. Gary S. Lincenberg, Esq.**
     1875 Century Park E, Suite 2300
     Los Angeles, California  90067
     gpanchapakesan@birdmarella.com
     glincenberg@birdmarella.com
     aneuman@birdmarella.com

For the Defendant Andrew Padilla:
     DAVID EISENBERG, PLC
     By:  **Mr. David S. Eisenberg, Esq.**
     3550 North Central Avenue, Suite 1155
     Phoenix, Arizona  85012
     david@deisenbergplc.com

For the Defendant Joye Vaught:
     JOY BERTRAND, ESQ, LLC
     By:  **Ms. Joy Malby Bertrand, Esq**
     P.O. Box 2734
     Scottsdale, Arizona  85252-2734
     Joy@joybertrandlaw.com

UNITED STATES DISTRICT COURT

4

1                    **I N D E X**

2    **SUMMARY OF COURT PROCEEDINGS:**                    **PAGE**

3    Proceedings Outside the Presence of the Jury        6
     Proceedings Outside the Presence of the Jury        40
4    Proceedings Outside the Presence of the Jury        92
     Motion for Mistrial                                 93
5    Proceedings Outside the Presence of the Jury        96

6

7    **WITNESSES FOR THE GOVERNMENT:**                    **PAGE**

8    Grant Snyder
             Direct Examination by Mr. Eisenberg         13
9            Cross-Examination by Mr. Berry              33
             Redirect Examination by Mr. Eisenberg       63
10           Cross-Examination (Cont'd) by Mr. Berry     100
     John R. Becker
11           Direct Examination by Mr. Cambria           66
             Cross-Examination by Mr. Stone              106
12           Redirect Examination by Mr. Cambria         132

13

14                     **EXHIBITS**

15   **NO.**     **DESCRIPTION**                          **REC'D**

16   5516      Jan. 2017 Binghamton Trust                78
               DEFLACEY 000012-000030
17
     5540      03.07.18 Letter from J. Becker to IRS on   79
18             behalf of M. Lacey, Requesting Extension
               to File Certain Business Income Tax,
19             Information, and Other Returns
               DEFLACEY000008
20
     5541      2018 M. Lacey FinCEN Form 114 for year     83
21             2017 DEFLACEY000031-000038

22   5542      2018.09.05 J. Becker Docs                  85
               DEFENSE 011886-011933

23

24

25

                 UNITED STATES DISTRICT COURT

| | | | |
|---|---|---|---|

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|---|---|---|
| 5545 | 2019 M. Lacey FinCEN Form 114 for year 2018<br>DEFENSE 006183-006184 | 89 |
| 5546 | 2020 M. Lacey FinCEN Form 114 for year 2019<br>DEFENSE 006186-006187 | 89 |
| 6264 | Email from Lacey to Becker, 07/29/2016<br>Becker 02057 (Page 30) | 77 |

UNITED STATES DISTRICT COURT

6

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (Court was called to order by the courtroom deputy.) |
| 3 | (Proceedings reconvene at 1:01 p.m.) |
| 4 | (Jury not present at 1:01 p.m.) |
| 5 | THE COURT: All right. Please be seated. | 13:01:55 |
| 6 | And we have our jurors in place, but let me -- let me |
| 7 | just tell you that over the break period, I looked at this |
| 8 | Exhibit 5507 entitled Why Village Voice Media's Backpage.com |
| 9 | Service Does Not Create Liability. |
| 10 | And I'm -- I guess a point of clarification, | 13:02:21 |
| 11 | Mr. Feder. This was authored by attorneys Mark Sableman and |
| 12 | Anthony Blum, but you kept referring to another attorney. And |
| 13 | I'm -- I'm kind of confused about that. You were -- you were |
| 14 | speaking about someone that is not an author, Mr. Suskin, of |
| 15 | this memo. | 13:02:52 |
| 16 | MR. FEDER: We were talking about two different |
| 17 | things, Judge. One is what you're looking at, Sableman. |
| 18 | Another is a fellow named Steve -- Steve Suskin, who is general |
| 19 | counsel for New Times and then Backpage. |
| 20 | THE COURT: Okay. All right. That clarifies that | 13:03:05 |
| 21 | question. So I was confused about that. |
| 22 | Now, what I would say about this Sableman exhibit, |
| 23 | that at page 23, there is an analysis about whether Backpage is |
| 24 | engaged in protected speech. And I would say that is relevant, |
| 25 | but everything above that is not. And so to the extent you | 13:03:39 |

UNITED STATES DISTRICT COURT

1  wish to use this as an exhibit in a redacted form, removing

2  everything up to Section 3 of the memorandum, then you can ask

3  your client, or anyone can ask their client, about their

4  awareness of this concluding information about First Amendment

5  protection.  And, of course, the government's able to ask the          13:04:26

6  defendants about what -- well, I should cav- -- there's a

7  caveat there in terms of the defendants' understanding of what

8  prompted this.

9         And -- and I don't know, Mr. Feder, if you were

10  intending to call either Mr. Sableman or Mr. Blum.  And if not,        13:04:57

11  then your clients, if they're going to testify about the

12  content or their awareness of the content and the conclusions

13  of it, then they need to be somehow aware of what was asked of

14  those counsel in this particular instance.  But I'm not going

15  to permit the exhibit to go back to the jury, because it's            13:05:22

16  replete with legal analysis, which is going to lead to

17  confusion.

18         You know, of course, the government can ask questions

19  about the ultimate conclusions.

20         MR. STONE:  Your Honor.                                         13:05:38

21         THE COURT:  Yes.

22         MR. STONE:  Just one point of clarification, is it

23  still seems like we're missing a key component here, because

24  this 31-page memo by Mr. Sableman is clearly advice of counsel.

25  I mean, this is --                                                     13:05:54

UNITED STATES DISTRICT COURT

8

```
 1                THE COURT:  It is.

 2                MR. STONE:  This is just a memo from an attorney

 3      saying what you're doing is legal.  But what's really needed

 4      and which hasn't been proffered and certainly if defendants

 5      proffer this information, it would be, you know, one of the      13:06:03

 6      four elements that Your Honor has referred to time and time

 7      again, is what information was shared with these attorneys --

 8                THE COURT:  Right.

 9                MR. STONE:  -- before they made these legal

10      conclusions?                                                     13:06:15

11                If they weren't told, for example, about the

12      reciprocal link program at The Erotic Review, then their --

13      their advice isn't reliable and it's not relevant.  And so --

14                THE COURT:  Well --

15                MR. STONE:  -- we would need to understand that, I     13:06:26

16      think, Your Honor --

17                THE COURT:  And I --

18                MR. STONE:  -- before it comes in.

19                THE COURT:  I completely agree.  I'm not letting the

20      defendants in using this exhibit leapfrog those additional      13:06:32

21      criteria.

22                So to the extent that you can -- you're bringing in

23      the author, either Sableman or Blum, about this, then they can

24      testify about what they were asked only with respect to

25      Section 3, not the other information.                           13:06:55
```

UNITED STATES DISTRICT COURT

1          And to the extent that your clients are relying upon

2    any portion of this memorandum, and I'm only going to limit you

3    to what's in Section 3, then they, too, have to put forward

4    some foundational testimony about what they understood the

5    question to be that was given to counsel.                          13:07:22

6          MR. LINCENBERG:  Your Honor?

7          THE COURT:  Yes.

8          MR. LINCENBERG:  So in regard to this exhibit, we

9    sought to introduce it on cross of Ferrer as an attachment to

10   an email that went to BMO.  It's, I think, 5507, 5508.  And, as   13:07:37

11   I recall, 5508 is the email from Brunst to BMO.

12          The Court did not permit me to go into it.  We would

13   move into evidence 5507 in the redacted form that the Court

14   just noted, meaning let Section 3 go back to the jury.  It

15   negates the government's claim that information was being        13:08:11

16   withheld from BMO.

17          THE COURT:  No.  I'm not going to permit it to go back

18   to the jury.  I just said that.  You can use it in your

19   examination of your witness, but I'm not going to let the

20   exhibit, even in a redacted form, go back to the jury because    13:08:27

21   it is inclusive of legal arguments that are not relevant.

22          I'm only suggesting that as -- with respect to

23   knowledge of -- or their belief, good-faith belief, that they

24   were First Amendment protected in their activity, that's what

25   this relates to, not anything else.                              13:08:50

 1          The government is also free to ask any of the

 2     individuals who relied on this whether or not they were aware

 3     that Backpage pled guilty.  They can also delve into what the

 4     ultimate conclusion was at paragraph -- at the -- the ultimate

 5     concluding paragraph at paragraph 3.                              13:09:11

 6          So there -- there -- just be mindful that there are

 7     other bits of information in this analysis that will be

 8     relevant to the case as well.

 9          So that's how we will proceed.

10          Let's have the jury in.                                      13:09:28

11          MR. STONE:  Your Honor, just a final point of

12     clarification.  Do I understand Your Honor correctly that it's

13     not coming in at all until there's a proffer about what

14     information was shared with the attorneys?

15          THE COURT:  Yes.                                             13:09:37

16          MR. STONE:  Okay.

17          MR. KESSLER:  Your Honor, again a point --

18          THE COURT:  Who's speaking?

19          MR. KESSLER:  This is Eric Kessler.

20          A point of clarification.  You mention page 23.             13:09:48

21     That's where Section Roman Numeral III begins.

22          THE COURT:  Yes.

23          MR. KESSLER:  It has six or seven subparts, A, B, C,

24     and so forth.  Are you allowing in the entire section, Roman

25     Numeral III?                                                      13:10:02

1    THE COURT:  Well, now that you mention that, I think

2  that the information related to the Missouri statute is

3  probably not relevant.  That actually may be in the previous

4  section.  But, in any event, I'm not going to permit you to

5  mark it as an exhibit to go back to the jury, so --                    13:10:52

6    MR. KESSLER:  I understand that, but in terms of

7  examining Mr. Sableman, were he to testify, is the entire Roman

8  Numeral III section permissible?

9    THE COURT:  Well, let -- give me some time.  When is

10  he scheduled to testify?                                               13:11:07

11    MR. FEDER:  We're just hearing this, like, now, Judge.

12  I don't know.  This is my answer.

13    THE COURT:  But you asked for it to be admitted, so I

14  don't know how else you were going to get it admitted if he

15  wasn't supposed to testify.                                           13:11:25

16    MR. FEDER:  Well, as -- as indicated, we tried to get

17  it in through Mr. Ferrer, and it was introduced and shown --

18  and I think shown to him, and then the Court denied its

19  admission.  I think, you know, I would reiterate what

20  Mr. Lincenberg said and ask that it be admitted through          13:11:43

21  Mr. Ferrer in pertinent part.

22    THE COURT:  No.  It's not going to go back to the jury

23  for all the reasons I've just stated.

24    So I guess you'll tell me at the end of the day when

25  Mr. Sableman is going to testify.                                    13:11:58

12

```
 1              MR. CAMBRIA:  Could I --

 2              THE COURT:  Let's bring the jury in.

 3              MR. CAMBRIA:  Could I make one comment?

 4              THE COURT:  Is it necessary right now?

 5              MR. CAMBRIA:  It is, because I just wanted to say that    13:12:09

 6    we would have also demonstrated that that memo went to

 7    Mr. Lacey.

 8              THE COURT:  I'm sorry.  That the memo was what?

 9              MR. CAMBRIA:  That went to Mr. Lacey, that he

10    was copied on that memo from Mr. Sableman.  So he had knowledge    13:12:19

11    of it, is what I'm saying.

12              THE COURT:  All right.  All right.  Let's have the

13    jury in.

14              Can we have the witness stand by the podium?

15              THE WITNESS:  Oh.                                        13:13:19

16              THE COURT:  All rise for the jury.

17         (Jury present at 1:13 p.m.)

18              THE COURT:  All right.  Please be seated.

19              And welcome back, members of the jury.  Everyone looks

20    refreshed and ready to go.  And so I hope everyone had a          13:13:57

21    pleasant long -- longer than anticipated weekend.  And, as we

22    ended on last Friday morning, the government, I'll remind you,

23    had rested its case-in-chief.  And so now we move to the

24    defendants' case-in-chief.

25              And so please call your first witness.                  13:14:19
```

UNITED STATES DISTRICT COURT

1      MR. EISENBERG:  Your Honor, the defendants call Grant

2  Snyder.

3      THE COURT:  Mr. Snyder, please come forward to my

4  courtroom deputy and be sworn.

5      THE COURTROOM DEPUTY:  Please raise your right hand.          13:14:30

6    (GRANT ALLAN SNYDER, a witness herein, was duly sworn or

7  affirmed.)

8      THE COURTROOM DEPUTY:  If you'd go ahead and step over

9  to the witness stand, please.

10     THE COURT:  Sir, please be seated.  Thank you.          13:14:54

11     And, Mr. Eisenberg, you may begin when you're ready.

12     MR. EISENBERG:  Thank you, Your Honor.

13                    DIRECT EXAMINATION

14 BY MR. EISENBERG:

15 Q.  Sir, would you tell the jury your name?          13:15:01

16 A.  Grant Allan Snyder.

17 Q.  Mr. Snyder, what community do you live in?

18 A.  Woodbury, Minnesota.

19 Q.  And are you currently employed?

20 A.  I am.          13:15:12

21 Q.  How are you employed, sir?

22 A.  I'm the vice president of operations and outreach for a

23 local nonprofit.

24 Q.  What does that local nonprofit do?

25 A.  We provide about 8,000 meals a week for people that are          13:15:21

GRANT SNYDER - DIRECT EXAMINATION

14

1  struggling with homelessness and provide other forms of support

2  to our first responders and other folks in that community.

3  Q.  And the funding for that group that -- that you work for,

4  where does it come from?

5  A.  Oh, 95 percent of our funding is fee-for-service to --                      13:15:41

6  through contracts with shelters, drop-in centers, things like

7  that.  We also receive some state-level grants under the

8  youth -- Homeless Youth Act and the ESG, and then also through

9  private donation.

10  Q.  Sir, how long have you been involved with that?                            13:16:00

11  A.  Since approximately April of 2018.

12  Q.  And is anyone else in your family involved in it?

13  A.  My wife is the executive director and my direct boss.

14  Q.  Prior -- I'm sorry?  Okay.

15         Prior to the time that you went with this group, where     13:16:17

16  did you work?

17  A.  Well, up until July 28th of this year, I was a commander

18  with the Minneapolis Police Department.

19  Q.  What rank is commander?

20  A.  Commander is approximately the rank of a captain.                          13:16:30

21  Commanders command divisions, whereas lieutenants command

22  units.

23  Q.  And how long had you worked for the police department?

24  A.  Approximately 27 years.

25  Q.  Which department is this, sir?                                             13:16:44

1   A.   The Minneapolis Police Department.

2   Q.   Starting with the time that you began, would you briefly

3   explain to the jury the career path that you took and the work

4   that you did.

5   A.   In 2000 -- I'm sorry, in 1996, I was recruited out of        13:16:59

6   graduate school.  I became a patrol officer in the City of

7   Minneapolis Fourth Police Precinct answering 911 calls.  In

8   approximately December of 1999, I became a street crimes

9   officer working, again, in the Fourth Precinct.  And in 2023,

10  approximately, I became a surveillance officer for our           13:17:24

11  strategic operations team.

12         Later in 2007, I was promoted to sergeant and moved

13  over to an FBI task force as a surveillance sergeant.  In 2011,

14  I transferred to the child abuse unit.  And in November of

15  2011, I started our juvenile human trafficking program, where I  13:17:45

16  remained until April 1st of 2018.

17         On April 1st of 2018, I started our department's

18  homeless outreach unit.  And I remained there until I became a

19  lieutenant in September of 2019, at which point I took over our

20  homeless outreach unit as lieutenant.  I was the lieutenant of   13:18:07

21  our hiring and recruitment program, our chaplains.  I remained

22  there until the end of 2020, when I moved over to the Fourth

23  Precinct as a patrol supervisor and administrative lieutenant

24  for the Fourth Precinct.  And then in August of 2022, I became

25  the commander of the community outreach bureau.                  13:18:31

GRANT SNYDER - DIRECT EXAMINATION

16

```
 1   Q.  Sir, in the course of your service with the police
 2   department, did you concentrate in a particular area, such as a
 3   human trafficking, prostitution, that sort of thing?
 4   A.  I did.  From approximately the time that I went to the --
 5   the street crimes unit in 1999, I was focused at that point on      13:18:48
 6   liveability issues, which related to prostitution, promotion of
 7   prostitution.  We hadn't heard the word human trafficking back
 8   then.  And when I went -- moved over to the -- the FBI task
 9   force in 2007, I started working human trafficking and
10   promotion of prostitution.  That's why I was brought over          13:19:12
11   there, to support an ongoing public corruption -- public
12   corruption case that the FBI was doing.  And then in 2011, I
13   started our human trafficking program, or juvenile human
14   trafficking program.
15   Q.  You mentioned a term "promotional prostitution."               13:19:29
16          Did I hear that right?
17   A.  Yes.
18   Q.  What does that mean?
19   A.  Promotional prostitution is that someone other than the
20   individual themself is -- is promoting them in prostitution, is    13:19:39
21   either causing, coercing, or providing any kind of material
22   support or means by -- through which that, you know,
23   facilitates the prostitution act.
24   Q.  Such as a pimp?
25   A.  Such as a pimp.                                                13:19:57
```

GRANT SNYDER - DIRECT EXAMINATION

17

```
1   Q.  You mentioned, sir, that you were recruited out of
2   university or college?
3   A.  Out of -- out of graduate school at the University of
4   Minnesota.
5   Q.  Okay.  So you have an undergraduate degree?        13:20:08
6   A.  At that point I did, yes.
7   Q.  In what?
8   A.  It was a bachelor of individualized studies with a focus on
9   human sexuality.
10  Q.  And -- go ahead.                                    13:20:16
11  A.  My area of interest was the ubiquity and function of
12  human -- I'm sorry -- of prostitution in every recorded human
13  society in history.
14  Q.  And was that at the University of Minnesota?
15  A.  It was.                                             13:20:29
16  Q.  And then you said you have graduate work or degree?
17  A.  I did -- I did two years of graduate work there, and then
18  later on I returned to graduate school and got a master's of
19  theology.
20  Q.  Where did you get your master's in theology?        13:20:42
21  A.  Northwestern.
22  Q.  All right.  So, now, in the course of your work, sir, did
23  you have -- were you connected with law enforcement units or
24  groups outside of the Minneapolis Police Department?
25  A.  Yes.                                                13:20:59
```

1   Q.  All right -- go ahead.

2   A.  We were -- well, certainly through the FBI task force, we

3   had a, you know, jurisdiction that well exceeded the boundaries

4   of the city and the state.  When I took over our juvenile human

5   trafficking program and -- well, started our juvenile human                13:21:13

6   trafficking program, we developed partnerships not just in the

7   Twin Cities area, but in the neighboring states and in other

8   states around the country.

9   Q.  So it sounds like you had a multistate oversight in terms

10  of what you were looking at, human trafficking?                            13:21:27

11  A.  Yeah.  I mean, I had involvement in case work that was

12  going on in other places, yes.

13          THE COURT:  Mr. Snyder, can I ask you just to slow

14  down a little bit.  You're really taxing our court reporter,

15  who's trying to keep up with you, very, very fast cadence of               13:21:41

16  speech.  But just take a breath a little bit and then slow

17  down.

18          THE WITNESS:  Absolutely, Your Honor.

19          THE COURT:  Thank you.

20          THE WITNESS:  It's not the first time I've heard that.             13:21:52

21          THE COURT:  Okay.  Thank you.

22  BY MR. EISENBERG:

23  Q.  And how about any other associations, such as International

24  Association of Human Trafficking?

25  A.  I'M the -- one of the vice presidents in charge of                     13:22:03

1  community connections and relationships through the

2  International -- or for the International Association of Human

3  Trafficking Investigators.  That relationship dates back to

4  approximately 2012.

5  Q.  And do you have any association or connection, or did you,    13:22:19

6  with the United States Marshal's office?

7  A.  I was a specially deputized U.S. Marshal.  I can't remember

8  the exact date, but it was in or around the 2008 or 2009 period

9  when I was part of the ATF task force.

10 Q.  Now -- I'm sorry.  I'm going to ask you about your role in    13:22:37

11 training others.  Okay?

12       Would you tell the jury the -- the types of training

13 that you've given to other people and who it was connected

14 with, that sort of thing.

15 A.  Sure.  I provided training under a number of different       13:22:54

16 grants originally that was focused on things like human

17 trafficking investigations, both preliminary and advanced human

18 trafficking investigation; victim management, trauma, informed

19 care, and interviewing victims.

20       We -- I also provided surveillance training, technical     13:23:14

21 surveillance education, undercover operations.  I conducted a

22 number of undercover operations, and myself, and so we -- we

23 provided curriculum that was oriented toward introducing people

24 to what trauma-informed, victim-centered undercover operation

25 would look like that wouldn't further traumatize or injure      13:23:39

1    victims that were already being exploited.

2            And things like individual officer wellness to follow,

3    online extrapolation and exploitation of sources.

4    Surveillance.  Physical and mobile surveillance.  And a variety

5    of other things that I'm probably forgetting right now.                13:24:02

6    Q.  Mr. Grant, again, I think if you could talk just a little

7    slower.  Okay?  All right.  Thank you, sir.

8            So did there come a time in your career when you did,

9    you, yourself, did prostitution investigations?

10   A.  Yes.  For the greatest portion of the time that I was in --       13:24:21

11   was a sworn officer, I participated in one way or another.

12   Q.  And in the course of doing that, did you consult

13   advertisements with respect to leads, if you will?

14   A.  I did.

15   Q.  Now, before -- you did have an association with Backpage;         13:24:39

16   is that correct?

17   A.  Yes.

18   Q.  Before we get to that, would you describe how you in your

19   police work would do an investigation of prostitution

20   through -- initiated through an ad.                                   13:24:53

21   A.  So the -- the traditional way of doing work investigating

22   prostitution was to engage in contact with a person that was

23   suspected to be engaged in prostitution, attempt to obtain an

24   offer of sex for money, and then make an arrest of the

25   individual, which was typically, in my experience, women,            13:25:21

 1   although it's by no means is only women, and then use that

 2   hammer, if you would, of arrest and potential prosecution to

 3   encourage cooperation.

 4        That we found to be very problematic for a number of

 5   reasons, not limited to that it further traumatizes people that    13:25:39

 6   are already experiencing some form of trauma.  And so we try

 7   to --

 8        MR. BERRY:  Objection, Your Honor.  Testifying in the

 9   narrative.

10        THE COURT:  Sustained.                                        13:25:53

11   BY MR. EISENBERG:

12   Q.  Sir, what did you -- can you complete the way that you

13   would go about conducting an investigation.

14   A.  We would use leads, online ads in some cases, to make

15   contact with individuals that may or may not have been involved    13:26:08

16   in prostitution or being exploited, and then assess whether or

17   not they were -- they needed help, were willing to accept our

18   assistance or the assistance of victim advocates that we

19   typically took with us.  Try and build a relationship and

20   rapport with that individual.  And never arrested people that      13:26:26

21   were themselves involved in prostitution.

22   Q.  Now, Mr. Grant, would you -- in the cases where you were

23   initiating your investigation through an ad, would you arrest

24   someone on the basis of the ad alone?

25   A.  No.                                                            13:26:47

```
 1   Q.  Why not?

 2   A.  Well, because the ad was -- was a lead.  It provided a

 3   potential starting point, but a very early starting point.  And

 4   there was no assurance that the individual, if there was a

 5   photo depicted, was even the individual that we would have        13:27:05

 6   contact with.

 7   Q.  Right.  Now, in the course of doing your investigations,

 8   would you consult Backpage?

 9   A.  Yes.

10   Q.  And would you look on Backpage for advertisements?            13:27:18

11   A.  I did.

12   Q.  And would you post your own advertisement in -- on

13   Backpage?

14   A.  I would when I was doing undercover reverse stings.

15   Q.  For, sir?                                                     13:27:32

16   A.  When I was doing reverse sting operations.

17   Q.  Oh, reverse sting.  What's the reverse sting?  I think the

18   jury may know, but, please, just --

19   A.  A reverse sting, which is where we were targeting the

20   buyers of sex, again, largely men, who were seeking to pay for   13:27:44

21   sex with women, and we would post an ad and, in fact, it was

22   not a 15- or 16-year-old woman.  It was me, which is an

23   alarming thing to have to deal with.

24   Q.  So let's get the time frame in terms of your using Backpage

25   or looking at Backpage ads.  When did you start and when did     13:28:09
```

1  you finish?

2  A.  So I started dealing with Backpage ads the earliest I

3  remember in 2007 when I moved over to what was then an ATF task

4  force that FBI was a part of.  And we started working on,

5  again, ads that were relevant to the prostitution in this          13:28:27

6  public corruption case.

7  Q.  So when you posted your own ads, tell the jury your

8  experience with what happened to those ads.

9  A.  Well, there was a -- a process that they would go through

10 when we posted an ad called moderation.  And many of the ads,     13:28:48

11 if we were too explicit, if there was any excess nudity, or if

12 we made references to age, the ads would not post.  They would

13 be blocked.  And we would have to go back to square one and try

14 again.

15 Q.  Would you try to repost that ad?  And, if so, what            13:29:09

16 happened?

17 A.  If -- if I removed problematic language, which often was a

18 guess, because I wasn't search -- sure in most cases what was

19 causing it, we would go back and try again.  And, you know, we

20 would have to use different, you know --                          13:29:28

21 Q.  Terms?

22 A.  -- terms, different wording.

23 Q.  How would you know an ad had been blocked?

24 A.  It would never show up.

25 Q.  But you knew that you actually put the ad in?                 13:29:39

1   A.  Yes.

2   Q.  Did you pay for it?

3   A.  Yep.

4   Q.  Did there come a time, sir, when you had contacts, physical

5   contacts with personnel at Backpage?                          13:29:52

6   A.  Yes.  I had numerous --

7   Q.  Okay.

8   A.  -- phone calls in particular, email contact, and later on a

9   few physical face-to-face contacts with people.

10  Q.  Let's talk about the phone calls.  I'm not going to ask you  13:30:05

11  what was said on either side of -- well, I'm going to ask you

12  this:  Why did you call?

13  A.  Well, in the early stages it was to try and figure out why

14  our ads weren't being posted or to get more information if

15  there was, you know, like an ad that I was trying to get a    13:30:22

16  return on or trying to find out more information.  So in the

17  early days, it was trying to obtain information pursuant to an

18  investigation.

19  Q.  And in the early days, when you were calling to find out

20  whether -- why an ad had been taken down or why it hadn't been  13:30:37

21  posted, did you find out the reason?

22  A.  No.

23  Q.  You just -- it was gone?  The ad was gone?

24  A.  Yeah.

25  Q.  Okay.  Later on did there come a reason or other reasons    13:30:47

1  why you called Backpage?

2  A.  There were times when we would have an exigent

3  circumstance, where we needed a response right away.  And if it

4  was at a time when the -- when the -- the U.S. Attorney -- the

5  U.S. Attorney?  I'm sorry -- the District Attorney's Office,        13:31:08

6  the Hennepin County Attorney's Office was closed, I was not

7  going to be able to get a subpoena signed.  So it rose to a

8  point where we would have to contact somebody to get an exigent

9  response.

10 Q.  Okay.  Let me ask you this:  What kind of information did      13:31:20

11 you need in order -- in an exigent time frame, what -- what

12 kind of information did you want to get?

13 A.  Well, I was looking in particular at -- I wanted to know if

14 there was an email account, if there was another phone number

15 associated with it, as many of the phones on those ads were      13:31:41

16 burner phones and later Google Voice, which really didn't go to

17 anything specifically.  IP addresses later on were helpful and

18 required additional investigation.  Later on, as we got more

19 sophisticated, we looked at ad history and where the postings

20 were.                                                              13:31:58

21 Q.  And did you -- I'm sorry, sir.  Did you get that

22 information back from Backpage?

23 A.  I did.

24 Q.  Who at Backpage did you -- did you talk with?

25 A.  Well, the -- the -- there were a number of people over        13:32:07

1    time.  I talked to somebody named Carl.  I think his last name

2    is Ferrer.

3    Q.  That's one.  Can you think of others?

4    A.  I talked to Liz McDougall on several occasions.

5    Q.  Okay.                                              13:32:23

6    A.  I talked to Andrew Padilla.

7    Q.  Okay.

8    A.  And there's a woman named Joye.  I can't -- I apologize.  I

9    can't remember.

10   Q.  Might her last name be Vaught?  If you remember.      13:32:31

11   A.  Yes.

12   Q.  Thank you.

13          And were they responsive to your requests?

14   A.  In the early stages, when I was dealing with Carl, it -- it

15   was pretty unresponsive.  We didn't -- we didn't receive a lot   13:32:42

16   of support, in my experience.  What we got back was either

17   delayed or it wasn't -- it wasn't particularly effective.  It

18   didn't have all the information.  Later on, there was a -- a

19   process where the returns evolved, both in terms of the

20   expediency --                                            13:33:07

21          MR. BERRY:  Objection.  Testifying in the narrative,

22   Your Honor.

23          THE COURT:  Sustained.

24   BY MR. EISENBERG:

25   Q.  What happened later on?                              13:33:11

GRANT SNYDER - DIRECT EXAMINATION
27

```
 1   A.  The -- the ads became -- or the returns became more
 2   efficient.  They were provided faster, and they had more
 3   information.
 4   Q.  Let me ask you then about Andrew Padilla.  Was he
 5   responsive to your needs?                                    13:33:24
 6   A.  He was.
 7   Q.  What times of the day or evening did you call Mr. Padilla?
 8   A.  Well, I mean, throughout the -- the day, during
 9   business hours, there wasn't a lot of cause to call.  It was
10   typically after hours, in the evenings.  Sometimes late at   13:33:41
11   night if we were working a case.
12   Q.  Were you able to get ahold of him --
13   A.  I was.
14   Q.  -- each time?
15          With respect to Ms. Vaught, when did you contact her,  13:33:50
16   the time of day?
17   A.  I think the majority of conversations I had with her were,
18   like, in the after midnight range.
19   Q.  And how long did it take them to get back to you with the
20   information that you were looking for?                       13:34:04
21   A.  Again, generally speaking, it was very fast.
22   Q.  Were you able to use it?
23   A.  Pardon me?
24   Q.  Were you able to use the information?
25   A.  I was.                                                   13:34:13
```

GRANT SNYDER - DIRECT EXAMINATION

28

1   Q.  You were able to -- well, okay.  Withdrawn.

2            And what about Ms. McDougall?  Was she responsive?

3   A.  Yeah.  Liz helped us to sort of identify those areas where

4   we could be more collaborative and provide what was needed

5   legally to be able to get a return.  She was also primarily          13:34:32

6   interested in what specifically we were looking for that would

7   make our job more effective.

8   Q.  Now, did there come a time, sir, when Ms. McDougall came to

9   Minneapolis?

10  A.  There was, yeah.  She came, I think, in 2016.                     13:34:52

11  Q.  Did she meet with you?

12  A.  She met with me, an HSI agent, a couple other local

13  investigators at the U.S. Attorney's Office.

14  Q.  And what was the purpose of that meeting?

15  A.  It was to discuss, again, ongoing collaboration,                  13:35:05

16  specifically were there questions we had, how we could provide

17  them feedback that would help them to give us a better return

18  that would be -- that would lead us to more effective outcomes

19  on our cases and things like that.

20  Q.  Would you say it was helpful?                                     13:35:23

21  A.  It was very helpful.

22  Q.  Now, I want to ask you about one more type of contact.  I

23  think you testified that you did get -- you would from time to

24  time need a subpoena; is that correct?

25  A.  Yes.                                                              13:35:43

```
 1   Q.  And would you give subpoenas or have them delivered to
 2   Backpage?
 3   A.  We would -- I would typically get my own subpoenas signed,
 4   and then I would send them myself.
 5   Q.  All right.  But then, nonetheless, they did go to Backpage?   13:35:54
 6   A.  Yes.
 7   Q.  And who did you look to for the response to the subpoena?
 8   A.  Again, it -- I think I sent them -- I can't remember what
 9   the email was.  It may have been records@backpage.com --
10   Q.  All right.                                                    13:36:12
11   A.  -- but I knew that there was a limited number of people
12   that were responding.  And, generally, it was -- it was either
13   Andrew or Joye.
14   Q.  Okay.  Now, in the course of your work, sir, did you also
15   look at other ad sites, if you will, besides Backpage?           13:36:25
16   A.  Yeah.
17           MR. BERRY:  Objection, Your Honor.  Relevance.
18           THE COURT:  Well, overruled.  The answer -- the
19   question has been answered.
20           And you can ask a new question, Mr. Eisenberg.           13:36:37
21   BY MR. EISENBERG:
22   Q.  Let me ask it this way, sir:  Did you need information from
23   those websites --
24   A.  I did.
25   Q.  -- the other ones?                                           13:36:47
```

1        And did you attempt to contact personnel with respect

2  to those other websites or sites?

3  A.  In the beginning, we did.

4  Q.  And was -- were they responsive?

5  A.  No.                                                      13:37:00

6  Q.  What happened as time went on?  You just didn't try

7  anymore?

8        MR. BERRY:  Objection to this line of testimony

9  regarding other companies that are not on trial here today.

10        THE COURT:  Sustained.                               13:37:10

11 BY MR. EISENBERG:

12 Q.  Now, there same a time, sir, when Backpage shut down; is

13 that correct?

14 A.  Yes, sometime in early 2018.

15 Q.  And when it shut down, how did that impact your ability to  13:37:30

16 conduct your operations?

17        MR. BERRY:  Objection.  Relevance.  Outside the scope

18 of the indictment.

19 BY MR. EISENBERG:

20 Q.  Well, how about --                                      13:37:46

21        THE COURT:  Well, so I'm going to overrule.  He can

22 answer.

23 BY MR. EISENBERG:

24 Q.  Go ahead, sir.  How did it affect your investigations?

25 A.  Well, we had to relearn a new -- where the -- where the ads  13:37:55

UNITED STATES DISTRICT COURT

GRANT SNYDER - DIRECT EXAMINATION

31

```
 1   were being posted, attempt to rebuild relationships that we'd

 2   relied upon to get a return, utilize different sources of

 3   information that we -- other than what we had been relying up

 4   until that point.

 5   Q.  And was it as effective as what you were getting from          13:38:19

 6   Backpage?

 7   A.  No.

 8   Q.  I also want to ask you about conferences in the course of

 9   your work.

10           You've -- you've attended conferences, I take it?          13:38:30

11   A.  Yes.

12   Q.  And did there come a time, sir, when you saw or met with

13   Ms. Vaught at a conference?

14   A.  Yes.  I believe I met with her in -- I think it was

15   New Orleans.  There was a conference, and we had a booth for       13:38:43

16   IHTI, the International Association of Human Trafficking

17   Investigators, there.  And I met her.

18   Q.  And for what purpose did you -- did you meet her?

19   A.  Well, we were excited and interested that a representative

20   from Backpage was available to answer questions.  Part of what    13:39:04

21   we do at the International Association of Human Trafficking

22   Investigators is to create connections so that we can get

23   information that's relevant right from the source.  And this

24   seemed like a good opportunity.

25   Q.  All right, sir.  Thank you very much.                         13:39:19
```

GRANT SNYDER - DIRECT EXAMINATION

32

```
 1        With respect to the ads that you were looking at on --
 2   on Backpage or -- well, we'll leave it at Backpage -- what were
 3   you particularly looking for in terms of whether it would
 4   further your investigation?
 5   A.  Well, in the first case we were looking for specific things    13:39:36
 6   that would lead us to a person we were looking for.  For
 7   example, if somebody from child protection, if we got a
 8   referral or a parent had called and said, my runaway daughter,
 9   I heard she's posting online, here's a photo of her, here's the
10   name that she's using, those would be things that we would       13:39:57
11   search for.
12   Q.  Uh-huh.
13   A.  We would also search for phone numbers, because phone
14   numbers are something that we could track.
15        Beyond that, it was -- it was sort of how the ad           13:40:06
16   itself felt.  Was there anything that gave us a lead to look
17   into that?
18   Q.  All right.  Sir, and when you look at an ad -- let's talk
19   about the picture first, or the photo.
20        Did these ads have photos?                                  13:40:23
21   A.  Most -- the vast majority of them did.
22   Q.  And can you tell on the basis of the photo the age of the
23   person who was in the photo?
24   A.  Not in my experience.
25   Q.  Could you tell and did there come a time, sir, when you      13:40:34
```

UNITED STATES DISTRICT COURT

1  found that the person in the photo wasn't even the person that

2  was connected with the ad?

3  A.  Yes.  That became pretty common knowledge, that many of the

4  photos that were posted were pirated photos generally from

5  another region of the U.S.                                    13:40:51

6  Q.  And, sir, the language in the ads, what were you -- what

7  were you looking for with respect to the language?

8  A.  Well, again, first and foremost, we were looking for any

9  indication that would give us a reason to think that this ad

10  involved prostitution.  The ads tended to not provide direct  13:41:06

11  evidence of that.

12  Q.  And so that's why you had to continue your investigation?

13  A.  Yeah.  The ad was a starting point for us.

14  Q.  Okay.  Thank you.

15        MR. EISENBERG:  Your Honor, that's all I have.          13:41:21

16        THE COURT:  Who is examining the witness?

17        MR. BERRY:  Me.  Austin Berry, Your Honor.

18        THE COURT:  All right.  Please come forward.  And when

19  you were ready.

20                    CROSS-EXAMINATION                          13:41:41

21  BY MR. BERRY:

22  Q.  Good afternoon, Mr. Snyder.

23  A.  Good afternoon, sir.

24  Q.  We've talked a couple of times now; correct?

25  A.  Yes, sir.                                                 13:42:02

UNITED STATES DISTRICT COURT

GRANT SNYDER - CROSS-EXAMINATION

34

1   Q.  And you are retired; correct?

2   A.  Happily so, sir.

3   Q.  Last time I talked to you, last -- or I guess before today,

4   last week you were on vacation with your family in Kentucky?

5   A.  I was, sir.                                          13:42:16

6   Q.  All right.  Are you being paid to be here today, sir?

7   A.  No.

8   Q.  Okay.  Were you subpoenaed to come here today?

9   A.  I was.

10  Q.  Would you have come here without a subpoena?         13:42:26

11  A.  No.

12  Q.  So you are here because a subpoena was issued, and you're

13  abiding by that subpoena; is that correct?

14  A.  Yes, sir.  I've never ignored a subpoena in my life, and

15  I'm not going to start now.                             13:42:38

16  Q.  You're not going to duck subpoenas; right?

17  A.  No.

18  Q.  They're -- they're the law.  You got to comply with them;

19  correct?

20  A.  Yes, sir.                                           13:42:45

21  Q.  You're not volunteering anything that the subpoena doesn't

22  require you to come here and do; correct?

23  A.  Correct.

24  Q.  When were you first contacted by the defense?

25  A.  In August of this year.                             13:42:53

GRANT SNYDER - CROSS-EXAMINATION

35

```
 1    Q.  Okay.  How did they contact you?

 2    A.  I got a voicemail, I believe, from a private investigator

 3    working for the defense team.

 4    Q.  Okay.  Do you remember who that was?

 5    A.  Andi.  I think last name is Murphy.                          13:43:11

 6    Q.  Okay.  And you said you got a voicemail.  Did you have any

 7    other -- did you call that person back?

 8    A.  I did.

 9    Q.  Did you leave a message?

10    A.  I don't recall.                                              13:43:24

11    Q.  Did you talk to that person at that time?

12    A.  I did.

13    Q.  Do you know if that conversation was recorded or anything?

14    A.  I have no idea.

15    Q.  Have you had any communications with anybody on the defense 13:43:34

16    side, and that includes Mr. Eisenberg, any of the defendants,

17    this Andi Murphy from Murphy Investigations, anybody associated

18    with the defense, have you had any written communications with

19    them since they first reached out to you?

20    A.  Yeah.  I mean, written to the extent if you consider text   13:43:51

21    messages written.

22    Q.  I do.

23    A.  The majority of the communication, I think with Ms. Murphy,

24    was through text messages.

25         I believe I sent an email to Mr. Kessler's email          13:44:04
```

1    address, for which I didn't initially receive a response, but

2    then some travel discussion and hotel arrangements were made

3    through, I think, Mr. Kessler's associate.

4    Q.  Okay.  And what was the nature of the text messages between

5    you and the defense investigator?                                    13:44:27

6    A.  Largely discussion about when I would be available.  In the

7    initial stage, would I be available to talk with the attorneys

8    on the defense team?  Would I be willing to do so?  And then

9    later on, housekeeping things, about, you know, when I would --

10   you know, did I receive a subpoena, when I would be here, that     13:44:58

11   came much later.

12         There was a long period of time that there was no

13   communication, from August until, you know, maybe last week,

14   so ...

15   Q.  Right.  In any of the meetings that you had with any of the    13:45:10

16   defense team, and, again, that means everybody on the defense

17   side, not a -- necessarily an attorney, were any notes taken at

18   any of those meetings, to your knowledge?

19   A.  The meeting that I had with them yesterday was the only

20   face-to-face up until that point that I had had.  And I guess I    13:45:36

21   wasn't paying attention.  I assumed people were taking notes.

22   Q.  You -- did you review those notes at all?

23   A.  No.

24   Q.  Okay.  Was any recording made of that meeting at all?

25   A.  No idea.                                                        13:45:55

1   Q.  To your knowledge, there wasn't?

2   A.  I have -- no, I don't know.

3   Q.  Okay.  You certainly didn't make one?

4   A.  No.

5   Q.  Okay.  Was there any report drafted about that meeting, to          13:46:03

6   your knowledge, that you've reviewed?

7   A.  No.

8   Q.  Did you prepare anything at the request of the defense?

9   A.  The only thing that I did was review, I think, a series of

10  ads on a Dropbox file that they sent to me late last week or          13:46:26

11  last weekend.

12  Q.  So you reviewed a series of ads?  Is that what you said?

13  A.  Yes, sir.

14  Q.  They provided you a link to a Dropbox file that had some

15  ads in it?          13:46:49

16  A.  Yes.

17  Q.  Okay.  Do you know how many ads there were?

18  A.  There was maybe eight to ten ads.  And that's a guess.  And

19  then there was some other documents that looked like either a

20  subpoena return or -- not that.  Something else.  I can't          13:47:19

21  really recall what they were.  But I didn't review those with

22  any great, you know, concentration.  I reviewed the ads

23  themselves.

24  Q.  Okay.

25          MR. BERRY:  Your Honor, at this time, the United          13:47:36

1  States moves for the production of these text messages and

2  emails between the defense and the witness under Rule 26.2 that

3  have not been provided to the United States.

4       In addition to that, the United States moves for the

5  production of these ads and other documents under 612 that says   13:47:50

6  that we are entitled to look at anything that was used to

7  look -- refresh the -- the witness's memory and should be

8  produced at the hearing for inspection.

9       MR. EISENBERG:  Your Honor, with respect --

10      THE COURT:  Please stand.                                    13:48:09

11      MR. EISENBERG:  I'm sorry.

12      THE COURT:  Please stand.

13      MR. EISENBERG:  With respect to the text messages, I

14  don't believe that -- that we have them.  But they were not

15  substantive, and we didn't keep them.                           13:48:19

16      With respect to what he was -- he was reviewed or has

17  been shown the other day, I'm not aware of the fact that I have

18  to produce that for the government under Rule 612, but we can

19  produce it.

20      THE COURT:  All right.  I'm going to order the              13:48:36

21  production of whatever you may have in terms of text

22  messages --

23      MR. EISENBERG:  All right.

24      THE COURT:  -- and the ads that were shown to the

25  witness.                                                        13:48:47

```
 1              MR. EISENBERG:  We can do the ads today, Your Honor.

 2              THE COURT:  Yes.

 3              MR. BERRY:  And apparently some other documents, some

 4   unspecified documents that he reviewed, although not in great

 5   detail.  Everything that was provided in that Dropbox file.       13:48:57

 6              THE COURT:  Yes, it should be produced, Mr. Eisenberg.

 7              MR. EISENBERG:  We will, Your Honor.

 8              MR. BERRY:  Your Honor, that's necessary for me to

 9   continue my examination of this witness.  That's why we asked

10   for the stuff in advance.                                        13:49:06

11         Could I ask the witness if he has a copy of these text

12   messages that the defense failed to produce?

13              THE COURT:  Certainly.  Certainly.

14   BY MR. BERRY:

15   Q.  Do you have those text messages, sir?                        13:49:17

16   A.  I -- on my phone.

17   Q.  You do have them --

18   A.  Yes.

19   Q.  -- available for me to review on a break?

20              THE COURT:  All right.  Mr. Berry, let's go ahead and  13:49:23

21   let the jury have a bit of a respite while we address this

22   issue.

23         Members of the jury, again, please continue to keep an

24   open mind.  There's some legal issues that I must address with

25   counsel, as you've had a highlight of, but, in any event,        13:49:39
```

1    please just continue to remember the admonition.  We'll call

2    you back, and I promise you it won't be any more than

3    ten minutes.

4            Please all rise for the jury.

5        (Jury not present at 1:49 p.m.)                    13:49:53

6            THE COURT:  Sir, you may step down.

7            Yes, you may step down and wait in the witness room.

8            MR. BERRY:  May I step out with the witness and review

9    his phone?

10           THE COURT:  Not just yet.                       13:50:23

11           MR. BERRY:  All right.

12           THE COURT:  Please be seated.

13           Counsel, I will remind you that the government last

14   week renewed its request for the long-standing production of

15   26.2 material.  We now have the situation where if you have not  13:50:35

16   produced anything and you're going to call a witness, and

17   Mr. Berry or his co-counsel go through this line of

18   questioning, that you're going to be left with -- the jury's

19   going to be left with an impression that you've got something

20   to hide.  And I don't think that's anything that anyone wants.  13:50:59

21           MR. EISENBERG:  Well, Your Honor, let me --

22           THE COURT:  Well, no.  Let me -- let me be very clear.

23   You need to go back and ask your investigators and your

24   witnesses whether or not they've been shown material.  And if

25   it falls under Rule 26.2 or 612, produce it before they get on  13:51:21

UNITED STATES DISTRICT COURT

1    the stand to avoid this problem.

2         I'm going to take a very limited break.  Mr. Berry can

3    go back and confer with whatever it is that -- that is on this

4    witness's phone, and be diligent at producing whatever other

5    material he reviewed in advance of his testimony.                    13:51:44

6         And -- and let me just be clear.  Whatever these ads

7    are that he reviewed obviously was going to be relevant to his

8    testimony, and so they are permitted to look at it.

9         And so with that, we'll stand in recess.

10        MR. EISENBERG:  May I be heard, Your Honor?                      13:52:04

11        THE COURT:  You may.  You may make a record.

12        MR. EISENBERG:  Thank you.

13        Rule 26.2 has nothing to do with the production of

14   ads, nothing to do with the production of anything other than a

15   statement made by the -- by the witness.  He has made no           13:52:14

16   statements that fall within the ambit of 26.2.

17        THE COURT:  We don't know that because --

18        MR. EISENBERG:  I'm --

19        THE COURT:  -- nothing has been produced.

20        MR. EISENBERG:  I've -- Your Honor, I -- with all due          13:52:25

21   respect, I'm an officer of the Court.  I know what a statement

22   is.  I can read that rule.  And I can assure the Court and

23   counsel for the government there has been no statement that

24   this man has given.  He has not incorporated a statement.

25   There's nothing that has been recorded.  There has nothing that    13:52:43

GRANT SNYDER - CROSS-EXAMINATION

42

1    he has reviewed and said that this is my statement.  It does

2    not exist.

3           With respect to documentation that he has seen, I'm

4    not sure that Rule 612 actually provides that.  But if the

5    government wants to look at it, I will take a look and -- and    13:53:00

6    determine whether we can produce it right now.

7           THE COURT:  The problem is --

8           MR. EISENBERG:  Frankly -- I'm sorry, Your Honor.

9    I've been called to task here, and I don't think it's right.  I

10   have not had any production of any statement.  There is none    13:53:13

11   that I know of.

12          And this type of argument and examination is a little

13   bit unfair.  I am so sorry, Your Honor, but that's the way I

14   feel about it.

15          THE COURT:  Well, let me just clarify, Mr. Eisenberg.    13:53:28

16   I'm talking about you and your co-counsel.  And I'm talking

17   about --

18          MR. EISENBERG:  Well --

19          THE COURT:  -- any witness who's going to be called,

20   not just this witness.                                          13:53:42

21          So if you stand by your statement --

22          MR. EISENBERG:  I do.

23          THE COURT:  -- that no witness -- wait.  Don't argue

24   with the Court.  You may argue to the Court.

25          MR. EISENBERG:  Yes, Your Honor.  I'm going to --        13:53:54

GRANT SNYDER - CROSS-EXAMINATION

43

1          THE COURT:  Now, let me just say if anyone is aware

2     that any pending witness that is going to be called has

3     produced a statement, has made a statement, it needs to be

4     turned over.  These obligations and requests have been ongoing

5     since the beginning of the first trial two years ago --          13:54:13

6          MR. EISENBERG:  Your Honor --

7          THE COURT:  -- and -- and so, please, that's how we

8     are going to operate.  And to the -- to the argument that this

9     is un- -- an unfair line of questioning, it's exactly the same

10    line of questioning that other defense counsel have gone          13:54:31

11    through with the prosecutor's witnesses.  So I'm going to

12    permit it, but --

13         MR. EISENBERG:  Respectfully, Your Honor --

14         THE COURT:  Don't start with respectfully, because if

15    you're going to argue with the Court, I'm not going to have it.   13:54:47

16    We have a jury waiting.  I've told Mr. Berry to go back and

17    meet with the witness and look at his text messages.  And we're

18    going to come back and reconvene.

19         THE COURTROOM DEPUTY:  All rise.

20      (Recess from 1:55 p.m. to 2:02 p.m.)                            13:55:03

21         THE COURT:  What is the issue?

22         MR. EISENBERG:  Well, there's two, Your Honor.  One is

23    Rule 612 does not give the government the authority to demand

24    what has been shown the witness.  If that were true, every time

25    one of the government's witnesses was debriefed and prepared      14:02:24

1  for trial in this case, every single document that that person

2  saw should have been given to us.  And in my case, Your Honor,

3  I've never seen them.  And I know some of those witnesses

4  have -- were prepped just before they got on the witness stand.

5  Now, why it's different here, I don't know.                    14:02:45

6         Secondly, with respect to the rule itself, it says,

7  "This rule gives an adverse party options when a witness uses a

8  writing to refresh memory."

9         None of what he was shown was used to refresh anything

10  on his part.  They were simply ads that were shown to him.  He   14:03:01

11  did not testify about them.  And so they are not produceable

12  the way I read Rule 612.

13        And I think that's the way it's worked for the

14  government.  Should be the same way it works for me, Your

15  Honor.                                                          14:03:16

16        THE COURT:  Well, it is true he didn't testify about

17  the ads, so let me get to the 26.2 text messages.

18        Where are we on that?

19        MR. EISENBERG:  I have no problem if the government

20  wants to look at them, Your Honor.  They're not substantive.   14:03:28

21  I'm not even sure why those are a matter to be produced.

22        THE COURT:  Well, we don't -- yeah, we don't know what

23  that back and forth was about.  So, all right.  So where --

24  where is the witness?

25        MR. EISENBERG:  Well, I -- he must be in the witness     14:03:42

1    room, Your Honor.

2         He has said -- has indicated to me that he wants his

3    own attorney.  I'm not sure that that's necessary.  I'll talk

4    to him and see whether that can be -- whether he wants that.

5    If he does, of course, he may.  But I have no understanding or    `14:03:57`

6    no reason to get involved with that.  But let me talk to him

7    and see if we could smooth this out.

8         THE COURT:  Well, let me ask you this question:  Why

9    can't whomever it was that he was texting back and forth with,

10   one of your investigators, why can't they produce those text    `14:04:14`

11   messages?

12        MR. EISENBERG:  We can do that as well, Your Honor.

13        THE COURT:  And so why can't we do that now?

14        MR. BERRY:  I think Mr. Eisenberg said a little bit

15   ago that they were not preserved, which is why I asked --    `14:04:24`

16        MR. EISENBERG:  Well --

17        MR. BERRY:  -- if he didn't preserve them, then maybe

18   the witness had them.

19        MR. EISENBERG:  I don't have any.  And whether my

20   investigator still has them, I don't know.  I --    `14:04:33`

21        THE COURT:  Is your investigator here?

22        MR. EISENBERG:  Yes, she is, Your Honor.

23        Do you still have them?

24        THE COURT REPORTER:  I can't hear.

25        (Discussion held off the record.)    `14:04:46`

GRANT SNYDER - CROSS-EXAMINATION

46

1        MR. EISENBERG:  Yeah, she's -- we'll be able to get

2    them together, Your Honor.

3        THE COURT:  Well, now the dilemma is we have a jury

4    waiting, and we're waiting for production to continue the

5    testimony.                                                    14:04:58

6        Mr. Berry, are there other areas that you can go into

7    with this witness who is now --

8        MR. BERRY:  There certainly are, but I would like to

9    see these before the end of my examination.  I mean, this was

10   just -- this was just the beginning.  I was trying to get into  14:05:12

11   it.  But it's part of what would direct my examination of him,

12   is to understand what he possibly said previously that he made

13   a -- if he made a statement in these messages that would

14   influence the flow of my examination.  That's why we've asked

15   for this stuff to be produced in advance.  And that's the point  14:05:28

16   of this, so there's not a delay at trial, which is exactly what

17   we were anticipating, which is why we consistently asked for

18   it.

19       THE COURT:  Well, here's what we're going to do,

20   because we have the jury waiting:  You're going to go into    14:05:40

21   whatever areas you can possibly go into on your

22   cross-examination of the witness.

23       MR. BERRY:  Yes, ma'am.

24       THE COURT:  He will await -- you will await the

25   production by the defense of whatever these text messages are.  14:05:51

UNITED STATES DISTRICT COURT

GRANT SNYDER - CROSS-EXAMINATION

47

1    And if we have to hold him over for subpoena purposes to

2    reexamine, then we'll do that.

3            But go through your cross-examination.  And if you

4    need to ask for additional time to examine the witness, then he

5    can step down.  We'll hold him on subpoena, and then we can          14:06:10

6    recall him tomorrow or later this afternoon, if it's necessary.

7            MR. BERRY:  Thank you.

8            THE COURT:  All right.  So let's bring the witness in,

9    and let's have the jury come back.

10           MR. LINCENBERG:  Your Honor, at the break can I have a        14:06:27

11   minute?  I'd like to bring a mistrial motion when the Court has

12   a minute at the break.

13           THE COURT:  Sure.

14           MR. LINCENBERG:  Should I do it now --

15           THE COURT:  No.                                               14:06:39

16           MR. LINCENBERG:  -- or wait for a break?

17           THE COURT:  You ask for a minute.  You always take

18   ten.

19           So let's bring the jury in.

20           MR. EISENBERG:  Your Honor, before they come in, I           14:06:45

21   have a suggestion as well.

22           THE COURT:  Yes, Mr. Eisenberg.

23           MR. EISENBERG:  Will Your Honor look at these text

24   messages to determine whether they're even substantive or they

25   should be turned over?                                               14:06:55

UNITED STATES DISTRICT COURT

 1          THE COURT:  I'm happy to do that.  Produce them now,

 2   please.

 3          All right.

 4          MR. EISENBERG:  Okay.  Thank you.

 5          THE COURT:  Sir, please come forward and take your          14:07:02

 6   seat.

 7          Oh, you're going to rise in a moment anyway, sir.

 8   Thank you.  You might as well stand.

 9          All rise for the jury.

10      (Jury present at 2:07 p.m.)                                     14:07:41

11          THE COURT:  All right.  Please be seated.

12          The record will reflect the presence of the jury.  The

13   witness is on the witness stand.

14          Mr. Berry, you may continue.

15          MR. BERRY:  Thank you, Your Honor.                          14:08:11

16   BY MR. BERRY:

17   Q.  All right, Mr. Snyder, we're back.  We were asking

18   questions about communications with defense, things like that.

19   I just want to move into your -- your human trafficking

20   investigation experience that you testified about.                14:08:23

21          So first and foremost, you're wearing a shirt right

22   now with a logo.  What is it?

23   A.  It's International Association of Human Trafficking

24   Investigators.

25   Q.  And what is that?                                             14:08:32

GRANT SNYDER - CROSS-EXAMINATION

49

A.  Oh, it's a collaboration, if you will.  It's a nonprofit

ran out of Knoxville.  Started in Clearwater.  Run by Jeremy

Lewis, who is a former human trafficking investigator from

the -- I think it's Pima County down there.  I can't remember

exactly.  And we conduct trainings.  We started just doing,                14:08:50

like, one a year, and now we do up to, like, four or five a

year in different parts of the country and internationally.

We've gone to Canada and places like that.

Q.  And you're -- in your direct examination, you were asked

some questions about when you started utilizing Backpage in          14:09:10

your human trafficking investigation.

          Do you recall that?

A.  Yes, sir.

Q.  And if we could just for a second, let's unpack what you

mean when you use the word "human trafficking," because you          14:09:23

would agree with me that has sort of a broad meaning and there

are different subparts to that.

          Would you agree with that?

A.  I do agree with that.

Q.  Okay.  So when we talk about human trafficking that you          14:09:36

investigated, were you investigating people like labor

trafficking, people being forced to work in the back of a -- a

food shop or a massage parlor or something like that?

A.  I participated in a number of cases that could have been

charged as labor trafficking cases, but I was not a specialized      14:09:56

UNITED STATES DISTRICT COURT

GRANT SNYDER - CROSS-EXAMINATION

50

1   labor trafficking investigator, as many people are.

2           MR. EISENBERG:  Object to this line of questioning,

3   Your Honor, because it doesn't relate to the allegations in the

4   indictment.

5           MR. BERRY:  Your Honor --                          14:10:12

6           THE COURT:  I think with respect to -- well, no.  I'll

7   overrule at this point.

8   BY MR. BERRY:

9   Q.  Okay.  So you -- you've done some labor trafficking.  But,

10  for the most part, your career focused on the part of human   14:10:26

11  trafficking that involved sex for money; correct?

12  A.  Correct.

13  Q.  That was previously or earlier in your career would have

14  been just strictly referred to as some form of prostitution;

15  correct?                                                    14:10:41

16  A.  Promotion of prostitution most likely.

17  Q.  But prostitution was involved; correct?

18  A.  Yes.

19  Q.  But when you use that term, you're talking more about

20  investigations of people who were exchanging sex for money with  14:10:53

21  some additional coercive element; correct?

22  A.  Correct.

23  Q.  In fact, your background or your -- the bulk of your career

24  did not focus on just straight prostitution investigations.

25  Was that fair to say?                                       14:11:11

1  A.  I -- I'm uncomfortable saying yes to that, even though I

2  was called a human trafficking investigator because we all

3  claim that mantel.  Much of what -- I mean, but for

4  prostitution, there wouldn't be sex trafficking.  So I

5  considered myself a subject matter expert in prostitution as      14:11:31

6  well.

7  Q.  And, in fact, there came a time where folks in law

8  enforcement, you included, took a more victim-centered approach

9  and started using a somewhat more victim-centric term to say

10  human trafficking rather than calling a victim of human          14:11:48

11  trafficking a prostitute; correct?

12  A.  Correct.

13  Q.  And so when we were talking about these words, I want to

14  make sure we understand where we are in that language.

15       Am I using the language the way you're used to?           14:11:59

16  A.  I think so.

17  Q.  Okay.  If I don't, if you would, please correct me about

18  that.

19       So that being said, you -- you testified on direct

20  that you started using Backpage in your human trafficking,      14:12:11

21  prostitution-related investigations in approximately 2007; is

22  that correct?

23  A.  Yes.  That was not a human trafficking investigation back

24  then.

25  Q.  That was the public corruption one I think you said --      14:12:25

 1    A.  Correct.

 2    Q.  -- correct?

 3            And it had a prostitution element to it; correct?

 4    A.  Yes, sir.

 5    Q.  So your very first exposure to Backpage in an investigation    14:12:31

 6    involved prostitution; is that right?

 7    A.  I think so.  I think I knew about Backpage before that, but

 8    I had not had opportunity to really -- as a street crimes

 9    officer, I wasn't working in the online environment.  I was

10    working on the streets.    14:12:50

11    Q.  I understand.  But that was your first investigation where

12    you utilized Backpage in some capacity, right, or it was

13    involved in some way?

14    A.  As far as I can recall.

15    Q.  All right.  And that was a prostitution case; correct?  Or    14:12:58

16    prostitution investigation related to the public corruption?

17    A.  Yes.

18    Q.  All right.  And we don't have to go into the details of

19    that.  I'm sure it's very interesting, but we'll keep moving.

20            So you start in 2007.  Do you continue to utilize    14:13:11

21    Backpage in your human trafficking, prostitution-related

22    investigations up through and until April of 2018?

23    A.  Yes.

24    Q.  For all those years, you were using Backpage in those

25    investigations?    14:13:25

GRANT SNYDER - CROSS-EXAMINATION

53

```
 1   A.  Yes.

 2   Q.  Were you using Backpage's furniture section?

 3   A.  No.

 4   Q.  Were you using their buy/sell/trade section?

 5   A.  Not that I recall.                                    14:13:37

 6   Q.  You were using their female escorts or escorts section for

 7   the most part; isn't that correct?

 8   A.  Yes.  I think there was some other locations in there, but

 9   they weren't -- they had to do with connections between people.

10   Q.  Like women seeking men, vice versa?                   14:13:53

11   A.  That's a -- that's one, yeah.

12   Q.  Okay.  And they all had similar type ads of these folks

13   offering what might appear to be prostitution; correct?

14   A.  Yes, to some extent.

15   Q.  Okay.  So from 2007 to 2018, that's where your -- your work  14:14:06

16   focuses in Backpage; correct?

17   A.  I mean, it was one of the places I was.  But, yes.

18   Q.  And that's what we're here to talk about, so that's what

19   I'm going to --

20   A.  Okay.                                                 14:14:20

21   Q.  -- ask you questions about.  Okay?

22           Do you understand?

23   A.  I think so, yes.

24   Q.  So you testified also that after Backpage shut down in

25   early 2018, it affected those investigations in some meaningful  14:14:32
```

UNITED STATES DISTRICT COURT

1  sense; correct?

2  A.  Yes.

3  Q.  So isn't it true that after April of 2018, you could not

4  find prostitution-related ads or human trafficking victims on

5  Backpage anymore?                                                14:14:53

6  A.  Correct.

7  Q.  It was all done, wasn't it?

8  A.  As far as I know, yes.

9  Q.  Okay.  But from 2007-2018, a good source for that; correct?

10 A.  Correct.                                                     14:15:04

11 Q.  And you testified on direct that some of the specific

12 things you were looking for in your investigation were if Child

13 Protective Services or there was talk about a runaway or

14 something like that, and phone numbers, that you would utilize

15 that information and go on Backpage to try to locate these --    14:15:28

16 these kids; correct?

17 A.  Well, the only information -- I was only interested in the

18 HT part of it.  So runaways that were not suspected of

19 participating in, you know, human trafficking or sex

20 trafficking wouldn't come my way.  So, yes, to the extent that  14:15:47

21 that's all I looked at.

22 Q.  In your experience, are runaways at risk of being human --

23 human trafficked?

24 A.  Yes.

25         MR. EISENBERG:  Objection, Your Honor.  It's            14:15:58

GRANT SNYDER - CROSS-EXAMINATION

55

```
 1   irrelevant to these charges.
 2          THE COURT:  Sustained.
 3   BY MR. BERRY:
 4   Q.  Now, when you talked about exigent circumstances earlier,
 5   you were talking about instances in which you're investigating    14:16:17
 6   a human trafficking case of some kind; correct?
 7   A.  Yes.
 8   Q.  Is that a yes?
 9   A.  Yes.
10   Q.  Sorry.  She can't get the head nods.                          14:16:28
11   A.  Sorry.
12   Q.  So you're investigating some human trafficking incident;
13   correct?
14          And you've already established that that usually has
15   some sort of sex trafficking prostitution element; correct?       14:16:37
16   A.  I apologize.  Can you repeat that question?  It had a bunch
17   of pieces to it.
18   Q.  That's completely fair.
19          So we've established that most of your investigations
20   involve human trafficking; correct?                               14:16:49
21   A.  Yes.
22   Q.  And that when we say human trafficking in the context of
23   your career, we're generally talking about sex trafficking and
24   prostitution; correct?
25   A.  Correct.                                                      14:16:58
```

```
1   Q.  So when you have an exigent circumstances situation in one

2   of your investigations, it had something to do with a

3   sex-trafficking event that is urgent; is that correct?

4   A.  Yes, although unconfirmed at this point.  Yes.

5   Q.  But that's part of your investigation; correct?          14:17:17

6   A.  Correct.

7   Q.  And so you're reaching out to Backpage because, once again,

8   Backpage is a source for something to do with prostitution and

9   sex trafficking in your investigation --

10          MR. EISENBERG:  Objection --                         14:17:32

11  BY MR. BERRY:

12  Q.  -- correct?

13          MR. EISENBERG:  -- to the characterization of "once

14  again," Your Honor.  Counsel's testifying.

15          THE COURT:  Overruled.                               14:17:38

16          THE WITNESS:  Can you repeat the question, sir?

17  BY MR. BERRY:

18  Q.  I'm going to ask the court reporter to do that one this

19  time.  I try not to do that.  I apologize.

20      (Record read.)                                           14:18:05

21          THE WITNESS:  Correct.

22  BY MR. BERRY:

23  Q.  Let me ask you about whether you are aware that Backpage

24  utilized something called a strip ad filter.

25          Are you familiar with that at all?                   14:18:39
```

UNITED STATES DISTRICT COURT

1  A.  No.

2  Q.  Are you aware of whether Backpage would remove the most

3  obvious sex-act-for-money language when people posted ads?

4          MR. EISENBERG:  Again, Your Honor, I'm sorry.  I

5  object to the characterization "most obvious."                    14:18:56

6          It's also argumentative.

7          THE COURT:  Well, I'll sustain.

8          And Mr. Berry can rephrase as to what he means by "the

9  most obvious."

10          MR. BERRY:  Thank you, Your Honor.  Let's -- let's ask  14:19:12

11  the witness.

12  BY MR. BERRY:

13  Q.  What are some obvious sex-for-money terms that you're

14  familiar with in your investigations?

15  A.  Well, reference generally to either the word "sex" or to   14:19:23

16  specific acts generally and common street parlance that

17  describe different sex acts would be one indication of that.

18  GFE is one example.  Girlfriend experience would be potentially

19  related to something like that.

20          I mean, there's other, you know, indications that I    14:19:52

21  think -- other wording that are escaping me right now.  But

22  typically those were sort of that explicit.  Sometimes it's

23  acronyms, you know, that would refer to a specific sex act that

24  I'm apprehensive to describe.

25  Q.  Why are you apprehensive?                                   14:20:16

GRANT SNYDER - CROSS-EXAMINATION

58

A.  Because we have a mixed jury of wonderful people, and I
would hate to -- my wife wouldn't be happy with me talking that
way in front of women.

Q.  Fair enough.

        Some of these words are -- are explicit or indicative          14:20:26
of explicit sex acts; correct?

A.  Correct.

Q.  And that's what's making you uncomfortable about actually
talking about them here in open court; correct?

A.  Yes.          14:20:41

Q.  Not the kind of thing we normally say in polite company?

A.  Correct.

Q.  Okay.  But GFE is one that you're familiar with; correct?

A.  Correct.

Q.  Are you aware of Back- -- I think you did testify that          14:20:48
you're aware of Backpage's moderation practices in some way;
correct?

A.  Only to the extent that I was on the receiving end of it.
Yes.

Q.  Are you aware of any relationship between Backpage and The          14:21:00
Erotic Review?

A.  No.

Q.  Are you aware that they would pay The Erotic Review money
to put links on their review site?

A.  No.  I was unaware of that.          14:21:15

GRANT SNYDER - CROSS-EXAMINATION

59

```
 1   Q.  Are you aware of any relationship between Backpage and
 2   people called super posters?
 3   A.  No.
 4   Q.  Are you aware of Backpage's aggregation methods?
 5   A.  No.                                                    14:21:29
 6   Q.  Are you aware of whether Backpage went over to Craigslist,
 7   when it was still around doing this stuff, and took those ads
 8   and put them on Backpage?
 9            MR. FEDER:  Objection.  Relevance.
10            MR. LINCENBERG:  Objection.                       14:21:43
11            MS. BERTRAND:  Goes beyond the scope of direct.
12            MR. LINCENBERG:  This goes to credibility.
13            THE COURT:  Wait.  Wait.  I thought I heard -- is it
14   Mr. Feder?
15            MR. FEDER:  Relevance.                            14:21:54
16            THE COURT:  And then?
17            MS. BERTRAND:  Goes beyond the scope of direct.
18            THE COURT:  Overruled as to both.
19   BY MR. BERRY:
20   Q.  You can answer.                                        14:22:06
21            Would you like me to ask that one again?
22   A.  Yeah, would you ask that question again, please.
23   Q.  You bet.
24            Are you aware of whether Backpage took ads from
25   Craigslist and put them on Backpage?                       14:22:14
```

UNITED STATES DISTRICT COURT

GRANT SNYDER - CROSS-EXAMINATION

60

```
1            MR. FEDER:  Same objection.

2            THE COURT:  Overruled.

3            THE WITNESS:  I'm unaware of that.

4    BY MR. BERRY:

5    Q.  Okay.  Are you aware of any meetings between any of the      14:22:23

6    owners of Backpage and people at the National Center For

7    Missing and Exploited Children?

8            MR. EISENBERG:  Objection as to the relevance of this,

9    Your Honor.

10           MS. BERTRAND:  And counsel's testifying.  Different       14:22:33

11   objection.

12           THE COURT:  I'll sustain.

13   BY MR. BERRY:

14   Q.  Are you aware of any meetings between Backpage and people

15   at Polaris?                                                       14:22:40

16           MR. EISENBERG:  Same objections, Your Honor.

17           MS. BERTRAND:  Same objection.

18           THE COURT:  Well, sustained.

19   BY MR. BERRY:

20   Q.  Are you aware of any documentaries about prostitution on      14:22:46

21   Backpage?

22           MR. EISENBERG:  Same objections, Your Honor.

23           MS. BERTRAND:  Same objection.

24           THE COURT:  He can answer if he's aware.

25           THE WITNESS:  I'm not aware.                              14:22:53
```

UNITED STATES DISTRICT COURT

GRANT SNYDER - CROSS-EXAMINATION

61

```
 1   BY MR. BERRY:
 2   Q.  Do you have Netflix?
 3           MS. BERTRAND:  Objection, Your Honor.  Argumentative.
 4           THE COURT:  Overruled.
 5           THE WITNESS:  I apologize.  Can you restate the          14:23:00
 6   question?
 7   BY MR. BERRY:
 8   Q.  I'm sorry.  Do you have Netflix?
 9   A.  I do.
10   Q.  Are you familiar with the documentary called I Am Jane Doe?  14:23:04
11           MS. BERTRAND:  Objection.  Goes beyond the scope of
12   direct.  Relevance.  And he has said he is not familiar with
13   documentaries.
14           MR. EISENBERG:  And it's also argumentative, Your
15   Honor.                                                          14:23:21
16           THE COURT:  Overruled.
17           THE WITNESS:  I am aware of that documentary, but I've
18   never seen it.
19   BY MR. BERRY:
20   Q.  Thank you.                                                  14:23:26
21           Would you say that Backpage was your number 1 ally in
22   law enforcement?
23   A.  No.
24   Q.  Were they a good resource?
25   A.  Yes.                                                        14:23:38
```

UNITED STATES DISTRICT COURT

GRANT SNYDER - CROSS-EXAMINATION

62

```
 1    Q.  Would you say that -- who was a better partner in your
 2    human trafficking investigations, Backpage or NCMEC?
 3    A.  I mean, NCMEC because of what they did.
 4    Q.  If you owned a website like Backpage, what would you do
 5    with it?                                                          14:24:05
 6            MR. EISENBERG:  Objection, Your Honor.  Relevance.
 7            THE COURT:  Sustained.
 8            MR. BERRY:  Just one second, Your Honor.
 9    BY MR. BERRY:
10    Q.  Sir, are you familiar with the Senate investigation report  14:24:29
11    of Backpage?
12            MR. EISENBERG:  Objection.  Again, Your Honor, it has
13    nothing to do with this witness's testimony.  It doesn't go to
14    credibility.
15            THE COURT:  Overruled.                                   14:24:41
16            THE WITNESS:  I'm not.
17    BY MR. BERRY:
18    Q.  And do you know Sergeant Byron Fassett of the Dallas Police
19    Department?
20    A.  I do.                                                        14:24:50
21    Q.  How do you know him?
22    A.  I've had numerous conversations with Byron.  I attended one
23    of his early trainings.
24            MR. BERRY:  No further questions, Your Honor.
25            THE COURT:  All right.  Mr. Eisenberg.                   14:25:21
```

UNITED STATES DISTRICT COURT

GRANT SNYDER - REDIRECT EXAMINATION

63

```
 1              MR. EISENBERG:  Yes, Your Honor.
 2                      REDIRECT EXAMINATION
 3   BY MR. EISENBERG:
 4   Q.  Mr. Snyder, you said that Backpage was a good resource?
 5   A.  Yes, sir.                                              14:25:37
 6   Q.  How was it a good resource?
 7   A.  By being expeditious in their responses; complete in giving
 8   us what we requested; by consulting when we had questions; by
 9   moderating the posts, to the extent that they could, I think;
10   by supporting the ongoing investigations; and later training   14:26:06
11   with law enforcement.
12   Q.  Now, you said moderation, to the extent that they could.
13              What did you mean by that?
14   A.  Well, I mean, I think that many of the ag- -- ads
15   themselves were quite vague and were difficult to ascertain   14:26:22
16   what was truly going on.  And I think that -- that they made an
17   appropriate effort, in my opinion, based on my experience and
18   on my ads themselves being taken down when I tried to post
19   undercover ads.
20   Q.  What sort of words -- when the -- when your ads were taken   14:26:48
21   down, do you know why?
22   A.  Yes.
23   Q.  Why?
24   A.  I would post references to age in referring to somebody as
25   young.  Any explicit or even veiled references to sexual   14:27:02
```

GRANT SNYDER - REDIRECT EXAMINATION

64

1   activity, those sorts of things, generally got our ads pulled.

2   That sort of thing.

3   Q.  Did you ever put GFE into an ad?

4   A.  I didn't because I tended to see those ads up for a short

5   period of time, and then they'd disappear.                    14:27:22

6   Q.  And you're talking about up on Backpage?

7   A.  Correct.

8   Q.  Okay.  You were asked by counsel for the government whether

9   you were -- you've been paid to come to testify?

10  A.  Yeah.                                                      14:27:36

11  Q.  Do you mean -- let me put this in this context:  You don't

12  mean that you're getting paid, money's being given to you; is

13  that correct?

14  A.  I wasn't sure exactly what that reference was, but the

15  truth is I'm not being paid by anybody to be here.            14:27:51

16  Q.  But your expenses are being covered?

17  A.  Correct.

18  Q.  Your flight and hotel?

19  A.  Yes.

20  Q.  Okay.  Thank you.                                         14:27:59

21          MR. EISENBERG:  Thank you, Your Honor.

22          THE COURT:  Is the government seeking to reserve the

23  witness?

24          MR. BERRY:  Yes, Your Honor.

25          THE COURT:  All right.  Sir, your testimony is         14:28:08

UNITED STATES DISTRICT COURT

```
 1   complete for this afternoon, but I'm going to hold you to the
 2   subpoena until further notice.  And so it shouldn't be too much
 3   longer, but there may be an opportunity for you to come back
 4   and testify further.  So just be a little patient with us, all
 5   right.  So you may stand down.                                    14:28:29
 6           Call your next witness.
 7           Watch your step.  Thank you.
 8           MR. CAMBRIA:  Your Honor, we're calling John Becker.
 9           He's out there somewhere.
10           THE COURT:  Sir, please come forward and be sworn.        14:29:55
11           MR. CAMBRIA:  I notice the podium is where it should
12   be, Your Honor.
13           MR. EISENBERG:  Because I put it there.
14           MR. BECKER:  Up here?
15           THE COURTROOM DEPUTY:  Right.                             14:30:09
16           MR. CAMBRIA:  She's going to swear you in first.
17           THE COURTROOM DEPUTY:  Here in front of the boxes,
18   please.
19           Please raise your right hand.
20       (JOHN R. BECKER, a witness herein, was duly sworn or
21   affirmed.)
22           THE COURTROOM DEPUTY:  If you'd please step over to
23   the witness stand and take a seat.
24           THE WITNESS:  Thank you.
25       ///
```

```
 1                         DIRECT EXAMINATION

 2     BY MR. CAMBRIA:

 3     Q.  Good afternoon.

 4     A.  Good afternoon.

 5     Q.  Can you state your name please, first and second.      14:30:35

 6     A.  First name John, middle initial R, last name Becker.

 7     Q.  Is there a microphone close to you there?

 8     A.  Okay.

 9     Q.  There you go.

10     A.  Okay.                                                  14:30:46

11     Q.  And, Mr. Becker, how are you employed?

12     A.  I'm an attorney.

13     Q.  And where are you located?

14     A.  My office is in North Scottsdale.

15     Q.  And what's your educational background?               14:30:53

16     A.  I have a JD from Arizona State University College of Law,

17     and I have a master's in tax from New York University.

18     Q.  And what sort of law do you practice, if you have a

19     concentration area?

20     A.  My practice is a trust and estates practice.  I do estate  14:31:15

21     planning and estate and trust administration.

22     Q.  All right.  Did there come a time that you did some work

23     for Michael Lacey?

24     A.  Yes.

25     Q.  And what sort of work was that?                       14:31:32
```

1   A.  I was engaged to do estate planning for Mr. Lacey.

2   Q.  And what did that entail?

3   A.  That entailed preparing basic estate planning documents for

4   him, making sure that his affairs were structured so that his

5   assets went where he wanted them to go upon his passing.  Also        14:31:49

6   some planning for incapacity.

7   Q.  And did there come a time when he came to you regarding a

8   banking situation that he had?

9   A.  Yes.

10  Q.  And what was that?                                                 14:32:08

11  A.  In my engagement of doing estate planning for Mr. Lacey,

12  Mr. Lacey conveyed to me that his banking accounts were being

13  closed.

14  Q.  And what did he ask you to do in that regard?

15  A.  He asked me to consider whether there were any other             14:32:24

16  structures to place his funds.

17  Q.  And did you give him some advice?

18  A.  Yes, I did.

19  Q.  And what was that?

20  A.  I explained to him that I do not do any type of                  14:32:36

21  international estate planning, there are other individuals that

22  do, but that he may want to look into a structure where the

23  accounts are outside of the United States in order to keep them

24  open and from being closed.

25  Q.  By banks?                                                        14:32:53

JOHN BECKER - DIRECT EXAMINATION

68

1   A.   Yes.

2   Q.   All right.  And did you advise him for another step?

3   A.   As part of doing our estate planning, we did a transaction,

4   which is allowed in the Internal Revenue Code under Code

5   Section 2702, and it's called a grantor retained annuity trust.    14:33:12

6   Q.   And what's --

7   A.   It's a --

8   Q.   -- that?

9   A.   It's a structure where Mr. Lacey transfers assets into the

10  trusts and the trusts pay him annuities in return.                 14:33:23

11  Q.   Okay.  And did you -- you said that you weren't an expert

12  in -- in investments where domestic banks wouldn't be able to

13  just close accounts.

14       Did you refer him to someone who you felt had that

15  expertise.                                                         14:33:41

16  A.   Yes, I did.

17  Q.   And who was that?

18  A.   Jacob Stein, who is based in Los Angeles.

19  Q.   And did -- did you and Mr. Lacey visit Mr. Stein?

20  A.   Yes, we did.                                                  14:33:53

21  Q.   And, as a result of that, was some advice given as to an

22  appropriate way to solve the problem of domestic banks closing

23  his accounts?

24            MR. STONE:  Objection.  Calls for hearsay.

25            THE COURT:  Sustained.                                   14:34:10

```
 1              MR. CAMBRIA:  No.  I asked whether or not advice was
 2    given.  I didn't ask what it was yet at this point, Your Honor.
 3              THE COURT:  He can answer yes or no then.
 4              MR. CAMBRIA:  There you go.
 5              THE WITNESS:  Yes.                                  14:34:19
 6    BY MR. CAMBRIA:
 7    Q.  All right.  Thank you.
 8              And, as a result of that, did you take any steps then
 9    to effectuate that advice, if you will?
10    A.  I worked with Mr. Stein in the establishment of a trust in  14:34:29
11    Hungary, but it was Mr. Stein that had created the trust, and
12    he was the contact person.
13    Q.  Okay.
14    A.  I was interfacing with --
15    Q.  Did Mr. Lacey pick a particular place to do it, or was he  14:34:50
16    given some options?
17    A.  He was given options.
18    Q.  All right.  And did you advise him further as to how to
19    carry out his original goal?
20    A.  Yes.                                                      14:35:07
21    Q.  And what was that?
22    A.  My advice was that if he was going to structure an account
23    overseas, he has to comply with all of the disclosures required
24    by the Treasury Department.  Not only does he have to provide
25    all the disclosures, he must report the income on his tax     14:35:22
```

1    return.

2    Q.  Okay.  And did you take steps to accomplish that?

3    A.  Absolutely.

4    Q.  All right.  And did -- eventually did the funds that he was

5    discussing come into your possession or under your control?    14:35:41

6    A.  They were -- the funds were already under my control.

7    These trusts that I established are -- or Mr. Lacey

8    established, these grantor retained annuity trusts, were

9    required to make the distributions to Mr. Lacey.  And so I was

10   required, as trustee, to make that distributions to him.    14:36:01

11          The problem was that -- the ongoing problem was there

12   was no place to put those funds in a domestic account.  And so

13   at the same time that this trust arrangement was being created

14   in Hungary, Mr. Lacey wanted to transfer the funds to that

15   account.    14:36:22

16   Q.  All right.  And this was pursuant to the advice of you and

17   this other attorney --

18   A.  Yes.

19          MR. STONE:  Objection.

20   BY MR. CAMBRIA:    14:36:29

21   Q.  -- as to how to do it legally?

22          MR. STONE:  Objection.  Calls for hearsay.

23          THE COURT:  Sustained.

24          MR. CAMBRIA:  He's here.

25          THE COURT:  You're also incorporating this other    14:36:35

 1   person.

 2           MR. CAMBRIA:  I'll restate it, and we'll make it

 3   easier.

 4   BY MR. CAMBRIA:

 5   Q.  And did you then advise him of, in your opinion,          14:36:40

 6   appropriate ways to legally create this trust and comply with

 7   the reporting requirements?

 8           MR. STONE:  Objection.  Leading.

 9           THE COURT:  Sustained.

10   BY MR. CAMBRIA:                                               14:36:54

11   Q.  Okay.  What did you advise him to do?

12   A.  I advised him that whatever structure was done outside the

13   United States, everything had to be done correctly.  And he was

14   a stickler for it.  He stated to me multiple times it has to be

15   done correctly.                                              14:37:10

16           MR. STONE:  Objection to the narrative.

17           THE COURT:  Sustained.

18           Sir, yes or no.

19           MR. CAMBRIA:  I'm sorry?

20           THE COURT:  I'm going to instruct the witness simply   14:37:16

21   to ask -- answer the question asked.  Okay?

22           MR. STONE:  Move to strike.

23           MR. CAMBRIA:  Thank you.

24           MR. STONE:  Move to strike that last answer.

25           THE COURT:  It will be stricken, and the jury will     14:37:26

 1  disregard.

 2          MR. CAMBRIA:  Okay.

 3  BY MR. CAMBRIA:

 4  Q.  Did you ever receive a communication from Mr. Lacey about

 5  the reporting requirements?                                      14:37:35

 6          MR. STONE:  Objection.  Calls for hearsay.

 7          THE COURT:  Well, he can answer yes or no, but --

 8          THE WITNESS:  Yes.

 9  BY MR. CAMBRIA:

10  Q.  Okay.  Now, Mr. Becker, have you had an opportunity to      14:37:44

11  review an email exchange between you and Mr. Lacey, copies of

12  which I provided to you?

13  A.  Yes.

14  Q.  All right.

15          MR. CAMBRIA:  And Exhibit 1, please.  Government         14:38:08

16  Exhibit 1.  Could you put up for the -- well, it's in evidence.

17          Can you put up, please, on the screen for everyone

18  Becker 02058 under Exhibit 1.  Government Exhibit 1.

19      (The Court and the courtroom deputy confer.)

20          MR. STONE:  This particular page is not in evidence.    14:38:41

21          THE COURT:  Yes.  This isn't in evidence, Mr. Lacey --

22  I'm sorry -- Mr. Cambria.  This is not in evidence.

23          MR. CAMBRIA:  I'm sorry?

24          THE COURT:  This -- this particular page is not part

25  of that --                                                      14:38:53

JOHN BECKER - DIRECT EXAMINATION

73

 1          MR. CAMBRIA:  Yes, it is.

 2          THE COURT:  -- Exhibit 1.

 3          Not as it was admitted.

 4          MR. CAMBRIA:  Yes.  You -- you admitted this for me.

 5     This was a 106 situation, and the government agreed to it.          14:39:01

 6          MR. STONE:  I think we're -- not to interject, but --

 7          MR. CAMBRIA:  Pardon?

 8          THE COURT:  There was a page that was not included.

 9          MR. CAMBRIA:  That's the one.  This was included.

10     This was the one that I objected to, and they agreed.          14:39:16

11          THE COURT:  All right.  Let's resolve the issue, but

12     by my recording, by my courtroom deputy's recording, it's not

13     part of the exhibit that was introduced and admitted.

14          MR. CAMBRIA:  Actually, it's 02058.

15          THE COURT:  I don't -- I don't know what you're          14:39:42

16     referring to.  That number means nothing to me, Mr. Cambria.

17          MR. CAMBRIA:  You --

18          MR. STONE:  Your Honor, if I may.  This is page 3 of

19     Exhibit 1.  Pages 3 and 4 were admitted.  The other pages were

20     not.  So it looks like we're on the correct page now.          14:39:54

21          THE COURT:  All right.

22          MR. CAMBRIA:  Yeah.  There isn't -- on the copy that I

23     have, it doesn't -- would you pull up page 3, then, please.

24          THE COURT:  Yes.  Give me a -- give my courtroom

25     deputy a moment --          14:40:05

UNITED STATES DISTRICT COURT

```
 1              MR. CAMBRIA:  Here it is.

 2              THE COURT:  Mr. Cambria, give my courtroom deputy a

 3   moment to confer with your staff --

 4              MR. CAMBRIA:  Very good.

 5              THE COURT:  -- who is --                          14:40:13

 6              MR. CAMBRIA:  This is -- yeah.

 7              THE COURT:  -- working the --

 8              MR. CAMBRIA:  The exhibit that's up now is what I'm

 9   looking for.

10              THE COURTROOM DEPUTY:  Okay.                      14:40:33

11              THE COURT:  All right.  Now, this is the exhibit.

12              MR. CAMBRIA:  On the left.

13              THE COURT:  All right.

14              THE COURTROOM DEPUTY:  Okay.

15              THE COURT:  Yes.                                  14:40:40

16              MR. CAMBRIA:  Okay.

17              THE COURT:  It may be published.

18   BY MR. CAMBRIA:

19   Q.  Do you see that, sir, the page on the left?

20   A.  Yes.                                                    14:40:45

21   Q.  All right.  And the email of 1/23/2017?

22   A.  Yes.

23   Q.  Okay.  And do you see the entry at -- it says at the top --

24   the one that at the top starts with a phone number?

25              Do you see that on that page?                    14:41:09
```

1    A.  Yes.

2    Q.  All right.  The bottom of that page is -- appears to be an

3    email from Mr. Lacey of 2/21/17.

4            Do you see that?

5    A.  Yes.                                                          14:41:22

6    Q.  Could you read that, please.

7    A.  Yes.  "John, do you or Jacob Stein do the reporting to

8    government on money that was moved?  Michael Lacey."

9    Q.  And so Mr. Lacey was asking you who's going to be

10   responsible for doing the necessary reporting on a trust like    14:41:38

11   this; correct?

12           MR. STONE:  Objection.  Leading.

13           THE COURT:  Sustained.

14   BY MR. CAMBRIA:

15   Q.  Well, that's what it says, doesn't it?                       14:41:48

16           THE COURT:  Well, that was a leading question,

17   Mr. Cambria.  I sustained the objection.

18           MR. CAMBRIA:  All right.

19   BY MR. CAMBRIA:

20   Q.  This particular quote that you read says that he's asking    14:41:59

21   you, "Do you or Jacob Stein do the reporting to the

22   government"; correct?

23   A.  Yes.

24   Q.  And did you respond?

25   A.  Yes.                                                         14:42:10

1    Q.  And what'd you say?

2    A.  I said in a -- the response is here.

3            Do you want me to read it --

4    Q.  Sure.

5    A.  -- or do you want me to paraphrase it?                    14:42:15

6            Okay.  I don't -- I don't see the response on the

7    screen.

8            MR. CAMBRIA:  Let's see.  Could you pull up -- it

9    would be the prior page.  At the bottom it says 30, but it's an

10   email of 2/21/2017 at 11:45 a.m.                              14:42:51

11   BY MR. CAMBRIA:

12   Q.  All right.  Do you see that on your screen?

13   A.  Yes.

14   Q.  All right.  And -- and what's your response?

15   A.  "I believe Jacob" --                                      14:43:07

16           MR. STONE:  Your Honor, I don't think this page is in

17   evidence.  No objection if he -- if Mr. Cambria wants to move

18   this in, though.

19           THE COURT:  Well, let's --

20           MR. CAMBRIA:  My understanding was the entire         14:43:18

21   Exhibit 1 was in evidence, Your Honor.  I remember at the time

22   we had an issue about a page, and then we resolved it.

23           THE COURT:  No.  Well, that doesn't coincide, I think,

24   with my memory.  And so what you can do is you -- if you wish

25   to ask questions about this page of the exhibit, have it       14:43:34

```
 1    remarked.  And then if you wish to move for its introduction,

 2    apparently there's not going to be an objection.

 3              MR. CAMBRIA:  Very good.

 4    BY MR. CAMBRIA:

 5    Q.  Do you remember this particular email?                      14:43:46

 6    A.  Yes.

 7    Q.  All right.  And it was between you and Mr. Lacey?

 8    A.  Yes.

 9    Q.  And it was 2/21/2017 at 11:45 a.m.?

10    A.  Yes.                                                         14:43:59

11              MR. CAMBRIA:  All right.  I move this into evidence,

12    Your Honor.  It's identified on it at the moment as

13    Becker 02057, which is part of Exhibit Number 1.  And it -- at

14    the bottom it says page 30.

15              THE COURT:  All right.  We -- we will use that 0205 as 14:44:19

16    an identifier, but the exhibit number will change to coincide

17    with the exhibit list just to avoid any confusion.

18              MR. CAMBRIA:  That's fine.

19              THE COURT:  All right.  So it may be admitted.  It may

20    be published.                                                   14:44:41

21              (Exhibit 6264 admitted into evidence.)

22    BY MR. CAMBRIA:

23    Q.  Could you read what it says there, please.

24    A.  Yes.

25    Q.  First of all, who is speaking?                              14:44:44
```

UNITED STATES DISTRICT COURT

1    A.  It is my email to Michael Lacey.

2    Q.  All right.  And what are you saying?

3    A.  "I believe Jacob Stein will receive the information needed

4    for the report, and your accountants will prepare it from the

5    information he furnishes."                                    14:44:58

6    Q.  All right.  Now, to your knowledge, were those reports

7    filed?

8    A.  Yes.

9    Q.  And --

10          MR. CAMBRIA:  First of all, if we could go to          14:45:19

11   Exhibit 5516, please.

12   BY MR. CAMBRIA:

13   Q.  Now, I'm showing you Exhibit 5516.

14          Do you re -- recognize that?

15   A.  Yes.                                                      14:45:37

16   Q.  And what is that?

17   A.  It's the trust that was established on the Hungarian law to

18   hold the monies.

19          MR. CAMBRIA:  Move that in evidence, Your Honor.

20          MR. STONE:  No objection.                              14:45:49

21          THE COURT:  It may be admitted, and it may be

22   published.

23          (Exhibit 5516 admitted into evidence.)

24          MR. CAMBRIA:  May we have Exhibit 5540, please.

25      ///

UNITED STATES DISTRICT COURT

1    BY MR. CAMBRIA:

2    Q.   Now, showing you Exhibit 5540, do you recognize that?

3    A.   Yes.

4    Q.   And what is that?

5    A.   That is my letter to the Internal Revenue Service          14:46:15

6    accompanying a Form 7004, which is an extension of time in

7    order to file one of the required income tax returns or

8    reporting returns for this account.

9    Q.   All right.  And who requested that extension?

10   A.   I did.                                                      14:46:34

11   Q.   All right.  That wasn't Mr. Lacey who requested that?

12   A.   No.

13   Q.   No.  All right.

14            MR. CAMBRIA:  I move that into evidence, please.

15            MR. STONE:  No objection.                               14:46:43

16            THE COURT:  Yes, 5540 may be admitted.  It may be

17   published.

18            (Exhibit 5540 admitted into evidence.)

19            MR. CAMBRIA:  Thank you.

20            Exhibit 5541, please.                                   14:46:54

21            THE COURT:  Are you going to give the jury some time

22   to at least examine the exhibit, Mr. Cambria?

23            MR. CAMBRIA:  I'm sorry, Your Honor?

24            THE COURT:  Are you going to give the jury at least

25   some time to examine the exhibit?                                14:47:04

JOHN BECKER - DIRECT EXAMINATION

80

```
 1              MR. CAMBRIA:  Oh, of course.

 2              THE COURT:  Because you just sort of flashed it up

 3    there --

 4              MR. CAMBRIA:  I'm sorry.

 5              THE COURT:  -- then moved swiftly --          14:47:09

 6              MR. CAMBRIA:  I apologize.

 7              THE COURT:  -- on.

 8              MR. CAMBRIA:  I apologize.  I'm in my own little world

 9    here.  I'm sorry.

10              Okay.  Thank you.                            14:47:47

11              Exhibit 5541, please.

12    BY MR. CAMBRIA:

13    Q.  Mr. Becker, do you see this, and do you recognize it?

14    A.  I see it, and I recognize it.

15    Q.  And what is it?                                    14:48:01

16    A.  It's a report -- Report of Foreign Bank and Financial

17    Accounts.

18    Q.  And do you -- how are you familiar with this?

19    A.  It's one of the required filings to report the account to

20    the federal government.                                14:48:19

21    Q.  Okay.  And did you -- are you -- you're familiar with this,

22    and was it filed?

23    A.  I'm familiar with it, and it was filed.

24    Q.  All right.  And what does it accomplish, or what is it

25    supposed to accomplish?                                14:48:34
```

UNITED STATES DISTRICT COURT

1    A.  It's supposed to -- it's required under the Internal

2    Revenue Code, and it is a -- it puts the government on notice

3    that a U.S. taxpayer has established a foreign account.

4    Q.  All right.  And there are several pages to this.  On those

5    pages, is someone identified in connection with the account?          14:49:00

6          MR. CAMBRIA:  It would be easier.  I move this -- Your

7    Honor, I move to admit this into evidence.

8          MR. STONE:  Your Honor, the only objection is

9    foundation as to how this witness knows about this particular

10   document.  There appears to be some other attorney who's listed        14:49:30

11   on this one.

12   BY MR. CAMBRIA:

13   Q.  How do you know about this --

14          THE COURT:  Well --

15   BY MR. CAMBRIA:                                                         14:49:36

16   Q.  -- document?

17          THE COURT:  Let me sustain first.

18          And now you could ask --

19          MR. CAMBRIA:  Thank you.

20          THE COURT:  -- how do you know?                                  14:49:40

21          MR. CAMBRIA:  Thank you.

22   BY MR. CAMBRIA:

23   Q.  How do you know?

24   A.  Because I'm the person that made sure it got filed.  I may

25   not have filed it, but I made sure it got filed.                       14:49:46

1  Q.  Okay.  So you're familiar with the document?

2  A.  Yes.

3          MR. CAMBRIA:  All right.  I move this into evidence,

4  please.

5          THE COURT:  Can he just explain how he knows it got          14:49:57

6  filed?

7          MR. CAMBRIA:  Certainly.

8  BY MR. CAMBRIA:

9  Q.  How do you know that, sir?

10  A.  Because the first one, I reached out to the attorney, Edwin   14:50:01

11  Hsu, that -- he's one of my former students, and I said to him

12  that we need to get this FBAR filed.  It's the first time.  I

13  don't have experience filing the FBAR.  I don't do this type of

14  work.  Would you please take care of it.

15          And he and I embarked on it and got it filed.             14:50:19

16          MR. STONE:  Object to the answer because it's hearsay.

17  It's an out-of-court statement.

18          THE COURT:  Sustained.

19          MR. CAMBRIA:  All right.

20          THE COURT:  That was my -- that was my error.  That       14:50:27

21  was an objection made to me, so I'm going to sustain my own

22  objection on myself.

23          MR. CAMBRIA:  Own objection.

24          THE COURT:  So, Mr. Cambria, you can move on.

25          MR. CAMBRIA:  Thank you so much.                          14:50:39

BY MR. CAMBRIA:

Q.  So you're familiar with this document, and you've indicated

you're familiar with the fact that it was filed?

A.  Yes.

Q.  All right.  And you're familiar with the contents of it?          14:50:46

A.  I -- you know, I didn't file it.  I didn't prepare it, but

I -- I know what the contents are, yes.

Q.  All right.

        MR. CAMBRIA:  I move it into evidence, Your Honor.

        MR. STONE:  Same objection on foundation.                      14:50:59

        THE COURT:  Overruled.  It may be -- it may be

admitted.  It may be filed.

        (Exhibit 5541 admitted into evidence.)

        MR. CAMBRIA:  Thank you.

BY MR. CAMBRIA:                                                        14:51:07

Q.  Does this particular document, which was -- goes to -- went

to the government, does it identify individuals and any other

information regarding this trust?

A.  I believe it does.

        MR. CAMBRIA:  And if you could go to the second page,         14:51:22

please.

BY MR. CAMBRIA:

Q.  As you look at the second page, is Mr. Lacey identified?

A.  Yes.

Q.  Okay.                                                             14:51:37

```
 1            MR. CAMBRIA:  Can you go to the next page, please.
 2   And then -- actually, one, two -- four page -- it's -- it's
 3   called page 7 of 7.  Would you go to that, please.
 4   BY MR. CAMBRIA:
 5   Q.  Well, right now on the screen is page 3 of 7.          14:52:05
 6            Do you see that?
 7   A.  Yes.
 8   Q.  All right.  And now it's page 7 of 7.
 9            Do you see that?
10   A.  Yes.                                                   14:52:12
11   Q.  All right.  And is there information there concerning
12   who -- well, what's the information that's on that sheet?
13   Let's put it that way.
14   A.  It's the preparer's information.  It's Edwin's information.
15   Q.  Okay.  And so does this document identify Mr. Lacey and the  14:52:32
16   particular trust?
17   A.  I believe it does.
18   Q.  And it was filed, to your knowledge, with the government?
19   A.  Yes.
20   Q.  All right.                                             14:52:46
21            MR. CAMBRIA:  Could we go to -- I don't know if I'm
22   making these things happen here -- 5542, please.
23   BY MR. CAMBRIA:
24   Q.  Now, do you see this letter?
25   A.  Yes.                                                   14:53:07
```

JOHN BECKER - DIRECT EXAMINATION

85

 1   Q.  Can you identify what this letter is?

 2   A.  Yes.  It's my letter to the Internal Revenue Service that

 3   accompanied one of the required filings for this account.  It

 4   is the first year.  So it's 2017.  This is the form I -- that

 5   we -- I got the extension on that you showed me previously.          14:53:24

 6   And so that extension related to this form.  So this form was

 7   timely filed based on the extension.

 8          MR. CAMBRIA:  Move this into evidence, Your Honor.

 9          MR. STONE:  No objection.

10   BY MR. CAMBRIA:                                                      14:53:39

11   Q.  And --

12          THE COURT:  Well, let me -- you asked me to do

13   something, Mr. Cambria.  Let me do it.

14          It may be admitted.  It may be published.

15          (Exhibit 5542 admitted into evidence.)                       14:53:47

16          MR. CAMBRIA:  May I note that I've actually given the

17   Court a direction?  Very good.  Thank you.

18          THE COURT:  I somehow think sometimes you wish to just

19   do it alone.

20          MR. CAMBRIA:  It would be --                                  14:54:01

21          THE COURT:  And I'm sure all counsel wish that as

22   well.

23          MR. CAMBRIA:  That's a dream of all lawyers, Your

24   Honor.

25          THE COURT:  All right.  Let's move forward.                   14:54:06

UNITED STATES DISTRICT COURT

```
 1   BY MR. CAMBRIA:

 2   Q.  Now, this particular exhibit, you notice there's several

 3   pages to it.

 4           Can you tell us what these pages --

 5           MR. CAMBRIA:  Could you flip to the next page, please.   14:54:16

 6   BY MR. CAMBRIA:

 7   Q.  All right.  Can you tell us what information is on this

 8   first page, just generally?

 9   A.  This is the IRS Form 3520-A -- it's one of the two forms

10   that need to get filed.  This one's captioned Annual            14:54:31

11   Information Return of Foreign Trust With a U.S. Owner.  And

12   it's going to show information about the foreign trust.  It's

13   going to show information about the U.S. owner.

14           MR. CAMBRIA:  Can you flip to the next page, please.

15   BY MR. CAMBRIA:                                                 14:54:49

16   Q.  And, again, can you tell us what's on this page?

17   A.  It's part of the annual disclosure.  This page is

18   reflecting the income and expenses of the trust, and it's also

19   showing a balance sheet for the trust.

20   Q.  Okay.  And page 3?                                          14:55:04

21   A.  More information about the trustee.

22   Q.  And page 4?

23   A.  Primarily blank, but both page 3 and page 4 have been

24   signed by the Hungarian trustee, which is required.

25   Q.  All right.  And was there -- at least to your knowledge,    14:55:23
```

1   was there some reason why this particular investment in this

2   place was suggested by Stein?

3           MR. STONE:  Object to hearsay.

4           THE COURT:  Sustained.

5           MR. CAMBRIA:  Okay.                                   14:55:47

6           Would you pull up 5543, please.

7   BY MR. CAMBRIA:

8   Q.  And can you tell us, Mr. Becker, what this is?

9   A.  Yes.

10  Q.  Okay.  What is it?                                        14:56:03

11  A.  It is the transmittal letter for the Form 3520-A.

12          MR. CAMBRIA:  And I move this into evidence.

13          THE COURT:  And I think we've already seen this one.

14          MR. STONE:  I agree.  I think it's the first page of

15  5542, so it's duplicative.                                   14:56:23

16          MR. CAMBRIA:  All right.

17          THE COURT:  So it -- so it is a duplicate,

18  Mr. Cambria.

19          MR. CAMBRIA:  Right.  I'll --

20          THE COURT:  You can use it if you want to because it's  14:56:32

21  already been admitted, but --

22          MR. CAMBRIA:  I'll move in -- I'll move to the next

23  one, Your Honor.

24          5544.

25      ///

JOHN BECKER - DIRECT EXAMINATION

88

1    BY MR. CAMBRIA:

2    Q.  Do you see that?

3    A.  Yes.

4    Q.  All right.  What's that?

5    A.  We've seen this one already.                              14:56:52

6    Q.  Okay.  And what follows from that?  Have we seen that also?

7           THE COURT:  We're only seeing the one page,

8    Mr. Cambria.

9           MR. CAMBRIA:  Right.  The next page, please.  It has a

10   3520-A up on the corner.                                      14:57:12

11          THE WITNESS:  Yes.

12   BY MR. CAMBRIA:

13   Q.  All right.  And that is what?

14   A.  That is the -- the initial filing on this a -- this trust

15   account.  And so the first filing was for this year.          14:57:22

16   Q.  Okay.

17          MR. CAMBRIA:  And 5545, please.

18   BY MR. CAMBRIA:

19   Q.  What's that?

20   A.  It's another of the FBARs or another one of the required  14:57:36

21   annual filings on behalf of the account.

22   Q.  Okay.

23          MR. CAMBRIA:  Move that into evidence, please, Your

24   Honor.

25          THE COURT:  Is there an objection?                     14:57:52

UNITED STATES DISTRICT COURT

1            MR. STONE:  No objection.  Sorry, Your Honor.

2            THE COURT:  Yes, it may be admitted, and it may be

3    published.

4            (Exhibit 5545 admitted into evidence.)

5            MR. CAMBRIA:  Okay.  5546.                    14:58:00

6    BY MR. CAMBRIA:

7    Q.  Again, do you recognize this?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's another of the annual FBARs or required filings on   14:58:16

11   behalf of this account.

12   Q.  Okay.

13           MR. CAMBRIA:  Move that into evidence, please.

14           MR. STONE:  No objection.

15           THE COURT:  Okay.  It may be admitted.  It may be    14:58:26

16   published.

17           (Exhibit 5546 admitted into evidence.)

18           MR. CAMBRIA:  5548.

19           THE WITNESS:  Same thing.  It's a part of the annual

20   filings.                                               14:58:39

21   BY MR. CAMBRIA:

22   Q.  Okay.  So the question, then, is, did you advise Mr. Lacey

23   as to all of the required procedural steps to legally file

24   information on a trust that's not within the United States?

25           MR. STONE:  Objection.  Leading and compound.    14:59:07

1        THE COURT:  Sustained.

2   BY MR. CAMBRIA:

3   Q.  Okay.  What did you advise him?

4   A.  I advised him -- not to the specifics as to the actual

5   filings.  I advised him it needed to be -- we needed to satisfy    14:59:17

6   all of the U.S. filing requirements, and I advised him that we

7   need to report all of -- he needs to report all of the income

8   on his individual income tax return.

9   Q.  All right.  And did he make any statement about taxes or

10  paying taxes to you?                                               14:59:35

11        MR. STONE:  Objection.  Calls for hearsay.

12        THE COURT:  Sustained.

13  BY MR. CAMBRIA:

14  Q.  All right.  In any event, in your opinion, was the trust

15  that was filed and created in Hungary in any way concealed from    14:59:47

16  the United States of America taxing authorities?

17        MR. STONE:  Objection.  Relevance.  Calls for some

18  sort of legal conclusion.

19        THE COURT:  Sustained.

20        MR. CAMBRIA:  I think he's qualified to make that            15:00:03

21  judgment.

22        THE COURT:  Sustained.

23        MR. CAMBRIA:  Thank you.

24  BY MR. CAMBRIA:

25  Q.  In any event, did you inform Mr. Lacey that all the legal      15:00:10

UNITED STATES DISTRICT COURT

1  procedures had been followed to correctly file this lawfully?

2  A.  Yes.

3          MR. STONE:  Objection.  Leading.

4  BY MR. CAMBRIA:

5  Q.  And --                                              15:00:23

6          THE COURT:  Sustained.

7  BY MR. CAMBRIA:

8  Q.  And from what you've reviewed, were all of those

9  requirements complied with?

10         MR. STONE:  Same objection.                      15:00:30

11         THE COURT:  Sustained.

12 BY MR. CAMBRIA:

13 Q.  Well, you knew what the requirements were, did you not?

14 A.  Yes.

15 Q.  All right.  Were they all filed?                     15:00:37

16 A.  Yes.

17 Q.  I mean, were they all complied with?

18 A.  Yes.

19         MR. CAMBRIA:  That's all I have.

20         THE COURT:  All right.  Members of the jury, it's just  15:00:43

21 beyond 3:00 o'clock -- or it is 3:00 o'clock by one of my

22 clocks, in any event, and so we will stand on our afternoon

23 break.  And be prepared to come back into the courtroom at

24 3:20.  Just remember the admonitions.

25         Please all rise for the jury.                    15:01:03

 1              And, sir, you may step down.

 2              THE WITNESS:  Thank you.

 3         (Jury not present at 3:01 p.m.)

 4              THE COURTROOM DEPUTY:  Sir, you can go ahead to the

 5    witness room.                                                    15:01:36

 6              THE COURT:  All right.  For purposes of the record,

 7    the added page to Government's Exhibit Number 1 is now

 8    Exhibit 6264.  6264.

 9              And, Mr. Lincenberg, you wanted two minutes.

10              MR. LINCENBERG:  One minute.                           15:01:53

11              THE COURT:  I'm sorry.  One minute.

12              MR. LINCENBERG:  Your Honor, government counsel was

13    permitted to grandstand for show in front of the jury to leave

14    an unfounded suggestion that defense counsel did something

15    improper and was hiding something.  In my 38 years, I've never  15:02:08

16    seen a prosecutor allowed to get away with that.

17              This Court -- and -- and the prosecutor knows that

18    arguments like this are things that the Court does not want in

19    terms of having argumentative objections and the like.  They

20    should be held at sidebar or outside the counsel -- the        15:02:27

21    presence of the jury.  And it was done intentionally, and it's

22    left an incurable impression.  It came in on the defendant's

23    first witness.  It creates an incurable impression of defense

24    counsel misconduct.  The Court then recessed the matter, which

25    I believe although it heightened the potential significance of  15:02:46

1  it, and we move for a mistrial.

2          THE COURT:  All right.  Mr. Berry.

3          MR. BERRY:  Yes, Your Honor.

4          I certainly disagree with the characterization of

5  grandstanding and making some show of it.  I believe the record          15:03:03

6  will reflect that what I did was turn to the Court after laying

7  some foundation regarding 26.2 and 612 and asked the Court to

8  move the Court for the production of statements complying with

9  those two rules.

10          I don't believe that I did anything that would even          15:03:23

11  remotely go beyond the bounds of that, the way Mr. Lincenberg

12  has suggested it.  It was something that certainly could have

13  been avoided if the defense had actually produced this stuff

14  any number of the times that we had asked pretrial before the

15  production of those 26.2 statements.  Indeed, it sounds like          15:03:42

16  Mr. Eisenberg has not even reviewed those statements at this

17  point because he didn't have them.  His investigator has.  And

18  we would ask you to deny the motion.

19          MR. EISENBERG:  May it please the Court, Your Honor?

20          THE COURT:  Yes.          15:04:00

21          MR. EISENBERG:  612 does not support what the

22  government is asking.  They're just --

23          THE COURT:  Well, no.  I don't want to hear a

24  relitigation about the 612 and the disclosures.

25          MR. EISENBERG:  Well --          15:04:11

UNITED STATES DISTRICT COURT

1       THE COURT:  I'm concentrating on the motion that's

2  before me.

3       So do you have anything related to the motion?

4       MR. EISENBERG:  That -- this is the one under

5  Rule 26.2 then, the production of text messages is the way I                  15:04:20

6  think we're at.

7       THE COURT:  No.  Mr. Lincenberg just made a motion --

8       MR. EISENBERG:  Oh, the motion.  I'm sorry.

9       THE COURT:  -- to dismiss.  That's what I'm talking

10 about.                                                                          15:04:32

11      MR. EISENBERG:  I'm sorry.  I join in it, Your Honor.

12      THE COURT:  Well, I will say this, that Mr. Eisenberg

13 also provided argument before the Court related to the lack of

14 production.  And -- and, quite frankly, I mean, defense counsel

15 are not on trial.  It's your clients.  And my sense is that the                15:04:55

16 frustration here is that counsel have -- at least with regard

17 to this witness haven't produced anything.  And I want to

18 remind counsel that 612(a)(2) also provides that the Court can

19 order the production of that material before the witness

20 testifies.                                                                      15:05:24

21      And, as I recall, those orders have already been

22 issued.  And that is why it caught my ire, because this is not

23 new to anyone.  These witnesses aren't new to anyone.  And for

24 there not to be a production of what is relied upon and to hear

25 for the first time that there were text messages that went                     15:05:49

JOHN BECKER - DIRECT EXAMINATION

95

1    between investigators, and so on and so forth, it's concerning.

2    It leaves a picture that counsel have not complied with

3    disclosure obligations that have been previously ordered by the

4    Court.

5            And so I don't find that there's showing of prejudice          15:06:05

6    as to the clients.  It may leave a puzzling question in the

7    jury's mind about, well, you know, what's -- what's going on in

8    terms of providing statements and so on?

9            And -- and it is fair to say that this Court has

10   always had an ongoing procedural rule that you do not argue         15:06:33

11   matters like this in front of the jury.  But it happened, and I

12   don't think it rises to the level of a motion to dismiss the

13   charges.

14           So let's move forward.  Make sure those productions

15   are had.  And this includes whatever the communications are         15:06:59

16   that is going on between investigators and subpoenaed defense

17   witnesses.  You better be talking to them about whatever those

18   conversations are or were.

19           And so let's stand in recess.

20           THE COURTROOM DEPUTY:  All rise.

21           THE COURT:  Who's the next --

22           MR. EISENBERG:  Your Honor, I have --

23           THE COURT:  Who is the next witness after this

24   gentleman?

25           MR. EISENBERG:  Your Honor, I have the packet --          15:07:47

UNITED STATES DISTRICT COURT

```
1              THE COURT:  Yes.

2              MR. EISENBERG:  -- the text messages.

3              THE COURT:  You may approach and bring those.

4              Who is the next witness after this gentleman?

5              When I come back, please let me know who the next     15:07:53

6     witness is.

7         (Recess from 3:07 p.m. to 3:25 p.m.)

8              THE COURTROOM DEPUTY:  All rise.

9              THE COURT:  Let me just tell you what -- let me just

10    tell you what it is that I provided.                           15:25:58

11             I looked at the -- the texts that were produced.  The

12    majority of them were, indeed, related to -- they were related

13    to arrangements, flight arrangements, hotel, time of meeting.

14             I provided to both Mr. Berry and Mr. Eisenberg what

15    I've found to be related to the testimony, and so you can let  15:26:21

16    me know whether or not Mr. Berry wishes to recall the witness.

17    But you should probably do so sooner rather than later.

18             MR. BERRY:  Yes, Your Honor.

19             Thank you so much for -- for doing that, providing

20    those.  That's exactly what we needed to see.                 15:26:35

21             Yes, I would like to briefly take him back on cross.

22    What I would propose is I believe that Mr. Cambria, while he

23    passed, he has requested that he have an opportunity to ask two

24    more questions of Mr. Becker.  I believe he said two.  I won't

25    hold him to it.  Just a couple more questions of Mr. Becker    15:26:54
```

1    before he properly passes.

2           And then so what I would like to do is let him do

3    that, properly pass, and before Mr. Stone starts his

4    cross-examination, I would like to bring back Mr. Snyder, knock

5    that out.  It will be very brief.  And then pull him off, let          15:27:08

6    him get home, and then we can put Mr. Becker back on and

7    complete however far we get.

8           Are we going to 4:30?

9           THE COURT:  4:30.

10          MR. BERRY:  4:30.  Yes.                                         15:27:21

11          THE COURT:  All right.  Let's proceed in that way.

12          So, Mr. Cambria, you can ask your two questions.

13   Let's bring the witness back and call the jury in.

14          MR. FEDER:  Judge, before we do that, given that the

15   door has been opened, and we're making a request right now for       15:27:37

16   all --

17          THE COURT:  I'm sorry.  We have a -- we have a witness

18   in the room.  Mr. Feder, we're bringing the jury in.  You can

19   make your statement, or whatever, at the end of the day when I

20   release the jury.                                                     15:27:48

21          Sir, you may resume your seat.

22          And let's bring the jury in.

23          All rise for the jury.

24      (Jury present at 3:28 p.m.)

25          THE COURT:  All right.  Please be seated.                      15:28:56

1          And, Mr. Cambria, you may continue.

2          MR. CAMBRIA:  Thank you, Your Honor.

3   BY MR. CAMBRIA:

4   Q.  Mr. Becker, I just have a couple more questions.

5          Did you at -- were you the one who physically          `15:29:10`

6   collected the funds and then transferred them for the trust?

7   A.  Yes.

8   Q.  All right.  And was there any particular way you did that?

9   A.  Yes.

10  Q.  How was that?          `15:29:25`

11  A.  There were five separate trusts that distributions needed

12  to be made to Mr. Lacey.  I needed to wire those to the trust

13  company in Hungary.  Rather than doing five wires, I

14  transferred all those funds into my IOLTA, my law firm account.

15  And once they were in the law firm account, I did a single wire          `15:29:46`

16  to Hungary.

17  Q.  All right.  And that was your decision?

18  A.  Yes.

19  Q.  All right.  And, as a result of these transfers, and so on,

20  were your bank accounts closed?          `15:29:59`

21  A.  Yes.

22          MR. STONE:  Object.

23          THE COURT:  All right.

24          MR. CAMBRIA:  That's all.

25          THE COURT:  At this juncture, Mr. Berry, do you wish          `15:30:07`

JOHN BECKER - DIRECT EXAMINATION

99

```
 1    to reserve time to recall the prior witness?

 2              MR. BERRY:  Yes, Your Honor.  We would like to delay

 3    our cross-examination of Mr. Becker and recall Mr. Snyder.

 4              THE COURT:  Yes.  Mr. Becker, at this point, because

 5    we have a witness who needs to get out of town, I've permitted    15:30:21

 6    government counsel some time to reexamine him so that he can

 7    leave by the end of today.  So I'm going to ask you to remain

 8    under oath.  You may step down, step out of the courtroom, and

 9    then we'll bring you back in.

10              THE WITNESS:  Okay.                                       15:30:40

11              THE COURT:  All right.  Thank you.

12              THE WITNESS:  Thank you, Your Honor.

13              THE COURT:  All right.  Mr. Berry.  I'm sorry.  Call

14    the witness.

15              MR. BERRY:  It's not my witness.                          15:30:48

16              THE COURT:  Recall --

17              MR. BERRY:  It's -- we're recalling Grant Snyder,

18    please.

19              THE COURT:  Yes, please.

20              MR. BERRY:  Your Honor, I've just been provided           15:30:57

21    another document.  Just one second, please.

22              THE COURT:  Sure.  Certainly.

23              All right.  Sir, you may resume the witness chair.  I

24    will remind you that you still remain under oath for this

25    continuation of your testimony.  Thank you.                        15:31:15
```

```
 1              THE WITNESS:  Copy that, Your Honor.
 2          (GRANT SNYDER, a witness herein, was previously duly sworn
 3      or affirmed.)
 4                    CROSS-EXAMINATION (Cont'd)
 5      BY MR. BERRY:                                              15:31:28
 6      Q.  Good afternoon, Mr. Snyder.  Thanks for coming back.
 7              Earlier in the beginning of your testimony when I was
 8      asking you questions, I was asking you about communications
 9      that you had with any member of the defense team.
10              Do you recall that?                                15:31:44
11      A.  I do.
12      Q.  And you acknowledged that there were some text
13      communications.
14              Do you remember that?
15      A.  Yes.                                                   15:31:52
16      Q.  Okay.  Do you recall that when you had those text
17      communications with the defense team, they had forwarded you an
18      email with the links to those ads that you talked about;
19      correct?
20      A.  Yes.                                                   15:32:07
21      Q.  And that you responded by text about your review of those
22      ads.
23              Do you recall that?
24      A.  I think so, yes.
25      Q.  Okay.  Do you recall that, among other things, that you    15:32:21
```

1    said in the text messages, you reviewed those ads and said,

2    "While others have direct effort" -- "while others have direct

3    references to sex for money," that you were talking about your

4    review of those ads.

5           Do you recall that?                                          15:32:44

6    A.  I remember saying something like that, but it was in the

7    context of a larger thought.

8    Q.  Sure.  Let me just show this to you.

9           MR. BERRY:  May I approach the witness, Your Honor?

10          MR. EISENBERG:  Has this been marked?                        15:32:54

11          MR. BERRY:  I'm not going to move it into evidence.

12          MR. EISENBERG:  It should be marked.

13          THE COURT:  It should be marked, and we can assign it

14   a number.

15          But you may go ahead and show the witness.                   15:33:03

16          MR. BERRY:  Sure.

17          Do we want -- Your Honor, would you like me to mark

18   everything that was provided to me or just the --

19          THE COURT:  Whatever -- whatever it is you're going to

20   use.                                                                15:33:17

21          MR. BERRY:  Sure.

22          THE COURT:  So let's -- let's proceed in that way, and

23   Liliana will assign it a number.

24          MR. BERRY:  Okay.  Thank you.

25          MR. EISENBERG:  Can I see it?                                15:33:26

1    MR. BERRY:  Sure.

2    THE COURTROOM DEPUTY:  Counsel, can we number that

3  7001?

4    MR. BERRY:  We -- absolutely.  I'm happy to do it that

5  way.  What I was suggesting is we're doing these types of    15:34:01

6  exhibits in the 3000 series, and so I thought I would put a

7  3000 number on it.  But I'll do whatever the Court prefers.

8    THE COURTROOM DEPUTY:  Okay.  Then that would be 3011.

9    MR. BERRY:  Yes, ma'am.

10    Now I don't know what the order is, but I'll do it    15:34:24

11  this way.

12    3011?  Is that what you said?

13    THE COURTROOM DEPUTY:  Correct.

14    MR. BERRY:  Thank you.

15    May I approach the witness?    15:34:35

16    THE COURT:  Yes, you may.

17    THE WITNESS:  Where do you want me to start reading?

18  BY MR. BERRY:

19  Q.  Just whenever you're done, tell me, and I'll turn it.

20  A.  I'm sorry.  Can you pull that back?  Okay.    15:35:00

21    Okay.

22  Q.  That's it.

23  A.  Okay.

24  Q.  Now having had an opportunity of what's been marked as

25  Government's Exhibit 3011, does that refresh your memory?    15:35:24

1    A.  Yes.

2    Q.  And do you recall now that in your text messages you were

3    talking about how the ads that you reviewed were maybe

4    suspicious and have elements we would find, but there's a great

5    range of ads there with some being particularly vague or benign          15:35:47

6    while others have direct references to sex for money?

7    A.  Yes.

8    Q.  Do you recall that?

9    A.  I do recall that.

10         MR. BERRY:  Thank you.  No further questions, Your          15:35:58

11   Honor.

12         THE COURT:  All right.  Sir, may the witness be

13   released from subpoena?

14         MR. EISENBERG:  May I have a recross, Your Honor?

15         MR. BERRY:  I object to that, Your Honor.          15:36:08

16         THE COURT:  No.  And so I'm going to deny that

17   request, Mr. Eisenberg, given the procedure that we went

18   through --

19         MR. EISENBERG:  Your Honor --

20         THE COURT:  -- for the limited purpose of the document          15:36:21

21   that was just shown to the witness.

22         MR. EISENBERG:  May I?

23         THE COURT:  And so with that, sir, may he be released

24   from subpoena, Mr. Eisenberg?

25         MR. EISENBERG:  I need a sidebar, Your Honor.  It'll          15:36:33

1    only be brief.

2         THE COURT:  Come forward.

3      (Sidebar discussion begins on the record.)

4         MR. EISENBERG:  Just -- just so I understand, Your

5    Honor, I won't be able to redirect him on the information that          15:36:54

6    is both beginning and after that portion of the email that was

7    just offered by the government and refreshed his recollection.

8         The reason why I'm concerned about this is that -- and

9    I understand about the emails not being produced until just

10   now.  Frankly, that would be part of a cross-examination, and I          15:37:17

11   would be able to redirect on it.  I don't see why at this point

12   in time there's any difference.

13        And I will say this, Your Honor:  I'll repeat it, and

14   at the risk of being repetitious, but we've gotten no text

15   messages from any witness from the government, even though they          15:37:42

16   have been demanded.  And I'd be very surprised if they're

17   just -- they just don't exist.

18        I am sorry for not having produced these earlier.  I

19   don't want to interrupt the flow of the trial.  But I really

20   take -- I really take -- I can't really find the word, Your          15:37:57

21   Honor, for this sort of procedure.  And I don't mean to be

22   disrespectful to the Court.  I didn't mean it if I was perhaps

23   a little bit exercised, but that's -- that's -- that's where I

24   come out on this.

25        I think it leaves a misimpression in the jury's mind          15:38:16

1  as to what's in the total context of those two or three text

2  messages.  That's my record.

3      MR. BERRY:  Your Honor, if the procedure had been

4  complied with pursuant to your orders, what would have happened

5  is I would have had those messages before I started my            15:38:34

6  cross-examination.  The way it was done, because it was not

7  produced, I didn't have an opportunity to do that.  And so

8  Mr. Eisenberg is correct.  He would have been able to do that

9  if he had complied with this Court's order about the production

10  of those messages in the first place, in addition to the fact   15:38:48

11  that he has represented to the Court that I've engaged in some

12  sort of histrionic demonstration about something where it

13  turned out there was, in fact, relevant messages subject --

14  related to the subject matter of his testimony.

15      So I would object to him having a second opportunity        15:39:03

16  to redirect given the fact that he failed to comply with this

17  Court's order regarding the production of those messages in the

18  first place.

19      THE COURT:  All right.  Well, I don't want to continue

20  the ongoing argument about --                                    15:39:14

21      MR. BERRY:  Sure.

22      THE COURT:  -- lack of production.  What I just heard

23  on the permitted cross-examination was related directly to

24  those two pages of text message in which he looked at the

25  advertisements, which you offer -- have already probed and       15:39:29

1    which you have sufficiently examined him on.  I don't see the

2    necessity to reopen for any other questions.  So at this

3    juncture, I'm not going to permit it.

4              All right.  Let's go forward.

5              MR. KESSLER:  Can we ask if he's released?      15:39:45

6              THE COURT:  Yeah.  I just did.

7              MR. EISENBERG:  Okay.  No objection.

8         (End of sidebar discussion.)

9              THE COURT:  All right.  Sir, is there an objection to

10   having -- by the government to having the witness released from   15:39:57

11   subpoena?

12             MR. BERRY:  No, Your Honor.

13             THE COURT:  All right.  Sir, thank you for your

14   testimony.  You are released from your subpoena.  You are free

15   to go.                                                  15:40:04

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Watch your step there.

18             All right.  Let's have Mr. Becker back in.

19             Sir, you may resume the witness chair.  Thank you.

20             THE WITNESS:  Sure, Your Honor.               15:40:29

21                         CROSS-EXAMINATION

22   BY MR. STONE:

23   Q.  Good afternoon, sir.

24   A.  Good afternoon.

25   Q.  Sir, we met before; correct?                       15:40:42

1    A.  I apologize.  I do not recall.

2    Q.  That's fair.  Do you recall having a meeting with -- at the

3    U.S. Attorney's Office --

4    A.  Yep.

5    Q.  -- in July 2018?                                    15:40:52

6    A.  Yes.

7    Q.  That was a meeting attended by prosecutors and agents;

8    correct?

9    A.  Yes.

10        MR. STONE:  Can the witness be shown what has been     15:41:05

11   marked as Exhibit 3007, please.

12   BY MR. STONE:

13   Q.  Sir, while that's being -- while that exhibit's being given

14   to you, I have a few questions that I'll move forward with.

15   Okay?                                                   15:41:26

16   A.  Yes.

17   Q.  When were you first contacted by the defense about your

18   testimony today?

19   A.  I do not recall.

20   Q.  You remember being contacted, though?               15:41:33

21   A.  Yes.

22   Q.  And who contacted you?

23   A.  I believe it was Mr. Cambria, but I can't recall for sure.

24   Q.  And you don't remember when?

25   A.  I do not.                                           15:41:47

1  Q.  Do you know how he communicated -- how he contacted you?

2  Over the phone?  Email?

3  A.  I believe it would have been either phone or email.

4  Q.  Do you recall sending emails back and forth with

5  Mr. Cambria or Mr. Cambria's office?                    15:42:04

6  A.  Oh, yes.

7  Q.  How -- how many?  Can you estimate?

8  A.  Maybe five, and they all dealt with the trial date or

9  scheduling.

10  Q.  Okay.  A couple of emails, perhaps, where they sent some  15:42:18

11  documents to you?

12  A.  I -- yes.

13  Q.  And were they some of the same documents that Mr. Cambria

14  showed you during your direct examination?

15  A.  Yes.                                                 15:42:32

16  Q.  Did you meet with Mr. Cambria or anyone else before

17  testifying today?

18  A.  Yes, I did.

19  Q.  Where did you -- did you -- was it an in-person meeting?

20  A.  Yes.                                                 15:42:46

21  Q.  When?

22  A.  Saturday morning.

23  Q.  Was that meeting recorded, if you know?

24  A.  No.

25  Q.  Were there any notes taken at that meeting?          15:42:54

1    A.  Not by me.

2    Q.  Did you notice any -- anyone else at the meeting taking

3    notes?

4    A.  No.

5    Q.  Nobody showed you any notes at the end of the meeting?          15:43:03

6    A.  No.

7    Q.  Before your testimony today, were you asked to prepare

8    anything?

9    A.  No.

10   Q.  And beyond the documents that were shown to you during your     15:43:15

11   direct examination, did the defense ask you to review anything

12   in preparation for your testimony today?

13   A.  No.

14   Q.  All right.  You have Exhibit 3007 in front of you, is that

15   right, sir?                                                          15:43:37

16   A.  I have the exhibit.  And I'll take your word as to what

17   number it is.  I'm sorry.

18   Q.  And -- well, there should be a --

19   A.  Let me get my glasses on --

20   Q.  -- a written number in the bottom --                            15:43:46

21   A.  Okay.

22   Q.  -- left-hand corner.

23   A.  I see it.  3007.

24   Q.  All right.  Excellent.

25           You received a subpoena from the United States             15:43:59

JOHN BECKER - CROSS-EXAMINATION

110

1    Attorney's Office in December 2017, did you not, sir?

2    A.  I believe so.

3    Q.  You remember receiving a subpoena; correct?

4    A.  I don't recall, to tell you the truth.

5    Q.  Do you remember producing documents?                15:44:11

6    A.  Yes.

7    Q.  You produced those documents in compliance with the

8    subpoena that you received?

9    A.  Apparently.  It's been six or seven years, so I just don't

10   remember.  I -- I assume it was -- it was a subpoena, and I --   15:44:23

11   I remember producing documents.  But I didn't go back and look

12   at anything, so I just assumed.

13   Q.  Fair.  You know what a subpoena is, though, don't you?

14   A.  Yes, I do.

15   Q.  A court order asking you to produce certain documents?        15:44:35

16   A.  Yes.

17   Q.  And here there was a subpoena asking you to produce certain

18   documents related to this transaction that you testified on

19   direct; correct?

20   A.  Yes.                                                 15:44:47

21   Q.  And you produced some documents?

22   A.  I did.

23   Q.  Would you have produced those documents without a subpoena?

24   A.  I believe -- I believe the documents were privileged, and

25   so I needed to get permission to release them.  So I needed to   15:45:01

UNITED STATES DISTRICT COURT

```
 1  have a subpoena.  I needed to have some sort of determination
 2  that I could release them.
 3  Q.  Okay.  That wasn't quite my question, but I appreciate the
 4  answer.
 5          If the United States Attorney's Office hadn't issued        15:45:13
 6  you a subpoena, would you have produced documents to the United
 7  States Attorney's Office?
 8  A.  No.
 9  Q.  Why not?
10  A.  Privilege.                                                      15:45:23
11          MR. CAMBRIA:  Asked and answered.
12          THE COURT:  Overruled.
13  BY MR. STONE:
14  Q.  Well, you had certain non-privileged documents in your
15  possession, did you not?                                           15:45:31
16  A.  I'm not aware of any.
17  Q.  Well, for example, we looked at some letters that you sent
18  on behalf of Mr. Lacey.
19          That's not a privileged document; correct?
20  A.  I -- I -- with my clients, I treat everything as              15:45:41
21  privileged.  And so if somebody has an exception to the
22  privilege.
23          This is in litigation.  I do not do litigation.  I
24  don't know what is and is not privileged.  I just treat
25  everything as privileged and confidential.                        15:45:55
```

UNITED STATES DISTRICT COURT

JOHN BECKER – CROSS-EXAMINATION
112

```
 1   Q.  I gotcha.
 2           MR. STONE:  One moment.
 3           May the witness be shown Exhibit 3009, please.
 4           Can I get a copy, too, please.
 5           THE WITNESS:  Thank you.  Oh.                    15:46:36
 6   BY MR. STONE:
 7   Q.  Do you have Exhibit 3009 in front of you, sir?
 8   A.  Yes, I do.
 9   Q.  And this is a declaration that you prepared; correct?
10   A.  I hired an attorney to prepare it for me.            15:46:49
11   Q.  Well, this is a declaration of statements that you made.
12   And on the page 3, you signed it under penalty of perjury;
13   correct?
14   A.  Yes, I did.
15   Q.  And on paragraph 12 -- do you see that, sir?          15:47:03
16   A.  Yes.
17   Q.  You wrote, "Through my counsel I agreed to produce
18   non-privileged documents subject to the subpoena."
19           Do you see that?
20   A.  Yes.                                                  15:47:17
21   Q.  Is that accurate?
22   A.  Yes.
23   Q.  "Thereafter my counsel" -- "counsel produced 2,775 pages of
24   responsive non-privileged documents."
25           That did I read that correctly?                   15:47:26
```

UNITED STATES DISTRICT COURT

1    A.  Yes.

2    Q.  And so those were documents that you produced because you

3    received a subpoena; correct?

4    A.  Yes.  Again, I apologize for the -- the time has just been

5    so long.                                                          15:47:38

6    Q.  No need to apologize.  That's why we have these documents

7    handy.

8         And those are pages that you would not have produced

9    unless you received the subpoena?

10        MR. CAMBRIA:  Your Honor, asked and answered.              15:47:47

11        THE COURT:  Sustained.

12        MR. STONE:  I'll move on.

13   BY MR. STONE:

14   Q.  Do you have a sense for what happens when you don't respond

15   to a subpoena?                                                   15:47:55

16        MR. CAMBRIA:  Objection.  Irrelevant.  He responded.

17        THE COURT:  Overruled.  He can answer if he knows.

18        THE WITNESS:  I believe --

19   BY MR. STONE:

20   Q.  Do you know?                                                 15:48:06

21   A.  I believe you'd be sanctioned.

22   Q.  You'd get in trouble with the Court?

23   A.  Probably.

24   Q.  All right.  Now, let me just direct your attention back to

25   Exhibit 3007.  That's the memorandum of the interview for your   15:48:30

JOHN BECKER - CROSS-EXAMINATION

114

```
 1   interview at the U.S. Attorney's Office.
 2           Do you see that, sir?
 3   A.  Yes.
 4   Q.  And in that meeting, you discussed much of what you're
 5   testifying about today.  Is that fair?              15:48:47
 6   A.  Yes.
 7   Q.  Do you remember telling the agents and prosecutors at that
 8   meeting that your client, Mr. Lacey, was having trouble finding
 9   a bank to do business with?
10   A.  Yes.                                             15:49:01
11   Q.  And you remember telling the agents and prosecutors that
12   Mike Lacey was looking to transfer his money overseas; correct?
13   A.  Yes.
14   Q.  All right.  And on direct examination, you testified about
15   a -- your IOLTA account; is that right?              15:49:22
16   A.  Yes.
17   Q.  What's an IOLTA account?
18   A.  It's a law firm trust account.
19   Q.  What's the purpose of having a law firm trust account?
20   A.  It's to hold clients' monies and to protect clients'  15:49:35
21   monies.
22   Q.  And this was the account that you wired $16.5 million of
23   your client's money to Hungary; correct?
24   A.  I transferred my client's money into the account.  And from
25   the account, I wired it out.                         15:49:53
```

UNITED STATES DISTRICT COURT

JOHN BECKER - CROSS-EXAMINATION

115

1  Q.  So that's yes?

2  A.  Yes.

3  Q.  16.5 million went from your IOLTA account to this bank

4  account in Hungary; right?

5  A.  Yes.                                                    15:50:02

6  Q.  How many times a year do you wire millions of dollars of

7  your client's money from your IOLTA account to an overseas

8  account?

9         MR. CAMBRIA:  Objection.  Relevance.

10        THE COURT:  Overruled.                               15:50:18

11        THE WITNESS:  On any given year?

12 BY MR. STONE:

13 Q.  Yes.

14 A.  Not very often.

15 Q.  Have you ever done it before, besides this one?         15:50:27

16 A.  Probably not.

17 Q.  And you've been an attorney for over 30 years; correct?

18 A.  Yes.

19 Q.  And you've been practicing in this realm of trusts and

20 estates for that entire time?                               15:50:40

21 A.  Yes.

22 Q.  And this was the only time that you wired $16.5 million to

23 an overseas account --

24 A.  This is the only --

25 Q.  -- correct?                                             15:50:50

JOHN BECKER - CROSS-EXAMINATION

116

```
 1   A.  -- time I wired exactly $16.5 million.  I have done other

 2   international wires that have been seven figures, but they were

 3   other types of transactions.

 4   Q.  Have you ever wired money to Hungary before?

 5   A.  No.                                                          15:51:08

 6   Q.  What about any country in Eastern Europe?

 7   A.  No.

 8   Q.  All right.  You remember that your client told you that the

 9   source of these funds were from Backpage; correct?

10   A.  No.  That's not correct.                                     15:51:24

11   Q.  Well, let's take a look at Exhibit 3007 and see if we can't

12   refresh your recollection.

13   A.  Okay.

14   Q.  All right.  So first page, 1D?

15   A.  Yep.                                                         15:51:50

16   Q.  Do you see that?

17   A.  Yes.

18   Q.  It reads, "Lacey told Becker that the source of the

19   funds" --

20           MR. CAMBRIA:  Object.  Object to reading from this as    15:51:55

21   not a statement.

22           THE COURT:  Sustained.

23           MR. STONE:  Your Honor --

24   BY MR. STONE:

25   Q.  Sir, do you see that?                                        15:52:02
```

UNITED STATES DISTRICT COURT

1    A.  Yes.

2    Q.  Does that refresh your recollection of what your client may

3    have told you?

4    A.  I don't recall saying this.  I recall saying that it was

5    from the sale of Backpage.  I don't know that I -- it was a --    15:52:11

6    specifically from the operation of the company.  I thought it

7    was from the sale of the company.

8    Q.  You understood it to be money from Backpage, though?

9    A.  Yes.

10   Q.  And the 16.5 million, you understood all that money to be    15:52:22

11   money from Backpage?  Whether it's from the sale or operations,

12   money from Backpage?

13   A.  Correct.

14   Q.  Okay.  When you were Mr. Lacey's attorney, did you do any

15   research into Backpage?                                          15:52:39

16   A.  No.

17   Q.  Did you ever look at the website?

18   A.  No.

19   Q.  So you never looked at the escort section of Backpage.com?

20   A.  Absolutely not.                                              15:52:55

21   Q.  Why do you say it like that, absolutely not?

22   A.  I read the New York Times, Wall Street Journal, Washington

23   Post.  I read those types of publications.  I don't need to be

24   spending my time reading Backpage.

25   Q.  Okay.  Well, you represent the owner of Backpage, or         15:53:07

```
 1   someone who did own Backpage.  Fair?
 2   A.  I read the -- read the New Times.
 3   Q.  But my question was, you represented someone who owned
 4   Backpage --
 5   A.  Yes.                                               15:53:19
 6   Q.  -- isn't that true?
 7   A.  Yes.
 8   Q.  And in the time that you were Mr. Lacey's attorney, you
 9   never looked at Backpage?  That's --
10   A.  No.                                                15:53:26
11   Q.  -- your testimony?
12   A.  Not to my recollection.
13   Q.  You assist Mr. Lacey with other things, not just this
14   transfer to Hungary.  Fair?
15   A.  Yes.                                               15:53:48
16   Q.  You assist him with checks that he sent out to former
17   employees?
18   A.  I assisted him with checks to former writers and editors
19   that he wanted to thank, yes.
20   Q.  Okay.  Those were $5,000 checks?                   15:54:03
21   A.  I don't recall the amounts.
22   Q.  Do you recall being several thousand dollars?
23   A.  I recall that they were under the annual exclusion, which
24   means those are the amounts that you can give without filing a
25   gift tax return.  And so they were under those amounts.  As to 15:54:21
```

1    the specifics, I just don't recall.

2    Q.  What's the annual exclusion rate?

3    A.  Right now it's $17,000.  Back then, I think it was more

4    like 13- or $14,000.

5    Q.  So some -- some amount of money under that?            15:54:32

6    A.  Yes.

7    Q.  And who did you issue those checks to?

8    A.  I was given a list of former writers and editors for

9    various publications that Mr. Lacey has been involved with, and

10   those are the individuals I was told to write the checks to.  15:54:49

11   Q.  I want to show you what's been admitted into evidence as

12   Exhibit 1.

13           MR. STONE:  This doesn't want to work.

14   BY MR. STONE:

15   Q.  All right.  This is the exhibit that Mr. Lacey showed you  15:55:55

16   on direct?

17   A.  I believe so.  I can't see it.

18           MR. STONE:  0001-0004.

19   BY MR. STONE:

20   Q.  All right.  Now it's up.  Technical difficulties.        15:56:12

21   A.  Yes.

22   Q.  All right.  This is the email you've -- and you've seen

23   this before?

24   A.  Yes.

25   Q.  All right.  And this is an email from Mr. Lacey?         15:56:19

1    A.   Yes.

2    Q.   The bottom part reads, "To revisit for just a moment, I'm

3    not interested in any tax avoidance.  I just want to put some

4    assets in place where litigious parties, including government

5    parties, cannot access my accounts."                            15:56:34

6         Do you see that?

7    A.   Yes.

8    Q.   Was this in connection with this transaction that you wired

9    from your IOLTA account to this bank account in Hungary?

10   A.   I don't understand the question.                           15:56:50

11   Q.   Well, does this refer to moving Mr. Lacey's money overseas?

12   A.   No.

13   Q.   It -- it doesn't?  You just --

14   A.   It doesn't say anything about overseas.

15   Q.   Well, you just answered questions on direct about how these 15:57:03

16   were emails from you and a Mr. Stein about potentially moving

17   money overseas.  No?

18   A.   Your question was, does this email reflect moving monies

19   overseas?  And the answer's no.

20   Q.   Okay.                                                      15:57:18

21   A.   What prompted this, though, was, you know, having the

22   discussion with Jacob Stein.  So this prompted setting up a

23   meeting with Mr. Stein.

24   Q.   You understood this to be your client's motivation in

25   sending the money; correct?                                    15:57:35

1   A.  My client's motivation was for -- to place his monies in an

2   account that won't be closed.

3   Q.  And you see the -- the first line here, you know, the one I

4   didn't read up top, "I think I'm ready to move forward with the

5   visit to the L.A. lawyer was mentioned" -- "you mentioned who          15:57:48

6   has expertise in offshore"?

7   A.  Yes.

8   Q.  So we're talking about the -- an offshore transaction here.

9   No?

10  A.  I'm talking about referring to Mr. Stein, and Mr. Stein can        15:57:58

11  advise what -- how to structure it --

12  Q.  Okay.

13  A.  -- whether it was offshore, where it needs to be.

14  Q.  And -- I'm sorry.

15          And you understood the motivation was to put assets in        15:58:07

16  place where litigious parties, including government parties,

17  couldn't access your client's account; right?

18  A.  Couldn't close the accounts.  Yes.

19  Q.  Well, just going by the language here, it says "access my

20  accounts."  Fair?                                                      15:58:22

21  A.  Well, you have to ask Mr. Lacey.  He wrote it.

22  Q.  No.  I'm asking you, sir.  You're on the stand.

23  A.  Okay.

24  Q.  That language there from your client says "cannot access my

25  accounts," does it not?                                                15:58:30

1    A.  Yes.

2    Q.  All right.  And do you remember when this transfer occurred

3    in January of 2017?

4    A.  Yes.

5    Q.  Let me show you what's been marked and admitted into          15:58:46

6    evidence as Exhibit 1479.

7          Sir, can you see that on your screen?

8    A.  Yes.

9    Q.  It may be a little small, but are you able to see it?

10   A.  Put my glasses on.                                            15:59:20

11         Okay.

12   Q.  Now, I don't think you've seen this before, but does this

13   not show how the money moved from Mr. Lacey's accounts to your

14   IOLTA account and then to the account in Hungary?

15   A.  Did you preface this with have I seen this before?           15:59:42

16   Q.  It was a comment.  I don't think you've seen this --

17   A.  No.

18   Q.  -- before.

19   A.  No, I haven't.

20   Q.  But my question is, does this flowchart show how the money   15:59:48

21   moved from Mr. Lacey's accounts to your IOLTA account and into

22   the account in Hungary?

23   A.  Yes.

24   Q.  And this is accurate?

25   A.  I have no basis of knowing whether the account numbers are   16:00:01

1  accurate.  I think so, but I don't know.

2  Q.  Fair.  But in terms of -- not the account numbers, but how

3  the money flowed, you remember that this was how it went?

4  A.  Yes.

5  Q.  You testified on direct about how five different accounts      16:00:16

6  went all to your IOLTA account and then you wired that amount

7  of money over to Hungary?

8  A.  Yes.

9  Q.  And this was in January of 2017; right?

10  A.  Yes.                                                          16:00:35

11  Q.  All right.  So in terms of the FBARs that you testified to

12  on your direct examination with Mr. Cambria, those weren't

13  filed in 2017, were they?

14         Do you remember?

15  A.  The FBAR?                                                     16:01:00

16  Q.  The FBAR.  The --

17  A.  I --

18  Q.  The documents -- let me -- let me withdraw that question

19  and step back.

20         You testified as to certain documents that Mr. Lacey      16:01:10

21  filed that dealt with this transaction; correct?

22  A.  Correct.

23  Q.  And those were filed after this date that the money was

24  wired to Hungary, were they not?

25  A.  Correct.                                                      16:01:26

1    Q.  And I have the first date from the exhibits that

2    Mr. Cambria showed to be filed on August 9th, 2018.

3           Does that give -- do you have any reason to dispute

4    that date?

5    A.  No.                                                    16:01:36

6    Q.  Did you ask for an extension before filing this -- this

7    document with the IRS?

8    A.  So the documents are required to be filed for the first

9    year.  So they need to be filed in 2018, not 2017.  And in

10   2018, we extended them.  And so the FBAR was on extension, to  16:01:52

11   the best of my knowledge, and the other documents were on

12   extension.

13   Q.  Okay.  And what does "on extension" mean?

14   A.  The F- -- I believe the FBAR was on extension.  I'm not

15   positive.  I believe the FBAR was.  And the Form 3520 and the  16:02:06

16   Form 3520-A were on extension.

17   Q.  Okay.  But my question is, what does extension mean?

18   A.  Extension means you have additional time.  The

19   government -- it's an automatic extension.  The government

20   gives you an automatic period of time to file the reports.    16:02:19

21   Q.  Were you aware of the indictment that was filed in this

22   case?

23   A.  I know -- I know Mr. Lacey was indicted.  I don't know

24   when.

25   Q.  Did you read that indictment?                             16:02:35

1    A.  No, not to my knowledge.

2    Q.  You don't -- if I told you that that indictment was issued

3    in April of 2018, no reason to dispute that?

4    A.  I have no reason.

5    Q.  But you haven't read it?                              16:02:48

6    A.  No.

7    Q.  And then this first filing was August of 2018.  So roughly

8    four months after the indictment if the indictment did, in

9    fact, come down in April of 2018.  Fair?

10   A.  The filings were filed on time.                       16:03:04

11   Q.  So is that a yes?

12   A.  It's a -- so they were filed on time.  It was after

13   apparently the indictment.

14   Q.  Four months after the indictment.  Fair?

15   A.  They were filed on time.                              16:03:18

16   Q.  Sir, I'm -- I think that's a pretty fair question that I'm

17   asking you.  It's yes or no.

18   A.  So, the best of my knowledge, if you said the indictment

19   was in April, we had a six-month extension to file things, and

20   so they were filed after that.                           16:03:34

21   Q.  So, yes, it was four months after the indictment that the

22   FBAR was filed.  Yes?

23   A.  Apparently, yes.

24   Q.  Thank you.

25          All right.  You remember telling the agents and    16:03:42

1    prosecutors in that meeting in 2018 that after the Senate

2    issued their report, you had concerns?

3    A.  I believe I said that, yes.

4    Q.  Did you read the Senate report?

5    A.  No.                                          16:04:03

6    Q.  So what were your concerns?

7    A.  Just that I don't like to have any transactions that are

8    going to have any type of hassle to them.  And so when somebody

9    tells me that the Senate's looking into Mr. Lacey or Backpage,

10   it just causes me concern.                       16:04:21

11   Q.  Do you recall having one or more discussions with the

12   corporate security unit of Johnson Bank?

13   A.  Yes.

14   Q.  Do you remember asking Johnson Bank not to use your

15   client's, Michael Lacey's name with the wire transfers?  16:04:39

16   A.  Yes.

17   Q.  And you did so because his name was toxic; right?

18   A.  I did so because I did not want my accounts closed as well

19   as this new account closed.

20   Q.  Because his name was toxic?                   16:04:54

21   A.  Because apparently he has a history or somebody's closing

22   all of his bank accounts, and I don't want my accounts

23   associated with his name.  Yes.

24   Q.  And you wanted to preserve the relationship you have with

25   Primis Bank; right?                              16:05:07

UNITED STATES DISTRICT COURT

1    A.   Yes.

2    Q.   Do you remember telling the prosecutors and agents that

3    Mr. Lacey withheld some information from you?

4    A.   No.

5    Q.   Take a look at Exhibit 3007.  I'm going to direct your          16:05:17

6    attention to paragraph 7.

7    A.   Okay.

8    Q.   And there's Subparts A, B, C, and D.  I want you to just

9    read those to yourself, please.

10   A.   Okay.                                                            16:05:33

11            Okay.

12   Q.   Does that refresh your recollection as to your client not

13   having told you some piece of information?

14   A.   I don't know anything about whether the file -- the charges

15   were refiled or not.  So he did not tell me.                         16:05:50

16   Q.   Okay.  If he had told you, would that have affected whether

17   or not you would have gone through with these transfers?

18            MR. CAMBRIA:  Object to relevance.  And there's no

19   foundation that he was -- that he asked Mr. Lacey anything.

20            THE COURT:  Overruled.                                       16:06:10

21   BY MR. STONE:

22   Q.   Do you need me to repeat the question?

23   A.   No.

24   Q.   Okay.

25   A.   Same issue as before when you asked me about the Senate         16:06:17

1    committee.  Same thing.  I don't want the hassle.  I don't want

2    to be here on Tuesday afternoon engaging in this.  I don't want

3    the hassle.  I don't need the hassle.  And so, yes, it would

4    have changed my view on things.

5           And so unless the transaction was clean, I don't want     16:06:35

6    to participate in it.

7    Q.  Okay.

8    A.  I don't -- I don't need the hassle.

9    Q.  If -- so if he had told you this information, you wouldn't

10   have gone through with it.  That's what I'm hearing.           16:06:45

11   A.  Probably not.  I don't need the hassle.

12   Q.  All right.  Let's talk about this offshore account, this

13   account in Hungary.  Okay?

14          That -- that was not an account that your client would

15   own; right?                                                    16:07:12

16   A.  Correct.

17   Q.  Primis Bank was the trustee.  Primis Bank was this bank in

18   Hungary?

19   A.  Yes.

20   Q.  And then there -- there were beneficiaries to this trust   16:07:26

21   that -- but it wasn't your client; correct?

22   A.  Correct.

23   Q.  And you remember telling agents and prosecutors that

24   sending the money overseas was your client's decision.  It was

25   Michael Lacey's decision; right?                               16:07:59

JOHN BECKER - CROSS-EXAMINATION

129

```
 1    A.  Yes.

 2    Q.  Do you remember that it was his decision to open this

 3    account in Hungary?

 4    A.  Yes.

 5    Q.  And you weren't sure why your client preferred Hungary as        16:08:06

 6    to other countries, but ultimately it was his decision?

 7    A.  He engaged with Mr. Stein in making that decision.  Yes.

 8    Q.  His decision, though, ultimately.  No?

 9    A.  His decision.

10    Q.  Did you ever have any conversations with Mr. Lacey about        16:08:28

11    Backpage's business practices?

12    A.  Not to my knowledge.

13    Q.  Were you made aware of Backpage's moderation practices?

14    A.  No.

15    Q.  Were you aware of Backpage's relationship with The Erotic      16:09:02

16    Review?

17    A.  I don't know what that means.

18    Q.  So, no?

19    A.  No.

20    Q.  Now, you mentioned you read the New York Times.  Did you        16:09:11

21    read any New York Times articles about Backpage?

22    A.  I believe I have.

23    Q.  Do you remember the subject matter?

24    A.  I do not.

25    Q.  How about any articles in the Wall Street Journal, another      16:09:25
```

UNITED STATES DISTRICT COURT

JOHN BECKER - CROSS-EXAMINATION

130

1    piece of paper you --

2    A.  Yes.

3    Q.  -- I believe you said you read?

4         Have you read any articles in the Wall Street Journal

5    about Backpage?                                                16:09:36

6    A.  I believe I have but just don't recall.

7    Q.  Okay.  Did you read -- recall reading an open letter from

8    the Auburn Theological Seminary --

9    A.  No.

10   Q.  -- about Backpage?                                         16:09:48

11   A.  No.

12   Q.  Your client tell you about any meetings he may have had

13   with NCMEC, the National Center for Missing and Exploited

14   Children?

15   A.  No.                                                        16:10:01

16   Q.  How about any meetings he or anyone else at Backpage may

17   have had with an organization called Polaris?

18   A.  No.

19   Q.  And what about Auburn Theological -- Theological Seminary?

20   Did he talk about any meetings he or others at Backpage may    16:10:13

21   have had?

22   A.  Not to my knowledge.

23        MR. STONE:  Just a moment, Your Honor.

24        All right.  Just a couple more questions, sir.

25        ///

JOHN BECKER – CROSS-EXAMINATION

131

```
 1    BY MR. STONE:
 2    Q.  When you talked about the checks that you were sending on
 3    behalf of Mr. Lacey to former employees, is that how you
 4    described it?
 5    A.  No.  Writers and editors.                                16:10:55
 6    Q.  Okay.  Writers and editors.
 7            Do you recall when those checks went out?  Like what
 8    year?
 9    A.  I think 2016 or 2017.  2016, I think.
10    Q.  And do you have any idea why Mr. Lacey didn't just wire    16:11:08
11    this money, the 16.5 million, himself?  Why he had to use your
12    IOLTA account?
13    A.  They -- they ran trusts that I controlled.  I was the
14    trustee of these trusts that needed to make the distribution.
15    And so I suppose I could have written all these checks to      16:11:37
16    Michael Lacey and let Michael Lacey do the wire, but it's the
17    same problem.  He didn't have an account to put them into
18    because the banks were closing his accounts.
19            MR. STONE:  Okay.  Fair enough.
20            That's it, Your Honor.  Thank you.                    16:11:50
21            MR. CAMBRIA:  Your Honor, I'd like to redirect on the
22    new subjects that he raised.
23            THE COURT:  Well, we'll see.
24            MR. CAMBRIA:  Okay.
25            MR. STONE:  Redirect?                                 16:12:02
```

UNITED STATES DISTRICT COURT

JOHN BECKER - REDIRECT EXAMINATION

132

| 1 | MR. CAMBRIA:  Yeah. |
|---|---|

REDIRECT EXAMINATION

BY MR. CAMBRIA:

Q.  Mr. Becker, did Mr. Lacey ever ask that there be an

extension for the filing of the FBAR?                    16:12:12

A.  No.

Q.  And you said it was automatic to get one.  You just ask for

it?

A.  The extension is automatic, yes.

Q.  Okay.  And hassle or not, was the trust, the way it was     16:12:23

created and the reporting, was it all legal?

A.  It was absolutely legal.  It was --

Q.  And --

A.  It was a solid transaction.

Q.  And the beneficiaries of the trust were who?               16:12:38

A.  I believe they're Mr. Lacey's two sons.

Q.  Okay.  Would you be upset if I didn't ask you another

question?

A.  You could ask me whatever.

        MR. CAMBRIA:  That's all I have.                        16:12:57

        THE COURT:  All right.  Is the witness released from

subpoena?

        Mr. Cambria?

        MR. CAMBRIA:  Yes, Your Honor.

        MR. STONE:  Yes, Your Honor.                           16:13:05

UNITED STATES DISTRICT COURT

1    THE COURT:  All right.  Sir, we thank you for your

2  testimony.  You are released from subpoena.  You may step down.

3       And watch your step going down.

4    THE WITNESS:  Okay.  Thank you, Your Honor.

5    THE COURT:  Thank you.                                    16:13:14

6    THE WITNESS:  Thank you.

7    THE COURT:  Call your next witness.

8    MR. FEDER:  Judge, we had discussed earlier today that

9  we were going to break early and that we told you we only had

10 two witnesses, if I recollect.                              16:13:24

11    THE COURT:  Well, I didn't recall that.  I heard five.

12 So do you have a witness prepared?

13    MR. FEDER:  I do not on behalf of Mr. Spear.

14    MR. CAMBRIA:  The next one I have is tomorrow morning,

15 Your Honor.                                                 16:13:45

16    THE COURT:  Well, members of the jury, apparently we

17 have miscommunication amongst the Court and counsel, all

18 counsel, as to the lineup of witnesses.  I thought we had one

19 more to go, but apparently -- and you never know when the

20 examination's going to end.  But, in any event, why don't we   16:14:05

21 stand in adjournment for the afternoon.  But, again, I do

22 remind you of the admonition not to come to any conclusions,

23 not to form an opinion about the matter, and to continue to

24 keep an open mind and not discuss the matter amongst yourselves

25 or anyone else.  And I will expect you here and ready to go    16:14:32

134

1    promptly at 9:00 a.m.

2           Please all rise for the jury.

3       (Jury not present at 4:14 p.m.)

4           THE COURT:  Please be seated.

5           I guess that answers the question as to why, when I    16:15:17

6    asked who the next witness was, no one responded.  I don't

7    recall being told there were only two witnesses available

8    today.  If you told me that, I don't remember it.  I thought

9    you had five witnesses who were identified that were ready to

10    go.    16:15:40

11           And so tomorrow, let's not have this problem.  Let's

12    have your witnesses ready to go.

13           And, Mr. Feder, before we took up the last witness,

14    you wanted to raise something.  I -- you may raise it now.  I

15    don't recall what it was.    16:16:00

16           MR. FEDER:  Given the government's request, we would

17    request --

18           THE COURT:  I don't know what the government's request

19    is that you're referring to.

20           MR. FEDER:  In regard to Mr. Snyder.  We would request    16:16:08

21    all emails, all texts, all any kind of communications that

22    either a government witness -- a government lawyer or a

23    government agent has had with any of their previous witnesses.

24           THE COURT:  Well, the problem with that overbroad

25    request, Mr. Feder, is that the request has already been made.    16:16:27

```
 1    And, as we were shown here a moment ago, there were
 2    conversations related to and opinions made about things that
 3    this witness was shown.  And so that was the basis for my -- my
 4    ruling and why I permitted Mr. Berry to reopen his
 5    cross-examination.                                              16:16:59
 6            And so if you can show me in the record where that was
 7    done with other witnesses, I may entertain it.  But I'm not
 8    going to order that it be done on that sort of a broad basis.
 9            All right.  Mr. Berry, you -- you're standing there
10    ominously, so you must wish to pursue something.                16:17:16
11            MR. BERRY:  Thank you, Your Honor.
12            I know it's late.  I know we want to get going.  I had
13    asked for a few minutes before we started earlier today, and
14    then we didn't have that opportunity.  Now seems to be better.
15            I received an email today indicating that a member of   16:17:32
16    the press was seeking access to both admitted and nonadmitted
17    exhibits in this case.  And it's something that I have been
18    concerned about with regard to not all of the exhibits.  I'm
19    certainly in favor of -- of the public having a full access to
20    the courts as appropriate.  But specific exhibits, and in      16:17:54
21    particular the ads of the victims, not just the ones that
22    testified, but, for example, Cynthia Worthy, whose sister
23    testified about her ad, I believe that under the Crime Victim's
24    Rights Act, under 18, U.S.C., Section 3771, Subsection (a)(5),
25    which gives victims the right to protect their dignity and      16:18:20
```

1   privacy, that these ads, and the photos of them in particular,

2   should be sealed as part of the record and not be made

3   available to the public.

4        My -- my deep concern here is that if those ads were

5   to be produced to the public, they could then be posted back on      16:18:40

6   the Internet.  We had one of the victims who was extremely

7   worried about testifying and wanted us to close the courtroom

8   and make certain requests like that.  We ultimately talked her

9   down off that ledge about that issue and did not come to the

10  Court with that sort of a -- a serious request.                      16:19:03

11       But we think that this is a middle ground that would

12  be appropriate, and I would ask -- I'm happy to brief this

13  issue if the Court would like it.  What my request is right now

14  is for at least a temporary order sealing all of the exhibits

15  until we can identify the specific exhibits that contain those       16:19:20

16  photos of these victims, which the Court has already ruled they

17  are, in fact, victims and such that the CVRA does apply to

18  them.  So that's my -- my oral motion and request at this time.

19  And then we would ask the Court to unseal everything except

20  those specific exhibits that ultimately get identified.  I'm         16:19:41

21  just not in a position right now to rattle off each exhibit

22  number.

23       THE COURT:  Well, it -- it's -- it's a difficult

24  position for the Court to make even a temporary ruling, because

25  I don't know what the precise request was that was made to the       16:19:57

1   government.  And perhaps if I see what that precise request was

2   from any media outlet, then I could then look at it in

3   conjunction with the provision that you gave to me.  And I am

4   always happy to in some new area that pops up to receive

5   further briefing and do the defendants want an opportunity to          16:20:23

6   respond to that.

7         And so having this sprung on me without anything more,

8   I think I'll need whatever it is that the request is that was

9   provided to you.  You could submit that to my chambers.

10        MR. BERRY:  Yes, Your Honor.  I actually did forward          16:20:42

11  the email to your chambers email address when I requested

12  ten minutes before the session.  I -- I don't know if it didn't

13  get it.  I know we've had some other issues with getting

14  certain things to the chambers email account.  But I'm happy to

15  forward it again if it was not received, but I did forward that          16:20:57

16  directly.  And it was simply an email that I got blind copied

17  on from a reporter to the clerk's office here --

18        THE COURT:  Okay.

19        MR. BERRY:  -- requesting access to admitted and

20  nonadmitted exhibits.          16:21:09

21        THE COURT:  All right.  I will confer with my clerk's

22  office to determine what information they received or requests

23  they received as well when we adjourn.  And then why don't you

24  prepare a short briefing on that statute and the -- as it

25  relates to the request and your motion to seal.          16:21:29

138

1              MR. BERRY:  I will.  Thank you, Your Honor.

2              THE COURT:  And I appreciate that.

3              MR. BERRY:  Thank you.

4              THE COURT:  Anything further from the government?

5              MR. BERRY:  Oh, yes.  We --       16:21:37

6              THE COURT:  Oh, you know, I actually have something

7 for defense.

8              Again I ask, who is the next witness?  Who's going to

9 be ready at 9:00?

10             I thought you produced five --    16:21:53

11             MR. CAMBRIA:  I --

12             THE COURT:  -- names, so who is going to be ready at

13 9:00, Mr. Cambria?

14             MR. CAMBRIA:  I believe witness --

15             THE COURT:  Can you turn on your microphone.  I'm  16:22:03

16 sorry.

17             MR. CAMBRIA:  Oh, I'm sorry.  I believe Dougherty

18 and -- and Strouse.

19             THE COURT:  That sounds like a law firm.  Dougherty.

20             MR. CAMBRIA:  Apparently there are a couple of other  16:22:29

21 witnesses, Your Honor, that I'm not familiar with, and I'm

22 getting a list now.  Dougherty and -- the two that I indicated,

23 but apparently there are a couple more from some other lawyers,

24 and I'm getting the names now.

25             Dougherty, not Strouse, Your Honor.  I'm told Strouse  16:23:21

UNITED STATES DISTRICT COURT

1    will be here Thursday.

2         THE COURT:  All right.

3         MR. CAMBRIA:  And she's telling me apparently what

4    other lawyers have names, what the names are.

5         THE COURT:  So we have one witness.  Who's the second?    16:23:34

6         MR. FEDER:  Potentially Stan Cook and Rick Yerman.

7         THE COURT:  Cook and -- and what was the other one?

8         MR. FEDER:  Yer- -- Y-E-R-M-A-N.  First name Rick.

9         THE COURT:  All right.

10        MR. BERRY:  These -- these are some of the names, Your    16:23:57

11   Honor, that were provided to us this morning when we were

12   sitting in Court that I mentioned.  And we still don't have any

13   designation of exhibits, if they are to be used at all.

14        MR. FEDER:  They're not.  There are none.

15        THE COURT:  Well, again, what I -- I -- the Court has    16:24:09

16   provided its procedure of disclosure to not only the Court of

17   the witnesses three days in advance, but to the government.

18   And this morning I heard there were a list of five.  And so

19   have your witnesses ready and prepared sharply at 9:00 a.m.

20        All right.  We are adjourned.    16:24:44

21        THE COURTROOM DEPUTY:  All rise.

22      (Proceedings adjourn at 4:24 p.m.)

23                    ---oOo---

24

25

1
2
3
4
5                        **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 26th day of October,

16   2023.

17

18

19                              /s/ Cathy J. Taylor
20                              Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

## $

**$14,000** [1] - 119:4
**$17,000** [1] - 119:3
**$5,000** [1] - 118:20

## /

**/s/Cathy** [1] - 140:19

## 0

**000012-000030** [1] - 4:16
**0001-0004** [1] - 119:18
**006183-006184** [1] - 5:4
**006186-006187** [1] - 5:6
**011886-011933** [1] - 4:22
**0205** [1] - 77:15
**02057** [2] - 5:7, 77:13
**02058** [2] - 72:18, 73:14
**03.07.18** [1] - 4:17
**07/29/2016** [1] - 5:7

## 1

**1** [11] - 61:21, 72:15, 72:16, 72:18, 73:2, 73:19, 76:21, 77:13, 92:7, 119:12
**1/23/2017** [1] - 74:21
**100** [1] - 4:10
**106** [2] - 4:11, 73:5
**114** [3] - 4:20, 5:3, 5:5
**1155** [1] - 3:8
**11:45** [2] - 76:10, 77:9
**11th** [1] - 2:9
**12** [1] - 112:15
**120** [1] - 2:13
**13** [2] - 4:8, 119:4
**1301** [1] - 2:9
**132** [1] - 4:12
**14202** [1] - 2:13
**1479** [1] - 122:6
**15** [1] - 22:22
**16-year-old** [1] - 22:22
**16.5** [6] - 114:22, 115:3, 115:22, 116:1, 117:10, 131:11
**160** [1] - 2:19
**18** [1] - 135:24
**1800** [1] - 2:5
**1875** [1] - 3:4
**1996** [1] - 15:5
**1999** [2] - 15:8, 16:5

## 2

**1:01** [3] - 1:8, 6:3, 6:4
**1:13** [1] - 12:17
**1:49** [1] - 40:5
**1:55** [1] - 43:20
**1D** [1] - 116:14
**1st** [2] - 15:16, 15:17

**2,775** [1] - 112:23
**2/21/17** [1] - 75:3
**2/21/2017** [2] - 76:10, 77:9
**2000** [1] - 15:5
**20005** [1] - 2:10
**2007** [6] - 15:12, 16:9, 23:3, 51:21, 52:20, 53:15
**2007-2018** [1] - 54:9
**2008** [1] - 19:8
**2009** [1] - 19:8
**2011** [3] - 15:13, 15:15, 16:12
**2012** [1] - 19:4
**2016** [3] - 28:10, 131:9
**2017** [9] - 4:16, 4:21, 85:4, 110:1, 122:3, 123:9, 123:13, 124:9, 131:9
**2018** [18] - 4:20, 5:3, 14:11, 15:16, 15:17, 30:14, 52:22, 53:15, 53:25, 54:3, 107:5, 124:2, 124:9, 124:10, 125:3, 125:7, 125:9, 126:1
**2018.09.05** [1] - 4:22
**2019** [3] - 5:3, 5:5, 15:19
**2020** [2] - 5:5, 15:22
**2022** [1] - 15:24
**2023** [3] - 1:8, 15:9, 140:16
**210** [1] - 2:16
**23** [3] - 1:14, 6:23, 10:20
**2300** [1] - 3:4
**24** [1] - 1:8
**26.2** [9] - 38:2, 40:15, 40:25, 41:13, 41:16, 44:17, 93:7, 93:15, 94:5
**26th** [1] - 140:15
**27** [1] - 14:24
**2702** [1] - 68:5
**2734** [1] - 3:12
**28th** [1] - 14:17
**2930** [1] - 2:19
**2:02** [1] - 43:20
**2:07** [1] - 48:10

## 2:18-cr-00422-DJH [1] - 1:5

## 3

**3** [12] - 7:2, 8:25, 9:3, 9:14, 10:5, 73:18, 73:19, 73:23, 84:5, 86:20, 86:23, 112:12
**30** [4] - 5:7, 76:9, 77:14, 115:17
**3000** [2] - 102:6, 102:7
**3007** [6] - 107:11, 109:14, 109:23, 113:25, 116:11, 127:5
**3009** [2] - 112:3, 112:7
**3011** [3] - 102:8, 102:12, 102:25
**31** [1] - 1:22
**31-page** [1] - 7:24
**312** [1] - 1:22
**322-7249** [1] - 1:23
**33** [1] - 4:9
**3520** [1] - 124:15
**3520-A** [4] - 86:9, 87:11, 88:10, 124:16
**3550** [1] - 3:8
**3771** [1] - 135:24
**38** [1] - 92:15
**3:00** [2] - 91:21
**3:01** [1] - 92:3
**3:07** [1] - 96:7
**3:20** [1] - 91:24
**3:25** [1] - 96:7
**3:28** [1] - 97:24

## 4

**4** [3] - 73:19, 86:22, 86:23
**40** [2] - 2:5, 4:3
**401** [1] - 1:22
**42** [1] - 2:13
**4:14** [1] - 134:3
**4:24** [1] - 139:22
**4:30** [3] - 97:8, 97:9, 97:10

## 5

**5507** [3] - 6:8, 9:10, 9:13
**5508** [2] - 9:10, 9:11
**5516** [4] - 4:16, 78:11, 78:13, 78:23
**5540** [5] - 4:17, 78:24, 79:2, 79:16, 79:18
**5541** [4] - 4:20, 79:20, 80:11, 83:13

**5542** [4] - 4:22, 84:22, 85:15, 87:15
**5543** [1] - 87:6
**5544** [1] - 87:24
**5545** [3] - 5:3, 88:17, 89:4
**5546** [3] - 5:5, 89:5, 89:17
**5548** [1] - 89:18

## 6

**6** [1] - 4:3
**602** [1] - 1:23
**612** [9] - 38:5, 38:18, 40:25, 42:4, 43:23, 44:12, 93:7, 93:21, 93:24
**612(a)(2** [1] - 94:18
**6264** [4] - 5:7, 77:21, 92:8
**63** [1] - 4:9
**66** [1] - 4:11
**6720** [1] - 2:16

## 7

**7** [6] - 84:3, 84:5, 84:8, 127:6
**7001** [1] - 102:3
**7004** [1] - 79:6
**77** [1] - 5:7
**78** [1] - 4:16
**79** [1] - 4:17

## 8

**8,000** [1] - 13:25
**83** [1] - 4:20
**85** [1] - 4:22
**85003-2151** [1] - 1:23
**85004-4408** [1] - 2:5
**85012** [1] - 3:9
**85016** [1] - 2:20
**85252-2734** [1] - 3:12
**85253** [1] - 2:17
**89** [2] - 5:3, 5:5

## 9

**90067** [1] - 3:4
**911** [1] - 15:7
**92** [1] - 4:4
**93** [1] - 4:4
**95** [1] - 14:5
**96** [1] - 4:5
**9:00** [4] - 134:1, 138:9, 138:13, 139:19
**9th** [1] - 124:2

## A

**a)(5** [1] - 135:24
**a.m** [4] - 76:10, 77:9, 134:1, 139:19
**abiding** [1] - 34:13
**ability** [1] - 30:15
**able** [13] - 7:5, 25:7, 27:12, 27:22, 27:24, 28:1, 28:5, 46:1, 68:12, 104:5, 104:11, 105:8, 122:9
**above-entitled** [1] - 140:12
**absolutely** [6] - 18:18, 70:3, 102:4, 117:20, 117:21, 132:12
**abuse** [1] - 15:14
**accept** [1] - 21:17
**access** [7] - 120:5, 121:17, 121:19, 121:24, 135:16, 135:19, 137:19
**accompanied** [1] - 85:3
**accompanying** [1] - 79:6
**accomplish** [3] - 70:2, 80:24, 80:25
**account** [45] - 25:14, 69:22, 70:12, 70:15, 79:8, 80:19, 81:3, 81:5, 85:3, 88:15, 88:21, 89:11, 98:14, 98:15, 114:15, 114:17, 114:18, 114:19, 114:22, 114:24, 114:25, 115:3, 115:4, 115:7, 115:8, 115:23, 120:9, 121:2, 121:17, 122:14, 122:21, 122:22, 122:25, 123:2, 123:6, 126:19, 128:12, 128:13, 128:14, 129:3, 131:12, 131:17, 137:14
**accountants** [1] - 78:4
**accounts** [16] - 67:12, 67:23, 68:13, 68:23, 98:20, 120:5, 121:18, 121:20, 121:25, 122:13, 122:21, 123:5, 126:18, 126:22, 131:18
**Accounts** [1] - 80:17
**accurate** [4] - 112:21,

122:24, 123:1, 140:11
**acknowledged** [1] - 100:12
**acronyms** [1] - 57:23
**act** [4] - 16:23, 57:3, 57:23, 140:8
**Act** [2] - 14:8, 135:24
**activity** [2] - 9:24, 64:1
**acts** [3] - 57:16, 57:17, 58:6
**actual** [1] - 90:4
**ad** [22] - 20:20, 21:23, 21:24, 22:2, 22:21, 23:10, 23:15, 23:23, 23:25, 24:15, 24:20, 24:23, 25:19, 29:15, 32:15, 32:18, 33:2, 33:9, 33:13, 56:24, 64:3, 135:23
**added** [1] - 92:7
**addition** [2] - 38:4, 105:10
**additional** [5] - 8:20, 25:18, 47:4, 50:21, 124:18
**address** [4] - 36:1, 39:21, 39:24, 137:11
**addresses** [1] - 25:17
**adjourn** [2] - 137:23, 139:22
**adjourned** [1] - 139:20
**adjournment** [1] - 133:21
**administration** [1] - 66:21
**administrative** [1] - 15:23
**admission** [1] - 11:19
**admit** [1] - 81:7
**admitted** [26] - 11:13, 11:14, 11:20, 73:3, 73:4, 73:13, 73:19, 77:19, 77:21, 78:21, 78:23, 79:16, 79:18, 83:12, 83:13, 85:14, 85:15, 87:21, 89:2, 89:4, 89:15, 89:17, 119:11, 122:5, 135:16, 137:19
**admonition** [2] - 40:1, 133:22
**admonitions** [1] - 91:24
**ads** [49] - 21:14, 22:25, 23:2, 23:5, 23:7, 23:8, 23:10, 23:12, 24:14, 25:15, 27:1, 30:25, 32:1, 32:20, 33:6, 33:10,

37:10, 37:12, 37:15, 37:17, 37:18, 37:22, 38:5, 38:24, 39:1, 41:6, 41:14, 44:10, 44:17, 53:12, 54:4, 57:3, 59:7, 59:24, 63:14, 63:18, 63:19, 63:20, 64:1, 64:4, 100:18, 100:22, 101:1, 101:4, 103:3, 103:5, 135:21, 136:1, 136:4
**advance** [4] - 39:10, 41:5, 46:15, 139:17
**advanced** [1] - 19:17
**adverse** [1] - 44:7
**advertisement** [1] - 22:12
**advertisements** [3] - 20:13, 22:10, 105:25
**advice** [8] - 7:24, 8:13, 67:17, 68:21, 69:1, 69:9, 69:22, 70:16
**advise** [7] - 68:2, 69:18, 71:5, 71:11, 89:22, 90:3, 121:11
**advised** [4] - 71:12, 90:4, 90:5, 90:6
**advocates** [1] - 21:18
**affairs** [1] - 67:4
**affect** [1] - 30:24
**affected** [2] - 53:25, 127:16
**affirmed** [3] - 13:7, 65:21, 100:3
**afternoon** [12] - 33:22, 33:23, 47:6, 65:1, 66:3, 66:4, 91:22, 100:6, 106:23, 106:24, 128:2, 133:21
**ag** [1] - 63:14
**age** [3] - 23:12, 32:22, 63:24
**agent** [2] - 28:12, 134:23
**agents** [6] - 107:7, 114:7, 114:11, 125:25, 127:2, 128:23
**aggregation** [1] - 59:4
**ago** [3] - 43:5, 45:15, 135:1
**agree** [5] - 8:19, 49:16, 49:18, 49:19, 87:14
**agreed** [3] - 73:5, 73:10, 112:17
**ahead** [7] - 13:8, 17:10, 18:1, 30:24,

39:20, 92:4, 101:15
**ahold** [1] - 27:12
**Aided** [1] - 1:25
**al** [1] - 1:8
**alarming** [1] - 22:23
**ALLAN** [1] - 13:6
**Allan** [1] - 13:16
**allegations** [1] - 50:3
**allowed** [2] - 68:4, 92:16
**allowing** [1] - 10:24
**ally** [1] - 61:21
**alone** [2] - 21:24, 85:19
**ambit** [1] - 41:16
**Amendment** [2] - 7:4, 9:24
**America** [2] - 1:5, 90:16
**amount** [2] - 119:5, 123:6
**amounts** [3] - 118:21, 118:24, 118:25
**analysis** [3] - 6:23, 7:16, 10:7
**Andi** [2] - 35:5, 35:17
**Andrew** [5] - 2:3, 3:7, 26:6, 27:4, 29:13
**andrew.stone@ usdoj.gov** [1] - 2:7
**aneuman@ birdmarella.com** [1] - 3:6
**Angeles** [2] - 3:4, 68:18
**Annual** [1] - 86:10
**annual** [6] - 86:17, 88:21, 89:10, 89:19, 118:23, 119:2
**annuities** [1] - 68:10
**annuity** [2] - 68:5, 70:8
**answer** [13] - 11:12, 29:18, 30:22, 31:20, 59:20, 60:24, 69:3, 71:21, 71:24, 72:7, 82:16, 111:4, 113:17
**answer's** [1] - 120:19
**answered** [4] - 29:19, 111:11, 113:10, 120:15
**answering** [1] - 15:7
**answers** [1] - 134:5
**Anthony** [1] - 6:12
**anticipated** [1] - 12:21
**anticipating** [1] - 46:17
**anyway** [1] - 48:7
**apologize** [9] - 26:8, 55:16, 56:19, 61:5,

80:6, 80:8, 107:1, 113:4, 113:6
**appear** [1] - 53:13
**apply** [1] - 136:17
**appointed** [1] - 140:8
**appreciate** [2] - 111:3, 138:2
**apprehensive** [2] - 57:24, 57:25
**approach** [4] - 51:8, 96:3, 101:9, 102:15
**appropriate** [5] - 63:17, 68:22, 71:6, 135:20, 136:12
**April** [8] - 14:11, 15:16, 15:17, 52:22, 54:3, 125:3, 125:9, 125:19
**area** [5] - 16:2, 17:11, 18:7, 66:19, 137:4
**areas** [3] - 28:3, 46:6, 46:21
**argue** [4] - 42:23, 42:24, 43:15, 95:10
**argument** [4] - 42:12, 43:8, 94:13, 105:20
**argumentative** [4] - 57:6, 61:3, 61:14, 92:19
**arguments** [2] - 9:21, 92:18
**ARIZONA** [1] - 1:2
**Arizona** [10] - 1:7, 1:23, 2:5, 2:17, 2:20, 3:9, 3:12, 66:16, 140:9, 140:15
**arrangement** [1] - 70:13
**arrangements** [3] - 36:2, 96:13
**arrest** [3] - 20:24, 21:2, 21:23
**arrested** [1] - 21:20
**articles** [3] - 129:21, 129:25, 130:4
**ascertain** [1] - 63:15
**assess** [1] - 21:16
**assets** [4] - 67:5, 68:9, 120:4, 121:15
**assign** [2] - 101:13, 101:23
**assist** [2] - 118:13, 118:16
**assistance** [2] - 21:18
**assisted** [1] - 118:18
**associate** [1] - 36:3
**associated** [3] - 25:15, 35:17, 126:23
**association** [2] - 19:5, 20:15

**Association** [5] - 18:24, 19:2, 31:16, 31:21, 48:23
**associations** [1] - 18:23
**assume** [1] - 110:10
**assumed** [2] - 36:21, 110:12
**assurance** [1] - 22:4
**assure** [1] - 41:22
**ATF** [2] - 19:9, 23:3
**attachment** [1] - 9:9
**attempt** [3] - 20:23, 30:1, 31:1
**attended** [3] - 31:10, 62:22, 107:7
**attention** [3] - 36:21, 113:24, 127:6
**attorney** [12] - 6:12, 8:2, 36:17, 45:3, 66:12, 70:17, 81:10, 82:10, 112:10, 115:17, 117:14, 118:8
**Attorney** [2] - 25:4, 25:5
**ATTORNEY'S** [1] - 2:2
**Attorney's** [8] - 25:5, 25:6, 28:13, 107:3, 110:1, 111:5, 111:7, 114:1
**attorneys** [4] - 6:11, 8:7, 10:14, 36:7
**Auburn** [2] - 130:8, 130:19
**August** [5] - 15:24, 34:25, 36:13, 124:2, 125:7
**Austin** [2] - 2:9, 33:17
**austin.berry2@ usdoj.gov** [1] - 2:10
**author** [2] - 6:14, 8:23
**authored** [1] - 6:11
**authorities** [1] - 90:16
**authority** [1] - 43:23
**automatic** [4] - 124:19, 124:20, 132:7, 132:9
**available** [6] - 31:20, 36:6, 36:7, 39:19, 134:7, 136:3
**Avenue** [4] - 2:5, 2:9, 2:13, 3:8
**avoid** [2] - 41:1, 77:17
**avoidance** [1] - 120:3
**avoided** [1] - 93:13
**await** [2] - 46:24
**aware** [24] - 7:13, 10:2, 38:17, 43:1, 56:23, 57:2, 58:15,

58:16, 58:20, 58:23, 59:1, 59:4, 59:6, 59:24, 60:5, 60:14, 60:20, 60:24, 60:25, 61:17, 111:16, 124:21, 129:13, 129:15
**awareness** [2] - 7:4, 7:12

# B

**bachelor** [1] - 17:8
**background** [2] - 50:23, 66:15
**Backpage** [69] - 6:19, 6:23, 10:3, 20:15, 22:8, 22:10, 22:13, 22:24, 22:25, 23:2, 24:5, 25:1, 25:22, 25:24, 29:2, 29:5, 29:15, 30:12, 31:6, 31:20, 32:2, 49:10, 51:20, 52:5, 52:7, 52:12, 52:21, 52:24, 53:16, 53:24, 54:5, 54:15, 56:7, 56:8, 56:23, 57:2, 58:20, 59:1, 59:6, 59:8, 59:24, 59:25, 60:6, 60:14, 60:21, 61:21, 62:2, 62:4, 62:11, 63:4, 64:6, 116:9, 117:5, 117:8, 117:11, 117:12, 117:15, 117:24, 117:25, 118:1, 118:4, 118:9, 126:9, 129:21, 130:5, 130:10, 130:16, 130:20
**Backpage's** [6] - 53:2, 58:16, 59:4, 129:11, 129:13, 129:15
**Backpage.com** [2] - 6:8, 117:19
**balance** [1] - 86:19
**Bank** [6] - 80:16, 126:12, 126:14, 126:25, 128:17
**bank** [6] - 98:20, 114:9, 115:3, 120:9, 126:22, 128:17
**banking** [2] - 67:8, 67:12
**banks** [4] - 67:25, 68:12, 68:22, 131:18
**based** [3] - 63:17, 68:18, 85:7
**basic** [1] - 67:3

**basis** [5] - 21:24, 32:22, 122:25, 135:3, 135:8
**became** [8] - 15:6, 15:8, 15:10, 15:18, 15:24, 27:1, 33:3
**Becker** [22] - 4:10, 4:17, 4:22, 5:7, 5:7, 65:8, 66:6, 66:11, 72:10, 72:18, 77:13, 80:13, 87:8, 96:24, 96:25, 97:6, 98:4, 99:3, 99:4, 106:18, 116:18, 132:4
**BECKER** [2] - 65:14, 65:20
**BEFORE** [1] - 1:12
**began** [1] - 15:2
**begin** [1] - 13:11
**beginning** [5] - 30:3, 43:5, 46:10, 100:7, 104:6
**begins** [2] - 10:21, 104:3
**behalf** [6] - 4:18, 88:21, 89:11, 111:18, 131:3, 133:13
**belief** [2] - 9:23
**beneficiaries** [2] - 128:20, 132:15
**benign** [1] - 103:5
**BERRY** [70] - 21:8, 26:21, 29:17, 30:8, 30:17, 33:17, 33:21, 37:25, 39:3, 39:8, 39:14, 40:8, 40:11, 45:14, 45:17, 46:8, 46:23, 47:7, 48:15, 48:16, 50:5, 50:8, 55:3, 56:11, 56:17, 56:22, 57:10, 57:12, 59:19, 60:4, 60:13, 60:19, 61:1, 61:7, 61:19, 62:8, 62:9, 62:17, 62:24, 64:24, 93:3, 96:18, 97:10, 99:2, 99:15, 99:17, 99:20, 100:5, 101:9, 101:11, 101:16, 101:21, 101:24, 102:1, 102:4, 102:9, 102:14, 102:18, 103:10, 103:15, 105:3, 105:21, 106:12, 135:11, 137:10, 137:19, 138:1, 138:3, 138:5, 139:10
**Berry** [18] - 2:9, 4:9,

4:10, 33:17, 39:20, 40:17, 41:2, 43:16, 46:6, 48:14, 57:8, 93:2, 96:14, 96:16, 98:25, 99:13, 135:4, 135:9
**BERTRAND** [8] - 3:11, 59:11, 59:17, 60:10, 60:17, 60:23, 61:3, 61:11
**Bertrand** [1] - 3:11
**best** [2] - 124:11, 125:18
**bet** [1] - 59:23
**better** [4] - 28:17, 62:1, 95:17, 135:14
**between** [11] - 36:4, 38:2, 53:9, 58:20, 59:1, 60:5, 60:14, 72:11, 77:7, 95:1, 95:16
**beyond** [7] - 32:15, 59:11, 59:17, 61:11, 91:21, 93:11, 109:10
**bf@federlawpa.com** [1] - 2:20
**Binghamton** [1] - 4:16
**BIRD** [1] - 3:2
**bit** [6] - 18:14, 18:16, 39:21, 42:13, 45:14, 104:23
**bits** [1] - 10:7
**blank** [1] - 86:23
**blind** [1] - 137:16
**blocked** [2] - 23:13, 23:23
**Blum** [3] - 6:12, 7:10, 8:23
**BMO** [3] - 9:10, 9:11, 9:16
**booth** [1] - 31:15
**boss** [1] - 14:13
**bottom** [5] - 75:2, 76:9, 77:14, 109:20, 120:2
**boundaries** [1] - 18:3
**bounds** [1] - 93:11
**Box** [1] - 3:12
**BOXER** [1] - 3:2
**boxes** [1] - 65:17
**break** [8] - 6:7, 39:19, 41:2, 47:10, 47:12, 47:16, 91:23, 133:9
**breath** [1] - 18:16
**brief** [3] - 97:5, 104:1, 136:12
**briefing** [2] - 137:5, 137:24
**briefly** [2] - 15:2, 96:21

**bring** [9] - 12:2, 47:8, 47:11, 47:19, 96:3, 97:4, 97:13, 97:22, 99:9
**bringing** [2] - 8:22, 97:18
**broad** [2] - 49:16, 135:8
**brought** [1] - 16:10
**Bruce** [1] - 2:19
**Brunst** [2] - 3:2, 9:11
**Buffalo** [1] - 2:13
**build** [1] - 21:19
**bulk** [1] - 50:23
**bunch** [1] - 55:16
**bureau** [1] - 15:25
**burner** [1] - 25:16
**Business** [1] - 4:18
**business** [3] - 27:9, 114:9, 129:11
**buy/sell/trade** [1] - 53:4
**buyers** [1] - 22:20
**BY** [84] - 13:14, 18:22, 21:11, 26:24, 29:21, 30:11, 30:19, 30:23, 33:21, 39:14, 48:16, 50:8, 55:3, 56:11, 56:17, 56:22, 57:12, 59:19, 60:4, 60:13, 60:19, 61:1, 61:7, 61:19, 62:9, 62:17, 63:3, 66:2, 69:6, 70:20, 71:4, 71:10, 72:3, 72:9, 74:18, 75:14, 75:19, 76:11, 77:4, 77:22, 78:12, 79:1, 80:12, 81:12, 81:15, 81:22, 82:8, 83:1, 83:15, 83:22, 84:4, 84:23, 85:10, 86:1, 86:6, 86:15, 87:7, 88:1, 88:12, 88:18, 89:6, 89:21, 90:2, 90:13, 90:20, 90:23, 90:24, 91:4, 91:7, 91:12, 91:19, 98:2, 98:3, 98:24, 111:11, 113:10, 113:16, 115:9, 116:20, 127:18, 131:21, 131:24, 132:1, 132:3, 132:20, 132:24, 133:14, 138:11, 138:14, 138:17, 138:20, 139:3
**Byron** [2] - 62:18, 62:22

# C

**cadence** [1] - 18:15
**California** [1] - 3:4

**CAMBRIA** [141] - 2:12, 12:1, 12:3, 12:5, 12:9, 65:8, 65:11, 65:16, 66:2, 69:1, 69:4, 69:6, 70:20, 70:24, 71:2, 71:4, 71:10, 71:19, 71:23, 72:2, 72:3, 72:9, 72:15, 72:23, 73:1, 73:4, 73:7, 73:9, 73:14, 73:17, 73:22, 74:1, 74:4, 74:6, 74:8, 74:12, 74:16, 74:18, 75:14, 75:18, 75:19, 76:8, 76:11, 76:20, 77:3, 77:4, 77:11, 77:18, 77:22, 78:10, 78:12, 78:19, 78:24, 79:1, 79:14, 79:19, 79:23, 80:1, 80:4, 80:6, 80:8, 80:12, 81:6, 81:12, 81:15, 81:19, 81:21, 81:22, 82:3, 82:7, 82:8, 82:19, 82:23, 82:25, 83:1, 83:9, 83:14, 83:15, 83:20, 83:22, 84:1, 84:4, 84:21, 84:23, 85:8, 85:10, 85:16, 85:20, 85:23, 86:1, 86:5, 86:6, 86:14, 86:15, 87:5, 87:7, 87:12, 87:16, 87:19, 87:22, 88:1, 88:9, 88:12, 88:17, 88:18, 88:23, 89:5, 89:6, 89:13, 89:18, 89:21, 90:2, 90:13, 90:20, 90:23, 90:24, 91:4, 91:7, 91:12, 91:19, 98:2, 98:3, 98:24, 111:11, 113:10, 113:16, 115:9, 116:20, 127:18, 131:21, 131:24, 132:1, 132:3, 132:20, 132:24, 133:14, 138:11, 138:14, 138:17, 138:20, 139:3
**Cambria** [24] - 2:12, 4:11, 4:12, 72:22, 73:16, 74:2, 75:17, 76:17, 79:22, 82:24, 85:13, 87:18, 88:8, 96:22, 97:12, 98:1, 107:23, 108:5, 108:13, 108:16, 123:12, 124:2, 132:23, 138:13

**Cambria's** [1] - 108:5
**Camelback** [1] - 2:19
**Canada** [1] - 49:8
**cannot** [2] - 120:5, 121:24
**capacity** [1] - 52:12
**captain** [1] - 14:20
**captioned** [1] - 86:10
**care** [2] - 19:19, 82:14
**career** [6] - 15:3, 20:8, 50:10, 50:13, 50:23, 55:23
**Carl** [2] - 26:1, 26:14
**carry** [1] - 69:19
**case** [14] - 10:8, 12:23, 12:24, 16:12, 18:11, 23:6, 27:11, 32:5, 44:1, 44:2, 52:15, 55:6, 124:22, 135:17
**case-in-chief** [2] - 12:23, 12:24
**cases** [6] - 21:14, 21:22, 23:18, 28:19, 49:24, 49:25
**Cathy** [2] - 1:21, 140:20
**CATHY** [1] - 140:1
**caught** [1] - 94:22
**causes** [1] - 126:10
**causing** [2] - 16:21, 23:19
**cav** [1] - 7:6
**caveat** [1] - 7:7
**Center** [2] - 60:6, 130:13
**centered** [2] - 19:24, 51:8
**centers** [1] - 14:6
**Central** [2] - 2:5, 3:8
**centric** [1] - 51:9
**Century** [1] - 3:4
**Certain** [1] - 4:18
**certain** [6] - 110:15, 110:17, 111:14, 123:20, 136:8, 137:14
**certainly** [11] - 8:4, 18:2, 37:3, 39:13, 46:8, 82:7, 93:4, 93:12, 99:22, 135:19
**certify** [1] - 140:7
**CERTIFY** [1] - 140:10
**chair** [2] - 99:23, 106:19
**chambers** [3] - 137:9, 137:11, 137:14
**change** [1] - 77:16
**changed** [1] - 128:4
**chaplains** [1] - 15:21
**characterization** [3] -

56:13, 57:5, 93:4
**charge** [1] - 18:25
**charged** [1] - 49:25
**charges** [3] - 55:1, 95:13, 127:14
**checks** [8] - 118:16, 118:18, 118:20, 119:7, 119:10, 131:2, 131:7, 131:15
**chief** [2] - 12:23, 12:24
**Child** [1] - 54:12
**child** [2] - 15:14, 32:7
**Children** [2] - 60:7, 130:14
**circumstance** [1] - 25:3
**circumstances** [2] - 55:4, 56:1
**Cities** [1] - 18:7
**City** [1] - 15:6
**city** [1] - 18:4
**claim** [2] - 9:15, 51:3
**clarification** [4] - 6:10, 7:22, 10:12, 10:20
**clarifies** [1] - 6:20
**clarify** [1] - 42:15
**clean** [1] - 128:5
**clear** [2] - 40:22, 41:6
**clearly** [1] - 7:24
**Clearwater** [1] - 49:2
**clerk's** [2] - 137:17, 137:21
**client** [11] - 7:3, 114:8, 116:8, 117:2, 121:24, 127:12, 128:14, 128:21, 129:5, 130:12
**client's** [8] - 114:23, 114:24, 115:7, 120:24, 121:1, 121:17, 126:15, 128:24
**clients** [5] - 7:11, 9:1, 94:15, 95:6, 111:20
**clients'** [2] - 114:20
**clocks** [1] - 91:22
**close** [4] - 66:7, 68:13, 121:18, 136:7
**closed** [7] - 25:6, 67:13, 67:24, 98:20, 121:2, 126:18, 126:19
**closing** [3] - 68:22, 126:21, 131:18
**co** [2] - 40:17, 42:16
**co-counsel** [2] - 40:17, 42:16
**Code** [3] - 68:4, 81:2
**coercing** [1] - 16:21
**coercive** [1] - 50:21

**coincide** [2] - 76:23, 77:16
**collaboration** [2] - 28:15, 49:1
**collaborative** [1] - 28:4
**collected** [1] - 98:6
**college** [1] - 17:2
**College** [1] - 66:16
**coming** [2] - 10:13, 100:6
**command** [2] - 14:21
**commander** [4] - 14:17, 14:19, 14:20, 15:25
**commanders** [1] - 14:21
**comment** [2] - 12:3, 122:16
**committee** [1] - 128:1
**common** [2] - 33:3, 57:16
**communicated** [1] - 108:1
**communication** [3] - 35:23, 36:13, 72:4
**communications** [8] - 35:15, 35:18, 48:18, 95:15, 100:8, 100:13, 100:17, 134:21
**community** [4] - 13:17, 14:2, 15:25, 19:1
**companies** [1] - 30:9
**company** [4] - 58:11, 98:13, 117:6, 117:7
**complete** [4] - 21:12, 63:7, 65:1, 97:7
**completely** [2] - 8:19, 55:18
**compliance** [1] - 110:7
**complied** [5] - 91:9, 91:17, 95:2, 105:4, 105:9
**comply** [4] - 34:18, 69:23, 71:6, 105:16
**complying** [1] - 93:8
**component** [1] - 7:23
**compound** [1] - 89:25
**Computer** [1] - 1:25
**Computer-Aided** [1] - 1:25
**concealed** [1] - 90:15
**concentrate** [1] - 16:2
**concentrating** [1] - 94:1
**concentration** [2] - 37:22, 66:19

**concern** [2] - 126:10, 136:4
**concerned** [2] - 104:8, 135:18
**concerning** [2] - 84:11, 95:1
**concerns** [2] - 126:2, 126:6
**concluding** [2] - 7:4, 10:5
**conclusion** [2] - 10:4, 90:18
**conclusions** [4] - 7:12, 7:19, 8:10, 133:22
**conduct** [2] - 30:16, 49:5
**conducted** [1] - 19:21
**conducting** [1] - 21:13
**confer** [4] - 41:3, 72:19, 74:3, 137:21
**conference** [2] - 31:13, 31:15
**conferences** [2] - 31:8, 31:10
**confidential** [1] - 111:25
**confused** [2] - 6:13, 6:21
**confusion** [2] - 7:17, 77:17
**conjunction** [1] - 137:3
**connected** [3] - 17:23, 19:13, 33:2
**connection** [2] - 19:5, 81:5, 120:8
**connections** [3] - 19:1, 31:22, 53:9
**consider** [2] - 35:20, 67:15
**considered** [1] - 51:5
**consistently** [1] - 46:17
**constitute** [1] - 140:10
**consult** [2] - 20:12, 22:8
**consulting** [1] - 63:8
**Cont'd** [4] - 3:1, 4:10, 5:1, 100:4
**contact** [10] - 20:22, 21:15, 22:6, 24:8, 25:8, 27:15, 28:22, 30:1, 35:1, 69:12
**contacted** [5] - 34:24, 107:17, 107:20, 107:22, 108:1
**contacts** [3] - 24:4, 24:5, 24:9
**contain** [1] - 136:15

**contained** [1] - 140:12
**content** [2] - 7:12
**contents** [2] - 83:5, 83:7
**context** [4] - 55:22, 64:11, 101:7, 105:1
**continuation** [1] - 99:25
**continue** [10] - 33:12, 39:9, 39:23, 40:1, 46:4, 48:14, 52:20, 98:1, 105:19, 133:23
**contracts** [1] - 14:6
**control** [3] - 70:5, 70:6, 140:14
**controlled** [1] - 131:13
**conversation** [1] - 35:13
**conversations** [5] - 27:17, 62:22, 95:18, 129:10, 135:2
**conveyed** [1] - 67:12
**Cook** [1] - 139:6
**cook** [1] - 139:7
**cooperation** [1] - 21:3
**copied** [2] - 12:10, 137:16
**copies** [1] - 72:11
**copy** [4] - 39:11, 73:22, 100:1, 112:4
**corner** [2] - 88:10, 109:22
**corporate** [1] - 126:12
**correct** [80] - 20:16, 28:24, 30:13, 33:24, 34:1, 34:13, 34:19, 34:22, 34:23, 50:11, 50:12, 50:15, 50:17, 50:21, 50:22, 51:11, 51:12, 51:17, 51:22, 52:1, 52:2, 52:3, 52:15, 53:7, 53:13, 53:16, 54:1, 54:6, 54:9, 54:10, 54:16, 55:6, 55:13, 55:15, 55:20, 55:24, 55:25, 56:3, 56:5, 56:6, 56:12, 56:21, 58:6, 58:7, 58:9, 58:12, 58:13, 58:14, 58:17, 64:7, 64:13, 64:17, 73:20, 75:11, 75:22, 100:19, 102:13, 105:8, 106:25, 107:8, 110:3, 110:19, 111:19, 112:9, 112:13, 113:3, 114:12, 114:23, 115:17, 115:25, 116:9,

116:10, 117:13, 120:25, 123:21, 123:22, 123:25, 128:16, 128:21, 128:22
**correctly** [5] - 10:12, 71:13, 71:15, 91:1, 112:25
**corruption** [5] - 16:11, 16:12, 23:6, 51:25, 52:16
**counsel** [27] - 6:19, 7:14, 7:24, 9:5, 39:25, 40:13, 40:17, 41:23, 42:16, 43:10, 64:8, 85:21, 92:12, 92:14, 92:20, 92:24, 94:14, 94:16, 94:18, 95:2, 99:6, 102:2, 112:17, 112:23, 133:17, 133:18
**counsel's** [2] - 56:14, 60:10
**countries** [1] - 129:6
**country** [3] - 18:8, 49:7, 116:6
**County** [2] - 25:6, 49:4
**couple** [8] - 28:12, 33:24, 96:25, 98:4, 108:10, 130:24, 138:20, 138:23
**course** [10] - 7:5, 7:18, 16:1, 17:22, 20:12, 22:7, 29:14, 31:8, 45:5, 80:1
**COURT** [231] - 1:1, 4:2, 6:5, 6:20, 7:21, 8:1, 8:8, 8:14, 8:17, 8:19, 9:7, 9:17, 10:15, 10:18, 10:22, 11:1, 11:9, 11:13, 11:22, 12:2, 12:4, 12:8, 12:12, 12:16, 12:18, 13:3, 13:10, 18:13, 18:19, 18:21, 21:10, 26:23, 29:18, 30:10, 30:21, 33:16, 33:18, 38:10, 38:12, 38:20, 38:24, 39:2, 39:6, 39:13, 39:20, 40:6, 40:10, 40:12, 40:22, 41:11, 41:17, 41:19, 42:7, 42:15, 42:19, 42:23, 43:1, 43:7, 43:14, 43:21, 44:16, 44:22, 45:8, 45:13, 45:21, 45:24, 46:3, 46:19, 46:24, 47:8, 47:13, 47:15, 47:17, 47:22, 48:1,

48:5, 48:11, 50:6, 55:2, 56:15, 57:7, 59:13, 59:16, 59:18, 60:2, 60:12, 60:18, 60:24, 61:4, 61:16, 62:7, 62:15, 62:25, 64:22, 64:25, 65:10, 68:25, 69:3, 70:23, 70:25, 71:9, 71:17, 71:20, 71:25, 72:7, 72:21, 72:24, 73:2, 73:8, 73:11, 73:15, 73:21, 73:24, 74:2, 74:5, 74:7, 74:11, 74:13, 74:15, 74:17, 75:13, 75:16, 76:19, 76:23, 77:15, 77:19, 78:21, 79:16, 79:21, 79:24, 80:2, 80:5, 80:7, 81:14, 81:17, 81:20, 82:5, 82:18, 82:20, 82:24, 83:11, 85:12, 85:18, 85:21, 85:25, 87:4, 87:13, 87:17, 87:20, 88:7, 88:25, 89:2, 89:15, 90:1, 90:12, 90:19, 90:22, 91:6, 91:11, 91:20, 92:6, 92:11, 93:2, 93:20, 93:23, 94:1, 94:7, 94:9, 94:12, 95:21, 95:23, 96:1, 96:3, 96:9, 97:9, 97:11, 97:17, 97:25, 98:23, 98:25, 99:4, 99:11, 99:13, 99:16, 99:19, 99:22, 101:13, 101:19, 101:22, 102:16, 103:12, 103:16, 103:20, 103:23, 104:2, 105:19, 105:22, 106:6, 106:9, 106:13, 106:17, 111:12, 113:11, 113:17, 115:10, 116:22, 127:20, 131:23, 132:21, 133:1, 133:5, 133:7, 133:11, 133:16, 134:4, 134:18, 134:24, 136:23, 137:18, 137:21, 138:2, 138:4, 138:6, 138:12, 138:15, 138:19, 139:2, 139:5, 139:7, 139:9, 139:15
**court** [5] - 18:14, 56:18, 58:9, 82:17,

110:15
**Court** [40] - 1:21, 1:24, 6:2, 9:12, 9:13, 11:18, 41:21, 41:22, 42:24, 43:15, 47:11, 72:19, 85:17, 92:17, 92:18, 92:24, 93:6, 93:7, 93:8, 93:19, 94:13, 94:18, 95:4, 95:9, 102:7, 104:22, 105:11, 113:22, 133:17, 136:10, 136:13, 136:16, 136:19, 136:24, 139:12, 139:15, 139:16, 140:8, 140:9
**Court's** [2] - 105:9, 105:17
**Courthouse** [1] - 1:22
**COURTROOM** [15] - 13:5, 13:8, 43:19, 65:15, 65:17, 65:22, 74:10, 74:14, 92:4, 95:20, 96:8, 102:2, 102:8, 102:13, 139:21
**courtroom** [9] - 6:2, 13:4, 72:19, 73:12, 73:24, 74:2, 91:23, 99:8, 136:7
**courts** [1] - 135:20
**covered** [1] - 64:16
**Craigslist** [2] - 59:6, 59:25
**CRC** [2] - 1:21, 140:20
**create** [2] - 31:22, 71:6
**Create** [1] - 6:9
**created** [4] - 69:11, 70:13, 90:15, 132:11
**creates** [1] - 92:23
**credibility** [2] - 59:12, 62:14
**Crime** [1] - 135:23
**crimes** [3] - 15:8, 16:5, 52:8
**criteria** [1] - 8:21
**Cross** [3] - 4:9, 4:10, 4:11
**cross** [10] - 9:9, 46:22, 47:3, 96:21, 97:4, 99:3, 104:10, 105:6, 105:23, 135:5
**CROSS** [3] - 33:20, 100:4, 106:21
**Cross-Examination** [3] - 4:9, 4:10, 4:11
**CROSS-EXAMINATION** [3] - 33:20, 100:4, 106:21
**cross-examination** [8]

- 46:22, 47:3, 97:4, 99:3, 104:10, 105:6, 105:23, 135:5
**CRR** [2] - 1:21, 140:20
**curriculum** [1] - 19:23
**CVRA** [1] - 136:17
**Cynthia** [1] - 135:22

## D

**Dallas** [1] - 62:18
**date** [6] - 19:8, 108:8, 123:23, 124:1, 124:4, 140:13
**DATED** [1] - 140:15
**dates** [1] - 19:3
**daughter** [1] - 32:8
**DAVID** [1] - 3:7
**David** [1] - 3:8
**david@ deisenbergplc.com** [1] - 3:9
**DAY** [1] - 1:14
**days** [3] - 24:17, 24:19, 139:17
**DC** [1] - 2:10
**deal** [1] - 22:23
**dealing** [2] - 23:2, 26:14
**dealt** [2] - 108:8, 123:21
**debriefed** [1] - 43:25
**December** [2] - 15:8, 110:1
**decision** [8] - 98:17, 128:24, 128:25, 129:2, 129:6, 129:7, 129:8, 129:9
**declaration** [2] - 112:9, 112:11
**deep** [1] - 136:4
**Defendant** [5] - 2:11, 2:15, 3:2, 3:7, 3:10
**defendant's** [1] - 92:22
**Defendants** [1] - 1:9
**defendants** [6] - 7:6, 8:4, 8:20, 13:1, 35:16, 137:5
**defendants'** [2] - 7:7, 12:24
**defense** [24] - 34:24, 35:3, 35:15, 35:18, 36:5, 36:8, 36:16, 37:8, 38:2, 39:12, 43:10, 46:25, 48:18, 92:14, 92:23, 93:13, 94:14, 95:16, 100:9, 100:17, 107:17, 109:11, 138:7

- 46:22, 47:3, 97:4, 99:3, 104:10, 105:6, 105:23, 135:5
**CRR** [2] - 1:21, 140:20
**curriculum** [1] - 19:23
**CVRA** [1] - 136:17
**Cynthia** [1] - 135:22

**DEFENSE** [3] - 4:22, 5:4, 5:6
**DEFLACEY** [1] - 4:16
**DEFLACEY000008** [1] - 4:19
**DEFLACEY000031-000038** [1] - 4:21
**degree** [2] - 17:5, 17:16
**Delaware** [1] - 2:13
**delay** [2] - 46:16, 99:2
**delayed** [1] - 26:17
**delivered** [1] - 29:1
**delve** [1] - 10:3
**demand** [1] - 43:23
**demanded** [1] - 104:16
**demonstrated** [1] - 12:6
**demonstration** [1] - 105:12
**denied** [1] - 11:18
**deny** [2] - 93:18, 103:16
**Department** [5] - 14:18, 15:1, 17:24, 62:19, 69:24
**DEPARTMENT** [1] - 2:8
**department** [3] - 14:23, 14:25, 16:2
**department's** [1] - 15:17
**depicted** [1] - 22:5
**deputized** [1] - 19:7
**deputy** [5] - 6:2, 13:4, 72:19, 73:25, 74:2
**DEPUTY** [15] - 13:5, 13:8, 43:19, 65:15, 65:17, 65:22, 74:10, 74:14, 92:4, 95:20, 96:8, 102:2, 102:8, 102:13, 139:21
**deputy's** [1] - 73:12
**describe** [3] - 20:18, 57:17, 57:24
**described** [1] - 131:4
**DESCRIPTION** [2] - 4:15, 5:2
**designation** [1] - 139:13
**detail** [1] - 39:5
**details** [1] - 52:18
**determination** [1] - 111:1
**determine** [3] - 42:6, 47:24, 137:22
**developed** [1] - 18:6
**DIANE** [1] - 1:12
**difference** [1] - 104:12

**different** [11] - 6:16, 19:15, 23:20, 23:22, 31:2, 44:5, 49:7, 49:17, 57:17, 60:10, 123:5
**difficult** [2] - 63:15, 136:23
**difficulties** [1] - 119:20
**dignity** [1] - 135:25
**dilemma** [1] - 46:3
**diligent** [1] - 41:4
**direct** [22] - 14:13, 33:10, 46:11, 49:9, 51:19, 54:11, 59:11, 59:17, 61:12, 101:2, 103:6, 108:14, 109:11, 110:19, 113:24, 114:14, 119:16, 120:15, 123:5, 123:12, 127:5
**Direct** [2] - 4:8, 4:11
**DIRECT** [2] - 13:13, 66:1
**direction** [2] - 85:17, 140:14
**directly** [2] - 105:23, 137:16
**director** [1] - 14:13
**disagree** [1] - 93:4
**disappear** [1] - 64:5
**disclosure** [3] - 86:17, 95:3, 139:16
**disclosures** [3] - 69:23, 69:25, 93:24
**discuss** [2] - 28:15, 133:24
**discussed** [2] - 114:4, 133:8
**discussing** [1] - 70:5
**Discussion** [1] - 45:25
**discussion** [5] - 36:2, 36:6, 104:3, 106:8, 120:22
**discussions** [1] - 126:11
**dismiss** [2] - 94:9, 95:12
**dispute** [2] - 124:3, 125:3
**disregard** [1] - 72:1
**disrespectful** [1] - 104:22
**distribution** [1] - 131:14
**distributions** [3] - 70:9, 70:10, 98:11
**District** [3] - 25:5, 140:9
**DISTRICT** [2] - 1:1, 1:2

**divisions** [1] - 14:21
**Docs** [1] - 4:22
**document** [11] - 44:1, 81:10, 81:16, 82:1, 83:2, 83:16, 84:15, 99:21, 103:20, 111:19, 124:7
**documentaries** [2] - 60:20, 61:13
**documentary** [2] - 61:10, 61:17
**documentation** [1] - 42:3
**documents** [26] - 37:19, 38:5, 39:3, 39:4, 67:3, 108:11, 108:13, 109:10, 110:5, 110:7, 110:11, 110:15, 110:18, 110:21, 110:23, 110:24, 111:6, 111:14, 112:18, 112:24, 113:2, 113:6, 123:18, 123:20, 124:8, 124:11
**Doe** [1] - 61:10
**dollars** [2] - 115:6, 118:22
**domestic** [3] - 68:12, 68:22, 70:12
**donation** [1] - 14:9
**done** [12] - 50:9, 54:7, 71:12, 71:13, 71:15, 92:21, 102:19, 105:6, 115:15, 116:1, 135:7, 135:8
**door** [1] - 97:15
**Dougherty** [4] - 138:17, 138:19, 138:22, 138:25
**down** [19] - 18:14, 18:17, 24:20, 30:12, 30:15, 40:6, 40:7, 47:5, 49:4, 53:24, 63:18, 63:21, 65:5, 92:1, 99:8, 125:9, 133:2, 133:3, 136:9
**drafted** [1] - 37:5
**dream** [1] - 85:23
**DROOKS** [1] - 3:2
**drop** [1] - 14:6
**drop-in** [1] - 14:6
**Dropbox** [3] - 37:10, 37:14, 39:5
**duck** [1] - 34:16
**due** [1] - 41:20
**duly** [4] - 13:6, 65:20, 100:2, 140:7
**duplicate** [1] - 87:17

**duplicative** [1] - 87:15
**during** [3] - 27:8, 108:14, 109:10

### E

**earliest** [1] - 23:2
**early** [9] - 22:3, 24:13, 24:17, 24:19, 26:14, 30:14, 53:25, 62:23, 133:9
**easier** [2] - 71:3, 81:6
**East** [1] - 2:19
**Eastern** [1] - 116:6
**editors** [4] - 118:18, 119:8, 131:5, 131:6
**education** [1] - 19:21
**educational** [1] - 66:15
**Edwin** [1] - 82:10
**Edwin's** [1] - 84:14
**effective** [4] - 26:17, 28:7, 28:18, 31:5
**effectuate** [1] - 69:9
**efficient** [1] - 27:2
**effort** [2] - 63:17, 101:2
**eight** [1] - 37:18
**EISENBERG** [73] - 3:7, 13:1, 13:12, 13:14, 18:22, 21:11, 26:24, 29:21, 30:11, 30:19, 30:23, 33:15, 38:9, 38:11, 38:13, 38:23, 39:1, 39:7, 40:21, 41:10, 41:12, 41:18, 41:20, 42:8, 42:18, 42:22, 42:25, 43:6, 43:13, 43:22, 44:19, 44:25, 45:12, 45:16, 45:19, 45:22, 46:1, 47:20, 47:23, 48:4, 50:2, 54:25, 56:10, 56:13, 57:4, 60:8, 60:16, 60:22, 61:14, 62:6, 62:12, 63:1, 63:3, 64:21, 65:13, 93:19, 93:21, 93:25, 94:4, 94:8, 94:11, 95:22, 95:25, 96:2, 101:10, 101:12, 101:25, 103:14, 103:19, 103:22, 103:25, 104:4, 106:7
**Eisenberg** [17] - 3:8, 4:8, 4:9, 13:11, 29:20, 35:16, 39:6, 42:15, 45:14, 47:22, 62:25, 93:16, 94:12,

96:14, 103:17, 103:24, 105:8
**either** [10] - 7:10, 8:23, 16:21, 24:11, 26:16, 29:12, 37:19, 57:15, 108:3, 134:22
**element** [3] - 50:21, 52:3, 55:15
**elements** [2] - 8:6, 103:4
**Email** [1] - 5:7
**email** [25] - 9:10, 9:11, 24:8, 25:14, 29:9, 35:25, 72:11, 74:21, 75:3, 76:10, 77:5, 78:1, 100:18, 104:6, 108:2, 108:3, 119:22, 119:25, 120:18, 135:15, 137:11, 137:14, 137:16
**emails** [6] - 38:2, 104:9, 108:4, 108:10, 120:16, 134:21
**embarked** [1] - 82:15
**employed** [3] - 13:19, 13:21, 66:11
**employees** [2] - 118:17, 131:3
**encourage** [1] - 21:3
**End** [1] - 106:8
**end** [8] - 11:24, 15:22, 46:9, 58:18, 97:19, 99:7, 109:5, 133:20
**ended** [1] - 12:22
**enforcement** [4] - 17:23, 51:8, 61:22, 63:11
**engage** [1] - 20:22
**engaged** [5] - 6:24, 20:23, 67:1, 105:11, 129:7
**engagement** [1] - 67:11
**engaging** [1] - 128:2
**entail** [1] - 67:2
**entailed** [1] - 67:3
**entertain** [1] - 135:7
**entire** [4] - 10:24, 11:7, 76:20, 115:20
**entitled** [3] - 6:8, 38:6, 140:12
**entry** [1] - 74:23
**environment** [1] - 52:9
**Eric** [2] - 2:16, 10:19
**eric.kesslerlaw@ gmail.com** [1] - 2:17
**Erotic** [4] - 8:12, 58:21, 58:23, 129:15

**error** [1] - 82:20
**escaping** [1] - 57:21
**escort** [1] - 117:19
**escorts** [2] - 53:6
**ESG** [1] - 14:8
**Esq** [12] - 2:3, 2:3, 2:4, 2:4, 2:9, 2:12, 2:16, 2:19, 3:3, 3:3, 3:8, 3:11
**ESQ** [1] - 3:11
**established** [6] - 55:14, 55:19, 70:7, 70:8, 78:17, 81:3
**establishment** [1] - 69:10
**estate** [7] - 66:20, 66:21, 67:1, 67:3, 67:11, 67:21, 68:3
**estates** [2] - 66:20, 115:20
**estimate** [1] - 108:7
**et** [1] - 1:8
**Europe** [1] - 116:6
**evening** [1] - 27:7
**evenings** [1] - 27:10
**event** [7] - 11:4, 39:25, 56:3, 90:14, 90:25, 91:22, 133:20
**eventually** [1] - 70:4
**evidence** [28] - 9:13, 33:11, 72:16, 72:20, 72:21, 72:22, 76:17, 76:21, 77:11, 77:21, 78:19, 78:23, 79:14, 79:18, 81:7, 82:3, 83:9, 83:13, 85:8, 85:15, 87:12, 88:23, 89:4, 89:13, 89:17, 101:11, 119:11, 122:6
**evolved** [1] - 26:19
**exact** [1] - 19:8
**exactly** [6] - 43:9, 46:16, 49:5, 64:14, 96:20, 116:1
**EXAMINATION** [7] - 13:13, 33:20, 63:2, 66:1, 100:4, 106:21, 132:2
**examination** [19] - 9:19, 39:9, 42:12, 46:9, 46:11, 46:14, 46:22, 47:3, 49:9, 97:4, 99:3, 104:10, 105:6, 105:23, 108:14, 109:11, 114:14, 123:12, 135:5
**Examination** [7] - 4:8, 4:9, 4:9, 4:10, 4:11,

4:11, 4:12

**examination's** [1] - 133:20

**examine** [3] - 47:4, 79:22, 79:25

**examined** [1] - 106:1

**examining** [2] - 11:7, 33:16

**example** [5] - 8:11, 32:7, 57:18, 111:17, 135:22

**exceeded** [1] - 18:3

**excellent** [1] - 109:24

**except** [1] - 136:19

**exception** [1] - 111:21

**excess** [1] - 23:11

**exchange** [1] - 72:11

**exchanging** [1] - 50:20

**excited** [1] - 31:19

**exclusion** [2] - 118:23, 119:2

**executive** [1] - 14:13

**exercised** [1] - 104:23

**exhibit** [19] - 6:22, 7:1, 7:15, 8:20, 9:8, 9:20, 11:5, 73:13, 74:8, 74:11, 76:25, 77:16, 77:17, 79:22, 79:25, 86:2, 109:16, 119:15, 136:21

**Exhibit** [34] - 6:8, 72:15, 72:16, 72:18, 73:2, 73:19, 76:21, 77:13, 77:21, 78:11, 78:13, 78:23, 78:24, 79:2, 79:18, 79:20, 80:11, 83:13, 85:15, 89:4, 89:17, 92:7, 92:8, 102:25, 107:11, 109:14, 112:3, 112:7, 113:25, 116:11, 119:12, 122:6, 127:5

**exhibit's** [1] - 107:13

**EXHIBITS** [2] - 4:14, 5:1

**exhibits** [10] - 102:6, 124:1, 135:17, 135:18, 135:20, 136:14, 136:15, 136:20, 137:20, 139:13

**exigent** [5] - 25:2, 25:8, 25:11, 55:4, 56:1

**exist** [2] - 42:2, 104:17

**expect** [1] - 133:25

**expediency** [1] - 26:20

**expeditious** [1] - 63:7

**expenses** [2] - 64:16, 86:18

**experience** [9] - 20:25, 23:8, 26:16, 32:24, 48:20, 54:22, 57:18, 63:17, 82:13

**experiencing** [1] - 21:6

**expert** [2] - 51:5, 68:11

**expertise** [2] - 68:15, 121:6

**explain** [2] - 15:3, 82:5

**explained** [1] - 67:20

**explicit** [5] - 23:11, 57:22, 58:5, 58:6, 63:25

**exploitation** [1] - 20:3

**Exploited** [2] - 60:7, 130:13

**exploited** [2] - 20:1, 21:16

**exposure** [1] - 52:5

**extended** [1] - 124:10

**extension** [17] - 79:6, 79:9, 85:5, 85:6, 85:7, 124:6, 124:10, 124:12, 124:13, 124:14, 124:16, 124:17, 124:18, 124:19, 125:19, 132:5, 132:9

**Extension** [1] - 4:18

**extent** [9] - 6:25, 8:22, 9:1, 35:20, 53:14, 54:20, 58:18, 63:9, 63:12

**extrapolation** [1] - 20:3

**extremely** [1] - 136:6

## F

**face** [4] - 24:9, 36:20

**face-to-face** [2] - 24:9, 36:20

**facilitates** [1] - 16:23

**fact** [10] - 22:21, 38:17, 50:23, 51:7, 83:3, 105:10, 105:13, 105:16, 125:9, 136:17

**failed** [2] - 39:12, 105:16

**fair** [15] - 50:25, 55:18, 58:4, 95:9, 107:2, 110:13, 114:5, 118:1, 118:14, 121:20, 123:2, 125:9, 125:14,

125:16, 131:19

**faith** [1] - 9:23

**fall** [1] - 41:16

**falls** [1] - 40:25

**familiar** [14] - 56:25, 57:14, 58:13, 61:10, 61:12, 62:10, 80:18, 80:21, 80:23, 82:1, 83:2, 83:3, 83:5, 138:21

**family** [2] - 14:12, 34:4

**far** [3] - 52:14, 54:8, 97:7

**Fassett** [1] - 62:18

**fast** [2] - 18:15, 27:21

**faster** [1] - 27:2

**favor** [1] - 135:19

**FBAR** [9] - 82:12, 82:13, 123:15, 123:16, 124:10, 124:14, 124:15, 125:22, 132:5

**FBARs** [3] - 88:20, 89:10, 123:11

**FBI** [5] - 15:13, 16:8, 16:12, 18:2, 23:4

**FEDER** [15] - 2:18, 6:16, 11:11, 11:16, 59:9, 59:15, 60:1, 97:14, 133:8, 133:13, 134:16, 134:20, 139:6, 139:8, 139:14

**Feder** [7] - 2:19, 6:11, 7:9, 59:14, 97:18, 134:13, 134:25

**federal** [1] - 80:20

**fee** [1] - 14:5

**fee-for-service** [1] - 14:5

**feedback** [1] - 28:17

**fellow** [1] - 6:18

**felt** [2] - 32:16, 68:14

**female** [1] - 53:6

**Ferrer** [4] - 9:9, 11:17, 11:21, 26:2

**few** [3] - 24:9, 107:14, 135:13

**figure** [1] - 24:13

**figures** [1] - 116:2

**File** [1] - 4:18

**file** [10] - 37:10, 37:14, 39:5, 79:7, 83:6, 89:23, 91:1, 124:20, 125:19, 127:14

**filed** [28] - 78:7, 80:22, 80:23, 81:24, 81:25, 82:6, 82:12, 82:15, 83:3, 83:12, 84:18, 85:7, 86:10, 90:15,

91:15, 123:13, 123:21, 123:23, 124:2, 124:8, 124:9, 124:21, 125:10, 125:12, 125:15, 125:20, 125:22

**filing** [8] - 82:13, 88:14, 88:15, 90:6, 118:24, 124:6, 125:7, 132:5

**filings** [7] - 80:19, 85:3, 88:21, 89:10, 89:20, 90:5, 125:10

**filter** [1] - 56:24

**final** [1] - 10:11

**Financial** [1] - 80:16

**FinCEN** [3] - 4:20, 5:3, 5:5

**fine** [1] - 77:18

**finish** [1] - 23:1

**firm** [5] - 98:14, 98:15, 114:18, 114:19, 138:19

**first** [35] - 12:25, 14:2, 18:20, 32:5, 32:19, 33:8, 34:24, 35:19, 43:5, 48:21, 52:5, 52:11, 65:16, 66:5, 66:6, 77:25, 78:10, 81:17, 82:10, 82:12, 85:4, 86:8, 87:14, 88:15, 92:23, 94:25, 105:10, 105:18, 107:17, 116:14, 121:3, 124:1, 124:8, 125:7, 139:8

**First** [2] - 7:4, 9:24

**five** [9] - 49:6, 98:11, 98:13, 108:8, 123:5, 133:11, 134:9, 138:10, 139:18

**flashed** [1] - 80:2

**flight** [2] - 64:18, 96:13

**flip** [2] - 86:5, 86:14

**Floor** [1] - 2:9

**flow** [2] - 46:14, 104:19

**flowchart** [1] - 122:20

**flowed** [1] - 123:3

**focus** [2] - 17:8, 50:24

**focused** [3] - 16:5, 19:16, 50:10

**focuses** [1] - 53:16

**folks** [3] - 14:2, 51:7, 53:12

**follow** [1] - 20:2

**followed** [1] - 91:1

**follows** [1] - 88:6

**food** [1] - 49:23

**FOR** [2] - 1:2, 4:7

**force** [5] - 15:13, 16:9, 18:2, 19:9, 23:4

**forced** [1] - 49:22

**foregoing** [1] - 140:10

**Foreign** [2] - 80:16, 86:11

**foreign** [2] - 81:3, 86:12

**foremost** [2] - 33:8, 48:21

**forgetting** [1] - 20:5

**Form** [8] - 4:20, 5:3, 5:5, 79:6, 86:9, 87:11, 124:15, 124:16

**form** [9] - 7:1, 9:13, 9:20, 21:6, 50:14, 85:4, 85:6, 133:23

**former** [6] - 49:3, 82:11, 118:16, 118:18, 119:8, 131:3

**forms** [2] - 14:1, 86:9

**forth** [5] - 10:24, 44:23, 45:9, 95:1, 108:4

**forward** [14] - 9:3, 13:3, 33:18, 48:5, 65:10, 85:25, 95:14, 104:2, 106:4, 107:14, 121:4, 137:10, 137:15

**forwarded** [1] - 100:17

**foundation** [4] - 81:9, 83:10, 93:7, 127:19

**foundational** [1] - 9:4

**four** [6] - 8:6, 49:6, 84:2, 125:8, 125:14, 125:21

**Fourth** [4] - 15:7, 15:9, 15:22, 15:24

**frame** [2] - 22:24, 25:11

**frankly** [3] - 42:8, 94:14, 104:10

**free** [2] - 10:1, 106:14

**Friday** [1] - 12:22

**front** [6] - 58:3, 65:17, 92:13, 95:11, 109:14, 112:7

**frustration** [1] - 94:16

**full** [2] - 135:19, 140:11

**function** [1] - 17:11

**funding** [2] - 14:3, 14:5

**funds** [9] - 67:16, 70:4, 70:6, 70:12, 70:14, 98:6, 98:14, 116:9, 116:19

furnishes [1] - 78:5
furniture [1] - 53:2
FURTHER [1] - 140:10

### G

Gary [1] - 3:3
general [1] - 6:18
generally [8] - 27:21,
29:12, 33:4, 55:23,
57:15, 57:16, 64:1,
86:8
gentleman [2] - 95:24,
96:4
GFE [3] - 57:18, 58:13,
64:3
gift [1] - 118:25
girlfriend [1] - 57:18
given [7] - 9:5, 19:13,
41:24, 44:2, 64:12,
68:21, 69:2, 69:16,
69:17, 85:16, 97:14,
103:17, 105:16,
107:13, 115:11,
119:8, 134:16
glasses [2] - 109:19,
122:10
glincenberg@
birdmarella.com [1]
- 3:5
goal [1] - 69:19
good-faith [1] - 9:23
Google [1] - 25:16
Gopi [1] - 3:3
gotcha [1] - 112:1
government [35] -
7:18, 10:1, 12:22,
38:18, 40:13, 41:23,
42:5, 43:23, 44:14,
44:19, 64:8, 64:22,
73:5, 75:8, 75:22,
80:20, 81:2, 83:17,
84:18, 92:12, 93:22,
99:6, 104:7, 104:15,
106:10, 120:4,
121:16, 124:19,
134:22, 134:23,
137:1, 138:4, 139:17
Government [3] - 2:2,
72:15, 72:18
GOVERNMENT [1] -
4:7
Government's [2] -
92:7, 102:25
government's [5] -
7:5, 9:15, 43:25,
134:16, 134:18
gpanchapakesan@
birdmarella.com [1]
- 3:5

graduate [5] - 15:6,
17:3, 17:16, 17:17,
17:18
grandstand [1] -
92:13
grandstanding [1] -
93:5
grant [2] - 20:6, 21:22
Grant [4] - 4:8, 13:1,
13:16, 99:17
GRANT [2] - 13:6,
100:2
grantor [2] - 68:5,
70:8
grants [2] - 14:7,
19:16
great [3] - 37:22, 39:4,
103:4
greatest [1] - 20:10
GREEN [1] - 2:12
ground [1] - 136:11
group [2] - 14:3, 14:15
groups [1] - 17:24
guess [7] - 6:10,
11:24, 23:18, 34:3,
36:20, 37:18, 134:5
guilty [1] - 10:3

### H

hammer [1] - 21:2
hand [3] - 13:5, 65:19,
109:22
handy [1] - 113:7
happily [1] - 34:2
happy [6] - 48:1, 58:2,
102:4, 136:12,
137:4, 137:14
hassle [7] - 126:8,
128:1, 128:3, 128:8,
128:11, 132:10
hate [1] - 58:2
head [1] - 55:10
hear [4] - 16:16,
45:24, 93:23, 94:24
heard [8] - 16:7,
18:20, 32:9, 41:10,
59:13, 105:22,
133:11, 139:18
hearing [3] - 11:11,
38:8, 128:10
hearsay [6] - 68:24,
70:22, 72:6, 82:16,
87:3, 90:11
heightened [1] - 92:25
held [2] - 45:25, 92:20
help [2] - 21:17, 28:17
helped [1] - 28:3
helpful [3] - 25:17,
28:20, 28:21

Hennepin [1] - 25:6
hereby [1] - 140:7
herein [4] - 13:6,
65:20, 100:2, 140:12
hide [1] - 40:20
hiding [1] - 92:15
highlight [1] - 39:25
himself [1] - 131:11
hired [1] - 112:10
hiring [1] - 15:21
history [3] - 17:13,
25:19, 126:21
histrionic [1] - 105:12
hold [6] - 47:1, 47:5,
65:1, 78:18, 96:25,
114:20
home [1] - 97:6
homeless [2] - 15:18,
15:20
Homeless [1] - 14:8
homelessness [1] -
14:1
Honor [116] - 7:20,
8:6, 8:16, 9:6, 10:11,
10:12, 10:17, 13:1,
13:12, 18:18, 21:8,
26:22, 29:17, 33:15,
33:17, 37:25, 38:9,
39:1, 39:7, 39:8,
40:21, 41:10, 41:20,
42:8, 42:13, 42:25,
43:6, 43:13, 43:22,
44:2, 44:15, 44:20,
45:1, 45:12, 45:22,
46:2, 47:10, 47:20,
47:23, 48:15, 50:3,
50:5, 54:25, 56:14,
57:4, 57:10, 60:9,
60:16, 60:22, 61:3,
61:15, 62:6, 62:8,
62:12, 62:24, 63:1,
64:21, 64:24, 65:8,
65:12, 69:2, 73:18,
76:16, 76:21, 77:12,
78:19, 79:23, 81:7,
81:8, 83:9, 85:8,
85:24, 87:23, 88:24,
89:1, 92:12, 93:3,
93:19, 94:11, 95:22,
95:25, 96:18, 98:2,
99:2, 99:12, 99:20,
100:1, 101:9,
101:17, 103:11,
103:14, 103:15,
103:19, 103:25,
104:5, 104:13,
104:21, 105:3,
106:12, 106:16,
106:20, 113:10,
116:23, 130:23,

131:20, 131:21,
132:24, 132:25,
133:4, 133:15,
135:11, 137:10,
138:1, 138:21,
138:25, 139:11
HONORABLE [1] -
1:12
hope [1] - 12:20
hotel [3] - 36:2, 64:18,
96:13
hours [2] - 27:9, 27:10
housekeeping [1] -
36:9
HSI [1] - 28:12
Hsu [1] - 82:11
HT [1] - 54:18
Human [5] - 18:24,
19:2, 31:16, 31:21,
48:23
human [35] - 15:15,
16:3, 16:7, 16:9,
16:13, 17:9, 17:12,
18:4, 18:5, 18:10,
19:16, 19:17, 48:19,
49:3, 49:11, 49:15,
49:20, 50:10, 51:2,
51:10, 51:20, 51:23,
52:21, 54:4, 54:19,
54:22, 54:23, 55:6,
55:12, 55:20, 55:22,
62:2
HUMETEWA [1] - 1:12
Hungarian [2] - 78:17,
86:24
Hungary [18] - 69:11,
70:14, 90:15, 98:13,
98:16, 114:23,
115:4, 116:4,
118:14, 120:9,
122:14, 122:22,
123:7, 123:24,
128:13, 128:18,
129:3, 129:5

### I

I'M [1] - 18:25
idea [3] - 35:14, 36:25,
131:10
identified [5] - 77:12,
81:5, 83:23, 134:9,
136:20
identifier [1] - 77:16
identify [5] - 28:3,
83:17, 84:15, 85:1,
136:15
ignored [1] - 34:14
IHTI [1] - 31:16
III [3] - 10:21, 10:25,

11:8
impact [1] - 30:15
impression [3] -
40:19, 92:22, 92:23
improper [1] - 92:15
in-person [1] - 108:19
incapacity [1] - 67:6
incident [1] - 55:12
included [3] - 51:8,
73:8, 73:9
includes [2] - 35:16,
95:15
including [2] - 120:4,
121:16
inclusive [1] - 9:21
Income [1] - 4:18
income [5] - 69:25,
79:7, 86:18, 90:7,
90:8
incorporated [1] -
41:24
incorporating [1] -
70:25
incurable [2] - 92:22,
92:23
indeed [2] - 93:15,
96:12
indicated [4] - 11:16,
45:2, 83:2, 138:22
indicating [1] - 135:15
indication [2] - 33:9,
57:17
indications [1] - 57:20
indicative [1] - 58:5
indicted [1] - 124:23
indictment [11] -
30:18, 50:4, 124:21,
124:25, 125:2,
125:8, 125:13,
125:14, 125:18,
125:21
individual [7] - 16:20,
20:2, 20:25, 21:20,
22:4, 22:5, 90:8
individualized [1] -
17:8
individuals [5] - 10:2,
21:15, 67:21, 83:17,
119:10
influence [1] - 46:14
inform [1] - 90:25
information [40] - 7:4,
8:5, 8:7, 8:25, 9:15,
10:7, 10:14, 11:2,
24:14, 24:16, 24:17,
25:10, 25:12, 25:22,
26:18, 27:3, 27:20,
27:24, 29:22, 31:3,
31:23, 54:15, 54:17,
78:3, 78:5, 83:18,

84:11, 84:12, 84:14, 86:7, 86:12, 86:13, 86:21, 89:24, 104:5, 127:3, 127:13, 128:9, 137:22

**Information** [2] - 4:19, 86:11

**informed** [2] - 19:18, 19:24

**initial** [3] - 36:7, 66:6, 88:14

**initiated** [1] - 20:20

**initiating** [1] - 21:23

**injure** [1] - 19:25

**inspection** [1] - 38:8

**instance** [1] - 7:14

**instances** [1] - 55:5

**instruct** [1] - 71:20

**intending** [1] - 7:10

**intentionally** [1] - 92:21

**interest** [1] - 17:11

**interested** [4] - 28:6, 31:19, 54:17, 120:3

**interesting** [1] - 52:19

**interfacing** [1] - 69:14

**interject** [1] - 73:6

**Internal** [4] - 68:4, 79:5, 81:1, 85:2

**International** [6] - 18:23, 19:2, 31:16, 31:21, 48:23

**international** [2] - 67:21, 116:2

**internationally** [1] - 49:7

**Internet** [1] - 136:6

**interrupt** [1] - 104:19

**interview** [2] - 113:25, 114:1

**interviewing** [1] - 19:19

**introduce** [1] - 9:9

**introduced** [2] - 11:17, 73:13

**introducing** [1] - 19:23

**introduction** [1] - 77:1

**investigated** [1] - 49:21

**investigating** [4] - 20:21, 49:21, 55:5, 55:12

**investigation** [18] - 19:18, 20:19, 21:13, 21:23, 24:18, 25:18, 32:4, 33:12, 48:20, 49:11, 51:23, 52:5, 52:11, 52:16, 54:12, 56:5, 56:9, 62:10

**Investigations** [1] - 35:17

**investigations** [15] - 19:17, 20:9, 22:7, 30:24, 50:20, 50:24, 51:21, 52:22, 52:25, 53:25, 55:19, 56:2, 57:14, 62:2, 63:10

**investigator** [4] - 35:2, 36:5, 45:20, 45:21, 49:3, 50:1, 51:2, 93:17

**investigators** [5] - 28:13, 40:23, 45:10, 95:1, 95:16

**Investigators** [4] - 19:3, 31:17, 31:22, 48:24

**investment** [1] - 87:1

**investments** [1] - 68:12

**involve** [1] - 55:20

**involved** [11] - 14:10, 14:12, 21:15, 21:21, 33:10, 45:6, 50:11, 50:17, 52:6, 52:13, 119:9

**involvement** [1] - 18:11

**IOLTA** [10] - 98:14, 114:15, 114:17, 115:3, 115:7, 120:9, 122:14, 122:21, 123:6, 131:12

**IP** [1] - 25:17

**ire** [1] - 94:22

**irrelevant** [2] - 55:1, 113:16

**IRS** [3] - 4:17, 86:9, 124:7

**issue** [8] - 39:22, 43:21, 73:11, 76:22, 119:7, 127:25, 136:9, 136:13

**issued** [5] - 34:12, 94:22, 111:5, 125:2, 126:2

**issues** [3] - 16:6, 39:24, 137:13

**it'll** [1] - 103:25

**itself** [2] - 32:16, 44:6

## J

**Jacob** [6] - 68:18, 75:7, 75:21, 76:15, 78:3, 120:22

**Jan** [1] - 4:16

**Jane** [1] - 61:10

**January** [2] - 122:3,

123:9

**JD** [1] - 66:16

**Jeremy** [1] - 49:2

**job** [1] - 28:7

**John** [5] - 3:2, 4:10, 65:8, 66:6, 75:7

**JOHN** [1] - 65:20

**Johnson** [2] - 126:12, 126:14

**join** [1] - 94:11

**Journal** [3] - 117:22, 129:25, 130:4

**JOY** [1] - 3:11

**Joy** [1] - 3:11

**joy@joybertrandlaw. com** [1] - 3:13

**Joye** [3] - 3:10, 26:8, 29:13

**Judge** [2] - 6:17, 11:11

**JUDGE** [1] - 1:12

**judge** [2] - 97:14, 133:8

**judgment** [1] - 90:21

**July** [2] - 14:17, 107:5

**juncture** [2] - 98:25, 106:3

**jurisdiction** [1] - 18:3

**jurors** [1] - 6:6

**Jury** [11] - 4:3, 4:3, 4:4, 4:5, 6:4, 12:17, 40:5, 48:10, 92:3, 97:24, 134:3

**JURY** [1] - 1:14

**jury** [42] - 7:15, 9:14, 9:18, 9:20, 10:10, 11:5, 11:22, 12:2, 12:13, 12:16, 12:19, 13:15, 15:3, 19:12, 22:18, 23:7, 39:21, 39:23, 40:4, 43:16, 46:3, 46:20, 47:9, 47:19, 48:9, 48:12, 58:1, 71:25, 79:21, 79:24, 91:20, 91:25, 92:13, 92:21, 95:11, 97:13, 97:18, 97:20, 97:22, 97:23, 133:16, 134:2

**jury's** [3] - 40:18, 95:7, 104:25

**JUSTICE** [1] - 2:8

**juvenile** [4] - 15:15, 16:13, 18:4, 18:5

## K

**keep** [6] - 18:15, 38:15, 39:23, 52:19, 67:23, 133:24

**Kentucky** [1] - 34:4

**kept** [1] - 6:12

**Kessler** [2] - 2:16, 10:19

**KESSLER** [6] - 2:15, 10:17, 10:19, 10:23, 11:6, 106:5

**Kessler's** [2] - 35:25, 36:3

**Kevin** [1] - 2:3

**kevin.rapp@usdoj. gov** [1] - 2:6

**key** [1] - 7:23

**kids** [1] - 54:16

**kind** [7] - 6:13, 16:21, 25:10, 25:12, 55:6, 58:11, 134:21

**knock** [1] - 97:4

**knowing** [1] - 122:25

**knowledge** [14] - 9:23, 12:10, 33:3, 36:18, 37:1, 37:6, 78:6, 84:18, 86:25, 124:11, 125:1, 125:18, 129:12, 130:22

**knows** [4] - 81:9, 82:5, 92:17, 113:17

**Knoxville** [1] - 49:2

**Kozinets** [1] - 2:4

## L

**L.A** [1] - 121:5

**labor** [4] - 49:21, 49:25, 50:1, 50:9

**Lacey** [53] - 1:8, 2:11, 4:18, 4:20, 5:3, 5:5, 5:7, 12:7, 12:9, 66:23, 67:1, 67:11, 67:12, 68:9, 68:19, 69:15, 70:7, 70:9, 70:14, 72:4, 72:11, 72:21, 75:3, 75:8, 75:9, 77:7, 78:1, 79:11, 83:23, 84:15, 89:22, 90:25, 98:12, 111:18, 114:8, 114:12, 116:18, 118:13, 119:9, 119:15, 119:25, 121:21, 123:20, 124:23, 126:9, 127:3, 127:19, 129:10, 131:3, 131:10, 131:16, 132:4

**Lacey's** [8] - 117:14, 118:8, 120:11, 122:13, 122:21,

126:15, 128:25, 132:16

**lack** [2] - 94:13, 105:22

**language** [8] - 23:17, 33:6, 33:7, 51:14, 51:15, 57:3, 121:19, 121:24

**largely** [1] - 22:20, 36:6

**larger** [1] - 101:7

**last** [14] - 12:22, 26:1, 26:10, 34:3, 34:4, 35:5, 36:13, 37:10, 37:11, 40:13, 66:6, 71:24, 134:13

**late** [3] - 27:10, 37:10, 135:12

**LAW** [2] - 2:15, 2:18

**law** [12] - 17:23, 34:18, 51:7, 61:22, 63:11, 66:18, 78:17, 98:14, 98:15, 114:18, 114:19, 138:19

**Law** [1] - 66:16

**lawfully** [1] - 91:1

**lawyer** [2] - 121:5, 134:22

**lawyers** [3] - 85:23, 138:23, 139:4

**laying** [1] - 93:6

**lead** [5] - 7:16, 22:2, 28:18, 32:6, 32:16

**leading** [5] - 71:8, 75:12, 75:16, 89:25, 91:3

**leads** [2] - 20:13, 21:14

**leapfrog** [1] - 8:20

**least** [5] - 79:22, 79:24, 86:25, 94:16, 136:14

**leave** [5] - 32:2, 35:9, 92:13, 95:6, 99:7

**leaves** [2] - 95:2, 104:25

**ledge** [1] - 136:9

**left** [6] - 40:18, 40:19, 74:12, 74:19, 92:22, 109:22

**left-hand** [1] - 109:22

**legal** [9] - 7:16, 8:3, 8:9, 9:21, 39:24, 90:18, 90:25, 132:11, 132:12

**legally** [4] - 28:5, 70:21, 71:6, 89:23

**letter** [7] - 79:5, 84:24, 85:1, 85:2, 87:11, 130:7

**Letter** [1] - 4:17
**letters** [1] - 111:17
**letting** [1] - 8:19
**level** [2] - 14:7, 95:12
**Lewis** [1] - 49:3
**Liability** [1] - 6:9
**lieutenant** [4] - 15:19,
15:20, 15:23
**lieutenants** [1] - 14:21
**life** [1] - 34:14
**likely** [1] - 50:16
**Liliana** [1] - 101:23
**limit** [1] - 9:2
**limited** [4] - 21:5,
29:11, 41:2, 103:20
**LINCENBERG** [9] -
9:6, 9:8, 47:10,
47:14, 47:16, 59:10,
59:12, 92:10, 92:12
**Lincenberg** [5] - 3:3,
11:20, 92:9, 93:11,
94:7
**line** [6] - 30:8, 40:17,
43:9, 43:10, 50:2,
121:3
**lineup** [1] - 133:18
**link** [2] - 8:12, 37:14
**links** [2] - 58:24,
100:18
**LIPTSITZ** [1] - 2:12
**list** [4] - 77:17, 119:8,
138:22, 139:18
**listed** [1] - 81:10
**litigation** [2] - 111:23
**litigious** [2] - 120:4,
121:16
**live** [1] - 13:17
**liveability** [1] - 16:6
**Liz** [2] - 26:4, 28:3
**LLC** [1] - 3:11
**LLP** [1] - 2:12
**local** [3] - 13:23,
13:24, 28:12
**locate** [1] - 54:15
**located** [1] - 66:13
**locations** [1] - 53:8
**logo** [1] - 48:22
**long-standing** [1] -
40:14
**look** [21] - 19:25,
22:10, 29:7, 29:15,
32:16, 32:18, 38:6,
38:7, 41:8, 42:5,
43:17, 44:20, 47:23,
67:22, 83:23,
110:11, 116:11,
117:17, 127:5, 137:2
**looked** [9] - 6:7,
25:19, 37:19, 54:21,
96:11, 105:24,

111:17, 117:19,
118:9
**looking** [16] - 6:17,
18:10, 22:25, 25:13,
27:20, 28:6, 32:1,
32:3, 32:5, 32:6,
33:7, 33:8, 54:12,
74:9, 114:12, 126:9
**looks** [2] - 12:19,
73:20
**Los** [2] - 3:4, 68:18

# M

**ma'am** [2] - 46:23,
102:9
**majority** [4] - 27:17,
32:21, 35:23, 96:12
**Malby** [1] - 3:11
**man** [1] - 41:24
**management** [1] -
19:18
**mantel** [1] - 51:3
**MARELLA** [1] - 3:2
**Margaret** [1] - 2:4
**margaret.perlmeter
@usdoj.gov** [1] - 2:7
**mark** [2] - 11:5, 101:17
**Mark** [1] - 6:11
**marked** [6] - 101:10,
101:12, 101:13,
102:24, 107:11,
122:5
**Marshal** [1] - 19:7
**Marshal's** [1] - 19:6
**massage** [1] - 49:23
**master's** [3] - 17:18,
17:20, 66:17
**material** [5] - 16:21,
40:15, 40:24, 41:5,
94:19
**matter** [7] - 44:21,
51:5, 92:24, 105:14,
129:23, 133:23,
133:24
**matters** [1] - 95:11
**McDougall** [3] - 26:4,
28:2, 28:8
**meals** [1] - 13:25
**mean** [21] - 7:25,
16:18, 18:11, 27:8,
35:20, 46:9, 49:15,
51:3, 53:17, 57:20,
62:3, 63:13, 63:14,
64:11, 64:12, 91:17,
94:14, 104:21,
104:22, 124:13,
124:17
**meaning** [2] - 9:14,
49:16

**meaningful** [1] - 53:25
**means** [8] - 16:22,
21:1, 36:16, 57:8,
73:16, 118:24,
124:18, 129:17
**media** [1] - 137:2
**Media's** [1] - 6:8
**meet** [4] - 28:11,
31:18, 43:17, 108:16
**meeting** [16] - 28:14,
36:19, 36:24, 37:5,
96:13, 107:2, 107:7,
108:19, 108:23,
108:25, 109:2,
109:5, 114:4, 114:8,
120:23, 126:1
**meetings** [7] - 36:15,
36:18, 60:5, 60:14,
130:12, 130:16,
130:20
**member** [2] - 100:9,
135:15
**members** [4] - 12:19,
39:23, 91:20, 133:16
**memo** [6] - 6:15, 7:24,
8:2, 12:6, 12:8,
12:10
**memorandum** [3] -
7:2, 9:2, 113:25
**memory** [4] - 38:7,
44:8, 76:24, 102:25
**men** [2] - 22:20, 53:10
**mention** [2] - 10:20,
11:1
**mentioned** [6] - 16:15,
17:1, 121:5, 129:20,
139:12
**message** [2] - 35:9,
105:24
**messages** [25] -
35:21, 35:24, 36:4,
38:1, 38:13, 38:22,
39:12, 39:15, 43:17,
44:17, 45:11, 46:13,
46:25, 47:24, 94:5,
94:25, 96:2, 101:1,
103:2, 104:15,
105:2, 105:5,
105:10, 105:13,
105:17
**met** [5] - 28:12, 31:12,
31:14, 31:17, 106:25
**methods** [1] - 59:4
**Michael** [9] - 1:8, 2:11,
66:23, 75:8, 78:1,
126:15, 128:25,
131:16
**microphone** [2] -
66:7, 138:15
**middle** [2] - 66:6,

136:11
**midnight** [1] - 27:18
**might** [3] - 26:10,
48:8, 53:13
**Mike** [1] - 114:12
**million** [6] - 114:22,
115:3, 115:22,
116:1, 117:10,
131:11
**millions** [1] - 115:6
**mind** [4] - 39:24, 95:7,
104:25, 133:24
**mindful** [1] - 10:6
**Minneapolis** [5] -
14:18, 15:1, 15:7,
17:24, 28:9
**Minnesota** [3] - 13:18,
17:4, 17:14
**minute** [5] - 47:11,
47:12, 47:17, 92:10,
92:11
**minutes** [4] - 40:3,
92:9, 135:13, 137:12
**miscommunication**
[1] - 133:17
**misconduct** [1] -
92:24
**misimpression** [1] -
104:25
**Missing** [2] - 60:7,
130:13
**missing** [1] - 7:23
**Missouri** [1] - 11:2
**Mistrial** [1] - 4:4
**mistrial** [2] - 47:11,
93:1
**mixed** [1] - 58:1
**mobile** [1] - 20:4
**moderating** [1] - 63:9
**moderation** [4] -
23:10, 58:16, 63:12,
129:13
**moment** [8] - 48:7,
73:25, 74:3, 77:12,
112:2, 120:2,
130:23, 135:1
**money** [29] - 20:24,
50:11, 50:20, 57:3,
57:13, 58:23, 75:8,
101:3, 103:6,
114:12, 114:23,
114:24, 115:7,
116:4, 117:8,
117:10, 117:11,
117:12, 119:5,
120:11, 120:17,
120:25, 122:13,
122:20, 123:3,
123:7, 123:23,
128:24, 131:11

**money's** [1] - 64:12
**monies** [5] - 78:18,
114:20, 114:21,
120:18, 121:1
**month** [1] - 125:19
**months** [5] - 122:22,
125:14, 125:21
**morning** [5] - 12:22,
108:22, 133:14,
139:11, 139:18
**most** [9] - 23:18,
32:21, 50:10, 50:16,
53:7, 55:19, 57:2,
57:5, 57:9
**motion** [9] - 47:11,
93:18, 94:1, 94:3,
94:7, 94:8, 95:12,
136:18, 137:25
**Motion** [1] - 4:4
**motivation** [3] -
120:24, 121:1,
121:15
**move** [29] - 9:13,
12:23, 48:19, 71:22,
71:24, 76:17, 77:1,
77:11, 78:19, 79:14,
81:6, 81:7, 82:3,
82:24, 83:9, 85:8,
85:25, 87:12, 87:22,
88:23, 89:13, 93:1,
93:8, 95:14, 101:11,
107:14, 113:12,
121:4
**moved** [8] - 15:12,
15:22, 16:8, 23:3,
75:8, 80:5, 122:13,
122:21
**moves** [2] - 38:1, 38:4
**moving** [4] - 52:19,
120:11, 120:16,
120:18
**MR** [370] - 6:16, 7:20,
7:22, 8:2, 8:9, 8:15,
8:18, 9:6, 9:8, 10:11,
10:16, 10:17, 10:19,
10:23, 11:6, 11:11,
11:16, 12:1, 12:3,
12:5, 12:9, 13:1,
13:12, 13:14, 18:22,
21:8, 21:11, 26:21,
26:24, 29:17, 29:21,
30:8, 30:11, 30:17,
30:19, 30:23, 33:15,
33:17, 33:21, 37:25,
38:9, 38:11, 38:13,
38:23, 39:1, 39:3,
39:7, 39:8, 39:14,
40:8, 40:11, 40:21,
41:10, 41:12, 41:18,
41:20, 42:8, 42:18,

42:22, 42:25, 43:6, 43:13, 43:22, 44:19, 44:25, 45:12, 45:14, 45:16, 45:17, 45:19, 45:22, 46:1, 46:8, 46:23, 47:7, 47:10, 47:14, 47:16, 47:20, 47:23, 48:4, 48:15, 48:16, 50:2, 50:5, 50:8, 54:25, 55:3, 56:10, 56:11, 56:13, 56:17, 56:22, 57:4, 57:10, 57:12, 59:9, 59:10, 59:12, 59:15, 59:19, 60:1, 60:4, 60:8, 60:13, 60:16, 60:19, 60:22, 61:1, 61:7, 61:14, 61:19, 62:6, 62:8, 62:9, 62:12, 62:17, 62:24, 63:1, 63:3, 64:21, 64:24, 65:8, 65:11, 65:13, 65:14, 65:16, 66:2, 68:24, 69:1, 69:4, 69:6, 70:19, 70:20, 70:22, 70:24, 71:2, 71:4, 71:8, 71:10, 71:16, 71:19, 71:22, 71:23, 71:24, 72:2, 72:3, 72:6, 72:9, 72:15, 72:20, 72:23, 73:1, 73:4, 73:6, 73:7, 73:9, 73:14, 73:17, 73:18, 73:22, 74:1, 74:4, 74:6, 74:8, 74:12, 74:16, 74:18, 75:12, 75:14, 75:18, 75:19, 76:8, 76:11, 76:16, 76:20, 77:3, 77:4, 77:11, 77:18, 77:22, 78:10, 78:12, 78:19, 78:20, 78:24, 79:1, 79:14, 79:15, 79:19, 79:23, 80:1, 80:4, 80:6, 80:8, 80:12, 81:6, 81:8, 81:12, 81:15, 81:19, 81:21, 81:22, 82:3, 82:7, 82:8, 82:16, 82:19, 82:23, 82:25, 83:1, 83:9, 83:10, 83:14, 83:15, 83:20, 83:22, 84:1, 84:4, 84:21, 84:23, 85:8, 85:9, 85:10, 85:16, 85:20, 85:23, 86:1, 86:5, 86:6, 86:14, 86:15, 87:3, 87:5, 87:7, 87:12, 87:14, 87:16, 87:19, 87:22, 88:1,

88:9, 88:12, 88:17, 88:18, 88:23, 89:1, 89:5, 89:6, 89:13, 89:14, 89:18, 89:21, 89:25, 90:2, 90:11, 90:13, 90:17, 90:20, 90:23, 90:24, 91:3, 91:4, 91:7, 91:10, 91:12, 91:19, 92:10, 92:12, 93:3, 93:19, 93:21, 93:25, 94:4, 94:8, 94:11, 95:22, 95:25, 96:2, 96:18, 97:10, 97:14, 98:2, 98:3, 98:22, 98:24, 99:2, 99:15, 99:17, 99:20, 100:5, 101:9, 101:10, 101:11, 101:12, 101:16, 101:21, 101:24, 101:25, 102:1, 102:4, 102:9, 102:14, 102:18, 103:10, 103:14, 103:15, 103:19, 103:22, 103:25, 104:4, 105:3, 105:21, 106:5, 106:7, 106:12, 106:22, 107:10, 107:12, 111:11, 111:13, 112:2, 112:6, 113:10, 113:12, 113:13, 113:16, 113:19, 115:9, 115:12, 116:20, 116:23, 116:24, 119:13, 119:14, 119:18, 119:19, 127:18, 127:21, 130:23, 131:1, 131:19, 131:21, 131:24, 131:25, 132:1, 132:3, 132:20, 132:24, 132:25, 133:8, 133:13, 133:14, 134:16, 134:20, 135:11, 137:10, 137:19, 138:1, 138:3, 138:5, 138:11, 138:14, 138:17, 138:20, 139:3, 139:6, 139:8, 139:10, 139:14
**MS** [7] - 59:11, 59:17, 60:10, 60:17, 60:23, 61:3, 61:11
**multiple** [1] - 71:14
**multistate** [1] - 18:9
**Murphy** [1] - 35:5,

35:17, 35:23
**must** [4] - 39:24, 44:25, 69:25, 135:10

## N

**name** [13] - 13:15, 26:1, 26:10, 32:10, 35:5, 66:5, 66:6, 126:15, 126:17, 126:20, 126:23, 139:8
**named** [3] - 6:18, 26:1, 26:8
**names** [5] - 138:12, 138:24, 139:4, 139:10
**narrative** [3] - 21:9, 26:21, 71:16
**National** [2] - 60:6, 130:13
**nature** [1] - 36:4
**NCMEC** [3] - 62:2, 62:3, 130:13
**necessarily** [1] - 36:17
**necessary** [5] - 12:4, 39:8, 45:3, 47:6, 75:10
**necessity** [1] - 106:2
**need** [19] - 7:13, 8:15, 25:11, 28:24, 29:22, 40:23, 47:4, 82:12, 86:10, 90:7, 103:25, 113:6, 117:23, 124:9, 127:22, 128:3, 128:8, 128:11, 137:8
**needed** [14] - 8:3, 21:17, 25:3, 28:4, 78:3, 90:5, 96:20, 98:11, 98:12, 110:25, 111:1, 131:14
**needs** [5] - 27:5, 43:3, 90:7, 99:5, 121:13
**negates** [1] - 9:15
**neighboring** [1] - 18:7
**NESSIM** [1] - 3:2
**Netflix** [2] - 61:2, 61:8
**never** [9] - 21:20, 23:24, 34:14, 44:3, 61:18, 92:15, 117:19, 118:9, 133:19
**New** [9] - 2:9, 2:13, 6:19, 31:15, 66:17, 117:22, 118:2, 122:19, 129:21
**new** [7] - 29:20, 30:25, 94:23, 126:19,

131:22, 137:4
**next** [14] - 65:6, 84:1, 86:5, 86:14, 87:22, 88:9, 95:21, 95:23, 96:4, 96:5, 133:7, 133:14, 134:6, 138:8
**night** [1] - 27:11
**NO** [2] - 4:15, 5:2
**nobody** [1] - 109:5
**non** [3] - 111:14, 112:18, 112:24
**non-privileged** [3] - 111:14, 112:18, 112:24
**nonadmitted** [2] - 135:16, 137:20
**none** [3] - 42:10, 44:9, 139:14
**nonetheless** [1] - 29:5
**nonprofit** [3] - 13:23, 13:24, 49:1
**normally** [1] - 58:11
**North** [4] - 2:5, 2:16, 3:8, 66:14
**Northwestern** [1] - 17:21
**note** [1] - 85:16
**noted** [1] - 9:14
**notes** [6] - 36:17, 36:21, 36:22, 108:25, 109:3, 109:5
**nothing** [7] - 41:13, 41:14, 41:19, 41:25, 62:13, 73:16
**notice** [5] - 65:2, 65:11, 81:2, 86:2, 109:2
**November** [1] - 15:14
**nudity** [1] - 23:11
**Number** [2] - 77:13, 92:7
**number** [19] - 19:15, 19:22, 21:4, 25:14, 25:25, 29:11, 49:24, 61:21, 73:16, 74:24, 77:16, 93:14, 101:14, 101:23, 102:2, 102:7, 109:17, 109:20, 136:22
**numbers** [5] - 32:13, 32:14, 54:14, 122:25, 123:2
**Numeral** [1] - 10:21, 10:25, 11:8
**numerous** [2] - 24:6, 62:22
**NW** [1] - 2:9

## O

**o'clock** [2] - 91:21
**O'Connor** [1] - 1:22
**oath** [2] - 99:8, 99:24
**object** [10] - 50:2, 57:5, 82:16, 87:3, 98:22, 103:15, 105:15, 116:20, 127:18
**objected** [1] - 73:10
**objection** [47] - 21:8, 26:21, 29:17, 30:8, 30:17, 54:25, 56:10, 59:10, 60:1, 60:8, 60:11, 60:17, 60:23, 61:3, 61:11, 62:6, 62:12, 68:24, 70:19, 70:22, 71:8, 71:16, 72:6, 75:12, 75:17, 76:17, 77:2, 78:20, 79:15, 81:8, 82:21, 82:22, 82:23, 83:10, 85:9, 88:25, 89:1, 89:14, 89:25, 90:11, 90:17, 91:3, 91:10, 106:7, 106:9, 113:16, 115:9
**Objection** [1] - 59:9
**objections** [3] - 60:16, 60:22, 92:19
**obligations** [2] - 43:4, 95:3
**obtain** [2] - 20:23, 24:17
**obvious** [4] - 57:3, 57:5, 57:9, 57:13
**obviously** [1] - 41:7
**occasions** [1] - 26:4
**occurred** [1] - 122:2
**October** [2] - 1:8, 140:15
**OF** [4] - 1:2, 1:13, 2:8, 4:2
**offer** [2] - 20:24, 105:25
**offered** [1] - 104:7
**offering** [1] - 53:13
**office** [5] - 19:6, 66:14, 108:5, 137:17, 137:22
**Office** [8] - 25:5, 25:6, 28:13, 107:3, 110:1, 111:5, 111:7, 114:1
**OFFICE** [3] - 2:2, 2:15, 2:18
**officer** [7] - 15:6, 15:9, 15:10, 20:2, 20:11, 41:21, 52:9
**Official** [2] - 1:21,

140:8
**offshore** [4] - 121:6, 121:8, 121:13, 128:12
**often** [2] - 23:17, 115:14
**ominously** [1] - 135:10
**once** [3] - 56:7, 56:13, 98:15
**one** [58] - 6:17, 7:22, 8:5, 12:3, 18:25, 20:11, 23:13, 26:3, 28:22, 37:3, 43:22, 43:25, 45:10, 49:6, 51:25, 53:11, 53:17, 56:1, 56:18, 57:17, 57:18, 58:13, 59:21, 62:8, 62:22, 73:9, 73:10, 74:24, 79:7, 80:19, 81:11, 82:10, 82:11, 84:2, 85:3, 86:9, 87:13, 87:23, 88:5, 88:7, 88:20, 91:21, 92:10, 92:11, 94:4, 98:5, 99:21, 112:2, 115:15, 121:3, 126:11, 132:7, 133:14, 133:18, 134:6, 136:6, 139:5, 139:7
**one's** [1] - 86:10
**ones** [2] - 29:25, 135:21
**ongoing** [7] - 16:11, 28:15, 43:4, 63:10, 70:11, 95:10, 105:20
**online** [4] - 20:3, 21:14, 32:9, 52:9
**oOo** [1] - 139:23
**open** [6] - 39:24, 58:9, 67:24, 129:2, 130:7, 133:24
**opened** [1] - 97:15
**operate** [1] - 43:8
**operation** [2] - 19:24, 117:6
**operations** [7] - 13:22, 15:11, 19:21, 19:22, 22:16, 30:16, 117:11
**opinion** [4] - 63:17, 71:5, 90:14, 133:23
**opinions** [1] - 135:2
**opportunity** [10] - 31:24, 52:8, 65:3, 72:10, 96:23, 102:24, 105:7, 105:15, 135:14, 137:5
**options** [3] - 44:7,

69:16, 69:17
**oral** [1] - 136:18
**order** [12] - 6:2, 25:11, 38:20, 67:23, 79:7, 94:19, 102:10, 105:9, 105:17, 110:15, 135:8, 136:14
**ordered** [1] - 95:3
**orders** [2] - 94:21, 105:4
**organization** [1] - 130:17
**oriented** [1] - 19:23
**original** [1] - 69:19
**originally** [1] - 18:9
**Orleans** [1] - 31:15
**out-of-court** [1] - 82:17
**outcomes** [1] - 28:18
**outlet** [1] - 137:2
**outreach** [4] - 13:22, 15:18, 15:20, 15:25
**outside** [5] - 17:24, 30:17, 67:23, 71:12, 92:20
**Outside** [4] - 4:3, 4:3, 4:4, 4:5
**overbroad** [1] - 134:24
**overrule** [2] - 30:21, 50:7
**overruled** [12] - 29:18, 56:15, 59:18, 60:2, 61:4, 61:16, 62:15, 83:11, 111:12, 113:17, 115:10, 127:20
**overseas** [9] - 69:23, 114:12, 115:7, 115:23, 120:11, 120:14, 120:17, 120:19, 128:24
**oversight** [1] - 18:9
**own** [9] - 22:12, 23:7, 29:3, 45:3, 80:8, 82:21, 82:23, 118:1, 128:15
**owned** [2] - 62:4, 118:3
**Owner** [1] - 86:11
**owner** [2] - 86:13, 117:25
**owners** [1] - 60:6

## P

**p.m** [14] - 1:8, 6:3, 6:4, 12:17, 40:5, 43:20, 48:10, 92:3, 96:7, 97:24, 134:3, 139:22

**P.M** [1] - 1:15
**P.O** [1] - 3:12
**PA** [1] - 2:18
**packet** [1] - 95:25
**Padilla** [4] - 3:7, 26:6, 27:4, 27:7
**Page** [1] - 5:7
**PAGE** [2] - 4:2, 4:7
**page** [38] - 6:23, 10:20, 72:20, 72:24, 73:8, 73:18, 73:20, 73:23, 74:19, 74:25, 75:2, 76:9, 76:16, 76:22, 76:25, 77:14, 83:20, 83:23, 84:1, 84:2, 84:3, 84:5, 84:8, 86:5, 86:8, 86:14, 86:16, 86:17, 86:20, 86:22, 86:23, 87:14, 88:7, 88:9, 92:7, 112:12, 116:14
**pages** [10] - 73:19, 81:4, 81:5, 86:3, 86:4, 105:24, 112:23, 113:8, 140:10
**paid** [4] - 34:6, 64:9, 64:12, 64:15
**Panchapakesan** [1] - 3:3
**paper** [1] - 130:1
**paragraph** [5] - 10:4, 10:5, 112:15, 127:6
**paraphrase** [1] - 76:5
**pardon** [2] - 27:23, 73:7
**parent** [1] - 32:8
**Park** [1] - 3:4
**parlance** [1] - 57:16
**parlor** [1] - 49:23
**part** [20] - 11:21, 19:9, 23:4, 31:20, 44:10, 46:11, 50:10, 53:7, 54:18, 56:5, 68:3, 72:24, 73:13, 77:13, 86:17, 89:19, 104:10, 120:2, 136:2
**participate** [1] - 128:6
**participated** [2] - 20:11, 49:24
**participating** [1] - 54:19
**particular** [17] - 7:14, 16:2, 24:8, 25:13, 69:15, 72:20, 72:24, 75:20, 77:5, 81:9, 83:16, 84:16, 86:2, 87:1, 98:8, 135:21, 136:1
**particularly** [3] -

26:17, 32:3, 103:5
**parties** [4] - 120:4, 120:5, 121:16
**partner** [1] - 62:1
**partnerships** [1] - 18:6
**parts** [1] - 49:7
**party** [1] - 44:7
**pass** [1] - 97:3
**passed** [1] - 96:23
**passes** [1] - 97:1
**passing** [1] - 67:5
**path** [1] - 15:3
**patient** [1] - 65:4
**patrol** [2] - 15:6, 15:23
**Paul** [1] - 2:12
**pay** [4] - 22:20, 24:2, 58:23, 68:10
**paying** [2] - 36:21, 90:10
**pcambria@lglaw. com** [1] - 2:14
**penalty** [1] - 112:12
**pending** [1] - 43:2
**people** [19] - 13:25, 19:13, 19:23, 21:5, 21:20, 24:9, 25:25, 29:11, 36:21, 49:21, 49:22, 50:1, 50:20, 53:9, 57:3, 58:1, 59:2, 60:6, 60:14
**percent** [1] - 14:5
**perhaps** [3] - 104:22, 108:10, 137:1
**period** [5] - 6:7, 19:8, 36:12, 64:5, 124:20
**perjury** [1] - 112:12
**Perlmeter** [1] - 2:4
**permissible** [1] - 11:8
**permission** [1] - 110:25
**permit** [7] - 7:15, 9:12, 9:17, 11:4, 43:12, 106:3
**permitted** [5] - 41:8, 92:13, 99:5, 105:23, 135:4
**person** [12] - 20:22, 32:6, 32:23, 33:1, 35:7, 35:11, 44:1, 69:12, 71:1, 81:24, 108:19
**personnel** [2] - 24:5, 30:1
**pertinent** [1] - 11:21
**Peter** [1] - 2:4
**peter.kozinets@ usdoj.gov** [1] - 2:6
**Phoenix** [6] - 1:7, 1:23, 2:5, 2:20, 3:9,

140:15
**phone** [12] - 24:8, 24:10, 25:14, 32:13, 39:16, 40:9, 41:4, 54:14, 74:24, 108:2, 108:3
**phones** [2] - 25:15, 25:16
**photo** [6] - 22:5, 32:9, 32:19, 32:22, 32:23, 33:1
**photos** [5] - 32:20, 33:4, 136:1, 136:16
**physical** [3] - 20:4, 24:4, 24:9
**physically** [1] - 98:5
**pick** [1] - 69:15
**picture** [2] - 32:19, 95:2
**piece** [2] - 127:13, 130:1
**pieces** [1] - 55:17
**Pima** [1] - 49:4
**pimp** [2] - 16:24, 16:25
**pirated** [1] - 33:4
**place** [10] - 6:6, 67:16, 69:15, 70:12, 87:2, 105:10, 105:18, 120:4, 121:1, 121:16
**places** [3] - 18:12, 49:8, 53:17
**Plaintiff** [1] - 1:6
**planning** [7] - 66:21, 67:1, 67:3, 67:6, 67:11, 67:21, 68:3
**PLC** [1] - 3:7
**pleasant** [1] - 12:21
**pled** [1] - 10:3
**podium** [2] - 12:14, 65:11
**point** [21] - 6:10, 7:22, 10:11, 10:17, 10:20, 15:19, 16:5, 17:6, 22:3, 25:8, 31:4, 33:13, 36:20, 46:15, 50:7, 56:4, 69:2, 93:17, 99:4, 104:11
**Polaris** [2] - 60:15, 130:17
**Police** [5] - 14:18, 15:1, 15:7, 17:24, 62:18
**police** [3] - 14:23, 16:1, 20:19
**polite** [1] - 58:11
**pops** [1] - 137:4
**portion** [4] - 9:2, 20:10, 104:6, 140:11
**position** [2] - 136:21,

136:24
**positive** [1] - 124:15
**possession** [2] - 70:5, 111:15
**possibly** [2] - 46:12, 46:21
**post** [5] - 22:12, 22:21, 23:12, 63:18, 63:24
**Post** [1] - 117:23
**posted** [8] - 23:7, 23:10, 24:14, 24:21, 31:1, 33:4, 57:3, 136:5
**posters** [1] - 59:2
**posting** [1] - 32:9
**postings** [1] - 25:19
**posts** [1] - 63:9
**potential** [3] - 21:2, 22:3, 92:25
**potentially** [3] - 57:18, 120:16, 139:6
**practice** [2] - 66:18, 66:20
**practices** [3] - 58:16, 129:11, 129:13
**practicing** [1] - 115:19
**Precinct** [4] - 15:7, 15:9, 15:23, 15:24
**precise** [2] - 136:25, 137:1
**preface** [1] - 122:15
**preferred** [1] - 129:5
**prefers** [1] - 102:7
**prejudice** [1] - 95:5
**preliminary** [1] - 19:17
**preparation** [1] - 109:12
**prepare** [6] - 37:8, 78:4, 83:6, 109:7, 112:10, 137:24
**Prepared** [1] - 1:25
**prepared** [6] - 43:25, 91:23, 112:9, 133:12, 139:19, 140:14
**preparer's** [1] - 84:14
**preparing** [1] - 67:3
**prepped** [1] - 44:4
**presence** [2] - 48:12, 92:21
**Presence** [4] - 4:3, 4:3, 4:4, 4:5
**present** [7] - 6:4, 12:17, 40:5, 48:10, 92:3, 97:24, 134:3
**preserve** [2] - 45:17, 126:24
**preserved** [1] - 45:15
**president** [1] - 13:22

**presidents** [1] - 18:25
**press** [1] - 135:16
**pretrial** [1] - 93:14
**pretty** [3] - 26:15, 33:3, 125:16
**previous** [2] - 11:3, 134:23
**previously** [5] - 46:12, 50:13, 85:5, 95:3, 100:2
**primarily** [2] - 28:5, 86:23
**Primis** [3] - 126:25, 128:17
**privacy** [1] - 136:1
**private** [2] - 14:9, 35:2
**privilege** [2] - 111:10, 111:22
**privileged** [8] - 110:24, 111:14, 111:19, 111:21, 111:24, 111:25, 112:18, 112:24
**probed** [1] - 105:25
**problem** [9] - 41:1, 42:7, 44:19, 68:22, 70:11, 131:17, 134:11, 134:24
**problematic** [2] - 21:4, 23:17
**procedural** [2] - 89:23, 95:10
**procedure** [4] - 103:17, 104:21, 105:3, 139:16
**procedures** [1] - 91:1
**proceed** [3] - 10:9, 97:11, 101:22
**proceedings** [1] - 140:12
**PROCEEDINGS** [2] - 1:13, 4:2
**Proceedings** [7] - 1:24, 4:3, 4:3, 4:4, 4:5, 6:3, 139:22
**process** [2] - 23:9, 26:19
**produce** [10] - 38:18, 38:19, 39:12, 40:25, 42:6, 45:10, 48:1, 110:15, 110:17, 112:17
**produceable** [1] - 44:11
**produced** [22] - 38:8, 39:6, 40:16, 41:19, 43:3, 44:21, 46:15, 93:13, 94:17, 96:11, 104:9, 104:18, 105:7, 110:7,

110:21, 110:23, 111:6, 112:23, 113:2, 113:8, 136:5, 138:10
**producing** [3] - 41:4, 110:5, 110:11
**production** [18] - 38:1, 38:5, 38:21, 40:14, 41:13, 41:14, 42:10, 46:4, 46:25, 93:8, 93:15, 94:5, 94:14, 94:19, 94:24, 105:9, 105:17, 105:22
**productions** [1] - 95:14
**proffer** [2] - 8:5, 10:13
**proffered** [1] - 8:4
**program** [7] - 8:12, 15:15, 15:21, 16:13, 16:14, 18:5, 18:6
**promise** [1] - 40:2
**promoted** [1] - 15:12
**promoting** [1] - 16:20
**promotion** [3] - 16:6, 16:10, 50:16
**promotional** [2] - 16:15, 16:19
**prompted** [3] - 7:8, 120:21, 120:22
**promptly** [1] - 134:1
**properly** [2] - 97:1, 97:3
**propose** [1] - 96:22
**prosecution** [1] - 21:2
**prosecutor** [2] - 92:16, 92:17
**prosecutor's** [1] - 43:11
**prosecutors** [6] - 107:7, 114:7, 114:11, 126:1, 127:2, 128:23
**prostitute** [1] - 51:11
**prostitution** [35] - 16:3, 16:6, 16:7, 16:10, 16:15, 16:19, 16:20, 16:23, 17:12, 20:9, 20:19, 20:22, 20:23, 21:16, 21:21, 23:5, 33:10, 50:14, 50:16, 50:17, 50:24, 51:4, 51:5, 51:21, 52:3, 52:6, 52:15, 52:16, 52:21, 53:13, 54:4, 55:15, 55:24, 56:8, 60:20
**prostitution-related** [3] - 51:21, 52:21, 54:4
**protect** [2] - 114:20,

135:25
**protected** [2] - 6:24, 9:24
**protection** [2] - 7:5, 32:7
**Protective** [1] - 54:13
**provide** [6] - 13:25, 14:1, 28:4, 28:16, 33:10, 69:24
**provided** [17] - 19:15, 19:20, 19:23, 22:2, 27:2, 37:14, 38:3, 39:5, 72:12, 94:13, 96:10, 96:14, 99:20, 101:18, 137:9, 139:11, 139:16
**provides** [2] - 42:4, 94:18
**providing** [3] - 16:21, 95:8, 96:19
**provision** [1] - 137:3
**public** [8] - 16:11, 23:6, 51:25, 52:16, 135:19, 136:3, 136:5
**publications** [2] - 117:23, 119:9
**published** [7] - 74:17, 77:20, 78:22, 79:17, 85:14, 89:3, 89:16
**pull** [5] - 73:23, 76:8, 87:6, 97:5, 102:20
**pulled** [1] - 64:1
**purpose** [4] - 28:14, 31:18, 103:20, 114:19
**purposes** [2] - 47:1, 92:6
**pursuant** [3] - 24:17, 70:16, 105:4
**pursue** [1] - 135:10
**put** [18] - 9:3, 23:25, 58:24, 59:8, 59:25, 64:3, 64:11, 65:13, 70:12, 72:16, 72:17, 84:13, 97:6, 102:6, 120:3, 121:15, 122:10, 131:17
**puts** [1] - 81:2
**puzzling** [1] - 95:6

**Q**

**qualified** [2] - 90:20, 140:8
**questioning** [4] - 40:18, 43:9, 43:10, 50:2
**questions** [19] - 7:18, 28:16, 31:20, 48:18, 49:10, 53:21, 62:24,

63:8, 76:25, 96:24, 96:25, 97:12, 98:4, 100:8, 103:10, 106:2, 107:14, 120:15, 130:24
**quite** [3] - 63:15, 94:14, 111:3
**quote** [1] - 75:20

**R**

**raise** [4] - 13:5, 65:19, 134:14
**raised** [1] - 131:22
**ran** [2] - 49:2, 131:13
**range** [2] - 27:18, 103:5
**rank** [2] - 14:19, 14:20
**Rapp** [1] - 2:3
**rapport** [1] - 21:20
**rate** [1] - 119:2
**rather** [3] - 51:10, 96:17, 98:13
**rattle** [1] - 136:21
**re** [1] - 78:14
**reached** [2] - 35:19, 82:10
**reaching** [1] - 56:7
**read** [22] - 41:22, 44:12, 56:20, 75:6, 75:20, 76:3, 77:23, 112:25, 117:22, 117:23, 118:2, 121:4, 124:25, 125:5, 126:4, 127:9, 129:20, 129:21, 130:3, 130:4, 130:7
**reading** [4] - 102:17, 116:20, 117:24, 130:7
**reads** [2] - 116:18, 120:2
**ready** [10] - 12:20, 13:11, 33:19, 121:4, 133:25, 134:9, 134:12, 138:9, 138:12, 139:19
**really** [8] - 8:3, 18:14, 25:16, 37:21, 52:8, 104:19, 104:20
**realm** [1] - 115:19
**reason** [9] - 24:21, 24:25, 33:9, 45:6, 87:1, 104:8, 124:3, 125:3, 125:4
**reasons** [3] - 11:23, 21:5, 24:25
**rebuild** [1] - 31:1
**REC'D** [2] - 4:15, 5:2
**recalling** [1] - 99:17

**receive** [7] - 14:7, 26:15, 36:1, 36:10, 72:4, 78:3, 137:4
**received** [8] - 109:25, 110:8, 113:3, 113:9, 135:15, 137:15, 137:22, 137:23
**receiving** [2] - 58:18, 110:3
**recess** [2] - 41:9, 95:19
**Recess** [2] - 43:20, 96:7
**recessed** [1] - 92:24
**reciprocal** [1] - 8:12
**recognize** [5] - 78:14, 79:2, 80:13, 80:14, 89:7
**recollect** [1] - 133:10
**recollection** [5] - 104:7, 116:12, 117:2, 118:12, 127:12
**reconvene** [2] - 6:3, 43:18
**Record** [1] - 56:20
**record** [9] - 41:11, 45:25, 48:12, 92:6, 93:5, 104:3, 105:2, 135:6, 136:2
**recorded** [4] - 17:12, 35:13, 41:25, 108:23
**recording** [3] - 36:24, 73:12
**records@backpage. com** [1] - 29:9
**recross** [1] - 103:14
**recruited** [2] - 15:5, 17:1
**recruitment** [1] - 15:21
**redacted** [3] - 7:1, 9:13, 9:20
**Redirect** [2] - 4:9, 4:12
**REDIRECT** [2] - 63:2, 132:2
**redirect** [5] - 104:5, 104:11, 105:16, 131:21, 131:25
**reexamine** [2] - 47:2, 99:6
**refer** [3] - 57:23, 68:14, 120:11
**reference** [2] - 57:15, 64:14
**references** [5] - 23:12, 63:24, 63:25, 101:3, 103:6
**referral** [1] - 32:8
**referred** [2] - 8:6,

50:14
**referring** [5] - 6:12, 63:24, 73:16, 121:10, 134:19
**refiled** [1] - 127:15
**reflect** [3] - 48:12, 93:6, 120:18
**reflecting** [1] - 86:18
**refresh** [7] - 38:7, 44:8, 44:9, 102:25, 116:12, 117:2, 127:12
**refreshed** [2] - 12:20, 104:7
**regard** [5] - 9:8, 67:14, 94:16, 134:20, 135:18
**regarding** [5] - 30:9, 67:7, 83:18, 93:7, 105:17
**region** [1] - 33:5
**reiterate** [1] - 11:19
**relate** [1] - 50:3
**related** [17] - 11:2, 16:6, 51:21, 52:16, 52:21, 54:4, 57:19, 85:6, 94:3, 94:13, 96:12, 96:15, 105:14, 105:23, 110:18, 135:2
**relates** [2] - 9:25, 137:25
**relationship** [6] - 19:3, 21:19, 58:20, 59:1, 126:24, 129:15
**relationships** [2] - 19:1, 31:1
**relearn** [1] - 30:25
**release** [3] - 97:20, 110:25, 111:2
**released** [7] - 103:13, 103:23, 106:5, 106:10, 106:14, 132:21, 133:2
**Relevance** [1] - 59:9
**relevance** [9] - 29:17, 30:17, 59:15, 60:8, 61:12, 62:6, 90:17, 115:9, 127:18
**relevant** [9] - 6:24, 8:13, 9:21, 10:8, 11:3, 23:5, 31:23, 41:7, 105:13
**reliable** [1] - 8:13
**relied** [3] - 10:2, 31:2, 94:24
**relitigation** [1] - 93:24
**relying** [2] - 9:1, 31:3
**remain** [2] - 99:7, 99:24

**remained** [3] - 15:16, 15:18, 15:21
**remarked** [1] - 77:1
**remember** [32] - 19:7, 23:3, 26:9, 26:10, 29:8, 35:4, 40:1, 49:4, 76:21, 77:5, 91:24, 100:14, 101:6, 107:20, 107:24, 110:3, 110:5, 110:10, 110:11, 114:7, 114:11, 116:8, 122:2, 123:3, 123:14, 125:25, 126:14, 127:2, 128:23, 129:2, 129:23, 134:8
**remind** [5] - 12:22, 40:13, 94:18, 99:24, 133:22
**remotely** [1] - 93:11
**remove** [1] - 104:14
**removed** [1] - 23:17
**removing** [1] - 7:1
**renewed** [1] - 40:14
**reopen** [2] - 106:2, 135:4
**repeat** [4] - 55:16, 56:16, 104:13, 127:22
**repetitious** [1] - 104:14
**rephrase** [1] - 57:8
**replete** [1] - 7:16
**Report** [1] - 80:16
**report** [10] - 37:5, 62:10, 69:25, 78:4, 80:16, 80:19, 90:7, 126:2, 126:4
**Reported** [1] - 1:24
**REPORTER** [1] - 45:24
**Reporter** [3] - 1:21, 1:24, 140:8
**reporter** [3] - 18:14, 56:18, 137:17
**REPORTER'S** [1] - 1:13
**reporting** [7] - 71:7, 72:5, 75:7, 75:10, 75:21, 79:8, 132:11
**reports** [2] - 78:6, 124:20
**repost** [1] - 23:15
**represent** [1] - 117:25
**representative** [1] - 31:19
**represented** [2] - 105:11, 118:3

**request** [17] - 37:8, 40:14, 97:15, 103:17, 134:16, 134:17, 134:18, 134:20, 134:25, 136:10, 136:13, 136:18, 136:25, 137:1, 137:8, 137:25
**requested** [5] - 63:8, 79:9, 79:11, 96:23, 137:11
**requesting** [1] - 137:19
**Requesting** [1] - 4:18
**requests** [4] - 26:13, 43:4, 136:8, 137:22
**require** [1] - 34:22
**required** [13] - 25:18, 69:23, 70:9, 70:10, 79:7, 80:19, 81:1, 85:3, 86:24, 88:20, 89:10, 89:23, 124:8
**requirements** [5] - 71:7, 72:5, 90:6, 91:9, 91:13
**research** [1] - 117:15
**reserve** [2] - 64:22, 99:1
**resolve** [1] - 73:11
**resolved** [1] - 76:22
**resource** [3] - 61:24, 63:4, 63:6
**respect** [14] - 8:24, 9:22, 20:13, 27:15, 30:1, 32:1, 33:7, 38:9, 38:13, 38:16, 41:21, 42:3, 44:6, 50:6
**respectfully** [2] - 43:13, 43:14
**respite** [1] - 39:21
**respond** [5] - 75:24, 113:14, 137:6
**responded** [3] - 100:21, 113:16, 134:6
**responders** [1] - 14:2
**responding** [1] - 29:12
**response** [7] - 25:3, 25:9, 29:7, 36:1, 76:2, 76:6, 76:14
**responses** [1] - 63:7
**responsible** [1] - 75:10
**responsive** [5] - 26:13, 27:5, 28:2, 30:4, 112:24
**restate** [2] - 61:5, 71:2
**rested** [1] - 12:23

**result** [3] - 68:21, 69:8, 98:19
**resume** [3] - 97:21, 99:23, 106:19
**retained** [2] - 68:5, 70:8
**retired** [1] - 34:1
**Return** [1] - 86:11
**return** [9] - 24:16, 28:5, 28:17, 31:2, 37:20, 68:10, 70:1, 90:8, 118:25
**returned** [1] - 17:18
**Returns** [1] - 4:19
**returns** [4] - 26:19, 27:1, 79:7, 79:8
**Revenue** [4] - 68:4, 79:5, 81:2, 85:2
**reverse** [5] - 22:14, 22:16, 22:17, 22:19
**review** [10] - 36:22, 37:9, 37:21, 39:19, 40:8, 58:24, 72:11, 100:21, 101:4, 109:11
**Review** [4] - 8:12, 58:21, 58:23, 129:16
**reviewed** [12] - 37:6, 37:12, 37:22, 38:16, 39:4, 41:5, 41:7, 42:1, 91:8, 93:16, 101:1, 103:3
**revisit** [1] - 120:2
**Rick** [2] - 139:6, 139:8
**Rights** [1] - 135:24
**rise** [11] - 12:16, 40:4, 43:19, 48:7, 48:9, 91:25, 95:20, 96:8, 97:23, 134:2, 139:21
**rises** [1] - 95:12
**risk** [2] - 54:22, 104:14
**RMR** [2] - 1:21, 140:20
**Road** [2] - 2:16, 2:19
**role** [1] - 19:10
**Roman** [3] - 10:21, 10:24, 11:7
**room** [4] - 40:7, 45:1, 92:5, 97:18
**rose** [1] - 25:7
**roughly** [1] - 125:7
**Rule** [8] - 38:2, 38:18, 40:25, 41:13, 42:4, 42:23, 44:12, 94:5
**rule** [4] - 41:22, 44:6, 44:7, 95:10
**ruled** [1] - 136:16
**rules** [1] - 93:9
**ruling** [2] - 135:4, 136:24
**run** [1] - 49:2

**runaway** [2] - 32:8, 54:13
**runaways** [2] - 54:18, 54:22

## S

**Sableman** [9] - 6:11, 6:17, 6:22, 7:10, 7:24, 8:23, 11:7, 11:25, 12:10
**sale** [3] - 117:5, 117:7, 117:11
**sanctioned** [1] - 113:21
**Sandra** [1] - 1:22
**satisfy** [1] - 90:5
**Saturday** [1] - 108:22
**saw** [2] - 31:12, 44:2
**scheduled** [1] - 11:10
**scheduling** [1] - 108:9
**school** [3] - 15:6, 17:3, 17:18
**SCIME** [1] - 2:12
**scope** [4] - 30:17, 59:11, 59:17, 61:11
**Scott** [1] - 2:15
**Scottsdale** [4] - 2:16, 2:17, 3:12, 66:14
**screen** [5] - 72:17, 76:7, 76:12, 84:5, 122:7
**seal** [1] - 137:25
**sealed** [1] - 136:2
**sealing** [1] - 136:14
**search** [3] - 23:18, 32:11, 32:13
**seat** [3] - 48:6, 65:23, 97:21
**seated** [7] - 6:5, 12:18, 13:10, 40:12, 48:11, 97:25, 134:4
**second** [8] - 49:14, 62:8, 66:5, 83:20, 83:23, 99:21, 105:15, 139:5
**secondly** [1] - 44:6
**Section** [7] - 7:2, 8:25, 9:3, 9:14, 10:21, 68:5, 135:24
**section** [7] - 10:24, 11:4, 11:8, 53:2, 53:4, 53:6, 117:19
**security** [1] - 126:12
**see** [35] - 45:4, 45:7, 46:9, 64:4, 74:19, 74:23, 74:25, 75:4, 76:6, 76:8, 76:12, 80:13, 80:14, 84:6, 84:9, 84:24, 88:2,

96:20, 101:25, 104:11, 106:1, 109:23, 112:15, 112:19, 114:2, 116:11, 116:16, 116:25, 119:17, 120:6, 121:3, 122:7, 122:9, 131:23, 137:1
**seeing** [1] - 88:7
**seeking** [4] - 22:20, 53:10, 64:22, 135:16
**Seminary** [2] - 130:8, 130:19
**Senate** [4] - 62:10, 126:1, 126:4, 127:25
**Senate's** [1] - 126:9
**send** [1] - 29:4
**sending** [4] - 108:4, 120:25, 128:24, 131:2
**sense** [3] - 54:1, 94:15, 113:14
**sent** [6] - 29:8, 35:25, 37:10, 108:10, 111:17, 118:16
**separate** [1] - 98:11
**September** [1] - 15:19
**Sergeant** [1] - 62:18
**sergeant** [2] - 15:12, 15:13
**series** [3] - 37:9, 37:12, 102:6
**serious** [1] - 136:10
**service** [2] - 14:5, 16:1
**Service** [3] - 6:9, 79:5, 85:2
**Services** [1] - 54:13
**session** [1] - 137:12
**SESSION** [1] - 1:15
**setting** [1] - 120:22
**seven** [3] - 10:23, 110:9, 116:2
**several** [4] - 26:4, 81:4, 86:2, 118:22
**sex** [19] - 20:24, 22:20, 22:21, 50:11, 50:20, 51:4, 54:19, 55:15, 55:23, 56:3, 56:9, 57:3, 57:13, 57:15, 57:17, 57:23, 58:6, 101:3, 103:6
**sex-act-for-money** [1] - 57:3
**sex-for-money** [1] - 57:13
**sex-trafficking** [1] - 56:3
**sexual** [1] - 63:25
**sexuality** [1] - 17:9
**shared** [2] - 8:7, 10:14

**sharply** [1] - 139:19
**Shawn** [1] - 2:4
**sheet** [2] - 84:12, 86:19
**shelters** [1] - 14:6
**shirt** [1] - 48:21
**shop** [1] - 49:23
**short** [2] - 64:4, 137:24
**show** [12] - 23:24, 86:12, 86:13, 92:13, 93:5, 101:8, 101:15, 119:11, 122:5, 122:13, 122:20, 135:6
**showed** [5] - 85:5, 108:14, 109:5, 119:15, 124:2
**showing** [4] - 78:13, 79:2, 86:19, 95:5
**shown** [11] - 11:17, 11:18, 38:17, 38:24, 40:24, 43:24, 44:9, 44:10, 103:21, 107:10, 109:10, 112:3, 135:1, 135:3
**shut** [3] - 30:12, 30:15, 53:24
**side** [3] - 24:11, 35:16, 36:17
**sidebar** [4] - 92:20, 103:25, 104:3, 106:8
**signed** [4] - 25:7, 29:3, 86:24, 112:12
**significance** [1] - 92:25
**similar** [1] - 53:12
**simply** [3] - 44:10, 71:20, 137:16
**single** [2] - 44:1, 98:15
**sister** [1] - 135:22
**site** [1] - 58:24
**sites** [2] - 29:15, 30:2
**sitting** [1] - 139:12
**situation** [4] - 40:15, 56:1, 67:8, 73:5
**six** [3] - 10:23, 110:9, 125:19
**six-month** [1] - 125:19
**slow** [2] - 18:13, 18:16
**slower** [1] - 20:7
**small** [1] - 122:9
**smooth** [1] - 45:7
**Snyder** [14] - 4:8, 13:2, 13:3, 13:16, 13:17, 18:13, 33:22, 48:17, 63:4, 97:4, 99:3, 99:17, 100:6, 134:20
**SNYDER** [2] - 13:6,

100:2
**society** [1] - 17:13
**solid** [1] - 132:14
**solve** [1] - 68:22
**someone** [7] - 6:14, 16:19, 21:24, 68:14, 81:5, 118:1, 118:3
**sometime** [1] - 30:14
**sometimes** [3] - 27:10, 57:22, 85:18
**somewhat** [1] - 51:9
**somewhere** [1] - 65:9
**sons** [1] - 132:16
**sooner** [1] - 96:17
**sophisticated** [1] - 25:19
**sorry** [32] - 12:8, 14:14, 15:5, 17:12, 19:10, 25:5, 25:21, 38:11, 42:8, 42:13, 55:10, 55:11, 57:4, 61:8, 71:19, 72:22, 72:23, 79:23, 80:4, 80:9, 89:1, 92:11, 94:8, 94:11, 97:17, 99:13, 102:20, 104:18, 109:17, 121:14, 138:16, 138:17
**sort** [18] - 16:3, 19:14, 28:3, 32:15, 49:16, 55:15, 57:22, 63:20, 64:2, 66:18, 66:25, 80:2, 90:18, 104:21, 105:12, 111:1, 135:8, 136:10
**sorts** [1] - 64:1
**sought** [1] - 9:9
**sounds** [3] - 18:9, 93:15, 138:19
**source** [5] - 31:23, 54:9, 56:8, 116:9, 116:18
**sources** [2] - 20:3, 31:2
**Spc** [1] - 1:22
**speaking** [4] - 6:14, 10:18, 27:21, 77:25
**Spear** [2] - 2:15, 133:13
**specialized** [1] - 49:25
**specially** [1] - 19:7
**specific** [7] - 32:5, 54:11, 57:16, 57:23, 135:20, 136:15, 136:20
**specifically** [4] - 25:17, 28:6, 28:16, 117:6
**specifics** [2] - 90:4,

119:1
**specified** [1] - 140:13
**speech** [2] - 6:24, 18:16
**spending** [1] - 117:24
**sprung** [1] - 137:7
**square** [1] - 23:13
**staff** [1] - 74:3
**stage** [1] - 36:7
**stages** [2] - 24:13, 26:14
**Stan** [1] - 139:6
**stand** [16] - 12:14, 13:9, 38:10, 38:12, 41:1, 41:9, 42:21, 44:4, 48:8, 48:13, 65:5, 65:23, 91:22, 95:19, 121:22, 133:21
**standing** [2] - 40:14, 135:9
**start** [5] - 22:25, 34:15, 43:14, 52:20, 102:17
**started** [14] - 15:15, 15:17, 16:9, 16:13, 18:5, 23:2, 23:4, 49:2, 49:5, 49:10, 51:9, 51:20, 105:5, 135:13
**starting** [4] - 15:2, 22:3, 33:13
**starts** [2] - 74:24, 97:3
**State** [1] - 66:16
**state** [3] - 14:7, 18:4, 66:5
**state-level** [1] - 14:7
**statement** [14] - 41:15, 41:21, 41:23, 41:24, 42:1, 42:10, 42:21, 43:3, 46:13, 82:17, 90:9, 97:19, 116:21
**statements** [6] - 41:16, 93:8, 93:15, 93:16, 95:8, 112:11
**STATES** [3] - 1:1, 2:2, 2:8
**states** [2] - 18:7, 18:8
**States** [13] - 1:5, 19:6, 38:1, 38:3, 38:4, 67:23, 71:13, 89:24, 90:16, 109:25, 111:5, 111:7, 140:9
**statute** [2] - 11:2, 137:24
**Stein** [14] - 68:18, 68:19, 69:10, 69:11, 75:7, 75:21, 78:3, 87:2, 120:16, 120:22, 120:23,

121:10, 129:7
**Stenographic** [1] - 1:24
**step** [15] - 13:8, 40:6, 40:7, 40:8, 47:5, 65:7, 65:22, 68:2, 92:1, 99:8, 106:17, 123:19, 133:2, 133:3
**Steve** [2] - 6:18
**stickler** [1] - 71:14
**still** [6] - 7:23, 45:20, 45:23, 59:7, 99:24, 139:12
**sting** [4] - 22:16, 22:17, 22:19
**stings** [1] - 22:14
**stone** [1] - 97:3
**Stone** [2] - 2:3, 4:11
**STONE** [59] - 7:20, 7:22, 8:2, 8:9, 8:15, 8:18, 10:11, 10:16, 68:24, 70:19, 70:22, 71:8, 71:16, 71:22, 71:24, 72:6, 72:20, 73:6, 73:18, 75:12, 76:16, 78:20, 79:15, 81:8, 82:16, 83:10, 85:9, 87:3, 87:14, 89:1, 89:14, 89:25, 90:11, 90:17, 91:3, 91:10, 98:22, 106:22, 107:10, 107:12, 111:13, 112:2, 112:6, 113:12, 113:13, 113:19, 115:12, 116:23, 116:24, 119:13, 119:14, 119:18, 119:19, 127:21, 130:23, 131:1, 131:19, 131:25, 132:25
**straight** [1] - 50:24
**strategic** [1] - 15:11
**Street** [4] - 1:22, 117:22, 129:25, 130:4
**street** [4] - 15:8, 16:5, 52:8, 57:16
**streets** [1] - 52:10
**stricken** [1] - 71:25
**strictly** [1] - 50:14
**strike** [2] - 71:22, 71:24
**strip** [1] - 56:24
**Strouse** [3] - 138:18, 138:25
**structure** [5] - 67:22,

68:9, 69:22, 71:12, 121:11
**structured** [1] - 67:4
**structures** [1] - 67:16
**struggling** [1] - 14:1
**students** [1] - 82:11
**studies** [1] - 17:8
**stuff** [4] - 39:10, 46:15, 59:7, 93:13
**subject** [5] - 51:5, 105:13, 105:14, 112:18, 129:23
**subjects** [1] - 131:22
**submit** [1] - 137:9
**subparts** [2] - 10:23, 49:17
**Subparts** [1] - 127:8
**subpoena** [32] - 25:7, 28:24, 29:7, 34:10, 34:12, 34:13, 34:14, 34:21, 36:10, 37:20, 47:1, 47:5, 65:2, 103:13, 103:24, 106:11, 106:14, 109:25, 110:3, 110:8, 110:10, 110:13, 110:17, 110:23, 111:1, 111:6, 112:18, 113:3, 113:9, 113:15, 132:22, 133:2
**subpoenaed** [2] - 34:8, 95:16
**subpoenas** [3] - 29:1, 29:3, 34:16
**Subsection** [1] - 135:24
**substantive** [3] - 38:15, 44:20, 47:24
**sufficiently** [1] - 106:1
**suggested** [2] - 87:2, 93:12
**suggesting** [2] - 9:22, 102:5
**suggestion** [2] - 47:21, 92:14
**Suite** [7] - 1:22, 2:5, 2:13, 2:16, 2:19, 3:4, 3:8
**SUMMARY** [1] - 4:2
**super** [1] - 59:2
**supervisor** [1] - 15:23
**support** [5] - 14:1, 16:11, 16:22, 26:16, 93:21
**supporting** [1] - 63:10
**suppose** [1] - 131:15
**supposed** [3] - 11:15, 80:25, 81:1

**surprised** [1] - 104:16
**surveillance** [6] - 15:10, 15:13, 19:20, 19:21, 20:4
**Suskin** [2] - 6:14, 6:18
**suspected** [2] - 20:23, 54:18
**suspicious** [1] - 103:4
**sustain** [4] - 57:7, 60:12, 81:17, 82:21
**sustained** [22] - 21:10, 26:23, 30:10, 55:2, 60:18, 62:7, 68:25, 70:23, 71:9, 71:17, 75:13, 75:17, 82:18, 87:4, 90:1, 90:12, 90:19, 90:22, 91:6, 91:11, 113:11, 116:22
**swear** [1] - 65:16
**swiftly** [1] - 80:5
**sworn** [6] - 13:4, 13:6, 20:11, 65:10, 65:20, 100:2

## T

**targeting** [1] - 22:19
**task** [6] - 15:13, 16:8, 18:2, 19:9, 23:3, 42:9
**Tax** [1] - 4:18
**tax** [6] - 66:17, 69:25, 79:7, 90:8, 118:25, 120:3
**taxes** [2] - 90:9, 90:10
**taxing** [2] - 18:14, 90:16
**taxpayer** [1] - 81:3
**TAYLOR** [1] - 140:7
**Taylor** [3] - 1:21, 140:19, 140:20
**team** [6] - 15:11, 35:3, 36:8, 36:16, 100:9, 100:17
**technical** [2] - 19:20, 119:20
**temporary** [2] - 136:14, 136:24
**ten** [4] - 37:18, 40:3, 47:18, 137:12
**tended** [2] - 33:10, 64:4
**term** [3] - 16:15, 50:19, 51:9
**terms** [14] - 7:7, 11:6, 18:9, 22:24, 23:21, 23:22, 26:19, 32:3, 38:21, 57:13, 92:19, 95:8, 123:2, 123:11

**testified** [12] - 28:23, 48:20, 51:19, 53:24, 54:11, 110:18, 114:14, 123:5, 123:11, 123:20, 135:22, 135:23
**testifies** [1] - 94:20
**testify** [11] - 7:11, 8:24, 11:7, 11:10, 11:15, 11:25, 44:11, 44:16, 58:15, 64:9, 65:4
**testifying** [7] - 21:8, 26:21, 56:14, 60:10, 108:17, 114:5, 136:7
**testimony** [17] - 9:4, 30:8, 41:5, 41:8, 46:5, 62:13, 64:25, 96:15, 99:25, 100:7, 105:14, 106:14, 107:18, 109:7, 109:12, 118:11, 133:2
**text** [24] - 35:20, 35:24, 36:4, 38:1, 38:13, 38:21, 39:11, 39:15, 43:17, 44:17, 45:10, 46:25, 47:23, 94:5, 94:25, 96:2, 100:12, 100:16, 100:21, 101:1, 103:2, 104:14, 105:1, 105:24
**texting** [1] - 45:9
**texts** [2] - 96:11, 134:21
**themself** [1] - 16:20
**themselves** [4] - 21:21, 37:23, 63:15, 63:18
**Theological** [3] - 130:8, 130:19
**theology** [2] - 17:19, 17:20
**thereafter** [1] - 112:23
**therein** [1] - 140:13
**they've** [1] - 40:24
**thousand** [1] - 118:22
**three** [2] - 105:1, 139:17
**throughout** [1] - 27:8
**Thursday** [1] - 139:1
**timely** [1] - 85:7
**today** [15] - 30:9, 34:3, 34:6, 34:8, 39:1, 99:7, 107:18, 108:17, 109:7, 109:12, 114:5, 133:8, 134:8, 135:13, 135:15

**together** [1] - 46:2
**tomorrow** [3] - 47:6, 133:14, 134:11
**took** [8] - 15:3, 15:19, 18:4, 21:19, 51:8, 59:7, 59:24, 134:13
**top** [3] - 74:23, 74:24, 121:4
**total** [1] - 105:1
**toward** [1] - 19:23
**town** [1] - 99:5
**toxic** [2] - 126:17, 126:20
**track** [1] - 32:14
**traditional** [1] - 20:21
**trafficked** [1] - 54:23
**Trafficking** [5] - 18:24, 19:3, 31:16, 31:21, 48:23
**trafficking** [40] - 15:15, 16:3, 16:7, 16:9, 16:13, 16:14, 18:5, 18:6, 18:10, 19:17, 19:18, 48:19, 49:3, 49:11, 49:15, 49:20, 49:22, 49:25, 50:1, 50:9, 50:11, 51:2, 51:4, 51:10, 51:11, 51:20, 51:23, 52:21, 54:4, 54:19, 54:20, 55:6, 55:12, 55:15, 55:20, 55:22, 55:23, 56:3, 56:9, 62:2
**training** [5] - 19:11, 19:12, 19:15, 19:20, 63:10
**trainings** [2] - 49:5, 62:23
**transaction** [7] - 68:3, 110:18, 120:8, 121:8, 123:21, 128:5, 132:14
**transactions** [2] - 116:3, 126:7
**transcript** [2] - 140:11, 140:13
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:13
**Transcription** [1] - 1:25
**transfer** [4] - 70:14, 114:12, 118:14, 122:2
**transferred** [4] - 15:14, 98:6, 98:14, 114:24
**transfers** [4] - 68:9, 98:19, 126:15,

127:17
**transmittal** [1] - 87:11
**trauma** [3] - 19:18, 19:24, 21:6
**trauma-informed** [1] - 19:24
**traumatize** [1] - 19:25
**traumatizes** [1] - 21:5
**travel** [1] - 36:2
**Treasury** [1] - 69:24
**treat** [2] - 111:20, 111:24
**trial** [7] - 30:9, 43:5, 44:1, 46:16, 94:15, 104:19, 108:8
**TRIAL** [1] - 1:14
**tried** [2] - 11:16, 63:18
**trouble** [2] - 113:22, 114:8
**true** [5] - 43:24, 44:16, 54:3, 118:6, 140:17
**truly** [1] - 63:16
**trust** [24] - 66:20, 66:21, 68:5, 69:10, 69:11, 70:13, 71:6, 75:10, 78:17, 83:18, 84:16, 86:12, 86:18, 86:19, 88:14, 89:24, 90:14, 98:6, 98:12, 114:18, 114:19, 128:20, 132:10, 132:15
**Trust** [2] - 4:16, 86:11
**trustee** [5] - 70:10, 86:21, 86:24, 128:17, 131:14
**trusts** [8] - 68:10, 70:7, 70:8, 98:11, 115:19, 131:13, 131:14
**truth** [2] - 64:15, 110:4
**try** [9] - 21:6, 21:19, 23:13, 23:15, 23:19, 24:13, 30:6, 54:15, 56:19
**trying** [5] - 18:15, 24:15, 24:16, 24:17, 46:10
**Tuesday** [1] - 128:2
**turn** [3] - 93:6, 102:19, 138:15
**turned** [3] - 43:4, 47:25, 105:13
**Twin** [1] - 18:7
**two** [17] - 6:16, 17:17, 43:5, 43:22, 84:2, 86:9, 92:9, 93:9, 96:23, 96:24, 97:12, 105:1, 105:24, 132:16, 133:10,

134:7, 138:22
**type** [6] - 28:22, 42:12, 53:12, 67:20, 82:13, 126:8
**types** [4] - 19:12, 102:5, 116:3, 117:23
**typically** [5] - 20:25, 21:19, 27:10, 29:3, 57:22

## U

**U.S** [12] - 1:22, 19:7, 25:4, 25:5, 28:13, 33:5, 81:3, 86:11, 86:13, 90:6, 107:3, 114:1
**U.S.C** [1] - 135:24
**ubiquity** [1] - 17:11
**ultimate** [3] - 7:19, 10:4
**ultimately** [4] - 129:6, 129:8, 136:8, 136:20
**unaware** [2] - 58:25, 60:3
**uncomfortable** [2] - 51:1, 58:8
**unconfirmed** [1] - 56:4
**under** [21] - 14:7, 19:15, 38:2, 38:5, 38:18, 40:25, 68:4, 70:5, 70:6, 72:18, 81:1, 94:4, 99:8, 99:24, 112:12, 118:23, 118:25, 119:5, 135:23, 135:24, 140:14
**undercover** [5] - 19:21, 19:22, 19:24, 22:14, 63:19
**undergraduate** [1] - 17:5
**understood** [5] - 9:4, 117:8, 117:10, 120:24, 121:15
**unfair** [2] - 42:13, 43:9
**unfounded** [1] - 92:14
**unit** [5] - 15:14, 15:18, 15:20, 16:5, 126:12
**UNITED** [3] - 1:1, 2:2, 2:8
**United** [13] - 1:5, 19:6, 37:25, 38:3, 38:4, 67:23, 71:13, 89:24, 90:16, 109:25, 111:5, 111:6, 140:9
**units** [2] - 14:22, 17:23
**university** [1] - 17:2

**University** [4] - 17:3, 17:14, 66:16, 66:17
**unless** [2] - 113:9, 128:5
**unpack** [1] - 49:14
**unresponsive** [1] - 26:15
**unseal** [1] - 136:19
**unspecified** [1] - 39:4
**up** [24] - 7:2, 14:17, 18:15, 23:24, 31:3, 36:20, 49:6, 52:22, 64:4, 64:6, 65:14, 72:16, 72:17, 73:23, 74:8, 76:8, 80:2, 87:6, 88:10, 119:20, 120:22, 121:4, 134:13, 137:4
**upset** [1] - 132:17
**urgent** [1] - 56:3
**uses** [1] - 44:7
**utilize** [3] - 31:2, 52:20, 54:14
**utilized** [1] - 52:12, 56:24
**utilizing** [1] - 49:10

## V

**vacation** [1] - 34:4
**vague** [2] - 63:15, 103:5
**variety** [1] - 20:4
**various** [1] - 119:9
**vast** [1] - 32:21
**Vaught** [4] - 3:10, 26:10, 27:15, 31:13
**veiled** [1] - 63:25
**versa** [1] - 53:10
**vice** [3] - 13:22, 18:25, 53:10
**victim** [6] - 19:18, 19:24, 21:18, 51:8, 51:9, 51:10
**Victim's** [1] - 135:23
**victim-centered** [2] - 19:24, 51:8
**victim-centric** [1] - 51:9
**victims** [8] - 19:19, 20:1, 54:4, 135:21, 135:25, 136:6, 136:16, 136:17
**view** [1] - 128:4
**Village** [1] - 6:8
**visit** [2] - 68:19, 121:5
**Voice** [2] - 6:8, 25:16
**voicemail** [2] - 35:2, 35:6
**volunteering** [1] -

34:21
**vs** [1] - 1:7

## W

**wait** [5] - 40:7, 42:23, 47:16, 59:13
**waiting** [4] - 43:16, 46:4, 46:20
**Wall** [3] - 117:22, 129:25, 130:4
**Walter** [1] - 2:16
**wants** [6] - 40:20, 42:5, 44:20, 45:2, 45:4, 76:17
**Washington** [3] - 1:22, 2:10, 117:22
**watch** [3] - 65:7, 106:17, 133:3
**ways** [1] - 71:6
**wearing** [1] - 48:21
**website** [2] - 62:4, 117:17
**websites** [2] - 29:23, 30:2
**week** [5] - 13:25, 34:4, 36:13, 37:10, 40:14
**weekend** [2] - 12:21, 37:11
**welcome** [1] - 12:19
**wellness** [1] - 20:2
**West** [1] - 1:22
**what'd** [1] - 76:1
**whereas** [1] - 14:21
**wife** [2] - 14:13, 58:2
**willing** [2] - 21:17, 36:8
**wire** [6] - 98:12, 98:15, 115:6, 126:15, 131:10, 131:16
**wired** [12] - 14:22, 114:25, 115:22, 116:1, 116:4, 120:8, 123:6, 123:24
**wires** [2] - 98:13, 116:2
**wish** [7] - 7:1, 76:24, 77:1, 85:18, 85:21, 98:25, 135:10
**wishes** [1] - 96:16
**withdraw** [1] - 123:18
**withdrawn** [1] - 28:1
**withheld** [2] - 9:16, 127:3
**WITNESS** [27] - 12:15, 18:18, 18:20, 56:16, 56:21, 60:3, 60:25, 61:5, 61:17, 62:16, 65:24, 69:5, 72:8, 88:11, 89:19, 92:2,

99:10, 99:12, 100:1, 102:17, 106:16, 106:20, 112:5, 113:18, 115:11, 133:4, 133:6
**witness** [74] - 9:19, 12:14, 12:25, 13:6, 13:9, 33:16, 38:2, 38:25, 39:9, 39:11, 40:7, 40:8, 40:16, 41:15, 42:19, 42:20, 42:23, 43:2, 43:17, 43:24, 44:4, 44:7, 44:24, 44:25, 45:18, 46:7, 46:22, 47:4, 47:8, 48:13, 57:11, 64:23, 65:6, 65:20, 65:23, 71:20, 81:9, 92:5, 92:23, 94:17, 94:19, 95:23, 96:4, 96:6, 96:16, 97:13, 97:17, 99:1, 99:5, 99:14, 99:15, 99:23, 100:2, 101:9, 101:15, 102:15, 103:12, 103:21, 104:15, 106:10, 106:19, 107:10, 112:3, 132:21, 133:7, 133:12, 134:6, 134:13, 134:22, 135:3, 138:8, 138:14, 139:5
**witness's** [3] - 38:7, 41:4, 62:13
**WITNESSES** [1] - 4:7
**witnesses** [16] - 40:24, 43:11, 43:25, 44:3, 94:23, 95:17, 133:10, 133:18, 134:7, 134:9, 134:12, 134:23, 135:7, 138:21, 139:17, 139:19
**WOLPERT** [1] - 3:2
**woman** [2] - 22:22, 26:8
**women** [5] - 20:25, 21:1, 22:21, 53:10, 58:3
**wonderful** [1] - 58:1
**woodbury** [1] - 13:18
**word** [5] - 16:7, 49:15, 57:15, 104:20, 109:16
**wording** [2] - 23:22, 57:21
**words** [3] - 51:13, 58:5, 63:20
**works** [1] - 44:14

**world** [1] - 80:8
**worried** [1] - 136:7
**Worthy** [1] - 135:22
**write** [1] - 119:10
**writers** [4] - 118:18,
119:8, 131:5, 131:6
**writing** [1] - 44:8
**written** [5] - 35:18,
35:20, 35:21,
109:20, 131:15
**wrote** [2] - 112:17,
121:21
**Wu** [1] - 2:4

## Y

**Y-E-R-M-A-N** [1] -
139:8
**year** [13] - 4:20, 5:3,
5:5, 14:17, 34:25,
49:6, 49:7, 85:4,
88:15, 115:6,
115:11, 124:9, 131:8
**years** [7] - 14:24,
17:17, 43:5, 52:24,
92:15, 110:9, 115:17
**Yer** [1] - 139:8
**Yerman** [1] - 139:6
**yesterday** [1] - 36:19
**York** [6] - 2:9, 2:13,
66:17, 117:22,
129:20, 129:21
**young** [1] - 63:25
**yourself** [2] - 20:9,
127:9
**yourselves** [1] -
133:24
**youth** [1] - 14:8
**Youth** [1] - 14:8

# EXHIBIT I

# EXHIBIT I

# Flowchart
# COUNTS 94-100



USAO-BP-0032732

EXHIBIT J

EXHIBIT J

Filters Used:

# Email Report
## Form Format

Date Printed: **12/08/2017**
Time Printed: **10:37AM**
Printed By: **SJR**

Telephone: (480) 240-4020 Fax: (480) 240-4021
Email: john@beckerandhouse.com

PLEASE NOTE THAT OUR OFFICE HOURS ARE MONDAY THROUGH THURSDAY 8:00 A.M. TO 5:00
P.M. AND FRIDAYS 8:00 A.M. TO NOON. THANK YOU.

The information transmitted by the following e-mail is intended only for the addressee and may contain confidential and/or privileged material. Any interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited by law and may subject them to criminal or civil liability. If you received this communication in error, please contact us immediately at (480) 240-4020 and delete the communication from any computer or network system.

From: Michael Lacey [mailto:mgl@qamer.net]
Sent: 02/21/2017 11:28 AM
To: John Becker
Subject:

john

do you or jacob stein do the reporting to govt on money that was moved?

michael lacey

---

| Date | 1/23/2017 | Time | 11:59AM | 11:59AM | Duration | 0.00 (hours) | Code | |
|------|-----------|------|---------|---------|----------|--------------|------|---|
| Subject | **Non-responsive individuals** | | | | | | Staff | John R. Becker |
| Client | **Michael Lacey** | | MatRef | **Lacey, Michael** | | | MatNo | |
| From | **Nicole Casaus** | | | | | | | |
| To | mgl@qamer.net | | | | | | | |
| CC To | tom.n.finkel@gmail.com; John Becker | | | | | | | |
| Bcc To | | | | | | | | |
| Reminders | | (days before) Follow | N | Done N | Notify | N Hide | N | Trigger N Private N Status |
| User1 | | | | | User3 | | | |
| User2 | | | | | User4 | | | |

Michael and Tom,

Please see the attached spreadsheet for the updated list of individuals who have not responded to our attempts at communication.

How would you like us to proceed?

31

Bckr 02058

# EXHIBIT K

# EXHIBIT K

**WARNING: PRINTED VERSIONS OF THE BSA E-FILING FORMS ARE NOT FOR SUBMISSION AND WILL NOT BE PROCESSED BY FINCEN.**



# Report of Foreign Bank and Financial Accounts     Version Number: 1.0

**FinCEN Form 114  OMB No. 1506-0009   Effective October 1, 2013**

The new annual due date for filing Reports of Foreign Bank and Financial Accounts (FBAR) for foreign financial accounts is April 18.

### Steps to Submit

1. Complete the report in its entirety with all requested or required data known to the filer.
2. Click "Validate" to ensure proper formatting and that all required fields are completed.
3. Sign with PIN.
4. Click "Save"; filers may also "Print" a paper copy for their records.
5. Click "Submit".

**Filing name**        ML 2017

By providing my PIN, I acknowledge that I am electronically signing the BSA report submitted.

**Remove Signature**

**If this report is being filed late, select the reason for filing late**

This form should be used to report a financial interest in, signature authority, or other authority over one or more financial accounts in foreign countries, as required by the Department of the Treasury Regulations 31 CFR 1010.350 . No report is required if the aggregate value of the accounts did not exceed $10,000.

## PRIVACY ACT AND PAPERWORK REDUCTION ACT NOTICE

Pursuant to the requirements of Public Law 93-579 (Privacy Act of 1974), notice is hereby given that the authority to collect information on FinCEN 114 in accordance with 5 USC 552a (e) is Public Law 91-508; 31 USC 5314; 5 USC 301; 31 CFR 1010.350. The principal purpose for collecting the information is to assure maintenance of reports where such reports or records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings. The information collected may be provided to those officers and employees of any constituent unit of the Department of the Treasury who have a need for the records in the performance of their duties. The records may be referred to any other department or agency of the United States upon the request of the head of such department or agency for use in a criminal, tax, or regulatory investigation or proceeding. The information collected may also be provided to appropriate state, local, and foreign law enforcement and regulatory personnel in the performance of their official duties. Disclosure of this information is mandatory. Civil and criminal penalties, including in certain circumstances a fine of not more than $500,000 and imprisonment of not more than five years, are provided for failure to file a report, supply information, and for filing a false or fraudulent report. Disclosure of the Social Security number is mandatory. The authority to collect is 31 CFR 1010.350 (formerly 31 CFR 103.24) . The Social Security number will be used as a means to identify the individual who files the report. The estimated average burden associated with this collection of information is 20 minutes per respondent or record keeper, depending on individual circumstances. Comments regarding the accuracy of this burden estimate, and suggestions for reducing the burden should be directed to the Financial Crimes Enforcement Network, P. O. Box 39, Vienna, VA 22183, Attn: Office of Regulatory Policy.

DEFLACEY000031

WARNING: PRINTED VERSIONS OF THE BSA E-FILING FORMS ARE NOT FOR SUBMISSION AND WILL NOT BE PROCESSED BY FinCEN.
This form has not been signed and cannot be altered.

| | | |
|---|---|---|
| 1 This report is for calendar year ended 12/31 | **2017** | Amended ☐   Prior Report BSA Identifier | |

## Part I    Filer Information

| | |
|---|---|
| 2 Type of filer | **Individual** |
| 3 U.S. Taxpayer Identification Number | **153385572** |
| 3a TIN type | **SSN/ITIN** |
| 4 Foreign identification | |
|     a Type | |
|     b Number | |
|     c Country/Region of issue | |
| 5 Individual's date of birth | **07/30/1948** |
| 6 Last name or organization's name | **LACEY** |
| 7 First name | **MICHAEL** |
| 8 Middle name | |
| 8a Suffix | |
| 9 Address | **3300 E. STELLA LANE** |
| 10 City | **PARADISE VALLEY** |
| 11 State | **AZ** |
| 12 ZIP/postal code | **85253** |
| 13 Country/Region | **US** |

14a Does the filer have a financial interest in 25 or more financial accounts?

☐ Yes    Enter number of accounts [ ]      **If "Yes" is checked do not complete Part II or Part III, but retain records of this information**

☒ No

14b Does the filer have signature authority over but no financial interest in 25 or more financial accounts?

☐ Yes    Enter number of accounts [ ]      **If "Yes" is checked Complete Part IV items 34 through 43 for each person on whose behalf the filer has signature authority.**

☒ No

This form has been signed and cannot be altered.

DEFLACEY000032

WARNING: PRINTED VERSIONS OF THE BSA E-FILING FORMS ARE NOT FOR SUBMISSION
This form has been signed and cannot be altered.
AND WILL NOT BE PROCESSED BY FINCEN.

**Part II     Information on Financial Account(s) Owned Separately  1   of   1**

| | | |
|---|---|---|
| 15 Maximum account value | **17,064,527** | 15a Maximum account value unknown ☐ |
| 16 Type of account | **Other** | **TRUST** |
| 17 Financial institution name | **PRIMUS TRUST** | |
| 18 Account number or other designation | **30422946-1-13** | |
| 19 Address | **1023 BUDAPEST, SZEPVOLGYI UT 6** | |
| 20 City | **BUDAPEST** | 21 State |
| 22 Foreign postal code | | 23 Country/Region **HU** |

This form has been signed and cannot be altered.

DEFLACEY000033

WARNING: PRINTED VERSIONS OF THE BSA E-FILING FORMS ARE NOT FOR SUBMISSION
This form has been signed and cannot be altered.
AND WILL NOT BE PROCESSED BY FINCEN.

**Part III**    Information on Financial Account(s) Owned Jointly  1    of   1

## Account Information

15 Maximum account value [               ]         15a Maximum account value unknown  ☐

16 Type of account [               ]      [                              ]

17 Financial institution name [                              ]

18 Account number or other designation [                      ]

19 Address [                              ]

20  City [                  ]         21 State [                  ]

22 Foreign postal code [              ]      23 Country/ Region [                  ]

24 Number of joint owners [              ]

## Principal Joint Owner Information      Check  ☐  if entity

25 Taxpayer Identification Number (TIN) [              ]      25a TIN type [                  ]

26  Last name  or organization name [                              ]

27  First name [                              ]

28  Middle name [                              ]

28a Suffix [                              ]

29  Address [                              ]

30  City [                  ]         31 State [                  ]

32 ZIP/postal code [              ]      33 Country/ Region [                  ]

DEFLACEY000034

**WARNING: PRINTED VERSIONS OF THE BSA E-FILING FORMS ARE NOT FOR SUBMISSION AND WILL NOT BE PROCESSED BY FINCEN.**

**Part IV**    Information on Financial Account(s) Where Filer has Signature or Other Authority but No financial Interest in the Account(s)  1  of  1

## Account Information

15 Maximum account value

15a Maximum account value unknown ☐

16 Type of account

17 Financial institution name

18 Account number or other designation

19 Address

20 City

21 State

22 Foreign postal code

23 Country/ Region

## Owner Information

Check ☐ if entity

34 Last name  or organization name

35 Taxpayer Identification Number (TIN)

35a TIN type

36 First name

37 Middle name

37a Suffix

38 Address

39 City

40 State/territory/province

41 ZIP/postal code

42 Country/Region

43 Filer's title with this owner

DEFLACEY000035

**WARNING: PRINTED VERSIONS OF THE BSA E-FILING FORMS ARE NOT FOR SUBMISSION AND WILL NOT BE PROCESSED BY FINCEN.**

**Part V**    Information on Financial Account(s) Where Filer is Filing a Consolidated Report   1   of   1

## Account Information

15 Maximum account value

15a Maximum account value unknown ☐

16 Type of account

17 Financial institution name

18 Account number or other designation

19 Address

20 City

21 State

22 Foreign postal code

23 Country/Region

## Owner Information

34 Organization name

35 Taxpayer Identification Number (TIN)

35a TIN type

38 Address

39 City

40 State/territory/province

41 ZIP/postal code

42 Country/Region

DEFLACEY000036

WARNING: PRINTED VERSIONS OF THE BSA E-FILING FORMS ARE NOT FOR SUBMISSION AND WILL NOT BE PROCESSED BY FINCEN.
This form has been signed and cannot be altered.

**Signature** 44a Click here ☒ if this report is completed by a third party preparer, complete the third party preparer section.

| | |
|---|---|
| 44 Filer signature | Form is signed. |
| 45 Filer title | |
| 46 Date of signature | 08/09/2018 |

(Date of signature will be auto-populated when the report is signed.)

## Third Party Preparer Use Only

| | |
|---|---|
| 47 Preparer's last name | HSU |
| 48 First name | EDWIN |
| 49 Middle name/initial | |

50 Check ☐ if self-employed

| | | | |
|---|---|---|---|
| 51 Preparer's TIN | P00291795 | 51a TIN type | PTIN |
| 52 Contact phone number | 6028205741 | 52a Extension | |
| 53 Firm's name | HSU LAW PLC | | |
| 54 Firm's TIN | 272158630 | 54a TIN type | EIN |
| 55 Address | 5090 N. 40TH STREET, SUITE 260 | | |
| 56 City | PHOENIX | | |
| 57 State | AZ | | |
| 58 ZIP/postal code | 85018 | | |
| 59 Country/Region | US | | |

DEFLACEY000037

| Save | | Print | Close |
|------|--|-------|-------|

**BSA E-Filing Secure Message Reply Form**  Version Number:  4.02

Do not use the built-in Adobe Reader attachments functionality to add or delete files on this form. Use the "Add Attachment" and "Delete Attachment" buttons on this form instead.

To:  **Edwin Hsu**

Subject:  **Acknowledgement for FX18-00514436**

Attachment(s): ☐

**Received acknowledgement for BSA Tracking Number FX18-00514436.**

**This FBARX has been assigned BSA ID: 31000130956741**
**Filing Name: ML 2017**

DEFLACEY000038

# EXHIBIT L

# EXHIBIT L

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

United States of America,    )
                             )   No. 2:18-cr-00422-DJH
         Plaintiff,          )
                             )
         vs.                 )   Phoenix, Arizona
                             )   October 17, 2023
Michael Lacey, et al.        )   8:59 a.m.
                             )
         Defendants.         )
_____)


**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**


<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**TRIAL - DAY 19 - A.M. SESSION**</u>


Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

## **A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
         **Mr. Peter S. Kozinets, Esq.**
         **Mr. Andrew C. Stone, Esq.**
         **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov

For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
    Washington, DC 20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
    bf@federlawpa.com
    - and -
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
    eric.kesslerlaw@gmail.com

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    LINCENBERG & RHOW, P.C.
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
         **Mr. Gary S. Lincenberg, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, CA 90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com


For the Defendant Andrew Padilla:
    DAVID EISENBERG, P.L.C.
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, AZ 85012
    david@deisenbergplc.com


For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ., L.L.C.
    By:  **Ms. Joy M. Bertrand, Esq.**
    P.O. Box 2734
    Scottsdale, AZ 85252
    joy@joybertrandlaw.com

## I N D E X

| PLAINTIFF WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| QUOC THAI (cont.) | 11 | 31, 62 | 70 | 77 |
| NAIOMY FIGUEROA | 80 | 102, 105 106, 108 | 109 | |

## E X H I B I T S

| EXHIBIT NO. | | PAGE: |
|---|---|---|
| 1689 | Summary Exhibit-Payments from Camarillo Holdings to Spear USAO-BP-0032697 | 16 |
| 1690 | Summary Exhibit-Payments from Cereus Properties to Spear USAO-BP-0032698 | 19 |
| 1693 | Summary Exhibit - Payments from Cereus Properties to Michael Lacey -- 01-11-2016 - 01-04-2017 USAO-BP-0025845-USAO-BP-0025847 | 23 |

UNITED STATES DISTRICT COURT

# P R O C E E D I N G S

(Proceedings commence at 8:59 a.m.)

COURTROOM DEPUTY:  All rise.  Court is now in session.

THE COURT:  All right.  Good morning.  We are missing    08:59:24
two jurors and, but I understand there was something that you
wished, counsel wished to raise.

MS. PERLMETER:  Yes, Your Honor.  Good morning.  Few
housekeeping and scheduling issues, Your Honor.  First, we have
a number of witnesses scheduled to testify today, one of whom    08:59:47
is -- her name is Astrid Cervantes.  She is one of our victims.
She has a misdemeanor DUI conviction.  I have conferred with
the defense and they have informed me that they are not going
to cross-examine her on that DUI.  It's not a 609 impeachment
eligible offense, so I just wanted to place that on the record    09:00:08
and it's also not relevant to this case.

THE COURT:  All right.  And anything else?

MS. PERLMETER:  Next, Your Honor, we have another
witness.  Her name is Andrea Benson.  She is another victim
witness.  She is scheduled to testify today.  She has a cold,    09:00:24
Your Honor.  She said she tested negative for COVID, and she is
willing to wear a mask when she testifies if the Court would
like her to, so I'm inquiring how the Court would like us to
proceed.

THE COURT:  Well, let's go ahead and have her wear a    09:00:39

mask.  Does she have one with her?

      MS. PERLMETER:  We do.  We have masks.

      THE COURT:  Yes, I think that's best for everyone.

      MS. PERLMETER:  Finally, Your Honor, regarding our
schedule of witnesses per day and for planning, we have --   09:00:55

      THE COURT:  Again, Ms. Perlmeter.  Go slowly.  Thank
you.

      MS. PERLMETER:  Mr. Thai is currently on direct
examination.  We don't know how long the cross-examination will
be.  We have on deck, Your Honor, four victim witness -- four   09:01:12
victim witness witnesses today who are prepared to testify.
They have all traveled from out of state.  And as the Court may
have seen, the direct and the cross-examination of the victim
witnesses have been relatively short.

      So in an effort or desire to kind of move them along   09:01:33
and get them in the courtroom and then off the stand so that
they can return to their homes and carry on with their lives,
we are proposing that we interrupt Mr. Thai's direct
examination this morning and proceed first with the four victim
witnesses, and then once we have completed have Mr. Thai resume   09:01:53
his direct examination.

      I have conferred with the defense on that and there
seems to be objections from them.

      THE COURT:  All right.  What are the objections?  What
are the objections?   09:02:12

MR. LINCENBERG:  I can.

THE COURT:  It's a scheduling issue, I think.

MR. LINCENBERG:  I've conferred with all counsel and all counsel objected.  The fact that the government would like to interrupt the exam to have greater convenience for these folks doesn't seem to be a sufficient reason to interrupt the flow of the exam and the cross-examination.  If one of them testifies tomorrow instead of today, they may still get to them today, and they get to them tomorrow.

THE COURT:  What is the prejudice?

MR. LINCENBERG:  The prejudice, you know, from conferring with defense counsel, is simply that there's a flow of witnesses and that this gentleman is on direct and the cross should continue in due course rather than chopping things up.  And with regard to one of the witnesses, I think Mr. Feder said that he's in charge of cross-examining that witness, didn't even bring the file in this morning.  It was just a discussion along those lines, Your Honor.

THE COURT:  When was the -- Ms. Perlmeter, when was the government given notice of the desire to have the four witnesses come in?

MS. PERLMETER:  The --

MR. LINCENBERG:  When was the defense given notice?

THE COURT:  Sorry, when was the defense given notice?

MR. LINCENBERG:  This morning.

THE COURT:  All right.

MS. PERLMETER:  Wait, Your Honor, that's not entirely accurate.  The government provided on Friday afternoon the list of 14 witnesses that we planned on calling this week.  Then on Saturday we provided the names of the next who we believed would be called on Tuesday at the defense request, and then --

09:03:52

THE COURT:  Did those who you believed would be called on Tuesday include these four?

MS. PERLMETER:  It included Astrid Cervantes, it included Naiomy Figueroa.  And then, although part of the list, Arshana Sanders and Andrea Benson, they were added later due to scheduling issues, and wanting to make sure that we made use of every moment of the jury's time we added Ms. Benson and Ms. Sanders to the list of witnesses that we'd like to call for today.

09:04:12

09:04:39

THE COURT:  And so is the individual who Mr. Feder was preparing for either Astrid Cervantes or Ms. Figueroa?

MR. FEDER:  It's Sanders, Judge, who I am just hearing about as we speak.

THE COURT:  As I understand it, all four of these women are from out of town.

09:04:57

MS. PERLMETER:  Yes, Your Honor.

MR. FEDER:  Just so I can -- I don't have a file.

THE COURT:  I'm speaking again, Mr. Feder.  We're going to start off clean slate, okay.

09:05:09

MR. FEDER:  Thank you.

THE COURT:  My understanding is it's a resource issue
or is it a convenience issue?  Are there urgent matters that
these four women need to attend to if they are not on today or
tomorrow?                                                    09:05:27

MS. PERLMETER:  It's both.

MR. LINCENBERG:  Your Honor, I would offer that those
who it's an urgent issue can easily get on and off today.  We
are going to get to a number of witnesses today.

THE COURT:  We don't know that.  I don't know that.    09:05:43

MS. PERLMETER:  Just based on what Ms. Perlmeter is
indicating is the amount of time involved in the witnesses,
that's what it clearly appears will be the case.

THE COURT:  Well, let's see how we go with the witness
who is currently on the stand this morning, and then if we need  09:05:59
to take a break, I'll permit that for the first two witnesses
that were noticed over the weekend.  I think there is some
necessity to give Mr. Feder some leeway to at least get or
refamiliarize himself with the witness that he's responsible
for, and so I'll permit you to call Ms. Cervantes, Ms. Figueroa  09:06:21
after the lunch hour if your current witness is not off the
stand.

MS. PERLMETER:  If the current witness gets off the
stand earlier, and if we move through the day more quickly,
we'll be permitted to continue on with the list of witnesses as  09:06:38

we prepared.

THE COURT:  Well, I think we'll see how that goes.
And with regard to the witness that Mr. Feder needs to prepare
for, I'm going to give him the lead time to do that.  He can at
least have 24 hours.

09:06:57

MS. PERLMETER:  We understand, but there is another
witness.

THE COURT:  Quickly.

MS. PERLMETER:  Another witness, her name is Andrea
Benson.  I have not heard the defense object to her testimony
today, so we would like to have -- give her the opportunity to
testify today as well because she is here from out of town.

09:07:06

THE COURT:  We'll see how the testimony goes and if
there's enough of the time in the afternoon to have three of
these witnesses on, then we'll see about getting those three
on, but otherwise, aside from I guess Ms. Sanders, then you'll
have to have somebody else on the standby whose been noticed by
the government.

09:07:27

MS. PERLMETER:  Yes, and I can say that as of
yesterday afternoon we informed the defense and the Court that
our witnesses for today are going to be Astrid Cervantes,
Andrea Benson or Arshana Sanders and Derek Fritze.  Derek
Fritze is a law enforcement officer, so he can -- we can wait
on his testimony.  We would like to prioritize the victim
witness testimony.

09:07:43

09:08:04

THE COURT:  All right.  Well, let's move forward with the witness.

Mr. Eisenberg, is this something relevant to this because we have our jury that's waiting?

MR. EISENBERG:  It is, Your Honor.  Given what's happened in the past concerning advertiser witnesses, then it appears to me that they don't testify on direct longer than 25, 30 minutes.  The cross-examinations up to now have been relatively brief, so this may not be an issue anyway.  Those who are from out of town seemingly will be on the stand and likely off the stand by the end of today anyway.

THE COURT:  Thank you for that commentary.  All right. So let's have the witness on the stand and let's check on our jury.

QUOC THAI,
being previously sworn, was examined and testified as follows:


THE COURT:  All rise for the jury.

(Jury is present)

(Proceedings commence at 9:10 a.m.)

THE COURT:  All right.  Please be seated, and welcome back, members of the jury, and I hope everyone had a very pleasant weekend.  We welcome you back, and the witness remains on the stand.

And I will remind you, sir, you are still under oath.

And Mr. Stone, you may proceed.

MR. STONE:  Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION

BY MR. STONE:

Q.  Good morning, Mr. Thai.                                    09:11:19

A.  Good morning, Mr. Stone.

MR. STONE:  May we publish what has been admitted as
1479?

THE COURT:  Yes.

BY MR. STONE:                                                  09:11:35

Q.  Okay.  Mr. Thai, I believe this was where we left off on

Friday afternoon.

A.  Yes, that's correct.

Q.  And these are Count 69 and 70?

A.  Yes, that's right.                                         09:11:47

Q.  And just to make sure we're in the same place, let's focus

on this first part of this page, which is page 17 of

Exhibit 1479.  What's the jury looking at on this highlighted

section, sir?

A.  This shows a transfer of funds of, in the amount of        09:12:08

6.5 million from the Backpage.com US Bank account to the

Camarillo Holdings BMO Harris Bank account.

Q.  This shows for about three weeks in February of 2013;

correct?

A.  That's correct, yes.                                       09:12:26

UNITED STATES DISTRICT COURT

12

Q.  Did you also review records for a longer period of time for the transfers from this Backpage US Bank account to this Camarillo Holdings bank account?

A.  I did, yes.

Q.  What time period?                                    09:12:39

A.  From February 4th, 2013, to June 9th, 2014, and the amount was approximately 99 million.

Q.  And that was Backpage proceeds?

A.  Yes.

Q.  All right.  You mentioned on Friday that in reviewing these   09:12:55
records you took notes; is that right?

A.  Yes.

Q.  How did you take notes?

A.  I collected all my notes in an Excel spreadsheet called
Master Table.                                            09:13:11

Q.  And what did those -- what did those notes show in this
Master Table, or what did they reflect?

A.  It reflected all the transactions step by step between the
various accounts, and it had information specific to where the
record was located, the amount that was reflected, the type of   09:13:30
record that was identified, which subpoena those records came
from, among other things.  I tried to keep it as detailed as
possible.

Q.  Okay.  And do you have an understanding if this Master
Table was disclosed to defense?                          09:13:46

UNITED STATES DISTRICT COURT

A. Oh, absolutely, yes.

Q. All right. Let's focus on the next part of this flowchart, and I've highlighted another section, what are we seeing here, sir?

A. We see two transactions. One from Camarillo Holdings, a $10,194.87 check to the Michael Lacey, Bank of America account. The account number is actually 9463. It's -- it's mistyped here on the flowchart.

Q. Okay. I want to stop there. This account number which is reflected right here, your testimony is that's an incorrect number?

A. Yes, it is correct that it is an incorrect number.

Q. That's a little confusing. This number is wrong?

A. Yes, the number is wrong.

Q. Is the number from the indictment?

A. It is the number from the indictment, yes.

Q. Okay. In your Master Table where you took notes, did your notes, or did you have a chance to review that Master Table recently?

A. Yes, I did.

Q. What number was reflected on that Master Table?

A. 9463.

Q. A different number than what's listed here?

A. Yes.

Q. In terms of the accounts, was it also a Michael Lacey bank

14

account?

A.  It was.

Q.  Was it also a bank account at Bank of America?

A.  Yes.

Q.  The only issue was that the last four numbers of the    09:15:15
account number are wrong on the indictment and incorrect here?

A.  Yes.

Q.  All right.  What about this other wire on August 30th?

A.  Yes, that's from -- a wire from Camarillo Holdings in the
amount of $3,071,687.50 to Mr. Michael Lacey's BMO Harris Bank    09:15:36
account at 5263.

Q.  Let's highlight or zoom in on the next portion.  So under
Count 69, what is reflected on this flowchart?

A.  We see a check written from Mr. Lacey's Bank of America
account to Stewart Title in the amount of $30,000.    09:16:07

Q.  All right.  And what about Count 70?

A.  For Count 70 we see a cashier's check written from Mr.
Lacey's BMO Harris account to Stewart Title in the amount
$62,491.47.

Q.  Did you have an opportunity to review the records to    09:16:28
determine if this Bank of America account controlled by
Michael Lacey received any other funds from Camarillo about the
same time?

A.  Oh, I did, yes.

Q.  Did it?    09:16:39

UNITED STATES DISTRICT COURT

A.  Yes, it did.

Q.  And Camarillo funds were derived from what?

A.  From Backpage.com.

Q.  All right.  Let's go to the next page, which is page 18 of Exhibit 1479, and this reflects Counts 71 through 77; is that correct?                                                    09:17:11

A.  That's correct.

Q.  And those are counts that have been charged against defendant Scott Spear?

A.  Yes, that's correct.                                       09:17:22

Q.  Highlighting this first part of the flowchart, what are we seeing here?

A.  We see a series of transactions between bank -- Backpage.com and US Bank to Camarillo Holdings at BMO Harris in the amount of $6.5 million.                                    09:17:46

Q.  Your testimony was you reviewed records that went from February 2013 to June 2014, and it was about 99 million that Backpage sent to Camarillo?

A.  That's correct, yes.

Q.  All right.  I highlighted the next part of this flowchart,   09:18:04 what does this show?

A.  We see 13 transactions from April 12th, 2013, to June 11th, 2014, in the amount of $2,672,770 to Scott and Ellona Spear at National Bank of Arizona.

Q.  All right.  I want to show you another exhibit side by side   09:18:29

with this that has not yet been admitted.

This is Exhibit 1689, do you recognize that exhibit,
sir?

A.  I do.

Q.  What is it?                                             09:19:14

A.  It's a summary of transactions from Camarillo Holdings and
BMO Harris to Mr. Spear at National Bank of Arizona from April
of 2013 through to January 2nd, 2015.

Q.  Did you prepare this exhibit?

A.  I did, yes.                                             09:19:38

MR. STONE:  Move to admit Exhibit 1689.

THE COURT:  Hearing no objection, it may be admitted.
It may be published.

(Exhibit 1689 is admitted.)

MR. STONE:  Thank you, Your Honor.  The jury can now    09:19:50
see Exhibit 1689, and let me just highlight it.

BY MR. STONE:

Q.  And why don't you talk through briefly what the jury is
seeing on their screen?

A.  This is a summary of transfers of payments from Camarillo  09:20:06
Holdings to Mr. Spear's National Bank of Arizona account.  It
goes from April 12th, 2013 through to January 2015.  The
total --

Q.  Is that January or is that November?

A.  Wait, yes, November 2nd, 2015.  I'm sorry.         09:20:29

Q.  What is the total?

A.  $6,270,188.53.

Q.  And on Exhibit 1479, it has 13 transaction between
April 2013 and June 2014 that went from Camarillo to a National
Bank of Arizona account for Scott Spear; correct?

A.  Yes, that's correct.

Q.  Is that also reflected in Exhibit 1689 that's now been
zoomed in on your screen?

A.  Yes, it is.

Q.  Okay.  After the money moves to Scott Spear's National Bank
of Arizona account, what happens next?

A.  It gets transferred to various accounts.  So for Count 71,
$300,000 was transferred to The Scott Spear and Ellona Spear
Family Trust; for Count 72, $200,000 was transferred to
Scott Spear's TD Ameritrade account; for Count 73, a million
dollars was transferred to the -- his UBS Financial Services;
for Count 74, $250,000 was transferred to Lincoln National Life
for an annuity; for Count 75, $50,000 was transferred to
Industrial Property Trust for a REIT, which is a Real Estate
Investment Trust; for Count 76, $300,000 was transferred to
Allied Bank for a five-year certificate of deposit; for Count
77, $200,000 was transferred to a Wells Fargo Advisor account.

Q.  Moving to the next page on Exhibit 1479, so that's page 19,
shows Count 78; is that correct, sir?

A.  Yes, that's right.

UNITED STATES DISTRICT COURT

Q.  Okay.  What is the jury seeing on this particular page?

A.  So here we see a transfer of $811,424 from Website Tech to Cereus Properties, and then, you know, we see a transfer from Cereus Properties to Mr. Spear's National Bank of Arizona account in the amount of $133,045.

Q.  All right.  I want to show --

        THE COURT:  Can I just stop you right there?  You referred to this as 1479, isn't it 1689?

        MR. STONE:  Your Honor, 1689 is on the right.  What I've highlighted is 1479.

        THE COURT:  Thank you.

        MR. STONE:  I want to show for the witness' eyes only Exhibit 1690.

BY MR. STONE:

Q.  Sir, do you recognize this exhibit?

A.  I do, yes.

Q.  What is it?

A.  This summarizes payments from Cereus Properties, which was held both at Dubuque Bank and Trust and Compass Bank to Mr. Spear's National Bank of Arizona account.

Q.  Is this an exhibit that you prepared?

A.  It is.

Q.  Did you prepare it by reviewing the bank records?

A.  I did, yes.

        MR. STONE:  Move to admit Exhibit 1690.

THE COURT:  Hearing no objection, it may be admitted.
It may be published.

    (Exhibit No. 1690 was admitted.)

BY MR. STONE:

Q.  I'm going to zoom in on the top portion of this exhibit.        09:24:47
Give a brief explanation to the jury now that they can see it,
please.

A.  This is a summary of payments from Cereus Properties, which
was held at Dubuque Bank and Trust and Compass Bank to
Mr. Spear's National Bank of Arizona account.  The dates are      09:25:02
actually January 11th, 2016, to January 4, 2017.

Q.  And the total amount that was transferred?

A.  The total amount is $2,941,500 --

Q.  And 83 cents?

A.  -- and 83 cents, yes.                                          09:25:25

Q.  Your testimony is that the title just reflects the
incorrect, reflects an incorrect date range?

A.  Yes, that's right.

Q.  All the payments that are on this page are from Cereus
Properties?                                                        09:25:43

A.  Yes, from Cereus Properties.

Q.  And where did Cereus Properties obtain money?

A.  From -- primarily from Website Tech, but from Backpage.com.

Q.  Ultimately, it's all revenue from Backpage.com?

A.  Yes, that's right, yeah.                                       09:26:01

Q.  So looking back at Exhibit 1479, page 19, Count 78 reflects a January 11th, 2016 transfer of money from Cereus Properties to Scott Spear's bank account; correct?

A.  Yes, that's right.

Q.  And that same transaction is reflected on Exhibit 1690 in the first entry?                                              09:26:33

A.  Yes, that's right.

Q.  Sir, this was a transfer of money from Cereus Properties, did Cereus Properties have a Chief Financial Officer?

A.  Yes, it does.                                              09:26:57

Q.  Who?

A.  Mr. Brunst.

Q.  What about -- was Mr. Brunst also a signatory on the bank account?

A.  He was, yes.                                              09:27:04

Q.  Just to remind the jury, what can a signatory on the bank accounts do?

A.  He can initiate --

        MR. PANCHAPAKESAN:  Objection; lacks foundation.

        THE COURT:  Sustained.                                09:27:17

BY MR. STONE:

Q.  Are you aware of what a signatory on a bank account can do?

A.  Yes.  Yeah, I am.

Q.  What can they do?

A.  They can make payments on the account.                    09:27:26

Q.  Initiate wires?

A.  Initiate wires, yes.

Q.  Transfer money?

A.  Yes.

Q.  Going to the next page, Exhibit 1479, page 20, what is    09:27:33
reflected on this particular page, sir?

A.  We see transfers from Website Tech to Cereus, four
transfers in the amount of $3,126,033.07.  From there Cereus
Properties transfers $101,000 -- $101,974 to Mr. Brunst's Wells
Fargo account.                                                 09:28:21

Q.  Is this Backpage money flowing through Website Technologies
to Cereus Properties and ultimately to Mr. Brunst's Wells Fargo
account?

A.  That's correct, yes.

Q.  Pulling up what's already been admitted as Exhibit 1691.   09:28:39
Just to remind the jury, 1691 reflects what?

A.  1691 reflects a summary of payments from Website Tech to
Cereus Properties from December 31, 2015 to August 31, 2016.

Q.  Same transaction reflected on both exhibits?

A.  Yes, that's right.                                         09:29:27

Q.  First four of the document on the right, Exhibit 1691, also
reflected in the flowchart, is that fair?

A.  Yes, that's right, yes.

Q.  Going to the next page, page 21 of Exhibit 1479, first
transaction or the first part of that shows what?             09:30:04

A.  Six transactions between Website Tech and Cereus for a total of $5,571,187.

Q.  Ultimately that money goes from Cereus Properties to an account held by James Larkin?

A.  Yes, that's right.                                          09:30:22

Q.  And Mr. Brunst you testified to is the CFO of Cereus Properties and signatory on that bank account?

A.  That's right, yes.

Q.  All right.  Next page of Exhibit 1479 reflects Count 81, what is the jury looking at with Count 81, sir?          09:30:47

A.  We see nine transactions from Website Tech to Cereus in the amount of $9,748,987.15 from Website Tech to Cereus.  And then we see a transfer from Cereus to Mr. Lacey's Bank of America account in the amount of $1,692,020.

Q.  All right.  I want to show for the witness' eyes only        09:31:18
Exhibit 1693.  Sir, do you recognize this exhibit?

A.  I do, yes.

Q.  What is it?

A.  It's a summary of payments from Cereus Properties to
Mr. Lacey.                                                       09:31:41

Q.  Three-page document?

A.  Three-page document, yes.

Q.  Did you prepare it?

A.  I did.

Q.  Did you prepare it reviewing bank records from this case?   09:31:50

A.  Yes.

      MR. STONE:  Move to admit Exhibit 1693.

      MR. CAMBRIA:  No objection.

      THE COURT:  Did I hear someone say something?

      MR. CAMBRIA:  No objection, Your Honor.      09:32:07

      THE COURT:  Mr. Cambria says "No objection."  The

exhibit may be admitted and it may be published.

   (Exhibit No. 1693 was admitted.)

BY MR. STONE:

Q.  Can you describe this for the jury, sir?      09:32:22

A.  Yes.  This summarizes payments from Cereus Properties

Arizona Bank and Trust to Mr. Lacey from the time period of

January 11th, 2016 through January 4th, 2017.

Q.  That's about a one-year period?

A.  Yes, that's right.      09:32:42

Q.  What is the total amount transferred?

A.  $30,353,596.20.

Q.  Some of the transactions that are on the flowchart, are

they also captured on this Exhibit 1693?

A.  They are, yes.      09:33:06

Q.  I will put back on your screen what's already been admitted

as Exhibit 1479, take you to page 22, so does this flowchart

reflect Backpage money going from Website Technologies to

Cereus Properties and ultimately to a Michael Lacey Bank of

America account?      09:33:37

A.  That's right, yes.

Q.  Move to the next count, Count 82.  The question is, the first part of this is similar to some of the other counts that we just reviewed?

A.  Yes, that's right.                                    09:33:49

Q.  Transactions from Website Technologies to Cereus Properties?

A.  Yes, that's right.

Q.  And ultimately where does money go on April 1st, 2016?

A.  From Cereus Properties it goes to Mr. Brunst's Wells Fargo    09:33:59 account in the amount of $220,944.

Q.  All right.  We move to the next page, page 24, and this shows Counts 83 and 84, and this there is more arrows on this than the previous pages, fair?

A.  Yes.                                                  09:34:25

Q.  All right.  Let's take it step by step.  First part is similar to what we've just reviewed on the previous counts?

A.  Yes, that's right.  We see 12 transactions for a total of $13,443,800.75 from Website Tech to Cereus Properties.

Q.  Let's look at the next step.  Just a little hard to see,    09:34:52 but walk us through where the money is going?

A.  Okay.  From here we see transactions split into five separate accounts from Cereus Properties to five different retained annuity and trust accounts belonging to Mr. Lacey. The first is a two-year, there's a four-year, a six-year, an    09:35:21

eight-year and a ten-year retained annuity trust. Each one of those transactions, each one of those accounts receives three payments totaling $821,916 from April 1st, 2016 to May 2, 2016.

Q. I am going to put admitted Exhibit 1693 back on the screen. I'm going to zoom in on a portion of this exhibit. Are the transactions that you just testified about also listed here in Exhibit 1693?

09:35:59

A. Yes, they reference the transactions that go to the Michael Lacey two, four, six, eight and ten-year annuity trusts.

Q. All right. Let me put 1479 back on the screen. Let's look at the next part of this flowchart, what is reflected here?

09:36:28

A. From those retained annuity trust accounts we find two transactions, one on May 5th, 2016 and one on June 21st, 2016. The transfer from -- on May is in the amount of $4,701,840, and the amount transferred from on June 21st is $750,761.45. Each of those amounts is transferred from each of the retained annuity trust accounts into Mr. Lacey's Arizona Bank & Trust account ending in 1793.

09:37:08

Q. All right. Last part of this exhibit, what is reflected here?

09:37:41

A. From there Mr. Lacey transfers $397.500 to -- to Fidelity Title, Fidelity National Title on, you know, June 27th, 2016, for Count 86, and for Count, sorry, for Count 83 and for Count 84 he transfers the remaining balance of $12,859,152.57.

Q. All right. This page reflects a number of transactions

09:38:16

flowing through, fair?

A.  Yes.

Q.  In your review of the records, is this money that makes up
Count 83 and Count 84 money that was generated from
Backpage.com?                                                    09:38:28

A.  It is, yes.

Q.  Let's go on to the next page, which shows Count 85, could
you describe the flow of money for this particular Count, sir?

A.  Yes.  Here we find Backpage.com transfers money from --
transfers money to Camarillo Holdings in the amounts of         09:38:57
6.5 million from February 4th, 2013 through February 25th,
2013.

Q.  I just want to stop you there.  Just to remind the jury,
you also reviewed records from February 2013 through June 2014
for the same flow of money; correct?                            09:39:14

A.  Yes, that's right.

Q.  And the amount of money that you reviewed that flowed from
Backpage to Camarillo during that time period was what?

A.  Was 99 million.

Q.  Okay.  Move forward from Camarillo to the Scott Spear       09:39:26
National Bank of Arizona account?

A.  From Camarillo there is a total of 26 transactions in the
amount of $6,270,188.53 to Mr. Spear's National Bank of Arizona
account.

Q.  Did you say 26?  It reflects 24 on this page; correct?      09:39:46

A.  Oh, yes, I am sorry.  I am seeing too many numbers.  It is 24 transactions.  I apologize.

Q.  And then from that account $50,000 went to the Strategic Storage Trust?

A.  Yes, that's right.                                    09:40:06

Q.  I am going to show you what has been admitted into evidence as Exhibit 1689, does this reflect the 24 transactions from Camarillo Holdings to Scott Spear's National Bank of Arizona account?

A.  It does, yes.                                         09:40:31

Q.  That's the total number; correct?

A.  Yes, that's right.

Q.  Putting back on the screen 1479, page 25, that's the same number?

A.  Yes, that's right.                                    09:40:54

Q.  All right.  Moving to the next page.  This is Count 86. For the first part we see similar flow from Website Technologies to Cereus Properties?

A.  Yes, that's right.

Q.  And then on August 2nd, 2016, what is reflected here?  09:41:18

A.  We see a transfer from Cereus Properties to Mr. Lacey's Wells Fargo account in the amount $16,243.

Q.  And Cereus Properties CFO is who?

A.  Mr. Brunst.

Q.  And he's also a signatory on this bank account?        09:41:34

A.  That's correct, yes.

Q.  Count 87, is this similar except the ultimate destination goes to a James Larkin account?

A.  That's correct, yes.

Q.  Count 88, first part similar in flow from Website Technologies to Cereus Properties?

09:41:48

A.  Yes, that's right.

Q.  And what about the money that was transferred on October 6th, 2016?

A.  Yes, it's in the amount $268,016 to Mr. Lacey's two-year annuity trust.

09:42:07

Q.  All right, sir, I put on your screen, or everyone's screen, Exhibit 1479, page 28, next to Exhibit 1693 and I zoomed in on a portion of Exhibit 1693, what are -- what is the jury seeing on this zoomed in portion?

09:43:04

A.  They are seeing the same transaction reflected on both exhibits.

Q.  Same transaction Count 88, what I highlight below?

A.  Yes, that's right.

Q.  Same with Count 89?

09:43:57

A.  Same with Count 89.

Q.  I am not going to highlight this.  Is this the same with Count 90?

A.  Same with Count 90, yes.

Q.  Same question for Count 91.

09:44:28

A.  Same with Count 91, yes.

Q.  And finally, Count 92?

A.  Yes, same with Count 92.

Q.  All right.  Moving on to Count 93, what is reflected on this flowchart, sir?

A.  We see 28 transactions between Website Tech to Cereus in the amount of $39,249,211.37, and from there we see a transfer from Cereus to Mr. Spear's National Bank of Arizona account in the amount of $141,444.

Q.  All right.  Finally, Counts 94 through 100, first part of this flowchart reflects transfers from Website Technologies to Cereus Properties?

A.  That's correct, yes.

Q.  Does the second part show transactions that you already testified about?

A.  Yes, that's right.

Q.  And money flowing to these five annuity trusts for Michael Lacey?

A.  Yes, that's right.

Q.  All right.  What happens after the money flows into the five annuity trusts?

A.  From there we see five wires from each account totaling 16.5 million flow through to an IOLTA account, which stands for Interest on Lawyers' Trust Account at Becker House at Johnson Bank.

Q.  And so each one of those five wires makes up Counts 94 through 98?

A.  Yes, that's right.

Q.  And it flows to this Interest on Lawyers' Trust Account at Becker & House PLLC, did you have an understanding that that was an account that, or if that was Michael Lacey's attorney?

A.  Yes.

Q.  And what happens for the last transactions here on this flowchart?

A.  From there we see a transfer from the IOLTA account to a Primus Trust Company for the benefit of Mr. Lacey at bank in Hungary, K & H Bank.

Q.  That's money that went from this bank, this Johnson Bank to a bank in Hungary?

A.  Yes, that's right.

Q.  Do you know where this Johnson Bank is located?

A.  I think it's located in the United States.  I don't know.

Q.  Put 1479 back on your screen.  That's an admitted exhibit. We just went through a number of pages on this flowchart that you prepared; correct?

A.  Yes, that's right.

Q.  That showed a number of transactions and money flowing to a number of accounts there?

A.  Yes, that's right.

Q.  In your review of the financial records, was all of this

09:46:58

09:47:19

09:47:38

09:48:24

09:48:31

money derived from revenue from Backpage.com?

A.  Yes.

        MR. STONE:  Just a moment, Your Honor.  That's it,
Your Honor.

        THE COURT:  All right.  I see Mr. Panchapakesan coming    09:49:06
to the podium.  You may proceed when you're ready.

                        CROSS-EXAMINATION

BY MR. PANCHAPAKESAN:

Q.  Good morning, Mr. Thai.

A.  Good morning, sir.                                             09:49:25

Q.  Am I pronouncing that right?

A.  Yes.

Q.  My name is Gopi Panchapakesan.  I represent Mr. Brunst.

        MR. PANCHAPAKESAN:  Ms. Ellig, if you could put up
Exhibit 1479 on the screen.                                       09:49:37

BY MR. PANCHAPAKESAN:

Q.  Thank you.  Now, sir, you provided a lot of -- can you take
the -- thank you.

        You provided a lot of testimony about these flow
charts.  So if I understand correctly, with this exhibit you're   09:49:55
essentially just showing money being transferred from one
account to another, is that fair?

A.  Yes, that's fair.

Q.  And there's a count number on this here.  It's Count 53 in
the middle.  That's not actually part of the wire transfer.       09:50:15

32

You just put that in there for illustrative purposes; is that right?

A. Yes.

Q. And to be clear, the box in the middle, that doesn't reflect some kind of intermediary. That just reflects the day of the transfer and the amount that's being transferred; correct?

A. Yes.

Q. Now, if you could go to Count 63, which is page 11, now you testified on direct exam as to this transfer, I believe that you didn't look at the purpose of this transfer; correct?

A. No, I didn't.

Q. Sitting here today you have no idea why this transfer was made, is that fair?

A. No, I don't.

Q. Okay. And is it fair to say that as to the other counts reflected in these flowcharts you also did not look at the underlying purpose of those transfers; correct?

A. That's correct, yes.

Q. Now, are you aware that in the indictment as to this Count, Count 63, are you aware the government alleges that this was a payment made to a website developer, aware of that?

A. Yes.

Q. So what this shows is that Backpage in 2014 made about a $6,000 payment to a web developer; correct?

UNITED STATES DISTRICT COURT

A.  Yes.

Q.  So in other words, if you were showing, for example, let's say a payment from Google to a website developer in India, in fairness, it would look a lot like this; right?

A.  Oh, yes.                                                          09:51:54

Q.  You can take that down for now.  Thank you.  You also testified during your direct exam that Carl Ferrer purchased the Backpage business in April of 2015, do you recall that?

A.  Yes, I do.

Q.  Now, you testified that you searched and reviewed thousands   09:52:16 of bank records; right?

A.  Yes.

Q.  As well as internal company documents; correct?

A.  Yes.

Q.  And you also sat through a number of interviews the            09:52:26 government conducted of Mr. Ferrer; correct?

A.  Yes, that's right.

Q.  So through that process you learned that there were actually two loans made by the sellers of Backpage to Mr. Ferrer, you became aware of that; right?                        09:52:41

A.  Yes.

Q.  And you learned that those loans amounted to about $600 million; is that correct?

A.  I'm not familiar with the amount.  I just know that, you know, the purchase happened, the transaction happened.          09:52:58

UNITED STATES DISTRICT COURT

34

Q.  So you're familiar there were loans, and is it fair to say you're familiar with the fact that the loans were in the hundreds of millions of dollars, is that fair?

A.  I just don't recall a number.

Q.  Okay.  So then in preparation for your testimony today you did not analyze the amounts of the sale; is that correct?          09:53:14

A.  No, I didn't.

Q.  You did not analyze the loan agreements in connection with the sale; correct?

A.  No, I did not.                                                   09:53:33

Q.  And you did not analyze the amount of either of those loans; correct?

A.  No, I didn't.

Q.  So that's not information that you factored into your testimony regarding these flowcharts; correct?                     09:53:44

A.  Yeah, that's correct.  I didn't factor them in.

Q.  Now, as a general matter, you learned that Ferrer's business like Website Technologies, you're aware that he made loan payments to the sellers after the sale; correct?

A.  I saw that he made payments.                                    09:54:08

Q.  And you understand those were loan payments; right?

A.  You know, I don't -- I don't know the nature of the loans or the payments, like I just know that the payments were made. I don't know if they were loan payments or what kind of payments they were.                                             09:54:31

UNITED STATES DISTRICT COURT

Q.  So then your testimony, sir, is that in the course of your
review of Backpage records, banking records, interviews with
Ferrer, you never learned that Carl Ferrer made loan payments
to the sellers, you never learned that?

A.  I may have -- I may have heard statements or information to        09:54:54
that effect, but it wasn't part of my analysis.

Q.  Okay.  So then to be clear, as part of your analysis and
everything you testified to on direct, you did not factor into
your analysis the nature of the loan payments that Ferrer was
making to the sellers; correct?                                       09:55:21

A.  Yes, that's right.

Q.  Now, are you aware, sir, that Cereus Properties collected
the interest and principal payments on the loan for Mr. Ferrer,
are you aware of that?

A.  Again, I didn't -- I couldn't differentiate based on the          09:55:43
bank records what was interest and what was principal.  I just
identified amounts and the movement of the funds.

Q.  So you looked at the bank records, you looked at the
amounts, and that's where your analysis stopped, is that fair?

A.  Yes, that's right.                                                09:56:03

        MR. PANCHAPAKESAN:  Now, if you could show the witness
Mr. Ferrer's testimony at this trial from September 21st in the
afternoon at page 91, line 1 through 3, and I request to
publish.  It's his testimony in the case.

        MR. STONE:  Your Honor, objection to putting up some          09:56:30

other witness' testimony on the screen.

      MR. PANCHAPAKESAN:  It's not hearsay.

      THE COURT:  I am going to sustain that.

BY MR. PANCHAPAKESAN:

Q.  Let me ask you about this, are you aware that Mr. Ferrer    09:56:40

testified in this case that Cereus Properties collected the

interest and debt payments from the loan in connection with

Backpage, are you aware of that?

A.  I have just been now made aware of it.

Q.  So your testimony then, sir, is that after spending a    09:56:55

couple of years investigating this case, reviewing thousands of

bank records, attending Ferrer's interviews, today is the first

day you've learned that Cereus Properties collected interest

and debt payments from the loan tied to the Backpage sale; is

that correct?    09:57:18

A.  Like I mentioned earlier, I may have heard that at some

point in the past, but that was not part of my analysis, not

part of my focus on the investigation.

      THE COURT:  Put the exhibit down, please.  Thank you.

      MR. PANCHAPAKESAN:  You can --    09:57:31

      THE COURT:  It's down.

      MR. PANCHAPAKESAN:  It's down.

      THE COURT:  Proceed.

BY MR. PANCHAPAKESAN:

Q.  Okay.  Now, are you aware, sir, that Mr. Ferrer's    09:57:37

businesses would make separate payments in connection with two different loans in the sale, are you aware of that?

       MR. STONE:  Object to the foundation.

       THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  Are you aware of the facts, sir, through your review of records your interviews with Ferrer, are you aware that there were two loans in connection with the sale, are you aware of that?

A.  The records I primarily reviewed were accounting records, and I saw a number of agreements between Mr. Ferrer and Mr. Brunst, but I didn't review them in depth.  I knew that they existed, but I -- I don't recall them and, you know, I just don't -- it wasn't part of my focus.

       MR. PANCHAPAKESAN:  So if I could show the witness what is in evidence.  It's Exhibit 5427.  And this is in evidence, Your Honor.  I request to publish.

       THE COURT:  You can ask your question.

       MR. PANCHAPAKESAN:  I just asked.  It's in evidence.

       COURTROOM DEPUTY:  Double-checking.

BY MR. PANCHAPAKESAN:

Q.  Now, sir, this is a loan agreement, do you see that?

A.  Yes, I do.

Q.  Do you see where it says, "Backpage U.S. Operations"?

A.  Yes.

Q.  Did you look at this in preparation of your testimony here today?

A.  At some point in the past when I was reviewing financial records I found this, but I didn't review it with any level of depth.  I just know that it's part of some of the financial records that I previously seen.

Q.  So then at some point over the past several years you became aware of this loan agreement concerning the sale of Backpage U.S. Operations, is that fair?

A.  Yes, and even in review like looking at this document here, I don't remember it being a final draft.  There were numerous copies of similar types of documents, but I don't remember if what I saw was a final draft, and I never focused on it.

Q.  So your testimony is that in preparing your flowcharts and preparing for your testimony, you did not focus on a loan agreement like this, is that accurate?

A.  Yes, it's right.

Q.  You can take it down.  Thank you.

         Now are you aware, sir, that you've heard of a company called Ad Tech BV, I believe you testified about it?

A.  Yes, that's right.

Q.  Now, are -- did you become aware at some point that after the Backpage sale in 2015 that payments from Ad Tech BV to Cereus were loan payments, did you become aware of that?

A.  I don't have any knowledge of the intricacies of the loans.

UNITED STATES DISTRICT COURT

39

Q.  If Mr. Ferrer testified to that effect, you'd have no reason to dispute his testimony; right?

A.  I don't have any opinion on Mr. Ferrer's testimony.

Q.  Do you have any reason to dispute that payments from Ad Tech BV after April 2015 to Cereus Property were made in the form of loan payments, do you have any reason to dispute that?

A.  I don't know.  I don't know how to answer that.

Q.  My question is, do you have a reason to dispute that one way or the other?

A.  I have no reason to dispute one way or the other.

Q.  And then with respect to Website Technologies, do you have any reason to dispute one way or the other that payments made from Website Technologies to Cereus Properties after April 2015 were in the form of loan payments?

A.  Again, I have no opinion about loan payments or knowledge of it.

Q.  You have no reason to dispute this notion of loan payments from Website Technologies to Cereus?

        MR. STONE:  Objection; asked and answered.

        THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  Your testimony is you have -- you have no -- it's not something you've considered; right?

A.  Yes, that's right.

Q.  Let's take a look at Exhibit 1691, which was admitted

10:01:03

10:01:19

10:01:39

10:01:51

10:02:03

UNITED STATES DISTRICT COURT

during Mr. Thai's direct.  Now, sir, all of these wire

transfers are after the April 2015 sale of Backpage; correct?

A.  It appears that way, yes.

Q.  Given everything we just talked about, do you have any

reason to dispute that these are all loan payments in          10:02:35

connection with the sale of Backpage?

       MR. STONE:  Objection; asked and answered.

       THE COURT:  Overruled.

       THE WITNESS:  I have no knowledge of the intricacies

of the loan, loans between Mr. Ferrer and the other parties.    10:02:46

BY MR. PANCHAPAKESAN:

Q.  When you say you're not aware of the intricacies, those are

the types of intricacies you did not look at in preparation for

your testimony; correct?

A.  That's correct.                                             10:03:01

Q.  Let's put back up Exhibit 1479, which is in evidence.  Now,

by my count, sir, I think about 37 of the 48 counts in here

reflect wire transfers from either Website Technologies or Ad

Tech BV to Cereus Properties after April 2015, does that sound

about right?                                                    10:03:28

A.  Yes, that sounds about right.

Q.  And just to kind of orient folks, April 2015, you

understand that to be when the Backpage sale took place;

correct?

A.  I understand it to be around that time.  I am not familiar  10:03:41

with the date.

Q.  Okay.  And focusing on this exhibit, do you have any reason to dispute, sir, that payments made from like in this flowchart Website Technologies to Cereus Properties in May of 2016, do you have any reason to dispute that the form of this payment was a loan payment?

A.  I don't know anything about the loan payment or the agreement as to the loan payment.

Q.  So all you looked at, for example, with respect to this flowchart, is just that there was a transfer of money.  That's all you looked at; right?

A.  Yes.

Q.  You didn't look at the purpose of the payment; correct?

A.  No, I didn't.

Q.  And if there might have been a loan agreement or a contract or something concerning this payment, you didn't look at that?

A.  No, I didn't look at that.

Q.  If there were contemporaneous e-mails, for example, between the parties documenting what the purpose of the transaction was, you didn't look at that either; correct?

A.  No, I didn't look at e-mails.

Q.  Now, isn't it fair to say, sir, that if a business, let's say Microsoft, takes out a loan from a bank, let's say Bank of America, and they are making monthly loan payments, and you were trying to depict that wire in a flowchart, wouldn't it

UNITED STATES DISTRICT COURT

look a lot like this, is that fair?

A.  So can you repeat what you just said?

Q.  Sure.  Sure.  So let's say you have a company like
Microsoft, and let's say think take out a loan from Bank of
America to buy a building or something, and there is monthly
loan payments made by Microsoft to the bank, in one box you
have Microsoft; right?  Correct?

A.  Uh-huh.

Q.  Can you answer audibly?

A.  Yes.

Q.  Thank you.  And then on the right you would have the bank
Bank of America; right?

A.  Yes.

Q.  And you would have a line in between?

A.  Uh-huh.

Q.  You have the date and you would have the amount of the
transfer; correct?

A.  Yeah, that's right.

Q.  Now, you look at Website Technologies on the left side of
this chart, you understand that their bank at the time was
Arizona Bank & Trust, do you understand that, sorry, scratch
that.

        If you look at the right side, Cereus Properties, you
understand that their bank was Arizona Bank & Trust?

A.  Yes, that's right.

Q.  And given your work on this case, Arizona Bank & Trust, you understand that's a bank based in Phoenix?

A.  Yeah, it appears that way, yes.

Q.  Do you have an understanding that they are a large bank with billions of assets, do you have that understanding?

10:06:47

A.  I don't know how large they are.

Q.  Okay.  Sir, do you generally have an understanding in your experience that banks have something called an anti-money laundering policy?  Do you have that understanding?

A.  Oh, yeah, of course.

10:07:09

Q.  And you subpoenaed Arizona Bank & Trust for their bank records; right?

A.  Yes.

Q.  Now, as to this wire transfer in Count 53, in your review of the records Arizona Bank & Trust produced, did you see any correspondence from Arizona Bank & Trust to Cereus Properties about a money laundering policy violation as to this transfer?

10:07:25

A.  I don't recall any correspondence.

Q.  You didn't see anything like that?

A.  I don't recall.

10:07:42

Q.  As to this count, Count 53, this transfer, in your review of the records that Arizona Bank & Trust produced, did you see any notification from the bank to Cereus Properties objecting or trying to prevent this transfer?

MR. STONE:  Objection, Your Honor, foundation.  I

10:08:04

think the witness testified that he didn't look at e-mails.

      THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  So then is it your testimony, sir, that you in the records

you subpoenaed from Arizona Bank & Trust, you didn't look at     10:08:18

any e-mails or letters or correspondence, is that your

testimony?

A.  I didn't see any, no, I don't recall any.

Q.  Okay.  All right.  Now, through your work on this case,

have you heard of something called The Erotic Review?     10:08:34

A.  I am familiar with it, yes.

Q.  Now, sir, do you know if any of the Backpage revenues

reflected in Count 53, do you know if any of those revenues

came from an advertisement that had a link to TER, do you know

that?     10:09:00

A.  I don't have knowledge of that, no.

      MR. PANCHAPAKESAN:  Ms. Ellig, can you represent TER

in demonstrative form on the exhibit?  You can take the top one

off.

BY MR. PANCHAPAKESAN:     10:09:14

Q.  Now --

      MR. STONE:  Your Honor, object to a modification of an

exhibit that's admitted.

      MR. PANCHAPAKESAN:  I intend to move for admission of

the demonstrative form.     10:09:24

MR. STONE:  Don't publish it while you ask questions.

THE COURT:  If it's not admitted as an exhibit, it should not be published.  Lay some foundation.

MR. PANCHAPAKESAN:  Keep it for his eyes only then.

BY MR. PANCHAPAKESAN:

Q.  It's true, sir, you testified that as to this transfer in this count you are not aware of any advertisement that had a link to TER that formed the basis for the revenue being transferred here; is that correct?

MR. STONE:  Object to foundation.

THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  Sir, did you, in preparing this chart, did you analyze the source of the revenue?

A.  I did, yes.

Q.  Did you analyze the source of the revenue on an ad-by-ad basis?

A.  I did not, no.

Q.  And so in preparing this chart you did not look as to whether a given advertisement -- you didn't look to the content of a given advertisement; is that right?

A.  I did not, no.

Q.  And so, for example, you testified you've heard of The Erotic Review.  You did not look as to this transfer to see if any of the advertisements that formed the basis for the revenue

UNITED STATES DISTRICT COURT

here had a link to The Erotic Review; is that correct?

A.  Yes, that's correct.

Q.  Now, you've heard of the term "moderation"; correct?

A.  I have heard of it, yes.

Q.  And you understand the general sense that Backpage had a

moderation department that moderated ads; right?

A.  That's correct, yes.

Q.  Now, sitting here today, given your testimony, did you

analyze whether any of the advertisements that might have

formed the basis for the revenue here, did you look at how they

were moderated, those ads?

A.  I did not.

Q.  So did you look at whether any of the ads that formed the

basis for this, the revenue here, did you look at whether they

were moderated in a way to hide what the ad was for?

        MR. STONE:  Objection; foundation.

        THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  But stepping back, I believe you testified you didn't look

at this on an ad-by-ad level and so you wouldn't have looked at

whether a given advertisement was moderated; is that fair?

A.  Yeah, that's right.

        MR. PANCHAPAKESAN:  And for the witness' eyes only,

please reflect that in demonstrative form.

BY MR. PANCHAPAKESAN:

Q.  Have you heard of a term called "aggregation"?

A.  I -- I am familiar with that term as a word in English, but I'm not aware of how that applies to this case.

Q.  So that's not a term you're familiar with at all in the context of this case, "aggregation," is that fair?                    10:12:32

A.  I think I have heard it sometime in the past, but I don't -- I don't really know how it applies.

Q.  Okay.  Fair enough.

        MR. PANCHAPAKESAN:  Your Honor, for the witness only now, I would move for the admission of this for demonstrative      10:12:47 purposes only as the next exhibit in line, which is 6260.

        MR. STONE:  Objection, Your Honor, the witness testified that he didn't look on the revenue on an ad-by-ad basis, so it's not accurate to have these words up with lines through them.                                                        10:13:07

        THE COURT:  And I would agree with that, Mr. Panchapakesan, so I am going to not permit you to admit it.

BY MR. PANCHAPAKESAN:

Q.  Okay.  Now, without sparing the jury of going through all of the flowcharts, is it fair to say that the answers you just   10:13:24 gave me about The Erotic Review, for example, would that hold -- would that be true as to the other flowcharts?

A.  Yeah, it should.

Q.  And your testimony about moderation, fair to say that would hold true as to the other flowcharts?                              10:13:43

A. Yes, that's right.

Q. And the fact that you didn't look at whether something was a loan payment, that would hold true as to the rest of the flowcharts; correct?

A. Yeah, that's right.                                          10:13:57

     MR. PANCHAPAKESAN: Now, as to these flowcharts, and if you could just put this back on the screen without -- no, sorry, you can take off the, yeah, and put the original exhibit, if you could publish that. Thank you.

     MR. STONE: No objection to this being published.      10:14:25

     THE COURT: It's admitted. It may be published. Sorry if you were waiting for me.

BY MR. PANCHAPAKESAN:

Q. Do you have any knowledge, sir, as to whether any defendant was specifically aware of any advertisement that might have         10:14:42 generated the revenue reflected here, is that something you looked at?

     MR. STONE: Objection; foundation.

     THE COURT: Sustained.

BY MR. PANCHAPAKESAN:                                          10:14:52

Q. Let me ask it this way then: In preparation for your testimony, you didn't look at what a given defendant may or may not have known about an advertisement, is that fair?

A. Yeah, that's fair.

Q. And that's the case as to this chart and the other charts;    10:15:05

correct?

A.  Yes, that's right.

Q.  You can take that down.  Thank you.  Now, we talked a bit about the Backpage sale and the loan.  Sir, in terms of your experience, have you ever published any papers about the seller-financed transactions, is that something you've ever done?

A.  I have never published papers about seller-financed transactions.

Q.  And I take it's -- you never taught a course in seller-financed transactions; correct?

A.  No, I haven't.

Q.  Have you ever worked as a loan officer at a bank, for example?

A.  No, I haven't.

Q.  Have you ever worked at a credit card company?

A.  No, I haven't.

Q.  And have you ever worked at a commercial bank like a Bank of America or something like that?

A.  I previously worked at Countrywide.

Q.  Countrywide.  Okay.  And at Countrywide, were you handling things like bank loan administration, was that part of your role?

A.  Bank loan administration?

Q.  Right.  So if a bank makes a loan to someone, was that

something you were doing at Countrywide?

A.   No.

Q.   Okay.  And sir, how many times have you testified as an expert in a federal criminal trial concerning the money flow of a website platform, how many times have you done that?

10:16:42

A.   This would be the first time.

Q.   And sir, you also testified that you were an inspector for the U.S. Postal Inspection Service for a period of time?

A.   Yes, that's right.

Q.   And fair to say the jurisdiction of U.S.P.I.S., it's the mail; right?

10:16:58

A.   Yes, but it's very broad.

Q.   It's broad, but it probably concerns -- the postal service is the mail service; right?

A.   Yes.  Well, the postal service in all its forms, so that includes, for example, you know, money orders that it sells as well.

10:17:15

Q.   Okay.  So it includes money orders, but that's correct to people going to the post office and getting a money order; right?

10:17:36

A.   Yes, that's right.

Q.   You also testified that you, I think you said you received an award for your work on a dark net case involving bitcoin, do you recall that?

A.   Yes, that's right.

10:17:46

51

Q.  So the jury understands, simplifying this, the dark net, it's the place on the Internet that's encrypted, is that fair?

A.  Yes, that's right.

Q.  You have a dark net site, for example, it can only be accessed using specific software credentials, is that a fair summary?

A.  Yeah, you'd have to access it with special software such as Tails to access the Tor network.

Q.  Tor network, what is that?

A.  I don't have the definition of it, but it's a type of encrypted network.

Q.  Put simply, the dark net has nothing to do with this case, right, is that fair?

A.  Well, not the dark net, no.

        MR. PANCHAPAKESAN:  If you do put Exhibit 1479 back up, just the clean version of it, and if you could go to page 17, Count 69 through 70.  Thank you.

BY MR. PANCHAPAKESAN:

Q.  Now, you testified that if we're looking at sort of the first part of this chart, that this reflects funds transferred from Backpage at US Bank to Camarillo at BMO Harris Bank; is that right?

A.  Yeah, that's right.

Q.  Now, first in your review of internal company records, you're aware that Camarillo Holdings was a parent company to

UNITED STATES DISTRICT COURT

Backpage; right?

A.  You know, in my review of the flowchart of entities I saw a number of companies that were supposed to be sort of related to other companies, but there were numerous flowcharts with numerous setups that in some cases it appears as though they changed over time.                                                    10:19:52

Q.  Now, did you ever look at an organizational chart in preparing these flowcharts?

A.  Yes, I looked at a number of them as I just said.

Q.  And so in looking at those organizational charts, did you   10:20:07 come to an understanding that in 2013 within the organization Camarillo was above Backpage?

A.  Well, the thing is some of those organizational charts, they weren't dated, and so and maybe, some of them were, some of them were not, there was just a number of them, and I don't   10:20:26 recall how the different entities related to other entities specifically.

Q.  So then is it fair to say that in preparing, for example, this chart you didn't analyze the organizational structure of the company in preparing this chart; is that right?            10:20:48

A.  No.  I specifically said I reviewed a number of organizational charts to determine the structure and it appears as though structures changed.

Q.  And in doing that, at some point did you come to the determination, did you take a look at an organizational chart   10:21:04

and realized that Camarillo was a parent company of Backpage, or is that something you never realized?

      MR. STONE:  Objection; asked and answered.

      THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  In preparing this chart, did you make any determinations about Backpage and Camarillo and their place within the organizational structure?

      MR. STONE:  Same objection.

      MR. PANCHAPAKESAN:  It's a yes or no.

      THE COURT:  He can answer yes or no.

      THE WITNESS:  No.

BY MR. PANCHAPAKESAN:

Q.  Now, if you look at this chart, the bank account at US Bank was held by Backpage, right, do you see that?

A.  Yes, that's right.

Q.  And did you subpoena US Bank for records?

A.  I did, yeah.

Q.  And in your review of those records, did you review any correspondence or e-mails or letters?

A.  No, I didn't see any correspondence in the Backpage records.  I don't recall them.

Q.  Okay.  So in preparing this, you didn't seek to determine whether US Bank had, for example, objected to this transfer, is that fair?

A.  I don't recall.

Q.  And in review, in putting together this chart you didn't seek to determine whether US Bank had sent out a notification of a money laundering violation; correct?

       MR. STONE:  Objection; foundation.

       THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  Why don't we take a look at Exhibit 1480, which I believe is in evidence.  Now, sir, you testified you put together this chart, did you personally analyze any of the advertisements that are -- that form the basis of this chart?

A.  I didn't analyze any advertisements.

Q.  You just sort of added up the numbers and put in a spreadsheet and that's what is reflected here; correct?

A.  Yes.

Q.  So as to the reference to adult entertainment, which is the second column in the spreadsheet, you analyzed the ads that formed the basis for that revenue; right?

       MR. STONE:  Objection, asked and answered.

       THE COURT:  Overruled.

       THE WITNESS:  I did not analyze the ads.

BY MR. PANCHAPAKESAN:

Q.  In your testimony today you're not offering an opinion or a view about what these ads are for, is that fair?

A.  That's fair.

10:22:35

10:23:06

10:23:21

10:23:52

10:24:07

Q.  Okay.  Now, the time period covered by this chart it looks like it's approximately, looks like October 2010 to November 2012, do you see that?

A.  Yeah, I see that.

Q.  Now, this analysis, it actually predates your flowcharts in 1479; correct?

A.  It does, yes.

Q.  The flowcharts, I think there were a few transfers in 2013 and most of them were 2015; is that right?

A.  That's right.

Q.  So you haven't presented an analysis about the source of ad revenue like this as to the 2013 to 2015 time period; is that correct?

A.  That's correct.

        MR. PANCHAPAKESAN:  Can you please show the witness Exhibit 1481, which is in evidence?

BY MR. PANCHAPAKESAN:

Q.  Now, if we take a look at towards the first chart on the top, this shows Backpage-related revenue from looks like 2013-2018; correct?

A.  Yes.

Q.  And in preparing this analysis, did you factor in the April 2015 sale of Backpage, did you include that in your analysis here?

A.  Well, it's factored in in the breakdown of the revenues

coming from Backpage, and I include the revenues coming in from Website Tech and Ad Tech BV.

Q.  And for example, if there were loan payments made on the sale, that's not reflected here; correct?

A.  This is an analysis of revenue, so it's not an analysis of loan payments.

10:25:49

Q.  Okay.  Now, if you look at the second chart, income from Medalist, now, you've looked at, I think you said you've looked at Cereus Property records, you recall testifying to that?

A.  Yes.

10:26:18

Q.  So did you become aware in that review of Cereus Property records, did you become aware that in 2013 Medalist sold a number of newspapers, did you become aware of that?

A.  I am familiar with some of the newspaper transactions.

Q.  Are you aware then 2013 there was a $30 million sale with newspapers, are you aware of that?

10:26:36

A.  I don't recall the amount or the specifics relating to the newspaper sales.

Q.  In your review of Cereus Properties records, did you come to learn that there were loans involved in that sale like the Backpage sale, did you come to learn that?

10:26:54

A.  I don't recall.

Q.  So then in analyzing Cereus Properties' records, that's not the kind of thing you were looking at; correct?

A.  That's right, yes.

10:27:07

Q.  Now, are you aware then in 2013, for example, Mr. Brunst received about $3 million from the sale of those newspapers, are you aware of that?

A.  I'm not aware of that.

Q.  That's not something that you analyzed in looking at this chart; right?

A.  No.

Q.  And so I take it that in preparation for your testimony the government didn't ask you to analyze that 2013 newspaper sale, fair?

A.  That's right.  I didn't look at the newspaper sales.

        MR. PANCHAPAKESAN:  You can take that down.  Thank you.

BY MR. PANCHAPAKESAN:

Q.  Now, you testified a little bit about virtual currency and bitcoin, do you recall that?

A.  Yeah, that's right.

Q.  And you testified you have a lot of experience dealing and analyzing virtual currency, is that fair?

A.  Yeah, that's fair.

Q.  So just so we're clear, in your experience dealing with virtual currency, as a general matter, virtual currency, it's a lawful form of payment; right?

A.  Yeah.

Q.  In fact, in given your experience, you're aware that

virtual currency, it's currently a multibillion dollar industry, is that fair?

A.  That's fair.

Q.  I could go to Starbucks and buy a latte, and I could probably use virtual currency to do that, depending on the location?

10:28:30

A.  Well, I don't know what Starbucks has been accepting as far as currency is concerned, but if they accept bitcoin, you can buy coffee with it, but I don't know what is going on with Starbucks.

10:28:44

Q.  And you're aware that, for example, from the 2015 to 2018 time period there were a number of major American companies that accepted virtual currency as a form of payment, is that fair?

MR. STONE:  Objection; foundation.

10:28:58

THE COURT:  Sustained.

BY MR. PANCHAPAKESAN:

Q.  You testified you're an expert on bitcoin, have you in the past looked at the types of companies that are accepting bitcoin, is that something you looked at?

10:29:11

MR. STONE:  Objection; misstates testimony in the question.

THE COURT:  Sustained.  Rephrase.

BY MR. PANCHAPAKESAN:

Q.  In the course of your work dealing with virtual currency in

10:29:20

the past, have you looked at, as a general matter, the types of companies that are accepting bitcoin as a form of payment?

A. Yes.

Q. Okay. And are you generally aware of the fact that there is a number of major American companies that have started to accept virtual currency as a form of payment?

A. Yes, I have.

Q. And that would have been true during the 2015 to 2018 time period; correct?

A. Yes, that's right.

        MR. PANCHAPAKESAN: Let's take a look at Exhibit 1545, which is in evidence, and request that it be published.

        THE COURT: Yes, it may be shown to the jury.

BY MR. PANCHAPAKESAN:

Q. Now, sir, this is a chart that you testified to during your direct exam. Now, this is a chart that simply illustrates that Backpage it looks like starting in January 2015 was accepting virtual currency as a form of payment; correct?

A. Yes, that's right.

Q. Now, isn't it true that there's an uptick in the amount of bitcoin being accepted, it looks like it's around October 2015, is that fair?

A. October. I mean, there is multiple upticks, you know, throughout 2015.

Q. So if you look, so looks like the monthly transactions

10:29:35

10:29:50

10:30:14

10:30:31

10:30:49

UNITED STATES DISTRICT COURT

through about June 2015 are, it's below 30,000?

A. Yes.

Q. And then it increases into the hundreds of thousands and then you're into the 1 to 2 million range?

A. That's right.                                          10:31:06

Q. Now, with the April 2015 sale as sort of a guiding line, isn't it true that the uptick you see starting in July 2015, that's after April 2015, right after the sale; correct?

A. Sure, yeah.

Q. Now, is this reference to, it looks like -- does this           10:31:24
reflect some sort of bitcoin wallet or something, or is this just acceptance of payment?

A. It's not a bitcoin wallet. It's the amount of transfers from GoCoin to Website Technologies.

Q. And GoCoin, is that something called a bitcoin wallet, is      10:31:48
that fair?

A. No. It's a company that serves as a bitcoin exchanger.

Q. And --

A. Digital currency exchanger broadly.

Q. And you're not testifying that any of the defendants had        10:32:03
any role with respect to that GoCoin exchange, correct, it's not part of your testimony?

            MR. STONE: Objection; vague.

            THE COURT: Sustained.

BY MR. PANCHAPAKESAN:                                              10:32:16

Q. Well, you just testified that GoCoin is a virtual currency exchange, do I have that right?

A. I refer to it as digital currency exchange, but yes.

Q. I will use your terminology. Then you testified GoCoin is a digital currency exchange, and I take it that they convert digital currency into U.S. dollars; is that right?

10:32:31

A. Yeah, it's a Fiat currency that could include U.S. dollars or euros.

Q. You're not testifying that any of the defendants played any role in that exchange of bitcoin into dollars. I didn't hear you testify to that, is that fair?

10:32:49

A. No, I am not.

Q. Okay.

    MR. PANCHAPAKESAN: I have no more questions, Your Honor.

10:33:05

    Thank you for your time.

    THE COURT: All right. I was going to go until about five more minutes, but I think we're at a natural breaking point for our morning recess. And so why don't we take that now. I will admonish the members of the jury again just to continue to keep an open mind not to discuss the case amongst yourselves or anyone else. Just simply enjoy your break. Be ready to come in, I would say in the 20-minute time frame, so that would put us about five to the hour, I guess.

10:33:21

    So please all rise for the jury.

10:33:43

UNITED STATES DISTRICT COURT

(Jury left courtroom at 10:34 a.m.)

THE COURT:  All right.  We will stand in recess.

(Proceedings reconvened at 10:55 a.m.)

THE COURT:  Is someone else going to cross-examine?
Mr. Cambria.                                                    10:55:21

(Jury is present at 10:57 a.m.)

THE COURT:  Please be seated.  Record will reflect the
presence of the jury.  The witness is on the stand.

Mr. Cambria, you may proceed.

MR. CAMBRIA:  Thank you.                                        10:58:04

CROSS-EXAMINATION

BY MR. CAMBRIA:

Q.  Good morning.

A.  Good morning.

Q.  In preparation for your testimony you reviewed a number of   10:58:07
bank records?

A.  A lot, yes.

Q.  And you traced money from one account to another account?

A.  Yes, that's right.

Q.  And you found that the bank records contain the appropriate  10:58:22
and accurate names of the individuals?

A.  Yes.

Q.  And addresses?

A.  Well, I didn't scrutinize the addresses.

Q.  But in any event, it appeared that the bank records were     10:58:39

the normal ordinary bank records in the names of the individuals that held the funds in the various accounts; correct?

A.  Yes.

Q.  All right.  Do you know what an FBAR is?          10:58:52

A.  I do.  I am familiar with it.

Q.  What is an FBAR?  Hang on one second, please.  My ears here.  There you go.  What is an FBAR?

A.  It's a Foreign Bank Account Report.

Q.  What's its purpose?                                10:59:11

A.  To report the existence of a foreign bank account by the owner of it.

Q.  And where is it filed?

A.  Based on my best recollection, I believe it's filed with the IRS.                                              10:59:25

Q.  How about the Department of Treasury?

A.  The Department of Treasury under FinCEN, I believe.

Q.  What is FinCEN?

A.  FinCEN, I forget what the acronym stands for, but it's a part of the Department of Treasury that, you know, oversees     10:59:44
banking-related matters, I believe.  I am not sure.

Q.  A part of the treasury department that deals with financial crimes?

A.  Yes, I think that's part of their mandate, but I am not an expert in what FinCEN does.                          11:00:08

64

Q.  Okay.  So if someone has a bank account or an investment
account, any kind of account, if you will, outside the borders
of the United States, they are obligated to file one of these
FBAR reports, are they not?

A.  Yes, that's right.                                          11:00:26

Q.  All right.  And in this case you indicated in one of the
exhibits here a flow, if you will, of money from Mr. Lacey to
his attorney, do you recall that?

A.  Yes, that's right.

Q.  And you talked about the IOLTA account of the attorney?     11:00:45

A.  Yes, that's right.

Q.  That's just a trust account, isn't it?  In other words, the
lawyer has to hold that money for purposes of their client in
trust?

        MR. STONE:  Object.  Objection; foundation.            11:01:02

        THE COURT:  Sustained.

BY MR. CAMBRIA:

Q.  Do you know?

A.  I am not an expert in IOLTA accounts.

Q.  Okay.  Do you know generally what they are?                11:01:13

A.  I mean, I know generally how they function.

Q.  What's that?

A.  That, you know, that it's an account held in the name of a
client, and you know --

Q.  By an attorney?                                            11:01:41

A.   By an attorney, yeah.

Q.   Okay.  And so you saw a flow of money here from Mr. Lacey to his attorney's IOLTA account, correct, the Becker, the attorney Mr. Becker?

A.   Yes, that's right.                                                    11:01:59

Q.   And then in your tracing you show that the attorney consolidates a number of deposits that are in his account and then he sends the money where?

A.   He sends it to a bank in Hungary.  Yeah, that's right.

Q.   Okay.  And so then did you logically search to determine     11:02:24 whether or not an FBAR report had been filed about that account?

A.   I did not search for an FBAR at the time.

Q.   You say at the time, at any time?

A.   No, I did not search for an FBAR at any time.                 11:02:45

Q.   Do you know one exists for that account?

A.   Well, I understand now that one exists for that account.

Q.   Why wasn't that in your flowchart to tell the jurors that the money went from Mr. Lacey to his attorney in his attorney's account and then it went from his attorney's account to this    11:03:13 investment, and then there was a specific report to the Department of the Treasury regarding that investment?  Why would you leave that out?

          MR. STONE:  Objection; compound.

          THE COURT:  Sustained.                                  11:03:27

UNITED STATES DISTRICT COURT

BY MR. CAMBRIA:

Q.  Why would you leave out the FBAR being filed with regard to that account?

A.  I just recently learned about the existence of the FBAR.

Q.  Did you learn about it before you got up here to testify?    11:03:37

A.  Yes, I did.

Q.  Okay.  So you had the opportunity then with the knowledge to tell this jury the end result of that investment, did you not?

A.  I don't have the details relating to the FBAR.    11:03:51

Q.  All you need, well, you could have found that out, could you not?

A.  Well, I am no longer working for the Federal government so I don't have access to those resources.

Q.  So it was an unimportant fact, is that the way you treated    11:04:04
it?

A.  I don't know if I qualify it as unimportant.

Q.  Well, wouldn't you agree that if you were going to give these ladies and gentlemen in the jury a full picture of the flow of this money, that you would show it went from Lacey to    11:04:28
Lacey's lawyer, from Lacey's lawyer to Hungary, and then there was a specific report to the Department of Treasury that it existed?

          MR. STONE:  Objection; compound.

          THE COURT:  Overruled.    11:04:47

          THE WITNESS:  I did not know about the details of the
FBAR, so --

BY MR. CAMBRIA:

Q.  Because you never accessed it; correct?

A.  Yes, that's right.                                        11:04:56

Q.  You knew it existed and you could have accessed it;
correct?

A.  No, I couldn't have accessed it with the current resources
I have as a private citizen.

Q.  How about asking them, the government?                    11:05:08

A.  I didn't know that that was a possibility.

          THE COURT:  Ask your next question.

BY MR. CAMBRIA:

Q.  You didn't know that you could ask them for any kind of
document that you discovered existed that dealt with the flow   11:05:25
of that money?

A.  No, I didn't know.  I am a private citizen now.  I felt
like my resources were restricted.

Q.  Well, they weren't restricted for everything you testified
to with regard to the government, were they?                  11:05:44

A.  Well, I prepared those documents before I left law
enforcement.

Q.  Would you consider it fair to present the complete picture
to the jury of the flow of that money and the report of it to
the Department of the Treasury?                               11:06:04

          MR. STONE:  Objection; asked and answered.

          THE COURT:  Sustained.

          MR. CAMBRIA:  I never asked that question before, Your

Honor, how could it be asked and answered?

          THE COURT:  I sustained the objection.                  11:06:17

BY MR. CAMBRIA:

Q.  Okay.  In any event, you knew that there was an FBAR, you

took no steps to find it and if you would have found it you

could have described to the jurors what it contained; correct?

A.  I could have if it was relevant and had I assessed that it  11:06:35

was relevant.

Q.  Okay.  Well, you're not the one making the strategic

decisions in this case, are you?

A.  I just report what I know.

Q.  Okay.  An FBAR would contain, would it not, where the money 11:06:53

went, true?

A.  I don't recall the details of what are on FBARs.

Q.  Well, the idea of an FBAR is to fully disclose to the

United States Government, to the Department of the Treasury,

any kind of foreign so-called investment, is it not?           11:07:15

          MR. STONE:  Objection; foundation.

BY MR. CAMBRIA:

Q.  Do you know?

          THE COURT:  Well, I will sustain the objection and you

can lay some foundation.                                        11:07:25

BY MR. CAMBRIA:

Q.  Do you know what the purpose of an FBAR is?

A.  I -- yes, I do.  I know about it generally from my class
that I took 12 years ago in FLETC, the Federal Law Enforcement
Training Center.                                               11:07:48

Q.  What do you know about it generally?

A.  I just know that it's something as an investigator we check
to make sure that the subjects of our investigation have or
don't have income from overseas or assets overseas.

Q.  Would you consider yourself an investigator in this case?  11:08:02

A.  I was at one point an investigator.  I am no longer an
investigator.

Q.  So as soon as the paycheck stops, you stop, is that
basically what you're saying?

        MR. STONE:  Objection; argumentative.                 11:08:17

        THE COURT:  Well, sustained.

BY MR. CAMBRIA:

Q.  Well, long story short here, that's a document you know
existed with regard to this account and you never mentioned it
until I asked you about it; correct?                          11:08:33

A.  Well, I only knew that an FBAR existed, but I did not know
how it related to the investigation as a whole.

Q.  Well, if an FBAR existed as to an account that you've been
investigating, it would be relevant, wouldn't it, to see what
it said and what it had in it?                                11:08:52

A.  Can you ask that again, sir?

     MR. CAMBRIA:  Would you mind reading that back, please.

     (Record read.)

     THE WITNESS:  I would be curious as to the relevance, yes.

BY MR. CAMBRIA:

Q.  But it turned out that you weren't curious because you didn't follow it through, did you?

A.  I did not, no.

     MR. CAMBRIA:  That's all.

     THE COURT:  Ms. Bertrand.

     MS. BERTRAND:  Nothing, Your Honor.  Thank you.

     THE COURT:  Mr. Eisenberg.

     MR. EISENBERG:  Nothing, Your Honor.

     THE COURT:  Mr. Kessler.

     MR. KESSLER:  No, Your Honor.

     THE COURT:  All right.  Mr. Stone.

             REDIRECT EXAMINATION

BY MR. STONE:

Q.  All right, sir, you were just asked a number of questions about an FBAR, fair?

A.  Yes, that's right.

Q.  Have you dealt with FBARs in previous investigations?

A.  Oh, I have, yes.

             UNITED STATES DISTRICT COURT

Q.  Generally, well, how many investigations?

A.  Oh, at least one, but I think I recall FBARs in two
additional ones that I can think of, yeah.

Q.  The one that you're thinking about, how did it come up?

A.  I was looking into the subject for the possibility of a tax          11:10:54
evasion charge, and the subject had an FBAR --

Q.  Let me stop you there.  Had an FBAR, what does that mean?

A.  It looks like she may have filed an FBAR.

Q.  So the subject filed an FBAR, go on?

A.  For an account overseas, yes.                                        11:11:19

Q.  Did that impact your investigation?

A.  It did, yeah.  I used it as a starting point because she
was hiding a significant amount of income that she was
generating and the FBAR did not cover the amount of money that
she was hiding because she also evaded taxes through the use of          11:11:43
funneling her revenue through her credit cards, which she then
used overseas, effectively creating her credit cards would be,
you know, international bank accounts.

Q.  Was the individual ultimately prosecuted?

A.  Yes.                                                                 11:12:03

Q.  Even though she filed an FBAR?

A.  Yes.

Q.  All right.  I am going to show you what has been admitted
as Exhibit 1545.

        MR. STONE:  Ask to publish.                                      11:12:28

72

THE COURT:  Yes, it may be published.

BY MR. STONE:

Q.  Mr. Panchapakesan asked you a few questions about this exhibit, do you remember that?

A.  Yes.

Q.  I think he asked you about this sale of Backpage in April of 2015?

A.  Yes.

Q.  And looking at this, well, first off, what is this, quickly, what does this exhibit depict?

A.  Oh, it shows transfers of, you know, sort of conversions of digital currency to cash and those conversions deposited into a Website Tech's bank account.

Q.  There's a big jump not in April of 2015 but in July and August 2015, fair?

A.  That's right, yes.

Q.  Do you have an understanding of what was occurring with Backpage's business in July and August 20th --

MR. PANCHAPAKESAN:  It's been asked and answered on direct.

THE COURT:  Overruled.

THE WITNESS:  Around that time is when credit card companies no longer accepted credit card payments for Backpage transactions.

BY MR. STONE:

11:12:51

11:13:09

11:13:34

11:13:45

11:13:55

UNITED STATES DISTRICT COURT

Q.  In your review of the records, was it more the credit card issues Backpage was happening -- that Backpage was experiencing rather than any sale of the business that caused this uptick?

       MR. PANCHAPAKESAN:  Leading, Your Honor.

       THE COURT:  What was the objection?

       MR. PANCHAPAKESAN:  Leading.

       THE COURT:  Sustained.

BY MR. STONE:

Q.  So April 2015 there was a sale; correct?

A.  Yes.

Q.  July and August 2015 there's a jump in revenue?

A.  Yes.

Q.  And that related to what based on your review of the records?

       MR. PANCHAPAKESAN:  Lacks foundation.

       THE COURT:  Overruled.

       THE WITNESS:  It was based upon the, you know, the credit card companies no longer accepting credit card transactions for Backpage, Backpage purchases and transactions.

BY MR. STONE:

Q.  Showing you what's admitted as Exhibit 1479.  There were some questions from Mr. Panchapakesan about this page of the flowchart; correct?

A.  Yes.

Q.  Just blow it up a little bit.  And your testimony was

something to the effect of, besides this money being

transferred from one bank account to the other, you don't have

any understanding of why it was transferred?

A.  Yeah, that's correct.

Q.  Mr. Panchapakesan asked you some questions about getting          11:15:28

into the defendants' heads or something like that?

          MR. PANCHAPAKESAN:  Argumentative.

          THE COURT:  Overruled.

BY MR. STONE:

Q.  Do you remember that -- do you remember him asking               11:15:38

questions about that?

A.  I think so, yeah.

Q.  But how you couldn't get into defendants' heads to

understand why something was done in terms of money transfers?

A.  That's correct, yeah, that's what I recall.                      11:15:49

Q.  That wasn't what you were asked to do, fair?

A.  Oh, yeah, no, I wasn't -- I wasn't asked to get in the

heads of the individuals.

Q.  Rather, what were you asked to do?

A.  I was asked to trace the funds from source to destination.       11:16:02

Q.  And whether those funds were, well, strike that.

          Your testimony is that all the funds that are shown on

this flowchart derive from where?

A.  From Backpage.com.

Q.  This is the next page, Cereus Properties, and the bank           11:16:30

there is Arizona Bank & Trust; correct?

A.  Yes, that's right.

Q.  Your understanding is that's an Arizona bank?

A.  Yes, that's my understanding.

Q.  Mr. Cambria asked you a few questions about this                    11:16:54
transaction or about this page and these transactions; right?

A.  Yes, that's right.

Q.  This specifically was a transaction in Counts 99 and 100
that went from a Johnson Bank, the IOLTA account, to a Primus
Trust Company in Hungary; correct?                                      11:17:13

A.  Yes, that's right.

Q.  And do you have an understanding if Johnson Bank has a
branch here in Arizona?

A.  Yes, I do.  I believe it's in Scottsdale.

Q.  Showing you what has been admitted as Exhibit 1481, and            11:17:38
there were some questions from Mr. Panchapakesan about this
part of Exhibit 1481; correct?

A.  Yes, that's right.

Q.  Did you analyze the money that's listed here for years
2013, 2014 and 2015?                                                    11:18:01

        MR. PANCHAPAKESAN:  Vague as to analyze.

        THE COURT:  I can't hear you.

        MR. PANCHAPAKESAN:  Vague as to analyze.

        THE COURT:  Sustained.

BY MR. STONE:                                                           11:18:09

Q.  Did you -- you prepared this document; correct?

A.  I did, yes.

Q.  When you prepared this document, did you review where this income came from?

A.  I did, yes.                                                    11:18:20

Q.  Do you have an understanding of where the majority of this income came from?

A.  I do, yes.

Q.  Where?

A.  Backpage.com.                                                 11:18:30

Q.  And when I say "majority," is that vast majority?

        MR. PANCHAPAKESAN:  Objection; lacks foundation.

        THE COURT:  Well, sustained.  You can lay some foundation.

        MR. STONE:  Thank you, Your Honor.                        11:18:45

BY MR. STONE:

Q.  When you say "majority," can you give a sense for what that means?

A.  Well, would it make sense for me to walk you through my logic for what I have done to that?                                 11:18:56

Q.  I don't think that's necessary, but you already testified that -- you can, if you would like to -- but you've already testified that the majority of this came from Backpage, and I want to get a sense for what that means.

A.  Well, what I did was I reviewed K-1, which are ownership      11:19:10

documents, and K-1 documents show ownership in income, and I also reviewed W-2s, which are employment income documents. When I reviewed those, they traced back to businesses and accounts that draw their income primarily from the Backpage.com website.

Q.  Thank you.

        MR. STONE:  No further questions, Your Honor.

        MR. CAMBRIA:  Your Honor, can I have recross on the new subject about the lady who didn't pay her taxes and clarify that?

        THE COURT:  Yes, limited to that.

                        RECROSS-EXAMINATION

BY MR. CAMBRIA:

Q.  Your example you gave us of your prior experience with the lady who didn't pay her taxes, do you recall that?

A.  Yes.

Q.  What happened is the FBAR gave you the information that she had an account overseas and how much money that was in there, and it was in her name and so on; correct?

A.  Yes.

Q.  It revealed that information, did it?

A.  Yes.

Q.  Right.  And then you used that to show that she didn't claim that money on her tax return in the United States and, therefore, she was charged with tax evasion; correct?

A.  No.  The case wasn't that simple, and I don't -- I recall
that the FBAR in and of itself was inaccurate after a more
thorough analysis.  So the FBAR existed.  I reviewed the FBAR
and I looked at additional income she was making, and I looked
at her activity relating to other bank accounts, and even then
I recall after an international request that she had
significantly more income or more assets held overseas than
what was revealed in the FBAR.

Q.  Okay.  But the FBAR helped you to get in the right
direction; in other words, it disclosed information about her
income that was not consistent with what she claimed; correct?

A.  Yes, that's right.

Q.  All right.  So it revealed as opposed to concealed
information, true?

A.  Well, it revealed some information.

Q.  And that information you used or somebody used to prosecute
her for not paying her taxes; correct?

A.  Well, that information was used to help support my
analysis, and in the prosecution was broadly for false, filing
false tax returns.

Q.  But the bottom line is because the FBAR included, included
information about her financial transactions, you used that to
help your prosecution, correct 'cause it revealed information?

A.  Well, I can't recall exactly, but it revealed -- it
revealed inaccurate information.

Q.  But it still revealed information which you used or
somebody used to prosecute her?

       MR. STONE:  Objection; it's been asked and answered.

       THE COURT:  Sustained.

BY MR. CAMBRIA:                                              11:22:49

Q.  It revealed information, did it not?

       MR. STONE:  Same objection.

       THE COURT:  Sustained.

BY MR. CAMBRIA:

Q.  Did you use any information that was in the FBAR in     11:22:55
connection with eventually prosecuting her?

A.  At the end of the investigation I -- it wasn't necessary to
prosecute her.  She pled out.

Q.  Okay.  But you used that information to get her to the
point where she took the plea; right?  Let's put it this way --  11:23:17

A.  No.  No.

Q.  -- it supplied information, did it not, which you used or
somebody used?

A.  I think I recall that we didn't reveal the information
relating to the international accounts because she -- in        11:23:33
preparation for a possible trial in the event that she wouldn't
go through with her plea, so --

       THE COURT:  All right.  I think we are getting far
field, Mr. Cambria.

       MR. CAMBRIA:  All right.  Thank you.           11:23:50

THE COURT:  All right.  Is the witness excused from subpoena?

MR. STONE:  Yes, Your Honor.

THE COURT:  Any objection from defense?

MR. PANCHAPAKESAN:  No objection.                    11:23:59

THE COURT:  Sir, thank you for your testimony.  You're excused from subpoena.  You may step down.

Please call your next witness.

MS. PERLMETER:  The United States called Astrid Cervantes.                                           11:24:12

MR. BERRY:  Looks like Ms. Cervantes has gone to the restroom.  We can swap out.  I can do a different witness.

THE COURT:  That's fine.  Do you have another witness ready to go?  Who is that?

MR. BERRY:  United States called Naiomy Figueroa.     11:24:39

So our jurors are aware and counsel, we are going to go through 12:15 and we will take our hour lunch since we start a little bit late.

NAIOMY FIGUEROA,

(Witness sworn.)                                      11:25:23

DIRECT EXAMINATION

BY MR. BERRY:

Q.  Good morning, Naiomy.

A.  Good morning, Austin.

Q.  Would you please state your name for the record?    11:25:59

81

A.   Naiomy Figueroa.

Q.   Would you please spell for the jury your first name?

A.   N-A-I-O-M-Y.

Q.   Great.  Would you please spell for the jury your last name?

A.   F-I-G-U-E-R-O-A.                                    11:26:15

Q.   How old are you, Naiomy?

A.   I am 25 years old.

Q.   Do you have any children?

A.   Yes, I have three children.

Q.   And what are their ages?                           11:26:26

A.   I have a seven-year-old daughter, a two-year-old son and a

one-year-old daughter.

Q.   Do you work outside the home?

A.   No, I do not.

Q.   Are you married?                                    11:26:37

A.   No.

Q.   Are you in a long-term relationship?

A.   Yes, I am.

Q.   Has your partner traveled with you to Phoenix for this

occasion?                                                11:26:47

A.   Yes, he did.

Q.   What state do you live in?

A.   Massachusetts.

Q.   Do you know what Backpage.com is?

A.   Yes, I do.                                          11:26:57

Q.  When did you first become aware of Backpage?

A.  Approximately 2014.

Q.  How did you become aware of what Backpage was?

A.  I became aware when I seen my pimps use it to post my ads.

Q.  So you're saying that you were posted on Backpage?          11:27:22

A.  Yes.  Correct.

Q.  Okay.  What is Backpage to your understanding?

A.  To my understanding, Backpage is a website that is used for

multiple things, but it was known for girls to use it to escort

and to get trafficked.                                          11:27:41

Q.  And when you use the word "escort," what do you mean by

that?

A.  I mean to exchange a sexual act for money or a gift.

Q.  And you mentioned that you were advertised on Backpage;

correct?                                                        11:28:04

A.  Correct.

Q.  What year or years were you advertised on Backpage?

A.  2014, I believe.

Q.  Were you -- where was your ad posted, what section on

Backpage?                                                       11:28:23

A.  It was posted on the escort section.

Q.  Were you involved with creating the ad?

A.  No, I never posted my own ads.

Q.  Who posted it of you?

A.  My pimps, Andy Pena, Hansel German, Enoc Ayuso, and Rafael. 11:28:40

Q. Did you ever have an opportunity to see what your ad looked like?

A. Yes, I have's seen some of my ads.

Q. When you mentioned that the escort was the exchange of sex acts for money; correct?                                      11:29:15

A. Correct.

Q. Were you advertised in exchange for sex acts for money?

A. Yes.

Q. Were -- did those sex acts involve the use of condoms?

A. Yes.                                                          11:29:28

Q. And what states were you advertised on Backpage?

A. I can't remember every single one off of top of my head, but I do know the fact it was Massachusetts, Maine, New Hampshire and I believe New York.

Q. And why were your ads posted on Backpage?               11:29:53

A. So my pimps could make money off of me.

Q. So you mentioned, you said that you were not involved with the creation of the ad, do you know how they paid for the ad?

A. Yes, I was seeing my pimps purchase one vanilla cards from convenience stores or 7-Eleven.                             11:30:23

Q. So vanilla cards?

A. Yes.

Q. And you said that you did see your ads from time to time; correct?

A. Yes, I would see them when they were working on them.    11:30:32

Q.  Do you remember the types of words that they would use in your ads?

A.  Yes.

Q.  Could you explain to the jury just a few of those words that you recall?                                                                    11:30:47

A.  I remember "fetish friendly" and like "satisfying your cravings."

Q.  Okay.  Did you have an understanding as to why those words were used in relation to your ads?

A.  Yes, it was a way to like reel in more customers.           11:31:13

Q.  What kind of photos were used of you?

A.  Basically nude photos.

Q.  Completely nude?

A.  No, not completely nude.

Q.  Can you describe for the jury as best you can?              11:31:31

A.  Sometimes I would have lingerie or like pantyhose or some form of lingerie.

Q.  And what type of poses were you doing in those ads?

A.  Seductive poses.

Q.  How did you know what poses to do?                          11:31:53

A.  Because my pimps would tell me what I had to do.

Q.  Where would the photos be taken?

A.  Mostly like in a hotel room or a hotel bathroom.

Q.  And who paid for those hotel rooms?

A.  It depended on which pimp was with me at the time, but for   11:32:14

the most part it was Andy Pena.

Q.  But always one of the pimps?

A.  Yes.

Q.  Never you?

A.  No, I wasn't old enough to get my own.                    11:32:26

Q.  Why were those kinds of photos that you said seductive

photos, seductive poses in lingerie, why were those kinds of

photos used in your ad?

A.  Because it would reel in more clients.

Q.  What name was used to advertise you?                      11:32:51

A.  Emily.

Q.  Why was your real name not used?

A.  I guess so nobody would be aware that it was me.

Q.  After the ad was created and posted on Backpage, what would

happen next?                                                  11:33:16

A.  I started getting a lot of phone calls.

Q.  What about text messages?

A.  Yes, text messages too.

Q.  Who handled the calls?

A.  For the most part I handled the calls and my pimps would   11:33:29

handle the text messages.

Q.  Why -- why were you handling the calls and them the texts?

A.  Because it needed to be a female's voice on the phone.

Q.  And why was that?

A.  Because it would probably scare the johns away.           11:33:44

Q.  Okay.  How soon after the ad posted would your phone start
to ring?

A.  It always changed, but usually within minutes.

Q.  When you say "minutes," can you give us an idea?

A.  Five, ten minutes.                                          11:34:07

Q.  At some point after you said phone starts ringing within
five to ten minutes, at some point did the calls taper off?

A.  Yes, they do.

Q.  What would you all do then?

A.  They would post another ad to get me on the top of the list   11:34:26
so that the calls keep coming in.

Q.  When you received these calls in response to the ad they
posted of you, help the jury understand just what does a
typical conversation go like there?

        MS. BERTRAND:  Objection, Your Honor, relevance, 403.     11:34:55

        THE COURT:  Overruled.  You may answer.

BY MR. BERRY:

Q.  You can answer.

A.  Sorry, can you repeat the question?

Q.  Yes.  Just a second.  When the call would come in, you said   11:35:04
you would answer the calls; correct?

A.  Correct.

Q.  Phone starts ringing, you take the calls; right?

A.  Yes.

Q.  Explain to the jury how a typical call goes.  I am not        11:35:14

asking you to remember verbatim every single call you ever had,
but just generally, how did this call go?

A.  So for every single call, first rule was to ask them if
they were affiliated with any type of law enforcement before
the conversation started, and then after that they would ask          11:35:30
like about my services, what the rates were, and, you know, if
they wanted to make an appointment or whatever, they would
just, you know, book the appointment.

Q.  Would they ask about your rates?

A.  They would -- sorry, what was that?                                11:35:47

Q.  Would they ask about the rates?

A.  Yes, they would.

Q.  What do you mean by that?

A.  Basically they would ask me like what are the prices per
hour or every half hour.                                               11:35:57

Q.  And is that the two typical time frames, hour or half hour?

A.  For the most part.

Q.  Are you okay?

A.  Yeah.

Q.  What is wrong?                                                     11:36:07

A.  My poppy popped.  It's like all over me.

        MR. BERRY:  Can we take a break?

        THE COURT:  There is some napkins or Kleenexes there.
I don't know if that will work for you.  Is there a trash can
beneath you?  Do you need additional paper towels or anything?         11:36:27

MR. BERRY:  Can she take a break?

THE COURT:  No, that's okay.  That's fine.  All right.
Let's have just about five-minute.  I don't know where the
closest restroom is.  Okay.  Ten minutes of a break.

Members of the jury, if you wish to retire to the jury    11:36:57
deliberation room, you may do so.  Why don't you do that.
Please all rise for the jury.

(Jury left the courtroom at 11:37 a.m.)

MR. BERRY:  Your Honor, with the jury outside the
presence, I want to note for the record what has just happened,  11:37:47
which is the witness is very nervous.  I told her she could
have something to fidget with her hands to keep her sort of
mind occupied or focused.  I don't know what she took up there.
It was some kind of an item that apparently exploded and gel
went everywhere on the floor.  It was all over her hands, and   11:38:06
that's why we have taken a break.

THE COURT:  I did see that she was juggling something
back and forth in her hands that looked like a ball or a small
toy, and so I did recognize that.  I thought it was a stuffed
animal of some sort.                                            11:38:22

MR. LINCENBERG:  Your Honor, while we have a break,
we'd like to note, I think the Court is aware it's a continuing
objection to the testimony designed to bring out discussion of
trafficking, which just occurred here again, designed to bring
out that the person was underage.  There's a pattern asking:    11:38:40

How old are you today?  When were you trafficked?  So it all
conjures up in the image of the jurors that the person was
underage at the time.

Even ostensibly this discussion about how many
children the person has seems to, you know, conjure up the
image of whether these were kids from some spouse versus
somebody that they slept with as a prostitute --

THE COURT:  Oh, no --

MR. LINCENBERG:  Hold on.  Hold on.

THE COURT:  No.  No.  No.  No.  You're getting far
field with that type of argument, Mr. Lincenberg.

MR. LINCENBERG:  Let me finish.

THE COURT:  It's an improper characterization of the
witness, which you should not be opining on with regard to that
particular question and answer.

MR. LINCENBERG:  I am not going to ask her that
question or answer.  I am just concerned about the speculation
and what the relevance of it is.  First two points are more
obvious.  As I noted, the third one is less obvious, but it's a
concern, and I just wanted to note for the record the
continuing objection.

THE COURT:  It's noted.  I've only heard her mention
the word "trafficked" once, and I've only heard her testify
that she was not old enough to pay for her ads, and I think the
jury can do the math as all of us can with regard to these

witnesses and their age today and the time that they were
posted.  There's nothing that we can do about that.  They are
the facts.

    And so your objection, however, your continuing
objection is noted.

    All right.  Let's check on Ms. Figueroa.

    MS. BERTRAND:  When Mr. Berry gets back, I have
another comment.  Your Honor, two-fold.  Actually, first, I
just wanted, and I made a 403 objection, I have some concerns
with this line of questioning that we're getting into the day
in the life, and that's a concern, but also I'd like to note,
and we already have her on the stand, I didn't have time to
object.  The United States sent us an e-mail yesterday
10:54 a.m. giving us the witness lineup for today.  Ms.
Figueroa wasn't on it, so we were scrambling to address this.
They had told us Ms. Figueroa was going to go, then they moved
her, so I'm just noting this is an ongoing issue and I am
making a record about it.

    THE COURT:  I think we discussed about this morning,
so I am aware.

    MS. BERTRAND:  Okay.

    THE COURT:  I don't see at this juncture that we are
getting into anything related to the day in the life, so but
your objection is noted.  Let's bring her in.  As well, bring
the jury back.

Ma'am, you may resume your seat.

And rise for the jury, please.

(Jury is present at 11:46 a.m.)

THE COURT:  All right.  Please be seated.  Record will reflect the jury has returned.  Our witness is on the stand.

11:46:35

And you may proceed, Mr. Berry.

MR. BERRY:  Thank you, Your Honor.

BY MR. BERRY:

Q.  Thank you.  We are back, Naiomy.  Are you nervous?

A.  Yes, I am.

11:46:47

Q.  Is this a difficult topic to talk about?

A.  Yes.

Q.  When just before we broke we were talking about the rates being discussed on the phone, and you said we talked about hour and half hour; is that correct?

11:47:05

A.  Yes.

Q.  Are those the increments, the amount of time that would be discussed?

A.  Majority of the times, yes.

Q.  When you would have these phone calls with these potential clients, were you cautious about what you said on the phone?

11:47:15

A.  Yes.

Q.  Explain that to the jury.

A.  Like I had stated previously, you had to always ask if they were affiliated with any type of law enforcement, but you still

11:47:35

UNITED STATES DISTRICT COURT

had to like be careful and use certain words like "roses" for money and stuff.

Q.  Where did most of these dates take place?

A.  Usually in a hotel room.

Q.  And when the individual got there to your hotel room, what's the first thing that would happen?

A.  We would have to ask them to touch us like somewhere like in the private parts to confirm that they were not a cop.

Q.  How long would you typically spend with an individual?

A.  Usually like half an hour, an hour.

Q.  And you mentioned earlier that during this hour, half hour, sex acts would occur?

A.  Yes.

Q.  And without getting graphic or detailed about what those acts were, do those acts always involve a condom?

A.  For the most part.

Q.  What percentage of the time would you say there was a condom versus not?

       MS. BERTRAND:  Your Honor, objection; relevance.

       THE COURT:  Sustained.

       MR. BERRY:  Your Honor, may I have a sidebar very briefly?

       THE COURT:  Very briefly.

(Sidebar)

       THE COURT:  Can I just mention, previously the court

11:47:55
11:48:23
11:48:40
11:48:52
11:49:26

reporters have alerted me to this concern, if there is side
conversations in the background that are going on, that it
makes it very difficult, so one at a time, okay?

MR. BERRY:  Your Honor, the issue with asking her
about condoms is because we want to be able to articulate for
the jury that these were sex acts that would qualify for the
prostitution act.  The defense has cross-examined several of
our witnesses about what constitutes a sex act.  For example,
stripping nude, not actually touching genitals, things like
that.  This is a person that's very nervous about testifying.
I don't think I have to ask her, "Did your genitals touch each
other," and get really graphic and gross with her.  It makes
her very uncomfortable.  If I simply ask her, "Was a condom
used, and what percentage of the time," the jury can make the
inference that condoms are used for largely one thing and one
thing only.

THE COURT:  You already asked the question previously
before we had the break.

MR. BERRY:  She now said it's not a hundred percent of
the time, so I wanted to clarify what percentage because now
that becomes relevant whether it was 50 percent, 20 percent or
90 percent.

MS. BERTRAND:  I don't see how any of this is relevant
as to whether or not any of the allegations set forth in the
counts of the indictment occurred and qualify as criminal acts.

11:49:43

11:50:00

11:50:17

11:50:29

11:50:46

This is a backdoor way to get in the day in the life and all kinds of other more details that have nothing to do with whether or not any of these defendants joined in a conspiracy to violate the Travel Act.  That's all this is.  And the fact that she's nervous is all the more reason to make this swift, but this is not a relevant line of questioning.

       MR. BERRY:  It's the opposite.  That's what I am trying to establish.

       THE COURT:  Well, the alternative is if Mr. Berry asks her, "Did you engage in sexual intercourse?  What amount of time was that?  Did you have oral sex?  Did you perform oral sex?"  So he either can ask the percentage of time used with a condom, or he can ask those two questions, and so that's how I will permit it to go forward.  All right.

(The following proceedings occurred in open court:)

BY MR. BERRY:

Q.  Okay.  Let's try this again.  You said a condom was used a vast majority or a majority of the time?

A.  Yes.

Q.  What percentage would you say a condom was used during the sex acts?

A.  About 90 percent.

Q.  When would the money change hands?

A.  Before the sexual act.

Q.  And then after the sex act occurred, what would happen

      11:51:07

      11:51:25

      11:51:48

      11:52:12

      11:52:32

next?

A.   They would go.

Q.   Okay.  And what would you do with the money?

A.   I would hand it over to my pimps.

Q.   How much were you allowed to keep?                    11:52:49

A.   Nothing.

Q.   In February of 2014, did someone respond to your ad that turned out to be a cop?

A.   Yes.

Q.   Where were you?                                        11:53:05

A.   I was in Salem, New Hampshire at the La Quinta Inn.

Q.   That's fine.  Thank you.  How long had you been there at that particular motel?

A.   I can't say exactly how long, but I know it was no more than a week.                                              11:53:23

Q.   And you mentioned this Andy Pena, was he there with you?

A.   Yes, he was.

Q.   You said you were in different states, Massachusetts, New Hampshire, New York?

A.   Yes.                                                   11:53:40

Q.   Who drove you from those locations?

A.   It always changed depending which pimp was with me, but for the most part it was Andy Pena.

Q.   After this incident in February of 2014, were you ever advertised on Backpage again?                             11:53:58

96

A.  No.

Q.  After this incident in February of 2014, how much money did Andy Pena make off of you?

A.  Zero dollars.

Q.  After this incident in February 2014, how much money did Backpage make off of your advertisements?

A.  Nothing.

     MS. BERTRAND:  Objection; calls for speculation.

     THE COURT:  Sustained.

BY MR. BERRY:

Q.  No more ads were posted?

A.  No.

Q.  Are you familiar with the word "in-call"?

A.  Yes, ma'am [sic].

Q.  Explain that to the jury.

A.  In-call is when a john comes to you.

     MR. BERRY:  All right.  I'm going to -- so I'm going to show for the witness what's already in evidence as government's Exhibit 214.

BY MR. BERRY:

Q.  Do you recognize this, Naiomy?

A.  Yes.

Q.  What is it?

A.  It's one of my ads.

Q.  And now I've zoomed in on the heading of it, would you

11:54:10

11:54:22

11:54:30

11:54:49

11:55:06

please read that for the jury?

A.  "Puerto Rican Mami in Walpole area in-calls 19."

Q.  What was the date on that?

A.  Wednesday, January 29, 2014.

Q.  Walpole, do you know where that was?                    11:55:28

A.  Yes.

Q.  Where?

A.  It's like near Dedham.  It's in Massachusetts.

Q.  And we see an e-mail address down here, whose e-mail was that?                                                        11:55:44

A.  That was my old e-mail.

Q.  That was what?

A.  My old e-mail.

Q.  But was it you posting the ad?

A.  No.                                                     11:55:52

Q.  Who was using that?

A.  Andy Pena.

Q.  And now very quickly I want to go through these photos, who is in these photos?

A.  That's me.                                              11:56:02

Q.  Is it hard for you to look at this ad?

A.  Yes.

Q.  Taking the photos down and we are just looking at the text. Are you okay for a minute?  Do you need a minute?

A.  It's okay.                                              11:56:23

Q.  Would you please read this ad that says, "Hey, my name,"
whose the name in there?

A.  Emily.

Q.  Okay.  Again, did you create this ad?

A.  No.                                                          11:56:35

Q.  Scrolling down here to this section, do you recognize this
name?

A.  Yes.

Q.  Who is that?

A.  That's Andy Pena.                                            11:56:49

Q.  Do you recognize that address?

A.  My pimp.

Q.  Address?

A.  Yes.

Q.  What address is that?                                        11:56:55

A.  That was his address at the time.

Q.  He was the one posting your ad?

A.  Yes.

Q.  Very briefly, I'm going to show you 214a, who is in these
ads?  Who is in this ad?                                         11:57:17

A.  That's me.

Q.  Is that another one of your ads?

A.  Yes.

Q.  Are those the photos you talked about a moment ago that
were taken of you?                                               11:57:27

A.  Yes, those are.

Q.  Are you okay?

A.  Yeah, I am fine.

Q.  Did your ad help you get more calls from johns?

A.  Yes.                                                                    11:57:43

Q.  How often would your ad get posted or reposted on Backpage?

A.  At least every hour or two at the very least.

Q.  Was every ad posted of you an offer of sex for money?

A.  Yes, it was.

Q.  Did you know a man named Nicholas Kristof?                              11:58:12

A.  Yes, I do.

Q.  Who is he?

A.  He is a journalist.

        MR. LINCENBERG:  Objection; relevance.

        THE COURT:  Well, overruled.  I will let her answer                11:58:23
the question and determine whether or not it's relevant.  She
may answer.

        THE WITNESS:  Nicholas Kristof is a journalist from
the New York Time lines.

BY MR. BERRY:                                                              11:58:37

Q.  Okay.  And how do you know him?

        MS. BERTRAND:  Objection; relevance; 403; prior
discussions.

        MR. BERRY:  Your Honor, the jury has heard evidence
about Mr. Kristof, and this links those things.                           11:58:48

THE COURT:  I will overrule the objection.

BY MR. BERRY:

Q.  Let me take a more narrow approach here.  You can answer

the question, but I will go a little more narrow.  Did

Mr. Kristof write anything in the New York Times about you?          11:59:05

        MS. BERTRAND:  Objection; relevance; hearsay.

        THE COURT:  Overruled.

        THE WITNESS:  Yes, he has.

BY MR. BERRY:

Q.  Was it about you being on Backpage?                              11:59:19

A.  Yes.

        MR. LINCENBERG:  Leading; relevance; hearsay.

        THE COURT:  Sustained as to leading.

        MR. BERRY:  I will ask it open-ended.

BY MR. BERRY:                                                       11:59:31

Q.  What was it about?

        MS. BERTRAND:  Objection; hearsay.

        MR. LINCENBERG:  And relevance.

        THE COURT:  I guess you can lay some foundation about

what she knew about the article, if she read and it so on, so       11:59:38

sustained as to relevance.

        MR. BERRY:  Sure.

BY MR. BERRY:

Q.  Do you recall there was a documentary that Mr. Kristof was

involved with as well?                                              11:59:53

MS. BERTRAND:  Objection; leading; relevance.

THE COURT:  Sustained.  Sustained as to leading.
Overruled as to relevance.

BY MR. BERRY:

Q.  In addition to what he wrote in the New York Times, are you
aware of anything else Mr. Kristof has done with regards to
Backpage and you?

MS. BERTRAND:  Objection.

MR. LINCENBERG:  Relevance.

THE COURT:  Overruled; leading.

THE WITNESS:  Can you ask that question in a different
form for me?

BY MR. BERRY:

Q.  Are you aware of whether Mr. Kristof was involved with
anything other than writing the New York Times article?

MS. BERTRAND:  Objection; leading.

THE COURT:  Overruled.

THE WITNESS:  Yes, I do know that he was filming, was
filming to help girls who were on the run --

MS. BERTRAND:  Objection.

MR. LINCENBERG:  Goes beyond the scope, also
relevance.

THE COURT:  Well, the answer may stand, but let's move
on.

MR. BERRY:  Just one second, Your Honor.

UNITED STATES DISTRICT COURT

102

        THE COURT:  And I will overrule the objection.

BY MR. BERRY:

Q.  Did the documentary have anything to do with Backpage?

        MS. BERTRAND:  Objection; relevance; hearsay; leading.

        THE COURT:  Overruled.                                    12:01:19

        THE WITNESS:  Yes.

BY MR. BERRY:

Q.  Did it have anything to do with you on Backpage?

        MS. BERTRAND:  Same objections.

        THE COURT:  Overruled.                                    12:01:27

        THE WITNESS:  Yes.

BY MR. BERRY:

Q.  Did it -- was your mother featured in it?

        MS. BERTRAND:  Objection; relevance; hearsay.

        MR. EISENBERG:  Rule 403, Your Honor.                     12:01:43

        THE COURT:  I am going to sustain the objection as to

relevance.

        MR. BERRY:  Thank you, Your Honor.  Pass the witness.

Hold on just a second.  Not pass.  Okay.

BY MR. BERRY:                                                     12:01:58

Q.  So you talked about Mr. Pena didn't let you keep any of the

money; correct?

A.  Correct.

Q.  Did he have any legitimate jobs, to your knowledge?

        MR. LINCENBERG:  Relevance.                               12:02:08

THE COURT:  Overruled.

THE WITNESS:  Not that I was aware of.

MR. BERRY:  Thank you.  Pass the witness.

THE COURT:  Who is coming forward?  Ms. Bertrand.

MS. BERTRAND:  May I proceed?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MS. BERTRAND:

Q.  Good morning, Ms. Figueroa.

A.  Good morning.

Q.  My name is Joy Bertrand.  I represent a woman named

Joye Vaught.  I don't believe we met, so I just wanted to

introduce myself.

Ms. Figueroa, do you know whether or not any of the

photos that were placed in any of your ads were ever deleted by

Backpage?

A.  I am not 100 percent sure.

Q.  Do you know whether or not any of your ads were deleted?

A.  I am not sure.

MS. BERTRAND:  Ms. Ellig, can you please pull up

Exhibit 214 and publish to the jury.  This has already been

admitted into evidence.

BY MS. BERTRAND:

Q.  Ms. Figueroa, do you see at the top there of the screen in

red?

A. Yes.

Q. It says, "This ad is not live."

A. Yes.

Q. "Status community removed," do you see that?

A. Yes.                                                    12:03:33

Q. Removed.  Excuse me.  Do you know what that means?

A. It was taken down.

Q. By Backpage?

A. Yeah.

Q. Yes.  Ms. Figueroa, there is some people sitting to my    12:03:44
left.  I am going to point them out to you and just ask if
their names sound familiar or if you've ever met them, okay?

A. Okay.

Q. Adam Padilla, have you ever met him?

A. No.                                                     12:04:04

Q. Name sound familiar?

A. No.

Q. Scott Spear?

A. No.

Q. Jed Brunst?                                             12:04:09

A. No, ma'am.

Q. Joye Vaught?

A. No.

Q. Michael Lacey?

A. Nope.                                                   12:04:20

105

Q.  And was it your testimony, I just want to make sure you're clear, that the way you end up coming into contact with law enforcement is they responded to a Backpage ad?

A.  Correct.

Q.  And at least one of the people involved with you has now served five years in prison; correct?

12:04:42

A.  Correct.

Q.  Do you know whether or not Backpage provided any assistance in that prosecution?

A.  I'm not really sure.

12:05:02

        MS. BERTRAND:  Thank you, Your Honor.  I have nothing further.  Thank you, Ms. Figueroa.

                    CROSS-EXAMINATION

BY MR. CAMBRIA:

Q.  Good afternoon.

12:05:17

A.  Good afternoon.

Q.  Just a couple questions.  From the testimony that you gave this morning you indicated that you had an ad go up, but then you received a phone call, is that fair to say?

A.  Once the ad posted, I would receive phone calls and text

12:05:35

messages.

Q.  And it was in the phone call that there was a discussion of some kind of sexual act for money?

A.  It was in both text messages and phone call.

Q.  I'm sorry.

12:05:49

106

A.  It was through both text messages and phone call.

Q.  Text messages and phone call?

A.  Yes.

Q.  The use of the phone -- using the phone is where the so-called agreement was made?

12:06:01

A.  Correct.

Q.  If anyone did in fact meet with you and exchange money for sex, where did that money go?

A.  It would go to my pimps.

Q.  Was any of that money paid to Backpage?

12:06:24

A.  I believe when I would post Backpage would get paid.

Q.  You paid for an ad; correct?

A.  Yes.

Q.  All right.  My question was if somebody came in, and I am just picking fantasy numbers here, somebody came in and they said:  Here's $500 for X, did any of that 500 go to Backpage?

12:06:40

A.  No.

        MR. CAMBRIA:  Thank you.

        THE COURT:  Mr. Eisenberg.

        MR. EISENBERG:  Thank you, Your Honor.

12:06:54

        Ms. Ellig, may we have Exhibit 212, please, again?

        THE COURT:  212 he asked for.

                    CROSS-EXAMINATION

BY MR EISENBERG:

Q.  Ma'am, I am going to have this shown to you again.

12:07:16

UNITED STATES DISTRICT COURT

107

MR. BERRY:  Objection; this is not her ad.

THE COURT:  This was not the exhibit that was used.

MR. EISENBERG:  214, Your Honor.  I'm sorry.

BY MR EISENBERG:

Q.  Just to make sure I am sure, this is your ad, is it not, ma'am?                                                    12:07:30

A.  Yes, it is.

Q.  And ma'am, your face is covered, isn't it?

A.  Partial of my face is covered.

Q.  Isn't it fair to say that in order to determine one's age,  12:07:38
the primary factor is what they look like in their face?

MR. BERRY:  Objection; calls for speculation.

THE COURT:  She can answer in her own opinion.

THE WITNESS:  I am sorry, can you re -- rephrase that
question for me.                                                 12:07:56

BY MR EISENBERG:

Q.  Yes, ma'am.  What I am asking in order to determine the
relative age of a person, right, one would concentrate, a
person would concentrate on their face, not their body?

A.  I don't agree with that.                                     12:08:10

Q.  Well, what there shows that you're under 19 years old?

A.  I did not post that.  My pimp posted it.

Q.  I understand it that, ma'am, but looking at this, would you
agree this is a photograph; right?

A.  Yes.                                                         12:08:25

Q.  Is there anything on that photograph that shows that you're under 18 years old?

A.  No.

        MR. EISENBERG:  Thank you.  That's all, Your Honor.

        THE COURT:  I see Mr. Feder.                           12:08:37

                        CROSS-EXAMINATION

BY MR. FEDER:

Q.  Hello.

A.  Hi.

Q.  You had no contact whatsoever with Backpage or anybody at   12:08:49

it, true?

A.  Sorry, can you re-ask that?

Q.  I said, you had no contact with anybody at Backpage or

anybody that worked there; right?

A.  No, sir.                                                   12:09:01

Q.  When there would be some kind of call to you or a text

because you and your pimps were careful, you would not discuss

even what kind of transaction you were hoping for on the phone;

right?

A.  Correct.                                                   12:09:21

Q.  It was only when that person, that potential customer came

to you in the hotel room that the actual transaction was

discussed in more detail; right?

A.  Yes, for the most part.

        MR. FEDER:  That's all I have.  Thanks.                12:09:46

THE COURT:  I think the only one left is Mr. Lincenberg.

MR. LINCENBERG:  No, Your Honor.

THE COURT:  All right.  Mr. Berry.

REDIRECT EXAMINATION

12:09:55

BY MR. BERRY:

Q.  If addition to not knowing who Adam Padilla is, do you not know who Andrew Padilla is?

A.  No.

Q.  With regard to whether Backpage made any money you were asked if they made any money off of these sex act dates things that occurred; correct?

12:10:12

MR. CAMBRIA:  Your Honor, that misstates the question. The question was:  Did they split the money, made the money, there's a difference.

12:10:32

THE COURT:  Mr. Cambria, that was not the question either, so I will ask Mr. Berry to rephrase.

MR. BERRY:  Sure.

BY MR. BERRY:

Q.  The money that was made off of the sex acts you performed, where did that money go?

12:10:40

A.  It went to my pimps.

Q.  Did he have any other legitimate source of income?

A.  No.

Q.  How did he pay for the ads to be posted?

12:10:51

110

A.  With one vanilla cards.

Q.  Where did that money come from?

A.  That went to Backpage.

Q.  Where did it come from to buy the vanilla card?

A.  The money that they had from selling my body.                    12:11:03

        MR. BERRY:  No further questions, Your Honor.

        THE COURT:  May the witness be excused from subpoena?

        MR. BERRY:  Yes.

        THE COURT:  Is there an objection from defense?

        MR. CAMBRIA:  No.                                           12:11:15

        THE COURT:  Ma'am, you are excused from subpoena.  We

thank you for your testimony.  You may step down.  You are

excused.

        Members of the jury, I said we would go until a

quarter after the hour before we took our lunch break, but    12:11:25

obviously it seems a natural time to do so now.  We will be at

lunch for an hour.  I'd ask you to be prepared to come in

roughly ten after the hour give or take a few minutes.  And so

with that, just remember the admonition and please all rise for

the jury.                                                        12:11:45

                    (Jury is not present.)

        THE COURT:  Let me just ask then who is the

government's next witness?

        MS. PERLMETER:  Next will be will be Astrid Cervantes.

        THE COURT:  And then after that?                          12:12:31

MS. PERLMETER:  Arshana Sanders.

MR. FEDER:  Persons not noticed to me that I have some information.

THE REPORTER:  Can't hear you.

MR. FEDER:  Arshana Sanders is the file we talked about this morning, Your Honor, that was not noticed to me that I have some information on but not the entire file.          12:12:45

THE COURT:  And who else do you have?

MS. PERLMETER:  We also have Andrea Benson.  We have no objection to having her go before Ms. Sanders if Mr. Feder needs additional time to prepare.  All of the witnesses that we are calling today were provided to the defense Friday evening along with the exhibits that we intend do show them.          12:13:06

THE COURT:  All right.  We can go with Ms. Cervantes, Ms. Benson and Ms. Sanders to give Mr. Feder the lunch hour to go over the file, and that's how we will proceed.  All right. Let's stand in lunch recess.          12:13:23

(Proceedings concluded at 12:13 p.m.)

# <u>C E R T I F I C A T E</u>

I, HILDA E. LOPEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 18th day of October, 2023.


s/Hilda E. Lopez_____
HILDA E. LOPEZ, RMR, FCRR

EXHIBIT M

EXHIBIT M

_____ FILED          _____ LODGED
_____ RECEIVED       _____ COPY

JUL 2 5 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

REDACTED FOR
PUBLIC DISCLOSURE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR 18-422-PHX-SPL (BSB) |
| Plaintiff, | |
| v. | **S U P E R S E D I N G<br>I N D I C T M E N T** |
| 1. Michael Lacey<br>(Counts 1-70, 81, 83-84, 86, 88-92,<br>and 94-100) | VIO: 18 U.S.C. § 371<br>(Conspiracy)<br>Count 1 |
| 2. James Larkin<br>(Counts 1-68, 80, and 87) | 18 U.S.C. § 1952(a)(3)(A)<br>(Travel Act—Facilitate Prostitution)<br>Counts 2-51 |
| 3. Scott Spear<br>(Counts 1-68, 71-78, 85, and 93) | 18 U.S.C. § 1956(h)<br>(Conspiracy to Commit Money<br>Laundering)<br>Count 52 |
| 4. John "Jed" Brunst<br>(Counts 1-70, 78-84, and 86-93) | 18 U.S.C. § 1956(a)(1)(B)(i)<br>(Concealment Money Laundering)<br>Counts 53-62 |
| 5. Dan Hyer<br>(Counts 1-68) | 18 U.S.C. § 1956(a)(2)(A)<br>(International Promotional Money<br>Laundering)<br>Counts 63-68 |
| 6. Andrew Padilla<br>(Counts 1-51) | 18 U.S.C. § 1957(a)<br>(Transactional Money Laundering)<br>Counts 69-99 |
| 7. Joye Vaught<br>(Counts 1-51) | 18 U.S.C. § 1956(a)(2)(B)(i)<br>(International Concealment Money<br>Laundering)<br>Count 100 |
| Defendants. | |

18 U.S.C. §§ 981(a)(1)(C),
982(a)(1) and (b); 21 U.S.C.
§ 853(p); 28 U.S.C. § 2461(c)
(Forfeiture Allegations)

THE GRAND JURY CHARGES:

**A.    Introduction**

1.    The website www.backpage.com ("Backpage") was, until being shut down by federal law enforcement authorities in April 2018, notorious for being the internet's leading source of prostitution advertisements.   Backpage derived the overwhelming majority of its revenue from such ads.   These practices enabled Backpage to earn over $500 million in prostitution-related revenue during its fourteen years of existence.

2.    Backpage was created in 2004 by defendant MICHAEL LACEY ("LACEY"), defendant JAMES LARKIN ("LARKIN"), and a third individual, C.F.   From 2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction. Additionally, LACEY and LARKIN retained significant control over the website (and continued receiving tens of millions of dollars of Backpage-related distributions) after purportedly selling their interests in Backpage in 2015.

3.    Defendant SCOTT SPEAR served as the Executive Vice President of one of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 4%.

4.    Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief Financial Officer of Backpage and several of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 6%.

5.    Defendant DAN HYER ("HYER") joined Backpage's marketing department in or around 2006 and served as Backpage's Sales and Marketing Director.

6.    Defendant ANDREW PADILLA ("PADILLA") served as Backpage's Operations Manager.

7.     Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant Operations Manager.

8.     The defendants identified above are referred to at times in this Superseding Indictment as the "BACKPAGE DEFENDANTS."

9.     As explained in detail below, the BACKPAGE DEFENDANTS were aware that the vast majority of the "adult" and "escort" ads appearing on Backpage were actually ads for prostitution and took steps to intentionally facilitate that illegal activity.   For example, during Backpage's early years of operation, the company's employees were actually trained to—and paid bonuses for—identifying prostitutes who were posting ads on rival websites, creating free ads on Backpage for them, and using the resulting Backpage ads (which would only remain free for a trial period) in an attempt to secure the prostitutes' future business.   These affirmative content-creation efforts, which were described internally as "content aggregation" or the "Dallas Plan," were vital to Backpage's early growth and success.

10.     Backpage also employed other business strategies that were specifically intended to promote and facilitate prostitution.  For example, for several years, Backpage had a reciprocal link agreement with The Erotic Review ("TER"), a website that permitted customers to post explicit "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts.  Backpage paid tens of thousands of dollars to TER in return for assistance in getting TER's customer base to start using Backpage.

11.     In addition to affirmatively creating prostitution-related content and intentionally soliciting prostitution-related business, Backpage also utilized a variety of strategies to conceal the true nature of the ads being posted on its website.  Most notably, Backpage periodically used computerized filters and human "moderators" to edit the wording of (or block) ads that explicitly offered sexual services in return for money.  The BACKPAGE DEFENDANTS admitted—in internal company documents and during private meetings—that, despite these editing practices, they knew the overwhelming

majority of the website's ads still involved prostitution.  In one internal document, LACEY actually bragged about the company's contributions to the prostitution industry: "Backpage is part of the solution.  Eliminating adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . . For the very first time, the oldest profession in the world has transparency, record keeping and safeguards."

12.     Notwithstanding      these      private      admissions,      the      BACKPAGE DEFENDANTS took pains to mislead the public, regulators, and law enforcement officials concerning the supposed sincerity of Backpage's efforts to prevent the publication of prostitution-related ads.  For example, after reviewing LACEY's written description of Backpage's contributions to the prostitution industry and editing practices, LARKIN instructed C.F. to prevent "any of the information in this being made public." PADILLA, who helped supervise Backpage's moderators, threatened to fire any employee who acknowledged in writing that the "escorts" depicted in the website's ads were actually prostitutes: "Leaving notes . . . implying that we're aware of prostitution . . . is enough to lose your job over."  And in one internal document, Backpage's media strategy was described simply as "Do not acknowledge the prostitution."

13.     Many of the ads published on Backpage depicted children who were victims of sex trafficking.  Once again, although Backpage sought to create the perception that it was diligently attempting to prevent the publication of such ads, the reality is that Backpage allowed such ads to be published while declining—for financial reasons—to take necessary steps to address the problem.  For example, for several years, Backpage's official policy, when presented with an ad featuring the prostitution of a child, was to delete the particular words in the ad denoting the child's age and then publish a revised version of the ad.  Such editing, of course, did nothing to change the fact the ad featured the prostitution of a child— it only created a veneer of deniability and helped Backpage's customers (*i.e.,* pimps trafficking children) evade detection.  Similarly, in April 2011, several BACKPAGE DEFENDANTS were warned that the term "New In Town" was a coded phrase used by "pimps who shuttle children to locations where they do not know anyone and cannot get

help." Nevertheless, Backpage continued for the next seven years to permit ads using the phrase "New In Town" to be published on its website.

14.     Backpage also contributed to the proliferation of ads featuring the prostitution of children in other ways.  For example, an anti-sex trafficking organization once suggested that Backpage provide an automatic warning message whenever a customer searched for particular terms indicative of the prostitution of a child.  In response, C.F. acknowledged the proposal was a good one but declined to adopt it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AGs [state attorneys general] so it has little PR value.  It is a low priority." Backpage also claimed it did everything in its power to alert the National Center for Missing and Exploited Children ("NCMEC") whenever it became aware that a child was being advertised on its website.  However, the BACKPAGE DEFENDANTS implemented policies to artificially limit such referrals.  In one training document, moderators were instructed not to send emergency alerts to NCMEC in response to complaints filed by the grandparents and other extended family members of children being advertised on the website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

15.     Virtually every dollar flowing into Backpage's coffers represented the proceeds of illegal activity.  In fact, by 2015, the major credit card companies stopped processing payments for Backpage and some banks closed Backpage's accounts out of concern they were being used for illegal purposes.  In response, the BACKPAGE DEFENDANTS pursued an array of money laundering strategies.  These strategies included (a) instructing customers to send checks and money orders to a particular Post Office box, depositing those payments in bank accounts held in the name of entities with no apparent connection to Backpage, and then giving customers a corresponding "credit" on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank accounts held in foreign countries and then redistributing the funds to certain BACKPAGE DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the United States (to conceal the nature of those funds and promote Backpage's ongoing

1    operations), and (c) converting customer payments, and the proceeds of Backpage's

2    business, into cryptocurrency.

3         16.    The BACKPAGE DEFENDANTS also engaged in other financial

4    transactions designed to conceal their misconduct and evade seizure by law enforcement.

5    For example, in July 2016, LACEY wrote an email seeking assistance in "put[ting] some

6    assets in place[s] where . . . government parties . . . can not access my accounts."  A few

7    months later, LACEY asked employees of an Arizona-based bank for advice on how to

8    move his assets "offshore" to protect them from seizure by the government.   Soon

9    afterward, $16.5 million in Backpage-derived cash was wired from LACEY's bank

10   accounts in the United States to an overseas bank account in Hungary.  At the time of the

11   Hungarian transfer, LACEY was facing criminal charges in California state court and was

12   aware of the federal grand jury investigation in this matter.

13        17.    For all of these reasons, the BACKPAGE DEFENDANTS are charged in this

14   superseding indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952),

15   concealment, transactional, international promotional, and international concealment

16   money laundering (18 U.S.C. §§ 1956 and 1957), and/or conspiracy to commit these

17   offenses (18 U.S.C § 371 and 1956).

18   **B.**    **Backpage's Origins, Ownership, and Control**

19        18.    LACEY and LARKIN are the founders of the *Phoenix New Times*, an

20   alternative newspaper based in Arizona.  Over time, LACEY and LARKIN acquired

21   several other alternative newspapers, which they came to operate through entities called

22   New Times Media and Village Voice Media Holdings (referred to collectively for ease of

23   reference as "VVMH").   Additionally, SPEAR served as VVMH's Executive Vice

24   President and BRUNST served as VVMH's Chief Financial Officer.

25        19.    The publications within the VVMH newspaper chain routinely featured

26   illegal prostitution ads.  In fact, more than 30 years ago, a federal court affirmed the

27   conviction of the operator of a prostitution business (which masqueraded as a massage

28   parlor) for publishing ads in the classified section of the *Village Voice*.  *See United States*

1    *v. Sigalow*, 812 F.2d 783 (2d Cir. 1987). The conviction was for violating 18 U.S.C.

2    § 1952, one of the same crimes charged in this Superseding Indictment.

3        20.    By 2000, the rise of the internet—and, in particular, the website

4    www.craigslist.com ("Craigslist"), which offered free classified ads—began to

5    significantly disrupt VVMH's business model, which depended on classified advertising

6    revenue for survival.

7        21.    LACEY and LARKIN, with assistance from C.F., sought to address this

8    threat by creating Backpage. Their decision to create Backpage was later described in an

9    internal company document as follows: "In 2004, in response to the Craigslist threat that

10   was decimating daily newspapers, VVM launched its own online classified site,

11   Backpage.com, named after the back page of VVM's print publication."

12       22.    During its first few years of operation, Backpage accounted for only a

13   fraction of VVMH's overall revenue. In January 2006, for example, VVMH estimated that

14   Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage

15   had "tremendous upside potential."

16       23.    This prediction proved prophetic. By 2008, Backpage was generating over

17   $5 million in annual profit. This annual profit figure increased to over $10 million in 2009.

18       24.    In 2010, Craiglist chose to shut down its "adult" section due to the prevalence

19   of ads for prostitution and other illegal services. The BACKPAGE DEFENDANTS,

20   sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share

21   of this market. In one internal document, LARKIN commented: "Craigslist has folded

22   . . . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . .

23   We have with the Village Voice probably the longest run of adult content advertising in

24   the US and it is, like it or not, in our DNA."

25       25.    This push was successful. In internal documents, Backpage stated that it

26   experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume."

27   Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and

28   over $78 million in 2012.

26.     These figures dwarfed the profits that VVMH's print publications were generating.  In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS decided to get rid of VVMH's publishing business so they could focus on Backpage's further development and expansion.   Accordingly, in or around November 2012, the BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as Backpage's parent companies.

27.     Following these transactions, LACEY held an ownership interest in Medalist (and, therefore, in Backpage) of approximately 45%, LARKIN held an ownership interest of approximately 43%, BRUNST held an ownership interest of approximately 6%, and SPEAR held an ownership interest of approximately 4%.

28.     Backpage's annual profits continued to skyrocket during and after these changes.  They grew to over $112 million in 2013 and over $134 million in 2014.

29.     In or around April 2015, LACEY, LARKIN, SPEAR, and BRUNST purported to sell their ownership interests in Backpage and several related entities for around $600 million to various Dutch entities.  These Dutch entities included Atlantische Bedrijven, C.V., which agreed to purchase Backpage's U.S. operations for around $526 million, and UGC Tech Group C.V., which agreed to purchase Backpage's overseas operations for around $77 million.

30.     In fact, these Dutch entities were controlled by C.F., who simply "borrowed" most of the $600 million from entities controlled by the sellers to finance the purchase.  Due to this financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant financial interest in Backpage after the transactions were completed.

31.     LACEY, LARKIN, SPEAR, and BRUNST also retained significant operational control over Backpage following these transactions.  For example, the April 2015 loan agreement required C.F. to sign a six-year employment agreement, required C.F. to provide the lenders with full access to Backpage's books and records, required C.F. to

1   provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited

2   C.F. from opening new bank accounts on Backpage's behalf without the lenders' consent.

3       32.    LARKIN and others also met regularly with C.F. following the April 2015

4   transaction to discuss and direct the operation of Backpage's business, often taking steps

5   (such as avoiding the use of email and holding the meetings in the presence of attorneys)

6   intended to conceal their continued involvement in, and control over, the company.

7   Through these mechanisms, LARKIN and others exerted post-April 2015 control over

8   Backpage's banking relationships, the migration of some of Backpage's operations to the

9   Philippines, the management of Backpage's counsel, Backpage's acceptance of gift cards,

10   Backpage's response to a Senate investigation, and Backpage's licensing agreements.

11   Additionally, LARKIN and others took steps in 2018 to attempt to sell the company to a

12   new buyer.

13   **C.**    **Knowledge And Facilitation Of Prostitution**

14       33.    Prostitution is illegal in 49 states and in most of Nevada. Advertisements for

15   prostitution services in those locations are, therefore, not protected by the First

16   Amendment.

17       34.    As explained below, the BACKPAGE DEFENDANTS were aware that the

18   overwhelming majority of the website's "adult" and "escort" ads were actually ads for

19   prostitution and took a variety of steps to intentionally facilitate that illegal activity. These

20   steps evolved over time and included, but were not limited to, creating free ads for

21   prostitutes in an attempt to secure future advertising revenues from them (*i.e.,* "content

22   aggregation"), entering into formal business arrangements with known prostitution

23   services and websites in an attempt to increase the volume of prostitution advertisements

24   being posted on Backpage (*i.e.,* reciprocal link and affiliate programs), and sanitizing ads

25   by editing them—specifically, removing terms and pictures that were particularly

26   indicative of prostitution and then publishing a revised version of the ad (*i.e.,*

27   "moderation").

28

i.   **Aggregation**

35.     On or about April 10, 2007, SPEAR sent an email to HYER and C.F. concerning HYER's aggregation efforts in Dallas. SPEAR encouraged HYER and C.F. to create a "blueprint" for "moving that process to other cities."

36.     Included as an attachment to this email was a document entitled "Dallas success in other markets." This document described Backpage's aggregation process in extensive detail. Among other things, it explained how Backpage employees would "secure content" by running Google searches to identify prostitutes advertising on other websites, then "Call clients. Ask them if they have tried backpage.com. If not, post a free ad with an auto repost for free for six weeks." The document further stated: "Dan Hyer to direct and manage this process for all the cities. [C.F.] to consult and supervise."

37.     Also included, as another attachment to this email, was a document entitled "Class Director Steps to grow Backpage.com visits and revenue." Under the heading "Aggregating Content," it explained: "For the past 6 months we have uploaded 25 adult . . . leads each week. Leads come from Adult websites, the Gay publication here in Dallas, and the daily paper."

38.     On or about June 15, 2007, several Backpage principals, including SPEAR, HYER, and C.F., met in Oregon to discuss various Backpage-related developments. The agenda for this meeting stated that HYER would be presenting on the topic "How Dallas grew to $40K+ per month" and that this revenue growth was driven in part by creating "adult content online for free" by posting "20 free adult ads per week for prospects on other sites with a 6 week auto repost for free."

39.     On July 18, 2007, HYER sent an email that, among other things, summarized Backpage's "Aggregation" efforts. It stated that Backpage's employees were responsible for "Aggregat[ing] new adult content from other sites."

40.     On or about July 20, 2007, several Backpage principals, including LARKIN, SPEAR, and C.F., met to discuss various Backpage-related developments. The agenda for this meeting included a "Dallas aggregation update."

41.     On or about August 20, 2007, SPEAR sent an email to LARKIN, C.F., and another Backpage principal.  Enclosed with that email was an agenda for a meeting to be held later that day.  The agenda provided for another "Dallas aggregation update" and stated that Backpage employees were "Wrapping up [aggregation] in SF, Nashville, KC and OC."

42.     On or about December 18, 2007, C.F. provided a document entitled "Backpage strategic plan" to LARKIN, SPEAR, and BRUNST.  Among other things, it stated that Backpage intended to expand the Dallas aggregation efforts to other cities: "Create additional Dallas adult revenue models in LA and NY."  This document also contained a detailed summary of how the aggregation process worked ("Here's the detail on what the backpage staff does to create Dallas like results"), which included "Set up free user posting (250 to 500 postings per market)."

43.     In November 2008, an internal company email was sent to LARKIN, C.F., and others stating that Backpage had just experienced its "best month ever" in terms of revenue.  In response, C.F. sent a series of emails explaining that nearly all of the revenue growth was due to HYER's aggregation efforts in Dallas: "btw: the revenue wasn;t [sic] that great except for dallas. . . .  Dallas sure gave us a nice bump.  Hyer's done an awesome job with his marketing crew."

44.     On or about October 25, 2013, C.F. sent an email to SPEAR summarizing his "to do list" for Backpage.  It included a plan to hire "Content creators" in the Netherlands to create free ads on Backpage for potential customers who were posting on "competing sites."

**ii.     Reciprocal Link And Affiliate Programs**

45.     On July 2, 2007, C.F. sent an email to SPEAR entitled "The erotic review." In this email, C.F. explained that Backpage received "2 million page views, 150,000 visits from the erotic review per month.  They bring in more referrals than the Village Voice." C.F. also sought permission from SPEAR to initiate a business arrangement with TER under which the two companies would post reciprocal ads on each other's website.

- 11 –

46.     On July 16, 2007, HYER sent an email to SPEAR and C.F. summarizing various criticisms of a particular Backpage employee.  Among other thing, the email chain stated that the employee was deleting adult ads too quickly, which "kills the sites seo [search engine optimization] as in no traffic from TheEroticReview.com. . . .  Why care?  Without TheEroticReview traffic you might as well kiss any growth in [that city] good bye."  On August 31, 2007, C.F. sent a follow-up email to HYER concerning this employee that explained:  "We have a deal with the TER.  It's a reciprocal link program where we get an additional million page views from TER. . . .  The TER deal is very big for us.  The internet makes strange bed fellows."

47.     On or about July 20, 2007, several Backpage principals, including LARKIN, SPEAR, and C.F., met to discuss various Backpage-related developments.  The agenda for this meeting stated that Backpage intended to "Trade with TER" in order to "increase traffic in adult."

48.     On or about August 20, 2007, several Backpage principals, including LARKIN, SPEAR, and C.F., met to discuss various Backpage-related developments.  The agenda for this meeting provided an update on the previous efforts to create a business partnership with The Erotic Review, stating:  "Trade with TER – complete."

49.     On or about December 18, 2007, C.F. provided a document entitled "Backpage strategic plan" to LARKIN, SPEAR, and BRUNST.  Among other things, it stated that Backpage intended to "look for more relationships like TER to drive traffic" and to "Expand relationship with TER."  The document also stated that, when seeking to expand Backpage's business in particular cities, Backpage employees would "Set up 100 fresh TER reciprocal links to the specific city" and that a key to Backpage's growth was "Drive traffic via reciprocal links . . . .  Example of PR [public relations] is the posting in the forums in TER talking about us."

50.     On or about December 20, 2007, C.F. provided a document entitled "2008 Budget and Business Plan for Backpage.com" to LARKIN, SPEAR, and potentially others.  Among other things, it explained:  "In terms of marketing, we struck a deal with

TheEroticReview (TER) with reciprocal links.  It created huge brand awareness in this niche industry and increased page views from TER by 120,000 per day."

51.    On or about December 14, 2008, C.F. provided SPEAR with a document discussing Backpage's budget.  Among other things, it noted that Backpage was paying $4,000 per month (*i.e.,* nearly $50,000 per year) to place advertisements on The Erotic Review ("4k- banner ad on ter").  The document further noted that "We have made a special buy with TER in terms of high quality referrals."

52.    On or about December 17, 2008, C.F. distributed, to other Backpage principals, a document entitled "How We Are Going To Get There In 2009."  Among other things, this document identified Backpage's top marketing strategy as "TER- high page view per referral" and stated "We have made a special buy with TER in terms of high qualify referrals."

53.    On May 7, 2009, HYER and C.F. exchanged emails concerning how to improve Backpage's business relationship with TER, with C.F. commenting:  "I think we need to move some staff on this project and make one more play to get to 40,000 referrals per day."

54.    On May 11, 2009, LARKIN forwarded a news article to SPEAR and C.F. that described a recent "prostitution bust" in Phoenix in which 43 people were "indicted on charges of having roles in a prostitution syndicate."  The article further noted that some of the defendants had provided reviews on TER, which was described in the article as a "prostitution website."  In the subject line of the email, LARKIN summarized the article's contents as follows: "johns accused of favorably rating escorts on Erotic Review in exchange for discounts."

55.    Between around June 10, 2009, and June 19, 2009, HYER and C.F. exchanged additional emails concerning how to improve Backpage's business relationship with TER.  In one email, C.F. stated:  "I need help creating a wish list to discuss with the TER people. . . .  We can get to 40k in referrals by 2010."

56.    On or about November 1, 2011, C.F. met with LARKIN and SPEAR to

discuss Backpage-related developments.  The agenda for this meeting noted that Backpage was still obtaining "very strong referral traffic" based on its "Reciprocal link relationships" and stated that Backpage was considering a "move offshore" because such a move would "Minimize restrictions" and "Allow more skin."

57.    The BACKPAGE DEFENDANTS were routinely forwarded and/or briefed about "Google Analytics" reports, which provided a monthly snapshot of which other websites were referring users to Backpage.  For example, on July 27, 2012, LARKIN sent an email to SPEAR, BRUNST, and C.F. stating:  "[C.F], Jed, and Scott: These are the topics I would like to cover in our discussion 10:00 am Wednesday in Phoenix. . . . [A]nalytics . . . ."  On December 19, 2012, C.F. sent an email to LARKIN, SPEAR, and BRUNST that included, as attachments, various Google Analytics reports.  And on March 4, 2014, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email from another executive stating:  "I have attached 2 items.  An agenda for tomorrow and an excerpt from Google Analytics to show a comparison of January and February."

58.    These Google Analytics reports confirmed that TER was playing a crucial role in driving traffic to the Backpage website.  For example, the monthly report for January 2009 stated that TER was the #1 outside source of referrals and was responsible for over half a million visits that month.  The daily report for March 22, 2010 showed that TER was responsible for referring more than 40,000 daily visits to Backpage—more than six times as many as the next-biggest referral source.  The daily report for February 1, 2012, again showed that TER was responsible for referring more than 40,000 daily visits to Backpage—more than three times as many as the next-biggest referral source.  The monthly report for August 2013 showed that TER was responsible for nearly 1 million visits each month.  And the monthly report for November 2014 showed that, once again, TER was the #1 source of non-search engine referrals.

59.    In addition to pursuing a formal partnership with TER, Backpage also formed "affiliate" partnerships with other organizations and individuals who were known to be involved in the prostitution industry.  One such individual, known as "Dollar Bill," earned

fees in return for arranging for prostitutes and pimps to post ads on Backpage.

60.     On March 5, 2010, PADILLA received an email from a co-worker that described Dollar Bill as a "super affiliate" and sought PADILLA's assistance in restoring two of Dollar Bill's ads that had been deleted from Backpage.  In response, PADILLA stated "i'm working . . . on it now" and forwarded the email chain to C.F.

61.     On or around March 18, 2010, Backpage deleted over 4,000 ads that had been presented by Dollar Bill.  After Dollar Bill called to complain, PADILLA sent an email to Backpage's computer programmers stating that "4200 ads need to be restored" and explaining that "[t]his is one of our largest adult accounts and the restoration of these ads is a high priority for us."

62.     On April 15, 2010, Dollar Bill sent an email to C.F. proposing the creation of a new website called "Dollar Bills Escort Roundup" that would "discuss[] issues in the escort business and give[] insider info from an Editor who knows the biz from both sides via my unique relationship with the girls."  The email further stated that the proposed new website "could sell ads in local areas just like best gfe does."

63.     On October 24, 2010, Dollar Bill sent an email to C.F. requesting a reduction in the rates that Backpage was him charging for ads.  Dollar Bill argued he was entitled to such a reduction because "I've championed Backpage in print and with the girls in the past" and because "I don't feel there should be a statute of limitations on residual benefits Backpage gives me for my previous contributions which by your own admission were consideration. . . .  [W]hy would you want to raise my rate when I was so instrumental in building New York, where you're making a bloody fortune?"

64.     On October 25, 2010, Dollar Bill sent an email to C.F. complaining about Backpage's decision to refuse one of his ads even though "IT NEVER SAID GFE" and noting that other, even more obvious prostitution ads had been published despite "saying GFE."

65.     On December 29, 2010, HYER sent an email to SPEAR and C.F. entitled "Sales & Marketing 2011 Working Agenda."  One of the agenda items was "[Dollar] Bill

. . . rate increase."

66.     On February 26, 2011, Dollar Bill wrote an email to C.F. complaining that the nude pictures had been stripped out of one of his ads (which was entitled "real-crazy-party-asian-girl-23"). In response, C.F. advised Dollar Bill that "[t]his user sneaking in nudes may need to be set for forced moderation" and then forwarded the email chain to HYER, who adjusted Backpage's filter accordingly.

67.     On December 21, 2011, Dollar Bill wrote an email to C.F. discussing whether Backpage would publish 15 ads depicting a particular "girl" who "makes about 10 grand a week . . . owns 4 apartments . . . and a store! . . . [A] millionaire several times over at age 28. And all from being an escort!" In response, C.F. stated that the enclosed picture was "a little too nude for us" and provided advice to Dollar Bill on how to wordsmith ads so they wouldn't be rejected by Backpage's moderators.

### iii.     Moderation And Notice

68.     In April 2008, C.F. wrote an email explaining that, although he was "under pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]" and result in "lost pageviews and revenue." Thus, he instructed Backpage's technical staff to edit the wording of such ads, by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

69.     On February 26, 2009, C.F. received an email asking why Backpage's terms of service purported to prevent customers from "suggest[ing] an exchange of sexual favors for money" in light of the fact that "[c]learly everyone on the entire backpage network breaks the rules." In response, C.F. didn't dispute the author's characterization and explained that Backpage had simply added the terms of service at the behest of "our attorney in SF" in an attempt to avoid liability in civil lawsuits.

70.     On May 25, 2009, SPEAR received an email summarizing a plan to begin "remov[ing] sex act pics and coded terms" from Backpage ads. Later that day, C.F. forwarded this email to HYER with the explanatory note that "We do not intend to be a

1    craig[slist] here, just get out the most egregious stuff."

2    71.    On March 8, 2010, C.F. testified in federal court (the United States District

3    Court for the Southern District of Florida) in the criminal trial of a pimp who had used

4    Backpage to post prostitution ads.  During his testimony, C.F. acknowledged the defendant

5    had used the email address "Youngpimpin86" when posting the ads.   C.F. also

6    acknowledged that the ads described one so-called escort as "five-foot-three, with a small

7    waist and amazing ass you'll have to see to believe. XL, XL, XL, Lollipop" and described

8    a different so-called escort as "discrete, sincere and extremely naughty. I am the type of

9    girl who absolutely adores a man who understands the many desires of a young beautiful

10   woman and how to accommodate a variety of fantasies."  This episode provided notice to

11   Backpage that it was implausible to pretend such ads were merely offering lawful escort

12   services.

13   72.    On September 1, 2010, PADILLA sent an email to HYER and C.F. stating

14   that customers who engaged in "extreme and repeat" violations of Backpage's posting rules

15   would have their ads deleted and be banned from the website.  However, PADILLA also

16   stated the bans would only be temporary and that "we'll do everything we can to affect

17   only the worst apples."

18   73.    On September 1, 2010, SPEAR received an email acknowledging that

19   Backpage's moderators were being instructed to "Remove any sex act pics in escorts [ads]"

20   and "Remove any illegal text in escorts [ads] to include any code words for sex act for

21   money."

22   74.    On September 21, 2010, a group of state attorneys general wrote a letter to

23   Backpage.  This letter observed that "ads for prostitution—including ads trafficking

24   children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will

25   not, adequately screen these ads, it should stop accepting them altogether."  The letter

26   acknowledged that this step would cause Backpage to "lose the considerable revenue

27   generated by the adult services ads" but stated that "no amount of money can justify the

28   scourge of illegal prostitution, and the misery of the women and children who will continue

1    to be victimized, in the marketplace provided by backpage."

2        75.    On September 25, 2010, C.F. wrote an email explaining that Backpage was

3    unwilling to delete ads that included terms indicative of prostitution because doing so

4    would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund

5    those customers' fees. Thus, C.F. announced that Backpage would "go back to having our

6    moderators remove bad content in a post . . . ."

7        76.    On September 30, 2010, C.F. testified in federal court (the United States

8    District Court for the District of Minnesota) in the criminal trial of a pimp who had used

9    Backpage to post prostitution ads.   During his testimony, C.F. acknowledged that

10   Backpage's servers are located in Arizona and that the ads posted by the Minnesota-based

11   defendant had therefore "traveled across state lines."

12       77.    On October 8, 2010, PADILLA sent an email (on which VAUGHT was cc'd)

13   threatening to fire any Backpage employee who acknowledged, in writing, that a customer

14   was a prostitute:  "Leaving notes on our site that imply that we're aware of prostitution, or

15   in any position to define it, is enough to lose your job over. . . .   This isn't open for

16   discussion. If you don't agree with what I'm saying completely, you need to find another

17   job."

18       78.    On October 16, 2010, PADILLA sent an email to a large group of Backpage

19   employees (including HYER and VAUGHT).   The email had two attachments that

20   provided guidance on how to "moderate" ads. The first was a Powerpoint presentation that

21   displayed a series of 38 nude and partially-nude photographs, some of which depicted

22   graphic sex acts.   Next to each picture was an instruction as to whether it should be

23   approved or disapproved by a Backpage moderator. These instructions included "Approve.

24   Nude rear shots are okay as long the model is not exposing her anus or genitalia." and

25   "Approve.  Rear shot okay.  Transparent wet panties okay."   The second was an Excel

26   spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should

27   be "stripped" from ads before publication.   PADILLA concluded the email by stating:

28   "[I]t's the language in ads that's really killing us with the Attorneys General.  Images are

- 18 -

1    almost an afterthought to them."

2    79.    On October 16, 2010, PADILLA sent a separate internal email (which also

3    included HYER and VAUGHT as recipients). In this email, PADILLA explained that "I'd

4    like to still avoid Deleting ads when possible," that "we're still allowing phrases with

5    nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

6    80.    On October 21, 2010, C.F. sent an email to PADILLA stating: "Maybe

7    lighten up on the images moderation. Spear tells me it's the text that is the problem." In

8    response, PADILLA wrote: "[T]hat's the training i've given the staff."

9    81.    On October 25, 2010, C.F. sent an email to SPEAR, HYER, and PADILLA

10    acknowledging that the "[i]llegal content removed" through Backpage's moderation

11    processes was "usually money for sex act." This email also explained that, after the "sex

12    act pics are removed," the "ad text may stay."

13    82.    On October 26, 2010, HYER and PADILLA received an email explaining:

14    "We will not remove ads with vaginas or penis showing, just the images unless they are a

15    frequent offender. We will not remove ads with rates under an hour, just the text with the

16    minimum rates. Users need time to react to this change."

17    83.    On October 27, 2010, PADILLA sent an email to the head of a group of

18    contractors from India who had been hired to moderate Backpage's adult ads. In this email,

19    PADILLA criticized the contractors for deleting too many ads, stated that this approach

20    was bad for business, and instructed the contractors to simply edit the ads to remove the

21    more-obvious language: "As long as your crew is editing and not removing the ad entirely,

22    we shouldn't upset too many users. Your crew has permission to edit out text violations

23    and images and then approve the ad."

24    84.    On November 4, 2010, C.F. sent an email to Backpage's India-based

25    moderators (on which PADILLA was cc'd) explaining that "[m]any of the ads need to have

26    15 minute and 30 minute pricing removed" and that "I'm being evaluated by lawyers [*i.e.,*

27    state attorneys general] later this week so cleaning up old stuff is important."

28    85.    On November 17, 2010, HYER and PADILLA received an email

1    acknowledging that the term Lolita is "code for under aged girl" but explaining that this

2    term could simply be stripped out from ads (as opposed to refusing to publish the ad).  The

3    email also explained that customers should be allowed to include their identification

4    numbers from The Erotic Review: "[A]llow users to put in TER IDs (just no live links)."

5        86.    On November 30, 2010, LARKIN, SPEAR, and other Backpage

6    representatives participated in a conference call with representatives from NCMEC.

7    During this call, the Backpage representatives were advised that a large portion of the ads

8    on Backpage were blatant prostitution ads, that many of those ads featured children, and

9    that the posting of such ads was illegal in every state.

10       87.    In December 2010, HYER, PADILLA, and others exchanged a series of

11   emails entitled "Deep cleaning strip out."  These emails identified a lengthy list of terms

12   that were indicative of prostitution and discussed plans for removing the terms from the

13   old ads in Backpage's archives.  During this exchange, C.F. stated that Backpage wasn't

14   willing to delete the old prostitution ads because "our users love" having access them,

15   "[s]o, best to do deep cleaning and not kill a valuable feature."  C.F. later encouraged

16   Backpage's staff to complete the project quickly to avoid scrutiny:  "This task is urgent

17   since CNN is runing [sic] a report soon."

18       88.    On January 13, 2011, HYER and PADILLA received an email summarizing

19   instructions that had been provided to members of Backpage's technical staff.  It explained

20   that the technical staff had been instructed "not to display the moderation log" in a

21   particular section of Backpage's database "since we pdf this page for subpoenas.  I would

22   rather not testify in court as to why my staff 'approved' . . . postings."

23       89.    In January 2011, LARKIN and LACEY met with a representative from

24   NCMEC.  During this meeting, LACEY asked which types of sex ads would be acceptable

25   from NCMEC's perspective.  When the NCMEC representative declined to say that any

26   such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution

27   is none of your business."

28       90.    On January 31, 2011, and February 1, 2011, C.F. engaged in an email

exchange concerning whether to remove links to other prostitution websites (such as TER) from expired Backpage ads. C.F. stated that, although SPEAR and his "internet safety guy" were recommending that such ads be removed, he thought this would "be a stupid move" because it would hurt Backpage financially (by reducing the number of referrals from other sites). C.F. added that "this overly zealous focus on moderation at the expense of other development is a lot of bullshit . . . ."

91.   On February 3, 2011, a Backpage customer who went by the name "Licks Alot" wrote an email to Backpage complaining that all of the pictures in one of her ads (entitled "Athletic SWF Guaranteed Low Mileage Boys!!!") had been deleted. C.F. responded to "Licks Alot" by explaining that one of her photos had been removed because "[o]ur crazy internet safety experts do not want any genitalia showing up around the thong." However, C.F. proceeded to apologize to "Licks Alot" over the removal of her remaining photos, allowed her ad (which was obviously for prostitution) to remain on the website, and offered her a free upgrade.

92.   On February 8, 2011, C.F. testified in federal court (the United States District Court for the Middle District of Florida) in the criminal trial of a pimp who had used Backpage to post prostitution ads. During his testimony, C.F. authenticated one of the ads the defendant had placed on Backpage, whose title was "Extra horny sexy newbie," confirmed that Backpage had allowed this ad to be posted multiple times in various East Coast cities, and acknowledged that Backpage published "a lot" of similar ads. This episode provided further notice to Backpage that it was implausible to pretend such ads were merely offering lawful escort services.

93.   On February 16, 2011, PADILLA sent an email to Backpage's India-based moderators (on which VAUGHT was cc'd) explaining that Backpage was adopting a "more lenient policy" and that he was instructing his Phoenix-based employees to "go easy on some types of violations." PADILLA acknowledged this approach would "likely" result in more "violations" but emphasized that "moderators should err on the side of the user."

94.   On February 16, 2011, PADILLA sent a separate email discussing whether

several terms should remain on Backpage's "filtered terms" list. During this discussion, PADILLA acknowledged—by placing quote marks around the term "companionship"—that he didn't actually believe the women being advertised on Backpage were providing lawful escort services: "[The term] implies some exchange of bodily fluids which kills our 'companionship' argument, but i don't think we've ever really gotten in trouble for it."

95. On February 22, 2011, PADILLA received an email requesting Backpage's "list of banned, stripped out adult terms." In response, PADILLA sent an Excel spreadsheet entitled "Phrase List 02211," which PADILLA described as "the latest greatest version of the list." The enclosed spreadsheet identified over 660 words or phrases that are indicative of prostitution, including an array of terms that are suggestive of child prostitution (*e.g.,* "lolita," "fresh," "high school," "tight," "young"). The spreadsheet explained that most such terms were simply to be "filtered" from the ads in which they appeared.

96. On February 23, 2011, PADILLA received an email concerning a particular ad that had been edited by Backpage's India-based moderators. The ad was obviously for prostitution—its title was "new-new-new-put me in your favorite position" and the poster had attempted to include two photographs that violated Backpage's posting rules. In response, the India-based moderators had deleted both of those photos, as well as a third photo that depicted the prostitute's face, and then allowed the ad to be published. The email received by PADILLA did not criticize the moderators for allowing an obvious prostitution ad to be published after editing. To the contrary, it emphasized that the ad should remain on Backpage and criticized the moderators for removing the third photo, threatening to fire them if they did it again: "2 out of 3 pics should have been removed. But [the] moderator deleted all three pics. This is plain wrong . . . . I would fire a moderator in Phoenix if they did this."

97. In March 2011, LARKIN, LACEY, SPEAR, and other Backpage representatives met with representatives from NCMEC. During this meeting, the Backpage representatives were again advised that a large portion of the ads on Backpage were blatant

prostitution ads.  The Backpage representatives also were advised they could be criminally prosecuted under federal law for their conduct.

98.     On or about March 9, 2011, C.F. distributed, to other Backpage principals, a document entitled "Backpage Growth Agenda."  Among other things, this document stated that the company intended to renew its focus on "growth and efficiency" by "adjust[ing] content rules to be more flexible" and to permit more coded terms:  "Allow 30 minutes, naughty, etc.  Nipples."  This document also discussed plans to expand to certain countries in Europe, where Backpage would explicitly "Allow nudity and sex for money text."

99.     On April 5, 2011, PADILLA sent an email whose recipients included VAUGHT and the supervisor of Backpage's Indian moderation team.  The email was entitled "relaxed image standards" and included, as an attachment, a document that displayed a series of 30 nude and partially-nude photographs.  Next to each picture was an instruction as to whether it should be approved or disapproved by a moderator.  One picture showed a woman sitting on a bed, wearing only a bra and panties, with her legs spread open and her hand partially covering her crotch.  The caption provided in part:  "okay – but barely."

100.     On April 27, 2011, LARKIN, SPEAR, C.F., and others received an email from a firm that Backpage had hired to assist with "internet safety" issues.  Enclosed with the email was a list of recommended "action items" for the company to pursue.  One such item, listed in the category of "Finding Illegal Ads," warned that "'New In Town' terminology is often used by pimps who shuttle children to different locations where they do not know anyone and cannot get help."  Another item, also listed in the category of "Finding Illegal Ads," recommended that Backpage should "[d]etermine if there is a way to figure out if a [credit] card being used is prepaid; this could be one indicator (of many) . . . as a potential trafficking ad."  And yet another recommendation, under the category of "Finding Illegal Ads," was to "[c]reate a way to figure out if one phone number is being used on numerous different ads . . . [because] this could indicate a prostitution situation or a human trafficking situation."

101.    Backpage disregarded all of these recommendations.  After April 2011, the company continued publishing ads using the phrase "New In Town," continued accepting prepaid credit cards (in fact, such cards supplied a large portion of the company's revenues), and continued allowing a person with a single phone number to post advertisements for multiple "escorts."

102.    Between April 2011 and March 2012, PADILLA, C.F., and others participated in an email exchange acknowledging that Backpage was deleting thousands of pictures from customer ads each week and seeking assistance in collecting all of the deleted pictures so they could be used for "entertainment" or to generate user "traffic for other projects."  The email explained that the deleted pictures could be made available to the public on a new website called "nakedpics.backpage.com" or "badpics.backpage.com."

103.    On April 19, 2011, LARKIN and SPEAR received an email seeking permission to terminate the contract of a third-party vendor that had been receiving $17,000 per month to "remov[e] any nude pics" from the expired ads in Backpage's database.  LARKIN responded:  "do it!"

104.    On June 7, 2011, C.F. received an inquiry from a law enforcement official about a particular ad that included the term "amber alert."  In response, C.F. acknowledged this might be "some kind of bizarre new code word for an under aged person."  C.F. then forwarded this exchange to PADILLA and stated that he had instructed HYER to add "amber alert" to Backpage's "strip out" list.  In other words, HYER, PADILLA, and C.F. did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

105.    On June 30, 2011, several Backpage representatives met with representatives from the office of the Washington State Attorney General.  During this meeting, the Backpage representatives initially attempted to claim that no prostitution ads appeared on their website.  In response, a representative from the Attorney General's office stated: "You mean to tell me that if someone responded to an advertisement, the woman they

- 24 -

called for services would be offering to go out for coffee?"  A Backpage representative responded to this question by looking at C.F., laughing, and acknowledging that Backpage couldn't "deny the undeniable."

106.   On July 27, 2011, C.F. sent an email to HYER and PADILLA, and a nearly-identical email to LARKIN and LACEY, concerning the possibility of using age-verification software.  In this email, C.F. acknowledged the software might be beneficial ("This might be our solution") but recommended against its wholesale adoption because it would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

107.   On July 28, 2011, LACEY sent LARKIN a draft editorial entitled "BackPage understood."  In this document, LACEY bragged about Backpage's contributions to the prostitution industry:  "Backpage is part of the solution.  Eliminating our adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . . For the very first time, the oldest profession in the world has transparency, record keeping and safeguards."  LACEY also acknowledged that Backpage used an automatic filter to remove particular phrases from ads that were indicative of prostitution but still published the ads after editing them.

108.   Soon afterward, LARKIN forwarded the editorial to C.F., with a cover note cautioning against some of LACEY's statements "being made public" because "we need to stay away from the very idea of 'editing' the posts, as you know."  C.F., in turn, revised the editorial to take out the paragraph lauding Backpage's contributions to the prostitution industry.

109.   On August 5, 2011, Backpage received a letter from the mayor of Seattle.  This letter warned that "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010" and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution."  The letter also recommended that Backpage require in-person age verification for all of the "escorts"

1   depicted in its ads.  Afterward, Backpage declined to adopt these recommendations.

2       110.   On August 15, 2011, PADILLA received an email containing an updated

3   version of Backpage's moderation guidelines.   This six-page document provided the

4   following instructions concerning photographs:  "Nude rear shots are okay as long the

5   model is not exposing her anus or genitalia," "Transparent wet panties okay should not be

6   able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]."  The

7   document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples

8   are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

9       111.   On August 31, 2011, Backpage received a letter from the National

10  Association of Attorneys General.   This letter characterized Backpage as "a hub" for

11  human trafficking, identified "more than 50 instances, in 22 states over three years, of

12  charges filed against those trafficking or attempting to traffic minors on Backpage.com,"

13  and noted that "[n]early naked persons in provocative positions are pictured in nearly every

14  adult services advertisement on Backpage.com and the site requires advertisements for

15  escorts, and other similar 'services,' to include hourly rates.  It does not require forensic

16  training to understand that these advertisements are for prostitution."

17      112.   In or around September 2011, certain BACKPAGE DEFENDANTS assisted

18  in the creation of a Powerpoint presentation, entitled "Management Presentation," that was

19  intended to describe Backpage's business model to potential buyers.   This presentation

20  acknowledged that the non-adult sections of the Backpage website were simply intended

21  to "allow[] 'plausible deniability,'" to make the website more palatable to "regulatory and

22  law enforcement" officials, and to otherwise make Backpage's adult section more

23  "defensible."

24      113.   On October 6, 2011, C.F. sent an email discussing various proposals for

25  addressing "the under aged issue."   With respect to one particular proposal, C.F.

26  acknowledged it was a good one but recommended against adopting it because Backpage

27  would not derive any public-relations benefit from doing so:  "This is a good idea but it is

28  not visible to AG's [state attorneys general] so it has little PR value.  It is a low priority."

- 26 –

114.    In the fall of 2011, Backpage sought the assistance of a public relations firm based in Washington, D.C.  On October 12, 2011, C.F. received a written copy of the firm's presentation.  Later, some of the BACKPAGE DEFENDANTS attended a meeting at which the presentation was discussed in more detail.  The presentation warned that Backpage's business practices would inevitably result in legal trouble ("One day the proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do not acknowledge the prostitution."  The presentation also noted that the "ads on the backpage.com site" generally fall into three categories, one of which is "Pimps and Men Looking for Kids."

115.    On October 21, 2011, LARKIN received an email discussing whether the Backpage website should include a warning message concerning the prostitution of children.  This email contained the following joke:  "Andrew [PADILLA] thinks it to[o] heavy handed and thinks our web site name will be entrapment.com (Hilarious)."

116.    On November 16, 2011, HYER and PADILLA received an email asking for "urgent" assistance in eliminating the word "teen" from the ads appearing on Backpage's website:  "Remove ads with teens or remove the text teen from . . . ads."  The following day, PADILLA wrote back with an update that he had found "76 pages of results" and that he had simply "edited" all of the ads posted within the last two months (*i.e.,* allowed those ads to remain on the website after sanitizing them).

117.    Between around January and March 2012, many of Backpage's moderators (who were supervised in part by PADILLA and VAUGHT) underwent performance appraisals.  These appraisals revealed that many of the moderators did "not report young looking escorts."  Nevertheless, these moderators were allowed to keep their jobs, and sometimes were given strong overall performance ratings.

118.    On February 23, 2012, C.F. was forwarded a legal notice claiming that several of Backpage's ads included copyrighted content from two competing websites called RubMaps.com and EroticMP.com.  C.F. also received copies of the underlying ads from the competing websites, which clearly involved prostitution.  In one of the ads, a

1    customer stated that, in return for $45 and a $5 tip, he had received a "Blow Job . . . w/

2    condom" from a woman who "had nice breasts."  In a different ad, a customer stated that,

3    in return for $60, he had oral and vaginal sex with a prostitute.  And in a different ad, a

4    customer stated:  "Her bj was slow and erotic, and she was happy to go with whatever

5    position I wanted."  When C.F. forwarded these materials to Backpage's staff, he was asked

6    whether the corresponding ads appearing on Backpage's website should be removed

7    immediately.  C.F. replied that they should be allowed to remain on Backpage for another

8    few weeks without any modification.

9        119.    On March 15, 2012, HYER received an email concerning the ads with the

10   copyrighted material.  This email stated that the ads shouldn't be deleted and that

11   Backpage's technical staff should merely "strip out" the names of the competing

12   prostitution websites:  "Copyright infringement issue.  We need to strip out every

13   appearance of rubmaps.com and eroticmp.com."  When a staff member sought more

14   guidance, HYER interjected:  "We don't need to delete ads or users."

15       120.    On April 7, 2012, PADILLA was informed that a woman had contacted

16   Backpage to report that one of the "escorts" depicted on the site was only 17 years old.

17   The woman provided the juvenile's full name and birth year and further stated that the

18   juvenile had been attempting to recruit the complaining party's daughter (who was 15).  In

19   response, PADILLA instructed his staff to refuse to remove the ad because "she's isn't

20   claiming her own daughter is in the ad."

21       121.    On April 8, 2012, LACEY sent an email emphasizing that "jim [LARKIN]

22   and I believe in legalized prostitution" and stating that Backpage's efforts to prevent the

23   prostitution of children on the site were "not perfect, by any means."

24       122.    On April 25, 2012, a Backpage representative spoke at a meeting of the New

25   York City Council's Women's Issues Committee.  During this meeting, the representative

26   stated it was better to have ads for sex work appear on Backpage than have them move to

27   other places on the internet.  The representative further stated:  "I don't deny that Backpage

28   is part of the problem, but the problem is the internet."

- 28 –

123.    On April 27, 2012, a woman wrote an email to Backpage's support department stating that her underage daughter had been kidnapped, drugged, and was being advertised as a prostitute against her will.  The email identified the specific phone number associated with the ads (754-229-xxxx), stated that the ads appeared on a website called BackpagePics.com, and asked that the ads be removed immediately:  "This is a drugged and held against her will child who had photos taken under threat and duress . . . .  Please remove."  This email was forwarded to PADILLA by a subordinate, who asked "should we respond?"    PADILLA replied by explaining that, because the website BackpagePics.com wasn't owned by Backpage, there was no need to respond to the mother.

124.    On April 30, 2012 (three days later), the same woman wrote another email to Backpage's support department.  In this email, the woman stated that "I have contacted backpage on several occassions [sic] to remove these pictures which were posted against her will and while she was drugged and held captive.  I have yet to receive a reply."  This time, the woman provided a link to her daughter's ad on Backpage (not BackpagePics.com), which included the same phone number (754-229-xxxx) that had been included in the other ad.

125.    On May 1, 2012 (the next day), the same woman wrote a third email to Backpage's support department.  In this email, the woman included a link to another ad on Backpage depicting her underage daughter and stated:  "I also found a pix of my daughter within this url both girls are in protective custody."  Later that day, the woman received an email from Backpage's support department stating:  "The post is confirmed removed."

126.    Some of these emails were forwarded to LACEY and LARKIN.  In response, LARKIN applauded Backpage's "good solid response" to the woman and remarked:  "this whole rigamarole seems a little odd to me."

127.    On May 10, 2012, the television news station CNN ran an expose on Backpage that emphasized "how young some of these girls look" and deemed the website "a hub for the sex trade."

128.   On May 11, 2012, PADILLA sent an email to VAUGHT and other Backpage employees entitled "forbidden planet." Enclosed with the email was an Excel spreadsheet that identified over 600 words and phrases that are indicative of prostitution. The spreadsheet also specified, for each word and phrase, whether an ad containing the offending language should be banned or whether Backpage should simply "strip term from ad" and then publish it after the revision.

129.   On July 12, 2012, PADILLA sent an email (which was also shared with VAUGHT) to the head of Backpage's Indian moderation team. In this email, PADILLA criticized the moderators for deleting too many ads and provided the following instruction: "I agree that 'over cautiousness' is as big of a problem as moderators that miss a lot of violations."

130.   Between June 2012 and August 2012, a Backpage representative, E.M., engaged in correspondence with a vendor about potentially acquiring software "that could help Backpage screen for minors." In one email, sent on August 16, 2012, the vendor stated that he understood, from his discussions with E.M., that "Backpage has a problem with pimps phoning in false accusations that another advertiser's women are underage. Do we know if there is any public DB [database] that they might affordably access to solve this?" and further stated that the vendor could not assist with this "problem." In response, E.M. thanked the vendor for the information, sought additional information about the cost of the software, and forwarded the email chain to C.F.

131.   In or around November 2012, a researcher at Arizona State University published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and that many of the ads depicted juvenile trafficking victims. On December 19, 2012, LACEY was forwarded a copy of the study's results. The researcher responsible for the study also met with a Backpage representative to propose various mechanisms for reducing or eliminating the prostitution of children on the website. Backpage declined to adopt these proposals.

132.   Between around September 2010 and October 2012, C.F. became aware that

1    a particular Backpage customer, P.R., was posting prostitution ads.  Rather than bar this

2    customer from posting future ads, C.F. repeatedly restored her posting privileges and gave

3    her advice on how to conform to Backpage's publication standards.  The communications

4    involving this woman's ads included the following:

5           •     On September 26, 2010, C.F. received an email from a woman who was

6    obviously posting prostitution ads on Backpage.  The woman, whose email address

7    included the phrase "provider4u," wrote to complain that her escort ad ("50 Red Roses

8    special – Dont Miss out !!!") had been removed even though "[o]ther women have more

9    explicit ads than me and they are up!"  The woman continued:  "I can not afford to have

10    this ad removed.  This is the only way I can get by and if its not on all the time I will not

11    be able to pay my bills . . . .  My fiancé is in jail and he is not able to help me at this

12    point."  In response, C.F. arranged for the woman to be allowed to continue posting ads.

13           •     On October 6, 2010, C.F. received another email from the same woman.  In

14    this email, she complained that her most recent ad had been removed because it included

15    an explicit picture of her body.  She provided a copy of the picture to C.F. and stated:  "If

16    the person [who removed the ad] is such a prude well maybe they should check out the

17    other women's ads in that [escorts] section."  On November 15, 2010, C.F. wrote back to

18    the woman to encourage her to edit the ad so it could be re-posted:  "Ok, please try editing

19    the ad now."  After this exchange, the woman was permitted to resume posting ads on

20    Backpage.

21           •     On June 6, 2011, C.F. received another email from the same woman.  It

22    stated:  "I would really appreciate it if you would please take the block off my ad for editing

23    . . . .  I wont post any more objectionable pics, ok?"  In response, C.F. arranged for the

24    woman's editing and posting privileged to be restored:  "You should be able to edit

25    now.  Please let us know if you are still having any trouble."  After this exchange, the

26    woman resumed posting ads on Backpage.

27           •     On July 14, 2012, C.F. received another email from the same woman.  It

28    stated:  "would you please take the edit block off my ad.  I need to change some info on it

and update it. I promise i wont put no more nude pics in it, you have my word. . . . [M]y ad says: 50 red roses special – dont miss out." After this exchange, the woman was allowed to continue posting ads on Backpage.

• On September 17, 2012, C.F. received another email from the same woman. This time, she complained that Backpage was editing her ads (whose title continued to feature the obvious prostitution term "50 Red roses special") to remove the most explicit pictures. She stated: "I would like to know why my ad in the escort section of backpage keeps getting messed with. . . . [S]omeone keeps erasing the link to my pics on the ad. that is so wrong. I am being deprived of income that I sorely need . . . . There are other woman posting pics on their ads that show more nudity . . . ." After this exchange, the woman was permitted to continue posting ads on Backpage.

• On October 16, 2012, the woman wrote another email to Backpage. In this email, she again complained about how Backpage was editing her ads to remove the most explicit pictures. She stated: "It is very hard for me to make any income from this ad as they continually go into my ad and remove the link from the ad that goes to my pictures. They wont allow me to post my pics on the ad yet other women with other ads show more nudity than my pictures ever did."

• This email was forwarded to VAUGHT and to PADILLA, who asked another Backpage employee to "dig into this one a little." On October 17, 2012, PADILLA received a follow-up email from his co-worker stating that the woman's ad had been posted on September 27, was still on the Backpage website, and that the pictures the woman had originally attempted to include in the ad (which had been stripped by Backpage) were "topless shots."

• Following these exchanges, between October 2012 and November 2015, the same customer was allowed to post over a dozen new ads on Backpage, many of which utilized the same identifying information, coded prostitution terms, and contact phone number as before.

133. On January 7, 2013, VAUGHT was informed by a moderator that Backpage

wasn't diligently pursuing reports of child exploitation: "We've supposedly been checking them, but some seem to be ignored. They get 'marked as read', but nothing gets done with them. It's aggravating and irresponsible."

134. On June 6, 2013, Backpage received a letter from NCMEC recommending the adoption of several specific security measures to prevent the trafficking of children. The recommended security measures included (a) verifying the age and identity of users who submitted adult ads, (b) verifying the age and identity of individuals depicted in photographs within adult ads, (c) prohibiting the use of anonymous payment sources such as prepaid credit cards, and (d) requiring users to utilize verified email addresses and telephone numbers. Backpage declined to follow any of these recommendations.

135. On August 30, 2013, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email notifying them that "Chase [Bank] was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking." In response, C.F. informed the group that he intended to begin "giv[ing] users free ads if they complain while we wait on directly transactions to another processor."

136. On September 11, 2013, a Backpage representative made a presentation to the Arizona Governor's Task Force on Human Trafficking. Following this presentation (which took place in Phoenix), the representative was asked whether there would be any "cons" to requiring verifiable identification of all escorts being advertised on Backpage's website. In response, the representative did not identify any financial or logistical hurdles to the adoption of such a requirement. Instead, the representative stated that such a requirement would simply cause Backpage to lose business to other prostitution websites like myRedBook.com or to overseas prostitution websites. During this meeting, members of the task force also provided the representative with evidence showing that Backpage's moderation efforts were ineffective at preventing the publication of prostitution ads.

137. On April 3, 2014, PADILLA and VAUGHT were forwarded an email that had been sent to Backpage by a credit card processing company in Canada. The email stated that "[w]e have multiple user accounts that are paying for your services for what I

1    understand to be prostitution advertisements" and sought information about "how you are

2    processing these transactions."

3        138.   On April 14, 2014, LARKIN and BRUNST received an email from C.F.

4    discussing why Backpage had experienced "past high growth" and identifying various

5    ideas for achieving "future growth." This email stated that Backpage had been the

6    beneficiary of "[m]igration of content from other . . . marketplaces to the internet" and

7    identified one particular marketplace as a key source of Backpage's customers: "[N]et loss

8    for brick and mortar marketplaces: Strip clubs, hotels, and gathering spots displaced by the

9    internet." In other words, the email acknowledged that the supposed "escorts" advertising

10   on Backpage were actually prostitutes (lawful escorts did not congregate at strip clubs,

11   hotels, and other brick-and-mortar "gathering spots" during the pre-internet age). This

12   email also attributed Backpage's success in part to its adoption of policies that allowed

13   customers to post ads without leaving any meaningful identifying information—in a list of

14   Backpage's advantageous policies, it identified "Anonymous," "Prepaid card friendly,"

15   "User can post paid ads without a valid email address," and "bitcoin."

16       139.   On April 24, 2014, VAUGHT sent an email to Backpage's moderators (while

17   cc'ing PADILLA). In this email, VAUGHT explained that if a moderator came across an

18   ad containing a link to a "sex for money" website, the moderator should add the link to a

19   list of banned terms but "don't bother removing it from the current ad."

20       140.   On September 4, 2014, Backpage was served with a brief that had been filed

21   by NCMEC in a lawsuit in Washington state court. In this brief, NCMEC criticized the

22   sincerity of Backpage's efforts to prevent child sex trafficking: "Backpage has repeatedly

23   claimed in public statements and court filings that it is working to reduce child sex

24   trafficking on its website. The unpleasant reality is that Backpage publicizes carefully

25   selected operational processes as a subterfuge to avoid increased scrutiny, while providing

26   traffickers with easy access to an online venue to sell children for sex. In practice,

27   Backpage's stated interest in doing something meaningful to stop child sex trafficking ads

28   on its site is apparently overridden by the enormous revenue it generates from its escort

1    ads, including ads selling children for sex."

2    141.   On March 17, 2015, a law enforcement officer with the California

3    Department of Justice spoke with a Backpage representative concerning the prevalence of

4    blatant prostitution ads on Backpage.  In response, the representative did not dispute the

5    officer's characterization and said the internet and prostitution were not going away.

6    142.   On or about July 19, 2015, LACEY and LARKIN received a "Thank You

7    Letter" from the Sex Worker's Outreach Project ("SWOP").  This letter lauded Backpage's

8    contributions to the prostitution industry ("Backpage has made quite a difference for many

9    of us . . . ."), thanked Backpage for continuing to permit sex workers "to advertise in the

10   'Adult' area," expressed gratitude for Backpage's willingness to accept alternative

11   payment methods "as a way to pay for ads when MasterCard and Visa abruptly halted

12   processing our credit card payments," and stated that Backpage had provided "our

13   community an opportunity to learn how to use alternative payment methods, like Bitcoin."

14   143.   On July 30, 2015, a document entitled "trainingJuly2015" was distributed to

15   Backpage's moderators.  This training manual specifically told moderators that, if they saw

16   a photograph depicting "a person [who] looks young/minor," they should "approve dont

17   delete the ad unless it has a banned term."  The training manual also identified, under the

18   heading "THESE ARE ALL OKAY," a long list of terms that are indicative of prostitution,

19   such as "99% CUM BACK FOR MORE," "car service," and "lollipop special."

20   144.   In or around August 2015, as part of a lawsuit in Illinois, Backpage was

21   served with an affidavit from a detective employed by the Seattle Police Department.  In

22   this affidavit, the detective avowed that "[t]o date, no Detective within the Seattle Police

23   Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort' (person

24   who charges simply for companionship with no offer of sex) or 'masseuse' (person offering

25   legitimate and licensed massage therapy rather than sex) while responding to ads placed in

26   these categories on Backpage.com" and that "every time the Seattle Police Department's

27   Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com,

28   we have found that the ad was a posting for illegal activity."  During the same lawsuit in

Illinois, Backpage was served with a different affidavit from a detective employed by the Boston Police Department.  In this affidavit, the detective avowed that "Backpage.com is the number one site in Boston for prostitution and sex trafficking," that his unit had "[s]ince 2010 . . . arrested over 100 buyers of sex of both adults and minors through Backpage.com ads," and that "nearly all the cases we find associated with it [Backpage] involve pimp controlled prostitution."

145.   On October 7, 2015, PADILLA received an email from another Backpage employee (which was later forwarded to VAUGHT) disclosing that there were "massive numbers of live ads with banned terms and pictures out on the site."

146.   On December 9, 2015, Backpage received an email from a reporter stating that "[o]f the 359 sex trafficking incidents Toronto Police have been involved in since 2013, every single girl that was rescued was advertised on Backpage."  The email also asked:  "Why hasn't Backpage closed down the adult escort ads portion of its site like Craigslist when it's known that underage girls are being exploited via Backpage?"

147.   In or around January 2016, Company A was retained to serve as a payment processor for some of Backpage's websites.  On April 29, 2016, Company A informed C.F. that it had conducted "a review of your website, and unfortunately we had to suspend your account . . . [because] advertising of illegal activities is strictly forbidden."

148.   Beginning in or around January 2016, Backpage's moderators were instructed to stop removing ads that contained the phrase "GFE."  For example, on January 28, 2016, VAUGHT was sent an email from a Backpage moderator explaining that "As far as I am aware we are no longer removing ads for GFE."  Similarly, on March 9, 2016, a Backpage moderator sent an email to his coworkers explaining that "Andrew [PADILLA] and I talked about the GFE thing, going forward we will not be removing ads for GFE" and clarifying "this includes even gfe with price."  And again, on March 25, 2016, an email was sent to Backpage's moderation staff stating that "We are no longer removing ads for 'GFE' or 'PSE.'"

149.   In fact, the BACKPAGE DEFENDANTS repeatedly acknowledged that the

term "GFE" (girlfriend experience) is a coded term for prostitution.  For example:

• On October 26, 2010, SPEAR, HYER, and PADILLA received an email from C.F. that explained:  "No coded sex act for money: GFE, PSE, BBBJ, DATY, etc."

• On May 4, 2011, HYER sent an email to PADILLA and others identifying GFE as a "code word" that should be forbidden.

• On August 31, 2011, PADILLA and C.F. exchanged emails in which they discussed a list of 100 "solid sex for money terms."  The list included "GFE = girlfriend experience."

• On November 2, 2011, PADILLA and VAUGHT received an email from a co-worker identifying GFE in a list of "sex phrases and coded terms" that are "not allowed."

150.   HYER, PADILLA, and other BACKPAGE DEFENDANTS periodically received a "Google alert" when articles discussing Backpage appeared in the news.  Many of the news articles identified in these alerts discussed instances in which prostitutes who had been advertised on Backpage were kidnapped, raped, or murdered.

151.   In January 2017, after conducting a lengthy investigation, the Senate Subcommittee on Permanent Investigations ("Subcommittee") issued a 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  This report concluded, among other things, that virtually all of Backpage's "adult" ads were actually solicitations for illegal prostitution services and that "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created."

152.   In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website.  However, the prostitution ads simply migrated to other sections of the website, where they remained until the website was shut down by federal law enforcement authorities in April 2018.

**D.     International Operations**

153.    In addition to facilitating prostitution through its U.S. website, Backpage also facilitated prostitution through its websites in foreign countries.  In this context, Backpage (as it did through its domestic "aggregation" efforts and the Dallas Plan) often affirmatively created the content of the prostitution ads being published.

154.    Around 2013 or 2014, Backpage hired a Philippines-based company (Company B) in an attempt to increase the profitability of Backpage's international operations.  Company B's employees were instructed to (1) visit rival prostitution websites in other countries, (2) obtain the email addresses of prostitutes who were posting ads on those websites (often by falsely posing as prospective customers), (3) use the information from the other website to create a competing prostitution ad on Backpage (a process referred to internally as "preboarding"), and then (4) transmit the new ad to the prostitute, often using the previously-harvested email account information, in an attempt to persuade the prostitute to become a Backpage customer.  Company B's employees were paid bonuses based on the amount of ad revenue they generated for Backpage using these techniques.

155.    Backpage's executives were fully aware of the plan to use Company B to create prostitution ads outside the United States.  For example, on or around November 6, 2013, C.F. made a presentation to LARKIN, SPEAR, and BRUNST.  Among other things, this presentation summarized Backpage's plans for "International Planning and Expansion."  One of the plans was to use the Philippines as a "test" market and hire Filipino contractors to "contact by email leads, secure email address, add ad and email address in [computer system] and assign to American staff.  American staff makes contact."

156.    On August 7, 2014, HYER sent an email stating that Company B was "an efficient and cost effective way for us to bring new users to backpage."  This email also contained the following summary of how Company B would operate: "Process after hiring company offering BPO services: 1. Backpage provides BPO with sites, categories & countries to target.  Backpage also provides sample 'scripts' and examples of phone

1  calls.  2.  BPO contacts users via phone from sites backpage provided, obtains user email

2  address & permission to preboard ad.  3.  BPO preboards ad as public user.  4.  After ad is

3  preboarded, users receive verification link to verify the ad."  This email also stated that

4  Backpage would offer a "bonus per verified authenticated ad."

5      157.  On April 10, 2015, a "five-year business plan" was emailed to LARKIN,

6  BRUNST, SPEAR, and C.F.  One of the goals for 2015 was "Off shore marketing staff in

7  the Philippines to grow to 166 and main task is international market content acquisition."

8  This email also included a separate attachment stating that HYER should be considered for

9  promotion because "his strengths are strong marketing and revenue growth skills" and he

10  had been "heavily involved in the user experience development" and that VAUGHT should

11  be considered for a promotion because "[h]er strengths include six years of experience

12  managing moderators."

13      158.  On May 15, 2015, a Company B employee posing as a Backpage employee

14  sent an email to an apparent prostitute.  The subject line was "Offering Free Advertisement

15  from Backpage.com" and the text of the email sought to persuade the prostitute to "upgrade

16  your ad with sponsor placement or automatic repost."  In response, the prostitute wrote

17  back that she had "managed to activate my ad and could buy credits as well. thanks for

18  your help.  I'm traveling today to [London] how can I change my location."  This email

19  exchange was later forwarded by HYER to C.F. with a cover note stating: "[I]deal scenario

20  for [Company B] agent – user activates ad, user purchases credit."

21      159.  On December 14, 2015, C.F. was part of an email exchange concerning an

22  ad that had an IP address associated with Company B.  This email contained the following

23  description of Company B's process for creating and selling prostitution ads on Backpage:

24  (1) "Staff found lead in assigned area."  (2)  "Staff entered all relevant into [database]

25  (phone/email/etc.)"  (3)  "Staff called lead to discuss creation of free ad"  (4)  "Staff created

26  free ad for lead (verification email sent)."  (5)  "Staff followed under with an email

27  reminding lead of phone conversation and detailing verification of ad."

28

**E.    Select Victim Summaries**

160.    Between in or around 2009 and 2013, Victim 1 was sold for sex, through the use of Backpage ads, in Ohio, Indiana, and Georgia. Victim 1's Backpage ads often included words and phrases that were indicative of prostitution, such as "roses" (money). On at least one occasion, Victim 1 contacted Backpage after a proposed ad had been rejected because it contained banned words and phrases. In response, a Backpage representative coached Victim 1 on how to re-write the ad using different words. Victim 1's trafficker took all of the money that was earned through her acts of prostitution.

161.    Between in or around 2009 and 2011, Victim 2 was sold for sex, through the use of Backpage ads, in Arizona, Georgia, North Carolina, Texas, New York, New Jersey, and Louisiana. Victim 2's trafficker drafted her Backpage ads and Victim 2 initially did not know she was being offered on Backpage. The ads contained words and phrases to make customers believe Victim 2 was "barely legal" and also contained words and phrases indicative of prostitution, such as "roses" (money).

162.    Between in or around 2009 and 2012, Victim 3 was sold for sex, through the use of Backpage ads, in Colorado and North Dakota. Victim 3's pimp instructed her to review existing prostitution ads on Backpage to learn how to draft her own ads. During a portion of this period, Victim 3 was required by her pimp to make week-long trips to North Dakota to work as a prostitute. During these trips, which would generate as much as $2,000 in prostitution-derived revenue each day, Victim 3 was forced to leave her children at home in the care of her pimp.

163.    In or around 2010, Victim 4 was sold for sex, through the use of Backpage ads, in Washington. During this period, Victim 4 was a juvenile (15 years old). Victim 4's pimp drafted the ads that were placed on Backpage. The wording of these ads was edited by Backpage before publication. The ads contained words and phrases such as "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL" and included pictures of Victim 4 in provocative positions showing her breasts and buttocks.

164.   Between in or around 2011 and 2016, Victim 5 was sold for sex, through the use of Backpage ads, in Massachusetts and Rhode Island.   During much of this period, Victim 5 was a juvenile (14-19 years old).   Victim 5's female pimp instructed Victim 5 that Backpage was the safest place to advertise because it did not require age verification. On one occasion, Backpage declined to accept a proposed ad that indicated Victim 5 was only 17 years old.   In response, the ad was simply resubmitted with a new (false) age of 19.   On other occasions, Backpage removed provocative pictures of Victim 5 from ads and then allowed edited versions of the ads to be published.   Victim 5's Backpage ads included words and phrases that were indicative of prostitution, such as "roses" (money) and "back door" (anal sex).   Some of the customers who responded Victim 5's Backpage ads forced Victim 5 to perform sexual acts at gun point, choked her to the point of having seizures, and gang-raped her.

165.   In or around June 2012, Victim 6 was sold for sex, through the use of Backpage ads, in Arizona.   Her traffickers utilized Backpage ads that did not offer a specific person but instead generally offered a woman with a particular type of hair color and build.   On June 22, 2012, Victim 6 was dispatched to a customer who had responded to a Backpage ad featuring "Nadia," who was described as a slender brunette woman. Upon her arrival at the location, Victim 6 was stabbed to death.

166.   Between in or around 2012 and 2015, Victim 7 was sold for sex, through the use of Backpage ads, in Washington and Oregon.   Victim 7's pimp drafted the ads that were placed on Backpage.   The wording of these ads was edited by Backpage before publication.   The ads contained provocative nude pictures of Victim 7.

167.   Between in or around 2013 and 2014, Victim 8 was sold for sex, through the use of Backpage ads, in Maine, Connecticut, and Massachusetts.   During this period, Victim 8 was a juvenile (15 years old).   Victim 8's uncle, as well as his friends, placed the ads on Backpage, which included words and phrases that were indicative of prostitution, such as "roses" (money), "fetish friendly," and 150 for 1/2 hour, 200 for full hour. Through these ads, Victim 8 was forced to do "in-calls" (where she was raped in hotels) as

1   well as "out-calls" (where she was raped at other locations chosen by the men paying for

2   her).

3       168.   In or around 2013, Victim 9 was sold for sex, through the use of Backpage

4   ads, in Florida.  Victim 9's pimp taught her how to use code words in her Backpage ads to

5   indicate how much she was charging for certain sex acts.  Victim 9 was brutally attacked

6   by her trafficker, causing bruises and a fractured cheek bone.

7       169.   Between in or around 2014 and 2015, Victim 10 was sold for sex, through

8   the use of Backpage ads, in California and Arizona.  During some of this period, Victim

9   10 was a juvenile (17 years old).  An associate of Victim 10's pimp took pictures of her

10   and drafted the ads that were placed on Backpage.  The Backpage ads contained words and

11   phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like

12   fire" and included pictures of Victim 10 in provocative positions showing her legs,

13   stomach, shoulder, and buttocks.

14       170.   Between in or around 2014 and 2015, Victim 11 was sold for sex, through

15   the use of Backpage ads, in Arizona, Colorado, Minnesota, Oregon, California, Montana,

16   Nevada, New Mexico, and Utah.   The Backpage ads contained words and phrases

17   indicative of prostitution and included pictures of Victim 11 in provocative positions.  On

18   some occasions, Backpage would remove certain explicit photos from the ads but publish

19   the remaining text and other photos.   Victim 11's trafficker gave her drugs, took her

20   identification documents, sexually assaulted her with a firearm, and forced her to work full-

21   time as a prostitute.

22       171.   In or around 2015, Victim 12 was sold for sex, through the use of Backpage

23   ads, in California and Arizona.  Victim 12 was first advertised on Backpage in San

24   Bernardino, California, but moved to the Phoenix metro area because the Super Bowl was

25   being held there.  Victim 12's advertisements on Backpage contained words and phrases

26   such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}"

27   and included pictures showing Victim 12's legs, stomach, shoulders and buttocks.

28       172.   In or around 2015, Victim 13 was sold for sex, through the use of Backpage

ads, in California. During this period, Victim 13 was a juvenile (15 years old). Victim 13 and her trafficker both posted the Backpage ads, which falsely represented that Victim 13 was 19 years old and showed pictures of her face and body. On at least one occasion, a Backpage representative contacted Victim 13 with instructions on how to fix an ad so it could be published.

173.   In or around June 2015, Victim 14 was sold for sex, through the use of a Backpage ad, in Texas. This ad contained words and phrases such as "fun, young, exotic," "Ready to be your fantasy girl," "OUT CALLS ONLY," and "NO BLACK MEN" and included pictures of Victim 14's stomach, breasts, shoulders, and buttocks. On or around June 20, 2015, Victim 14 was murdered by a customer. Afterward, the customer attempted to destroy Victim 14's corpse by lighting it on fire. Victim 14's father later contacted Backpage to request that the ads showing his deceased daughter be removed. Backpage did not immediately comply with this request.

174.   In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana. These ads contained words and phrases such as "Thick Glass of Chocolate Milk Looking for a GoodTime!!!" and "sexy certified freak" and contained pictures showing Victim 15's legs, shoulders and buttocks. On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will. In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.

175.   In or around July and August 2015, Victim 16 was sold for sex, through the use of Backpage ads, in Michigan. These ads contained words and phrases such as "OUTCALLS ONLY," "Juicy Caramel Lady On Duty," "Sexy, Erotic Caramel Dream," and "No Thugs, Pimps Or Weirdos" and contained pictures showing Victim 16's breasts, legs, lips, buttocks, and face. On August 15, 2015, Victim 16 was murdered by a customer. Afterward, the customer dumped her corpse in a park.

176.   Between in or around 2015 and 2016, Victim 17 was sold for sex, through the use of Backpage ads, in Arizona and California. Victim 17 averaged ten customers a

1  day during this time and turned over all of her prostitution earnings (approximately $1,500

2  per day) to her pimp.  An associate of Victim 17's pimp took pictures of her and drafted

3  the ads that were placed on Backpage.  The Backpage ads contained words and phrases

4  such as "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true!" and

5  "Sorry, but NO BLACK MEN" and included pictures of Victim 17's buttocks and face.

6  **F.**      **Money Laundering Activities**

7    177.    Backpage's customers overwhelmingly used the proceeds of criminal

8  activity (*i.e.,* money earned from pimping and prostitution) when purchasing ads on

9  Backpage.  In addition, because Backpage's publication of such ads was an independent

10  crime (*e.g.,* violation of 18 U.S.C. § 1952), the fees it collected from customers posting

11  prostitution ads—estimated at more than $500 million—constituted the proceeds of

12  unlawful activity.

13    178.    For these and other reasons, banks and financial institutions repeatedly

14  refused to do business with Backpage.  In response, the BACKPAGE DEFENDANTS

15  pursued a variety of money laundering strategies.  For example, on August 27, 2013, C.F.

16  was forwarded an array of emails from Backpage customers who were complaining that

17  their credit card companies had refused to process Backpage-related transactions.  One

18  customer wrote:  "Have you resolved the issue of Chase Bank not honoring payment for

19  you for ethical reasons?"  C.F. forwarded these complaint emails to LARKIN, SPEAR, and

20  BRUNST and proposed, as a "solution" to the problem, that Backpage reconfigure its

21  website to fool credit card companies into believing the charges were being incurred on a

22  different website.

23    179.    During a November 2013 presentation by C.F. to LARKIN, SPEAR, and

24  BRUNST, C.F. again discussed strategies for fooling credit card companies into believing

25  that Backpage-associated charges were being incurred on different websites, including a

26  proposal to set up shell companies without any apparent connection to Backpage ("create

27  new companies with new principals") and use their bank accounts to accept payment.

28  Another "solution" was to "allow users to fund an account thru several other sites" that

1   "have no adult or images."

2       180.   On November 6, 2013, LARKIN, SPEAR, and BRUNST received an email

3   entitled "Options for the future of Backpage." This email discussed various strategies for

4   creating new entities to process Backpage-related payments "without ever disclosing ties

5   to Backpage."

6       181.   On April 1, 2015, BRUNST and C.F. were informed that Mastercard was

7   "snooping around" Backpage and might stop processing payments for Backpage. In

8   response, C.F. offered several suggestions for setting up new payment channels that would

9   conceal Backpage's involvement. One such proposal was to begin routing Backpage-

10  related transactions through banks located in the country of Mauritius. In response,

11  BRUNST stated: "Didnt we go down the Mauritius path once and the banks had the same

12  issue with our content?"

13      182.   Notwithstanding these strategies, the three major credit card companies

14  stopped doing business with Backpage. On or about April 30, 2015, Backpage learned that

15  American Express would no longer allow its cards to be used for any purchases in

16  Backpage's adult section. In or around July 2015, Backpage learned that Mastercard would

17  no longer allow its cards to be used for Backpage-related transactions. When discussing

18  this decision, MasterCard stated that it "has rules that prohibit our cards from being used

19  for illegal activities." Around the same time, Backpage learned that Visa would no longer

20  allow its cards to be used for Backpage-related transactions. When discussing this

21  decision, Visa stated that its "rules prohibit our network from being used for illegal

22  activity."

23      183.   Similarly, some banks closed accounts that were held by Backpage (or

24  Backpage-related entities) out of concern the accounts were being used for illegal purposes.

25  For example, on April 2, 2014, BRUNST received a letter from U.S. Bank that was

26  addressed to "Backpage.com." The letter explained: "Dear Jed . . . please be advised that

27  we have elected to close your Account with us."

28      184.   Backpage responded to these developments in several ways. One was to

- 45 –

1    encourage customers to send checks and money orders to a Post Office box held in the

2    name of a seemingly-unrelated entity called Posting Solutions LLC ("Posting Solutions")

3    and give such customers a corresponding credit on Backpage. For example, on July 31,

4    2015, C.F. exchanged email correspondence with a representative from a payment

5    processing company. In this email, C.F. identified himself as the CEO of Posting

6    Solutions, described Backpage as a "brand" operated by Posting Solutions, and explained

7    he was seeking to "find a way to position payments under another company."

8         185.    The following episode provides an example of how the Posting Solutions

9    payment process worked. On October 16, 2015, Backpage received an email from a

10   customer complaining about her inability to pay for ads using a credit card. In response, a

11   Backpage representative explained—in an email exchange later forwarded to VAUGHT—

12   that "[i]f you would like to pay for upgrades or buy credits, we suggest posting with

13   alternative payment methods such as Bitcoin. If you are in the United States, you can also

14   pay by check or money order. Please make payable to 'Posting Solutions.' WE CAN

15   ONLY ACCEPT CHECKS OR MONEY ORDERS MADE OUT TO 'POSTING

16   SOLUTIONS.' Posting Solutions. Attn: Accounts. P.O. Box 192307. Dallas, TX 75219.

17   Please send through the United States Postal Service. FedEx, UPS, or other mail delivery

18   alternatives cannot deliver to a P.O. Box. When sending your payment please be sure to

19   include your email address. Please do not make your payments out to backpage.com as we

20   will no longer be able to accept them."

21        186.    Between around September 2015 and June 2016, over $7.1 million of checks

22   and money orders sent by Backpage customers were deposited in bank accounts held by

23   Posting Solutions.

24        187.    Backpage also utilized a different entity, called Website Technologies, LLC

25   ("Website Technologies"), to process Backpage-related funds and took steps to make it

26   appear that Backpage and Website Technologies were independent entities. For example,

27   on March 10, 2014, BRUNST, SPEAR, and others participated in an email exchange with

28   the subject line "Website Technologies vs Backpage (Vendors, audits, risk assessments,

email)."  During this exchange, one person stated "[C.F.] and I were just discussing company names and the possibility of updating our email addresses to websitetechnologies.com."  In response, BRUNST cautioned:  "We need to think this thru or all the work to separate it from BP will be lost."  Similarly, on April 3, 2014, BRUNST sent an email to SPEAR and others explaining that "[b]y May 1 we will have to be out of US Bank.  We will move all banking under Website Technologies at [a different bank, BMO Harris]."

188.   In many instances, Backpage-related money that was initially deposited into accounts held by Posting Solutions was later transmitted to accounts held by Website Technologies.  For example:

•   On October 27, 2015, C.F. received an email entitled "Two packages coming your way! (Money Orders)."  The email stated that two UPS packages filled with money orders were being sent—one containing $47,647.25 of money orders made out to Backpage and the other containing $52,251.48 of money orders made out to Posting Solutions.

•   Similarly, on November 16, 2015, C.F. received an email entitled "Three packages sent today $441,408.69."  The email stated that three packages filled with money orders were being sent—one containing $129,193.61 of money orders made out to Backpage, another containing $244,353.63 of money orders made out to Posting Solutions, and the last containing an additional $67,861.75 of money orders made out to Posting Solutions.

•   And again, on January 29, 2016, a Posting Solutions account wired $2.4 million to a Website Technologies account.  PADILLA and C.F. were both authorized signers on the recipient account.

189.   In addition to receiving millions of dollars from Posting Solutions, the Website Technologies accounts also served as the repository for millions of dollars of wires from international bank accounts controlled by Backpage-associated entities.  For example, between January 2015 and December 2016, Website Technologies accounts received over $45.4 million in wire transfers from Backpage-associated bank accounts in Liechtenstein,

1  over $30.1 million in wire transfers from Backpage-associated bank accounts in Iceland,

2  and over $3.9 million in wire transfers from Backpage-associated bank accounts in the

3  Netherlands.

4  190.   In many instances, the next stage of the money-laundering process was for

5  money to be wired from Website Technologies accounts to bank accounts held by a

6  different entity called Cereus Properties LLC ("Cereus Properties").   The authorized

7  signers on the Cereus Properties accounts included SPEAR and BRUNST.   Between

8  around December 2015 and October 2016, Website Technologies accounts sent wire

9  transfers totaling over $47 million to accounts held by Cereus Properties.

10  191.   Accounts held by Cereus Properties also received money directly from

11  international bank accounts controlled by Backpage-associated entities.   For example,

12  between around August 2016 and November 2016, Cereus Properties accounts received

13  over $11.3 million in deposits and wire transfers from Backpage-associated accounts in the

14  Netherlands.

15  192.   After money reached Cereus Properties, large portions of it were funneled

16  back to Backpage or to certain BACKPAGE DEFENDANTS.   For example, between

17  January 2016 and January 2017, LACEY (and LACEY's family members) received

18  distributions totaling over $30.3 million and LARKIN separately received distributions

19  totaling over $21 million.

20  193.   Backpage also furthered its money laundering efforts through the use of

21  bitcoin processing companies.   Over time, Backpage utilized companies such as CoinBase,

22  GoCoin, Paxful, Kraken, and Crypto Capital to receive payments from customers and/or

23  route money through the accounts of related companies.

24  194.   Backpage also furthered its money laundering efforts by developing ways for

25  customers to purchase ads using gift cards issued by third-party vendors.   This process was

26  described in a July 23, 2015, email exchange between various Backpage employees on

27  which HYER and others were copied.   This exchange included the following: "[W]hat if

28  we used a customers [sic] payment method, say visa prepaid card, to buy [bitcoin] from

our seller account . . . giving said bitcoin to our catch-all wallet elsewhere (instead of to user), simultaneously adding credits/purchasing paid ad or upsells?   From the user's perspective they just input their prepaid card and get their credits or purchase."

**COUNT 1**

**(Conspiracy)**

195.   The factual allegations in Paragraphs 1-194 are incorporated by reference and re-alleged as though fully set forth herein.

196.   Beginning in or around 2004, and continuing through April 2018, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

a.   18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution).

**OBJECT OF THE CONSPIRACY**

197.   The object of the conspiracy was to obtain money.

**MANNER AND MEANS OF THE CONSPIRACY**

198.   The manner and means of the conspiracy are described in paragraphs 1-194 above, incorporated by reference and re-alleged as though fully set forth herein.

**OVERT ACTS**

199.   Overt acts were committed in furtherance of the conspiracy, including but not limited to those described in paragraphs 1-194 above, incorporated by reference and re-alleged as though fully set forth herein.

In violation of 18 U.S.C. § 371.

**COUNTS 2-51**

**(Travel Act—Facilitate Prostitution)**

200.   The factual allegations in Paragraphs 1-199 are incorporated by reference and re-alleged as though fully set forth herein.

- 49 –

201.   On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214, and thereafter performed and attempted to perform an act that did promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as follows:

| Count | Date | Description |
|---|---|---|
| 2. | Sept. 10, 2013 | Publish ad depicting Victim 5 entitled "Get freaky Tuesday . . Come spend ur day with us – 19," with accompanying text "Doin incalls and outcalls" |
| 3. | Jan. 27, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 4. | Jan. 29, 2014 | Publish ad depicting Victim 8 entitled "Puerto Rican mami in walpole area INCALLS –19" after deleting one picture from the originally-submitted ad |
| 5. | Jan. 31, 2014 | Publish ad depicting Victim 8 entitled "Exotic latina, south portland area, ready to play, INCALLS, 30 min specials!!! – 19" after deleting one picture from originally-submitted ad |
| 6. | Feb. 6, 2014 | Publish ad involving P.R. entitled "75 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 7. | Apr. 20, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |

| 8. | May 7, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 9. | May 31, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 10. | July 1, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 11. | Aug. 19, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 12. | Nov. 23, 2014 | Publish ad depicting Victim 10 entitled "New in Town Super Hot Skinny Mixed Cuban Girl With Long Black Hair – 18" after deleting picture from originally-submitted ad |
| 13. | Jan. 29, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asain Bombshell with a Nice & Tight {Booty} – 23" after deleting one picture from the originally-submitted ad |
| 14. | Jan. 31, 2015 | Publish ad depicting Victim 10 entitled "NEW IN TOWN sexy sweet European mixed Cuban California girl – 21" |
| 15. | Jan. 31, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asian mixed Bombshell – 23" after deleting one picture from the originally-submitted ad |
| 16. | Feb. 4, 2015 | Publish ad depicting Victim 11 entitled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy – 26," after deleting pictures from originally-submitted ad |
| 17. | Feb. 18, 2015 | Publish ad depicting Victim 11 entitled "Alexis Foxx the HOTTEST in town!!!!! – 26," after deleting six pictures from the originally-submitted ad |
| 18. | Feb. 26, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |

| 19. | May 18, 2015 | Publish ad depicting Victim 15 entitled "GORGEOUS ebony PLAYMATE Perfect Curves…Skills to make ur TOES CURL – 19," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" |
| 20. | May 19, 2015 | Publish ad depicting Victim 15 entitled "Hot & Driping Submissive Ebony Playmates – 20," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "We're ready to please and accommodate all of your needs and wants!!  With a mouth that'll ROCK your [] and a [picture of cat] that'll leave you purring for more" |
| 21. | July 1, 2015 | Publish ad depicting Victim 17 entitled "AbSoLuTeLy AmAziNg CoMe PLaY WiTh Me #1 MoST WaNtEd SwEeT SEXii PlAymate – 20," with accompanying text "By contacting me you agree that you are not affiliated with any form of law enforcement," PERFECT & Will satisfy your every need," and "IN/CALLS – ONLY" |
| 22. | July 2, 2015 | Publish ad depicting Victim 17 entitled "SeXy!! Exotic playmate Call me! the girl you NEED to See! – 20," with accompanying text "I DO NOT OFFER 40$, 50$, 60$ SPECIALS" and "IN/CALLS – ONLY" |
| 23. | Aug. 13, 2015 | Publish ad depicting Victim 13 entitled "Young SEXY PUERTO RICAN – 19," which accompanying text "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" |

| 24. | Aug. 15, 2015 | Publish ad depicting Victim 16 entitled "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW – 23" |
| 25. | Sept. 13, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 26. | Nov. 28, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 27. | Apr. 21, 2016 | Publish ad entitled "Finally!!  PSE & GFE – Kimber Rae and MIA Marie Together BOOK NOW" |
| 28. | Nov. 3, 2016 | Publish ad entitled "GFEE New – 18" |
| 29. | Nov. 11, 2016 | Publish ad entitled "Mind blowing Tiffany. Incall in Taunton – 37," with accompanying text "Soft GFE . . . Im real and reviewed" |
| 30. | Nov. 14, 2016 | Publish ad entitled "Top Model  2016 Special  'Best Looking Young Asian' . . . – 22," with accompanying text "Sexy Asian Girl Incall Service" and "GFE" |
| 31. | Nov. 14, 2016 | Publish ad entitled "Sometimes It's All About The Journey, And The Destination…..Erectile Dysfunctional G F E Provider – 44," with accompanying test "You can find a few current reviews at T3R xxxxxx#" and "I have been EROS authenticated" |
| 32. | Nov. 19, 2016 | Publish ad entitled "The True (G)irl (F)riend (E)xperience… Visiting November 27th Sunday ～ PRE-BOOKING SPECIAL ～ - 100," with accompanying text "Let's blur restrictions between financial transaction & Romantic Connection" |

| 33. | Nov. 24, 2016 | Publish ad entitled "Top Asian Grand Opening 100% Young 100% Sexy . . . – 23," with accompanying text "BEST INCALL IN TOWN!" and "GFE" |
| 34. | Nov. 26, 2016 | Publish ad entitled "I LOVE MEN!! I'm a GFE. OutCall and Incall with exception on the Incall!! – 42" |
| 35. | Dec. 20, 2016 | Publish ad entitled "OMG Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24," with accompanying text "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" |
| 36. | Jan. 15, 2017 | Publish ad entitled "Real & Reviewed Girlfriend Theonesweet.weebly.com – 30," with accompanying text "250 G F E" |
| 37. | Apr. 4, 2017 | Publish ad entitled "KISSING & GFE KOREAN GIRLS – 20" |
| 38. | Apr. 11, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 39," with accompanying text "complete GFE experience" |
| 39. | July 3, 2017 | Publish ad entitled "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit – 20," with accompanying text "100% GFE with 100% no Pimps" |
| 40. | July 15, 2017 | Publish ad entitled "Ready for some fun daddy? This is your chance too have a amazing time - 21," with accompanying text "Slim body, nice tits, freaky, GFE" |
| 41. | July 15, 2017 | Publish ad entitled "New in town BiGBubble Booty SWEETLiPS HOT BODY – 24," with "GFE" in accompanying text |
| 42. | July 21, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 30," with accompanying text "complete GFE experience" |

| 43. | July 23, 2017 | Publish ad entitled "ASIAN GODDESS young – 20," with accompanying text "100% Discreet service" and "#GFE" |
| 44. | Jan. 26, 2018 | Publish ad entitled "GFE Service Available!   Private Encounters w/ Pampering Beauty" |
| 45. | Jan. 30, 2018 | Publish ad entitled "241 & white plans area  Carfun  Perfect Treat   Available No Rush," with "Sweet Sexy GFE" in accompanying text |
| 46. | Jan. 30, 2018 | Publish ad entitled "GFE REAL HOT Sweet DREAM AMAZING BEST RELAX" |
| 47. | Jan. 30, 2018 | Publish ad entitled "Tall, Slim & Sexy Luxe Goddess * NARCISA * Sensual Body Rub + Fetish Sessions," with accompanying text "gfe Hh: $160  H: $220" |
| 48. | Jan. 31, 2018 | Publish ad entitled "Exotic Asian Beauty," with accompanying text "I am an independent GFE with excellent massage skills" |
| 49. | Feb. 1, 2018 | Publish ad entitled "Nuru (Best GFE ever) incall only" |
| 50. | Feb. 6, 2018 | Publish ad entitled "Tuesday with Ashleigh. Available now," with "GFE" in accompanying text |
| 51. | Feb. 6, 2018 | Publish ad entitled "GFE   Kisskisspop 100% Real Photo Choice 9Asian girl Nurunude" |

In violation of 18 U.S.C. § 1952(a)(3)(A).

## COUNT 52

### (Conspiracy To Commit Money Laundering)

202.   The factual allegations in Paragraphs 1-201 are incorporated by reference and re-alleged as though fully set forth herein.

203.   Beginning in or around 2004, and continuing through April 2018, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and

HYER, and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:

       a.    18 U.S.C. § 1956(a)(1)(A)(i) (Promotional Money Laundering)

       b.    18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering)

       c.    18 U.S.C. § 1956(a)(2)(A) (Int'l Promotional Money Laundering)

       d.    18 U.S.C. § 1956(a)(2)(B)(i) (Int'l Concealment Money Laundering)

       e.    18 U.S.C. § 1957(a) (Transactional Money Laundering)

In violation of 18 U.S.C. § 1956(h).

## COUNTS 53-62

### (Concealment Money Laundering)

204.   The factual allegations in Paragraphs 1-203 are incorporated by reference and re-alleged as though fully set forth herein.

205.   On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|---|---|---|---|
| 53. | May 18, 2016 | $1,476,505.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 54. | May 18, 2016 | $264,438.00 | Website Technologies (x2008) to Cereus Properties (x6211) |

| 55. | May 31, 2016 | $3,171,675.80 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 56. | May 31, 2016 | $432,961.87 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 57. | June 20, 2016 | $842,878.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 58. | June 30, 2016 | $3,076,147.75 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 59. | July 27, 2016 | $3,252,681.62 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 60. | July 27, 2016 | $438,818.86 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 61. | Aug. 16, 2016 | $804,250.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 62. | Aug. 31, 2016 | $3,171,264.42 | Website Technologies (x2008) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(1)(B)(i).

## COUNTS 63-68

### (International Promotional Money Laundering)

206.     The factual allegations in Paragraphs 1-205 are incorporated by reference and re-alleged as though fully set forth herein.

207.     On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and

through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 63. | Mar. 4, 2014 | $6,450.00 | U.S. Bank (x1165) to S.B. (web developer in India) |
| 64. | Aug. 5, 2016 | $5,005,732.86 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 65. | Sept, 22, 2016 | $2,916,955.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 66. | Oct. 3, 2016 | $354,050.84 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 67. | Nov. 2, 2016 | $2,726,170.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 68. | Nov. 15, 2016 | $351,403.54 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(2)(A).

## COUNTS 69-99

### (Transactional Money Laundering)

208.    The factual allegations in Paragraphs 1-207 are incorporated by reference and re-alleged as though fully set forth herein.

209.    On or about the dates set forth below, each instance constituting a separate count of this Superseding Indictment, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|---|---|---|---|---|
| 69. | LACEY, BRUNST | Aug. 21, 2013 | $30,000.00 | Bank of America (x1793) to Stewart Title (partial payment for Sedona property) |
| 70. | LACEY, BRUNST | Sept. 13, 2013 | $62,491.47 | BMO Harris to Stewart Title (partial payment for Sedona property) |
| 71. | SPEAR | June 11, 2014 | $300,000.00 | National Bank of Arizona (x0178) to Spear Family Trust |
| 72. | SPEAR | June 20, 2014 | $200,000.00 | National Bank of Arizona (x0178) to TD Ameritrade |
| 73. | SPEAR | Nov. 4, 2014 | $1,000,000.00 | National Bank of Arizona (x0178) to UBS Financial |
| 74. | SPEAR | May 14, 2015 | $250,000.00 | National Bank of Arizona (x0178) to Lincoln National Life |
| 75. | SPEAR | May 26, 2015 | $50,000.00 | National Bank of Arizona (x0178) to Industrial Property Trust |
| 76. | SPEAR | Nov. 3, 2015 | $300,000.00 | National Bank of Arizona (x0178) to Ally Bank |
| 77. | SPEAR | Dec. 1, 2015 | $200,000.00 | National Bank of Arizona (x0178) to Wells Fargo |
| 78. | SPEAR, BRUNST | Jan. 11, 2016 | $133,045.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |

| | | | | |
|---|---|---|---|---|
| 79. | BRUNST | Jan. 26, 2016 | $101,974.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 80. | LARKIN, BRUNST | Feb. 3, 2016 | $1,507.944.00 | Cereus Properties (x6211) to Charles Schwab |
| 81. | LACEY, BRUNST | Mar. 1, 2016 | $1,692,020.00 | Cereus Properties (x6211) to Bank of America (x5554) |
| 82. | BRUNST | Apr. 1, 2016 | $220,944.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 83. | LACEY, BRUNST | June 27, 2016 | $397,9500.00 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 84. | LACEY, BRUNST | July 20, 2016 | $12,859,152.57 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 85. | SPEAR | July 22, 2016 | $50,000.00 | National Bank of Arizona (x0178) to Strategic Storage Trust II |
| 86. | LACEY, BRUNST | Aug. 2, 2016 | $16,243.00 | Cereus Properties (x6211) to Wells Fargo (x0495) |
| 87. | LARKIN, BRUNST | Oct. 6, 2016 | $1,206,356.00 | Cereus Properties (x6211) to Charles Schwab (x4693) |
| 88. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1967) |
| 89. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1972) |
| 90. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1986) |

| 91. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1991) |
| 92. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x2014) |
| 93. | SPEAR, BRUNST | Oct. 6, 2016 | $141,444.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |
| 94. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 95. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 96. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 97. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 98. | LACEY | Dec. 29, 2016 | $3,300,000.00 | Arizona Bank & Trust/Dubuque Bank & Trust to Johnson Bank (x9992) |
| 99. | LACEY | Jan. 3, 2017 | $16,500,000.00 | Johnson Bank (x9992) to Primus Trust Co./K&H Bank (Hungary) |

In violation of 18 U.S.C. § 1957(a).

## COUNT 100

### (International Concealment Money Laundering)

210.   The factual allegations in Paragraphs 1-209 are incorporated by reference and re-alleged as though fully set forth herein.

211.   On or about the date set forth below, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|-------|-----------|------|--------|-------------|
| 100. | LACEY | Jan. 3, 2017 | $16,500,000.00 | Johnson Bank (x9992) to Primus Trust Co./K&H Bank (Hungary) |

In violation of 18 U.S.C. § 1956(a)(2)(B)(i).

**FORFEITURE ALLEGATION ONE**

**[18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]**

1.     The factual allegations in Paragraphs 1-211 are incorporated by reference and re-alleged as though fully set forth herein.

2.     Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of this Superseding Indictment.  Each defendant so convicted shall forfeit to the United States the following:

a.     All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense.  Such property includes, but is not limited to, the real property located at the following addresses:

1.     10647 N. State Route 89A, Sedona, AZ 86336

2.     1100 Union St. #700, San Francisco, CA 94109

3.     1308 E. 56th Street, 2, Chicago, IL 60637

4.     14, rue Saint Guillaume, Paris, France 75007

5.     2043 Pleasant Hill Rd, Sebastopol, CA 95472

6.     2416 N. Foote Dr., Phoenix, AZ 85008

7.     2531 Tumbleweed Way, Frisco, TX 75034

8.     2755 Fillmore St, San Francisco, CA 94123

9.     3300 E. Stella Lane, Paradise Valley, AZ 85253

10.    3304 E. Stella Lane, Paradise Valley, AZ 85253

11.    3308 E. Stella Lane, Paradise Valley, AZ 85253

12.    3311 E. Stella Lane, Paradise Valley, AZ 85253

13.    3353 Red Robin Road, Pinetop, AZ 85935

14.    343 Presidio Ave, San Francisco, CA 94115

15.     3516 Estacado Lane, Plano, TX 75025-4432 (Rental)

16.     493 Zinfandel Lane, Saint Helena, CA 94574

17.     4931 E. White Gates Drive, Phoenix, AZ 85018

18.     5245 Evening Sun Dr., Frisco, TX 75034

19.     5555 North Casa Blanca Drive, Paradise Valley, AZ 85253

20.     5751 N. 77th Place, Scottsdale, AZ 85250

21.     5830 E. Calle Del Media (Medio), Phoenix, AZ 85018

22.     6300 N. 33rd Street, Paradise Valley, AZ 85253

23.     6314 N. 33rd Street, Paradise Valley, AZ 85253

24.     7409 Kingsbarns, The Colony, TX 75056

25.     8604 E. San Ardo Dr., Scottsdale, AZ 85258

26.     948 Carlsbad Dr., Plano, TX 75023

Such property also includes, but is not limited to, all funds, securities, and/or other assets held in the following bank accounts:

1.      Prosperity Bank account number XXXXX7188

2.      Compass Bank Account number XXXXXX3873

3.      Compass Bank Account number XXXXXX3825

4.      National Bank of Arizona Account number XXXX0178

5.      National Bank of Arizona Account number XXXX0151

6.      National Bank of Arizona Account number XXXX3645

7.      Live Oak Bank Account Number x6910

8.      Ascensus Broker Dealer Services Account Number XXXXX6943-01

9.      Ascensus Broker Dealer Services account Number XXXXX5280-01

10.     First Federal Savings & Loan of San Rafael account number XXXX3620

11.     Republic Bank of Arizona account number XXXX1889

12.     Republic Bank of Arizona account number XXXX2592

13.     Republic Bank of Arizona account number XXXX2500

14.     Republic Bank of Arizona account number XXXX1938

15.   Bank of America Account number XXXXXXXXXXXX8225

16.   Bank of America Account number XXXXXXXXXXXX7054

17.   Bank of America Account number XXXXXXXXXXXX9342

18.   Bank of America Account number XXXXXXXXXXXX0071

19.   San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

20.   Ally Bank Account Number XXXXXX6292

21.   Branch Banking and Trust Bank account number XXXXXXXXX0218

22.   Green Bank Account number XXX4832

23.   Green Bank Account number XXXXXX4293

24.   Perkins Coie Brokerage Account number xxxxxx7012

25.   Perkins Coie Liquid Assets xxxxxxx0012

26.   Alliance Bernstein Brokerage Account number xxxx6878

27.   Alliance Bernstein Brokerage Account number xxxx4954

28.   Alliance Bernstein Brokerage Account number xxxx7892

29.   Alliance Bernstein Brokerage Account number xxxx7888

30.   Alliance Bernstein Brokerage Account number xxxx6485

31.   Republic Bank of Arizona Brokerage Account number xxxx2485

32.   Republic Bank of Arizona Brokerage Account number xxxx1897

33.   Republic Bank of Arizona Brokerage Account number xxxx3126

34.   Republic Bank of Arizona Certificate of Deposit xxxxxx8316

35.   Republic Bank of Arizona Certificate of Deposit xxxxxx8324

36.   Republic Bank of Arizona Certificate of Deposit xxxxxx8332

37.   Republic Bank of Arizona Certificate of Deposit xxxxxx8103

38.   Republic Bank of Arizona Certificate of Deposit xxxxxx8162

39.   Republic Bank of Arizona Certificate of Deposit xxxxxx8189

40.   Paul Hastings LLP Account number xxxxx0457

41.   Global Trading Solutions xxx7177

42.   K&H Bank Account number xxxxxxxxxxxxxxxxxxxxxxxx1210

43. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5803

44. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5801

45. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5805

46. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2226

47. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2231

48. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2230

49. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4194

50. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4196

51. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4198

52. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8083

53. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8086

54. Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8080

55. Bank Frick Account number xxxxxxxxxxxxxxxx LI090x

56. Bank Frick Account number xxxxxxxxxxxxxxxx LI300x

57. Bank Frick Account number xxxxxxxxxxxxxxxx LI740x

58. Bank Frick Account number xxxxxxxxxxxxxxxx LI900x

59. Knab Bank Account number xxxxxxxxxxxxxx7664

60. Rabo Bank Account number xxxxxxxxxxxxx2452

61. Rabo Bank Account number xxxxxxxxxxxxx4721

62. Acacia Conservation Fund Brokerage Account number x2020

63. Saxo Payments Account number x1262

64. AS LHV Pank Account number xxxxxxxxxxxxxxxxx4431

65. Bitcoin Wallet -6Lix5 in the amount of 6 BTC

66. Bitcoin Wallet -6Lix5 in the amount of 199.99995716 BTC

67. Bitcoin Wallet -6Lix5 in the amount of 404.9984122 BTC

68. JP Morgan Chase Bank account number xxxxx4455 in the amount of $699,940

69. JP Morgan Chase Bank account number xxxxx4455 in the amount of $106,988.41

70. JP Morgan Chase Bank account number xxxxx4455 in the amount of $499,910

71. JP Morgan Chase Bank account number xxxxx4455 in the amount of $50,000

72. Bitcoin Cash Wallet –t8v7e in the amount of 3,673.59306905 BCH

73. Litecoin Wallet -goaeV in the amount of 16,310.79413202 LTC

74. Bitcoin Wallet -6Lix5 in the amount of 173.97319 BTC

75. Bitcoin Cash Wallet –t8v7e in the amount of 55.5 BCH

76. Bitcoin Wallet -6Lix5 in the amount of 411.00019 BTC

77. Bitcoin Wallet -6Lix5 in the amount of 2.00069333 BTC

78. Bitcoin Wallet -6Lix5 in the amount of 136.6544695 BTC

79. Bitcoin Cash Wallet –t8v7e in the amount of 73.62522241 BCH

80. Litecoin Wallet –goaeV in the amount of 783.9735116 LTC

81. Bitcoin Gold Wallet -KK1mJ in the amount of 509.81904619 BTG

82. Crypto Capital account number x1124

83. Crypto Capital account number x1933

84. Any and all bank funds, securities, cryptocurrency, or other assets on deposit or seized from an account held at Kraken in the name of Ad Tech BV.

85. JP Morgan Chase Bank account number xxxxx4155 in the amount of $42,500

86. Alliance Bernstein Brokerage account x7889

87. Alliance Bernstein Brokerage account x0582

88. Midfirst Bank account x4139

89. Crypto Capital account number x6886

Such property further includes, but is not limited to, the following domain names:

1. admoderation.com (Versio)

2. admoderators.com (Versio)

3. adnet.ws (NetNames)

4. adplace24.com (Versio)

5. adplaces24.com (Versio)

6. adpost24.com (Versio)

7. adpost24.cz (GoDaddy)

| | | |
|---|---|---|
| 1 | 8. | adquick365.com (Versio) |
| 2 | 9. | adreputation.com (NetNames) |
| 3 | 10. | ads-posted-mp.com (Versio) |
| 4 | 11. | adsplace24.com (Versio) |
| 5 | 12. | adspot24.com (Versio) |
| 6 | 13. | adspots24.com (Versio) |
| 7 | 14. | adsspot24.com (Versio) |
| 8 | 15. | adtechbv.co.nl (NetNames) |
| 9 | 16. | adtechbv.com (NetNames) |
| 10 | 17. | adtechbv.nl (NetNames) |
| 11 | 18. | advert-ep.com (Versio) |
| 12 | 19. | adverts-mp.com (Versio) |
| 13 | 20. | axme.com (GoDaddy) |
| 14 | 21. | back0age.com (NetNames) |
| 15 | 22. | backpa.ge (NetNames) |
| 16 | 23. | backpaee.com (NetNames) |
| 17 | 24. | backpage-insider.com (NetNames) |
| 18 | 25. | backpage.adult (NetNames) |
| 19 | 26. | backpage.ae (NetNames) |
| 20 | 27. | backpage.at (NetNames) |
| 21 | 28. | backpage.ax (NetNames) |
| 22 | 29. | backpage.be (NetNames) |
| 23 | 30. | backpage.bg (European domains) |
| 24 | 31. | backpage.bg (NetNames) |
| 25 | 32. | backpage.ca (NetNames) |
| 26 | 33. | backpage.cl (NetNames) |
| 27 | 34. | backpage.cn (European domains) |
| 28 | 35. | backpage.cn (NetNames) |

| | | |
|---|---|---|
| 1 | 36. | backpage.co.id (NetNames) |
| 2 | 37. | backpage.co.nl (European domains) |
| 3 | 38. | backpage.co.nl (NetNames) |
| 4 | 39. | backpage.co.nz (NetNames) |
| 5 | 40. | backpage.co.uk (NetNames) |
| 6 | 41. | backpage.co.ve (NetNames) |
| 7 | 42. | backpage.co.za (NetNames) |
| 8 | 43. | backpage.com (NetNames) |
| 9 | 44. | backpage.com.ar (NetNames) |
| 10 | 45. | backpage.com.au (NetNames) |
| 11 | 46. | backpage.com.ph (NetNames) |
| 12 | 47. | backpage.cz (NetNames) |
| 13 | 48. | backpage.dk (NetNames) |
| 14 | 49. | backpage.ec (NetNames) |
| 15 | 50. | backpage.ee (European domains) |
| 16 | 51. | backpage.ee (NetNames) |
| 17 | 52. | backpage.es (NetNames) |
| 18 | 53. | backpage.fi (European domains) |
| 19 | 54. | backpage.fi (NetNames) |
| 20 | 55. | backpage.fr (European domains) |
| 21 | 56. | backpage.fr (NetNames) |
| 22 | 57. | backpage.gr (European domains) |
| 23 | 58. | backpage.gr (NetNames) |
| 24 | 59. | backpage.hk (European domains) |
| 25 | 60. | backpage.hk (NetNames) |
| 26 | 61. | backpage.hu (European domains) |
| 27 | 62. | backpage.hu (NetNames) |
| 28 | 63. | backpage.ie (NetNames) |

| | | |
|---|---|---|
| 1 | 64. | backpage.in (NetNames) |
| 2 | 65. | backpage.it (NetNames) |
| 3 | 66. | backpage.jp (NetNames) |
| 4 | 67. | backpage.kr (NetNames) |
| 5 | 68. | backpage.lt (NetNames) |
| 6 | 69. | backpage.lv (European domains) |
| 7 | 70. | backpage.lv (NetNames) |
| 8 | 71. | backpage.me (NetNames) |
| 9 | 72. | backpage.mx (NetNames) |
| 10 | 73. | backpage.my (NetNames) |
| 11 | 74. | backpage.net (NetNames) |
| 12 | 75. | backpage.nl (NetNames) |
| 13 | 76. | backpage.no (European domains) |
| 14 | 77. | backpage.no (NetNames) |
| 15 | 78. | backpage.nz (NetNames) |
| 16 | 79. | backpage.pe (NetNames) |
| 17 | 80. | backpage.ph (NetNames) |
| 18 | 81. | backpage.pk (NetNames) |
| 19 | 82. | backpage.pl (NetNames) |
| 20 | 83. | backpage.porn (NetNames) |
| 21 | 84. | backpage.pt (NetNames) |
| 22 | 85. | backpage.ro (European domains) |
| 23 | 86. | backpage.ro (NetNames) |
| 24 | 87. | backpage.se (NetNames) |
| 25 | 88. | backpage.sex (NetNames) |
| 26 | 89. | backpage.sg (NetNames) |
| 27 | 90. | backpage.si (European domains) |
| 28 | 91. | backpage.si (NetNames) |

| | | |
|---|---|---|
| 1 | 92. | backpage.sk (European domains) |
| 2 | 93. | backpage.sk (NetNames) |
| 3 | 94. | backpage.sucks (NetNames) |
| 4 | 95. | backpage.tw (NetNames) |
| 5 | 96. | backpage.uk (NetNames) |
| 6 | 97. | backpage.uk.com (NetNames) |
| 7 | 98. | backpage.us (NetNames) |
| 8 | 99. | backpage.vn (NetNames) |
| 9 | 100. | backpage.xxx (NetNames) |
| 10 | 101. | backpage.xyz (NetNames) |
| 11 | 102. | backpagecompimp.com (NetNames) |
| 12 | 103. | backpagecompimps.com (NetNames) |
| 13 | 104. | backpagepimp.com (NetNames) |
| 14 | 105. | backpagepimps.com (NetNames) |
| 15 | 106. | backpagg.com (NetNames) |
| 16 | 107. | backpagm.com (NetNames) |
| 17 | 108. | backpagu.com (NetNames) |
| 18 | 109. | backpaoe.com (NetNames) |
| 19 | 110. | backpawe.com (NetNames) |
| 20 | 111. | backqage.com (NetNames) |
| 21 | 112. | backrage.com (NetNames) |
| 22 | 113. | backxage.com (NetNames) |
| 23 | 114. | bakkpage.com (NetNames) |
| 24 | 115. | bcklistings.com (NetNames) |
| 25 | 116. | bestofbackpage.com (NetNames) |
| 26 | 117. | bestofbigcity.com (NetNames) |
| 27 | 118. | bickpage.com (NetNames) |
| 28 | 119. | bigcity.com (NetNames) |

| 1 | 120. | bpclassified.com (NetNames) |
| 2 | 121. | bpclassifieds.com (NetNames) |
| 3 | 122. | carlferrer.com (NetNames) |
| 4 | 123. | clasificadosymas.com (NetNames) |
| 5 | 124. | clasificadosymas.net (NetNames) |
| 6 | 125. | clasificadosymas.org (NetNames) |
| 7 | 126. | classifiedsolutions.co.uk (NetNames) |
| 8 | 127. | classifiedsolutions.net (NetNames) |
| 9 | 128. | classyadultads.com (Versio) |
| 10 | 129. | columbusbackpage.com (NetNames) |
| 11 | 130. | connecticutbackpage.com (NetNames) |
| 12 | 131. | cracker.co.id (NetNames) |
| 13 | 132. | cracker.com (NetNames) |
| 14 | 133. | cracker.com.au (NetNames) |
| 15 | 134. | cracker.id (NetNames) |
| 16 | 135. | cracker.net.au (NetNames) |
| 17 | 136. | crackers.com.au (NetNames) |
| 18 | 137. | crackers.net.au (NetNames) |
| 19 | 138. | ctbackpage.com (NetNames) |
| 20 | 139. | dallasbackpage.com (NetNames) |
| 21 | 140. | denverbackpage.com (NetNames) |
| 22 | 141. | easypost123.com (Versio) |
| 23 | 142. | easyposts123.com (Versio) |
| 24 | 143. | emais.com.pt (NetNames) |
| 25 | 144. | evilempire.com (NetNames) |
| 26 | 145. | ezpost123.com (Versio) |
| 27 | 146. | fackpage.com (NetNames) |
| 28 | 147. | fastadboard.com (Versio) |

1   148.   guliettagroup.nl (Versio)

2   149.   htpp.org (NetNames)

3   150.   ichold.com (NetNames)

4   151.   internetspeechfoundation.com (nameisp)

5   152.   internetspeechfoundation.org (nameisp)

6   153.   loads2drive.com (NetNames)

7   154.   loadstodrive.com (NetNames)

8   155.   loadtodrive.com (NetNames)

9   156.   losangelesbackpage.com (NetNames)

10   157.   mediafilecloud.com (NetNames)

11   158.   miamibackpage.com (NetNames)

12   159.   minneapolisbackpage.com (NetNames)

13   160.   mobileposting.com (Versio)

14   161.   mobilepostings.com (Versio)

15   162.   mobilepostlist.com (Versio)

16   163.   mobilposting.com (Versio)

17   164.   naked.city (NetNames)

18   165.   nakedcity.com (NetNames)

19   166.   newyorkbackpage.com (NetNames)

20   167.   paidbyhour.com (NetNames)

21   168.   petseekr.com (NetNames)

22   169.   petsfindr.com (NetNames)

23   170.   phoenixbackpage.com (NetNames)

24   171.   posteasy123.com (Versio)

25   172.   postfaster.com (NetNames)

26   173.   postfastly.com (NetNames)

27   174.   postfastr.com (NetNames)

28   175.   postonlinewith.com (Versio)

176. postonlinewith.me (Versio)

177. postseasy123.com (Versio)

178. postsol.com (GoDaddy)

179. postszone24.com (Versio)

180. postzone24.com (Versio)

181. postzones24.com (Versio)

182. rentseekr.com (NetNames)

183. results911.com (NetNames)

184. sandiegobackpage.com (NetNames)

185. sanfranciscobackpage.com (NetNames)

186. seattlebackpage.com (NetNames)

187. sellyostuffonline.com (Versio)

188. sfbackpage.com (NetNames)

189. simplepost24.com (Versio)

190. simpleposts24.com (Versio)

191. svc.ws (NetNames)

192. truckrjobs.com (NetNames)

193. ugctechgroup.com (NetNames)

194. universads.nl (Versio)

195. villagevoicepimps.com (GoDaddy)

196. websitetechnologies.co.uk (NetNames)

197. websitetechnologies.com (NetNames)

198. websitetechnologies.net (NetNames)

199. websitetechnologies.nl (NetNames)

200. websitetechnologies.org (NetNames)

201. weprocessmoney.com (GoDaddy)

202. wst.ws (NetNames)

203. xn--yms-fla.com (NetNames)

| | | |
|---|---|---|
| 1 | 204. | ymas.ar.com (European domains) |
| 2 | 205. | ymas.br.com (European domains) |
| 3 | 206. | ymas.br.com (NetNames) |
| 4 | 207. | ymas.bz (European domains) |
| 5 | 208. | ymas.bz (NetNames) |
| 6 | 209. | ymas.cl (European domains) |
| 7 | 210. | ymas.cl (NetNames) |
| 8 | 211. | ymas.co.bz (European domains) |
| 9 | 212. | ymas.co.bz (NetNames) |
| 10 | 213. | ymas.co.cr (European domains) |
| 11 | 214. | ymas.co.cr (NetNames) |
| 12 | 215. | ymas.co.ni (European domains) |
| 13 | 216. | ymas.co.ni (NetNames) |
| 14 | 217. | ymas.co.ve (European domains) |
| 15 | 218. | ymas.co.ve (NetNames) |
| 16 | 219. | ymas.com (NetNames) |
| 17 | 220. | ymas.com.br (European domains) |
| 18 | 221. | ymas.com.br (NetNames) |
| 19 | 222. | ymas.com.bz (European domains) |
| 20 | 223. | ymas.com.bz (NetNames) |
| 21 | 224. | ymas.com.co (European domains) |
| 22 | 225. | ymas.com.co (NetNames) |
| 23 | 226. | ymas.com.do (European domains) |
| 24 | 227. | ymas.com.do (NetNames) |
| 25 | 228. | ymas.com.ec (European domains) |
| 26 | 229. | ymas.com.ec (NetNames) |
| 27 | 230. | ymas.com.es (European domains) |
| 28 | 231. | ymas.com.es (NetNames) |

| | | |
|---|---|---|
| 1 | 232. | ymas.com.gt (European domains) |
| 2 | 233. | ymas.com.gt (NetNames) |
| 3 | 234. | ymas.com.hn (European domains) |
| 4 | 235. | ymas.com.hn (NetNames) |
| 5 | 236. | ymas.com.mx  (NetNames) |
| 6 | 237. | ymas.com.ni (European domains) |
| 7 | 238. | ymas.com.ni (NetNames) |
| 8 | 239. | ymas.com.pe (European domains) |
| 9 | 240. | ymas.com.pe (NetNames) |
| 10 | 241. | ymas.com.pr (European domains) |
| 11 | 242. | ymas.com.pr (NetNames) |
| 12 | 243. | ymas.com.pt  (NetNames) |
| 13 | 244. | ymas.com.uy (European domains) |
| 14 | 245. | ymas.com.uy (NetNames) |
| 15 | 246. | ymas.com.ve (European domains) |
| 16 | 247. | ymas.com.ve (NetNames) |
| 17 | 248. | ymas.cr (European domains) |
| 18 | 249. | ymas.cr (NetNames) |
| 19 | 250. | ymas.do (European domains) |
| 20 | 251. | ymas.do (NetNames) |
| 21 | 252. | ymas.ec (European domains) |
| 22 | 253. | ymas.ec (NetNames) |
| 23 | 254. | ymas.es (European domains) |
| 24 | 255. | ymas.es (NetNames) |
| 25 | 256. | ymas.org (NetNames) |
| 26 | 257. | ymas.pe (European domains) |
| 27 | 258. | ymas.pe (NetNames) |
| 28 | 259. | ymas.pt (NetNames) |

1   260.   ymas.us (European domains)

2   261.   ymas.us (NetNames)

3   262.   ymas.uy (European domains)

4   263.   ymas.uy (NetNames)

5   264.   ymas.uy.com (European domains)

6   265.   atlantabackpage.com (NetNames)

7   266.   backpage.com.br (NetNames)

8   267.   chicagobackpage.com (NetNames)

9   268.   tampabackpage.com (NetNames)

10      b.      To the extent such property is not available for forfeiture, a sum of money

11 equal to the total value of the property described in subparagraph (a).

12      3.      Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

13 Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute

14 property, up to the total value of the property described in the preceding paragraph if, as

15 the result of any act or omission of the defendant, the property described in the preceding

16 paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence;

17 (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond

18 the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

19 commingled with other property that cannot be divided without difficulty.

20                    **FORFEITURE ALLEGATION TWO**

21                       **[18 U.S.C. § 982(a)(1)]**

22      1.      The factual allegations in Paragraphs 1-211 are incorporated by reference

23 and re-alleged as though fully set forth herein.

24      2.      Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is

25 hereby given that the United States will seek forfeiture as part of any sentence, pursuant

26 Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction

27 under Counts 52 through 100 of this Superseding Indictment. Each defendant so convicted

28 shall forfeit to the United States the following:

a.    All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Counts 52 through 100 of this Superseding Indictment. Such property includes, but is not limited to, the real property located at the following addresses:

1.    10647 N. State Route 89A, Sedona, AZ 86336

2.    1100 Union St. #700, San Francisco, CA 94109

3.    1308 E. 56th Street, 2, Chicago, IL 60637

4.    14, rue Saint Guillaume, Paris, France 75007

5.    2043 Pleasant Hill Rd, Sebastopol, CA 95472

6.    2416 N. Foote Dr., Phoenix, AZ 85008

7.    2531 Tumbleweed Way, Frisco, TX 75034

8.    2755 Fillmore St, San Francisco, CA 94123

9.    3300 E. Stella Lane, Paradise Valley, AZ 85253

10.    3304 E. Stella Lane, Paradise Valley, AZ 85253

11.    3308 E. Stella Lane, Paradise Valley, AZ 85253

12.    3311 E. Stella Lane, Paradise Valley, AZ 85253

13.    3353 Red Robin Road, Pinetop, AZ 85935

14.    343 Presidio Ave, San Francisco, CA 94115

15.    3516 Estacado Lane, Plano, TX 75025-4432 (Rental)

16.    493 Zinfandel Lane, Saint Helena, CA 94574

17.    4931 E. White Gates Drive, Phoenix, AZ 85018

18.    5245 Evening Sun Dr., Frisco, TX 75034

19.    5555 North Casa Blanca Drive, Paradise Valley, AZ 85253

20.    5751 N. 77th Place, Scottsdale, AZ 85250

21.    5830 E. Calle Del Media (Medio), Phoenix, AZ 85018

22.    6300 N. 33rd Street, Paradise Valley, AZ 85253

23.    6314 N. 33rd Street, Paradise Valley, AZ 85253

24.    7409 Kingsbarns, The Colony, TX 75056

25.   8604 E. San Ardo Dr., Scottsdale, AZ 85258

26.   948 Carlsbad Dr., Plano, TX 75023

Such property also includes, but is not limited to, all funds, securities, and/or other assets held in the following bank accounts:

1.   Prosperity Bank account number XXXXX7188

2.   Compass Bank Account number XXXXXX3873

3.   Compass Bank Account number XXXXXX3825

4.   National Bank of Arizona Account number XXXX0178

5.   National Bank of Arizona Account number XXXX0151

6.   National Bank of Arizona Account number XXXX3645

7.   Live Oak Bank Account Number x6910

8.   Ascensus Broker Dealer Services Account Number XXXXX6943-01

9.   Ascensus Broker Dealer Services account Number XXXXX5280-01

10.   First Federal Savings & Loan of San Rafael account number XXXX3620

11.   Republic Bank of Arizona account number XXXX1889

12.   Republic Bank of Arizona account number XXXX2592

13.   Republic Bank of Arizona account number XXXX2500

14.   Republic Bank of Arizona account number XXXX1938

15.   Bank of America Account number XXXXXXXXXXX8225

16.   Bank of America Account number XXXXXXXXXXX7054

17.   Bank of America Account number XXXXXXXXXXX9342

18.   Bank of America Account number XXXXXXXXXXX0071

19.   San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

20.   Ally Bank Account Number XXXXXX6292

21.   Branch Banking and Trust Bank account number XXXXXXXXX0218

22.   Green Bank Account number XXX4832

23.   Green Bank Account number XXXXXX4293

24.   Perkins Coie Brokerage Account number xxxxxx7012

| | | |
|---|---|---|
| 1 | 25. | Perkins Coie Liquid Assets xxxxxxx0012 |
| 2 | 26. | Alliance Bernstein Brokerage Account number xxxx6878 |
| 3 | 27. | Alliance Bernstein Brokerage Account number xxxx4954 |
| 4 | 28. | Alliance Bernstein Brokerage Account number xxxx7892 |
| 5 | 29. | Alliance Bernstein Brokerage Account number xxxx7888 |
| 6 | 30. | Alliance Bernstein Brokerage Account number xxxx6485 |
| 7 | 31. | Republic Bank of Arizona Brokerage Account number xxxx2485 |
| 8 | 32. | Republic Bank of Arizona Brokerage Account number xxxx1897 |
| 9 | 33. | Republic Bank of Arizona Brokerage Account number xxxx3126 |
| 10 | 34. | Republic Bank of Arizona Certificate of Deposit xxxxxx8316 |
| 11 | 35. | Republic Bank of Arizona Certificate of Deposit xxxxxx8324 |
| 12 | 36. | Republic Bank of Arizona Certificate of Deposit xxxxxx8332 |
| 13 | 37. | Republic Bank of Arizona Certificate of Deposit xxxxxx8103 |
| 14 | 38. | Republic Bank of Arizona Certificate of Deposit xxxxxx8162 |
| 15 | 39. | Republic Bank of Arizona Certificate of Deposit xxxxxx8189 |
| 16 | 40. | Paul Hastings LLP Account number xxxxx0457 |
| 17 | 41. | Global Trading Solutions xxx7177 |
| 18 | 42. | K&H Bank Account number xxxxxxxxxxxxxxxxxxxxxxxx1210 |
| 19 | 43. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5803 |
| 20 | 44. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5801 |
| 21 | 45. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx5805 |
| 22 | 46. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2226 |
| 23 | 47. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2231 |
| 24 | 48. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx2230 |
| 25 | 49. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4194 |
| 26 | 50. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4196 |
| 27 | 51. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx4198 |
| 28 | 52. | Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8083 |

1    53.    Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8086

2    54.    Fio Bank Account number xxxxxxxxxxxxxxxxxxxx8080

3    55.    Bank Frick Account number xxxxxxxxxxxxxxxx LI090x

4    56.    Bank Frick Account number xxxxxxxxxxxxxxxx LI300x

5    57.    Bank Frick Account number xxxxxxxxxxxxxxxx LI740x

6    58.    Bank Frick Account number xxxxxxxxxxxxxxxx LI900x

7    59.    Knab Bank Account number xxxxxxxxxxxxxx7664

8    60.    Rabo Bank Account number xxxxxxxxxxxxxx2452

9    61.    Rabo Bank Account number xxxxxxxxxxxxxx4721

10    62.    Acacia Conservation Fund Brokerage Account number x2020

11    63.    Saxo Payments Account number x1262

12    64.    AS LHV Pank Account number xxxxxxxxxxxxxxxx4431

13    65.    Bitcoin Wallet -6Lix5 in the amount of 6 BTC

14    66.    Bitcoin Wallet -6Lix5 in the amount of 199.99995716 BTC

15    67.    Bitcoin Wallet -6Lix5 in the amount of 404.9984122 BTC

16    68.    JP Morgan Chase Bank account number xxxxx4455 in the amount of $699,940

17    69.    JP Morgan Chase Bank account number xxxxx4455 in the amount of $106,988.41

18    70.    JP Morgan Chase Bank account number xxxxx4455 in the amount of $499,910

19    71.    JP Morgan Chase Bank account number xxxxx4455 in the amount of $50,000

20    72.    Bitcoin Cash Wallet –t8v7e in the amount of 3,673.59306905 BCH

21    73.    Litecoin Wallet -goaeV in the amount of 16,310.79413202 LTC

22    74.    Bitcoin Wallet -6Lix5 in the amount of 173.97319 BTC

23    75.    Bitcoin Cash Wallet –t8v7e in the amount of 55.5 BCH

24    76.    Bitcoin Wallet -6Lix5 in the amount of 411.00019 BTC

25    77.    Bitcoin Wallet -6Lix5 in the amount of 2.00069333 BTC

26    78.    Bitcoin Wallet -6Lix5 in the amount of 136.6544695 BTC

27    79.    Bitcoin Cash Wallet –t8v7e in the amount of 73.62522241 BCH

28    80.    Litecoin Wallet –goaeV in the amount of 783.9735116 LTC

1   81.   Bitcoin Gold Wallet -KK1mJ in the amount of 509.81904619 BTG

2   82.   Crypto Capital account number x1124

3   83.   Crypto Capital account number x1933

4   84.   Any and all bank funds, securities, cryptocurrency, or other assets on deposit or

5         seized from an account held at Kraken in the name of Ad Tech BV.

6   85.   JP Morgan Chase Bank account number xxxxx4155 in the amount of $42,500

7   86.   Alliance Bernstein Brokerage account x7889

8   87.   Alliance Bernstein Brokerage account x0582

9   88.   Midfirst Bank account x4139

10  89.   Crypto Capital account number x6886

11  Such property further includes, but is not limited to, the following domain names:

12  1.    admoderation.com (Versio)

13  2.    admoderators.com (Versio)

14  3.    adnet.ws (NetNames)

15  4.    adplace24.com (Versio)

16  5.    adplaces24.com (Versio)

17  6.    adpost24.com (Versio)

18  7.    adpost24.cz (GoDaddy)

19  8.    adquick365.com (Versio)

20  9.    adreputation.com (NetNames)

21  10.   ads-posted-mp.com (Versio)

22  11.   adsplace24.com (Versio)

23  12.   adspot24.com (Versio)

24  13.   adspots24.com (Versio)

25  14.   adsspot24.com (Versio)

26  15.   adtechbv.co.nl (NetNames)

27  16.   adtechbv.com (NetNames)

28  17.   adtechbv.nl (NetNames)

| | | |
|---|---|---|
| 1 | 18. | advert-ep.com (Versio) |
| 2 | 19. | adverts-mp.com (Versio) |
| 3 | 20. | axme.com (GoDaddy) |
| 4 | 21. | back0age.com (NetNames) |
| 5 | 22. | backpa.ge (NetNames) |
| 6 | 23. | backpaee.com (NetNames) |
| 7 | 24. | backpage-insider.com (NetNames) |
| 8 | 25. | backpage.adult (NetNames) |
| 9 | 26. | backpage.ae (NetNames) |
| 10 | 27. | backpage.at (NetNames) |
| 11 | 28. | backpage.ax (NetNames) |
| 12 | 29. | backpage.be (NetNames) |
| 13 | 30. | backpage.bg (European domains) |
| 14 | 31. | backpage.bg (NetNames) |
| 15 | 32. | backpage.ca (NetNames) |
| 16 | 33. | backpage.cl (NetNames) |
| 17 | 34. | backpage.cn (European domains) |
| 18 | 35. | backpage.cn (NetNames) |
| 19 | 36. | backpage.co.id (NetNames) |
| 20 | 37. | backpage.co.nl (European domains) |
| 21 | 38. | backpage.co.nl (NetNames) |
| 22 | 39. | backpage.co.nz (NetNames) |
| 23 | 40. | backpage.co.uk (NetNames) |
| 24 | 41. | backpage.co.ve (NetNames) |
| 25 | 42. | backpage.co.za (NetNames) |
| 26 | 43. | backpage.com (NetNames) |
| 27 | 44. | backpage.com.ar (NetNames) |
| 28 | 45. | backpage.com.au (NetNames) |

46.   backpage.com.ph (NetNames)

47.   backpage.cz (NetNames)

48.   backpage.dk (NetNames)

49.   backpage.ec (NetNames)

50.   backpage.ee (European domains)

51.   backpage.ee (NetNames)

52.   backpage.es (NetNames)

53.   backpage.fi (European domains)

54.   backpage.fi (NetNames)

55.   backpage.fr (European domains)

56.   backpage.fr (NetNames)

57.   backpage.gr (European domains)

58.   backpage.gr (NetNames)

59.   backpage.hk (European domains)

60.   backpage.hk (NetNames)

61.   backpage.hu (European domains)

62.   backpage.hu (NetNames)

63.   backpage.ie (NetNames)

64.   backpage.in (NetNames)

65.   backpage.it (NetNames)

66.   backpage.jp (NetNames)

67.   backpage.kr (NetNames)

68.   backpage.lt (NetNames)

69.   backpage.lv (European domains)

70.   backpage.lv (NetNames)

71.   backpage.me (NetNames)

72.   backpage.mx (NetNames)

73.   backpage.my (NetNames)

| | | |
|---|---|---|
| 1 | 74. | backpage.net (NetNames) |
| 2 | 75. | backpage.nl (NetNames) |
| 3 | 76. | backpage.no (European domains) |
| 4 | 77. | backpage.no (NetNames) |
| 5 | 78. | backpage.nz (NetNames) |
| 6 | 79. | backpage.pe (NetNames) |
| 7 | 80. | backpage.ph (NetNames) |
| 8 | 81. | backpage.pk (NetNames) |
| 9 | 82. | backpage.pl (NetNames) |
| 10 | 83. | backpage.porn (NetNames) |
| 11 | 84. | backpage.pt (NetNames) |
| 12 | 85. | backpage.ro (European domains) |
| 13 | 86. | backpage.ro (NetNames) |
| 14 | 87. | backpage.se (NetNames) |
| 15 | 88. | backpage.sex (NetNames) |
| 16 | 89. | backpage.sg (NetNames) |
| 17 | 90. | backpage.si (European domains) |
| 18 | 91. | backpage.si (NetNames) |
| 19 | 92. | backpage.sk (European domains) |
| 20 | 93. | backpage.sk (NetNames) |
| 21 | 94. | backpage.sucks (NetNames) |
| 22 | 95. | backpage.tw (NetNames) |
| 23 | 96. | backpage.uk (NetNames) |
| 24 | 97. | backpage.uk.com (NetNames) |
| 25 | 98. | backpage.us (NetNames) |
| 26 | 99. | backpage.vn (NetNames) |
| 27 | 100. | backpage.xxx (NetNames) |
| 28 | 101. | backpage.xyz (NetNames) |

| | | |
|---|---|---|
| 1 | 102. | backpagecompimp.com (NetNames) |
| 2 | 103. | backpagecompimps.com (NetNames) |
| 3 | 104. | backpagepimp.com (NetNames) |
| 4 | 105. | backpagepimps.com (NetNames) |
| 5 | 106. | backpagg.com (NetNames) |
| 6 | 107. | backpagm.com (NetNames) |
| 7 | 108. | backpagu.com (NetNames) |
| 8 | 109. | backpaoe.com (NetNames) |
| 9 | 110. | backpawe.com (NetNames) |
| 10 | 111. | backqage.com (NetNames) |
| 11 | 112. | backrage.com (NetNames) |
| 12 | 113. | backxage.com (NetNames) |
| 13 | 114. | bakkpage.com (NetNames) |
| 14 | 115. | bcklistings.com (NetNames) |
| 15 | 116. | bestofbackpage.com (NetNames) |
| 16 | 117. | bestofbigcity.com (NetNames) |
| 17 | 118. | bickpage.com (NetNames) |
| 18 | 119. | bigcity.com (NetNames) |
| 19 | 120. | bpclassified.com (NetNames) |
| 20 | 121. | bpclassifieds.com (NetNames) |
| 21 | 122. | carlferrer.com (NetNames) |
| 22 | 123. | clasificadosymas.com (NetNames) |
| 23 | 124. | clasificadosymas.net (NetNames) |
| 24 | 125. | clasificadosymas.org (NetNames) |
| 25 | 126. | classifiedsolutions.co.uk (NetNames) |
| 26 | 127. | classifiedsolutions.net (NetNames) |
| 27 | 128. | classyadultads.com (Versio) |
| 28 | 129. | columbusbackpage.com (NetNames) |

130. connecticutbackpage.com (NetNames)

131. cracker.co.id (NetNames)

132. cracker.com (NetNames)

133. cracker.com.au (NetNames)

134. cracker.id (NetNames)

135. cracker.net.au (NetNames)

136. crackers.com.au (NetNames)

137. crackers.net.au (NetNames)

138. ctbackpage.com (NetNames)

139. dallasbackpage.com (NetNames)

140. denverbackpage.com (NetNames)

141. easypost123.com (Versio)

142. easyposts123.com (Versio)

143. emais.com.pt (NetNames)

144. evilempire.com (NetNames)

145. ezpost123.com (Versio)

146. fackpage.com (NetNames)

147. fastadboard.com (Versio)

148. guliettagroup.nl (Versio)

149. htpp.org (NetNames)

150. ichold.com (NetNames)

151. internetspeechfoundation.com (nameisp)

152. internetspeechfoundation.org (nameisp)

153. loads2drive.com (NetNames)

154. loadstodrive.com (NetNames)

155. loadtodrive.com (NetNames)

156. losangelesbackpage.com (NetNames)

157. mediafilecloud.com (NetNames)

158.   miamibackpage.com (NetNames)

159.   minneapolisbackpage.com (NetNames)

160.   mobileposting.com (Versio)

161.   mobilepostings.com (Versio)

162.   mobilepostlist.com (Versio)

163.   mobilposting.com (Versio)

164.   naked.city (NetNames)

165.   nakedcity.com (NetNames)

166.   newyorkbackpage.com (NetNames)

167.   paidbyhour.com (NetNames)

168.   petseekr.com (NetNames)

169.   petsfindr.com (NetNames)

170.   phoenixbackpage.com (NetNames)

171.   posteasy123.com (Versio)

172.   postfaster.com (NetNames)

173.   postfastly.com (NetNames)

174.   postfastr.com (NetNames)

175.   postonlinewith.com (Versio)

176.   postonlinewith.me (Versio)

177.   postseasy123.com (Versio)

178.   postsol.com (GoDaddy)

179.   postszone24.com (Versio)

180.   postzone24.com (Versio)

181.   postzones24.com (Versio)

182.   rentseekr.com (NetNames)

183.   results911.com (NetNames)

184.   sandiegobackpage.com (NetNames)

185.   sanfranciscobackpage.com (NetNames)

1 186. seattlebackpage.com (NetNames)

2 187. sellyostuffonline.com (Versio)

3 188. sfbackpage.com (NetNames)

4 189. simplepost24.com (Versio)

5 190. simpleposts24.com (Versio)

6 191. svc.ws (NetNames)

7 192. truckrjobs.com (NetNames)

8 193. ugctechgroup.com (NetNames)

9 194. universads.nl (Versio)

10 195. villagevoicepimps.com (GoDaddy)

11 196. websitetechnologies.co.uk (NetNames)

12 197. websitetechnologies.com (NetNames)

13 198. websitetechnologies.net (NetNames)

14 199. websitetechnologies.nl (NetNames)

15 200. websitetechnologies.org (NetNames)

16 201. weprocessmoney.com (GoDaddy)

17 202. wst.ws (NetNames)

18 203. xn--yms-fla.com (NetNames)

19 204. ymas.ar.com (European domains)

20 205. ymas.br.com (European domains)

21 206. ymas.br.com (NetNames)

22 207. ymas.bz (European domains)

23 208. ymas.bz (NetNames)

24 209. ymas.cl (European domains)

25 210. ymas.cl (NetNames)

26 211. ymas.co.bz (European domains)

27 212. ymas.co.bz (NetNames)

28 213. ymas.co.cr (European domains)

| | |
|---|---|
| 1 | 214.   ymas.co.cr (NetNames) |
| 2 | 215.   ymas.co.ni (European domains) |
| 3 | 216.   ymas.co.ni (NetNames) |
| 4 | 217.   ymas.co.ve (European domains) |
| 5 | 218.   ymas.co.ve (NetNames) |
| 6 | 219.   ymas.com (NetNames) |
| 7 | 220.   ymas.com.br (European domains) |
| 8 | 221.   ymas.com.br (NetNames) |
| 9 | 222.   ymas.com.bz (European domains) |
| 10 | 223.   ymas.com.bz (NetNames) |
| 11 | 224.   ymas.com.co (European domains) |
| 12 | 225.   ymas.com.co (NetNames) |
| 13 | 226.   ymas.com.do (European domains) |
| 14 | 227.   ymas.com.do (NetNames) |
| 15 | 228.   ymas.com.ec (European domains) |
| 16 | 229.   ymas.com.ec (NetNames) |
| 17 | 230.   ymas.com.es (European domains) |
| 18 | 231.   ymas.com.es (NetNames) |
| 19 | 232.   ymas.com.gt (European domains) |
| 20 | 233.   ymas.com.gt (NetNames) |
| 21 | 234.   ymas.com.hn (European domains) |
| 22 | 235.   ymas.com.hn (NetNames) |
| 23 | 236.   ymas.com.mx  (NetNames) |
| 24 | 237.   ymas.com.ni (European domains) |
| 25 | 238.   ymas.com.ni (NetNames) |
| 26 | 239.   ymas.com.pe (European domains) |
| 27 | 240.   ymas.com.pe (NetNames) |
| 28 | 241.   ymas.com.pr (European domains) |

242. ymas.com.pr (NetNames)

243. ymas.com.pt  (NetNames)

244. ymas.com.uy (European domains)

245. ymas.com.uy (NetNames)

246. ymas.com.ve (European domains)

247. ymas.com.ve (NetNames)

248. ymas.cr (European domains)

249. ymas.cr (NetNames)

250. ymas.do (European domains)

251. ymas.do (NetNames)

252. ymas.ec (European domains)

253. ymas.ec (NetNames)

254. ymas.es (European domains)

255. ymas.es (NetNames)

256. ymas.org (NetNames)

257. ymas.pe (European domains)

258. ymas.pe (NetNames)

259. ymas.pt (NetNames)

260. ymas.us (European domains)

261. ymas.us (NetNames)

262. ymas.uy (European domains)

263. ymas.uy (NetNames)

264. ymas.uy.com (European domains)

265. atlantabackpage.com (NetNames)

266. backpage.com.br (NetNames)

267. chicagobackpage.com (NetNames)

268. tampabackpage.com (NetNames)

b.     To the extent such property is not available for forfeiture, a sum of money

1  equal to the total value of such property.

2      3.      Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

3  Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52

4  through 100 of this Superseding Indictment shall forfeit substitute property, if, by any act

5  or omission of that defendant, the property described in the preceding paragraph, or any

6  portion thereof, cannot be located upon the exercise of due diligence; has been transferred,

7  sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court;

8  has been substantially diminished in value; or has been commingled with other property

9  that cannot be divided without difficulty.

A TRUE BILL

_S/_ _____
FOREPERSON OF THE GRAND JURY
Date:  July 25, 2018

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

BRIAN BENCZKOWSKI Assistant Attorney General
Criminal Division, U.S. Department of Justice

_S/_ _____
KEVIN M. RAPP
MARGARET PERLMETER
PETER KOZINETS
ANDREW STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

EXHIBIT N

EXHIBIT N

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-DJH |
|       Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al., | |
|       Defendants. | |

A three-month Jury Trial in this matter commenced on August 29, 2023. (Doc. 1741).  At the close of the Government's case, Defendants orally moved for a judgment of acquittal on all charges under Federal Rule of Criminal Procedure 29 ("Rule 29").  (Doc. 1903 at 19–93).  The Court exercised its discretion under Rule 29(b) to reserve its ruling until after the Jury returned its verdict.  (Doc. 1852).

On November 16, 2023, the Jury returned a verdict that found Defendant Michael Lacey ("Mr. Lacey") guilty of one count of International Concealment Money Laundering (Count 100)[1] and not guilty of one count of International Promotional Money Laundering (Count 63).  (Doc. 1978).  The Jury did not reach a verdict on the remaining counts against Mr. Lacey, which consisted of charges of Conspiracy to Commit Travel Act violations (Count 1); Travel Act violations (Counts 2–51); Conspiracy to Commit Money Laundering (Count 52); Domestic Concealment of Money Laundering (Counts 53–62); International Promotional Money Laundering (Counts 64–68); and Transactional Money Laundering (Counts 69, 70, 81, 83–84, 86, 88–92 and 94–99).  (*See* Docs. 1978; 1981).

---

[1] All "Count" references are to the Superseding Indictment (Doc. 230).

The Jury found Defendant Scott Spear ("Mr. Spear") guilty of Conspiracy to Commit Travel Act violations (Count 1); the Travel Act violations alleged in Counts 2–18; Conspiracy to Commit Money Laundering (Count 52); Domestic Concealment of Money Laundering (Counts 53–62); and Transactional Money Laundering (Counts 71–78, 85, and 93). He was found not guilty as to the Travel Act violations alleged in Counts 19–51, and the money laundering counts alleged in Counts 63–68.

Defendant John Brunst ("Mr. Brunst") was found guilty of Conspiracy to Commit Travel Act violations (Count 1); Conspiracy to Commit Money Laundering (Count 52); domestic Concealment Money Laundering (Counts 53–62), International Promotional Money Laundering (Counts 64–68); and Transactional Money Laundering (Counts 78–84, 86–93). He was found not guilty of all the Travel Act violations alleged in Counts 2–51, and of one count of International Promotional Money Laundering (Count 63).

Defendants Andrew Padilla ("Mr. Padilla") and Joye Vaught ("Ms. Vaught") were acquitted on all charges in the Superseding Indictment.[2]

Following the verdict, Messrs. Lacey, Brunst, and Spear (collectively, "Defendants") asked to supplement their oral Rule 29 Motions, which the Court granted. Those supplemental motions are now fully briefed.[3] Defendants have also jointly filed a Motion for New Trial (Doc. 2009) under Federal Rule of Criminal Procedure 33 ("Rule 33"), which is also fully briefed.[4]

The Court now issues its ruling.[5]

/ / /

---

[2] In light of their acquittal, Mr. Padilla and Ms. Vaught's oral Rule 29 motions are denied as moot.

[3] Each Defendant joined in their co-Defendant's Supplemental Motion. The briefing on Mr. Lacey's Supplemental Rule 29 Motion is at Docs. 2004; 2020; 2033; the briefing on Mr. Spear's Supplemental Rule 29 Motion is at Docs. 2006; 2021; 2030; and the briefing on Mr. Brunst's Supplemental Rule 29 Motion is at Docs. 2007; 2019; 2029.

[4] The Government's Response is at Doc. 2022 and the Defendants' Reply is at Doc. 2031.

[5] Defendants each request oral argument on their Motions. The Court finds that further oral argument will not aid the Court's decisional process. *See e.g., Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

## I.     BACKGROUND[6]

Considered in the light most favorable to the Government, its proof at trial established the following:

Launched in 2004 in Phoenix, Arizona, Backpage.com ("Backpage") was an online website offering classified ads for a variety of goods and services. (Trial Tr., Doc. 1786 at 6:6–11). Defendants owned Backpage with Mr. James Larkin ("Mr. Larkin")[7] from its inception in 2004 until the website was sold to Mr. Carl Ferrer ("Mr. Ferrer") in April of 2015. (Trial Tr., Doc. 1786 at 11:23–12:5; 78:25–79:1; Trial Ex. 5). Defendants had leadership roles in Backpage's parent company Village Voice Media ("Village Voice") during that time: Mr. Lacey served as Chief Editorial Officer; Mr. Brunst served as Chief Financial Officer ("CFO"); and Mr. Spear was an Executive Vice President ("VP"). (Trial Ex. 5). Mr. Larkin was the Chief Executive Officer ("CEO"). (*Id.*) From 2004 to 2018, Mr. Ferrer was a project manager at Backpage, then became a sales and marketing director of Backpage. (Trial Tr., Doc. 1786 at 5:25–6:1; 16:4–9). Mr. Spear was Mr. Ferrer's immediate supervisor. (*Id.* at 10:5–20). Mr. Ferrer testified that Messrs. Spear, Larkin and Brunst were his superiors. (*Id.* at 35).

Mr. Ferrer testified that Backpage was started as a competitor to Craigslist, an online advertising site that "was eroding into the revenue of [Village Voice] newspapers." (Trial Tr., Doc. 1786 at 25:24–25). To generate revenue, Backpage initially decided that it would only charge for "Adult" ads. (*Id.* at 26:10–11). The Adult section on Backpage contained the categories "Female Escorts"; "Male Escorts"; "Transsexual Escorts"; "Body Rubs"; "Adult Jobs"; and "Phone and Web." (*Id.* at 6:18–20). Mr. Ferrer characterized the ads in the Female Escort section of Backpage between 2004 and 2009 as prostitution ads. (*Id.* at 7:10–12). These types of ads were profitable because escorts "needed repeat business" so they would often post their ads every day. (Trial Tr., Doc. 1900 at 96:1–15;

---

[6] The Court's review of the trial evidence was significantly hampered by the fact that neither the Government nor Defendants provided specific citations to the Court's docket in their briefings.

[7] Mr. Larkin's death preceded the commencement of trial.

95:4–96:19).

Messrs. Spear and Ferrer soon realized that Backpage's "Female Escort" section was by far the most profitable section, and so they focused Backpage's growth efforts accordingly. (Trial Tr., Doc. 1786 at 90:12–91:22; Trial Exs. 1056, 1056a, 1057; Trial Tr., Doc. 1900 at 96:1–15). After Craigslist closed its Adult section in 2010, Backpage experienced exponential growth in "revenue from online prostitution ads." (Trial Tr., Doc. 1793 at 35:23–36:9). From 2010 through 2012, Backpage's Adult section yielded $138,850,097.36 compared to $208,658.90 from its non-Adult sections, i.e., a 94.2% difference in profits. (Trial Ex. 1480).

Mr. Ferrer testified at length about Defendants' involvement in the marketing strategies used to grow and/or maintain Backpage's Female Escort section; Defendants' efforts to fend off outside groups' attempts to shut Backpage down; as well as the Defendants' knowledge of Backpage's business practices, Backpage's banking issues, and the sale of Backpage to Mr. Ferrer in 2015.

A.      "Content Aggregation"

Mr. Ferrer stated that Mr. Spear directed the roll-out of Backpage's "content aggregation" marketing strategy in the early years of Backpage. (Trial Tr., Doc. 1786 at 26:16–24). "Content aggregation" was considered the "internal code for stealing ads from Craigslist"—and more specifically, primarily stealing ads from Craiglist's "Erotic Services" section. (Id.) This strategy required staff to identify an Adult escort ad on Craigslist and repost it on Backpage in hopes that the original posters and any responding users would start paying to post ads on Backpage instead of Craigslist. (Id. at 27:3–14). Mr. Spear and Mr. Ferrer presented the idea to Mr. Brunst as a strategy to meet growth goals in 2009 because Mr. Brunst's approval was needed to fund the staffing needed to execute this strategy. (Trial Tr., Doc. 1792 at 42:16–43:11; Trial Tr., Doc. 1786 at 30:6–12 and 89:1-90:1–7 (discussing plan to "seed the site, the Female Escorts category, with 200 independent escorts")). Mr. Brunst approved the budget plan and Mr. Spear authorized Mr. Ferrer to use the strategy "in every major metro market in the U.S." (Trial Tr., Doc.

1786 at 29:24–25; Trial Tr., Doc. 1791 at 16:18–20:9; Trial Exs. 10 and 10a).  Around

2010, when Craigslist dropped its Adult section, this type of content aggregation strategy

was no longer necessary because Backpage then had "the monopoly" on Adult ads.  (Trial

Tr., Doc. 1786 at 20–23).

## B.   Backpage's Relationship with "The Erotic Review"

The "secret sauce" to increasing Backpage's adult ad revenue, as characterized by

Mr. Ferrer, was a hyperlink exchange agreement Backpage had with The Erotic Review

("TER"), a prostitution review website described as "Yelp for prostitution."  (Trial Tr.,

Doc. 1786 at 7) ("Johns who frequent prostitutes . . . post reviews in TER").  Starting

around 2006 or 2007, when a person posted a review of their experience on TER, TER

would include a link to the ad on Backpage, and vice versa.  (Trial Tr., Doc. 1786 at 32:22–

33:7; 39:12–15; Trial Tr., Doc. 1853 at 134:20–136:9).  Under increasing pressure from

outside groups to remove links to the TER, Backpage ceased including the hyperlinks in

their Adult ads in 2011 or 2012, but still allowed posters to include their TER "ID number."

(Trial Tr., Doc. 1786 at 39:22–24; 40:7–10).  TER ID numbers remained on Backpage ads

through 2017.  (*Id.* at 40:15).  The TER relationship with Backpage also included a "banner

ad exchange program" where each website featured banner-like ads for the other on their

respective websites.  (*Id.* at 35:18–37:2).  For years, Backpage paid TER $4,000 per month

as part of this relationship.  (*Id.*)

There was evidence showing Messrs. Spear and Brunst were aware of the nature

and importance of Backpage's relationship with TER.  Mr. Ferrer discussed the importance

of TER referral traffic with Messrs. Spear and Brunst.  (Trial Tr., Doc. 1786 at 41:1–6).

Mr. Spear was an author of the 2008 budget plan that was presented to Messrs. Larkin and

Brunst detailing the TER partnership.  That plan noted that Backpage had "struck a deal

with TheEroticReview.com, TER, with reciprocal links it created huge brand awareness in

this niche industry and increased page views from TER by 120,000 per day."  (Trial Ex.

23 at 3; Trial Tr., Doc. 1791 at 70:10–73:20; Trial Tr., Doc. 1972 at 43:12–44:1; Trial Exs.

19, 20).  Mr. Ferrer also submitted TER invoices to Messrs. Spear and Brunst for approval.

- 5 -

(Trial Tr., Doc. 1792 at 27:17–28:6, 35:11–12).  Mr. Spear signed the checks for these payments.  (Trial Tr., Doc. 1853 at 142:13–143:5).  Mr. Spear closely tracked the relationship with TER and according to Mr. Ferrer, Mr. Spear understood that "the traffic from The Erotic Review was very, very important for Backpage's success."  (Trial Tr., Doc. 1792 at 65:5–24, 84:24–85:4).

Mr. Ferrer also testified that Messrs. Spear, Brunst, and Larkin regularly received Google Analytics reports showing TER as the number one source of non-search engine referrals to Backpage.  (Trial Tr., Doc. 1786 at 35:6–12, 41:1–7; Trial Tr., Doc. 1791 at 21:21–27:5; Trial Exs. 19, 986, 986a, 1151, 1151a, 1919, 1919a, 1924, 1926).

### C. "Super Posters"

Backpage also developed an affiliate program with what Mr. Ferrer described as bulk prostitution advertisers, or "super posters." These super posters would have "thousands of prostitution ads that they could bring to the site." (Trial Tr., Doc. 1786 at 41:8–19).  Messrs. Larkin and Spear sent Mr. Ferrer to New York City to meet with several of these posters in person.  (*Id.* at 41:20–42:23).  In exchange for posting their ads on Backpage, Backpage gave these super posters VIP treatment, including access to managers like Mr. Ferrer who could provide them advice on how to tailor their ads for Backpage. (Trial Tr., Doc. 1786 at 46:23–47:4).

### D. Efforts to Moderate Explicit Ad Content

Mr. Ferrer also testified extensively about Backpage's efforts to moderate ads that otherwise contained sexual content or express offers for prostitution.  He told the Jury that these efforts started as early as 2006 with a PowerPoint prepared by Mr. Spear that aimed at getting rid of ad images depicting sex acts, like "a woman giving a man oral sex." (Trial Tr., Doc. 1786 at 58:2–19 (stating that Mr. Spear coined a standard of "between Hustler and Playboy . . . [t]hat meant sex act pics needed to go and you could still have full nudity but couldn't have extreme closeups of genitalia"), 65:1).  The removal of such images, however, did not mean the whole ad was removed or that the user was blocked from posting on Backpage.  (*Id.* at 59:3–6, 60:7, 66:7–10).  "[T]he moderation department's main

priority was to not ban prostitution advertisers but to provide tools and mechanisms to coach them.  It was about growing revenue and not removing illegal content." (Trial Tr., Doc. 1824 at 25:18–21).  Mr. Spear would direct Mr. Ferrer to scrub ads to edit and remove sex act images and sex act language.  (Trial Tr., Doc. 1792 at 9–11).  Mr. Ferrer told TER that Mr. Spear wanted the ads to be "less escort-ish", meaning that if the ads looked less like prostitution they could maintain credibility.  (Trial Tr., Doc. 1792 at 60–61; Trial Ex. 574).  Mr. Ferrer explained that "[w]e wanted to keep that veneer of credibility of being like a Craigslist even though we were entirely -- almost entirely prostitution head-based revenue." (Trial Tr., Doc. 1792 at 60:25–61:2).

Backpage also began sanitizing the site of certain "terms [that] made the ads more obvious prostitution[.]" (Trial Tr., Doc. 1786 at 60:8–10, 60:15–17).  For example, the terms "incall and outcall" were terms associated with prostitution and indicated whether the prostitute would come to the customer, or the customer would go to the prostitute. (Trial Tr., Doc. 1923 at 60).  Mr. Ferrer testified that they "started removing those words from the ad but not deleting the ad." (*Id.* at 60:17–18).  Mr. Spear was responsible for Backpage's terms of use, which he continually modified.  (Trial Tr., Doc. 1791 at 14:15–21).  He also continued to approve changes to moderation guidelines.  (Trial Tr., Doc. 1808 at 92:10–19; Trial Ex. 1612b; Trial Tr., Doc. 1810 at 98:14–19; Trial Exs. 725, 725b).  Mr. Ferrer said Mr. Spear approved changes to the terms and images that were allowed and sent Mr. Ferrer specific emails with ads "that need to be cleaned up, edited." (Trial Tr., Doc. 1791 at 92:71–0; Trial Tr., Doc. 1792 at 10:2–8).  Messrs. Spear and Ferrer also had knowledge of specific terms that needed to be changed, for example, changing "Greek" to "G-R-3-3-K" (Trial Tr., Doc. 1972 at 85–88; Trial Exs. 585, 585a); "hooker" to "Female Escort" (Trial Tr., Doc. 1786 at 90–91; Trial Exs. 1056 and 1056a); and using the term "roses" for "cash" (Trial Tr., Doc. 1793 at 13–14).  Mr. Ferrer would alert Mr. Spear when local papers raised concerns about terms used in Backpage ads, or when advertisers complained that their ads were being removed for including coded terms.  (Trial Tr., Doc. 1791 at 27–35; Trial Ex. 2).  Mr. Spear was alerted to these issues because he was Mr. Ferrer's boss and had the ability to resolve the conflict.  (*Id.*)

- 7 -

Mr. Ferrer testified that ad content moderation became increasingly challenging as they had to clean up ads in various markets, like South Carolina, where they were under scrutiny. (Trial Tr., Doc. 1792 at 73–75; Trial Ex. 579). Ultimately, Mr. Spear decided to hire a company called El Camino to assist with ad clean-up efforts. (Trial Tr., Doc. 1793 at 86–87). Messrs. Spear, Larkin, and Brunst approved the needed budget increases for content moderation, with Mr. Spear responding to one such request with: "Approved. Go get em." (Trial Tr., Doc. 1792 at 106:21–107:2; Trial Tr., Doc. 1793 at 31:13). Near the end of 2012, Messrs. Larkin, Brunst, and Spear asked Mr. Ferrer to provide a comparison of revenue growth by sections from October 2010 to November 2012. (Trial Tr., Doc. 1811 at 64:6–66:1; Trial Exs. 355, 355b). The comparison showed huge growth in Adult compared to all other sections, which Mr. Ferrer attributed to Backpage's moderation strategy. (Trial Tr., Doc. 1811 at 65:19–20; 65:23–66:1).

In 2012, Backpage hired attorney Elizabeth McDougall to supervise content moderation of Backpage ads.[8] Despite her role, Mr. Ferrer said "she was sidelined a good portion" of the time. (Trial Tr., Doc. 1831 at 59:17–60:7; 60:9–10).

### E.      Responses to Public and Law Enforcement Concerns

Following the shutdown of the Adult escort ads on Craigslist and subsequent migration of ads to Backpage in 2010 and after several State Attorneys Generals ("AGs") began criticizing Backpage's "rampant" prostitution advertising, Backpage started receiving thousands of prostitution investigation subpoenas. (*See, e.g.*, Trial Tr., Doc. 1791 at 62:16–25; Trial Tr., Doc. 1786 at 47:9–49:12; Trial Ex. 52). Messrs. Spear, Ferrer, and Larkin had "watched Craigslist be attacked by the Attorneys General and were very concerned that [they were] next[.]" (Trial Tr., Doc. 1786 at 48:18–25, 49:7–15).

The number of subpoenas became so plentiful that Messrs. Spear and Brunst approved hiring staff to respond to them. (Trial Tr., Doc. 1791 at 62:11–15, 63:11–21, 65:4–9). Mr. Lacey became aware that Backpage was receiving such subpoenas and in April 2010, he asked Mr. Spear whether there was evidence of child trafficking on the site.

---

[8] Defendants refused to waive the attorney-client privilege regarding their communications with Ms. McDougall.

1    Mr. Spear replied that: "[w]e have had subpoenas that deal with this exact issue. . . . We

2    get a ton of subpoenas that we comply with on a daily basis."  (Trial Ex. 804).

3            Mr. Ferrer testified that they discussed a "slow dance strategy with the Attorney

4    Generals" that Mr. Ferrer described as giving the AGs "very, very little but creat[ing] the

5    impression that we're doing something," without harming revenue.  (Trial Tr., Doc. 1792

6    at 93:9–22, 94:1–4).  To gain the AGs' "blessing," Messrs. Larkin and Spear directed Mr.

7    Ferrer to "not throw the baby out with the bathwater" and "implement the changes

8    gradually, [so] we won't lose revenue[.]"  (Trial Tr., Doc. 1795 at 25:20–26:7; Trial Ex.

9    1021; Trial Tr., Doc. 1809 at 30:3–4).  Mr. Ferrer continued to meet with Messrs. Larkin

10   and Spear about these changes, communicated the results to staff, and solicited further

11   changes "to get approved by [Mr. Spear]."  (Trial Tr., Doc. 1808 at 20:11–14, 22:11–12;

12   Trial Exs. 73, 610).

13           In late 2010, Backpage learned CNN was planning an exposé on Backpage.  (Trial

14   Tr., Doc. 1793 at 80:20–21).  It showed CNN reporter Amber Lyon posting an ad of herself

15   on Backpage's Escorts section, using text from an old Backpage ad offering a 12-year-old

16   girl for sex.  (Trial Ex. 1052b1).  When Lyon posted her ad, her phone immediately

17   "start[ed] ringing off the hook." (Trial Tr., Doc. 1808 at 59:16–23).  Messrs. Lacey, Spear,

18   and Brunst tried to stop rebroadcasts of the story.  (*Id.* at 60:10–62:13).  Backpage

19   management watched and discussed the CNN report in early 2011.  (*Id.* at 43:15–44:7).

20           Following the broadcast, Backpage faced more pressure to remove any references

21   to TER.  (Trial Tr., Doc. 1808 at 82:7–16).  By January 2011, Messrs. Spear and Ferrer

22   agreed that moderators should remove "TER links in ads," though they still allowed "users

23   to put [in] TER IDs (just no live links)."  (Trial Tr., Doc. 1808 at 24:10–19; 82; Trial. Exs.

24   73, 647).  Mr. Ferrer testified that removing the links would not hurt revenue because the

25   johns responding to Backpage prostitution ads knew "that when it says 'highly reviewed'

26   and then an ID number that [TER] is the place to go" to look for the advertiser's review.

27   (Trial Tr., Doc. 1808 at 25:12–19).

28           Backpage also hired internet safety experts, who recommended screening ads

- 9 -

1   bought with prepaid cards because this was an "indicator [of] a potential trafficking ad."

2   (Trial Tr., Doc. 1809 at 36:2–8).  Messrs. Spear, Larkin, and Ferrer rejected that change,

3   because "up to 70 percent of our transactions came from prepaid cards[.]"  (*Id.* at 36:9–

4   19).  They also ignored recommendations to completely remove ads visited from TER.  (*Id.*

5   at 37:13–38:11).

6           **F.     Backpage's Banking Problems**

7           By 2012, U.S. financial institutions were dropping Backpage as a customer due to

8   its reputation for hosting ads that were resulting in prostitution and human trafficking.

9   (Trial Ex. 2042).  In 2013, Backpage was dropped by its U.S.-based credit card processor,

10  Litle.   (Trial Tr., Doc. 1786 at 69:17–70:8).   That same year, Chase Bank informed

11  Backpage that it "was no longer accepting transactions from Backpage.com, due to their

12  involvement in human trafficking."  (Trial Ex. 173).  The banks' refusal to do business

13  with Backpage meant Backpage had to expend tremendous efforts in finding ways for users

14  to pay for ads.  (Trial Tr., Doc. 1812 at 29:7–16).  One example that proved successful was

15  Backpage's acceptance of the cash for credit Vanilla Visa card which enabled anonymous

16  payment for ads.  (Trial Tr., Doc 1786 at 75–76).

17          Mr. Ferrer testified that he worked closely with Messrs. Brunst, Spear, and Larkin

18  during this time "to secure credit card processing from Europe."  (Trial Tr., Doc. 1812 at

19  14:22–15:7).  For example, after Chase Bank stopped accepting Backpage transactions,

20  Backpage directed Chase credit card purchasers to e-Merchant Pay ("EMP"), a European

21  processor that would "use a different billing descriptor that won't say Backpage.com on

22  it." (Trial Tr., Doc. 1812 at 21:7–22; Trial Exs. 173; 1110).  In September 2013, Mr. Ferrer

23  wrote Messrs. Brunst and Spear about using Netcash, a Cyprus-based credit card processor.

24  (Trial Tr., Doc. 1812 at 13:3–8; Trial Ex. 1092).  In October 2013, Mr. Ferrer exchanged

25  emails with Mr. Brunst, copying Messrs. Larkin and Spear, about getting the CCBill

26  contract signed, and Mr. Ferrer's discussions with "JetPay" regarding other banking

27  solutions that would enable users to pay for Backpage ads.  (Trial Tr., Doc. 1812 at 31:12–

28  37:23; Trial Ex. 752).

1    Backpage also sought the assistance of an outside consultant.  In November 2013,

2    Mr. Ferrer sent Messrs. Larkin, Brunst, and Spear the consultant's recommendations on

3    credit card transactions.  (Trial Tr., Doc. 1812 at 37:24–40:13; Trial Ex. 175).  Those

4    recommendations included using names, internet addresses, and billing descriptors that

5    would not include the name "Backpage."  (Trial Tr., Doc. 1812 at 38:24–42:22; Trial Ex.

6    175).  The recommendations also included "load balancing across many banks with

7    different billing descriptors." (*Id.* at 38:10–23; Trial Ex. 175).  Mr. Ferrer explained that

8    this meant "adding a lot of banks" and "distributing . . . transactions" to stay below

9    thresholds that would otherwise trigger reviews by Mastercard and Visa.  (Trial Tr., Doc.

10   1812 at 38:10–23).  In implementing these recommendations, Backpage formed an entity

11   called Classified Solutions in England that could do credit card processing with EMP in

12   Bulgaria; it then spread payments from EMP across other banks including Borgun in

13   Iceland and Bank Frick in Liechtenstein.  (*Id.* at 43:18–44:6; Trial Tr., Doc. 1814 at 76:3;

14   Trial Ex. 6189).  Mr. Brunst, who continued to serve as Backpage's CFO, avoided using a

15   "backpage.com" email address because of the "reputational risk" of being associated with

16   Backpage.  (Trial Tr., Doc. 1812 at 14:2–9; 13:9–14:1).  Indeed, when a Backpage

17   employee asked Mr. Brunst whether they could replace their "backpage.com" email

18   addresses with "websitetechnologies.com," Mr. Brunst replied: "We need to think this thru

19   or all the work to separate it from BP will be lost."  (Trial Ex. 177).

20   Backpage executives also "opened up holding companies with innocuous names

21   like Classified Solutions, Payment Solutions, just general-sounding companies" that did

22   not say Backpage.  (Trial Tr., Doc. 1812 at 15:12–23; Trial Tr., Doc. 1853 at 74:13–14).

23   Mr. Ferrer testified that Mr. Brunst created a separate "shell company" called Website

24   Technologies, for the purpose of opening bank accounts under a name that was not

25   Backpage.  (Trial Tr., Doc. 1814 at 89:8–10; *see also* Trial Tr., Doc. 1812 at 28:19–26

26   ("We needed a name other than Backpage . . . . Brunst asked me for names and I suggested

27   Website Technologies and that's the name we ended up using."); Trial Tr., Doc. 1812 at

28   71:17–72:4 ("[Brunst] set up Website Technologies to handle payroll, 401(k) and to do

leases so he wants to ensure that its reputation is protected, not affiliated with Backpage."); Trial Tr., Doc. 1814 at 89:8–10 ("Posting Solutions was another shell company similar to, like, Website Technologies, very generic sounding company that we could open bank accounts with."). The money that flowed through Website Technologies, which Mr. Ferrer described as "the same company" as Backpage, derived "from postings in the Female Escorts section primarily." (Trial Tr., Doc. 1814 at 90:16–22; 11:23–12:4; *see also* Trial Tr., Doc. 1923 at 138 (Mr. Thai confirming that Website Technologies held Backpage.com revenue)).

When US Bank gave notice in April 2014 that it was dropping Backpage, Mr. Brunst informed Messrs. Spear, Ferrer, and others that Backpage would be moving "all banking under Website Technologies at BMO." (Trial Tr., Doc. 1812 at 72:5–73:4; Trial Exs. 178, 178a). That same month, Mr. Ferrer emailed Messrs. Brunst and Spear to tell them that Chase had "figured . . . out" that Backpage had temporarily succeeded in allowing customers to use Chase credit cards for adult ads by using "a different billing descriptor," "so we just have to change again." (Trial Ex. 1120; Trial Tr., Doc. 1812 at 90:17–24, 91:25–92:4).

### G. Sale of Backpage to Mr. Ferrer in 2015

As early as 2011, the Backpage owners were looking to sell the website, efforts that were led by Mr. Brunst. (Trial Tr., Doc. 1810 at 16:4–16:6, 17:11–18:2). Mr. Brunst asked Mr. Ferrer to help create a PowerPoint presentation to give to Backpage's potential buyers. (Trial Tr., Doc. 1810 at 15:17–16:6). That PowerPoint included a slide on revenue, which showed that nearly 80% of Backpage's revenue derived from the Female Escorts section and over 94% of the revenue was generated from the Adult category. (Trial Exs. 120 at 15, 17). Mr. Ferrer testified that "[i]n order to sell the site, we couldn't sell it as a prostitution review site so we had to make it look and sound like a general classified site." (Trial Tr., Doc. 1810 at 21:23–25). The PowerPoint presentation Brunst created and presented to buyers contained the statement that: "[m]aintaining a vibrant general purpose classifieds site strengthens Backpage's defensible market position in the Adult category:

1   Creates mainstream environment for site participants and allows 'plausible deniability' for

2   exposure." (Trial Ex. 120 at 17).  The Defendants discussed not sharing information of the

3   "prostitution ad marketing activities" with potential buyers.  (Trial Tr. Doc. 1786 at 76–

4   77).  These early attempts to sell Backpage were ultimately unsuccessful.

5       Mr. Ferrer testified that Backpage revenue from 2014 through 2015 was annually

6   around $150 to $160 million.  (Trial Tr., Doc. 1786 at 80:10–17).  In April 2015, Messrs.

7   Lacey, Larkin, Brunst, and Spear sold Backpage to Mr. Ferrer for approximately $600

8   million.  (Trial Tr., Doc. 1814 at 15:21; Trial Tr., Doc. 1923 at 130:19–21).  The sale

9   consisted of two loan agreements: a larger loan representing the sale of the U.S. portion of

10  Backpage (Trial Ex. 5427) and a smaller loan representing the sale of the foreign portion

11  of Backpage (Trial Ex. 5459).  Cereus Properties, a company owned by Messrs. Lacey,

12  Larkin, Brunst, and Spear, collected the interest and debt payments from the $600 million

13  loan. (Trial Tr., Doc. 1814 at 90:24–91:3).  Mr. Ferrer testified that the source of the money

14  that went to Cereus Properties "was the prostitution ads posted on Backpage."  (*Id.* at

15  91:16–17).

16      Mr. Ferrer testified that the sale of Backpage was intended to distance the

17  Defendants from Backpage's business of selling illegal ads for prostitution.  But Mr. Ferrer

18  also testified that even after the sale, both Messrs. Brunst and Spear stayed involved in the

19  business of Backpage.  For example, after Visa, Mastercard, and American Express

20  dropped Backpage in the middle of 2015, Mr. Brunst assisted Backpage in trying to obtain

21  credit card processing.  (Trial Tr., Doc. 1786 at 81:7–16).  Mr. Ferrer testified that Mr.

22  Brunst "was involved in the financial problems the company was having and wanted to

23  understand the revenue that was coming in and what our options were for banking and

24  when we might, you know, get the reserves coming from these other credit card

25  processors[.]" (*Id.* at 81:2–-82:3).  Either Mr. Ferrer or Backpage's CFO had contact with

26  Mr. Brunst "[a] minimum of a few times a week" from July 2015 going forward.  (Trial

27  Tr., Doc. 1786 at 82:4–8).  Mr. Brunst also helped find alternative methods for receiving

28  money from posters on Backpage, including receiving payment by cryptocurrency.  (Trial

Ex. 897; Trial Tr., Doc. 1814 at 78:19–79:19; 93:24–94:20).    Evidence showed that in January 2015, revenue from cryptocurrency amounted to $35,540.68, but by May 2016, it had reached a high of $3,564,376.24.  (Trial Ex. 1545).

### H.    Money Transfers and Transactions

Starting in 2015, the year that Backpage was sold to Mr. Ferrer, revenue from Backpage was split between Backpage, Website Technologies, and Ad Tech BV, a company registered in the Netherlands.  (Trial Tr. Doc. 1923 at 129–30; Trial Ex. 1481). Following the sale, and until the Backpage website was shut down by the federal government in 2018, revenue from Backpage was only sent to and divided between Website Technologies and Ad Tech BV.  (Trial Tr., Doc. 1923 at 131:23–132:1).

Mr. Ferrer testified that following the 2015 sale, Backpage proceeds going to Website Technologies derived "from postings in the Female Escort section primarily." (Trial Tr., Doc. 1814 at 90:20–22).  The Government's financial expert Quoc Thai ("Mr. Thai") described how money "relating to funds from Backpage.com and through the various entities ultimately land[ed] in the accounts of the defendants."  (Trial Tr., Doc. 1923 at 135:6-8).  Mr. Thai did not provide testimony as to the purpose of the transfers. His testimony, along with Mr. Ferrer's, formed much of the basis of the money laundering counts against the Defendants.

### 1.    18 U.S.C. § 1956 Charges: Counts 53–62 and 64–68

Mr. Thai testified that the transfers in Counts 53–62 for concealment money laundering against Messrs. Lacey, Brunst, and Spear were made from a Website Technologies bank account to a bank account held by Cereus Properties at Arizona Bank & Trust.  (Trial Tr., Doc. 1923 at 136–138; Trial Ex. 1479).  He said the transfers in these Counts occurred between the three-month period of May 18, 2016, and August 16, 2016, and totaled close to $17 million.  (*Id.*)  Cereus Properties "collected the interest and debt payments from the $600 million loan" from the sale of Backpage.  (Trial Tr., Doc. 1814 at 91:2–3).  Mr. Ferrer testified that the source of the monies paid to Cereus Properties "was

the prostitution ads posted on Backpage and/or Cracker.[9]"  (Trial Tr., Doc. 1814 at 90:3–7; 90:20–22; 91:16–17).  Mr. Thai testified that between December 31, 2015, to August 31, 2016, Website Technologies transferred a total of $39,249,211.37 to Cereus Properties.  (Trial Tr., Doc. 1923 at 148:22; Trial Ex. 1691).

Mr. Thai testified that the transfers in Counts 64–68 against Messrs. Lacey and Brunst for international promotional money laundering were made from a Netherlands bank account of Ad Tech B.V. to a bank account held by Cereus Properties.   (Trial Tr., Doc. 1928 at 150–51; Trial Ex. 1479).  These transfers occurred between August 5, 2016, and November 15, 2016, and totaled approximately $11.3 million.  (*Id.*)

## 2.    18 U.S.C. § 1957 Charges: Counts 69–99

### a.    Camarillo Holdings Transfers

Counts 69–77, and 85 charge Defendants with transactional money laundering related to transfers made from an entity called Camarillo Holdings, LLC ("Camarillo Holdings").  Mr. Thai testified that Camarillo Holdings was an entity owed by Defendants that would receive funds derived from Backpage to pay "the various owners and the various payroll responsibilities of, you know, the Backpage.com as a whole."  (Trial Tr., Doc. 1923 at 153:13–18; Trial Tr., Doc. 1898 at 15:2–3).  Mr. Brunst was the CFO of Camarillo Holdings.  (*Id.* at 153:23).   The evidence showed that between February 4 and 25, 2013, $6.5 million was transferred from a US Bank account held by Backpage.com to a BMO Harris Bank account held by Camarillo Holdings.  (Trial Ex. 1479).  Mr. Thai stated that between February 4, 2013, and June 9, 2014, transfers from this Backpage.com account to Camarillo Holdings amounted to approximately $99 million.  (Trial Tr., Doc. 1898 at 12:6–7).  All of these funds were Backpage proceeds.  (*Id.* at 12:8–9).

The specific transfers at issue in Counts 69–77, and 85 are transfers Messrs. Lacey and Spear made out of their personal bank accounts after receiving deposits from Camarillo Holdings.

---

[9] Mr. Ferrer testified that Cracker was a classified Australian site "that like Backpage, was predominantly prostitution."  (Trial Tr., Doc. 1813 at 24–25).

Counts 69 and 70 are against Messrs. Lacey and Brunst (presumedly because there was evidence that Mr. Brunst was CFO of Camarillo Holdings and a signor on that entity's bank account). Trial evidence showed that on May 17, 2013, and August 30, 2013, Camarillo Holdings transferred $10,194.87 to Mr. Lacey's Bank of America account and $3,0171,687.50 to Mr. Lacey's BMO Harris Bank account, respectively. (Trial Ex. 1479). Mr. Lacey subsequently transferred a check in the amount of $30,000.00 out of his Bank of America account and a cashier's check in the amount of $62,491.47 from his BMO Harris account to Stewart Title. (Trial Ex. 1479). Mr. Lacey's transfers to Stewart Title are the bases for Counts 69 and 70.

Counts 71–77 and 85 are against Mr. Spear. Trial evidence showed that between April 12, 2013, and June 11, 2014, in over 13 transactions, Camarillo Holdings transferred $2,672,770.54 to Spear's account at National Bank of Arizona. (Trial Ex. 1479). Mr. Thai testified that between April 12, 2013, to November 2, 2015, Camarillo Holdings transferred a total of $6,279,188.53 to Spear's account at National Bank of America. (Trial Tr., Doc. 1898 at 16–17; Trial Ex. 1689). The transfers forming the basis of Counts 71–77 were made between June 11, 2014, and December 1, 2015, out of Mr. Spear's National Bank of Arizona account. Count 71 is a $300,000.00 transfer to the Scott G. Spear & Ellona Spear Family Trust; Count 72 is a $200,000.00 transfer to Scott G. Spear TD Ameritrade; Count 73 is a $1,000,000.00 transfer to UBS Financial Services; Count 74 is a $250,000.00 transfer to Lincoln National Life; Count 75 is a $50,000.00 transfer to Industrial Property Trust; Count 76 is a $300,000.00 transfer to Ally Bank; and Count 77 is a $200,000.00 transfer to Wells Fargo Advisors. (Trial Ex. 1479). Count 85 relates to a July 22, 2016, $50,000.00 transfer from Mr. Spear's National Bank of Arizona account to a Strategic Storage Trust II, Inc. (*Id.*)

### b. Cereus Properties Transfers

Counts 78–84 and 85–93 charge Messrs. Lacey, Brunst, and Spear with transactional money laundering related to transfers made from Cereus Properties. Mr. Brunst was Cereus Properties' CFO and was a signatory on its bank accounts. (Trial Tr.,

Doc. 1898 at 20:8–25; 21:1–4).  Mr. Thai testified that Cereus Properties obtained all of its funds from Website Technologies, which in turn obtained all of its funds from Backpage proceeds.  (*Id.* at 19:22–25).

Counts 78–84 and 85–93 stem from transfers Cereus Properties made to bank accounts owned by Defendants and Mr. Larkin.  Mr. Thai testified that between January 11, 2016, and January 4, 2017, Cereus Properties transferred a total of $22,941,500.83 to Mr. Spear's National Bank of America account.  (Trial Ex. 1690; Trial Tr., Doc. 1898 at 19:13–15).  His review also showed that during the same period, Cereus Properties transferred a total of $30,353,596.20 to Mr. Lacey's accounts at Arizona Bank and Trust.  (Trial Ex. 1693; Trial Tr. Doc. 1898 at 23; Trial Ex. 1479).

Counts 78 and 93 are against Messrs. Spear and Brunst.  Mr. Thai testified that Cereus Properties transferred $133,045.00 to Spear's National Bank of America account on January 11, 2016 (Count 78), and another $141,444.00 on October 6, 2016 (Count 93).  (Trial Exs. 1479, 1690; Trial Tr., Doc. 1898 at 20; 29:6–9).

Counts 79, 80, 82, 87 are against Mr. Brunst.  Evidence showed that in the first month of 2016, Website Technologies had transferred $3,126,033.07 to Cereus Properties.  (Trial Exs. 1479; 1691; Trial Tr., Doc. 1898 at 21:8).  On January 26, 2016, Cereus Properties transferred $101,974.00 to Mr. Brunst's account at Wells Fargo Bank (Count 79) and on April 1, 2016, it transferred another $220,944.00 ) (Count 82).  (Trial Ex. 1479; Trial Tr., Doc. 1898 at 21:7–10).  Counts 80 and 87 relate to a $1,507,944.00 transfer on February 3, 2016, and a $1,206,356.00 transfer on October 6, 2016, from Cereus Properties to the accounts of Mr. Larkin.  (Trial Ex. 1479).

Counts 81, 86, 88, 89, 90, 91, and 92 are against Messrs. Lacey and Brunst.  They reflect transfers from Cereus Properties to various accounts of Mr. Lacey at Bank of America, Wells Fargo, and Arizona Bank and Trust between March 1, 2016, and October 6, 2016.  (Trial Ex. 1479; Trial Tr. Doc. 1898 at 22; 27–29).

Counts 83 and 84 are against Messrs. Lacey and Brunst.  They reflect transfers from Mr. Lacey's Arizona Bank and Trust account to Fidelity National Title Company.  (Trial

Ex. 1479).  The first transfer on June 27, 2016, for $397,500.00, was earnest money on a property Mr. Lacey purchased in San Francisco.  (Trial Ex. 1479; Trial Tr., Doc. 1898 at 25).  The second transfer on July 20, 2016, for $12,859,152.57, was the balance on the property.  (*Id.*)  Mr. Thai testified that these funds, like others, traced back to transfers that Website Technologies made to Cereus Properties, and Cereus Properties subsequently transferred to Mr. Lacey.  (Trial Tr., Doc. 1898 at 26:3–5).

### 3.    18 U.S.C. §§ 1956 and 1957 Charges Against Mr. Lacey: Counts 94–100

Counts 94–99 consist of five wire transfers made on January 29, 2016, each in the amount of $3.3 million, from Mr. Lacey's five annuity trust accounts at Arizona Bank and Trust to an IOLTA[10] account held by Mr. Lacey's attorney's firm at Johnson Bank.  On January 3, 2017, Mr. Lacey, through his attorney, transferred $16.5 million from the IOLTA account at Arizona Johnson Bank to a Primus Trust Company in Hungary for the benefit of Mr. Lacey at a Hungarian bank, K& H Bank.  (Trial Tr., Doc. 1898 at 30:10–12).  This transfer forms the basis of Count 100.

## II.   DEFENDANTS' RULE 29 MOTIONS

Rule 29 obligates the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  Fed. R. Crim. P. 29(a), (c).  However, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high."  *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).  "When evaluating a sufficiency challenge, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Singh*, 995 F.3d 1069, 1075 (9th Cir. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In so considering, the court "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw

---

[10] An IOLTA is an "Interest on Lawyers' Trust Account" which is a non-interest-bearing account a lawyer holds on behalf of a client for services not yet performed.

reasonable inferences from proven facts." *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) (internal quotation marks and citation omitted).  Stated differently, "the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or 'rule out every hypothesis except that of guilt beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (quoting *Jackson*, 443 U.S. at 326).  "[A]ny conflicts in the evidence are to be resolved in favor of the jury's verdict." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201–02 (9th Cir. 2000).

Defendants' Rule 29 Motions challenge the sufficiency of evidence on all the Counts on which they were charged and/or found guilty.  They also make various legal challenges to their convictions.  The Court will address each Count in turn.

### A.    Conspiracy to Facilitate the Promotion of Prostitution (Count 1)

The Jury found Messrs. Spear and Brunst guilty of conspiracy to commit Travel Act violations under 18 U.S.C. § 371 but did not reach a verdict on this charge as to Mr. Lacey.  "To prove a conspiracy under 18 U.S.C. § 371, the government must establish: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016) (citation and internal quotation marks omitted).

The Government's theory for this count was that between 2004–2018, there was an agreement among the Defendants to facilitate the promotion of prostitution businesses by posting their sex for money ads on Backpage, as charged in the Travel Act Counts; that each Defendant became a member of the conspiracy knowing of at least one of its objects— "to make money"—and intending to help accomplish it; and that one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy.  (Doc. 1998 at 24).

Defendants argue that they are entitled to judgments of acquittal on Count 1.  They contend the Government did not establish the existence of a conspiracy specifically related

to the ads charged in Counts 2–51.  (Doc. 2007 at 6–8).  Defendants also argue that they cannot be guilty of conspiracy to violate the Travel Act because the alleged purpose of the charged conspiracy—to make money—is entirely lawful and it is impossible to tell if the Jury convicted Messrs. Spear and Brunst on a legally permissible object of the conspiracy. (*Id.* at 9–10).

### 1.    Agreement to Publish One of the 50 Travel Act Ads

Defendants first argue that the Government failed to show there was a specific agreement to commit the substantive crimes tied to the 50 Travel Act ads charged in Counts 2–51. (Doc. 1903 at 30; Doc. 2007 at 11).  They state it is not sufficient for the Government to vaguely proffer there may have been ads that were posted between 2013 and 2018 that could have been for prostitution.  (Doc. 1903 at 31).

Defendants' proffered standard for a specific, detailed agreement tied to the 50 ads is too stringent.  The Superseding Indictment alleged that the Defendants conspired to facilitate prostitution in violation of the Travel Act.  (Doc. 230 at 49).  Unlike the substantive Travel Act counts, the conspiracy allegations were not specifically tied to the 50 ads.  To establish the conspiracy, the Government had to show there was an agreement to facilitate the promotion of prostitution businesses by posting sex for money ads on Backpage. (*Id.*)

Viewing the evidence in the light most favorable to the Government, the Court finds there is sufficient evidence supporting the existence of an agreement among the Defendants, as framed by the Government, to work together toward the goal of making money by helping prostitution posters make their ads look less obviously like prostitution ads.  The Government argued that this collective effort was a "deliberate and intentional effort to allow the continued promotion and facilitation of prostitution and to assist Backpage's customers by helping them . . . use Backpage as a platform for doing that." (Doc. 1903 at 79).

"An agreement to commit a crime can be explicit or tacit, and can be proved by direct or circumstantial evidence, including inferences from circumstantial evidence."

- 20 -

*Kaplan*, 836 F.3d at 1212 (quotation marks and citation omitted); *see also United States v. Gonzalez*, 906 F.3d 784, 792 (9th Cir. 2018) (noting that a tacit agreement is sufficient for a conspiracy conviction). "[I]t is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) (citing *United States v. Romero*, 282 F.3d 683, 687 (9th Cir. 2002)). "Typically, the inference of an overall agreement is drawn from proof of a single objective, or from proof that the key participants and the method of operation remained constant throughout the conspiracy." *United States v. Duran*, 189 F.3d 1071, 1080 (9th Cir. 1999) (internal citations omitted).

Here, the alleged objective of the conspiracy was to make money through the unlawful means of posting prostitution ads for prostitution businesses. At trial, the Government offered evidence that Messrs. Lacey, Spear, and Brunst knew the demand for Adult ads was especially high in proportion to Backpage's total business; that Backpage derived the majority of its revenues from its Female Escort section—ads Mr. Ferrer characterized as prostitution ads; and that the sale of ads that led to prostitution offenses became the dominant portion of Backpage's business.

There was also evidence that each of these Defendants were on notice by law enforcement, State Attorneys General, non-profits, and the media that a portion of Backpage's escort ads were in fact leading to prostitution offenses. *Direct Sales Co. v. United States*, 319 U.S. 703, 707 (1943) (where the manufacturer had sold quantities of morphine to the physician "*so frequently* and *over so long a period* it must have known he . . . was therefore distributing the drug illegally").[11] Mr. Ferrer further testified that this

---

[11] Noting that an overt act in furtherance of a conspiracy must occur within the applicable statute of limitations, Mr. Spear argues that "the substantial majority" of evidence was improperly considered because it occurred before March 28, 2013. (Doc. 2006 at 13). *See also Grunewald v. United States*, 353 U.S. 391, 396–97 (1957). The Jury was properly instructed to consider whether "one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy." (Doc. 1989 at 24). This does not mean, however, that the Jury improperly considered facts related to the existence of the conspiracy that occurred prior to March 28, 2013, which was alleged to have spanned from 2004 to 2018. (*See* Doc. 1643 at 4 ("[T]he Court has already clarified that the Government may introduce proof of the entirety of the scope of the conspiracy.")).

knowledge resulted in the "slow dance" strategy of pretending to work with law enforcement by responding to subpoenas while simultaneously modifying Backpages moderation practices to ensure it could continue to be used as a prostitution advertisement platform. (Trial Tr., Doc. 1792 at 93–94). Evidence was also offered that suggested Defendants' structured Backpage in a way to ensure the majority of its revenues were derived from prostitution ads to their financial benefit. (Trial Tr., Doc. 1903 at 65–66).

With regard to Mr. Brunst, Mr. Ferrer testified that he and Mr. Spear presented their content aggregation marketing strategy to Mr. Brunst and had to obtain Mr. Brunst's approval for the budget needed to staff the plan. (Trial Tr., Doc. 1792 at 42:16–43:11; Trial Tr., Doc. 1791 at 20:6–13). Mr. Brunst argues that his participation in Backpage's annual budget meetings is insufficient proof of his agreement to violate the Travel Act. But the Supreme Court has stated that a defendant's stake in making the profits which he knew could come only from its encouragement of illicit operations evinces "informed and interested cooperation, stimulation, instigation." *Direct Sales Co.*, 319 U.S. at 713. Again, the Government offered evidence that the sale of Backpage ads that ultimately led to prostitution offenses became the dominant portion of Backpage's business, and Mr. Brunst's participation in structuring Backpage to maintain its longevity and maximize profits from these sales was sufficient.

With regard to Mr. Spear, the Government offered evidence showing Mr. Spear knew that removing certain words and replacing them with certain coded words and phrases made escort ads less susceptible to appearing like blatant prostitution ads. The Government also adduced evidence showing that Messrs. Ferrer, Spear, and Brunst internally knew the purpose of TER and knew that Adult escort ads published on Backpage were linked to the reviews on TER for an illegal purpose—namely, prostitution. (Trial Tr., Doc. 1903 at 78). Mr. Ferrer testified to discussing TER with Mr. Spear, and they decided to remove the hyperlinks and "the words TER but leav[e] in the ID numbers so people could look up the reviews on their own." (*Id.*) This directive was disseminated to moderation staff, evidence that showed that Mr. Spear joined in the conspiracy to make its

- 22 -

1    accomplishment possible.  (Trial Ex. 647).

2            When the evidence discloses such a system, working in prolonged

3        cooperation with a physician's unlawful purpose to supply him with his stock

     in trade for his illicit enterprise, there is no legal obstacle to finding that the
4
     supplier not only knows and acquiesces, but joins both mind and hand with
5
     him to make its accomplishment possible.  The step from knowledge to intent
6    and agreement may be taken.  There is more than suspicion, more than

7    knowledge, acquiescence, carelessness, indifference, lack of concern.  There
     is informed and interested cooperation, stimulation, instigation. And there is
8
     also a 'stake in the venture' which, even if it may not be essential, is not
     irrelevant to the question of conspiracy.

9    *Direct Sales*, 319 at 713.

10           The evidence for Mr. Lacey is more attenuated but meets the low threshold on a

11   Rule 29 motion.  The Government introduced testimony and evidence that by 2009, Mr.

12   Lacey's newspaper enterprises were economically declining while Backpage's adult

13   section revenues were exploding.  (Trial Tr., Doc. 1792 at 44).  Mr. Ferrer testified that

14   Mr. Lacey was a 'hands on' editor whose New Times paper ran a detailed story about the

15   TER's "prostitution reviews."  (Trial Tr., Doc. 1792 at 51–57; Trial Ex. 573a).  As early

16   as 2010, Mr. Lacey was notified by a group of State Attorneys General that "blatant

17   prostitution ads are rampant" on Backpage and they requested that Backpage take down

18   the "adult services portion of Backpage."   (Trial Ex. 52).   As owner and CEO of

19   Backpage's parent company, Village Voice, Mr. Lacey was routinely confronted by non-

20   governmental agencies ("NGOs") including the Auburn Theological Seminary, POLARIS,

21   and the National Center for Missing and Exploited Children, who alleged that Backpage

22   was a platform for prostitution ads.  An NGO witness who testified at trial recalled that

23   when Mr. Lacey was confronted with these allegations, he essentially stated "consenting

24   adults can do what consenting adults want to do" leaving an impression that he knew

25   prostitution was occurring on Backpage "and that it was legitimate." (Trial Tr., Doc. 1921

26   at 65:20–25; 67:21–22).  News outlets, including the New York Times, also ran stories on

27   Backpage's Adult section, and Mr. Lacey watched the Amber Lyon expose on CNN.  (Trial

28   Ex. 633).  Taken together, there is sufficient evidence from which a reasonable juror could

find that Mr. Lacey was aware of and implicitly agreed to the conspiracy's alleged objective to make money by providing a platform for prostitutes and prostitution businesses to post prostitution ads on Backpage.

The Court finds there is sufficient evidence that Messrs. Lacey, Brunst, Spear and Ferrer joined the conspiracy of making Backpage's Adult section profitable by developing and sustaining a platform where prostitutes and prostitution enterprises could advertise sex for money, including in states where prostitution is illegal.  Those efforts helped the advertisers make ads look less obviously like offers for prostitution.  They also developed a facade of aiding law enforcement in investigating prostitution through responding to subpoenas.  Even so, there is sufficient evidence that the sale of ad space leading to prostitution offenses was the primary focus of Backpage's business and each Defendant reaped substantial financial benefit from knowingly providing Backpage's service.

### 2.       Object of the Conspiracy

Messrs. Spear and Brunst argue, as they did during trial, that their conspiracy convictions cannot stand because the Government improperly argued to the Jury that one of the objects of the conspiracy was to make money, which is an entirely lawful object. (Doc. 2007 at 9).[12]  They argue that "a federal conspiracy conviction [cannot] be upheld when non-federal offenses as well as federal offenses were submitted to the jury as objects of the conspiracy, and it [is] impossible to determine on which basis the jury convicted." (Doc. 2007 at 9 citing *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997)).

The Court rejects the Defendants' improper object argument, again.  As discussed with the parties while finalizing jury instructions on this point, in the Ninth Circuit, a conspiracy is a "combination of two or more persons to accomplish some unlawful purpose, *or some lawful purpose by unlawful means*."  *United States v. Caplan*, 633 F.3d 534, 542 (9th Cir. 1980) (emphasis added).  In its closing arguments, the Government clarified for the Jury that the crime here was not merely making money and stated that Defendants crime was *how* they made that money: "off the backs of people engaged in

---

[12] Defendants make the same argument in their Rule 33 Motions for New Trial, as discussed *infra*.

1  illegal prostitution business enterprises." (Trial Tr., Doc. 1961 at 40:12–21). Moreover,

2  the only object alleged here was to make money through an agreement to violate the Travel

3  Act. *Cf. United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995) (overturning a conspiracy

4  conviction where two of the underlying objects alleged were insufficient as a matter of law

5  and the general verdict form used by the jury made it impossible for court to determine

6  which object or objects formed the basis of their decision); *United States v. Johnson*, 44 F.

7  App'x 752 (9th Cir. 2002) (same). There is no basis to Defendants' argument that both

8  federal and non-federal offenses were submitted to the Jury as objects of the conspiracy.

9  **B.     Sufficiency of Travel Act Charges (Counts 2–51)**

10  Mr. Spear was found guilty of committing the Travel Act violations charged in

11  Counts 2–18; Mr. Brunst was acquitted on Counts 2–51; and the Jury could not reach a

12  decision as to Mr. Lacey on Counts 2–51. Both Messrs. Spear and Lacey argue the Court

13  must enter a judgment of acquittal on the Travel Act charges, Mr. Spear with regard to 2–

14  18 and Mr. Lacey with regard to 2–51.

15  The Travel Act makes it a federal offense for a person to use a facility in interstate

16  commerce with the intent to promote or facilitate the promotion of an unlawful activity—

17  here, facilitating the promotion of prostitution. 18 U.S.C. § 1952(a)(3). To convict, the

18  Government had the burden of showing that Messrs. Spear and Lacey (1) used

19  Backpage.com; (2) with intent to facilitate the promotion of prostitution businesses; and

20  (3) did a subsequent overt act in furtherance of that unlawful activity, by, for example,

21  publishing the prostitution ad or editing the ad to make it look less like an ad for

22  prostitution. *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981).

23  Before assessing the sufficiency of evidence arguments made as to these counts, the

24  Court will address the First Amendment legal arguments Messrs. Spear and Lacey make

25  with regard to the Travel Act Counts.

26  **1.     First Amendment Protections of the Backpage Ads**

27  Defendants argue that the Government failed to establish that any of the 50 ads

28  charged in the Superseding Indictment were not protected by the First Amendment. Mr.

Spear specifically asserts that the Government failed, as a matter of law, to show that Backpage's publication of the Ads in Counts 2–18 were unprotected by the First Amendment. (Doc. 2006 at 5). Mr. Lacey similarly asserts that the Government "failed to overcome the presumption that the ads were 50 instances of protected expression." (Doc. 2004 at 13). Mr. Lacey states that "even if he had been involved with Backpage's operation . . . its operations understood that the operation of a platform for third-party speech and the third-party speech itself was First Amendment protected." (*Id.*) He orally posited that any Jury instruction on the First Amendment would have to draw a distinction from the ad creator and the third-party publisher. (Trial Tr., Doc. 1931 at 69).

Prior to trial, the Court considered Defendants' similar First Amendment arguments. In so doing, the Court iterated that the First Amendment does not protect "offers to engage in illegal transactions." (Doc. 793 at 14 *citing United States v. Williams*, 553 U.S. 285, 297 (2008)). Applying the requisite pre-trial standards of review, the Court found, as to the ads in Counts 2–51, that "the factual allegations in the [Superseding Indictment] are sufficient to show the ads were for prostitution" and "[p]rostitution ads are ads for illegal transactions." (*Id.* at 11; 14). Therefore, facts existed to support that the ads were not First Amendment protected. (*Id.*) The Court will not second-guess its prior and consistently held rulings, rulings that well informed the Defendants on this issue.

However, the Court did conclude that at trial the Government still bore the burden to prove to the fact finder that the ads were for an illegal purpose, and therefore unprotected. At the conclusion of trial, the Court observed that the parties had fully briefed their respective positions on the First Amendment Jury Instruction. The Court determined that the Government's theory was that the Defendants all knew that the ads were sex for money ads, so it held "based on the totality of the case [as] presented in court to this jury" that it would give them a modified First Amendment instruction. (Doc. 1931 at 64–73). The Jury was provided the following instruction:

> All speech is presumptively protected by the First Amendment to the United
> States Constitution. However, the First Amendment does not protect speech

that proposes an illegal transaction.  Prostitution is illegal in 49 states and most of Nevada.  It is the government's burden to establish that each of the ads alleged in this case is an ad for prostitution and not for another purpose such as an ad for escort, dating or massage services.  If you find that an ad proposes an illegal transaction, it is not protected by the First Amendment.

(Doc. 1998 at 48).

Though Defendants say they do not wish to "relitigate" the Court's instruction, they essentially argue that the ads are protected by the First Amendment because they were for lawful escort services and that use of "coded words" did not revert them into facially unlawful prostitution ads.   (Doc. 2030 at 4–5).   On consideration of the evidence, particularly the victims' testimony that (1) their ads were what the Government purported them to be; (2) all of the ads used at least some language the Government established was indicative of prostitution; (3) ads 3, 6–11, and 18 were posted by a person known to be a prostitute by Mr. Ferrer; and (4) the photos in the ads initially submitted in Counts 4, 5, 12, 13, 15, 16, and 17 were removed or otherwise moderated by Backpage, the Court finds sufficient evidence for the Jury to find that these were offers of sex for money ads.  Given the Jury's verdict as to Mr. Spear, they apparently found that each of the 18 ads were in fact ads for prostitution and not for some other purpose such as a lawful escort ad.[13]  Thus, applying the instruction, they necessarily found that the ads in Counts 2–18 were unprotected speech.

Reviewing the evidence in comparison to the holding in *Pittsburgh Press v Pitt, Comm. on Human Relations*, 413 U.S, 376, 377–80 (1973) does not change the Court's analysis here because Mr. Ferrer and several victims and witnesses who created or helped to create each ad in the Superseding Indictment testified that they were posting sex for money ads on Backpage.  (*See e.g.*, Trial Tr., Doc. 1786 at 7) (testimony from Mr. Ferrer that the ads posted on Backpage from 2004 through 2009 were "prostitution ads"); Trial Tr., Doc. 1922 at 76 (testimony from victim in Count 23 ad that ads posted in Los Angeles area in 2015 were posted "to get customers or to get people to pay for sex"); Trial Tr., Doc.

---

[13] The Court will not speculate about whether the Jury concluded that the ads in counts 19 – 50 were First Amendment protected.

1920 at 124, 131 (testimony from victim that she posted on Backpage from 2012 through 2015 for the purpose of selling "acts of prostitution"); *see also infra* Section III.B.2, (testimony from victims that their ads were posted to offer sex for money).  There is sufficient evidence for a reasonable juror to find that each Superseding Indictment ad was illegal and therefore not protected by the First Amendment.  Consequently, the Defendants' Motion for Acquittal based on First Amendment grounds is denied.

### 2. Sufficiency of Evidence to Support the Travel Act Counts (Counts 2–51)

The Jury was instructed that to find the Defendants guilty of a Travel Act offense, they would have to find each of the following elements beyond a reasonable doubt:

> First, the defendant used any facility in interstate commerce with the specific intent to promote or facilitate the promotion of any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed (as specified below[14]), and
>
> Second, after doing so the defendant performed an act that did promote or facilitate the promotion, of any business enterprise involving prostitution offenses, specifically, by publishing on Backpage.com the ads listed in Counts 2–51 of the indictment.

(Doc. 1998 at 30).  This instruction went on to explain:

> To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.
>
> In the context of this Travel Act case, the terms to "promote" or "facilitate the promotion of" means intentionally helping someone else commit a prostitution offense in violation of state law.
>
> The phrase "Business enterprise," means a continuous course of criminal conduct, that is, engaging or planning to engage in two or more violations of law, rather than a sporadic, casual, individual, or isolated violation. . . .

---

[14] The Jury Instructions provided the relevant state law for each Travel Act Count alleged.

- 28 -

(*Id.* at 30).

The Government also advanced a theory of liability for the Travel Act counts under *Pinkerton v. United States*, 328 U.S. 640 (1946). *Pinkerton* liability is "a judicially-created rule that makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy." *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002). In that regard, the Jury Instructions explained:

> Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.
>
> Therefore, you may find a defendant guilty of committing a Travel Act crime as charged in Counts 2–51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:
>
> First, a member of the conspiracy committed a Travel Act offense alleged in one of the Counts;
>
> Second, that person was a member of the conspiracy charged in Count 1 of the indictment;
>
> Third, the person committed the Travel Act offense in furtherance of the conspiracy;
>
> Fourth, a defendant was a member of the same conspiracy at the time the Travel Act offense was committed; and
>
> Fifth, that the Travel Act offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

(Doc. 1998 at 27).

Messrs. Spear and Lacey argue there is an insufficiency of evidence showing their personal association with the prostitution businesses that posted the ads. They argue that there was no testimony or exhibit that shows that they ever had any contact with the advertisers in these ads; ever saw or knew the content of any of the ads before they were published; moderated the ad; or knew an ad was associated with a super poster. (Doc. 2006 at 3). They also point out that none of the ads in Counts 2–18 contain TER links or even a TER number. (*Id.*) Mr. Spear asserts that there is only evidence of TER association in the

- 29 -

1    charged ads *after* Mr. Ferrer purchased Backpage in 2015.[15]  Therefore, Mr. Spear asserts

2    that his convictions are legally unsupported.

3            As explained by the jury instructions, to show that Messrs. Spear and Lacey violated

4    the Travel Act by selling and publishing prostitution ads on Backpage, the Government

5    was required to establish that Messrs. Spear and Lacey "in some significant manner

6    associated" themselves with the ad poster's prostitution business enterprise.  (Doc. 1998 at

7    30); *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  Thus, unlike

8    conspiracy to violate the Travel Act, to convict on a Travel Act charge, the Government

9    had to show that Defendants—or one of their co-conspirators—in some significant manner

10   associated themselves with the prostitution businesses that posted the ads in each Count.

11           With regards to Mr. Spear, the Government points to his work in overseeing

12   Backpage's growth and development, and the strategies he helped implement to ensure the

13   adult escort section of Backpage flourished.  It argues that "[w]hen the pimps and

14   prostitutes who posted the ads in Counts 2–18 used Backpage to advertise their illegal

15   commercial services, they utilized a website tailored-made to promote, and facilitate the

16   promotion of, prostitution enterprises like theirs."  (Doc. 2021 at 16).  Viewing the

17   testimony and evidence in a light most favorable to the Government, the Court agrees that

18   Mr. Spear's role in making Backpage a platform from which prostitution could be

19   advertised is sufficient to establish his specific intent to facilitate the promotion of the

20   prostitution businesses posting the ads in Counts 2–18.   Evidence sufficiently shows that

21   Mr. Spear, in the interest of making money, directly helped develop moderation and editing

22   policies that facilitated the promotion of prostitution and allowed Backpage to continue to

23   accept payment from pimps, traffickers, and prostitutes for posting the illegal ads.  The

24   Court also finds, as detailed below, that there was sufficient evidence adduced that Mr.

25   Ferrer, a co-conspirator, also significantly associated himself with and helped promote the

26   poster's enterprises such that his acts in relation to the ads in Counts 2–18 were fairly

27
28   _____
     [15] The ads in Counts 2–18 are dated from September 10, 2013, to April, 2015, just before
     the sale of Backpage to Mr. Ferrer.  The ads in Counts 19–51 post-date the sale of Backpage
     to Mr. Ferrer.  No Defendant was found guilty of Counts 19–51.

attributed to Mr. Spear under a *Pinkerton* theory of liability.

With regard to Mr. Lacey, the Court finds there is an insufficiency of trial evidence supporting a direct theory of liability for any of the Travel Act charges brought against him. Specifically, the Government did not put forth sufficient evidence of Mr. Lacey's specific intent to facilitate the promotion of the posters or prostitution businesses comprising Counts 2 through 51, as that *mens rea* is defined by the Ninth Circuit. Though the Government put forth some evidence that Mr. Lacey had knowledge that Backpage's Adult section evolved into an on-line prostitution advertising platform operating in states that outlaw prostitution and that he extraordinarily benefited financially therefrom, there was no evidence that he was involved with developing or overseeing Backpage's moderation or aggregation practices for the ads in Counts 2–51.[16] Among other evidence, the Government's evidence of Mr. Lacey's reaction to an arrest of a Backpage user (*see* Trial Ex. 940 ("[a]re the perps different than the rest of Backpage?"), and his stated support for legalized prostitution, among other evidence, suggests he knew of Backpage's intended purpose. (Trial Ex. 1911b). Indeed, the Government's argument that Mr. Lacey's wealth depended on the success of Backpage's Adult section was clearly established. This evidence may suffice for the conspiracy count but a conviction on a Travel Act count requires more. *See Gibson*, 507 F.2d at 449 ("Were we not to define intent in the travel act in this manner, the act would be plagued by the very overexpansiveness which Congress sought to rule out by inclusion of an express *mens rea* requirement."). (*See also* Doc. 1998 at 30). The Government offered no evidence or testimony that Mr. Lacey exerted control over the advertisers in Counts 2–51 or how they published their ads. *Gibson*, 507 F.2d at 450 (dismissing Travel Act counts where prosecution conceded that defendant manufacturers of gambling paraphernalia had "no financial interest in or control over the Montana distributorships to which the [gambling paraphernalia] were sold"). To the

---

[16] Without much more, the Government's brief largely tracks the Superseding Indictment's allegations in which Mr. Lacey is referenced in the "Knowledge And Facilitation of Prostitution" paragraphs related to his broad knowledge that Backpage had a reputation as an on-line prostitution advertisement platform. (*See* Doc. 230 at ¶¶ 89; 97; 106, 107; 121; 126).

contrary, the evidence showed that Mr. Lacey was rarely pulled into the business side of Village Voice or the day-to-day operations of Backpage, and unlike Messrs. Spear and Ferrer, he had no occasion to review or perfect ads or coach the advertisers how to successfully code sex act terms so they could appear on Backpage's Adult section.

Though the Court finds that there was insufficient evidence of Mr. Lacey's intent, the Court will nonetheless deny his Motion as to Counts 2–18 because there was sufficient evidence under *Pinkerton*, as described below, for a rational juror to find him guilty through the acts of one of his co-conspirators, namely Mr. Ferrer and Mr. Spear.

### a.     Commission of Travel Act Violation in Count 2

The Jury convicted Mr. Spear of violating the Travel Act in Count 2 of the Superseding Indictment but did not reach a verdict as to Mr. Lacey on this Count. Count 2 alleges that the Defendants used Backpage.com to post a prostitution ad on September 10, 2013, in Massachusetts. (Doc. 230 at 50). Prostitution is illegal in Massachusetts. (Doc. 1998 at 31).

Brian Griffin, a Sergeant with the Northborough Police Department ("Sgt. Griffin"), testified that in September 2013 he was alerted to suspicious circumstances of two females loitering around a hotel room. (Trial Tr., Doc. 1923 at 62–70). Believing that they may be involved in prostitution, Sgt. Griffin went to Backpage.com[17] and found an ad depicting one of the females. (Trial Tr., Doc. 1923 at 64–65; Trial Exs. 212, 212a). This ad is the subject of Count 2. Sgt. Griffin called the ad number and made an appointment to see "Destinee," to pay her for oral sex. (Trial Tr., Doc. 1923 at 66). Upon entering the hotel room, Sgt. Griffin observed a male "John" in the bathroom and learned that he paid for the hotel room in exchange for sex. (*Id.* at 70). Based on this testimony, there is sufficient evidence from which a reasonable juror could find that the ad in Count 2 was a sex for money ad on Backpage posted in violation of Massachusetts law.

There is also sufficient evidence for a reasonable juror to find that the moderation

---

[17] Backpage.com was known in various Massachusetts law enforcement communities as "a new place . . . to go to investigate these crimes." (Trial Tr., Doc. 1923 at 52–53).

efforts taken by Messrs. Ferrer and Spear evince sufficient association with the poster and amounted to the Travel Act offense alleged in Count 2. Viewing the ads used by Sgt. Griffin (Trial Exs. 212 and 212a), Mr. Ferrer identified them as Backpage.com ads that would have been viewable on a mobile phone. (Trial Tr., Doc. 1812 at 52:2–3 ("This is the time when we were moving to a mobile phone experience so the page is built for a mobile phone view."); 68:17–69:3).[18] The ad read: "Our dazzling smile & stunning personality will keep you coming back for more. We keep ourselves well manicured, hygienically correct & always classy! Doin incalls and outcalls. 2 girl for 1 or 2 girl special. Call or text us five0eight-nine33-eight52one." (Trial Tr., Doc. 1812 at 57; Trial Ex. 212). Observing that the telephone number was spelled out in the ad, Mr. Ferrer testified that in the moderation process, they learned that if a prior user was banned, the user would revert to spelling out a telephone number to avoid the ad being rejected. (*Id.* at 58:9–12). The Court finds that this testimony sufficiently establishes that Messrs. Ferrer and Spear, through their moderation development and oversight, committed the Travel Act offense alleged in Count 2 by helping to facilitate and promote the advertiser's business.

### b. Commission of Travel Act Violations in Counts 3, 6–11, 18

The Jury convicted Mr. Spear of violating the Travel Act in Counts 3, 6–11 and 18 of the Superseding Indictment but did not reach a verdict as to Mr. Lacey. The ads in these Counts were posted by a woman named Pamela Robinson ("Ms. Robinson"). Each Count alleges that the Defendants helped Ms. Robinson post prostitution ads on Backpage in Washington on January 27, 2014 (Count 3), February 6, 2014 (Count 6), April 20, 2013 (Count 7), May 7, 2014 (Count 8), May 31, 2014 (Count 9), July 1, 2014 (Count 10), August 19, 2014 (Count 11), and February 26, 2015 (Count 18). (Doc. 230 at 50–51).

---

[18] Mr. Ferrer testified that he "worked with [a man] in Dallas to design this look . . . I approved the wire frames and then we launched this mobile view of postings." (*Id.* at 51-52:15–17). He further testified about changes that were made to enable better viewing of the ads' texts and images for mobile phones versus desktop ads which include a large Backpage.com logo. (*Id.* at 52–53). Mr. Ferrer identified the ads' features that he approved, that he is familiar with how it all looks because at that time they were trying to increase their "page views and mobile and it went to nearly 90 percent." (*Id.* at 53:20–54:5).

Prostitution is illegal in Washington.  (Doc. 1998 at 31).

Mr. Ferrer testified that he communicated with Ms. Robinson from 2010 through 2018 using his email address carl@Backpage.com.  (Trial Tr., Doc. 1795 at 79).  Ferrer identified each ad set forth in Trial Exhibits 504–513 that are listed in Counts 3, 6–11, 18, and 25–26 as Ms. Robinson's Backpage ads.  (*Id.* at 79–87; Trial Exs. 162 –165; 168, 504–511).  He testified that he believed Ms. Robinson was engaged in prostitution and solicited her services by posting ads on Backpage.  (Trial Tr., Doc. 1795 at 79–81).  He explained how he provided Ms. Robinson with a "promo code" for discounts on escort ads, and that he restored her editing rights so she could post ads on Backpage for prostitution.  (*Id.* at 81, 87).  He also testified to his personal knowledge of her ads posted on Backpage from 2014 to 2015, and that she threatened to complain to the Better Business Bureau because her ads were being rejected.  (*Id.* at 105–08).  Ferrer described the ads' rejection as part of Backpage's moderation process.  (*Id.* at 87–88).

Mr. Ferrer's testimony undermines the Defendants' contention that there is no evidence that he was personally interacting with Ms. Robinson.  (*See* Doc. 1867 at 103–04).  Mr. Ferrer testified that he communicated directly with Ms. Robinson through his email address at Backpage.  The Jury must have found this testimony credible.  The Defendants' argument that this and other Backpage ads are not Travel Act violations because they may or may not have resulted in sex acts for money is also unconvincing because each state statute makes "offers" to engage in sex illegal.  Therefore, the Court finds that there is sufficient evidence from which a reasonable juror could find that Mr. Ferrer and co-conspirator Mr. Spear, violated the Travel Act as alleged in Counts 3, 6–11, and 18.

### c.       Commission of Travel Act Violations in Counts 4 and 5

The Jury convicted Mr. Spear of committing Travel Act offenses in Counts 4 and 5 but did not reach a verdict as to Mr. Lacey on these Counts.  Count 4 is a Backpage ad posted on January 29, 2014, and Count 5 is a Backpage ad posted on January 31, 2014.  (Doc. 230 at 50).  Both ads were posted on Backpage.com in Massachusetts, where

1    prostitution is illegal.

2         Naiomy Figueroa ("Ms. Figueroa") identified the ads from Counts 4 and 5 (Trial

3    Exs. 214 and 214a, respectively) as ads her pimp posted of her on Backpage.  (Trial Tr.,

4    Doc. 1898 at 96–98).  Ms. Figueroa testified that she became familiar with Backpage when

5    she saw her pimp use it to post her ads.  (*Id.* at 82).  She believed Backpage was a website

6    "for girls to use [] to escort and to get trafficked."  (*Id.*)  According to her, "escort" meant

7    "to exchange a sexual act for money or a gift." (*Id.*)  She testified that she would not create

8    her ads, that her pimp created and posted them.  (*Id.*)  She understood that she was

9    advertised for sex acts for money "so my pimps could make money off of me." (*Id.* at 83).

10   She testified that she saw her pimps purchase "vanilla cards" from convenience stores and

11   use them to purchase her ads.  (*Id.*) Ms. Figueroa testified that her ads included terms like

12   "fetish friendly" and "satisfying your cravings" and included photos of her in lingerie,

13   pantyhose and in seductive poses.  (*Id.* at 84).  Photos for the ads would be taken in hotel

14   rooms paid for by pimps because she was not old enough to pay.  (*Id.* at 85).  Once posted,

15   she said her phone would ring within minutes.  (*Id.* at 86).  When the calls tapered off,

16   "they would post another ad to get me to the top of the list so that the calls keep coming

17   in." (*Id.*)  The caller would ask "what are the prices per hour." (*Id.* at 87).  In discussing

18   rates, she would use words like "roses" as a code word for money.  (*Id.* at 92).  She was

19   also familiar with the term "in-call" as "when the john comes to you."  (*Id.* at 96).  She

20   testified that upon meeting, she would "ask them to touch us somewhere like in the private

21   parts to confirm that they were not a cop." (*Id.* at 92).  Ms. Figueroa testified that every ad

22   posted of her was an offer of sex for money.  (*Id.* at 99).  She testified that she would not

23   keep the money but that the pimps would.  (*Id.* at 94–95).  This evidence is sufficient to

24   show that the ads in Counts 4 and 5 were ads for prostitution.

25        Mr. Ferrer identified Trial Exhibit 214 from Count 4 "as the administrative view of

26   a posting in the Boston Escort Section of Backpage." (Trial Tr. Doc. 1812 at 60:3–8).  He

27   explained that the "administrative view" would show "the email address, the payment

28   information, and other information gathered in even what we called Object Editor.  It's all

kind of an internal printout of an ad in admin view." (*Id.*)  He explained that the page showed transactions and customer data as well as various customer invoices. (*Id*. at 61:3–25).[19]  From this data, he testified that one page of exhibit 214 was "an image that was deleted.  And in this administrative view, an administrator could restore or remove that image and then hit 'updates.'"  (*Id*. at 61:24 to 62:1).  From the administrative view, he could tell the transaction was ultimately approved. (*Id.*)  Mr. Ferrer similarly testified that the data in Trial Exhibit 214a from Count 5 showed that an image had been deleted. (*Id.* at 63:1–10).[20]

The Court finds that this testimony sufficiently establishes that Messrs. Ferrer and Spear, through their moderation development and oversight of Ms. Figueroa's ads, committed the Travel Act offenses alleged in Counts 4 and 5.

### d.      Commission of Travel Act in Counts 12, 13, 14 and 15

Count 12 is a California Backpage ad posted on November 23, 2014, and Count 13 is a California Backpage ad posted on January 29, 2015.  (Doc. 230 at 51).  Prostitution is illegal in California.  (Doc. 1998 at 32).  Count 14 is an Arizona Backpage ad posted on January 31, 2015, and Count 15 is an Arizona Backpage ad posted on January 31, 2015.  (Doc. 230 at 51).  Prostitution is illegal in Arizona.  (Doc. 1998 at 32).

Astrid Cervantes ("Ms. Cervantes") testified that she was advertised for an "exchange of money for sex acts" on Backpage.com from November 2014 through January 2015 in Oceanside, San Diego, and other places in California and in Phoenix.  (Trial Tr.,

---

[19]  In distinguishing Trial Exhibits 212 and 212a (the ads in Count 2) from exhibit 214 (Count 4), Mr. Ferrer explained that Trial Exhibit "212a was a view from a mobile phone. [Trial Exhibit 214] would be viewed -- from a desktop computer that was looking at the ad with somebody having admin access at Backpage and then making a PDF of that data." (*Id*. at 60:12–15).

[20] Mr. Ferrer also stated that he was familiar with the postings in Trial Exhibits 214 and 214a because "the person posted in this ad was in a Nicholas Kristof column in the 'New York Times.'"  (Trial Tr. Doc. 1812 at 65:1–2).  Mr. Ferrer testified that the New York Times article "discussed how a juvenile was prostituted and then how they were able to recover this juvenile by finding the person on Backpage."  (*Id*. at 65:18–20).  Ferrer said that after he received an email from a producer at Dateline he went to find the records of the victim in the story "so we [could] do our standard operating procedure of when was the ad posted, by who, what payment data was gathered." (*Id*. at 67:3–7).  He said that data would also tell him whether they had sent NCMEC a report.  (*Id.*)

Doc. 1897 at 30–38).  Ms. Cervantes identified herself and a woman called "Storm" in the ads associated with Counts 12–15.  (*Id*. at 32–35, 47–48).[21]  She said Storm was part of a group she was in that was "being trafficked" by a man she referred to as "L.G." (*Id*.)  She testified that L.G. was her pimp and that L.G. and a woman named Star, another girl that was being trafficked by L.G., would create and post her ads on Backpage.  (*Id*. at 32–33).  Ms. Cervantes testified that L.G. and Star took pictures of her in lingerie and then used those photos in her Backpage ads.  (*Id*. at 33–34).  Ms. Cervantes said L.G. would post her ad using his cell phone.  (*Id*. at 34).  Upon the ad being posted, "clients"—meaning "the men that would want to exchange money for sex"—would call and text for sex.  (*Id*. at 35).  After engaging in sexual intercourse with the client, Ms. Cervantes would text L.G. and he would arrive and retrieve the money.  (*Id*. at 37–39).  Ms. Cervantes testified that she did not observe L.G. to have a job other than being a pimp.  (*Id*. at 45).  Ms. Cervantes testified that L.G. thought they could make a lot of money during the Super Bowl so she, L.G., Storm, and Star traveled from California to Arizona in January.  (*Id*. at 37-38).  She testified that L.G. or Star provided the car, and once in Arizona, L.G. purchased a hotel room and Storm began writing her Backpage ad profile.  (*Id*. at 41).  Ms. Cervantes had a few "dates" while in Phoenix.  Eventually, she and Storm agreed to meet a customer who requested "a two-girl special."  (*Id*. at 43).  The customer ended up being an undercover police officer.  After that, Ms. Cervantes stopped working for L.G.  (*Id*. at 54).

Viewing Trial Exhibits 217 and 217a, Mr. Ferrer identified each as Backpage ads, the market they were posted in, and as examples of "somebody who is posting in two different markets."  (Doc. 1813 at 25:14–15).  Mr. Ferrer said he could tell Trial Exhibit 217 was printed out by an administrator, and that it contained a deleted image.  (Doc. 1813

---

[21] Ms. Cervantes identified herself in Trial Exhibits 215 and 215a, which are respectively the January 31, 2015, Backpage ad posted in Phoenix, Arizona associated with Count 14 (Trial Tr., Doc. 1897 at 47–48); and the November 23, 2014, ad posted on Backpage.com in San Diego, California that is associated with Count 12.  (*Id*. at 47).  She testified that her acquaintance "Storm" is the person in the ad at Trial Exhibit 217a, the January 29, 2015, Backpage ad posted in Inland Empire, California that is associated with Count 13 (*id*. at 46), and in Trial Exhibit 217, the January 31, 2015, Backpage ad posted in Phoenix, Arizona that is associated with Count 15.  (*Id*. at 46–47).

at 22:24–23:2).  Mr. Ferrer explained that the options of "Keep deleted," "Restore," and "Removed" displayed on the exhibit meant the administrator/moderator had the "option to…update the ad and restore it, or [] update it and permanently remove it.  Right now the ad is deleted, but it could be restored."  (*Id.* at 23:20–25).  Mr. Ferrer said he thought the image of Storm was violative of Backpage policies because it was "too much of a butt shot . . ."  (*Id.* at 24:3).

The titles of the ads in Trial Exhibits 215 and 215a read "New In Town," a term that NGOs like NCMEC and Polaris told Defendants were indicative of prostitution and trafficking.  (*Id.* at 21–24).  Mr. Ferrer described exhibit 215 as a Backpage ad that you could view on a mobile device that had "been created into a pdf with admin access." (*Id.* at 17).  He said the exhibit included "object editor data" and that he could tell from the exhibit that an image from the ad had been deleted again, "because "it's just too much of a butt shot on a hotel bed mattress."  (*Id.* at 19).

There is sufficient evidence and testimony from which a reasonable juror could find that the ads depicted in Counts 12 through 15 are Backpage.com ads advertising sex acts for money in violation of California and Arizona state laws, and that Messrs. Ferrer and Spear facilitated the promotion of prostitution ads through their moderation efforts.

### e.    Commission of Travel Act Violations in Count 16 and 17

Counts 16 and 17 allege that prostitution ads were posted on Backpage in Colorado on February 4 and 18, 2015, respectively.  (Doc. 230 at 51).  Prostitution is illegal in Colorado.  (Doc. 1998 at 33–34).

Breahannah Leary ("Ms. Leary") testified that she posted herself on Backpage.com in Denver, Colorado from approximately 2012 through 2015.  (Trial Tr., Doc. 1920 at 122–24).  She copied and pasted other ads and used the "lingo" on Backpage.com to create her own ads.  (*Id.*)  She testified that her ad would often appear differently than as she originally posted; that sometimes her picture was removed, or the ad would be pushed to the bottom and require her to repost it so it would go to the top.  (*Id.* at 124).  She stated that even when her picture was removed, the rest of the ad's content would remain.  (*Id.* at 125).

1   Once posted, she said her telephone would ring and she would "go and have dates with the
2   gentlemen" which she said meant "acts of prostitution." (*Id.*).

3       In January 2015, Ms. Leary began to work for Brock Franklin ("Mr. Franklin"), who
4   wanted to post her on Backpage.com. (*Id.* at 128–29). When she arrived at his home, she
5   observed other women living there. (*Id.*). Mr. Franklin and "one of his girls" Isis, took
6   photos of her in a hotel room in Denver where she posed in various positions wearing
7   lingerie. (*Id.* at 131). She testified that for the four to five months she was involved with
8   Franklin, she engaged in daily acts of prostitution for him and that he only permitted her to
9   perform acts of oral sex. (*Id.* at 132–34). Once she received money for the act, it would
10  be immediately handed over to Franklin. (*Id.*). Ms. Leary identified herself in Trial
11  Exhibit 216 as the photos that were taken of her the first night she moved in with Franklin.
12  (*Id.* at 138). She stated that the ad was posted on February 4, 2015, in Denver. (*Id.*). She
13  also identified herself in Trial Exhibit 216a as an ad posted in Ft. Collins, Colorado on
14  February 18, 2015. She testified that both advertisements lead to acts of prostitution. (*Id.*).

15      Based on direct and circumstantial evidence about how Ms. Leary's ads were
16  moderated e.g., photos being deleted, terms removed, her ad moved to the bottom—there
17  is sufficient evidence for a rational juror to find Messrs. Spear's and Ferrer's
18  implementation of their moderation policies resulted in the Travel Act violations alleged
19  in Counts 16 and 17.

20      In sum, there is sufficient evidence that Messrs. Ferrer and Spear committed the
21  Travel Act charges in Counts 2–18 via their moderation efforts.

22              **f.**     ***Pinkerton* Liability and the Travel Act Counts 2–18**

23      Citing *United States v. Castaneda*, Defendants argue "that due process constrains
24  the application of *Pinkerton* where the relationship between the defendant and the
25  substantive offense is slight." 9 F.3d 761 (9th Cir. 1993), *overruled by United States v.*
26  *Nordby*, 225 F.3d 1053 (9th Cir. 2000). Messrs. Lacey and Spear maintain that, although
27  they were aware of the moderation function at Backpage, they were not directly involved
28  in the moderation practices, and the connection between that fact and Mr. Ferrer's acts in

facilitating the publication of these ads is too slight for *Pinkerton* to apply. In other words, Defendants assert that the Travel Act offenses in the Superseding Indictment are just a few examples out of millions of ads published by Backpage, and it is not reasonably foreseeable to Defendants that the publication of a specific ad might be moderated in some improper way to facilitate prostitution. (Doc. 1903 at 34).

But the question is not whether it is reasonably foreseeable that Messrs. Lacey or Spear knew a specific Travel Act ad would occur among millions of other ads. The question is whether publication of the Travel Act ads "could reasonably have been foreseen to be a necessary or natural consequence *of the unlawful agreement*." *Pinkerton*, 328 U.S. at 647–48 (emphasis added); *Alvarez-Valenzuela*, 231 F.3d at 1202. As mentioned, the unlawful agreement among the Defendants and Mr. Ferrer as identified by the Government is making Backpage ads look less obviously like prostitution to continue profiting off of ads for illegal sex acts. So, the question is whether it was reasonably foreseeable that Messrs. Ferrer, Spear, or other members of the conspiracy, would help an advertiser of prostitution post an ad for prostitution in Backpage by moderating an ad. The evidence supports that conclusion for Counts 2–18. As discussed, sufficient evidence was adduced showing each Defendant knew that prostitution was occurring through Backpage ads, and that the vast majority of Backpage's revenue came from prostitution ads. It is reasonable that a member of the conspiracy would have foreseen (indeed, expected), another member to take steps to further their unlawful agreement—for example, to moderate submitted prostitution ads or "slow dance" responses to law enforcement subpoenas to make it look like Backpage was not publishing prostitution ads so Defendants could continue to profit from that illegal revenue.

### g. Travel Act Violations in Counts 19–51

The Government put forth sufficient evidence that the Backpage ads in Counts 19–51 were prostitution ads violating the associated state laws. However, Messrs Spear, Brunst, Padilla, and Ms. Vaught were acquitted of these Counts. In so finding, the Jury necessarily concluded that no Defendant committed a Travel Act violation related to each

Count, nor did *Pinkerton* liability attach to any Defendant through a co-conspirator's act. Notably, each ad in Counts 19–51 post-dates the sale of Backpage from its owners to Mr. Ferrer.   Considering the evidence and testimony, the Court finds that there is an insufficiency of evidence showing any acts by Mr. Ferrer, or any other co-conspirator, taken *after* the sale of Backpage was a reasonably foreseeably consequence of the unlawful agreement.   The evidence accords with the Jury's likely conclusion that the sale of Backpage to Mr. Ferrer was a break in the conspiracy's agreement to violate the Travel Act.  At best, the Government's evidence showed that Mr. Ferrer used Backpage's profits after the sale of Backpage to satisfy the loans he assumed for Backpage's purchase.   For that reason, the Court finds that there is insufficient evidence to convict Mr. Lacey of Counts 19–51, even under a *Pinkerton* theory of liability.  The Court will therefore grant Mr. Lacey's motion for acquittal of the Travel Act violations alleged in Counts 19–51.

### C.   Money Laundering Counts

Defendants were charged with conspiracy to commit money laundering (Count 52), money laundering under 18 U.S.C. § 1956, relating to the laundering of monetary instruments (Counts 53–68, 100), and money laundering under 18 U.S.C. § 1957, relating to engaging in monetary transactions in property derived from specified unlawful activity (Counts 69–99).   They challenge the sufficiency of the evidence supporting the charges on which the Jury found them guilty.  The Court will first assess the Defendants' arguments regarding the substantive money laundering counts and then will address the conspiracy to commit money laundering count.

### 1.   Money Laundering Counts Under 18 U.S.C. § 1956

"18 U.S.C. § 1956 prohibits specified transfers of money derived from unlawful activities.  Subsection (a)(1) makes it unlawful to engage in certain financial transactions, while subsection (a)(2) criminalizes certain kinds of transportation." *Regalado Cuellar v. United States*, 553 U.S. 550, 557 (2008) ("*Cuellar*").  Defendants here were charged under both Subsections.[22]  Counts 53–62 charge violations of Subsection 1956(a)(1)(B)(i), aimed

---

[22] Unless where otherwise noted, all Section and Subsection references are to Chapter 18 of the United States Code.

at financial transactions that are intended to conceal the source of illegal proceeds.  Counts 63–68 charged violations of Subsection 1956(a)(1)(A)(i), which prohibits transporting funds internationally for the purpose of promoting specified unlawful activities.  Count 100 against Mr. Lacey charged a violation of Subsection 1956(a)(2)(B)(i), which prohibits transporting funds internationally that are intended to conceal the source of illegal proceeds.

> ### a.   Counts 53–62: Transactional Concealment Money Laundering under Subsection 1956(a)(1)(B)(i) (Messrs. Lacey, Brunst & Spear)

Defendants were charged in Counts 53–62 with money laundering under Subsection 1956(a)(1)(B)(1).   The Superseding Indictment states that Website Technologies transferred the funds in these transactions to Cereus Properties; that Defendants knew the funds represented proceeds of some form of unlawful activity; and that Defendants made the transfers in whole or in part to conceal the source of the proceeds of the unlawful activity.  (Doc. 230 ¶¶ 204–205).

At trial, it was established that after 2016, Backpage proceeds were collected and divided between Website Technologies and Ad Tech B.V., a company registered in the Netherlands.   (Trial Ex. 1479).   Mr. Thai testified that the transfers from Website Technologies in Counts 53–62 all occurred between the three-month period of May 18, 2016, and August 16, 2016, and totaled close to $17 million.  (Trial Tr., Doc. 1923 at 136–138; Trial Ex. 1479).   Each transfer was made from a Website Technologies bank account at Branch Banking & Trust to a bank account held by Cereus Properties at Arizona Bank & Trust.  (Trial Tr., Doc. 1923 at 136–138; Trial Ex. 1479).  Mr. Thai and Mr. Ferrer both testified that Cereus Properties "collected the interest and debt payments from the $600 million loan" from the sale of Backpage, and that Defendants were owners of Cereus Properties.  (Trial Tr., Doc. 1814 at 91:2–3).

Subsection 1956(a)(1)(B)(i) states in pertinent part:

(a)(1) Whoever, knowing that the property involved in a financial transaction

represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(B) knowing that the transaction is designed in whole or in part—

. . .

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

shall be sentenced to a fine. . . or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i). *See also United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (holding that "[t]o convict a person for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew 'that the transaction [was] designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'") (internal citations omitted)).

Defendants argue the Government's evidence was insufficient in showing (1) the funds in these transfers were proceeds of Travel Act violations; and (2) they had an intent to conceal the nature or source of the funds.

### i. Specified Unlawful Activity

Defendants first argue that a judgment of acquittal is warranted on Counts 53–62 because the Government did not provide sufficient evidence showing the funds at issue were the proceeds of any prostitution ad sales during the timeframe of these Counts. (Doc. 2007 at 14). The Government says this argument is a red herring. It argues Ninth Circuit law is clear that a defendant may be convicted of money laundering even if the defendant is not charged or convicted of the underlying specified unlawful activity. (Doc. 2019 at 12).

The Court agrees with the Government. A defendant need not actually be convicted of the specified unlawful activity—what here would be Travel Act offenses—before a money laundering conviction can be had under Section 1956(a)(1)(B)(i). *See e.g.*, *United*

1   *States v. Golb*, 69 F.3d 1417, 1422 (9th Cir. 1995). In fact, even if evidence of the

2   underlying activity is insufficient to convict a defendant, where there is evidence from

3   which a jury could infer the source of the funds was from the underlying unlawful activity,

4   a Section 1956(a)(1)(B)(i) conviction can stand. *Id.* This was precisely the case in *United*

5   *States v. Golb*, where the Ninth Circuit Court of Appeals affirmed the convictions for

6   money laundering where there was evidence from which a jury could have inferred that the

7   source of laundered proceeds was illegitimate—even though the jury found that the same

8   evidence was insufficient to convict the defendant for the actual "specified unlawful

9   activity." *Id.* *See also United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir. 1990)

10   (affirming conviction where the jury could infer that the funds came from the "specified

11   unlawful activity"); *United States v. Mankarious*, 151 F.3d 694, 702 (7th Cir. 1998)

12   (affirming conviction and noting "money laundering statute does not require the

13   government to trace the laundered proceeds to a specific predicate offense"); *United States*

14   *v. Yagman*, 2007 WL 9724388, at *20 (C.D. Cal. May 3, 2007) (noting out-of-circuit case

15   law standing for the same).

16         Defendants have also objected to the time difference between the Travel Act Counts

17   on which Mr. Spear was convicted and the first transaction in Court 53. The Travel Act

18   ads in Counts 2–18 are dated September 10, 2013, to February 26, 2015. The transactions

19   in Counts 53–62 are dated May 18, 2016, to August 31, 2016. The Court finds the time

20   difference here immaterial. The Jury need not necessarily have found that it was the Travel

21   Act violations alleged in Counts 2–18 that specifically created the unlawful proceeds. The

22   federal money laundering statute criminalizes transactions in proceeds, not the transactions

23   that create the proceeds. *Wilkes*, 662 F.3d at 545; *see also United States v. Garcia*, 37 F.3d

24   1359, 1365 (9th Cir. 1994) (finding that under Section 1956, "due to the fungibility of

25   money, it is sufficient [to] prove that the funds in question came from an account in which

26   tainted proceeds were commingled with other funds").

27         The requirements under Section 1956 are that Defendants knew the proceeds

28   derived from unlawful activity and that the proceeds "in fact" derived from unlawful

activity. 18 U.S.C. § 1956(a)(1). This accords with what the Jury was instructed. (*See* Doc. 1998 at 41 (stating that the Government had to prove beyond a reasonable doubt for each of these counts that "the defendant conducted a financial transaction involving property that represented the proceeds of a violation or violations of the Travel Act").

Although the Government did not trace the funds in Counts 53–62 to particular Travel Act violations—i.e., sale proceeds from the sale of particular prostitution ads—there was sufficient evidence from which a jury could infer that the funds were proceeds from Backpage's sales of sex-for-money ads and that Defendants or their conspirators knew they were proceeds from sex-for-money ads. As has been discussed, evidence relating to Defendants' knowledge that Backpage sold prostitution ads was more than sufficiently adduced. Mr. Ferrer told the Jury that following the 2015 sale, the ultimate source of the monies paid to Cereus Properties from Website Technologies "was the prostitution ads posted on Backpage and/or Cracker." (Trial Tr., Doc. 1814 at 90:3–7; 90:20–22; 91:16–17). Mr. Thai explained the movement of these funds: from Backpage ad sales to Website Technologies to Cereus Properties. A rational jury could have concluded that the funds transferred in Counts 53–62 were proceeds from Backpage's sale of illegal prostitution ads.

### ii.   Intent to Conceal

Defendants also argue that there was insufficient evidence of their intent to conceal the source of these transactions to convict them of these charges. Defendants maintain that "[t]here was no testimony that the sale of Backpage and associated loan was consummated for the *purpose* of concealing from financial institutions the source of the funds." (Doc. 2007 at 16).

"[A] conviction under this provision requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute." *Cuellar*, 553 U.S. at 567.[23] "In other words, that a transaction is structured to hide its source is not enough. The government must prove that the transaction had the purpose of concealing

---

[23] The Subsection at issue in *Cuellar* concerned concealment under the statute's transportation prong(A)(2)(B)(ii), however, various circuit courts of appeal have applied *Cuellar* to cases involving concealment under the statute's transaction prong (A)(1)(B)(i). *See Singh*, 995 F.3d at 1075 (collecting cases).

the source." *Singh*, 995 F.3d at 1075. "Where a defendant takes no steps to disguise or conceal the source or destination of the funds, leaving an easy-to-follow trail in moving money around, those transactions conspicuously lack the 'convoluted' character associated with money laundering." *Wilkes*, 662 F.3d at 545–46 (cleaned up). *See also United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) ("The money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds."). The Eleventh Circuit has opined the following:

> Evidence to consider in determining whether a transaction was designed to conceal includes, among other things: statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006) (cleaned up). "Another important consideration is whether the money is better concealed or concealable after the transaction than before." *Id.* (internal quotation omitted).

Defendants argue that the only testimony as to these transactions came from Mr. Ferrer, who testified that these transfers were loan payments in connection with the sale of Backpage. (Doc. 2007 at 16). They say the sale and loan documents were prepared by attorneys and accountants and clearly reference the sale of Backpage, not a "shell" company. (Trial Exs. 5427, 5364). They say that witness testimony simply asserting that the transactions in these counts "involve" Backpage proceeds is insufficient to prove concealment. (Doc. 2029 at 10).

The Court disagrees. Mr. Ferrer testified that Mr. Brunst formed Website Technologies as a shell company with the purpose of concealing that the proceeds going to Website Technologies was revenue from the sale of Backpage ads. (Trial Tr., Doc. 1814 at 89:8–10; Trial Ex. 1481). He also testified that the primary source of money that flowed from Backpage ads was revenue from prostitution ads and that Defendants owned the

recipient entity Cereus Properties. (Trial Tr., Doc. 1814 at 91:16–17). From this evidence, a rational jury could infer that the purpose of the transactions, at least in part, was to conceal that the source of the proceeds flowing through Website Technologies to Cereus were illegal proceeds of prostitution ads sold on Backpage. *See Golb*, 69 F.3d at 1423–24 (noting that jury did not have to accept defendant's explanation that "the convoluted payment methods were only used to avoid Colombian currency exportation laws," and not to conceal the source of the funds).

Defendants' requests for judgment of acquittal on Counts 53–62 are denied.

### b. Counts 64–68: International Promotional Money Laundering Under Subsection 1956(a)(2)(A) (Messrs. Lacey and Brunst)

Messrs. Lacey and Brunst were charged with violation of international promotional money laundering in Counts 64–68. Mr. Brunst was convicted of each charge and no verdict was returned on Mr. Lacey.

To satisfy the requirements of Subsection 1956(a)(2)(A), evidence must establish that a defendant or co-conspirator transferred funds internationally with "the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). At trial, it was established that Ad Tech B.V. made these transfers from its Netherlands bank account to Cereus Properties' Arizona Bank & Trust account between August 5, 2016, and November 15, 2016, and that they totaled approximately $11.3 million. (Trial Tr., Doc. 1928 at 150–51; Trial Ex. 1479). Defendants argue that there is insufficient evidence of their intent to promote Travel Act violations from which a jury could convict on these Counts. The Court again disagrees.

A jury may infer intent to promote the illegal activity from evidence that illicit proceeds have been transferred. *United States v. Barragan,* 263 F.3d 919 (9th Cir. 2001) (noting that in the Ninth Circuit, government is not required to prove that a defendant reinvested illegal proceeds into the illegal enterprise to show intent to promote). For example, courts have found sufficient intent to promote where evidence showed that funds were distributed to co-conspirators, *Manarite*, 44 F.3d at 1415–16 (holding that evidence

that defendants distributed proceeds from illegal chip-cashing scheme was sufficient to support conviction for money laundering because the "scheme could not benefit its participants unless the chips were cashed"); were used to pay persons integral to the success of the illegal activity, *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir. 1995) (finding evidence that defendant made payments to suppliers of contraband cigarettes was evidence of intent to promote on grounds that the defendant "could not have continued the illegal trafficking without paying his. . . suppliers"); and even where the defendant simply deposited a check in his own bank account, *United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir. 1991), *rev'd on other grounds, McCormick v. United States*, 500 U.S. 257 (1991) (holding that depositing a check in a bank account evidenced an intent to promote on the grounds that defendant could only make use of the funds if he deposited the check).

Here, Mr. Thai testified that Ad Tech B.V. received revenue from Backpage following the April 2015 sale of Backpage to Ferrer.   (Trial Tr., Doc. 1923 at 129: 4–17; Trial Ex. 1481).   The transfers at issue show Ad Tech B.V. sending funds to Cereus Properties, funds that then "almost immediately" went to Defendants. (Trial Tr., Doc. 1923 at 136–37).   The Court finds that these transfers sufficiently evidence Defendants' intent to promote the carrying on of Travel Act offenses.   Construing the evidence in the light most favorable to the prosecution, the Jury could have divined an intent to promote the Travel Act offenses from Ad Tech B.V.'s deposit of funds into Cereus Properties' account. *Mararite*, 44 F.3d at 1415.   A rational jury could also have concluded that Mr. Ferrer, as the co-conspirator in control of Ad Tech B.V., could not have continued selling prostitution ads on Backpage without making these payments to Cereus Properties, which was owned by Defendants. *Baker*, 63 F.3d at 1494.[24]   Defendants' requests for judgments of acquittal on Counts 64–68 are denied.

/ / /

/ / /

---

[24] This reasoning applies whether or not Cereus Properties was used for Backpage payroll purposes or solely functioned to collect the balance and interest on the loan.

### c. Count 100: International Concealment Money Laundering Under Section 1956(a)(2)(B)(i) (Mr. Lacey)

Mr. Lacey was convicted of international concealment money laundering in Count 100. The Superseding Indictment states that on January 3, 2017, Mr. Lacey transferred $16.5 million from his Johnson Bank of Arizona account to a Primus Trust Co./K&H Bank in Hungary. (Doc. 230 ¶¶ 210–11.) It alleges that Mr. Lacey knew the funds represented proceeds of some form of unlawful activity; and that he made the transfer in whole or in part to conceal the source of the proceeds of the unlawful activity. (*Id.* ¶ 211.)

Section 1956(a)(2)(B)(i) provides in relevant part,

> (2) Whoever transports or attempts to transport a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
> . . .
> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that the transportation, transmission, or transfer is designed in whole or in part - -
> . . .
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; . . .
> shall be sentenced to a fine of $500,000 or twice the value of the monetary instrument or funds involved in the transportation, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(2)(B)(i); *United States v. Monroe*, 943 F.2d 1007, 1015 (9th Cir. 1991).

The evidence at trial showed that upon receiving his share of the loan payments to Cereus Properties, Mr. Lacey put his funds into five (5) two-year annuity trusts that he controlled.[25] In July 2016, Mr. Lacey sent a letter to his attorney John Becker ("Mr. Becker") asking Mr. Becker to connect him with another attorney "who has expertise in off-shore." (Trial Ex. 1). The letter stated, "to revisit for just a moment, I am not interested in any tax avoidance, I just want to put some assets in place where litigious parties,

---

[25] These transfers for the basis of Counts 94–99.

including government parties, cannot access my accounts." (*Id.*)  Then, sometime in November 2016, Mr. Lacey met with bank officer Lin Howard at Arizona Bank & Trust, seeking advice on how assets were seized and could be protected.  (Trial Tr., Doc. 1925 at 11:1–7).   During that meeting, which Ms. Howard testified made her "very uncomfortable," Mr. Lacey made it clear that he was not looking to avoid paying taxes on the assets but was looking to move some assets "offshore in order to protect them from government seizure." (*Id.* at 15:10–11; 11:11–13).   After this exchange, Arizona Bank & Trust ceased doing business with Mr. Lacey. (*Id.*).

Mr. Lacey's five (5) annuity trusts were ultimately consolidated into Mr. Becker's IOLTA account and on January 3, 2017, Mr. Lacey, through Becker, transferred $16.5 million from the IOLTA account at Arizona Johnson Bank to Primus Trust Company/K&H Bank in Hungary to create a trust for the benefit of Mr. Lacey's two sons.  (Trial Ex. 1479). Thereafter, Mr. Becker, on behalf of Mr. Lacey, timely filed with the United States government a "Foreign Bank Account Report," or "FBAR" related to the Hungary account, but only after obtaining extension of time for Mr. Lacey to do so.

As with Counts 53–62, Mr. Lacey argues that there was insufficient evidence at trial to show (1) he actually concealed or intended to conceal any attribute of the funds at issue in Count 100; or (2) that he knew the funds at issue were the proceeds of specified unlawful activity.  (Doc. 2004 at 2).  The Court will address each argument in turn.

### i.     Concealment

Mr. Lacey argues that there was insufficient evidence that his international transfer was designed to conceal that the source of the funds were illegal proceeds of prostitution ads.  He compares his case to that of the drug courier in *Cuellar*.  In that case, Mr. Cuellar was charged with international concealment money laundering after authorities discovered him transporting $81,000 of drug proceeds into Mexico.  *Id.* at 552.  The funds were found in a secret compartment of his car, covered in plastic bags and animal hair.  *Id.*  The Supreme Court agreed that this evidence showed Mr. Cuellar intended to conceal the money *to transport it* into Mexico but held that that evidence was insufficient to uphold

Mr. Cuellar's concealment conviction because it did not show that it was his ultimate purpose to conceal an attribute of the funds. *Id.* The Court found the evidence showed Mr. Cuellar's ultimate purpose was to "compensate the leaders of the operation," not to conceal its source. *Id.* at 566 (explaining "*how* one moves the money is distinct from *why* one moves the money"). *See also id.* ("The evidence suggested that the secretive aspects of the transportation were employed to *facilitate* the transportation . . . , but not necessarily that secrecy was the *purpose* of the transportation.").

Mr. Lacey argues that his international transfer to the Hungarian account similarly had no concealment purpose. He says the purpose of the transfer was to put the funds "into a bank that would not close the account thereby causing further banking instability, and to fund a trust that had been created for Mr. Lacey's sons." (Doc. 2004 at 8). He further argues that his stated interest in placing funds where government entities could not access them does not evidence an intent to conceal the source of the funds because the word "access" does not mean the same thing as to "conceal," and the Government has pointed to no authority supporting this "analytical leap." (Doc. 2033 at 2). He points out that the Court defined "concealment" for the Jury as "the act of preventing disclosure or refraining from disclosing." (Doc. 1999 at 4). He says his transactions relating to Count 100 were entirely "open and obvious," showing only an intent to disclose the attributes of the transfer. For support, he points out that all the bank accounts at issue clearly belonged to him because he was the owner or the beneficiary of each of them; that Mr. Thai confirmed as much when he testified that he could follow each transaction with ease due to the names on the accounts; and that the existence of the Hungarian account, its location, value, and associated taxpayer (Mr. Lacey), were timely reported to the United States government via a required "FBAR." (*Id.* at 6). He says that his statements to Mr. Becker and Ms. Howard that he had no interest in seeking a tax shelter in moving his assets off-shore further reflect an intention to disclose the attributes of the funds, not to conceal them.

Although Mr. Lacey raises some plausible characterizations of the trial evidence, the Court ultimately disagrees that a rational juror could not have found the purpose of his

1    international transfer was to conceal the source of the funds.  The money laundering statute

2    is violated if the transaction in question is "designed in whole or *in part*" to conceal.  18

3    U.S.C. § 1956(a)(2)(B)(i) (emphasis added).  Unlike in *Cuellar*, the Government provided

4    sufficient evidence to show that the purpose of Mr. Lacey's transfers to the Hungary

5    account, at least in part, was to conceal that the true source of the funds stemmed from

6    sales of Backpage prostitution ads.

7        The Jury could possibly have divined this intent from Mr. Lacey's statements to his

8    attorney and Ms. Howard that he wanted to put his assets somewhere the government

9    "could not access them."  Though the Government has not provided the Court with a case

10   in which a defendant's intent to shield assets from government seizure amounted to

11   concealment under Subsection 1956(a)(2)(B)(i), the Court nonetheless finds that a rational

12   Jury could have interpreted Mr. Lacey's statements to mean that he thought the

13   international transfer would further conceal the origin of the funds and thus prevent the

14   government from accessing them.  The Court rejects Mr. Lacey's suggestion that this is an

15   improper analytical leap to make.

16       Moreover, the jurors could have also been persuaded by the fact that Mr. Lacey's

17   transfer to Hungary was the last transfer in a series of unusual transactions that had the

18   effect of distancing the funds from Backpage proceeds.  In *United States v. Wilkes*, the

19   defendant was convicted of bribery for making payments to a congressman in exchange

20   for government contracts and transactional money laundering concealment under

21   § 1956(a)(1)(B)(i).  662 F.3d at 547.  In upholding the defendant's conviction, the Ninth

22   Circuit noted that certain transactions that "provided additional buffers between the corrupt

23   contract and the [payoffs]" were evidence of intent to conceal the source of the funds

24   because these transactions were "convoluted" and not "simple transactions."  *Compare id.*

25   *with Adefehinti*, 510 F.3d at 323 (finding no evidence of intent to conceal where a

26   fraudulent check was negotiated at a bank and most of the proceeds "were either cashed or

27   went directly into accounts in the name of defendants or their associates without passing

28   through any other person's account").

- 52 -

As in *Wilke*, the Government here provided evidence of similar "buffer" transactions that a rational jury could have found were indicative of an intent to conceal the source of the funds. Specifically, there was evidence showing that Mr. Lacey and his alleged co-conspirators created Website Technologies and Cereus Properties to insulate those entities from the tainted Backpage proceeds. The Government's expert witness showed how these funds flowed through these entities before being distributed to Mr. Lacey, who then sent the funds to five separate annuity trusts he controlled. From there, Mr. Lacey wired the funds in the trusts to Mr. Becker, who consolidated the money into his IOLTA account before transferring it to Hungary to create a trust for the benefit of Mr. Lacey's two sons. Even though the Government's expert testified that he could follow the trail of funds with relevant ease, there is enough here to suggest that these transfers, including the one charged in Count 100, were not the type of "simple transactions" that fall outside of the money laundering statute. *Accord United States v. Chang*, 2020 WL 5702131, * (N.D. Cal. Sept. 24, 2020) (denying defendant's Rule 29 motion where the Government introduced evidence that transfers of improperly solicited donations were made to an illegitimate enterprise entity in order to conceal that defendant used the money on personal expenses). *See also United States v. Tekle*, 329 F.3d 1108, 1113–14 (9th Cir. 2003) (rejecting the defendant's argument "that the government did not prove that he intended to conceal the illegal nature of [drug trafficking] funds because the 'transactions in question were open, notorious, and did not disguise defendant's identity'" as "[t]he necessary concealment. . . is that of the source of the funds, not the identity of the money-launderer"). And though the FBAR that Mr. Lacey filed suggests that he intended to pay his taxes on the funds therein, the filing does not necessarily negate the fact that the transfer concealed the source of the funds more than it did before the funds were transferred. *Johnson*, 440 F.3d at 1291. Based on these facts, a rational jury could have found that the purpose of Mr. Lacey's Hungary transfer was at least in part to conceal that the funds found their source in the proceeds of illegal Backpage prostitution ads.

/ / /

## ii.     Knowledge

Mr. Lacey also says the Government adduced insufficient evidence that he knew "the funds at issue were proceeds of specified unlawful activity in the form of Travel Act violations for the facilitation of prostitution business enterprises." (Doc. 2033 at 9). Not so. The Court finds that there was substantial evidence from which a rational juror could have inferred Mr. Lacey's knowledge that the funds were proceeds from Backpage prostitution advertisements.

First, the Government provided sufficient evidence from which a juror could infer that Mr. Lacey knew Backpage sold ads for prostitution. As has been discussed, *supra*, such evidence included Mr. Lacey's article on Backpage's business practice, in which he writes that Backpage is providing "the oldest profession in the world" with transparency (Trial Ex. 113a) and his public statement that he believed "in legalized prostitution" (Trial Ex. 1911b). The Government also introduced evidence of statements made during meetings Mr. Lacey and the other owners of Backpage had with NCMEC. During that meeting, NCMEC representatives presented Mr. Lacey and others with Backpage ads from the Adult escort section that contained links to TER. This evidence could have led a rational juror to infer that Mr. Lacey was aware that all or some of the Adult escort ads on Backpage were illegal sex for money ads. *See Singh*, 995 F.3d at 1075. In doing so, the Jury could have also found that the ads were not deserving of any First Amendment protections that may otherwise have insulated Mr. Lacey from liability.

Second, as described above, testimony from Messers. Ferrer and Thai provided sufficient evidence from which the Jury could have concluded that the funds at issue in Count 100 came from Backpage's prostitution ads. Mr. Lacey argues his statement to his lawyer that the source of the funds was revenue from the sale of Backpage "cannot be equated with knowledge that the funds at issue were the proceeds of specified unlawful activity, meaning the proceeds from one of the 50 charged ads." (Doc. 2004 at 11). But again, there is also no requirement that the Government must show that Mr. Lacey had knowledge that the funds that were transferred were proceeds from the specific 50 ads

1   charged. Where there is evidence from which a jury could infer the source of the funds

2   was from violations of the Travel Act—here, in the form of selling sex for money ads, Mr.

3   Lacey's Subsection 1956(a)(1)(B)(i) conviction can stand.

4       Defendants' Motions for a Judgment of Acquittal on the Section 1956 Counts are

5   denied.

6       **2.      Money Laundering Counts Under 18 U.S.C. § 1957**

7       Defendants argue that judgments of acquittal should enter in their favor on the

8   Section 1957 Counts because the prosecution failed to prove that any alleged laundered

9   money in Counts 69–99 "derived from specified unlawful activity"—in this case,

10  violations of the Travel Act. (Doc. 2007 at 18). All of the transfers at issue in Counts 69–

11  99 are alleged to derive from unlawful Backpage proceeds.

12      "A conviction for money laundering under 18 U.S.C. § 1957 requires the

13  government to show: (1) the defendant knowingly engaged in a monetary transaction; (2)

14  he knew the transaction involved criminal[ly derived] property; (3) the property's value

15  exceeded $10,000; and (4) the property was derived from a specified unlawful activity."

16  *United States v. Roger*, 321 F.3d 1226, 1229 (9th Cir. 2003).[26]  The statute defines

17  "criminally derived property" as "any property constituting, or derived from, proceeds

18  obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). "In a prosecution for an offense

19  under this section, the Government is not required to prove the defendant knew that the

20  offense from which the criminally derived property was derived was specified unlawful

21  activity." *Id.* § 1957(c).  Indeed, the "statute applies to the most open, above-board

22  transaction." *United States v. Rutgard*, 116 F.3d 1270, 1291 (9th Cir. 1997).

23      Unlike Section 1956 charges, the Ninth Circuit imposes a tracing requirement in

24  Section 1957 cases due to Section 1957's potentially broad reach.  Under this view, the

25  prosecution can succeed on a Section 1957 charge in one of three ways: (1) by establishing

26  that the entire business from which the funds derived was an illegal enterprise; (2) by

27  showing that a deposit of at least $10,000 of criminally derived proceeds were made into

28

---

[26] Travel Act violations qualify as "specified unlawful activity." 18 U.S.C. § 1957(f)(3);
18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1).

defendant's account; or (3) in the case of a withdrawal transaction, by showing that all of the funds were transferred out of the account. *Rutgard*, 116 F.3d at 1292; *United States v. Yagman*, 502 F.Supp.2d 1084 (C.D. Cal. Aug. 17, 2007). In contrast to other circuits, the Ninth Circuit rejects the presumption that proof that some criminally derived funds exist in an account means that a subsequent transfer of funds out of that account involves those criminally derived funds. *Rutgard*, 116 F.3d at 1292–93 (explaining that "[t]he statute does not create a presumption that any transfer of cash in an account tainted by the presence of a small amount of fraudulent proceeds must be a transfer of these proceeds . . . and [t]o create such a presumption in order to sustain a conviction under § 1957 would be to multiply many times the power of that draconian law").

Here, the Government's theory was that *all* proceeds from Backpage were criminally derived from Defendants' Travel Act violations, and thus *all* subsequent transfers stemming from Backpage and/or Website Technologies and Ad Tech B.V. were unlawful under Section 1957.[27] The Government did not, however, provide sufficient evidence at trial that every ad sold on Backpage.com prior to these transfers was a Travel Act violation such that a rational jury could have traced the funds back to a criminally-derived source. Even the fact that the Government offered evidence showing that the majority of Backpage's revenue—at times up to 96%—stemmed from sales of ads posted in the Adult Escort section of Backpage is insufficient to sustain these convictions. A nearly identical argument was unsuccessfully advanced in *United States v. Hanley*, 190 F.3d 1017, 1024, 1025–26 (9th Cir. 1999), *superseded in part by* U.S.S.G. § 2S1.1 (2001) (rejecting the government's argument that the tracing requirement was satisfied where the

---

[27] The Court asked Government counsel to clarify this point during oral argument on the Rule 29 Motions:

**Court:** So is it your position that, essentially then, any proceeds that were received from the operation of Backpage at that time then - - because they were considered illegals proceeds, then whatever was used with that money to purchase then could be alleged?
**Mr. Kozinets:** Absolutely, Your Honor.
**Court:** That's the – that's the position?
**Mr. Kozinets**: Absolutely.

(Doc. 1903 at 69).

government had proven that the great majority of the funds in the account were criminally derived funds). And because the Government made no attempt to trace the proceeds that derived from a particular Travel Act violation or violations, it cannot be said that a rational jury could have concluded "beyond mere speculation" that at least $10,000 of criminally derived proceeds were transferred to Defendants in any of the Section 1957 charges. *Yagman*, 502 F.Supp.2d at 1089.

Because Counts 69–99 all suffer from this evidentiary deficiency, the Court will enter judgments of acquittal on each of these charges.

### 3.    Conspiracy to Commit Money Laundering (Count 52)

To convict an offender of money laundering conspiracy under Subsection 1956(h), the government must prove the following elements beyond a reasonable doubt: (1) there was an agreement to commit money laundering; (2) the defendant knew the objective of the agreement; and (3) the defendant joined the agreement with the intent to further its unlawful purpose. *United States v. Jaimez*, 45 F.4th 1118, 1124 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1038 (2023). Here, the object of the alleged conspiracy was to commit the substantive money laundering offenses alleged in the Superseding Indictment. (Doc. 230 ¶ 203(a)–(e)).

Defendants reiterate many of the arguments they made relating to the alleged deficiency of evidence supporting the substantive money laundering offense to argue they are entitled to a judgment to acquittal on the conspiracy to commit money laundering charge. (*See* Doc. 2007 at 20–21). They also argue there was insufficient evidence of an agreement to launder money as alleged. As discussed above, the Court finds that there is sufficient evidence to convict Defendants on all of the Section 1956 money laundering charges. As explained, *supra*, the Government was not required to "link" a particular Travel Act violation to a violation of Section 1956 in order for those charges to stand. *See e.g.*, *Golb*, 69 F.3d at 1422 (stating that a defendant need not actually be convicted of the underlying specified unlawful activity for a money laundering conviction to stand where there is evidence from which a jury could have inferred that the source of laundered

proceeds was illegitimate).

Moreover, a rationale juror could have inferred that Defendants agreed to form entities and structure the sale of Backpage to distance themselves from the unlawful proceeds stemming from Backpage's sale of prostitution ads, i.e., violations of the Travel Act by facilitating the promotion of prostitution.  *Kaplan*, 836 F.3d at 1212 (holding that an agreement "can be proved by direct or circumstantial evidence, including inferences from circumstantial evidence").

The Court will therefore deny Defendants' request to enter a judgment of acquittal on Count 52.

## III.   DEFENDANTS' RULE 33 MOTION FOR NEW TRIAL[28]

Defendants have also filed a joint Motion for a New Trial.  Rule 33 permits the Court to vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  Although a court's power to grant a motion for a new trial is "much broader than its power to grant a motion for judgment of acquittal," it may not grant the motion unless it finds that "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict" such that "a serious miscarriage of justice may have occurred."  *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citation omitted); *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992).  The "burden of justifying a new trial rests with the defendant." *United States v. Saya*, 101 F.Supp.2d 1304, 1307 (D. Haw. 1999) (citing *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986)).  "[T]he government bears the burden of proving beyond a reasonable doubt that an error was harmless."  *United States v. Benamor*, 925 F.3d 1159, 1166 (9th Cir. 2019) (citation omitted).  In general, motions for new trial "are not favored by the courts and should be viewed with great caution." *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984) (internal quotation omitted).

The Court will review Defendants' arguments in turn.

---

[28] The Court notes that the parties, again, omit record support for their assertions, and quite often mischaracterize the record testimony.  The Court declines to scour the months-long trial record or years long case docket to find support for their unsupported assertions.

## A.   Jencks & *Brady* Violations

Making some of the same arguments that they did in their unsuccessful post-trial Motions to Dismiss (Docs. 1958; 1967; 1972), Defendants first argue that a new trial is warranted because the Government failed to make timely disclosures to the Defendants as required by the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*").[29]   They argue the Government failed to timely produce (1) emails between Mr. Ferrer and government witness postal inspector Lyndon Versoza; and (2) documents disclosing "the factual information the government developed during its investigation of Backpage.com in Western District of Washington in 2012–2013 [(the "WDWA Investigation")]."  (Doc. 2009 at 3).

### 1.   Mr. Ferrer's Emails to Lyndon Versoza

The Court's February 7, 2024, Order denying Defendants' Motion to Dismiss (Doc. 2042) addressed certain of Mr. Ferrer's emails, finding that they were "signed or otherwise approved or adopted" by him and therefore qualified as Jencks material under 18 U.S.C. § 3500(e).  (*Id.* at 8).  However, the Court also determined that the Government's late disclosure did not warrant dismissal of the case or striking Mr. Ferrer's testimony because the material had been previously disclosed.  (*Id.* at 9).  Defendants do not advance any new grounds in their Rule 33 Motion.   Thus, for the reasons stated in its February 7, 2024, Order, the Defendants' Motion for a New Trial based on these grounds is denied.

### 2.   Presumed *Brady* Information From the 2012–13 WDWA Investigation of Backpage

Defendants next argue the Government failed "to produce nearly all the factual information developed during the WDWA Investigation . . . [which] did not result in a prosecution of Backpage or its owners."  (Doc 2009 at 2).  The Government responds that this argument "speculate[s] about what that investigation 'determined' and assert[s], without support that unspecified materials from the investigation are plainly exculpatory

---

[29] The Defendants asserted this argument without benefit of the Court's February 7, 2024, Order (Doc. 2042) and the Court incorporates its findings from that Order because their arguments are mostly duplicative.

and impeaching" and that Defendants have already litigated and lost this argument. (Doc. 2022 at 3).

The Defendants' Motion is indeed based on speculative findings of the WDWA Investigation and the reasons why it did not result in a prosecution of Backpage or its owners. Defendants speculate that the WDWA Investigation included potential *Brady* material because it likely determined that "though many people who saw Backpage.com adult ads might conclude the ads related to prostitution, their conclusions would be unsound because so many activities involving sex and money are lawful;" and because "Backpage.com's moderation practices were consistent with industry standards." (Doc. 2009 at 5). They do not cite to any record evidence or testimony to support these claims. Nonetheless, they accuse the Government of failing to produce this material under *Brady* and say this failure warrants a new trial. (Doc. 2009 at 5 ("[T]he government's refusal to produce to the defense *these plainly exculpatory and impeaching materials* warrants, at minimum, a new trial.") (emphasis added)).

As best as the Court can glean, Defendants assert that they were prejudiced by the non-production because in their absence they were unable to adequately defend against Mr. Ferrer's statement at trial that in 2012 Backpage was experiencing "pressure" due to "another prostitution investigation of the site." (Trial Tr., Doc. 1971 at 80:5–8; *see* Doc. 2009 at 4 (arguing that when the Government elicited this statement it "used the investigation as a sword at trial while seeking to shield disclosures relating to that investigation")). They argue that, without the WDWA disclosure, they were hampered from offering that the WDWA Investigation exonerated Backpage and its owners from illegality. (*See* Doc. 2009 at 4–5).

From the outset of the case, Defendants have strenuously litigated the Government's discovery production relating to the WDWA Investigation. In addressing Defendants' November 1, 2021, Motion to Dismiss the Superseding Indictment (Doc. 1355), this Court reviewed their assertion that the Government failed to produce exculpatory evidence related to the WDWA investigation. (*See* Doc. 1444 (the Court's December 29, 2021

Order)).  Earlier, in Defendants' September 9, 2021, Motion to Compel (Doc. 1281), Defendants sought an order compelling the Government to produce all materials from its WDWA investigation that were relied upon when its attorneys concluded that there was no evidence of criminality and asserting that they sought all evidence from the investigation, noting that it is likely exculpatory.  (*Id*. at 6).  This Court found that these same arguments had been previously considered and ruled upon.  Two previously-assigned courts had already found "[i]t is clear to the Court that the investigation that took place in the Western District of Washington is wholly separate from the criminal case before the Court . . . and [t]he Defendants have failed to demonstrate how the mental impressions and legal analyses from attorneys that are not involved in this case could potentially be considered exculpatory evidence."  (*See* Doc. 1444 (citing Doc. 449)).  Those courts also found that the attorney memos were irrelevant to the indictment and proceedings in *this* criminal case.  That the Court has now heard the case in its totality does not give it reason to change these rulings or grant Defendants a new trial based on alleged *Brady* violations.

During the trial, the Court permitted the Government to introduce testimony of the Defendants' knowledge that Backpage was being used to promote prostitution.  For example, Mr. Ferrer was allowed to testify that several NGOs repeatedly informed Defendants that their website was selling girls and women for money and that Backpage was receiving thousands of subpoenas relating to prostitution and trafficking on Backpage.  Mr. Ferrer's brief statement that Backpage and its owners were "pressured" was another example of testimony that suggested Defendants knew their website was facilitating the promotion of prostitution.  Defendants, in turn, had ample opportunity to solicit testimony from the Government and their witnesses about whether the Travel Act counts were actually offers of sex for money or that the Defendants were on notice that they were sex for money ads.  Indeed, the Defendants' own expert witness, Dr. Kimberly Mehlman Orozco, testified that no one could be certain that any ad, irrespective of where it was posted, is an actual sex for money ad.  Trial Tr., Doc. 1930 at 50:12–20.  The Defendants have not convinced this Court (or any other, previously-assigned court) that the presumed

*Brady* material from the WDWA Investigation would have been material to the issues at trial, could have been used to impeach witnesses, or that a new trial would likely have resulted in acquittal.  *United States v. Kulczyk,* 931 F.2d 542, 548 (9th Cir. 1991).  Defendant's Rule 33 Motion is therefore denied on that basis.

**B.  Mr. Ferrer's Testimony Relating to Ms. Robinson**

Defendants next argue that they are entitled to a new trial because the Government "elicited false or misleading testimony from Carl Ferrer" relating to his communications with Ms. Robinson, the poster in ads from Counts 3, 6–11, and 18.  (Doc.  2009 at 6); *see also supra* Section II.B(2)(b) ("Commission of Travel Act Violations in Counts 3, 6–11, 18").  When, as here, a defendant asserts a new trial is warranted because the prosecution used perjured testimony, additional standards apply.  If the perjury was used knowingly the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have [a]ffected the judgment of the jury."  *United States v. Young,* 17 F.3d 1201, 1203 (9th Cir. 1994) (quoting *United States v. Agurs,* 427 U.S. 97, 103 (1976)).  If the defendants cannot show that the Government knowingly used false testimony, then the conviction will be set aside "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Endicott,* 869 F.2d 452, 455 (9th Cir. 1989) (citing *United States v. Bagley,* 473 U.S. 667, 682 (1985)).

Upon review of the record, the Court does not find evidence that Mr. Ferrer's testimony about his communications with Ms. Robinson were false or misleading.  The Government introduced hundreds of exhibits and testimony through Ferrer about his email communications.  Mr. Ferrer testified that he used several email addresses including carl.ferrer@backpage.com and carl@backpage.com.  Mr. Ferrer testified that he recalled having email exchanges with Ms. Robinson using carl@backpage.com "from 2010–2018" and that "there were a lot of emails."  (Trial Tr., Doc. 1795 at 79).

Defendants say a new trial is required because Mr. Ferrer stated on cross-examination that carl@backpage.com "really wasn't my email address."  From this

1    statement they conclude that his testimony that he communicated with Ms. Robinson

2    through that email address "was false (or at least highly misleading)." (Doc. 2009 at 8).

3    They contend "Mr. Ferrer admitted on cross-examination that the emails to and from the

4    carl@backpage.com email address were *received by and responded to by his staff, not by*

5    *him*, contrary to his testimony on direct examination." (Doc. 2009 at 8) (emphasis added).

6            These contentions are unsupported by the record and conveniently ignore other

7    testimony Mr. Ferrer gave about his communications. The Court's scrutiny of Mr. Ferrer's

8    testimony fails to find a statement that Mr. Ferrer did not respond to emails sent to

9    carl@backpage.com. The record reflects that Mr. Ferrer acknowledged his *primary* email

10   address was carl.ferrer@backpage.com, but that he also received emails at

11   carl@backpage.com. (*See* Trial Tr., Doc. 1867 at 106–07). Though Mr. Ferrer testified

12   he used carl@backpage.com primarily for marketing and that others also used it, he also

13   testified that "they would often bring emails to my attention if they needed help with it."

14   (Doc. 1867 at 104). Significantly, Mr. Ferrer recognized certain email exchanges as emails

15   that he personally responded to. For example, when asked whether Trial Exhibit 163 was

16   "also an e-mail exchange between you and Pamela Robinson?" he answered "Yes, it is."

17   (Trial Tr., Doc. 1795 at 86). He further acknowledged that Trial Exhibit 164 was a

18   responsive email he drafted to Ms. Robinson, and that he had to have Mr. Spear approve it

19   before he sent it because the email addressed Backpage's safety and security

20   enhancements, decisions he said were at Mr. Spear's pay grade. (*Id.* at 89–90).

21           Based on these circumstances, the Court does not find that Mr. Ferrer's testimony

22   recalling eight years of email exchanges between carl@backpage.com and Ms. Robinson

23   was perjury. The Defendants merely anchor their Rule 33 Motion to Mr. Ferrer's

24   acknowledgment that others had access to that email address. Without more, the Court

25   cannot find that this one statement "could have affected the judgment of the jury" in

26   convicting Mr. Spear on Counts 3, 6–11, and 18. Thus, Defendants Rule 33 Motion is

27   denied on this basis.

28   / / /

1      **C.      The Government's Opening and Closing Statements**

2          Defendants next argue they are entitled to a new trial because "the the Government

3  repeatedly made improper arguments in its opening and closing statements."

4  (Doc. 2009 at 9).  They claim the Government improperly urged the Jury to convict them

5  on improper grounds including: (1) on a legally insufficient object of conspiracy, that is

6  "to make money;"[30] (2) an impermissible boundless conspiracy; (3) on the grounds of

7  "promoting prostitution" (where statute only proscribes facilitating the promotion of

8  prostitution);  (4) without a showing of specific intent, and (5) because it improperly

9  "exhorted" the Jury to convict Defendants on publication of ads protected by the First

10 Amendment.  (*Id*. at 9–16).  Defendants also argue that the Government improperly

11 referenced evidence in its closing argument that was admitted under hearsay exceptions for

12 truth of the matter.

13         As an initial matter, the Court notes that the Jury was instructed that

14 "statements . . . and arguments by the lawyers are not evidence."  (Doc. 1998 at 7).  The

15 Jury was clearly instructed on the substantive Conspiracy count and on the meaning of

16 "promote" or "facilitate the promotion of" as those terms are defined in the Travel Act.

17 (*Id*. at 24–25, 30).  Without new and/or material evidence to the contrary, a jury is regularly

18 presumed to accept the law as stated by the court, not as stated by counsel.  *See United*

19 *States v. Rodrigues*, 159 F.3d 439, 451 (9th Cir. 1998).  So, this Court presumes that the

20 Jury adhered to its instructions, rather than the attorneys' arguments, in its decisional

21 process.

22         Nonetheless, a criminal conviction can be overturned based on a prosecutor's

23 comments if they affected the fundamental fairness of the trial.  *United States v. Young,*

24 470 U.S. 1, 11 (1985).  A "trial Judge has broad discretion in controlling closing argument,

25 and improprieties in counsel's arguments to the jury do not constitute reversible error

26 unless they are so gross as probably to prejudice the defendant, and the prejudice has not

27 been neutralized by the trial judge." *United States v. Navarro,* 608 F.3d 529, 535–36 (9th

28 ───────────────
[30] This is the same argument asserted in their Rule 29 Motions.  To the extent previously
discussed, the Court incorporates its related findings for purposes of their Rule 33 Motion.

Cir. 2010) (internal quotations and citations omitted).  Furthermore, it is not misconduct for the Government to argue reasonable inferences based on the record.  *See United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).

### 1.    Legally Insufficient Object of the Conspiracy

As they did in their Rule 29 Motions, Defendants maintain the Government improperly told the Jury it was enough to convict Defendants of conspiracy to commit the Travel Act when the prosecutor stated that the object of the conspiracy was to make money, which Defendants contend is a legally insufficient object on which to convict for conspiracy.  (Trial Tr., Doc. 1933 at 6–7).[31]  The Court has repeatedly addressed and rejected this argument.  The Ninth Circuit recognized that the object of a conspiracy can be to accomplish an unlawful purpose, or a "lawful purpose by unlawful means."  *Caplan*, 633 F.3d at 542.  In its rebuttal closing argument, the Government clarified this point for the Jury:

> The defendants say, "Hey, it's not illegal in the United States of America to make money."  We haven't charged them with that.  There is no federal statute that says it's illegal to make hundreds of millions of dollars.  That is not the charge.  That is not the crime.  They are not charged with making money.  They are charged with *how* they made money.  Money was the object of the conspiracy.  They are charged with *how* they made money, and that was off the backs of people engaged in illegal prostitution business enterprises.

(Trial Tr., Doc. 1961 at 40:12–20) (emphasis added).  The Government's rebuttal demonstrates that it did not ask the Jury to convict on a legally insufficient object of conspiracy.

### 2.    Boundless Conspiracy

The Court need not address Defendants' boundless conspiracy argument because nothing in the Government's summation supports that claim.  In reminding the Jury of the evidence supporting each Travel Act count, the Government adhered to the Court's prior orders that Defendants were not "indicted for the amorphous notion of

---

[31] The record does not reflect that any Defendant objected to the Government's statement.

'prostitution' . . . they were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related business, or other groups were involved in the business of prostitution." (Doc. 946 at 13).

### 3.    Promoting Prostitution and Specific Intent

The Court rejects Defendants' arguments that the Government urged the Jury to convict them on the grounds of promoting prostitution and without a showing of specific intent. Defendants identify statements made by the Government during opening and closing arguments that they say inferred the Jury could convict Defendants on promoting prostitution as opposed to facilitating the promotion of prostitution. However, the Court will not hold the Government to a standard that requires the prosecutors to quote the language of the Travel Act each time they refer to it. As discussed, the Jury was properly instructed on the elements of the Travel Act. (Doc. 1998 at 30). The same is true with regard to the legal definition of specific intent. (*Id.*) The Jury is presumed to follow the Court's instructions, including that they apply the law as given to them. (*Id.* at 2).

### 4.    Reference to Evidence Admitted Under Exceptions to Hearsay

Defendants next argue a new trial is warranted because the Government improperly told the Jury during its closing that (1) Defendants "know about the Attorneys Generals letters, and they know they are not on solid ground;" and (2) that the CNN documentary showed that Backpage had "cornered the market on prostitution advertisement" and "all you had to do was go to Backpage.com and post an ad and the phone started ringing in minutes." (Doc. 1009 at 17). Defendants say in doing so, the Government improperly referenced evidence "for the truth"—e.g., "that all the adult ads on Backpage.com were prostitution ads, and that nearly all of the Backpage.com's revenues were from prostitution ads"—when at trial, the State Attorneys General letters and CNN documentary were only admitted to prove Defendants were on notice that Backpage posted ads for prostitution. (*Id.*)[32]

---

[32] Defendants also state that the Government used "that evidence for its truth throughout the trial . . ." (Doc. 2009 at 17). However, Defendants offer no trial record citation for this assertion, so the Court declines to consider it.

Upon review of the record, the Court rejects this kitchen sink argument. As acknowledged, the Government sought the admission of the AG letters and the CNN documentary to show that Defendants were aware of Backpage's prostitution ad platform. Relevant evidence is admissible so long as it is "probative of the proposition it is offered to prove, and . . . the proposition to be proved must be one that is of consequence to the determination of the action" and the Government is permitted to argue reasonable inferences based on the record. *Necoechea*, 986 F.2d at 1276; *United States v. Click*, 807 F.2d 847, 850 (9th Cir. 1989). The Government introduced evidence, including co-conspirator statements, to show Defendants' knowledge or absence of mistake that sex for money ads were being posted on Backpage. There was nothing grossly prejudicial about the Government's closing references to these categories of evidence, especially considering the Court's instructions and admonishment that attorneys' arguments are not evidence.

Indeed, the Jury's mixed verdict supports an inference that they adhered to the Jury Instructions by applying the evidence and testimony to the law. The Court finds nothing in the Government's closing argument affected the fundamental fairness of the Defendants' trial. The Court denies the Defendants' Rule 33 Motion on these grounds.

### D. Jury Instruction Changes

Defendants next argue that they should receive a new trial because the Court, after receiving briefing from the parties, made modifications to two of the Jury Instructions prior to closing arguments. Though Defendants "welcomed" the changes, they claim the changes "severely prejudiced" them in three ways, namely because (1) they were unable to make use of the instructions in their opening statements; (2) they were unable to shape testimony elicited on cross-examination; and (3) they were unable to assess the witnesses they would call in the defense case. (Doc. 2009 at 17–19). The Court is not persuaded.

#### 1. First Amendment Jury Instruction

Prior to trial, the Court approved a First Amendment-related jury instruction that stated in part that "the First Amendment does not protect speech relating to illegal activity." (*Id*. at 18). After the close of evidence, but prior to closing arguments, the parties were

1    allowed to argue their positions as to certain Jury Instructions.  With regard to the

2    First Amendment instruction, the Court replaced the statement that "the First Amendment

3    does not protect speech relating to illegal activity," with a sentence that read, "[i]f you find

4    that an ad proposes an illegal transaction, it is not protected by the First Amendment."

5    (Doc. 1998 at 48).[33]

6          Defendants first argue, without explanation, that "the instruction ultimately given

7    would have allowed for a viable advice of counsel defense" at trial.  (Doc. 2009 at 19).

8    Whether Defendants could raise an advice of counsel defense was an issue that was

9    litigated extensively and *ad nauseum* in pre-trial motions, on the eve of trial, and again at

10   various points during trial.  The Court told Defendants, in no uncertain terms, that the

11   defense was theirs to raise if they could first meet the four preconditions laid out in

12   *United States v. McLennan*, 563 F.2d 943, 946 (9th Cir. 1977).  (*See* e.g., Doc. 1643 at 12–

13   13 (stating that "to the extent [Defendants] intended to raise this argument, whether in

14   opening statement, closing argument, or their case in chief, they must first proffer a

15   showing of all four factors.")).[34]  Defendants steadfastly refused to waive the attorney-

16   client privilege with regards to their communications.  (Doc. 1643 at 12–13).  The

17   Defendants *never* attempted to clear the *McLennan* hurdles, so they cannot now claim

18   prejudice over their own inaction by somehow placing blame on changes to the First

19   Amendment Jury Instruction.

20         In an equally unspecific manner, Defendants also argue that the Court admitted

21   _____

     [33] The complete Jury Instruction states:

22
     All speech is presumptively protected by the First Amendment to the United States
23   Constitution.  However, the First Amendment does not protect speech that proposes an
     illegal transaction.  Prostitution is illegal in 49 states and most of Nevada.  It is the
24   government's burden to establish that each of the ads alleged in this case is an ad for
     prostitution and not for another purpose such as an ad for an escort, dating or massage
25   service.  If you find that an ad proposes an illegal transaction, it is not protected by the First
     Amendment.

26   (Doc. 1998 at 48).

27   [34] The factors include: (1) they made a complete disclosure to counsel; (2) they requested
     counsel's advice as to the legality of the contemplated action; (3) they received advice that
28   it was legal; and (4) they relied in good faith on the advice.  563 F.2d at 946.

- 68 -

"large quantities of evidence that was highly prejudicial to the defense that arguably could have been relevant under a 'speech relating to illegal activity' standard, but which would not have been under the "speech that poses an illegal transaction" standard. (Doc. 2009 at 19). They say that if they knew the case would go to the Jury under "speech that proposes an illegal transaction" standard, they would have "had much stronger arguments to exclude most, if not all, of the 'notice' evidence," which they say "could have dramatically altered the evidence admitted." (*Id.*) Defendants entirely fail to specify what "notice" evidence they say would not have been admitted. They also say they "objected to all of this evidence," but do not give a description or record citations to support their contention. (*Id.*) The Court refuses to sift through the lengthy trial record and make guesses on Defendants' behalf. The Court does note that Mr. Spear, in closing, asserted "[t]hese ads are not on their face anywhere close to being prostitution ads. You've heard the witnesses tell you that." (Trial Tr., Doc. 1959 at 16).[35] But in sum, Defendants have not met their Rule 33 burden.

### 2.    Travel Act Jury Instruction

Defendants also claim they were prejudiced because the Court did not provide the Jury with the following instructions:

> [T]o satisfy the specific intent requirements of the Travel Act, the government must prove beyond a reasonable doubt, for each Count, that each defendant in some significant manner associated himself or herself with the particular business enterprise associated with the ad charged in that Count with the intent to promote, or facilitate the promotion of, the prostitution offenses committed by that business enterprise.

(Doc. 2009 at 1718). Instead, the Court instructed the Jury as follows:

> To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.

---

[35] Notably, Defendants omit reference to the Jury being instructed that they can apply the direct and circumstantial evidence instruction to determine if each ad was protected by the First Amendment.

(Doc. 1998 at 30).

First, the Defendants argue that, had the Court settled on their proposed instruction, they would have been able to "mount the specific intent defense they intended – an aiding and abetting defense – whether in their openings or through eliciting evidence during the trial." (Doc. 2009 at 18). Here too, Defendants do not explain why they were prevented from mounting an aiding and abetting defense under the Court's instruction, and the Court will not attempt to define their argument. So, again, the Court cannot make a prejudice determination.

Defendants further assert that they learned of these two changes "on the cusp of closing" and so they had no time to prepare. Not so. As the Government points out, the closing statements took place over the course of several days—October 27 through November 2, 2023—due to juror circumstances and to enable the defense counsel to prepare. Moreover, Mr. Lacey's counsel sought and received his preferred First Amendment jury modification so he cannot now fain prejudice. The Court is not persuaded that these assertions suggest that "a serious miscarriage of justice may have occurred." *Alston*, 974 F.2d at 1211–12. The Defendants have not met their burden of demonstrating that standard is met and thus, a new trial will not be granted on this basis. *Endicott*, 869 F.2d at 454.

### E.  Insufficient First Amendment and Travel Act Jury Instructions

Defendants next assert that, though the First Amendment instruction "included the correct legal standard," more was needed. Relating to the Travel Act instruction, they claim that "although the Court added language looking somewhat like an aiding and abetting instruction" that language materially "eroded what was required for the jury to find specific intent." (Doc. 2009 at 20). They urge that these flaws require a new trial.

A Rule 33 motion may be granted for failure to give proper jury instructions. However, an instructional error does not automatically warrant a new trial because a defendant must show that the error affects substantial rights. *See* Fed. R. Crim. P. 52(a); *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020). "[A]n error in misdescribing

1  or omitting an element of the offense in a jury instruction is harmless if it is 'clear beyond
2  a reasonable doubt that a rational jury would have found the defendant guilty absent the
3  error.'" *United States v. Thongsy*, 577 F.3d 1036, 1043 (9th Cir. 2009) (quoting *Neder v.*
4  *United States*, 527 U.S. 1, 18 (1999)).  When applying this standard, a court should consider
5  "the jury instructions and the trial record as a whole."  *United States v. Espino*, 892 F.3d
6  1048, 1053 (9th Cir. 2018).  Where the evidence actually presented at trial and "other
7  language in the jury instructions" assures the court that the jury could not have based its
8  verdict on the erroneous language in the instruction, the Ninth Circuit has found the error
9  to be harmless. *Miller*, 953 F.3d at 1103; *see also Espino*, 892 F.3d at 1053; *United States*
10  *v. Perez*, 116 F.3d 840, 847 (9th Cir. 1997) ("Even though an element of the offense is not
11  specifically mentioned [in the jury instructions], it remains possible the jury made the
12  necessary finding.").

13  ### 1.        First Amendment Jury Instruction

14          With regard to the First Amendment instruction, the Defendants would have
15  preferred the Court to have told the Jury that "the speech must be evaluated from the
16  content of the speech alone, and speech is presumptively protected unless it proposes a
17  transaction [sic] would necessarily constitute an illegal act."  (Doc. 2009 at 19).  Because
18  the Jury was not told as much, they say Mr. Spear was convicted on Travel Act counts
19  "even though the publication of the ads underlying those counts were protected by the First
20  Amendment."  (*Id.* at 20).  But when viewing the Court's instruction in light of the entire
21  trial record, the Court disagrees.  As discussed *supra* in Section II.B of this Order, co-
22  conspirators and law enforcement witnesses understood the terms in the Government's
23  Travel Act ad exhibits to be sex for money ads because the ads were accompanied by
24  photos of barely clad females and because they included coded terms like "roses", "GFE"
25  (girl-friend experience), "in-call and out-call," "clean," "hygienic" and "G-R-3-3-K."
26  Moreover, each victim/witness that testified identified her ad and stated that the ads were
27  sex for money ads.  So, an instruction stating "the speech must be evaluated from the
28  content of the speech alone" would not have altered Mr. Spear's outcome.  Therefore, a

1    new trial on these grounds is not warranted.

2                    **2.       Travel Act Jury Instruction**

3           Finally, the Court's Travel Act instruction adhered to the Ninth Circuit's precedent.

4    The instructions clearly stated that to show that Messrs. Spear and Lacey violated the

5    Travel Act by selling and publishing prostitution ads on Backpage, the Government was

6    required to establish that Messrs. Spear and Lacey "in some significant manner associated"

7    themselves with the prostitution business seeking to post an ad on Backpage.  (Doc. 1998

8    at 30); *see also Gibson Specialty Co.*, 507 F.2d at 449 (requiring the government to show

9    each defendant "had specific intent to promote, manage, establish, carry on or facilitate

10   one of the prohibited activities"); *United States v. Polizzi*, 500 F.2nd 856, 876–77 (9th Cir.

11   1974) (stating the required *mens rea* under the Travel Act is the "specific intent to facilitate

12   an activity which the accused knew to be unlawful under state law").  Given the Court's

13   adherence to this Circuit's precedent, it is hard to see how the jury instructions

14   misdescribed or omitted an element of the offense, such that a rational jury would have

15   acquitted a defendant absent the error.

16          Having considered each argument advanced in the Defendants' Rule 33 Motion for

17   a New Trial, the Court is not persuaded that a serious miscarriage of justice may have

18   occurred.  Accordingly, the Rule 33 Motion is denied.

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

**IV.     CONCLUSION**

In conclusion, after viewing the record in the light most favorable to the Government, the Court finds there is insufficient of evidence to support convictions under Counts 19–51 as to Mr. Lacey and Counts 66–99 as to Messrs. Lacey, Brunst, and Spear. The Court will issue judgments of acquittal for those Counts.  In all other respects, Defendants' Rule 29 Motions are denied.  Moreover, the Court does not find cause to grant a new trial for any of the reasons stated in Defendants' Rule 33 Motion.  That Motion will be denied in its entirety.

Accordingly,

**IT IS ORDERED** that Defendants' Oral and Supplemental Rule 29 Motions (Docs. 2004; 2006; 2007) are **granted in part and denied in part**.  The Clerk is directed to issue Judgments of Acquittal for Defendant Michael Lacey on Counts 19–51 and 66–70, 81, 83–84, 86, 88–92 and 94–99; for Defendant John Brunst on Counts 66–68, 78–84, 86–93; and for Defendant Scott Spear on Counts 71–78, 85 and 93.  In all other respects, the Motions are **denied**.

**IT IS FURTHER ORDERED** that Defendants' Rule 33 Motion for New Trial (Doc. 2009) is **denied** as stated herein.

Dated this 23rd day of April, 2024.

Honorable Diane J. Humetewa
United States District Judge

# EXHIBIT O

## (FILED UNDER SEAL)

# EXHIBIT O

## (FILED UNDERSEAL)

# EXHIBIT P

# EXHIBIT P

Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| United States of America, | NO. CR-18-00422-PHX-DJH |
|---|---|
| Plaintiff, | **DEFENDANT MICHAEL LACEY'S MOTION FOR BAIL PENDING APPEAL** |
| vs. | |
| Michael Lacey, *et al.*, | (Oral argument requested) |
| Defendants. | |

Defendant Michael Lacey, by and through his undersigned counsel, files the instant Motion for Bail Pending Appeal. Each pertinent factor[1] weighs heavily in favor of bail pending appeal. Mr. Lacey is a person of integrity, who presents no risk of flight and no risk of danger to the community—not a lifelong criminal. Moreover, as this Court already recognized, "there are substantial issues that have to be considered by the Ninth Circuit" that "may change the complexity [of the case] or … what the government may or may not be able to pursue with regard to a retrial" (1/29/2024 Tr. at 9). An appeal will not be pursued for purposes of delay.

## ARGUMENT

### I.      Mr. Lacey is a person of integrity.

Mr. Lacey is a retired, seventy-six year old, award winning journalist. He sought and followed the advice of two respected lawyers in structuring and carrying out the financial transaction that led to his conviction for international concealment money laundering—his first felony conviction. Quite the opposite of a life of crime, Mr. Lacey dedicated his life to fighting injustices through high-quality, hard-hitting journalism. A more fulsome discussion of Mr. Lacey's accomplishments, contributions to his community, and generosity is set forth in his Sentencing Memorandum, and attachments, incorporated herein by reference. (*See* Doc. 2133.)

### II.     The record in this case demonstrates that Mr. Lacey poses no risk of flight.

Mr. Lacey was arrested on April 6, 2018. After surrendering his passport and posting a surety bond, Mr. Lacey was released on April 13, 2018. Mr. Lacey been on supervised release the entire

---

[1]      Bail pending appeal should be granted if there is "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" and if "the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in— []reversal, [] an order for a new trial, [] a sentence that does not include a term of imprisonment, or [] a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143; *accord United States v. Garcia*, 340 F.3d 1013, 1015 (9th Cir. 2003); *United States v. Handy*, 761 F.2d 1279, 1279–80 (9th Cir. 1985). Under *Handy* and *Garcia*, the defendant need not show "a likelihood of success on appeal," but "only a non-frivolous issue that, if decided in the defendant's favor, would likely result in reversal" or a sentence to less than the expected duration of the appeal. *Garcia*, 340 F.3d at 1020 n.5.

six and a half years that this case has been pending, and, critically, this Court decreased his conditions of release – granting his motion to remove his ankle monitor – on April 7, 2023. (Docs. 1560, 1561.) Mr. Lacey sought that relief on his Pretrial Services Officer's suggestion and the government did not oppose his motion, demonstrating that neither had concerns about Mr. Lacey presenting a risk of flight. Further, this Court continued Mr. Lacey on release after his conviction. With and without electronic monitoring and before and after his conviction, Mr. Lacey has been authorized to travel outside of Arizona for extended periods, including post-conviction travel outside of Arizona several times for several weeks at a time. Mr. Lacey has remained compliant with his conditions of release throughout this case—and Probation recently concluded that he would be a "good candidate for voluntary surrender" because he has "kept all court appearances, and has been in compliance with pretrial release **and is not viewed as a flight risk** …" (PSR at 57 (emphasis added).)[2]

Fighting this case is central to Mr. Lacey's existence. He plans to see his appeal and any potential retrial through to their conclusions. The funds Mr. Lacey transferred to Hungary are neither a motivation for, nor means of, flight. Not only does Mr. Lacey not have his passport, but those funds are held in an irrevocable trust benefitting his adult sons. Moreover, Mr. Lacey has appeared for every court proceeding since 2018 despite the existence of the trust in Hungary. Similarly, the potential severity of Mr. Lacey's sentence presents no new risk of flight. Mr. Lacey is elderly and, due to his age, medical conditions, and high risk of being subjected to inmate extortion and abuse, has understood from the inception of this case that, if incarcerated, he likely would die in prison. That factor has been present since the inception of this case and he has not fled.

## III.   The record demonstrates that Mr. Lacey poses no risk of danger to the public.

Mr. Lacey has committed no crimes on release. He is alleged to have been part of a conspiracy to facilitate prostitution enterprises through his involvement with the Backpage.com

---

[2]      In addition to Mr. Lacey's exemplary record on pretrial release, additional factors weigh in his favor. He has strong ties to Arizona, where he has lived since 1966. He has two adult children with whom he maintains a very close relationship. He has never run from any challenge and is committed to clearing his name—and that of his late business partner and lifelong friend, James Larkin. He will not give up the people, principles, and places he holds most dear.

website.  The criminal conduct alleged by the government ended not later than April 2018 with the government's seizure of Backpage.com, if not three years earlier (*i.e.* nine and one-half years ago) upon the sale of Backpage.com to Mr. Ferrer.[3]  With respect to his crime of conviction, there are no victims associated with the wire transfer at issue.  Further, Probation concluded that he was "***not viewed as . . . a danger to the community***."  (PSR at 57.)  Mr. Lacey's conduct on release, as recognized by Probation, presents no danger to public safety.

**IV.    There is no basis to find that an appeal would be for delay.**

There is no basis to find that an appeal would be for delay, as Mr. Lacey will seek Ninth Circuit review of the substantial issues this Court already recognized are presented by this case.

**V.    There are "substantial issues" for the Ninth Circuit to resolve**.

This Court already found there are "substantial issues" for the Ninth Circuit to resolve on appeal.[4]  The government, too, has already acknowledged there are substantial issues to be resolved by the Ninth Circuit that could result in reversals and a new trial.[5]  Even if the Court

---

[3]    Doc. 2063 at 41 ("Considering the evidence and testimony, the Court finds that there is an insufficiency of evidence showing any acts by Mr. Ferrer, or any other co-conspirator, taken after the sale of Backpage was a reasonably foreseeably consequence of the unlawful agreement.  The evidence accords with the Jury's likely conclusion that the sale of Backpage to Mr. Ferrer was a break in the conspiracy's agreement to violate the Travel Act.").

[4]    This Court recognized "[t]here are substantial issues that have to be considered by the Ninth Circuit," which "may change the complexity or the, what the government may or may not be able to pursue with regard to retrial of the 84 remaining counts against Mr. Lacey." (1/29/2024 Tr. at 9.)  Further, "the post sentencing appeals" to be filed by "Spear and Brunst, could inform all the parties, including Mr. Lacey, going forward.  So it may be that on appeal several of those convictions are set aside or remanded back." (5/13/2024 Tr. at 15.)  Finally, this Court noted that the Ninth Circuit "will let us know what they think.  It's conceivable that they decide it comes back, it comes back in total with possibly Mr. Spear, Mr. Brunst, [and] Mr. Lacey" for retrial.  (*Id.* at 16.)

[5]    Government counsel stated that "[b]oth parties think that it would be more efficient to have the Ninth Circuit rule on these issues before any retrial." (5/13/2024 Tr. at 9); *see also* 10 ("If we had a trial in August or October, . . . and then there was an appeal, there could be something in that appeal that would require yet another trial."); Doc. 2091 at 2 ("Lacey should be sentenced now and take his appeal with Brunst and Spear.  This is an option that is supported by law, and assuages Lacey's concern (shared by the United States) that proceeding to trial before the Ninth Circuit rules on the appellate issues is inefficient."); Doc. 2049 ("Lacey has expressed concern that if a retrial occurs before the appeal and then the 'Ninth Circuit

and the government had not already recognized the "substantial issues" that could require retrial or reversal of convictions, the record also demonstrates that there are numerous issues to be resolved by the Ninth Circuit that could result in reversal, a new trial, or a sentence less than the time the appeal would be pending.

**VI.     There are substantial issues concerning Count 100.**

At trial, the government failed to establish the requisite elements for international concealment money laundering as articulated in *Cuellar v. United States*, 553 U.S. 550, 561 (2008). (*See* Docs. 2004, 2033.)  Mr. Lacey had no intent to conceal or nor was there any concealment. Instead, Mr. Lacey not only expressed his intent to reveal (through the reporting of the transaction through the filing an FBAR and through the payment of taxes), but his counsel actually revealed the attributes of the funds to the government through the filing of timely FBARs.   No case, whether in this Circuit or elsewhere, has affirmed an international concealment money laundering conviction where the defendant expressed an intent to reveal and actually revealed the attributes of the funds to the government.  On this basis, alone, the appeal here will set precedent on the sufficiency of proof of concealment, but there are many other substantial issues concerning this conviction.

First, in denying the Rule 29 Motion, this Court ruled that the jury could have found an intent to conceal based on Mr. Lacey's expressed intent in preventing the government from "accessing" his banking and disrupting his banking relationships, even though, as this Court indicated, there is no authority from the Ninth Circuit or elsewhere permitting the word "access" to be interpreted to mean "conceal" as used in 18 U.S.C. § 1956(a)(2)(B)(i).  (Doc. 2063 at 52.)  This issue of statutory interpretation is an issue of first impression.  Section 1956 does not define the term "conceal."  The Ninth Circuit has explained that "[w]hen a statute does not define a term," courts should "give the phrase its ordinary meaning . . . consulting common dictionary definitions in the usual course." *A.L.D.F. v. U.S.D.A.*, 933 F.3d 1088,

---

finds legal error,' the parties would be facing a fourth trial.  The United States agrees with this concern.").

1093 (9th Cir. 2019) (citations omitted).  Just like the dictionary definition of "individual" could not mean "animal" in *A.L.D.F.*, the dictionary definition of "conceal" does not include "access," and using a definition of "conceal" other than the dictionary definition to deny the Rule 29 motion was legal error.[6]

Second, the Court found sufficient proof of intent to conceal because "Mr. Lacey's transfer to Hungary was the last transfer in a series of unusual transactions that had the effect of distancing the funds from Backpage proceeds," relying on *United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011).  (Doc. 2063 at 52.)  But *Wilkes* has no relevance, as *Wilkes* addressed ***domestic*** concealment money laundering, not ***international*** concealment money laundering.[7] That difference matters, because the Supreme Court has limited the proof to be considered in ***international*** concealment money laundering:

> [I]t is important to keep in mind that ***the critical transportation was not the transportation of the funds within this country on the way to the border***.  Instead, the term 'such transportation' means transportation 'from a place in the United States to … a place outside the United States'—here, from the United States to Mexico.  Therefore, what the Government had to prove was that ***petitioner knew that taking the funds to [another country] was "designed," at least in part, to conceal or disguise their "nature," "location," "source," "ownership," or "control."***

*Cuellar*, 553 U.S. at 562 (emphasis added).  As a result, this Court's stated basis for upholding the conviction – a series of transfers within the United States prior to the international transfer – is not relevant to a determination about whether the wire from the United States to Hungary was designed or intended to conceal the attributes of the funds.  *See id.* at 568 ([T]he only evidence introduced to prove this element showed that petitioner engaged in extensive efforts to conceal the funds *en route* to Mexico, and thus his conviction cannot stand.").

---

[6]    That definition of "concealment" also was inconsistent with this Court's jury instruction, in which this Court defined "concealment" as "the act of preventing disclosure or refraining from disclosing." (Dkt. 1999 at 4.)  By abandoning the definition given to the jury in its Rule 29 ruling, the Court also created an independent due process violation.

[7]    Moreover, the wire transfers in *Wilkes* are distinguishable from the transfers here (Doc. 2033 at 5-6), because there was no way to connect the dollars at issue with the defendant.

6

Third, the Supreme Court in *Cuellar* held that the international concealment money laundering statute "encompasses only **substantial** efforts at concealment," *id.* at 563 (emphasis in original), but, as this Court recognized, the transaction underpinning the money laundering conviction was straightforward and could be followed with "ease." (Doc. 2063 at 53.) Mr. Lacey's counsel have been unable to find any case in which a wire transfer from one account readily connected to the defendant to another account readily connected to the defendant was sufficient to be considered as "**substantial** efforts at concealment."

Fourth, the government presented no evidence that the purpose of the wire from the United States to Hungary was designed, even in part, to conceal the attributes of the funds – which also means the conviction must be vacated. *See Cuellar*, 553 U.S. at 566 n.7 (reversing conviction because, although "[c]oncealing or disguising a listed attribute need be only one of the purposes of the transportation," "compensating the leaders of the operation was the only purpose to which" the government witness testified). Here, Mr. Thai testified that he had no idea why Lacey (or any defendant) transferred funds. (Day 19 A.M. 10/17/2023 Tr. at 74.) Ms. Howard – the other government witness – testified that she did not understand Mr. Lacey to be asking her for help concealing or hiding anything. (Day 17 P.M. 10/12/2024 Tr. at 16, 22.) The only evidence about the purpose of the transfer was the testimony of attorney John Becker, who testified the purpose of the transfer was to stabilize Mr. Lacey's banking and to fund a trust that had been created for Mr. Lacey's sons. (Day 23 10/24/2024 Tr. at 67-70; Exs. 1; 5516 at 17.) Under *Cuellar*, the government failed to carry its burden.

Fifth, there was no basis for the conviction because there was no proof that Mr. Lacey knew that the funds transferred were "the proceeds of some form of unlawful activity" or that the funds, "in fact," were "the proceeds of specified unlawful activity." In acquitting Mr. Lacey of Counts 94-99, this Court acquitted the very funds at issue in Count 100 – twice. (Doc. 2063 at 55-57.) In acquitting Mr. Lacey of the post-sale Travel Act violations (Counts 19-51), this Court also ruled that there was no basis to hold any defendant or Ferrer liable for Travel Act violations post-sale, under direct liability or *Pinkerton* liability, and that the alleged conspiracy ended at the sale of Backpage to

Ferrer.  (Doc. 2063 at 40-41.)  As a result, the government failed to prove that the funds at issue in Count 100 – which derived entirely from the publication of post-sale ads (Tr. Ex. 1479) – derived from specified unlawful activity, and this conviction cannot stand.  *See, e.g.*, *United States v. Lichtenberg*, 309 F. App'x 107, 109 (9th Cir. 2009) (vacating money laundering convictions because there was no proof that the funds at issue were proceeds of specified unlawful activity).

Sixth, any sentence imposed must be based on the loss table method and cannot involve a base offense level higher than 10, or the sentence would improperly count acquitted or unresolved conduct, thereby creating clear error.  (*See* Docs. 2101, 2124.)  Further, there is no underlying conduct attributable to Mr. Lacey's wire transfer because the funds conclusively are from post-sale ads (Ex. 1479), and this Court has ruled that the conspiracy ended at the sale and that no one, even Ferrer could be liable for Travel Act violations post-sale (Doc. 2063).  (Doc. 2024.)  As a result, the underlying conduct method is not available here, and using it would create clear error.

## VII.   Execution of a sentence without bail may violate due process.

A judgment on Count 100, with 34 pending and unresolved counts, may result in the Ninth Circuit declining jurisdiction over Mr. Lacey's appeal because the judgment on Count 100 is not a "final judgment," resulting in the dismissal of Mr. Lacey's appeal.  (Docs. 2080, 2092.)  If Mr. Lacey's sentence on Count 100 is executed without bail, Mr. Lacey may be incarcerated but unable to challenge his conviction or sentence, which would "violate fundamental notions of due process." *United States v. King*, 257 F.3d 1013, 1020 (9th Cir. 2001).  The Court should avoid the potential for such a "fundamental" due process violation by either staying execution of the sentence or granting bail pending appeal.  At a minimum, the question of whether Mr. Lacey will be able to appeal his conviction on Count 100 is a substantial issue.

## VIII.   There are "substantial issues" outside the context of Count 100.

Mr. Lacey incorporates by reference the substantial issues raised by his co-defendants in their bail motions that are common to all defendants.  Mr. Lacey will raise those issues in his appeal of Count 100 to the extent that they:  (1) negate Mr. Lacey's lack of knowledge that the funds were

proceeds; (2) demonstrate a violation of Mr. Lacey's statutory or constitutional rights; (3) support a judgment of acquittal on Mr. Lacey's unresolved counts; or (4) support retrial.

### CONCLUSION

For all the reasons, Mr. Lacey respectfully requests that this Court grant bail pending appeal.

RESPECTFULLY SUBMITTED this 23rd day of August, 2024,

Paul J. Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME CAMBRIA LLP

By:     /s/ Paul J. Cambria, Jr.
Paul J. Cambria, Jr.
Attorneys for Michael Lacey

On August 23, 2024, a PDF version
of this document was filed with
Clerk of the Court using the CM/ECF
System for filing and for Transmittal
Of a Notice of Electronic Filing to the
Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Austin Maxwell Berry, austin.berry2@usdoj.gov

# EXHIBIT Q

# EXHIBIT Q

1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 29, 2024 |
| Michael Lacey, et al. | ) | 9:16 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**STATUS CONFERENCE**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

1               **A P P E A R A N C E S**

2

    For the Government:
3       UNITED STATES ATTORNEY'S OFFICE
        By:  **Mr. Kevin M. Rapp, Esq.**
4            **Mr. Peter S. Kozinets, Esq.**
             **Mr. Andrew C. Stone, Esq.**
5            **Ms. Margaret Wu Perlmeter, Esq.**
        40 North Central Avenue, Suite 1200
6       Phoenix, Arizona 85004
        kevin.rapp@usdoj.gov
7       peter.kozinets@usdoj.gov
        andrew.stone@usdoj.gov
8       margaret.perlmeter@usdoj.gov

9   For the Government:
        UNITED STATES DEPARTMENT OF JUSTICE
10      By:  **Mr. Austin Berry, Esq.**  (Appears via Zoom)
        1301 New York Avenue, NW, 11th Floor
11      Washington, DC 20005
        austin.berry2@usdoj.gov

12
    For the Defendant Michael Lacey:
13      LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
        By:  **Mr. Paul J. Cambria, Jr., Esq.**
14      42 Delaware Avenue, Suite 120
        Buffalo, NY 14202
15      pcambria@lglaw.com

16

17

18

19

20

21

22

23

24

25

                 UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

1

2

3      (Proceedings commence at 9:16 a.m.)

4      COURTROOM DEPUTY:  This is case number CR 18-422,

5  United States of America vs. Michael Lacey, on for status

6  conference.

7      Counsel, please announce your record -- presence for

8  the record.  Sorry.

9      MR. STONE:  Good morning, Your Honor, Andy Stone,

10  Peter Kozinets, Kevin Rapp, Peggy Perlmeter and Austin Berry is

11  on the screen for the United States.

12      THE COURT:  Good morning.

13      MR. CAMBRIA:  Good morning, Your Honor, Paul Cambria

14  for Mr. Lacey.

15      THE COURT:  Good morning to you.  Good morning,

16  Mr. Lacey.

17      Now, I wanted to bring the parties in because having

18  received the notice that the government intends to retry

19  Mr. Lacey on the 84 counts for which there was no verdict, I

20  wanted to get a sense of what you thought the timing would be

21  of all of this in the wake of, I will make you aware, of all of

22  the sort of moving parts that we have here.

23      As you know, and I'm going not to address the matters

24  that are pending before the Court, but you have one count of

25  conviction, which I assume is going to be the subject of an

1    appeal, and the -- what I assume to be the eventual appeal of

2    the jury verdicts by the codefendants.  I wanted to get a sense

3    of how you think, from the government's perspective, what the

4    timing of all of this would look like because it seems to me a

5    complex issue in terms of scheduling.  Have you thought about

6    that in terms of the Speedy Trial Act and all of what I think

7    are all continuing moving parts?

8         MR. STONE:  Yes, Your Honor, and I will do my best to

9    address the Court's concerns.  And if you have questions,

10   please interrupt me.  Obviously there's a number of moving

11   parts, and this is a complex matter where you have

12   multidefendants and the jury reached verdicts, complete

13   verdicts as to four of the defendants, and with one there were

14   count of acquittal, count of conviction, and then the 84 counts

15   that were hung up.

16        Obviously there's a number of motions pending before

17   Your Honor that have the potential, if leave was given, to --

18   to end this case really, and all of that sort of overlaid with

19   the Speedy Trial Act and the Ninth Circuit law on that, which

20   is dissimilar as to other circuits, and so there are complex

21   issues here, Your Honor.

22        I think if we take them one at a time, we have the

23   Speedy Trial Act that we need to ensure that we are in

24   compliance with.  The government's notice demonstrates that

25   there's two scenarios in which we are in compliance with it.

1    Mr. Cambria filed a response on Friday where he's waived his

2    client's time, waived his rights to a speedy trial, so that's a

3    third, a third path to make sure that we're in compliance with

4    the speedy trial.

5            THE COURT:  I have not seen the notice.  I was not

6    aware.

7            MR. STONE:  That was filed at 2038 on January 26th,

8    which I believe was Friday.  On page 3, if Mr. Cambria doesn't

9    mind, I'll just read what he wrote on that.  It says, "Finally,

10   in order to have sufficient time to obtain funds to retain the

11   undersigned as counsel for the third trial, Lacey waives any

12   Speedy Trial Act rights to the extent the time is not tolled by

13   virtue of the pending Rule 29 and 33 motions."

14           THE COURT:  All right.  I appreciate that,

15   Mr. Cambria.

16           MR. STONE:  So there are a couple options here.  One

17   is that we haven't fully explored and we would want a little

18   more time to understand all of the implications, but one

19   scenario, as I laid out, or as we laid out in our motion in

20   Document 2035, and what has been done in other cases that had

21   similar, that had similar facts, would be that Mr. Lacey is

22   sentenced on the count of conviction, it goes up on appeal, the

23   Ninth Circuit does whatever the Ninth Circuit does, and then

24   there's a decision on whether or not the trial will commence on

25   the 84 hung counts.

```
1              I'm not stating that that's the United States'
2   position as we sit here today.  I think we need to get a trial
3   on the calendar and make sure we're okay with the speedy trial
4   rights, but that is an option that has been done in other cases
5   that may be something that we can look to in this case as well.
6              THE COURT:  So what you're suggesting is wait for the
7   Ninth Circuit to render any decision on the count of conviction
8   and then pursue the trial?
9              MR. STONE:  That is one viable option, Your Honor.
10  That is not the United States' position as we sit here today.
11  We would need more time to explore that, but that is something
12  that has been done in a number of other cases, and I've cited
13  those cases in Document 2035.
14             THE COURT:  All right.  Option two, do you have one?
15             MR. STONE:  Well, option two, first off, we need to
16  understand the rulings on these post-trial motions because
17  there is no sense in having a trial if a Rule 29 motion is
18  going to be successful.  I think --
19             THE COURT:  Well, let's just, for sake of argument,
20  let's assume that, you know, half of your counts remain, you
21  have 84 counts.
22             MR. STONE:  Option two, we have a trial date set on
23  Count 3, Your Honor.
24             THE COURT:  Mr. Cambria, have you given any of this
25  any thought?
```

1        MR. CAMBRIA:  First off, Your Honor, I agree that the

2   two defendants who were convicted who had nothing to do with

3   this proceeding now, I assume are going to immediately appeal,

4   Brunst and Spear, and go to the Ninth Circuit, and there will

5   be a number of issues that could have an impact on any

6   subsequent trial where Mr. Lacey would be involved in.  And so

7   to that degree, it does make sense to wait to hear from the

8   Ninth Circuit.

9        The other thing is I have not been retained for a

10  third trial.  It appears that you didn't receive the material

11  that we filed.  I apologize.  I don't know why.

12       THE COURT:  Well, I did not look at the docket, so it

13  might -- I am sure you did file it.  I note that you did file

14  it, but I didn't receive it, so...

15       MR. CAMBRIA:  Well, basically what I said there is

16  part of this, that there will be issues the Ninth Circuit would

17  decide that could have an impact on any subsequent trial.  But

18  in addition, we have not been retained because Mr. Lacey's

19  assets have been seized, and we would like to have the

20  opportunity to go and file a Monsanto motion to determine

21  whether or not we could have funds available for a retrial and

22  to retain me for such a trial, and other expenses that we've

23  had, and I would be prepared obviously to do that as soon as

24  possible.

25       A couple of those, I think, have been granted already

8

1    for Brunst, but we haven't made one, but we need to, and so

2    that this way Mr. Lacey can retain me for any retrial, if there

3    is a retrial.

4           So I think from a practical matter, we need to know

5    what the Ninth Circuit says because there's no use trying the

6    case and then they rule a certain way that has an impact on

7    that and then we're doing it again.  Three times is enough as

8    far as I'm concerned.

9           And so what I'm suggesting, and we did specifically

10   waive any speedy trial issue here, so what I'm suggesting is

11   that at minimum you give me the opportunity to make this quick

12   Monsanto motion.  Hopefully it would be granted, and then I

13   could be retained if there is a third trial.

14          And in addition, I do -- I do believe that it's

15   worthwhile from an economic, the Court's time and others to

16   basically hear what the Ninth Circuit has to say.  There are

17   some unique issues in this case, especially as the First

18   Amendment intertwines in this area, and I think it's worthwhile

19   to hear what they have to say about those issues, and I assume

20   that Spear and Brunst, who have no reason to delay an appeal on

21   their part, you know, will be there and these issues will be

22   common and have an impact on anything that might happen with

23   regard to Mr. Lacey in another trial.

24          So at minimum, I'd ask the Court to allow us to make

25   the Monsanto motion.  Hopefully if it's successful, I can be

1  retained and then we can talk about what -- what should be

2  next.  Ideally, we would simply hold things in abeyance and

3  wait for the Ninth Circuit.

4          THE COURT:  Well, you can at any time file a Monsanto

5  motion.

6          MR. CAMBRIA:  I'm sorry?

7          THE COURT:  You can at any time file a Monsanto

8  motion.

9          MR. CAMBRIA:  Yeah.

10          THE COURT:  And so there's no prohibition in having

11  you do that, and having the government, of course, respond to

12  that as well.  In all likelihood we will likely have to have a

13  hearing related to that motion.  So I think if you get that

14  done, we can have that at least settled --

15          MR. CAMBRIA:  I will.

16          THE COURT:  -- in a more orderly fashion.  I guess at

17  this juncture, just understanding the posture of the case and

18  because there are substantial issues that have to be considered

19  by the Ninth Circuit, it may -- I do agree it may change the

20  complexity or the, what the government may or may not be able

21  to pursue with regard to a retrial of the 84 remaining counts

22  against Mr. Lacey.

23          And so I think at this point we'll look for your

24  motion, Mr. Cambria.  And I guess I note too that there are

25  additional named counsel.  I'm assuming that these are

1    individuals that are part of your firm who have signed on to

2    the post-trial pleadings, Mr. Cambria?

3          MR. CAMBRIA:  Erin McCampbell Paris has been assisting

4    me.  She has been responsible for research and writing and so

5    on, and so she would be the one who would join with me in

6    filing that Monsanto motion as soon as we practically can do

7    it.

8          THE COURT:  Okay.  And I guess -- well, so at this

9    juncture there's really nothing to be done in terms of setting

10   any sort of hearing status or otherwise, but do pay attention

11   to the docket and I think we'll all move forward in that

12   fashion.

13          Is there anything further from the government at this

14   juncture?

15          MR. STONE:  I think, Your Honor, it would perhaps be

16   easier for the record if we could get a date down for the trial

17   rather than just having it be open-ended.  I know that there's

18   been a waiver of the speedy trial rights, but in most cases

19   when there's a potential for a trial there is at least a date.

20   Sometimes it's just a placeholder, but there is a date that the

21   Court issues so that we at least have that issue and the

22   parties know about it.  That's one thing.

23          The second point, Your Honor, is in terms of the

24   differences of the proposal of waiting to try Mr. Lacey until

25   after the Ninth Circuit has ruled, Mr. Cambria's suggestion is

1  that Mr. Lacey is not sentenced and he doesn't go up on appeal.

2  We don't think that's right.  We think he would need to be

3  sentenced.  He can take his own appeal.  If he has any issues

4  he wants to raise, he can raise.  And then, depending on what

5  the Ninth Circuit does, there can be a determination on his

6  trial.

7          For the four or five cases I cited in Doc 2035, that's

8  the procedure it would be for the defendant to be sentenced on

9  counts of conviction, take his appeal up, and then after that

10  there's the determination on whether there's going to be a

11  retrial on the hung counts.  Those are my two points, Your

12  Honor.

13          MR. CAMBRIA:  My only comment on that, Your Honor, is

14  we do have motions pending in front of Your Honor, and so

15  rather than, you know, push along on that, we know that the

16  other two defendants who were convicted are going to an

17  immediate trial and so, therefore, the Ninth Circuit will have

18  the case and the issues will be up to us.  And so for what they

19  suggest is that you would go forward with your decisions and

20  then we would, if they were against us, if you will, he would

21  be sentenced and then we would go to the Ninth Circuit.  To me

22  it just seems that it's -- we have two defendants who clearly

23  are going to expeditiously go to appeal, so whatever the

24  decisions will be there the issues will become.

25          THE COURT:  Yes, I agree with that, but I do think

1    that holding in abeyance a sentencing on the count of

2    conviction really to me doesn't help the matter along.  In

3    fact, I think, unless, Mr. Cambria, you have a reason supported

4    by case law that you think that sentencing should be held in

5    abeyance, then I'll entertain that, but I don't -- I don't

6    think that that's going to be useful to the posture of the

7    case.  I think sentencing -- because, as you know, the

8    triggering mechanism for an appeal is really after the sentence

9    has been imposed.  And so I think we have to move forward in

10   that regard.

11           But in any event, I do agree that we probably should

12   at least have a placeholder date in which we can treat as a

13   non-firm trial date, but it will help keep us on the calendar

14   if something should arise.  But I will tell you that I cannot

15   do that until after May, and just going to my own trial

16   schedule.  So what is your suggestion for a placeholder trial

17   date, if you have one, if you discussed it at all?

18           MR. STONE:  Your Honor, we would just ask based on

19   your availability as soon as possible.  As soon as practicable

20   after your calendar opens up.

21           MR. CAMBRIA:  My trial, the last one will be finished

22   at the end of July.  I have a homicide April 1st, and then a

23   federal, I am sure it's happened in this district as well, PPP

24   bank fraud, et cetera, type case, which is scheduled for

25   July 12th through probably the end of that month, so after July

1   there are no trials scheduled at this time.

2          THE COURT:  We're destined to always be in August.

3   And I guess, Mr. Cambria, I was led to believe that you are

4   easing up in your practice, but it seems you are ratcheting up.

5          MR. CAMBRIA:  Not at all.  There may be some people

6   trying to ease me up in my practice, but that's not happening

7   at all.  As a matter of fact, I have a vigorous schedule, as I

8   always have, and I intend to do it that way.  My hope is that I

9   am found some day with my head down on my desk on a winning

10  decision and I passed.

11         THE COURT:  Well, that remains to be seen, but we

12  won't hope that that happens anytime soon.  So as a

13  placeholder -- should we do August the 6th?  We will set August

14  the 6th and we'll use that as our placeholder.  And at some

15  point we probably will meet again in terms of a status hearing

16  or something of that sort before that time depending on how all

17  these moving parts play out, but in any regard, that's what we

18  will do.

19         COURTROOM DEPUTY:  How long?

20         THE COURT:  And I suspect this will be a shorter

21  trial?

22         MR. STONE:  Yes, Your Honor.  We were just discussing

23  that, we think five weeks is a good estimate.

24         THE COURT:  Mr. Cambria, my guess is you've thought

25  about your potential defense case, one week maybe?

14

1          MR. CAMBRIA:  We might add two days on to that, a week

2    maybe.

3          THE COURT:  We'll keep a note that it will roughly be

4    about six weeks.

5          Anything further from the government?

6          MR. STONE:  No, Your Honor, just, was there a thought

7    that there would be oral argument scheduled on the pending

8    motions?

9          THE COURT:  I -- right now I -- they are fully

10   briefed, and they are almost overly briefed, and that was the

11   reason for one of my subtle hints that, look, only concentrate

12   on what has been argued and presented and not new argument.  So

13   in any event, I have not contemplated that at this juncture

14   because, again, they are fully briefed.  We have a

15   fully-developed record, which is the reason it's taken some

16   time.

17          And so anything further from you, Mr. Cambria?

18          MR. CAMBRIA:  Not at all, Your Honor.

19          THE COURT:  All right.  Thank you.  Then this matter

20   is adjourned.

21          MR. STONE:  Thank you, Your Honor.

22       (Proceedings concluded at 9:38 a.m.)

23

24

25

UNITED STATES DISTRICT COURT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    **C E R T I F I C A T E**

3

4          I, HILDA E. LOPEZ, do hereby certify that I am duly

5    appointed and qualified to act as Official Court Reporter for

6    the United States District Court for the District of Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 5th day of April,

13   2024.

14

15

16                              s/Hilda E. Lopez_____

17                              HILDA E. LOPEZ, RMR, FCRR

18

19

20

21

22

23

24

25

EXHIBIT R

EXHIBIT R

1

**UNITED STATES DISTRICT COURT**


**FOR THE DISTRICT OF ARIZONA**


_____


| | |
|---|---|
| **United States of America,** | ) |
| | )   No. 2:18-cr-00422-DJH |
| Plaintiff, | ) |
| | ) |
| vs. | )   Phoenix, Arizona |
| | )   May 13, 2024 |
| **Michael Lacey,** et al. | )   3:45 p.m. |
| | ) |
| Defendants. | ) |
| _____ | ) |


**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**


**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**


**<u>STATUS CONFERENCE</u>**


Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

For the Government:
     UNITED STATES ATTORNEY'S OFFICE
3    By:  **Mr. Kevin M. Rapp, Esq.**
          **Mr. Peter S. Kozinets, Esq.**
4         **Mr. Andrew C. Stone, Esq.**
          **Ms. Margaret Wu Perlmeter, Esq.**
5    40 North Central Avenue, Suite 1200
     Phoenix, Arizona 85004
6    kevin.rapp@usdoj.gov
     peter.kozinets@usdoj.gov
7    andrew.stone@usdoj.gov
     margaret.perlmeter@usdoj.gov
8

9
For the Defendant Michael Lacey:
10    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
      By:  **Mr. Paul J. Cambria, Jr., Esq.**
11         **Ms. Eric McCampbell Paris** (Telephonic)
      42 Delaware Avenue, Suite 120
12    Buffalo, NY 14202
      pcambria@lglaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    P R O C E E D I N G S
 3
 4        (Proceedings commence at 3:45 p.m.)
 5             THE COURT:  All right.  Please be seated.
 6             COURTROOM DEPUTY:  This is Case No. CR 18-422, United
 7    States of America vs. Michael Lacey, on for status conference.
 8             MR. STONE:  Good afternoon, Your Honor, Andy Stone,
 9    Kevin Rapp, Peter Kozinets, and Peggy Perlmeter for the United
10    States.
11             THE COURT:  Good afternoon.
12             MR. CAMBRIA:  Good afternoon, Your Honor,
13    Paul Cambria, all alone, for Mr. Lacey.
14             THE COURT:  I don't think you're all alone.  I think
15    we're joined here by Erin McCampbell.  Is she on the line?
16             MR. CAMBRIA:  I hope so.  That would be great.  I
17    don't know.
18             THE COURT:  Ms. McCampbell, are you on the line?
19             MS. MCCAMPBELL:  Yes, I am here, Your Honor.
20             THE COURT:  You're not alone.
21             All right.  Before the Court is Mr. Cambria's request
22    for a status conference to determine or to, once again, put
23    forward to the Court a question about how we should proceed in
24    view of the pending sentencing and the counts on which the jury
25    did not return a verdict.
```

1          I have permitted the government an opportunity to

2   provide a response, and I just saw that Mr. Cambria yesterday

3   filed a reply.

4          Has the government seen that?

5          MR. STONE:  Yes, Your Honor.

6          THE COURT:  All right.  Does the government wish to

7   or, I'm sorry, Mr. Cambria, do you wish to put further argument

8   before the Court?

9          MR. CAMBRIA:  Just briefly, Your Honor, sure.

10          THE COURT:  Yes.  Please come forward.

11          MR. CAMBRIA:  Our position is that since the judgement

12   is not final, that the Ninth Circuit could not take the case.

13   And as a result of that, I think that the *King* case we cited

14   from the Ninth Circuit indicates there's a due process issue at

15   that point if there is a sentence and there isn't an immediate,

16   if you will, right to appeal.

17          In addition, we've tried this twice now, I -- I -- the

18   comments by the government at one point in one of their

19   submissions, they indicated that they thought that information,

20   if you will, from the Ninth Circuit would be valuable before a

21   retrial.  Your Honor in January made a similar statement that

22   there were issues and so on that could be fleshed out, if you

23   will, by the Ninth Circuit.

24          I think the only way for that to happen, I might note

25   that the last time we were in front of the Ninth Circuit they

1   were able to accept briefs and argument and come up with a

2   decision in somewhere around eight months, which was a very

3   prompt, if you will, handling of that situation.

4         We do know that defendants Brunst and Spear do have

5   the right to appeal immediately.  They will.  The issues that

6   they will raise will be very important in a retrial of

7   Mr. Lacey.  I just -- I -- I have -- I've already indicated

8   this for the record, I haven't yet been retained for a third

9   trial.  There's some issues with regard to that, possible

10  Monsanto issues and so on that we'll have to address if we go

11  forward.

12        The last thing that I'd like to see, and I think the

13  Court and the appellate court would agree, is for there to be

14  some kind of proceeding for Mr. Lacey, and then a different one

15  if there's a reversal with regard to Spear or Brunst.  There

16  should be at some point in time, if there is going to be a

17  retrial, there should be one and only one, and it should be

18  addressed with all of the information that we can glean from

19  the Ninth Circuit.

20        The only way we could do that would be to hold

21  Mr. Lacey's case in abeyance and have Spear and Brunst proceed

22  to appeal.  There will be issues that will be critical that

23  they would raise concerning things like jury instructions and

24  Jencks situations and so on, which would make a difference.  I

25  don't think any of us want a situation where we would go

1   forward with a trial and then there would be a decision in the

2   Ninth Circuit for Brunst and Spear, and it would have an impact

3   to require a fourth trial on behalf of Mr. Lacey.

4        I just think that for efficiency purposes it makes

5   sense to hear from the Ninth Circuit.  I know you mentioned the

6   value of that; the government mentioned the value of that in

7   some pleadings that they filed; I see the value of it, and I

8   think the Ninth Circuit would as well.  There are issues that

9   would be raised by Brunst and Spear that are common to

10  Mr. Lacey, and so they would give us some education on a third

11  trial if there was to be one.

12       I think as it currently stands, Your Honor, the case

13  is not one that the Ninth Circuit would take because of the

14  outstanding hung counts.  I know the government has suggested

15  otherwise, and they cite the *Abrams* case, but this isn't an

16  *Abrams* case situation.

17       Number one, here we don't have a severance of counts.

18  In the *Abrams* case, the way that played out the government

19  said:  Well, if we have an affirmance on this count, we are

20  going to forego all the rest of the other counts, which would

21  make it a final situation.  We don't have any such

22  representation in this case, and so it seems to me that the

23  other issue is, and this was in the *King* case in the Ninth

24  Circuit, where the Court said that unless there is an ability

25  to have an immediate appeal on a sentence, a due process issue

UNITED STATES DISTRICT COURT

1   is raised.

2           There was some dicta, if you will, in that case sort

3   of suggestive of something the government raised here, although

4   under *Abrams*, where in the *King* case there was a statement

5   about, well, if -- if there was an appeal and then they stayed

6   the execution in order to have the appeal, that perhaps would

7   give the Ninth Circuit jurisdiction.  But as the *King* court

8   laid out, that was just a hypothetical.  That wasn't the set of

9   facts in front of the Court at that time.

10          So all I'm trying to accomplish here for the Court,

11  for the Court of Appeals, for my client, for myself, is

12  whatever is going to happen next should be it, and I don't

13  think we should be in a situation where you pronounce a

14  sentence, we go to the Ninth Circuit, and they say:  We can't

15  take the case because there is no final judgement.

16          And if we look at all the cases we cited, *Berman* and

17  all the rest of them, we see that a final judgement means that

18  all of the counts have been disposed of by a resolution, a

19  decision, and that all there is left to do at that point is to

20  determine whether or not they are sufficient; and if so, what

21  the outcome is of the counts.  We don't have that here.  We

22  have several counts which the jury was hung on.

23          I suppose another variable, if you will, is if -- if

24  you sentence Mr. Lacey and -- and at that point stopped, if you

25  will, held the sentence in abeyance and granted appeal, then we

8

1  would see what the Ninth Circuit says as far as jurisdiction is

2  concerned, and that would avoid the due process issue that was

3  raised in *King* where there's some kind of sentence imposed but

4  you have no right to an immediate appeal, and that's something

5  that I don't think should happen here.

6  So it seems to be the thing that makes the most sense

7  is to hear from the Ninth Circuit, as I indicated.  This Court

8  mentioned that; the government has mentioned that.  The

9  question is how does it get accomplished?  And I think the way

10  it gets accomplished is we hold off on sentencing Mr. Lacey,

11  the other two get sentenced, and appeal, and we look at the

12  outcome of that appeal and what impact it has on the case.

13  There are issues there that are common and critical.

14  There will be issues about Jencks; there will be issues about

15  instructions to the jury.  You remember it was sort of a

16  complicated First Amendment constellation there and there were

17  a number of objections made and so on.

18  THE COURT:  I guess -- let me stop you there.  I am

19  confused as to how the reviewing court makes any pronouncement

20  as to Mr. Lacey if everything is held in abeyance.

21  MR. CAMBRIA:  No.  Well, yes, there will be issues

22  common that he would raise as well.  For example, the jury

23  instructions.  That's one of them.  There is also the Jencks

24  issue that arose in that case as a result of the testimony, and

25  then later on revelation of information.  Those things are

1   common to all the defendants, and so they will all be there.

2   Will there be a judgement on Count 100, whether there is

3   concealment?  No, there wouldn't be, but there are enough other

4   areas that are critical and that would have an impact,

5   especially jury instructions in the First Amendment area.  You

6   know, that isn't something that pops up everyday.  And so the

7   courts have been in various places.  We think that some of the

8   instructions that were given were not in accord with the Ninth

9   Circuit and the law there, and so they would clearly be common.

10          Other issues about the issue of aiding and abetting, I

11  mean, there are lots of issues that would impact on Mr. Lacey's

12  case.  The only one not is Count 100, the concealment.

13          THE COURT:  All right.  Mr. Stone.

14          MR. STONE:  Thank you, Your Honor.  There is a lot of

15  agreement here, Your Honor.  Both parties think that it would

16  be more efficient to have the Ninth Circuit rule on these

17  issues before any retrial, and so really the only issue before

18  this Court right now is, what's the best procedure to get it

19  before the Ninth?

20          We just disagree with Mr. Cambria and Mr. Lacey's

21  position that he's -- his appellate rights can be argued when

22  he's not part of the appeal.  He needs to be part of the

23  appeal.  He can't let the other two carry the water for him

24  here, and that's supported by case law.  United States vs.

25  *Sehnal,* S-E-H-N-A-L, the 1991 opinion, that's on all fours with

1    this.  The only issue is that they didn't bring up jurisdiction

2    at the Ninth, but it was a four-count trial, two counts hung,

3    two counts convicted.  They went up on appeal with the two

4    counts unresolved, and the Ninth Circuit heard the arguments.

5    So there is two counts still pending before the trial court,

6    two counts of conviction.  The defendant argued all of --

7    everything that he wanted to argue before the Ninth.

8        Now, the analysis in the *Abrams* case, which is that

9    Second Circuit opinion, really lays it all out and demonstrates

10   why this is such a good idea and why it's in accord with the

11   applicable statute with respect to it being a final judgement,

12   is that it just saves resources and time for the appellate

13   court to weigh in on some of these thorny issues before there

14   is any retrial.

15       We agree with Mr. Cambria here.  If we had a trial in

16   August or October, another one, and then there was an appeal,

17   there could be something in that appeal that would require yet

18   another trial.  So that's inefficient.  I think everybody

19   agrees on that.

20       And the *King* case, which is post *Abrams*, cited *Abrams*

21   approvingly.  In *King*, there was like a -- like a 50-count

22   indictment, I may be a little bit off on that, but there were a

23   number of counts, there was a plea to 15 or so of the counts,

24   and then a number of the counts were unresolved.  There wasn't

25   like other pleas where you just dismiss it and you just go up

1    on the counts of conviction.  They were resolved and left

2    before the trial court.  And again, the Ninth Circuit heard the

3    appeal.  There wasn't any issue with the jurisdiction there,

4    and that was when the government was arguing:  Hey, this would

5    be a piecemeal appellate process, piecemeal review process, so

6    there is no final judgement.  And the Court said:  No, there

7    was a conviction here of certain counts and we are permitted

8    then to review those counts, and that is -- that is just

9    similar to this case.

10          So we propose that a sentencing hearing is scheduled.

11   We think it would be efficient for a sentencing to occur for

12   all three on the same date, and then Mr. Lacey would be able to

13   take his appeal up on Count 100.  The other two defendants

14   certainly are going to appeal their counts of conviction, and

15   they have more.  And then after the Ninth Circuit weighs in,

16   the United States will decide whether it's going to retry

17   Mr. Lacey at that point or just dismiss the remaining counts.

18          So that's a procedure that is permitted by law and we

19   think would be most efficient.

20          THE COURT:  Mr. Cambria.

21          Oh, and I will correct the government.  It was 42

22   counts.

23          MR. STONE:  Thank you, Your Honor.  I had it wrong.

24          THE COURT:  And the individual pled guilty to 20 of

25   them.

12

1          Mr. Cambria.

2          MR. CAMBRIA:  We addressed the *Sehnal* case in footnote

3    4 where we indicate there that it involved counts as to which

4    there had been a conviction, and also counts which the jury had

5    hung.  The decision said nothing, however, about when the

6    defendant had been sentenced about the finality of the counts

7    of conviction or about the Ninth Circuit's jurisdiction to hear

8    an appeal of the counts of conviction.  So it isn't authority.

9    It wasn't raised.  It wasn't dealt with by the Court.

10          As far as any other reliance, for example, on *Abrams*,

11   et cetera, again, we had something there that we don't have

12   here, which is we had a representation by the government that

13   the case would be over if the appellate court affirmed on the

14   one count they would, the government, would dismiss the

15   remaining counts.  We have no such representation here.  This

16   isn't -- those facts are not the same.

17          And as far as *Abrams* being cited in the *King* case, the

18   Ninth Circuit, was never cited for the theory that we're

19   talking about here, which is whether or not under *Berman*, which

20   is a Supreme Court decision, there can be jurisdiction for an

21   appeal where there are a number of counts that are not

22   resolved.

23          We don't have a discrete severance here like we do in

24   the cases they refer to.  They are either severed because

25   somebody took a plea, or they are severed because the subject

UNITED STATES DISTRICT COURT

1    matters are different.

2         Here, the counts are interrelated.  They are

3    intertwined.  They are not severable.  There was no motion for

4    severance.  There was no indication of severance on the part of

5    the government.  They tried it and alleged it in the indictment

6    all together intertwined.

7         So we don't have any of those distinguishing factors

8    in the cases where they say:  Oh, well, look here, they did an

9    appeal and there were hung counts, but nobody raised the issue

10   of jurisdiction, or there was a discrete severance and there

11   wasn't an intertwined situation.

12        *Berman* is -- it's as high as you need to get as far as

13   authority is concerned, and we're in a situation here where we

14   don't have a, if you will, finality on a number of counts and

15   you need that in order to have jurisdiction.

16        Now, can -- could the Court say:  Well, all right,

17   we're going to hold execution on the judgement and bail pending

18   appeal, file your Notice of Appeal, and let's see what the

19   Ninth Circuit does?  In that circumstance we wouldn't violate

20   due process.  In a situation where there was -- *King*

21   specifically dealt with a situation where somebody would be

22   sentenced but they would have no right to appeal.

23        And what we're saying is we don't see a right to

24   appeal at this point because there is no finality.  So that

25   means there's a due process problem unless there is some sort

14

1    of remedy, and the remedy would have to be, all right,

2    everything is stayed.  Let's see what the Ninth Circuit says as

3    far as jurisdiction.  I haven't seen a case that's done that,

4    but the cases that they cite, they have facts we don't have.

5          THE COURT:  Well, let me -- I am intrigued by this

6    footnote 3 in your reply.  You essentially say, "Alternatively,

7    the Court could sentence Mr. Lacey on Count 100 at the same

8    time his codefendants are sentenced," but this is the part that

9    I am curious about, "but the order or judgement addressing his

10   sentence would not be final and could not be executed."

11         Why?

12         MR. CAMBRIA:  Well, because he's entitled to a right

13   to appeal under the *King* case, and he would need to be able to

14   go through that right before it could be executed.

15         THE COURT:  Well, I think really, to me, looking at

16   all of these cases, in particular the *King* case, and then

17   looking at the reference in *Abrams*, although it's an

18   out-of-circuit case, and really looking at the statute of final

19   judgment, and 18 U.S.C. 3582 basically says a judgment of

20   conviction that includes a sentence is a final judgement for

21   all other purposes, which include appeals.

22         And I think that here in *King,* the Court does look at

23   the situation of the guilty plea on 20 counts and the remaining

24   outstanding charges and basically says that the final judgement

25   rule had not been violated despite the possibility that the

UNITED STATES DISTRICT COURT

1 District Court jurisdiction over one of the severed cases was

2 concurrent with the appeals court over the other, and that's

3 more akin to what we have here, as is the, I don't know how you

4 say it, *Sehnal* case, which my good friend and former mentor

5 Judge Rosenblat handled.

6      And it seems to me if there is a continuing question

7 about whether or not the Ninth Circuit has the jurisdiction to

8 hear this particular matter, then this should be the case that

9 it does so to make those refinements. I don't think there is a

10 necessity to do that. Because here, I think, Mr. Cambria, as I

11 mentioned before, there are common issues.

12      So, for example, the jury convicted Mr. Spear of

13 conspiracy and the Travel Act offenses of which Mr. Lacey

14 remains charged, it convicted Mr. Brunst of certain money

15 laundering charges, of which Mr. Lacey remains charged, but the

16 jury did not make those findings as to Mr. Lacey.

17      So the post sentencing appeals on their convictions,

18 Spear and Brunst, could inform all the parties, including

19 Mr. Lacey, going forward. So it may be that on appeal several

20 of those convictions are set aside or remanded back.

21      And it seems to me a better use, and I think it was

22 the *Abrams* case that basically observed that forcing trials

23 that may never be needed, impose expense and burden on the

24 prosecution and the defense, which is not a desirable result.

25      MR. CAMBRIA: I don't know.

1            THE COURT:  So the Court, though, and I am sure the

2    government has considered this in its response, this Court

3    remains concerned about the age of the case, the attendant

4    effect on the witnesses and the testifying witness' memories,

5    certainly the status and age of all of the defendants, but --

6    and no, I haven't considered you, Mr. Cambria --

7            MR. CAMBRIA:  I'd volunteer.

8            THE COURT:  -- but I think that it makes better sense

9    to pursue the appeals, have the sentencing hearings, have the

10    imposition of sentence; in other words, a final judgement that

11    is appealable, in that way then the total package goes up to

12    the Ninth.  They will let us know what they think.

13            It's conceivable that they decide it comes back.  And

14    if it comes back, it comes back in total with possibly

15    Mr. Spear, Mr. Brunst, Mr. Lacey, and I think that's the better

16    way to use all of the parties' resources as well as not only

17    this court, but the reviewing court's resources.  And I don't

18    necessarily find that to be a due process violation because you

19    have a charge, a trial, a conviction and a sentence that is

20    then a final judgement, and appealable.

21            And even though Mr. Lacey's appeal may or may not

22    include, I don't know what the Ninth Circuit will permit you to

23    argue, it may or may not include the circumstances of those

24    hung -- those convictions for which Mr. Spear has now, and

25    Mr. Brunst, and at some point in time the government may come

1   back and say:  We're going to retry the case or we're not going

2   to retry the case.  I think it all depends on what happens at

3   the Ninth Circuit.

4          And I suspect that it will not be eight months when we

5   hear from them.  I suspect it will be longer.  And that to me

6   is the one thing that I hesitate about because the delay is not

7   desirable in any regard for any parties' position, including

8   the Court.

9          And so I think that's -- that's the better approach.

10  We will proceed to sentencing.  You can then take up the

11  appeal, and we'll wait to hear whatever the decision is from

12  the Ninth Circuit.

13         I'm going to vacate the placeholder trial date in

14  August.  You will also then know, Mr. Cambria, that to the

15  extent you need to file your Monsanto hearing, you'll have a

16  better idea of how you're going to pursue that, but that's how

17  we will proceed.

18         MR. CAMBRIA:  If I might.  The one thing that's of

19  concern, let's assume the following scenario:  There's a

20  sentence, we file an appeal.  And after briefing of whatever

21  time or whatever the schedule is for the Ninth Circuit, they

22  then say:  We can't hear this appeal because it wasn't final.

23         I think that causes a due process problem for my

24  client because he really had no right to appeal, as we had

25  said.  The only way that that might be alleviated is if this

1  Court grants bail pending appeal and stays the execution of the

2  sentence.

3          THE COURT:  Well, that remains to be seen and we will

4  decide that at the sentencing hearing.  I think, Mr. Cambria,

5  in looking at the briefing, I am -- I am convinced by the

6  pronouncement in *Abrams* as well, and even though it's a Second

7  Circuit case, but I also think the language in the *King* case,

8  as well as its reference back to the *Powell* decision, I think

9  all taken together, and the statutory term of final judgement,

10  puts the Court on solid ground in making this approach.

11          MR. CAMBRIA:  The only thing that *Abrams* lacks,

12  however, this case lacks that *Abrams* had, was a discrete

13  representation by the government that certain charges would be

14  finally dismissed if an affirmance was granted, and so that was

15  the last chip in the finality situation.  We don't have that

16  here.

17          And in the other cases, there was a pretrial severance

18  of counts, and we don't have that here either.  So there is --

19  there is -- there are differences in those cases.  And again,

20  I'm concerned that with -- if we're right and there is no right

21  of appeal at the moment because of the hung counts, that due

22  process is a problem if in some way he's incarcerated while he

23  is finding out, oh, after six months you don't have a right to

24  appeal.  That doesn't help the witnesses that you're talking

25  about either.  If there is that piece and it turns out that we

1   were right and they don't have jurisdiction, that's a further

2   delay put into the case, which wouldn't have to be.

3           THE COURT:  All right.

4           MR. CAMBRIA:  Thank you.

5           THE COURT:  Mr. Stone.

6           MR. STONE:  I want to attempt to ease Mr. Cambria's

7   concerns, although I am not sure I am going to be successful,

8   but the quote from the United States vs. *King*, which I think he

9   referenced, Your Honor, this is direct quote, "Because the

10  Court imposed sentence on Counts 24 through 42, *King* was

11  entitled to appeal the sentence despite the pending charges."

12          So too here.

13          MR. CAMBRIA:  That was the argument.  That was the

14  argument, and the Court went on to say, "but we didn't have to

15  address that here."

16          THE COURT:  Well, but I think, again, taken in

17  totality and looking at all of those cases, I think there is

18  jurisdiction for the Court to hear that appeal on the final

19  judgement once it's imposed.

20          Having made that determination, I want to address the

21  government's Motion to Continue the sentence.  And I did not

22  address it earlier, although the time that you requested for an

23  extension in which to file your response to objections has

24  past.  The reason that I'm hesitant to go along with the

25  motion, which asks me to have the sentence -- sentences of all

1    three individuals, Mr. Lacey, Mr. Spear, Mr. Brunst, occur on

2    one day, is for the following reason:  You, and I anticipated

3    that you would, have victim witness statements.  Given the

4    number of those who testified, I don't know how long that's

5    going to be.

6            Number two, I already have an 18-page filing of

7    objections by Mr. Brunst.  Every single one of those objections

8    this Court needs to address, and I tend to address those

9    objections and give counsel an opportunity to argue them again

10   at open hearing.

11           I suspect Mr. Cambria and Mr. Spear are going to file

12   similar lengthy objections.  In a trial day, I get perhaps six

13   and a half hours of an entire day, giving myself and my

14   courtroom staff a break, so I don't see the reality of having

15   all three sentences occur in one day unless you minimize the

16   number of people that come in for victim allocution, and unless

17   the defense counsel waives any oral argument of their

18   objections, and I don't foresee that happening.

19           So the best that I can do for your request to

20   accommodate those individuals, and I suspect, Mr. Spear, Brunst

21   and Lacey are going to have other people who wish to be heard

22   as well, the best that I can do is put them on a day and a

23   half.  So right now we have Mr. Spear, because of his counsel's

24   schedule, that sentence is occurring in July, and so we can add

25   one additional sentence on that day and then put the other in

1   the next morning.  I think that's realistic.  I don't know how

2   you foresee this going, but that's, I think, what I anticipate.

3   　　　　　MR. RAPP:  I don't think from our perspective we were

4   under any illusion that the sentence with all of the argument

5   over objections and the allocution of the defendants would

6   happen on a single day.  We just figured we would start on

7   July 9th, we get what could be done, and I am sure the Court

8   would tell us what day we would come back, and just as long as

9   the victims can come in on one day and address the Court if

10  they so choose.

11  　　　　　I think they are -- they would be under the

12  understanding that the imposition of sentencing might be on

13  another day, and if they want to come back for that they can,

14  but I don't think anybody was under any impression that all of

15  this would be accomplished on a single day.

16  　　　　　THE COURT:  Well, so Mr. Lacey, I don't think you had

17  an objection to the Motion to Continue sentence; is that right?

18  　　　　　MR. CAMBRIA:  No objection, Your Honor.  I have a

19  homicide case to try at the beginning of September, so I'm

20  going to be a busy boy.

21  　　　　　THE COURT:  So no objection.  What I will do, my

22  courtroom deputy alerts me I have a full calendar the afternoon

23  of July the 9th, which Mr. Spear is currently set for.  So what

24  I will do is I will grant the Motion to Continue and extend the

25  government's motion, if they so need, in order to respond to

1  the objections.  We'll move those sentencing hearings to begin

2  on July the 10th and we'll hold over until the 11th of July.

3         Disregard what I just said.  July the 9th will remain

4  and we'll extend it to July the 10th, and I will issue a minute

5  entry with regard to that.

6         All right.  Anything further from the government?

7         MR. RAPP:  No, Your Honor.  Thank you.

8         Judge --

9         THE COURT:  Yes.  I will issue your extension for your

10  time to respond, and I will take the latter date.

11         MR. RAPP:  All right.  I appreciate that.  I just

12  wanted to draw your attention to footnote 1 in our filing.  I

13  am just reminded that counsel for Defendant Brunst have some

14  conflicts on July 10th through 12th, July 10th through the

15  12th, and then one of the other counsel has a California state

16  court appearance from July 26th to August 16th, and then the

17  10th through the 15th.  Both counsel have a problem with the

18  10th.

19         THE COURT:  Both --

20         MR. RAPP:  Mr. --

21         THE COURT:  Brunst counsel?

22         MR. RAPP:  Mr. Lincenberg and Mr. Panchapakesan.

23         THE COURT:  Well, we can -- what was the nature of

24  the -- but they are both available on July 9th; right?

25         MR. RAPP:  Yes.

```
 1            THE COURT:  We can begin with them on July 9th.
 2            MR. RAPP:  Very well.
 3            THE COURT:  All right.  Anything further then,
 4   Mr. Rapp?
 5            MR. RAPP:  No, Your Honor.  Thank you.
 6            THE COURT:  Mr. Cambria.
 7            MR. CAMBRIA:  No, Your Honor.  Thank you.
 8            THE COURT:  All right.  Thank you, counsel we will see
 9   you in July.
10        (Proceedings concluded at 4:24 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT

1

2

3

4          **C E R T I F I C A T E**

5

6          I, HILDA E. LOPEZ, do hereby certify that I am duly

7  appointed and qualified to act as Official Court Reporter for

8  the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10 a full, true, and accurate transcript of all of that portion of

11 the proceedings contained herein, had in the above-entitled

12 cause on the date specified therein, and that said transcript

13 was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 17th day of May,

15 2024.

16

17

18                              s/Hilda E. Lopez_____
19                              HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

EXHIBIT S

EXHIBIT S

<table>
<tr><td>☒ FILED</td><td>☐ LODGED</td></tr>
</table>

**Nov 16 2023**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

1
2
3
4
5

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

8
9   United States of America,                 No. CR-18-00422-001-PHX-DJH

10              Plaintiff,                      **FINAL JURY INSTRUCTIONS**

11  v.

12  Michael Lacey, et al.,

13              Defendants.

14

15          The Court administered the following jury instructions to assist the jury in its

16  deliberations in this case.

17          Dated this 16th day of November, 2023.

18
19
20                                              _____
                                                Honorable Diane J. Humetewa
21                                              United States District Judge
22
23
24
25
26
27
28

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.  You will recall that you took an oath promising to do so at the beginning of the case.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

You must follow all these instructions and not single out some and ignore others; they are all important.  Please do not read into these instructions or into anything I may have said or done as any suggestion as to what verdict you should return—that is a matter entirely up to you.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The indictment is not evidence. Defendants have pleaded not guilty to the charges. Each defendant is presumed to be innocent unless and until the United States proves the defendant guilty beyond a reasonable doubt. In addition, none of the defendants have to testify or present any evidence. The defendants do not have to prove innocence; the United States has the burden of proving every element of the charges beyond a reasonable doubt.

A defendant in a criminal case has a constitutional right not to testify.  In arriving at your verdict, the law prohibits you from considering in any manner that the defendant did not testify.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that a defendant is guilty.  It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that a defendant is guilty, it is your duty to find the defendant not guilty.  On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that a defendant is guilty, it is your duty to find the defendant guilty.

The evidence you are to consider in deciding what the facts are consists of:

First, the sworn testimony of any witness; and

Second, the exhibits received in evidence.

In reaching your verdict you may consider only the testimony and exhibits received in evidence. The following things are not evidence, and you may not consider them in deciding what the facts are:

1. Questions, statements, objections, and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence. Similarly, what the lawyers have said in their opening statements, will say in their closing arguments, and have said at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

2. Any testimony that I have excluded, stricken, or instructed you to disregard is not evidence. In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence in a limited way, you must do so.

3. Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. In considering the testimony of any witness, you may take into account the following:

First, the opportunity and ability of the witness to see or hear or know the things testified to;

Second, the witness's memory;

Third, the witness's manner while testifying;

Fourth, the witness's interest in the outcome of the case, if any;

Fifth, the witness's bias or prejudice, if any;

Sixth, whether other evidence contradicted the witness's testimony;

Seventh, the reasonableness of the witness's testimony in light of all the evidence; and

Eighth, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

You have heard evidence that Carl Ferrer, a witness, made prior statements under oath that were inconsistent with his testimony at trial. You may consider this evidence in deciding whether or not to believe this witness and how much weight to give to the testimony of this witness.

You have heard testimony from Carl Ferrer and Dan Hyer, witnesses who received favored treatment from the government in connection with this case and pleaded guilty to a crime arising out of the same events for which the defendants are on trial.  These guilty pleas are not evidence against the defendants, and you may consider Carl Ferrer and Dan Hyer's pleas only in determining their believability.

For these reasons, in evaluating the testimony of Carl Ferrer and Dan Hyer, you should consider the extent to which or whether their testimony may have been influenced by their pleas.  In addition, you should examine the testimony of Carl Ferrer and Dan Hyer with greater caution than that of other witnesses.

1    You have heard testimony from Kimberly Mehlman-Orozco, who testified about

2  her opinions and the reasons for those opinions.  This opinion testimony is allowed because

3  of the specialized knowledge, skill, experience, training, or education of this witness.

4    Such opinion testimony should be judged like any other testimony.  You may accept

5  it or reject it, and give it as much weight as you think it deserves, considering the witness's

6  knowledge, skill, experience, training, or education, the reasons given for the opinion, and

7  all the other evidence in the case.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

During the trial, certain charts and summaries were shown to you to help explain the evidence in the case.  These charts and summaries were not admitted into evidence and will not go into the jury room with you.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

Certain charts and summaries have been admitted into evidence. Charts and summaries are only as good as the underlying supporting material. You should, therefore, give them only such weight as you think the underlying material deserves.

1    You are here only to determine whether the defendants are guilty or not guilty of the

2  charges in the indictment.  The defendants are not on trial for any conduct or offense not

3  charged in the indictment.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial.  You must decide the case of each defendant on each crime charged against that defendant separately.  Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.

All the instructions apply to each defendant and to each count unless a specific instruction states that it applies only to a specific defendant and count.

The indictment charges that the offenses alleged were committed "on or about" a certain date.

Although it is necessary for the government to prove beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offense was committed precisely on the date charged.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so.  During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, text messaging, or any Internet chat room, blog, website or any other forms of social media.  This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings , and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

1          Some of you have taken notes during the trial.  Whether or not you took notes, you

2   should rely on your own memory of what was said.  Notes are only to assist your memory.

3   You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the court to decide.  You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the Courtroom Deputy that you are ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the Courtroom Deputy signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt of the defendant, until after you have reached a unanimous verdict or have been discharged.

The defendants are charged in Count 1 of the indictment with conspiring to violate the Travel Act in violation of Section 1952(a)(3)(A) of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt with respect to that defendant:

First, beginning in or around 2004, and ending on or about April 2018, there was an agreement between two or more persons to commit at least one Travel Act offense as charged in Counts 2-51 of the indictment by promoting, or facilitating the promotion of, a business enterprise or enterprises involving prostitution offenses in violation of the laws of the State in which they were committed, in violation of 18 U.S.C. § 1952(a)(3)(A) and § 1952(b)(i)(1);

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime, *i.e.* the Travel Act violations, which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the

originators.  On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The United States is not required to prove that the defendant personally did one of the overt acts.

A conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even though a defendant did not directly conspire with every other defendant or every other conspirator in the overall scheme, that defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt:

First, that a defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy;

Second, that a defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and

Third, that a defendant had reason to believe that whatever benefits the defendant might get from the conspiracy probably were dependent upon the success of the entire enterprise.

It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of committing a Travel Act crime as charged in Counts 2-51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed a Travel Act offense alleged in one of the Counts;

Second, that person was a member of the conspiracy charged in Count 1 of the indictment;

Third, that person committed the Travel Act offense in furtherance of the conspiracy;

Fourth, a defendant was a member of the same conspiracy at the time the Travel Act offense was committed; and

Fifth, that Travel Act offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of committing a Concealment Money Laundering crime as charged in Counts 53-62 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed a Concealment Money Laundering offense alleged in one of the Counts;

Second, that person was a member of the conspiracy charged in Count 52 of the indictment;

Third, that person committed the Concealment Money Laundering offense in furtherance of the conspiracy;

Fourth, a defendant was a member of the same conspiracy at the time the Concealment Money Laundering offense was committed; and

Fifth, the Concealment Money Laundering offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

Each member of the conspiracy is responsible for the actions of the other conspirators performed during the course and in furtherance of the conspiracy. If one member of a conspiracy commits a crime in furtherance of a conspiracy, the other members have also, under the law, committed that crime.

Therefore, you may find a defendant guilty of committing an International Promotional Money Laundering crime as charged in Counts 63-68 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed an International Promotional Money Laundering offense alleged in one of the Counts;

Second, that person was a member of the conspiracy charged in Count 52 of the indictment;

Third, that person committed the International Promotional Money Laundering offense in furtherance of the conspiracy;

Fourth, a defendant was a member of the same conspiracy at the time the International Promotional Money Laundering offense was committed; and

Fifth, the International Promotional Money Laundering offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

The defendants are charged in Counts 2-51 of the indictment with violating Section 1952(a)(3) of Title 18 of the United States Code, a statute also referred to as "the Travel Act." In order for the defendants to be found guilty of Counts 2-51, the United States must prove, for each count, the following elements beyond a reasonable doubt:

First, the defendant used any facility in interstate commerce with the specific intent to promote or facilitate the promotion of any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed (as specified below), and

Second, after doing so the defendant performed an act that did promote or facilitate the promotion, of any business enterprise involving prostitution offenses, specifically, by publishing on Backpage.com the ads listed in Counts 2-51 of the indictment.

To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.

In the context of this Travel Act case, the terms to "promote" or "facilitate the promotion of" means intentionally helping someone else commit a prostitution offense in violation of state law.

The phrase "Business enterprise," means a continuous course of criminal conduct, that is, engaging or planning to engage in two or more violations of law, rather than a sporadic, casual, individual, or isolated violation.

The phrase "uses any facility in interstate commerce" as used in the Travel Act, 18 U.S.C. § 1952(a), means employing or utilizing any method of communication or transportation between one state and another, and includes, for example, the use of telephones, mails, and the Internet.

1    <u>Counts 2, 4, 27, 29-30, 33, 35, 37, 40 and 43</u> concern prostitution offenses in

2    violation of the laws of the State of Massachusetts.  A prostitution offense in Massachusetts

3    occurs when:

4         (1) A person engaged, agreed to engage, or offered to engage, in sexual conduct

5              with another person; and

6         (2)  The sexual conduct was, or was to be, done in return for a fee.

7         The term "sexual conduct" includes sexual intercourse; anal intercourse; fellatio, or

8    oral sex involving contact between the mouth of one person and the penis of another

9    person; cunnilingus, or oral sex involving contact between the mouth of one person and

10   the female sex organs—the vagina, vulva or labia—of another person; masturbation of

11   another person; or any intrusion of a part of one person's body or some other object into

12   the genital or anal opening of another person's body.

13

14        <u>Counts 3, 6-11, 18, 25-26, and 28</u> concern prostitution offenses in violation of the

15   laws of the State of Washington.  A prostitution offense in Washington  occurs when:

16        (1) A person engaged, agreed to engage, or offered to engage in sexual conduct with

17              another person; and

18        (2) The sexual conduct, agreement, or offer was in return for a fee.

19        "Sexual conduct" means sexual contact or sexual intercourse.  "Sexual contact"

20   means any touching of the sexual or other intimate parts of a person done for the purpose

21   of gratifying sexual desire of either party or a third party.  "Sexual intercourse" means that

22   the sexual organ of the male entered and penetrated the sexual organ of the female and

23   occurs upon any penetration, however slight, or any penetration of the vagina or anus

24   however slight, by an object, when committed on one person by another, whether such

25   persons are of the same or opposite sex, or any act of sexual contact between persons

26   involving the sex organs of one person and the mouth or anus of another whether such

27   persons are of the same or opposite sex.

28

1    Counts 14-15, 21-22, and 31 concern prostitution offenses in violation of the laws

2    of the State of Arizona. A prostitution offense in Arizona occurs when:

3    A person knowingly engaged, agreed, or offered to engage in sexual conduct with

4    another person under a fee arrangement with any person for money or any other valuable

5    consideration.

6    "Sexual conduct" means sexual contact, sexual intercourse, oral sexual contact, or

7    sadomasochistic abuse.

8    "Sexual contact" means any direct or indirect fondling or manipulating of any part

9    of the genitals, anus or female breast.

10   "Sexual intercourse" means penetration into the penis, vulva or anus by any part of

11   the body or by an object.

12   "Oral sexual contact" means oral contact with the penis, vulva or anus.

13   "Sadomasochistic abuse" means flagellation or torture by or on a person who is

14   nude or clad in undergarments or in revealing or bizarre costume or the condition of being

15   fettered, bound or otherwise physically restrained on the part of one so clothed.

16

17   Counts 12-13, 23, and 34 concern prostitution offenses in violation of the laws of

18   the State of California.  A prostitution offense in California occurs when:

19   An individual solicits, or agrees to engage in, or engages in, any act of prostitution

20   with the intent to receive compensation, money, or anything of value from another person.

21   An act of prostitution occurs when a person has sexual intercourse or does a lewd

22   act with someone else in exchange for money or other compensation.  A lewd act means

23   touching the genitals, buttocks, or female breast of either the prostitute or customer with

24   some part of the other person's body for the purpose of sexual arousal or gratification.

25

26   Counts 45-47 and 51 concern prostitution offenses in violation of the laws of the

27   State of New York.  A prostitution offense in New York occurs when:

28   A person engaged, agreed, or offered to engage, in sexual conduct with another

- 32 -

person for a fee.

Counts 19-20 and 50 concern prostitution offenses in violation of the laws of the State of Texas.  A prostitution offense in Texas occurs when:

A person knowingly offers or agrees to receive a fee from another to engage in sexual conduct.

"Sexual conduct" includes deviate sexual intercourse, sexual contact, and sexual intercourse.

"Sexual intercourse" means any penetration of the female sex organ by the male sex organ.

"Sexual contact" means any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person.

"Fee" means the payment or offer of payment in the form of money, goods, services, or other benefit.

"Deviate sexual intercourse" means any contact between the genitals of one person and the mouth or anus of another person.

A person acts knowingly, or with knowledge, with respect to the nature of his/her conduct or to circumstances surrounding his/her conduct when he/she is aware of the nature of his/her conduct or that the circumstances exist.

Counts 16-17 concern prostitution offenses in violation of the laws of the State of Colorado.  A prostitution offense occurs in Colorado when:

A person performed, offered, or agreed to perform, any act of sexual intercourse, fellatio, cunnilingus, masturbation, or anal intercourse, with any person who was not his or her spouse, in exchange for money or other thing of value.

Or when:

A person solicited another for the purpose of prostitution.

Colorado law provides the following definitions:

"Anal intercourse" means contact between human beings of the genital organs of one and the anus of another.

"Fellatio" means any act of oral stimulation of the penis.

"Cunnilingus" means any act of oral stimulation of the vulva or clitoris.

"Masturbation" means stimulation of the genital organs by manual or other bodily contact exclusive of sexual intercourse.

"Thing of value" includes real property, tangible and intangible personal property, contract rights, choses in action, services, confidential information, medical records information, and any rights of use or enjoyment connected therewith.

Counts 38 and 42 concern prostitution offenses in violation of the laws of the State of Ohio. A prostitution offense occurs in Ohio when:

A person engaged in sexual activity for hire.

Or when:

A person recklessly induces, entices, or procures another to engage in sexual activity for hire in exchange for the person giving anything of value to the other person.

Ohio law provides the following definitions:

"Sexual activity" means sexual conduct or sexual contact, or both.

"Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

"Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

"For hire" means for pay or compensation.

1    <u>Counts 36 and 49</u> concern prostitution offenses in violation of the laws of the State

2    of Nevada.   A prostitution offense in Nevada occurs when:

3        A person engaged in prostitution or solicitation therefor, except in a licensed house

4    of prostitution.

5        "Prostitution" means engaging in sexual conduct with another person in return for

6    a fee, monetary consideration or other thing of value.

7        "Sexual conduct" means sexual intercourse, oral-genital contact or any touching of

8    the sexual organs or other intimate parts of a person for the purpose of arousing or

9    gratifying the sexual desire of either person.

10

11    <u>Counts 24 and 44</u> concern prostitution offenses in violation of the laws of the State

12    of Michigan.  A prostitution offense in Michigan occurs when:

13        A person engaged or offered to engage the services of another person, not his or her

14    spouse, for the purpose of prostitution, lewdness, or assignation, by the payment in money

15    or other forms of consideration.

16

17    <u>Count 32</u> concerns prostitution offenses in violation of the laws of the State of

18    Louisiana.  A prostitution offense in Louisiana occurs when:

19        A person engaged in indiscriminate sexual intercourse for compensation, or

20    solicited another with the intent to engage in indiscriminate sexual intercourse for

21    compensation.

22        "Sexual intercourse" means anal, oral, or vaginal sexual intercourse.

23

24    <u>Count 48</u> concerns prostitution offenses in violation of the laws of the State of

25    Florida.  A prostitution offense in Florida occurs when:

26        A person offered to commit, committed, or engaged in prostitution, lewdness, or

27    assignation.

28        -OR-

- 35 -

A person solicited, induced, enticed, or procured another to commit prostitution, lewdness, or assignation.

"Prostitution" is the giving or receiving of the body for sexual activity for hire but excludes sexual activity between spouses.

"Lewdness" is any indecent or obscene act. "Indecent" means wicked, lustful, unchaste, licentious, or sensual intention on the part of the person doing the act.

"Sexual activity" means oral, anal, or vaginal penetration by, or union with, the sexual organ of another; anal or vaginal penetration of another by any other object; or the handling or fondling of the sexual organ of another for the purpose of masturbation; however, the term does not include acts done for bona fide medical purposes.

"Assignation" includes the making of any appointment or engagement for prostitution or lewdness or any act in furtherance of such appointment or engagement.

To "solicit" means to command, encourage, hire, or request another person to engage in specific conduct.

To "procure" means to persuade, induce, prevail upon or cause a person to do something.

Count 39 concerns prostitution offenses in violation of the laws of the State of Alabama. A prostitution offense in Alabama occurs under any of the following:

(1)     A person commits an act of prostitution, which is . any natural or unnatural sexual act, sodomy, or sexual contact for monetary consideration or other thing of value.

(2)     A person solicited, compelled, or coerced any person to have sexual intercourse or participate in any natural or unnatural sexual act, deviant sexual intercourse, or sexual contact for monetary consideration or other thing of marketable value.

(3)     A person agreed to engage in sexual intercourse, deviant sexual intercourse, or sexual contact with another or participate in the act for monetary consideration or other thing of marketable value and give or accept monetary consideration or other thing of value in furtherance of the agreement.

(4)     A person knowingly did any of the following:

a)   Caused or aided a person to commit or engage in prostitution.

b)   Procured or solicited patrons for prostitution.

c)   Provided persons or premises for prostitution purposes.

d)   Received or accepted money or other thing of value pursuant to a prior agreement with any person whereby he or she participated or is to participate in the proceeds of any prostitution activity.

e)   Operated or assisted in the operation of a house of prostitution or a prostitution enterprise.

Count 41 concerns prostitution offenses in violation of the laws of the State of Arkansas.  A prostitution offense in Arkansas occurs when:

A person engaged in, agreed, or offered to engage in sexual activity with any other person in return for or in expectation of a fee.

"Sexual activity" means sexual intercourse, deviate sexual activity, or sexual contact.

"Sexual intercourse" means penetration, however slight, of the labia majora by a penis.

"Deviate sexual activity" means any act of sexual gratification involving: (A) the penetration, however slight, of the anus or mouth of a person by the penis of another person; or (B) the penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person.

"Sexual contact" means any act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female.

Count 5 concerns prostitution offenses in violation of the laws of the State of Maine. A prostitution offense in Maine occurs when:

A person engages in, or agrees to engage in, or offers to engage in a sexual act or sexual contact in return for a pecuniary benefit to be received by the person engaging in prostitution or a 3rd person.

"Sexual act" means: (1) Any act between 2 persons involving direct physical contact between the genitals of one and the mouth or anus of the other, or direct physical contact between the genitals of one and the genitals of the other; (2) Any act between a person and an animal being used by another person which act involves direct physical contact between the genitals of one and the mouth or anus of the other, or direct physical contact between the genitals of one and the genitals of the other; or (3) Any act involving direct physical contact between the genitals or anus of one and an instrument or device manipulated by another person when that act is done for the purpose of arousing or gratifying sexual desire or for the purpose of causing bodily injury or offensive physical contact.

"Sexual contact" means any touching of the genitals or anus, directly or through clothing, other than as would constitute a sexual act, for the purpose of arousing or gratifying sexual desire or for the purpose of causing bodily injury or offensive physical contact.

The United States does not have to prove that the referenced states' laws were actually violated, only that each defendant had intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses in violation of state law, and committed a subsequent overt act in furtherance of the unlawful activity.

1
2
3
4
5
6
7
8

Defendants are charged with violating the Travel Act by facilitating state-law prostitution offenses, conspiracy to violate the Travel Act, and money laundering. Although some testimony and evidence in the trial occasionally may refer to "human trafficking," "sex trafficking," or "child sex trafficking," no defendant is charged with crimes of "human trafficking," "sex trafficking," or "child sex trafficking" or with facilitating those crimes. So, you should not conclude from any use of those terms during the trial that any defendant has been charged with a trafficking crime or facilitating a trafficking crime.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants Lacey, Spear, and Brunst are charged in Counts 53-62 of the indictment with Concealment Money Laundering in violation of Section 1956(a)(1)(B)(i) of Title 18 of the United States Code.  For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant conducted a financial transaction involving property that represented the proceeds of a violation or violations of the Travel Act;

Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

Third, the defendant knew that the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of the Travel Act violation(s).

A financial transaction is a transaction involving the movement of funds by wire or other means that affects interstate or foreign commerce in any way.

The phrase "knew that the property represented the proceeds of some form of unlawful activity" means that the defendant knew that the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony.  I instruct you that violating the Travel Act is a felony.

Defendants Lacey, Brunst, and Spear are charged in Counts 63–68 of the indictment with transporting funds to promote unlawful activity in violation of Section 1956(a)(2)(A) of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant transported money from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States; and

Second, the defendant acted with the intent to promote a violation of the Travel Act.

Defendant Lacey is charged in Count 100 of the indictment with transporting money for the purpose of laundering in violation of Section 1956(a)(2)(B) of Title 18 of the United States Code.  For defendant Lacey to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, defendant Lacey transported money from a place in the United States to or through a place outside the United States;

Second, defendant Lacey knew that the money represents the proceeds of a violation or violations of the Travel Act; and

Third, defendant Lacey knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the Travel Act violation(s) or to avoid a transaction reporting requirement under state or federal law.

Defendant Lacey is charged in Counts 69-70, 81, 83-84, 86, 88-92, and 94-99; Defendant Spear is charged in Counts 71-78, 85, and 93; and Defendant Brunst is charged in Counts 69-70, 78-84, and 86-93 of the indictment with transactional money laundering in violation of Section 1957 of Title 18 of the United States Code. For a defendant to be found guilty of that charge, the United States must prove, for each Count, each of the following elements beyond a reasonable doubt with respect to that defendant:

First, the defendant knowingly engaged in a monetary transaction. An act is done knowingly if the defendant is aware of the act, and does not act or fail to act through ignorance, mistake, or accident. You may consider evidence of the defendants' words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly;

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value greater than $10,000;

Fourth, the property was, in fact, derived from violations of the Travel Act; and

Fifth, the transaction occurred in the United States.

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "financial institution" means an insured bank, commercial bank, or credit union.

The term "criminally derived property" means any property constituting, or derived from, the proceeds obtained from a criminal offense.

The United States must prove that each defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The United States does not have to prove that each defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of a violation of the Travel Act.

Although the United States must prove that, of the property at issue, more than

$10,000 was criminally derived, the United States does not have to prove that all the property at issue was criminally derived.

Defendants Lacey, Spear, and Brunst are charged in Count 52 the indictment with money laundering conspiracy in violation of Section 1956(h) of Title 18 of the United States Code.  For a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt with respect to that defendant:

First, there was an agreement to commit money laundering;

Second, the defendant knew the objective of the agreement;

Third, the defendant joined the agreement with the intent to further its unlawful purpose.

The government has the burden to prove beyond a reasonable doubt that a defendant acted with criminal intent and did not act in good faith.  "Good faith" encompasses a belief or opinion honestly held and an absence of malice or ill will.  If a defendant carries out his or her actions in good faith, there is no criminal intent.  A person who acts on a belief or an opinion honestly held is not punishable under the charges in the indictment merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong.  If the government fails to meet its burden to prove a defendant lacked good faith, you must return a not guilty verdict.

1    All speech is presumptively protected by the First Amendment to the United States
2 Constitution.  However, the First Amendment does not protect speech that proposes an
3 illegal transaction.  Prostitution is illegal in 49 states and most of Nevada.  It is the
4 government's burden to establish that each of the ads alleged in this case is an ad for
5 prostitution and not for another purpose such as an ad for an escort, dating or massage
6 service.  If you find that an ad proposes an illegal transaction, it is not protected by the First
7 Amendment.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT T

# EXHIBIT T

Gross Revenue by Section
10/1/2010 - 11/1/2012
Analysis derived from file (ATTACHMENT – Monthly Revenue & Ad Count report by Section and Category.xlsx)

| Date | adult entertainment | buy, sell, trade | community | musician | real estate for sale | services | Local Places | automotive | jobs | personals | rentals | Monthly Adult Total | Monthly Non-Adult Total | Percentage of Revenue Generated from Adult Section |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/1/10 | 1,172,388.49 | 882.17 | 203.92 | 192.47 | 466.76 | 29,475.57 | | 217.08 | 1,075.86 | 1,254.00 | 1,041.20 | 1,172,388.49 | 34,809.03 | 97.12% |
| 11/1/10 | 3,281,842.25 | 27,151.65 | 7,064.55 | 3,572.35 | 8,873.14 | 134,417.55 | | 5,613.14 | 24,467.41 | 17,126.29 | 16,947.82 | 3,281,842.25 | 245,233.90 | 93.05% |
| 12/1/10 | 3,359,721.43 | 24,657.33 | 6,896.41 | 2,912.25 | 7,726.00 | 142,663.15 | | 4,242.28 | 19,306.08 | 17,123.13 | 13,724.77 | 3,359,721.43 | 239,251.40 | 93.35% |
| 1/1/11 | 3,636,542.38 | 21,733.59 | 6,528.43 | 3,279.75 | 8,531.46 | 167,174.23 | | 4,182.64 | 21,868.12 | 16,983.48 | 13,787.13 | 3,636,542.38 | 264,068.83 | 93.23% |
| 2/1/11 | 3,422,812.18 | 26,341.35 | 5,560.14 | 2,723.04 | 8,005.27 | 157,035.82 | | 5,096.48 | 26,411.74 | 17,766.20 | 12,356.74 | 3,422,812.18 | 261,296.78 | 92.91% |
| 3/1/11 | 4,120,845.18 | 36,339.23 | 8,923.21 | 3,186.09 | 9,846.36 | 179,730.21 | | 4,106.44 | 23,818.34 | 20,769.57 | 12,479.21 | 4,120,845.18 | 299,198.66 | 93.23% |
| 4/1/11 | 4,142,653.77 | 26,077.30 | 6,580.42 | 3,130.21 | 8,492.96 | 175,922.93 | | 5,279.88 | 16,368.60 | 18,623.82 | 10,438.90 | 4,142,653.77 | 270,915.02 | 93.86% |
| 5/1/11 | 4,521,199.08 | 28,851.01 | 5,982.85 | 4,068.25 | 7,889.32 | 194,051.89 | | 5,466.18 | 14,534.66 | 23,095.54 | 12,177.88 | 4,521,199.08 | 296,117.58 | 93.86% |
| 6/1/11 | 4,690,660.37 | 31,597.43 | 6,238.32 | 3,162.80 | 7,961.59 | 214,153.72 | | 5,867.70 | 14,614.23 | 13,718.49 | 11,493.21 | 4,690,660.37 | 308,807.49 | 93.82% |
| 7/1/11 | 4,808,444.94 | 26,050.38 | 7,209.08 | 3,016.85 | 7,531.78 | 213,609.62 | | 4,943.80 | 13,881.12 | 14,856.55 | 10,667.38 | 4,808,444.94 | 301,766.56 | 94.09% |
| 8/1/11 | 4,924,207.19 | 24,953.14 | 7,796.55 | 2,527.92 | 7,123.66 | 216,886.61 | | 4,084.69 | 14,952.00 | 16,023.76 | 11,126.32 | 4,924,207.19 | 305,474.65 | 94.16% |
| 9/1/11 | 4,864,109.40 | 33,300.14 | 7,771.01 | 2,731.84 | 6,262.62 | 221,825.56 | | 3,691.96 | 11,450.17 | 16,108.77 | 12,744.82 | 4,864,109.40 | 315,886.89 | 93.90% |
| 10/1/11 | 5,103,094.84 | 25,963.16 | 6,718.70 | 2,152.78 | 5,749.88 | 238,869.65 | | 4,972.68 | 13,221.22 | 15,857.64 | 11,186.81 | 5,103,094.84 | 324,692.52 | 94.02% |
| 11/1/11 | 4,966,743.65 | 23,353.12 | 4,906.76 | 2,447.68 | 3,996.78 | 221,109.90 | | 4,288.86 | 12,950.03 | 17,876.90 | 9,426.36 | 4,966,743.65 | 300,356.39 | 94.30% |
| 12/1/11 | 5,229,829.96 | 21,595.54 | 4,847.72 | 2,363.16 | 4,471.51 | 217,695.47 | 11.58 | 5,049.84 | 9,742.03 | 18,562.05 | 9,331.43 | 5,229,829.96 | 293,670.33 | 94.68% |
| 1/1/12 | 5,263,107.33 | 25,502.90 | 5,663.37 | 2,741.32 | 5,962.85 | 249,105.31 | 19.43 | 4,834.03 | 14,472.58 | 19,225.19 | 9,255.12 | 5,263,107.33 | 336,782.10 | 93.99% |
| 2/1/12 | 5,122,707.17 | 29,191.91 | 5,733.61 | 2,393.99 | 5,479.42 | 239,671.08 | 43.05 | 4,769.42 | 12,921.92 | 17,910.71 | 7,432.54 | 5,122,707.17 | 325,547.65 | 94.02% |
| 3/1/12 | 6,105,260.59 | 34,917.85 | 6,042.17 | 2,380.07 | 5,986.16 | 275,823.27 | 142.05 | 4,625.69 | 11,988.95 | 20,722.01 | 5,695.28 | 6,105,260.59 | 368,323.50 | 94.31% |
| 4/1/12 | 6,046,400.44 | 30,082.83 | 6,339.32 | 3,564.42 | 6,560.98 | 270,975.77 | 276.35 | 4,327.02 | 11,536.40 | 21,978.82 | 6,839.56 | 6,046,400.44 | 362,481.47 | 94.34% |
| 5/1/12 | 6,805,397.88 | 34,265.56 | 7,059.33 | 2,028.00 | 5,539.45 | 278,077.72 | 187.60 | 4,236.77 | 9,624.27 | 24,531.37 | 6,604.28 | 6,805,397.88 | 372,154.35 | 94.82% |
| 6/1/12 | 7,333,857.91 | 28,734.39 | 8,003.85 | 3,202.16 | 6,611.34 | 283,794.46 | 233.28 | 4,087.82 | 8,632.55 | 21,308.68 | 5,610.32 | 7,333,857.91 | 370,218.85 | 95.19% |
| 7/1/12 | 7,751,310.96 | 31,839.88 | 6,833.60 | 2,264.26 | 6,058.67 | 312,728.74 | 249.79 | 4,594.90 | 8,041.68 | 18,052.42 | 5,905.77 | 7,751,310.96 | 396,569.71 | 95.13% |
| 8/1/12 | 8,257,268.93 | 30,412.05 | 6,273.77 | 2,677.81 | 5,996.06 | 314,237.44 | 357.02 | 3,196.58 | 7,113.81 | 19,042.79 | 5,355.30 | 8,257,268.93 | 394,662.63 | 95.44% |
| 9/1/12 | 7,868,991.49 | 35,384.86 | 6,545.39 | 3,502.28 | 4,738.66 | 310,711.46 | 494.88 | 3,672.00 | 6,865.79 | 19,714.23 | 5,092.27 | 7,868,991.49 | 396,721.82 | 95.20% |
| 10/1/12 | 8,277,525.99 | 32,413.66 | 6,957.05 | 2,600.07 | 4,594.90 | 308,345.36 | 351.71 | 4,057.74 | 9,864.05 | 21,062.73 | 5,256.51 | 8,277,525.99 | 425,503.79 | 95.11% |
| 11/1/12 | 7,773,173.56 | 33,351.21 | 3,505.20 | 2,050.36 | 2,986.01 | 319,921.10 | 515.96 | 3,168.96 | 7,293.66 | 21,372.86 | 3,981.68 | 7,773,173.56 | 398,147.00 | 95.13% |
| Total by Section | 138,850,097.36 | 724,943.64 | 162,184.73 | 70,872.18 | 163,443.59 | 5,918,013.59 | 2,882.70 | 112,674.58 | 347,017.28 | 470,668.00 | 235,958.61 | 138,850,097.36 | 8,208,658.90 | 94.42% |

# EXHIBIT U

EXHIBIT U

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 27, 2024 |
| Michael Lacey, et al. | ) | 9:37 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SENTENCING - DAY 1**

**PAGES 1-129**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

1                            **A P P E A R A N C E S**

2

    For the Government:
3        UNITED STATES ATTORNEY'S OFFICE
         By:  **Mr. Kevin M. Rapp, Esq.**
4              **Mr. Peter S. Kozinets, Esq.**
               **Ms. Margaret Wu Perlmeter, Esq.**
5              **Joseph Franklin Bozdech, Esq.**
         40 North Central Avenue, Suite 1200
6        Phoenix, Arizona 85004
         kevin.rapp@usdoj.gov
7        peter.kozinets@usdoj.gov
         andrew.stone@usdoj.gov
8        margaret.perlmeter@usdoj.gov

9   For the Government:
         UNITED STATES DEPARTMENT OF JUSTICE
10       By:  **Mr. Austin Berry, Esq.**
         1301 New York Avenue, NW, 11th Floor
11       Washington, DC 20005
         austin.berry2@usdoj.gov

12

    For the Defendant Michael Lacey:
13       LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
         By:  **Mr. Paul J. Cambria, Jr., Esq.**
14       **Erin McCampbell Paris, Esq.**
         42 Delaware Avenue, Suite 120
15       Buffalo, NY 14202
         pcambria@lglaw.com

16

    For the Defendant Scott Spear:
17       FEDER LAW OFFICE, P.A.
         By:  **Mr. Bruce S. Feder, Esq.**
18       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
19       bf@federlawpa.com
         - and -
20       KESSLER LAW OFFICE
         By:  **Mr. Eric Walter Kessler, Esq.**
21       6720 N. Scottsdale Road, Suite 210
         Scottsdale, AZ 85253
22       eric.kesslerlaw@gmail.com

23

24

25

                    UNITED STATES DISTRICT COURT

**APPEARANCES CONTINUED**

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    LINCENBERG & RHOW, P.C.
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
         **Mr. Gary S. Lincenberg, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, CA 90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com

```
 1                    P R O C E E D I N G S

 2

 3        (Proceedings commence at 9:37 a.m.)

 4             THE COURT:  All right.  Please be seated.

 5             COURTROOM DEPUTY:  We are on the record in case number    09:37:50

 6   CR-18-422, United States of America vs. Michael Lacey,

 7   Scott Spear and John Brunst, on for sentencing.

 8             MR. RAPP:  Good morning.  Kevin Rapp, Peter Kozinets,

 9   Margaret Perlmeter and Austin Berry on behalf of the United

10   States.                                                            09:38:06

11             THE COURT:  Good morning.

12             MR. RAPP:  And also, Joe Bozdech also for the United

13   States.

14             THE COURT:  Good morning to each of you.

15             MR. CAMBRIA:  Good morning, Your Honor, Paul Cambria     09:38:19

16   and Erin Paris for Mr. Lacey.

17             THE COURT:  Good morning.

18             MR. FEDER:  Bruce Feder and Eric Kessler for

19   Mr. Spear.

20             THE COURT:  Good morning.                                09:38:32

21             MR. LINCENBERG:  Good morning, Your Honor,

22   Gary Lincenberg and Gopi Panchapakesan for Mr. Brunst, who is

23   present in court.

24             THE COURT:  Good morning.  All right.  I think I'll

25   explain to you how I intend to proceed in this matter.  There      09:38:56
```

5

```
1   are, I know, some unresolved objections that I need to address.
2   There may be some lingering objections that the individual
3   defendants have filed that I may not have addressed or
4   overlooked.  And to the extent that I've done that, I'll
5   address those.                                              09:39:24
6        I will then resolve those objections and then provide
7   Mr. Spear, Brunst and Lacey with the sentencing guideline
8   calculation and range.
9        I will then proceed to hear from the respective
10  defendants, character witnesses, family members, if they wish  09:39:49
11  to be heard, and then I will proceed to hear from the
12  government if there are victims who wish to make a statement
13  here in open court.
14       Depending on how long that proceeds, then I will this
15  afternoon hear from each defense counsel, if you wish to       09:40:10
16  provide information to either enhance, or if there's something
17  in addition to your Sentencing Memorandums you have each
18  submitted, and then I will hear from the government.
19       I don't have an idea really from any party the number
20  of witnesses you intend to have heard here in open court.  Let 09:40:43
21  me start with you, Mr. Rapp, do you have any indication?
22       MR. RAPP:  Yes, Judge, we expect that three victims
23  will address the Court.  In addition, we just recently received
24  a letter from a victim who actually testified at trial, and we
25  intend to read that into open court.                           09:41:09
```

UNITED STATES DISTRICT COURT

6

```
 1              THE COURT:  All right.  And Mr. Cambria, do you have
 2    any indication as to the number of character references or
 3    family members who wish to speak?
 4              MR. CAMBRIA:  Your Honor, we attached a number of
 5    character letters to --                                      09:41:30
 6              THE COURT:  I've read those.
 7              MR. CAMBRIA:  We have no live witnesses other than
 8    that.
 9              THE COURT:  All right.  Mr. Kessler.
10              MR. KESSLER:  I believe that we're in the same      09:41:41
11    position as Mr. Lacey.  We provided a number of character
12    letters.  We do not have any additional live witnesses to
13    present today.
14              THE COURT:  All right.  Thank you.  Mr. Panchapakesan,
15    or Mr. Lincenberg.                                           09:42:00
16              MR. LINCENBERG:  Yes, Your Honor, I believe the
17    Court's order was that if people wrote a letter they shouldn't
18    be speaking in court, and so we'll be submitting on the letters
19    with no additional people speaking or any of those persons
20    repeating.                                                   09:42:14
21              THE COURT:  So then after the government's
22    presentation of their testimonies, then I will permit counsel
23    then to provide the Court with any argument.  And then if any
24    of the defendants, Mr. Lacey, Mr. Brunst, Mr. Spear wish to
25    speak, I can hear them.                                      09:42:45
```

UNITED STATES DISTRICT COURT

1    In the event that we run long today -- of course, I'm

2    going to take a break in the morning.  I will have a lunch for

3    my staff and you.  My objective is to then move to the actual

4    imposition of sentencing phase tomorrow morning.  And so,

5    again, that depends on how long we take this morning and this          09:43:14

6    afternoon.

7        All right.  So I do want to say that I have reviewed

8    the mounds of submissions to the Court.  I reviewed some of the

9    renewed and amended objections to the presentence reports that

10   had been revised.  I have reviewed the respective government's        09:43:39

11   and defendants' responses to the objections of the opposing

12   party.  I have reviewed the summary Sentencing Memorandums from

13   the government as to all of the defendants.  I reviewed the

14   responses from each defendant to the government's Sentencing

15   Memorandums.  I received yesterday late Notice of Errata, and         09:44:13

16   frankly I haven't had a chance to read that.

17       Mr. Rapp, do you want to explain the Notice of Errata?

18       MR. KOZINETS:  Your Honor, Peter Kozinets.  The Notice

19   of Errata just corrected an inadvertent mathematical error in

20   the Exhibit A that we attached to the filing we made last            09:44:33

21   Monday, I believe it's Doc. 2137.  So we had Exhibit A.  We had

22   a table regarding Mr. Spear's guideline calculation and the

23   grouping analysis, and there was just a discrepancy in the unit

24   calculation, whether it's a half unit per count group that

25   deserved a unit, or a full unit.  As it turns out, a full unit       09:45:01

8

1   applies.  So it just increased the total offense level by one

2   offense level, still above the statutory maximum.

3          THE COURT:  All right.  I'll take a look at that and

4   see if it addresses anything that I need to revise or have

5   revised in the Presentence Investigation Report.                09:45:31

6          The Court notes the presence of each of the probation

7   officers here who interviewed Mr. Spear, Brunst and Lacey and

8   who drafted each of the reports.

9          I intend to begin with Mr. Spear, and then I will move

10  to Mr. Brunst and then Mr. Lacey, and then I will again resolve  09:45:54

11  the objections.

12         I think for purposes of resolving some of these

13  objections and beginning the procedure, I'll have all

14  defendants remain seated at counsel table.

15         And so Mr. Spear, you were convicted by a trial jury     09:46:25

16  of Count 1, conspiracy to commit Travel Act violations;

17  Count 2, which relates to using a facility in interstate

18  commerce to promote or facilitate the promotion of

19  prostitution, in violation of Massachusetts law; Counts 3, 6

20  through 11 and 18, which relates to using a facility in         09:46:51

21  interstate commerce to promote or facilitate the promotion of

22  prostitution, in violation of Washington state law; Counts 4

23  and 5, which relate to using a facility in interstate commerce

24  to promote or facilitate the promotion of prostitution, in

25  violation of Massachusetts law; Counts 12 and 13 relate to      09:47:15

1   using a facility to, in interstate commerce, to promote or

2   facilitate the promotion of prostitution, in violation of

3   California law; Count 14 and 15 relate to using a facility in

4   interstate commerce to promote or facilitate the promotion of

5   prostitution, in violation of Arizona law; Counts 16 and 17     09:47:44

6   relate to using a facility in interstate commerce to promote or

7   facilitate the promotion of prostitution, in violation of

8   Colorado state law.

9        The statutory term of each Travel Act violation is not

10  more than five years and a $250,000 fine.                       09:48:09

11       The jury also convicted you of Count 52, conspiracy to

12  commit money laundering, in violation of Title 18 United States

13  Code Section 1956(h), which relates to the money laundering

14  counts in Counts 53 through 62.  The statutory term of sentence

15  for each count is not more than 20 years and a $500,000 fine.    09:48:41

16       You were also convicted of Counts 53 through 62,

17  concealment money laundering, in violation of Title 18 United

18  States Code Sections 1956(a)(1)(B)(i) relating to the

19  concealment of Backpage funds deposited in Website Technologies

20  to Cereus Properties, on various dates from May 18th of 2016     09:49:11

21  through August 31st of 2016.  The statutory term of sentence

22  for each count is no more than 20 years and a $500,000 fine.

23       Now, as to Mr. Brunst, Mr. Brunst, you were convicted

24  by a trial jury of Count 1, conspiracy to commit Travel Act

25  violations, in violation of Title 18 United States Code Section  09:50:27

1    371, and the statutory sentence is not more than five years and

2    a $250,000 fine.  Though, the jury acquitted you of all

3    substantive Travel Act counts.

4          You are also convicted of Count 2, conspiracy to

5    commit money laundering, in violation of Title 18 United States   09:50:50

6    Code Sections 1956(h) relating to the money laundering counts

7    in Counts 53 through 62.

8          MR. LINCENBERG:  Your Honor, I may have misheard you.

9    I think you said Count 2.  Should that be Count 52?

10         THE COURT:  Count 52.  Yes.  I left the five off.   09:51:13

11         You were also convicted of Count 53 through 62,

12    concealment money laundering, in violation of Title 18 United

13    States Code Section 1956(a)(1)(B)(i), and that relates to the

14    concealment of Backpage funds deposited in Website Technologies

15    to Cereus Properties from various dates beginning on May 18th,   09:51:41

16    2016, through August 31st of 2016.  The statutory term of

17    sentence for each count is no more than 20 years and a $500,000

18    fine.

19          You were also convicted of Count 64 through 68,

20    international promotional money laundering, in violation of   09:52:03

21    Title 18 United States Code Section 1965(a)(2)(a) relating

22    to --

23         MR. LINCENBERG:  Did the Court say 1965?  I think it's

24    1956.

25         THE COURT:  1956.  Yes.  Relating to transferring of   09:52:27

11

1    Backpage funds to and through Ad Tech BV in the Netherlands to

2    Cereus Properties from August, various dates from August 5th

3    2016, to November 15th of 2016.  The statutory term of sentence

4    for each offense is not more than 20 years and a $500,000 fine.

5         Now, I do want to clarify for the record that I                    09:53:02

6    identified an error in the presentence report and in the

7    court's record.  There was to have been a judgment of acquittal

8    as to Mr. Brunst with regard to Counts 69 and 70 which allege

9    transactional money laundering, and that for some reason wasn't

10   lodged on the docket and it will today, and so there -- the        09:53:39

11   presentence report will be revised to reflect that or remove

12   any reference to Counts 69 and 70.

13        Mr. Lacey, the jury did not reach a verdict on the

14   conspiracy to commit Travel Act violations or any Travel Act

15   count, and you do remain under indictment for those violations.   09:54:29

16   The Court also directed a verdict in your favor as to Counts 19

17   through 51, which did charge you with Travel Act violations.

18   The jury, however, returned a guilty verdict as to Count 100

19   alleging a violation, international concealment money

20   laundering under Title 18 United States Code Sections             09:54:55

21   1956(a)(2)(b)(1), and the statutory term for this offense is 20

22   years and two times the value of the laundered funds, or

23   $500,000.

24        Now, having resolved numerous objections there remain

25   a couple outstanding.  And there was an objection, and they       09:55:28

12

1    were made in a variety of forms either to specific paragraphs

2    in the presentence report or verbiage in the presentence

3    report, but it all, in my view, relates to an argument of what

4    is relevant conduct.

5           The Court is aware that pending before the United          09:55:54

6    States Sentencing Commission is an amendment which directs the

7    courts not to consider acquitted conduct.  That amendment is

8    not today in effect.  It does not take effect until November.

9           All right.  Please, whomever is on their cell phone,

10   please step out.  Step out.  There's a large door or a large    09:56:20

11   sign on the door that says, "No cell phones."  Or turn off the

12   cell phones.  Not to be on vibrate; turn them off.  I will have

13   anyone who has a cell phone go off in this courtroom removed

14   and you won't be able to return.  Save for counsel.

15          Well, where was I?  Well, in any event, the guidelines    09:57:14

16   do indicate that there is this new amendment that will in the

17   future guide courts in that regard, however, the case law of

18   this circuit has made it historically clear that relevant

19   conduct can be considered in certain circumstances.  And here,

20   the dilemma is that the counts of conviction of each defendant   09:57:52

21   are so closely intertwined with one another.

22          For example, the money laundering and concealment

23   counts, the reason they were charged and the reason there was a

24   conviction was because there had to have been a finding by the

25   jury that it derived from illegal proceeds, and you can't put    09:58:17

1  blinders on to the legality of how those proceeds were gotten.

2  They originated from the sex-for-money ads posted on Backpage's

3  platform, which, by the way, was created for that purpose, and

4  so the jury obviously considered the conspiracy, the *Pinkerton*

5  instruction, which attributes the acts of one conspirator to     09:58:54

6  another.  And similarly, the Court cannot separate out that

7  conduct, the acquitted conduct.

8       And I do want to say that the revisions in the PSRs

9  were developed because of the Court's Rule 29 order.  So the

10  findings then and the reiteration of those findings in the       09:59:22

11  various offense conduct paragraphs then rely on indicia of

12  reliability as to those facts, which the Court listened to and

13  the evidence which the Court reviewed.  And so the objection as

14  to relevant and or, excuse me, the objection to acquitted

15  conduct is, therefore, overruled.       09:59:55

16       There were instances where, again, counsel raised what

17  I determine to be an advice of counsel argument as an

18  objection.  Each defendant in some form or fashion, whether it

19  be in their Sentencing Memorandum or the objections raise or

20  reassert their reliance on attorney counsel for acts that are    10:00:31

21  the subject of their convictions.  The Court wholly overrules

22  any sort of objection for all the reasons that are peppered

23  throughout the Court's docket in this case.

24       The record belies this assertion, and the Court relies

25  on its own Rule 29 order, again, reiterating defendants'         10:01:03

14

obligation to put forth that information that was given to

every counsel he says provided advice, and that has never

happened in this case. So advice of counsel in terms of the

objection or Sentencing Memorandum, I'm going to set that

aside.                                                          10:01:35

There was also a request to rely on the Judiciary

Sentencing Information. Now, I did review the Judiciary

Sentencing Information, and oftentimes I do find that data

informative and indeed it is useful in some instances, but the

unique and complex circumstances of this case, the counts of   10:02:00

conviction here make it wholly inapplicable, especially in view

of the multiple enhancements related to the counts of

conviction, and really the underlying Travel Act conspiracy

convictions, and so I do not rely on the JSI information.

Now, each defendant objected to particular victim       10:02:36

impact information. They also objected to restitution. I did

address those objections. But I've considered, once again, the

counts of conviction for Travel Act, and in my observation of

the jury conviction I determined that the jury likely found the

conspiracy to commit Travel Act violations ended upon the sale  10:03:22

of Backpage to Carl Ferrer in 2015. So the Court is hesitant

to rely upon victim information or testimonials for acts

occurring outside of the last count of conviction.

And the Court will consider, however, victim impact

information and testimonies prior to 2015, the date of the last 10:03:55

1    count of conviction.  The presentence reports will be amended

2    accordingly.

3          And I want to -- so, for example, the -- let me point

4    out paragraphs 146 and 147, therefore, will not be considered

5    and they will be amended out of the presentence reports.  The        10:05:04

6    paragraph should be the same in every presentence report.

7          The victim information, however, may be preserved.

8    That victim information for victims beyond 2015 may be

9    preserved as it relates to the pending proceeding of

10   Mr. Ferrer, and so the Court will not wholesale dismiss that        10:05:34

11   information.  It will retain it for later proceedings.

12         All right.  Now, let me just move to then Mr. Spear.

13   There are specific objections that you made and I want to see

14   if I understand them.  You objected to the enhancements, and

15   you essentially say that the enhancement should only apply in        10:06:18

16   one substantive guideline calculation, and that is the

17   application of guideline section 3B1.1A stating that it should

18   only be applied a single time.  The government did not respond

19   to that objection, but I've reviewed the section 3B1.1A, and

20   I've also reviewed the application notes 3D1.3, along with the        10:06:57

21   Chapter 2 and 3 provisions outlined, and I find that this is a

22   correct application of the enhancement to each group.  Each

23   group is to be determined individually and then the units

24   counted, and that's precisely what the probation officer did

25   here, and so the objection is overruled.        10:07:29

1       Mr. Spear, you also objected because the presentence

2 report does not identify downward departures under guideline

3 section 5H1.1, and 5H1.4, but I don't know if you overlooked

4 it. The presentence report does include those considerations

5 as potential downward variance recommendations. And so given   10:08:04

6 that, the objection will be overruled.

7       Mr. Spear, have I resolved all of your objections?

8       MR. FEDER: I don't think so, but --

9       THE COURT: What remains? Yes.

10       MR. FEDER: First, Judge, and I don't know how you   10:08:39

11 want to proceed, but --

12       THE COURT: I'm proceeding the way I want to proceed,

13 and so I'm asking you beyond all of the objections that I've

14 already resolved by written order, the ones I have just

15 resolved that relate to all defendants, you all made a similar   10:09:05

16 objection in that same form or fashion. Are there any

17 outstanding objections that you made on behalf of Mr. Spear

18 that I have yet to resolve?

19       MR. FEDER: Yes.

20       THE COURT: Which ones?   10:09:24

21       MR. FEDER: Well, in the offense conduct paragraphs,

22 which the probation officer identified as having been prepared

23 by the government, there were a number of objections made

24 throughout those offense conduct paragraphs that need to be

25 resolved pretty much sentence by sentence or paragraph by   10:09:42

1    paragraph.

2         THE COURT:  I guess I didn't state clearly enough that

3    I adopt the offense conduct paragraphs.  And the reason I do is

4    because it relates to relevant conduct.  It's information that

5    is in the record.  It's information that was gathered from the     10:10:11

6    trial from the pleadings in the case, and it's information that

7    was included in my Rule 29 order.  And so to the extent you

8    wish to bring out certain sentences, I've read all of the

9    offense conduct, and I am going to overrule the objection.

10        MR. FEDER:  Judge, what we don't want to happen, and       10:10:35

11   as I understand Rule 32 dictates, the Court needs to -- we

12   don't want this to apply as if we had not objected in the Court

13   of Appeals.  And so if the Court is going to basically adopt

14   wholesale the offense conduct submitted by the government that

15   is not from trial testimony but from their various 302s, et       10:10:59

16   cetera, then I object to that in general.  And I am guessing

17   the other defendants will do the same.

18        As I understand Rule 32, if the Court, unless we

19   object, then the Court adopts essentially those assertions as

20   fact, and we don't agree to that.                                 10:11:22

21        THE COURT:  Well, your objections are on the record.

22   You filed your objections to the presentence report.  You filed

23   addendums to that, and so it is in the record, but I overruled

24   them.

25        MR. FEDER:  Okay.  Just if we can go back to a couple       10:11:37

```
 1   things you already said to make sure I am clear and whether or

 2   not I need to make an additional record.  You've talked about

 3   the proceeds and how you have determined that the proceeds are

 4   connected, are connected to the conspiracy, and I just want to

 5   be sure that on the record that the Court understands that the          10:12:18

 6   Court also found, I think in the Rule 29 motion, that the

 7   government never connected in any way a single dollar to a

 8   count in the indictment, to an alleged victim in the

 9   indictment --

10          THE COURT:  I think that's an overstatement,                     10:12:33

11   Mr. Feder.

12          MR. FEDER:  -- to an alleged ad.  Well, that's why I

13   am trying to make a record, Judge.

14          THE COURT:  But you said that's what I said, and what

15   I'm saying is that's an overstatement.  Okay.                           10:12:44

16          MR. FEDER:  I misspoke.

17          THE COURT:  Yes, go ahead.

18          MR. FEDER:  We have the situation that has been

19   identified in the sentencing memos and the objections where

20   Judge Brnovich initially said that this conspiracy is bound by          10:13:00

21   the 50 ads, and then during trial it became unbound when

22   Mr. Berry, in his closing argument, said that basically

23   everybody is a co-conspirator, whether or not they are in the

24   50 ads or not, and the Court overruled our objections to that.

25   But I want to make sure that the record is clear that we do not         10:13:24
```

1    agree that any monies for advertisers outside of the 50 ads,

2    and in Mr. Spear's case outside of the 18 counts of the Travel

3    Act that he was convicted of, can be used as, A, as victims;

4    but B, can be counted in as part of the conspiracy. That, in

5    our belief, would violate the Fifth and Sixth Amendments since    10:13:53

6    we haven't been notified. There was no trial, there was no

7    cross-examination, there was no nothing as to the essentially

8    amorphus alleged victims that Mr. Berry referred to in his

9    closing argument.

10          Next is the -- did the Court just say that our    10:14:11

11    objection to the double billing, double, sorry, the double

12    counting in paragraphs, I think it's 279, sorry, 275 and 279

13    that the Court had overruled, that there was a role adjustment

14    twice, plus four?

15          THE COURT: Yes.    10:14:48

16          MR. FEDER: Okay.

17          THE COURT: That's the application of 3B1.1 and the

18    note 3D1.3.

19          MR. FEDER: In the application note 2C and 2S1.1 says

20    that the application of any Chapter 3 adjustment shall be    10:15:09

21    determined based on the offense covered by this guideline,

22    i.e., laundering criminally-derived funds and not on the

23    underlying offense from which the laundered funds were derived.

24    So we, I mean, just to clarify what the Court has said.

25          Next is the objections as to whether or not probation    10:15:32

1   is available.

2           THE COURT:  I resolved that.

3           MR. FEDER:  So it's clear, Judge, in the presentence

4   report the presentence investigator identified that while the

5   guidelines indicate that probation is not available.  If it's      10:15:50

6   an offense level D, the statute of 18 U.S.C. 3561(a)(3)

7   indicates as follows:  The defendant is sentenced at the same

8   time to a term of imprisonment for the same or a different

9   offense that is not a petty offense.  That you can't give

10  probation and prison for the same thing.  That's what the          10:16:16

11  statute says.  The guidelines, as the Court knows, are advisory

12  at best.  And based on some recent Supreme Court decisions,

13  it's a question whether or not even that advisory role will be

14  recognized.  So we would ask the Court to follow the statute

15  and not the guidelines in regard to whether or not probation is    10:16:35

16  available as to all defendants.

17          THE COURT:  I see that as a sentencing recommendation

18  or argument, not an objection to the PSR.  The PSR correctly,

19  as I pointed out in my written order, correctly states that if

20  a defendant is in Zone B probation is not eligible.                10:16:54

21          MR. FEDER:  Well, Judge, actually the presentence

22  report indicates that probation is available under this

23  statute, but is not available under -- under the guidelines.

24          THE COURT:  Yes, it's a correct statement of law, so

25  that's why I overruled the objection.                              10:17:12

1      MR. FEDER:  Okay.  As to the Court's indication

2  regarding acquitted conduct, acquitted conduct is not a

3  proposal.  The amended -- this amendment took place by an act

4  of Congress bipartisan.

5      THE COURT:  Yes, I understand.                          10:18:47

6      MR. FEDER:  So I mean, we believe, I mean, again, over

7  the Court's assertion, we believe that acquitted conduct should

8  not have any place in the PSRs and, therefore, in the Court's

9  sentencing.

10     I think that's it, Judge.  Thank you.                    10:19:06

11     THE COURT:  All right.  Having resolved your

12  objections, Mr. Spear, your Sentencing Guidelines are

13  calculated as follows:  With regard to Count 1 and Count 2,

14  conspiracy to commit Travel Act violation, the base offense

15  level is determined by the offense level applicable to the      10:20:00

16  underlying crime of violence.  And because Count 2 involved a

17  minor victim, the guideline manual references 2G1.3 in

18  determining the offense level, and it guides the Court that the

19  base offense level involving a minor victim in a Travel Act

20  violation is an offense level 24.                            10:20:44

21     Two levels are added because the Court has previously

22  found that there was a use of a computer or interactive

23  computer service to entice, encourage, offer or solicit a

24  person to engage in prohibited sexual conduct with a minor.

25     Two points are added because subsection (a)(4) applies   10:21:09

1    and this offense involved a commercial sex act.  That is the

2    offense involved the solicitation of illegal prostitution

3    services in exchange for money through a paid advertisement

4    feature -- featuring a minor on Backpage.com.

5         Four levels are added, as the Court has previously          10:21:44

6    found that Mr. Spear was an organizer or leader of the criminal

7    activity involving five or more participants, or his role was

8    otherwise extensive.

9         Here, Mr. Spear directed Backpage's daily operations

10   from 2004 until 2015, and he directed the activities of          10:22:08

11   Mr. Ferrer.  He oversaw the website's moderation policies and

12   practices, he approved the website's financial and strategic

13   relationships with the prostitution review site known as The

14   Erotic Review, he directed the website's implementation of a

15   program that aggregated conduct from other website prostitution  10:22:40

16   websites, and he also encouraged partnerships with others to

17   purchase advertising on Backpage.  Ultimately, profiting

18   millions of dollars in laundered funds from soliciting illegal

19   prostitution.  The four-level enhancement applies.

20        The adjusted offense level for Counts 1 and 2 is            10:23:16

21   therefore 32.

22        Now, rather than go piecemeal count by count, the

23   various sentencing guideline calculation changes whether a

24   minor victim was involved in the ad or an adult victim, so I'm

25   going to first go through the calculation as to the adult        10:23:50

1   victim counts.  Those Travel Act counts of conviction involving

2   adult victims are Count 3, 6, 8, 10, 11, 13, 15, 16 and 17.

3   The guideline for a Travel Act violation under 18 U.S.C.

4   1952(a)(3)(A) is guideline 2E1.2.  And under that guideline and

5   applying guideline 2G1.1, the base offense level number for          10:24:40

6   these counts is 14.

7          There is a four-point increase for having been an

8   organizer or leader, as previously stated, and the adjusted

9   offense level subtotals for each of these counts is 18.

10         With regard to the remaining Travel Act violations          10:25:10

11  that involve minor victims, they are Counts 4, 5, 12 and 14.

12  Again, the guideline violation for 18 U.S.C. Section

13  1952(a)(3)(A) is guideline 2E1.2.

14         Applying section (a)(2), the base offense level which

15  involves a minor victim, therefore, applies guideline 2G1.3,       10:25:48

16  and the base offense level is 24.

17         Two levels are added because there was a use of a

18  computer or interactive computer service to entice, encourage,

19  offer or solicit a person to engage in a prohibited sex act

20  with a minor in each of these counts.                              10:26:11

21         Two levels are also added because the offense involved

22  a commercial sex act.  Here, specifically with regard to Counts

23  4, an online advertisement was published on January 29th of

24  2014 which depicted Victim 8 who is a minor female at the time

25  of the offense.                                                    10:26:47

1        There is a four-level enhancement for being an

2   organizer or a leader as stated previously, and the adjusted

3   offense level is therefore 32.

4        MR. KOZINETS:  Your Honor, I apologize if I misheard,

5   but did you in that discussion, did you mention both of the          10:27:40

6   plus two enhancements?

7        THE COURT:  Yes.

8        MR. KOZINETS:  Okay.  Thank you.

9        THE COURT:  Now, with regard to the conspiracy to

10  commit money laundering, that is Count 52 through 62, the base       10:27:56

11  offense level for a 1956(h) violation is determined by the

12  offense level for the underlying offense from which the

13  laundered funds derived, and the laundered funds derived from

14  the Travel Act violations.  And so the violation was committed

15  under 1952(a)(3)(A) and, therefore, guideline 2E1.2 applies,         10:28:46

16  and the base offense level is determined by the underlying

17  crime of violence.  And here, because the underlying crime of

18  violence both referred to adult victims and minor victims, the

19  guidelines counsel that we must use the base offense level that

20  yielded the highest range, and that was -- that was those           10:29:18

21  counts related to the minor victims.  And so the highest base

22  offense level is 24.

23        Adding the four-level role adjustment, then the base

24  offense level for conspiracy to commit money laundering, those

25  Counts 52 through 62 is 32.  And the guidelines say add two          10:29:47

```
 1    more points because the defendant was convicted of a violation
 2    of 18 U.S.C. 1956(h).  There is an additional two-level
 3    enhancement for the offense involving a sophisticated                10:30:24
 4    laundering scheme, and there's a four-level enhancement for
 5    being an organizer or leader of a criminal activity.  The
 6    adjusted offense level, therefore, is 40.
 7             Now, applying the multiple count adjustments to each
 8    of the groups, there were 19 in total, the number of units
 9    assigned to the combined group is 3.5.  And the guidelines
10    instruct that the offense level is increased by the number of       10:30:58
11    units assigned and, therefore, there is a four-point
12    enhancement that is added.  The combined adjusted offense level
13    is 44.
14             Now, you know that the sentencing guideline table only
15    goes to 43, so your resulting offense level is off of that          10:31:31
16    guideline chart.
17             MR. KOZINETS:  Your Honor --
18             THE COURT:  Yes.
19             MR. KOZINETS:  Thank you.  This relates to the Notice
20    of Errata that we filed yesterday.  The government has              10:31:50
21    indicated in its filings that there is a modification that I
22    think is called for in connection with Count through 18 or 19,
23    the one that involves the money laundering calculation.
24             I think in the course of calculating the number 40 for
25    the adjusted offense level, the four-point role adjustment is       10:32:20
```

1  considered two times in reaching the number 40, and the

2  government respectfully submits that with respect to that

3  particular calculation it would be appropriate only to count

4  the four-point adjustment once.  And if -- if that is the case,

5  then 40 becomes 36 in the adjusted offense level for that money       10:32:51

6  laundering count.

7       THE COURT:  Do you have a copy of your Notice of

8  Errata?  I am not following you.  All right.  Now, let me see

9  if we are now on the same page.  In paragraph -- well, they've

10  been renumbered.  But in any event, in the multiple count       10:34:51

11  adjustment, group one would qualify for one unit, group three

12  would also qualify for one, as would group four.  Group 11

13  would qualify for one unit, as would group 13.  The adjusted

14  offense level, therefore, is 36.  The total number of units

15  would then be six.  So then the greater of the adjusted offense       10:35:42

16  level would then be 36.  Instead of the four-level increase

17  there would be a five-level increase.

18       MR. KOZINETS:  Due to the way the grouping unit

19  calculations resolve, that is the end result of this.

20       THE COURT:  And so the combined adjusted offense       10:36:14

21  level, the total offense level is 41.

22       MR. KOZINETS:  Correct.

23       THE COURT:  We will make that modification.  All

24  right.  Okay.  Now, Mr. Spear, your resulting sentencing

25  guideline range, based on an offense level 41, and having no       10:37:29

```
 1   prior criminal history, you are in a Criminal History Category
 2   of I.  The resulting sentencing guideline range is a low end of
 3   324 months to a high end of 405.  Because of that range
 4   essentially the statutory maximum for each of the offenses is
 5   the applicable sentencing range.                                  10:38:02
 6        All right.  Let's run through Mr. Brunst's resulting
 7   guideline, but I want to make sure that I hear from counsel.
 8   Have I resolved all objections with regard to Mr. Brunst?
 9        MR. LINCENBERG:  I'm not sure.  I'm not sure, and I
10   can explain why if the Court wants me to.                         10:39:10
11        THE COURT:  Well, I either have or I have not,
12   Mr. Lincenberg.
13        MR. LINCENBERG:  Your Honor, I believe I understand
14   that the Court is applying 2G1.3 to Mr. Brunst as well.
15        THE COURT:  Yes.                                             10:39:36
16        MR. LINCENBERG:  The Court's order may have just had
17   some language that was confusing, but that was -- that's my
18   understanding.  So if that's the case and the Court is -- the
19   Court's order did not address the McEnry case about looking to
20   the charge as opposed to the underlying offense conduct, but I   10:39:53
21   think implicit in the Court's order is addressing it and
22   denying our position on that as well.
23        THE COURT:  Yes.
24        MR. LINCENBERG:  With regard to use of acquitted
25   conduct, we are in a slightly different position from Mr.        10:40:05
```

1   Spear, but I believe I understand the Court to be ruling that

2   the Court is using conduct even in connection with the 50

3   counts that Mr. Brunst was acquitted on as part of relevant

4   conduct; is that correct?

5          THE COURT:  Yes.                                    10:40:25

6          MR. LINCENBERG:  With regard to the -- I would note

7   that in addition to the arguments made, I would just add for

8   the record not only that the sentencing commission indicated it

9   would be fundamentally unfair to do that and would frustrate

10  the goals of sentencing, but even the original PSR at paragraph   10:40:44

11  157 where the probation office had contacted the sentencing

12  commission for advice and the sentencing commission advised not

13  to use the acquitted conduct, I would submit on that point.

14         With regard to role in the offense --

15         THE COURT:  Well, let me say that I also discussed    10:41:04

16  that post meeting with the commission and the probation office,

17  and that was not my understanding.

18         MR. LINCENBERG:  Okay.  With regard to role in the

19  offense, I believe the Court has decided that.  The Court did

20  not address specifically our citation to U.S. vs. Whitney where   10:41:20

21  the Court talked about exercising control over others.

22  Mr. Brunst supervised no one.  There was no evidence that he

23  did.  The Court did, in the Court's Rule 29 order, have a

24  statement that I believe was just incorrect that Mr. Brunst

25  supervised Mr. Spear.  But as I understand it, the Court is not   10:41:43

1    looking to entertain further argument on our objections about

2    role in the offense; is that correct?

3          THE COURT:  That's correct.

4          MR. LINCENBERG:  All right.  We would note that it

5    appears that the Court is treating prostitutes or advertised on          10:41:59

6    Backpage as, quote, victims and treating them whether or not

7    they are in the counts of conviction for Mr. Spear or not.  We

8    object to that, but I believe that our record is preserved on

9    that and the Court has addressed that as well.

10         And then --                                                        10:42:18

11         THE COURT:  Well, they were proximally harmed.  That

12   was my finding.  Your briefing makes it sound like there has to

13   be some physical harm.  There is ample information in the

14   record that many of these individuals were advertised not of

15   their own free will and they were minors, and that many of them          10:42:39

16   to date suffer from extreme emotional psychological traumas.

17   That, in my view, aligns with the definition of victim.

18         MR. LINCENBERG:  Right.  Our argument was, in part,

19   that no acts of my client proximately caused this.  If people

20   were victimized by their pimp or whoever, that is not a victim          10:43:06

21   for purposes of this statute, and --

22         THE COURT:  Proximate harm analysis.

23         MR. LINCENBERG:  Okay.  And then the last thing I

24   would just raise with regard to offense conduct, we still have

25   in the presentence report conduct that was objected to, for             10:43:25

```
 1   example, at paragraphs 108 through 118 referencing alleged
 2   kidnappings and rapes and murders which were not part of this
 3   case, which are not met proximate harm and the like, we
 4   objected to those.  We have laid out our objections in our
 5   papers.  I am not going to repeat them.  We break them down     10:43:46
 6   into various categories of offense conduct, and we give
 7   specific examples of statements in the PSR that are just
 8   blatantly at odds with testimony even by Mr. Ferrer, and I just
 9   want to make sure that the Court has carefully considered all
10   of our objections to the offense conduct as well.              10:44:05
11         THE COURT:  Well, I think, Mr. Lincenberg, the indicia
12   of reliability is as to what I find reliable, and having
13   presided over the case and having ruled on pretrial motions
14   what comes in is too prejudicial to come in in front of a jury,
15   that is all adequately provided for in the PSR, and my findings 10:44:32
16   related thereto had to do with prejudicial evidence being
17   presented in front of that jury in support of your respective
18   motions.
19         MR. LINCENBERG:  Okay.
20         THE COURT:  And so, however, I do find it reliable and   10:44:56
21   relevant, and that's why it is included in the PSR.  I did not
22   take it out.
23         MR. LINCENBERG:  Then in that event I believe in
24   response to the Court's questions the Court has covered all of
25   our objections.  Thank you, Your Honor.                        10:45:11
```

31

```
1              THE COURT:  All right.  And so Mr. Spear, excuse me,

2     Mr. Brunst, your Sentencing Guidelines are calculated as

3     follows:  With regard to the conspiracy to commit money

4     laundering offense, the base offense level is guided by

5     guideline section 2S1.1, and under subsection (a)(1) that level    10:45:54

6     is determined by the underlying offense from which the

7     laundered funds were derived.  And considering the jury's

8     verdict and the relevant evidence and conduct, then we look to

9     the Travel Act allegation and 2E1.2 is therefore used to

10    determine the offense level.  Under subsection (a)(2), we then    10:46:37

11    look at the underlying crime or other unlawful activity.

12             And applying all of the chapter adjustments, we also

13    have to consider that the offense included minor victims as

14    well as adults, and so we must apply 2G1.3 because it yields

15    the greater offense level as opposed to the offense level that    10:47:17

16    applies to adult individuals.

17             Because the relevant conduct involves counts of

18    conviction pertaining to three minors, those in particular in

19    Counts 2, 4, 5, 10, 12 and 14, the base offense level is 24.

20    Two levels are added because there was a computer or    10:47:59

21    interactive computer service used to entice, encourage, offer

22    or solicit a person to engage in prohibited sexual conduct with

23    a minor.

24             There are two additional levels that are added because

25    the offense involved a commercial sex act, sex-for-money ads    10:48:18
```

1  essentially, and the four levels are added because the Court

2  has already found that you were an organizer and leader of that

3  conspiracy.  The adjusted offense level for that count is 32.

4       With regard to the Counts 4 and 5, the base offense

5  level is 24 and there are two levels added, again, for the use          10:49:02

6  of a computer or interactive computer service.  There are an

7  additional two levels that are added for a commercial sex act.

8  There is the organizer leader role that applies a four-level

9  enhancement, and the adjusted offense level is 32.

10      MR. LINCENBERG:  Your Honor, can I ask for                         10:49:38

11 clarification?  Your Honor mentioned Counts 4 and 5, I believe

12 Mr. Brunst was acquitted on those counts.

13      THE COURT:  Well, Counts 4 and 5 are necessary to

14 understand the application of the 24 offense level.  They

15 involve the minor victims.  Those are the relevant conduct.        10:49:57

16      The -- and we have to go through that exercise because

17 it results in the grouping and the identification of what the

18 final offense level is with all of the adjustments.  And Mr.

19 Brunst is entitled to know the origin of his highest offense

20 level, but if -- but if you do not necessarily need me to go           10:50:37

21 through that, I can, if he wishes to waive reading of that.

22      MR. LINCENBERG:  No I don't wish to waive reading.  I

23 appreciate the Court going through it.  We disagree, but the

24 Court knows that.  So that's okay.

25      THE COURT:  And again, leaving off the adjusted role           10:50:56

1    in the offense is four, a four-level enhancement, so the

2    adjusted offense level subtotal is 32.

3            The guideline calculation is the same for Counts 12

4    and 14, and then you apply the multiple count adjustment which

5    results in a unit subtotal of three.                    10:51:48

6            And so the total number of units is three and the

7    greater of the adjusted offense level, therefore, is 32.  We

8    use the 32 as the offense level.  That is increased by the

9    number of units assigned, so there is a three-point adjustment

10   there.  And the combined adjusted offense level that applies to    10:52:59

11   the group with the highest offense level then results in an

12   offense 35.

13           There are two points that are added because Mr. Brunst

14   was under section 1956(h).  There are an additional two points

15   that are added because he was involved in a sophisticated money    10:53:30

16   laundering scheme.  He also received a four-point adjustment

17   for role in the offense.  His adjusted offense level,

18   therefore, is 43.

19           Mr. Brunst has no prior criminal history, so he is in

20   a Criminal History Category of I.  Because the sentencing    10:54:07

21   guideline table ends at 43, there is no guideline range

22   applicable and the statutory term of sentence applies to each

23   count in this case.

24           MR. LINCENBERG:  So then Your Honor, is the Court

25   going to double count the leadership enhancement?    10:54:35

1    THE COURT:  It had to be counted because you have to

2   apply the enhancement to the underlying offense, so yes.  All

3   right.  With that, let me --

4    MR. KOZINETS:  So Your Honor.

5    THE COURT:  -- stand in recess for about 15 minutes          10:54:57

6   and then we will resume.

7    MR. KOZINETS:  Just as to this prior calculation, we

8   did point out in our papers that there is consideration twice

9   of the role adjustment in this calculation.  So we've pointed

10  out that instead of 43, the total would be 39 if the role          10:55:19

11  adjustment is just considered once in that final step in your

12  calculation.

13    THE COURT:  Well, I will consider your late errata

14  notice on the break.  And I will say that it makes my

15  responsibility difficult when I receive these last-minute          10:55:41

16  addendums, errata notices, late objections, renewed objections.

17    MR. KOZINETS:  I apologize for that, Your Honor.  We

18  did raise that issue, though, in our prior brief as well.

19    THE COURT:  All right.  We will stand in recess for

20  15 minutes.          10:56:02

21    COURTROOM DEPUTY:  All rise.

22    (Recess was taken at 10:56 a.m.)

23    (Proceedings reconvened at 11:20 a.m.)

24    THE COURT:  Please be seated.  All right.  We are back

25  on the record.  And the Court notes the presence of counsel and          11:20:32

1    all defendants.

2          And I have had our probation officers provide to you

3    the various sections of the sentencing guideline manual that

4    supports the counting of the leadership role, and the beginning

5    of that analysis is in 2S1.1, and so I don't agree with the        11:21:03

6    government's memorandum because clearly, as outlined and

7    instructed by the commission, when you have multiple counts,

8    and especially when you have counts involving money laundering,

9    you necessarily have to look at the source, the illegal

10   activity that produced the funds, and that's why those            11:21:46

11   sentencing guideline enhancements apply.

12         And though it may seem like double counting, the

13   commission instructs the Court to arrive at whatever the

14   greatest offense level is for the underlying offense, and

15   that's precisely what the Court did.  And so that's how we will    11:22:09

16   proceed.

17         Now, let's continue with the review of Mr. Brunst's

18   sentencing guideline calculation.  We had arrived at the

19   greater of the adjusted offense level, which is 32, applying

20   the three-unit increase to a combined adjusted offense level of    11:22:48

21   35.  Adding the two points pursuant to 2S1.1 (b)(2)(B), because

22   Mr. Brunst was convicted of a 1956(h) offense, the guidelines

23   instruct to add two points.  Two points are then added because

24   the Court has found that this involved a sophisticated

25   laundering acts.                                                   11:23:25

UNITED STATES DISTRICT COURT

1        Four points are then added for Mr. Brunst's organizer

2  and leadership role.  And to be clear, the objections were as

3  to this, the fact that Mr. Brunst didn't directly supervise

4  five or more individuals, its organizer or leadership role, and

5  the Court has sufficiently held that he had such a role.  The          11:23:58

6  adjusted offense level is, therefore, 43.

7        Now, Mr. Brunst does not have any prior criminal

8  convictions, and so he is in an offense level of 43.  The

9  sentencing guideline table ends at 43 and the guideline

10 provision on the guideline table indicates a life term.  So,          11:24:40

11 therefore, we revert to the statutory maximum terms as to those

12 counts as I stated earlier.

13       Now, with regard to Mr. Lacey, Mr. Cambria, have I

14 resolved all of Mr. Lacey's objections?

15       MS. PARIS:  Your Honor, I will be addressing                     11:25:09

16 objections.  I would like to address them from the podium.  But

17 first I have a, actually, a housekeeping matter that's relevant

18 here.  When Your Honor was laying out the counts with regard to

19 Mr. Lacey, Your Honor discussed Counts 2 through 51 and then

20 Count 100, but there are a number in between.  Should I lay           11:25:25

21 them out in the resolution, or I could perhaps just submit

22 something on the record afterwards?  I got it in front of me if

23 you want me to read it.

24       THE COURT:  I am not sure what you mean because he is

25 only being sentenced here as to Count 100.                            11:25:39

UNITED STATES DISTRICT COURT

1    MS. PARIS:  Yes.  And so Your Honor went through the

2  open Counts 2 through -- 1 through 18, the acquitted Counts 19

3  through 51.  He also has open Counts 52 through 62, acquitted

4  63, open 64 to 68, and acquitted 69 to 99.  So I wanted to make

5  sure that was complete before I took the podium.          11:26:02

6    THE COURT:  I am not sure what you mean by "complete."

7  I issued my Rule 29 order.  I directed verdict in his favor as

8  to 19 through 51.  He is only being sentenced here today for

9  Count 100, but there do remain standing indictments against

10 him, and so we're only here to address Count 100.          11:26:26

11    MS. PARIS:  Correct.  I just wasn't sure at the

12 beginning when you listed the counts and what the resolution

13 were for each of them for Mr. Lacey, there were a portion that

14 were not addressed, and I wanted to make sure for the record

15 that was addressed.          11:26:42

16    THE COURT:  Yes, you may come forward.  What were the

17 outstanding objections as to Mr. Lacey?

18    MS. PARIS:  Okay.  I'll do my best to streamline this.

19    THE COURT:  I'm sorry?

20    MS. PARIS:  I will do my best to streamline this in          11:27:02

21 light of everything that's occurred today.  At the outset we

22 object to the rulings that have occurred thus far, both in the

23 order from August 25th, Docket No. 2161, and the rulings that

24 have been made today with respect to the codefendants that are

25 applicable here as well.  We join.  They're maintaining their          11:27:19

1    objections on those.

2         The key things we want to talk about, and there is

3    just a few I want to address, the first was a point of

4    clarification we had.  With respect to Your Honor's ruling on

5    restitution, in Docket 2161, we had indicated that under        11:27:35

6    controlling Ninth Circuit precedent, in order for them to be a

7    victim for purposes of restitution, the person must suffer a

8    pecuniary interest directly related to and as a result of that

9    wire transfer.  Your Honor mentioned that in the order, but

10   then resolved the restitution order or issue on discussion of   11:27:54

11   Brunst and Spear's issues, which are separate and distinct from

12   Mr. Lacey's, so we weren't sure if we are appearing at that

13   hearing to be able to address restitution further there and how

14   it's not applicable to Mr. Lacey, or if the ruling is that it

15   is applicable to Mr. Lacey and his separate count and he should  11:28:16

16   appear for the hearing for purposes of restitution.

17        THE COURT:  Well, as I mentioned, with regard to

18   Mr. Lacey, he's in a different posture because, of course, he

19   was not convicted, although he was not acquitted, of the

20   conspiracy to commit Travel Act violations or a Travel Act       11:28:39

21   violation, and again, there remains a pending indictment on him

22   for those offenses.  But my ruling is, I guess to be clear,

23   because you have to look at the source of funds from which he

24   was convicted, if the jury found that his international

25   transfer of funds didn't derive from an illegal source, then     11:29:16

UNITED STATES DISTRICT COURT

1   they would have returned judgment in his favor and they did not

2   do that.

3        So again, going through the exercise of determining

4   his sentencing guideline range, I have to look at the

5   underlying conduct, the relevant conduct.  Where did the money    11:29:37

6   come from?  The money came from, by my review of the trial

7   record, as pointed out in my Rule 29 order, it came from the

8   Backpage platform, the sex-for-money ads, and so necessarily

9   there has to be some consideration in terms of restitution, but

10   at this juncture I can't make that determination.  But for my    11:30:08

11   purposes, for sentencing purposes, I will have to consider it.

12        MS. PARIS:  I guess what I'm saying is there's two

13   kinds of separate issues here with respect to the victims, and

14   so I do want to address it with respect to sentencing and how

15   that impacts his guidelines range.  But the preliminary issue    11:30:27

16   was just we weren't clear if Your Honor was ruling that we

17   should be attending the restitution hearing because Your Honor

18   had found that there was someone who had suffered pecuniary

19   harm who had a property interest in those funds because that's

20   the standard for restitution, and was harmed as a result of    11:30:46

21   that transfer.  That's like a separate technical thing from

22   what I'll address in a minute here, which is the sentencing.

23        THE COURT:  Well, I think we're jumping the gun a bit

24   as to Mr. Lacey because, again, he has not been convicted of a

25   conspiracy to commit Travel Act violations or a Travel Act    11:31:02

1    violation, so he may be in a different standing.  That's all to

2    say that that's something that I don't want to address here.

3    It's a separate restitution hearing that I instructed the

4    parties to consider and think about in terms of when that

5    should occur.                                                    11:31:20

6           So beyond that, what else?

7           MS. PARIS:  So the first thing I want to address is

8    what are these funds derived from?  And that is the standard

9    here.  The reason why we're looking at, potentially, this

10   underlying conduct is there's this finding that the funds have   11:31:33

11   been derived from underlying conduct.  In this particular

12   situation, it's a factual impossibility for anyone who is

13   associated with an ad that was published prepublication, sorry,

14   presale to Mr. Ferrer, to have anything to do with Count 100

15   because under the government's own exhibit, Exhibit 1479, that    11:31:53

16   final page, the funds can --

17          THE COURT:  Let me stop you there.  It sounds like

18   you're making a renewed motion for judgment of acquittal, and

19   it also sounds like you're making a sentencing argument.

20          MS. PARIS:  No, Your Honor.  The issue would be which      11:32:09

21   method for calculating Mr. Lacey's sentence do we look at?  Do

22   we do the loss table method, which is what we advocate, or do

23   we look at the underlying conduct method, which is what

24   probation and the government here have advocated?  The method

25   they advocated here is a factual impossibility.  So you can't     11:32:26

```
 1    use the underlying conduct method here because the ads that are
 2    affiliated with the people who are identified in the PSR as the
 3    purported victims here, those funds are not at issue in Count
 4    100, period.  Government Exhibit 1479 shows us that.  Count
 5    100's funds were solely derived from ads published after the     11:32:51
 6    sale of Backpage to Ferrer.
 7              So a second reason why we don't want the underlying
 8    conduct method to be used here is that those counts are
 9    unresolved as to Mr. Lacey.  So any punishment here has a
10    potential to be a double jeopardy issue.                         11:33:12
11              But even if Your Honor doesn't want to go down that
12    path, there's actually a third reason why those counts can't be
13    used here with respect to Count 100, which is that at this
14    third trial for Mr. Lacey we believe he'll be acquitted of
15    Counts 1 through 18.  It's not known yet, but at some point in   11:33:28
16    time in the future we will know what the resolution of those
17    counts are.  And so you're being asked here to use this
18    conduct, which very well may be acquitted conduct in the
19    future, and to greatly increase his sentence from a base
20    offense level we believe of 10 to one of 43, based solely on     11:33:45
21    conduct that is unresolved, that factually is impossible to be
22    used here, and that may in the future be acquitted conduct,
23    which I'm not even sure at that juncture what the procedure
24    would be to then come back and rectify the sentence if it's
25    subsequently acquitted.  So there's a number of issues here,     11:34:03
```

```
 1   and we think that the key outstanding issue for Mr. Lacey here
 2   is that we believe that the loss table method is the
 3   appropriate method to be used here in calculating his
 4   guidelines range.
 5         I just wanted to thumb through my notes.              11:34:16
 6         THE COURT:  Well, let me hear from the government on
 7   that argument.  Who is speaking for the government?
 8         MR. KOZINETS:  Thank you, Your Honor.  First of all,
 9   with respect to that loss table method as we outlined in our
10   filings, even application of that method gets us in the end to  11:34:48
11   the same result, so I don't think that would make any
12   difference overall in the calculations.
13         But with respect to the underlying conduct method, as
14   Your Honor has observed, the jury implicitly found in its
15   verdict that the source of these funds were illegal          11:35:09
16   prostitution ads that had been published by Backpage and that
17   Mr. Lacey knew that to be the case, and I think overall you
18   can't divorce Count 100 from the underlying context of how
19   those funds came to be and why those funds were transferred
20   overseas by Mr. Lacey.                                       11:35:34
21         You found in your role adjustment ruling that
22   Mr. Lacey was a leader or organizer of this organization
23   throughout its history; that he had been involved over the
24   course of more than a decade in the development, growth and
25   sustained viability of the website.  So that is all relevant to  11:35:55
```

1    determining what his sentence would be here.

2          And I think that, you know, you've made multiple

3    findings about that.  In, for instance, your Rule 29 order

4    where you talked about on page 21 about how Lacey, Spear,

5    Brunst and others knew that demand for Backpage adult ads were          11:36:22

6    especially high in proportion to the total business of the

7    website, they derived the majority of their revenues from those

8    ads, and the sale of those ads constituted the dominant portion

9    of their business.  You found that, and that's at page 21 of

10   that ruling.          11:36:40

11         At page 31, you found that Mr. Lacey's wealth depended

12   on the success of Backpage's adult section, and it was -- and

13   then that suffices to establish his membership in the Count 1

14   conspiracy; that there was sufficient evidence at page 40 of

15   that ruling; that each defendant knew what was occurring          11:37:04

16   through the Backpage ads, and that the vast majority of revenue

17   came from prostitution ads.

18         So we have all of that.  And then in your ruling from

19   this weekend, Doc 2161, we have additional rulings that support

20   the notion that, as that order puts it, that there was clear          11:37:24

21   and convincing evidence that the defendants, including

22   Mr. Lacey, were on notice that minors were among those who were

23   being advertised on Backpage; that that notice came from

24   multiple sources over multiple years; that NGOs, attorney

25   generals, media reports, meetings that were personally attended          11:37:48

1  by the defendants all involved this kind of notice.

2      There were multiple requests to make changes to the

3  website to address this issue.  The defendants hired an

4  Internet safety expert that recommended certain things like not

5  using prepaid gift cards, not running ads that many of which    11:38:06

6  tied to the same phone number, not running ads that had the

7  phrase "New In Town," which indicated possibility of a child

8  being shuttled from town to town where it's more difficult for

9  them to get help, many of the same recommendations made a

10  couple years later by NCMEC to the defendants, the            11:38:26

11  recommendation being disregarded so as not to hurt the bottom

12  line.  This is all part of the trial record.  We respectfully

13  submit this is all relevant conduct that can be considered

14  here.

15      So there is that clear and convincing evidence that      11:38:40

16  minors were involved.  We think there is at least a

17  preponderance of the evidence to show, for sentencing purposes,

18  not for -- not for offense related purposes, not for double

19  jeopardy.  The *Monge* case from the Supreme Court makes clear

20  that sentencing determinations are not offense determinations.  11:38:58

21  They don't count for double jeopardy purposes.

22      So the Court could properly make a finding by a

23  preponderance of the evidence that Mr. Lacey was a member of

24  the Count 1 conspiracy, and the Count 1 conspiracy encompassed,

25  I think you could also find the publication of the ads that    11:39:19

```
 1    involved the minors that are referenced in the PSR here.
 2              So there is all of that, and does Your Honor have any
 3    questions about that?
 4              THE COURT:  No.  Thank you.
 5              MR. KOZINETS:  Thank you.                              11:39:39
 6              MS. PARIS:  May I respond, Your Honor?
 7              THE COURT:  No.  I will tell you that I have
 8    considered this, and I have looked at the filed objection.  I
 9    have heard your renewed objection.  And simply put, he was not
10    acquitted of the conspiracy to commit Travel Act, nor was he   11:39:53
11    acquitted of Count 2 through 51.
12              MS. PARIS:  Yes, we understand that, Your Honor.
13              THE COURT:  So I am entitled to look at relevant
14    conduct, and that's what I intend to do as I noted in my
15    written ruling on that objection.  So my ruling stands.        11:40:15
16              Okay.  You can cover whatever the next matter is.
17              MS. PARIS:  Yes.  So the next thing, if Your Honor is
18    going to use the underlying conduct method, we have a couple of
19    issues we just want to raise with respect to that.  The first,
20    again, would be that you can't use any of the enhancements that 11:40:34
21    will be victim related because those particular ads have
22    nothing to do with the dollars at issue in Count 100.  Count
23    100's dollars derived from post sale ads.  That's conclusive
24    based on the government's own proof.  So we'd ask that you
25    strike those particular enhancements from his calculation.     11:40:54
```

46

```
1              The next point I would raise is that, and we have
2      raised this in our briefing, but just briefly --
3              THE COURT:  Let me just respond to that.  It's the
4      same conduct.
5              MS. PARIS:  Yes.                                         11:41:11
6              THE COURT:  So again, it's relevant conduct.
7              MS. PARIS:  So first, we were arguing, right, that
8      this method shouldn't be used, but if you're going to go within
9      this method, again, the conclusive evidence is that the dollars
10     at issue were post sale dollars.  So whatever happened presale,   11:41:23
11     cannot be the dollar -- like those ads -- those dollars are not
12     derived from those particular ads.  It's a factual
13     impossibility.
14             So even if we use this conduct method, our approach
15     would be you don't count the victim-related enhancements.         11:41:38
16             THE COURT:  I understand, and I overruled that.
17             MS. PARIS:  Thank you.  Let's see --
18             MR. LINCENBERG:  Your Honor, excuse me, this is
19     Mr. Lincenberg.  Just for the record, we join in that argument
20     because it equally applies to Mr. Brunst.                        11:41:54
21             MS. PARIS:  I am not going to rehash the admitted,
22     pardon me, acquitted conduct.  I have been through that one.
23             We just want to relate that this method can't be used
24     without acquitted or unresolved conduct, which I understand
25     Your Honor is overruling.  That's why it's a problem.            11:42:15
```

UNITED STATES DISTRICT COURT

1        And additionally, when we look at who would qualify as

2   a victim, it's the direct and proximate harm.  In fact, judges

3   in this courthouse, Judges Campbell and Teilborg, in United

4   States vs. Avila and United States vs. Mason, have said that we

5   don't even go to proximate and direct harm unless we have even                    11:42:43

6   gotten to but for harm, and here that's not even met with

7   respect to these particular people with respect to Count 100.

8   So that's another bases I wanted to raise to make sure the

9   record is complete.

10       We also join in the challenges of the four-point role       11:42:58

11  adjustment being counted twice.  An example where it's being

12  done here is paragraphs 187 and 200 for Mr. Lacey.  We also

13  believe that 2G1.1 should not be applied here.  We join our

14  colleagues' objections with respect to that guideline.

15       THE COURT:  All right.  I think, Ms. Paris, I ruled on      11:43:21

16  these in my written order.

17       MS. PARIS:  I just want to make sure the record is

18  clear we objected to those rulings.

19       One final point.  There are a number of factual errors

20  in the PSR.  We have laid them out in depth and in Docket No.    11:43:34

21  2124-1, which is Exhibit A to our last round of objections, and

22  a number of those remain outstanding.  My understanding is that

23  Your Honor has ruled on those, but just to be clear, there's

24  things like Mr. Lacey being the creator of Backpage when we

25  provided testimony from Mr. Ferrer himself that it was him and   11:43:59

48

```
 1    Mr. Larkin; not Mr. Lacey.  Mr. Lacey's sons have never had an

 2    interest in any entity owned by these individuals.  It was

 3    Mr. Larkin's sons.  And I can go down the whole litany list,

 4    but those factual errors I believe are still outstanding and we

 5    believe should be ruled in our favor.                               11:44:18

 6            THE COURT:  Where is the reference to the sons?

 7            MS. PARIS:  One moment, Your Honor.  It's on page 6 of

 8    our Document 2124-1 and --

 9            THE COURT:  I'm talking about in the PSR.

10            MS. PARIS:  Yes.  It would be paragraph, I believe,      11:45:12

11    290.  And this is just an example, right.  This is not all the

12    errors, but this is an example that is just out there that

13    sticks out.  I don't think that's the right paragraph number.

14    Just a minute.  Pardon me, Your Honor, paragraph 29.  I'm so

15    sorry.                                                             11:45:42

16            THE COURT:  So you're alleging that the statement that

17    Mr. Lacey's two sons each held an ownership interest of 2

18    percent, however, Lacey controlled his son's stake, that's an

19    error?

20            MS. PARIS:  There is nothing in the record on that.       11:46:24

21            THE COURT:  So what you're saying the sons never had

22    the 2 percent ownership?

23            MS. PARIS:  Never did.  It was Mr. Larkin's sons.

24            THE COURT:  We will strike that sentence.

25            MS. PARIS:  If we are allowed to, I'd like to go          11:46:42
```

49

```
 1   through all of the other errors.  I just grabbed this one
 2   'cause it's kind of silly.
 3            THE COURT:  It's not silly.
 4            MS. PARIS:  I don't mean to say "silly."  It's one
 5   that, you know, jumped out that hasn't been rectified yet.        11:46:54
 6            THE COURT:  Where are the other errors?
 7            MS. PARIS:  They are in that Document 2124-1, and --
 8            THE COURT:  2124-1.  I am looking at 2146, the PSR.
 9            MS. PARIS:  So I will -- if you'd like me to go on I
10   will address.  I will run down our list.  Okay.  So beginning   11:47:18
11   on paragraph 13, we challenged the use here or anywhere of the
12   phrase that Backpage advertised prostitution.  There was no
13   category of ad for prostitution.  There was escorting and there
14   was dating.
15            THE COURT:  Overruled.                                  11:47:39
16            MS. PARIS:  There is no proof that Lacey ever oversaw
17   the website's policies or strategic direction.  That's
18   paragraph 13.
19            THE COURT:  Overruled.
20            MS. PARIS:  It was listed throughout that Lacey held   11:47:51
21   an ownership interest in Backpage per se.  He held an ownership
22   interest in the parent company.  That's a technical thing, but
23   it's not true.
24            THE COURT:  Overruled.
25            MS. PARIS:  Paragraph 17 says that Ferrer was the      11:48:06
```

UNITED STATES DISTRICT COURT

1    nominal owner of Backpage. Ferrer was the owner from 2015

2    forward. We know this because Ferrer and Ferrer alone shut the

3    website down.

4          THE COURT: We'll omit "nominal."

5          MS. PARIS: Paragraph 19, that Lacey was aware that    11:48:26

6    most adult and escort ads were ads for prostitution and took

7    steps to intentionally facilitate this activity.

8          THE COURT: Overruled.

9          MS. PARIS: Lacey, again, paragraph 23, was described

10    as having involvement in the business side and financial    11:48:55

11    issues, or finance issues for the companies. He was never

12    involved with that. The evidence at trial is conclusive on

13    that. He had nothing to do with financing or business issues.

14          Paragraph 27 --

15          THE COURT: I will modify that to he was aware of the    11:49:12

16    finance issues.

17          MS. PARIS: We maintain the objection, but thank you,

18    Your Honor.

19          Paragraph 27, Lacey was never involved in any decision

20    to acquire a newspaper in any city. Wasn't something he was    11:49:29

21    ever consulted on.

22          THE COURT: You're going to have to slow down, please,

23    for my court reporter.

24          MS. PARIS: I am sorry. I recognize I am doing it. I

25    am trying to stop myself.    11:49:40

1          THE COURT:  One moment.  I am still there.  Overruled.

2     The statement is supported by the trial record.

3          MS. PARIS:  Again, we maintain that Lacey and his

4     colleagues did not purport to sell Backpage, but they did in

5     fact sell Backpage.  That would be paragraph 34.                    11:50:20

6          THE COURT:  Overruled.

7          MS. PARIS:  Lacey never had operational control over

8     Backpage as is discussed in paragraph 31.  There is no proof of

9     that.  The proof is to the contrary; that people who worked

10    there didn't even know him and he was considered to be a layer    11:50:35

11    away.

12         THE COURT:  Overruled.  That's contrary to the trial

13    evidence.

14         MS. PARIS:  The next two objections are paragraphs 33

15    and then 66 through 115, if you will, that talk about the          11:50:58

16    notice evidence and what the significance of that is.  We

17    obviously maintain our position that it did not give the

18    clients notice of any illegal conduct on the site as it was

19    happening, and there is no proof of that in the record.

20         THE COURT:  Overruled.                                        11:51:17

21         MS. PARIS:  Again, we maintain the objection that, to

22    the phrase $500 million earned from Backpage was the proceeds

23    of unlawful activity.  That's at paragraph 139.  There was no

24    tracing at this trial.  Even with respect to the ads that are

25    the subject of these particular counts that will be used at        11:51:43

1    sentencing, those dollars were never traced to any of the money

2    laundering counts, and we don't even know if all those ads even

3    were ads for money.  Sometimes there are free ads.  So we

4    maintain this objection.

5         Additionally, there are plenty of activities, ads for          11:52:01

6    lawful activities on the website, and so there has never been a

7    tracing as to what was prostitution related and what was

8    generated from lawful activities like --

9         THE COURT:  I think there was ample evidence in the

10   trial record in exhibits that show that the majority, sometimes    11:52:17

11   98 percent of funds, was derived from the sex-for-money ads.

12   So your objection is overruled.  It's noted for the record

13   these are relevant conduct type questions, and I think the

14   issue is is that I've already made that determination based on

15   the jury's conviction that they necessarily found that these       11:52:41

16   monies came from illegal sources.  And so your objections to

17   those paragraphs are overruled.

18        MS. PARIS:  Okay.  I believe there's a second

19   reference to Lacey's sons.  I think it would be paragraph 137.

20   I just want to double-check.  I think I have a printed version.    11:53:07

21        THE COURT:  Did you say 147?

22        MS. PARIS:  I thought it was 137.  Pardon me, it's

23   136.

24        THE COURT:  What is it?

25        MS. PARIS:  Paragraph 136, at the bottom of that              11:53:27

1    paragraph it says that Lacey and Lacey's family, referencing

2    the sons, received these distributions, and that should have

3    been Larkin.

4         THE COURT:  Mr. Rapp, I didn't laser in on that

5    sentence, and it reads:  Lacey and -- it says Lacey and Lacey,        11:53:53

6    so I'm assuming that meant Lacey and Larkin's family members

7    received distributions which totaled over 30.3 million, and

8    Larkin separately received distributions of over 21 million.

9         So your objection is to the reference to Mr. Lacey's

10   family receiving over 30.3 million?                                  11:54:18

11        MS. PARIS:  Lacey's family shouldn't be mentioned

12   there.  It should be Larkin's.

13        MR. RAPP:  We don't have a problem striking that

14   sentence.

15        THE COURT:  The sentence that begins with "Between,"       11:54:44

16   will then be stricken.

17        MS. PARIS:  Thank you, Your Honor.  We then wanted to

18   briefly talk about the only crime of conviction here for

19   Mr. Lacey, which is Count 100, and that's only addressed, I

20   believe, in paragraph 24, and it's an incomplete discussion of      11:55:11

21   the evidence.

22        So for example, some of the statements were included

23   about him desiring to transfer funds abroad, but they were

24   incomplete.  They did not include his statement that he wanted

25   to make sure all taxes were filed and all forms were filed, so      11:55:35

1    that's an incomplete picture of what the conduct was with

2    respect to Count 100.  He said both in writing, and other

3    witnesses testified, that he intended to file taxes.  He didn't

4    want to avoid any taxes; that he had a firm in place, I think

5    it was BMO, but he said BDO, and made sure that all taxes would       11:55:56

6    be filed and that all forms would be filed.

7         THE COURT:  What I will include at the end is

8    Mr. Lacey contradicts this assertion and states he never

9    intended --

10        MS. PARIS:  Separately --                                        11:56:43

11        THE COURT:  -- to avoid paying government taxes.

12        MS. PARIS:  Yes.  Additionally, we want to acknowledge

13   that the government's own witness testified that with respect

14   to Count 100, there were no fictitious names or entities used;

15   that he followed the funds from the U.S. to Hungary with ease,       11:57:08

16   and it was again demonstrated in Exhibit 1479.  That's also

17   absent here.

18        MR. KOZINETS:  Your Honor, the jury heard all of this

19   and rejected it.

20        THE COURT:  And that is in the record, Ms. Paris, and          11:57:28

21   so I'm going to overrule that as to a modification to the PSR

22   or an added sentence.

23        MS. PARIS:  Okay.  I know a number of folks have hit

24   on the idea of leader, creator, founder, that type of thing.  I

25   want to talk about the factual record here was that he wasn't       11:57:56

55

```
 1   the creator or founder or the organizer.  That's in a number of
 2   paragraphs, 1325 to 26, 140, 173, 180, 187, 230.  Again, the
 3   evidence was contrary.  When asked, Mr. Ferrer said that the
 4   idea for Backpage originated with him and Mr. Larkin, and that
 5   after they had had some meetings about it, Mr. Larkin made the      11:58:20
 6   determination that Mr. Ferrer should take on that project.
 7   That's the trial testimony.
 8          So I think based on that, Mr. Lacey cannot be
 9   described as the creator, the founder or the organizer.  I
10   think that title would rest with Mr. Larkin --                      11:58:36
11          THE COURT:  Well, I think --
12          MS. PARIS:  -- and Ferrer.
13          THE COURT:  -- given the three-month trial, there was
14   ample evidence of his involvement of leading the organization.
15   And as I have laid out in my written order on the objection, he     11:58:49
16   appeared in Congress.  He was the biggest cheerleader of
17   Backpage.  He acknowledged that he was going to bring
18   transparency to the oldest profession in the world.
19          So I listened to the entirety of the testimony,
20   Ms. Paris, and you've only stated one sentence of a witness'        11:59:19
21   testimony.  And so I'm looking at the entire trial record and
22   so that objection is overruled, and I have already made my
23   written ruling as to the enhancement for organizer or leader.
24          MS. PARIS:  I understand that with respect to the
25   enhancement.  I am saying as a factual matter.  I don't --          11:59:40
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  I agree.  Are there any other
 2    unresolved --
 3              MS. PARIS:  I want to skim my notes real quick, if you
 4    don't mind, 'cause this is so important.  Just a final note
 5    that we maintain the objection to the inclusion of any victim    12:00:06
 6    impact information anywhere in the PSR or its attachments that
 7    is not related to someone being harmed by the sending of funds
 8    from the United States to Hungary, that sole transaction.
 9              THE COURT:  And I refer you once again to my written
10    order.                                                           12:00:25
11              MS. PARIS:  Thank you, Your Honor.
12              THE COURT:  All right.  Now we are at the noon hour,
13    and we will take a lunch recess.  We will reconvene at 1:30.
14              (Recess was taken at 12:00 o'clock p.m.)
15              (Reconvened at 1:33 p.m.)                              13:33:22
16              THE COURT:  All right.  Please be seated.  I
17    resolved -- well let the record reflect the presence of the
18    parties and all defendants are present.  I've resolved all of
19    the objections with regard to Mr. Lacey.  And it is the fact
20    that, unlike Mr. Spear and Mr. Brunst, Mr. Lacey was not        13:33:57
21    convicted of conspiracy to commit a Travel Act violation, nor
22    was he convicted of a Travel Act, substantive Travel Act
23    offense.
24              While the Court has overruled the objections to
25    relevant conduct and the conduct that I consider which includes  13:34:17
```

1    the entirety of the trial record, I find that the testimony and

2    the evidence do have indicia of reliability.

3           It is a fine point, but an important point that his

4    sentencing guideline calculation must reflect the count of

5    conviction.  And I am persuaded that the money loss table,          13:34:43

6    therefore, is the applicable guideline for Mr. Lacey, and so I

7    will proceed then to revise his sentencing guideline

8    calculation pursuant to that.

9           And so Mr. Lacey having been convicted of Count 100,

10   international concealment money laundering, the base offense        13:35:22

11   level assigned pursuant to Guideline 2S1.1 is eight, plus the

12   offense level from table section 2B1.1, which corresponds to

13   the alleged laundered, or having been found guilty of

14   laundering funds of 16.5 million.  The guideline basically puts

15   it in the category of more than 9.5 million but less than 25        13:36:00

16   million.  So as a result, base offense level 20 applies.

17   Excuse me, the 20-level increase then results in a base offense

18   level 28.

19           MS. PARIS:  Your Honor --

20           THE COURT:  The two levels are added for having been         13:36:24

21   convicted under section 1956(a)(2)(b)(1).  The two-level

22   enhancement is added related to sophisticated laundering.  Four

23   levels are added because I have previously found Mr. Lacey an

24   organizer or leader.  That results in an adjusted offense level

25   of 36.  There are no additional Chapter 4 enhancements.  His         13:37:01

58

1    resulting offense level, therefore, is 36.

2         MS. PARIS:  Your Honor, I just want to state for the

3    record, we did file objections to the calculation under the

4    loss table method.  It's Document 2101.  And because those

5    funds have been acquitted twice, and because Mr. Lacey and no          13:37:29

6    one has been convicted of a post sale Travel Act violation, and

7    the conspiracy ended at that point in time, his base offense

8    level, based on our objections, is 10.  I just wanted to state

9    that objection.  We didn't discuss it today at length because

10   we were talking about the underlying conduct method, but if we         13:37:48

11   look at the loss table method -- sorry, should I --

12         THE COURT:  No.  Please stand.

13         MS. PARIS:  I am so sorry.  If we are going to look at

14   the loss table method, we ask that you consider the objections

15   that were at 2101, our original objections to the original PSR         13:38:03

16   under the loss table method.  We feel that you cannot count

17   those dollars for the reasons stated.  They have been acquitted

18   twice in Counts 94 through 99.  That's the very same dollars at

19   issue in Count 100.

20         And separately, additionally, as you ruled, the                  13:38:22

21   conspiracy ends at the sale and there are no post sale Travel

22   Act violations.  So by our math, that means you take the base

23   level of eight, and we understand you have to do the

24   enhancement for 1956, that's two points.  That gets us to 10.

25         We disagree -- we understand you're going to, but we             13:38:38

```
 1   disagree with sophistication, we disagree with leadership.  But
 2   regardless of that, you can't count that 16.5 million.  Thank
 3   you for hearing me.
 4        THE COURT:  I can count it because it was a count of
 5   conviction.  It relates to his relevant conduct.  He was not          13:38:53
 6   acquitted of Count 100.  And the basis of that count is the
 7   16.5 million transfer, and so it is counted.  So I have
 8   overruled the objection.
 9        MS. PARIS:  Thank you for hearing me.
10        MR. KOZINETS:  Your Honor, I am sorry, may I be heard            13:39:13
11   just briefly on the loss table calculation?
12        THE COURT:  Yes.
13        MR. KOZINETS:  So there is an additional provision
14   under 2S1.1, it's B 1, little three, that involves a six-level
15   adjustment if underlying unlawful activity involved minor            13:39:33
16   victims.
17        THE COURT:  Well, again, and I pointed out quite
18   clearly, that my calculation as to Mr. Lacey cannot necessarily
19   include those enhancements relating to any Travel Act
20   violation.                                                           13:39:52
21        So, for example, at an eventual trial, perhaps he gets
22   convicted of a conspiracy count; perhaps he doesn't.  Perhaps
23   he gets convicted of one Travel Act violation that involves an
24   adult.  So that's the reason that I'm applying this method
25   avoiding and in erring to Mr. Lacey's benefit that he does not       13:40:14
```

1   get the adjustment for a minor, and that's my rationale.

2          So your total offense level is 36.  You have no

3   countable criminal history.  You are in a Criminal History

4   Category of I.  Your resulting sentencing guideline range is

5   188 months to 235 months.                                      13:40:50

6          Now, having determined the objections, the sentencing

7   guideline calculation as to each defendant, I do want to note

8   for the parties that necessarily the presentence report will be

9   amended accordingly in the form and fashion we discussed here.

10  And in addition to that, just yesterday I believe there was     13:41:24

11  another Victim Impact Statement that was received by one of the

12  testifying victims.  I asked that that information be included

13  into the presentence report as well.  You've received that

14  information.

15         Having resolved the objections and resolved the          13:41:44

16  sentencing guideline calculation as to each defendant, I

17  understand from defense counsel, all defense counsel, that

18  there is no one to be heard had terms of oral presentment of

19  character information.  I have received abundant letters and I

20  have considered those.  And so let's move to the government if   13:42:14

21  you wish to provide impact information.

22         MR. RAPP:  Judge, before we do that, I'd just like to

23  make a brief argument on what the Court is considering a victim

24  in this case, if I may.

25         THE COURT:  Yes.                                          13:42:32

1      MR. RAPP:  The Court has ruled that, sort of set a

2   demarcation for the conspiracy, the Travel Act conspiracy.  I'm

3   not asking you to reconsider your Rule 29 ruling or your more

4   definitive ruling this morning on that.  The conspiracy under

5   the Travel Act ends at the last Travel Act violation before the      13:42:51

6   sale.

7      Our concern about that is we believe that victims

8   after the sale that were trafficked on Backpage should be

9   included in the PSR for this case, and they also should be able

10  to address the Court, and for really a couple reasons.  One, we      13:43:14

11  lay this out in Document 2137 at page 28, and under 18 U.S.C.

12  Section 3661, there's no limitation shall be placed on the

13  information concerning the background, character and conduct of

14  a person convicted of an offense, which a court of the United

15  States may receive and consider for the purpose of imposing an      13:43:41

16  appropriate sentence.

17      A Court can allow an individual to speak at sentencing

18  without regard to whether that individual meets the CVRA's

19  definition of a victim, and that's *United States vs.*

20  *Degenhardt*, D-E-G-E-N-H-A-R-D-T, 405 F. Supp. 2d 1341, Utah      13:43:58

21  2005.

22      So the Court really has broad discretion to hear from

23  anybody who is relevant.  And in our view, just on the law,

24  anybody who was trafficked on Backpage before the sale or after

25  the sale should be able to address the Court, and their      13:44:22

1  information should be included in the PSR and considered in the

2  sentencing of these defendants.  That's our first argument.

3        But more importantly, the Court has not made that same

4  determination on the Travel Act conspiracy with respect to the

5  money laundering conspiracy.  The money laundering conspiracy          13:44:42

6  spanned the entirety of this -- of the operation of Backpage up

7  until it was taken down.  And it had three objects to it:

8  Transactional.  We understand the Court's ruling on that.  We

9  don't want you to revisit or not asking you to revisit it here,

10 but the two other objects that are promotional money                   13:45:04

11 laundering, which means these defendants are using the proceeds

12 of Travel Act violations to continue to promote and keep

13 Backpage viable so victims can continue to be posted and to be

14 victimized.

15       And for that reason, anybody who was trafficked after           13:45:23

16 the sale, and when these defendants were convicted of money

17 laundering, first Mr. Lacey on Count 100, which I'll talk about

18 in a second, but Mr. Brunst and Mr. Spear, both convicted of

19 both concealment and international promotion, and the

20 conspiracy and Mr. Spear convicted of concealment.  And then          13:45:46

21 Mr. Lacey, of course, is convicted of international concealment

22 money laundering, and the Court should look squarely at the

23 facts underlying that count.

24       You will remember from Exhibit 1 where he says, "I'm

25 trying to keep this money from the government," that's us.  But       13:46:07

63

1    he also says, "I'm trying to keep that money from litigious

2    parties."  And in January of 2017 he was spiralling towards

3    trial in the case of J.S. vs. Backpage, and this is a case that

4    the defense does not talk about.  It's one they lost that went

5    to discovery and was going to trial, wasn't stayed, and was          13:46:31

6    settled on the eve of trial.

7          That J.S. is Jessika Svengard who testified in this

8    trial.  She was clearly a victim.  She, along with a number of

9    other underage trafficking victims, had sued Mr. Lacey, and we

10   would argue that when he says "litigious parties" he's trying       13:46:50

11   to keep that money from these people who were victimized, and

12   so for those reasons, we believe that the Court should allow

13   anybody who was trafficked on Backpage, either before the sale

14   or after the sale, in light of the money laundering conspiracy

15   and in light of the broad discretion the Court has to consider      13:47:08

16   any relevant information, they should be allowed to address the

17   Court.  Thank you.

18         THE COURT:  Mr. Cambria, Ms. Paris, do you wish to

19   respond?  I will let all parties respond.

20         MS. PARIS:  Yes, Your Honor, a couple of points, and I        13:47:28

21   will try to go slowly.  I did have coffee at lunch.  But the

22   first point is that there is no person who is going to come

23   before the Court today who can meet the elements of a victim

24   with respect to Count 100, and the reason being is that you

25   need to look at the offense of the conviction.                      13:47:54

UNITED STATES DISTRICT COURT

1    So here, the wire of the funds from the U.S. to

2  Hungary.  And based solely on those facts and based solely on

3  the facts that were adduced at trial, you need to determine if

4  someone suffered a harm from that wire transfer, not from the

5  stuff with Count 1, which is what the government wants you to          13:48:12

6  loop in here, but from that actual transfer.

7    And the other issue is that there's been no, you know,

8  tracing.  These funds are derived from something, but we don't

9  know what.  We don't know if it was ads for lawful activity,

10  ads for activity that appeared to be facially lawful, but             13:48:29

11  afterwards party to something that wasn't from the face of the

12  ad.  We don't know those things.  So these folks aren't here a

13  victim of Count 100.

14    Count 1 could be a different issue.  There is

15  different arguments to be made there, but no one was harmed           13:48:41

16  from the wiring of funds, and that's the act at issue with

17  Count 100.  It's different from some of the other charges we

18  have here.  But the law is clear, we cited a case in briefing.

19  It's from the Sixth Circuit, but it reflects, you know, the

20  circuit as a whole, you have to look at what was in the record        13:48:57

21  about who was harmed by that count, Count 100.  And here, there

22  is nothing in the record that someone was harmed by the act of

23  that wire transfer.  That's our position, Your Honor.

24    THE COURT:  Mr. Lincenberg.

25    MR. LINCENBERG:  Your Honor, I would just briefly add          13:49:20

1    that the same argument applies to Mr. Brunst.  The money

2    laundering convictions were all post sale under the Court's

3    Rule 29 ruling.  There was no conspiracy to violate the Travel

4    Act, at least to Mr. Brunst or Mr. Spear or Mr. Lacey were a

5    part of post sale, so the arguments apply the same to          13:49:40

6    Mr. Brunst.

7              THE COURT:  Mr. Kessler.

8              MR. KESSLER:  Join.

9              THE COURT:  All right.  Well, I think, Ms. Paris, your

10   argument isn't supported by the record.  Again, it's not the    13:49:55

11   transfer.  It's the source of funds.  It's the fact that

12   there's the allegation, and the jury finding that the source of

13   funds was illegal, otherwise we wouldn't be here.  And the

14   source of funds were derived from sex-for-money ads in

15   violation of state prostitution laws, and that's very clear     13:50:20

16   from the record.

17             The concern that I have, Mr. Rapp, is that there was

18   an obvious, as explained in my prior order, there was an

19   obvious determination by the jury as to when the conspiracy

20   likely ended, and that sale, but at the same time there were    13:50:47

21   counts of a conviction for Travel Act violation as to

22   Mr. Brunst and Mr. Spear, and I'd like to consider that and

23   other similarly-situated individuals who were posted, whether

24   they be minor or adults under the control of what we heard as

25   pimps and so on.  That's information that I'd like to hear.     13:51:15

66

1       I'm not going to disregard any information with regard

2   to the eventual sentencing of Mr. Ferrer.  I think that's a

3   wholly different circumstance.

4       I can consider all of the victim information related

5   to up to the time that the Backpage was seized.  I can consider    13:51:40

6   that today if they are here so that I don't have to have them

7   repeat or come back, and I can consider it and compartmentalize

8   it as best I can, but I think that's the best determination

9   here going forward.

10      So understand, though, let's assume that you go to    13:52:07

11  trial, Mr. Lacey, I don't necessarily know that you want to

12  bring back a victim or victims to, again, provide information.

13  That's the gray area that we are in.  And so I'll leave it to

14  your discretion as to what you want to do, but certainly if you

15  present victim testimonies of individuals who are not involved    13:52:36

16  in any of these counts, then I got to kind of compartmentalize

17  it to the best that I can in all transparency to the parties.

18  But I may not in sentencing necessarily apply them to the

19  defendants.  So that's how we will proceed.

20      MR. RAPP:  Very well.    13:53:03

21      MS. PERLMETER:  Your Honor, we have three individuals

22  who wish to address the Court in person this afternoon.  We'll

23  have them come up one by one, and then there is a fourth person

24  who was unable to be here today.  She has submitted a writing

25  to Your Honor, and she's also requested that it be read aloud    13:53:35

1    in the courtroom.

2            THE COURT:  And you may do so.

3            MS. PERLMETER:  Thank you.

4            THE COURT:  Ma'am, I am going to ask you to place

5    yourself in front of the microphone probably right here.  And        13:53:44

6    please state your full name.  Spell your last name for the

7    record.

8            DESTINEE ORTIZ:  My name is Destinee Ortiz, O-R-T-I-Z.

9            THE COURT:  And what is it you wish the Court to know,

10   Ms. Ortiz?                                                           13:54:00

11           DESTINEE ORTIZ:  I would like to start by saying thank

12   you to Judge Humetewa for giving me the chance to speak today.

13   I know there are a lot of different things you will consider

14   when sentencing these defendants, but I think one of the most

15   important things to consider is how their actions have impacted     13:54:14

16   me and young women and girls like me throughout the country.

17           As a result of their actions of these men, my life has

18   been changed forever for the worse.  At the time that I was

19   trafficked on Backpage, I was still in school and had dreams of

20   finishing high school.  Because of what happened to me, I have      13:54:31

21   never been able to do that.  I have also struggled to maintain

22   positive relationships in my personal life as a result of what

23   happened to me.  I have issues with affection, both with adults

24   and children.  That has been very difficult for me because I

25   have children of my own now.                                        13:54:49

1      My physical health has also suffered as a result of
2  what happened to me.  Being trafficked --
3      THE COURT:  Ms. Ortiz, I recognize you're reading, and
4  you're doing so very quickly.  I have a court reporter who is
5  working really diligently.  Can you just slow down?  I know      13:55:02
6  you're nervous, and you can take your time.
7      DESTINEE ORTIZ:  Thank you.
8      Finally, these defendants' actions also negatively
9  impacted my mental health.  I have been diagnosed with Bipolar
10 I, reactive attachment disorder, as well as anxiety and         13:55:18
11 depression.  At times I have struggled with substance abuse as
12 a result.  I have to see a therapist twice a week to help me
13 work through everything that happened to me related to
14 Backpage.
15     To this day, I have trouble sleeping.  I have            13:55:34
16 insomnia.  I still have night terrors about what happened to
17 me.  I have to take medication to sleep at all.  It impacts the
18 way I interact with people and limits what I am able to
19 accomplish.
20     It is very important to me that the people responsible   13:55:49
21 for creating and running Backpage spend the rest of their lives
22 in jail.  They were free for so many years before this, and
23 they chose to use that freedom to operate their company this
24 way and make money at the expense of so many young women.  It
25 is fair that they should have to spend the rest of their lives  13:56:09

1    in jail as a result.  Thank you.

2            THE COURT:  Thank you, Ms. Ortiz.

3            MS. PERLMETER:  Next, Your Honor, is Nacole Svendgard.

4            MS. NACOLE SVENDGARD:  My name is Nacole Svengard,

5    S-V-E-N-D-G-A-R-D, and I am here today just speaking on behalf    13:56:47

6    of my daughter who couldn't be here due to the emotional trauma

7    that not only being sold on Backpage's had, but the course of

8    the 14-year battle and court cases that we have fought with the

9    owners of Backpage.

10           My daughter was recovered in September of 2010, and    13:57:08

11   here we are in August of 2024 finishing what we started back

12   then.

13           I would like to tell you today a story of courage,

14   strength and perseverance.  In the face of great odds that, and

15   a promise kept to my daughter that I made, in 2010 when she was    13:57:35

16   recovered and we went to our first trial with the pimp

17   Brody Hobson, I promised her then that we would find all people

18   involved in her exploitation and hold them accountable, and

19   that is what brings us to this court today.

20           You see, since my daughter's recovery in 2010 by law    13:57:58

21   enforcement where she was sold on a Backpage ad and recovered

22   in a prostitution sting, Backpage has done everything in their

23   power to prevent us from speaking.

24           In 2010 I had never heard of Village Voice Media or

25   Backpage, but it wouldn't take long for me to see the role that    13:58:30

1 they had played, and it was also a surprise to me to learn --

2 to learn that not only a year earlier they had been made aware

3 that human trafficking and prostitution of young minors was

4 something that happened on their website and they did nothing

5 to stop it. 13:58:50

6    You will see that over the course of the last 14 years

7 it has been a tale of courage and cowardness while the women

8 and the victims in these cases have done everything to try and

9 have their voices heard.  The men behind me have sat behind

10 their lawyers in these desks and hidden in the courtrooms; that 13:59:13

11 every turn they have tried to waylay and prevent us from having

12 our day here in court.

13    It is because of this my daughter is not here today.

14 This is the third time we have set a sentencing hearing.  It is

15 the second time we have traveled to this state from half way 13:59:37

16 across the country and she could not physically do it one more

17 time to be here to speak for herself.

18    She too suffers from those night terrors.  She too

19 struggles with those relationships, trust, anxiety, the ability

20 to hold down a job and to care for her children. 14:00:04

21    But through all of that she has been a passionate

22 advocate.  She has fought diligently for other victims so that

23 this would not happen to them.  She testified on Capitol Hill

24 trying to change laws that would prevent other websites like

25 Backpage from ever existing, and to hold these men accountable 14:00:31

1   for the acts that they have done.  And we are not talking about

2   one or two victims.  We are talking thousands and tens of

3   thousands of victims.

4           See, in 2011 several of Attorney Generals from all

5   across this country asked Backpage to look at their fundamental      14:00:52

6   website and what was happening on there.  And what did they do?

7   They expanded their outreach.  They opened their website in

8   more cities and in more countries.  In fact, they were just

9   getting started.  Over the next few years they would continue

10  to grow becoming the world's largest platform for human             14:01:22

11  trafficking, and all the while ignoring the damage done and

12  leaving in their wake broken lives.

13          And yet, through all of this, the survivors have

14  persevered.  They have been strong each in their own way taking

15  their own turns, testifying before you, coming and pleading to      14:01:49

16  courts all across this country, on Capitol Hill and in their

17  cities and states, and telling their stories of what had

18  happened to them and the exploitation that they suffered at the

19  hands of Backpage, and these men have made choices themselves.

20          In 2012, after the filing of the lawsuit by my              14:02:11

21  daughter and two other victims, Backpage and Village Voice

22  Media decided to split ways.  Now, you would say that this

23  might be a good thing.  For these men had made a media empire,

24  and they were to be respected amongst their peers.  And

25  although it sounds good, they held the purse strings.  They         14:02:38

1  were still there.  They were still involved.  Nothing changed.

2  The money never stopped rolling in.

3         And the devastation continued.  They were asked to

4  speak or to come to Capitol Hill under subpoena to testify at a

5  Senate hearing.  They didn't even respect that enough to show.        14:03:11

6  It wasn't until they were held in contempt that they would show

7  up.  And the arrogance that was displayed was awful.  It was at

8  this hearing, while walking in the hall, that Mr. Lacey looked

9  at my family and said, "If these fucking yahoos would just shut

10 up."  And I am here to say that I will never stop seeking        14:03:40

11 justice for my child.  I will not be quiet.  I will not shut

12 up.

13        This will be my legacy.  This will be my daughter's

14 legacy.  Just as yours will be a cautionary tale of what

15 happens when men follow greed instead of compassion for human        14:04:07

16 beings.

17        For this I am asking the Court to impose -- impose the

18 harshest possible sentence under the law, and I thank you for

19 your time.

20        THE COURT:  Thank you, Ms. Svengard.        14:04:21

21        MS. PERLMETER:  Next, Your Honor, will be

22 Yvonne Ambrose.

23        YVONNE AMBROSE:  Thank you, Your Honor, for allowing

24 me to speak here today on behalf of myself and my daughter

25 Desiree, who is no longer here with us.        14:04:54

```
1            THE COURT:  And your last name is Ambrose?

2            YVONNE AMBROSE:  A-M-B-R-O-S-E.

3            THE COURT:  Your first name?

4            YVONNE AMBROSE:  Yvonne, Y-V-O-N-N-E.  When you have

5    your first child, your whole world changes.  You're not the        14:05:09

6    same person that you were before children.  So on May --

7    March 29th of 2000 was the day I became a mother, one of the

8    greatest gifts that God has ever given me.  Desiree was my

9    firstborn child and my only daughter.  She had a smile that was

10   so contagious.  She will light up any room that she entered.       14:05:33

11   She was loved by all and loved everyone she encountered.  She

12   grew up in a family full of love, laughter and spent almost

13   every weekend with her family.

14            Our family did everything together, vacations, church,

15   dinners, or just hanging around the house for the weekend.         14:05:55

16            She shared the same experiences they did until she was

17   taken advantage of by adult men that care more about making

18   profits than human life.

19            Desiree was a good person with a great -- with a very

20   bright future, with a goal of becoming a physician in the          14:06:24

21   United States Air Force.  She had dreams of graduating high

22   school.  She had dreams of going to college.  She had the same

23   goals and dreams that all children have, but all of her dreams

24   were stolen from her the day she was introduced on

25   Backpage.com.                                                      14:06:48
```

1       She was preyed upon and exploited by adults who sold

2   her as if she was a piece of clothing until the day they

3   murdered her.  December 24th, 2016, my daughter was murdered.

4   That was the worst day of my life.  Desiree has been missing,

5   was missing since the beginning of December, and I was praying          14:07:18

6   for her safe return home, but unfortunately this never

7   happened.  I received a call about 11:50 that night from a

8   detective, Christmas Eve, saying that they found my daughter's

9   slain body in a garage outside of Chicago, a suburb outside of

10  Chicago.  I screamed.  I cried.  I didn't know what to do or          14:07:47

11  where to go.  I wanted my baby home with my family.  I wanted

12  to hold her and kiss her red cheek as I always did.  I wasn't

13  able to tell her goodbye.  I wasn't able to tell her how much I

14  loved her.  I didn't know what to now tell my son on Christmas

15  morning.                                                             14:08:13

16      How do you tell your son that he is now the only child

17  because his big sister was murdered after being sex trafficked?

18  This stole the most wonderful time of year, Christmas, from our

19  entire family.  I don't get Merry Christmas texts anymore.  I

20  get now, "Thinking of you; praying for you" from friends and         14:08:39

21  family.  You not only stole Christmas from us, but you also

22  stole my being able to celebrate the birth of my Lord and

23  Savior Jesus Christ on that day.  I have had a hard time

24  celebrating this, and I know Christmas is the time for

25  celebrating his birthday, but I have not been able to do that        14:09:03

1    because I'm too sad and depressed to think of anything else

2    other than the day that I got the call that my daughter was

3    murdered.

4           You have forever changed not only my connection to my

5    family, but my connection to God.  The days following her death

6    were a blur other than having to identify her body and signing

7    her death certificate.  I don't even remember how she looked in

8    her casket.  I had to bury her body forever, and my last memory

9    is of her is actually identifying her body.

10          I could not process what happened to her, but what I

11   do know is I will not rest until everyone is held accountable

12   for their part in my baby's murder, Charles McFee for

13   introducing her to Hazley, Hazley for selling her and driving

14   her to the person who murdered her, Rosales for murdering an

15   innocent girl who was forced to do unimaginable things, and

16   Backpage.com and its owners for not only allowing this to

17   continue on their site, but also for teaching pimps how to

18   traffic girls by having their moderators catch keywords like

19   "New" or "Girl," not to alarm the face of the FBI of their

20   wrongdoing.

21          Since her murder I have had a very difficult time with

22   life itself.  I am no longer the same person I was before she

23   was taken from me.  My son was 14 when this happened.  During

24   the vital time in his life when he was trying to figure out who

25   he is as a person, how can I be a good mom without the person

14:09:21

14:09:55

14:10:20

14:10:51

14:11:10

1  who made me a mom?  How can my son be a brother without a

2  sibling?  We struggle everyday trying to find our new normal.

3  Our conversations are now awkward between my son and I because

4  we don't know what to say to each other anymore.

5       I've gotten a divorce because I didn't know how to be

6  a part of a family with a key part of my life gone.

7       My mom died from uncurable cancer due to her

8  depression.  She didn't get the help she needed due to the pain

9  she was feeling over the loss of her grandbaby.  The pain of

10 losing Desiree was more painful to my mom than death to

11 herself.

12      My dad has gone through a lot of health issues,

13 extreme weight loss and depression.

14      My siblings suffer as well.  And all of the first

15 cousins, they are all in the age range within two years of each

16 other, birthdays within two weeks of each other.  There used to

17 be happy times in the family as the girls got to celebrate each

18 other, but losing Desiree was just as hard on them as it is for

19 us.  It was like losing a sibling of theirs.

20      I not only carry the pain of losing my baby, my first

21 child, my only daughter, but I also carry the pain of watching

22 my family in pain.  It's hard seeing everyone go through so

23 much agony and not being able to help them.  I can barely get

24 out of bed most days myself.  So how can I be a comfort to

25 anyone else?  This is why myself and the other victims are

```
 1    survivors of these crimes are seeking restitution.

 2              Her death not only affected my family but also her

 3    friends.  I had to explain to her friends, her teenage friends,

 4    about the horrible, horrible world of people exploiting

 5    children.                                                         14:13:44

 6              These are children whose lives you've ruined due to

 7    lack of caring for humanity.  They did not deserve to be

 8    exposed to this at a certain age, but unfortunately they were

 9    not the last.

10              I suffer everyday from the loss of my baby.  I wake up  14:14:00

11    every morning hoping that this was a dream, but then reality

12    sets in that she's never coming home.  Having to live these

13    past seven years without my baby has been the worst pain a

14    mother could ever endure.  Not only did I have to bury my

15    child, which no parent should ever have to do, but I still must  14:14:22

16    consistently go to court and relive these horrors of the day

17    and the events surrounding her murder.

18              I couldn't say bye to her, kiss her on her cheeks,

19    tell her I love her, but she's always with me.  Excuse me.  I

20    won't even be able to see her grow up, get married, or have      14:14:48

21    children.  I haven't had a chance to even grieve properly.  I

22    have had several numerous breakdowns since her murder that have

23    completely incapacitated me.  How does one heal for this?  I

24    don't know who I am anymore.  So I am asking for the harshest

25    penalty for them so that they can understand the hurt and pain   14:15:12
```

78

1    that they have caused my daughter, my family, and other

2    victims.  Thank you so much.

3           THE COURT:  Thank you, ma'am.

4           MS. PERLMETER:  Finally, Your Honor, we'd like to read

5    aloud a statement that has been prepared by Naiomy Figueroa,    14:15:45

6    N-A-I-O-M-Y, F-I-G-U-E-R-O-A.

7           "First I want to thank you, Judge Humetewa, for

8    listening to my testimony during the trial and for allowing me

9    to submit this statement today.  Testifying at trial about what

10   happened to me on Backpage was very difficult and scary, but it  14:16:09

11   was incredibly important to me because the people who worked at

12   Backpage and owned Backpage need to be held responsible.

13          I hope that what I have to share today will help you

14   to understand how they have changed my life and the lives of so

15   many other young women and girls for the worse.              14:16:30

16          What I experienced as a result of the defendants'

17   actions have affected my entire life.  Because of what happened

18   to me, I have severe anxiety.  That makes it difficult for me

19   to stay still and to focus.  Because of my anxiety, I was never

20   able to finish high school.  I have tried to go back to class   14:16:56

21   many times, but I get too anxious sitting still in class, so I

22   still have not been able to complete my courses.

23          It has also impacted the lives of my three beautiful

24   children.  It caused me to have severe trust issues and

25   separation anxiety.  Those issues have a serious impact on my    14:17:20

79

1   children because it makes me paranoid and it makes me feel that

2   I cannot trust any male figure with my children, even my close

3   family.

4           This experience has also negatively affected me --

5   negatively affected the other relationships in my life.  For                    14:17:41

6   example, it has damaged the bonds that I had with my family.  I

7   was very close with certain members of my family before I was

8   trafficked on Backpage, but they do not understand what I have

9   gone through, or I feel like they judge me for what happened,

10  so we aren't close anymore.                                                      14:18:00

11          I am still broken and trying to heal the scars that I

12  have for being trafficked on Backpage.  While these defendants

13  have been able to continue living their lives, they should have

14  to spend the rest of their lives in jail so that they could not

15  cause this type of pain to anyone else in this life and so that   14:18:18

16  they can understand the consequences of their actions."  Thank

17  you.

18          THE COURT:  Thank you.  All right.  Is there anyone

19  else to be heard from?

20          MS. PERLMETER:  No, Your Honor.                                          14:18:34

21          THE COURT:  All right.  Well, I think at this point

22  I'll permit defense counsel, if they wish to make any

23  additional statement on behalf of your client, I will permit

24  the government to do the same.

25          Mr. Cambria.                                                             14:18:51

1    MR. CAMBRIA:  Yes, Your Honor.

2    THE COURT:  And again, I have reviewed all of the

3 sentencing memorandums, the responses to opposing memorandums,

4 and so I have all of that information.  I've also reviewed all

5 of the letters, as I mentioned, and the documents that were          14:19:07

6 attached to your Sentencing Memorandum.

7    MR. CAMBRIA:  Thank you, Your Honor.  May it please

8 the Court, I'm the parent of six girls, four adopted, two

9 natural.  I understand when parents lose their children or they

10 feel that their children are abused or used, that it's painful.     14:19:42

11 It's sincere, and I don't question any of that by any of the

12 women who spoke here today.  I know that I would obviously feel

13 great pain if anything had occurred to any of my daughters.

14 They are my life.

15    I do say, however, that Mr. Lacey, who I represent,         14:20:06

16 Mr. Lacey is not responsible for what happened to these young

17 girls.  We're not in a position to know what their life was

18 about, how they were raised, what their friendships were.  They

19 had -- we know from the evidence in this case that there were

20 so called pimps, people who, if you will, handle women and men     14:20:35

21 in sexual encounters for money, and we don't know what those

22 relationships were and how much responsibility those

23 individuals should shoulder.

24    I do know that we sat through this trial and we

25 participated in this trial and heard from a number of              14:21:00

1    witnesses, and I had an opportunity over the several years that

2    we've been involved to get to know Mr. Lacey and to get to know

3    the number of the other individuals who were charged in this

4    case.  There isn't a single person charged in this case who in

5    any way would condone or not feel respect and sorrow for          14:21:23

6    parents who go through the loss of their children over the

7    abuse of their children.

8            Mr. Lacey, as the record indicated here, was a

9    journalist.  He was an individual who was responsible for a

10   number of newspapers across the country.  He joined while he     14:21:50

11   was in college Mr. Larkin.  Mr. Larkin is no longer with us.

12   Apparently the pressure of the charges here and so on caused

13   Mr. Larkin to take his life.

14           Mr. Lacey, on the other hand, everybody who knows him

15   and who was involved with him, various writers who testified in  14:22:17

16   this case, people who encountered him in connection with the

17   running of the newspapers, said he was a newspaper man, he was

18   a writer, he was an editor.  The testimony was clear that he

19   wasn't involved in the day-to-day business aspect of Backpage.

20   He was the person who wrote the hard hitting, if you will,       14:22:42

21   articles that maybe some of the general media overlooked.  He

22   has a long history of being a sincere journalist.

23           As you know, the testimony in this case was that

24   Mr. Ferrer, for example, who was one of the star witnesses for

25   the prosecution, told, when asked by Mr. Lacey, because we did   14:23:09

1    have testimony from people who said, "We told the people at

2    Backpage that there was prostitution on their publications,"

3    and we know just from general knowledge as a citizen, a person

4    part of a community, that you can take a phone book and look at

5    the Yellow Pages and you'll see ads for people there for so                14:23:40

6    called massage and all this other stuff.

7            We know that phones, for example, are used in order to

8    set up dates and tricks and encounters.  And so the people who

9    own the phones know that people use their mechanism, if you

10   will, their phones, to commit crimes, and I guess we have a                 14:24:04

11   choice.  One is do we ban all phones because some people abuse

12   them, or do we do what we can to report police, et cetera, the

13   users of these things?

14           Now, we do know because in this case we had a number

15   of law enforcement people come in and testify that the Backpage           14:24:28

16   individuals cooperated with them in prosecuting people who were

17   abusing Backpage.  We also had testimony that there were a

18   number of other outlets, Craigslist, some other lists that are

19   out there that were used and abused by individuals, and we

20   collectively as citizens in the country have decisions to make.          14:24:52

21   So if there are some people who misuse something like a

22   telephone or a firearm, do we eliminate every one of those so

23   that it will never happen again, or do we focus in on the

24   people who committed the crimes and we punish them?

25           We have a long history in this case and the testimony             14:25:20

```
 1    in this case of time after time when Backpage sent records to

 2    police authorities to prosecute individuals who were preying

 3    upon young girls and boys and to, if you will, bring them to

 4    justice.  We have testimony of employees of Backpage being

 5    called by the prosecution to trials to testify and to connect        14:25:46

 6    the dots so that the police are in a position to find, detect

 7    and punish those people who were actually hands-on abusing the

 8    individuals, selling them, splitting the money that they were

 9    getting with them, having phone numbers, having hotel rooms and

10    all the rest of it that so called pimps were with.                   14:26:10

11          Backpage even got, as you know, a citation from the

12    head of the FBI thanking them for the cooperation and for the

13    help that they gave them to bring people to justice who were

14    abusing others.

15          And the same thing with other police officers and           14:26:30

16    police agencies around the country.  And the testimony here and

17    the evidence shows that Backpage, at their expense, sent people

18    to be witnesses at these trials and help have -- helped the

19    police convict individuals and bring them to justice.  Were

20    there people that abused Backpage?  Yes.  There is no doubt        14:26:55

21    about it.  Just like people that abuse the Yellow Pages.

22    Yellow Pages kind of dates me a little bit because -- you're

23    smiling -- before there were cell phones this kind of activity

24    was in the Yellow Pages, or it was in the, you know, the little

25    boxes you see on the street with the newspapers in there, in      14:27:16
```

```
 1    those as well.  And in some of the other major papers there
 2    would be want ads and so on.
 3            The idea there is that there are always people who are
 4    going to figure out how to gain things that are innocent,
 5    newspapers -- I'm sorry -- telephones, guns, we see that        14:27:38
 6    happen.  You know, innocent people have the right to a gun
 7    under the Second Amendment, but there are all kinds of people
 8    who abuse that and go out and use them for bad things.  And
 9    that happened here with Backpage.  There is no doubt about it
10    that it happened here with Backpage.                            14:27:59
11            And the evidence shows that Backpage individuals
12    cooperated with the police.  Now, of course, the prosecution
13    has a different view of all of this.  That's their job.  They
14    are supposed to have a different view of all of this, and they
15    do.  They will say, oh, well, their buzz word was "plausible     14:28:18
16    deniability" that they just may believe that they would agree
17    or they would help on a few areas, but really it was all about
18    the money.  Well, there are people always in society are going
19    to take things that others use lawfully and use them
20    unlawfully, and that did happen here.                           14:28:41
21            We had a number of individuals, and I go back to this,
22    the police officers, and we had a lot of them, and we had even
23    ones we didn't bring here to trial, thanked them for helping
24    them.  There was never a time that somebody came in here and
25    testified that was in the police department and said:  Well, we  14:29:03
```

85

1   asked Backpage to help us and they told us no.  Every time the

2   answer was yes, they helped us, they gave us records, they gave

3   us a trail, and we were able to bring people to justice, and

4   that happened.

5         Like I say, there are always going to be people to       14:29:19

6   figure out a way to gain everything in society that hopefully

7   we all use in a lawful situation.

8         Mr. Lacey.  Mr. Lacey was the real deal newspaper man.

9   The chief witness for the prosecution, Mr. Ferrer, even said

10  that Mr. Lacey was, quote, "a layer away from the Backpage      14:29:44

11  operation" that Ferrer was so intertwined with.  And the reason

12  was Lacey, as the testimony demonstrated, was the person who

13  was writing the articles.  They were proud hard-hitting

14  articles that sometimes would take the government and others to

15  task for things that they had done.  That was what he did.  He  14:30:04

16  was that person.

17        We had Carl Ferrer, the same government witness, in a

18  situation where at one time Mr. Lacey inquired of him about,

19  "Do we have prostitution, or what's going on with this

20  prostitution?"  And Carl Ferrer wrote, "We don't have           14:30:24

21  prostitution."  That's what Carl Ferrer said to him when asked.

22  Sure, there were other companies that said, and news agencies

23  and so on that said, you know, we're putting you on notice that

24  there are people advertising, and these people are advertising

25  prostitution.                                                   14:30:53

1    Your Honor, today you could take your cell phone, you

2  could go to TikTok and you can find people marketing themselves

3  as prostitutes.  Do we eliminate TikTok?  No.  We try to fix

4  it.  We try to regulate it.  You can do the same thing.  You

5  can go online and you can find all the people you want all day          14:31:14

6  long who are using computers to do the same thing, and we don't

7  just say, well, we are going to ban all the computers.  That

8  punishes the people who aren't going to doing anything wrong.

9  We are going to ban the phones.  That punishes those

10 individuals.                                                            14:31:33

11    Here, we are in a situation where Mr. Lacey is part of

12 this business as a writer.  We had a number of writers come in

13 and they said he was serious; he traveled all over the country,

14 edited their stories.  They won 3800 awards for their

15 journalism, and everybody agreed he was the head of the                 14:31:51

16 journalistic aspect of Backpage.

17    Mr. Larkin was somebody who ran the business side and

18 eventually Backpage, and also ran -- so did Mr. Ferrer.

19 Remember Mr. Ferrer's testimony where when he described

20 Mr. Lacey, he said he was a layer away, and that's buttressed          14:32:13

21 by Mr. Hyer.  Mr. Hyer was a longtime employee of Backpage.  He

22 was front and center up to his hips in Backpage business, day

23 in and day out.  And he said in the 13 years that he worked for

24 Backpage, he never once met Mr. Lacey.

25    There was a separation between the newspaper side and          14:32:40

1  the business side. I know the government is going to come up

2  here and, 'cause they have done it 400 times in the last three

3  years that we've been here, and they will say: Oh, well, he

4  said, you know, we -- forgot exactly the words -- we legit --

5  not legitimize -- we created transparency for prostitution.      14:33:06

6  And of course, they take that and twist it into this: Oh,

7  well, see, he knew all about prostitution. No. What he was

8  saying is that we cooperated with the authorities and we gave

9  them the information that we have and they get exposed. And

10  all these cases that we heard about where they prosecuted pimps  14:33:29

11  and people who were actually doing these things, Backpage

12  supplied the information so that they could connect the dots

13  and they could convict these individuals.

14       And so we look again to Mr. Lacey. You know, he spent

15  his whole life creating an editor, a writer. As we know from   14:33:52

16  the evidence, Mr. Lacey started off with a pretty kind of rough

17  life. He had alcoholic parents. They abused him. He was

18  beaten. In fact, his mother and father died of a suicide

19  murder. They had drinking problems. There were lots of issues

20  in his early life, but he hung in there and got himself         14:34:19

21  educated. Do you remember the testimony was he was like sent

22  across the country at 18 years of age all by himself and came

23  out here and went to school in Arizona. That's where he met

24  Mr. Larkin.

25       And the two of them together started these various         14:34:36

```
1    publications.  And the publications were valuable because they

2    would take government agencies to task.  If there was an

3    expose' that should have happened, they did it.  It was such

4    that even at one time for one expose' they were arrested in the

5    middle of the night.  And as it turned out, they sued because      14:35:02

6    of that arrest because it was wrong.  They recovered that

7    $3.7 million.  And what did they do with it?  They donated it

8    all to charity, to minority groups, to women groups, to lots of

9    different groups, which demonstrates to you, and should anyway,

10   that, you know, this wasn't just all about money.  I know they    14:35:28

11   will say they made millions of dollars and so on, but they did

12   a lot of good things as well, and he did.

13          The thing that I know that you've said, and we were

14   talking about using certain conduct and so on, we think and we

15   have said in our papers, that this should be a level 10.  And     14:35:49

16   one of the reasons is because it should be the crime of

17   conviction as opposed to underlying.  And I say that for a

18   couple of reasons.

19          Number one, there is no proof in this case that a

20   majority of the money was ill-gotten and criminal.  As a matter   14:36:10

21   of fact -- and the reason is because there was never any

22   tracing of money that came in, and it was then identified as to

23   whether it came as a result of some illegal act or whether it

24   came as a result of all the other things that they advertised

25   and so on on Backpage, including adult things, which were not     14:36:32
```

UNITED STATES DISTRICT COURT

1  criminal.  There were many adult things not criminal.  So

2  number one, there is no tracing, so you can't say, oh, yes,

3  there is proof that most all the money was as a result of some

4  crime.

5          And the other part of that is, because everything that    14:36:51

6  was on Backpage was published, that means it's First Amendment

7  area and the rules of the First Amendment.  And don't get me

8  wrong, I am not hiding behind the First Amendment.  What we're

9  saying is, in a court of law you apply the law.  Well, one of

10 the laws is that the First Amendment presumptively protects all    14:37:11

11 speech communication, which means that the ads in Backpage,

12 unless there is specific proof that that ad was for an illegal

13 service, it is presumed to be legal.

14         So there was no evidence in this case of tracing all

15 the ads in Backpage, and there were millions, and saying a        14:37:37

16 majority of them were criminal activity involving sex.  And

17 some of those statements that have been made here today, they

18 are just not true.  They are not supported by the record.

19 There was no such tracing that happened.  There was nothing to

20 overcome the presumption that the First Amendment has, that we    14:37:56

21 all enjoy, that speech is protected unless it's demonstrated

22 beyond a reasonable doubt in a courtroom that it is not

23 protected.  And that did not happen here.

24         And we know from the testimony, there were a number of

25 ^ STOP people who testified to services that may have been        14:38:16

1   adult, but they were not illegal.  And so to say a majority of

2   the money demonstrates -- generated here was illegal, is not

3   backed up by the record.

4        So when we go to, and you know, we submitted some

5   affidavits of individuals who are -- who were involved and                14:38:37

6   employed by the Bureau of Prisons and worked on the Sentencing

7   Committee and so on, and those individuals, number one, said,

8   this Mr. Allenbaugh, for example, said at one point that the

9   suggested sentence here by probation would set an all-time

10  record for somebody who was charged with the particular conduct           14:39:06

11  that my client was charged with.

12       And as far as whether or not the conduct that

13  underlies his charge is legal or is criminal, there is a

14  presumption.  It has not been overcome.  The only way it would

15  be overcome is if the prosecution went ad by ad by ad and was             14:39:29

16  able to demonstrate that it wasn't protected because there's a

17  presumption that it is protected, and so --

18       THE COURT:  Let me just remind you, Mr. Cambria, the

19  jury was so instructed with regard to a First Amendment

20  instruction.  They nevertheless convicted your client of Count            14:39:56

21  100 necessarily finding the proceeds were illegal.  I want you

22  to recall.

23       MR. CAMBRIA:  I understand what the elements are, Your

24  Honor, but since nobody ever talked to the jury, we don't know

25  how they understood that, whether they applied it in the way              14:40:14

1   that we all know it's supposed to be applied.  We don't know

2   that.  We do know that obviously sending these funds overseas

3   is not illegal.

4           Another thing, if you want to go down what we think

5   the jury found, well, you might say, well, the jury obviously    14:40:35

6   found concealment.  Now, we were all here.  We heard the

7   evidence.  This is going to be a very major topic on an appeal.

8   They -- they -- first of all, the government asks that you put,

9   you know, an organizer and special effort person addition on

10  here for Mr. Lacey for Count 100.  He didn't create this trust.  14:41:02

11          What happened is he went to attorneys.  These

12  attorneys have never been in any way discredited in this

13  courtroom.  And we had one of them, the principal one testify

14  here, and basically said, "Where can I go so that the

15  authorities can't access my funds?"  And the testimony was what  14:41:27

16  he meant by that was that government individuals would say,

17  "Oh, what they are doing is wrong."  And then agents would show

18  up at a bank, and the banks would say, "Oh, we are banks.  We

19  don't do anything wrong" and then close the account.  And so

20  Mr. Lacey had said, "I need some stability in my banking."      14:41:48

21  That was testimony in this case.

22          And so what he meant by that was we need to do this in

23  a way that I am not going to get my bank account closed down

24  every time some agent walks in and starts asking questions.

25  Because the bankers who are like, well, what time are we going  14:42:06

1  to the Country Club, are worried that they are going to look

2  bad.  Okay.

3       So what happens is, and the testimony is unrefuted

4  here, he goes to an attorney here, Mr. Becker, and he says,

5  "How can I do this so that they, so that litigious people and      14:42:22

6  others can't access my funds?"  Okay.  Now, "access" is

7  different than "discover," or know about.  This is -- one of

8  the elements is that it has to be concealment.  There was no

9  concealment here.  And what he asked to be done, he said, and

10  if you recall the testimony, "and I am not trying to avoid      14:42:46

11  taxes."  So what does that mean?  That means he reports this

12  money to the IRS.  That's not concealment.  That's revelation,

13  if you will.

14       And then he filed so called FBARs.  That was our

15  testimony.  They are in evidence.  And what are they?  They are      14:43:06

16  written documents to the Department of Treasury that says:  I

17  took this money.  Here's how much it is, and sent it here, and

18  that's where it is.  And if there are beneficiaries, here's who

19  they are, and so on.  No concealment whatsoever in this case.

20       But we don't -- obviously the jury thought something,      14:43:27

21  we don't know what.  We didn't question the jurors.  We didn't

22  see whether they said:  Well, wait a minute, this went to

23  Hungary, so it must have been wrong.  Why would it go there?

24  Money can go to other countries all over the place as long as

25  you follow the rules.      14:43:48

93

1          Now, think about what the testimony was here.  Was

2   there an intent on the part of Mr. Lacey to conceal the funds?

3   Do you remember the testimony, Your Honor, he said to

4   Mr. Becker, who -- he said it in an e-mail or an e-mail or text

5   message, one or the other, in writing, "Who will be responsible          14:44:08

6   for the reporting requirements of this trust?"  That's what he

7   asked Mr. Becker.  Now, does that sound like the intent of

8   someone who is trying to conceal something?  He's saying, "Who

9   is responsible for reporting?"  And he got a response and the

10  response was, "We're taking care of that."  And then it turned          14:44:31

11  out they did take care of it and they did file what they call

12  an FBAR with the Department of Justice, and in that FBAR they

13  had all the details revealing all of the facts concerning that

14  trust.  So there wasn't any concealment there.

15          And also, when they talk about access funds, access is          14:44:55

16  different.  Access is to take something.  That's not an issue

17  and that's not an element of the offense he was convicted of;

18  concealment is, and there was no concealment and that is the

19  proof.

20          We also gave the Court some affidavits by people who          14:45:16

21  were -- worked in the past for the Sentencing Commission and so

22  on, and basically what they indicated is that this would be a

23  level 10, I believe, a level 10 or 12.  A level 10.  And that

24  as a result of that, we're talking about a sentence nowhere

25  near what has been suggested here.  And as I indicated, you          14:45:53

94

1    know, we were told that the sentence suggested here would be an

2    all time record for that offense.  But in any event, it was

3    some six to ten months was the actual sentence that if you

4    looked at comparable charges, and that's what this expert did

5    for us, he looked at comparable defendants throughout the      14:46:18

6    country and what they had been sentenced to for the very same

7    offense, and the average apparently was six to 12 months, and

8    77 percent were not jailed as a result of this offense.

9         And so if we look at the statistics for the very same

10   offense that Mr. Lacey was convicted of, all of those          14:46:50

11   individuals, that percentage, were not even incarcerated let

12   alone incarcerated for the, you know, all the year 200 and

13   whatever years, or months rather, that had been recommended

14   here.

15        And there are other factors that need -- so what I'm      14:47:06

16   saying is when you look at this and you look at the statistics

17   in others in similarly-situated positions, they have not been

18   sentenced anywhere near what is being recommended here.  The

19   other things that were told, and we put these in our sentencing

20   materials, that are important is that, that they take into      14:47:32

21   consideration the age of the defendant.  The elderly defendant,

22   it turns out, incarcerated for these kinds of charges, number

23   one, there is a diminution of life expectancy, there is a

24   history of being victimized by other inmates, there are a

25   number of other negative factors there that we discovered as a  14:47:59

1    result of that.

2           We also did express an opinion, and you discussed it

3    when, a little while ago, when we talked about acquitted

4    conduct, and so you pointed out to one of the other speakers,

5    well, your client wasn't acquitted and so, but here is the          14:48:25

6    equivalent of being acquitted.  It's First Amendment

7    advertisement, First Amendment generated dollars.  So there's a

8    presumption of innocence.  There's a presumption of legality

9    there.  That is the functional equivalent of an acquittal of

10   that same charge because what the law says when it comes to          14:48:50

11   First Amendment is that there is a presumption that the law has

12   not been violated.  That is -- that is the same.

13          And so here we have a number of other things that

14   should be taken into consideration.  His age.  We are told that

15   at some point in the Presentence Investigation Report they keep      14:49:14

16   talking about child sex trafficking and so on.  He's not

17   convicted of child sex trafficking.  And unfortunately, because

18   that's all over this report, our experts tell us that he will

19   be targeted if he's incarcerated.

20          And the next thing is there is, if you will, a              14:49:37

21   hierarchy of places.  Number one, we think he's a base level

22   10, and the advisory sentence on that is six to 12 months.

23          We look at a number of things that are important.

24   Number one, self-surrender.  Probation doesn't disagree with

25   self-surrender.  Self-surrender is very important to people at      14:50:06

1     the Bureau of Prisons.  It means a lot to them, and there is no

2     reason to think that he would in any way not show up if he were

3     incarcerated.  And we would ask you specifically that if you do

4     sentence him to incarceration, that it should be a situation

5     where he could voluntarily surrender so he can, you know,                14:50:31

6     attend to his affairs and so on and get things in order so he

7     can serve the sentence.

8            There is the probation people that really have given

9     him a great report.  He had an ankle bracelet on.  There was a

10    minor violation, and in the beginning there was a restriction            14:50:51

11    on the ankle bracelet.  As he went on, because he demonstrated

12    that he was not someone who would flee, they took the bracelet

13    off so he was able to make that self-surrender.

14           There is nothing that's preventing the Court from

15    sentencing him to probation.  There's nothing here that stops            14:51:17

16    that or says that can't happen.  He is 76 years old.  He has

17    shown up in court all the time.  As I said, he wasn't a

18    problem.  Took the ankle bracelet off.  We would hope that you

19    would put him on probation as opposed to incarcerated.  If not,

20    there's a declining scale here.  The next thing is house                 14:51:45

21    arrest.  The next thing after that would be for a prison camp,

22    a camp facility, and then, of course, the last part would be a

23    low level situation.

24           If you -- if you decide that regardless of everything

25    I've said here today that you are going to in some way                   14:52:16

UNITED STATES DISTRICT COURT

1    incarcerate him, we have another couple other things to think

2    of.  Because of some of the language in the presentence

3    investigation, we'd like this sex offender, you know, underage

4    sex offender kind of vibe, if you will, in this probation

5    report, and we were told by the -- by the people that we hired    14:52:47

6    who were involved with the Bureau of Prisons in the past and so

7    on, that if he's given that -- if that's the mantel they put on

8    him, the other prisoners and so on, that he will be in trouble.

9    He will be subject to violence and so on.  And so I would ask

10   that we make it clear that he's not been convicted of some kind    14:53:12

11   of underage sex situation.

12          This is a financial crime.  It is -- it's not, you

13   know, underage trafficking or anything like that.

14   Recommendations that you make would make a huge difference in

15   what happens also.  I know this from past cases that I've been    14:53:38

16   involved in.  As I say, we think that he should be put on

17   probation and that he would be a fine candidate for that.

18          The next thing down the scale, obviously, would be

19   house arrest.  The next thing would be low level, would be

20   camp, and after that low level.  Low level puts him into the    14:53:59

21   danger zone.  The camp would be better, but recommendations by

22   the Court mean a lot to the Bureau of Prisons.  I know that

23   because I have had that experience in the past.

24          Indeed, I had a case where when the judge made a

25   recommendation about a camp, the prisoner was immediately taken    14:54:20

```
1   from the low security area and taken right to a camp.  It made
2   a very big difference.

3          He's 76 years old.  This kind of sentence is, you
4   know, sort of the end of the trail there.  It would be a
5   difference if you had a sentence and you're 30 years old and      14:54:48
6   you got a great life expectancy.  The experts that we gave you
7   reports on, one indicated that life expectancy dramatically
8   drops once somebody is in prison, especially if it's a
9   situation where, number one, they are isolated for their own
10  safety because they are either viewed as elderly and             14:55:11
11  vulnerable, or there is this so-called underage, you know, they
12  think there's an underage element to the crime of conviction,
13  which there isn't here.  This is a money laundering case, a
14  financial case.

15         So those things all matter in what you say in             14:55:29
16  connection with that matters.  If you were to recommend a camp,
17  for example, if you reject our request that it be probation and
18  you recommend a camp, that would go a long way to having a camp
19  be the place that he would go.  Whatever the sentence, life
20  expectancy, and I have to tell you, I paid a lot of attention    14:55:58
21  to this because Mr. Lacey and I are fairly contemporary in age,
22  and I was like, what?  When we talked about what your life
23  expectancy would be, I was hoping they would be like 30 years.
24  It's not even close.  We are talking less than seven years, and
25  it's hastened down as a result of prison.                        14:56:27
```

UNITED STATES DISTRICT COURT

1    So all and all, all and all we have a financial crime

2 with a person who specifically instructed his lawyers to follow

3 all the rules to report it.  It was in fact reported several

4 times several years in a row.  We have someone who's a

5 journalist.  We have testimony in the case.  Ferrer told him,                14:56:54

6 "Hey, we don't have prostitution."  And Ferrer ran the thing.

7 There is no doubt about Ferrer ran that site.  We know that.

8 Not only from Ferrer, who characterized him as a layer away

9 from the Backpage business, but Hyer, who never even met him.

10    I ask you, Your Honor, to take all these circumstances    14:57:17

11 into consideration and to sentence him to probation or a camp,

12 I think that he's a perfect candidate for that, and allow him

13 to self-surrender.  Self-surrender is a big deal with the

14 Bureau of Prisons, and there's no reason to not let himself

15 surrender.  He's always appeared every time for every court              14:57:45

16 appearances that have been going on for years.  As we know,

17 it's been a real strain for everybody involved, including Your

18 Honor, because there is a lot to do here and a lot to look at.

19    I hope that during the course of this case I conducted

20 myself appropriately and I did not upset the Court, and I think          14:58:07

21 you would have told me.  I don't think you would have held back

22 if it was there.  But I ask you from the bottom of my heart to

23 see that this is -- this is a real journalistic person here.

24 This is the real deal, and he -- he can -- this whole situation

25 sent a message out to the world.  And deterrence here doesn't            14:58:34

1  require a long prison term.  For any of these individuals who

2  are up in their years, you know, a sentence of five years or

3  more is basically a life sentence.

4         I appreciate, Your Honor, all the kind consideration

5  you've given to us during the course of this trial, and it was          14:58:56

6  a pleasure for me to be in front of you, Your Honor.  Thank

7  you.

8         THE COURT:  Thank you, Mr. Cambria.  We are upon the

9  3:00 o'clock hour.  We will stand in recess for approximately

10 20 minutes.                                                              14:59:09

11         (A recess was taken at 2:59 p.m.)

12       (Proceedings reconvened at 3:20 p.m.)

13         THE COURT:  All right.  Please be seated.

14         The record will reflect the presence of counsel.  The

15 defendants are all present.                                             15:20:47

16         Let me turn now to Mr. Brunst.  Mr. Panchapakesan,

17 Mr. Lincenberg, who is speaking?

18         MR. LINCENBERG:  Want us to go next, Your Honor?

19         THE COURT:  Yes.

20         MR. LINCENBERG:  Your Honor, there were a few things          15:21:07

21 at the end of Mr. Cambria's comments dealing with bail pending

22 appeal, designations if there were prison sentences, sex

23 offender status.  I'm assuming we should leave that argument

24 for arguments about bail pending appeal if we get there, or

25 should we --                                                            15:21:31

1          THE COURT:  Well, I'm considering your Sentencing

2     Memorandum.  If you want to emphasize or add anything to that,

3     now is the time to do that.

4          MR. LINCENBERG:  I didn't know if the Court wanted to

5     separate out those arguments or not.                          15:21:45

6          Your Honor, this case had 22 witnesses and 21 of them

7     were witnesses who did not say a word about Jed Brunst.  There

8     was one witness, Carl Ferrer, was the only percipient witness

9     who gave any testimony about Mr. Brunst.  The government's

10    witnesses, including -- included Dan Hyer.  I believe his title   15:22:15

11    was vice president of marketing, somebody who had pled guilty,

12    one of the stars of the show, said zero about Mr. Brunst in a

13    case which is focused on the marketing of ads.

14         No more important is lack of testimony about the fact

15    that Mr. Brunst should not be here as part of a Travel Act       15:22:44

16    case.  He had zero to do with the operations of the business or

17    the creation of the business.

18         The government called Jess Adams, and I believe that

19    they wanted to get some testimony from Mr. Adams since he was a

20    business manager.  I believe they argued that he reported up to   15:23:09

21    Mr. Brunst.  He had essentially nothing to say about

22    Mr. Brunst.

23         For all of the testimony that the government elicited

24    to, incriminating about the case, there was nothing involving

25    Mr. Brunst.  The only witness who testified about Mr. Brunst is   15:23:28

102

1    Mr. Ferrer, and he went after all of the defendants, and the

2    Court knows our view about his credibility and certainly about

3    his motivation.

4           But putting that aside, I think for purposes of

5    sentencing, the most important piece of testimony that          15:23:52

6    Mr. Ferrer gave was when I asked him, "Isn't it true that

7    Mr. Brunst always insisted that you be honest?"  And he said,

8    "Yes, that's correct."  The Court may recall this came up in

9    connection with testimony about Website Technologies and the

10   creation of some of the companies as they were looking for new  15:24:17

11   payment processes, and we had gone through those documents,

12   which also all showed that Backpage was connected, and that was

13   disclosed to the banks and the like.

14          And so whatever efforts were being made to bring in

15   new payment processors after the credit card companies would no 15:24:38

16   longer process the payments, Mr. Brunst always insisted on

17   being transparent and honest.

18          And that came through with regard to both the lack and

19   lack of testimony in connection with the banks, for example,

20   where you recall there was that partially redacted letter to     15:25:03

21   BMO involving the legal challenges that were facing Backpage

22   and the advice that was coming from the lawyers that Mr. Brunst

23   would forward on.

24          And although Mr. Brunst himself had very little to do

25   with the lawyers or defending the operations or arguing the      15:25:22

UNITED STATES DISTRICT COURT

1  case under the Communications Decency Act or First Amendment or

2  whatever the case may be, what he did do is whether it was

3  investors or banks, if they wanted information, he put them in

4  touch with those who had the information, whether that were the

5  operational executives or the lawyers, as was the case in that          15:25:45

6  partially redacted -- the Court admitted part of the letter but

7  not all of the letter.  That was the day he dealt with

8  everybody.

9         And so as we -- and in this case, the government kept

10 pushing part of their theme or mantra, this idea, they kept          15:26:06

11 calling Mr. Brunst the CFO of Backpage because there were

12 documents that would list people under positions, even though

13 all of the testimony was that he had no CFO role at Backpage.

14 He wasn't the CFO of Backpage.  He was a CFO of a parent

15 company.                                                              15:26:29

16        Also, what is interesting was the absence of witnesses

17 in this regard because there were CFOs of Backpage, Nathan

18 Kopecky, Michael Gage, they were never put on the stand because

19 the idea was to present Mr. Brunst, who was indicted, as if he

20 were the CFO of Backpage.                                             15:26:48

21        And when it came to meetings with these different

22 organizations that were attacking Backpage, whether it was

23 Polaris or NCMEC or Congress or interactions with the attorney

24 generals, you never heard Mr. Brunst's name because he had no

25 role with regard to the operations or how moderation can or           15:27:07

UNITED STATES DISTRICT COURT

1    should be changed, or the compliance efforts or their subpoenas

2    and so forth.

3           He was a CFO of a media holding company that he went

4    to work for in 1992.  It was much smaller than the newspaper,

5    and he remained the CFO of that company as they purchased           15:27:32

6    different newspapers, as they formed Backpage and the like.

7           And his role with each of those, we'll call them

8    subsidiaries, was once a year to have a budget review meeting.

9    And the government, of course, focused on the meeting at the

10   end of the year at Backpage where there would be a big document    15:27:55

11   and he would look at it from a budget point of view.  And he

12   did the same as he did with the newspapers.  He would look at

13   the overall budget.  And you'll recall Mr. Ferrer's testimony

14   on cross-examination, asked him, "Isn't it true that the main

15   thing he was reviewing it for was executive compensation,          15:28:11

16   salaries things like that?"  And Mr. Ferrer said, "Yes."  That

17   was his role.  But because buried in some of those large

18   documents, was a page that mentioned TER and then that

19   mushroomed into somehow he knew about TER or what they were

20   about even though the Jess Adams of the world and the likes        15:28:33

21   conceded even Mr. Ferrer that Mr. Brunst had no connection with

22   any of those folks.

23          Ad moderation, TER, referrals, the operation not only

24   of Backpage, but he had no role with the operations of the

25   newspapers.                                                        15:28:51

1       So who is he?  If I'm a sentencing judge, I want to

2  give as good of a sense as I can.  He didn't testify.  The

3  Court got some of that sense from our submission as to what he

4  would testify to, as well as the letter that we submitted, and

5  I would suggest that part of the story of who he is we learned        15:29:16

6  in the trial with Mr. Ferrer that say he's honest.  Nobody

7  else.  Not one other witness saying a negative word about him.

8  If they -- not even a mention of him.

9       But the reason why we included the letters to the

10 Court that we did was because these are the people who know        15:29:35

11 Mr. Brunst the best.  And in the courtroom today -- briefly

12 stand up if I mention your name -- is Mr. Brunst's wife

13 Maryanne, who Your Honor has seen throughout the trial in

14 support of her husband, wife of 30 years, who described to the

15 Court how Jed raised four children after his previous wife,        15:29:58

16 they got separated, and she passed away, raised four children

17 as a single father.  Then took on her children.  Wonderful

18 husband.  Legally took on her son.  He helped her parents

19 through their declining health; always cared for the entire

20 family.                                                             15:30:19

21      His daughter Kate, who described what her father has

22 meant for her and her community.  Kate is here from Virginia.

23 His daughter Kelly, who lives here in Phoenix.  The Court

24 probably recognizes Kelly.  Kelly was here during the large

25 part of the trial.  When Kelly's mother died, Jed, she              15:30:40

1    described, as shock absorber for Kelly's grief, always setting

2    aside his own needs.

3          His son Michael, Jed's oldest son, a command master

4    chief and 30-year Navy SEAL, has been involved in the riskiest

5    most important missions of our country, some of which are          15:31:02

6    public but cannot be discussed because they are classified, but

7    being privy to some of this, it's incredible what this man has

8    done for his country.  And he writes that his father raised him

9    that way; that his father was not preachy, but taught him to

10   work hard, tell the truth, and stand up for what you believe      15:31:28

11   in.

12         Here with Michael is Jed's oldest grandson John and

13   daughter Sarah, who is the youngest daughter, described her

14   close father-daughter relationship, how she relied on her

15   father to help her struggle through some periods of anxiety,       15:31:52

16   and that Jed taught her to stay true to who I am and not let

17   any storm drag me under, and she's with her boyfriend Ethan who

18   is also here in support of Mr. Brunst.

19         Scott Brunst who is here is an adopted son, adopted

20   legally through Maryanne, and described that having Jed as a       15:32:14

21   dad answered my prayers and guided me through my challenges.

22         The Court received letters from some sister-in-laws

23   who are not here.  His brother-in-law Clyde is here describes

24   how Jed selflessly cares for everyone in the entire family,

25   knows him, has known him for a long time to be a humble, honest    15:32:40

1    and kind gentleman.  Clyde is here from Chicago.

2         Friend Bob Mayfield who attended much of the trial, we

3    submitted a letter from Mr. Mayfield because he described the

4    charitable and community work that they've done together over

5    the past 25 years, and I believe Bob's wife Mary is here as          15:33:02

6    well.

7         John and Amy Schraeder.  John and Amy adopted Jed's

8    grandson, whose name I won't mention, he's a minor, and have

9    become part of the Brunst broader family.  And a number of

10   other friends who are here today to provide support who did          15:33:27

11   not -- we were limited to 10 letters and we submitted 10

12   letters, but there's a community that is a very close community

13   and an important community, and what they say universally is

14   that Mr. Brunst is an honest man with integrity and he is a

15   rule follower.                                                        15:33:57

16        So one of the issues that Your Honor and I argued a

17   lot about during the trial was the evidence we wanted to

18   introduce of good faith, and I noted in our sentencing brief,

19   Your Honor, that while the Court has decided on that issue,

20   it's certainly relevant for sentencing separate and apart just       15:34:31

21   as there was evidence as the Court noted earlier in the

22   sentencing hearing that was excluded from the trial, but it's

23   still important for the Court to consider.

24        We find ourself in this interesting almost catch-22

25   type of position where Mr. Brunst, who his boss Jim Larkin          15:34:51

1    said, "Do your job as CFO.  Stay in your lane.  Others in the

2    company will deal with the legal issues, will deal with ad

3    moderation, will deal with marketing and so forth," and the

4    word that came back to Mr. Brunst was either through them,

5    people like Jim Larkin primarily, little bit Don Moon and                15:35:11

6    others, and then on occasion some of the lawyers.

7          One of the Court's rulings was that we couldn't

8    reference legal advice because we didn't meet the test for full

9    disclosures to the lawyers.  And my response was, first of all,

10   it's not reliance on advice-of-counsel defense.  Mr. Brunst               15:35:34

11   would not be in a position to raise that defense as the law

12   defines it because he wasn't the one who was deciding what

13   facts to disclose to the outside lawyers.  He doesn't know what

14   was disclosed to the lawyers.  But as a CFO, what his job is,

15   is to make sure that there's, you know, controls in place,                15:35:55

16   counsel in place, and that the responsible people, and that's

17   what he did.

18         And we submitted this declaration to the Court from

19   this expert Professor Chookaszian.  Professor Chookaszian had

20   been on our witness list.  Judge Brnovich ruled that testimony           15:36:15

21   would be admissible in support of Mr. Brunst's testimony and

22   when Mr. Brunst didn't testify, we didn't include that, but we

23   submitted, because I think it gives the Court a sense of what a

24   CFO does and doesn't do in a company.  And we're in this

25   situation here where we believe that while the government                 15:36:36

```
1   discusses a message of deterrence that needs to be sent, that
2   really the wrong message can be sent to CFOs of a wide variety
3   of companies, whether it's Meta or Instagram or Internet
4   companies or other types of companies, that they somehow should
5   have to take responsibility, take over the role of general          15:37:02
6   counsel or CEO or dealing with outside counsel, and that in an
7   organization they can't just stay in their lane.  They can't
8   rely on others to do their jobs in good faith.
9        We think that's important because that's what
10  Mr. Brunst tried to do.  He tried to act in good faith.  He         15:37:21
11  tried to do his job responsibly, make sure the taxes were paid,
12  make sure that the accounting and books and records were right,
13  make sure if there were banking relationships and the banks had
14  questions they could get answers from the appropriate people.
15  And if a sentence of a CFO who didn't play that role is a           15:37:42
16  prison sentence, particularly the lengthier, I would ask the
17  Court to consider what message that sends to other CFOs of
18  other companies.
19       And particularly when the other thing that Mr. Brunst
20  is notified of is court decisions which support what the CEO        15:38:05
21  and the counsel were doing.  And the government's argument on
22  these court decisions is that they shouldn't have been
23  considered, they shouldn't have been allowed into evidence
24  because we don't know what those judges were told.  Well,
25  whether or not that's an accurate legal argument or not, from       15:38:28
```

1    Mr. Brunst's perspective, he certainly would have no reason to

2    believe that others are not doing their jobs in good faith.  In

3    fact, it's really belied by the entire prosecution case because

4    there are Attorney Generals, there are ladies who testified

5    here today as victims saying, you know, Ms. Svengard said:  We        15:38:52

6    brought a lawsuit.  All of this was out in the public.  All of

7    these Attorney General letters.  These other letters, the Court

8    opinions in the Seventh Circuit, they all talk about the

9    different allegations.  So there's no reason for Mr. Brunst to

10   believe that the judges are, that something is being hidden        15:39:13

11   from them, or that something is being hidden from the counsel

12   for advising the company or otherwise.

13          Again, I am not re-litigating right now the question

14   of liability, of course.  But for purposes of sentencing, I

15   think it's probably the most important factor for the Court to        15:39:32

16   consider in granting leniency to Mr. Brunst because otherwise

17   we're in this position where somebody almost can't defend

18   themselves in the sense that, well, I first of all, I am not

19   the holder of the privilege; I can't waive the privilege; I

20   wasn't involved with counsel; I don't know everything that was        15:39:53

21   disclosed anyway.  So how could he even raise it?  He can only

22   try to act in good faith and do his job as a CFO should do,

23   which is what he did.

24          The other -- two other points I wanted to mention,

25   Your Honor, that make this case a little bit unique and the        15:40:11

111

```
 1    Court has to consider in sentencing, one is, in general, this
 2    applies to everybody, the uniqueness of a federal prosecution
 3    which is based on state statutes, prostitution, misdemeanor
 4    statutes and the like, for which case after case we know that
 5    the CDA applies, talk about the First Amendment applying, and          15:40:34
 6    yet it's sort of being wedged in this federal angle which makes
 7    it unique, and there is not a lot of, you know, prior precedent
 8    in that arena that the government says would put somebody on
 9    notice that there's something criminal going on.
10            More importantly, and particularly unique for                 15:41:02
11    Mr. Brunst, is that the Court is sentencing a man who was
12    acquitted on every single Travel Act count.  And I understand
13    the Court has indicated that the Court is going to consider all
14    of the evidence and all of the testimony in the case whether
15    there was an acquittal or not, but does the Court then say:  I         15:41:22
16    am going to completely ignore the fact that there were 50
17    counts and he was acquitted on every count?  And I understand
18    legally the argument one can make that's not inconsistent with
19    conspiracy, you could be guilty of conspiracy but not the
20    substantive count, but there is something there.  When a jury          15:41:47
21    goes back and unanimously acquits Mr. Brunst of every count
22    that's the heart of the case, and it's a case that it was a
23    conspiracy essentially to commit these 50 counts, I'm not sure
24    how the Court, you know, considers that.  I am not here to tell
25    the Court you shouldn't consider all the evidence because the         15:42:11
```

112

1    Court will, as the Court has said the Court would, but I would

2    ask the Court to give some weight to those acquittals.  They

3    should mean something in terms of the assessment of what type

4    of punishment Mr. Brunst should receive.

5         And with regard to the money laundering, we also have     15:42:29

6    this unique circumstance that I've never seen before in my

7    almost 40 years of practicing law of where you have presale

8    Travel Act counts, Mr. Brunst was acquitted, but put that

9    aside, presale Travel Act counts, and all of the money

10   laundering counts are post sale.  And the money laundering     15:42:54

11   counts are just any old wire out there.  There were wires where

12   there was zero evidence involving Mr. Brunst other than he's

13   signatory on a bank account and that he did banking.  So he

14   would know that wires are going back and forth, but these wires

15   were basically all repayments of, or payments on a purchase of  15:43:17

16   a business.

17        So you have this disconnect.  It will be an issue on

18   appeal in its own right.  But for purposes of sentencing, I am

19   not sure how the Court deals with it, but it seems that some

20   weight should be given with this disconnect because there is no  15:43:37

21   money laundering count which, as Ms. Paris noted, traces back

22   to any count of conviction or count of acquittal even with

23   regard to Mr. Brunst.

24        So what the Court is left with is a 72-year-old man

25   who has lived his life as a rule follower, who is somebody who  15:44:07

1   religiously pays his taxes.  He's a guy who, if there is a

2   yellow light -- I spent a lot of time in the car with

3   Mr. Brunst driving to court -- he doesn't speed up for the

4   yellow light.  He slows down.  That's the way he is.  He drives

5   slowly.  He slows down.  He follows the rules.  He teaches his          15:44:28

6   wonderful family these same lessons and serves as a role model,

7   and to this day everyday cares for his family.

8        And he did the best he could to act in good faith.

9   And whether or not that met the legal requirements in the

10  Court's mind or a jury's mind for purposes of sentencing, I          15:44:52

11  would ask the Court to give great weight to that.

12       Your Honor, then I would just address the issue of

13  bail pending appeal if the Court does decide to sentence

14  Mr. Brunst to incarceration.  And I am not going to repeat the

15  arguments in my brief.  I know the Court has read them.  We've          15:45:17

16  laid them out between the three counsel.  I think we've

17  identified the very significant issues on appeal, which Your

18  Honor, at least as to some of them has also recognized these

19  are important issues and tough issues and fairly debatable

20  issues.                                                                15:45:37

21       There is one argument that we didn't have in there

22  that was raised earlier today, which is the issue that I raised

23  a moment ago about the disconnect between the lone Travel Act

24  conspiracy count that was presale and the all post sale money

25  laundering counts, but basically you have a presentence report          15:46:00

1    which notes that Mr. Brunst is no danger to the community, nor

2    is he a flight risk.  He lives in this community.  He has

3    children in this community.  His entire life is his family, and

4    the last thing in the world he would ever do would be to do

5    anything to intentionally mar the Brunst name when he has          15:46:20

6    children who are serving their country in the highest capacity.

7            So with no danger and no flight risk and a number of

8    fairly debatable important issues that are substantial on

9    appeal, we would ask the Court to allow Mr. Brunst to continue

10   his defense through the appellate process on the condition of      15:46:45

11   bail that he has religiously observed for the past six years.

12           I would note one other point with regard to the bail

13   issue that I don't believe was mentioned in the papers.  The

14   Court is aware, we mentioned in the papers that there was a

15   settlement of the financial issues.  That settlement, depending    15:47:05

16   on the value of certain things at a given time, is something

17   like 160 to $200 million that the Larkin estate and the three

18   gentlemen here in court today, have forfeited their right to

19   fight over.

20           And the main reason they forfeited the right to fight      15:47:28

21   over that was, number one, to be able to have funds to secure

22   and be able to prepare as good of an appeal as possible because

23   this is obviously their life's mission, as Mr. Cambria

24   eloquently noted, to defend the position they are on.

25           And also second, while we strongly disagree with the       15:47:51

UNITED STATES DISTRICT COURT

1   idea that these offenses involve restitution, we've also taken

2   the position that if the Court ends up ordering restitution,

3   that we have no objection to funds going to individuals, people

4   who were prostitutes or former prostitutes who suffered, and if

5   the Court deems that they should receive money.  So there's a          15:48:09

6   huge pool of funds that is available to them to deal with that.

7          And then with regard to --

8          THE COURT:  Are you saying -- was there an agreement

9   that with regard to Mr. Larkin's estate and the other funds

10  that were sought forfeited, that you and the government have an        15:48:36

11  agreement that any of those funds go to restitution payment, is

12  that what I just heard you say?

13         MR. LINCENBERG:  We have an argument that all of those

14  funds are forfeited.  I am stating it from memory.  I believe

15  that the government's -- I believe the government's position is        15:48:54

16  that those funds can be applied to satisfy the restitution, and

17  we don't object to those funds satisfying restitution.

18         So the last point I would raise, because it was

19  mentioned by Mr. Cambria, if there is a prison sentence in

20  terms of designation, Your Honor, is that one of the reports          15:49:21

21  noted that it was critically important that the defendants not

22  be designated as sex offenders, and I believe that Mr. Rapp, I

23  think it was in a pleading indicated he has no objection to

24  that taking place, so we'd ask the Court if there is going to

25  be a sentence of incarceration, that that be a part of the            15:49:47

1    sentence.

2         Otherwise, Your Honor, unless the Court has any

3    questions for me, I thank you for your courtesy, and ask the

4    Court to sentence Mr. Brunst to probation.

5         THE COURT:  All right.  Thank you.                        15:50:04

6         Mr. Feder, how much time will you need?

7         MR. FEDER:  Half an hour probably.

8         THE COURT:  All right.  You may proceed.  I will give

9    you up to 4:30.  That's more than a half hour.

10        MR. FEDER:  I represent the 4 percent owner of          15:50:58

11   formerly Backpage.  We join in the comments that have been made

12   by other counsel.  I have known Scott Spear probably for

13   40 years.  He's been a friend.  He's been an honest friend.

14   He's been a charitable friend.  I have known him to be a law

15   abiding person.  So I guess I add my comments to the 10 letters   15:51:21

16   that have been submitted to you.  He's a wonderful human being.

17        He is not going to allocute because I told him that I

18   would try to say what he would say.  And the reason that he is

19   a law abiding person is that he follows what he's been told.

20   And I don't want to get into trying to re-litigate the case.  I   15:51:52

21   know the Court doesn't want to hear re-litigation at a

22   sentencing hearing, but what the Court does know is that

23   Mr. Spear in 2011 went to a psychiatrist named Dr. Bernstein,

24   whose letter was filed under seal, and has been today given to

25   the government, and that Dr. Bernstein, knowing the bad          15:52:20

1    condition that Mr. Spear was in, experimented until he found

2    the right diagnosis for Mr. Spear and the right prescriptions

3    for Mr. Spear, and that's the middle of 2011.

4         And how that fits into the testimony that was at trial

5    is that in 2011 Hemu was hired by Mr. Larkin to essentially          15:52:44

6    guide moderation and the rest of Backpage.

7         And then in early 2012 Liz McDougall was hired as

8    general counsel, and the Court has the documents to show where

9    she took over moderation, and there's a reason for that, and

10   that is that Mr. Spear's role in Backpage receded substantially      15:53:13

11   from about 2011 when these diagnoses occurred and these new

12   prescriptions occurred until the end of Backpage.

13        Now, the government went to great length to put

14   Mr. Spear cc's on e-mails into evidence, but he's not the CEO,

15   he wasn't the financier, he wasn't the CEO, he wasn't the CFO,       15:53:41

16   and his role receded after this diagnosis.  Nevertheless, he

17   was convicted of these Travel Act counts probably because

18   Mr. Ferrer claimed that he was the head of moderation

19   notwithstanding the documentary evidence that the court saw,

20   notwithstanding the fact that Backpage in trying to thread the       15:54:14

21   needle of being certainly on the right side of the law, hired a

22   woman named Liz McDougall, formerly of Perkins Coie law firm,

23   formally counsel for Craigslist, to help them make sure that

24   their moderation efforts were legal.

25        Similarly, they hired, at least -- they didn't hire,            15:54:41

```
 1    Don Moon had been on their board for a number of years by that

 2    time, and he too began to supervise the moderation process as

 3    the Court knows, and that was Exhibit 171 admitted maybe

 4    inadvertently by the government into evidence.  But as the

 5    Court may remember, Mr. Moon articulated chapter and verse what      15:55:05

 6    he had told Mr. Spear, Mr. Lacey, Mr. Brunst about how they

 7    were compliant with the First Amendment, protected by the First

 8    Amendment, and what they were doing was on the right side of

 9    the law.

10            Similar to what Mr. Lincenberg said and what                 15:55:29

11    Mr. Cambria said, this is a case where you have the first

12    prosecution and trial of a website regarding third-party ads

13    posted on that site being criminally prosecuted and convicted

14    for that.

15            Since that has happened, there have been lawsuits            15:55:53

16    where they are suing, "they" meaning people that believe they

17    have been harmed, hotels where prostitutes would go to do their

18    services; they sued Salesforce for their Internet programs.  In

19    the papers recently there have been lawsuits against parents

20    for the crimes of their children.  And these are societal           15:56:19

21    questions, in my humble opinion, better served by Congress

22    doing something than the criminal law picking out somebody

23    experimentally to see if they can get a conviction.

24            As the Court will remember, in 2018 after Backpage was

25    closed, the Congress did try to close some of the loopholes by      15:56:45
```

UNITED STATES DISTRICT COURT

1    FOSTA and SESTA, which they characterized as the,

2    quote/unquote, anti-Backpage laws.  The inference being the

3    laws before 2018 didn't apply.

4         But that's not really what I want to talk about.  What

5    I want to talk about is whether or not this Court is going to     15:57:18

6    impose, essentially, a death penalty on Mr. Spear.  And I am

7    not trying to be ridiculous, but as the Court has seen by the

8    declarations of Mr. Allenbaugh and Ms. Purdue, one, the prison

9    system, the Bureau of Prisons, cannot, is not operating as

10   prisons in a way that can guarantee in any substantial way the    15:57:47

11   safety of these aging men if the Court sends them to prison.

12        Similarly, as the Court knows from those declarations,

13   whether the Court does as Mr. Lincenberg asked, designate on

14   the sentencing order and on the sentence, there is another

15   document I am forgetting right now, that these are not sex        15:58:12

16   offenses, that the inmates in facilities, especially in the

17   upper levels of security, find out about what the crimes of

18   conviction are, and they take it out on the inmates

19   accordingly.

20        And then third is, of course, the prisons are                15:58:31

21   overpopulated, understaffed.  I'm going to ask you at the end

22   that if you are going to send Mr. Spear to prison, that you

23   send him to a camp.  There is one in Phoenix and there is one

24   in Tucson, but if you give him 10 years or more, then that's

25   medium security automatically.  And if it's a sex offense,        15:58:54

1    again, as these declarations indicate, then the Bureau of

2    Prisons is going to assert that a prison camp is not allowed,

3    therefore, at the very least or best minimum security which,

4    again, not to repeat what Mr. Cambria and Mr. Lincenberg said,

5    for Mr. Spear and the health concerns that he has physically          15:59:21

6    and mentally, it's a death sentence for him in a very short

7    period of time.

8         And the question is, maybe a death sentence for

9    somebody that traffics children, why a number of years as a

10   pimp directly associating himself with girls and women and           15:59:45

11   taking advantage of them, maybe a life sentence is fine for

12   them.  But these are men who had a business that sold ads for

13   five bucks, or gave free ads, and they are essentially

14   facilitators of facilitators of facilitators of potentially

15   illegal activity, and I don't think that a death sentence is         16:00:11

16   appropriate for that.

17        In the Sentencing Memorandum that was filed by

18   Mr. Spear and others in June, and then in the subsequent ones

19   that have been filed, the Allenbaugh and Purdue declarations

20   were included, and the government did not in any way oppose          16:00:37

21   what they were saying or assert that they were not right.  This

22   is the Bureau of Prisons under the same Department of Justice

23   that the prosecutors work for.  And so the question for the

24   Court is, is it appropriate, Judge, in a sentence where under

25   3553 that you give a sentence not greater than necessary, is it      16:01:03

1   appropriate to give essentially a death sentence to them for

2   this offense?

3            The Office of the Inspector General has recently found

4   in a report these prisons are just not operating appropriately.

5   They are not safe.  They are overcrowded.  The medicine, you          16:01:30

6   can't get the proper medicines.  Uncontested by the government.

7            The Tucson prison camp, the Phoenix prison camp, the

8   Tucson minimum security camp, the Phoenix minimum security

9   camp, the minimum security facility in Safford, all

10  overpopulated well beyond their capacity.                            16:01:58

11           Ms. Purdue talked about the medications that Mr. Spear

12  needs, not wants, but needs in order to survive.  They are not

13  going to be available.  I was sent the -- I forgot what it's

14  called, but it's the thing that shows what the Bureau of

15  Prisons, the medications that they allow.  Many of the               16:02:21

16  medications Mr. Spear relies on to live and be sufficient are

17  not on it.

18           In my Sentencing Memorandum, Judge, I articulated the

19  experience that Mr. Spear had six years ago just by spending

20  the weekend in CCA down in Florence where the marshals wouldn't      16:02:41

21  take the medications.  I personally tried to give them to him

22  and I drove down to CCA personally to give them the medication,

23  and they didn't take them either, so Mr. Spear spent just three

24  nights at CCA without medications for his physical well-being

25  and his mental well-being.  And when he came back Monday when        16:03:05

1    the Magistrate Judge released him after three days of

2    incarceration, it took him months to recover.

3         We are here because Mr. Spear and others have been

4    convicted of a felony, and it seems like very few people take

5    that very seriously.  There's a wonderful case called *United*     16:03:37

6    *States vs. Nesbeth*, N-E-S-B-E-T-H, 188 F. Supp. 3d 179, Eastern

7    District of New York 2016, and in that case a Senior Judge

8    spent probably 50 pages in a drug case involving a lot of

9    cocaine for which there would be a substantial prison sentence

10   usually, spent about 50 pages talking about the consequences of   16:04:08

11   a felony conviction.  Let me read.  He articulated that there

12   were 50,000 federal and state laws that impose penalties,

13   disqualifications and disadvantages on people with a felony.

14   12,000 federal collateral consequences for a conviction.

15        Then I think in our moving papers we cited the Court        16:04:44

16   to *United States vs. Colucci*, August 5th, 2024, a case where

17   two judges were identified as not wanting to send anybody that

18   they wanted to send to prison to a local facility in the New

19   York area.  And I assert to you, Judge, that given the

20   condition of the Bureau of Prisons and the specific            16:05:08

21   conditions -- facilities in Arizona that are overcrowded and

22   not safe, for somebody especially like Mr. Spear, that the

23   Court shouldn't do that.

24        I have been to CCA recently.  It's not any better than

25   it was six years ago.  I'm asking the Court, I know the Court    16:05:33

1    has said that it agrees with the presentence report that you

2    cannot give probation, but given the fact that Mr. Spear has

3    spent three days, I would ask the Court to give him time

4    served, put him on supervised release.  If the Court wants to

5    give him home confinement for some period of time in that          16:06:05

6    regard, then we're fine with that.  The Court has seen where

7    Mr. Spear has lived.  It's not palatial by any means.  It's A

8    two-bedroom, one bath and a living room, kitchen on 12th Street

9    in Phoenix.  And at least if he's in that small space, just

10   like he would be in a small space in prison, he'll have access  16:06:29

11   to his medications, access to his psychiatrist, access to his

12   medical doctors, many of whom he needs, access to spine

13   surgery, if he needs to get spine surgery, because he had a

14   fusions years ago and the statistics are that if you have a

15   fusion at one level you got a 50 percent chance of needing       16:06:53

16   further surgery above and below because of the damage the

17   fusion does.

18          He has other problems, as the Court knows from the

19   moving papers.  So I would ask the Court for that sentence.  If

20   the Court decides that prison is appropriate, then I would ask   16:07:15

21   the Court to designate either the Phoenix or Tucson prison

22   camp.  One is called FCI-Phoenix; one is called USP camp

23   Tucson.  Would ask the Court to attach Dr. Bernstein's report

24   to any orders that the Court issues.  According to Ms. Purdue,

25   because of Mr. Spear's physical and mental conditions, he will   16:07:45

124

```
1    not be designated for a lengthy period of time because it will
2    not be done at the typical level.  It will have to go to
3    Washington for them to try to figure out what to do with him.
4         As we've already talked about recommending that this
5    not be viewed as a sex offense.  It may have a beneficial          16:08:06
6    effect.  I would ask that the Court do that, and put that also
7    in the Statement of Reasons.
8         But as the papers show, elderly people convicted of
9    what can only be characterized as an experimental prosecution
10   obviously learn their lesson and obviously are not going to        16:08:37
11   reoffend given their age and physical and mental condition.
12   They are not a flight risk.  The presentence report says they
13   are not a flight risk, the Pretrial Services says they are not
14   a flight risk, and in the motion that we filed regarding
15   release on appeal, this Court found in releasing them for after    16:08:55
16   conviction before sentencing that by clear and convincing
17   evidence they were not flight risks or dangers to the
18   community.  That's what the statute requires.
19        THE COURT:  That was prior to conviction?
20        MR. FEDER:  No.  After conviction.  After conviction.         16:09:16
21        THE COURT:  Yes.  Yes.  Okay.
22        MR. FEDER:  Sorry.
23        THE COURT:  I thought you were referring to the
24   pretrial release.
25        MR. FEDER:  I got it right here, 18 U.S.C. 3143(a).           16:09:27
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Yes, I am familiar.

2          MR. FEDER:  Release of detention pending sentencing.

3     That is the very same criteria for 3143(a)(B), which is where

4     we are today after sentencing.  It's the same clear and

5     convincing evidence that they are not a flight risk or a danger          16:09:50

6     to the community.

7          Then the only question really before the Court is

8     whether or not there are substantial issues on appeal.  In my

9     humble opinion, there are many, and the Court's opinion that

10    was expressed that there are substantial issues.  So I would          16:10:08

11    ask the Court to release them pending appeal, or at the very

12    least let them self-surrender so that we can go to the Ninth

13    Circuit on an emergency motion to attempt to get release

14    pending appeal from that Court.  Thank you, Judge.

15         THE COURT:  Thank you.          16:10:30

16         MR. LINCENBERG:  Your Honor, is now the time if my

17    client does have a statement to read to the Court?  The Court

18    had invited argument.  I may have misunderstood as to

19    whether --

20         THE COURT:  Yes, you did.  You misunderstood.  I asked          16:10:46

21    this morning how you would proceed and you suggested that --

22         MR. LINCENBERG:  We had no character witnesses, right,

23    other than the letter.  Well, then it's my mistake.  Can I have

24    Mr. Brunst address the Court?  Thank you, Your Honor.

25         THE COURT:  Sir, please come forward.  And I guess I          16:11:02

126

1    should have asked Mr. Cambria and Mr. Feder, again, do your

2    clients wish to address the Court?

3             MR. CAMBRIA:  Yes.

4             THE COURT:  He does, Mr. Cambria?

5             MR. CAMBRIA:  Sorry.                              16:11:39

6             THE COURT:  Mr. Feder, I ask you the same, does your

7    client wish to address the Court?

8             MR. FEDER:  He does not.

9             THE COURT:  All right.  You may proceed, Mr. Brunst.

10            MR. BRUNST:  Thank you.  Thank you, Your Honor.  Just  16:12:00

11   a short statement.

12            These last six and a half years have been the toughest

13   years of my life.  I have lost many of my longtime friends,

14   business associates.  I have lost a lifetime of building my

15   credibility and my reputation, and most of my life savings.   16:12:21

16   The effect on this on myself and my family has been

17   devastating.  I have lived my life with honesty and integrity.

18            My time with VVMH was no different.  I have held many

19   senior financial positions during my career.  I know the role

20   of a corporate CFO and have not strayed from that.  This role   16:12:49

21   does not include managing subsidiary business operations, its

22   personnel or its strategy decisions.  At Backpage those matters

23   were the direct responsibility of the subsidiary's operating

24   officers, including Mr. Larkin, Mr. Ferrer and Mr. Hyer.

25            I'm a compassionate person who has never wished harm   16:13:13

UNITED STATES DISTRICT COURT

1    on anyone.  I have no part in the management, daily operations,

2    approvals or decisions made by others regarding moderation or

3    marketing.

4         Because my role was outside the Backpage operations, I

5    relied on advice of lawyers, outside counsel and other experts.    16:13:33

6    I was an open book with lenders and investors.

7         I took direction from the CEO, Jim Larkin, who kept me

8    informed regarding legal advice of experts, court decisions in

9    favor of Backpage, and prior investigations.  These facts

10   helped me form my decision that Backpage was operating legally    16:13:54

11   and I would not ever participate in a conspiracy.

12        Your Honor, I do have remorse and I deeply regret

13   those harmed through the misuse of Backpage's website.  I

14   understand their grief, and I pray for their healing.  I hope

15   you will consider these and other facts in deciding my          16:14:19

16   sentence, and I humbly ask you for leniency.

17        Thank you for allowing me to speak.

18        THE COURT:  Thank you, Mr. Brunst.

19        Mr. Cambria, does your client wish to address the

20   Court?                                                          16:14:38

21        MR. CAMBRIA:  Your Honor, he indicated that I covered

22   the things that he was going to discuss.  I appreciate that.

23        THE COURT:  All right.  How long will the government

24   take in its oral statement?

25        MR. RAPP:  I would say probably a little bit over an        16:14:55

1    hour.

2          THE COURT:  All right.  We will recess and reconvene

3    tomorrow at 9:30.  I will then hear from the government.

4          (Recess was taken at 4:15 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                       **C E R T I F I C A T E**

4

5          I, HILDA E. LOPEZ, do hereby certify that I am duly

6  appointed and qualified to act as Official Court Reporter for

7  the United States District Court for the District of Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9  a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 29th day of August,

14  2024.

15

16

17                            s/Hilda E. Lopez_____

18                            HILDA E. LOPEZ, RMR, FCRR

19

20

21

22

23

24

25