Nos. 24-5374, 24-5375, 24-5376

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SCOTT SPEAR

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court for the District of
Arizona, The Honorable Diane J. Humetewa, Presiding.
CR No. 2:18-cr-00422-DJH

———————————

**APPELLANTS' EXCERPTS OF RECORD
VOLUME 46 OF 55**

———————————

Gary S. Lincenberg
Gopi K. Panchapakesan
Michael C. Landman
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM,
LLP
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
Telephone: (310) 201-2100
glincenberg@birdmarella.com
gpanchapakesan@birdmarella.com
mlandman@birdmarella.com

*Attorneys for Defendant-Appellant John
("Jed") Brunst*

Alyssa D. Bell
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 232-5160
abell@cohen-williams.com

*Attorneys for Defendant-Appellant Scott
Spear*

Erin McCampbell Paris
MAURICE WUTSCHER, LLP
50 Fountain Pl., Suite 1400
Buffalo, NY 14202
Telephone: (716) 261-4703
eparis@mauricewutscher.com

*Attorneys for Defendant-Appellant
Michael Lacey*

Paul J. Cambria, Jr.
LIPSITZ GREEN SCIME CAMBRIA,
LLP
42 Delaware Avenue
Buffalo, NY 14202
Telephone: (716) 849-1333
pcambria@lglaw.com

*Attorneys for Defendant-Appellant
Michael Lacey*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

United States of America,    )
                             )    No. 2:18-cr-00422-DJH
          Plaintiff,         )
                             )
          vs.                )         Phoenix, Arizona
                             )         October 17, 2023
Michael Lacey, et al.        )         8:59 a.m.
                             )
          Defendants.        )
_____ )


**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**


<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**TRIAL - DAY 19 - A.M. SESSION**</u>


Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

63

the normal ordinary bank records in the names of the

individuals that held the funds in the various accounts;

correct?

A.  Yes.

Q.  All right.  Do you know what an FBAR is?                10:58:52

A.  I do.  I am familiar with it.

Q.  What is an FBAR?  Hang on one second, please.  My ears

here.  There you go.  What is an FBAR?

A.  It's a Foreign Bank Account Report.

Q.  What's its purpose?                                    10:59:11

A.  To report the existence of a foreign bank account by the

owner of it.

Q.  And where is it filed?

A.  Based on my best recollection, I believe it's filed with

the IRS.                                                   10:59:25

Q.  How about the Department of Treasury?

A.  The Department of Treasury under FinCEN, I believe.

Q.  What is FinCEN?

A.  FinCEN, I forget what the acronym stands for, but it's a

part of the Department of Treasury that, you know, oversees   10:59:44

banking-related matters, I believe.  I am not sure.

Q.  A part of the treasury department that deals with financial

crimes?

A.  Yes, I think that's part of their mandate, but I am not an

expert in what FinCEN does.                                11:00:08

UNITED STATES DISTRICT COURT

64

Q.  Okay.  So if someone has a bank account or an investment

account, any kind of account, if you will, outside the borders

of the United States, they are obligated to file one of these

FBAR reports, are they not?

A.  Yes, that's right.                                          11:00:26

Q.  All right.  And in this case you indicated in one of the

exhibits here a flow, if you will, of money from Mr. Lacey to

his attorney, do you recall that?

A.  Yes, that's right.

Q.  And you talked about the IOLTA account of the attorney?    11:00:45

A.  Yes, that's right.

Q.  That's just a trust account, isn't it?  In other words, the

lawyer has to hold that money for purposes of their client in

trust?

        MR. STONE:  Object.  Objection; foundation.            11:01:02

        THE COURT:  Sustained.

BY MR. CAMBRIA:

Q.  Do you know?

A.  I am not an expert in IOLTA accounts.

Q.  Okay.  Do you know generally what they are?               11:01:13

A.  I mean, I know generally how they function.

Q.  What's that?

A.  That, you know, that it's an account held in the name of a

client, and you know --

Q.  By an attorney?                                            11:01:41

UNITED STATES DISTRICT COURT

65

A.  By an attorney, yeah.

Q.  Okay.  And so you saw a flow of money here from Mr. Lacey to his attorney's IOLTA account, correct, the Becker, the attorney Mr. Becker?

A.  Yes, that's right.                                            11:01:59

Q.  And then in your tracing you show that the attorney consolidates a number of deposits that are in his account and then he sends the money where?

A.  He sends it to a bank in Hungary.  Yeah, that's right.

Q.  Okay.  And so then did you logically search to determine    11:02:24
whether or not an FBAR report had been filed about that account?

A.  I did not search for an FBAR at the time.

Q.  You say at the time, at any time?

A.  No, I did not search for an FBAR at any time.               11:02:45

Q.  Do you know one exists for that account?

A.  Well, I understand now that one exists for that account.

Q.  Why wasn't that in your flowchart to tell the jurors that the money went from Mr. Lacey to his attorney in his attorney's account and then it went from his attorney's account to this    11:03:13
investment, and then there was a specific report to the Department of the Treasury regarding that investment?  Why would you leave that out?

        MR. STONE:  Objection; compound.

        THE COURT:  Sustained.                                   11:03:27

UNITED STATES DISTRICT COURT

66

BY MR. CAMBRIA:

Q.  Why would you leave out the FBAR being filed with regard to that account?

A.  I just recently learned about the existence of the FBAR.

Q.  Did you learn about it before you got up here to testify?    11:03:37

A.  Yes, I did.

Q.  Okay.  So you had the opportunity then with the knowledge to tell this jury the end result of that investment, did you not?

A.  I don't have the details relating to the FBAR.    11:03:51

Q.  All you need, well, you could have found that out, could you not?

A.  Well, I am no longer working for the Federal government so I don't have access to those resources.

Q.  So it was an unimportant fact, is that the way you treated    11:04:04
it?

A.  I don't know if I qualify it as unimportant.

Q.  Well, wouldn't you agree that if you were going to give these ladies and gentlemen in the jury a full picture of the flow of this money, that you would show it went from Lacey to    11:04:28
Lacey's lawyer, from Lacey's lawyer to Hungary, and then there was a specific report to the Department of Treasury that it existed?

        MR. STONE:  Objection; compound.

        THE COURT:  Overruled.    11:04:47

UNITED STATES DISTRICT COURT

67

            THE WITNESS:  I did not know about the details of the

FBAR, so --

BY MR. CAMBRIA:

Q.  Because you never accessed it; correct?

A.  Yes, that's right.                                              11:04:56

Q.  You knew it existed and you could have accessed it;

correct?

A.  No, I couldn't have accessed it with the current resources

I have as a private citizen.

Q.  How about asking them, the government?                          11:05:08

A.  I didn't know that that was a possibility.

            THE COURT:  Ask your next question.

BY MR. CAMBRIA:

Q.  You didn't know that you could ask them for any kind of

document that you discovered existed that dealt with the flow       11:05:25

of that money?

A.  No, I didn't know.  I am a private citizen now.  I felt

like my resources were restricted.

Q.  Well, they weren't restricted for everything you testified

to with regard to the government, were they?                       11:05:44

A.  Well, I prepared those documents before I left law

enforcement.

Q.  Would you consider it fair to present the complete picture

to the jury of the flow of that money and the report of it to

the Department of the Treasury?                                     11:06:04

MR. STONE:  Objection; asked and answered.

THE COURT:  Sustained.

MR. CAMBRIA:  I never asked that question before, Your Honor, how could it be asked and answered?

THE COURT:  I sustained the objection.                    11:06:17

BY MR. CAMBRIA:

Q.  Okay.  In any event, you knew that there was an FBAR, you took no steps to find it and if you would have found it you could have described to the jurors what it contained; correct?

A.  I could have if it was relevant and had I assessed that it    11:06:35 was relevant.

Q.  Okay.  Well, you're not the one making the strategic decisions in this case, are you?

A.  I just report what I know.

Q.  Okay.  An FBAR would contain, would it not, where the money    11:06:53 went, true?

A.  I don't recall the details of what are on FBARs.

Q.  Well, the idea of an FBAR is to fully disclose to the United States Government, to the Department of the Treasury, any kind of foreign so-called investment, is it not?              11:07:15

MR. STONE:  Objection; foundation.

BY MR. CAMBRIA:

Q.  Do you know?

THE COURT:  Well, I will sustain the objection and you can lay some foundation.                                          11:07:25

69

BY MR. CAMBRIA:

Q.  Do you know what the purpose of an FBAR is?

A.  I -- yes, I do.  I know about it generally from my class that I took 12 years ago in FLETC, the Federal Law Enforcement Training Center.

Q.  What do you know about it generally?

A.  I just know that it's something as an investigator we check to make sure that the subjects of our investigation have or don't have income from overseas or assets overseas.

Q.  Would you consider yourself an investigator in this case?

A.  I was at one point an investigator.  I am no longer an investigator.

Q.  So as soon as the paycheck stops, you stop, is that basically what you're saying?

        MR. STONE:  Objection; argumentative.

        THE COURT:  Well, sustained.

BY MR. CAMBRIA:

Q.  Well, long story short here, that's a document you know existed with regard to this account and you never mentioned it until I asked you about it; correct?

A.  Well, I only knew that an FBAR existed, but I did not know how it related to the investigation as a whole.

Q.  Well, if an FBAR existed as to an account that you've been investigating, it would be relevant, wouldn't it, to see what it said and what it had in it?

UNITED STATES DISTRICT COURT

70

A.  Can you ask that again, sir?

      MR. CAMBRIA:  Would you mind reading that back,
please.

      (Record read.)

      THE WITNESS:  I would be curious as to the relevance,    `11:09:26`
yes.

BY MR. CAMBRIA:

Q.  But it turned out that you weren't curious because you
didn't follow it through, did you?

A.  I did not, no.    `11:09:37`

      MR. CAMBRIA:  That's all.

      THE COURT:  Ms. Bertrand.

      MS. BERTRAND:  Nothing, Your Honor.  Thank you.

      THE COURT:  Mr. Eisenberg.

      MR. EISENBERG:  Nothing, Your Honor.    `11:09:48`

      THE COURT:  Mr. Kessler.

      MR. KESSLER:  No, Your Honor.

      THE COURT:  All right.  Mr. Stone.

            REDIRECT EXAMINATION

BY MR. STONE:    `11:09:59`

Q.  All right, sir, you were just asked a number of questions
about an FBAR, fair?

A.  Yes, that's right.

Q.  Have you dealt with FBARs in previous investigations?

A.  Oh, I have, yes.    `11:10:36`

UNITED STATES DISTRICT COURT

ER 12970

71

Q.  Generally, well, how many investigations?

A.  Oh, at least one, but I think I recall FBARs in two additional ones that I can think of, yeah.

Q.  The one that you're thinking about, how did it come up?

A.  I was looking into the subject for the possibility of a tax                    11:10:54
evasion charge, and the subject had an FBAR --

Q.  Let me stop you there.  Had an FBAR, what does that mean?

A.  It looks like she may have filed an FBAR.

Q.  So the subject filed an FBAR, go on?

A.  For an account overseas, yes.                                                  11:11:19

Q.  Did that impact your investigation?

A.  It did, yeah.  I used it as a starting point because she was hiding a significant amount of income that she was generating and the FBAR did not cover the amount of money that she was hiding because she also evaded taxes through the use of    11:11:43
funneling her revenue through her credit cards, which she then used overseas, effectively creating her credit cards would be, you know, international bank accounts.

Q.  Was the individual ultimately prosecuted?

A.  Yes.                                                                           11:12:03

Q.  Even though she filed an FBAR?

A.  Yes.

Q.  All right.  I am going to show you what has been admitted as Exhibit 1545.

        MR. STONE:  Ask to publish.                                                11:12:28

72

THE COURT:  Yes, it may be published.

BY MR. STONE:

Q.  Mr. Panchapakesan asked you a few questions about this exhibit, do you remember that?

A.  Yes.                                                    11:12:51

Q.  I think he asked you about this sale of Backpage in April of 2015?

A.  Yes.

Q.  And looking at this, well, first off, what is this, quickly, what does this exhibit depict?                         11:13:09

A.  Oh, it shows transfers of, you know, sort of conversions of digital currency to cash and those conversions deposited into a Website Tech's bank account.

Q.  There's a big jump not in April of 2015 but in July and August 2015, fair?                                             11:13:34

A.  That's right, yes.

Q.  Do you have an understanding of what was occurring with Backpage's business in July and August 20th --

MR. PANCHAPAKESAN:  It's been asked and answered on direct.                                                         11:13:45

THE COURT:  Overruled.

THE WITNESS:  Around that time is when credit card companies no longer accepted credit card payments for Backpage transactions.

BY MR. STONE:                                              11:13:55

UNITED STATES DISTRICT COURT

73

Q.  In your review of the records, was it more the credit card

issues Backpage was happening -- that Backpage was experiencing

rather than any sale of the business that caused this uptick?

      MR. PANCHAPAKESAN:  Leading, Your Honor.

      THE COURT:  What was the objection?                    11:14:08

      MR. PANCHAPAKESAN:  Leading.

      THE COURT:  Sustained.

BY MR. STONE:

Q.  So April 2015 there was a sale; correct?

A.  Yes.                                                        11:14:16

Q.  July and August 2015 there's a jump in revenue?

A.  Yes.

Q.  And that related to what based on your review of the

records?

      MR. PANCHAPAKESAN:  Lacks foundation.                  11:14:25

      THE COURT:  Overruled.

      THE WITNESS:  It was based upon the, you know, the

credit card companies no longer accepting credit card

transactions for Backpage, Backpage purchases and transactions.

BY MR. STONE:                                                   11:14:51

Q.  Showing you what's admitted as Exhibit 1479.  There were

some questions from Mr. Panchapakesan about this page of the

flowchart; correct?

A.  Yes.

Q.  Just blow it up a little bit.  And your testimony was       11:15:08

UNITED STATES DISTRICT COURT

74

something to the effect of, besides this money being

transferred from one bank account to the other, you don't have

any understanding of why it was transferred?

A.   Yeah, that's correct.

Q.   Mr. Panchapakesan asked you some questions about getting          11:15:28

into the defendants' heads or something like that?

          MR. PANCHAPAKESAN:  Argumentative.

          THE COURT:  Overruled.

BY MR. STONE:

Q.   Do you remember that -- do you remember him asking                11:15:38

questions about that?

A.   I think so, yeah.

Q.   But how you couldn't get into defendants' heads to

understand why something was done in terms of money transfers?

A.   That's correct, yeah, that's what I recall.                       11:15:49

Q.   That wasn't what you were asked to do, fair?

A.   Oh, yeah, no, I wasn't -- I wasn't asked to get in the

heads of the individuals.

Q.   Rather, what were you asked to do?

A.   I was asked to trace the funds from source to destination.        11:16:02

Q.   And whether those funds were, well, strike that.

          Your testimony is that all the funds that are shown on

this flowchart derive from where?

A.   From Backpage.com.

Q.   This is the next page, Cereus Properties, and the bank            11:16:30

UNITED STATES DISTRICT COURT

75

there is Arizona Bank & Trust; correct?

A.  Yes, that's right.

Q.  Your understanding is that's an Arizona bank?

A.  Yes, that's my understanding.

Q.  Mr. Cambria asked you a few questions about this                    11:16:54

transaction or about this page and these transactions; right?

A.  Yes, that's right.

Q.  This specifically was a transaction in Counts 99 and 100

that went from a Johnson Bank, the IOLTA account, to a Primus

Trust Company in Hungary; correct?                                      11:17:13

A.  Yes, that's right.

Q.  And do you have an understanding if Johnson Bank has a

branch here in Arizona?

A.  Yes, I do.  I believe it's in Scottsdale.

Q.  Showing you what has been admitted as Exhibit 1481, and            11:17:38

there were some questions from Mr. Panchapakesan about this

part of Exhibit 1481; correct?

A.  Yes, that's right.

Q.  Did you analyze the money that's listed here for years

2013, 2014 and 2015?                                                   11:18:01

        MR. PANCHAPAKESAN:  Vague as to analyze.

        THE COURT:  I can't hear you.

        MR. PANCHAPAKESAN:  Vague as to analyze.

        THE COURT:  Sustained.

BY MR. STONE:                                                          11:18:09

UNITED STATES DISTRICT COURT

76

Q.  Did you -- you prepared this document; correct?

A.  I did, yes.

Q.  When you prepared this document, did you review where this income came from?

A.  I did, yes.                                                          11:18:20

Q.  Do you have an understanding of where the majority of this income came from?

A.  I do, yes.

Q.  Where?

A.  Backpage.com.                                                       11:18:30

Q.  And when I say "majority," is that vast majority?

        MR. PANCHAPAKESAN:  Objection; lacks foundation.

        THE COURT:  Well, sustained.  You can lay some foundation.

        MR. STONE:  Thank you, Your Honor.                             11:18:45

BY MR. STONE:

Q.  When you say "majority," can you give a sense for what that means?

A.  Well, would it make sense for me to walk you through my logic for what I have done to that?                                        11:18:56

Q.  I don't think that's necessary, but you already testified that -- you can, if you would like to -- but you've already testified that the majority of this came from Backpage, and I want to get a sense for what that means.

A.  Well, what I did was I reviewed K-1, which are ownership   11:19:10

UNITED STATES DISTRICT COURT

77

documents, and K-1 documents show ownership in income, and I

also reviewed W-2s, which are employment income documents.

When I reviewed those, they traced back to businesses and

accounts that draw their income primarily from the Backpage.com

website.                                                                          11:19:35

Q.  Thank you.

        MR. STONE:  No further questions, Your Honor.

        MR. CAMBRIA:  Your Honor, can I have recross on the

new subject about the lady who didn't pay her taxes and clarify

that?                                                                             11:20:00

        THE COURT:  Yes, limited to that.

                        RECROSS-EXAMINATION

BY MR. CAMBRIA:

Q.  Your example you gave us of your prior experience with the

lady who didn't pay her taxes, do you recall that?                                11:20:14

A.  Yes.

Q.  What happened is the FBAR gave you the information that she

had an account overseas and how much money that was in there,

and it was in her name and so on; correct?

A.  Yes.                                                                          11:20:31

Q.  It revealed that information, did it?

A.  Yes.

Q.  Right.  And then you used that to show that she didn't

claim that money on her tax return in the United States and,

therefore, she was charged with tax evasion; correct?                            11:20:41

78

A.  No.  The case wasn't that simple, and I don't -- I recall
that the FBAR in and of itself was inaccurate after a more
thorough analysis.  So the FBAR existed.  I reviewed the FBAR
and I looked at additional income she was making, and I looked
at her activity relating to other bank accounts, and even then       11:21:05
I recall after an international request that she had
significantly more income or more assets held overseas than
what was revealed in the FBAR.

Q.  Okay.  But the FBAR helped you to get in the right
direction; in other words, it disclosed information about her       11:21:27
income that was not consistent with what she claimed; correct?

A.  Yes, that's right.

Q.  All right.  So it revealed as opposed to concealed
information, true?

A.  Well, it revealed some information.       11:21:45

Q.  And that information you used or somebody used to prosecute
her for not paying her taxes; correct?

A.  Well, that information was used to help support my
analysis, and in the prosecution was broadly for false, filing
false tax returns.       11:22:12

Q.  But the bottom line is because the FBAR included, included
information about her financial transactions, you used that to
help your prosecution, correct 'cause it revealed information?

A.  Well, I can't recall exactly, but it revealed -- it
revealed inaccurate information.       11:22:37

UNITED STATES DISTRICT COURT

79

Q.  But it still revealed information which you used or

somebody used to prosecute her?

        MR. STONE:  Objection; it's been asked and answered.

        THE COURT:  Sustained.

BY MR. CAMBRIA:                                                    11:22:49

Q.  It revealed information, did it not?

        MR. STONE:  Same objection.

        THE COURT:  Sustained.

BY MR. CAMBRIA:

Q.  Did you use any information that was in the FBAR in          11:22:55

connection with eventually prosecuting her?

A.  At the end of the investigation I -- it wasn't necessary to

prosecute her.  She pled out.

Q.  Okay.  But you used that information to get her to the

point where she took the plea; right?  Let's put it this way --  11:23:17

A.  No.  No.

Q.  -- it supplied information, did it not, which you used or

somebody used?

A.  I think I recall that we didn't reveal the information

relating to the international accounts because she -- in         11:23:33

preparation for a possible trial in the event that she wouldn't

go through with her plea, so --

        THE COURT:  All right.  I think we are getting far

field, Mr. Cambria.

        MR. CAMBRIA:  All right.  Thank you.                     11:23:50

80

```
        THE COURT:  All right.  Is the witness excused from
subpoena?

        MR. STONE:  Yes, Your Honor.

        THE COURT:  Any objection from defense?

        MR. PANCHAPAKESAN:  No objection.                    11:23:59

        THE COURT:  Sir, thank you for your testimony.  You're
excused from subpoena.  You may step down.

        Please call your next witness.

        MS. PERLMETER:  The United States called
Astrid Cervantes.                                            11:24:12

        MR. BERRY:  Looks like Ms. Cervantes has gone to the
restroom.  We can swap out.  I can do a different witness.

        THE COURT:  That's fine.  Do you have another witness
ready to go?  Who is that?

        MR. BERRY:  United States called Naiomy Figueroa.     11:24:39

        So our jurors are aware and counsel, we are going to
go through 12:15 and we will take our hour lunch since we start
a little bit late.

NAIOMY FIGUEROA,

 (Witness sworn.)                                            11:25:23

                    DIRECT EXAMINATION

BY MR. BERRY:

Q.  Good morning, Naiomy.

A.  Good morning, Austin.

Q.  Would you please state your name for the record?         11:25:59
```

UNITED STATES DISTRICT COURT

81

A.  Naiomy Figueroa.

Q.  Would you please spell for the jury your first name?

A.  N-A-I-O-M-Y.

Q.  Great.  Would you please spell for the jury your last name?

A.  F-I-G-U-E-R-O-A.                                    11:26:15

Q.  How old are you, Naiomy?

A.  I am 25 years old.

Q.  Do you have any children?

A.  Yes, I have three children.

Q.  And what are their ages?                            11:26:26

A.  I have a seven-year-old daughter, a two-year-old son and a one-year-old daughter.

Q.  Do you work outside the home?

A.  No, I do not.

Q.  Are you married?                                    11:26:37

A.  No.

Q.  Are you in a long-term relationship?

A.  Yes, I am.

Q.  Has your partner traveled with you to Phoenix for this occasion?                                           11:26:47

A.  Yes, he did.

Q.  What state do you live in?

A.  Massachusetts.

Q.  Do you know what Backpage.com is?

A.  Yes, I do.                                          11:26:57

UNITED STATES DISTRICT COURT

82

Q.  When did you first become aware of Backpage?

A.  Approximately 2014.

Q.  How did you become aware of what Backpage was?

A.  I became aware when I seen my pimps use it to post my ads.

Q.  So you're saying that you were posted on Backpage?    11:27:22

A.  Yes.  Correct.

Q.  Okay.  What is Backpage to your understanding?

A.  To my understanding, Backpage is a website that is used for

multiple things, but it was known for girls to use it to escort

and to get trafficked.    11:27:41

Q.  And when you use the word "escort," what do you mean by

that?

A.  I mean to exchange a sexual act for money or a gift.

Q.  And you mentioned that you were advertised on Backpage;

correct?    11:28:04

A.  Correct.

Q.  What year or years were you advertised on Backpage?

A.  2014, I believe.

Q.  Were you -- where was your ad posted, what section on

Backpage?    11:28:23

A.  It was posted on the escort section.

Q.  Were you involved with creating the ad?

A.  No, I never posted my own ads.

Q.  Who posted it of you?

A.  My pimps, Andy Pena, Hansel German, Enoc Ayuso, and Rafael.    11:28:40

UNITED STATES DISTRICT COURT

83

Q.  Did you ever have an opportunity to see what your ad looked
like?

A.  Yes, I have's seen some of my ads.

Q.  When you mentioned that the escort was the exchange of sex
acts for money; correct?                                         11:29:15

A.  Correct.

Q.  Were you advertised in exchange for sex acts for money?

A.  Yes.

Q.  Were -- did those sex acts involve the use of condoms?

A.  Yes.                                                         11:29:28

Q.  And what states were you advertised on Backpage?

A.  I can't remember every single one off of top of my head,
but I do know the fact it was Massachusetts, Maine, New
Hampshire and I believe New York.

Q.  And why were your ads posted on Backpage?                    11:29:53

A.  So my pimps could make money off of me.

Q.  So you mentioned, you said that you were not involved with
the creation of the ad, do you know how they paid for the ad?

A.  Yes, I was seeing my pimps purchase one vanilla cards from
convenience stores or 7-Eleven.                                  11:30:23

Q.  So vanilla cards?

A.  Yes.

Q.  And you said that you did see your ads from time to time;
correct?

A.  Yes, I would see them when they were working on them.        11:30:32

UNITED STATES DISTRICT COURT

ER 12983

84

Q.  Do you remember the types of words that they would use in your ads?

A.  Yes.

Q.  Could you explain to the jury just a few of those words that you recall?

A.  I remember "fetish friendly" and like "satisfying your cravings."

Q.  Okay.  Did you have an understanding as to why those words were used in relation to your ads?

A.  Yes, it was a way to like reel in more customers.

Q.  What kind of photos were used of you?

A.  Basically nude photos.

Q.  Completely nude?

A.  No, not completely nude.

Q.  Can you describe for the jury as best you can?

A.  Sometimes I would have lingerie or like pantyhose or some form of lingerie.

Q.  And what type of poses were you doing in those ads?

A.  Seductive poses.

Q.  How did you know what poses to do?

A.  Because my pimps would tell me what I had to do.

Q.  Where would the photos be taken?

A.  Mostly like in a hotel room or a hotel bathroom.

Q.  And who paid for those hotel rooms?

A.  It depended on which pimp was with me at the time, but for

11:30:47

11:31:13

11:31:31

11:31:53

11:32:14

85

the most part it was Andy Pena.

Q. But always one of the pimps?

A. Yes.

Q. Never you?

A. No, I wasn't old enough to get my own.          11:32:26

Q. Why were those kinds of photos that you said seductive

photos, seductive poses in lingerie, why were those kinds of

photos used in your ad?

A. Because it would reel in more clients.

Q. What name was used to advertise you?          11:32:51

A. Emily.

Q. Why was your real name not used?

A. I guess so nobody would be aware that it was me.

Q. After the ad was created and posted on Backpage, what would

happen next?          11:33:16

A. I started getting a lot of phone calls.

Q. What about text messages?

A. Yes, text messages too.

Q. Who handled the calls?

A. For the most part I handled the calls and my pimps would          11:33:29

handle the text messages.

Q. Why -- why were you handling the calls and them the texts?

A. Because it needed to be a female's voice on the phone.

Q. And why was that?

A. Because it would probably scare the johns away.          11:33:44

86

Q.  Okay.  How soon after the ad posted would your phone start
to ring?

A.  It always changed, but usually within minutes.

Q.  When you say "minutes," can you give us an idea?

A.  Five, ten minutes.                                    11:34:07

Q.  At some point after you said phone starts ringing within
five to ten minutes, at some point did the calls taper off?

A.  Yes, they do.

Q.  What would you all do then?

A.  They would post another ad to get me on the top of the list    11:34:26
so that the calls keep coming in.

Q.  When you received these calls in response to the ad they
posted of you, help the jury understand just what does a
typical conversation go like there?

        MS. BERTRAND:  Objection, Your Honor, relevance, 403.    11:34:55

        THE COURT:  Overruled.  You may answer.

BY MR. BERRY:

Q.  You can answer.

A.  Sorry, can you repeat the question?

Q.  Yes.  Just a second.  When the call would come in, you said    11:35:04
you would answer the calls; correct?

A.  Correct.

Q.  Phone starts ringing, you take the calls; right?

A.  Yes.

Q.  Explain to the jury how a typical call goes.  I am not    11:35:14

87

asking you to remember verbatim every single call you ever had,
but just generally, how did this call go?

A.  So for every single call, first rule was to ask them if
they were affiliated with any type of law enforcement before
the conversation started, and then after that they would ask          11:35:30
like about my services, what the rates were, and, you know, if
they wanted to make an appointment or whatever, they would
just, you know, book the appointment.

Q.  Would they ask about your rates?

A.  They would -- sorry, what was that?                                11:35:47

Q.  Would they ask about the rates?

A.  Yes, they would.

Q.  What do you mean by that?

A.  Basically they would ask me like what are the prices per
hour or every half hour.                                               11:35:57

Q.  And is that the two typical time frames, hour or half hour?

A.  For the most part.

Q.  Are you okay?

A.  Yeah.

Q.  What is wrong?                                                     11:36:07

A.  My poppy popped.  It's like all over me.

        MR. BERRY:  Can we take a break?

        THE COURT:  There is some napkins or Kleenexes there.
I don't know if that will work for you.  Is there a trash can
beneath you?  Do you need additional paper towels or anything?        11:36:27

88

MR. BERRY:  Can she take a break?

THE COURT:  No, that's okay.  That's fine.  All right.
Let's have just about five-minute.  I don't know where the
closest restroom is.  Okay.  Ten minutes of a break.

Members of the jury, if you wish to retire to the jury    11:36:57
deliberation room, you may do so.  Why don't you do that.
Please all rise for the jury.

(Jury left the courtroom at 11:37 a.m.)

MR. BERRY:  Your Honor, with the jury outside the
presence, I want to note for the record what has just happened,    11:37:47
which is the witness is very nervous.  I told her she could
have something to fidget with her hands to keep her sort of
mind occupied or focused.  I don't know what she took up there.
It was some kind of an item that apparently exploded and gel
went everywhere on the floor.  It was all over her hands, and    11:38:06
that's why we have taken a break.

THE COURT:  I did see that she was juggling something
back and forth in her hands that looked like a ball or a small
toy, and so I did recognize that.  I thought it was a stuffed
animal of some sort.    11:38:22

MR. LINCENBERG:  Your Honor, while we have a break,
we'd like to note, I think the Court is aware it's a continuing
objection to the testimony designed to bring out discussion of
trafficking, which just occurred here again, designed to bring
out that the person was underage.  There's a pattern asking:    11:38:40

UNITED STATES DISTRICT COURT

ER 12988

89

How old are you today?  When were you trafficked?  So it all

conjures up in the image of the jurors that the person was

underage at the time.

        Even ostensibly this discussion about how many

children the person has seems to, you know, conjure up the          11:39:00

image of whether these were kids from some spouse versus

somebody that they slept with as a prostitute --

        THE COURT:  Oh, no --

        MR. LINCENBERG:  Hold on.  Hold on.

        THE COURT:  No.  No.  No.  No.  You're getting far          11:39:16

field with that type of argument, Mr. Lincenberg.

        MR. LINCENBERG:  Let me finish.

        THE COURT:  It's an improper characterization of the

witness, which you should not be opining on with regard to that

particular question and answer.                                     11:39:30

        MR. LINCENBERG:  I am not going to ask her that

question or answer.  I am just concerned about the speculation

and what the relevance of it is.  First two points are more

obvious.  As I noted, the third one is less obvious, but it's a

concern, and I just wanted to note for the record the             11:39:45

continuing objection.

        THE COURT:  It's noted.  I've only heard her mention

the word "trafficked" once, and I've only heard her testify

that she was not old enough to pay for her ads, and I think the

jury can do the math as all of us can with regard to these          11:40:02

UNITED STATES DISTRICT COURT

90

witnesses and their age today and the time that they were
posted. There's nothing that we can do about that. They are
the facts.

And so your objection, however, your continuing
objection is noted.                                                            11:40:19

All right. Let's check on Ms. Figueroa.

MS. BERTRAND: When Mr. Berry gets back, I have
another comment. Your Honor, two-fold. Actually, first, I
just wanted, and I made a 403 objection, I have some concerns
with this line of questioning that we're getting into the day    11:44:42
in the life, and that's a concern, but also I'd like to note,
and we already have her on the stand, I didn't have time to
object. The United States sent us an e-mail yesterday
10:54 a.m. giving us the witness lineup for today. Ms.
Figueroa wasn't on it, so we were scrambling to address this.    11:45:01
They had told us Ms. Figueroa was going to go, then they moved
her, so I'm just noting this is an ongoing issue and I am
making a record about it.

THE COURT: I think we discussed about this morning,
so I am aware.                                                    11:45:16

MS. BERTRAND: Okay.

THE COURT: I don't see at this juncture that we are
getting into anything related to the day in the life, so but
your objection is noted. Let's bring her in. As well, bring
the jury back.                                                   11:45:30

          Ma'am, you may resume your seat.

          And rise for the jury, please.

               (Jury is present at 11:46 a.m.)

          THE COURT:  All right.  Please be seated.  Record will

reflect the jury has returned.  Our witness is on the stand.     11:46:35

          And you may proceed, Mr. Berry.

          MR. BERRY:  Thank you, Your Honor.

BY MR. BERRY:

Q.  Thank you.  We are back, Naiomy.  Are you nervous?

A.  Yes, I am.                                                   11:46:47

Q.  Is this a difficult topic to talk about?

A.  Yes.

Q.  When just before we broke we were talking about the rates

being discussed on the phone, and you said we talked about hour

and half hour; is that correct?                                 11:47:05

A.  Yes.

Q.  Are those the increments, the amount of time that would be

discussed?

A.  Majority of the times, yes.

Q.  When you would have these phone calls with these potential   11:47:15

clients, were you cautious about what you said on the phone?

A.  Yes.

Q.  Explain that to the jury.

A.  Like I had stated previously, you had to always ask if they

were affiliated with any type of law enforcement, but you still  11:47:35

92

had to like be careful and use certain words like "roses" for

money and stuff.

Q.  Where did most of these dates take place?

A.  Usually in a hotel room.

Q.  And when the individual got there to your hotel room,          11:47:55

what's the first thing that would happen?

A.  We would have to ask them to touch us like somewhere like

in the private parts to confirm that they were not a cop.

Q.  How long would you typically spend with an individual?

A.  Usually like half an hour, an hour.                            11:48:23

Q.  And you mentioned earlier that during this hour, half hour,

sex acts would occur?

A.  Yes.

Q.  And without getting graphic or detailed about what those

acts were, do those acts always involve a condom?                  11:48:40

A.  For the most part.

Q.  What percentage of the time would you say there was a

condom versus not?

        MS. BERTRAND:  Your Honor, objection; relevance.

        THE COURT:  Sustained.                                     11:48:52

        MR. BERRY:  Your Honor, may I have a sidebar very

briefly?

        THE COURT:  Very briefly.

(Sidebar)

        THE COURT:  Can I just mention, previously the court       11:49:26

UNITED STATES DISTRICT COURT

93

reporters have alerted me to this concern, if there is side
conversations in the background that are going on, that it
makes it very difficult, so one at a time, okay?

MR. BERRY:  Your Honor, the issue with asking her
about condoms is because we want to be able to articulate for          11:49:43
the jury that these were sex acts that would qualify for the
prostitution act.  The defense has cross-examined several of
our witnesses about what constitutes a sex act.  For example,
stripping nude, not actually touching genitals, things like
that.  This is a person that's very nervous about testifying.          11:50:00
I don't think I have to ask her, "Did your genitals touch each
other," and get really graphic and gross with her.  It makes
her very uncomfortable.  If I simply ask her, "Was a condom
used, and what percentage of the time," the jury can make the
inference that condoms are used for largely one thing and one          11:50:17
thing only.

THE COURT:  You already asked the question previously
before we had the break.

MR. BERRY:  She now said it's not a hundred percent of
the time, so I wanted to clarify what percentage because now          11:50:29
that becomes relevant whether it was 50 percent, 20 percent or
90 percent.

MS. BERTRAND:  I don't see how any of this is relevant
as to whether or not any of the allegations set forth in the
counts of the indictment occurred and qualify as criminal acts.          11:50:46

UNITED STATES DISTRICT COURT

94

This is a backdoor way to get in the day in the life and all kinds of other more details that have nothing to do with whether or not any of these defendants joined in a conspiracy to violate the Travel Act. That's all this is. And the fact that she's nervous is all the more reason to make this swift, but this is not a relevant line of questioning.

11:51:07

MR. BERRY: It's the opposite. That's what I am trying to establish.

THE COURT: Well, the alternative is if Mr. Berry asks her, "Did you engage in sexual intercourse? What amount of time was that? Did you have oral sex? Did you perform oral sex?" So he either can ask the percentage of time used with a condom, or he can ask those two questions, and so that's how I will permit it to go forward. All right.

11:51:25

(The following proceedings occurred in open court:)

11:51:48

BY MR. BERRY:

Q. Okay. Let's try this again. You said a condom was used a vast majority or a majority of the time?

A. Yes.

Q. What percentage would you say a condom was used during the sex acts?

11:52:12

A. About 90 percent.

Q. When would the money change hands?

A. Before the sexual act.

Q. And then after the sex act occurred, what would happen

11:52:32

UNITED STATES DISTRICT COURT

95

next?

A.  They would go.

Q.  Okay.  And what would you do with the money?

A.  I would hand it over to my pimps.

Q.  How much were you allowed to keep?                          11:52:49

A.  Nothing.

Q.  In February of 2014, did someone respond to your ad that
turned out to be a cop?

A.  Yes.

Q.  Where were you?                                             11:53:05

A.  I was in Salem, New Hampshire at the La Quinta Inn.

Q.  That's fine.  Thank you.  How long had you been there at
that particular motel?

A.  I can't say exactly how long, but I know it was no more
than a week.                                                   11:53:23

Q.  And you mentioned this Andy Pena, was he there with you?

A.  Yes, he was.

Q.  You said you were in different states, Massachusetts, New
Hampshire, New York?

A.  Yes.                                                        11:53:40

Q.  Who drove you from those locations?

A.  It always changed depending which pimp was with me, but for
the most part it was Andy Pena.

Q.  After this incident in February of 2014, were you ever
advertised on Backpage again?                                  11:53:58

UNITED STATES DISTRICT COURT

ER 12995

96

A.  No.

Q.  After this incident in February of 2014, how much money did Andy Pena make off of you?

A.  Zero dollars.

Q.  After this incident in February 2014, how much money did Backpage make off of your advertisements?                     11:54:10

A.  Nothing.

        MS. BERTRAND:  Objection; calls for speculation.

        THE COURT:  Sustained.

BY MR. BERRY:                                                  11:54:22

Q.  No more ads were posted?

A.  No.

Q.  Are you familiar with the word "in-call"?

A.  Yes, ma'am [sic].

Q.  Explain that to the jury.                                  11:54:30

A.  In-call is when a john comes to you.

        MR. BERRY:  All right.  I'm going to -- so I'm going to show for the witness what's already in evidence as government's Exhibit 214.

BY MR. BERRY:                                                  11:54:49

Q.  Do you recognize this, Naiomy?

A.  Yes.

Q.  What is it?

A.  It's one of my ads.

Q.  And now I've zoomed in on the heading of it, would you    11:55:06

UNITED STATES DISTRICT COURT

97

please read that for the jury?

A.   "Puerto Rican Mami in Walpole area in-calls 19."

Q.   What was the date on that?

A.   Wednesday, January 29, 2014.

Q.   Walpole, do you know where that was?                          11:55:28

A.   Yes.

Q.   Where?

A.   It's like near Dedham.  It's in Massachusetts.

Q.   And we see an e-mail address down here, whose e-mail was

that?                                                             11:55:44

A.   That was my old e-mail.

Q.   That was what?

A.   My old e-mail.

Q.   But was it you posting the ad?

A.   No.                                                          11:55:52

Q.   Who was using that?

A.   Andy Pena.

Q.   And now very quickly I want to go through these photos, who

is in these photos?

A.   That's me.                                                   11:56:02

Q.   Is it hard for you to look at this ad?

A.   Yes.

Q.   Taking the photos down and we are just looking at the text.

Are you okay for a minute?  Do you need a minute?

A.   It's okay.                                                   11:56:23

UNITED STATES DISTRICT COURT

98

Q.  Would you please read this ad that says, "Hey, my name,"

whose the name in there?

A.  Emily.

Q.  Okay.  Again, did you create this ad?

A.  No.                                                                    11:56:35

Q.  Scrolling down here to this section, do you recognize this

name?

A.  Yes.

Q.  Who is that?

A.  That's Andy Pena.                                                      11:56:49

Q.  Do you recognize that address?

A.  My pimp.

Q.  Address?

A.  Yes.

Q.  What address is that?                                                  11:56:55

A.  That was his address at the time.

Q.  He was the one posting your ad?

A.  Yes.

Q.  Very briefly, I'm going to show you 214a, who is in these

ads?  Who is in this ad?                                                   11:57:17

A.  That's me.

Q.  Is that another one of your ads?

A.  Yes.

Q.  Are those the photos you talked about a moment ago that

were taken of you?                                                        11:57:27

UNITED STATES DISTRICT COURT

99

A.  Yes, those are.

Q.  Are you okay?

A.  Yeah, I am fine.

Q.  Did your ad help you get more calls from johns?

A.  Yes.                                                                    11:57:43

Q.  How often would your ad get posted or reposted on Backpage?

A.  At least every hour or two at the very least.

Q.  Was every ad posted of you an offer of sex for money?

A.  Yes, it was.

Q.  Did you know a man named Nicholas Kristof?                              11:58:12

A.  Yes, I do.

Q.  Who is he?

A.  He is a journalist.

        MR. LINCENBERG:  Objection; relevance.

        THE COURT:  Well, overruled.  I will let her answer            11:58:23

the question and determine whether or not it's relevant.  She

may answer.

        THE WITNESS:  Nicholas Kristof is a journalist from

the New York Time lines.

BY MR. BERRY:                                                              11:58:37

Q.  Okay.  And how do you know him?

        MS. BERTRAND:  Objection; relevance; 403; prior

discussions.

        MR. BERRY:  Your Honor, the jury has heard evidence

about Mr. Kristof, and this links those things.                           11:58:48

UNITED STATES DISTRICT COURT

100

```
          THE COURT:  I will overrule the objection.

BY MR. BERRY:

Q.  Let me take a more narrow approach here.  You can answer

the question, but I will go a little more narrow.  Did

Mr. Kristof write anything in the New York Times about you?        11:59:05

          MS. BERTRAND:  Objection; relevance; hearsay.

          THE COURT:  Overruled.

          THE WITNESS:  Yes, he has.

BY MR. BERRY:

Q.  Was it about you being on Backpage?                            11:59:19

A.  Yes.

          MR. LINCENBERG:  Leading; relevance; hearsay.

          THE COURT:  Sustained as to leading.

          MR. BERRY:  I will ask it open-ended.

BY MR. BERRY:                                                      11:59:31

Q.  What was it about?

          MS. BERTRAND:  Objection; hearsay.

          MR. LINCENBERG:  And relevance.

          THE COURT:  I guess you can lay some foundation about

what she knew about the article, if she read and it so on, so      11:59:38

sustained as to relevance.

          MR. BERRY:  Sure.

BY MR. BERRY:

Q.  Do you recall there was a documentary that Mr. Kristof was

involved with as well?                                            11:59:53
```

UNITED STATES DISTRICT COURT

ER 13000

101

          MS. BERTRAND:  Objection; leading; relevance.

          THE COURT:  Sustained.  Sustained as to leading.

Overruled as to relevance.

BY MR. BERRY:

Q.  In addition to what he wrote in the New York Times, are you          12:00:04

aware of anything else Mr. Kristof has done with regards to

Backpage and you?

          MS. BERTRAND:  Objection.

          MR. LINCENBERG:  Relevance.

          THE COURT:  Overruled; leading.          12:00:15

          THE WITNESS:  Can you ask that question in a different

form for me?

BY MR. BERRY:

Q.  Are you aware of whether Mr. Kristof was involved with

anything other than writing the New York Times article?          12:00:23

          MS. BERTRAND:  Objection; leading.

          THE COURT:  Overruled.

          THE WITNESS:  Yes, I do know that he was filming, was

filming to help girls who were on the run --

          MS. BERTRAND:  Objection.          12:00:35

          MR. LINCENBERG:  Goes beyond the scope, also

relevance.

          THE COURT:  Well, the answer may stand, but let's move

on.

          MR. BERRY:  Just one second, Your Honor.          12:00:47

UNITED STATES DISTRICT COURT

102

```
            THE COURT:  And I will overrule the objection.

BY MR. BERRY:

Q.  Did the documentary have anything to do with Backpage?

            MS. BERTRAND:  Objection; relevance; hearsay; leading.

            THE COURT:  Overruled.                                12:01:19

            THE WITNESS:  Yes.

BY MR. BERRY:

Q.  Did it have anything to do with you on Backpage?

            MS. BERTRAND:  Same objections.

            THE COURT:  Overruled.                                12:01:27

            THE WITNESS:  Yes.

BY MR. BERRY:

Q.  Did it -- was your mother featured in it?

            MS. BERTRAND:  Objection; relevance; hearsay.

            MR. EISENBERG:  Rule 403, Your Honor.                 12:01:43

            THE COURT:  I am going to sustain the objection as to

relevance.

            MR. BERRY:  Thank you, Your Honor.  Pass the witness.

Hold on just a second.  Not pass.  Okay.

BY MR. BERRY:                                                     12:01:58

Q.  So you talked about Mr. Pena didn't let you keep any of the

money; correct?

A.  Correct.

Q.  Did he have any legitimate jobs, to your knowledge?

            MR. LINCENBERG:  Relevance.                           12:02:08
```

UNITED STATES DISTRICT COURT

103

THE COURT:  Overruled.

THE WITNESS:  Not that I was aware of.

MR. BERRY:  Thank you.  Pass the witness.

THE COURT:  Who is coming forward?  Ms. Bertrand.

MS. BERTRAND:  May I proceed?                    12:02:28

THE COURT:  Yes.

CROSS-EXAMINATION

BY MS. BERTRAND:

Q.  Good morning, Ms. Figueroa.

A.  Good morning.                                12:02:31

Q.  My name is Joy Bertrand.  I represent a woman named

Joye Vaught.  I don't believe we met, so I just wanted to

introduce myself.

Ms. Figueroa, do you know whether or not any of the

photos that were placed in any of your ads were ever deleted by   12:02:47

Backpage?

A.  I am not 100 percent sure.

Q.  Do you know whether or not any of your ads were deleted?

A.  I am not sure.

MS. BERTRAND:  Ms. Ellig, can you please pull up         12:03:02

Exhibit 214 and publish to the jury.  This has already been

admitted into evidence.

BY MS. BERTRAND:

Q.  Ms. Figueroa, do you see at the top there of the screen in

red?                                             12:03:26

UNITED STATES DISTRICT COURT

104

A.  Yes.

Q.  It says, "This ad is not live."

A.  Yes.

Q.  "Status community removed," do you see that?

A.  Yes.                                                    12:03:33

Q.  Removed.  Excuse me.  Do you know what that means?

A.  It was taken down.

Q.  By Backpage?

A.  Yeah.

Q.  Yes.  Ms. Figueroa, there is some people sitting to my     12:03:44

left.  I am going to point them out to you and just ask if

their names sound familiar or if you've ever met them, okay?

A.  Okay.

Q.  Adam Padilla, have you ever met him?

A.  No.                                                    12:04:04

Q.  Name sound familiar?

A.  No.

Q.  Scott Spear?

A.  No.

Q.  Jed Brunst?                                             12:04:09

A.  No, ma'am.

Q.  Joye Vaught?

A.  No.

Q.  Michael Lacey?

A.  Nope.                                                   12:04:20

UNITED STATES DISTRICT COURT

105

Q.  And was it your testimony, I just want to make sure you're

clear, that the way you end up coming into contact with law

enforcement is they responded to a Backpage ad?

A.  Correct.

Q.  And at least one of the people involved with you has now          12:04:42

served five years in prison; correct?

A.  Correct.

Q.  Do you know whether or not Backpage provided any assistance

in that prosecution?

A.  I'm not really sure.                                              12:05:02

        MS. BERTRAND:  Thank you, Your Honor.  I have nothing

further.  Thank you, Ms. Figueroa.

                        CROSS-EXAMINATION

BY MR. CAMBRIA:

Q.  Good afternoon.                                                   12:05:17

A.  Good afternoon.

Q.  Just a couple questions.  From the testimony that you gave

this morning you indicated that you had an ad go up, but then

you received a phone call, is that fair to say?

A.  Once the ad posted, I would receive phone calls and text         12:05:35

messages.

Q.  And it was in the phone call that there was a discussion of

some kind of sexual act for money?

A.  It was in both text messages and phone call.

Q.  I'm sorry.                                                        12:05:49

106

A.  It was through both text messages and phone call.

Q.  Text messages and phone call?

A.  Yes.

Q.  The use of the phone -- using the phone is where the
so-called agreement was made?                              12:06:01

A.  Correct.

Q.  If anyone did in fact meet with you and exchange money for
sex, where did that money go?

A.  It would go to my pimps.

Q.  Was any of that money paid to Backpage?                12:06:24

A.  I believe when I would post Backpage would get paid.

Q.  You paid for an ad; correct?

A.  Yes.

Q.  All right.  My question was if somebody came in, and I am
just picking fantasy numbers here, somebody came in and they  12:06:40
said:  Here's $500 for X, did any of that 500 go to Backpage?

A.  No.

          MR. CAMBRIA:  Thank you.

          THE COURT:  Mr. Eisenberg.

          MR. EISENBERG:  Thank you, Your Honor.          12:06:54

          Ms. Ellig, may we have Exhibit 212, please, again?

          THE COURT:  212 he asked for.

                    CROSS-EXAMINATION

BY MR EISENBERG:

Q.  Ma'am, I am going to have this shown to you again.     12:07:16

107

```
              MR. BERRY:  Objection; this is not her ad.

              THE COURT:  This was not the exhibit that was used.

              MR. EISENBERG:  214, Your Honor.  I'm sorry.

BY MR EISENBERG:

Q.  Just to make sure I am sure, this is your ad, is it not,      12:07:30

ma'am?

A.  Yes, it is.

Q.  And ma'am, your face is covered, isn't it?

A.  Partial of my face is covered.

Q.  Isn't it fair to say that in order to determine one's age,    12:07:38

the primary factor is what they look like in their face?

              MR. BERRY:  Objection; calls for speculation.

              THE COURT:  She can answer in her own opinion.

              THE WITNESS:  I am sorry, can you re -- rephrase that

question for me.                                                  12:07:56

BY MR EISENBERG:

Q.  Yes, ma'am.  What I am asking in order to determine the

relative age of a person, right, one would concentrate, a

person would concentrate on their face, not their body?

A.  I don't agree with that.                                      12:08:10

Q.  Well, what there shows that you're under 19 years old?

A.  I did not post that.  My pimp posted it.

Q.  I understand it that, ma'am, but looking at this, would you

agree this is a photograph; right?

A.  Yes.                                                          12:08:25
```

UNITED STATES DISTRICT COURT

108

Q.  Is there anything on that photograph that shows that you're under 18 years old?

A.  No.

        MR. EISENBERG:  Thank you.  That's all, Your Honor.

        THE COURT:  I see Mr. Feder.                                    12:08:37

                    CROSS-EXAMINATION

BY MR. FEDER:

Q.  Hello.

A.  Hi.

Q.  You had no contact whatsoever with Backpage or anybody at    12:08:49
it, true?

A.  Sorry, can you re-ask that?

Q.  I said, you had no contact with anybody at Backpage or
anybody that worked there; right?

A.  No, sir.                                                     12:09:01

Q.  When there would be some kind of call to you or a text
because you and your pimps were careful, you would not discuss
even what kind of transaction you were hoping for on the phone;
right?

A.  Correct.                                                     12:09:21

Q.  It was only when that person, that potential customer came
to you in the hotel room that the actual transaction was
discussed in more detail; right?

A.  Yes, for the most part.

        MR. FEDER:  That's all I have.  Thanks.                  12:09:46

UNITED STATES DISTRICT COURT

109

THE COURT:  I think the only one left is Mr. Lincenberg.

MR. LINCENBERG:  No, Your Honor.

THE COURT:  All right.  Mr. Berry.

REDIRECT EXAMINATION

12:09:55

BY MR. BERRY:

Q.  If addition to not knowing who Adam Padilla is, do you not know who Andrew Padilla is?

A.  No.

Q.  With regard to whether Backpage made any money you were asked if they made any money off of these sex act dates things that occurred; correct?

12:10:12

MR. CAMBRIA:  Your Honor, that misstates the question. The question was:  Did they split the money, made the money, there's a difference.

12:10:32

THE COURT:  Mr. Cambria, that was not the question either, so I will ask Mr. Berry to rephrase.

MR. BERRY:  Sure.

BY MR. BERRY:

Q.  The money that was made off of the sex acts you performed, where did that money go?

12:10:40

A.  It went to my pimps.

Q.  Did he have any other legitimate source of income?

A.  No.

Q.  How did he pay for the ads to be posted?

12:10:51

UNITED STATES DISTRICT COURT

ER 13009

110

A.  With one vanilla cards.

Q.  Where did that money come from?

A.  That went to Backpage.

Q.  Where did it come from to buy the vanilla card?

A.  The money that they had from selling my body.                    12:11:03

        MR. BERRY:  No further questions, Your Honor.

        THE COURT:  May the witness be excused from subpoena?

        MR. BERRY:  Yes.

        THE COURT:  Is there an objection from defense?

        MR. CAMBRIA:  No.                                            12:11:15

        THE COURT:  Ma'am, you are excused from subpoena.  We

thank you for your testimony.  You may step down.  You are

excused.

        Members of the jury, I said we would go until a

quarter after the hour before we took our lunch break, but      12:11:25

obviously it seems a natural time to do so now.  We will be at

lunch for an hour.  I'd ask you to be prepared to come in

roughly ten after the hour give or take a few minutes.  And so

with that, just remember the admonition and please all rise for

the jury.                                                           12:11:45

                    (Jury is not present.)

        THE COURT:  Let me just ask then who is the

government's next witness?

        MS. PERLMETER:  Next will be will be Astrid Cervantes.

        THE COURT:  And then after that?                            12:12:31

UNITED STATES DISTRICT COURT

ER 13010

111

MS. PERLMETER:  Arshana Sanders.

MR. FEDER:  Persons not noticed to me that I have some information.

THE REPORTER:  Can't hear you.

MR. FEDER:  Arshana Sanders is the file we talked    12:12:45
about this morning, Your Honor, that was not noticed to me that I have some information on but not the entire file.

THE COURT:  And who else do you have?

MS. PERLMETER:  We also have Andrea Benson.  We have
no objection to having her go before Ms. Sanders if Mr. Feder    12:13:06
needs additional time to prepare.  All of the witnesses that we are calling today were provided to the defense Friday evening along with the exhibits that we intend do show them.

THE COURT:  All right.  We can go with Ms. Cervantes,
Ms. Benson and Ms. Sanders to give Mr. Feder the lunch hour to    12:13:23
go over the file, and that's how we will proceed.  All right. Let's stand in lunch recess.

     (Proceedings concluded at 12:13 p.m.)

112

# C E R T I F I C A T E

I, HILDA E. LOPEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 18th day of October, 2023.


s/Hilda E. Lopez_____
HILDA E. LOPEZ, RMR, FCRR

UNITED STATES DISTRICT COURT

ER 13012

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| Michael Lacey, et al., | ) | October 17, 2023 |
| | ) | 1:15 p.m. |
| Defendants. | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 19

(P.M. SESSION)

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

```
 1                    A P P E A R A N C E S

 2    For the Government:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Mr. Kevin M. Rapp, Esq.
               Mr. Andrew C. Stone, Esq.
 4             Mr. Peter Shawn Kozinets, Esq.
               Ms. Margaret Wu Perlmeter, Esq.
 5             Mr. Daniel G. Boyle, Esq.
          40 North Central Avenue, Suite 1800
 6        Phoenix, Arizona  85004-4408
          kevin.rapp@usdoj.gov
 7        peter.kozinets@usdoj.gov
          andrew.stone@usdoj.gov
 8        margaret.perlmeter@usdoj.gov
          - and -
 9        UNITED STATES DEPARTMENT OF JUSTICE
          By:  Mr. Austin Berry, Esq.
10        1301 New York Avenue NW, 11th Floor
          Washington, DC  20005
11        austin.berry2@usdoj.gov

12    For the Defendant Michael Lacey:
          LIPTSITZ GREEN SCIME CAMBRIA, LLP
13        By:  Mr. Paul J. Cambria, Esq.
          42 Delaware Avenue, Suite 120
14        Buffalo, New York  14202
          pcambria@lglaw.com
15
      For the Defendant Scott Spear:
16        KESSLER LAW OFFICE
          By: Mr. Eric Walter Kessler, Esq.
17        6720 North Scottsdale Road, Suite 210
          Scottsdale, Arizona  85253
18        eric.kesslerlaw@gmail.com
          - and -
19        FEDER LAW OFFICE, PA
          By:  Mr. Bruce S. Feder, Esq.
20        2930 East Camelback Road, Suite 160
          Phoenix, Arizona  85016
21        bf@federlawpa.com

22

23

24

25
```

ER 13014

3

1              **A P P E A R A N C E S (Cont'd)**

2   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
3        By:   **Mr. Gopi K. Panchapakesan, Esq.**
               **Mr. Gary S. Lincenberg, Esq.**
4              **Mr. Ariel A. Neuman, Esq.**
         1875 Century Park E, Suite 2300
5        Los Angeles, California  90067
         gpanchapakesan@birdmarella.com
6        glincenberg@birdmarella.com
         aneuman@birdmarella.com

7
    For the Defendant Andrew Padilla:
8        DAVID EISENBERG, PLC
         By:   **Mr. David S. Eisenberg, Esq.**
9        3550 North Central Avenue, Suite 1155
         Phoenix, Arizona  85012
10       david@deisenbergplc.com

11  For the Defendant Joye Vaught:
         JOY BERTRAND, ESQ, LLC
12       By:   **Ms. Joy Malby Bertrand, Esq**
         P.O. Box 2734
13       Scottsdale, Arizona  85252-2734
         Joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

ER 13015

4

1                          **I N D E X**

2    <u>SUMMARY OF COURT PROCEEDINGS:</u>                        <u>PAGE</u>

3    Proceedings Outside the Presence of the Jury              5
     Proceedings Outside the Presence of the Jury             12
4    Proceedings Outside the Presence of the Jury             16
     Motion for Mistrial                                      17
5    Proceedings Outside the Presence of the Jury            141

6

7    <u>WITNESSES FOR THE GOVERNMENT:</u>                          <u>PAGE</u>

8    Astrid Cervantes
             Direct Examination by Ms. Perlmeter             29
9            Cross-Examination by Mr. Eisenberg              49
     Andrea Benson
10           Direct Examination by Ms. Perlmeter             54
             Cross-Examination by Mr. Eisenberg              71
11           Cross-Examination by Mr. Cambria                77
             Cross-Examination by Mr. Feder                  79
12   Arshana Sanders-Willis
             Direct Examination by Mr. Berry                 89
13   Derek Fritze
             Direct Examination by Mr. Berry                102
14           Cross-Examination by Mr. Kessler               132

15

16                         <u>EXHIBITS</u>

17   <u>NO.</u>      <u>DESCRIPTION</u>                              <u>REC'D</u>

18   1606     Email from Officer Fritze to Backpage          119
              "Post ID 80670844", 07/16/2012,
19            DOJ-BP-0000162047

20   1606a    Email from Officer Fritze to Backpage          119
              "Post ID 5656110", 07/16/2012,
21            DOJ-BP-0000164992

22   1606b    Email from Officer Fritze to Backpage          119
              "Post ID 7756616", 07/16/2012,
23            DOJ-BP-0000164226

24   1606c    Email from Officer Fritze to Backpage          119
              "Post ID 804357", 07/16/2012,
25            DOJ-BP-0000166089

                    UNITED STATES DISTRICT COURT

5

<u>**P R O C E E D I N G S**</u>

1

2      (Proceedings reconvene at 1:15 p.m.)

3      (Jury not present at 1:15 p.m.)

4          THE COURT:  All right.  Please be seated.

5          Before -- before we bring any witness in, it has come          13:15:46

6   to my attention that -- and the record will reflect counsel are

7   only present.  No witness; no jurors.

8          It has come to my attention that upon entering the

9   building, one of our jurors -- and Liliana will retrieve the

10  jurors -- was greeted by a CSO.  And the CSO essentially          13:16:17

11  recognized him as one of the Lacey jurors, stated something to

12  the effect of, oh, so you're in it for the long haul, and then

13  proceeded to ask him the question, didn't one of the defendants

14  commit suicide?

15          And the juror essentially just extracted him away --          13:16:44

16  himself away from the conversation.

17          And as that juror reported this incident to Liliana,

18  he did so in front of two other jurors, who clearly heard the

19  statement.

20          So what I intend to do is call the juror in          13:17:06

21  individually, ask him about the incident.  And I don't

22  recall -- my memory is not fresh on the particular jurors that

23  have been seated that may or may not have had prior knowledge.

24          I do remember Mr. Cambria making some statement in his

25  opening as to, we all know what happened to Mr. Larkin.  And I          13:17:38

6

1   admonished him on that.

2        So I think that's the appropriate procedure.

3        I have relayed my concern to the acting U.S. Marshal

4   to admonish the CSOs not to engage in that type of that sort of

5   conversation or communication going forward.                    13:18:01

6        And so does the government wish to be heard?

7        MS. PERLMETER:  No, Your Honor.

8        THE COURT:  Anyone from the defense?

9        MR. CAMBRIA:  I don't remember making that statement,

10  Your Honor, in the opening.                                      13:18:14

11       THE COURT:  I remember it clearly.

12       MR. FEDER:  What's a CSO?

13       THE COURT:  Court security officer.

14       MS. BERTRAND:  The blue coats.

15       THE COURT:  The individuals who guard the entry of the     13:18:26

16  courthouse.

17       All right.  So we will bring in the first juror who

18  had the interaction.

19       MR. BERRY:  Your Honor, we -- I'd ask Liliana if we

20  could have a couple minutes before the jury comes in to discuss  13:18:36

21  some issues.  Obviously this is more important right now.  I

22  would like to take something up before we bring the whole panel

23  back in to start the afternoon.  It relates to one witness

24  that's coming.  I don't know if you want to hear it now or

25  later.                                                           13:18:49

7

```
 1            THE COURT:  Let's hear it later.

 2            MR. BERRY:  That's fine.

 3            MR. KESSLER:  Your Honor, I have the same issue, that

 4    I asked Liliana if I could make a point.  It has to do with

 5    upcoming witnesses.  And so whenever Your Honor is able to hear      13:19:01

 6    that.

 7            MR. CAMBRIA:  And my recollection, Your Honor, I said

 8    he was deceased.  I don't remember anything else.  If there's

 9    something specific, I'd like to know what it is, please.

10            THE COURT:  I'll give you your opening transcript.         13:19:17

11    How's that?

12            MR. CAMBRIA:  Thank you.

13            MR. FEDER:  Judge, could -- could we address or --

14            THE COURT:  One thing at a time.  Let's -- let's

15    concentrate on one thing at time, please.                          13:19:30

16            MR. FEDER:  Okay.

17       (Juror Number 10 joins the proceedings.)

18            THE COURTROOM DEPUTY:  Let me grab a mic for him.

19            THE COURT:  Okay.

20            THE COURTROOM DEPUTY:  Can you just speak into this         13:20:33

21    one?  Let me go turn it on.  Let me see, 2, the number 2.

22            Oh, it's on.  It's on.

23            JURY PANEL MEMBER:  It's on.

24            THE COURT:  I have my reading glasses on.  I can't

25    tell your juror number.  I'm sorry.                                13:20:45
```

UNITED STATES DISTRICT COURT

8

```
 1            JURY PANEL MEMBER:  Oh, yeah.  I'm Juror Number 10.

 2            THE COURT:  Juror Number 10.  Okay.

 3            Thank you, Juror Number 10.

 4            I called you in because I was told that you had a -- a

 5    brief interaction, one of -- with one of our court security      13:20:59

 6    officers today --

 7            JURY PANEL MEMBER:  Right.

 8            THE COURT:  -- who acknowledged that you were serving

 9    as a juror in this trial.

10            JURY PANEL MEMBER:  Right.                                13:21:10

11            THE COURT:  And what time of the day was this?  Do you

12    recall?

13            JURY PANEL MEMBER:  It was when I got here, so it was

14    probably --

15            THE COURT:  Can you use the microphone.                   13:21:18

16            JURY PANEL MEMBER:  -- 8:35 or so when I got here.

17            THE COURT:  8:35.

18            JURY PANEL MEMBER:  Uh-huh.

19            THE COURT:  Okay.  And can you just briefly describe

20    for us what that exchange -- what -- what occurred in that       13:21:27

21    exchange.

22            JURY PANEL MEMBER:  Okay.  Yeah, usually when I come

23    in, they say hi or -- because they've seen us so much.  And he

24    said:  Welcome back.  And he said:  Yeah, you're on the Lacey

25    case.                                                            13:21:41
```

9

```
 1            And I said:  Yes.
 2            And he said:  Oh, didn't one of the owners kill
 3   himself?
 4            And I said:  Well, I don't know.
 5            And I didn't know why he was even asking me questions,    13:21:58
 6   so -- and that was really it.  And I walked off.
 7            THE COURT:  All right.  Juror Number 10, prior to
 8   being asked that question, had you had any prior knowledge
 9   about any of that?
10            JURY PANEL MEMBER:  No.  I -- I haven't.                   13:22:17
11            THE COURT:  And now, having been asked the question,
12   or having been suggested that, has that changed your ability in
13   any way to remain a fair and impartial juror?
14            JURY PANEL MEMBER:  No.  Not at all.
15            THE COURT:  All right.  Is there anything from the        13:22:39
16   government?
17            MS. PERLMETER:  No, Your Honor.
18            THE COURT:  Anything from defense?
19            Mr. --
20            MR. LINCENBERG:  Lincenberg.                              13:22:53
21            THE COURT:  -- Lincenberg, do you --
22            MR. LINCENBERG:  Your Honor, maybe I missed it.  I
23   think there was something you conveyed to us that you had --
24   that you didn't explore with Juror Number 10.  I don't know if
25   the Court wanted to do that.  In terms of others.                 13:23:06
```

10

```
 1              THE COURTROOM DEPUTY:  Huh?

 2              THE COURT:  Well -- oh, yes.

 3              Just to be clear, Juror Number 10, when you conveyed

 4   this conversation to my courtroom deputy, were there other

 5   jurors present?                                              13:23:31

 6              JURY PANEL MEMBER:  There was.  And I probably

 7   shouldn't have -- I should have said it just to Elizabeth, but,

 8   yeah.

 9              THE COURT:  And do you recall the juror numbers who

10   were present?                                                13:23:44

11              JURY PANEL MEMBER:  I --

12              THE COURT:  If not, it's okay.

13              JURY PANEL MEMBER:  I don't know the numbers.  I think

14   we know which ones.

15              THE COURT:  Yeah.  I think Liliana can provide that to  13:23:53

16   me.

17              JURY PANEL MEMBER:  Yeah.

18              THE COURT:  All right.  Mr. Lincenberg, anything else?

19              MR. CAMBRIA:  Yeah.

20              THE COURT:  I'm sorry?                            13:24:04

21              MR. CAMBRIA:  I just wondered what was said.

22              THE COURT:  What --

23              MR. CAMBRIA:  If -- with the other jurors.

24              THE COURT:  You want him to reiterate what the court

25   security officer said?  He just --                          13:24:14
```

UNITED STATES DISTRICT COURT

11

```
 1        MR. CAMBRIA:  No, no, no, no.  I just didn't know
 2   whether there was a conversation other than the court security
 3   officer in the presence of the jurors.
 4        THE COURT:  No.  My understanding is -- and you can
 5   correct me if I'm wrong, Juror Number 10 -- you essentially          13:24:27
 6   just told Liliana what the court security officer said to you
 7   this morning; is that correct?
 8        JURY PANEL MEMBER:  Correct.
 9        THE COURT:  All right.
10        All right.  Anything from you, Ms. Bertrand?  I lost            13:24:39
11   you.  I didn't see you back there.
12        MS. BERTRAND:  I can't see from my seat, so I -- I
13   moved.  Thank you.
14        No.  Thank you, Your Honor.
15        THE COURT:  Mr. Cambria?                                        13:24:53
16        MR. CAMBRIA:  No, Your Honor.
17        THE COURT:  Mr. Eisenberg?
18        MR. EISENBERG:  No, Your Honor.  Thank you.
19        THE COURT:  Mr. Feder?
20        MR. FEDER:  No, thanks.                                         13:25:00
21        THE COURT:  All right.  Thank you.
22        You may return.  And, again, just don't discuss
23   anything that we've talked about so far.  And Liliana will take
24   you back into the jury room.
25        And you can retrieve one of the two individuals that            13:25:11
```

UNITED STATES DISTRICT COURT

 1   was present.

 2          Thank you.

 3      (Juror Number 10 leaves the proceedings.)

 4      (Jury not present at 1:25 p.m.)

 5          MR. LINCENBERG:  Your Honor, outside of the jurors --     13:25:27

 6   and you'd like, I can wait --

 7          THE COURT:  Yes.

 8          MR. LINCENBERG:  I -- I think some type of inquiry

 9   maybe should be made of all of the jurors, even if it's in

10   muted questions, because the fact that one juror came forward     13:25:39

11   and talked --

12          THE COURT:  Stop.

13      (Juror Number 6 joins the proceedings.)

14          THE COURTROOM DEPUTY:  Use this microphone to speak.

15          THE COURT:  Okay.  Good afternoon.     13:26:02

16          I'm just going to ask you to hold the microphone to

17   your -- close to your mouth --

18          JURY PANEL MEMBER:  Okay.

19          THE COURT:  -- and identify yourself.  You are juror

20   number?     13:26:13

21          JURY PANEL MEMBER:  6.

22          THE COURT:  And, Juror Number 6, I have been informed

23   that you were present when Juror Number 10 conveyed to you --

24   or, I'm sorry -- conveyed to my courtroom deputy in front of

25   you a conversation that took place between a court security     13:26:30

13

```
 1   officer and Juror Number 10; is that correct?

 2           JURY PANEL MEMBER:  Vaguely, yeah.

 3           THE COURT:  And do you recall what it is that you

 4   heard?

 5           JURY PANEL MEMBER:  That one of the security guards    13:26:42

 6   was mentioning something about one of the people from this

 7   case.

 8           THE COURT:  And do you recall what it was that he said

 9   to Juror Number 10?

10           JURY PANEL MEMBER:  I didn't really hear all of it.  I   13:26:55

11   just heard that he was saying something about Mr. Larkin, and

12   didn't he die or kill himself?

13           THE COURT:  All right.  And is that information that

14   you had previously had prior to being selected as a juror here?

15           JURY PANEL MEMBER:  Like, did I already know that?     13:27:22

16           THE COURT:  Yes.

17           JURY PANEL MEMBER:  No.

18           THE COURT:  And now, having heard that statement, has

19   that any -- in any way affected your ability to be fair or

20   impartial going forward?                                       13:27:35

21           JURY PANEL MEMBER:  No.

22           THE COURT:  And at this point, Juror Number 6, have

23   you conveyed or shared that conversation with anyone else in

24   the jury?

25           JURY PANEL MEMBER:  No.                                13:27:50
```

UNITED STATES DISTRICT COURT

14

```
 1              THE COURT:  All right.  Is there anything from the
 2    government?
 3              MS. PERLMETER:  No, Your Honor.
 4              THE COURT:  Anything from the defense?
 5              I'll go down with Mr. Cambria first.                    13:27:56
 6              MR. CAMBRIA:  No, Your Honor.
 7              THE COURT:  Ms. Bertrand?
 8              MS. BERTRAND:  No, thank you.
 9              THE COURT:  Mr. Lincenberg?
10              MR. LINCENBERG:  No, Your Honor.                        13:28:01
11              THE COURT:  Mr. Feder?
12              MR. FEDER:  No, thank you.
13              THE COURT:  Mr. Eisenberg?
14              MR. EISENBERG:  No, Your Honor.
15              THE COURT:  All right.  You may return to the jury      13:28:06
16    room.  And just do not communicate anything that we've
17    discussed so far.
18              Thank you.
19         (Juror Number 6 leaves the proceedings.)
20         (Juror Number 15 joins the proceedings.)                    13:28:34
21              THE COURT:  All right.  And would you identify
22    yourself by your juror number.
23              JURY PANEL MEMBER:  Number 15.
24              THE COURT:  Juror Number 15, it has come to my
25    attention that you were present when Juror Number 10 conveyed    13:28:48
```

UNITED STATES DISTRICT COURT

1    some communication that -- an exchange he had with one of the

2    court security officers this morning and that you were present

3    when he was relaying this information to my courtroom deputy;

4    is that correct?

5          JURY PANEL MEMBER:  That's correct.                    `13:29:08`

6          THE COURT:  And, to the best of your recollection,

7    what is it that you recall Juror Number 10 telling my courtroom

8    deputy?

9          JURY PANEL MEMBER:  He inquired the -- the deputy --

10   the security officer asked him if we were on the long case or   `13:29:21`

11   something, mentioned the case by one of the names, and then

12   asked something about one of the prior owners or something.

13         THE COURT:  And do you recall what it is that he said

14   about the prior owner?

15         JURY PANEL MEMBER:  That the security guard said that   `13:29:37`

16   he thought he was deceased now or something.

17         THE COURT:  Okay.  And prior to overhearing this

18   conversation between Juror Number 10 and my courtroom deputy,

19   had you had any previous knowledge related to that statement

20   about the prior owner?                                         `13:29:59`

21         JURY PANEL MEMBER:  No.

22         THE COURT:  And now, having heard such a statement,

23   would that in any way change your ability to be fair and

24   impartial to the parties in this case?

25         JURY PANEL MEMBER:  No.  It has no bearing to me.        `13:30:14`

UNITED STATES DISTRICT COURT

16

```
 1            THE COURT:  All right.  Thank you.

 2            Is there anything from the government?

 3            MS. PERLMETER:  No, Your Honor.

 4            THE COURT:  Anything from you, Mr. Cambria?

 5            MR. CAMBRIA:  No, Your Honor.                    13:30:23

 6            THE COURT:  Ms. Bertrand?

 7            MS. BERTRAND:  No, thank you.

 8            THE COURT:  Mr. Lincenberg?

 9            MR. LINCENBERG:  No, Your Honor.

10            THE COURT:  Mr. Eisenberg?                       13:30:29

11            MR. EISENBERG:  No, Your Honor.

12            THE COURT:  Mr. Feder?

13            MR. FEDER:  No, thanks.

14            THE COURT:  All right.  Thank you.

15       And when you return to the jury room, please don't   13:30:34

16   discuss any matters that we've covered so far and just wait

17   patiently until you're called in.

18            JURY PANEL MEMBER:  Thank you.

19            THE COURT:  Thank you.

20      (Juror Number 15 leaves the proceedings.)             13:30:47

21            THE COURT:  Now, there's a suggestion that all of the

22   jurors be polled in this fashion, but to do so would

23   essentially open the door to suggest the information that some

24   of them may not have.  And so I think that's problematic.

25            And my understanding is that those were the only two  13:31:26
```

UNITED STATES DISTRICT COURT

17

```
 1  individuals that were present when the statement was reiterated

 2  to my courtroom deputy.  So I don't necessarily feel the need

 3  or find the necessity to go any further.  I don't want to bring

 4  new information to jurors that may not have had any such

 5  information at present.                                    13:31:50

 6          And so does the government wish to be heard?

 7          MS. PERLMETER:  No, Your Honor.  We agree with the

 8  Court.

 9          THE COURT:  Anyone from the defense?

10          MR. LINCENBERG:  Well, Your Honor, first, we would  13:32:04

11  move for a mistrial, not simply -- not really solely based on

12  what these jurors are saying, but at the Court's lack of

13  follow-up on this issue.  And it really compounds what we felt

14  was insufficient opportunity to explore this during voir dire.

15          I think one other --                              13:32:24

16          THE COURT:  Explore this, meaning what?

17          MR. LINCENBERG:  Meaning the effect of publicity and

18  the like.

19          Now, the -- the other thing the Court could do would

20  be to question the chief security officer -- or the courtroom  13:32:34

21  security officer as to whether he has had conversations with

22  other jurors, made comments to other jurors in a similar vein.

23          THE COURT:  Well, number 1, I'm going to --

24          Oh, and I saw Mr. Cambria reaching for the microphone.

25  Did you wish to say something, Mr. Cambria?             13:32:54
```

18

```
1            MR. CAMBRIA:  The only thing I was going to say,
2   Your Honor, is I assume that the security officers will be told
3   not to converse with the jurors.
4            THE COURT:  Well, that was -- you can be assured that
5   that was the very first thing I did.  And going forward, they     13:33:08
6   will be admonished by their employer.
7            Now, with regard to the motion to dismiss based on the
8   Court's, I guess what's characterized by Mr. Lincenberg as not
9   going into voir dire in this subject area, I believe the record
10  will show that the Court did go through it.  I also believe       13:33:36
11  that the record will show that oftentimes defense counsel were
12  raising the issue repeatedly, and I, therefore, carefully went
13  into the area, not seeking to taint any potential jurors
14  because of those recent events.
15           And so, further, I understand Mr. Lincenberg's motion   13:34:00
16  to encompass the fact that the Court will not one by one call
17  jurors in to somehow ask them a question without revealing to
18  them that one of the owners is deceased or committed suicide.
19  To do that would essentially undercut what you wish to prevent
20  in the first instance.                                            13:34:28
21           So for that reason, I am also denying the motion to
22  dismiss.
23           MR. LINCENBERG:  And, Your Honor --
24           THE COURT:  There was a --
25           MR. LINCENBERG:  Excuse me.                              13:34:38
```

UNITED STATES DISTRICT COURT

```
 1            THE COURT:  There was an issue that the government

 2    wished to receive -- I made my ruling, Mr. Lincenberg.  Do you

 3    have --

 4            MR. LINCENBERG:  It's not about the ruling.

 5            Your Honor, I was just going to ask, you have a light    13:34:44

 6    in front of you that is sort of tilted at us now I think for

 7    the first time, and it's the way it's tilted, it's now kind of

 8    causing a glare.

 9            THE COURT:  It's illuminating me as though I'm on

10    high.  Didn't you -- didn't you get that?                        13:34:58

11            MR. LINCENBERG:  Yes.

12            THE COURT:  Is it distracting still?

13            MR. LINCENBERG:  Now it's good.  Thank you,

14    Your Honor.

15            THE COURT:  Okay.                                        13:35:04

16            MR. LINCENBERG:  It just hasn't been that way all

17    trial.  And thank you.

18            THE COURT:  Okay.  First, Mr. Stone, then Mr. Kessler,

19    and then somebody else wanted to speak to me.

20            I'm sorry.  Was it you, Mr. Feder, or Mr. Kessler?       13:35:19

21            MR. FEDER:  It was -- it was me.  There may be others

22    but --

23            THE COURT:  Okay.  Mr. Stone?

24            MR. BERRY:  I appreciate you thinking I'm as dashing

25    as Mr. Stone.                                                    13:35:30
```

20

```
 1              THE COURTROOM DEPUTY:  It's Mr. Berry.

 2              THE COURT:  I'm sorry.  Mr. Berry.  I'm sorry.  I'm

 3    sorry.

 4              MR. BERRY:  That's okay.

 5              THE COURT:  Can you turn -- do we have the microphone     13:35:35

 6    on?  Okay.  Thank you.

 7              MR. BERRY:  Yes, Your Honor.

 8              What I wanted to mention is, we have the witness

 9    Arshana Sanders coming up in a little bit, and before we put

10    her on, so we didn't have to take a break right before that, I    13:35:45

11    just wanted to make the Court aware of -- of who she is and

12    what the sort of a proffer of her testimony's going to be,

13    because I foresee there being some objections and some concerns

14    that I want the Court to be aware that I'm going to try to

15    navigate around.                                                   13:36:02

16              So Ms. Sanders is not someone who was posted on

17    Backpage, but her sister was.  Her sister's name is Cynthia

18    Worthy.  Her sister responded to a Backpage ad in August of

19    2015 and was ultimately murdered by the person who responded to

20    that ad.                                                           13:36:22

21              Obviously I am not going to get into that.  And I'm

22    going to try to steer around where she is, why she's not here,

23    what happened when she responded to the ad, any of that.  But

24    obviously, because this is a little bit different witness than

25    what we've been putting on, I want the Court to be aware that     13:36:39
```

UNITED STATES DISTRICT COURT

21

```
 1    I'm putting on someone who wasn't herself posted.  But she has
 2    personal knowledge of her sister's activity on Backpage;
 3    personally witnessed postings, personally witnessed her going
 4    to CVS and purchasing things to go along with her dates, and
 5    personally sat outside a couple of dates for a period of time    13:36:59
 6    when her sister went in.
 7          Obviously she can't put her in the room, can't be in
 8    the room and say what actually transpired, but I think her
 9    testimony is sufficiently based on her personal knowledge and
10    observations and does not include hearsay, that she can          13:37:15
11    adequately testify about what her sister was doing on Backpage.
12    And we'll also identify her sister's ad.
13          That's the limited purpose for which I intend to put
14    her on the stand, and I just wanted the -- Your Honor to be
15    aware of that and the defense.                                   13:37:32
16          I have told -- I've counseled Ms. Sanders that we're
17    going to try to steer around what happened to her sister and
18    not talk about that.  But I've also told her that if the
19    defense asks you a question, where's your sister, what happened
20    to her, that she has to answer truthfully.                       13:37:48
21          And so I just want the Court to be aware of that.  I
22    want the defense to be aware of that.  I don't want them
23    walking into a buzz saw.  I'm definitely going to try to steer
24    around that, and I just wanted the Court to be aware of that.
25          THE COURT:  All right.  So long as you can establish       13:38:02
```

UNITED STATES DISTRICT COURT

```
 1   personal knowledge of her awareness of the ad, what she saw,
 2   what she did.  Nothing related to hearsay --
 3           MR. BERRY:  That's right.
 4           THE COURT:  -- will come in through her.  And just
 5   adhere to the Court's prior orders with regard to any other       13:38:18
 6   affiliated crimes --
 7           MR. BERRY:  That's right.
 8           THE COURT:  -- by third parties, and we should be
 9   fine.
10           MR. BERRY:  That's the plan, Your Honor.                   13:38:29
11           THE COURT:  All right.  Mr. Feder?
12           MR. FEDER:  That's actually what I wanted to talk to
13   the Court about.
14           This is cumulative.  It's obviously extraordinarily
15   concerning that something will come out that will violate 401     13:38:39
16   and 403.  The idea that they've brought this woman down from
17   Detroit to basically talk about hearsay and observations of an
18   alleged victim that, as Mr. Berry just said, she didn't really
19   see anything happen.
20           Their big relevance in regard to the 302 is that she      13:38:57
21   observed her -- her sister buy a credit card.  And I just don't
22   see the point of doing this at the risk of an obvious mistrial
23   if one word is mentioned by this woman.
24           THE COURT:  Well --
25           MR. FEDER:  I mean, we've had how many witnesses now       13:39:15
```

23

```
 1    that have talked about this same stuff, except they're actually
 2    first-party witnesses to what happened.  And now it's another
 3    one?
 4            Just -- it just seems an un- -- an unnecessary risk.
 5    It's 403 -- you know, definitely potential 403 that I could          13:39:31
 6    promise you if one word comes out of her lips that -- that is
 7    anything close to that something happened to her sister -- and
 8    it's going to be obvious that she's here talking about her
 9    sister, who is not here.  What do you think that's going to
10    infer to the jury?                                                   13:39:51
11            So I would ask the Court to preclude her as a risk
12    that you should not take and it's cumulative.
13            THE COURT:  Well, with respect to the cumulative
14    argument, I'll remind the parties that there are 51 counts
15    related to individual ads.  And so I don't find it to be            13:40:08
16    cumulative.  Now, it would be cumulative if the next witness
17    starts referring to ads that other of these witnesses have
18    testified about.  And so it's not cumulative, in my view.
19            There is the potential for the prejudicial statement
20    to come out that the sister is deceased, or what have you, but      13:40:34
21    all counsel have the obligation now, knowing that there's the
22    potential for that prejudice, not to probe the witness on that
23    area.
24            And so she's only offered for the narrow purpose of
25    identifying her sister's ad, watching what her sister's acts        13:40:52
```

UNITED STATES DISTRICT COURT

24

```
 1    were with regard to paying for the ad, receiving cards or
 2    whatnot to pay for those ads.  I think Mr. Berry said something
 3    about watching her meet a person outside of a hotel room or
 4    something of that nature.
 5           And if it relates to the ad that is charged, then it      13:41:15
 6    is relevant.  And so that's how we will proceed with that
 7    witness.
 8           Mr. Feder?
 9           I'm sorry.  Mr. Kessler?
10           MR. KESSLER:  I wasn't going to talk about this, but      13:41:30
11    I -- I have to ask the government whether or not this is one
12    one of the charged ads.  I don't believe it is, but I could be
13    wrong.
14           Is it?
15           MR. BERRY:  Victim 16, Count 24.                          13:41:48
16           MR. KESSLER:  Okay.
17           THE COURT:  All right.
18           MR. KESSLER:  I stand corrected.
19           Your Honor, just following up on Mr. Lincenberg's
20    concerns about sort of gratuitous and unnecessary evidence of    13:41:57
21    underaged prostitution, you know, what -- what's gone, you
22    know, before us is -- is done, but with any upcoming witnesses
23    that have been posters or the sister of a poster, contrary to
24    what Your Honor said, you said we can't do anything about it,
25    about the evidence of the age because they were, in fact, the    13:42:33
```

UNITED STATES DISTRICT COURT

25

```
 1    age that they were when they advertised.

 2          But we can.  We can stop asking, for example, the

 3    witness their age now, what their current age is.  It's

 4    unnecessary.  It's not relevant.  But it does allow the jury to

 5    do the math and determine that this person was underage.          13:42:55

 6          Secondly, we can refrain from questions that are

 7    clearly designed to draw out the fact that they were underage.

 8    For example, did you rent the hotel room?  Well, if she's

 9    underage, she can't, and she's going to tell us that.

10          That's not relevant to anything, other than that she    13:43:17

11    was underaged.  So --

12          THE COURT:  No, I -- you know, let me just stop you

13    there.  I've heard the arguments before, as has the prior

14    Court.  There was a ruling on this with regard to -- and it's

15    the same set of circumstances that necessarily child           13:43:34

16    prostitution is part of this as well and that they're clearly

17    advertisements where people were underage, as here.  And so it

18    is simply part of the case.

19          Now, we can't talk about child trafficking or things

20    of that nature, to the extent that the Court has already        13:43:56

21    admonished the government.  But it is relevant in terms of the

22    time that the ad was posed, the allegations in the indictment.

23          And so if it just so happens to be that one of these

24    individuals who posted the ad was 17 or 16 at the time, those

25    are facts.  And we are to put the facts before the jury so that 13:44:25
```

UNITED STATES DISTRICT COURT

26

```
 1    they can find for themselves what is or is not relevant to the

 2    charges in the indictment.

 3              And so we're going to go forward in the manner in

 4    which I already -- --

 5              MR. KESSLER:  Judge --                                    13:44:43

 6              THE COURT:  -- instructed the parties.

 7              And let's move on to whatever it was you originally

 8    were going to talk about.

 9              MR. KESSLER:  Well, that's -- that's what I was going

10    to talk about.                                                     13:44:52

11              THE COURT:  Okay.  So then we'll --

12              MR. KESSLER:  It's --

13              THE COURT:  We'll reserve whatever else you're going

14    to talk about until the break.  We have a jury that's waiting,

15    and let's move forward.                                            13:45:00

16              MR. KESSLER:  Your Honor, I have -- I get the feeling

17    that there's a disconnect, that -- that the Court is not

18    understanding the point I'm trying to make.

19              They may have been 14 years old when they posted.  We

20    can't change that.  But by asking them what their age is now,     13:45:16

21    I'll -- that just points out.  It's like gratuitous evidence of

22    child prostitution, which I had been led to believe was

23    something we were going to try to mitigate against.

24              THE COURT:  The argument has been made, and it hasn't

25    been lost on me, Mr. Kessler.  There is no disconnect.  There's   13:45:43
```

UNITED STATES DISTRICT COURT

27

```
 1    a prior order that specifically speaks to this.  I've made
 2    numerous oral pronouncements related to it.  And you can
 3    grimace all you want.
 4            MR. KESSLER:  I'm --
 5            THE COURT:  At some point it becomes exhausting, yes,    13:45:59
 6    for me as well.  But I'm going to -- I'll give you the precise
 7    order, I have them all here, the one that addresses this
 8    particular issue.  And I'll have you review it tonight.  And if
 9    you feel differently, if you feel that it says something
10    different, then you can come back and make a record.  But at    13:46:25
11    this juncture we're going to proceed in the way that I have
12    described previously, this morning and last week.  And that's
13    how we are going to proceed.
14            MR. KESSLER:  Very well.  Thank you.
15            THE COURT:  All right.  Let's have our jury in.    13:46:44
16            MR. CAMBRIA:  Could I make one comment?
17            I pulled up my opening, Your Honor.
18            THE COURT:  Okay.
19            MR. CAMBRIA:  And all I said was, "He, along with
20    Mr. Larkin, who you know is deceased, started when they were    13:46:55
21    students."
22            THE COURT:  Well, again --
23            MR. CAMBRIA:  That's it.  Nothing about how deceased
24    or whatever.
25            THE COURT:  Well, who you know is deceased --    13:47:05
```

UNITED STATES DISTRICT COURT

28

```
 1              MR. CAMBRIA:  Yeah.

 2              THE COURT:  -- is the issue.  The jurors, half of them

 3      didn't know that he was deceased.

 4              MR. CAMBRIA:  I don't think that's true at all.

 5              THE COURT:  I do believe so.  I think the voir dire      13:47:15

 6      will show that, Mr. Cambria.

 7              MR. CAMBRIA:  No.

 8              THE COURT:  All rise for the jury.

 9          (Jury present at 1:47 p.m.)

10              THE COURT:  All right.  Please be seated.              13:48:19

11          The jury is welcomed back from the extended lunch.  It

12      has been one of those moments where we had some things to

13      discuss that -- of a legal nature, and so I apologize for

14      keeping you waiting.

15          The government may call its next witness.                 13:48:38

16              MS. PERLMETER:  Thank you.

17          The United States calls Astrid Cervantes.

18              THE COURT:  Ma'am, please come forward to my courtroom

19      deputy here and be sworn.

20              THE COURTROOM DEPUTY:  Please raise your right hand.    13:48:55

21          (ASTRID CERVANTES, a witness herein, was duly sworn or

22      affirmed.)

23              THE COURTROOM DEPUTY:  Thank you.

24          Please proceed to the witness stand.

25              MS. PERLMETER:  May I proceed, Your Honor?             13:49:26
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

29

```
 1              THE COURT:  Yes, you may.
 2                      DIRECT EXAMINATION
 3   BY MS. PERLMETER:
 4   Q.  Good afternoon.
 5   A.  Good afternoon.                                    13:49:30
 6   Q.  Could you please introduce yourself to the members of the
 7   jury.
 8   A.  My name is Astrid Cervantes.
 9   Q.  Can you spell your first name.
10   A.  A-S-T-R-I-D.                                       13:49:38
11   Q.  And your last name.
12   A.  C-E-R-V-A-N-T-E-S.
13   Q.  Where are you from, Ms. Cervantes?
14   A.  Montana, California.
15   Q.  And for those of us unfamiliar, where in California is    13:49:47
16   that?
17   A.  Southern California.
18   Q.  And did you graduate from high school?
19   A.  Yes.
20   Q.  Do you have any licenses?                          13:49:54
21   A.  I have my cosmetology license and my NASM certification for
22   fitness training.
23   Q.  And what kind of work do you do?
24   A.  I'm a fitness trainer part time.
25   Q.  Do you have any children?                          13:50:08
```

ASTRID CERVANTES - DIRECT EXAMINATION

30

1    A.  I have two boys.

2    Q.  Okay.  And how old are you?

3    A.  Me?

4    Q.  Yes.

5    A.  26.                                                    13:50:14

6    Q.  Okay.  What do you like to do in your free time?

7    A.  I like to read.  Exercise mainly.

8    Q.  Ms. Cervantes, have you heard of a web -- the website

9    Backpage.com?

10   A.  Yes.                                                   13:50:27

11   Q.  Now, what is Backpage.com?

12   A.  It's a website, based on my understanding, where you go and

13   advertise --

14         MR. KESSLER:  Objection.  That calls for speculation

15   and lacks foundation.                                      13:50:39

16         THE COURT:  You can lay some foundation.

17         MS. PERLMETER:  Okay.

18         THE COURT:  I'll sustain the objection.

19   BY MS. PERLMETER:

20   Q.  Ms. Cervantes, were you advertised on Backpage.com?    13:50:46

21   A.  Yes.

22   Q.  So what do you know as to -- what do you know -- what --

23   what is Backpage.com?

24   A.  You go and advertise anything you want to sell.

25   Q.  And do you remember -- you told us you were advertised on  13:51:00

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

31

```
 1    Backpage.
 2            Do you remember when you were advertised on
 3    Backpage.com?
 4    A.  You mean what year?
 5    Q.  Yes.  What year or number of years were you advertised on      13:51:13
 6    Backpage.com?
 7    A.  2014, November, through January 2015.
 8    Q.  Okay.  And were you involved in the creation of your
 9    advertisements on Backpage.com?
10    A.  I was never the one posting.                                    13:51:31
11    Q.  I'm sorry?  What did you say?
12    A.  Can you rephrase your --
13    Q.  Sure.
14    A.  -- question?
15    Q.  And when you -- if you could do me a favor.  When you           13:51:38
16    answer the question, if you could please pull the microphone up
17    close to you and try to speak loudly so that we can all hear
18    you.
19            Is that okay?
20    A.  Yeah.                                                           13:51:49
21    Q.  Okay.  Were you involved in the creation of the
22    advertisements that were made for you on Backpage.com?
23    A.  Yes.  I was posted, but --
24    Q.  Okay.
25    A.  -- I never --                                                   13:52:01
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

32

1  Q.  So what I mean is, did you create the ad?  Did you type the

2  words or did you --

3  A.  Never.

4  Q.  Okay.  Do you know what you were advertised for?

5  A.  For trafficking.                                    13:52:13

6  Q.  What does that mean to you?

7  A.  It means an act of -- exchange of money for sex acts.

8  Q.  Now, you said you didn't post your ads.  Who created the

9  advertisements that were advertising you on Backpage.com?

10  A.  Someone named -- that goes by the name L.G.          13:52:33

11  Q.  Anyone else?

12  A.  Star.

13  Q.  Okay.  And are those the names that you know these people

14  as?

15  A.  Yeah.                                                13:52:42

16  Q.  Okay.  So who was L.G.?

17  A.  He was the pimp, mainly.

18  Q.  And what does pimp mean to you?

19  A.  Well, the one that was doing -- he was the guy doing all

20  the trafficking, everything for me.                     13:52:56

21  Q.  Okay.  And who is Star?

22        MS. BERTRAND:  Your Honor, objection.  Move to strike

23  as to prior orders.

24        THE COURT:  Overruled, as the witness has provided a

25  definition.                                             13:53:09

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

33

1    BY MS. PERLMETER:

2    Q.  And who is Star?

3    A.  She was one of the girls that was also being trafficked.

4    Q.  Okay.  And can you tell us what she looked like?

5    A.  She was Caucasian, blonde.                          13:53:22

6    Q.  Okay.  And was she also advertising -- do you know if she

7    was advertising as well on Backpage.com?

8    A.  Yes.

9    Q.  So were you aware that there were photographs -- like were

10   there photographs taken of you to use in the Backpage          13:53:39

11   advertisements?

12   A.  Yeah.

13   Q.  Okay.  Who took those photos?

14   A.  It was both of them, L.G. and Star.

15   Q.  Where were those photos taken?                        13:53:51

16   A.  In a motel room in San Bernardino.

17   Q.  Okay.  Is that in California?

18   A.  Yes.

19   Q.  How did you get to the motel?

20   A.  L.G. picked me up from home and drove me to San Bernardino.  13:54:01

21   Q.  Okay.  Were you given instructions, for example, what

22   clothes to bring for the photos?

23   A.  Yeah.  He told me what to bring.

24   Q.  What clothing did you bring for the purpose of taking

25   photographs?                                             13:54:19

UNITED STATES DISTRICT COURT

ER 13045

ASTRID CERVANTES - DIRECT EXAMINATION

34

1    A.  He told me to bring different pairs of underwears and bra.

2    Basically lingerie.

3    Q.  And then when you got to the motel room, did L.G. and Star

4    take photos of you?

5    A.  Yeah.                                                        13:54:31

6    Q.  And what -- did those photographs, were they later used to

7    post ads for you on Backpage.com?

8    A.  Yeah.

9    Q.  Okay.  Now, I think you told us that you did not write any

10   of the words that went into your advertisements; is that right?  13:54:41

11   A.  Yes, that's correct.

12   Q.  Do you know who did?

13   A.  It was mainly L.G.

14   Q.  Did anybody else write any of the words that went into your

15   ads?                                                             13:54:52

16   A.  I don't remember.

17   Q.  Do you know how L.G. created your ads?  And what I mean is,

18   did -- what kind of device L.G. may have used.

19          MS. BERTRAND:  Objection.  Relevance.

20          THE COURT:  Overruled.                                    13:55:06

21          THE WITNESS:  A cell phone.

22   BY MS. PERLMETER:

23   Q.  And did you happen to see your ad at some point after it

24   was posted on Backpage.com?

25   A.  Yeah.  He showed me.                                         13:55:18

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

35

```
 1   Q.  Okay.  What name did you use on your Backpage.com
 2   advertisements?
 3   A.  He came up with the name Fire.
 4   Q.  And is that the name that you went by when you were posted
 5   on Backpage?                                                    13:55:33
 6   A.  Yes.
 7   Q.  Now, what would happen after your ad on Backpage was
 8   posted?
 9   A.  So basically just wait around for clients to call and text
10   for the service.                                                13:55:50
11   Q.  Okay.  And what do you mean by "client"?
12   A.  Well, that's what we called them, the men that would want
13   to exchange the money for sex.
14   Q.  Okay.  And what do you mean by "service"?
15   A.  Well, that sex is a service.                                13:56:03
16   Q.  Okay.  So who handled the phone calls and the making of the
17   arrangements?
18   A.  Star was answering the phone for me so that -- because I
19   didn't know what to do.  So she'll be the one that was doing
20   all the talking for me.                                         13:56:22
21   Q.  Okay.  So then what would -- would then a -- a client come
22   to -- well, where did the meetings take place, the meetings
23   with the clients?
24   A.  In a hotel room.
25   Q.  Okay.  And, in general, how would you get to these motel    13:56:34
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

36

1  rooms or hotel rooms?

2  A.  Well, L.G. would pick me up from my house, and then we

3  would start as soon as we arrived at the motel.

4  Q.  Okay.  And then once you're in the motel room or the hotel

5  room and the client appears, what happens?                    13:56:58

6  A.  Well, the client would text me saying that he's here, and

7  then everybody, like Star and L.G., would leave the room.

8  Q.  Okay.  Do you know where Star and L.G. would leave when the

9  client arrived?

10  A.  I don't know.                                             13:57:15

11  Q.  Okay.  And then what happened when they left and the client

12  was in the room?

13  A.  Well, I would -- I think I remember I would, like, accept

14  the money first, and then I would text L.G., got money --

15  Q.  Okay.                                                     13:57:35

16  A.  -- so that he'll know.

17  Q.  And what happened after you received the money and texted

18  L.G. that you got the money?

19  A.  Then the service will begin.

20  Q.  Okay.  And is that when you exchanged the sex acts with the  13:57:44

21  client?

22  A.  Yes.

23  Q.  Okay.  And I don't mean to be graphic, but can you just --

24  it's important for the jury to understand what you mean by "sex

25  acts."  So can you just define for us generally what -- what    13:58:00

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

37

1   you -- what that means to you.

2   A.   Sexual intercourse.

3   Q.   What happened after the -- the meeting was over?

4   A.   The client would leave, and I would text L.G. that it's

5   done.                                                        13:58:16

6   Q.   Okay.  After you texted L.G. you were done, what happened

7   after that?

8   A.   Well, he would come back into the room and he held onto the

9   money.

10  Q.   Okay.  You gave him the money?                           13:58:25

11  A.   Yes.

12  Q.   The hotel rooms where these dates took place, did you pay

13  for these rooms?

14  A.   No.

15  Q.   Do you know who did?                                     13:58:36

16  A.   Either Star or L.G.

17  Q.   And where did these dates take place?  Like in, like, what

18  cities?

19  A.   Mainly in San Bernardino, but we also went to Oceanside and

20  a little bit in Apple Valley.                                13:58:52

21  Q.   Okay.  So did L.G. or Star also advertise for you in other

22  places in California?

23  A.   It was mainly on -- outside of California?

24  Q.   No.  In California.  I think you said Oceanside?

25  A.   Yeah.                                                    13:59:09

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

38

1    Q.  Is that in California?

2    A.  Yes.  It's towards --

3    Q.  I --

4    A.  -- San Diego.

5    Q.  Okay.  It's close to San Diego?                          13:59:14

6         Were -- did L.G. or Star ever post or advertise you

7    somewhere other than California?

8    A.  No.

9         Oh, other than California, yes.

10   Q.  Outside of California.  Did they post you in a different  13:59:26

11   city or state?

12   A.  In Arizona.

13   Q.  Okay.

14   A.  Yes.

15   Q.  So they posted an advertisement for you on Backpage in    13:59:33

16   Arizona?

17   A.  Yes.

18   Q.  Okay.  When was this?

19   A.  2015, January -- around the Super Bowl time in January --

20   Q.  Okay.                                                     13:59:47

21   A.  -- 30th.

22   Q.  So in January of 2015, was it towards the end of the month?

23   A.  Yeah.

24   Q.  And where was the Super Bowl taking place?

25   A.  I believe it was Phoenix, Arizona.                        13:59:59

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

39

```
 1    Q.  Okay.  So did L.G. decide that he would come out here with
 2    you and post you on Backpage out here?
 3              MR. CAMBRIA:  Objection.
 4              MS. BERTRAND:  Objection.  Leading.
 5              MR. CAMBRIA:  Leading.                          14:00:14
 6              THE COURT:  Sustained.
 7    BY MS. PERLMETER:
 8    Q.  All right.  Whose idea was it to come out to Arizona and
 9    post Backpage ads here?
10    A.  His idea.                                             14:00:20
11    Q.  Okay.  And do you know why he decided to do that?
12    A.  Well, he thought we would make a lot of money coming here.
13    Q.  Okay.  Ms. Cervantes, do you know someone named Storm?
14    A.  Yes.
15    Q.  Okay.  Who is Storm?                                  14:00:34
16    A.  She was one of the new girls that joined the same weekend
17    when we came out to Arizona.
18    Q.  Okay.  So did you meet -- where did you -- where did you
19    meet Storm, like a -- a few days before you came out to
20    Arizona?                                                  14:00:50
21    A.  I met her the night before we drove out here in Arizona.
22    Q.  Okay.  What does -- what -- what did Storm look like?
23    A.  She was African-American.  And that's all I remember.
24    Q.  Okay.  And when you met Storm, were you and L.G. all still
25    in California?                                            14:01:07
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

40

1   A.  Yeah.

2   Q.  Okay.  How -- and then did you guys all travel together

3   from California to the Phoenix area?

4   A.  Yeah.  All four of us did.

5   Q.  Okay.  And when you said "all four," who were the four          14:01:15

6   people that came from --

7   A.  So me, Storm, L.G., and Star.

8   Q.  Okay.  How did you get out here?

9   A.  L.G. and Star were taking turns driving.

10  Q.  Okay.  Do you know whose car it was?                            14:01:28

11  A.  I'm not sure if it was Star's or L.G.

12  Q.  Okay.  Did you pay for any of the gas?

13  A.  No.

14  Q.  Did you pay for any of the food or snacks you guys may have

15  eaten on the way out?                                              14:01:37

16  A.  No.

17  Q.  When you arrived to Arizona, was it the Phoenix area?

18  A.  I believe so.

19  Q.  Okay.  Where did you go?

20  A.  When we arrived?                                               14:01:49

21  Q.  Yes.

22  A.  In a motel, but I'm not sure which one it was.

23  Q.  Okay.  Was it a motel here in the Phoenix area somewhere?

24  A.  Yeah.

25  Q.  And what happened once you got to the -- this motel?          14:02:00

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

41

```
 1   A.  Firstly, we started setting up our profiles.  But I wasn't
 2   the one setting it up.  It was L.G.
 3   Q.  Okay.
 4   A.  So everybody was just doing their profiles.
 5   Q.  Okay.  What do you mean everybody -- what do you mean by      14:02:14
 6   "profile"?
 7   A.  Their Backpage profile ad.
 8   Q.  Okay.  And you said everyone was doing their profile.  So
 9   who was everyone?
10   A.  Storm was.  Star.  And L.G. was doing mine.                   14:02:23
11   Q.  Okay.  So did L.G. post a Backpage ad of you here in the
12   Phoenix area once you got here?
13   A.  Yeah.
14   Q.  Okay.  And did you do any dates here in Phoenix?
15   A.  I did a few.                                                  14:02:39
16   Q.  Okay.  Did -- where did they take place?
17   A.  In a motel room.
18   Q.  And what happened with the money when you were here in
19   Phoenix?  Was it similar to what would happen in California?
20   A.  Yeah.                                                         14:03:00
21   Q.  Where were -- where was L.G. when you were having your
22   dates?
23   A.  I'm not sure.
24   Q.  Okay.  Do you -- was -- do you know where Star was?
25   A.  Star?                                                         14:03:14
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

42

1   Q.  Yeah.

2   A.  I'm not sure.  She might have been doing her own.

3   Q.  Okay.  And how about Storm?  Do you know where she was?

4   A.  No.

5   Q.  Okay.  Did you eventually move to a different motel?        14:03:22

6   A.  Yes.

7   Q.  And when was that?

8   A.  When?

9   Q.  Yeah.

10  A.  I think it was the next day.  The next --                   14:03:28

11  Q.  Okay.

12  A.  -- morning, I believe.

13  Q.  So the next day you switched to a different motel?

14  A.  Yeah.

15  Q.  And then were there more Backpage ads or the same ads still  14:03:38

16  being used to advertise you?

17  A.  Yeah.

18  Q.  Okay.  Did -- did you learn that there was a client who

19  wanted a two girl special?

20          MS. BERTRAND:  Objection.                                14:03:54

21          THE WITNESS:  Yes.

22          MS. BERTRAND:  Leading.

23          THE COURT:  Sustained.

24  BY MS. PERLMETER:

25  Q.  Okay.  Did you learn about a particular date that a client   14:03:57

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

43

```
 1    requested in the second motel?
 2              MS. BERTRAND:  Same objection.  Leading.
 3              THE COURT:  Sustained.
 4    BY MS. PERLMETER:
 5    Q.  What happened in the second motel?                        14:04:14
 6    A.  Well, I think we just -- we just got there, right, and I
 7    think somebody requested a two girl special.
 8    Q.  Okay.
 9    A.  Looking for a threesome.
10              So I don't know whose phone it might have been.  It  14:04:28
11    wasn't -- I don't know if it was mine or Storm's.
12              MS. BERTRAND:  Your Honor, objection to this line of
13    questioning as to relevance and 403.
14              THE COURT:  Overruled.  I'll give Ms. Perlmeter
15    limited leeway.                                               14:04:42
16    BY MS. PERLMETER:
17    Q.  And what was your understanding as to what was -- what was
18    expected of you for this client?
19              MS. BERTRAND:  Same objection.
20              THE COURT:  Overruled.                              14:04:51
21    BY MS. PERLMETER:
22    Q.  You can answer, if you know.
23    A.  Can you repeat it?
24    Q.  Sure.
25              What was -- what was the -- what did you think was   14:04:59
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

44

```
 1    expected of you in regards to this client who wanted the

 2    threesome?

 3    A.  Well, basically the same thing, I guess, as having a

 4    service.

 5    Q.  Okay.  Having a service with you?              14:05:16

 6    A.  And Storm.

 7    Q.  And Storm.  Okay.

 8          So was she -- was Storm with you in the motel when --

 9    on that second day?

10    A.  Yeah.                                          14:05:28

11    Q.  Okay.  Did somebody show up -- did somebody show up for

12    this date?

13    A.  Yes.

14    Q.  And did the person who showed up turn out to be an

15    officer working undercover?                        14:05:40

16    A.  Yes.

17    Q.  Okay.  And after that, did you stop working for L.G.?

18    A.  Yeah.

19    Q.  Okay.  And during this time that you were with L.G., did

20    you observe him to have any legitimate form of employment?  14:05:53

21          MS. BERTRAND:  Objection.  Calls for speculation.

22          THE COURT:  Overruled.

23          She can answer if she has knowledge.

24          THE WITNESS:  Can you repeat that?

25      ///
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

45

1    BY MS. PERLMETER:

2    Q.  During the time that you were with L.G., did you observe

3    him to have any legitimate form of employment?

4           MR. FEDER:  Relevance.

5           THE WITNESS:  He did not.                                    14:06:13

6           THE COURT:  Overruled.

7           MS. PERLMETER:  Okay.

8           THE COURT:  The answer will stand.

9    BY MS. PERLMETER:

10   Q.  Now, Astrid, I want to show you a few exhibits that have        14:06:23

11   already been admitted.

12          MS. PERLMETER:  I'm showing the witness Exhibit 217a,

13   which is in evidence.

14          THE COURTROOM DEPUTY:  Ms. Perlmeter, are you

15   connected?                                                          14:06:46

16          THE COURT:  It doesn't appear you're connected.

17          MS. PERLMETER:  Oh.

18   BY MS. PERLMETER:

19   Q.  Ms. Cervantes, do you see the exhibit?

20   A.  Yeah.                                                           14:07:15

21   Q.  Okay.  What is the date of this posting?

22   A.  January 29th, 2015.

23   Q.  And where was it posted?

24   A.  Inland Empire.

25   Q.  Okay.  Where is the Inland Empire?  Do you know?               14:07:39

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

46

```
 1    A.   San Bernardino County, California.

 2    Q.   I'm going to scroll down a few pages.  I'm going to show

 3    you a series of photographs; one, two, three, four.

 4         Do you recognize the person in these photos?

 5    A.   Yes.                                                      14:08:06

 6    Q.   Who is it?

 7    A.   Storm.

 8         MS. PERLMETER:  Okay.  I'm showing the witness Exhibit

 9    Number 217, which is in evidence.

10    BY MS. PERLMETER:                                              14:08:20

11    Q.   Ms. Cervantes, where was this exhibit posted?

12    A.   In Phoenix.

13    Q.   And on what day was it posted?

14    A.   January 31st.

15    Q.   And what year?                                           14:08:41

16    A.   2015.

17    Q.   Is this when you were in Phoenix for the Super Bowl?

18    A.   Yes.

19    Q.   I'm going to scroll down and show you the photos.

20         Do you recognize the person in these pictures?          14:08:58

21    A.   Yes.

22    Q.   Who is it?

23    A.   It's Storm.

24    Q.   Now I'm going to show you Exhibit 215a, which is also in

25    evidence.                                                     14:09:28
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

47

```
 1          Can you tell me what date this was posted?
 2    A.   November 23rd, 2014.
 3    Q.   And in what city was this ad posted in?
 4    A.   San Diego.
 5    Q.   Okay.  I'm going to scroll through, and I'd like you to      14:09:53
 6    please take a look at the photos.
 7          Do you recognize the person in these pictures?
 8    A.   Yes.
 9    Q.   Who is it?
10    A.   Me.                                                          14:10:11
11    Q.   Okay.  Are these the photos that you were telling us about
12    earlier that L.G. took of you in the motel?
13    A.   Yeah.
14    Q.   Okay.  I'm showing you Exhibit 215, which has also been
15    admitted into evidence.                                          14:10:29
16          Astrid, can you tell us what date that this ad was
17    posted?
18    A.   January 31st, 2015.
19    Q.   And in what city was the ad posted in?
20    A.   Phoenix.                                                     14:10:47
21    Q.   Okay.  Is this when you traveled with L.G. and Star and
22    Storm from California to Phoenix for the Super Bowl?
23    A.   Yeah.
24    Q.   If you could also briefly look at these photos, and let me
25    know if you recognize who that person is.                        14:11:02
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

48

```
 1           Do you recognize the person in the photos?
 2    A.  Yeah.
 3    Q.  Who is it?
 4    A.  It's me.
 5    Q.  Okay.  Astrid, just a couple more questions for you.      14:11:16
 6           I want to ask you if you know any -- I'm going to
 7    ask -- I'm going to give you a couple names, and I'm going to
 8    ask you if you know any of them.  Okay?
 9           Do you recognize any -- do you know anyone named
10    Michael Lacey?                                                 14:11:36
11    A.  No.
12    Q.  Do you know anyone named Scott Spear?
13    A.  No.
14    Q.  Do you know anyone named Jed Brunst?
15    A.  No.                                                        14:11:42
16    Q.  How about Andrew Padilla?
17    A.  No.
18    Q.  And how about Joye Vaught?
19    A.  No.
20    Q.  Okay.                                                      14:11:45
21           MS. PERLMETER:  Okay.  No further questions for the
22    witness, Your Honor.
23           THE COURT:  All right.  Who is cross-examining this
24    witness?
25           Mr. Eisenberg.  I see you're at the ready.             14:11:57
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - CROSS-EXAMINATION

49

```
 1          May I proceed, Your Honor?

 2          THE COURT:  Yes, you may.

 3                    CROSS-EXAMINATION

 4   BY MR. EISENBERG:

 5   Q.  Good morning -- good afternoon.                    14:12:09

 6   A.  Good afternoon.

 7   Q.  I represent Mr. Padilla, the gentleman to my left.

 8          You have never seen him before today, I take it?

 9   A.  No.

10   Q.  Ms. Cervantes, you have indicated that you didn't actually   14:12:19

11   post the ad.  Somebody else did; is that correct?

12   A.  Correct.

13   Q.  And you didn't pay for the ads.  Somebody else did;

14   correct?

15   A.  Right.                                             14:12:37

16   Q.  And that you didn't take the photographs that we've seen of

17   yourself.  Somebody else did; is that correct?

18   A.  Right.

19   Q.  And that when you got money and money you gave -- you gave

20   to, is it L.G.?                                        14:12:56

21   A.  Yeah.

22   Q.  Is L.G. also known as Jerome?

23   A.  He is.

24   Q.  And when you gave the money to Jerome, you don't know what

25   he did with it; correct?                              14:13:05
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - CROSS-EXAMINATION

50

```
1   A.  I have no idea.

2   Q.  Okay.  As far as you know, though, he didn't pay Backpage

3   except for the ad; is that right?

4   A.  I'm -- I'm guessing.

5   Q.  Well, we don't want you to guess, so --                    14:13:19

6   A.  Well, I don't know the answer.

7   Q.  Okay.  That's fine.

8         Now, when you came out here during Super Bowl time,

9   you came out with a couple of other people; correct?

10  A.  Yeah.                                                      14:13:29

11  Q.  And then there came a time when an ad was posted; correct?

12  A.  Correct.

13  Q.  And that ad -- one of the ads is number 215.

14        MR. EISENBERG:  May we have that back up on the

15  monitor again?                                                 14:13:43

16  BY MR. EISENBERG:

17  Q.  Ma'am, do you recognize this ad?

18  A.  Yes.

19  Q.  That ad is -- this is you; is that correct?

20  A.  Yeah.                                                      14:13:50

21  Q.  And in this first picture, ma'am, would you agree with me

22  you're fully clothed, aren't you?

23  A.  Yeah.

24  Q.  And would you agree with me in all of the other pictures

25  you are fully clothed; right?                                  14:14:03
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - CROSS-EXAMINATION

51

```
 1    A.   Right.
 2    Q.   There's no place in this ad where it says "sex for money,"
 3    is there?
 4    A.   Well, I don't know.  I've never even wrote it, so --
 5    Q.   Okay.                                                      14:14:14
 6    A.   -- whatever it is, I didn't -- I didn't even know about it.
 7    Q.   I -- I understand that.
 8            But if you look at the ad, in no place does it say
 9    "sex for money," does it?
10    A.   No.                                                        14:14:25
11    Q.   Okay.  Now, my understanding -- excuse me.
12            You weren't forced to work this type of work, were
13    you?
14    A.   Well, I was in -- already stuck in this situation with this
15    guy.  So, I mean, it was consensual, but it was also            14:14:44
16    uncomfortable for me to do.
17    Q.   I understand that.  But you weren't forced to do it, were
18    you?
19            MS. PERLMETER:  Objection.
20            THE WITNESS:  No.                                       14:14:56
21            MS. PERLMETER:  Relevance.
22            THE COURT:  Sustained.
23    BY MR. EISENBERG:
24    Q.   You weren't brought to Phoenix against your will, were you?
25            MS. PERLMETER:  Objection.  Relevance.                  14:15:05
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - CROSS-EXAMINATION

52

```
 1           MR. EISENBERG:  Your Honor, it goes to --

 2           THE COURT:  I'll permit him some leeway.

 3   Mr. Eisenberg can have a little leeway.

 4           MR. EISENBERG:  Thank you, Your Honor.

 5           THE COURT:  You may answer the question.        14:15:17

 6   BY MR. EISENBERG:

 7   Q.  You weren't forced to come to Phoenix, were you?

 8   A.  No.

 9   Q.  And with respect to all of the other postings and issues --

10   I'm sorry.  Let me revise that.                          14:15:26

11           All of the other visitations, can I use that word, by

12   johns, you weren't forced to do that either, were you?

13   A.  No.

14           MR. EISENBERG:  Thank you, ma'am.

15           That's all I have, Your Honor.                   14:15:37

16           THE COURT:  All right.  Anyone else from defense?

17           Mr. Cambria?

18           MR. CAMBRIA:  No, Your Honor.

19           THE COURT:  Ms. Bertrand?

20           MS. BERTRAND:  No, thank you.                    14:15:46

21           THE COURT:  Mr. Lincenberg?

22           MR. LINCENBERG:  No, Your Honor.

23           THE COURT:  Mr. Kessler or Mr. Feder?

24           MR. FEDER:  No, thanks.

25           THE COURT:  All right.  Ms. Perlmeter, any redirect?  14:15:52
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - CROSS-EXAMINATION

53

| 1 | MS. PERLMETER:  No, Your Honor. |
|---|---|
| 2 | THE COURT:  May the witness be excused from subpoena? |
| 3 | MS. PERLMETER:  Yes. |
| 4 | THE COURT:  Any objection from the defense? |
| 5 | MR. EISENBERG:  No, Your Honor. |

14:16:05

MR. KESSLER:  No.

THE COURT:  And, ma'am, we thank you for your
testimony.  You are released from your subpoena, and you may
step down.

THE WITNESS:  Thank you, Your Honor.          14:16:13

THE COURT:  Call your next witness.

MS. PERLMETER:  The next witness is Andrea Benson.

THE COURT:  Ma'am, please come forward and be sworn by
my courtroom deputy.

THE COURTROOM DEPUTY:  Please raise your -- please      14:17:03
raise your right hand.

    (ANDREA BENSON, a witness herein, was duly sworn or
affirmed.)

THE COURTROOM DEPUTY:  Please step over to the witness
stand.  Thank you.                          14:17:18

MS. PERLMETER:  May I proceed, Your Honor?

THE COURT:  You may.

MS. PERLMETER:  Okay.

    ///

    ///

UNITED STATES DISTRICT COURT

ER 13065

ANDREA BENSON – DIRECT EXAMINATION

54

| | |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MS. PERLMETER: |
| 3 | Q. Good afternoon. |
| 4 | Could you please introduce yourself to the jury. |
| 5 | A. Andrea Benson. |
| 6 | Q. Okay. Please spell your first name and then your last |
| 7 | name. |
| 8 | A. A-N-D-R-E-A, B-E-N-S-O-N. |
| 9 | Q. And, Ms. Benson, do you have a little bit of a cold today? |
| 10 | A. I do, yes. |
| 11 | Q. Okay. So just for the safety of all of us in the |
| 12 | courtroom, could you please put a mask on. |
| 13 | A. Yes. I just have to put a cough drop in my mouth, too. |
| 14 | Q. Okay. And there's also a cup of water at the table if you |
| 15 | need it. |
| 16 | A. Thank you. |
| 17 | Q. All right. Ms. Benson, where -- where are you traveling |
| 18 | from today? |
| 19 | A. The Bay area. |
| 20 | Q. Okay. And is that where you live? |
| 21 | A. Yes, it is. |
| 22 | Q. Okay. And how far did you get in school? |
| 23 | A. I have my master's degree. |
| 24 | Q. Okay. What did you get your undergraduate in? |
| 25 | A. Psychology. |

Timestamps:
- 14:17:39 (line 5)
- 14:17:49 (line 10)
- 14:18:03 (line 15)
- 14:18:17 (line 20)
- 14:18:27 (line 25)

UNITED STATES DISTRICT COURT

ANDREA BENSON – DIRECT EXAMINATION

55

```
 1   Q.  Okay.  And what is your master's in?

 2   A.  Sport and performance psychology.

 3   Q.  Okay.  Are you working currently?

 4   A.  I'm on maternity leave currently.

 5   Q.  Okay.  Did you recently have a baby?          14:18:37

 6   A.  I did.

 7   Q.  Okay.  When you were working, what type of work do you do?

 8   A.  I did finance for about six years, and then I went into

 9   personal training, got my master's, and now I'm in staffing.

10   Q.  Okay.  And how old are you, Ms. Benson?        14:18:53

11   A.  33.

12   Q.  Okay.  Have you ever heard of a website called

13   Backpage.com?

14   A.  Yes, I have.

15   Q.  And what is Backpage.com?                      14:19:01

16   A.  Classifieds and escort ads.

17   Q.  Okay.  And what are escort ads to you in relation to

18   Backpage.com?

19   A.  Escort ads are used to sell sex.

20   Q.  Okay.  Have you ever been advertised on Backpage.com?  14:19:14

21   A.  Yes, I have.

22   Q.  Can you tell us what year or years you were posted on

23   Backpage?

24   A.  I would say November or December of 2012 through March of

25   2015.                                             14:19:29
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

56

1   Q.   Okay.  What were you advertised for on Backpage?

2   A.   Sexual acts.

3   Q.   Okay.  Did you create your ads, or were your ads created by

4   somebody else, or both?

5   A.   Both.                                                    14:19:43

6   Q.   Okay.  Let's talk about the time when your advertisements

7   were being created by somebody else first.  Okay?

8   A.   (No audible response.)

9   Q.   Do you know somebody named Michael Knight?

10  A.   I do.                                                    14:19:56

11  Q.   Okay.  And who is he?

12  A.   He was my pimp.

13  Q.   Okay.  And is he the person that was creating ads for you

14  on Backpage?

15  A.   Yes, he was.                                             14:20:05

16  Q.   Okay.  Do you know where -- in what cities or where he was

17  posting you on Backpage?

18  A.   The Portland, Oregon, area, and Salem, Oregon, area.

19  Q.   Okay.  And what would happen when Mr. Knight would post an

20  advertisement for you on Backpage?                           14:20:28

21  A.   I would start receiving phone calls and text messages for

22  my services.

23  Q.   Okay.  And did Mr. Knight have other females working for

24  him at this same time?

25  A.   Yes.  He had five to six other girls.                   14:20:39

UNITED STATES DISTRICT COURT

ANDREA BENSON – DIRECT EXAMINATION

57

```
 1    Q.  Okay.  And what were they doing?  Were they doing the same
 2    thing as you?
 3    A.  Yes, they were.
 4    Q.  Okay.  Did the advertisements that Mr. Knight posted for
 5    you on Backpage include any photos?                              14:20:55
 6    A.  Yes, they did.
 7    Q.  Did you happen to see the ads that Mr. Knight posted for
 8    you?
 9    A.  I did at some point.  Not initially.
10    Q.  Okay.  But when they were being posted, how did those        14:21:04
11    photographs -- like, when were those photographs taken?
12    A.  Those photographs were taken in November of 2012.
13    Q.  Okay.  Where were they taken?
14    A.  They were taken in our home and a hotel.
15    Q.  Okay.  And were you provided any instructions on what to     14:21:22
16    wear or how to pose, for example?
17    A.  Yes, I was.
18    Q.  And how -- and what were you told to wear?
19    A.  Sometimes I would wear provocative clothing, and there are
20    also photos of me not wearing any clothing.                      14:21:34
21    Q.  Okay.  Were you at this point part of the drafting on which
22    words or what text would be included in your ad?
23    A.  No.
24    Q.  Okay.  And who was in charge of that?
25    A.  Michael was.                                                 14:21:48
```

UNITED STATES DISTRICT COURT

ANDREA BENSON – DIRECT EXAMINATION

58

1   Q.  Okay.  Did you have a particular name that you used, or did

2   you use your real name when Mr. Knight was posting these ads?

3   A.  I used the name Rachel.

4   Q.  Okay.  Did you pay for the Backpage ads at this point in

5   time?                                                    14:22:04

6   A.  No, I did not.

7   Q.  Okay.  Do you know who did?

8   A.  Michael did.

9   Q.  Okay.  And then once the ads went live, you said that the

10  phone would start ringing.  And then what would you do at that   14:22:13

11  point, if anything?

12  A.  I would answer the phone.

13  Q.  Okay.  What was Mr. Knight doing?

14  A.  He would answer text messages.

15  Q.  Okay.  And so when you answered the phone, what -- what   14:22:23

16  were you having conversations about, generally?

17  A.  We were having conversations about the sexual services that

18  I would provide and how much those would cost.

19  Q.  Okay.  And then after those conversations, what would

20  happen next?                                              14:22:39

21  A.  They would come to my hotel.

22  Q.  Okay.  And did you guys use -- go to different hotels on

23  different days?

24  A.  Yes, we did.

25  Q.  Okay.  So what would happen when a -- when -- when a john   14:22:49

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

59

```
 1   would come to the hotel?
 2   A.  He'd knock on the door.  I would let him in.  I would ask
 3   for the donation, which is the -- the payment.  And then I
 4   would take it into the bathroom to count it, hide it, and then
 5   we would proceed with performing whatever sexual acts they had       14:23:08
 6   asked for.
 7   Q.  Okay.  And where was Mr. Knight when this was happening?
 8   A.  Either the car or the lobby.
 9   Q.  Okay.  After the act was over or after the date was over --
10   before we go there, let me just ask you, so that the jury           14:23:30
11   understands, what sexual acts mean to you.
12        What would happen -- what would you do with the johns
13   that came to the hotel room after they gave you money?
14   A.  Oral sex or vaginal sex.
15   Q.  Okay.  And then after that was completed, did the john          14:23:45
16   leave?
17   A.  Yes.
18   Q.  And then did you ask Mr. Knight to come back to the room?
19   A.  Yes, I did.
20   Q.  And then what would happen with the money?                      14:23:54
21   A.  He would take the money with him.
22   Q.  Okay.  Do you know -- or did you pay for these hotel rooms
23   when you were with Mr. Knight?
24   A.  No, I did not.
25   Q.  Okay.  Do you know who did pay for them?                        14:24:16
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

60

1   A.   He did.

2   Q.   Okay.  Did you observe Mr. Knight having a legitimate

3   source of employment during the time that you were with him?

4        MS. BERTRAND:  Objection.

5        THE WITNESS:  No.                                      14:24:26

6        MS. BERTRAND:  Speculation.

7        THE WITNESS:  This was --

8        THE COURT:  Overruled.  She can testify as to what she

9   observed.

10  BY MS. PERLMETER:                                           14:24:32

11  Q.   Did you observe Mr. -- during the time that you were with

12  him whether Mr. Knight had any legitimate form of employment?

13  A.   No.  We were always together, and he did not do anything

14  else.

15  Q.   Okay.  So how did he pay for the Backpage ads?          14:24:42

16  A.   With his debit card.

17  Q.   Okay.  And where did the money come from that went into his

18  debit card?

19  A.   From me.

20  Q.   Okay.  And was it from the -- the dates that you were going  14:24:52

21  on?

22  A.   Yes, it was.

23  Q.   About how long did -- did -- were you working for

24  Mr. Knight?

25  A.   Four months.                                           14:25:02

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

61

```
 1    Q.  Okay.  And at some point did you stop working for him?

 2    A.  Yes, I did.

 3    Q.  Do you remember when that was?

 4    A.  It was in March of 2013, March 19th.

 5    Q.  Okay.  And was that the day when a john -- what -- who you    14:25:14

 6    thought was a john came to a hotel to have sex with you?

 7    A.  Yes.

 8    Q.  And that person ended up being an undercover police

 9    officer?

10    A.  Yes.                                                         14:25:29

11    Q.  And after that day, did you stop working for Mr. Knight?

12    A.  Yes.

13    Q.  What city were you in when this happened?

14    A.  Portland.

15    Q.  Okay.  Is that in Oregon?                                    14:25:37

16    A.  Yes.

17    Q.  Okay.  After you stopped working for Mr. Knight, did you

18    continue to have ads posted on Backpage?

19    A.  Yes, I did.

20    Q.  Okay.  And who was posting at this point?                    14:25:49

21    A.  I was.

22    Q.  Okay.  Now, with Mr. Knight, you did not post ads.  So how

23    did you learn how to create an advertisement for yourself on

24    Backpage?

25    A.  By looking at my old ads and looking at other girls' ads.    14:26:03
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

62

```
 1    Q.  Okay.  How were you able to find your old ads on
 2    Backpage.com?
 3    A.  Looking for my phone number.
 4    Q.  Okay.  So how did -- like, can you tell the jury how that
 5    worked?  How did you use your phone number to find other ads          14:26:17
 6    that were on Backpage for you?
 7    A.  You just type it into Google.
 8    Q.  Okay.  Okay.  And what kind of pictures did you use at this
 9    point when you were creating your own ads?
10    A.  Provocative and nude pics --                                      14:26:35
11    Q.  Okay.
12    A.  -- pictures as well.
13    Q.  Were they of you?
14    A.  Sometimes they were; sometimes they weren't.
15    Q.  Okay.  What cities did you post in?                               14:26:43
16    A.  I posted in the Portland area, the Seattle/Tacoma area, and
17    the San Francisco Bay area.
18    Q.  Okay.  And did you use your real name when posting ads on
19    Backpage?
20    A.  No, I did not.                                                    14:26:58
21    Q.  Okay.  Why not?
22    A.  It was not safe to do so.
23    Q.  Okay.  What's -- what section on Backpage were you posting
24    in at this time?
25    A.  I believe it was called the escort section.                      14:27:07
```

UNITED STATES DISTRICT COURT

ANDREA BENSON – DIRECT EXAMINATION

63

```
 1    Q.   Okay.  And what was the purpose of your advertising on

 2    Backpage?  What were you selling?

 3    A.   I was selling myself.

 4    Q.   Okay.

 5    A.   Sex.                                                    14:27:18

 6    Q.   Now, were your ads, did they -- did you phrase your

 7    advertisements so that there were words in the ad that were

 8    very explicitly stating that you were selling sexual services

 9    for money?

10         MS. BERTRAND:  Objection.  Leading.                     14:27:33

11         MR. FEDER:  Leading.

12         THE COURT:  What was -- I'm sorry, Mr. Feder.  What

13    did -- what was your objection?

14         MR. FEDER:  Probably the same one that Ms. Bertrand

15    said.                                                        14:27:48

16         THE COURT:  Oh.

17         MR. FEDER:  Leading.

18         THE COURT:  Sustained.

19         MS. PERLMETER:  Okay.

20         THE COURT:  You can rephrase.                           14:27:51

21    BY MS. PERLMETER:

22    Q.   Did your advertisements on Backpage say, I'm going to have

23    sex with you if you give me money?

24    A.   No.

25         MR. FEDER:  Leading.                                    14:27:58
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

64

```
 1            THE COURT:  Sustained.

 2            MS. PERLMETER:  Okay.

 3    BY MS. PERLMETER:

 4    Q.  Were you -- was your intent to advertise a prostitution ad

 5    on Backpage?                                              14:28:09

 6            MR. CAMBRIA:  I object to that.

 7            THE WITNESS:  Yes.

 8            MS. BERTRAND:  And relevance.

 9            THE COURT:  I'm sorry.  I thought I heard Mr. Cambria

10    say something.                                           14:28:20

11            MR. CAMBRIA:  I did, Your Honor.  I think that --

12            THE COURT:  What was the form of the objection?

13            MR. CAMBRIA:  The objection is that it's irrelevant

14    and it's speculative.

15            MR. FEDER:  And leading.                          14:28:26

16            Bruce Feder.

17            THE COURT:  Well, I'll sustain the leading objection.

18    BY MS. PERLMETER:

19    Q.  Okay.  What kind of ads were you creating for yourself on

20    Backpage?  Like what were you -- what services were you trying  14:28:35

21    to sell?

22    A.  I was trying to sell sex.

23    Q.  Okay.  And how did you do that?  Can you tell us what words

24    you used and -- and maybe how you create -- designed your ad?

25    A.  Yes.  I used words like busty, young, freaky, eager to      14:28:48
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

65

1    please.  Words that clearly were advertising sex.

2    Q.  Okay.  Did you use the word "sex"?

3    A.  No.

4    Q.  How come?

5    A.  That would not be allowed.                          14:29:02

6    Q.  Okay.  What would happen if you -- did you ever try just

7    typing out "sex"?

8    A.  No.

9    Q.  Okay.  When -- are you familiar with, like, words that --

10   like in -- words that are coded words for prostitution?   14:29:16

11   A.  Yes.

12   Q.  What are some examples?

13   A.  So you may say "roses" for the amount of money, because

14   you're not allowed to use dollar signs.  Or you may say

15   "donation."  There's words that are, like, acronyms for certain  14:29:33

16   services, like your menu.  So the letters BB would stand for

17   bareback, meaning not having to use a condom.

18   Q.  All right.  And are these words that you learned through

19   the process of posting on Backpage?

20   A.  Yes.                                                  14:29:53

21   Q.  Okay.  While you were advertising yourself, did you observe

22   that the ad that you were creating was not necessarily the one

23   that ended up being posted live?

24   A.  Yes.

25   Q.  What did you see?                                     14:30:07

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

66

1    A.  I would see photos that I had put in my ad initially not be

2    posted, or words switched or removed.

3    Q.  Okay.  Did that result in -- did you still receive callers

4    in response to your ad?

5    A.  Yes.                                                              14:30:26

6    Q.  Okay.  Did you ever receive communications from Backpage

7    that what you were posting was not permissible?

8    A.  No.

9    Q.  Okay.  Did you ever get a notice from Backpage that your

10   photo, for example, was not allowed?                                  14:30:41

11   A.  No.

12   Q.  Did you ever receive any messages from Backpage that you

13   were violating any terms of use?

14   A.  No.

15   Q.  Did you give any -- did you receive any communications from       14:30:51

16   Backpage that, hey, if you continue posting certain photos,

17   then we're going to ban you from the website?

18          MS. BERTRAND:  Objection.  Leading.

19          THE COURT:  Overruled.

20   BY MS. PERLMETER:                                                     14:31:11

21   Q.  You can answer.

22   A.  No.

23   Q.  Okay.  All right.  Ms. Benson, I'm going to show you an

24   exhibit.  It's already in evidence.  It's 1546.

25          Do you recognize the exhibit?                                  14:31:38

UNITED STATES DISTRICT COURT

ANDREA BENSON – DIRECT EXAMINATION

67

 1   A.   Yes, I do.

 2   Q.   And what is it?

 3   A.   That's the ad that was posted on the day that the

 4   undercover sting happened.

 5   Q.   Okay.  And can you tell us what date that was?                    14:31:59

 6   A.   March 19th, 2013.

 7   Q.   Okay.  And was it posted in Portland, where the undercover

 8   officer showed up?

 9   A.   Yes.

10   Q.   Do you recognize the photos in the ad?                            14:32:09

11   A.   I do.

12   Q.   Who are they of?

13   A.   They're of me.

14   Q.   Okay.  I want to ask you some questions about the words in

15   the ad.                                                                14:32:36

16        Is this -- is this one of the advertisements from your

17   time with Mr. Knight?

18   A.   Yes, it is.

19   Q.   Okay.  And you were going by the name Rachel at the time?

20   A.   Yes.                                                              14:32:46

21   Q.   Now, are there indicators in this -- what language in this

22   ad suggests to you that this is an advertisement for

23   prostitution?

24   A.   Busty.  Round booty.  Freaky.  Satisfaction.  A real

25   pleaser.                                                               14:33:05

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

68

1   Q.  Do you see a telephone number in the ad?

2   A.  I do.

3   Q.  Do you see how there's a combination of numbers and letters

4   used to list out the phone number?

5   A.  Yes.                                                    14:33:24

6   Q.  Did you also, when you were posting yourself, type your

7   phone number in this way?

8   A.  Yes.

9   Q.  Why would you do that?

10  A.  So that the police can't track your ads as easily.       14:33:32

11  Q.  Okay.  So when you -- when you said you were looking at --

12  when you were telling the jury earlier about looking for old

13  ads on Backpage, did you search in this way or did you search

14  them in a different way?

15  A.  I searched in this way.                                  14:33:50

16  Q.  Okay.  But if you did not know that that's the way it

17  looked, would it be more difficult to search a phone number?

18  A.  It would.

19  Q.  Okay.  And, Ms. Benson, it says that you're well reviewed

20  in your ad.                                                  14:34:10

21         At this time, in March of 2015 -- 2015, did you know

22  that you had reviews?

23  A.  I did not.

24  Q.  Okay.  Did you learn at some point -- or let me ask you

25  this:  Do you now know about something -- a website called The  14:34:28

UNITED STATES DISTRICT COURT

ANDREA BENSON - DIRECT EXAMINATION

69

1   Erotic Review?

2   A.   Yes.

3   Q.   What is The Erotic Review to you?

4   A.   Website where johns review their sexual experiences with

5   escorts.                                                          14:34:39

6   Q.   And at the time of the undercover, you know, sting, did you

7   know that you had reviews on The Erotic Review, whether or not

8   you did?

9           MR. FEDER:  Objection.  Leading.

10          THE WITNESS:  I didn't.                                    14:34:52

11          THE COURT:  Well, I think she rephrased to "whether or

12   not you did."

13          So in that context, the answer -- excuse me -- the

14   witness may answer.

15          THE WITNESS:  I did not know until the undercover         14:35:02

16   police told me.

17          MS. PERLMETER:  Okay.

18          MR. FEDER:  Objection.  Hearsay.  Move to strike.

19          THE COURT:  Sustained.

20          And the jury will disregard the last statement of the    14:35:10

21   witness.

22   BY MS. PERLMETER:

23   Q.   Okay.  So don't tell me what somebody else told you.  But

24   did you learn at a later point that you had a profile on The

25   Erotic Review?                                                   14:35:21

UNITED STATES DISTRICT COURT

```
 1              MR. FEDER:  Calls for hearsay.
 2              THE COURT:  Overruled.
 3              She can answer --
 4              THE WITNESS:  Yes.
 5              THE COURT:  -- if she learned.                14:35:26
 6   BY MS. PERLMETER:
 7   Q.  What did you say?
 8   A.  Yes.
 9   Q.  Okay.  Did you actually -- have you ever gone on The Erotic
10   Review to view your -- to see what your profile may look like?  14:35:32
11   A.  No.
12   Q.  Okay.  So is it -- so this might seem silly, but did you
13   create any profile on The Erotic Review for yourself?
14   A.  No.
15   Q.  Okay.  Did you know that Backpage had a business           14:35:58
16   relationship with The Erotic Review?
17              MS. BERTRAND:  Objection.
18              THE WITNESS:  No.
19              MS. BERTRAND:  Leading.
20              THE COURT:  Sustained.                        14:36:07
21   BY MS. PERLMETER:
22   Q.  Okay.  Did you at some time stop posting advertisements on
23   Backpage?
24   A.  Yes.
25   Q.  Okay.  And was that in, I think you told us earlier, March  14:36:15
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

71

```
 1   of 2015?

 2   A.  Yes.

 3        MS. PERLMETER:  Okay.  Nothing further at this time.

 4   Thank you.

 5        THE COURT:  All right.  Mr. Eisenberg?              14:36:27

 6                   CROSS-EXAMINATION

 7   BY MR. EISENBERG:

 8   Q.  Good afternoon, Ms. Benson.

 9   A.  Hello.

10   Q.  You needn't be afraid.  I'm Dave Eisenberg.  I represent   14:36:52

11   Andrew Padilla, the gentleman to my left.

12        You've never met him, have you?

13   A.  No.

14   Q.  In fact, you haven't heard the name, perhaps, until this

15   case began; is that correct?                          14:37:04

16   A.  Correct.

17   Q.  There are several other people seated here up at counsel

18   table on the defense side.  There's -- well, do you recognize

19   any of them?

20   A.  I do recognize them.                              14:37:17

21   Q.  Who?

22   A.  The guy with the glasses.

23   Q.  Who is that?

24   A.  Is that Larkin?

25   Q.  And where do you recognize him from?              14:37:28
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

72

1    A.  Since the case has happened, I've --

2    Q.  Oh, okay.

3    A.  I don't live under a rock, so ...

4    Q.  All right.  But, I mean, by the time you were posting ads,

5    you didn't have any of the dealings with any of the people on    14:37:39

6    this side of the courtroom, did you?

7    A.  No.

8    Q.  When did you graduate from college, ma'am?

9    A.  2011.

10   Q.  So that was before the ads began being posted --    14:37:48

11   A.  Yes.

12   Q.  -- is that correct?

13   A.  Yes.

14   Q.  These ads are 2013; right?

15   A.  2012 through 2015.    14:37:58

16   Q.  Okay.  Now, one of the ads that you've identified -- or the

17   ad that you have identified is Document -- or Exhibit 1546.

18        MR. EISENBERG:  Can we just get that back up on the

19   screen just for a moment.

20   BY MR. EISENBERG:    14:38:16

21   Q.  And this was shown to you by the government.  1546.

22        Okay.  Do you see it there, ma'am?

23   A.  Yes.

24   Q.  Okay.  Now, this ad has your -- has the name that you

25   posted, and that's Rachel; is that correct?    14:38:37

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

73

1    A.   Yes.

2    Q.   And it has your age of 21 --

3    A.   Yes.

4    Q.   -- is that correct?

5         You were at least 21, were you not?                    14:38:43

6    A.   Yes.

7    Q.   And then there's this telephone number that you were asked

8    about.

9         Can you read that to the jury, ma'am.

10   A.   "702six7four6077" [as read].                           14:38:52

11   Q.   And that was the telephone number that was posted in this

12   ad; correct?

13   A.   Yes.

14   Q.   And that's the number that the johns called you at in order

15   to get ahold of you; correct?                               14:39:04

16   A.   Yes.

17   Q.   So they didn't have any problem getting ahold of you;

18   right?

19   A.   Right.

20   Q.   So there came a time after Mr. Knight -- I think that's     14:39:20

21   what his name was.  Was he the man who originally was posting

22   ads for you?

23   A.   Yes.  He was my pimp.

24   Q.   Okay.  And you lived with him for a time; is that correct?

25   A.   Yes.                                                   14:39:32

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

74

1   Q.  And then after a point -- there came a point in time when

2   he -- he was the one who took the photographs of you; is that

3   correct?

4   A.  Yes.

5   Q.  And he's the one who did the texts with customers; is          14:39:44

6   that --

7   A.  Yes.

8   Q.  -- correct?

9   A.  Yes.

10  Q.  Okay.  And he's the one who wrote the language that went       14:39:50

11  into the posts --

12  A.  Yes.

13  Q.  -- is that correct?

14          There came a time when he came -- or fell out of the

15  picture; right?                                                     14:39:59

16  A.  Yes.

17  Q.  And then you continued on your own to post ads --

18  A.  Yes.

19  Q.  -- is that correct?

20          So at that point in time, you didn't have a pimp?          14:40:06

21  A.  Correct.

22  Q.  And that lasted for about two and a half years; is that

23  correct?

24  A.  Correct.

25  Q.  Okay.  So at some point in time when you were posting ads,     14:40:13

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

75

1    you, yourself, were posting ads on Backpage, there came points

2    in time when words were taken out of your ads; right?

3    A.  Yes.

4    Q.  And there came a -- a point in time when photographs were

5    taken out of your ads.  They were missing; right?         14:40:39

6    A.  Yes.

7    Q.  And those photographs, I believe, were ones where you

8    were -- had posted naked photographs of yourself; right?

9    A.  Yes.

10    Q.  And so those were the ones that were removed; right?    14:40:51

11    A.  Yes.

12    Q.  Okay.  There were times, too, when you tried to use

13    terminology that was sexually explicit; correct?

14    A.  Yes.

15    Q.  And give me an example of that that you used that was    14:41:13

16    sexually explicit.

17    A.  I can't recall.

18    Q.  Okay.  But that language got taken out of ads, too, didn't

19    it?

20    A.  Yes.                                 14:41:27

21    Q.  Okay.  And there became a point in time when some of your

22    ads were published; is that correct?

23    A.  No.  They were always published.

24    Q.  Always published?

25    A.  Yes.                                 14:41:40

ER 13087

ANDREA BENSON - CROSS-EXAMINATION

76

```
 1   Q.  The only one that you can identify, however, is the one
 2   that you've shown that's here today, 1546; is that correct?
 3   A.  It's the only one that's in evidence.
 4   Q.  That's the only one that's in evidence; right --
 5   A.  Right.                                                      14:41:54
 6   Q.  -- as far as you know?
 7           It's really not a fair question.  Okay.
 8           And at the time this ad, 1546, was posted -- I believe
 9   you've told us what your age is.
10           Ma'am, is that your picture in the ad?                  14:42:11
11           And I think we've taken it off, but we needn't bring
12   it back up.
13           That is your picture in the ad?
14   A.  Yes.
15   Q.  Okay.  The top picture and middle picture as well?          14:42:20
16   A.  Yes.
17   Q.  And the bottom picture as well?
18   A.  Yes.
19   Q.  All right.  And in the bottom picture, you're covering your
20   breasts; is that correct?                                       14:42:29
21   A.  Yes.
22   Q.  You did that deliberately.  I mean, that was planned,
23   wasn't it?
24   A.  By Michael, yes.
25   Q.  Yes.  Okay.                                                 14:42:35
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

77

| | |
|---|---|
| 1 | MR. EISENBERG:  No further questions, Your Honor. |
| 2 | THE COURT:  Mr. Cambria? |
| 3 | CROSS-EXAMINATION |
| 4 | BY MR. CAMBRIA: |
| 5 | Q.  Good afternoon. |
| 6 | You indicated that at one point in time a -- an |
| 7 | undercover police officer responded to you.  Is that what |
| 8 | happened? |
| 9 | A.  Yes. |
| 10 | Q.  And was there a conversation with that police officer that |
| 11 | led to you being arrested? |
| 12 | A.  No. |
| 13 | Q.  Well, the officer -- well, were you at a hotel or |
| 14 | something? |
| 15 | A.  Yes. |
| 16 | Q.  And an officer knocked on the door? |
| 17 | A.  Yes. |
| 18 | Q.  All right.  Was there a discussion then about sex for |
| 19 | money? |
| 20 | A.  No. |
| 21 | Q.  Okay.  As a result of being arrested at that time, did you |
| 22 | cease performing any prostitution work after that experience? |
| 23 | MS. PERLMETER:  Objection.  Misstates testimony. |
| 24 | MR. CAMBRIA:  I'm sorry.  I didn't hear that. |
| 25 | MS. PERLMETER:  I can -- I don't want to do a speaking |

14:42:47

14:42:59

14:43:13

14:43:21

14:43:46

UNITED STATES DISTRICT COURT

```
 1    objection, but I can point to the part of the question if the
 2    Court would like.
 3            MR. CAMBRIA:  I'm just asking if she quit doing it.
 4            THE COURT:  Overruled.  She can answer yes or no.
 5    BY MR. CAMBRIA:                                              14:43:57
 6    Q.  Did you quit?
 7    A.  I cannot answer yes or no because the question was not
 8    phrased in a way that I can do that.
 9            He put incorrect information in the question.
10            THE COURT:  Rephrase your question.  She's unable to  14:44:07
11    answer the current one.
12    BY MR. CAMBRIA:
13    Q.  Okay.  The question was, after that arrest experience, did
14    you stop doing prostitution work?
15    A.  I still cannot answer the question.                      14:44:19
16    Q.  I'm sorry?
17    A.  I still cannot answer that question.  I was not arrested.
18    Q.  Oh, I'm sorry.
19            The police officer -- I thought that you said that an
20    undercover police officer encountered you on that day?       14:44:30
21    A.  But I was not arrested.
22            MR. CAMBRIA:  Okay.  Very good.  That's all.
23            THE COURT:  Ms. Bertrand?
24            MS. BERTRAND:  Nothing.  Thank you, Your Honor.
25            THE COURT:  Mr. Lincenberg?                           14:44:40
```

ANDREA BENSON - CROSS-EXAMINATION

79

```
 1            MR. LINCENBERG:  No, Your Honor.

 2            THE COURT:  Mr. Feder?

 3                       CROSS-EXAMINATION

 4   BY MR. FEDER:

 5   Q.  I just want to follow up on something.              14:44:57

 6            MR. FEDER:  Could you bring 1546 back up, please.

 7   BY MR. FEDER:

 8   Q.  Do you see where it says "credit cards accepted"?

 9   A.  Yes.

10   Q.  Is that true?                                       14:45:20

11   A.  Yes.

12   Q.  Which credit cards were accepted by you and -- and -- I'm

13   sorry -- Mr. -- your friend was?

14            MS. PERLMETER:  Objection.  Misstates testimony.

15            THE COURT:  Sustained.                         14:45:33

16   BY MR. FEDER:

17   Q.  Were your actions paid for by credit cards?

18   A.  Sometimes, yes.

19   Q.  Which ones?

20   A.  Any that the Square would take.                     14:45:41

21   Q.  So Visa, MasterCharge, American Express?

22   A.  I don't know for sure if it took American -- American

23   Express, because that's not always taken --

24   Q.  Yeah.

25   A.  -- actually.                                        14:45:53
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

80

```
 1    Q.  And then, to your knowledge, how would -- how would you get
 2    paid from the credit card companies?
 3    A.  That would go into my bank account.
 4    Q.  Did you have a personal bank account, or did you have some
 5    kind of corporate name for your -- for your business that        14:46:07
 6    would -- that the credit card companies would pay?
 7    A.  You could choose whatever name you wanted on the Square
 8    app.
 9    Q.  So what name did you choose?
10    A.  I did not choose it.  Michael did.  And I don't recall the    14:46:18
11    name.
12    Q.  Okay.  Did you ever see any -- any of the checks that were
13    paid to Michael or anything else so you might know that?
14    A.  No.
15    Q.  How long did that go on?  I mean, in other words, from the    14:46:29
16    time that you were with Michael, I think you testified
17    four months?
18    A.  Right.
19    Q.  Paid on a monthly basis from the credit cards?
20    A.  I imagine that there were only maybe less than five people    14:46:40
21    that even wanted to pay with a credit card considering what
22    they were purchasing.
23    Q.  Okay.  Do you -- I mean, do you know anything about how
24    the -- the act was set up with Visa and MasterCharge?
25              MS. PERLMETER:  Objection.  Calls for speculation.      14:46:55
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

81

```
 1          THE COURT:  Well, she can answer if she knows.  He
 2   asked her, "Do you know?"
 3          THE WITNESS:  No.
 4   BY MR. FEDER:
 5   Q.  When you went out on your own and started to -- to go into    14:47:02
 6   business independently, did you also accept credit cards?
 7   A.  I do not recall.
 8   Q.  You don't recall?
 9   A.  Well, we've dragged court on for six years, so, no.  It's
10   been a long time.                                                 14:47:17
11   Q.  Okay.  You testified that when you went out on your own you
12   were able to retrieve your old ads from Google?
13   A.  Yes.
14   Q.  And was it -- was it the actual ad?
15   A.  Yes.                                                          14:47:36
16   Q.  So you would -- you typed in to Google, you put in your
17   phone number, and all of the ads that had been posted in regard
18   to your services were right there?
19   A.  I believe when you repost you're not seeing all of the ads.
20   You're just seeing the most recent one.                          14:47:51
21   Q.  Okay.  Did you ever get any calls from the ads that were on
22   Google?
23   A.  No.
24   Q.  But the -- but the ads that -- the 15 -- 1546 that -- the
25   ad was read on Google?                                           14:48:05
```

UNITED STATES DISTRICT COURT

ER 13093

ANDREA BENSON - CROSS-EXAMINATION

82

1    A.  And then you click on Backpage.

2    Q.  Okay.  All right.

3         How many times have you talked to the -- to the

4    prosecutors?  If you know.

5    A.  I think, like, four or five times.                    14:48:27

6    Q.  And where did those discussions take place?

7    A.  Sometimes in person.  Sometimes over, like, Microsoft

8    Teams.

9    Q.  I'm sorry?  Could you give the -- give me that again.

10   A.  Sometimes in person, and sometimes over Microsoft Teams.  14:48:44

11   Q.  Of the times in person, where did -- where was that --

12   where did that take place?

13   A.  Portland and Tampa.

14   Q.  And, if you recall, how many people from the government

15   came up to see you on those occasions?                     14:48:55

16   A.  I believe both times it was three people.

17   Q.  Do you see any of those folks in the -- in the courtroom

18   here?

19   A.  Yeah.

20   Q.  Could you point them out and tell me?                  14:49:05

21   A.  Peggy and Desirae.  But I believe that the third person,

22   Amy, is not here.

23   Q.  Okay.  Were any of those visits or calls on Teams

24   tape-recorded, to your knowledge?

25   A.  I do not recall.                                        14:49:23

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

83

1    Q.  Presumably you've never heard the -- a recording of any of

2    those meetings?

3    A.  I have not.

4    Q.  How long did those meetings last, if you recall?

5    A.  I believe the first one was several hours.  The second one          14:49:32

6    was probably more like an hour.

7    Q.  Okay.  You were asked a number of questions about what

8    happened -- that some of your ads -- your ads and Mr. Knight's

9    ads were edited; is that right?

10   A.  Right.                                                              14:49:57

11   Q.  So both -- Mr. -- to your knowledge, both Mr. Knight's ads

12   on behalf of you and then your own ads on behalf of yourself

13   were edited?

14   A.  I can only speak on the ads that I posted.

15   Q.  You never saw the ads that -- that Mr. Knight posted for          14:50:08

16   you?

17   A.  By the time I did see them, he wasn't sharing information

18   like this with me.

19   Q.  Understood.  Okay.

20          As to your own ads, have you -- have you been shown          14:50:17

21   your own ads since you've started cooperating with the

22   government?

23   A.  I think that -- I don't recall if we found my ads or not.

24   Q.  Okay.  In regard to your own ads, you said -- I think you

25   testified that you looked at your own ad on -- on Google,           14:50:40

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

84

```
 1    number 1, and that you went on to Backpage and found --

 2    basically tried to copy -- kind of copy and paste from the --

 3    from those ads, too.

 4          Did you look at any other source to get some -- to get

 5    ideas?                                                          14:50:56

 6    A.  No.

 7          THE COURT:  What was the objection?

 8          MS. PERLMETER:  It's -- it's a 412 objection.  I'd ask

 9    counsel to ask a more direct question that does not trigger

10    412.                                                            14:51:11

11          THE COURT:  Overruled as to the question before the

12    witness.

13    BY MR. FEDER:

14    Q.  Did you go to any other sources other than your own ad on

15    Google or Backpage to get ideas on how to craft the ads that   14:51:22

16    you posted?

17    A.  No.

18          MS. PERLMETER:  Objection.  412.

19          THE COURT:  Overruled.  And the answer will stand.

20    BY MR. FEDER:                                                   14:51:40

21    Q.  Did you meet Michael on Facebook?

22          MS. PERLMETER:  Objection.  Relevance.

23          THE COURT:  Sustained.

24    BY MR. FEDER:

25    Q.  Did you tell the government that you met Michael on         14:51:58
```

UNITED STATES DISTRICT COURT

```
 1   Facebook?

 2           MS. PERLMETER:  Objection.  Relevance.

 3           THE COURT:  Sustained.

 4   BY MR. FEDER:

 5   Q.  When you were crafting your own ads after you left Michael,    14:52:07

 6   you testified that essentially you would see the ad and some

 7   part of it would have been edited out; right?

 8   A.  Correct.

 9   Q.  And that included some of the photographs that you had

10   taken of yourself; right?                                          14:52:27

11   A.  Yes.

12   Q.  Some of the words that you had used in those ads were taken

13   out?

14   A.  Yes.

15   Q.  Would the result be an ad that was mush or didn't make any     14:52:34

16   sense?

17   A.  Not at all.

18   Q.  No?

19           But the things that were -- that were edited out were

20   things that -- that you had been warned about when you went       14:52:48

21   into Backpage and went through the terms of use and the posting

22   rules; right?

23   A.  Some.

24   Q.  Well, no nudity; right?

25   A.  I can't recall the rules.  I have not posted since 2015.       14:53:00
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

86

1    Q.  No sex-for-money ads; right?

2    A.  I can't recall.

3    Q.  You haven't -- you didn't -- you weren't shown them when

4    you were practicing for your testimony with the prosecutors?

5    A.  No.                                                                    14:53:17

6    Q.  So you would look at the ad that you had posted.  You would

7    see that parts of it are missing; right?

8           MS. PERLMETER:  Objection.  Asked and answered.

9           THE COURT:  Well, I'll sustain.  It's a form of a

10   prior question.                                                          14:53:33

11   BY MR. FEDER:

12   Q.  How many -- when you were on your own, how many ads would

13   you say -- independent -- or, I'm sorry -- original ads would

14   you say you posted on Backpage?

15   A.  Can you clarify that question?  Original versus what?               14:53:44

16   Q.  Versus reposting or something like that.

17          Do you know what reposting is?

18   A.  Yes, I do.

19   Q.  Okay.  When you repost, you're just reposting the same old

20   ad; right?                                                               14:54:00

21   A.  I used a lot of original ads because I used different names

22   and phone numbers frequently once I was posting myself.

23   Q.  Okay.  And would -- how many different ads would you say

24   you crafted your own and posted on Backpage?

25   A.  If I had to guess, I would say at least six.                        14:54:16

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

87

```
1    Q.  Six?

2    A.  If I had --

3    Q.  And of those six ads that you created on your own, how many

4    of them were edited in some fashion?

5    A.  Most of them were edited photo-wise.                        14:54:32

6    Q.  How about terminology?

7    A.  I figured out the terminology pretty quick.

8    Q.  Well, I mean, anybody can take one word and try to scramble

9    it up to make it not the same word; right?

10   A.  Right.                                                      14:54:50

11   Q.  And you're a college graduate, so, I mean, you were pretty

12   good at doing that; right?

13         MS. PERLMETER:  Objection.  Argumentative.

14         THE COURT:  Well, sustained as to the form of the

15   question.                                                      14:55:00

16         MR. FEDER:  That's all I have.  Thanks.

17         THE COURT:  Thank you.

18         Ms. Perlmeter?

19         MS. PERLMETER:  No, Your Honor.  Thank you.

20         THE COURT:  May the witness be released from subpoena?    14:55:20

21         MS. PERLMETER:  Yes, please.

22         THE COURT:  Is there any objection from the defense?

23         MR. CAMBRIA:  No, Your Honor.

24         MS. BERTRAND:  No.

25         THE COURT:  All right.  Ma'am, you are released from      14:55:27
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

88

1   subpoena.  We thank you for your testimony.  You may step down.

2              THE WITNESS:  Thank you.

3              THE COURT:  And I had anticipated taking a break at

4   3:00 o'clock, but let's -- since we're at a transition point

5   and counsel have been here since 1:15, let's go ahead and take    14:55:45

6   our afternoon recess.

7              Members of the jury, again I remind you of the

8   admonishment.  It's critical, as we are progressing forward,

9   not to come to any conclusions.  We're still receiving

10  testimony.  And not to do any sort of research and just to        14:56:03

11  simply keep an open mind.

12             And with that, we will stand in recess for 20 minutes.

13             Please all rise for the jury.

14     (Jury not present at 2:56 p.m.)

15             THE COURT:  All right.  Mr. Kessler, my law clerk will  14:56:35

16  give you the order that I referred to, and we will stand in

17  recess.

18     (Recess from 2:56 p.m. to 3:20 p.m.)

19     (Jury not present at 3:20 p.m.)

20             THE COURT:  All right.  Let's have the jury in.         15:20:06

21             All rise for the jury.

22     (Jury present at 3:20 p.m.)

23             THE COURT:  All right.  Welcome back, members of the

24  jury.  Please be seated.

25             And the government may call its next witness.           15:21:03

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

89

```
 1          MR. BERRY:  Thank you, Your Honor.  The United States
 2   calls Arshana Sanders.
 3          THE COURT:  Ma'am, please come forward and be sworn by
 4   my courtroom deputy.
 5          THE COURTROOM DEPUTY:  Please raise your right hand.    15:21:21
 6      (ARSHANA SANDERS-WILLIS, called as a witness herein, was
 7   duly sworn or affirmed.)
 8          THE COURTROOM DEPUTY:  Please proceed to the witness
 9   stand.
10          THE COURT:  You may proceed when you're ready.         15:21:47
11          MR. BERRY:  Thank you, Your Honor.
12                        DIRECT EXAMINATION
13   BY MR. BERRY:
14   Q.  Good afternoon, Arshana.
15          Would you please state and spell your first name for   15:21:54
16   the jury.
17   A.  Arshana, A-R-S-H-A-N-A.
18   Q.  All right.  That was really fast.  Can you spell it slowly
19   a little bit.
20   A.  A-R-S-H-A-N-A.                                            15:22:03
21   Q.  Thank you.
22          And what's your last name, Arshana?
23   A.  It's hyphenated.  So Sanders, S-A-N-D-E-R-S, Willis,
24   W-I-L-L-I-S.
25   Q.  All right.  Thank you.                                    15:22:17
```

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

90

```
 1              And where do you live?

 2    A.   Right outside Detroit, Michigan.

 3    Q.   Okay.  Is that where you traveled from to be here this

 4    week?

 5    A.   Yes.                                                      15:22:30

 6    Q.   Do you have any children?

 7    A.   No.

 8    Q.   Where do you -- what do you do for a living?

 9    A.   I work for Detroit Light Company and Kroger grocery store.

10    Q.   All right.  And what do you do for the Detroit Light      15:22:45

11    Company?

12    A.   Customer service for low income.

13    Q.   Okay.  And for Kroger, what do you do?

14    A.   Cashier.

15    Q.   And how old are you, Arshana?                             15:22:55

16    A.   29.

17    Q.   Are you familiar with Backpage.com?

18    A.   Yes.

19    Q.   When did you first -- approximately when did you first

20    become aware of Backpage?                                     15:23:11

21    A.   Year 2014.

22    Q.   Okay.  And what was the -- the -- how did you become aware

23    of it?

24    A.   My sister was using -- she was posting on Backpage.

25    Q.   Okay.  And who -- what was your sister's name?           15:23:31
```

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

91

```
 1    A.   Cynthia Worthy.

 2    Q.   And what's the difference in age between you and Cynthia?

 3    A.   She's three and a half years older than me.

 4    Q.   So you learned that your sister was utilizing Backpage in

 5    approximately 2014; is that right?                          15:23:55

 6    A.   Yes.

 7    Q.   All right.  Did you ever observe your sister utilizing

 8    Backpage?

 9    A.   Yes.

10    Q.   What do you recall personally observing her doing on      15:24:06

11    Backpage?

12    A.   She would post pictures and, like, lingerie.  Like,

13    would -- oh, okay.  Yeah, she would post pictures and -- I

14    mean, I don't know.  Like what else?

15    Q.   Were there pictures of herself?                           15:24:34

16    A.   Oh, yeah, of herself in lingerie.

17    Q.   All right.  And would those pictures be part of an

18    advertisement of some kind?

19    A.   Yeah.  She would actually -- she would call it like she had

20    to post an ad.  That's what she would say.                    15:24:47

21    Q.   Okay.  And you would see her do this yourself?

22    A.   Yes.

23    Q.   And it's important as we keep going forward through this,

24    Arshana, that as best you can, I'm going to ask you questions

25    about what you saw as opposed to what she said.  Okay?        15:25:00
```

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

92

1   A.  Okay.

2   Q.  So let's try to stick to that as best we can.  I understand

3   that that's sometimes a little challenging.

4   A.  Okay.

5   Q.  So you said that you saw her posting these ads; correct?          15:25:11

6   A.  Yes.

7   Q.  And do you know in what section on Backpage she would post

8   ads?

9   A.  Yes.

10  Q.  What sections?                                                    15:25:22

11  A.  Oh, there was a section for escorts.

12  Q.  Okay.  And what did you understand your sister's ads in the

13  escort section on Backpage to be about?

14          MR. FEDER:  Objection.  Hearsay.

15          MR. BERRY:  I asked what she understands.                     15:25:42

16          THE COURT:  Overruled.  She can answer if she -- if

17  she can.

18          THE WITNESS:  She would post, like, ads of herself

19  through -- for other people to, like, get online to see them so

20  she can meet with them to have sex for money.                        15:25:59

21  BY MR. BERRY:

22  Q.  Okay.  And you said that she would post in these ads

23  pictures of herself in lingerie; correct?

24  A.  Yes.

25  Q.  What other features of the ad do you recall seeing              15:26:16

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

93

```
 1    yourself?  Like the -- what different parts of the ad?
 2    Describe it as best you can to the jury.
 3    A.  I recall seeing, like, pictures of her, like, of course in
 4    the lingerie or -- or identified that it was her from, like,
 5    tattoos that she had.  What she would name -- what she -- the        15:26:40
 6    name that she went by when she would post ads.  Her, like,
 7    telephone number, like -- things like that.
 8    Q.  All right.  And what name did she go by on Backpage escort
 9    section?
10    A.  Lady.                                                            15:26:58
11    Q.  Okay.  And you said you also recognized the phone number
12    that she utilized in the ad?
13    A.  Yes.
14    Q.  Okay.  Do you remember whether her ads had any kind of
15    emojis in them?                                                      15:27:12
16    A.  Yeah.  She always would use, like, emojis, yeah.  She used
17    emojis in her ads.
18    Q.  Okay.  And can you describe for the jury, as best you
19    recall, what type of emojis you saw her use in these ads.
20    A.  It was a variety.  She would use, like, hearts, kissy           15:27:29
21    faces, the three, like, water, like, dripping inside.  And
22    then, like, the candy, like, lollipop ones.  I've seen that
23    before.
24    Q.  Okay.  And did you have any understanding as to whether
25    those emojis had any specific meaning in the context of her         15:27:56
```

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

94

```
 1   ads?
 2   A.  Yeah.  The water sign.
 3   Q.  What did that mean, in your understanding?
 4          MS. BERTRAND:  Objection.  Calling for speculation.
 5          MR. FEDER:  And hearsay.                              15:28:12
 6          THE COURT:  Overruled.
 7   BY MR. BERRY:
 8   Q.  You can answer.
 9   A.  It -- I -- I don't know how to answer this.
10   Q.  Is this -- is this a difficult topic to talk about?     15:28:26
11   A.  No.  It's just uncomfortable.  I guess it just meant
12   like -- it was like -- it was sexual.
13   Q.  All right.  That's fine.  So you -- the three droplets was
14   sexual in nature is your understanding?
15   A.  Yes.                                                     15:28:43
16   Q.  All right.  What about the lollipop?  Was that also sexual
17   in nature?
18          MS. BERTRAND:  Same objection.  Leading and
19   speculation.
20          THE COURT:  Well --                                   15:28:52
21          MR. FEDER:  And hearsay.
22          THE COURT:  -- I'll sustain just as to leading.
23          MR. BERRY:  Yes, Your Honor.
24   BY MR. BERRY:
25   Q.  What was your understanding as to the meaning behind the 15:28:59
```

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

95

```
 1   lollipop emoji that your sister used in these ads?
 2           MS. BERTRAND:  Same objections.
 3           THE COURT:  Overruled.  She can answer if she had an
 4   understanding.
 5           THE WITNESS:  I understood that it meant -- because          15:29:10
 6   I've seen her, like -- I've seen her in her ads say something
 7   like sweet as candy.  So that's what I kind of understood that
 8   to be.
 9   BY MR. BERRY:
10   Q.  Okay.  Do you know if your sister made any money off of the    15:29:24
11   ads that she posted on Backpage?
12   A.  Off the ads, per se, no.  But I know that she posted the
13   ads to make money, to meet with people to make money.
14   Q.  And that's what I was getting at.  So you -- you got there,
15   so thank you.                                                      15:29:52
16   A.  Uh-huh.
17   Q.  Where would you all typically be when she would go to post
18   her ad?
19   A.  We pretty much hung out every day.  So we would do things
20   like go to the beach.  We spent a lot of time with my nieces      15:30:10
21   and my little sister.  So we would always be, like, at a family
22   member house, like, or maybe go to a club.  And then we would
23   always just be out, and she would post ads after we leave.
24   Q.  And why was she posting the ads?
25   A.  She was more so like -- she was our big sister.  So she --     15:30:33
```

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

96

```
 1    anytime we went out, she always took care of a lot of stuff, so

 2    she would say she would have to make her money back.

 3    Q.  Okay.  And when she posted an ad, what happened after that,

 4    typically after her ad would go live?

 5              MS. BERTRAND:  Objection.  Speculation.          15:30:52

 6              THE COURT:  Lay some foundation.

 7              MR. BERRY:  Sure.

 8    BY MR. BERRY:

 9    Q.  Were you ever with her -- I think you already testified

10    that you were with her when you watched her post ads; correct?   15:31:01

11    A.  Yes.

12    Q.  All right.  Were you ever with her after the ad went live?

13    A.  Yes.

14    Q.  And do you know what would happen to her phone after her ad

15    went live?                                                 15:31:13

16              MS. BERTRAND:  Objection.  Vague as to time.

17              THE COURT:  Well, overruled.

18              But then I'll just put Mr. Berry on notice that he

19    needs to perhaps lay some foundation as to time.

20              MR. BERRY:  Sure.                                15:31:26

21    BY MR. BERRY:

22    Q.  So you testified that you first became aware of her utility

23    of Backpage in 2014; correct?

24    A.  Yes.

25    Q.  Did that end sometime in August of 2015?               15:31:33
```

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

97

1    A.  Yes.

2    Q.  All right.  So between 2014 and August of 2015.  All my

3    questions to you are relating to that time period.  Okay?

4    A.  Okay.

5    Q.  All right.  So when she would post these ads during that          15:31:48

6    time frame and you were with her, do you know what, if

7    anything, would happen to her phone?

8    A.  Yeah.  Her phone would start ringing.

9    Q.  All right.  And how soon after her ad went live would her

10   phone start ringing?                                                  15:32:08

11   A.  Fairly quickly.  And if not, she would post again.

12   Q.  Okay.  Were you ever -- do you know if the -- she would

13   ever repost the ad back at the top?

14   A.  Yes.

15   Q.  Was this her main source of income, or did she have another      15:32:27

16   income?

17           MR. FEDER:  Calls for hearsay.

18           THE COURT:  Overruled.

19   BY MR. BERRY:

20   Q.  You can answer.                                                   15:32:39

21   A.  It was her main source of income.

22   Q.  How often was she posting her ads in the escort section on

23   Backpage between 2014 and 2015?

24   A.  When I learned in 2014, she would post every day.  Towards

25   August 2015, it probably, like, once or twice a week.                15:33:09

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

98

```
 1   Q.  Okay.  How would she -- well, let me ask you.  Do you know
 2   how she would pay for the ad, like, physically?  Do you know
 3   how she would physically pay for the ad?
 4   A.  Yes.  We would go to, like, CVS, like a drugstore, like a
 5   Walmart.  She would get prepaid Vanilla cards.                  15:33:37
 6   Q.  Vanilla cards?
 7   A.  Yes.
 8   Q.  Okay.  And you watched her do that?
 9   A.  Yes.
10   Q.  Did she have a regular bank account?                        15:33:44
11   A.  Yes.
12   Q.  And did she have, like, a debit card associated with that
13   bank account?
14   A.  Yes.
15   Q.  Did she use that regular bank account and debit card for    15:33:53
16   her Backpage activity?
17   A.  Yes.
18   Q.  She would use a regular debit card, or she would use --
19   A.  Oh, I'm sorry.
20   Q.  -- the Vanilla cards?                                       15:34:04
21   A.  She would use Vanilla cards.
22   Q.  Okay.  So she would not use her regular bank account?
23   A.  No.
24   Q.  Okay.  You said you went with her and saw her buy these
25   Vanilla cards to post the ads.                                  15:34:20
```

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

99

```
 1              Did you ever go with her to any other stores that were
 2    associated with her Backpage activity?
 3    A.   Like lingerie stores.
 4    Q.   Okay.  Did you ever --
 5    A.   Like --                                                    15:34:33
 6    Q.   Did you ever go to CVS with her?
 7    A.   Yes.
 8    Q.   And what would you see her purchase at CVS?
 9    A.   She would get lubricant, like Y condoms.
10    Q.   Did you -- were you ever in the car with her when someone  15:34:50
11    would call responding to her ad?
12    A.   Yes.
13    Q.   Okay.  Did you have an opportunity to overhear those
14    conversations?
15    A.   Yes.                                                       15:35:03
16    Q.   After you heard those conversations, did you ever ride with
17    her to a meet location?
18    A.   Yes.
19    Q.   And what would you do and what would she do when you were
20    at that location, to the best of your knowledge?               15:35:23
21    A.   I'll wait in the car.  She would take -- she probably would
22    drink some wine and take the condoms and the lubricant, and
23    she'll go inside.
24    Q.   And how long would she typically be inside?
25    A.   It depends.  Like 30 minutes, 45 minutes.                  15:35:43
```

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

100

 1   Q.  Never more than that?

 2   A.  Poss- -- possibly.  I've only been with her twice.

 3   Q.  Okay.  Have you ever been inside her apartment?

 4   A.  Yes.

 5   Q.  And did you ever observe anything in her apartment that you    15:36:02

 6   believed was connected to her Backpage activity?

 7   A.  Yes.

 8   Q.  Like what?

 9   A.  Vanilla cards.

10   Q.  Okay.  Did you see -- how -- you know, how many of them did    15:36:16

11   you see?

12   A.  A lot.  They were, like, on her nightstand.  They were

13   just -- they were just, like, around the house.

14   Q.  And do you -- do you know whether she used those for

15   anything other than Backpage?    15:36:28

16   A.  Not to my knowledge.

17   Q.  Okay.  All right.  I'm going to show you what's already in

18   evidence as Government's Exhibit 221.  And I'm going to scroll

19   through these photographs.

20        Do you recognize the person in these photographs?    15:36:54

21   A.  Yes.

22   Q.  Who is it?

23   A.  Cynthia.

24   Q.  And were you able to identify her by some of the tattoos

25   and things like that in her ad?    15:37:12

UNITED STATES DISTRICT COURT

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

101

1   A.  Yes.

2   Q.  In addition to seeing her face?

3   A.  Yes.

4   Q.  This phone number down here, do you recognize that?

5   A.  Yes.                                                    15:37:32

6   Q.  What is it?

7   A.  Cynthia's phone number.

8   Q.  And what about this name here?

9   A.  This was the name that she went by.

10  Q.  Just for purposes of the record, what is the date on this   15:37:48

11  particular ad?

12  A.  August 15th, 2015.

13          MR. BERRY:  Okay.  Pass the witness, Your Honor.

14          THE COURT:  Who's going to examine for the defense?

15          Mr. Cambria.                                         15:38:31

16          MR. CAMBRIA:  No questions.

17          THE COURT:  Ms. Bertrand?

18          MS. BERTRAND:  None.  Thank you.

19          THE COURT:  Mr. Lincenberg?

20          MR. LINCENBERG:  No, Your Honor.                     15:38:37

21          THE COURT:  Mr. Kessler?

22          MR. KESSLER:  No, Your Honor.

23          THE COURT:  Mr. Eisenberg?

24          MR. EISENBERG:  No, Your Honor.

25          THE COURT:  All right.  May the witness be excused    15:38:42

UNITED STATES DISTRICT COURT

DEREK FRITZE – DIRECT EXAMINATION

102

```
1    from subpoena?

2            MR. BERRY:  Yes.

3            THE COURT:  Any objection from defense?

4            MR. CAMBRIA:  No, Your Honor.

5            THE COURT:  Ma'am, we thank you for your testimony.     15:38:49

6    You are excused from subpoena.  You may step down.

7            THE WITNESS:  Thank you.

8            THE COURT:  The government may call its next witness.

9            MR. BERRY:  Thank you, Your Honor.  The United States

10   calls Derek Fritze.                                             15:39:04

11           THE COURT:  Sir, please come forward to my courtroom

12   deputy and be sworn.

13           THE COURTROOM DEPUTY:  Please raise your right hand.

14       (DEREK FRITZE, a witness herein, was duly sworn or

15   affirmed.)                                                      15:39:39

16           THE COURTROOM DEPUTY:  If you will please step over to

17   the witness stand.  Thank you.

18           THE COURT:  And you may proceed when ready.

19           MR. BERRY:  Thank you, Your Honor.

20                        DIRECT EXAMINATION                         15:40:02

21   BY MR. BERRY:

22   Q.  Good afternoon, Mr. Fritze.

23           Would you please state your first name and spell it

24   for the jury.

25   A.  Derek, D-E-R-E-K.                                           15:40:10
```

UNITED STATES DISTRICT COURT

ER 13114

DEREK FRITZE - DIRECT EXAMINATION

103

```
1    Q.  And would you please state your last name and spell it for

2    the jury.

3    A.  It's Fritze, F-R-I-T-Z-E.

4    Q.  In what state do you live, sir?

5    A.  State of Minnesota.                                         15:40:25

6    Q.  And did you travel from there to be here for this trial

7    this week?

8    A.  Yes, I did.

9    Q.  How old are you, sir?

10   A.  43 years old.                                               15:40:37

11   Q.  And where do you work?

12   A.  I work for the Maplewood Police Department in Maplewood,

13   Minnesota.

14   Q.  And, if you would, please give the ladies and gentlemen of

15   the jury a little sense about the size of your community and    15:40:49

16   the size of your police department.

17   A.  The city of Maplewood is a first-ring suburb of St. Paul.

18   We have -- population is about 40,000 people.  Our department

19   has approximately 53 sworn officers right now.

20   Q.  Okay.  And what is your -- your present title, job?         15:41:12

21   A.  Currently I'm a detective.

22   Q.  Do you have any college education?

23   A.  Yes, I do.

24   Q.  Please explain that to the jury.

25   A.  I have a bachelor's degree in criminal justice, a master's  15:41:32
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

104

```
 1    degree in sport management, and a master's degree in police
 2    leadership.
 3    Q.  How long have you worked with the Maplewood Police
 4    Department?
 5    A.  About 16 years.                                              15:41:47
 6    Q.  If you would, please, explain to the jury your work history
 7    in law enforcement during those 16 years.
 8    A.  I've had several different positions.  I've -- was a patrol
 9    officer.  I was part of a street crimes unit.  I was a school
10    resource officer and a juvenile investigator.  I was a retail    15:42:12
11    crime investigator and a -- a detective for several years.  And
12    then I was a patrol sergeant for three years.
13            And then as of the beginning of January this year, I'm
14    a detective again.
15    Q.  So several different investigative jobs with Maplewood?       15:42:31
16    A.  Yes.
17    Q.  Okay.  Did you receive any kind of general training on how
18    to be a police officer when you first started?
19    A.  Yes, I did.
20    Q.  Explain that to the jury.                                     15:42:47
21    A.  Minnesota has a police officer licensing certificate, so it
22    involved specific courses and then a practical skills
23    application before getting hired as a -- as a police officer.
24    Q.  Okay.  So you did that before you even got on with the
25    police department?                                               15:43:06
```

UNITED STATES DISTRICT COURT

DEREK FRITZE – DIRECT EXAMINATION

105

 1    A.  Yes.

 2    Q.  All right.  And then did you ever have any more specific

 3    training on how to investigate prostitution offenses?

 4    A.  Yes, I did.

 5    Q.  Explain that to the jury.                                    15:43:17

 6    A.  While I was working in the street crimes unit, I was --

 7    took a course, a training course with the St. Paul Police

 8    Department.  It was a learning and a practical training on

 9    prostitution operations and kind of the procedure and how to go

10    about it.                                                        15:43:36

11    Q.  All right.  And you say a -- a practical training.  Help

12    the jury understand what that means.

13    A.  As part of the class, St. Paul Police Department did a

14    actual prostitution sting operation, and we participated in --

15    in that.                                                         15:43:54

16    Q.  All right.  So you had hands-on training, basically, with

17    doing these types of stings?

18    A.  Yes.

19    Q.  Okay.  After this training, did it -- did you then go back

20    to Maplewood and conduct similar type stings?                   15:44:04

21    A.  Yes.

22    Q.  All right.  And we'll talk about that in a -- in a second.

23         About how many prostitution-related investigations

24    could you estimate that you've worked in the course of your

25    career?                                                          15:44:19

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

106

1   A.  I'd say probably approximately a hundred or so.

2   Q.  Okay.  Are you familiar with a website Backpage.com?

3   A.  Yes, I am.

4   Q.  How did you first become aware of Backpage?

5   A.  It was through that -- the training that I took with the          15:44:38

6   St. Paul Police Department.

7   Q.  Okay.  So was that utilized in that training?

8   A.  Yes, it was.

9   Q.  And what was it that you learned -- well, let's -- let's

10  establish a time frame here.                                          15:44:51

11          When was that training approximately?

12  A.  Approximately 2011.

13  Q.  Okay.  And what was it that you learned about Backpage

14  during that training?

15  A.  That was the method used for the prostitution stings,             15:45:04

16  whether they were stings or reverse stings.

17  Q.  Okay.  And why was Backpage the place you went to do those

18  types of stings?

19  A.  Because that's where prostitution-related offenses were --

20  were found at that time.                                              15:45:25

21  Q.  And so when you went back to Maplewood after your training

22  at St. Paul, so we're talking about 2011 and later, did you

23  utilize Backpage in your law enforcement investigations?

24  A.  Yes, I did.

25  Q.  Did you do stings of your own?                                    15:45:45

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

107

1    A.   Yes.

2    Q.   If you would, please, explain to the jury what the -- what

3    the stings entailed.  And it -- you can distinguish and

4    articulate sting versus reverse sting, or however you referred

5    to it.                                                                15:46:05

6    A.   Yeah.  So we would -- as a department, we would typically

7    have a two-day operation, and we'd do it about

8    every approximately three months, where we would get a hotel

9    room within the city of Maplewood.  One day we would do a

10   prostitution sting, where we would use Backpage to look for ads      15:46:22

11   of females and have them come to us.  And then on a second day,

12   we would do the reverse sting and have the -- we would post ads

13   on Backpage and have the -- the males call us and respond to

14   our location.

15   Q.   All right.  So you would have two-day ops.  One day was you     15:46:46

16   were going after the people posting the ads?

17   A.   Yes.

18   Q.   And one day you're going after the people responding to the

19   ads?

20   A.   Yes.                                                            15:46:58

21   Q.   Okay.  When doing the -- the stings, where you're

22   responding to an ad already published, did you look at those

23   ads to investigate them?

24   A.   Yes.

25   Q.   How -- explain to the jury how that would work, when you        15:47:17

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

108

```
 1    would do those types of stings.
 2    A.  Well, typically part of our investigation, we would look
 3    for ones that posted in close to our area, posted in Maplewood.
 4    We would look for -- depending on if they had given an age, or
 5    looking at the photographs, if it were -- if they gave, like, a      15:47:38
 6    younger age, closer to 18 or younger -- or, sorry.  If they
 7    looked younger in pictures, we would try to get them hoping it
 8    was an underage person that's -- has that ad.  And more to
 9    locate, I guess, more victims of prostitution.
10    Q.  Is that where you were focusing your resources, is on those      15:48:06
11    types of people being posted?
12    A.  For the -- those stings, yes.
13    Q.  Okay.  Would you then call those ads to set up a date?
14    A.  Yes.
15    Q.  How many ads would you say you have reviewed in your law         15:48:19
16    enforcement career in the escort section on Backpage?
17    A.  Hundreds.
18    Q.  Okay.  In the course of reviewing those hundreds of ads,
19    did you come to understand or learn the terminology that was
20    commonly used in the content of those ads?                          15:48:41
21    A.  Yes.
22    Q.  What were some of those commonly used terms, to the best of
23    your memory?
24    A.  There are several.  I mean, it started with incall or
25    outcall.  And having them come to you or you going to them.         15:49:00
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

109

```
 1   Age of the -- the person.  Physical descriptions.  Body

 2   measurements.  Breast size.  Things like that.

 3   Q.  Okay.

 4   A.  Language.  Talking about different -- coded -- coded

 5   language talking about different acts or different features of    15:49:27

 6   a body, like -- as an example, like, kitty meaning vagina, or

 7   Greek, meaning anal sex.  Talking about money and dollar

 8   amounts.  Like they would use words like donations or roses.

 9          Those are just some of the examples.

10   Q.  Okay.  When you did -- let's pivot.  So let's do the          15:49:54

11   other -- the flip side of that.  Let's talk about the reverse

12   stings.  And, again, the reverse stings were when you all --

13   the police department would post an ad and try to get johns; is

14   that correct?

15   A.  Yes.                                                          15:50:17

16   Q.  All right.  Were you ever involved in creating the ads for

17   those reverse stings?

18   A.  Yes.

19   Q.  How did you know what content to include in the ads?

20   A.  Basically looking at other ads that were out there and        15:50:33

21   using similar language and similar photos.

22   Q.  Okay.  So let's start at the top.  Where -- what's the

23   first thing that you're going to go look for to figure out how

24   to post an ad?

25   A.  Just looking at some of those -- the language that was        15:50:49
```

UNITED STATES DISTRICT COURT

DEREK FRITZE – DIRECT EXAMINATION

110

1    used.

2    Q.  All right.  What about the -- the location where the ad was

3    posted?

4    A.  Oh, we always put it in a Backpage ad, the escorts.

5    Q.  So on Backpage in the escort section?                    15:51:01

6    A.  Yes.

7    Q.  Okay.  So you wouldn't go to buy/sell/trade on Craigslist

8    or anywhere else?

9    A.  No.

10   Q.  Okay.  What about the amount of time and money?  Would that    15:51:11

11   be something that you would include in the ad?

12   A.  Yes.

13   Q.  And how would that typically be designated in the ad?

14   A.  It would be -- typically we would put either a half hour or

15   an hour time increment.  We'd -- we'd try to put a lower dollar    15:51:25

16   amount, because we obviously knew we weren't going to be, you

17   know, paying.  We were hoping that people would respond more by

18   seeing a lower dollar amount.

19   Q.  Gotcha.

20        And would you typically put in there incall or            15:51:46

21   outcall?

22        MR. KESSLER:  Objection.  Leading.

23        THE COURT:  Sustained.

24   BY MR. BERRY:

25   Q.  What are some other terms that you would include in the ads    15:51:55

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

111

1   when you were creating them?

2   A.  Well, since we were doing it at our -- at a hotel, I mean,

3   we'd put in there that it's incall.

4   Q.  Okay.  You were never going to go to the john in this

5   scenario?                                                              15:52:11

6   A.  I'm sorry?  What was that?

7   Q.  You were never going to go to the john in this scenario;

8   correct?

9   A.  No.

10  Q.  All right.  What other language do you remember being put    15:52:17

11  in the content of these ads when you were creating them?

12  A.  We'd put a lot of physical descriptions.  Put things, you

13  know, trying to entice them, you know, that we're -- we'll do

14  anything, anything for the right price.  And putting some of

15  those even, you know, more playful words, kind of like fun and,   15:52:41

16  I'm going to entertain you, or, you know, things like that.

17  Q.  All right.  Would you put in there, I will have sex with

18  you for money?

19          MR. KESSLER:  Objection.  Leading.

20          THE COURT:  Sustained.                                    15:52:59

21  BY MR. BERRY:

22  Q.  Would you put in explicit sex-for-money language?

23  A.  No.

24  Q.  Why not?

25  A.  Ad, it would be taken down by Backpage if we did.            15:53:08

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

112

1    Q.  After the ads that you all created were posted, what would

2    happen next?

3    A.  We would get phone calls immediately.

4    Q.  When you say "immediately," can you give the jury a sense

5    of the time frame?                                               15:53:30

6    A.  Within minutes.

7    Q.  What did the escort term on Backpage mean to you as an

8    investigator?

9            MR. KESSLER:  Objection.  Relevance.

10           THE COURT:  Overruled.                                    15:53:55

11   BY MR. BERRY:

12   Q.  You can answer.

13   A.  That -- that it's prostitution.

14   Q.  Did you send any emails to Backpage in July of 2012?

15           MS. BERTRAND:  Objection.  Leading.                       15:54:11

16           THE COURT:  Sustained.

17   BY MR. BERRY:

18   Q.  Did you ever send any emails to Backpage?

19           MS. BERTRAND:  Same objection.  Leading.

20           THE COURT:  Overruled.                                    15:54:23

21           THE WITNESS:  Yes.

22   BY MR. BERRY:

23   Q.  Do you know approximately when you sent them?

24   A.  Probably in July of 2012.

25   Q.  Okay.  And before we keep going to those, back to the ads    15:54:32

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

113

1    that you were posting, how did you and your fellow officers

2    know how to post ads on Backpage and what the content should

3    include?

4    A.   From -- from the training we'd -- or that I took and just

5    by viewing ads on Backpage.                              15:54:56

6    Q.   Just looking at what else is already out there?

7    A.   Yeah.

8    Q.   Okay.  Okay.  So you said in 2012 you sent some emails to

9    Backpage?

10   A.   Yes.                                                15:55:10

11   Q.   Why were you sending those emails to Backpage?

12   A.   It was a -- in response to -- we had done a prostitution

13   sting.  It was a response to some of the arrests that we made

14   based on the ads that were on Backpage.

15   Q.   All right.  So flush that out a little bit for the jury.   15:55:27

16   What -- what had happened, and what did -- what steps did you

17   take next?

18   A.   So we had done a prostitution sting.  We had made -- used

19   Backpage to call females incall to us at the hotel.  They

20   responded, and we made arrests based on the ads that were      15:55:46

21   posted on Backpage.

22   Q.   And what kind of arrests were those?

23   A.   For prostitution, and I believe one was for promotion of

24   prostitution.

25   Q.   All right.  So you had done this many times before at this   15:56:02

UNITED STATES DISTRICT COURT

DEREK FRITZE – DIRECT EXAMINATION

114

1  point; correct?

2  A.  Yes.

3  Q.  All right.  And so what prompted you to send these emails

4  to Backpage at that time?

5  A.  I think just -- I think it got to that point where we're          15:56:12

6  seeing it happen over and over again and not understanding how

7  they could allow this to continue.

8          MS. BERTRAND:  Your Honor, objection.  Relevance.

9  Move to strike.

10          MR. BERRY:  I'm laying foundation for four exhibits,          15:56:29

11  Your Honor.

12          THE COURT:  I'll overrule the objection.

13  BY MR. BERRY:

14  Q.  You can answer.

15  A.  I'm sorry.  What was it?  Can you repeat the question?          15:56:39

16  Q.  Sure.  Yeah.  So you had done this sting before.  Why --

17  why now?  What triggered you --

18  A.  Right.

19  Q.  -- to do this now?

20  A.  It was -- it was more of just a feeling that, how does          15:56:49

21  Backpage allow this to -- to happen, because every -- every ad

22  on there, in my --

23          MR. EISENBERG:  Objection.  Objection.  He's answered

24  the question.

25          THE COURT:  Yes, he has.  Let's move on.          15:57:05

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

115

```
 1   BY MR. BERRY:
 2   Q.  Did you email them about some specific ads?
 3   A.  Yes.
 4   Q.  All right.  What do you remember about the ads that you
 5   were emailing Backpage about?                              15:57:13
 6   A.  They -- like specific content of the ad or --
 7   Q.  Yeah.
 8   A.  They were similar to all the other ads.  I know one -- some
 9   of them were just local area, but they were just -- you know,
10   the photos in them were provocative photos.  It was all the   15:57:35
11   same kind of language as every other ad that we had seen.
12   Q.  And they had photos of females?
13   A.  Yes.
14   Q.  And you said provocative photos, you said?
15   A.  Yes.                                                   15:57:51
16   Q.  How were they dressed?
17           MR. KESSLER:  Objection.  Foundation.  It sounds like
18   there was more than one.
19           THE COURT:  Well, I'll overrule.
20           And I guess, Mr. Berry, you can lay some additional   15:58:01
21   foundation as to --
22           MR. BERRY:  Sure.
23           THE COURT:  -- how he knows.
24           MR. BERRY:  Let's do that.
25       ///
```

UNITED STATES DISTRICT COURT

DEREK FRITZE – DIRECT EXAMINATION

116

1    BY MR. BERRY:

2    Q.  So we're talking about -- about four ads --

3    A.  Uh-huh.

4    Q.  -- correct?

5    A.  Yeah.                                                    15:58:11

6    Q.  Were each of these ads similar in nature?

7    A.  Yes.

8    Q.  Was there any critical differences between them from --

9    from the four ads versus any ads that you posted or that you

10   observed on Backpage?                                       15:58:25

11   A.  No.

12   Q.  Just run-of-the-mill escort ads on Backpage?

13   A.  Yes.

14   Q.  All right.  So how were the -- were all of the females in

15   these four ads dressed in a similar fashion?                15:58:38

16   A.  Yes.

17   Q.  And what was that?

18   A.  Dressed -- typically without fully clothed.  Showing, you

19   know, in a bra or underwear.  Just showing body parts.

20        MR. BERRY:  Okay.  I'm going to show for the witness's  15:58:56

21   eyes only United States 1606.

22   BY MR. BERRY:

23   Q.  Do you see this, sir?

24   A.  Yes, I do.

25   Q.  Do you recognize it?                                    15:59:22

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

117

```
 1    A.  Yes.

 2    Q.  How do you recognize it?

 3    A.  It has my email address on it.  It's an email that I sent

 4    to Backpage.

 5    Q.  Is this -- is this one of several emails?              15:59:33

 6    A.  Yes.

 7    Q.  And approximately when did this take place?

 8    A.  July 16th, 2012.

 9    Q.  All right.  And I'm going to --

10         MR. BERRY:  Your Honor, I'm going to go through, just   15:59:48

11    lay the foundation for four exhibits, and then come back and

12    move them all in, as best I can.

13         So let me show you -- just for the witness's eyes --

14    1606a.

15    BY MR. BERRY:

16    Q.  I'm showing 1606a for the witness only.  Do you recognize

17    it?

18    A.  Yes.

19    Q.  How do you recognize it?

20    A.  It's an email that I sent.                              16:00:10

21    Q.  To?

22    A.  To Backpage.

23    Q.  Okay.  And it's -- you recognize your email address?

24    A.  Yes.

25    Q.  And was this on the same day as the previous exhibit we  16:00:17
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

118

```
 1    just looked at?
 2    A.  Yes.
 3    Q.  But it's a different email, different time?
 4    A.  Yeah, a few minutes later.
 5    Q.  Was it in relation to a different ad?          16:00:27
 6    A.  Yes, it was.
 7            MR. BERRY:  I'm now showing, for the witness only,
 8    1606b.
 9    BY MR. BERRY:
10    Q.  Do you recognize that, Detective?              16:00:41
11    A.  Yes, I do.
12    Q.  What is it?
13    A.  Another email that I sent with my email address, same
14    time -- same date, again, just a few minutes later with a
15    different ad.                                       16:00:54
16    Q.  Okay.  Finally, 1606c.
17            Do you recognize that?
18    A.  Yes, I do.
19    Q.  And how do you recognize it?
20    A.  It's an email I sent to Backpage with my email address, and  16:01:08
21    same date and a couple minutes later.
22    Q.  Is that about a different ad?
23    A.  Yes, it was.
24    Q.  Do all four of these emails contain similar content and
25    message that you were trying to convey to Backpage?  16:01:25
```

UNITED STATES DISTRICT COURT

DEREK FRITZE – DIRECT EXAMINATION

119

1   A.   Yes.

2          MR. BERRY:  At this time, Your Honor, the United

3   States moves for the admission of Government's Exhibits 1606,

4   1606a, 1606b, and 1606c.

5          MS. BERTRAND:  Objection.                              16:01:40

6          Go ahead, Eric.

7          Foundation.  Relevance.  Hearsay.

8          THE COURT:  Overruled.

9          MS. BERTRAND:  Hearsay within hearsay.

10          THE COURT:  Overruled within each -- with -- I'm       16:01:53

11   sorry.  Overruled, each objection.

12          They may be admitted.  They may be published.

13          MR. BERRY:  Thank you, Your Honor.

14      (Exhibits 1606, 1606a, 1606b and 1606c admitted into

15   evidence.)                                                   16:02:04

16   BY MR. BERRY:

17   Q.   All right.  So now -- now we're looking at 1606 now in

18   evidence.

19          Is this your email address here at the top?

20   A.   Yes, it is.                                             16:02:19

21   Q.   And what address did you send it to?

22   A.   At abuse@backpage.com.

23   Q.   And what date and time did you send it?

24   A.   July 16th, 2012.

25   Q.   All right.  So let's go through this top portion of the  16:02:33

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

120

1    email.  And, actually, we'll just clarify here.

2            This is just a one-page email; correct?

3    A.  Correct.

4    Q.  Each one of these is just one page; correct?

5    A.  Yes.                                                    16:02:49

6    Q.  All right.  So let's start at the top.

7            If you would, please, read that out to the jury, and

8    I'll tell you when to stop.

9    A.  "Backpage.com, I'm contacting you regarding a listing that

10   violated the following terms or use.  User conduct:  4(c),     16:03:05

11   posting any solicitation directly or in 'coded' fashion for any

12   illegal service exchanging sexual favors for money or other

13   valuable consideration."

14   Q.  All right.  Stop there for just a second.

15           So you told them that you believe it violated their     16:03:24

16   terms of use.  Explain to the jury what you did to go get these

17   items under the user conduct and -- and put it in this email.

18   A.  I copied and pasted them directly from Backpage's website.

19   Q.  Okay.  And one of -- one of the terms of use that you found

20   on Backpage, they say is, you can't use coded fashion for any     16:03:51

21   illegal service; correct?

22   A.  Correct.

23   Q.  Did that strike you as odd considering your investigations?

24   A.  Yes.

25   Q.  Why?                                                        16:04:05

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

121

 1   A.  Because I believed every -- every ad on there had some sort

 2   of coded language regarding prostitution.

 3   Q.  All right.  Move on to the next one, 4(e).

 4   A.  "4(e):  Posting any material on the site that in any way

 5   constitutes or assists in human trafficking."                   16:04:23

 6   Q.  Number 5?

 7   A.  "Posting any ad for products or services, use or sale of

 8   which is prohibited by any" -- "any law or regulation."

 9   Q.  And why did you put that one on there?

10   A.  Because I -- I believed the ads were for prostitution,      16:04:38

11   which is illegal.

12   Q.  An illegal service in Minnesota; correct?

13   A.  Yep.

14   Q.  And what about 16?  What does that one say?

15   A.  "Using the site to engage in or assist another individual   16:04:56

16   or entity to engage in fraudulent, abusive, manipulative" --

17   "manipulative or illegal activity."

18   Q.  And explain to the jury why you included that one.

19   A.  Again, because it -- the site assists in prostitution,

20   which is an illegal activity.                                   16:05:16

21   Q.  The site itself?

22   A.  Yeah.

23   Q.  Okay.  All right.  Now let's move down in the email a

24   little bit.

25        What is this section right here that has a -- appears      16:05:27

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

122

```
 1    to be a hyperlink to a -- a website?  What is that?
 2    A.   The hyperlink is just a link to the actual ad of one -- of
 3    what we used or found on the prostitution sting, one of the
 4    ads.
 5    Q.   And in what part of Backpage was it posted?  What city?        16:05:45
 6    A.   It's in Minneapolis.
 7    Q.   All right.  And what section on Backpage?
 8    A.   Female escorts.
 9    Q.   And can you tell from this link here what the title of the
10    ad was?                                                             16:05:58
11    A.   Yes.
12    Q.   How do you tell that?  Or where is that?
13    A.   Just after the -- the female escorts.
14    Q.   And what did it say?
15    A.   "New-ultimate-pleasure-25."                                    16:06:07
16    Q.   All right.  And then below that you had some more message
17    for Backpage, and this is kind of the end of it.
18              Read that part to the jury, where it starts with "this
19    listing."
20    A.   "This listing under the adult services-escort section of      16:06:30
21    your site resulted in the arrest of three people for engaging
22    in prostitution and promoting the prostitution of others.
23    Although Backpage.com legally defends that they do not support
24    illegal activity such as prostitution and human trafficking,
25    any reasonable person knows that every listing in the adult        16:06:47
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

123

```
 1    services-escort section is an advertisement for illegal
 2    prostitution.  Every listing violates each of the above listed
 3    items in the user conduct agreement and should not be allowed
 4    to be posted at all.  Please take responsible" -- "or
 5    reasonable steps as a business to ensure these people do not        16:07:06
 6    use Backpage.com as a means to advertise prostitution."
 7    Q.  And what were you trying to convey to whoever would listen
 8    at Backpage?
 9            MR. KESSLER:  Objection.  It's in the email.
10            THE COURT:  Well, I'll sustain.                             16:07:28
11    BY MR. BERRY:
12    Q.  Did each of these four emails say basically the same thing?
13    A.  Yes.
14    Q.  What was different about any of the four in this section of
15    the email?                                                         16:07:40
16    A.  Just the resulted in the arrest of -- depend.  Just
17    different people.
18    Q.  All right.
19    A.  One or two words.
20    Q.  So this one happens to say three people.  The other ones       16:07:50
21    might say one person?
22    A.  Yes.
23    Q.  Do each of them say they were arrested for prostitution?
24    A.  Yes.
25    Q.  And then after that sentence, so starting with "although,"     16:07:59
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

124

```
 1    is everything the same in those subsequent three emails?
 2    A.  Yes.
 3    Q.  And they were, each one, conveying the same message?
 4    A.  Yes.
 5    Q.  All right.  Have you ever arrested someone for prostitution    16:08:13
 6    in Minnesota based solely on the face of the ad?
 7    A.  No.
 8    Q.  Okay.  Why not?
 9    A.  Most of the time we're doing stings, so I'm getting the
10    actual identification of the person, getting them to come to us    16:08:50
11    so we can identify them.
12            Other than that, just building a stronger case for an
13    actual prosecution, not just an arrest.
14    Q.  Okay.  When you've called ads on Backpage, have you ever
15    encountered prostitutes?                                           16:09:14
16    A.  Yes.
17    Q.  What percentage of the time?
18    A.  Every time.
19    Q.  100 percent?
20    A.  Every time.                                                    16:09:23
21    Q.  Have you ever called an ad and it turned out to not be a
22    prostitute?
23    A.  No.
24    Q.  You are at least generally familiar with the prostitution
25    statutes in Minnesota; correct?                                    16:09:40
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

125

```
 1   A.   Yes.

 2   Q.   Do you know the difference between the prostitution statute

 3   in Minnesota and the federal crime of promotion of a

 4   prostitution business enterprise?

 5             MR. CAMBRIA:  Objection.                            16:09:54

 6             MS. BERTRAND:  Objection.  Calls for a legal

 7   conclusion.

 8             MR. BERRY:  I'm asking if he knows the difference.

 9             THE COURT:  The question is, "Do you know the

10   difference between?"                                         16:10:00

11             He can answer yes or no if he knows the difference.

12             THE WITNESS:  No.

13   BY MR. BERRY:

14   Q.   You don't know?

15   A.   No.                                                     16:10:06

16   Q.   Do you know -- yes or no, do you know whether Backpage used

17   something called a strip ad filter?

18   A.   No.

19   Q.   Do you know -- are you aware -- or are you aware whether

20   Backpage would remove the most obvious sex-act-for-money      16:10:30

21   language from ads?

22             MS. BERTRAND:  Objection.  Leading.

23             THE COURT:  Overruled.

24   BY MR. BERRY:

25   Q.   You can answer.                                         16:10:38
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

126

```
 1   A.  No.

 2   Q.  You don't know?

 3   A.  No.

 4   Q.  Okay.  Are you aware of Backpage's moderation practices?

 5   A.  No.                                                      16:10:47

 6   Q.  Do you know what The Erotic Review is?

 7   A.  Yes.

 8   Q.  Explain to the jury what that is.

 9   A.  It's a website that -- where prostitution -- prostitutes

10   could be rated and given, you know, comments about things that  16:11:06

11   they've done based on searchable features, like phone numbers

12   or names or things like that.

13   Q.  Did you ever utilize that in connection with your Backpage

14   investigations?

15   A.  Yes.                                                      16:11:21

16   Q.  Explain that to the jury.

17   A.  If we had an ad that had a phone number or name or

18   anything, we'd look on The Erotic Review to see if they had any

19   reviews or any -- any comments about what they've done, more

20   explicit comments.                                           16:11:39

21   Q.  Did you ever see anything about The Erotic Review on the

22   Backpage ads?

23   A.  Not that I could -- not that I could recall.

24   Q.  All right.  That you would -- would you go do the

25   investigation yourself --                                     16:11:55
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

127

| | |
|---|---|
| 1 | A. Yeah. |
| 2 | Q. -- based on the ad? |
| 3 | A. Yeah. |
| 4 | Q. Okay. Is that a yes? |
| 5 | Are you saying yes? |
| 6 | A. Yeah. Yeah. |
| 7 | Q. Okay. Are you aware of any relationship between Backpage |
| 8 | and The Erotic Review? |
| 9 | A. No. |
| 10 | Q. Are you aware that Backpage was paying The Erotic Review? |
| 11 | MS. BERTRAND: Objection. Counsel's testifying. |
| 12 | Leading. |
| 13 | THE COURT: Overruled. |
| 14 | THE WITNESS: No. |
| 15 | THE COURT: He can -- |
| 16 | BY MR. BERRY: |
| 17 | Q. So you're not aware -- |
| 18 | A. No. |
| 19 | Q. -- that they were paying? |
| 20 | A. No. |
| 21 | Q. Okay. Are you aware of any relationship between Backpage |
| 22 | and so-called super posters? |
| 23 | A. No. |
| 24 | Q. Are you aware of Backpage's aggregation methods? |
| 25 | A. No. |

16:12:02

16:12:13

16:12:24

16:12:28

16:12:38

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

128

```
 1   Q.  Are you aware of whether Backpage took ads from Craigslist
 2   and posted them on Backpage?
 3   A.  No.
 4   Q.  Are you aware of any meetings between the owners of
 5   Backpage and the people at NCMEC?                              16:12:49
 6        MS. BERTRAND:  Objection, Your Honor.  What's the
 7   foundation for even asking this person these questions?  And
 8   they're presuming the -- the truth of the question.
 9        MR. BERRY:  I'm actually --
10        THE COURT:  All right.                                    16:13:01
11        MR. BERRY:  -- laying the foundation by asking if he's
12   aware.
13        THE COURT:  Let's lay some foundation then, Mr. Berry.
14        MR. BERRY:  Yes, Your Honor.  That's what I'm
15   attempting to do by asking if he's aware, yes or no.  And then 16:13:10
16   if the answer's yes, then we go forward.  If we don't, we move
17   on to the next question.
18   BY MR. BERRY:
19   Q.  Are you aware of any meetings between Backpage and NCMEC?
20   A.  No.                                                        16:13:20
21   Q.  Are you aware of any meetings between Backpage and the
22   people at Polaris?
23   A.  No.
24   Q.  Are you aware of any meetings between the owners of
25   Backpage and people at Auburn Theological Seminary?           16:13:30
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

129

1    A.   No.

2         MR. FEDER:  Judge, I'm going to object to this.

3    They've met with this guy.  Clearly he doesn't know this, and

4    they're trying to summarize their case with someone who

5    obviously doesn't know the answer.                              16:13:44

6         THE COURT:  Is there an objection based on the rule?

7         MR. FEDER:  Yes.  Foundation and relevance and

8    cumulative.

9         THE COURT:  Overruled.

10        MR. BERRY:  Just one second, Your Honor.                   16:14:01

11   BY MR. BERRY:

12   Q.   Did you ever see any of your original changes to the

13   Backpage ads after sending them emails about every ad being a

14   prostitution ad?

15   A.   I never checked to see if it -- are you saying if -- were  16:14:28

16   they still there?

17   Q.   Sure.

18   A.   I don't know if they were taken down or not.

19   Q.   Okay.  So let's actually go back to that.  That's a good

20   point.                                                          16:14:42

21        After you sent these four emails telling them

22   prostitution, prostitution, prostitution, did you get a

23   response?

24   A.   Yes.

25   Q.   From Backpage?                                             16:14:50

UNITED STATES DISTRICT COURT

DEREK FRITZE - DIRECT EXAMINATION

130

1  A.  Yes.

2  Q.  Do you recall the -- the general substance of that?

3  A.  It was one email response to the -- I don't know which ad

4  it was, but it said, thank you for letting us know, and -- and

5  we'll take -- remove these ads.                                    16:15:05

6  Q.  Okay.  We'll remove these ads.

7        Did they engage you on the substance of what you were

8  saying about how you're using coded terms, violating the

9  service, it's all prostitution?

10       Did they engage you on the substance of that at all?      16:15:18

11       MS. BERTRAND:  Objection.  Leading.

12       MR. EISENBERG:  Objection.  Asked and answered.

13       THE COURT:  Overruled.

14  BY MR. BERRY:

15  Q.  You can answer.                                              16:15:24

16  A.  No.

17  Q.  Just thanks for letting us know.  We took them down.

18  A.  Yeah.

19  Q.  All right.  Was Backpage a good resource for you in

20  investigating prostitution offenses?                            16:15:34

21       MS. BERTRAND:  Objection.  Leading.

22       THE COURT:  Overruled.

23       THE WITNESS:  Yes, it was.

24  BY MR. BERRY:

25  Q.  Were -- was Backpage a good partner to you in law           16:15:42

UNITED STATES DISTRICT COURT

DEREK FRITZE – DIRECT EXAMINATION

131

1   enforcement in your investigations?

2   A.  I don't think it was a -- it was not a good partnership

3   because -- because a partnership would have similar goals, and

4   I don't think we had similar goals in terms of what we were

5   trying to do.                                                    16:16:01

6   Q.  And what were those differences?

7        MR. KESSLER:  Objection.  That's speculation.

8        THE COURT:  Overruled.

9        THE WITNESS:  We were trying to remove or get rid of

10  prostitution and -- and means to -- to have it, you know, to    16:16:12

11  operate it, prostitution, and they were allowing it to happen.

12       MR. FEDER:  Objection.  Beyond the scope, and improper

13  opinion.

14       THE COURT:  Overruled.

15  BY MR. BERRY:                                                    16:16:27

16  Q.  Keep going.

17       THE COURT:  I think he's answered the question.

18       MR. BERRY:  All right.  I felt like the objection was

19  inter- -- interrupting him, but, all right.  I'll move on.

20  BY MR. BERRY:                                                    16:16:38

21  Q.  In your prostitution stings, you used the phone to call --

22  to talk to people, correct, that were either seeking sex for

23  money or the girls that were advertising it; correct?

24  A.  Correct.

25  Q.  Did you ever consider charging the phone company for        16:16:54

UNITED STATES DISTRICT COURT

DEREK FRITZE - CROSS-EXAMINATION

132

```
 1   facilitating the crime of prostitution?
 2   A.  No.
 3   Q.  Why not?
 4   A.  A couple reasons.  It -- I mean, it just comes down to
 5   knowledge.  I don't think phone companies had the same          16:17:09
 6   knowledge that Backpage did about the extent of the -- the
 7   prostitution.  Also, just the -- I guess the -- you know, I
 8   guess the volume.  When I say, you know, Backpage, every
 9   listing is -- in my opinion is prostitution.  You know, phone
10   calls, how did -- how do we know what phone calls are -- are    16:17:33
11   all prostitution?
12           So there's a lot of non-illegal phone calls.
13           MR. BERRY:  Thank you.
14           Pass the witness.
15           THE COURT:  Who's examining?                             16:17:45
16           Mr. Kessler, please come forward.
17           And, Mr. Kessler, we'll go through to 4:30.
18           MR. KESSLER:  Okay.  Thank you.
19           THE COURT:  Whenever you're ready.
20                     CROSS-EXAMINATION                              16:18:23
21   BY MR. KESSLER:
22   Q.  Hello.
23   A.  Hello.
24   Q.  Could you get a little closer to your microphone.
25           Thank you.                                               16:18:28
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - CROSS-EXAMINATION

133

```
 1              We've never met, have we?
 2    A.  No.
 3    Q.  My name is Eric Kessler.  I represent -- I'm one of the
 4    attorneys that represents Scott Spear, one of the former owners
 5    of Village Voice.                                             16:18:45
 6              Do you understand that?
 7    A.  Yeah.
 8    Q.  Okay.  I want to talk to you a little bit about your work
 9    history in Maplewood.
10              As I understand, that's a suburb of the Twin Cities;  16:19:02
11    correct?
12    A.  Correct.
13    Q.  About 40,000 population?
14    A.  Yes.
15    Q.  You worked in the street crimes unit at one point; correct?  16:19:12
16    A.  Yes.
17    Q.  What does that mean, street crimes unit?
18    A.  It's a -- it's more of a proactive investigation unit
19    within just our -- our jurisdiction, our city.
20    Q.  What did you typically investigate while working in that   16:19:31
21    unit?
22    A.  My focus on -- during that time was hotel issues and
23    supervise prostitution-related and narcotics related, which was
24    kind of all encompassing hotels.
25    Q.  Okay.  So a street crimes unit included prostitution?     16:19:56
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - CROSS-EXAMINATION

134

```
1    A.  It can, yes.

2    Q.  And you've testified that you received specialized training

3    in the investigation of prostitution; correct?

4    A.  Yes.

5    Q.  And that occurred in roughly 2011?                        16:20:13

6    A.  I believe so, yes.

7    Q.  You said that you've been on the force in Maplewood for

8    16 years; is that correct?

9    A.  Correct.

10   Q.  That would put you joining the force roughly 2007?        16:20:27

11   A.  Correct.

12   Q.  Did you have law enforcement experience before that?

13   A.  No.

14   Q.  Other than working for Maplewood Police Department, have

15   you been engaged in law enforcement in any other capacity     16:20:52

16   during your life?

17   A.  Yes.

18   Q.  Tell me about that.

19   A.  Prior to that, I was a community service officer with the

20   Cottage Grove Police Department, which is another suburb of   16:21:04

21   St. Paul.  Just more of a non-licensed law enforcement role.

22   Q.  You mean you were not a sworn officer at that time?

23   A.  No.

24   Q.  Couldn't carry a gun?

25   A.  No.                                                       16:21:20
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - CROSS-EXAMINATION

135

```
 1   Q.  Okay.  Anything else?
 2   A.  Not -- I've done loss prevention of catching shoplifters
 3   before that as well.
 4   Q.  So while working for Maplewood -- well, first, when you go
 5   through the Minnesota police officer training, I'm -- and, I'm        16:21:39
 6   sorry.  I don't know the exact name of that program.  Could you
 7   tell us what that is.
 8   A.  Yep.  It's the Minnesota Peace Officer Standards and
 9   Training.  It's a certification where you have certain class --
10   classroom credits.                                                     16:22:01
11   Q.  Okay.
12   A.  And it's --
13   Q.  And while you're not expected to be a lawyer, in terms of
14   knowledge of laws, you are taught about criminal laws; correct?
15   A.  Correct.                                                           16:22:17
16   Q.  You have to be proficient in understanding what constitutes
17   a violation of one of the state's criminal laws; correct?
18   A.  Correct.
19   Q.  And that includes prostitution?
20   A.  Correct.                                                           16:22:35
21   Q.  And then you go to work for Maplewood, a relatively small
22   community, but it's close to a couple very large ones; right?
23   A.  Yes.
24   Q.  And you're there a decade and a half.
25             At some point are you expected to have a pretty good         16:22:52
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - CROSS-EXAMINATION

136

1    handle on the Maplewood city or municipal code?

2    A.  Yes.

3    Q.  Okay.  Now, to be clear, Maplewood is governed by, like, a

4    city council; correct?

5    A.  Yes.                                                    16:23:17

6    Q.  And the city council members are elected by the citizens of

7    Maplewood; correct?

8    A.  Correct.

9    Q.  Yeah.  And the city council then carries out the wishes of

10   its constituents in passing the city code; correct?          16:23:31

11   A.  Correct.

12   Q.  And are you familiar with that code?

13   A.  And, just to be clear, there's -- we have a state statute

14   and criminal code for city ordinance.

15   Q.  Right.  I thought I covered that.  We --                 16:23:52

16   A.  Right.

17   Q.  We talked about you, before you became a police officer,

18   when you were in the Minnesota State training --

19   A.  Yeah.

20   Q.  -- for police, that's where you learn about the criminal   16:24:02

21   laws for the state of Minnesota as a whole; correct?

22   A.  Yes.

23   Q.  But there are individual cities within Minnesota, Maplewood

24   being one of them, and most of them have city councils that

25   pass laws pertaining to just those cities; right?            16:24:21

UNITED STATES DISTRICT COURT

DEREK FRITZE - CROSS-EXAMINATION

137

1    A.   Yes.

2    Q.   And that's the case in Maplewood?

3    A.   Yeah.  If -- if I could clarify?

4    Q.   Sure.

5    A.   I know there's -- there's city ordinance.  We -- the -- the          16:24:33

6    city ordinance is not strictly based on what we, you know, try

7    to -- I mean -- what am I trying to say?  It's not the only

8    thing that we use to enforce crimes.

9    Q.   No.  Understood.

10   A.   It's more -- it's more state statute --                              16:24:56

11   Q.   Yeah.

12   A.   -- that we do.

13   Q.   I understand.

14   A.   Okay.

15   Q.   I'm just trying to establish that you are familiar with the          16:25:01

16   Maplewood city code.

17   A.   Yeah.  In a -- and if there's -- I mean, I wouldn't say

18   I've ever memorized it, but I know where to look things up and

19   find things.

20   Q.   Okay.  Fair enough.                                                  16:25:14

21        In your career at Maplewood, you spent some time

22   investigating illegal massage parlors; is that correct?

23   A.   Yes.

24   Q.   And, as you've testified, you participated in a number of

25   sting operations targeting potential prostitutes; correct?            16:25:49

UNITED STATES DISTRICT COURT

DEREK FRITZE - CROSS-EXAMINATION

138

```
 1   A.  Correct.

 2   Q.  Your department would place a fake ad in Backpage.  The

 3   officer, usually female, would pose as a prostitute and would

 4   make contact with individuals who responded to the ad.

 5          Is that basically the way it worked?            16:26:17

 6   A.  Yes.

 7   Q.  When you placed the ads with Backpage, I -- did you ever do

 8   that yourself?

 9   A.  One of my partners would usually do -- we'd -- we'd talk

10   about the ad, but he would be the one -- be the one that would    16:26:39

11   post them --

12   Q.  Okay.

13   A.  -- physically post them.

14   Q.  So my question is, did you ever place or post an ad on

15   Backpage yourself?                                    16:26:48

16   A.  It -- I -- I've physically been there when it's posted,

17   yes.  I haven't pressed the button of --

18   Q.  Okay.

19   A.  -- that.

20   Q.  But you've watched it happen?                      16:27:03

21   A.  Yes.

22   Q.  All right.  And as a person begins to post an ad in, let's

23   say, the adult services, and be more specific, if you want, the

24   escort section of adult services, there are some, shall we say,

25   warnings that you have to go through before you can actually    16:27:31
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - CROSS-EXAMINATION

139

1   place the ad; correct?

2   A.  I don't -- I don't remember --

3   Q.  Well --

4   A.  -- what they were.

5   Q.  -- let me point you to it.                              16:27:43

6       The first thing that you come across is a notification

7   that this is an adult site?

8       MR. BERRY:  Objection, Your Honor.  He just said he

9   doesn't remember.

10      THE COURT:  Sustained.                                  16:27:56

11      MR. KESSLER:  No.  He also said he was there.

12  BY MR. KESSLER:

13  Q.  So let me ask you this again.

14      Did you watch somebody post these ads?

15  A.  Yes.                                                    16:28:05

16  Q.  Okay.  And did you watch when the age verification warning

17  came up?

18  A.  I don't -- honestly, I don't remember what was on there

19  when it was being posted.

20  Q.  You said that every ad for escorts was a prostitution ad;  16:28:21

21  correct?

22  A.  Correct.

23  Q.  But you never posted an ad yourself; correct?

24  A.  I was there when they were posted.

25  Q.  Did you ever see the age verification warning?          16:28:39

UNITED STATES DISTRICT COURT

140

```
 1              MR. BERRY:  Objection.  Asked and answered.
 2              THE COURT:  Sustained.
 3    BY MR. KESSLER:
 4    Q.  Did you ever see the terms of use?
 5    A.  I've looked them up.                                    16:28:49
 6    Q.  Well, you must have, because they're in your email, all
 7    four of them; correct?
 8    A.  Correct.
 9    Q.  And so you understand that in order to lawfully -- or at
10    least within the terms allowed by Backpage.com, you have to   16:29:11
11    agree to a number of terms of use; correct?
12              MR. BERRY:  Objection.  Compound question.
13              THE COURT:  Overruled.
14              But we'll leave it at that.
15              Members of the jury, we are at 4:30, so it is time to  16:29:32
16    adjourn for the afternoon.
17         I do again remind you of the admonishment.  It's very
18    important not to come to any conclusions, not to conduct any
19    research, discuss the matter amongst yourselves or anyone else.
20    Continue to have an open mind and just enjoy the evening.  And  16:29:47
21    we will see you promptly in court at 9:00 a.m. tomorrow.  So
22    have a pleasant evening.
23              All rise for the jury.
24         (Jury not present at 4:30 p.m.)
25              THE COURT:  And the witness may step down.           16:30:21
```

UNITED STATES DISTRICT COURT

1          And I'd like to discuss a couple of issues and

2    scheduling matters with counsel.

3          I see that at the time of -- including this gentleman

4    here, there are roughly 14, 15 government witnesses on the

5    witness list that are to be called.  Today, obviously, we got          16:30:55

6    through about five.  And so if the government continues at this

7    pace, I suspect we're going to possibly finish if not Friday,

8    but possibly bleed into Tuesday of next week with the

9    government's case.

10         So that prompts me to do this.          16:31:20

11         MR. RAPP:  Judge?

12         THE COURT:  Unless there's some sort of firm

13   objection, counsel has other matters to attend to, I would like

14   you to keep your Friday afternoon calendars clear beginning

15   this Friday at 1:30 to 3:30, roughly 4:00 o'clock, so that we          16:31:38

16   can do a number of things:

17         First, I'd like you to start reviewing the current

18   jury instructions that have been already agreed to, provide to

19   the Court by Friday any amended jury instructions, if there's

20   language to be altered or any of that sort of thing.          16:32:06

21         But, again, I think Friday afternoon you should have

22   to me any amended -- amendments to the already predetermined

23   jury instructions.

24         Now, I suspect one or more of you may want to move for

25   new instructions, and so I want to build time to hear your          16:32:31

142

```
 1   argument on those Fridays.  My Monday is completely booked with
 2   criminal and civil matters.
 3          And so in addition to that, I, once again, reviewed
 4   the forms of verdict.  And because I don't want to be caught
 5   behind and keeping the jury waiting, I want the government to      16:32:54
 6   look at its form of verdict.  I think there are edits,
 7   substantive edits that need to go into that form of verdict.  I
 8   think the descriptions in the current form of verdict are
 9   confusing, not helpful, do not precisely track the counts and
10   perhaps the exhibits that relate to the counts, and so you         16:33:25
11   should look at that.  Nowhere in the proposed form of verdict
12   does it mention the states in which the violation is alleged to
13   have occurred.  So do be mindful of that, and also remain --
14   remove the defendant who is not a party to this case.  So do be
15   mindful of that.  And then we will discuss when to have that       16:33:51
16   ready for the Court's review.  We can do that on Friday.
17          But, in any event, please keep this Friday, next
18   Friday, November the 3rd, Friday afternoon clear.  If you have
19   a conflict, you can send me a note as to whether or not you're
20   anticipated in another court, or you can tell me why it is you     16:34:17
21   cannot be here and present so that we can make sure that the
22   jury remains on schedule.
23          Mr. Rapp?
24          MR. RAPP:  Judge, I think we're going to rest on
25   Thursday.                                                          16:34:33
```

UNITED STATES DISTRICT COURT

143

```
 1              THE COURT:  Well, there we go.

 2              MR. RAPP:  We think we have about five witnesses that

 3      we're going to put on.  We're going to end -- we're going to

 4      finish up --

 5              THE COURT:  Can you speak into the mic.                16:34:44

 6              MR. RAPP:  I thought I was.  Sorry about that.

 7              We're going to finish, obviously, with Detective --

 8      Detective Fritze.  We are then going to proceed to Jordan

 9      Thurman, who is a substantive count victim.  Then we're going

10      to have Brad Myles.  We're going to have John Shehan, which we   16:34:59

11      noticed a couple of weeks ago.  And then depending on flight

12      scheduling, we're either going to have Dan Hyer, then Megan

13      Lundstrom, or Megan Lundstrom, Dan Hyer.  Then we're going to

14      be ready to rest.

15              So we -- we think that could happen as early as         16:35:19

16      Thursday, so we believe that the defense should have witnesses

17      in the building on Thursday.

18              THE COURT:  All right.  You have been put on notice,

19      and you will have your witness -- your witnesses identified and

20      provided to the government three days in advance of Thursday,    16:35:37

21      which is -- we're -- we're within that time period.

22              And, so, then, again, it's necessary for us then to

23      use the afternoon on Friday to address some of these other

24      miscellaneous matters.  And so that's how we will proceed.

25              MR. LINCENBERG:  Your Honor, can I raise a question      16:36:05
```

UNITED STATES DISTRICT COURT

144

```
 1    about what Mr. Rapp just indicated?
 2              THE COURT:  Yes.
 3              MR. LINCENBERG:  Thank you.
 4              THE COURT:  Question to Mr. Rapp or to me?
 5              MR. LINCENBERG:  Well, it's really for both.     16:36:12
 6         We've been advised of about 15 witnesses that were
 7    going to be called this week.  We've been spending the entire
 8    weekend and so forth preparing for them.  Can I take it from
 9    Mr. Rapp's representation that the individuals who Mr. Rapp did
10    not just identify are not going to be called?              16:36:31
11              MR. RAPP:  Yes.  They will not be called in our
12    case-in-chief.  They -- they may still be called in rebuttal,
13    depending what the defense puts on.
14              MR. LINCENBERG:  Okay.  That's helpful.
15         I'd like to make one other point, if I may,            16:36:43
16    Your Honor.
17              THE COURT:  Yes.
18              MR. LINCENBERG:  This is just for the record with
19    regard to the current witness, to note our objections with
20    respect to the Court's not allowing, for example, reference to  16:36:57
21    Communication Decency Act, Section 230.
22         What we see is yet another state law law enforcement
23    person who comes into court, and the prosecution, knowing that
24    we can't ask these questions, sort of has the witness suggest
25    that he could have made arrests of Backpage or that Backpage    16:37:18
```

UNITED STATES DISTRICT COURT

145

```
 1    was somehow violating the law, even though he full well knows,
 2    based upon all of the court cases, that there was no violation
 3    of state criminal laws in Minnesota, because of the CDA.
 4         THE COURT:  Well, I don't think there was any
 5    testimony by this witness that he knows about any court cases    16:37:36
 6    related to the CDA.  Of course, the government wasn't permitted
 7    to ask that area of questioning.  So there's no evidence in
 8    the -- no testimony in the record as to his knowledge of court
 9    cases relating to the CDA.
10         MR. LINCENBERG:  That's not what we suggested.  That's    16:37:55
11    not what we suggested.
12         THE COURT:  No.  That's exactly what you said,
13    Mr. Lincenberg.
14         MR. LINCENBERG:  No.
15         THE COURT:  I saw it, I heard it, and I see it on the    16:38:02
16    record.  All right.
17         MR. LINCENBERG:  That's not correct.
18         THE COURT:  Well --
19         MR. LINCENBERG:  Can I restate my point to make it
20    clear if I wasn't clear?                                        16:38:08
21         THE COURT:  Yes, please.
22         MR. LINCENBERG:  Thank you, Your Honor.
23         What we said is that this is another state law
24    enforcement witness who comes into court and makes it seem like
25    he could have easily gone out and arrested people at Backpage.  16:38:18
```

UNITED STATES DISTRICT COURT

146

```
 1    You know, Mr. Berry's questioning, for example, was sort of
 2    preempting other lines of cross that have been used with other
 3    witnesses.  Mr. Berry says, now, you didn't make any arrests
 4    based upon the ads, right?  Right.  Well, it's just because we
 5    were -- we wanted to do further work.                              16:38:42
 6         The suggestion that he could have, that these are
 7    clear violations of the laws that he's involved with, when he
 8    knows that's not the case, and the prosecution knows that we're
 9    forbidden from cross-examining to bring out the whole story.
10    That's my point.                                                   16:38:57
11         THE COURT:  Well, I think what gets lost in these
12    discussions is I have not been given by the defense, by the
13    government, anyone else, I've not seen a criminal prosecution
14    under the CDA.  That is a civil tool.  I've not seen any case.
15    You can bring it to my attention if you wish.  Research all       16:39:18
16    night.  I -- I'd like to see it.  Provide that to me, and then
17    maybe I'll reevaluate the prior orders.  But, as far as I know,
18    this is not a civil prosecution.
19         MR. LINCENBERG:  Right.
20         THE COURT:  This is a criminal prosecution.  This            16:39:36
21    individual was not, as my -- my understanding of his testimony,
22    he was investigating prostitution crimes.
23         MR. LINCENBERG:  Under state law.
24         THE COURT:  Yes.
25         MR. LINCENBERG:  For which they're immune under the          16:39:48
```

UNITED STATES DISTRICT COURT

1  CDA.

2          THE COURT:  Well, he wasn't investigating, I don't

3  think, the CDA.

4          MR. LINCENBERG:  No.  It's not a --

5          THE COURT:  Mr. Berry?                                    16:39:57

6          MR. LINCENBERG:  It's not a matter of him

7  investigating the CDA.  Of course not.

8          THE COURT:  Yes, it is.

9          MR. RAPP:  He --

10         THE COURT:  All right.  Mr. Berry?                         16:40:03

11         MR. RAPP:  Well, he --

12         THE COURT:  Mr. Rapp.

13         MR. RAPP:  Well, he's conflating the Travel Act, which

14  is a federal criminal prosecution with state prostitution

15  offenses.  And so he's investigating state prosecution         16:40:14

16  offenses.  There is a carve-out, as the defense knows, for

17  federal criminal prosecution for violation of the Travel Act.

18  That's what we're -- that's what this case is.

19         MR. LINCENBERG:  Exactly.  He doesn't bring Travel Act

20  investigations or cases.  He's a state law prosecutor.  They're  16:40:28

21  using him to come in and talk about how Backpage -- how he had

22  jurisdiction and he's doing these investigations because

23  Backpage folks are violating these laws, when he knows that the

24  CDA makes all of our clients immune under the state of

25  Minnesota laws.  But we can't -- we can't counter that --       16:40:46

148

```
 1              THE COURT:  Well, why don't you --
 2              MR. LINCENBERG:  -- because of the Court's ruling.
 3              THE COURT:  -- give me your line of questioning for
 4   this witness in that category, and I'll evaluate it and see
 5   based on -- and I'll look at his testimony.                    16:41:02
 6              MR. LINCENBERG:  Do you want me to give it to --
 7              THE COURT:  But --
 8              MR. LINCENBERG:  -- you now or --
 9              THE COURT:  No.  I want you to give it to me in
10   written form.                                                  16:41:06
11              MR. LINCENBERG:  When?  Overnight?  Today.
12              THE COURT:  Yes.
13              MR. LINCENBERG:  Okay.
14              THE COURT:  I mean, the witness is testifying.  He's
15   on the stand.  He's on cross-examination.                      16:41:10
16              And while I'm on the point, those of you who have two
17   counsel, the person who makes the objection is the person who
18   is taking the witness.
19              So, Mr. Feder, try to refrain from objecting when it
20   was Mr. Kessler's witness.  Mr. Kessler and you were objecting 16:41:31
21   on the same witness.  So let's make sure that that doesn't
22   happen again.
23              I see Mr. Cambria waiting patiently.  So you wish to
24   make a record of some sort?
25              MR. CAMBRIA:  No.  I wish to ask a question.         16:41:43
```

UNITED STATES DISTRICT COURT

149

```
 1            Our -- is the suggestion here that the defense is
 2      supposed to have witnesses ready this Thursday or a week from
 3      Thursday?
 4            THE COURT:  This Thursday.  You just heard Mr. Rapp
 5      say they might rest on Thursday.                                16:41:57
 6            MR. CAMBRIA:  Well, the problem is, using this Friday,
 7      that was one of the days that I had witnesses set up for me to
 8      prepare.  So I do have a conflict with being in court on
 9      Friday.
10            THE COURT:  Well, as you know, we have trial on Friday    16:42:15
11      morning.
12            MR. CAMBRIA:  Just on the morning.
13            THE COURT:  Yes.  And so you can delay your
14      preparation of your witnesses, as we all do, on the weekends.
15      I've been working on the weekends.  Many of you have as well.   16:42:28
16            So that's what we're going to do.  We're not going to
17      waste any of the jury's time.  We're going to maximize the use
18      of what we have.  We only have, as I noted, on this accelerated
19      schedule now possibly only two Fridays to work with.
20            Mr. Panchapakesan?                                       16:42:51
21            MR. PANCHAPAKESAN:  Good afternoon, Your Honor.  I had
22      a quick question on the jury instructions.
23            So there's the preliminary ones the Court gave at the
24      outset of the case.  I have, I think, a July 20th, 2023, draft
25      that I think was circulated in hard copy.  And I just want to   16:43:06
```

150

1    make sure we're working off the same copy.  This one is, I

2    think, 62 pages.  As to some of the instructions, the Court, I

3    think, kept the objection in, and so I just want to make sure

4    I -- we know what we're dealing with.

5             THE COURT:  I will double-check, but I thought we had          16:43:22

6    gone over that at a subsequent final pretrial conference.  And

7    so there might be a different version that's beyond that.  And

8    I'll double-check that, and I'll have my law clerk send you a

9    note so that you can begin reviewing that.

10            MR. PANCHAPAKESAN:  Okay.  Thank you.                          16:43:43

11            THE COURT:  All right.  Anything further from the

12   government?

13            MR. RAPP:  Oh, well, obviously we'd like the -- the

14   defense witnesses on -- in that same vein with these witnesses,

15   we've asked repeatedly -- of course there's scheduling orders         16:44:01

16   in this regard, but we've asked repeatedly for 26.2 statements

17   of these witnesses.  We have never gotten a confirmation, a

18   definitive confirmation from the defense that they have

19   disclosed those 26.2 statements for every, you know, now

20   150 witnesses.                                                         16:44:21

21            And so we've been sending them emails, giving them

22   case law, giving them examples of -- of judges in this district

23   who have compelled the defense to disclose those statements.

24   We have not got a confirmation of that.  And so not only would

25   we like the witnesses that they should be prepared to put on          16:44:42

UNITED STATES DISTRICT COURT

151

```
 1    the stand this week, we also would like them to disclose their

 2    26.2 statements that they have been obligated to do so for the

 3    last two or three years based upon scheduling orders.  So ...

 4         THE COURT:  All right.  Well, that's not an

 5    unreasonable request.                                        16:45:02

 6         Who's responsible for the witnesses?

 7         MR. LINCENBERG:  I -- I'm not here --

 8         THE COURT:  I would assume that each of you are.

 9         MR. LINCENBERG:  Yeah.  I'm here to just note the

10    unfairness of what is happening here, where the government gave   16:45:12

11    us a list of 15 witnesses, which would have clearly taken us

12    through the week, and they decide to wait until Tuesday at

13    night to tell us:  You know what?  We may be ending Thursday.

14    You have to get your witnesses here Friday morning.  We're only

15    going to call seven of the 15 that -- that we said.          16:45:30

16         So that the Court, which I understand, wants to keep

17    the trial moving, but now it puts the -- the defense, like

18    Mr. Cambria, who has been anticipating, based upon the

19    representations from -- from the prosecution, that those

20    witnesses would become no -- be coming no earlier than next   16:45:47

21    week.

22         THE COURT:  Well, your statement is noted, but I will

23    say that on balance there has been a lack of cooperation

24    amongst the parties.  Everything is a fight.

25         On Friday at 4:30, Mr. Feder all of a sudden says       16:46:10
```

UNITED STATES DISTRICT COURT

152

1   everybody's left town, we don't know who our witnesses are,

2   compelling me to direct you to at least identify the first

3   five.  What I received in response was not a listing on

4   Saturday, as I ordered, but a filing early this week saying:

5   We don't intend to call these seven odd witnesses, and we          16:46:35

6   possibly may call these five city ordinance people.

7            So I'm operating on the assumption that at the very

8   least those people that you've identified, in Mr. Cambria's

9   filing earlier this week, are going to be the witnesses you're

10  going to call.  And you better have your witnesses available to    16:46:57

11  testify if the government rests on Thursday.

12           I don't think any of us anticipated that we would get

13  through five witnesses today.  I certainly didn't.

14           And so that has been my observation.

15           Provide the statements that are necessary.  Provide       16:47:22

16  the identity of the witnesses that you intend to call this

17  week.  Make yourselves available from 1:30 to 4:00 o'clock on

18  Friday to address these other matters.  And that's all I'm

19  asking.

20           MR. BERRY:  Your Honor, could you please give the         16:47:47

21  defense a time by which they need to file these -- or notify us

22  of these 26.2 statements and the exhibits for Thursday?

23           THE COURT:  Wednesday at 4:00 o'clock.

24           I think the fact that this is the retrial should have

25  generated that information and the production of it by now.        16:48:12

153

1        And so is there anything further from the government?

2        MR. RAPP:  Just the last -- our last point is we

3   actually have been researching some of these witnesses, and we

4   have found that many of these witnesses were surprised to hear

5   they were defense witnesses in this case.  Many of them do not        `16:48:35`

6   have subpoenas.  For sure the federal agent witnesses don't

7   even have subpoenas.  And there's -- of course there's the --

8   the Touhy regulations that need to be complied with.  So, you

9   know, we're a little bit perplexed about who it is the defense

10  is intending to call.        `16:48:57`

11       To the extent that they have a question about whether

12  they are obligated to disclose 26.2 statements and they have

13  some statements of these witnesses in their possession, we ask

14  that they bring them to court so there's not a delay, so they

15  don't put a witness on the stand and our first question is, did        `16:49:11`

16  you give statements to the defense in the form of emails or

17  whatever, and they say, yeah, we did; and the defense says,

18  well, we didn't think we were obligated to bring -- to disclose

19  them, and we don't have them in court.

20       We would ask that they bring them in court so that if        `16:49:27`

21  there is a -- a dispute over it, the Court can look at them in

22  camera so there's not a delay in -- and that we are at a

23  disadvantage in our cross-examination.

24       THE COURT:  I've just ordered the production of those

25  statements by tomorrow -- excuse me -- Wednesday -- well, I        `16:49:42`

154

```
 1    guess that's tomorrow -- Wednesday at 4:00 for the first
 2    witnesses to be called.  Beyond that, you should be starting to
 3    prepare those additional statements.  Again, they're long
 4    overdue.
 5          And I am not yet at the point where I think about          16:49:59
 6    sanctions for not complying with your obligations.  And I say
 7    that only because the government's case has moved rapidly along
 8    these last two weeks.  You've produced a witness list of 156.
 9    They produced a witness list of almost 50.  And we've gone
10    through a number of those individuals today and last week.  But   16:50:36
11    that's the nature of trial work.
12          Be prepared.  Be ready.  Block out that time so we can
13    get these other additional important matters done and done
14    correctly.
15          And we will stand in recess.                                16:51:01
16       (Proceedings adjourn at 4:51 p.m.)
17                        ---oOo---
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT

155

1

2

3

4

5                        **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8     appointed and qualified to act as Official Court Reporter for

9     the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11    a full, true, and accurate transcript of all of that portion of

12    the proceedings contained herein, had in the above-entitled

13    cause on the date specified therein, and that said transcript

14    was prepared under my direction and control.

15          DATED at Phoenix, Arizona, this 17th day of October,

16    2023.

17

18

19                    /s/ Cathy J. Taylor
20                    Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

ER 13167

1

**'** [1]

**'coded'** [1] - 120:11

**/**

**/s/Cathy** [1] - 155:19

**0**

**07/16/2012** [4] - 4:18, 4:20, 4:22, 4:24

**1**

**1** [2] - 17:23, 84:1
**10** [15] - 7:17, 8:1, 8:2, 8:3, 9:7, 9:24, 10:3, 11:5, 12:3, 12:23, 13:1, 13:9, 14:25, 15:7, 15:18
**100** [1] - 124:19
**102** [1] - 4:13
**1155** [1] - 3:9
**119** [4] - 4:18, 4:20, 4:22, 4:24
**11th** [1] - 2:10
**12** [1] - 4:3
**120** [1] - 2:13
**1301** [1] - 2:10
**132** [1] - 4:14
**14** [2] - 26:19, 141:4
**141** [1] - 4:5
**14202** [1] - 2:14
**15** [9] - 14:20, 14:23, 14:24, 16:20, 81:24, 141:4, 144:6, 151:11, 151:15
**150** [1] - 150:20
**1546** [7] - 66:24, 72:17, 72:21, 76:2, 76:8, 79:6, 81:24
**156** [1] - 154:8
**15th** [1] - 101:12
**16** [7] - 4:4, 24:15, 25:24, 104:5, 104:7, 121:14, 134:8
**160** [1] - 2:20
**1606** [5] - 4:18, 116:21, 119:3, 119:14, 119:17
**1606a** [5] - 4:20, 117:14, 117:16, 119:4, 119:14
**1606b** [4] - 4:22, 118:8, 119:4, 119:14
**1606c** [4] - 4:24, 118:16, 119:4, 119:14
**16th** [2] - 117:8,

119:24
**17** [3] - 1:8, 4:4, 25:24
**17th** [1] - 155:15
**18** [1] - 108:6
**1800** [1] - 2:5
**1875** [1] - 3:4
**19** [1] - 1:14
**19th** [2] - 61:4, 67:6
**1:15** [4] - 1:8, 5:2, 5:3, 88:5
**1:25** [1] - 12:4
**1:30** [2] - 141:15, 152:17
**1:47** [1] - 28:9

**2**

**2** [2] - 7:21
**20** [1] - 88:12
**20005** [1] - 2:10
**2007** [1] - 134:10
**2011** [4] - 72:9, 106:12, 106:22, 134:5
**2012** [8] - 55:24, 57:12, 72:15, 112:14, 112:24, 113:8, 117:8, 119:24
**2013** [3] - 61:4, 67:6, 72:14
**2014** [8] - 31:7, 47:2, 90:21, 91:5, 96:23, 97:2, 97:23, 97:24
**2015** [18] - 20:19, 31:7, 38:19, 38:22, 45:22, 46:16, 47:18, 55:25, 68:21, 71:1, 72:15, 85:25, 96:25, 97:2, 97:23, 97:25, 101:12
**2023** [3] - 1:8, 149:24, 155:16
**20th** [1] - 149:24
**21** [2] - 73:2, 73:5
**210** [1] - 2:17
**215** [2] - 47:14, 50:13
**215a** [1] - 46:24
**217** [1] - 46:9
**217a** [1] - 45:12
**221** [1] - 100:18
**230** [1] - 144:21
**2300** [1] - 3:4
**23rd** [1] - 47:2
**24** [1] - 24:15
**26** [1] - 30:5
**26.2** [5] - 150:16, 150:19, 151:2, 152:22, 153:12
**2734** [1] - 3:12
**29** [2] - 4:8, 90:16
**2930** [1] - 2:20

**29th** [1] - 45:22
**2:18-cr-00422-DJH** [1] - 1:5
**2:56** [2] - 88:14, 88:18

**3**

**30** [1] - 99:25
**302** [1] - 22:20
**30th** [1] - 38:21
**31** [1] - 1:22
**312** [1] - 1:21
**31st** [2] - 46:14, 47:18
**322-7249** [1] - 1:23
**33** [1] - 55:11
**3550** [1] - 3:9
**3:00** [1] - 88:4
**3:20** [3] - 88:18, 88:19, 88:22
**3:30** [1] - 141:15
**3rd** [1] - 142:18

**4**

**4(c** [1] - 120:10
**4(e** [1] - 121:4
**4(e)** [1] - 121:3
**40** [1] - 2:5
**40,000** [2] - 103:18, 133:13
**401** [2] - 1:22, 22:15
**403** [4] - 22:16, 23:5, 43:13
**412** [3] - 84:8, 84:10, 84:18
**42** [1] - 2:13
**43** [1] - 103:10
**45** [1] - 99:25
**49** [1] - 4:9
**4:00** [4] - 141:15, 152:17, 152:23, 154:1
**4:30** [4] - 132:17, 140:15, 140:24, 151:25
**4:51** [1] - 154:16

**5**

**5** [2] - 4:3, 121:6
**50** [1] - 154:9
**51** [1] - 23:14
**53** [1] - 103:19
**54** [1] - 4:10
**5656110** [1] - 4:20

**6**

**6** [5] - 12:13, 12:21, 12:22, 13:22, 14:19

**602** [1] - 1:23
**62** [1] - 150:2
**6720** [1] - 2:17

**7**

**702six7four6077** [1] - 73:10
**71** [1] - 4:10
**77** [1] - 4:11
**7756616** [1] - 4:22
**79** [1] - 4:11

**8**

**804357** [1] - 4:24
**80670844** [1] - 4:18
**85003-2151** [1] - 1:22
**85004-4408** [1] - 2:6
**85012** [1] - 3:9
**85016** [1] - 2:20
**85252-2734** [1] - 3:13
**85253** [1] - 2:17
**89** [1] - 4:12
**8:35** [2] - 8:16, 8:17

**9**

**90067** [1] - 3:5
**9:00** [1] - 140:21

**A**

**A-R-S-H-A-N-A** [2] - 89:17, 89:20
**A-S-T-R-I-D** [1] - 29:10
**a.m** [1] - 140:21
**ability** [3] - 9:12, 13:19, 15:23
**able** [4] - 7:5, 62:1, 81:12, 100:24
**above-entitled** [1] - 155:12
**abuse@backpage.com** [1] - 119:22
**abusive** [1] - 121:16
**accelerated** [1] - 149:18
**accept** [2] - 36:13, 81:6
**accepted** [2] - 79:8, 79:12
**account** [6] - 80:3, 80:4, 98:10, 98:13, 98:15, 98:22
**accurate** [1] - 155:11
**acknowledged** [1] - 8:8
**acronyms** [1] - 65:15
**Act** [4] - 144:21,

147:13, 147:17, 147:19
**act** [5] - 32:7, 59:9, 80:24, 125:20, 155:8
**acting** [1] - 6:3
**actions** [1] - 79:17
**activity** [7] - 21:2, 98:16, 99:2, 100:6, 121:17, 121:20, 122:24
**acts** [8] - 23:25, 32:7, 36:20, 36:25, 56:2, 59:5, 59:11, 109:5
**actual** [5] - 81:14, 105:14, 122:2, 124:10, 124:13
**ad** [105] - 20:18, 20:20, 20:23, 21:12, 22:1, 23:25, 24:1, 24:5, 25:22, 25:24, 32:1, 34:23, 35:7, 41:7, 41:11, 47:3, 47:16, 47:19, 49:11, 50:3, 50:11, 50:13, 50:17, 50:19, 51:2, 51:8, 57:22, 63:7, 64:4, 64:24, 65:22, 66:1, 66:4, 67:3, 67:10, 67:15, 67:22, 68:1, 68:20, 72:17, 72:24, 73:12, 76:8, 76:10, 76:13, 81:14, 81:25, 83:25, 84:14, 85:6, 85:15, 86:6, 86:20, 91:20, 92:25, 93:1, 93:12, 95:18, 96:3, 96:4, 96:12, 96:14, 97:9, 97:13, 98:2, 98:3, 99:11, 100:25, 101:11, 107:22, 108:8, 109:13, 109:24, 110:2, 110:4, 110:11, 110:13, 111:25, 114:21, 115:6, 115:11, 118:5, 118:15, 118:22, 121:1, 121:7, 122:2, 122:10, 124:6, 124:21, 125:17, 126:17, 127:2, 129:13, 129:14, 130:3, 138:2, 138:4, 138:10, 138:14, 138:22, 139:1, 139:20, 139:23
**addition** [2] - 101:2, 142:3
**additional** [3] - 115:20, 154:3,

UNITED STATES DISTRICT COURT

154:13
**address** [9] - 7:13, 117:3, 117:23, 118:13, 118:20, 119:19, 119:21, 143:23, 152:18
**addresses** [1] - 27:7
**adequately** [1] - 21:11
**adhere** [1] - 22:5
**adjourn** [2] - 140:16, 154:16
**admission** [1] - 119:3
**admitted** [4] - 45:11, 47:15, 119:12, 119:14
**admonish** [1] - 6:4
**admonished** [3] - 6:1, 18:6, 25:21
**admonishment** [2] - 88:8, 140:17
**ads** [136] - 23:15, 23:17, 24:2, 24:12, 32:8, 34:7, 34:15, 34:17, 39:9, 42:15, 49:13, 50:13, 55:16, 55:17, 55:19, 56:3, 56:13, 57:7, 58:2, 58:4, 58:9, 60:15, 61:18, 61:22, 61:25, 62:1, 62:5, 62:9, 62:18, 63:6, 64:19, 68:10, 68:13, 72:4, 72:10, 72:14, 72:16, 73:22, 74:17, 74:25, 75:1, 75:2, 75:5, 75:18, 75:22, 81:12, 81:17, 81:19, 81:21, 81:24, 83:8, 83:9, 83:11, 83:12, 83:14, 83:15, 83:20, 83:21, 83:23, 83:24, 84:3, 84:15, 85:5, 85:12, 86:1, 86:12, 86:13, 86:21, 86:23, 87:3, 92:5, 92:8, 92:12, 92:18, 92:22, 93:6, 93:14, 93:17, 93:19, 94:1, 95:1, 95:6, 95:11, 95:12, 95:13, 95:23, 95:24, 96:10, 97:5, 97:22, 98:25, 107:10, 107:12, 107:16, 107:19, 107:23, 108:13, 108:15, 108:18, 108:20, 109:16, 109:19, 109:20, 110:25, 111:11, 112:1, 112:25, 113:2, 113:5,

113:14, 113:20, 115:2, 115:4, 115:8, 116:2, 116:6, 116:9, 116:12, 116:15, 121:10, 122:4, 124:14, 125:21, 126:22, 128:1, 129:13, 130:5, 130:6, 138:7, 139:14, 146:4
**adult** [5] - 122:20, 122:25, 138:23, 138:24, 139:7
**advance** [1] - 143:20
**advertise** [7] - 30:13, 30:24, 37:21, 38:6, 42:16, 64:4, 123:6
**advertised** [8] - 25:1, 30:20, 30:25, 31:2, 31:5, 32:4, 55:20, 56:1
**advertisement** [6] - 38:15, 56:20, 61:23, 67:22, 91:18, 123:1
**advertisements** [13] - 25:17, 31:9, 31:22, 32:9, 33:11, 34:10, 35:2, 56:6, 57:4, 63:7, 63:22, 67:16, 70:22
**advertising** [7] - 32:9, 33:6, 33:7, 63:1, 65:1, 65:21, 131:23
**advised** [1] - 144:6
**affected** [1] - 13:19
**affiliated** [1] - 22:6
**affirmed** [4] - 28:22, 53:18, 89:7, 102:15
**afraid** [1] - 71:10
**African** [1] - 39:23
**African-American** [1] - 39:23
**afternoon** [18] - 6:23, 12:15, 29:4, 29:5, 49:5, 49:6, 54:3, 71:8, 77:5, 88:6, 89:14, 102:22, 140:16, 141:14, 141:21, 142:18, 143:23, 149:21
**age** [13] - 24:25, 25:1, 25:3, 26:20, 73:2, 76:9, 91:2, 108:4, 108:6, 109:1, 139:16, 139:25
**agent** [1] - 153:6
**aggregation** [1] - 127:24
**ago** [1] - 143:11
**agree** [4] - 17:7,

50:21, 50:24, 140:11
**agreed** [1] - 141:18
**agreement** [1] - 123:3
**ahead** [2] - 88:5, 119:6
**ahold** [2] - 73:15, 73:17
**Aided** [1] - 1:24
**al** [1] - 1:8
**allegations** [1] - 25:22
**alleged** [2] - 22:18, 142:12
**allow** [3] - 25:4, 114:7, 114:21
**allowed** [5] - 65:5, 65:14, 66:10, 123:3, 140:10
**allowing** [1] - 131:11, 144:20
**almost** [1] - 154:9
**altered** [1] - 141:20
**amended** [2] - 141:19, 141:22
**amendments** [1] - 141:22
**America** [1] - 1:5
**American** [4] - 39:23, 79:21, 79:22
**amount** [4] - 65:13, 110:10, 110:16, 110:18
**amounts** [1] - 109:8
**Amy** [1] - 82:22
**anal** [1] - 109:7
**ANDREA** [2] - 53:17, 54:8
**Andrea** [3] - 4:9, 53:12, 54:5
**Andrew** [4] - 2:3, 3:7, 48:16, 71:11
**andrew.stone @ usdoj.gov** [1] - 2:7
**aneuman @ birdmarella.com** [1] - 3:6
**Angeles** [1] - 3:5
**answer** [31] - 21:20, 31:16, 43:22, 44:23, 45:8, 50:6, 52:5, 58:12, 58:14, 66:21, 69:13, 69:14, 70:3, 78:4, 78:7, 78:11, 78:15, 78:17, 81:1, 84:19, 92:16, 94:8, 94:9, 95:3, 97:20, 112:12, 114:14, 125:11, 125:25, 129:5, 130:15
**answer's** [1] - 128:16
**answered** [6] - 58:15, 86:8, 114:23,

130:12, 131:17, 140:1
**answering** [1] - 35:18
**anticipated** [3] - 88:3, 142:20, 152:12
**anticipating** [1] - 151:18
**anytime** [1] - 96:1
**apartment** [2] - 100:3, 100:5
**apologize** [1] - 28:13
**app** [1] - 80:8
**appear** [1] - 45:16
**Apple** [1] - 37:20
**application** [1] - 104:23
**appointed** [1] - 155:8
**appreciate** [1] - 19:24
**appropriate** [1] - 6:2
**area** [16] - 18:9, 18:13, 23:23, 40:3, 40:17, 40:23, 41:12, 54:19, 56:18, 62:16, 62:17, 108:3, 115:9, 145:7
**argument** [3] - 23:14, 26:24, 142:1
**argumentative** [1] - 87:13
**arguments** [1] - 25:13
**Ariel** [1] - 3:4
**ARIZONA** [1] - 1:2
**Arizona** [17] - 1:7, 1:22, 2:6, 2:17, 2:20, 3:9, 3:13, 38:12, 38:16, 38:25, 39:8, 39:17, 39:20, 39:21, 40:17, 155:9, 155:15
**arrangements** [1] - 35:17
**arrest** [4] - 78:13, 122:21, 123:16, 124:13
**arrested** [7] - 77:11, 77:21, 78:17, 78:21, 123:23, 124:5, 145:25
**arrests** [5] - 113:13, 113:20, 113:22, 144:25, 146:3
**arrived** [4] - 36:3, 36:9, 40:17, 40:20
**Arshana** [8] - 4:12, 20:9, 89:2, 89:14, 89:17, 89:22, 90:15, 91:24
**ARSHANA** [1] - 89:6
**articulate** [1] - 107:4
**assist** [1] - 121:15
**assists** [2] - 121:5, 121:19

**associated** [2] - 98:12, 99:2
**assume** [2] - 18:2, 151:8
**assumption** [1] - 152:7
**assured** [1] - 18:4
**Astrid** [6] - 4:8, 28:17, 29:8, 45:10, 47:16, 48:5
**ASTRID** [1] - 28:21
**attempting** [1] - 128:15
**attend** [1] - 141:13
**attention** [4] - 5:6, 5:8, 14:25, 146:15
**ATTORNEY'S** [1] - 2:2
**attorneys** [1] - 133:4
**Auburn** [1] - 128:25
**audible** [1] - 56:8
**August** [5] - 20:18, 96:25, 97:2, 97:25, 101:12
**Austin** [1] - 2:9
**austin.berry2 @ usdoj.gov** [1] - 2:11
**available** [2] - 152:10, 152:17
**Avenue** [4] - 2:5, 2:10, 2:13, 3:9
**aware** [27] - 20:11, 20:14, 20:25, 21:15, 21:21, 21:22, 21:24, 33:9, 90:20, 90:22, 96:22, 104:4, 125:19, 126:4, 127:7, 127:10, 127:17, 127:21, 127:24, 128:1, 128:4, 128:12, 128:15, 128:19, 128:21, 128:24
**awareness** [1] - 22:1

**B**

**B-E-N-S-O-N** [1] - 54:8
**baby** [1] - 55:5
**bachelor's** [1] - 103:25
**Backpage** [128] - 4:18, 4:20, 4:22, 4:24, 20:17, 20:18, 21:2, 21:11, 31:1, 33:10, 35:5, 35:7, 38:15, 39:2, 39:9, 41:7, 41:11, 42:15, 50:2, 55:23, 56:1, 56:14, 56:17, 56:20, 57:5, 58:4, 60:15, 61:18,

61:24, 62:6, 62:19, 62:23, 63:2, 63:22, 64:5, 64:20, 65:19, 66:6, 66:9, 66:12, 66:16, 68:13, 70:15, 70:23, 75:1, 82:1, 84:1, 84:15, 85:21, 86:14, 86:24, 90:20, 90:24, 91:4, 91:8, 91:11, 92:7, 92:13, 93:8, 95:11, 96:23, 97:23, 98:16, 99:2, 100:6, 100:15, 106:4, 106:13, 106:17, 106:23, 107:10, 107:13, 108:16, 110:4, 110:5, 111:25, 112:7, 112:14, 112:18, 113:2, 113:5, 113:9, 113:11, 113:14, 113:19, 113:21, 114:4, 114:21, 115:5, 116:10, 116:12, 117:4, 117:22, 118:20, 118:25, 120:20, 122:5, 122:7, 122:17, 123:8, 124:14, 125:16, 125:20, 126:13, 126:22, 127:7, 127:10, 127:21, 128:1, 128:2, 128:5, 128:19, 128:21, 128:25, 129:13, 129:25, 130:19, 130:25, 132:6, 132:8, 138:2, 138:7, 138:15, 144:25, 145:25, 147:21, 147:23
**Backpage's** [3] - 120:18, 126:4, 127:24
**Backpage.com** [24] - 30:9, 30:11, 30:20, 30:23, 31:3, 31:6, 31:9, 31:22, 32:9, 33:7, 34:7, 34:24, 35:1, 55:13, 55:15, 55:18, 55:20, 62:2, 90:17, 106:2, 120:9, 122:23, 123:6, 140:10
**balance** [1] - 151:23
**ban** [1] - 66:17
**bank** [6] - 80:3, 80:4, 98:10, 98:13, 98:15,

98:22
**bareback** [1] - 65:17
**based** [16] - 17:11, 18:7, 21:9, 30:12, 113:14, 113:20, 124:6, 126:11, 127:2, 129:6, 137:6, 145:2, 146:4, 148:5, 151:3, 151:18
**basis** [1] - 80:19
**bathroom** [1] - 59:4
**Bay** [2] - 54:19, 62:17
**BB** [1] - 65:16
**beach** [1] - 95:20
**bearing** [1] - 15:25
**became** [3] - 75:21, 96:22, 136:17
**become** [4] - 90:20, 90:22, 106:4, 151:20
**becomes** [1] - 27:5
**BEFORE** [1] - 1:12
**began** [2] - 71:15, 72:10
**begin** [2] - 36:19, 150:9
**beginning** [2] - 104:13, 141:14
**begins** [1] - 138:22
**behalf** [1] - 83:12
**behind** [2] - 94:25, 142:5
**below** [1] - 122:16
**BENSON** [1] - 53:17
**Benson** [9] - 4:9, 53:12, 54:5, 54:9, 54:17, 55:10, 66:23, 68:19, 71:8
**Bernardino** [4] - 33:16, 33:20, 37:19, 46:1
**BERRY** [69] - 6:19, 7:2, 19:24, 20:4, 20:7, 22:3, 22:7, 22:10, 24:15, 89:1, 89:11, 89:13, 92:15, 92:21, 94:7, 94:23, 94:24, 95:9, 96:7, 96:8, 96:20, 96:21, 97:19, 101:13, 102:2, 102:9, 102:19, 102:21, 110:24, 111:21, 112:11, 112:17, 112:22, 114:10, 114:13, 115:1, 115:24, 116:1, 116:20, 116:22, 117:10, 117:15, 118:7, 118:9, 119:2,

119:13, 119:16, 123:11, 125:8, 125:13, 125:24, 127:16, 128:9, 128:11, 128:14, 128:18, 129:10, 129:11, 130:14, 130:24, 131:15, 131:18, 131:20, 132:13, 139:8, 140:1, 140:12, 152:20
**Berry** [13] - 2:9, 4:12, 4:13, 20:1, 20:2, 22:18, 24:2, 96:18, 115:20, 128:13, 146:3, 147:5, 147:10
**Berry's** [1] - 146:1
**BERTRAND** [41] - 3:11, 6:14, 11:12, 14:8, 16:7, 32:22, 34:19, 39:4, 42:20, 42:22, 43:2, 43:12, 43:19, 44:21, 52:20, 60:4, 60:6, 63:10, 64:8, 66:18, 70:17, 70:19, 78:24, 87:24, 94:4, 94:18, 95:2, 96:5, 96:16, 101:18, 112:15, 112:19, 114:8, 119:5, 119:9, 125:6, 125:22, 127:11, 128:6, 130:11, 130:21
**Bertrand** [8] - 3:12, 11:10, 14:7, 16:6, 52:19, 63:14, 78:23, 101:17
**best** [8] - 15:6, 91:24, 92:2, 93:2, 93:8, 99:20, 108:22, 117:12
**better** [1] - 152:10
**between** [14] - 12:25, 15:18, 91:2, 97:2, 97:23, 116:8, 125:2, 125:10, 127:7, 127:21, 128:4, 128:19, 128:21, 128:24
**beyond** [3] - 131:12, 150:7, 154:2
**bf@federlawpa.com** [1] - 2:21
**big** [2] - 22:20, 95:25
**BIRD** [1] - 3:2
**bit** [9] - 20:9, 20:24, 37:20, 54:9, 89:19, 113:15, 121:24, 133:8, 153:9

**bleed** [1] - 141:8
**block** [1] - 154:12
**blonde** [1] - 33:5
**blue** [1] - 6:14
**body** [3] - 109:1, 109:6, 116:19
**booked** [1] - 142:1
**booty** [1] - 67:24
**bottom** [2] - 76:17, 76:19
**Bowl** [5] - 38:19, 38:24, 46:17, 47:22, 50:8
**Box** [1] - 3:12
**BOXER** [1] - 3:2
**Boyle** [1] - 2:5
**boys** [1] - 30:1
**bra** [2] - 34:1, 116:19
**Brad** [1] - 143:10
**break** [3] - 20:10, 26:14, 88:3
**breast** [1] - 109:2
**breasts** [1] - 76:20
**brief** [1] - 8:5
**briefly** [2] - 8:19, 47:24
**bring** [16] - 5:5, 6:17, 6:22, 17:3, 33:22, 33:23, 33:24, 34:1, 76:11, 79:6, 146:9, 146:15, 147:19, 153:14, 153:18, 153:20
**brought** [2] - 22:16, 51:24
**Bruce** [2] - 2:19, 64:16
**Brunst** [2] - 3:2, 48:14
**Buffalo** [1] - 2:14
**build** [1] - 141:25
**building** [3] - 5:9, 124:12, 143:17
**business** [5] - 70:15, 80:5, 81:6, 123:5, 125:4
**busty** [2] - 64:25, 67:24
**button** [1] - 138:17
**buy** [2] - 22:21, 98:24
**buy/sell/trade** [1] - 110:7
**buzz** [1] - 21:23
**BY** [74] - 29:3, 30:19, 33:1, 34:22, 39:7, 42:24, 43:4, 43:16, 43:21, 45:1, 45:9, 45:18, 46:10, 49:4, 50:16, 51:23, 52:6, 54:2, 60:10, 63:21, 64:3, 64:18, 66:20, 69:22, 70:6, 70:21,

71:7, 72:20, 77:4, 78:5, 78:12, 79:4, 79:7, 79:16, 81:4, 84:13, 84:20, 84:24, 85:4, 86:11, 89:13, 92:21, 94:7, 94:24, 95:9, 96:8, 96:21, 97:19, 102:21, 110:24, 111:21, 112:11, 112:17, 112:22, 114:13, 115:1, 116:1, 116:22, 117:15, 118:9, 119:16, 123:11, 125:13, 125:24, 127:16, 128:18, 129:11, 130:14, 131:15, 131:20, 132:21, 139:12, 140:3

**C**

**C-E-R-V-A-N-T-E-S** [1] - 29:12
**calendars** [1] - 141:14
**California** [17] - 3:5, 29:14, 29:15, 29:17, 33:17, 37:22, 37:23, 37:24, 38:1, 38:7, 38:9, 38:10, 39:25, 40:3, 41:19, 46:1, 47:22
**callers** [1] - 66:3
**CAMBRIA** [37] - 2:12, 6:9, 7:7, 7:12, 10:19, 10:21, 10:23, 11:1, 11:16, 14:6, 16:5, 18:1, 27:16, 27:19, 27:23, 28:1, 28:4, 28:7, 39:3, 39:5, 52:18, 64:6, 64:11, 64:13, 77:4, 77:24, 78:3, 78:5, 78:12, 78:22, 87:23, 101:16, 102:4, 125:5, 148:25, 149:6, 149:12
**Cambria** [15] - 2:13, 4:11, 5:24, 11:15, 14:5, 16:4, 17:24, 17:25, 28:6, 52:17, 64:9, 77:2, 101:15, 148:23, 151:18
**Cambria's** [1] - 152:8
**Camelback** [1] - 2:20
**camera** [1] - 153:22
**candy** [2] - 93:22, 95:7
**cannot** [4] - 78:7,

4

78:15, 78:17, 142:21
**capacity** [1] - 134:15
**car** [4] - 40:10, 59:8, 99:10, 99:21
**card** [9] - 22:21, 60:16, 60:18, 80:2, 80:6, 80:21, 98:12, 98:15, 98:18
**cards** [12] - 24:1, 79:8, 79:12, 79:17, 80:19, 81:6, 98:5, 98:6, 98:20, 98:21, 98:25, 100:9
**care** [1] - 96:1
**career** [3] - 105:25, 108:16, 137:21
**carefully** [1] - 18:12
**carries** [1] - 136:9
**carry** [1] - 134:24
**carve** [1] - 147:16
**carve-out** [1] - 147:16
**case** [21] - 8:25, 13:7, 15:10, 15:11, 15:24, 25:18, 71:15, 72:1, 124:12, 129:4, 137:2, 141:9, 142:14, 144:12, 146:8, 146:14, 147:18, 149:24, 150:22, 153:5, 154:7
**case-in-chief** [1] - 144:12
**cases** [4] - 145:2, 145:5, 145:9, 147:20
**cashier** [1] - 90:14
**catching** [1] - 135:2
**category** [1] - 148:4
**CATHY** [1] - 155:7
**Cathy** [2] - 1:21, 155:20
**Caucasian** [1] - 33:5
**caught** [1] - 142:4
**causing** [1] - 19:8
**CDA** [8] - 145:3, 145:6, 145:9, 146:14, 147:1, 147:3, 147:7, 147:24
**cease** [1] - 77:22
**cell** [1] - 34:21
**Central** [2] - 2:5, 3:9
**Century** [1] - 3:4
**certain** [3] - 65:15, 66:16, 135:9
**certainly** [1] - 152:13
**certificate** [1] - 104:21
**certification** [1] - 29:21, 135:9
**certify** [1] - 155:17
**CERTIFY** [1] - 155:10
**Cervantes** [10] - 4:8,

28:17, 29:8, 29:13, 30:8, 30:20, 39:13, 45:19, 46:11, 49:10
**CERVANTES** [1] - 28:21
**challenging** [1] - 92:3
**change** [2] - 15:23, 26:20
**changed** [1] - 9:12
**changes** [1] - 129:12
**characterized** [1] - 18:8
**charge** [1] - 57:24
**charged** [2] - 24:5, 24:12
**charges** [1] - 26:2
**charging** [1] - 131:25
**check** [2] - 150:5, 150:8
**checked** [1] - 129:15
**checks** [1] - 80:12
**chief** [2] - 17:20, 144:12
**child** [3] - 25:15, 25:19, 26:22
**children** [2] - 29:25, 90:6
**choose** [3] - 80:7, 80:9, 80:10
**circulated** [1] - 149:25
**circumstances** [1] - 25:15
**Cities** [1] - 133:10
**cities** [5] - 37:18, 56:16, 62:15, 136:23, 136:25
**citizens** [1] - 136:6
**city** [19] - 38:11, 47:3, 47:19, 61:13, 103:17, 107:9, 122:5, 133:19, 136:1, 136:4, 136:6, 136:9, 136:10, 136:14, 136:24, 137:5, 137:6, 137:16, 152:6
**civil** [3] - 142:2, 146:14, 146:18
**clarify** [3] - 86:15, 120:1, 137:3
**class** [2] - 105:13, 135:9
**classifieds** [1] - 55:16
**classroom** [1] - 135:10
**clear** [8] - 10:3, 136:3, 136:13, 141:14, 142:18, 145:20, 146:7
**clearly** [7] - 5:18, 6:11,

25:7, 25:16, 65:1, 129:3, 151:11
**clerk** [2] - 88:15, 150:8
**click** [1] - 82:1
**client** [12] - 35:11, 35:21, 36:5, 36:6, 36:9, 36:11, 36:21, 37:4, 42:18, 42:25, 43:18, 44:1
**clients** [3] - 35:9, 35:23, 147:24
**close** [6] - 12:17, 23:7, 31:17, 38:5, 108:3, 135:22
**closer** [2] - 108:6, 132:24
**clothed** [3] - 50:22, 50:25, 116:18
**clothes** [1] - 33:22
**clothing** [3] - 33:24, 57:19, 57:20
**club** [1] - 95:22
**coats** [1] - 6:14
**code** [5] - 136:1, 136:10, 136:12, 136:14, 137:16
**coded** [6] - 65:10, 109:4, 120:20, 121:2, 130:8
**cold** [1] - 54:9
**college** [3] - 72:8, 87:11, 103:22
**combination** [1] - 68:3
**coming** [4] - 6:24, 20:9, 39:12, 151:20
**comment** [1] - 27:16
**comments** [4] - 17:22, 126:10, 126:19, 126:20
**commit** [1] - 5:14
**committed** [1] - 18:18
**commonly** [2] - 108:20, 108:22
**communicate** [1] - 14:16
**communication** [2] - 6:5, 15:1
**Communication** [1] - 144:21
**communications** [2] - 66:6, 66:15
**community** [3] - 103:15, 134:19, 135:22
**companies** [2] - 80:2, 80:6, 132:5
**Company** [2] - 90:9, 90:11
**company** [1] - 131:25
**compelled** [1] -

150:23
**compelling** [1] - 152:2
**completed** [1] - 59:15
**completely** [1] - 142:1
**complied** [1] - 153:8
**complying** [1] - 154:6
**compound** [1] - 140:12
**compounds** [1] - 17:13
**Computer** [1] - 1:24
**Computer-Aided** [1] - 1:24
**concentrate** [1] - 7:15
**concern** [1] - 6:3
**concerning** [1] - 22:15
**concerns** [2] - 20:13, 24:20
**conclusion** [1] - 125:7
**conclusions** [2] - 88:9, 140:18
**condom** [1] - 65:17
**condoms** [2] - 99:9, 99:22
**conduct** [5] - 105:20, 120:10, 120:17, 123:3, 140:18
**conference** [1] - 150:6
**confirmation** [3] - 150:17, 150:18, 150:24
**conflating** [1] - 147:13
**conflict** [2] - 142:19, 149:8
**confusing** [1] - 142:9
**connected** [3] - 45:15, 45:16, 100:6
**connection** [1] - 126:13
**consensual** [1] - 51:15
**consider** [1] - 131:25
**consideration** [1] - 120:13
**considering** [2] - 80:21, 120:23
**constituents** [1] - 136:10
**constitute** [1] - 155:10
**constitutes** [2] - 121:5, 135:16
**Cont'd** [1] - 3:1
**contact** [1] - 138:4
**contacting** [1] - 120:9
**contain** [1] - 118:24
**contained** [1] - 155:12
**content** [6] - 108:20, 109:19, 111:11, 113:2, 115:6, 118:24
**context** [2] - 69:13,

93:25
**continue** [4] - 61:18, 66:16, 114:7, 140:20
**continued** [1] - 74:17
**continues** [1] - 141:6
**contrary** [1] - 24:23
**control** [1] - 155:14
**conversation** [8] - 5:16, 6:5, 10:4, 11:2, 12:25, 13:23, 15:18, 77:10
**conversations** [6] - 17:21, 58:16, 58:17, 58:19, 99:14, 99:16
**converse** [1] - 18:3
**convey** [2] - 118:25, 123:7
**conveyed** [6] - 9:23, 10:3, 12:23, 12:24, 13:23, 14:25
**conveying** [1] - 124:3
**cooperating** [1] - 83:21
**cooperation** [1] - 151:23
**copied** [1] - 120:18
**copy** [4] - 84:2, 149:25, 150:1
**corporate** [1] - 80:5
**correct** [83] - 11:5, 11:7, 11:8, 13:1, 15:4, 15:5, 34:11, 49:11, 49:12, 49:14, 49:17, 49:25, 50:9, 50:11, 50:12, 50:19, 71:15, 71:16, 72:12, 72:25, 73:4, 73:12, 73:15, 73:24, 74:3, 74:8, 74:13, 74:19, 74:21, 74:23, 74:24, 75:13, 75:22, 76:2, 76:20, 85:8, 92:5, 92:23, 96:10, 96:23, 109:14, 111:8, 114:1, 116:4, 120:2, 120:3, 120:4, 120:21, 120:22, 121:12, 124:25, 131:22, 131:23, 131:24, 133:11, 133:12, 133:15, 134:3, 134:8, 134:9, 134:11, 135:14, 135:15, 135:17, 135:18, 135:20, 136:4, 136:7, 136:8, 136:10, 136:11, 136:21, 137:22, 137:25, 138:1, 139:1, 139:21,

UNITED STATES DISTRICT COURT

139:22, 139:23, 140:7, 140:8, 140:11, 145:17
**corrected** [1] - 24:18
**correctly** [1] - 154:14
**cosmetology** [1] - 29:21
**cost** [1] - 58:18
**Cottage** [1] - 134:20
**cough** [1] - 54:13
**council** [3] - 136:4, 136:6, 136:9
**councils** [1] - 136:24
**counsel** [9] - 5:6, 18:11, 23:21, 71:17, 84:9, 88:5, 141:2, 141:13, 148:17
**counsel's** [1] - 127:11
**counseled** [1] - 21:16
**count** [2] - 59:4, 143:9
**Count** [1] - 24:15
**counter** [1] - 147:25
**counts** [3] - 23:14, 142:9, 142:10
**County** [1] - 46:1
**couple** [10] - 6:20, 21:5, 48:5, 48:7, 50:9, 118:21, 132:4, 135:22, 141:1, 143:11
**course** [9] - 93:3, 105:7, 105:24, 108:18, 146:6, 147:7, 150:15, 153:7
**courses** [1] - 104:22
**COURT** [262] - 1:1, 4:2, 5:4, 6:8, 6:11, 6:13, 6:15, 7:1, 7:10, 7:14, 7:19, 7:24, 8:2, 8:8, 8:11, 8:15, 8:17, 8:19, 9:7, 9:11, 9:15, 9:18, 9:21, 10:2, 10:9, 10:12, 10:15, 10:18, 10:20, 10:22, 10:24, 11:4, 11:9, 11:15, 11:17, 11:19, 11:21, 12:7, 12:12, 12:15, 12:19, 12:22, 13:3, 13:8, 13:13, 13:16, 13:18, 13:22, 14:1, 14:4, 14:7, 14:9, 14:11, 14:13, 14:15, 14:21, 14:24, 15:6, 15:13, 15:17, 15:22, 16:1, 16:4, 16:6, 16:8, 16:10, 16:12, 16:14, 16:19, 16:21, 17:9, 17:16, 17:23, 18:4, 18:24, 19:1, 19:9, 19:12,

19:15, 19:18, 19:23, 20:2, 20:5, 21:25, 22:4, 22:8, 22:11, 22:24, 23:13, 24:17, 25:12, 26:6, 26:11, 26:13, 26:24, 27:5, 27:15, 27:18, 27:22, 27:25, 28:2, 28:5, 28:8, 28:10, 28:18, 29:1, 30:16, 30:18, 32:24, 34:20, 39:6, 42:23, 43:3, 43:14, 43:20, 44:22, 45:6, 45:8, 45:16, 48:23, 49:2, 51:22, 52:2, 52:5, 52:16, 52:19, 52:21, 52:23, 52:25, 53:2, 53:4, 53:7, 53:11, 53:13, 53:22, 60:8, 63:12, 63:16, 63:18, 63:20, 64:1, 64:9, 64:12, 64:17, 66:19, 69:11, 69:19, 70:2, 70:5, 70:20, 71:5, 77:2, 78:4, 78:10, 78:23, 78:25, 79:2, 79:15, 81:1, 84:7, 84:11, 84:19, 84:23, 85:3, 86:9, 87:14, 87:17, 87:20, 87:22, 87:25, 88:3, 88:15, 88:20, 88:23, 89:3, 89:10, 92:16, 94:6, 94:20, 94:22, 95:3, 96:6, 96:17, 97:18, 101:14, 101:17, 101:19, 101:21, 101:23, 101:25, 102:3, 102:5, 102:8, 102:11, 102:18, 110:23, 111:20, 112:10, 112:16, 112:20, 114:12, 114:25, 115:19, 115:23, 119:8, 119:10, 123:10, 125:9, 125:23, 127:13, 127:15, 128:10, 128:13, 129:6, 129:9, 130:13, 130:22, 131:8, 131:14, 131:17, 132:15, 132:19, 139:10, 140:2, 140:13, 140:25, 141:12, 143:1, 143:5, 143:18, 144:2, 144:4, 144:17, 145:4, 145:12,

145:15, 145:18, 145:21, 146:11, 146:20, 146:24, 147:2, 147:5, 147:8, 147:10, 147:12, 148:1, 148:3, 148:7, 148:9, 148:12, 148:14, 149:4, 149:10, 149:13, 150:5, 150:11, 151:4, 151:8, 151:22, 152:23, 153:24
**court** [19] - 6:13, 8:5, 10:24, 11:2, 11:6, 12:25, 15:2, 81:9, 140:21, 142:20, 144:23, 145:2, 145:5, 145:8, 145:24, 149:8, 153:14, 153:19, 153:20
**Court** [25] - 1:20, 1:24, 9:25, 17:8, 17:19, 18:10, 18:16, 20:11, 20:14, 20:25, 21:21, 21:24, 22:13, 23:11, 25:14, 25:20, 26:17, 78:2, 141:19, 149:23, 150:2, 151:16, 153:21, 155:8, 155:9
**Court's** [6] - 17:12, 18:8, 22:5, 142:16, 144:20, 148:2
**Courthouse** [1] - 1:21
**courthouse** [1] - 6:16
**courtroom** [14] - 10:4, 12:24, 15:3, 15:7, 15:18, 17:2, 17:20, 28:18, 53:14, 54:12, 72:6, 82:17, 89:4, 102:11
**COURTROOM** [14] - 7:18, 7:20, 10:1, 12:14, 20:1, 28:20, 28:23, 45:14, 53:15, 53:19, 89:5, 89:8, 102:13, 102:16
**covered** [2] - 16:16, 136:15
**covering** [1] - 76:19
**craft** [1] - 84:15
**crafted** [1] - 86:24
**crafting** [1] - 85:5
**Craigslist** [2] - 110:7, 128:1
**CRC** [2] - 1:21, 155:20
**create** [5] - 32:1, 56:3, 61:23, 64:24, 70:13

**created** [6] - 32:8, 34:17, 56:3, 56:7, 87:3, 112:1
**creating** [7] - 56:13, 62:9, 64:19, 65:22, 109:16, 111:1, 111:11
**creation** [2] - 31:8, 31:21
**credit** [9] - 22:21, 79:8, 79:12, 79:17, 80:2, 80:6, 80:19, 80:21, 81:6
**credits** [1] - 135:10
**crime** [3] - 104:11, 125:3, 132:1
**crimes** [8] - 22:6, 104:9, 105:6, 133:15, 133:17, 133:25, 137:8, 146:22
**criminal** [11] - 103:25, 135:14, 135:17, 136:14, 136:20, 142:2, 145:3, 146:13, 146:20, 147:14, 147:17
**critical** [2] - 88:8, 116:8
**Cross** [5] - 4:9, 4:10, 4:11, 4:11, 4:14
**cross** [5] - 48:23, 146:2, 146:9, 148:15, 153:23
**CROSS** [5] - 49:3, 71:6, 77:3, 79:3, 132:20
**cross-examination** [2] - 148:15, 153:23
**CROSS-EXAMINATION** [5] - 49:3, 71:6, 77:3, 79:3, 132:20
**Cross-Examination** [5] - 4:9, 4:10, 4:11, 4:11, 4:14
**cross-examining** [2] - 48:23, 146:9
**CRR** [2] - 1:21, 155:20
**CSO** [3] - 5:10, 6:12
**CSOs** [1] - 6:4
**cumulative** [7] - 22:14, 23:12, 23:13, 23:16, 23:18, 129:8
**cup** [1] - 54:14
**current** [5] - 25:3, 78:11, 141:17, 142:8, 144:19
**customer** [1] - 90:12
**customers** [1] - 74:5

**CVS** [4] - 21:4, 98:4, 99:6, 99:8
**Cynthia** [4] - 20:17, 91:1, 91:2, 100:23
**Cynthia's** [1] - 101:7

## D

**D-E-R-E-K** [1] - 102:25
**Dan** [2] - 143:12, 143:13
**Daniel** [1] - 2:5
**dashing** [1] - 19:24
**date** [13] - 42:25, 44:12, 45:21, 47:1, 47:16, 59:9, 67:5, 101:10, 108:13, 118:14, 118:21, 119:23, 155:13
**DATED** [1] - 155:15
**dates** [7] - 21:4, 21:5, 37:12, 37:17, 41:14, 41:22, 60:20
**Dave** [1] - 71:10
**DAVID** [1] - 3:8
**David** [1] - 3:8
**david@ deisenbergplc.com** [1] - 3:10
**DAY** [1] - 1:14
**days** [4] - 39:19, 58:23, 143:20, 149:7
**DC** [1] - 2:10
**dealing** [1] - 150:4
**dealings** [1] - 72:5
**debit** [5] - 60:16, 60:18, 98:12, 98:15, 98:18
**decade** [1] - 135:24
**deceased** [8] - 7:8, 15:16, 18:18, 23:20, 27:20, 27:23, 27:25, 28:3
**December** [1] - 55:24
**Decency** [1] - 144:21
**decide** [2] - 39:1, 151:12
**decided** [1] - 39:11
**defendant** [1] - 142:14
**Defendant** [5] - 2:12, 2:15, 3:2, 3:7, 3:11
**defendants** [1] - 5:13
**Defendants** [1] - 1:9
**defends** [1] - 122:23
**defense** [28] - 6:8, 9:18, 14:4, 17:9, 18:11, 21:15, 21:19, 21:22, 52:16, 53:4, 71:18, 87:22, 101:14, 102:3,

6

143:16, 144:13, 146:12, 147:16, 149:1, 150:14, 150:18, 150:23, 151:17, 152:21, 153:5, 153:9, 153:16, 153:17
**define** [1] - 36:25
**definitely** [2] - 21:23, 23:5
**definition** [1] - 32:25
**definitive** [1] - 150:18
**degree** [4] - 54:23, 103:25, 104:1
**Delaware** [1] - 2:13
**delay** [3] - 149:13, 153:14, 153:22
**deliberately** [1] - 76:22
**denying** [1] - 18:21
**DEPARTMENT** [1] - 2:9
**Department** [7] - 103:12, 104:4, 105:8, 105:13, 106:6, 134:14, 134:20
**department** [6] - 103:16, 103:18, 104:25, 107:6, 109:13, 138:2
**deputy** [11] - 10:4, 12:24, 15:3, 15:8, 15:9, 15:18, 17:2, 28:19, 53:14, 89:4, 102:12
**DEPUTY** [14] - 7:18, 7:20, 10:1, 12:14, 20:1, 28:20, 28:23, 45:14, 53:15, 53:19, 89:5, 89:8, 102:13, 102:16
**DEREK** [1] - 102:14
**Derek** [4] - 4:13, 102:10, 102:25
**describe** [3] - 8:19, 93:2, 93:18
**described** [1] - 27:12
**DESCRIPTION** [1] - 4:17
**descriptions** [3] - 109:1, 111:12, 142:8
**designated** [1] - 110:13
**designed** [2] - 25:7, 64:24
**Desirae** [1] - 82:21
**detective** [3] - 103:21, 104:11, 104:14
**Detective** [3] - 118:10,

143:7, 143:8
**determine** [1] - 25:5
**Detroit** [4] - 22:17, 90:2, 90:9, 90:10
**device** [1] - 34:18
**DIANE** [1] - 1:12
**die** [1] - 13:12
**Diego** [3] - 38:4, 38:5, 47:4
**difference** [5] - 91:2, 125:2, 125:8, 125:10, 125:11
**differences** [2] - 116:8, 131:6
**different** [25] - 20:24, 27:10, 34:1, 38:10, 42:5, 42:13, 58:22, 58:23, 68:14, 86:21, 86:23, 93:1, 104:8, 104:15, 109:4, 109:5, 118:3, 118:5, 118:15, 118:22, 123:14, 123:17, 150:7
**differently** [1] - 27:9
**difficult** [2] - 68:17, 94:10
**dire** [3] - 17:14, 18:9, 28:5
**DIRECT** [4] - 29:2, 54:1, 89:12, 102:20
**Direct** [4] - 4:8, 4:10, 4:12, 4:13
**direct** [2] - 84:9, 152:2
**direction** [1] - 155:14
**directly** [2] - 120:11, 120:18
**disadvantage** [1] - 153:23
**disclose** [4] - 150:23, 151:1, 153:12, 153:18
**disclosed** [1] - 150:19
**disconnect** [2] - 26:17, 26:25
**discuss** [7] - 6:20, 11:22, 16:16, 28:13, 140:19, 141:1, 142:15
**discussed** [1] - 14:17
**discussion** [1] - 77:18
**discussions** [2] - 82:6, 146:12
**dismiss** [3] - 18:7, 18:22
**dispute** [1] - 153:21
**disregard** [1] - 69:20
**distinguish** [1] - 107:3
**distracting** [1] - 19:12
**District** [2] - 155:9

**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 150:22
**Document** [1] - 72:17
**DOJ-BP-0000162047** [1] - 4:19
**DOJ-BP-0000164226** [1] - 4:23
**DOJ-BP-0000164992** [1] - 4:21
**DOJ-BP-0000166089** [1] - 4:25
**dollar** [4] - 65:14, 109:7, 110:15, 110:18
**donation** [2] - 59:3, 65:15
**donations** [1] - 109:8
**done** [12] - 24:22, 37:5, 37:6, 113:12, 113:18, 113:25, 114:16, 126:11, 126:19, 135:2, 154:13
**door** [3] - 16:23, 59:2, 77:16
**double** [2] - 150:5, 150:8
**double-check** [2] - 150:5, 150:8
**down** [14] - 14:5, 22:16, 46:2, 46:19, 53:9, 88:1, 101:4, 102:6, 111:25, 121:23, 129:18, 130:17, 132:4, 140:25
**draft** [1] - 149:24
**drafting** [1] - 57:21
**dragged** [1] - 81:9
**draw** [1] - 25:7
**dressed** [3] - 115:16, 116:15, 116:18
**drink** [1] - 99:22
**dripping** [1] - 93:21
**driving** [1] - 40:9
**DROOKS** [1] - 3:2
**drop** [1] - 54:13
**droplets** [1] - 94:13
**drove** [2] - 33:20, 39:21
**drugstore** [1] - 98:4
**duly** [5] - 28:21, 53:17, 89:7, 102:14, 155:7
**during** [11] - 17:14, 44:19, 45:2, 50:8, 60:3, 60:11, 97:5, 104:7, 106:14, 133:22, 134:16

**DISTRICT** [2] - 1:1, 1:2

**E**

**eager** [1] - 64:25
**early** [2] - 143:15, 152:4
**easily** [2] - 68:10, 145:25
**East** [1] - 2:20
**eaten** [1] - 40:15
**edited** [6] - 83:9, 83:13, 85:7, 85:19, 87:4, 87:5
**edits** [2] - 142:6, 142:7
**education** [1] - 103:22
**effect** [2] - 5:12, 17:17
**EISENBERG** [20] - 3:8, 11:18, 14:14, 16:11, 49:4, 50:14, 50:16, 51:23, 52:1, 52:4, 52:6, 52:14, 53:5, 71:7, 72:18, 72:20, 77:1, 101:24, 114:23, 130:12
**Eisenberg** [11] - 3:8, 4:9, 4:10, 11:17, 14:13, 16:10, 48:25, 52:3, 71:5, 71:10, 101:23
**either** [6] - 37:16, 52:12, 59:8, 110:14, 131:22, 143:12
**elected** [1] - 136:6
**Elizabeth** [1] - 10:7
**Email** [4] - 4:18, 4:20, 4:22, 4:24
**email** [19] - 115:2, 117:3, 117:20, 117:23, 118:3, 118:13, 118:20, 119:19, 120:1, 120:2, 120:17, 121:23, 123:9, 123:15, 130:3, 140:6
**emailing** [1] - 115:5
**emails** [13] - 112:14, 112:18, 113:8, 113:11, 114:3, 117:5, 118:24, 123:12, 124:1, 129:13, 129:21, 150:21, 153:16
**emoji** [1] - 95:1
**emojis** [5] - 93:15, 93:16, 93:17, 93:19, 93:25
**Empire** [2] - 45:24, 45:25
**employer** [1] - 18:6
**employment** [4] - 44:20, 45:3, 60:3,

60:12
**encompass** [1] - 18:16
**encompassing** [1] - 133:24
**encountered** [2] - 78:20, 124:15
**end** [4] - 38:22, 96:25, 122:17, 143:3
**ended** [2] - 61:8, 65:23
**ending** [1] - 151:13
**enforce** [1] - 137:8
**enforcement** [9] - 104:7, 106:23, 108:16, 131:1, 134:12, 134:15, 134:21, 144:22, 145:24
**engage** [5] - 6:4, 121:15, 121:16, 130:7, 130:10
**engaged** [1] - 134:15
**engaging** [1] - 122:21
**enjoy** [1] - 140:20
**ensure** [1] - 123:5
**entailed** [1] - 107:3
**entering** [1] - 5:8
**enterprise** [1] - 125:4
**entertain** [1] - 111:16
**entice** [1] - 111:13
**entire** [1] - 144:7
**entitled** [1] - 155:12
**entity** [1] - 121:16
**entry** [1] - 6:15
**Eric** [3] - 2:16, 119:6, 133:3
**eric.kesslerlaw@ gmail.com** [1] - 2:18
**Erotic** [12] - 69:1, 69:3, 69:7, 69:25, 70:9, 70:13, 70:16, 126:6, 126:18, 126:21, 127:8, 127:10
**escort** [14] - 55:16, 55:17, 55:19, 62:25, 92:13, 93:8, 97:22, 108:16, 110:5, 112:7, 116:12, 122:20, 123:1, 138:24
**escorts** [6] - 69:5, 92:11, 110:4, 122:8, 122:13, 139:20
**Esq** [14] - 2:3, 2:3, 2:4, 2:4, 2:5, 2:9, 2:13, 2:16, 2:19, 3:3, 3:3, 3:4, 3:8, 3:12
**ESQ** [1] - 3:11

UNITED STATES DISTRICT COURT

**essentially** [6] - 5:10, 5:15, 11:5, 16:23, 18:19, 85:6
**establish** [3] - 21:25, 106:10, 137:15
**estimate** [1] - 105:24
**et** [1] - 1:8
**evaluate** [1] - 148:4
**evening** [2] - 140:20, 140:22
**event** [1] - 142:17
**events** [1] - 18:14
**eventually** [1] - 42:5
**evidence** [14] - 24:20, 24:25, 26:21, 45:13, 46:9, 46:25, 47:15, 66:24, 76:3, 76:4, 100:18, 119:15, 119:18, 145:7
**exact** [1] - 135:6
**exactly** [2] - 145:12, 147:19
**EXAMINATION** [9] - 29:2, 49:3, 54:1, 71:6, 77:3, 79:3, 89:12, 102:20, 132:20
**Examination** [9] - 4:8, 4:9, 4:10, 4:10, 4:11, 4:11, 4:12, 4:13, 4:14
**examination** [2] - 148:15, 153:23
**examine** [1] - 101:14
**examining** [3] - 48:23, 132:15, 146:9
**example** [9] - 25:2, 25:8, 33:21, 57:16, 66:10, 75:15, 109:6, 144:20, 146:1
**examples** [3] - 65:12, 109:9, 150:22
**except** [2] - 23:1, 50:3
**exchange** [5] - 8:20, 8:21, 15:1, 32:7, 35:13
**exchanged** [1] - 36:20
**exchanging** [1] - 120:12
**excuse** [4] - 18:25, 51:11, 69:13, 153:25
**excused** [3] - 53:2, 101:25, 102:6
**exercise** [1] - 30:7
**exhausting** [1] - 27:5
**Exhibit** [6] - 45:12, 46:8, 46:24, 47:14, 72:17, 100:18
**exhibit** [5] - 45:19, 46:11, 66:24, 66:25,

117:25
**Exhibits** [2] - 119:3, 119:14
**exhibits** [5] - 45:10, 114:10, 117:11, 142:10, 152:22
**EXHIBITS** [1] - 4:16
**expected** [4] - 43:18, 44:1, 135:13, 135:25
**experience** [3] - 77:22, 78:13, 134:12
**experiences** [1] - 69:4
**explain** [10] - 103:24, 104:6, 104:20, 105:5, 107:2, 107:25, 120:16, 121:18, 126:8, 126:16
**explicit** [4] - 75:13, 75:16, 111:22, 126:20
**explicitly** [1] - 63:8
**explore** [3] - 9:24, 17:14, 17:16
**Express** [2] - 79:21, 79:23
**extended** [1] - 28:11
**extent** [3] - 25:20, 132:6, 153:11
**extracted** [1] - 5:15
**extraordinarily** [1] - 22:14
**eyes** [2] - 116:21, 117:13

**F**

**F-R-I-T-Z-E** [1] - 103:3
**face** [2] - 101:2, 124:6
**Facebook** [2] - 84:21, 85:1
**faces** [1] - 93:21
**facilitating** [1] - 132:1
**fact** [6] - 12:10, 18:16, 24:25, 25:7, 71:14, 152:24
**facts** [2] - 25:25
**fair** [6] - 9:13, 13:19, 15:23, 76:7, 137:20
**fairly** [1] - 97:11
**fake** [1] - 138:2
**familiar** [6] - 65:9, 90:17, 106:2, 124:24, 136:12, 137:15
**family** [1] - 95:21
**far** [7] - 11:23, 14:17, 16:16, 50:2, 54:22, 76:6, 146:17
**fashion** [5] - 16:22,

87:4, 116:15, 120:11, 120:20
**fast** [1] - 89:18
**favor** [1] - 31:15
**favors** [1] - 120:12
**features** [3] - 92:25, 109:5, 126:11
**FEDER** [38] - 2:19, 6:12, 7:13, 7:16, 11:20, 14:12, 16:13, 19:21, 22:12, 22:25, 45:4, 52:24, 63:11, 63:14, 63:17, 63:25, 64:15, 69:9, 69:18, 70:1, 79:4, 79:6, 79:7, 79:16, 81:4, 84:13, 84:20, 84:24, 85:4, 86:11, 87:16, 92:14, 94:5, 94:21, 97:17, 129:2, 129:7, 131:12
**Feder** [14] - 2:19, 4:11, 11:19, 14:11, 16:12, 19:20, 22:11, 24:8, 52:23, 63:12, 64:16, 79:2, 148:19, 151:25
**federal** [4] - 125:3, 147:14, 147:17, 153:6
**fell** [1] - 74:14
**fellow** [1] - 113:1
**felt** [2] - 17:13, 131:18
**female** [3] - 122:8, 122:13, 138:3
**females** [5] - 56:23, 107:11, 113:19, 115:12, 116:14
**few** [9] - 39:19, 41:15, 45:10, 46:2, 118:4, 118:14
**fight** [1] - 151:24
**figure** [1] - 109:23
**figured** [1] - 87:7
**file** [1] - 152:21
**filing** [2] - 152:4, 152:9
**filter** [1] - 125:17
**final** [1] - 150:6
**finally** [1] - 118:16
**finance** [1] - 55:8
**fine** [4] - 7:2, 22:9, 50:7, 94:13
**finish** [3] - 141:7, 143:4, 143:7
**Fire** [1] - 35:3
**firm** [1] - 141:12
**first** [29] - 6:17, 14:5, 17:10, 18:5, 18:20, 19:7, 19:18, 23:2, 29:9, 36:14, 50:21,

54:6, 56:7, 83:5, 89:15, 90:19, 96:22, 102:23, 103:17, 104:18, 106:4, 109:23, 135:4, 139:6, 141:17, 152:2, 153:15, 154:1
**first-party** [1] - 23:2
**first-ring** [1] - 103:17
**firstly** [1] - 41:1
**fitness** [3] - 29:22, 29:24
**five** [8] - 56:25, 80:20, 82:5, 141:6, 143:2, 152:3, 152:6, 152:13
**flight** [1] - 143:11
**flip** [1] - 109:11
**Floor** [1] - 2:10
**flush** [1] - 113:15
**focus** [1] - 133:22
**focusing** [1] - 108:10
**folks** [2] - 82:17, 147:23
**follow** [2] - 17:13, 79:5
**follow-up** [1] - 17:13
**following** [2] - 24:19, 120:10
**food** [1] - 40:14
**FOR** [2] - 1:2, 4:7
**forbidden** [1] - 146:9
**force** [2] - 134:7, 134:10
**forced** [4] - 51:12, 51:17, 52:7, 52:12
**foregoing** [1] - 155:10
**foresee** [1] - 20:13
**form** [12] - 44:20, 45:3, 60:12, 64:12, 86:9, 87:14, 142:6, 142:7, 142:8, 142:11, 148:10, 153:16
**former** [1] - 133:4
**forms** [1] - 142:4
**forth** [1] - 144:8
**forward** [14] - 6:5, 12:10, 13:20, 18:5, 26:3, 26:15, 28:18, 53:13, 88:8, 89:3, 91:23, 102:11, 128:16, 132:16
**foundation** [13] - 30:15, 30:16, 96:6, 96:19, 114:10, 115:17, 115:21, 117:11, 119:7, 128:7, 128:11, 128:13, 129:7
**four** [10] - 40:4, 40:5, 46:3, 60:25, 80:17, 82:5, 114:10, 116:2,

116:9, 116:15, 117:11, 118:24, 123:12, 123:14, 129:21, 140:7
**frame** [3] - 97:6, 106:10, 112:5
**Francisco** [1] - 62:17
**fraudulent** [1] - 121:16
**freaky** [2] - 64:25, 67:24
**free** [1] - 30:6
**frequently** [1] - 86:22
**fresh** [1] - 5:22
**Friday** [16] - 141:7, 141:14, 141:15, 141:19, 141:21, 142:16, 142:17, 142:18, 143:23, 149:6, 149:9, 149:10, 151:14, 151:25, 152:18
**Fridays** [2] - 142:1, 149:19
**friend** [1] - 79:13
**FRITZE** [1] - 102:14
**Fritze** [9] - 4:13, 4:18, 4:20, 4:22, 4:24, 102:10, 102:22, 103:3, 143:8
**front** [5] - 5:18, 12:24, 19:6
**full** [2] - 145:1, 155:11
**fully** [3] - 50:22, 50:25, 116:18
**fun** [1] - 111:15
**FURTHER** [1] - 155:10

**G**

**Gary** [1] - 3:3
**gas** [1] - 40:12
**general** [3] - 35:25, 104:17, 130:2
**generally** [3] - 36:25, 58:16, 124:24
**generated** [1] - 152:25
**gentleman** [3] - 49:7, 71:11, 141:3
**gentlemen** [1] - 103:14
**girl** [2] - 42:19, 43:7
**girls** [4] - 33:3, 39:16, 56:25, 131:23
**girls'** [1] - 61:25
**given** [4] - 33:21, 108:4, 126:10, 146:12
**glare** [1] - 19:8
**glasses** [2] - 7:24,

8

71:22
glincenberg@
  birdmarella.com [1]
  - 3:6
goals [2] - 131:3,
131:4
Google [7] - 62:7,
81:12, 81:16, 81:22,
81:25, 83:25, 84:15
Gopi [1] - 3:3
gotcha [1] - 110:19
governed [1] - 136:3
GOVERNMENT [1] -
4:7
Government [1] - 2:2
government [25] - 6:6,
9:16, 14:2, 16:2,
17:6, 19:1, 24:11,
25:21, 28:15, 72:21,
82:14, 83:22, 84:25,
88:25, 102:8, 141:4,
141:6, 142:5,
143:20, 145:6,
146:13, 150:12,
151:10, 152:11,
153:1
government's [2] -
141:9, 154:7
Government's [2] -
100:18, 119:3
gpanchapakesan@
  birdmarella.com [1]
  - 3:5
grab [1] - 7:18
graduate [3] - 29:18,
72:8, 87:11
graphic [1] - 36:23
gratuitous [2] - 24:20,
26:21
Greek [1] - 109:7
GREEN [1] - 2:12
greeted [1] - 5:10
grimace [1] - 27:3
grocery [1] - 90:9
Grove [1] - 134:20
guard [2] - 6:15, 15:15
guards [1] - 13:5
guess [10] - 18:8,
44:3, 50:5, 86:25,
94:11, 108:9,
115:20, 132:7,
132:8, 154:1
guessing [1] - 50:4
gun [1] - 134:24
guy [4] - 32:19, 51:15,
71:22, 129:3
guys [3] - 40:2, 40:14,
58:22

**H**

half [5] - 28:2, 74:22,
91:3, 110:14, 135:24
hand [4] - 28:20,
53:16, 89:5, 102:13
handle [1] - 136:1
handled [1] - 35:16
hands [1] - 105:16
hands-on [1] - 105:16
hard [1] - 149:25
haul [1] - 5:12
hear [8] - 6:24, 7:1,
7:5, 13:10, 31:17,
77:24, 141:25, 153:4
heard [16] - 5:18, 6:6,
13:4, 13:11, 13:18,
15:22, 17:6, 25:13,
30:8, 55:12, 64:9,
71:14, 83:1, 99:16,
145:15, 149:4
hearsay [12] - 21:10,
22:2, 22:17, 69:18,
70:1, 92:14, 94:5,
94:21, 97:17, 119:7,
119:9
hearts [1] - 93:20
held [1] - 37:8
hello [3] - 71:9,
132:22, 132:23
help [1] - 105:11
helpful [2] - 142:9,
144:14
hereby [1] - 155:7
herein [5] - 28:21,
53:17, 89:6, 102:14,
155:12
herself [5] - 21:1,
91:15, 91:16, 92:18,
92:23
hi [1] - 8:23
hide [1] - 59:4
high [2] - 19:10, 29:18
himself [3] - 5:16, 9:3,
13:12
hired [1] - 104:23
history [2] - 104:6,
133:9
hold [1] - 12:16
home [2] - 33:20,
57:14
honestly [1] - 139:18
Honor [77] - 6:7, 6:10,
6:19, 7:3, 7:5, 7:7,
9:17, 9:22, 11:14,
11:16, 11:18, 12:5,
14:3, 14:6, 14:10,
14:14, 16:3, 16:5,
16:9, 16:11, 17:7,
17:10, 18:2, 18:23,

19:5, 19:14, 20:7,
21:14, 22:10, 24:19,
24:24, 26:16, 27:17,
28:25, 32:22, 43:12,
48:22, 49:1, 52:1,
52:4, 52:15, 52:18,
52:22, 53:1, 53:5,
53:10, 53:21, 64:11,
77:1, 78:24, 79:1,
87:19, 87:23, 89:1,
89:11, 94:23,
101:13, 101:20,
101:22, 101:24,
102:4, 102:9,
102:19, 114:8,
114:11, 117:10,
119:2, 119:13,
128:6, 128:14,
129:10, 139:8,
143:25, 144:16,
145:22, 149:21,
152:20
HONORABLE [1] -
1:12
hoping [2] - 108:7,
110:17
hotel [17] - 24:3, 25:8,
35:24, 36:1, 36:4,
37:12, 57:14, 58:21,
59:1, 59:13, 59:22,
61:6, 77:13, 107:8,
111:2, 113:19,
133:22
hotels [2] - 58:22,
133:24
hour [3] - 83:6,
110:14, 110:15
hours [1] - 83:5
house [3] - 36:2,
95:22, 100:13
human [2] - 121:5,
122:24
HUMETEWA [1] - 1:12
hundred [1] - 106:1
hundreds [2] - 108:17,
108:18
hung [1] - 95:19
Hyer [2] - 143:12,
143:13
hyperlink [2] - 122:1,
122:2
hyphenated [1] -
89:23

**I**

ID [4] - 4:18, 4:20,
4:22, 4:24
idea [4] - 22:16, 39:8,
39:10, 50:1

ideas [2] - 84:5, 84:15
identification [1] -
124:10
identified [5] - 72:16,
72:17, 93:4, 143:19,
152:8
identify [8] - 12:19,
14:21, 21:12, 76:1,
100:24, 124:11,
144:10, 152:2
identifying [1] - 23:25
identity [1] - 152:16
illegal [10] - 120:12,
120:21, 121:11,
121:12, 121:17,
121:20, 122:24,
123:1, 132:12,
137:22
illuminating [1] - 19:9
imagine [1] - 80:20
immediately [2] -
112:3, 112:4
immune [2] - 146:25,
147:24
impartial [3] - 9:13,
13:20, 15:24
important [5] - 6:21,
36:24, 91:23,
140:18, 154:13
improper [1] - 131:12
incall [10] - 108:24,
110:20, 111:3,
113:19
incident [2] - 5:17,
5:21
include [6] - 21:10,
57:5, 109:19,
110:11, 110:25,
113:3
included [4] - 57:22,
85:9, 121:18, 133:25
includes [1] - 135:19
including [1] - 141:3
income [4] - 90:12,
97:15, 97:16, 97:21
incorrect [1] - 78:9
increment [1] - 110:15
independent [1] -
86:13
independently [1] -
81:6
indicated [3] - 49:10,
77:6, 144:1
indicators [1] - 67:21
indictment [2] - 25:22,
26:2
individual [4] - 23:15,
121:15, 136:23,
146:21
individually [1] - 5:21

individuals [7] - 6:15,
11:25, 17:1, 25:24,
138:4, 144:9, 154:10
infer [1] - 23:10
information [8] -
13:13, 15:3, 16:23,
17:4, 17:5, 78:9,
83:17, 152:25
informed [1] - 12:22
inland [1] - 45:24
Inland [1] - 45:25
inquired [1] - 15:9
inquiry [1] - 12:8
inside [4] - 93:21,
99:23, 99:24, 100:3
instance [1] - 18:20
instructed [1] - 26:6
instructions [8] -
33:21, 57:15,
141:18, 141:19,
141:23, 141:25,
149:22, 150:2
insufficient [1] - 17:14
intend [4] - 5:20,
21:13, 152:5, 152:16
intending [1] - 153:10
intent [1] - 64:4
inter [1] - 131:19
interaction [2] - 6:18,
8:5
intercourse [1] - 37:2
interrupting [1] -
131:19
introduce [2] - 29:6,
54:4
investigate [3] -
105:3, 107:23,
133:20
investigating [6] -
130:20, 137:22,
146:22, 147:2,
147:7, 147:15
investigation [4] -
108:2, 126:25,
133:18, 134:3
investigations [7] -
105:23, 106:23,
120:23, 126:14,
131:1, 147:20,
147:22
investigative [1] -
104:15
investigator [3] -
104:10, 104:11,
112:8
involved [5] - 31:8,
31:21, 104:22,
109:16, 146:7
irrelevant [1] - 64:13
issue [6] - 7:3, 17:13,

UNITED STATES DISTRICT COURT

18:12, 19:1, 27:8, 28:2
**issues** [4] - 6:21, 52:9, 133:22, 141:1
**items** [2] - 120:17, 123:3
**itself** [1] - 121:21

## J

**January** [8] - 31:7, 38:19, 38:22, 45:22, 46:14, 47:18, 104:13
**Jed** [1] - 48:14
**Jerome** [2] - 49:22, 49:24
**job** [1] - 103:20
**jobs** [1] - 104:15
**John** [2] - 3:2, 143:10
**john** [6] - 58:25, 59:15, 61:5, 61:6, 111:4, 111:7
**johns** [5] - 52:12, 59:12, 69:4, 73:14, 109:13
**joined** [1] - 39:16
**joining** [1] - 134:10
**joins** [3] - 7:17, 12:13, 14:20
**Jordan** [1] - 143:8
**JOY** [1] - 3:11
**Joy** [1] - 3:12
**joy@joybertrandlaw. com** [1] - 3:13
**Joye** [2] - 3:11, 48:18
**JUDGE** [1] - 1:12
**judge** [5] - 7:13, 26:5, 129:2, 141:11, 142:24
**judges** [1] - 150:22
**July** [5] - 112:14, 112:24, 117:8, 119:24, 149:24
**juncture** [1] - 27:11
**jurisdiction** [2] - 133:19, 147:22
**juror** [15] - 5:15, 5:17, 5:20, 6:17, 7:25, 8:9, 9:13, 10:9, 12:10, 12:13, 12:19, 13:14, 14:20, 14:22, 16:20
**Juror** [19] - 7:17, 8:1, 8:2, 8:3, 9:7, 9:24, 10:3, 11:5, 12:3, 12:22, 12:23, 13:1, 13:9, 13:22, 14:19, 14:24, 14:25, 15:7, 15:18
**jurors** [20] - 5:7, 5:9, 5:10, 5:11, 5:18,

5:22, 10:5, 10:23, 11:3, 12:5, 12:9, 16:22, 17:4, 17:12, 17:22, 18:3, 18:13, 18:17, 28:2
**Jury** [11] - 4:3, 4:3, 4:4, 4:5, 5:3, 12:4, 28:9, 88:14, 88:19, 88:22, 140:24
**JURY** [32] - 1:14, 7:23, 8:1, 8:7, 8:10, 8:13, 8:16, 8:18, 8:22, 9:10, 9:14, 10:6, 10:11, 10:13, 10:17, 11:8, 12:18, 12:21, 13:2, 13:5, 13:10, 13:15, 13:17, 13:21, 13:25, 14:23, 15:5, 15:9, 15:15, 15:21, 15:25, 16:18
**jury** [54] - 6:20, 11:24, 13:24, 14:15, 16:15, 23:10, 25:4, 25:25, 26:14, 27:15, 28:8, 28:11, 29:7, 36:24, 54:4, 59:10, 62:4, 68:12, 69:20, 73:9, 88:7, 88:13, 88:20, 88:21, 88:24, 89:16, 93:2, 93:18, 102:24, 103:2, 103:15, 103:24, 104:6, 104:20, 105:5, 105:12, 107:2, 107:25, 112:4, 113:15, 120:7, 120:16, 121:18, 122:18, 126:8, 126:16, 140:15, 140:23, 141:18, 141:19, 141:23, 142:5, 142:22, 149:22
**jury's** [1] - 149:17
**JUSTICE** [1] - 2:9
**justice** [1] - 103:25
**juvenile** [1] - 104:10

## K

**keep** [7] - 88:11, 91:23, 112:25, 131:16, 141:14, 142:17, 151:16
**keeping** [2] - 28:14, 142:5
**kept** [1] - 150:3
**KESSLER** [25] - 2:16, 7:3, 24:10, 24:16, 24:18, 26:5, 26:9,

26:12, 26:16, 27:4, 27:14, 30:14, 53:6, 101:22, 110:22, 111:19, 112:9, 115:17, 123:9, 131:7, 132:18, 132:21, 139:11, 139:12, 140:3
**Kessler** [13] - 2:16, 4:14, 19:18, 19:20, 24:9, 26:25, 52:23, 88:15, 101:21, 132:16, 132:17, 133:3, 148:20
**Kessler's** [1] - 148:20
**Kevin** [1] - 2:3
**kevin.rapp@usdoj. gov** [1] - 2:6
**kill** [2] - 9:2, 13:12
**kind** [17] - 19:7, 29:23, 34:18, 62:8, 64:19, 80:5, 84:2, 91:18, 93:14, 95:7, 104:17, 105:9, 111:15, 113:22, 115:11, 122:17, 133:24
**kissy** [1] - 93:20
**kitty** [1] - 109:6
**Knight** [19] - 56:9, 56:19, 56:23, 57:4, 57:7, 58:2, 58:13, 59:7, 59:18, 59:23, 60:2, 60:12, 60:24, 61:11, 61:17, 61:22, 67:17, 73:20, 83:15
**Knight's** [2] - 83:8, 83:11
**knock** [1] - 59:2
**knocked** [1] - 77:16
**knowing** [2] - 23:21, 144:23
**knowledge** [16] - 5:23, 9:8, 15:19, 21:2, 21:9, 22:1, 44:23, 80:1, 82:24, 83:11, 99:20, 100:16, 132:5, 132:6, 133:14, 145:8
**known** [1] - 49:22
**knows** [11] - 81:1, 115:23, 122:25, 125:8, 125:11, 145:1, 145:5, 146:8, 147:16, 147:23
**Kozinets** [1] - 2:4
**Kroger** [2] - 90:9, 90:13

## L

**L.G** [34] - 32:10, 32:16, 33:14, 33:20, 34:3, 34:13, 34:17, 34:18, 36:2, 36:7, 36:8, 36:14, 36:18, 37:4, 37:6, 37:16, 37:21, 38:6, 39:1, 39:24, 40:7, 40:9, 40:11, 41:2, 41:10, 41:11, 41:21, 44:17, 44:19, 45:2, 47:12, 47:21, 49:20, 49:22
**Lacey** [5] - 1:8, 2:12, 5:11, 8:24, 48:10
**lack** [2] - 17:12, 151:23
**lacks** [1] - 30:15
**ladies** [1] - 103:14
**Lady** [1] - 93:10
**language** [13] - 67:21, 74:10, 75:18, 109:4, 109:5, 109:21, 109:25, 111:10, 111:22, 115:11, 121:2, 125:21, 141:20
**large** [1] - 135:22
**Larkin** [4] - 5:25, 13:11, 27:20, 71:24
**last** [12] - 27:12, 29:11, 54:6, 69:20, 83:4, 89:22, 103:1, 151:3, 153:2, 154:8, 154:10
**lasted** [1] - 74:22
**LAW** [2] - 2:16, 2:19
**law** [17] - 88:15, 104:7, 106:23, 108:15, 121:8, 130:25, 134:12, 134:15, 134:21, 144:22, 145:1, 145:23, 146:23, 147:20, 150:8, 150:22
**lawfully** [1] - 140:9
**laws** [9] - 135:14, 135:17, 136:21, 136:25, 145:3, 146:7, 147:23, 147:25
**lawyer** [1] - 135:13
**lay** [6] - 30:16, 96:6, 96:19, 115:20, 117:11, 128:13
**laying** [2] - 114:10, 128:11
**leadership** [1] - 104:2
**Leading** [3] - 39:4,

63:10, 69:9
**leading** [20] - 39:5, 42:22, 43:2, 63:11, 63:17, 63:25, 64:15, 64:17, 66:18, 70:19, 94:18, 94:22, 110:22, 111:19, 112:15, 112:19, 125:22, 127:12, 130:11, 130:21
**learn** [7] - 42:18, 42:25, 61:23, 68:24, 69:24, 108:19, 136:20
**learned** [6] - 65:18, 70:5, 91:4, 97:24, 106:9, 106:13
**learning** [1] - 105:8
**least** [6] - 73:5, 86:25, 124:24, 140:10, 152:2, 152:8
**leave** [7] - 36:7, 36:8, 37:4, 55:4, 59:16, 95:23, 140:14
**leaves** [3] - 12:3, 14:19, 16:20
**led** [2] - 26:22, 77:11
**leeway** [3] - 43:15, 52:2, 52:3
**left** [5] - 36:11, 49:7, 71:11, 85:5, 152:1
**legal** [2] - 28:13, 125:6
**legally** [1] - 122:23
**legitimate** [4] - 44:20, 45:3, 60:2, 60:12
**less** [1] - 80:20
**letters** [2] - 65:16, 68:3
**letting** [1] - 130:4, 130:17
**license** [1] - 29:21
**licensed** [1] - 134:21
**licenses** [1] - 29:20
**licensing** [1] - 104:21
**life** [1] - 134:16
**Light** [2] - 90:9, 90:10
**light** [1] - 19:5
**Liliana** [7] - 5:9, 5:17, 6:19, 7:4, 10:15, 11:6, 11:23
**limited** [2] - 21:13, 43:15
**LINCENBERG** [40] - 9:20, 9:22, 12:5, 12:8, 14:10, 16:9, 17:10, 17:17, 18:23, 18:25, 19:4, 19:11, 19:13, 19:16, 19:22, 52:22, 79:1, 101:20, 143:25, 144:3,

144:5, 144:14, 144:18, 145:10, 145:14, 145:17, 145:19, 145:22, 146:19, 146:23, 146:25, 147:4, 147:6, 147:19, 148:2, 148:6, 148:8, 148:11, 148:13, 151:7, 151:9
**Lincenberg** [12] - 3:3, 9:20, 9:21, 10:18, 14:9, 16:8, 18:8, 19:2, 52:21, 78:25, 101:19, 145:13
**Lincenberg's** [2] - 18:15, 24:19
**line** [2] - 43:12, 148:3
**lines** [1] - 146:2
**lingerie** [6] - 34:2, 91:12, 91:16, 92:23, 93:4, 99:3
**link** [2] - 122:2, 122:9
**lips** [1] - 23:6
**LIPTSITZ** [1] - 2:12
**list** [5] - 68:4, 141:5, 151:11, 154:8, 154:9
**listed** [1] - 123:2
**listen** [1] - 123:7
**listing** [7] - 120:9, 122:19, 122:20, 122:25, 123:2, 132:9, 152:3
**live** [10] - 54:20, 58:9, 65:23, 72:3, 90:1, 96:4, 96:12, 96:15, 97:9, 103:4
**lived** [1] - 73:24
**living** [1] - 90:8
**LLC** [1] - 3:11
**LLP** [1] - 2:12
**lobby** [1] - 59:8
**local** [1] - 115:9
**locate** [1] - 108:9
**location** [4] - 99:17, 99:20, 107:14, 110:2
**lollipop** [3] - 93:22, 94:16, 95:1
**look** [18] - 39:22, 47:6, 47:24, 51:8, 70:10, 84:4, 86:6, 107:10, 107:22, 108:2, 108:4, 109:23, 126:18, 137:18, 142:6, 142:11, 148:5, 153:21
**looked** [6] - 33:4, 68:17, 83:25, 108:7, 118:1, 140:5
**looking** [11] - 43:9,

61:25, 62:3, 68:11, 68:12, 108:5, 109:20, 109:25, 113:6, 119:17
**Los** [1] - 3:5
**loss** [1] - 135:2
**lost** [3] - 11:10, 26:25, 146:11
**loudly** [1] - 31:17
**low** [1] - 90:12
**lower** [2] - 110:15, 110:18
**lubricant** [2] - 99:9, 99:22
**lunch** [1] - 28:11
**Lundstrom** [2] - 143:13

## M

**ma'am** [13] - 28:18, 50:17, 50:21, 52:14, 53:7, 53:13, 72:8, 72:22, 73:9, 76:10, 87:25, 89:3, 102:5
**main** [2] - 97:15, 97:21
**Malby** [1] - 3:12
**males** [1] - 107:13
**man** [1] - 73:21
**management** [1] - 104:1
**manipulative** [2] - 121:16, 121:17
**manner** [1] - 26:3
**Maplewood** [21] - 103:12, 103:17, 104:3, 104:15, 105:20, 106:21, 107:9, 108:3, 133:9, 134:7, 134:14, 135:4, 135:21, 136:1, 136:3, 136:7, 136:23, 137:2, 137:16, 137:21
**March** [6] - 55:24, 61:4, 67:6, 68:21, 70:25
**MARELLA** [1] - 3:2
**Margaret** [1] - 2:4
**margaret.perlmeter @usdoj.gov** [1] - 2:8
**Marshal** [1] - 6:3
**mask** [1] - 54:12
**massage** [1] - 137:22
**master's** [5] - 54:23, 55:1, 55:9, 103:25, 104:1
**MasterCharge** [2] - 79:21, 80:24
**material** [1] - 121:4

**maternity** [1] - 55:4
**math** [1] - 25:5
**matter** [2] - 140:19, 147:6
**matters** [7] - 16:16, 141:2, 141:13, 142:2, 143:24, 152:18, 154:13
**maximize** [1] - 149:17
**mean** [31] - 22:25, 31:4, 32:1, 32:6, 32:18, 34:17, 35:11, 35:14, 36:23, 36:24, 41:5, 51:15, 59:11, 72:4, 76:22, 80:15, 80:23, 87:8, 87:11, 91:14, 94:3, 108:24, 111:2, 112:7, 132:4, 133:17, 134:22, 137:7, 137:17, 148:14
**meaning** [7] - 17:16, 17:17, 65:17, 93:25, 94:25, 109:6, 109:7
**means** [5] - 32:7, 37:1, 105:12, 123:6, 131:10
**meant** [2] - 94:11, 95:5
**measurements** [1] - 109:2
**meet** [7] - 24:3, 39:18, 39:19, 84:21, 92:20, 95:13, 99:17
**meeting** [1] - 37:3
**meetings** [8] - 35:22, 83:2, 83:4, 128:4, 128:19, 128:21, 128:24
**Megan** [2] - 143:12, 143:13
**MEMBER** [31] - 7:23, 8:1, 8:7, 8:10, 8:13, 8:16, 8:18, 8:22, 9:10, 9:14, 10:6, 10:11, 10:13, 10:17, 11:8, 12:18, 12:21, 13:2, 13:5, 13:10, 13:15, 13:17, 13:21, 13:25, 14:23, 15:5, 15:9, 15:15, 15:21, 15:25, 16:18
**member** [1] - 95:22
**members** [5] - 29:6, 88:7, 88:23, 136:6, 140:15
**memorized** [1] - 137:18
**memory** [2] - 5:22, 108:23

**men** [1] - 35:12
**mention** [2] - 20:8, 142:12
**mentioned** [2] - 15:11, 22:23
**mentioning** [1] - 13:6
**menu** [1] - 65:16
**message** [3] - 118:25, 122:16, 124:3
**messages** [3] - 56:21, 58:14, 66:12
**met** [6] - 39:21, 39:24, 71:12, 84:25, 129:3, 133:1
**method** [1] - 106:15
**methods** [1] - 127:24
**mic** [2] - 7:18, 143:5
**Michael** [13] - 1:8, 2:12, 48:10, 56:9, 57:25, 58:8, 76:24, 80:10, 80:13, 80:16, 84:21, 84:25, 85:5
**Michigan** [1] - 90:2
**microphone** [7] - 8:15, 12:14, 12:16, 17:24, 20:5, 31:16, 132:24
**Microsoft** [2] - 82:7, 82:10
**middle** [1] - 76:15
**might** [7] - 42:2, 43:10, 70:12, 80:13, 123:21, 149:5, 150:7
**mill** [1] - 116:12
**mind** [2] - 88:11, 140:20
**mindful** [2] - 142:13, 142:15
**mine** [2] - 41:10, 43:11
**Minneapolis** [1] - 122:6
**Minnesota** [14] - 103:5, 103:13, 104:21, 121:12, 124:6, 124:25, 125:3, 135:5, 135:8, 136:18, 136:21, 136:23, 145:3, 147:25
**minutes** [8] - 6:20, 88:12, 99:25, 112:6, 118:4, 118:14, 118:21
**miscellaneous** [1] - 143:24
**missed** [1] - 9:22
**missing** [2] - 75:5, 86:7
**misstates** [2] - 77:23, 79:14

**mistrial** [2] - 17:11, 22:22
**Mistrial** [1] - 4:4
**mitigate** [1] - 26:23
**moderation** [1] - 126:4
**moment** [1] - 72:19
**moments** [1] - 28:12
**Monday** [1] - 142:1
**money** [36] - 32:7, 35:13, 36:14, 36:17, 36:18, 37:9, 37:10, 39:12, 41:18, 49:19, 49:24, 51:2, 51:9, 59:13, 59:20, 59:21, 60:17, 63:9, 63:23, 65:13, 77:19, 86:1, 92:20, 95:10, 95:13, 96:2, 109:7, 110:10, 111:18, 111:22, 120:12, 125:20, 131:23
**monitor** [1] - 50:15
**Montana** [1] - 29:14
**month** [1] - 38:22
**monthly** [1] - 80:19
**months** [3] - 60:25, 80:17, 107:8
**morning** [8] - 11:7, 15:2, 27:12, 42:12, 49:5, 149:11, 149:12, 151:14
**most** [5] - 81:20, 87:5, 124:9, 125:20, 136:24
**motel** [16] - 33:16, 33:19, 34:3, 35:25, 36:3, 36:4, 40:22, 40:23, 40:25, 41:17, 42:5, 42:13, 43:1, 43:5, 44:8, 47:12
**motion** [3] - 18:7, 18:15, 18:21
**Motion** [1] - 4:4
**mouth** [2] - 12:17, 54:13
**move** [14] - 17:11, 26:7, 26:15, 32:22, 42:5, 69:18, 114:9, 114:25, 117:12, 121:3, 121:23, 128:16, 131:19, 141:24
**moved** [2] - 11:13, 154:7
**moves** [1] - 119:3
**moving** [1] - 151:17
**MR** [237] - 6:9, 6:12, 6:19, 7:2, 7:3, 7:7, 7:12, 7:13, 7:16,

9:20, 9:22, 10:19, 10:21, 10:23, 11:1, 11:16, 11:18, 11:20, 12:5, 12:8, 14:6, 14:10, 14:12, 14:14, 16:5, 16:9, 16:11, 16:13, 17:10, 17:17, 18:1, 18:23, 18:25, 19:4, 19:11, 19:13, 19:16, 19:21, 19:24, 20:4, 20:7, 22:3, 22:7, 22:10, 22:12, 22:25, 24:10, 24:15, 24:16, 24:18, 26:5, 26:9, 26:12, 26:16, 27:4, 27:14, 27:16, 27:19, 27:23, 28:1, 28:4, 28:7, 30:14, 39:3, 39:5, 45:4, 49:4, 50:14, 50:16, 51:23, 52:1, 52:4, 52:6, 52:14, 52:18, 52:22, 52:24, 53:5, 53:6, 63:11, 63:14, 63:17, 63:25, 64:6, 64:11, 64:13, 64:15, 69:9, 69:18, 70:1, 71:7, 72:18, 72:20, 77:1, 77:4, 77:24, 78:3, 78:5, 78:12, 78:22, 79:1, 79:4, 79:6, 79:7, 79:16, 81:4, 84:13, 84:20, 84:24, 85:4, 86:11, 87:16, 87:23, 89:1, 89:11, 89:13, 92:14, 92:15, 92:21, 94:5, 94:7, 94:21, 94:23, 94:24, 95:9, 96:7, 96:8, 96:20, 96:21, 97:17, 97:19, 101:13, 101:16, 101:20, 101:22, 101:24, 102:2, 102:4, 102:9, 102:19, 102:21, 110:22, 110:24, 111:19, 111:21, 112:9, 112:11, 112:17, 112:22, 114:10, 114:13, 114:23, 115:1, 115:17, 115:22, 115:24, 116:1, 116:20, 116:22, 117:10, 117:15, 118:7, 118:9, 119:2, 119:13, 119:16, 123:9, 123:11, 125:5, 125:8, 125:13, 125:24,

127:16, 128:9, 128:11, 128:14, 128:18, 129:2, 129:7, 129:10, 129:11, 130:12, 130:14, 130:24, 131:7, 131:12, 131:15, 131:18, 131:20, 132:13, 132:18, 132:21, 139:8, 139:11, 139:12, 140:1, 140:3, 140:12, 141:11, 142:24, 143:2, 143:6, 143:25, 144:3, 144:5, 144:11, 144:14, 144:18, 145:10, 145:14, 145:17, 145:19, 145:22, 146:19, 146:23, 146:25, 147:4, 147:6, 147:9, 147:11, 147:13, 147:19, 148:2, 148:6, 148:8, 148:11, 148:13, 148:25, 149:6, 149:12, 149:21, 150:10, 150:13, 151:7, 151:9, 152:20, 153:2
**MS** [99] - 6:7, 6:14, 9:17, 11:12, 14:3, 14:8, 16:3, 16:7, 17:7, 28:16, 28:25, 29:3, 30:17, 30:19, 32:22, 33:1, 34:19, 34:22, 39:4, 39:7, 42:20, 42:22, 42:24, 43:2, 43:4, 43:12, 43:16, 43:19, 43:21, 44:21, 45:1, 45:7, 45:9, 45:12, 45:17, 45:18, 46:8, 46:10, 48:21, 51:19, 51:21, 51:25, 52:20, 53:1, 53:3, 53:12, 53:21, 53:23, 54:2, 60:4, 60:6, 60:10, 63:10, 63:19, 63:21, 64:2, 64:3, 64:8, 64:18, 66:18, 66:20, 69:17, 69:22, 70:6, 70:17, 70:19, 70:21, 71:3, 77:23, 77:25, 78:24, 79:14, 80:25, 84:8, 84:18, 84:22, 85:2, 86:8, 87:13, 87:22, 92:14, 94:4, 94:18, 96:5, 96:16, 102:3, 110:22, 111:19, 112:9, 112:15, 112:19, 114:8, 114:12, 114:23, 115:17, 119:5, 119:11, 123:9, 125:5, 125:6, 125:22, 127:11, 128:6, 129:6, 130:11, 130:12, 130:21, 131:7, 131:12, 131:18, 139:8, 140:1, 140:12, 141:13, 148:17, 150:3
**objections** [3] - 20:13, 95:2, 144:19
**obligated** [3] - 151:2, 153:12, 153:18
**obligation** [1] - 23:21
**obligations** [1] - 154:6

observation [1] - 152:14
observations [2] - 21:10, 22:17
observe [7] - 44:20, 45:2, 60:2, 60:11, 65:21, 91:7, 100:5
observed [3] - 22:21, 60:9, 116:10
observing [1] - 91:10
obvious [3] - 22:22, 23:8, 125:20
obviously [10] - 6:21, 20:21, 20:24, 21:7, 22:14, 110:16, 129:5, 141:5, 143:7, 150:13
occasions [1] - 82:15
occurred [3] - 8:20, 134:5, 142:13
Oceanside [2] - 37:19, 37:24
October [2] - 1:8, 155:15
odd [2] - 120:23, 152:5
OF [4] - 1:2, 1:13, 2:9, 4:2
offenses [5] - 105:3, 106:19, 130:20, 147:15, 147:16
offered [1] - 23:24
OFFICE [3] - 2:2, 2:16, 2:19
Officer [5] - 4:18, 4:20, 4:22, 4:24, 135:8
officer [27] - 6:13, 10:25, 11:3, 11:6, 13:1, 15:10, 17:20, 17:21, 44:15, 61:9, 67:8, 77:7, 77:10, 77:13, 77:16, 78:19, 78:20, 104:9, 104:10, 104:18, 104:21, 104:23, 134:19, 134:22, 135:5, 136:17, 138:3
officers [5] - 8:6, 15:2, 18:2, 103:19, 113:1
Official [2] - 1:20, 155:8
often [1] - 97:22
oftentimes [1] - 18:11
old [11] - 26:19, 30:2, 55:10, 61:25, 62:1, 68:12, 81:12, 86:19, 90:15, 103:9, 103:10
older [1] - 91:3
once [7] - 36:4, 40:25,

41:12, 58:9, 86:22, 97:25, 142:3
one [92] - 5:9, 5:11, 5:13, 6:23, 7:14, 7:15, 7:21, 8:5, 9:2, 11:25, 12:10, 13:5, 13:6, 15:1, 15:11, 15:12, 17:15, 18:16, 18:18, 22:23, 23:3, 23:6, 24:11, 24:12, 25:23, 27:7, 27:16, 28:12, 31:10, 32:19, 33:3, 35:19, 39:16, 40:22, 41:2, 46:3, 50:13, 63:14, 65:22, 67:16, 72:16, 74:2, 74:5, 74:10, 76:1, 76:3, 76:4, 77:6, 78:11, 81:20, 83:5, 87:8, 107:9, 107:15, 107:18, 113:23, 115:8, 115:18, 117:5, 120:2, 120:4, 120:19, 121:3, 121:9, 121:14, 121:18, 122:2, 122:3, 123:19, 123:20, 123:21, 124:3, 129:10, 130:3, 133:3, 133:4, 133:15, 135:17, 136:24, 138:9, 138:10, 141:24, 144:15, 149:7, 150:1
one-page [1] - 120:2
ones [9] - 10:14, 75:7, 75:10, 79:19, 93:22, 108:3, 123:20, 135:22, 149:23
online [1] - 92:19
oOo [1] - 154:17
open [3] - 16:23, 84:11, 140:20
opening [4] - 5:25, 6:10, 7:10, 27:17
operate [1] - 131:11
operating [1] - 152:7
operation [2] - 105:14, 107:7
operations [2] - 105:9, 137:25
opinion [2] - 131:13, 132:9
opportunity [2] - 17:14, 99:13
opposed [1] - 91:25
ops [1] - 107:15
oral [2] - 27:2, 59:14
order [5] - 27:1, 27:7, 73:14, 88:16, 140:9

ordered [2] - 152:4, 153:24
orders [5] - 22:5, 32:23, 146:17, 150:15, 151:3
ordinance [4] - 136:14, 137:5, 137:6, 152:6
Oregon [3] - 56:18, 61:15
original [4] - 86:13, 86:15, 86:21, 129:12
originally [2] - 26:7, 73:21
outcall [1] - 108:25, 110:21
outset [1] - 149:24
outside [5] - 12:5, 21:5, 24:3, 37:23, 38:10, 90:2
Outside [4] - 4:3, 4:3, 4:4, 4:5
overdue [1] - 154:4
overhear [1] - 99:13
overhearing [1] - 15:17
overnight [1] - 148:11
overrule [2] - 114:12, 115:19
overruled [30] - 32:24, 34:20, 43:14, 43:20, 44:22, 45:6, 60:8, 66:19, 70:2, 78:4, 84:11, 84:19, 92:16, 94:6, 95:3, 96:17, 97:18, 112:10, 112:20, 119:8, 119:10, 119:11, 125:23, 127:13, 129:9, 130:13, 130:22, 131:8, 131:14, 140:13
own [16] - 42:2, 62:9, 74:17, 81:5, 81:11, 83:12, 83:20, 83:21, 83:24, 83:25, 84:14, 85:5, 86:12, 86:24, 87:3, 106:25
owner [2] - 15:14, 15:20
owners [6] - 9:2, 15:12, 18:18, 128:4, 128:24, 133:4

**P**

p.m [12] - 1:8, 5:2, 5:3, 12:4, 28:9, 88:14, 88:18, 88:19, 88:22, 140:24, 154:16

P.M [1] - 1:15
P.O [1] - 3:12
PA [1] - 2:19
pace [1] - 141:7
Padilla [4] - 3:7, 48:16, 49:7, 71:11
page [2] - 120:2, 120:4
PAGE [2] - 4:2, 4:7
pages [3] - 46:2, 150:2, 155:10
paid [4] - 79:17, 80:2, 80:13, 80:19
pairs [1] - 34:1
PANCHAPAKESAN [2] - 149:21, 150:10
Panchapakesan [2] - 3:3, 149:20
panel [1] - 6:22
PANEL [31] - 7:23, 8:1, 8:7, 8:10, 8:13, 8:16, 8:18, 8:22, 9:10, 9:14, 10:6, 10:11, 10:13, 10:17, 11:8, 12:18, 12:21, 13:2, 13:5, 13:10, 13:15, 13:17, 13:21, 13:25, 14:23, 15:5, 15:9, 15:15, 15:21, 15:25, 16:18
Park [1] - 3:4
parlors [1] - 137:22
part [12] - 25:16, 25:18, 29:24, 57:21, 78:1, 85:7, 91:17, 104:9, 105:13, 108:2, 122:5, 122:18
participated [2] - 105:14, 137:24
particular [5] - 5:22, 27:8, 42:25, 58:1, 101:11
parties [5] - 15:24, 22:8, 23:14, 26:6, 151:24
partner [1] - 130:25
partners [1] - 138:9
partnership [2] - 131:2, 131:3
parts [3] - 86:7, 93:1, 116:19
party [2] - 23:2, 142:14
pass [3] - 101:13, 132:14, 136:25
passing [1] - 136:10
paste [1] - 84:2
pasted [1] - 120:18
patiently [2] - 16:17, 148:23
patrol [2] - 104:8,

104:12
Paul [7] - 2:13, 103:17, 105:7, 105:13, 106:6, 106:22, 134:21
pay [14] - 24:2, 37:12, 40:12, 40:14, 49:13, 50:2, 58:4, 59:22, 59:25, 60:15, 80:6, 80:21, 98:2, 98:3
paying [4] - 24:1, 110:17, 127:10, 127:19
payment [1] - 59:3
pcambria@lglaw. com [1] - 2:14
Peace [1] - 135:8
Peggy [1] - 82:21
people [28] - 13:6, 25:17, 32:13, 40:6, 50:9, 71:17, 72:5, 80:20, 82:14, 82:16, 92:19, 95:13, 103:18, 107:16, 107:18, 108:11, 110:17, 122:21, 123:5, 123:17, 123:20, 128:5, 128:22, 128:25, 131:22, 145:25, 152:6, 152:8
per [1] - 95:12
percent [1] - 124:19
percentage [1] - 124:17
performance [1] - 55:2
performing [2] - 59:5, 77:22
perhaps [3] - 71:14, 96:19, 142:10
period [3] - 21:5, 97:3, 143:21
Perlmeter [7] - 2:4, 4:8, 4:10, 43:14, 45:14, 52:25, 87:18
PERLMETER [59] - 6:7, 9:17, 14:3, 16:3, 17:7, 28:16, 28:25, 29:3, 30:17, 30:19, 33:1, 34:22, 39:7, 42:24, 43:4, 43:16, 43:21, 45:1, 45:7, 45:9, 45:12, 45:17, 45:18, 46:8, 46:10, 48:21, 51:19, 51:21, 51:25, 53:1, 53:3, 53:12, 53:21, 53:23, 54:2, 60:10, 63:19, 63:21, 64:2, 64:3,

13

64:18, 66:20, 69:17, 69:22, 70:6, 70:21, 71:3, 77:23, 77:25, 79:14, 80:25, 84:8, 84:18, 84:22, 85:2, 86:8, 87:13, 87:19, 87:21
**permissible** [1] - 66:7
**permit** [1] - 52:2
**permitted** [1] - 145:6
**perplexed** [1] - 153:9
**person** [26] - 20:19, 24:3, 25:5, 44:14, 46:4, 46:20, 47:7, 47:25, 48:1, 56:13, 61:8, 82:7, 82:10, 82:11, 82:21, 100:20, 108:8, 109:1, 122:25, 123:21, 124:10, 128:7, 138:22, 144:23, 148:17
**personal** [5] - 21:2, 21:9, 22:1, 55:9, 80:4
**personally** [4] - 21:3, 21:5, 91:10
**pertaining** [1] - 136:25
**Peter** [1] - 2:4
**peter.kozinets@ usdoj.gov** [1] - 2:7
**Phoenix** [19] - 1:7, 1:22, 2:6, 2:20, 3:9, 38:25, 40:3, 40:17, 40:23, 41:12, 41:14, 41:19, 46:12, 46:17, 47:20, 47:22, 51:24, 52:7, 155:15
**phone** [31] - 34:21, 35:16, 35:18, 43:10, 56:21, 58:10, 58:12, 58:15, 62:3, 62:5, 68:4, 68:7, 68:17, 81:17, 86:22, 93:11, 96:14, 97:7, 97:8, 97:10, 101:4, 101:7, 112:3, 126:11, 126:17, 131:21, 131:25, 132:5, 132:9, 132:10, 132:12
**photo** [2] - 66:10, 87:5
**photo-wise** [1] - 87:5
**photographs** [17] - 33:9, 33:10, 33:25, 34:6, 46:3, 49:16, 57:11, 57:12, 74:2, 75:4, 75:7, 75:8, 85:9, 100:19, 100:20, 108:5

**photos** [20] - 33:13, 33:15, 33:22, 34:4, 46:4, 46:19, 47:6, 47:11, 47:24, 48:1, 57:5, 57:20, 66:1, 66:16, 67:10, 109:21, 115:10, 115:12, 115:14
**phrase** [1] - 63:6
**phrased** [1] - 78:8
**physical** [2] - 109:1, 111:12
**physically** [4] - 98:2, 98:3, 138:13, 138:16
**pick** [1] - 36:2
**picked** [1] - 33:20
**pics** [1] - 62:10
**picture** [8] - 50:21, 74:15, 76:10, 76:13, 76:15, 76:17, 76:19
**pictures** [12] - 46:20, 47:7, 50:24, 62:8, 62:12, 91:12, 91:13, 91:15, 91:17, 92:23, 93:3, 108:7
**pimp** [5] - 32:17, 32:18, 56:12, 73:23, 74:20
**pivot** [1] - 109:10
**place** [15] - 12:25, 35:22, 37:12, 37:17, 38:24, 41:16, 51:2, 51:8, 82:6, 82:12, 106:17, 117:7, 138:2, 138:14, 139:1
**placed** [1] - 138:7
**places** [1] - 37:22
**Plaintiff** [1] - 1:6
**plan** [1] - 22:10
**planned** [1] - 76:22
**playful** [1] - 111:15
**PLC** [1] - 3:8
**pleasant** [1] - 140:22
**pleaser** [1] - 67:25
**point** [37] - 7:4, 13:22, 22:22, 26:18, 27:5, 34:23, 57:9, 57:21, 58:4, 58:11, 61:1, 61:20, 62:9, 68:24, 69:24, 74:1, 74:20, 74:25, 75:4, 75:21, 77:6, 78:1, 82:20, 88:4, 114:1, 114:5, 129:20, 133:15, 135:25, 139:5, 144:15, 145:19, 146:10, 148:16, 153:2, 154:5
**points** [2] - 26:21, 75:1

**Polaris** [1] - 128:22
**police** [17] - 61:8, 68:10, 69:16, 77:7, 77:10, 78:19, 78:20, 103:16, 104:1, 104:18, 104:21, 104:23, 104:25, 109:13, 135:5, 136:17, 136:20
**Police** [7] - 103:12, 104:3, 105:7, 105:13, 106:6, 134:14, 134:20
**polled** [1] - 16:22
**population** [2] - 103:18, 133:13
**portion** [2] - 119:25, 155:11
**Portland** [5] - 56:18, 61:14, 62:16, 67:7, 82:13
**pose** [2] - 57:16, 138:3
**posed** [1] - 25:22
**positions** [1] - 104:8
**poss** [1] - 100:2
**possession** [1] - 153:13
**possibly** [5] - 100:2, 141:7, 141:8, 149:19, 152:6
**post** [35] - 32:8, 34:7, 38:6, 38:10, 39:2, 39:9, 41:11, 49:11, 56:19, 61:22, 62:15, 74:17, 91:12, 91:13, 91:20, 92:7, 92:18, 92:22, 93:6, 95:17, 95:23, 96:10, 97:5, 97:11, 97:24, 98:25, 107:12, 109:13, 109:24, 113:2, 138:11, 138:13, 138:14, 138:22, 139:14
**Post** [4] - 4:18, 4:20, 4:22, 4:24
**posted** [57] - 20:16, 21:1, 25:24, 26:19, 31:23, 34:24, 35:4, 35:8, 38:15, 45:23, 46:11, 46:13, 47:1, 47:3, 47:17, 47:19, 50:11, 55:22, 57:4, 57:7, 57:10, 61:18, 62:16, 65:23, 66:2, 67:3, 67:7, 72:10, 72:25, 73:11, 75:8, 76:8, 81:17, 83:14, 83:15, 84:16, 85:25, 86:6, 86:14, 86:24,

95:11, 95:12, 96:3, 108:3, 108:11, 110:3, 112:1, 113:21, 116:9, 122:5, 123:4, 128:2, 138:16, 139:19, 139:23, 139:24
**poster** [1] - 24:23
**posters** [2] - 24:23, 127:22
**posting** [27] - 31:10, 45:21, 56:17, 58:2, 61:20, 62:18, 62:23, 65:19, 66:7, 66:16, 68:6, 70:22, 72:4, 73:21, 74:25, 75:1, 85:21, 86:22, 90:24, 92:5, 95:24, 97:22, 107:16, 113:1, 120:11, 121:4, 121:7
**postings** [2] - 21:3, 52:9
**posts** [1] - 74:11
**potential** [5] - 18:13, 23:5, 23:19, 23:22, 137:25
**practical** [3] - 104:22, 105:8, 105:11
**practices** [1] - 126:4
**practicing** [1] - 86:4
**precise** [1] - 27:6
**precisely** [1] - 142:9
**preclude** [1] - 23:11
**predetermined** [1] - 141:22
**preempting** [1] - 146:2
**prejudice** [1] - 23:22
**prejudicial** [1] - 23:19
**preliminary** [1] - 149:23
**prepaid** [1] - 98:5
**preparation** [1] - 149:14
**prepare** [2] - 149:8, 154:3
**Prepared** [1] - 1:24
**prepared** [3] - 150:25, 154:12, 155:14
**preparing** [1] - 144:8
**presence** [1] - 11:3
**Presence** [4] - 4:3, 4:3, 4:4, 4:5
**present** [5] - 5:3, 5:7, 10:5, 10:10, 12:1, 12:4, 12:23, 14:25, 15:2, 17:1, 17:5, 28:9, 88:14, 88:19, 88:22, 103:20, 140:24, 142:21

**pressed** [1] - 138:17
**presumably** [1] - 83:1
**presuming** [1] - 128:8
**pretrial** [1] - 150:6
**pretty** [4] - 87:7, 87:11, 95:19, 135:25
**prevent** [1] - 18:19
**prevention** [1] - 135:2
**previous** [2] - 15:19, 117:25
**previously** [2] - 13:14, 27:12
**price** [1] - 111:14
**proactive** [1] - 133:18
**probe** [1] - 23:22
**problem** [2] - 73:17, 149:6
**problematic** [1] - 16:24
**procedure** [2] - 6:2, 105:9
**proceed** [13] - 24:6, 27:11, 27:13, 28:24, 28:25, 49:1, 53:21, 59:5, 89:8, 89:10, 102:18, 143:8, 143:24
**proceeded** [1] - 5:13
**proceedings** [7] - 7:17, 12:3, 12:13, 14:19, 14:20, 16:20, 155:12
**PROCEEDINGS** [2] - 1:13, 4:2
**Proceedings** [7] - 1:24, 4:3, 4:3, 4:4, 4:5, 5:2, 154:16
**process** [1] - 65:19
**produced** [2] - 154:8, 154:9
**production** [2] - 152:25, 153:24
**products** [1] - 121:7
**proffer** [1] - 20:12
**proficient** [1] - 135:16
**profile** [6] - 41:6, 41:7, 41:8, 69:24, 70:10, 70:13
**profiles** [2] - 41:1, 41:4
**program** [1] - 135:6
**progressing** [1] - 88:8
**prohibited** [1] - 121:8
**promise** [1] - 23:6
**promoting** [1] - 122:22
**promotion** [2] - 113:23, 125:3
**prompted** [1] - 114:3
**promptly** [1] - 140:21

**prompts** [1] - 141:10
**pronouncements** [1] - 27:2
**proposed** [1] - 142:11
**prosecution** [10] - 124:13, 144:23, 146:8, 146:13, 146:18, 146:20, 147:14, 147:15, 147:17, 151:19
**prosecutor** [1] - 147:20
**prosecutors** [2] - 82:4, 86:4
**prostitute** [2] - 124:22, 138:3
**prostitutes** [3] - 124:15, 126:9, 137:25
**prostitution** [56] - 24:21, 25:16, 26:22, 64:4, 65:10, 67:23, 77:22, 78:14, 105:3, 105:9, 105:14, 105:23, 106:15, 106:19, 107:10, 108:9, 112:13, 113:12, 113:18, 113:23, 113:24, 121:2, 121:10, 121:19, 122:3, 122:22, 122:24, 123:2, 123:6, 123:23, 124:5, 124:24, 125:2, 125:4, 126:9, 129:14, 129:22, 130:9, 130:20, 131:10, 131:11, 131:21, 132:1, 132:7, 132:9, 132:11, 133:23, 133:25, 134:3, 135:19, 139:20, 146:22, 147:14
**prostitution-related** [3] - 105:23, 106:19, 133:23
**provide** [6] - 10:15, 58:18, 141:18, 146:16, 152:15
**provided** [3] - 32:24, 57:15, 143:20
**provocative** [4] - 57:19, 62:10, 115:10, 115:14
**psychology** [2] - 54:25, 55:2
**publicity** [1] - 17:17
**published** [5] - 75:22,

75:23, 75:24, 107:22, 119:12
**pull** [1] - 31:16
**pulled** [1] - 27:17
**purchase** [1] - 99:8
**purchasing** [2] - 21:4, 80:22
**purpose** [4] - 21:13, 23:24, 33:24, 63:1
**purposes** [1] - 101:10
**put** [27] - 20:9, 21:7, 21:13, 25:25, 54:12, 54:13, 66:1, 78:9, 81:16, 96:18, 110:4, 110:14, 110:15, 110:20, 111:3, 111:10, 111:12, 111:17, 111:22, 120:17, 121:9, 134:10, 143:3, 143:18, 150:25, 153:15
**puts** [2] - 144:13, 151:17
**putting** [3] - 20:25, 21:1, 111:14

## Q

**qualified** [1] - 155:8
**questioning** [4] - 43:13, 145:7, 146:1, 148:3
**questions** [13] - 9:5, 12:10, 25:6, 48:5, 48:21, 67:14, 77:1, 83:7, 91:24, 97:3, 101:16, 128:7, 144:24
**quick** [2] - 87:7, 149:22
**quickly** [1] - 97:11
**quit** [2] - 78:3, 78:6

## R

**Rachel** [3] - 58:3, 67:19, 72:25
**raise** [6] - 28:20, 53:15, 53:16, 89:5, 102:13, 143:25
**raising** [1] - 18:12
**rapidly** [1] - 154:7
**RAPP** [10] - 141:11, 142:24, 143:2, 143:6, 144:11, 147:9, 147:11, 147:13, 150:13, 153:2
**Rapp** [7] - 2:3, 142:23,

144:1, 144:4, 144:9, 147:12, 149:4
**Rapp's** [1] - 144:9
**rated** [1] - 126:10
**reaching** [1] - 17:24
**read** [5] - 30:7, 73:9, 81:25, 120:7, 122:18
**read]** [1] - 73:10
**reading** [1] - 7:24
**ready** [8] - 48:25, 89:10, 102:18, 132:19, 142:16, 143:14, 149:2, 154:12
**real** [3] - 58:2, 62:18, 67:24
**really** [8] - 9:6, 13:10, 17:11, 17:13, 22:18, 76:7, 89:18, 144:5
**reason** [1] - 18:21
**reasonable** [2] - 122:25, 123:5
**reasons** [1] - 132:4
**rebuttal** [1] - 144:12
**REC'D** [1] - 4:17
**receive** [6] - 19:2, 66:3, 66:6, 66:12, 66:15, 104:17
**received** [3] - 36:17, 134:2, 152:3
**receiving** [3] - 24:1, 56:21, 88:9
**recent** [2] - 18:14, 81:20
**recently** [1] - 55:5
**recess** [4] - 88:6, 88:12, 88:17, 154:15
**Recess** [1] - 88:18
**recognize** [22] - 46:4, 46:20, 47:7, 47:25, 48:1, 48:9, 50:17, 66:25, 67:10, 71:18, 71:20, 71:25, 100:20, 101:4, 116:25, 117:2, 117:16, 117:19, 117:23, 118:10, 118:17, 118:19
**recognized** [2] - 5:11, 93:11
**recollection** [2] - 7:7, 15:6
**reconvene** [1] - 5:2
**record** [9] - 5:6, 18:9, 18:11, 27:10, 101:10, 144:18, 145:8, 145:16, 148:24
**recorded** [1] - 82:24
**recording** [1] - 83:1

**redirect** [1] - 52:25
**reevaluate** [1] - 146:17
**reference** [1] - 144:20
**referred** [2] - 88:16, 107:4
**referring** [1] - 23:17
**reflect** [1] - 5:6
**refrain** [2] - 25:6, 148:19
**regard** [9] - 18:7, 22:5, 22:20, 24:1, 25:14, 81:17, 83:24, 144:19, 150:16
**regarding** [2] - 120:9, 121:2
**regards** [1] - 44:1
**regular** [4] - 98:10, 98:15, 98:18, 98:22
**regulation** [1] - 121:8
**regulations** [1] - 135:21
**reiterate** [1] - 10:24
**reiterated** [1] - 17:1
**relate** [1] - 142:10
**related** [9] - 15:19, 22:2, 23:15, 27:2, 105:23, 106:19, 133:23, 145:6
**relates** [2] - 6:23, 24:5
**relating** [2] - 97:3, 145:9
**relation** [2] - 55:17, 118:5
**relationship** [3] - 70:16, 127:7, 127:21
**relatively** [1] - 135:21
**relayed** [1] - 6:3
**relaying** [1] - 15:3
**released** [3] - 53:8, 87:20, 87:25
**Relevance** [1] - 84:22
**relevance** [12] - 22:20, 34:19, 43:13, 45:4, 51:21, 51:25, 64:8, 85:2, 112:9, 114:8, 119:7, 129:7
**relevant** [5] - 24:6, 25:4, 25:10, 25:21, 26:1
**remain** [2] - 9:13, 142:13
**remains** [1] - 142:22
**remember** [16] - 5:24, 6:9, 6:11, 7:8, 30:25, 31:2, 34:16, 36:13, 39:23, 61:3, 93:14, 111:10, 115:4, 139:2, 139:9, 139:18
**remind** [3] - 23:14, 88:7, 140:17

**remove** [5] - 125:20, 130:5, 130:6, 131:9, 142:14
**removed** [2] - 66:2, 75:10
**rent** [1] - 25:8
**repeat** [3] - 43:23, 44:24, 114:15
**repeatedly** [3] - 18:12, 150:15, 150:16
**rephrase** [3] - 31:12, 63:20, 78:10
**rephrased** [1] - 69:11
**Reported** [1] - 1:24
**reported** [1] - 5:17
**Reporter** [3] - 1:20, 1:24, 155:8
**REPORTER'S** [1] - 1:13
**repost** [3] - 81:19, 86:19, 97:13
**reposting** [3] - 86:16, 86:17, 86:19
**represent** [3] - 49:7, 71:10, 133:3
**representation** [1] - 144:9
**representations** [1] - 151:19
**represents** [1] - 133:4
**request** [1] - 151:5
**requested** [2] - 43:1, 43:7
**research** [3] - 88:10, 140:19, 146:15
**researching** [1] - 153:3
**reserve** [1] - 26:13
**resource** [2] - 104:10, 130:19
**resources** [1] - 108:10
**respect** [3] - 23:13, 52:9, 144:20
**respond** [2] - 107:13, 110:17
**responded** [6] - 20:18, 20:19, 20:23, 77:7, 113:20, 138:4
**responding** [3] - 99:11, 107:18, 107:22
**response** [7] - 56:8, 66:4, 113:12, 113:13, 129:23, 130:3, 152:3
**responsible** [2] - 123:4, 151:6
**rest** [3] - 142:24, 143:14, 149:5
**restate** [1] - 145:19

**rests** [1] - 152:11
**result** [3] - 66:3, 77:21, 85:15
**resulted** [2] - 122:21, 123:16
**retail** [1] - 104:10
**retrial** [1] - 152:24
**retrieve** [3] - 5:9, 11:25, 81:12
**return** [3] - 11:22, 14:15, 16:15
**revealing** [1] - 18:17
**reverse** [6] - 106:16, 107:4, 107:12, 109:11, 109:12, 109:17
**review** [3] - 27:8, 69:4, 142:16
**Review** [12] - 69:1, 69:3, 69:7, 69:25, 70:10, 70:13, 70:16, 126:6, 126:18, 126:21, 127:8, 127:10
**reviewed** [3] - 68:19, 108:15, 142:3
**reviewing** [3] - 108:18, 141:17, 150:9
**reviews** [3] - 68:22, 69:7, 126:19
**revise** [1] - 52:10
**rid** [1] - 131:9
**ride** [1] - 99:16
**ring** [1] - 103:17
**ringing** [3] - 58:10, 97:8, 97:10
**rise** [4] - 28:8, 88:13, 88:21, 140:23
**risk** [3] - 22:22, 23:4, 23:11
**RMR** [2] - 1:21, 155:20
**Road** [2] - 2:17, 2:20
**rock** [1] - 72:3
**role** [1] - 134:21
**room** [19] - 11:24, 14:16, 16:15, 21:7, 21:8, 24:3, 25:8, 33:16, 34:3, 35:24, 36:4, 36:5, 36:7, 36:12, 37:8, 41:17, 59:13, 59:18, 107:9
**rooms** [5] - 36:1, 37:12, 37:13, 59:22
**roses** [2] - 65:13, 109:8
**roughly** [4] - 134:5, 134:10, 141:4, 141:15
**round** [1] - 67:24

**rule** [1] - 129:6
**rules** [2] - 85:22, 85:25
**ruling** [4] - 19:2, 19:4, 25:14, 148:2
**run** [1] - 116:12
**run-of-the-mill** [1] - 116:12

## S

**safe** [1] - 62:22
**safety** [1] - 54:11
**sale** [1] - 121:7
**Salem** [1] - 56:18
**San** [8] - 33:16, 33:20, 37:19, 38:4, 38:5, 46:1, 47:4, 62:17
**sanctions** [1] - 154:6
**Sanders** [6] - 4:12, 20:9, 20:16, 21:16, 89:2, 89:23
**SANDERS** [2] - 89:6, 89:23
**Sanders-Willis** [1] - 4:12
**SANDERS-WILLIS** [1] - 89:6
**Sandra** [1] - 1:21
**sat** [1] - 21:5
**satisfaction** [1] - 67:24
**Saturday** [1] - 152:4
**saw** [9] - 17:24, 21:23, 22:1, 83:15, 91:25, 92:5, 93:19, 98:24, 145:15
**scenario** [2] - 111:5, 111:7
**schedule** [2] - 142:22, 149:19
**scheduling** [4] - 141:2, 143:12, 150:15, 151:3
**school** [3] - 29:18, 54:22, 104:9
**SCIME** [1] - 2:12
**scope** [1] - 131:12
**Scott** [3] - 2:15, 48:12, 133:4
**Scottsdale** [3] - 2:17, 2:17, 3:13
**scramble** [1] - 87:8
**screen** [1] - 72:19
**scroll** [4] - 46:2, 46:19, 47:5, 100:18
**se** [1] - 95:12
**search** [3] - 68:13, 68:17
**searchable** [1] -

126:11
**searched** [1] - 68:15
**seat** [1] - 11:12
**seated** [5] - 5:4, 5:23, 28:10, 71:17, 88:24
**Seattle/Tacoma** [1] - 62:16
**second** [8] - 43:1, 43:5, 44:9, 83:5, 105:22, 107:11, 120:14, 129:10
**secondly** [1] - 25:6
**Section** [1] - 144:21
**section** [15] - 62:23, 62:25, 92:7, 92:11, 92:13, 93:9, 97:22, 108:16, 110:5, 121:25, 122:7, 122:20, 123:1, 123:14, 138:24
**sections** [1] - 92:10
**security** [13] - 6:13, 8:5, 10:25, 11:2, 11:6, 12:25, 13:5, 15:2, 15:10, 15:15, 17:20, 17:21, 18:2
**see** [41] - 7:21, 11:11, 11:12, 22:19, 22:22, 34:23, 45:19, 48:25, 57:7, 65:25, 66:1, 68:1, 68:3, 70:10, 72:22, 79:8, 80:12, 82:15, 82:17, 83:17, 85:6, 86:7, 91:21, 92:19, 99:8, 100:10, 100:11, 116:23, 126:18, 126:21, 129:12, 129:15, 139:25, 140:4, 140:21, 141:3, 144:22, 145:15, 146:16, 148:4, 148:23
**seeing** [7] - 81:19, 81:20, 92:25, 93:3, 101:2, 110:18, 114:6
**seeking** [2] - 18:13, 131:22
**seem** [2] - 70:12, 145:24
**selected** [1] - 13:14
**sell** [4] - 30:24, 55:19, 64:21, 64:22
**selling** [3] - 63:2, 63:3, 63:8
**Seminary** [1] - 128:25
**send** [7] - 112:14, 112:18, 114:3, 119:21, 119:23, 142:19, 150:8

**sending** [3] - 113:11, 129:13, 150:21
**sense** [3] - 85:16, 103:15, 112:4
**sent** [7] - 112:23, 113:8, 117:3, 117:20, 118:13, 118:20, 129:21
**sentence** [1] - 123:25
**sergeant** [1] - 104:12
**series** [1] - 46:3
**service** [12] - 35:10, 35:14, 35:15, 36:19, 44:4, 44:5, 90:12, 120:12, 120:21, 121:12, 130:9, 134:19
**services** [11] - 56:22, 58:17, 63:8, 64:20, 65:16, 81:18, 121:7, 122:20, 123:1, 138:23, 138:24
**services-escort** [2] - 122:20, 123:1
**serving** [1] - 8:8
**SESSION** [1] - 1:15
**set** [4] - 25:15, 80:24, 108:13, 149:7
**setting** [2] - 41:1, 41:2
**seven** [2] - 151:15, 152:5
**several** [7] - 71:17, 83:5, 104:8, 104:11, 104:15, 108:24, 117:5
**sex** [25] - 32:7, 35:13, 35:15, 36:20, 36:24, 51:2, 51:9, 55:19, 59:14, 61:6, 63:5, 63:23, 64:22, 65:1, 65:2, 65:7, 77:18, 86:1, 92:20, 109:7, 111:17, 111:22, 125:20, 131:22
**sex-act-for-money** [1] - 125:20
**sex-for-money** [1] - 86:1, 111:22
**sexual** [1] - 37:2, 56:2, 58:17, 59:5, 59:11, 63:8, 69:4, 94:12, 94:14, 94:16, 120:12
**sexually** [2] - 75:13, 75:16
**shall** [1] - 138:24
**shared** [1] - 13:23
**sharing** [1] - 83:17
**Shawn** [1] - 2:4
**Shehan** [1] - 143:10

**shoplifters** [1] - 135:2
**show** [13] - 18:10, 18:11, 28:6, 44:11, 45:10, 46:2, 46:19, 46:24, 66:23, 100:17, 116:20, 117:13
**showed** [3] - 34:25, 44:14, 67:8
**showing** [7] - 45:12, 46:8, 47:14, 116:18, 116:19, 117:16, 118:7
**shown** [4] - 72:21, 76:2, 83:20, 86:3
**side** [3] - 71:18, 72:6, 109:11
**sign** [1] - 94:2
**signs** [1] - 65:14
**silly** [1] - 70:12
**similar** [11] - 17:22, 41:19, 105:20, 109:21, 115:8, 116:6, 116:15, 118:24, 131:3, 131:4
**simply** [3] - 17:11, 25:18, 88:11
**sister** [18] - 20:17, 20:18, 21:6, 21:11, 21:17, 21:19, 22:21, 23:7, 23:9, 23:20, 24:23, 90:24, 91:4, 91:7, 95:1, 95:10, 95:21, 95:25
**sister's** [7] - 20:17, 21:2, 21:12, 23:25, 90:25, 92:12
**site** [6] - 121:4, 121:15, 121:19, 121:21, 122:21, 139:7
**situation** [1] - 51:14
**six** [6] - 55:8, 56:25, 81:9, 86:25, 87:1, 87:3
**size** [3] - 103:15, 103:16, 109:2
**skills** [1] - 104:22
**slowly** [1] - 89:18
**small** [1] - 135:21
**snacks** [1] - 40:14
**so-called** [1] - 127:22
**solely** [2] - 17:11, 124:6
**solicitation** [1] - 120:11
**someone** [7] - 20:16, 21:1, 32:10, 39:13, 99:10, 124:5, 129:4
**sometime** [1] - 96:25

**sometimes** [9] - 57:19, 62:14, 79:18, 82:7, 82:10, 92:3
**somewhere** [2] - 38:7, 40:23
**soon** [2] - 36:3, 97:9
**sorry** [25] - 7:25, 10:20, 12:24, 19:20, 20:2, 20:3, 24:9, 31:11, 52:10, 63:12, 64:9, 77:24, 78:16, 78:18, 79:13, 82:9, 86:13, 98:19, 108:6, 111:6, 114:15, 119:11, 135:6, 143:6
**sort** [11] - 6:4, 19:6, 20:12, 24:20, 88:10, 121:1, 141:12, 141:20, 144:24, 146:1, 148:24
**sounds** [1] - 115:17
**source** [4] - 60:3, 84:4, 97:15, 97:21
**sources** [1] - 84:14
**Southern** [1] - 29:17
**Spc** [1] - 1:22
**speaking** [1] - 77:25
**speaks** [1] - 27:1
**Spear** [3] - 2:15, 48:12, 133:4
**special** [2] - 42:19, 43:7
**specialized** [1] - 134:2
**specific** [7] - 7:9, 93:25, 104:22, 105:2, 115:2, 115:6, 138:23
**specifically** [1] - 27:1
**specified** [1] - 155:13
**speculation** [8] - 30:14, 44:21, 60:6, 80:25, 94:4, 94:19, 96:5, 131:7
**speculative** [1] - 64:14
**spell** [6] - 29:9, 54:6, 89:15, 89:18, 102:23, 103:1
**spending** [1] - 144:7
**spent** [2] - 95:20, 137:21
**sport** [2] - 55:2, 104:1
**Square** [2] - 79:20, 80:7
**St** [6] - 103:17, 105:7, 105:13, 106:6, 106:22, 134:21
**staffing** [1] - 55:9
**stand** [15] - 21:14, 24:18, 28:24, 45:8, 53:20, 65:16, 84:19,

88:12, 88:16, 89:9, 102:17, 148:15, 151:1, 153:15, 154:15
**Standards** [1] - 135:8
**star** [3] - 32:12, 41:10, 41:25
**Star** [14] - 32:21, 33:2, 33:14, 34:3, 35:18, 36:7, 36:8, 37:16, 37:21, 38:6, 40:7, 40:9, 41:24, 47:21
**Star's** [1] - 40:11
**start** [9] - 6:23, 36:3, 56:21, 58:10, 97:8, 97:10, 109:22, 120:6, 141:17
**started** [2] - 27:20, 41:1, 81:5, 83:21, 104:18, 108:24
**starting** [2] - 123:25, 154:2
**starts** [2] - 23:17, 122:18
**State** [1] - 136:18
**state** [17] - 38:11, 89:15, 102:23, 103:1, 103:4, 103:5, 136:13, 136:21, 137:10, 144:22, 145:3, 145:23, 146:23, 147:14, 147:15, 147:20, 147:24
**state's** [1] - 135:17
**statement** [10] - 5:19, 5:24, 6:9, 13:18, 15:19, 15:22, 17:1, 23:19, 69:20, 151:22
**statements** [11] - 150:16, 150:19, 150:23, 151:2, 152:15, 152:22, 153:12, 153:13, 153:16, 153:25, 154:3
**STATES** [3] - 1:1, 2:2, 2:9
**states** [1] - 142:12
**States** [7] - 1:5, 28:17, 89:1, 102:9, 116:21, 119:3, 155:9
**stating** [1] - 63:8
**statute** [3] - 125:2, 136:13, 137:10
**statutes** [1] - 124:25
**steer** [3] - 20:22, 21:17, 21:23
**Stenographic** [1] - 1:24

**step** [6] - 53:9, 53:19, 88:1, 102:6, 102:16, 140:25
**steps** [2] - 113:16, 123:5
**stick** [1] - 92:2
**still** [9] - 19:12, 39:24, 42:15, 66:3, 78:15, 78:17, 88:9, 129:16, 144:12
**sting** [12] - 67:4, 69:6, 105:14, 107:4, 107:10, 107:12, 113:13, 113:18, 114:16, 122:3, 137:25
**stings** [16] - 105:17, 105:20, 106:15, 106:16, 106:18, 106:25, 107:3, 107:21, 108:1, 108:12, 109:12, 109:17, 124:9, 131:21
**Stone** [4] - 2:3, 19:18, 19:23, 19:25
**stop** [10] - 12:12, 25:2, 25:12, 44:17, 61:1, 61:11, 70:22, 78:14, 120:8, 120:14
**stopped** [1] - 61:17
**store** [1] - 90:9
**stores** [2] - 99:1, 99:3
**Storm** [12] - 39:13, 39:15, 39:19, 39:22, 39:24, 40:7, 42:3, 44:6, 44:7, 44:8, 46:23, 47:22
**storm** [2] - 41:10, 46:7
**Storm's** [1] - 43:11
**story** [1] - 146:9
**street** [5] - 104:9, 105:6, 133:15, 133:17, 133:25
**Street** [1] - 1:22
**strictly** [1] - 137:6
**strike** [4] - 32:22, 69:18, 114:9, 120:23
**strip** [1] - 125:17
**stronger** [1] - 124:12
**stuck** [1] - 51:14
**students** [1] - 27:21
**stuff** [2] - 23:1, 96:1
**subject** [1] - 18:9
**subpoena** [6] - 53:2, 53:8, 87:20, 88:1, 102:1, 102:6
**subpoenas** [2] - 153:6, 153:7
**subsequent** [2] -

124:1, 150:6
**substance** [3] - 130:2, 130:7, 130:10
**substantive** [2] - 142:7, 143:9
**suburb** [3] - 103:17, 133:10, 134:20
**sudden** [1] - 151:25
**sufficiently** [1] - 21:9
**suggest** [2] - 16:23, 144:24
**suggested** [3] - 9:12, 145:10, 145:11
**suggestion** [3] - 16:21, 146:6, 149:1
**suggests** [1] - 67:22
**suicide** [2] - 5:14, 18:18
**Suite** [7] - 1:21, 2:5, 2:13, 2:17, 2:20, 3:4, 3:9
**summarize** [1] - 129:4
**SUMMARY** [1] - 4:2
**Super** [5] - 38:19, 38:24, 46:17, 47:22, 50:8
**super** [1] - 127:22
**supervise** [1] - 133:23
**support** [1] - 122:23
**supposed** [1] - 149:2
**surprised** [1] - 153:4
**suspect** [2] - 141:7, 141:24
**sustain** [5] - 30:18, 64:17, 86:9, 94:22, 123:10
**sustained** [17] - 39:6, 42:23, 43:3, 51:22, 63:18, 64:1, 69:19, 70:20, 79:15, 84:23, 85:3, 87:14, 110:23, 111:20, 112:16, 139:10, 140:2
**sweet** [1] - 95:7
**switched** [2] - 42:13, 66:2
**sworn** [10] - 28:19, 28:21, 53:13, 53:17, 89:3, 89:7, 102:12, 102:14, 103:19, 134:22

### T

**table** [2] - 54:14, 71:18
**taint** [1] - 18:13
**Tampa** [1] - 82:13
**tape** [1] - 82:24
**tape-recorded** [1] - 82:24

**targeting** [1] - 137:25
**tattoos** [2] - 93:5, 100:24
**taught** [1] - 135:14
**Taylor** [3] - 1:21, 155:19, 155:20
**TAYLOR** [1] - 155:7
**Teams** [3] - 82:8, 82:10, 82:23
**telephone** [4] - 68:1, 73:7, 73:11, 93:7
**term** [1] - 112:7
**terminology** [4] - 75:13, 87:6, 87:7, 108:19
**terms** [15] - 9:25, 25:21, 66:13, 85:21, 108:22, 110:25, 120:10, 120:16, 120:19, 130:8, 131:4, 135:13, 140:4, 140:10, 140:11
**testified** [9] - 23:18, 80:16, 81:11, 83:25, 85:6, 96:9, 96:22, 134:2, 137:24
**testify** [3] - 21:11, 60:8, 152:11
**testifying** [2] - 127:11, 148:14
**testimony** [12] - 21:9, 53:8, 77:23, 79:14, 86:4, 88:1, 88:10, 102:5, 145:5, 145:8, 146:21, 148:5
**testimony's** [1] - 20:12
**text** [7] - 35:9, 36:6, 36:14, 37:4, 56:21, 57:22, 58:14
**texted** [2] - 36:17, 37:6
**texts** [1] - 74:5
**themselves** [1] - 26:1
**Theological** [1] - 128:25
**therefore** [1] - 18:12
**therein** [1] - 155:13
**they've** [5] - 8:23, 22:16, 126:11, 126:19, 129:3
**thinking** [1] - 19:24
**third** [2] - 22:8, 82:21
**three** [12] - 46:3, 82:16, 91:3, 93:21, 94:13, 104:12, 107:8, 122:21, 123:20, 124:1, 143:20, 151:3

**threesome** [2] - 43:9, 44:2

**Thurman** [1] - 143:9

**Thursday** [11] - 142:25, 143:16, 143:17, 143:20, 149:2, 149:3, 149:4, 149:5, 151:13, 152:11, 152:22

**tilted** [2] - 19:6, 19:7

**title** [2] - 103:20, 122:9

**today** [9] - 8:6, 49:8, 54:9, 54:18, 76:2, 141:5, 148:11, 152:13, 154:10

**together** [2] - 40:2, 60:13

**tomorrow** [3] - 140:21, 153:25, 154:1

**tonight** [1] - 27:8

**took** [12] - 12:25, 33:13, 37:12, 47:12, 74:2, 79:22, 96:1, 105:7, 106:5, 113:4, 128:1, 130:17

**tool** [1] - 146:14

**top** [6] - 76:15, 97:13, 109:22, 119:19, 119:25, 120:6

**topic** [1] - 94:10

**Touhy** [1] - 153:8

**towards** [3] - 38:2, 38:22, 97:24

**town** [1] - 152:1

**track** [2] - 68:10, 142:9

**trafficked** [1] - 33:3

**trafficking** [5] - 25:19, 32:5, 32:20, 121:5, 122:24

**trainer** [1] - 29:24

**Training** [1] - 135:9

**training** [18] - 29:22, 55:9, 104:17, 105:3, 105:7, 105:8, 105:11, 105:16, 105:19, 106:5, 106:7, 106:11, 106:14, 106:21, 113:4, 134:2, 135:5, 136:18

**Transcript** [1] - 1:24

**transcript** [3] - 7:10, 155:11, 155:13

**TRANSCRIPT** [1] - 1:13

**Transcription** [1] - 1:24

**transition** [1] - 88:4

**transpired** [1] - 21:8

**Travel** [3] - 147:13, 147:17, 147:19

**travel** [2] - 40:2, 103:6

**traveled** [2] - 47:21, 90:3

**traveling** [1] - 54:17

**TRIAL** [1] - 1:14

**trial** [6] - 8:9, 19:17, 103:6, 149:10, 151:17, 154:11

**tried** [2] - 75:12, 84:2

**trigger** [1] - 84:9

**triggered** [1] - 114:17

**true** [3] - 28:4, 79:10, 155:11

**truth** [1] - 128:8

**truthfully** [1] - 21:20

**try** [14] - 20:14, 20:22, 21:17, 21:23, 26:23, 31:17, 65:6, 87:8, 92:2, 108:7, 109:13, 110:15, 137:6, 148:19

**trying** [11] - 26:18, 64:20, 64:22, 111:13, 118:25, 123:7, 129:4, 131:5, 131:9, 137:7, 137:15

**Tuesday** [2] - 141:8, 151:12

**turn** [3] - 7:21, 20:5, 44:14

**turned** [1] - 124:21

**turns** [1] - 40:9

**twice** [2] - 97:25, 100:2

**Twin** [1] - 133:10

**two** [15] - 5:18, 11:25, 16:25, 30:1, 42:19, 43:7, 46:3, 74:22, 107:7, 107:15, 123:19, 148:16, 149:19, 151:3, 154:8

**two-day** [2] - 107:7, 107:15

**type** [9] - 6:4, 12:8, 32:1, 51:12, 55:7, 62:7, 68:6, 93:19, 105:20

**typed** [1] - 81:16

**types** [4] - 105:17, 106:18, 108:1, 108:11

**typically** [10] - 95:17, 96:4, 99:24, 107:6, 108:2, 110:13, 110:14, 110:20, 116:18, 133:20

**typing** [1] - 65:7

### U

**U.S** [1] - 1:21, 6:3

**ultimately** [1] - 20:19

**unable** [1] - 78:10

**uncomfortable** [2] - 51:16, 94:11

**under** [8] - 72:3, 120:17, 122:20, 146:14, 146:23, 146:25, 147:24, 155:14

**underage** [5] - 25:5, 25:7, 25:9, 25:17, 108:8

**underaged** [2] - 24:21, 25:11

**undercover** [4] - 44:15, 61:8, 67:4, 67:7, 69:6, 69:15, 77:7, 78:20

**undercut** [1] - 18:19

**undergraduate** [1] - 54:24

**understood** [4] - 83:19, 95:5, 95:7, 137:9

**underwear** [1] - 116:19

**underwears** [1] - 34:1

**unfairness** [1] - 151:10

**unfamiliar** [1] - 29:15

**unit** [7] - 104:9, 105:6, 133:15, 133:17, 133:18, 133:21, 133:25

**UNITED** [3] - 1:1, 2:2, 2:9

**United** [7] - 1:5, 28:17, 89:1, 102:9, 116:21, 119:2, 155:9

**unless** [1] - 141:12

**unnecessary** [3] - 23:4, 24:20, 25:4

**unreasonable** [1] - 151:5

**up** [32] - 6:22, 17:13, 20:9, 24:19, 27:17, 31:16, 33:20, 35:3, 36:2, 41:1, 41:2, 44:11, 44:14, 50:14, 61:8, 65:23, 67:8, 71:17, 72:18, 76:12, 79:5, 79:6, 80:24, 82:15, 87:9, 108:13, 137:18, 139:17, 140:5, 143:4, 149:7

**upcoming** [2] - 7:5, 24:22

**user** [3] - 120:10, 120:17, 123:3

**utility** [1] - 96:22

**utilize** [2] - 106:23, 126:13

**utilized** [2] - 93:12, 106:7

**utilizing** [2] - 91:4, 91:7

### V

**vagina** [1] - 109:6

**vaginal** [1] - 59:14

**vague** [1] - 96:16

**vaguely** [1] - 13:2

**Valley** [1] - 37:20

**valuable** [1] - 120:13

**Vanilla** [4] - 98:5, 98:20, 98:21, 98:25

**vanilla** [2] - 98:6, 100:9

**variety** [1] - 93:20

**Vaught** [2] - 3:11, 48:18

**vein** [2] - 17:22, 150:14

**verdict** [5] - 142:4, 142:6, 142:7, 142:8, 142:11

**verification** [2] - 139:16, 139:25

**version** [1] - 150:7

**versus** [4] - 86:15, 86:16, 107:4, 116:9

**Victim** [1] - 24:15

**victim** [2] - 22:18, 143:9

**victims** [1] - 108:9

**view** [2] - 23:18, 70:10

**viewing** [1] - 113:5

**Village** [1] - 133:5

**violate** [1] - 22:15

**violated** [2] - 120:10, 120:15

**violates** [1] - 123:2

**violating** [4] - 66:13, 130:8, 145:1, 147:23

**violation** [4] - 135:17, 142:12, 145:2, 147:17

**violations** [1] - 146:7

**Visa** [2] - 79:21, 80:24

**visitations** [1] - 52:11

**visits** [1] - 82:23

**Voice** [1] - 133:5

**voir** [3] - 17:14, 18:9, 28:5

**volume** [1] - 132:8

**vs** [1] - 1:7

### W

**W-I-L-L-I-S** [1] - 89:24

**wait** [5] - 12:6, 16:16, 35:9, 99:21, 151:12

**waiting** [4] - 26:14, 28:14, 142:5, 148:23

**walked** [1] - 9:6

**walking** [1] - 21:23

**Walmart** [1] - 98:5

**Walter** [1] - 2:16

**wants** [1] - 151:16

**warned** [1] - 85:20

**warning** [2] - 139:16, 139:25

**warnings** [1] - 138:25

**Washington** [2] - 1:22, 2:10

**waste** [1] - 149:17

**watch** [2] - 139:14, 139:16

**watched** [3] - 96:10, 98:8, 138:20

**watching** [2] - 23:25, 24:3

**water** [3] - 54:14, 93:21, 94:2

**wear** [3] - 57:16, 57:18, 57:19

**wearing** [1] - 57:20

**web** [1] - 30:8

**website** [10] - 30:8, 30:12, 55:12, 66:17, 68:25, 69:4, 106:2, 120:18, 122:1, 126:9

**Wednesday** [3] - 152:23, 153:25, 154:1

**week** [14] - 27:12, 90:4, 97:25, 103:7, 141:8, 144:7, 149:2, 151:1, 151:12, 151:21, 152:4, 152:9, 152:17, 154:10

**weekend** [2] - 39:16, 144:8

**weekends** [2] - 149:14, 149:15

**weeks** [2] - 143:11, 154:8

**welcome** [2] - 8:24, 88:23

**welcomed** [1] - 28:11

**West** [1] - 1:22

**whatnot** [1] - 24:2

**whole** [3] - 6:22, 136:21, 146:9

**Willis** [2] - 4:12, 89:23

**WILLIS** [1] - 89:6

UNITED STATES DISTRICT COURT

18

**wine** [1] - 99:22
**wise** [1] - 87:5
**wish** [7] - 6:6, 17:6, 17:25, 18:19, 146:15, 148:23, 148:25
**wished** [1] - 19:2
**wishes** [1] - 136:9
**WITNESS** [23] - 34:21, 42:21, 44:24, 45:5, 51:20, 53:10, 60:5, 60:7, 64:7, 69:10, 69:15, 70:4, 70:18, 81:3, 88:2, 92:18, 95:5, 102:7, 112:21, 125:12, 127:14, 130:23, 131:9
**witness** [52] - 5:5, 5:7, 6:23, 20:8, 20:24, 23:16, 23:22, 24:7, 25:3, 28:15, 28:21, 28:24, 32:24, 45:12, 46:8, 48:22, 48:24, 53:2, 53:11, 53:12, 53:17, 53:19, 69:14, 69:21, 84:12, 87:20, 88:25, 89:6, 89:8, 101:13, 101:25, 102:8, 102:14, 102:17, 117:16, 118:7, 132:14, 140:25, 141:5, 143:19, 144:19, 144:24, 145:5, 145:24, 148:4, 148:14, 148:18, 148:20, 148:21, 153:15, 154:8, 154:9
**witness's** [2] - 116:20, 117:13
**witnessed** [2] - 21:3
**witnesses** [35] - 7:5, 22:25, 23:2, 23:17, 24:22, 141:4, 143:2, 143:16, 143:19, 144:6, 146:3, 149:2, 149:7, 149:14, 150:14, 150:17, 150:20, 150:25, 151:6, 151:11, 151:14, 151:20, 152:1, 152:5, 152:9, 152:10, 152:13, 152:16, 153:3, 153:4, 153:5, 153:6, 153:13, 154:2
**WITNESSES** [1] - 4:7
**WOLPERT** [1] - 3:2
**woman** [2] - 22:16, 22:23

**wondered** [1] - 10:21
**word** [6] - 22:23, 23:6, 52:11, 65:2, 87:8, 87:9
**words** [21] - 32:2, 34:10, 34:14, 57:22, 63:7, 64:23, 64:25, 65:1, 65:9, 65:10, 65:15, 65:18, 66:2, 67:14, 75:2, 80:15, 85:12, 109:8, 111:15, 123:19
**Worthy** [2] - 20:18, 91:1
**write** [2] - 34:9, 34:14
**written** [1] - 148:10
**wrote** [2] - 51:4, 74:10
**Wu** [1] - 2:4

## Y

**year** [6] - 31:4, 31:5, 46:15, 55:22, 90:21, 104:13
**years** [14] - 26:19, 31:5, 55:8, 55:22, 74:22, 81:9, 91:3, 103:10, 104:5, 104:7, 104:11, 104:12, 134:8, 151:3
**York** [2] - 2:10, 2:14
**young** [1] - 64:25
**younger** [3] - 108:6, 108:7
**yourself** [20] - 12:19, 14:22, 29:6, 49:17, 54:4, 61:23, 64:19, 65:21, 68:6, 70:13, 75:1, 75:8, 83:12, 85:10, 91:21, 93:1, 126:25, 138:8, 138:15, 139:23
**yourselves** [2] - 140:19, 152:17

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,     )
                              )
            Plaintiff,        )   NO. 2:18-cr-00422-DJH
v.                            )
                              )   Phoenix, Arizona
Michael Lacey, et al.,        )   October 18, 2023
                              )   8:59 a.m.
            Defendants.       )
_____)

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**JURY TRIAL DAY 20**
**A.M. SESSION**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

ER 13186

2

```
 1                    A P P E A R A N C E S

 2   For the Plaintiff:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Kevin M. Rapp, Esq.
               Andrew C. Stone, Esq.
 4             Peter Shawn Kozinets, Esq.
               Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
          LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8        By:  Paul J. Cambria, Jr. Esq.
          42 Delaware Avenue, Suite 120
 9        Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
11        By:  David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
12        Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
          KESSLER LAW OFFICE
14        By:  Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
15        Scottsdale, Arizona 85253
          - and -
16        FEDER LAW OFFICE, PA
          By:  Bruce S. Feder, Esq.
17        2930 East Camelback Road, Suite 160
          Phoenix, Arizona 85016
18

19   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20        By: Gary S. Lincenberg, Esq.
               Gopi K. Panchapakesan, Esq.
21        1875 Century Park E, Suite 2300
          Los Angeles, California 90067
22

23   For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
24        By:  Joy Malby Bertrand, Esq.
          P.O. Box 2734
25        Scottsdale, Arizona 85252-2734
```

UNITED STATES DISTRICT COURT

ER 13187

3

*I N D E X*

**GOVERNMENT WITNESS:**                                                        **PAGE**

DEREK FRITZE
Continued Cross-Examination by Mr. Kessler..................13
Redirect Examination by Mr. Berry...........................47

JORDAN THURMAN
Direct Examination by Ms. Perlmeter.........................55
Cross-Examination by Mr. Eisenberg..........................80

BRADLEY MYLES
Direct Examination by Mr. Rapp..............................90

UNITED STATES DISTRICT COURT

4

***P R O C E E D I N G S***

*(Whereupon the proceedings began at 8:59 a.m.)*

      COURTROOM DEPUTY:  All rise, court is now in session.

**08:59a**       THE COURT:  All right, please be seated.

      And the record will reflect that we have counsel present.  There is no witness or juror present.  I thought a little bit more about the schedule.  Now, if it is the fact that the Government is going to rest either Thursday --

**09:00a** whether it be Thursday early afternoon or towards the end of the day, I think it would -- I anticipate that there would be a number of motions then presented by defense counsel; and so if it is the case that they do, indeed, rest on Thursday, what we could do is release the jurors for the weekend, use Friday

**09:00a** morning -- and even if the Government rests on Friday morning, use the remainder of the day to take up those motions, the responses and the replies and that way the defendants may have until Tuesday to begin their case in chief.

      I think that's the better course.  So that's how we

**09:01a** will plan for it.  We'll have to see what it looks like Thursday midday in terms of how far the Government gets.

      Ms. Perlmeter, you wish to raise something?

      MS. PERLMETER:  Yes, thank you.  I just wanted to let the Court know that our next witness after Detective

**09:01a** Fritze is finished is Jordan Thurman.  She is a woman who was

5

| | |
|---|---|
| 1 | advertised on Backpage.  What is different -- slightly |
| 2 | different from what her testimony -- what we expect her |
| 3 | testimony to be is that she actually was arrested and charged |
| 4 | and has pleaded guilty and been convicted of money laundering |
| 09:01a 5 | related to the prostitution-related offenses she was |
| 6 | originally charged with. |
| 7 | She was originally indicted for sex trafficking of a |
| 8 | minor, the 1591 charge.  We do not intend to -- when we -- |
| 9 | when we ask her questions, we don't intend to elicit the fact |
| 09:02a 10 | that there was a minor involved.  We will talk about it in |
| 11 | terms of another female, another person. |
| 12 | So I just wanted to let the Court -- when we talk |
| 13 | about the recruitment and the postings of who was the minor, |
| 14 | we will refer to it as another female.  So I just wanted to |
| 09:02a 15 | let the Court know that we don't intend or we're not trying to |
| 16 | elicit testimony about minors or children, but that is a fact |
| 17 | in the case and our plan moving forward is to have her |
| 18 | referred to as "the other female." |
| 19 | Her Backpage posting name was Snowflake.  So if you |
| 09:02a 20 | hear the witness talking about Snowflake, that is the person |
| 21 | that is being referenced. |
| 22 | THE COURT:  Okay.  All right.  Well, thank you for |
| 23 | the notice. |
| 24 | I also wanted to raise an issue that Mr. Lincenberg |
| 09:03a 25 | raised yesterday with regard to this witness who's on the |

6

| | |
|---|---|
| 1 | stand.  By my review of his testimony, I think that there -- |
| 2 | the defense may be permitted to ask this witness whether he |
| 3 | pursued an investigation -- a state -- whether he pursued an |
| 4 | investigation related to prostitution claims against Backpage |
| 09:03a 5 | or any of the named defendants, and certainly whether or not |
| 6 | this witness says he did it's probative to ask him why or why |
| 7 | he did not. |
| 8 | Now, beyond that, depending on what he says, I don't |
| 9 | want anyone to mention, "Well do you know what the |
| 09:04a 10 | Communications Decency Act is?"  "Do you know what Section 230 |
| 11 | of the Communications Decency Act is?" |
| 12 | Those are the type of questions that I'm not going |
| 13 | to permit, but depending on -- because the Government has laid |
| 14 | foundation for his investigation into these matters and |
| 09:04a 15 | because he pursued the matters related to sending the e-mail |
| 16 | to notice Backpage that they were in violation of their own |
| 17 | terms, I think it is probative to determine whether or not he |
| 18 | opened his own investigation into whether or not Backpage or |
| 19 | any of the named defendants did violate the laws that he was |
| 09:04a 20 | in charge of investigating.  So that's -- that's what I will |
| 21 | permit. |
| 22 | MR. LINCENBERG:  Can I ask -- |
| 23 | THE COURT:  No, wait, Mr. Lincenberg. |
| 24 | But as an example, there was an earlier |
| 09:05a 25 | cross-examination question that began with the phrase, |

UNITED STATES DISTRICT COURT

7

```
 1    "Section 230 of the CDA is X, Y and Z."
 2           Nothing like that.  I'm not going to permit it.  It
 3    is confusing and it is irrelevant.  It doesn't apply to the
 4    case.  So those are the parameters.
```
09:05a  5           MR. LINCENBERG:  Can I ask a question of
```
 6    clarification?
 7           THE COURT:  You can.
 8           MR. LINCENBERG:  So if I understand, the Court is
 9    saying you can ask the witness whether he pursued an
```
09:05a 10    investigation, but we can't point out that the reason why he
```
11    didn't is because there's no state law that Backpage would
12    have violated?  Is that my understanding?
13           THE COURT:  Well, I think when you refer to "no
14    state law" --
```
09:06a 15           MR. LINCENBERG:  Because of the CDA.
```
16           THE COURT:  -- remember where he's from.
17           MR. LINCENBERG:  Right.
18           THE COURT:  And his knowledge only goes so far as to
19    what he has been trained on, what he understands the code to
```
09:06a 20    be as he was testifying in response to Mr. Kessler's
```
21    cross-examination; but you can't offer to him, "Isn't it true
22    that the Communications Decency Act operates to X, Y and Z?"
23    because he has not testified about his knowledge related to
24    the Communications Decency Act.
```
09:06a 25           MR. LINCENBERG:  All right.  So -- so then, as I

UNITED STATES DISTRICT COURT

8

1    understand it, it's really not worth the defense pursuing

2    because if the witness says just says, "I don't..." whatever

3    he did to pursue it, but can't say, "The reason I didn't

4    pursue it is because" -- he should know given what he's doing,

09:07a  5    that the Communication Decency Act would preclude him from

6    bringing any charge under state law, then it's not worth

7    pursuing; and as I understand it, the Court is saying we can't

8    do that so that helps us with clarification.

9            THE COURT:  Well, you're going to have to make the

09:07a 10    determination whether or not it's worth pursuing.  I'm not

11    going to tell you that it is or it isn't, but that's what I'm

12    telling you.

13            You're permitted to ask him why he investi -- or

14    didn't investigate or if he did and if he didn't, why not?

09:07a 15    But when you raise this Communication Decency Act, without

16    more it is confusing to the jury.  It's -- and it's an issue

17    that isn't relevant to the specific charges in the case, and

18    so you can make that determination on your own as to whether

19    or not you wish to pursue it, but those are the parameters.

09:08a 20            MR. LINCENBERG:  Thank you, Your Honor.

21            MR. FEDER:  Judge, could I ask one other question in

22    that same vein?

23            THE COURT:  Yes.

24            MR. FEDER:  Without mentioning Section 230, is it

09:08a 25    permissible to ask him, "You're aware that federal law

UNITED STATES DISTRICT COURT

9

```
 1   precludes -- federal law precludes any state prosecutions?"
 2           THE COURT:  You can and he can answer "yes" or "no."
 3           MR. FEDER:  And then if he says, "Yes, I'm aware of
 4   that," is there follow-up again without --
```
09:08a  5           THE COURT:  I -- I don't know.
```
 6           MR. FEDER:  -- without --
 7           THE COURT:  I don't know if there's follow-up.
 8   We'll have to see.
 9           MR. FEDER:  You just did it to me, what I've been
```
09:08a 10   doing to you.
```
11           THE COURT:  I know, I know.
12           MR. FEDER:  To ask him, again, without mentioning
13   the actual term, "You're aware about this federal law and what
14   the federal law is about?" because, I mean, yesterday
```
09:08a 15   Mr. Berry was asking all kinds of questions of this guy that
```
16   he obviously didn't know.
17           We objected, and the Court allowed them to go into,
18   basically, chapter and verse of their case themes, all the
19   things that he would have no reason to know; and I think we're
```
09:09a 20   entitled, conversely, to be able to do that without mentioning
```
21   230 by name.
22           THE COURT:  Well, we'll see.
23           MR. BERRY:  May I be heard on this, Your Honor?
24           THE COURT:  We'll see.
```
09:09a 25           Quickly.

UNITED STATES DISTRICT COURT

10

| | |
|---|---|
| 1 | MR. BERRY:  Your Honor, what it sounds like |
| 2 | Mr. Feder wants to do is ask the same series of questions that |
| 3 | Your Honor just said they can't ask but just do it in another |
| 4 | way.  So it asks the Court to reconsider whether they can |
| 09:09a 5 | actually question this witness, "Are you aware that there's a |
| 6 | federal law that prohibits you from going after Backpage for |
| 7 | certain crimes?" |
| 8 | That door was not opened and attempting to do it by |
| 9 | -- even if they're just not saying Section 230 or CDA, it's |
| 09:09a 10 | the same effect.  It injects in front of the jury the idea |
| 11 | that there is some other law out there that actually impacts |
| 12 | the outcome of this case; and this Court has issued orders in |
| 13 | 793, 840 and 1643 that have clearly, clearly held that there |
| 14 | should be no references to that. |
| 09:10a 15 | And "reference" means not just using the letters |
| 16 | "CDA" or the numbers "230."  It means referencing the law, and |
| 17 | that's clearly what they're trying to do by saying, "Are you |
| 18 | aware there's a federal law?"  Just because he doesn't know |
| 19 | the name of it is kind of irrelevant, and just the fact he |
| 09:10a 20 | doesn't use the numbers or letters is also irrelevant.  I |
| 21 | think anything along those lines violates your prior orders. |
| 22 | MR. FEDER:  Can I respond briefly? |
| 23 | THE COURT:  Quickly. |
| 24 | MR. FEDER:  I mean, it's a little bit off track, but |
| 09:10a 25 | the Court has ordered that we are allowed to use an expert |

UNITED STATES DISTRICT COURT

11

|         |    |                                                                    |
|---------|----|--------------------------------------------------------------------|
|         | 1  | named Eric Goldman to talk about CD 230, that incentivizes         |
|         | 2  | moderation, et cetera, and --                                      |
|         | 3  | THE COURT:  Well, okay, let's stick to this witness                |
|         | 4  | and this cross-examination.                                        |
| 09:10a  | 5  | MR. FEDER:  The question is:  If we're not gonna be                 |
|         | 6  | able to use -- I mean, if we're going to be able to use him,       |
|         | 7  | then this is a segue into that where Mr. Goldman can explain       |
|         | 8  | that and make the connection so that it's not confusing.          |
|         | 9  | THE COURT:  All right.  I'm not going to permit you                 |
| 09:11a  | 10 | to put forward before this witness questions about, "Are you       |
|         | 11 | aware that there's a federal law that immunizes Backpage or        |
|         | 12 | the defendants from X, Y and Z?"  So that's -- that's off the      |
|         | 13 | table; but as I mentioned before, there -- I will give you         |
|         | 14 | some leeway to ask those questions that I presented to you.        |
| 09:11a  | 15 | I saw Mr. Kessler's draft of questions.  Don't                     |
|         | 16 | reference Dart.  Don't reference Section 230.  I think your        |
|         | 17 | question about whether or not -- if he knows whether or not a      |
|         | 18 | prostitution or pimp commits a crime in Minnesota where they      |
|         | 19 | -- the question is -- it's a -- it's an oddly-worded question     |
| 09:12a  | 20 | but, in any event, Question No. 6, for example, but none of       |
|         | 21 | these questions that relate to the Communications Decency Act,     |
|         | 22 | No. 3, 4, No. 7 as you've presented them, those are -- are        |
|         | 23 | going to be prohibited so --                                       |
|         | 24 | MR. KESSLER:  Your Honor, point of clarification.                  |
| 09:12a  | 25 | Following Mr. Feder's argument, I believe you said                  |

UNITED STATES DISTRICT COURT

12

```
 1   it was okay to -- or permissible to ask whether this witness

 2   is aware that federal law prohibits state prosecution of

 3   Internet platforms such as Backpage, just -- just that.

 4            THE COURT:  No, no, I did not say that.  I listened

 5   to the argument of the Government.  I listened to Mr. Feder,

 6   who, by the way, is not examining this witness but -- so, no.

 7   I changed my position with regard to that.  So as I started

 8   out before, those are the parameters.

 9            All right, the record has been made.  Let's have the

10   jury in.

11            MR. FEDER:  Judge, since I'm not examining him,

12   could I briefly take a walk outside and come right back in?

13            THE COURT:  What was that, I'm sorry?

14            MR. FEDER:  Can I be excused for about two minutes?

15   You can go ahead and --

16            THE COURT:  Yes, yes.

17            MR. FEDER:  Thanks.

18            THE COURT:  Oh, we don't -- where's our witness?

19            Let's have our witness in.

20            MR. RAPP:  While we're getting the witness, can I

21   just raise a scheduling issue just quickly?

22            THE COURT:  Yes.

23            MR. RAPP:  Our lineup today is, obviously, this

24   witness, then Jordan Thurman, then Brad Myles.  We are having

25   a little bit of a flight issue with one of our issues.
```

09:13a (line 5)
09:13a (line 10)
09:14a (line 15)
09:14a (line 20)
09:14a (line 25)

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    13

1    Depending on what time we start this third -- we

2    finish Brad Myles, we would like to put Dan Hyer on the stand

3    and then take him off in our direct and put John Shehan on the

4    stand, get him finished up, get him back on a plane, and then

09:14a    5    continue with Mr. Hyer.

6    THE COURT:  Well, we'll see how it goes.

7    MR. RAPP:  Thank you.

8    THE COURT:  Thank you for the heads up.

9    All rise for the jury.

09:16a   10    (Jury in at 9:15 a.m.)

11    THE COURT:  Okay, please be seated.

12    Welcome back to our jury members.  Again, we thank

13    you for your patience this morning, and we do have the witness

14    on the stand.  Sir, you remain under oath.

09:16a   15    And, Mr. Kessler, you may continue.

16    MR. KESSLER:  Thank you, your Honor.

17    If we could have Exhibit 1606, which is in evidence,

18    brought up; and if you could, enlarge the top half.

19    Thank you.

09:17a   20    CONTINUED CROSS-EXAMINATION

21    BY MR. KESSLER:

22    Q.   Good morning, detective.

23    A.   Good morning.

24    Q.   You have on the screen in front of you what's already

09:17a   25    been admitted as Exhibit 1606, which is one of four similar

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    14

 1   e-mails that you sent to Backpage July 12th of 2012, correct?

 2   A.    Correct.

 3   Q.    And we had just begun to talk at the conclusion of

 4   yesterday's proceedings about the terms of use on the Backpage

09:17a  5   site.  Do you remember that?

 6   A.    Yes.

 7   Q.    We had discussed whether you had ever tried to post, and

 8   I believe that you said you may not have, but you were present

 9   when it was being done and you had the opportunity to at least

09:18a 10   watch somebody else do it, correct?

11   A.    Yes.

12   Q.    Nonetheless, you have taken the time, have you not, to

13   look at Backpage's Terms of Use specifically to determine

14   whether these advertisers are violating any of those Terms of

09:18a 15   Use, correct?

16   A.    Correct.

17   Q.    And based on that research, you were able to compose this

18   e-mail?

19   A.    Yes.

09:18a 20   Q.    Take a look at -- on the e-mail what you have identified

21   as 4(c).  Do you see that?

22   A.    Yes.

23   Q.    Is that the number and letter designation of the Term of

24   Use found on the Backpage site?

09:19a 25   A.    Yes.

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER   15

1    Q.   Following that you wrote, "Posting any solicitation

2    directly or in 'coded' fashion for any illegal service

3    exchanging sexual favors for money or other valuable

4    consideration."  Correct?

09:19a 5   A.   Correct.

6    Q.   And did you take that verbatim or word for word from the

7    Terms of Use and put it into this e-mail?

8    A.   Yes.

9    Q.   And so your -- your e-mail to Backpage, this July 12th

09:19a 10  e-mail, is telling Backpage that some of the advertisers are

11   violating that particular Term of Use, correct?

12   A.   Yes.

13   Q.   And that particular Term of Use deals with the specific

14   content of the ad, correct?

09:20a 15  A.   Correct.

16   Q.   Now, when your department engaged in some sting

17   operations --

18        THE COURT:  Mr. Kessler, can I just ask you to move

19   that microphone up.  It's rubbing against your shoulder, I

09:20a 20  think, and making that --

21        MR. KESSLER:  I'm so sorry.

22        THE COURT:  That's okay.

23        MR. KESSLER:  I didn't know that.  I was wondering

24   what that was.

09:20a 25  BY MR. KESSLER:

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    16

1    Q.    When your department decided to run some sting ads -- I

2    think you may have testified to this on direct examination;

3    but, nonetheless, it would be fair to say that some of the ads

4    that your department posted did, in fact, violate 4(c) and

09:21a  5    were either rejected or modified by Backpage, correct?

6    A.    The -- I -- I recall one time that we had one that was

7    rejected based on the wording.

8    Q.    There was also a time when a photograph was removed,

9    correct?

09:21a 10    A.    Yeah, we had one -- I believe a photograph.

11    Q.    So was that the same e-mail that your department composed

12    that was rejected on the one hand because of a photo and on

13    the other hand because some of the text or were there two

14    separate e-mails?

09:22a 15    A.    I -- I don't -- honestly, I don't remember which one was

16    which.

17    Q.    Okay, not important.  The point is that Backpage rejected

18    an ad or two from your department because it violated Terms of

19    Use 4(c), correct?

09:22a 20    A.    Correct.

21    Q.    Are you aware of any of the moderation efforts Backpage

22    employed back in 2012 or the years leading to 2012 to try to

23    weed out improper words, improper coded words and improper

24    pictures?

09:22a 25    A.    No.

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER   17

1  Q.   Are you aware that Backpage employed many dozens of

2  individuals not only in this country, but in India and in the

3  Philippines, that were hired specifically to address 4(c),

4  namely, making sure that there aren't any naked pictures and

09:23a  5  there aren't any terms that would suggest sex for money?

6        Are you aware of that?

7  A.   No.

8  Q.   Are you aware that Backpage paid a significant sum every

9  money -- or every month for computers at a different site to

09:23a  10  perform a similar search for offensive words or terms?

11  A.   No.

12  Q.   Did you know that Backpage had developed a list of

13  hundreds of words, abbreviations, codes that might be

14  considered an effort for an advertiser to be suggesting that

09:24a  15  there was sex for money involved in the ad?

16  A.   No.

17  Q.   You don't know about any of that?

18  A.   No.

19  Q.   Does it surprise --

09:24a  20       THE COURT:  Could I interrupt you just --

21       MR. KESSLER:  Sure.

22       THE COURT:  -- one moment, Mr. Kessler.

23       I'm sorry, Mr. Lincenberg.  I have very sensitive

24  hearing and I can hear that you're carrying on a conversation

09:24a  25  back there.  Perhaps make sure that your microphone is off but

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    18

1    I can -- it's a little bit distracting, so thank you.

2            MR. LINCENBERG:  It is off, but I apologize.

3            THE COURT:  All right, thank you.

4            You can continue, Mr. Kessler.

09:24a  5            MR. KESSLER:  Okay.

6    BY MR. KESSLER:

7    Q.   Well, you may not have known that and you may not have

8    any reason to know it, but you experienced the end result of

9    that when ads your department placed were rejected for the

09:25a  10   reasons we talked about, right?

11           MR. BERRY:  Objection.  Foundation, Your Honor.

12           He just said he didn't know.

13           MR. KESSLER:  That was an entirely different issue,

14   Judge.

09:25a  15           THE COURT:  Overruled.

16           THE WITNESS:  Can you repeat that?

17           MR. KESSLER:  Sure.

18   BY MR. KESSLER:

19   Q.   While you may not have known about all the moderation

09:25a  20   practices employed by Backpage, you at least experienced the

21   end result, namely, you post an ad that has a photograph that

22   violates the Terms of Use or has any text that violates the

23   Terms of Use, that those items are going to be stripped out of

24   the ad or the ad is going to be rejected, correct?

09:26a  25           MR. BERRY:  Objection, he's assuming facts that are

UNITED STATES DISTRICT COURT

1    not in evidence asked to this witness.

2            THE COURT:  Well, I'll overrule.

3            He can answer if he can.

4            THE WITNESS:  I'd say in this way experienced one or

09:26a   5    very minimal out of --

6            MR. KESSLER:  I didn't ask you that.

7            MR. BERRY:  Objection.  He's trying to answer the

8    question, Your Honor.

9            MR. KESSLER:  It's a "yes" or "no" question.

09:26a  10            MR. BERRY:  It was a very compound question so it

11    wasn't really "yes" or "no."

12            THE COURT:  Well, let's have the witness complete

13    his answer, and then Mr. Kessler can ask another question.

14            You can complete your answer, sir.

09:26a  15            THE WITNESS:  Okay.  Out of, I mean, the many over

16    and over ads that we've -- we posted, one or maybe two, I

17    don't recall if it was the same ad or not, with very similar

18    coded language, there had to have been -- I don't recall the

19    exact language on it that got rejected, but all of our ads had

09:27a  20    a similar coded language on it.

21    BY MR. KESSLER:

22    Q.   Well, we haven't seen any of those ads, but you've told

23    us about one or two ads that were rejected, correct?

24    A.   Yep.

09:27a  25    Q.   All right.  And now you understand why they were

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    20

```
     1   rejected, correct?
     2          MR. BERRY:  Objection, foundation.  He says he
     3   doesn't know.
     4          THE COURT:  Sustained.
09:27a  5          MR. KESSLER:  Could we have 1606 back up.
     6   BY MR. KESSLER:
     7   Q.   Okay.  You also listed Item No. 5.  Again, that refers to
     8   Terms of Use No. 5, correct?
     9   A.   Correct.
09:28a 10   Q.   And what you wrote is, "Posting any ad for products or
    11   services, use or sale of which is prohibited by any law or
    12   regulation."  Is that correct?
    13   A.   Correct.
    14   Q.   Did you take that verbatim from Backpage's Terms of Use?
09:28a 15   A.   Yes.
    16   Q.   You understand that Backpage as a publisher of ads sold
    17   advertising space?  Do you understand that?
    18   A.   I understand that.
    19   Q.   Okay.  And Backpage could control, to a certain extent,
09:28a 20   what was in the ad and, as we've seen in some cases, modified
    21   the ad; is that correct?
    22   A.   Correct.
    23   Q.   But would you agree that Backpage has no control over
    24   what happens after an ad is placed with respect to that
09:29a 25   particular advertiser; isn't that correct?
```

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    21

1   A.   I believe there's an obligation to -- for Backpage to --

2   Q.   I would like you to answer my question.  It was a "yes"

3   or "no."

4        Backpage has no control what the advertiser does with his

09:29a 5   or her life once they post the ad, correct?

6   A.   If you're asking that specific question, yes.

7   Q.   All right, thank you.

8        And to the extent that any of these ads were, as you put

9   it, prostitution ads, in order to establish that it was a

09:30a 10  prostitution ad you would need, No. 1, a person to respond to

11  the ad, correct?

12  A.   There's an advertisement for prostitution so your --

13  Q.   But to establish that prostitution occurred or there was

14  an agreement to engage in prostitution, it would require

09:30a 15  somebody to respond to the ad, right?

16  A.   And I'm just going based on Minnesota law, which is the

17  offer -- it's a offer to hire for sexual contact, sexual

18  penetration.  So even the offers or the ad by itself by

19  Minnesota law would be an offer just based on all of the

09:31a 20  content.

21  Q.   Okay.  So it was illegal just because it was suggestive

22  of prostitution; is that what you're saying?

23  A.   It's because of the content in the ad, because where it

24  is, they all point probable cause to believe that that's where

09:31a 25  there is prostitution.

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    22

1      MR. BERRY:  Objection, Your Honor.  He's still

2  trying to finish his answer, and Mr. Kessler is interrupting

3  him.

4      MR. KESSLER:  I let him finish.

09:31a  5      THE COURT:  Yes, you may finish your answer.

6      MR. KESSLER:  I think he did.

7      Did you finish your answer?

8      THE WITNESS:  Yes.

9      MR. KESSLER:  All right, thank you.

09:31a 10  BY MR. KESSLER:

11  Q.   So are you suggesting that you could go out to whoever

12  posted and arrest that person just because of the post?

13  A.   Yes.

14  Q.   You were asked the question on direct examination, "You

09:32a 15  can't go out and arrest people just because they posted this

16  ad?" and you agreed with that statement?

17  A.   I said I don't necessarily would.  It doesn't mean I

18  couldn't.

19  Q.   Okay.  Have you ever arrested anybody because of just

09:32a 20  what was posted in the ad?

21  A.   Not -- no.

22  Q.   And that's because you don't have probable cause to make

23  an arrest, correct?

24  A.   I believe I do have probable cause.

09:32a 25  Q.   So you are knowingly and willingly allowing people to

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    23

1  commit crimes in your jurisdiction related to prostitution and

2  you've never arrested any of them based solely on the ad; is

3  that correct?

4  A.    Well, can I add context to that question?

09:33a  5  Q.    Just try to answer the question.

6  A.    Well, there's -- most of the time we don't know who the

7  person is so we have to take steps to identify them, which

8  includes setting up a time for them to meet, to come.

9        So there were times where we made arrests just by the

09:33a  10  person showing up because we could identify them.  So it's

11  based solely on the ad and them responding to the ad and

12  showing up.

13  Q.    Okay, "and them responding to the ad."  That gets back to

14  my original question, which is that in order for you to make

09:33a  15  an arrest for prostitution or for the solicitation of

16  prostitution, you need somebody to respond to the ad, right?

17  A.    Not necessarily.

18  Q.    Well, if the -- by the way, you've told us that now you

19  believe you could arrest advertisers in Maplewood simply on

09:34a  20  the strength of the ad and nothing else, correct?

21  A.    Correct.

22  Q.    And the reason you haven't done that ever is because you

23  need to identify who they are; is that correct?

24  A.    Along with identifying who they are and there's -- in

09:34a  25  terms of the way even our attorneys, our prosecutors, they

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    24

1    want more information for a prosecution, not necessarily just

2    an arrest or probable cause.

3    Q.    Well, finding them can't be too hard.  They put their

4    phone number in the -- in the ad, don't they?

09:34a  5    A.    They put their phone number in there, yeah.

6    Q.    And you can call them up -- doesn't have to be a sting.

7    You can call them up and find out where they are.  Under some

8    pretext, go to their home and arrest them, right, under your

9    theory?

09:35a  10    A.    If, per se, they were right in front of me, they posted

11    the ad right in front of me and I had them right there, there

12    would be probable cause to arrest.

13    Q.    I appreciate that, but that isn't the question I asked

14    you.

09:35a  15        You told us that the reason you have never arrested

16    anyone based solely on the ad is you have to identify who they

17    are and where they are, correct?

18    A.    Yes.

19    Q.    Okay.  Can't you just use the phone number that's in the

09:35a  20    ad to locate them?  You're a detective.

21    A.    Some people use spoof numbers, they use other people's

22    phone numbers, other people's phones.

23    Q.    Have you ever taken a day and pulled up all the Backpage

24    ads for the escort section for Maplewood and called every

09:36a  25    single one of those people?  Have you ever done that?

UNITED STATES DISTRICT COURT

ER 13209

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    25

1    A.    I have looked them up.  I've sent subpoenas to

2    Backpage --

3    Q.    That's not what I'm asking you.  Listen to my question.

4          Have you ever taken a day -- because Backpage comes out

09:36a  5    every day, right?

6    A.    Yep.

7    Q.    It changes almost in realtime, correct?

8    A.    Yes.

9    Q.    Have you ever -- have you ever called everybody that has

09:36a 10    posted in Maplewood under the escort section?

11    A.    Not everybody.

12    Q.    Okay.  Whether or not a person responds to the ad, the

13    so-called john, that's not something that Backpage has any

14    control over, correct?

09:37a 15    A.    It's a "yes" because the ads are posted in the first

16    place.

17    Q.    So your answer is "yes"?

18    A.    'Cuz the ads are there, yes.

19    Q.    Once somebody responds to the ad, law enforcement needs

09:37a 20    to know before making an arrest for prostitution what the

21    agreement is going to be.  In other words, what service is the

22    advertiser going to provide and what amount of money the

23    so-called john is willing to pay, correct?

24    A.    It doesn't have to be that specific, according to

09:38a 25    Minnesota law.

UNITED STATES DISTRICT COURT

ER 13210

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    26

```
 1   Q.   Well, in order to determine if it's an unlawful act, you
 2   need evidence that somebody solicited prostitution and another
 3   person agreed to pay for it?
 4          MR. BERRY:  Objection, Your Honor, asked and
 5   answered.
 6          THE COURT:  Sustained.
 7   BY MR. KESSLER:
 8   Q.   You cannot possibly -- you yourself cannot possibly be
 9   present for that meeting unless it's a sting, correct?
10   A.   Meeting between --
11   Q.   The alleged prostitute and the alleged john.
12   A.   No, I'm not present for those.
13   Q.   Okay.  So you have no way of knowing what kind of deal
14   they made, if any?
15   A.   No.
16   Q.   In fact, your department ran a series of stings and there
17   were at least on two occasions men who responded to the sting
18   ad and they were not arrested and they were turned away
19   because they were not -- they did not engage in prostitution
20   or they didn't agree to engage in prostitution, correct?
21   A.   I -- I don't remember specifics.
22          MR. KESSLER:  Could we have --
23          THE COURT:  Please silence your phone or leave.
24          MR. KESSLER:  Could we have Exhibit EK-DF-1 for the
25   witness' eyes only.
```

09:38a 5
09:38a 10
09:38a 15
09:39a 20
09:40a 25

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER  27

```
 1              I have to apologize, I identified the wrong exhibit.
 2              The exhibit I intended was EK-DF-5 for the witness'
 3     eyes only, and if you could highlight the bottom paragraph.
 4              And, detective, if you would just read that to
 5     yourself, please.
 6     BY MR. KESSLER:
 7     Q.   Okay.  Does that help refresh your recollection of --
 8     A.   Yeah.
 9     Q.   -- about there being two men, two males who were let go
10     because they were not involved in prostitution when they
11     responded?
12     A.   They were not arrested on this detail, yes.
13     Q.   Okay.  And they weren't arrested because they were unable
14     to make a deal with the decoy female officer, correct?
15     A.   They did not, yes.
16     Q.   And that's why they were let go, right?
17     A.   Yes.
18     Q.   Okay, thank you.
19              And I'm sure I'll be corrected if I already asked you
20     this, I just don't recall.  Backpage doesn't play a role in
21     the negotiation of the deal, so to speak, between the alleged
22     prostitute and the alleged john, correct?
23     A.   No.
24     Q.   All right.  At the bottom of each of the four e-mails
25     that you sent on July 12th of 2012 to Backpage you wrote the
```

09:41a (line 5)
09:41a (line 10)
09:42a (line 15)
09:42a (line 20)
09:43a (line 25)

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    28

1   following:  "Every listing in the adult services escort

2   section is an advertisement for illegal prostitution.  Every

3   listing violates each of the above listed items in the user

4   conduct agreement and should not be allowed to be posted at

09:43a  5   all."

6       Is that what you wrote?

7   A.   Yes.

8   Q.   Now, you didn't take that from anywhere else.  That was

9   your thought, correct?

09:44a  10   A.   Correct.

11   Q.   That was your opinion?

12   A.   Yep.

13   Q.   That was your assumption, correct?

14   A.   Based on my experience, yes.

09:44a  15   Q.   Okay.  But the only way you would know that as a

16   detective -- I assume that you don't arrest people on

17   assumptions, correct?

18   A.   Correct.

19   Q.   And you don't arrest people because you have an adverse

09:44a  20   opinion of them, correct?

21   A.   No.

22   Q.   You arrest people when you have sufficient evidence to

23   establish probable cause, correct?

24   A.   When there's a -- yes, a series of facts leading to

09:44a  25   probable cause.

UNITED STATES DISTRICT COURT

1  Q.   Correct.  To you, based on your training and experience,

2  how could you best define "probable cause" as you use it in

3  making decisions whether to arrest somebody?

4  A.   Simply put -- I mean, exactly what I put in that message,

09:45a  5  a reasonable person based -- if they knew all the facts, a

6  reasonable person, based on everything they know about the

7  situation, that's probable cause.

8  Q.   In order to get probable cause sufficient to arrest, you

9  need to know what the agreement is between the john and the

09:46a 10  prostitute, right?

11          MR. BERRY:  Objection, Your Honor, asked and

12  answered.

13          THE COURT:  Sustained.

14  BY MR. KESSLER:

09:46a 15  Q.   Do you know what or how prostitution is defined in

16  Minnesota?

17  A.   Yes.

18  Q.   Let me read this to you, and you tell me if this sounds

19  similar to what you recall.

09:46a 20      (Reading) Prostitution means hiring, offering to hire or

21  agreeing to hire another individual to engage in sexual

22  penetration or sexual conduct or being hired, offering to be

23  hired or agreeing to be hired, by another individual to engage

24  in sexual penetration or sexual contact.

09:46a 25      Is that what you understand prostitution to be?

1    A.    Yes.

2    Q.    There is a definition of what "sexual contact" means in

3    the Minnesota laws within the context of that statute,

4    correct?

09:47a 5    A.    Yes.

6    Q.    And "sexual contact" means any of the following:  If the

7    acts can reasonably be construed as being for the purpose of

8    satisfying the actor's sexual impulses, No. 1.  The

9    intentional touching by an individual of a prostitute's

09:47a 10    intimate parts or the intentional touching by the prostitute

11    of another individual's intimate parts.

12        In other words, you either have to have penetration of a

13    bodily orifice or you need to have such sexual contact, which

14    means either the john touches the alleged prostitute's

09:47a 15    intimate parts or vice versa, correct?

16    A.    Correct.

17    Q.    But short of that, any other sexual behavior between the

18    two people standing alone is not sufficient to satisfy the

19    prostitution statute, correct?  For example, hugging?

09:48a 20        MR. BERRY:  Objection, compound, Your Honor.

21        THE COURT:  Yes, let's stick with the first part of

22    the question.

23        MR. KESSLER:  Okay.  Can you answer the first

24    question?

09:48a 25        THE WITNESS:  Can you repeat the first part?

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    31

1          MR. KESSLER:  Madam court reporter, can you repeat

2    that?

3          (The reporter read back the question.)

4          MR. KESSLER:  Can you answer the first question?

09:49a  5          THE WITNESS:  I'm sorry, could you repeat that one

6    more time.

7          (The reporter read back the question.)

8          THE WITNESS:  Correct.

9    BY MR. KESSLER:

09:49a 10    Q.   As an example I gave, hugging is not gonna do it, right?

11    A.   No.

12    Q.   Kissing is not gonna do it?

13    A.   No.

14    Q.   Both of them taking off their clothes is not gonna do it?

09:49a 15    A.   No.

16    Q.   Asking the prostitute to take off her clothes and dance

17    in a seductive way without there being any touching, that's

18    not gonna do it, is it?

19    A.   That would not, no.

09:50a 20    Q.   So you have to get information that satisfies the

21    definition of prostitution before you can make an arrest,

22    right?

23          MR. BERRY:  Asked and answered, Your Honor.

24          THE COURT:  Sustained.

09:50a 25    BY MR. KESSLER:

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    32

1   Q.   I asked you some questions yesterday during the short

2   time we had about your understanding of the Maplewood City

3   ordinances.  Do you remember those questions?

4   A.   Yeah.

09:50a  5   Q.   And you know that in Maplewood escorts are licensed;

6   isn't that true?

7   A.   Massage therapists are.  I don't recall if escorts are.

8        MR. KESSLER:  Could we pull up EK-DF-3 for this

9   witness' eyes only.

09:51a  10  BY MR. KESSLER:

11  Q.   The first page describes this document as they call it a

12  muni code, but the City code for Maplewood, Minnesota.

13       Do you see that?

14  A.   Yes.

09:51a  15  Q.   If we could turn to the second page.  You see at the top

16  Section 14-886.  If you would read that paragraph.

17       MR. BERRY:  Objection, Your Honor, to reading in  a

18  municipal city code that is not in evidence.

19       MR. KESSLER:  I'm asking him to read it to himself.

09:52a  20       I'm sorry, I should have been clearer.

21       THE COURT:  Yes, he may read it to himself.

22       MR. BERRY:  Okay.

23       THE WITNESS:  All right.

24       MR. KESSLER:  Thank you.

09:52a  25  BY MR. KESSLER:

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER     33

1   Q.   Does that help refresh your recollection about whether

2   escort services are licensed in Maplewood, Minnesota?

3   A.   Yes.

4   Q.   They are, aren't they?

09:52a   5   A.   They should be if they're escorts, yeah.

6   Q.   Right.  The code provides that to be an escort you have

7   to be licensed?

8   A.   Yes.

9   Q.   Okay.  Do you know what the prohibited acts are of

09:53a  10   licensed escorts?

11   A.   No.

12           MR. KESSLER:  Could we go to the third page, please,

13   and to yourself read the paragraph following Section 14-891.

14           THE WITNESS:  Okay.

09:53a  15   BY MR. KESSLER:

16   Q.   Does that help refresh your recollection of what escorts

17   are not permitted to do?

18   A.   Yes.

19   Q.   And that would be essentially to commit acts of

09:54a  20   prostitution?

21   A.   Yes.

22   Q.   Okay.

23           MR. KESSLER:  Could we turn to the fourth page,

24   please.

09:54a  25   BY MR. KESSLER:

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    34

```
         1   Q.   Do you recall, sir, that escorts have to pay a fee for

         2   their license?

         3   A.   No.

         4   Q.   Well, if you would to yourself, please read Section

09:54a   5   14-916.  Are you done?

         6   A.   Yep.

         7   Q.   Okay, thank you.  Does that help refresh your

         8   recollection about the requirement that escorts pay a fee for

         9   their license?

09:55a  10   A.   Yes.

        11   Q.   And they have to, don't they?

        12   A.   Yes.

        13   Q.   In fact, that's not the only fee they have to pay.  They

        14   have to pay what's called an investigative fee on top of that.

09:55a  15        Do you know that?

        16   A.   No.

        17   Q.   Okay.  On that same page, if you would to yourself, read

        18   Section 14-917 paragraphs (a) and (b).

        19   A.   Okay.

09:55a  20   Q.   Have you read that?

        21   A.   Yeah.

        22   Q.   All right, thank you.  Does that help refresh your

        23   recollection about whether there is a separate investigative

        24   fee that is required of escorts who initially apply for a

09:56a  25   license?
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER   35

1   A.   Yes.

2   Q.   They have to pay that fee, correct?

3   A.   Correct.

4   Q.   And that fee is so the City before issuing a license can

09:56a  5   do a background check on the applicant, correct?

6   A.   Correct.

7   Q.   We talked a little bit about the city government in

8   Maplewood.  This is a community of about 40,000 and it has an

9   elected -- is it a city council?

09:57a 10   A.   Yes.

11   Q.   Okay.  And you understand the City Council carries out

12   the wishes of its constituents and passes laws, correct?

13   A.   Yes.

14   Q.   That are related solely to Maplewood?

09:57a 15   A.   Yes.

16   Q.   So it would be fair to say that the elected officials of

17   Maplewood, Minnesota, have determined that escorts may act as

18   escorts provided they have a license and they pay all the fees

19   associated with it, correct?

09:57a 20   A.   Without giving a "yes" or "no" answer, could I give some

21   context to that?

22   Q.   Can you answer it with a "yes" or "no"?

23   A.   I can.

24   Q.   Please do so.

09:57a 25   A.   Yes.

ER 13220

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    36

```
 1   Q.   Great.  The City Council passed these ordinances, right?
 2   A.   Yes.
 3   Q.   And the City generates revenue for its own purposes by
 4   virtue of collecting fees from applicants for escort licenses,
```
09:58a 5   correct?
```
 6           MR. BERRY:  Objection, asked and answered.
 7           THE COURT:  Sustained.
 8           MR. KESSLER:  I haven't asked about whether they
 9   collect fees.
```
09:58a 10          MR. BERRY:  You asked about 14-916, which is fees.
```
11   You asked about 14-917, which is investigative fees.
12           THE COURT:  Sustained.
13   BY MR. KESSLER:
14   Q.   Well, the City is generating revenue off these escorts,
```
09:58a 15   correct?
```
16           MR. BERRY:  Objection, asked and answered.
17           THE COURT:  Well, I'll overrule that question -- I
18   mean that objection.
19           You may answer if you know.
```
09:58a 20          THE WITNESS:  I don't know if the City generates
```
21   money.
22   BY MR. KESSLER:
23   Q.   Do you know where that money goes?
24   A.   I don't even know if they do generate any money from it.
```
09:59a 25   Q.   Do you know where the money from the fees goes?

UNITED STATES DISTRICT COURT

1          MR. BERRY:  Objection, asked and answered.

2          THE COURT:  Sustained.

3    BY MR. KESSLER:

4    Q.   Aside from Backpage, where in Maplewood might an escort

09:59a  5    advertise her services?

6          MR. BERRY:  Objection, calls for speculation, not

7    relevant to this trial.

8          THE COURT:  Sustained.

9    BY MR. KESSLER:

09:59a 10    Q.   Well, escorts would reasonably be expected to -- licensed

11   escorts would be reasonably expected to advertise their

12   services somewhere, correct?

13         MR. BERRY:  Objection, calls for speculation.

14         THE COURT:  He can answer if he has knowledge.

09:59a 15         THE WITNESS:  I don't know where they would besides

16   for Backpage.

17   BY MR. KESSLER:

18   Q.   Right.  That's where they would probably advertise,

19   correct?

10:00a 20   A.   Yes.

21   Q.   Okay.  So the City has created a legal mechanism for

22   escorts to work as escorts and not as prostitutes, and they

23   are most likely to advertise in the escort section of

24   Backpage, correct?

10:00a 25         MR. BERRY:  Objection, calls for speculation.

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    38

```
          1        MR. KESSLER:  He's already answered that.

          2        THE COURT:  I'm going to sustain the question --

          3   sustain the objection, form of the question.  You can reask a

          4   new question, Mr. Kessler -- or ask a new question, excuse me.

10:00a    5   BY MR. KESSLER:

          6   Q.   Escorts would advertise in Maplewood in Backpage,

          7   correct?

          8   A.   I don't -- I suppose they would.

          9   Q.   Right.  Because you don't know where else they would,

10:01a   10   right?

         11   A.   I honestly don't know if we're distinguishing escorts and

         12   prostitution as --

         13   Q.   Pardon me?

         14   A.   -- two different things.

10:01a   15   Q.   Pardon me?

         16   A.   I don't -- I don't focus on escorts in my position.

         17   Q.   When you make the rather broad statement that every

         18   escort ad in Maplewood in Backpage is really a prostitution

         19   ad, you're including legal escorts in there, aren't you?

10:01a   20   A.   I don't believe that any advertisement on Backpage was

         21   just escorts.

         22   Q.   So that we're clear, that is your personal belief,

         23   correct?

         24   A.   Based on my experience and my training and what I've

10:02a   25   learned on the job --
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    39

```
  1   Q.   There is --
  2   A.   -- I've never had a situation where it wasn't
  3   prostitution.
  4   Q.   About how many ads are posted in Maplewood under escort
10:02a 5   sections back in 2012?  Would you imagine every day?
  6   A.   A handful every day and they would vary because St. Paul
  7   was so close.  A lot of them would just be St. Paul.
  8   Q.   What does a "handful" mean to you?
  9   A.   With specific Maplewood as a location, probably ten --
10:02a 10   five to ten.
 11   Q.   Now, escorts can still have sex with their clients, just
 12   not for money, right?  Isn't that true?
 13   A.   Sure.
 14   Q.   Okay.
10:03a 15   A.   It would depend on if they're exchanging something.
 16   Q.   Well, let me give you a -- sorry about that.
 17        Let me give you a short example.
 18        Bob, he's responding to Betty's escort ad.  Betty is a
 19   licensed escort, and they get together and they agree that Bob
10:03a 20   will pay her for her time as an escort.  Let's say five
 21   hundred dollars for two hours because he's going to a class
 22   reunion and he wants somebody that looks sharp to be with him.
 23        That's legal, isn't it?
 24            MR. BERRY:  Objection, Your Honor.  This witness
10:03a 25   does not have the foundation about this municipal code that
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    40

1  he's been asking about, and it's calling for a legal

2  conclusion about that.

3          THE COURT:  Sustained.

4  BY MR. KESSLER:

10:04a  5  Q.   You sent four e-mails on a single day to Backpage,

6  correct?

7  A.   Correct.

8  Q.   Did you ever send an e-mail to Backpage on any other

9  occasion?

10:04a  10  A.   No.

11  Q.   Each of these e-mails -- please correct me if I'm

12  wrong -- asked for two -- well, conveyed two things.

13      No. 1, here is the website address of somebody we believe

14  to be a prostitute and you wanted it taken down, correct?

10:04a  15  A.   It was after the actual --

16  Q.   Right.  But you wanted it taken down, right?

17  A.   Oh, yes, of course.

18  Q.   And Backpage did that?

19  A.   I don't know for sure.  I didn't check after the fact if

10:04a  20  they did.

21  Q.   Okay.  I think you testified yesterday that you did get a

22  response to at least one of those ads and they confirmed that

23  the ad had been taken down.

24      That's what you said yesterday, correct?

10:05a  25  A.   Yes.

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    41

1    Q.   All right.  The other purpose, it appears to be, of these

2    four on the same day e-mails is you wanted to, for lack of a

3    better word, lecture BP about your opinion about the ads in

4    the escort section, correct?

10:05a   5    A.   My opinion is more of what I've been dealing with --

6    Q.   Can you answer my question?  Wasn't that --

7    A.   It was not facts that created my opinion.

8    Q.   Right.  Wasn't the purpose -- rather than sending a

9    single ad on July 12th with the four escorts that you want ads

10:06a  10    taken down and then inserting your opinion at the bottom, you

11    sent four separate ads, correct?

12    A.   Yep.

13    Q.   And that was so that you could lecture BP four times on

14    the same day about Detective Fritze's opinion about these ads,

10:06a  15    correct?

16    A.   There were four different ads and they had four different

17    type -- because they were four different -- they just had some

18    of the same language in it.

19    Q.   Can you answer my question, please?

10:06a  20    A.   It wasn't specific just to -- I wanted to let Backpage

21    know that this was going on.

22    Q.   Okay.  And you let them know four times on the same day?

23    A.   Yes.

24    Q.   Have you ever e-mailed them, Backpage, after this, after

10:07a  25    July 12th of --

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    42

```
        1   A.   No.

        2   Q.   -- 2012?

        3   A.   No.

        4            MR. BERRY:  Objection, asked and answered.

10:07a  5            THE COURT:  Overruled.

        6            THE WITNESS:  No.

        7   BY MR. KESSLER:

        8   Q.   Okay.  So July 12th is the only day that you ever

        9   communicated with Backpage?

10:07a 10            MR. BERRY:  Objection, asked and answered.

       11            THE COURT:  Sustained.

       12   BY MR. KESSLER:

       13   Q.   However, your department sent a number of subpoenas to

       14   Backpage over the years, correct?

10:07a 15   A.   Yes.

       16   Q.   Did you play any role in the creation of or the decision

       17   to send those subpoenas to Backpage?

       18   A.   Yes.

       19   Q.   What was your role?

10:07a 20   A.   I sent them.

       21   Q.   You mean you transmitted them by some means?

       22   A.   Yes, I e-mailed them to Backpage.

       23   Q.   How many would you estimate?

       24   A.   I don't recall.  I know it was at least a handful.

10:08a 25   Q.   Again, what does that mean in this context?
```

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    43

1    A.   Five to ten.

2    Q.   Okay.

3    A.   I don't know exactly, though.

4    Q.   And besides transmitting those five to ten subpoenas, did

10:08a  5    you know what those subpoenas were asking for?

6    A.   Yes.

7    Q.   You read the subpoenas?

8    A.   Yes.

9    Q.   Did you participate in the creation of the document that

10:08a  10    was a subpoena?

11    A.   Yes.

12    Q.   And you created the -- or helped create the list of

13    documents that you wanted to get from Backpage by virtue of

14    that subpoena, correct?

10:08a  15    A.   Correct.

16    Q.   And in every case that you transmitted those subpoenas to

17    Backpage you got a prompt and thorough response; isn't that

18    correct?

19    A.   Yes, I believe so.

10:09a  20    Q.   In other words, to the extent you were asking for help

21    from Backpage relative to potential violation of the law in

22    the area of prostitution, Backpage gave you the help you were

23    asking for, correct?

24    A.   They complied with subpoenas, yes.

10:09a  25    Q.   And typically how long -- what was the turnaround time?

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    44

1    From the time you e-mailed it to the time you got the

2    documents you were asking for, typically how long was that?

3    A.    I honestly don't remember.

4    Q.    Was it --

10:09a  5    A.    It was not a long period of time.

6    Q.    A day or two?

7    A.    I don't recall exactly, but it was a shorter period of

8    time.

9    Q.    It was never long enough that you had to contact BP and

10:09a  10    give them a little nudge to get them to comply, right?

11    A.    Correct.

12    Q.    Are you aware that Backpage has been recognized by dozens

13    of law enforcement agencies throughout the country for its,

14    Backpage's, assistance to law enforcement?

10:10a  15    A.    No.

16    Q.    Do you know that the then president and subsequent owner

17    of Backpage even got a certificate signed by Bob Mueller with

18    the FBI, a FBI certificate that was a recognition of the work

19    that Backpage had done to further FBI investigations?

10:10a  20    A.    No.

21    Q.    Not aware of that.

22          Now, Backpage -- do you know it shut down in 2018?

23    A.    Yes.

24    Q.    Does prostitution continue in your community?

10:11a  25          MR. BERRY:  Objection.  Relevance, Your Honor.

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    45

```
 1              THE COURT:  Sustained.
 2    BY MR. KESSLER:
 3    Q.   Where did all those prostitution ads go?
 4              MR. BERRY:  Objection.  Relevance, Your Honor.
 5              THE COURT:  Sustained.
 6    BY MR. KESSLER:
 7    Q.   You no longer have a source like Backpage; isn't that
 8    correct?
 9              MR. BERRY:  Objection, relevance.
10              MR. KESSLER:  I didn't even finish my question.
11              THE COURT:  I thought you said "isn't that correct"?
12              MR. KESSLER:  No, I started a new question.
13              It will probably generate the same objection and
14    ruling, but I am entitled to ask it.
15              THE COURT:  Well, your question was, "You no longer
16    have a source like Backpage; isn't that correct?" and I
17    sustained the objection.  So I thought the question was
18    completed, Mr. Kessler.
19              MR. KESSLER:  Okay, let me -- let me reask it then
20    and make sure I -- I covered what I wanted to.
21    BY MR. KESSLER:
22    Q.   You do not have -- you are not receiving assistance from
23    any other Internet platform like you did with Backpage?
24              MR. BERRY:  Objection.  Same objection regarding
25    relevance.
```

10:11a (line 5)
10:11a (line 10)
10:11a (line 15)
10:12a (line 20)
10:12a (line 25)

UNITED STATES DISTRICT COURT

DEREK FRITZE - CONT'D CROSS-EXAMINATION BY MR. KESSLER    46

1          THE COURT:  Sustained.

2          MR. KESSLER:  Let me -- let me finish with -- with

3    this.

4    BY MR. KESSLER:

10:12a 5    Q.   Those four e-mails that you took the time to send

6    separately and each contained your opinion -- your personal

7    opinion about the nature of escort ads in your community, were

8    you accusing Backpage of committing a crime?

9    A.   In terms of Minnesota law?

10:13a 10   Q.   Anywhere.

11   A.   No.

12   Q.   Were you accusing Backpage of violating a criminal

13   statute of any kind that you know of?

14   A.   No.

10:13a 15   Q.   And you didn't, for example, cite a particular statute,

16   whether it be state or federal, that Backpage was violating by

17   virtue of the kind of ads that were coming out in your

18   community?

19          MR. BERRY:  Objection, he said he wasn't accusing

10:13a 20   Backpage of violating any law.

21          THE COURT:  Overruled, he can answer the question.

22          THE WITNESS:  I was going based on state law and

23   there was -- there was no state law that Backpage fit in.

24   BY MR. KESSLER:

10:14a 25   Q.   The answer to my question is "no," you didn't identify a

UNITED STATES DISTRICT COURT

         1  particular statute that you thought they might be violating?

         2  A.   No.

         3  Q.   Okay, thank you.

         4       MR. KESSLER:  That's all I have.

10:14a   5       THE COURT:  Mr. Eisenberg?

         6       MR. EISENBERG:  No, Your Honor, thank you.

         7       THE COURT:  Mr. Cambria?

         8       MR. CAMBRIA:  No, Your Honor.

         9       THE COURT:  Ms. Bertrand?

10:14a  10       MS. BERTRAND:  No, Your Honor.

        11       THE COURT:  Mr. Lincenberg?

        12       MR. LINCENBERG:  No, Your Honor.

        13       THE COURT:  Mr. Berry?

        14       MR. BERRY:  Thank you, your Honor.

10:14a  15                     REDIRECT EXAMINATION

        16  BY MR. BERRY:

        17  Q.   You were asked a bunch of questions about the municipal

        18  code of which you were unaware in Maplewood regarding escorts.

        19       Do you remember those questions?

10:15a  20  A.   Yes.

        21  Q.   Have you ever in your experience come across someone who

        22  is licensed as an escort in Maplewood who had advertised on

        23  Backpage?

        24  A.   No.

10:15a  25       THE COURT:  Can you move closer to the microphone,

UNITED STATES DISTRICT COURT

DEREK FRITZE - REDIRECT EXAMINATION BY MR. BERRY        48

1    thank you.

2              MR. BERRY:  Sorry.  I have a little softer voice

3    today, I apologize.

4    BY MR. BERRY:

10:15a  5    Q.   In fact, who were the people you came across who were

6    advertising on Backpage?

7    A.   The people who are advertising for prostitution.

8    Q.   Were any of them -- so none of them were licensed as

9    escorts?  They were all prostitutes?

10:15a 10            MR. KESSLER:  Objection, leading.

11            THE COURT:  Sustained.

12   BY MR. BERRY:

13   Q.   You asked -- you were asked a question something about

14   escorts can act as escorts and then you said, may I give some

10:16a 15   context?  Do you remember that?

16   A.   Yes.

17   Q.   You weren't allowed to give that context.  Why don't you

18   go ahead and give it now.

19   A.   Just looking at -- I looked at the municipal code.  I

10:16a 20   mean, the date on it was 1982.  Backpage wasn't even a thing

21   then.  That's back when escorts were -- and prostitution was

22   completely different.  It was more -- I mean, it was street

23   prostitution.  It was done on-line so I've never -- in

24   investigations I've never seen a license for escorts.

10:16a 25        I've never even heard of it happening in the City.  I

UNITED STATES DISTRICT COURT

DEREK FRITZE - REDIRECT EXAMINATION BY MR. BERRY     49

1  started as a police officer in 2007.  Never even knew or seen

2  that there was any sort of license for escorts.

3  Q.    You were also asked a question, so you're knowingly

4  allowing people to commit prostitution and not arresting them,

10:17a  5  and you asked if you could add some context to that question.

6      Do you remember that?

7  A.    Yes.

8  Q.    Would you please go ahead and add that context now.

9  A.    To say every ad on Backpage is prostitution doesn't mean

10:17a 10  that we're arresting everybody.  Mostly -- and I said it was

11  just for identification purposes, but also just for

12  prosecution purposes.  We want to build solid cases, not just

13  go out and arrest somebody for specific -- you know, just 'cuz

14  I have probable cause doesn't mean that it's a solid case.

10:18a 15  Q.    Okay, thank you.  And then you were asked Backpage

16  doesn't play a role in the negotiation of a deal between a

17  prostitute and a john.  Do you remember that?

18  A.    Yep.

19  Q.    Does Backpage play a role in bringing those two people

10:18a 20  together?

21  A.    Yes.

22  Q.    How?

23  A.    By having a -- allowing the ads to be placed in the first

24  place, having a platform where there can be deals like that

10:18a 25  made.

UNITED STATES DISTRICT COURT

DEREK FRITZE - REDIRECT EXAMINATION BY MR. BERRY          50

```
 1   Q.   Does Backpage help or assist in some way for that

 2   negotiation to actually take place?

 3              MR. KESSLER:  Objection, leading.

 4              THE COURT:  Sustained.

 5              MR. BERRY:  No further questions, your Honor.

 6              THE COURT:  May the witness be excused from

 7   subpoena?

 8              MR. BERRY:  Yes.

 9              THE COURT:  Is there any objection from defense?

10              MR. KESSLER:  No.

11              THE COURT:  All right.  Sir, thank you very much for

12   your testimony.  You are released from your subpoena.  You may

13   step down and have a safe trip home.

14              Please call your next witness.

15              MS. PERLMETER:  The next witness will be Jordan

16   Thurman.

17              MR. EISENBERG:  Your Honor, may I have a sidebar --

18   excuse me.  May I have a sidebar just briefly with respect to

19   this witness?

20              THE COURT:  Yes.

21              MR. EISENBERG:  I'm sorry I didn't bring it up

22   before.

23              (Following discussion held at sidebar.)

24              MR. EISENBERG:  Your Honor, Ms. Perlmeter said

25   something at the beginning of the day with respect to this
```

10:18a  (line 5)
10:19a  (line 10)
10:19a  (line 15)
10:19a  (line 20)
10:19a  (line 25)

DEREK FRITZE - REDIRECT EXAMINATION BY MR. BERRY     51

```
 1   witness, and she informed the Court that this witness has a
 2   conviction in this Court with respect to events that are
 3   surrounding sexual -- I guess sex for money.
 4          My concern is that if that conviction is brought
 5   out, it will include the fact that Ms. Thurman was convicted
 6   in CR16-1375 before Judge Campbell for money laundering and
 7   I'm afraid that that's gonna cause prejudice to our clients,
 8   who have been accused of the same thing.
 9          The circumstances involving Ms. Thurman are
10   dissimilar in one way, doesn't have to do specifically with
11   posting on Backpage, although it may have.  I'm not sure as to
12   the circumstances.
13          However, it did involve, I'll say this, sex
14   trafficking.  She was sentenced to eighteen months, and the
15   information I have is that between the dates of January 1, '16
16   -- I believe it's '16 --
17          THE COURT:  Come a little closer to the microphone.
18          MR. EISENBERG:  I'm sorry, Judge.
19          January 1st of '16 through April 28th of '16 in
20   Arizona Ms. Thurman was involved in a financial transaction
21   that represented the proceeds of some form of unlawful
22   activity, that is, intent to carry out sex trafficking of a
23   minor.
24          She was here at that time in which an ad was posted
25   that is the subject of this case.  So she herself prostituted
```

10:20a (line 5)
10:20a (line 10)
10:21a (line 15)
10:21a (line 20)
10:21a (line 25)

UNITED STATES DISTRICT COURT

DEREK FRITZE - REDIRECT EXAMINATION BY MR. BERRY        52

```
 1  herself.  I just think when we start talking about money

 2  laundering, it's going to redound to the detriment of our

 3  clients.  Now, my client has not been accused of money

 4  laundering but others have --
```

10:22a  5        MS. PERLMETER:  I don't mean to interrupt, but maybe

```
 6  I can short circuit this.

 7              MR. EISENBERG:  Go ahead.

 8              MS. PERLMETER:  If the defense would prefer not to

 9  elicit testimony regarding her felony conviction for money
```

10:22a 10  laundering, the United States has no objection.

```
11              However, it is a felony offense.  It is impeachable

12  and it does qualify within Rule 609.  However, if you wish to

13  waive that, then we won't ask her any questions about it,

14  about the conviction.
```

10:22a 15              MR. EISENBERG:  That solves the problem, Your Honor.

```
16              THE COURT:  That's how we will proceed.

17              MS. PERLMETER:  She is --

18              THE COURT:  Wait, wait.

19              MS. PERLMETER:  So she is prepared to, you know,
```

10:23a 20  tell the Court that she has a felony conviction.  So given

```
21  this change, would it be appropriate to take, perhaps, the

22  bathroom break now and during the break I can tell her about

23  the change?

24              THE COURT:  Well, yes.
```

10:23a 25              MS. PERLMETER:  Because optically I think it looks

UNITED STATES DISTRICT COURT

DEREK FRITZE - REDIRECT EXAMINATION BY MR. BERRY          53

```
 1   weird.

 2              THE COURT:  Yes.

 3              MR. EISENBERG:  Thank you, Your Honor.

 4              THE COURT:  Thank you.

 5              (End of discussion at sidebar.)

 6              THE COURT:  Okay.  Members of the Jury, there's just

 7   been one technical issue that we have to work out.  So we're

 8   going to take -- I had anticipated we would go a little bit

 9   longer this morning just because you came in at a quarter

10   after 9:00, but I think at this point we'll go ahead and take

11   our morning break of our usual twenty minutes.

12              And just again, remember the admonishment not to

13   come to any conclusions or to discuss the matter amongst

14   yourselves or anyone else.  Just be prepared to come back into

15   the courtroom at a quarter 'til the hour.  So with that,

16   please all rise for the jury.

17              (Jury out at 10:24 a.m.)

18              THE COURT:  All right, we will stand in recess.

19              (Recess taken at 10:24 a.m.)

20              COURTROOM DEPUTY:  All rise, court is now in

21   session.

22              (Back on the record at 10:44 a.m.)

23              THE COURT:  I understood Mr. Kessler wanted five

24   minutes.  So I don't know where he is, but five minutes

25   usually turns in to 15 so --
```

10:23a (line 5)
10:23a (line 10)
10:24a (line 15)
10:44a (line 20)
10:44a (line 25)

UNITED STATES DISTRICT COURT

DEREK FRITZE - REDIRECT EXAMINATION BY MR. BERRY          54

```
 1              MR. EISENBERG:  I'll take a look.

 2              MS. BERTRAND:  May we be seated?

 3              THE COURT:  Yes, please.

 4              MR. KESSLER:  Thank you, Your Honor.  I'm sorry I

 5   was a moment late.

 6              I just want to make a record.  Towards the end of

 7   the cross-examination on Detective Fritze I had asked a series

 8   of questions about sort of the landscape of prostitution in

 9   his town following the closure of Backpage.

10              They were all objected to and sustained on the

11   ground of relevance.  My argument about that -- about

12   relevance was this particular witness took a rather aggressive

13   approach to his reading of the Backpage ads, at least in terms

14   of what we've heard others testify to, and because he said

15   that all escort ads were, in fact, prostitution ads, I thought

16   it was relevant to determine what happened to the volume of

17   prostitution when Backpage was no longer publishing.

18              I thought it was relevant because of his statement

19   that they're all prostitution ads.  So I just wanted to make

20   that record.

21              THE COURT:  All right.

22              MR. KESSLER:  Thank you.

23              THE COURT:  Okay.  Are we ready for the witness and

24   the jury?

25              MS. PERLMETER:  Yes.
```

The timestamps in the left margin: 10:45a (line 5), 10:46a (line 10), 10:46a (line 15), 10:46a (line 20), 10:47a (line 25).

UNITED STATES DISTRICT COURT

JORDAN THURMAN – DIRECT EXAMINATION BY MS. PERLMETER     55

```
 1              THE COURT:  All right, let's have the jury in.
 2              All rise for the jury.
 3              (Jury in at 10:47 a.m.)
 4              THE COURT:  All right, please be seated.
 5              The record should reflect the presence of our jury.
 6              Ms. Perlmeter, you may call your next witness.
 7              MS. PERLMETER:  The next witness is Jordan Thurman.
 8              THE COURT:  Ma'am, please come forward to my
 9    courtroom deputy and be sworn.
10              COURTROOM DEPUTY:  Please raise your right hand.
11    (Witness is sworn.)
12              COURTROOM DEPUTY:  Please step over to the witness
13    stand.
14              THE COURT:  And you can proceed when ready and just
15    remember to slow your cadence down, Ms. Perlmeter.  Thank you.
16              MS. PERLMETER:  I will, thank you.
17                          DIRECT EXAMINATION
18    BY MS. PERLMETER:
19    Q.   Good morning.
20    A.   Good morning.
21    Q.   Please pull the microphone up to your face and speak
22    directly into it, okay?
23    A.   Yes, ma'am.
24    Q.   Could you please introduce yourself to the Members of the
25    Jury.
```

Timestamps in left margin: 10:48a (line 5), 10:48a (line 10), 10:49a (line 15), 10:49a (line 20), 10:49a (line 25)

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER     56

1    A.    I'm Jordan Thurman.

2    Q.    Spell your first name.

3    A.    J-o-r-d-a-n, T-h-u-r-m-a-n.

4    Q.    And where do you live, Ms. Thurman?

10:49a  5    A.    In Dallas, Texas.

6    Q.    How far did you get in school?

7    A.    I graduated from high school.

8    Q.    Do you work?

9    A.    Yes.

10:49a  10    Q.    Where do you work?

11    A.    I have two jobs.  I work at Whataburger and a smoke shop.

12    Q.    Do you have any children?

13    A.    Yes, I have two, a boy and a girl.

14    Q.    How old are -- oh, you have a boy and a girl.

10:50a  15          And how old are you?

16    A.    I'm 28.

17    Q.    Ms. Thurman, have you ever been advertised on

18    Backpage.com?

19    A.    Yes.

10:50a  20    Q.    What is Backpage.com?

21    A.    It is a website where women go and post ads to do sexual

22    activity on.

23    Q.    In what year or what years were you advertised on

24    Backpage.com?

10:50a  25    A.    2015 to 2016.

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER     57

1    Q.   Were you living in the Phoenix area during that time?

2    A.   Yes, ma'am.

3    Q.   In what sections of the website were you posted in, if

4    you recall?

10:50a  5    A.   Escorts.

6    Q.   And do you recall in what cities or what states you were

7    posted in?

8    A.   I posted in Texas -- I mean in Arizona and in California.

9    Q.   Now, who created the ads that featured you on Backpage?

10:51a  10   Was it you or other people or perhaps a combination?

11   A.   It was a combination.

12   Q.   So who posted you on Backpage?

13   A.   Myself and Derek Terry.

14   Q.   Who is Derek Terry?

10:51a  15   A.   He was my pimp.

16   Q.   What does "pimp" mean to you?

17   A.   It means a lot of different things.  Somebody that has

18   control over what you do or, like, controlling, a boss.

19   Q.   A boss.  So during the time you were being -- were you --

10:52a  20   during the time that you were posted on Backpage.com, were you

21   working for Mr. Terry?

22   A.   Yes.

23   Q.   Did he have other women working for him at the same time

24   that you were?

10:52a  25   A.   Yes.

UNITED STATES DISTRICT COURT

ER 13242

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER     58

```
         1   Q.   About how many?

         2   A.   Four or five.

         3   Q.   Now, I want to talk to you about the ads, okay.

         4        So in the beginning Mr. Terry posted the ads for you; is

10:52a   5   that what you said?

         6   A.   Correct.

         7   Q.   Okay.  Were you aware that there were photos as part of

         8   the advertisements?

         9   A.   Yes.

10:52a  10   Q.   Let's talk about the photos.  Who took photos of you for

        11   your Backpage ad?

        12   A.   Derek Terry and myself.

        13   Q.   And where were those photos taken?

        14   A.   Hotels.

10:52a  15   Q.   Were you given any instructions on what to wear or what

        16   to bring to the hotel for the photos?

        17   A.   Yes.

        18   Q.   Who gave you those instructions?

        19   A.   Derek.

10:52a  20   Q.   And what clothing did you bring?

        21   A.   Lingerie.

        22        THE COURT:  I'm going to stop the both of you just

        23   for a moment.  We have a court reporter taking down everything

        24   that's said.  You both have very quick cadence.  In other

10:53a  25   words, you both speak very quickly; and so just take a moment
```

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER      59

```
 1    to let the question lie on the record and then you can answer,

 2    because you kinda tend to, you know, tightly answer the

 3    question.  I know you're a little bit nervous.

 4              THE WITNESS:  I am.

 5              THE COURT:  Take a breath, okay, and let's move a

 6    little bit slowly so we can make sure that we take everything

 7    down.  Thank you very much.  Okay, Ms. Perlmeter.

 8    BY MS. PERLMETER:

 9    Q.   Did Mr. Terry tell you how to stand or pose for the

10    photographs?

11    A.   Yes.

12    Q.   Now, in the beginning were you involved in the drafting

13    of what words would go in to your Backpage ad?

14    A.   Say that again, I'm sorry.

15    Q.   In the beginning were you involved in choosing what words

16    or what text would be included in your Backpage ad?

17    A.   We went on other ads and just took what bits and pieces

18    of other people posted.

19              MR. EISENBERG:  Objection, Your Honor,

20    non-responsive.

21              THE COURT:  Overruled.

22              MS. PERLMETER:  You can answer the question.  If you

23    don't recall it, I can ask you again or -- would you like me

24    to ask you again?

25              THE WITNESS:  Yeah, go ahead and ask.
```

10:53a (line 5)
10:53a (line 10)
10:53a (line 15)
10:54a (line 20)
10:54a (line 25)

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER        60

```
         1            MS. PERLMETER:  Okay.
         2    BY MS. PERLMETER:
         3    Q.   My question was, were you -- were you the one that was
         4    writing -- writing the words that were in the ad?
10:54a   5    A.   Oh, yes, me and Derek Terry.
         6    Q.   Okay.  And how did that work?
         7    A.   I would go on the other women's ads and we would copy and
         8    paste bits and pieces of other people's ads and put them on
         9    our own ad.
10:54a  10    Q.   And do you know who paid for these ads in the beginning?
        11    A.   Derek.
        12    Q.   Do you know how he paid for them?
        13    A.   With a Visa card, like a gift card.
        14    Q.   And what name were you using for the Backpage ads?
10:55a  15    A.   Karma.
        16    Q.   Did you get a chance to see the ads after they were
        17    posted and were on-line?
        18    A.   Yes.
        19    Q.   What happened after the ad was posted and on-line?
10:55a  20    A.   About five minutes later my phone would ring for about an
        21    hour or two with calls and text messages.
        22    Q.   Okay.  And how would you handle that?
        23    A.   Just reply back.
        24    Q.   Okay.  And what were the conversations or the reply texts
10:55a  25    back to the callers about?
```

ER 13245

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER          61

1   A.   We would just make sure they weren't law enforcement,

2   like have them send pictures of themselves.  Briefly have a

3   conversation just so we would feel comfortable.

4   Q.   Okay.  And when you were -- in having these conversations

10:56a  5   with the callers, were you trying to make dates for them to

6   come see you?

7   A.   Yes.

8   Q.   And what -- what was the purpose of them coming to see

9   you?

10:56a  10   A.   To make money.

11   Q.   Okay.  And what would you do to make the money?

12   A.   Sexual activity.

13   Q.   Where did you -- where did these meetings take place?

14   A.   Hotels.

10:56a  15   Q.   And the people who came to see you, what do you call

16   them?

17   A.   Tricks.

18   Q.   Okay.  And in your view what is a "trick"?

19   A.   It's a person that pays for sexual activity or time.

10:56a  20   Q.   Okay.  And how would you instruct the tricks to -- to

21   come see you?  Like what instructions would you give them?

22        What would happen?

23   A.   Depending on where my room was located, I would have them

24   pull to where I could see them pulling in to verify that they

10:57a  25   were not police and just -- it was -- be very cautious.

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER     62

```
 1   Q.   And who taught you how to do that?  Who taught you to
 2   talk to the tricks so that you could minimize the possibility
 3   they would be police?
 4        MR. EISENBERG:  Objection.  Objection, Your Honor.
 5   Calls for hearsay.  It calls for speculation.
 6        THE COURT:  Overruled as to the question.
 7        THE WITNESS:  Can you repeat the question?
 8        MS. PERLMETER:  Yes.
 9   BY MS. PERLMETER:
10   Q.   Who taught you to -- you know, to take these steps to
11   verify that the tricks were not police?
12   A.   Derek Terry.
13   Q.   So what happens once the trick arrives and knocks on your
14   room, knocks on your door?
15   A.   They would come in.  We would have a conversation, kinda
16   make ourselves feel comfortable, and then we would have sexual
17   activity and they would leave the money and leave.
18   Q.   Okay.  And so just to be clear to make sure the jury
19   understands what's happening in the room, when you say "sexual
20   activity," what do you mean by that?
21   A.   Sexual intercourse.
22   Q.   Where was Derek Terry when these dates were happening?
23   A.   Gone.
24   Q.   What happened after the date finished and the trick left?
25   A.   Sorry, say that one more time.
```

Lines with timestamps:
10:57a  5
10:57a 10
10:57a 15
10:58a 20
10:58a 25

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER      63

```
 1   Q.   What happened when your date finished and the trick left
 2   your room?
 3   A.   I would take a shower and get back on my phone and wait
 4   for another trick.
10:58a  5   Q.   And then would you repeat --
 6   A.   Yes, ma'am.
 7   Q.   -- the same process?
 8   A.   Yes, ma'am.
 9   Q.   Okay.  And do you recall how many generally tricks you
10:58a 10   might see in a day?
11   A.   Ten to fifteen.
12   Q.   And at the end of the day do you recall generally how
13   much money you would have made?
14   A.   Between 3,000 to 5,000.
10:59a 15   Q.   What would you do with that money?
16   A.   Give it to Derek Terry.
17   Q.   Did you get to choose which motel or hotel you would
18   conduct these dates out of?
19   A.   No.
10:59a 20   Q.   Who told you where to go?
21   A.   Derek.
22        MS. BERTRAND:  Objection, relevance as to the counts
23   in this indictment.
24        THE COURT:  Overruled.
10:59a 25   BY MS. PERLMETER:
```

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER    64

 1  Q.   So after a while did you learn how to create your own ads

 2  on Backpage?

 3  A.   Yes.

 4  Q.   Okay.  And who showed you how to do it?

10:59a  5  A.   Derek Terry.

 6  Q.   Did Derek also have other girls that were posting that

 7  you learned from?

 8          MR. EISENBERG:  Objection, relevance.

 9          THE COURT:  Overruled.

10:59a 10          THE WITNESS:  Can you repeat that?

11  BY MS. PERLMETER:

12  Q.   Did Derek Terry also have other women who were posting

13  that you learned from?

14  A.   Yes.

10:59a 15  Q.   So when you're posting advertisements for yourself, are

16  you using your own photos?

17  A.   Yes.

18  Q.   And for the words, what words are you using?

19  A.   We would use "incall," "outcall."  That means either they

11:00a 20  would come in the hotel or we would go to their location.

21      We would post "leave satisfied," "happy ending," which

22  means you'll get what you come for as far as sexual activity.

23  Q.   Now, when you were posting, how were you paying for the

24  ads?

11:00a 25  A.   I was buying a Visa prepaid gift card from, like, a

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER    65

1    convenience store or, like, Walgreens and I would -- the money

2    would be on there and I would put it -- the card information

3    on Backpage to post the ad.

4    Q.    Okay.  And where would you get the money to buy the

**11:00a** 5    Vanilla Visa gift card?

6    A.    From Derek Terry.

7    Q.    And so what -- when you posted the ad, did you receive

8    calls and make appointments for tricks to see you like you

9    told us a few minutes ago?

**11:01a** 10   A.    Yes.

11          MR. EISENBERG:  Objection, Your Honor, asked and

12   answered.

13          THE COURT:  Sustained.

14   BY MS. PERLMETER:

**11:01a** 15   Q.    Were there times when the calls would slow down or stop?

16   A.    Yes.

17   Q.    What would you do when that happened?

18   A.    I would repost.

19   Q.    When you reposted, did you have to pay an additional fee

**11:01a** 20   to Backpage to do that?

21   A.    Yes, you have to pay every time you post.

22   Q.    And what happened when you reposted?

23   A.    You would get brought to the top of the page.

24   Q.    For the rooms that you conducted these dates with the

**11:01a** 25   tricks, who paid for the rooms?

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER          66

1   A.   We did.  I did.

2   Q.   What do you mean by "we"?

3   A.   Me 'cuz I give the money to Derek and Derek would give it

4   back to me to pay for the room.

11:02a 5   Q.   Did Derek, Mr. Terry, give you money to do other things?

6   A.   Yes.

7   Q.   Like what?

8   A.   Like get my nails done or my hair or buy clothes or food.

9   Q.   If you needed money for something, would you ask Derek

11:02a 10   for it?

11   A.   Yes.

12   Q.   Was he in charge of the money that you made?

13   A.   Yes.

14   Q.   Now, you mentioned that you had posted -- or there are

11:02a 15   ads posted of you here in the Phoenix area as well as other

16   places?

17   A.   Yes.

18   Q.   What were the other places?

19   A.   San Bernardino, California.  Ontario, California.  Mesa,

11:02a 20   Arizona.

21   Q.   Okay.  So would you travel back and forth between Arizona

22   and Southern California to have dates as a result of ads being

23   posted on Backpage?

24   A.   Yes.

11:02a 25            MS. BERTRAND:  Objection, leading.

UNITED STATES DISTRICT COURT

1          MR. EISENBERG:  Objection, leading.

2          THE COURT:  Overruled.

3   BY MS. PERLMETER:

4   Q.  Who went on these trips?  Like how would you get to

11:03a  5   Phoenix to, you know, Southern California, for example?

6   A.  We rented a car --

7          MS. BERTRAND:  Objection, relevance.  Rule 403.

8          THE COURT:  Just a reminder, because of the multiple

9   objections, if an objection is being made, can you wait for

11:03a 10   one another due to the court reporter's challenge.

11          Okay, thank you.

12   BY MS. PERLMETER:

13   Q.  How would you get from Phoenix to Southern California?

14   A.  We would rent a car and then we bought -- we bought a

11:03a 15   car.  I bought a car and we would use that.

16   Q.  Okay.  What kind of car were you able to purchase?

17   A.  I bought a BMW.

18   Q.  And with what money did you use to purchase this BMW?

19          MR. EISENBERG:  Objection, Your Honor, relevance,

11:03a 20   403.

21          THE COURT:  Overruled.  I'll give Ms. Perlmeter a

22   little bit of leeway.

23          THE WITNESS:  Can you repeat yourself?

24   BY MS. PERLMETER:

11:04a 25   Q.  Where did you get the money to purchase the BMW?

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER    68

1   A.   From dates.

2   Q.   And so generally who went from Phoenix to California to

3   post Backpage ads in California?

4   A.   Me, Derek and the other women that was working for him.

11:04a  5   Q.   And did that sometime -- was there more than one trip?

6   A.   Like at a time?

7   Q.   Like would you go to California, come back to Phoenix?

8   A.   Yes.

9   Q.   At a later point go back to California?

11:04a 10   A.   Yes.

11   Q.   So a little bit of a back and forth?

12   A.   Yes.

13   Q.   Okay.  So when you went to California, generally how long

14   would you stay there?

11:04a 15   A.   Like two to three weeks, a month.  It just -- it varies.

16   We -- we never knew.

17   Q.   Did it depend on what Mr. Terry wanted to do?

18   A.   Correct.

19   Q.   And while you were in California, did you and the other

11:04a 20   women post ads on Backpage in those cities?

21   A.   Yes.

22   Q.   And then were there -- where did you guys stay in

23   California?

24   A.   I'm sorry, say that again.

11:05a 25   Q.   Where did you guys stay when you were in California?

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER        69

```
          1   A.   We would stay in the hotels that we worked out of.

          2   Q.   Okay.  And who paid for those hotels?

          3   A.   I did.

          4   Q.   What did you do with the money that you earned when you

11:05a    5   were seeing tricks in California?

          6   A.   I would give the money to Derek Terry.

          7   Q.   During the time you were with Mr. Terry, did you observe

          8   him to have any legitimate form of employment?

          9   A.   No.

11:05a   10   Q.   Ms. Thurman, was there a time when paying for the ads

         11   using the Vanilla Visa gift cards you've told us about, was

         12   there a time that stopped working?

         13   A.   Yes.

         14   Q.   And when that happened, did you tell Mr. Terry?

11:05a   15   A.   Yes.

         16   Q.   And were you -- were ads posted for you after that on

         17   Backpage?

         18   A.   Yes.

         19   Q.   Okay.  So did Mr. Terry somehow figure out how to get the

11:06a   20   ad to work?

         21        MR. EISENBERG:  Objection, Your Honor.  It's

         22   testifying by counsel.  It's leading.

         23        THE COURT:  Sustained.

         24   BY MS. PERLMETER:

11:06a   25   Q.   Were you able to have ads posted on Backpage of you after
```

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER    70

1    you had trouble with the Vanilla Visa cards?

2    A.    Yes.

3    Q.    Were there times that you noticed there were changes to

4    your Backpage ad after it went on-line?

11:06a  5    A.    Yes.

6    Q.    Can you tell us about that?

7    A.    It would disappear.  It would really just disappear.

8    Q.    Okay.  So you noticed that your ad would disappear?

9    A.    Uh-huh.

11:06a  10    Q.    Sorry --

11    A.    Sorry, yes.

12    Q.    Sorry, you can't go "uh-huh."

13        Was there a function on Backpage on the website that

14    allowed a user to report ads?

11:06a  15    A.    Yes.

16    Q.    Okay.  Are you okay?

17    A.    Yeah.

18    Q.    Okay.  Have you done that?

19    A.    Yes, I have.

11:06a  20    Q.    Okay.  Under what circumstances would you do that?

21    A.    Derek --

22    Q.    Let me break that down a bit, okay?

23        So you worked for Mr. Terry?

24    A.    Yes.

11:07a  25    Q.    Did Mr. Terry have a competing pimp?

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER    71

```
         1   A.    Yes.

         2   Q.    And did Mr. Terry's competing pimp have other girls

         3   working for him?

         4   A.    Yes.

11:07a   5         MR. EISENBERG:  Objection, Your Honor, relevance.

         6         THE COURT:  Sustained.

         7   BY MS. PERLMETER:

         8   Q.    Did Mr. Terry try to maximize the amount of money and

         9   opportunities for you and the girls that were working for him?

11:07a  10   A.    Yes.

        11         MR. EISENBERG:  Objection, leading.

        12         THE COURT:  Sustained.

        13   BY MS. PERLMETER:

        14   Q.    So you told us that you did report ads on Backpage?

11:07a  15   A.    Yes.

        16   Q.    Whose ads did you report?

        17   A.    The other women that worked for the other pimp.

        18   Q.    Ms. Thurman, are you familiar with The Erotic Review?

        19   A.    Somewhat.

11:07a  20   Q.    What do you know about it?

        21         MR. EISENBERG:  Objection, Your Honor.  It's an

        22   open-ended question, calls for speculation, no foundation, and

        23   it's irrelevant to this proceeding with this witness.

        24         THE COURT:  I'll sustain as to foundation and then

11:08a  25   determine whether it's relevant.
```

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER    72

1   BY MS. PERLMETER:

2   Q.   Did you look at The Erotic Review?

3   A.   I have.

4   Q.   Okay.  What did you see?

11:08a  5   A.   It's women that post on there that work on other sites to

6   get reviews to let other tricks know that they're not the

7   police, like they're 100 percent guarantee.

8   Q.   Okay.  So, Ms. Thurman, was there a time when you decided

9   that you didn't want to work for Mr. Terry anymore?

11:08a 10   A.   Yes.

11   Q.   Did Mr. Terry say, "Okay" --

12          MR. EISENBERG:  Objection, Your Honor.

13          MS. PERLMETER:  -- "you can quit"?

14          MR. EISENBERG:  Objection, it calls for hearsay.

11:09a 15          THE COURT:  Sustained.

16   BY MS. PERLMETER:

17   Q.   What did you do when you decided you wanted to stop

18   working for Mr. Terry?

19   A.   I recruited another woman.

11:09a 20   Q.   Were you looking for a replacement?

21   A.   Yes.

22   Q.   And did you -- and you found another woman?

23   A.   Yes.

24          MR. EISENBERG:  Objection, relevance.

11:09a 25          THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER    73

```
        1  BY MS. PERLMETER:
        2  Q.   What was her name -- her Backpage name?
        3  A.   Snowflake.
        4  Q.   Did you introduce Snowflake to Mr. Terry?
11:09a  5  A.   Yes.
        6  Q.   Did you train Snowflake on how to make money?
        7          MR. EISENBERG:  Objection -- sorry, ma'am.
        8          Sorry, leading.
        9          THE COURT:  Sustained.
11:09a 10  BY MS. PERLMETER:
       11  Q.   What did you tell -- what did you show Snowflake how to
       12  do?
       13  A.   How to post pictures -- like how to take pictures to post
       14  on Backpage.
11:09a 15  Q.   And then did Snowflake begin working for Mr. Terry?
       16  A.   Yes.
       17          MR. EISENBERG:  Objection, Your Honor, leading.
       18          THE COURT:  Sustained.
       19  BY MS. PERLMETER:
11:10a 20  Q.   Did you and Snowflake travel to California together to
       21  work off your Backpage ads?
       22  A.   Yes.
       23          MS. BERTRAND:  Objection, leading.
       24          THE COURT:  Sustained.
11:10a 25  BY MS. PERLMETER:
```

UNITED STATES DISTRICT COURT

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER       74

 1   Q.   What did you do with Snowflake after you met her and

 2   trained her?

 3          MR. EISENBERG:  Objection, Your Honor.  It's open

 4   ended, vague.

11:10a   5          MS. BERTRAND:  Objection, relevance, 403.

 6          THE COURT:  I'll sustain as to vague.

 7   BY MS. PERLMETER:

 8   Q.   Was -- did Ms. -- did Snowflake become like a -- become

 9   part of the group of women that were working for Mr. Terry?

11:10a  10   A.   Yes.

11          MS. BERTRAND:  Objection, leading.

12          THE COURT:  Overruled.

13          Ms. Perlmeter, please refrain from leading the

14   witness.  You're not on cross-examination, you're on direct.

11:11a  15   BY MS. PERLMETER:

16   Q.   So let's move forward to April of 2016, okay?

17          Did Snowflake have a date with -- did Snowflake have a

18   date?

19   A.   Yes.

11:11a  20          MR. EISENBERG:  Objection, foundation and leading.

21          THE COURT:  Sustained as to foundation.

22   BY MS. PERLMETER:

23   Q.   In April of 2016 do you know if Snowflake had an ad

24   posted on Backpage?

11:11a  25   A.   Yes.

UNITED STATES DISTRICT COURT