**Case Nos. 24-5374, 24-5375, 24-5376**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MICHAEL LACEY,
*Defendant-Appellant.*

_____

*On Appeal from the United States District Court for the District of Arizona (Phoenix),
Case No. 2:18-cr-00422-DJH-1 • The Honorable Diane J. Humetewa, District Judge*

## APPELLANT'S OPENING BRIEF

PAUL JOHN CAMBRIA, JR.
**LIPSITZ GREEN SCIME
CAMBRIA, LLP**
42 Delaware Avenue, Suite 300
Buffalo, NY 14202
Telephone: (716) 849-1333
pcambria@lglaw.com

ERIN MCCAMPBELL PARIS
**MAURICE WUTSCHER LLP**
50 Fountain Plaza Downtown, Suite 1400
Buffalo, NY 14202
Telephone: (716) 261-4703
eparis@mauricewutscher.com

*Attorneys for Defendant-Appellant Michael Lacey*

 COUNSEL PRESS · (800) 3-APPEAL          PRINTED ON RECYCLED PAPER

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

PRELIMINARY STATEMENT ..............................................................1

JURISDICTIONAL STATEMENT ..........................................................3

DETENTION STATUS............................................................................3

ISSUES PRESENTED..............................................................................3

STANDARD OF REVIEW ......................................................................4

STATEMENT OF THE CASE AND FACTS ..........................................5

I.      Backpage originates from within a newspaper company...............5

II.     Backpage was formed under the "business" side of the company..................7

III.    Lacey relies on others for information about Backpage.................7

IV.     Online adult advertising faces a wave of criticism.......................9

V.      Lacey's defense of Backpage was rooted in his First Amendment beliefs.......................................................................................10

VI.     Courts recognize Backpage's First Amendment rights.................12

VII.    Banking for Backpage and the Defendants becomes unstable.......12

VIII.   Lacey funds a trust account in Hungary to stabilize his banking..................14

PROCEDURAL HISTORY.......................................................................18

I.      The first trial ends in a mistrial.....................................................19

II.     The new judge presides over the second trial with new rules........19

        A.      New pretrial rulings change the trajectory of the case.......20

        B.      The second trial commences .............................................23

                1.      No money laundering charges were proven ............23

                        a.      Thai establishes that none of the attributes of the funds were concealed from the government..................24

i

b.     There was no proof of purpose or intent to conceal ........................................................... 26

c.     There was no proof the funds were proceeds of SUA ........................................................... 26

2.     The case against Lacey was based entirely on "notice" evidence ........................................ 28

3.     No limitation was placed on child-sex trafficking evidence ............................................... 31

4.     Good faith evidence was precluded ........................... 34

5.     Government witnesses were allowed to testify about things for which they had no foundation ................ 36

C.     The verdict was the unreliable result of a flawed trial ....................... 37

III.     The District Court rules on Rule 29 motions ................................................. 38

IV.     The Court sentences Lacey by inconsistently applying her own rulings. ......................................................... 41

SUMMARY OF ARGUMENT ................................................................. 45

ARGUMENT ........................................................................................... 46

I.     None of the attributes of the funds were concealed from the government ......................................................... 46

II.     There was no proof of intent to conceal ....................................... 48

A.     The use of bank accounts with actual names is incompatible with an intent to conceal ............................................... 48

B.     Lacey's stated intent to disclose and his actual disclosure to the government were incompatible with an intent to conceal ............. 50

C.     The only proof regarding Lacey's purpose for the transfer was to stabilize his banking and establish a trust for his sons ........... 52

III.     There were no proceeds ................................................. 54

A.     The First Amendment required the tracing of publishing revenue to the publication of ads outside of the protections of the First Amendment and in violation of the Travel Act, which did not occur ................................................. 54

ii

B.      There are no proceeds because no Travel Act violations were proven at the time Backpage generated the funds.................................59

IV.     There was no proof that Lacey knew that the funds were proceeds .............60

V.      Erroneous evidentiary rulings deprived Appellants of a fair trial.................61

A.      Certain evidentiary rulings rose to the level of constitutional error ............................................................................................................61

B.      Other categories of rulings were abuses of discretion .......................62

    1.     The admission of speculative testimony was an abuse of discretion...............................................................................63

    2.     The admission of child-sex trafficking evidence was an abuse of discretion ................................................................64

    3.     The admission of notice evidence was an abuse of discretion..................................................................................65

C.      These cumulative errors deprived Defendants of a fair trial..............66

    VI.    Lacey joins in co-Appellants' issues raised on appeal ............67

CONCLUSION ....................................................................................................67

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ..................................................................64

*Backpage.com, LLC v. Cooper*,
939 F. Supp. 2d 805 (M.D. Tenn. 2013)...............................................12

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) .................................................. 13, 14, 35

*Backpage.com, LLC v. Hoffman*,
2013 U.S. Dist. LEXIS 119811 (D.N.J. Aug. 20, 2013) ......................................12

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) .................................................. 12, 35

*Bursey v. United States*,
466 F.2d 1059 (9th Cir. 1972) .................................................. 2, 54, 55, 57

*Cuellar v. United States*,
553 U.S. 550 (2008) .................................................. 45, 46

*In re Winship*,
397 U.S. 358 (1970) ..................................................................4

*Kennedy v. Louisiana*,
554 U.S. 407 (2008) ..................................................................65

*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012) ..................................................................6

*Nationwide Transp. Fin. v. Cass Info. Sys.*,
523 F.3d 1051 (9th Cir. 2008) ..................................................................65

*Sable Comms. of Cal. v. F.C.C.*,
492 U.S. 115 (1989) ..................................................................55

*Thunder Studios, Inc. v. Kazal*,
13 F.4th 736 (9th Cir. 2021) ..................................................................5

*United States v. Adefehinti*,
510 F.3d 319 (D.C. Cir. 2007) .................................................. 47, 49

iv

*United States v. Bahamonde*,
 445 F.3d 1225 (9th Cir. 2006) ........................................ 61, 62

*United States v. Bradley*,
 5 F.3d 1317 (9th Cir. 1993) ....................................................65

*United States v. Caldwell*,
 560 F.3d 1214 (10th Cir. 2009) ...........................................1, 46

*United States v. Enbry,*
 644 F. App'x 565 (6th Cir. 2016) .........................................48

*United States v. Esterman*,
 324 F.3d 565 (7th Cir. 2003) ....................................... 48, 49

*United States v. Eubanks*,
 591 F.2d 513 (9th Cir. 1979) ...............................................63

*United States v. Frederick*,
 78 F.3d 1370 (9th Cir. 1996) ........................................ 61, 67

*United States v. Gotti*,
 457 F. Supp. 2d 411 (S.D.N.Y. 2006).................................52

*United States v. Johnson*,
 440 F.3d 1286 (11th Cir. 2006)..................................... 46, 47

*United States v. Lichtenberg*,
 309 F. App'x 107 (9th Cir. 2009) ................................. 54, 60

*United States v. Lloyd*,
 807 F.3d 1128 (9th Cir. 2015).......................................66, 67

*United States v. McGahee*,
 257 F.3d 520 (6th Cir. 2001) ..............................................49

*United States v. Olaniyi-Oke*,
 199 F.3d 767 (5th Cir. 1999) ..............................................47

*United States v. Orduno-Aguilera*,
 183 F.3d 1138 (9th Cir. 1999).............................................4

*United States v. Playboy Entm't Gr.*,
 529 U.S. 803 (2000) ............................................. 1, 55, 57

*United States v. Rockelman*,
 49 F.3d 418 (8th Cir. 1995) ................................. 1, 50, 51, 52

v

*United States v. Shoff*,
151 F.3d 889 (8th Cir. 1998) .................................................................47

*United States v. Stephenson*,
183 F.3d 110 (2d. Cir. 1999)................................................................51

*United States v. Waters*,
627 F.3d 345 (9th Cir. 2010) ......................................................... 62, 63

**Statutes & Other Authorities:**

U.S. Const., Amend. I ............................................................... *passim*

18 U.S.C. § 1952(b)(1)............................................................... 27, 56

18 U.S.C. § 1956.......................................................................... *passim*

18 U.S.C. § 1956(a)(2)(B)(i)...................................................................45

18 U.S.C. § 1957 ......................................................... 39, 40, 42, 58

18 U.S.C. § 3231 ...................................................................................3

18 U.S.C. § 3742 ...................................................................................3

28 U.S.C. § 1291 ...................................................................................3

47 U.S.C. § 230.....................................................................................12

Carr, D., New York Times, *A Knock in the Night in Phoenix*
(May 12, 2008) .................................................................................7

Fed. R. Crim. P. 29.................................................................... 38, 60

Fed. R. Evid. 401 .................................................................................65

Fed. R. Evid. 403 .................................................................................65

Fed. R. Evid. 602 ......................................................................... 63, 64

IRS New Release (Mar. 21, 2022) ......................................................18

## PRELIMINARY STATEMENT

Michael Lacey asks this Court to vacate his international concealment money laundering conviction. There is no case affirming a concealment money laundering conviction where, as here, the defendant: (1) concealed no attributes of the funds; (2) stated his intent to disclose the attributes of the funds to the government, before and after the charged transaction; (3) actually disclosed all attributes of the funds to the government; and (4) used bank accounts in his own name. Unsurprisingly, courts have uniformly ruled that such transparent transactions are not concealment money laundering. *See, e.g.*, *United States v. Caldwell*, 560 F.3d 1214, 1222 (10th Cir. 2009). Courts also have uniformly ruled that a defendant's disclosure is incompatible with the intent to conceal. *See*, *e.g.*, *United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995).

Lacey's conviction—like every money laundering conviction in this consolidated appeal—has another fundamental problem: there was no proof that the funds at issue were "proceeds" of "specified unlawful activity" ("SUA"), as required under 18 U.S.C. § 1956. Unlike a drug case, where the revenue-generating activity always is illegal, the economic activity here was ***publishing*** millions of third-party classified ads on www.backpage.com ("Backpage")—***a constitutionally protected and presumptively lawful activity***. *See, e.g.*, *United States v. Playboy Entm't Gr.*, 529 U.S. 803, 817 (2000). The government tried its case as if this fundamental

1

distinction did not exist and, in doing so, failed to prove that the website's revenues constituted proceeds of SUA.

Because Backpage's revenues came from small fees for publishing presumptively-protected third-party speech to its site, to establish "proceeds" the government had to prove: (i) Backpage published "particular expressions" (*i.e.* particular ads written by website users) falling "outside" of the First Amendment's "reach;"[1] (ii) Backpage's publication of those ads constituted Travel Act violations (the only alleged SUA); and (iii) the funds in the money laundering counts were revenues from those Travel Act violations. Here, the government not only failed to overcome the constitutional presumptions, but also admitted its failure to trace those funds to Travel Act violations.

Moreover, all the money laundering charges must be vacated for a second, independent reason. There was no proof of Travel Act violations occurring during the time period when the website generated the funds at issue in the money laundering counts. As a result, not only was there no proof of "proceeds" of SUA, there was no proof of SUA.

Lacey's sole conviction—an anomaly under the law—is the end-result of an experimental prosecution. The government charged Lacey, co-Appellants Spear and

---

[1]     *See Bursey v. United States*, 466 F.2d 1059, 1081-82 (9th Cir. 1972).

2

Brunst, and others in a 100-count indictment related to Backpage. Notwithstanding a trial infected by one erroneous and prejudicial ruling after another, *fifty-one* of Lacey's charges either were acquitted or dismissed, laying bare the weakness of the government's case. As this brief will demonstrate, Lacey's sole count of conviction not only should be vacated, but he never should have been charged.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## DETENTION STATUS

On November 21, 2024, this Court granted Lacey's motion for bail pending appeal. (Doc. 36.) On November 22, 2024, Lacey was released from custody. (3-ER-583.)

## ISSUES PRESENTED

1. Whether a transaction in which no attributes of the funds were concealed from the government can support a concealment money laundering conviction?

2. Whether a defendant's expressed intent to disclose a transaction to the government, use of bank accounts in his name, and actual disclosures

3

to the government through the filing of government forms is incompatible with an intent to conceal?

3. Whether funds can be designated as "proceeds" for money laundering purposes when (a) the funds, which were not traced to any SUA, were revenue earned from an economic activity that is presumed lawful under the First Amendment, until proven otherwise; and (b) no SUA was proven at the time the revenue at issue was earned?

4. Whether there can be proof of a defendant's knowledge that funds were "proceeds" of SUA when there was no SUA proven?

5. Whether the District Court's erroneous and highly-prejudicial evidentiary rulings deprived Defendants of a fair trial by, among other things, improperly swaying the jury?

## STANDARD OF REVIEW

The Due Process Clause requires the government to prove each element of a crime beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). This Court conducts *de novo* review of the denial of a motion for acquittal based on insufficiency of the evidence. *See United States v. Orduno-Aguilera*, 183 F.3d 1138, 1139-40 (9th Cir. 1999).

This Court conducts an "independent examination of the whole record," or *de novo* review, of "constitutional facts" when determining whether a judgment was

4

obtained in violation of the First Amendment. *See Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021).

## STATEMENT OF THE CASE AND FACTS

**I.   Backpage originates from within a newspaper company.**

In 1970, Lacey founded an alternative newspaper, the *Phoenix New Times*. (3-ER-788.)  The newspaper initially struggled financially, with Lacey even donating blood and plasma for cash to help keep it afloat. (3-ER-789.)  After James Larkin joined Lacey, they restructured the newspaper—offering magazine-style articles for free, and generating revenue from advertising, including classified ads published on the back pages of the newspaper. (*Id*.)

Larkin oversaw the business (*i.e.* revenue-generating) side of the newspaper, as its Chief Executive Officer. (*Id*.; 34-ER-9551.)  Lacey, a writer, served as the newspaper's Editor-in-Chief. (34-ER-9551; 40-ER-11305.)  To protect the integrity of the newspaper's journalism from financial considerations, the "business" and "editorial" sides of the paper were kept separate, eventually even in separate buildings. (3-ER-789; 35-ER-9791; 43-ER-12098-12099.)  Lacey could not tell Larkin how or how not to generate revenue; Larkin could not tell Lacey what to publish.[2] (3-ER-789.)  The newspaper sometimes "lost large, lucrative, national

---

[2]   Within the media industry, this division used to be commonplace and was known as "separation of church and state." (3-ER-789.)

advertising accounts…because they wouldn't soften or sacrifice their principles or content even when they knew a given story…would cause their profit arrow to point south." (24-ER-6827.)

Nonetheless, the company flourished. (3-ER-789-791.) Under Larkin's supervision, the company expanded, ultimately becoming a conglomerate of seventeen alternative weekly newspapers named Village Voice Media Holdings, LLC ("VVMH"). (28-ER-8012.) Amid this expansion, Spear became VVMH's Vice President and Brunst its Chief Financial Officer. (*Id*.)

Lacey and his team of editors and journalists thrived, too, winning thousands of journalism awards, including a Pulitzer Prize. (3-ER-789, 809-857.)

Central to VVMH's success was an unwavering commitment to First Amendment speech and press rights, which Lacey did not abandon even when his liberty was at risk. (3-ER-792-794.) VVMH's investigative journalism routinely put it in the crosshairs of powerful people. (3-ER-794.) For example, then-Maricopa County Sheriff Joe Arpaio arrested Lacey and Larkin for publishing an article about his unlawful subpoenas targeting VVMH's online readers and their internet usage. (*Id*.) This Court recognized Arpaio's violation of Lacey's and Larkin's First Amendment speech and press rights in an *en banc* opinion, *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) (*en banc*). Indeed, Lacey's unflinching commitment to the First Amendment, including internet free speech rights, made national headlines

long before this prosecution. *See* Carr, D., New York Times, *A Knock in the Night in Phoenix* (May 12, 2008), available at: https://www.nytimes.com/2009/05/12/business/media/12.carr.html (last visited Mar. 12, 2025).

## II. Backpage was formed under the "business" side of the company.

In the early 2000s, advertising shifted from print to online platforms. (47-ER-13422.) In 2004, VVMH employee Carl Ferrer met with Larkin, proposing that VVMH create a classified ad website like Craigslist. (34-ER-23.) Larkin authorized the project and gave Ferrer $50,000 to develop the website. (47-ER-13423-13424.) Backpage was overseen by Larkin, like all other revenue-generating activities. (28-ER-8012.)

## III. Lacey relies on others for information about Backpage.

Lacey took no part in, and had no knowledge of, Backpage's operations, such as the marketing and business growth strategies the government claimed made Backpage into the internet's leading source of prostitution advertising. Instead, he was so out-of-the-loop that he asked questions about "basic" operational information. (25-ER-7076-7077.) For example, in 2010, six years after Backpage launched, Lacey had no idea whether Backpage had any "guidelines" for its staff. (25-ER-7078.)

Lacking first-hand knowledge, Lacey relied on what Ferrer (and others) told him about Backpage's operations (11-ER-2752-2758), including:

7

- Backpage had "100 staff members," known as moderators, who reviewed ads on the website to "remov[e]" "illegal or harmful postings." (25-ER-7090.)

- The moderators' "priorities" were to "(1) deter, remove, and report bad postings and (2) help prosecute any child exploitation or human trafficking case." (25-ER-7085.)

- Backpage kept records on every ad published, which was costly but provided law enforcement with "valuable personally identifiable information." (25-ER-7088.)

- Backpage responded to law enforcement's requests for information as "expeditiously as possible," "often within the hour," and much faster than other websites. (25-ER-7089.)

- Backpage aided law enforcement "in making the site as safe as possible." (25-ER-7090.)

- Ferrer had testified as a government witness on numerous occasions. (40-ER-11362.)

Ferrer's words and actions demonstrated to Lacey that Backpage was a partner to law enforcement, but law enforcement agencies across the country also praised Backpage's assistance. (26-ER-7245-7479; 27-ER-7482-7519; 28-ER-8005-8010.) Among other accolades, law enforcement told Backpage that, with its "super-fast

8

response" times (26-ER-7434), Backpage was: "the best" (26-ER-7451); "fabulous" (25-ER-7417); "instrumental in helping" with prosecutions (26-ER-7367); and "truly an asset to" law enforcement (26-ER-7475). Indeed, Ferrer received a commendation from the Director of the F.B.I. (28-ER-8011).

## IV.    Online adult advertising faces a wave of criticism.

In 2010, Craigslist shut down its adult services advertising section due to pressure from various non-governmental organizations ("NGOs"), such as the National Association of Attorneys General ("NAAG"), which had repeatedly called for the closure of that website section because prostitutes or traffickers had posted ads on the site. (*Id*.) Craigslist posted a banner on its shuttered website section saying: "Censored." (47-ER-13518.) Ferrer, who followed Craigslist's battles over adult ads, advised Lacey that "[t]he pressure on Craig[slist] was not legal." (35-ER-9809-9810; 24-ER-6756.)

After Craigslist capitulated, NGOs like NAAG, Auburn Theological Seminary ("Auburn"), and others began targeting Backpage. (24-ER-6745-6747; 37-ER-10341.) Backpage's representatives met with the NGOs to discuss internet safety. (36-ER-10177-10179.) Some NGOs called for Backpage to close its adult advertising section, just like Craigslist, because prostitutes or traffickers had posted ads on the website. (24-ER-6745-6747.) Backpage made clear it would work with NGOs and regulators to address internet safety concerns and even invited a dialogue

on setting national best practices for internet safety (24-ER-6824-6838), but would not agree to close its adult section, which was a First Amendment protected forum for third parties to exchange information. (*Id.*; 3-ER-607-22.)

In 2011, Auburn placed a full-page ad in the *New York Times* asking Backpage to shut its adult section. (43-ER-12308.) Larkin, Lacey, and others subsequently met with Auburn. (37-ER-10343.) Auburn argued a website hosting content connected with the trafficking of even one child should shut down, because "one child is too many." (37-ER-10352.) Lacey acknowledged Auburn's standard might be a good campaign slogan or "bumper sticker," but "not [a] realistic policy" for any website. (37-ER-10353.) Larkin sought to address Auburn's concerns about instances of child-sex trafficking with information concerning Backpage's content moderation process and law enforcement cooperation, but Larkin made clear he would not shut down Backpage's adult advertising section because censoring adult advertising would implicate "free speech issues" and do nothing to help law enforcement investigate trafficking. (43-ER-12325, 12330.)[3]

## V. Lacey's defense of Backpage was rooted in his First Amendment beliefs.

On occasion, Lacey, a writer, was asked to defend Backpage. Lacey—who had already fought for internet free speech rights—wrote a draft editorial arguing that censorship was not a solution for crime prevention:

---

[3] Notably, VVMH's lawyers had articulated that same view. (3-ER-607-622.)

[A]ny time you have large numbers of people congregating in one place, you are going to have people who will attempt to game the system.

However, Backpage is part of the solution. Eliminating our adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. It certainly will not prevent the exploitation of teenagers. If anything, it will simply make it far more difficult for law enforcement to arrest and prosecute those who seek to harm children.

For the very first time, the oldest profession in the world has transparency, record keeping and safeguards. Driving adult activity back into the shadows doesn't end the activity, it ends the safeguards.

That's why we remain committed to the free exchange of information by our users. Millions of consenting adults should not be punished because a few seek to break the law.

If someone overindulges in a bar, you don't ban alcohol. The bar does what it can: it adds more safety and security measures; it seeks law enforcement's help.

We do the same.

(24-ER-6761-6762.)

Lacey's belief in the lawfulness of Backpage's publication of adult advertising —despite after-the-fact knowledge that some prostitutes and traffickers placed ads on the website—is so cemented in this record that the District Court acknowledged Lacey had a ***"bona fide held belief that what [he was] doing was not illegal."*** (1-ER-110 (emphasis added).)

11

## VI.   Courts recognize Backpage's First Amendment rights.

Amid calls for Backpage to shut down, three federal courts upheld Backpage's First Amendment right to publish third-party adult advertising notwithstanding claims that many ads were associated with prostitution or trafficking. *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268, 1282 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 U.S. Dist. LEXIS 119811, *20-31 (D.N.J. Aug. 20, 2013).

Subsequently, the California Attorney General's Office charged Lacey, Larkin, and Ferrer with pimping. (4-ER-992.) Twice the California Superior Court dismissed the pimping charges, rejecting the idea that website operators could be prosecuted for publishing such third-party speech, even if the operator learned, after publication, that some escort ads posted to the website had been placed by prostitutes or traffickers. (4-ER-990-1028.) Although dismissing the charges under 47 U.S.C. § 230, the court expressly recognized that "the First Amendment [wa]s implicated" in any prosecution like California's. (4-ER-994.)

## VII.  Banking for Backpage and the Defendants becomes unstable.

After these efforts failed to force Backpage to discontinue publishing adult advertising, some law enforcement officers began pressuring financial institutions to terminate Backpage and Appellants as customers. (38-ER-10716.) In 2015,

12

American Express terminated Backpage, not for "doing anything illegal," but because of "reputational risk." (44-ER-12459.) After Cook County, Illinois, Sheriff Dart sent threatening letters to Visa and Mastercard, both refused to process credit card transactions for Backpage. (41-ER-11510-11511.) Backpage sued Sheriff Dart to stop his unlawful intimidation campaign, supported by numerous industry and civil rights organizations. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 229 (7th Cir. 2015) (listing as *amicus curiae*: Cato Institute, Electronic Frontier Foundation, Reason Foundation, Center for Democracy & Technology, DKT Liberty Project, and Association of Alternative Newsmedia).

In a unanimous opinion, the Seventh Circuit enjoined Sheriff Dart from his efforts to "crush" Backpage, holding Dart violated the First Amendment by threatening Mastercard and Visa for allowing the use of their cards on Backpage because "the ads might be for illegal sex-related products or services, such as prostitution." *See id*. at 230 ("[A] public official who tries to shut down an avenue of expression of ideas and opinions…is violating the First Amendment."). Dart's conduct "violat[ed] the First Amendment unless there [was] *no* constitutionally protected speech in the ads on Backpage's website—and no one [was] claiming that." *Id*. at 231 (emphasis in original). Further, the Court recognized many commercial sex activities advertised on Backpage were lawful, such as fetishism, phone sex, striptease performances, and dominatrix services. *See id*. at 234 ("[N]ot

13

all advertisements for sex are advertisements for illegal sex."). The Court expressly rejected the idea that "a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid[s] and abet[s] the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity." *Id*.

Despite the Seventh Circuit's decision, law enforcement continued to pressure financial institutions, including the banks holding Appellants' personal funds. As a result, Lacey's ability to bank became unstable, with bank after bank closing his accounts. (49-ER-13964.)

## VIII. Lacey funds a trust account in Hungary to stabilize his banking.

In early 2016, Lacey met with his estate-planning lawyer, John Becker, who was already in the process of preparing "basic estate planning documents" and "some planning for incapacity." (*Id*.) Lacey told Becker his banks had been closing his accounts and sought advice about stabilizing his banking. (*Id*.) Lacey's banking instability was a problem not just for Lacey, but for Becker, too, who served as the trustee for Lacey's five grantor retained annuity trusts ("GRATs"), which were due to make distributions to Lacey. (49-ER-13967.) Becker worried that Lacey had "no place to put those funds in a domestic account." (*Id*.)

Becker suggested that Lacey consult with Jacob Stein, an international estate planning attorney in Los Angeles, who could advise on how to "keep [accounts] open and from being closed." (*Id*.; 49-ER-13965.) On July 29, 2016, Lacey told

14

Becker he wanted to meet Stein. (24-ER-6707.) Lacey told Becker: "[T]o revisit for just a moment, *[I] am not interested in any tax avoidance.* I just want to put some assets in place where litigious parties, including government parties, cannot access my accounts." (*Id*. (emphasis added).) Lacey's "motivation" was "to place his monies in an account that won't be closed." (49-ER-14018.)

Lacey and Becker subsequently met with Stein. (49-ER-13965.) Stein advised them that "an appropriate way to solve the problem of domestic banks closing [Lacey's] accounts" was the "establishment of a trust in Hungary." (49-ER-13965-13966.) Becker advised Lacey about the Treasury Department's reporting requirements for offshore bank accounts and the requirement that Lacey report the trust income on his income tax returns. (49-ER-13966-13967.)

Upon the advice of Stein and Becker, Lacey authorized the formation of a Hungarian trust, with trust's assets to be deposited in a bank in Hungary. (49-ER-13966, 13975; 28-ER-7925-7943.) Lacey formed the trust "for the benefit of [his sons]." (28-ER-7929.) Lacey insisted that all reporting requirements and income tax filings be done correctly. (24-ER-6706-6707; 44-ER-12582.)

In November 2016, Lacey visited Arizona Bank & Trust to set up two new bank accounts to be able to pay bills. (44-ER-12579-12580.) He met with Lin Howard, a bank employee. (*Id*.) According to Howard, Lacey asked if she:

15

…knew how assets were seized and how assets were protected. He further went on to state that he had an attorney named John Becker who had indicated that there were some places around the world—and he mentioned the Cook Islands in which assets were protected from seizure and then he also mentioned Nevis Island….

He continued on by saying that *he wanted to make it clear that he wasn't looking to avoid paying taxes, that he had [an accountant] he directed to make sure that all taxes were paid and no tax shelters were taken*, but he was looking to see about moving a percentage of his assets offshore in order to protect them from government seizure.

(44-ER-12582 (emphasis added).)

At trial, Howard testified that she was "shocked" by the conversation (44-ER-12584), despite acknowledging that offshore investment accounts were lawful. (44-ER-12588.) She further admitted she had no knowledge about the formation or reporting requirements for lawful offshore investments and had no experience with international banking. (44-ER-12588-12589.) Instead, her career had been limited to domestic retail banking. (44-ER-12576.)

Most importantly, she testified that *Lacey did not ask for help concealing anything*. (44-ER-12593.) To the contrary, she testified that paying taxes on assets—like Lacey said he intended to do—was a form of disclosure to the government of those assets. (44-ER-12587-12588.) Further, she acknowledged that, absent any restraints on his assets, Lacey was free to transfer funds overseas. (44-ER-12590.) Finally, she agreed that, if a foreign bank account was set up in

16

accordance with the "rules" for such accounts, it would be a legal account. (44-ER-12591.)

On January 3, 2017, Becker wired $16.5 million to Hungary to fund the trust. (25-ER-7171.) To do so, he consolidated the GRATs into his IOLTA trust account, for the benefit of Lacey. (49-ER-13995.) He then transferred the consolidated funds to a Hungarian bank account for the trust. (*Id.*) Becker did not inform Lacey about the consolidation because Becker was the trustee of the GRATs, had the authority to consolidate the funds, and thought one international wire was more efficient than five. (49-ER-13995, 14028.) Becker testified that he could have written five checks to Lacey, to enable Lacey to send the funds himself, but Becker did not believe that Lacey had the ability to deposit the funds in a domestic account, which would have been necessary to wire the funds to Hungary. (49-ER-14028.)

Notably, a few weeks after Becker transferred the funds, Lacey emailed Becker asking:

> "[D]o you or [J]acob [S]tein do the ***reporting to govt on money that was moved***?"

(24-ER-6706 (emphasis added).) That same day, Becker responded that Stein would receive information on the trust, which Lacey's accountants then would use to prepare and file Lacey's first Report of Foreign Bank and Financial Accounts ("FBAR") with the Treasury Department. (24-ER-6705; 28-ER-8014.) FBARs are

17

an "annual disclosure" (49-ER-13983) "put[ting] the government on notice that a U.S. taxpayer has established a foreign account" (49-ER-13978).

On March 7, 2018, Becker, on his own initiative, requested an automatic extension of the April 15, 2018, deadline for filing the first FBAR. (49-ER-13976; 28-ER-7961-7962.)[4] On August 9, 2018, Lacey timely filed his first FBAR. (28-ER-7983-7997.) The FBAR identified Lacey as the "U.S. owner" of the funds, the name and address of the financial institution holding the funds, and the amount of the funds. (*Id.*) Becker advised Lacey "all the legal procedures had been followed" and "complied with." (49-ER-13987-13988.) At trial, Becker testified the formation and funding of the trust was a "solid transaction" and "absolutely legal." (49-ER-14029.)

Lacey timely filed the initial and all subsequent FBARs. (*E.g.*, 28-ER-8001-8004.)

### PROCEDURAL HISTORY

On March 28, 2018, a grand jury issued an indictment, which later was superseded ("Indictment"). (20-ER-5506-5601.) The Indictment charged Lacey with 86 counts: conspiracy to violate the Travel Act; Travel Act violations; and

---

[4] This automatic extension is available each year to all FBAR filers even if not requested in advance like Becker did here. *See, e.g.*, IRS New Release (Mar. 21, 2022), available at: https://www.irs.gov/newsroom/irs-reminds-holders-of-foreign-bank-and-financial-accounts-of-april-fbar-deadline (last visited Apr. 10, 2025).

various money laundering violations, including one count of international concealment money laundering ("Count 100") (*id.*), which is the subject of this appeal. The only alleged SUA for the money laundering charges was Travel Act violations. (20-ER-5549.)

## I.     The first trial ends in a mistrial.

The trial commenced September 1, 2021. (29-ER-8113.) Within days, the District Court declared a mistrial because the government repeatedly solicited evidence concerning child-sex trafficking—a charge no Defendant faced—in violation of the Court's rulings. (32-ER-8955-8956.) Defendants moved for dismissal under the Double Jeopardy Clause. (12-ER-3224-17-ER-4690.)

While that motion was pending, the District Court recused. (12-ER-3223.) A newly-assigned Judge denied the motion to dismiss (12-ER-3177-3193), which this Court affirmed on appeal (12-ER-3172-3176). Notably, at oral argument on the appeal, the Honorable Jay S. Bybee remarked: "You got the mistrial, *so all of that evidence is going be excluded.*" (Ninth Cir. Oral Argument Archive, Case No. 22-CR-10000, available at: ca9.uscourts.gov/media/video/?20220902/22-10000/ (at 6:55 (emphasis added).)

## II.     The new judge presides over the second trial with new rules.

The District Court scheduled the second trial to begin on August 8, 2023. (29-ER-8138.)

19

### A. New pretrial rulings change the trajectory of the case.

On July 24, 2023, the District Court ruled on motions in limine, indicating that the case would be tried under a new set of rules. (2-ER-525.) First, Defendants now would be prohibited from "invok[ing] their First Amendment rights as a defense to the allegations." (2-ER-532-533.) This meant that, in this prosecution of Defendants based on Backpage's publication of third-party speech, the First Amendment would have no role, despite past court decisions expressly deciding that Backpage's publication of adult ads was protected by the First Amendment.

Second, the District Court banned Defendants from presenting evidence about the prior judicial opinions recognizing Backpage's First Amendment rights because those opinions did not address Travel Act charges, so the Court deemed them "irrelevant." (2-ER-535.) The very documents Defendants read in making their subjective determinations about the lawfulness of publishing third-party adult ads online would be hidden from the jury. The ban even applied to this Court's opinion in *Lacey v. Arpaio*, which would have shown the jury that Lacey had not conveniently concocted First Amendment beliefs for the trial, but, instead, had already risked incarceration to protect Internet free-speech rights.

Third, Defendants now would be barred from presenting any attorney letters or opinions (including non-privileged letters written to third parties) unless Defendants established the prerequisites for a jury instruction on advice of counsel

20

(full disclosure, request of advice, receipt of advice, and reliance) and also showed that the opinion to be introduced was related to "an ad listed in Counts 2-51" or "described" in the Indictment. (2-ER-536-537.) Because none of the Defendants had seen or known of any of the ads "listed" or "described" in the Indictment before issuance of the Indictment, the Court's ruling appeared to preclude a defense based on the advice of counsel, even though attorneys had provided extensive advice on Backpage's operations and had specifically advised that the online publication of third-party adult ads was lawful. (3-ER-678-686, 696-704.)

In contrast, the Court allowed the government to present troves of evidence untethered to ads "listed" or "described" in the Indictment, including:

- Evidence of child-sex trafficking, unrelated to the ads "listed" or "described" in the Indictment, on the basis that such evidence (***which had caused the first mistrial***) now was admissible as "proof of the entirety of the scope of the conspiracy." (2-ER-528.) That evidence purportedly also was relevant because it provided Defendants with "notice…that the website was being used for illegal purposes" (*id.*), even though "notice" was insufficient, as a matter of law, for proof of the specific intent required for Travel Act violations (*see* Spear Br.).

- Evidence that Backpage gave discounts to advertising agents (aka "superposters"), who purchased large volumes of ads for their clients,

21

although none of the ads "listed" or "described" in the Indictment were posted by advertising agents. (2-ER-531.)

On July 27, 2023, the parties appeared for the Final Pretrial Conference. (11-ER-2848-3010.) Defendants sought clarification on inconsistencies in the rulings. For example, years ago, the prior Judge had ruled that many communications by lawyers were not privileged. (2-ER-546-549.) Based on that ruling, which was the law of the case, Defendants asserted they should be permitted to introduce evidence of those non-privileged communications without, as the new Judge had ordered, waiving privilege as to everything. (11-ER-2894-2898.)

Defendants also sought clarification as to the admissibility of evidence unrelated to the fifty "listed" ads. The ruling appeared to have precluded the defense from using attorney opinions not addressing the ads "listed" or "described" in the Indictment as "irrelevant," while allowing the government to present unlimited evidence of conduct unrelated to those ads. (11-ER-2899.) Defendants asserted there should be one standard that applied equally to both sides. (11-ER-2899-2900.)

With respect to so-called "notice" evidence, Defendants explained that, under the Court's rulings, the jury would learn various NGOs demanded that Backpage stop publishing all adult advertising because prostitutes or traffickers used the website, but the jury would not see Backpage's responses defending Backpage's constitutional right to publish adult advertising because the responses, even though

22

not privileged, were sent by lawyers. (11-ER-2903-2904.) Although Defendants had disputed the admissibility of "notice" evidence in various pleadings, their argument here was one of fundamental fairness: if "notice" evidence was to be admitted at all, then, in fairness, the responses to that evidence, too, should be admitted. (*Id*.)

Finally, Defendants sought to clarify whether they could isolate portions of prior judicial opinions addressing Backpage's First Amendment rights, redact the rest, and admit the isolated portions of those opinions, which had been central to each Defendant's subjective intent. (11-ER-2906.)

The District Court issued no further rulings, clarifying or otherwise, stating "my ruling is what my ruling is." (*Id*.)

Four days later, James Larkin killed himself. (11-ER-2847.)

## B.     The second trial commences.

On August 29, 2023, the trial for the remaining Defendants commenced. (29-ER-8151.) The trial was notable for many reasons, five of which will be addressed herein.

### 1.     No money laundering charges were proven.

Quoc Thai, the government's investigator, testified about his money laundering investigation. (45-ER-12838.) Thai's testimony and charts established

that: (1) nothing was concealed from the government; and (2) none of the funds in the money laundering counts could be designated as "proceeds" of crime.

### a. Thai establishes that none of the attributes of the funds were concealed from the government.

Thai established that none of the attributes of the funds for the money laundering convictions were concealed from the government. Thai testified Defendants sold Backpage to Ferrer in 2015 in a seller-financed deal. (45-ER-12930-12931, 12937; 46-ER-12973.) After the sale, Ferrer and his entities (Backpage, Website Technologies, and Ad Tech BV) made monthly loan payments to entities controlled by Defendants, which included Cereus Properties and Medalist Holdings, Inc. ("Medalist"). (38-ER-10699-10700, 10838.) Thai testified all the payments from Ferrer and his entities to Defendants and their entities were sourced from Backpage revenues. (45-ER-12856; 53-ER-152850, 15082.) Thai prepared numerous charts—admitted at trial—demonstrating the transparent flow of Backpage funds from Ferrer to Defendants. (25-ER-7171-7173.)

Thai's testimony and exhibits documented the *disclosure* of Backpage revenue as the source of the funds in all charged transactions. For example, Exhibit 1481 shows Backpage revenue being distributed to an entity controlled by the Defendants, Medalist. (25-ER-7173.) It then shows Backpage revenue as the "Total *Reported Income*" of the Medalist stockholder/officers (Lacey, Larkin, Brunst, and Spear) for tax years 2013-2015. (*Id*. (emphasis added).) Thai testified he used

24

corporate and individual tax records to create this exhibit. (45-ER-12849, 12853, 12855; 46-ER-12976-12977.)

Notably, Thai's spreadsheet, prepared from the tax returns of Defendants and their entities, showed that all of the "Reported Income" paid to Lacey, Brunst, and Spear was "Backpage revenue earned for that year." (45-ER-12856; *see also* 53-ER-15082 ("[T]he records show that the funds" held in "Website Tech" and "Cereus" bank accounts "c[a]me from Backpage.com.").) Thai then followed those "funds from Backpage"—that had been declared in tax returns—until they "ultimately land[ed] in the accounts of the [D]efendants." (45-ER-12857; 25-ER-7171.)

Further, Thai testified that each of the bank accounts holding Backpage revenues were properly titled in the actual names of Defendants or their companies. (45-ER-12959-46-ER-12963.) None were titled with fictitious names, enabling Thai to *identify* the owner or controller of the funds, the amount of the funds, and the location of the funds. (25-ER-7171.)

Finally, regarding Lacey's transfer of funds to a bank account in Hungary— the basis of Lacey's international *concealment* money laundering conviction—Thai conceded he "did not search for an FBAR at any time" (46-ER-12965), even though Thai knew an FBAR was used "[t]o *report* the existence of a foreign bank account by the owner" to the government. (46-ER-12963 (emphasis added).)

Unconvincingly, Thai said he "didn't know" he could ask the Treasury Department for the FBAR as part of his investigation. (46-ER-12967.)

### b. There was no proof of purpose or intent to conceal.

Thai admitted he did not know the purpose of any of the transfers for any of the money laundering counts. (45-ER-12929, 12938.)

### c. There was no proof the funds were proceeds of SUA.

Thai testified he did not trace the funds at issue to any particular ads. (45-ER-12942.) He also "didn't analyze any advertisements" during the investigation. (45-ER-12951.) Tellingly, this case was Thai's first investigation involving revenue from a website hosting third-party speech. (45-ER-12947.)

Notwithstanding these admissions, Thai's own exhibit showed the importance of tracing in this case. Exhibit 1480 showed that Backpage generated millions of dollars of revenue from publishing non-adult ads for unquestionably lawful activities like automotive, jobs, rentals, musicians, and real estate (25-ER-7172), and the government presented no evidence that any non-adult ads were associated with unlawful activity. Thus, Thai, himself, disproved the government's specious claim that all Backpage revenue came from Travel Act violations. (*Id.*)

Further, Thai's analysis of the revenue generated by the "adult entertainment" ad categories failed to distinguish between the revenue generated from ads associated with lawful activities like stripping, strip clubs, phone sex, domination,

26

and escorting, and the revenue, if any, from ads associated with illegal activities like prostitution. (*Id.*) But, even if Exhibit 1480 had made that critical distinction, Thai quantified revenues for the wrong time period. In Exhibit 1480, Thai categorized revenue for ads posted to Backpage from 2010-2012 (25-ER-7172), but Exhibit 1479 showed the funds in the money laundering counts were generated by ads published ***four years later***, from December 31, 2015, to August 2016. (25-ER-7138-7171.) Thai conceded he presented no analysis of revenue earned from December 31, 2015, to August 2016. (45-ER-12952.)

Finally, Thai did not distinguish between revenues Backpage generated from ads in the United States versus revenue Backpage generated from ads overseas or on websites other than Backpage. Notably, Ferrer testified that his transmission of funds from Website Technologies to entities controlled by Defendants included revenue generated from ads posted to Backpage ***and*** ads posted to another website, Crackr. (38-ER-10838.) Ferrer testified Crackr operated in Australia (38-ER-10614), where prostitution is legal. Funds generated from ads published on Crackr in Australia, or on Backpage in overseas locations, could not be designated as "proceeds" of Travel Act violations because the Travel Act only applies to prostitution "in violation of the laws of the ***State***" where the prostitution occurred. See 18 U.S.C. § 1952(b)(1) (emphasis added). Yet, Thai did not distinguish these various categories of revenue. (25-ER-7173.)

27

### 2. The case against Lacey was based entirely on "notice" evidence.

There was no evidence that Lacey was involved in Backpage's operations. A corporate organization chart showed that Lacey had no role in the oversight of any of the subsidiaries on the "business side" of VVMH, including Backpage. (*Id*.) Backpage was in a different building from Lacey and the writers. (35-ER-9791; 43-ER-12098-10299.) Ferrer, the government's star witness, described Lacey as a "layer away" from Backpage's operations. (40-ER-11307.) Another member of Backpage's senior management—who worked at VVMH, beginning in its print advertising department in 1998, and then for thirteen years at Backpage—never met Lacey during his decades' long tenure at VVMH. (48-ER-13680.) There was no proof that Lacey saw any of the ads "listed" or "described" in the Indictment. There was no proof Lacey ever had contact with any website user.

In the absence of this requisite proof, the government was allowed to present evidence to show that Lacey was on "notice" from politicians, ministers, and celebrities that prostitutes or traffickers had used the website. Throughout the trial, the Court indicated that she viewed "notice" evidence as a permissible substitute for proof of the requisite specific intent. (*E.g.*, 35-ER-9918.) The government even argued during closings that this "notice" evidence was sufficient to convict Lacey. (51-ER-14493-14494.)

Moreover, the Court allowed the government to introduce "notice" evidence, even when the government failed to satisfy the most basic evidentiary rules, as if the fact that an exhibit was claimed to be admissible for "notice" meant that no other rules of evidence needed to be considered. For instance:

- The Court admitted a report prepared by AIM Group, entitled "*Backpage replaces Craigslist as prostitution-ad leader*," claiming that Backpage had become "the new leader in prostitution advertising." (26-ER-7184-86.) There was no proof Lacey saw, or knew of, the report. The Court admitted it over objections for hearsay, foundation, relevance, prejudice, and others, instructing the jury that "the exhibit is not offered for the truth of the content." (35-ER-9887-9888.) Incredibly, the Court immediately allowed the government to ask Ferrer about "***the accuracy***" of information in "***this report***." (35-ER-9888 (emphasis added).) Defendants' objection to the obvious use of the report for its truth was overruled. (35-ER-9890.)

- Over objections, the Court allowed admission of a second AIM Group report stating Backpage had earned "$17.5 million for online commercial-sex ads in 2010." (26-ER-7183; 35-9892.) Again, there was no proof Lacey saw, or knew of, the report. The Court allowed

29

Ferrer to testify to the accuracy of the report, even though it purportedly was admitted for notice—not for the truth of its content. (*Id.*)

- The Court admitted a fax received at VVMH, purportedly sent by the Montgomery County Maryland Department of Police ("DOP"), claiming Backpage's publication of "countless" ads associated with prostitution or trafficking violated federal law. (25-ER-7105-7106.) There was no proof Lacey ever saw, or knew of, the fax. There also was no proof the fax actually came from the DOP or whether anything in it was true. It was obvious hearsay. It discussed trafficking with no connection to any count; and, it expressed a legal conclusion about the ultimate issue in the case. The Court overruled all objections, stating only that the exhibit "was not offered for the truth." (35-ER-9897.)

- The Court admitted a letter from NAAG telling an attorney for Backpage that "prostitution—including ads trafficking children—are rampant on the site." (24-ER-6745-6747.) There was no proof Lacey ever saw this letter. Although obvious hearsay, the Court admitted the exhibit, saying it was "not offered for the truth of the content in it." (35-ER-9910.) Yet, when denying a mistrial motion, the Court said the exhibit was admitted to prove "***the knowledge of certain defendants as to what was going on on Backpage***," *i.e.* for the truth of the matters

30

asserted in the exhibit. (35-ER-9919 (emphasis added).) Similarly, although the Court initially said the exhibit was admissible because it put "defendants on notice" (35-ER-9918), just minutes later the Court disclaimed ever saying the exhibit had been admitted for "notice." (35-ER-9919.)

- The Court admitted an email forwarding an article from the *New York Times* entitled "*How Pimps Use the Web to Sell Girls*," in which the author quoted others accusing Backpage of becoming a "hub" for "pimps trying to sell girls" and saying Backpage had earned millions "from prostitution advertising." (25-ER-7117-7119.) The article was hearsay embedded in hearsay, discussing trafficking with no connection to any count, and expressing a legal conclusion about the ultimate issue in the case. The Court admitted the exhibit over these objections. (37-ER-10366.)

### 3. No limitation was placed on child-sex trafficking evidence.

The Court imposed no limitations on the government's introduction of child-sex trafficking evidence, even though no Defendant faced such a charge and the ages of advertisers had no bearing on the Travel Act elements. Defendants moved for mistrial five times, each of which was denied.

31

In addition to Defendants' standing objection to the admission of this irrelevant and unduly prejudicial evidence, the District Court also admitted exhibits discussing child-sex trafficking without regard to basic evidentiary rules. For example, over objections, the government admitted an email through Ferrer which contained nothing but a link to a petition found on www.change.org, entitled "*Tell Village Voice Media to Stop Child Sex Trafficking on Backpage*." (25-ER-7104.) It was a prejudicial hearsay accusation from unidentified parties claiming that Backpage violated federal law. (35-ER-9893-9894). It was admitted, nonetheless. (*Id.*)

In just one morning, the government admitted 20 exhibits concerning child-sex trafficking, including an exhibit with three references in the first paragraph. (37-ER-10290-10291.) The defense moved for a mistrial asserting that the prejudice of the evidence admitted that morning, alone, vastly exceeded the prejudice causing the prior mistrial. (37-ER-10291-10294.) In denying the mistrial, the District Court refused to apply the mistrial standard from the first trial, stating it was just "water under the bridge" concerning "different testimony." (37-ER-10294.)

The Court then ruled that the age of a person featured in an ad was "relevant" and admissible to show the Defendants' "knowledge about whether or not indeed the ads that were placed on Backpage were prostitution ads" as long as the government "tie[d] each of these exhibits to some of the counts in the indictment." (37-ER-

32

10296.)    Setting aside the obvious flaws in that evidentiary ruling (proof of an advertiser's age does not equal proof of a Travel Act violation), the District Court did not even enforce this new rule.  None of the 20 exhibits that prompted the mistrial motion related to any of the Travel Act charges.

The Court's failure to enforce this new rule continued throughout the trial. Incredibly, the Court allowed a minister to testify at length about child sex-trafficking, including testimony that his organization, Auburn, had "stacked…the shoes of children" outside VVMH's office to "symbolize" children "that had been sold for sex on Backpage."  (43-ER-12333-12334.)  Defense counsel moved for a mistrial, asserting that this testimony, unconnected to any Travel Act counts, was "way beyond" what even the Court said was permissible.  (43-ER-12335-12336.) The Court denied the motion.  (43-ER-12338.)

When the defense renewed its mistrial motion at the conclusion of the minister's testimony (44-ER-12410-12414), the Court acknowledged his "continued" use of "the phrase 'child prostitution'" (44-ER-12438).  Although the minister's extensive child-sex trafficking testimony was unrelated to the substantive charges in the case, which the Court previously ruled would be required, the Court denied the mistrial motion, saying the minister simply was "putting forward his own beliefs."  (44-ER-12439.)  Additionally, the Court claimed defense counsel had somehow opened the door to the minister's child-sex trafficking testimony by

subsequently ***cross-examining*** the minister about his ***direct testimony*** that the government elicited over defense objections. (44-ER-12439-12440.)

### 4. Good faith evidence was precluded.

The Court precluded evidence of good faith. First, there was an ever-shifting set of rules on attorney-related evidence. At the outset, the Court prohibited defense counsel from using the word "lawyer." (34-ER-9467.) Lacey's counsel was admonished for stating that Lacey relied, in good faith, on Ferrer, who had "attorneys advising him." (34-ER-9432; 34-ER-9464.) Further, the Court ruled that defense counsel would be precluded from asking Ferrer about the fact that he had hired lawyers unless defense counsel established the prerequisites of an advice-of-counsel defense. (34-ER-9475-9481.)

Initially, government counsel referred to Backpage's lawyers as "representatives" when questioning Ferrer. (39-ER-10926.) However, as the trial progressed, the government repeatedly opened the door to the admission of non-privileged attorney letters and emails, as well as the existence of lawyers, by soliciting testimony from Ferrer about Backpage's lawyers and admitting exhibits addressed to Backpage's lawyers through Ferrer. (11-ER-2793-2795.) When Defendants attempted to ask Ferrer about non-privileged responsive letters, the Court precluded all such questioning. (*E.g.*, 40-ER-11182.)

Second, Defendants were precluded from presenting evidence about prior judicial rulings, even where the government had repeatedly opened the door. As Defendants noted in a chart submitted to the Court, the government repeatedly solicited testimony about the facts that led to the *McKenna* case (relating to a newly enacted age verification law targeting Backpage) and to the *Dart* case (relating to a sheriff's harassment of Backpage's credit card processors). (11-ER-2790-2793.) Defendants, however, were prohibited from asking Ferrer about the existence of those cases, their underlying facts (such as a letter to Mastercard and VISA in response to Sheriff Dart's threats), or their outcomes. (41-ER-11511-11515.) Incredibly, the government admitted an exhibit through Ferrer that referenced Lacey's arrest by Sheriff Arpaio. (11-ER-6728.) But, when counsel sought to ask Ferrer about that portion of an ***admitted exhibit***, which accused Lacey of being a lawbreaker, the Court precluded all such questioning because the arrest had been the subject of prior litigation. (40-ER-11370-11371.)

Third, Defendants were precluded from testifying about the very things they considered when making their determinations that Backpage operated lawfully and well within the protections of the First Amendment. (49-ER-13844-13874.) Defendants could not testify about ***non-privileged*** attorney letters that they had read because they had ***not waived privilege as to those non-privileged letters***. (49-ER-13844-13847.) Defendants even filed detailed proffers as to the statements and

35

documents they had relied upon in making their determination that Backpage was a lawful operation (11-2752-2774), but they were precluded from telling their side of the story (49-ER-13844-13847).

### 5. Government witnesses were allowed to testify about things for which they had no foundation.

Although Defendants were precluded from testifying about statements and documents on which they relied in determining the legality of Backpage, the Court repeatedly allowed government witnesses to testify about things for which they had no personal knowledge. For example, over objections as to foundation, hearsay, and relevance, the Court allowed the government to admit emails through Ferrer that he never received, for which he was not the document custodian, and that had nothing to do with the purported conspiracy, such as an email between Lacey and his ex-wife (37-ER-10393 (admitting 26-ER-7242)), an email between Lacey and his attorney, Becker (38-ER-10835 (admitting 24-ER-6705-6709)), and an email between Lacey and a journalist (37-ER-10367-10368 (admitting 26-ER-7240-41)).

The Court occasionally restrained the government, but then quickly returned to giving it a free hand. For example, the Court precluded Ferrer from testifying about what he thought someone else meant when writing the phrase "secretive hobby," because that called for "speculation as to what someone else intended when they wrote something." (35-ER-9691-9692.) But the Court then allowed Ferrer to

36

speculate on the stand for weeks that advertisers intended unlawful conduct when they wrote and posted facially lawful adult ads. (*See* Spear Br. 19-20.)

Incredibly, the Court allowed Ferrer, a lay witness, to opine that all Backpage ads for the lawful activities of escorting, massages, and dating—***millions of ads Ferrer had never seen and the government did not show to Ferrer or the jury at trial***—actually were ads for illegal prostitution. (35-ER-9798-9799.) Ferrer ultimately conceded on cross examination, with respect to the couple dozen of ads he was shown at trial, he was only making an "educated guess" that those facially lawful ads were for illegal prostitution. (40-ER-11261-11262.)

### C. The verdict was the unreliable result of a flawed trial.

At the conclusion of the government's case, Lacey and his co-Defendants moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29"). (48-ER-13715-13756; 13779-13792.) The District Court declined to rule on the motions that day, but, instead, took them "under advisement." (48-ER-12792.) Consequently, in this case, in which the defense had been derailed by one inconsistent ruling after another, 49 money laundering charges would be sent to the jury, even though there was no proof of proceeds, no tracing, and proof of ***disclosure*** rather than ***concealment***.

On November 16, 2023, after several messages from the jury that it was deadlocked (53-ER-14973, 15053, 15170), and after an implicit and then explicit

37

*Allen* instruction was given (53-ER-15053-15054), the jury announced its verdict. The jury acquitted Lacey of one count, convicted him of Count 100, and was unable to reach a verdict as to Lacey on his remaining 84 counts. (2-ER-411-454.)

Lacey subsequently filed written supplements to his oral Rule 29 motion. (7-ER-1783-1796; 5-ER-1303-1313.)

### III. The District Court rules on Rule 29 motions.

In ruling on the outstanding Rule 29 motions, the Court ***acquitted Lacey of 50 counts***, for an overall total of 51 acquittals, but affirmed his sole conviction for Count 100. (1-ER-267-2-ER-350.) The Court characterized the case against Lacey as "attenuated." (2-ER-301.)

With respect to the conspiracy charge, for which the jury reached no verdict as to Lacey, the Court refused to dismiss this hung count because evidence in the record showed: (1) Lacey's newspapers began making less money by 2009; (2) Backpage's revenues were increasing; (3) a writer at one of Lacey's seventeen newspapers had written a blog post about The Erotic Review ("TER") website, saying TER contained "prostitution reviews" and some Backpage ads had links to TER; (4) NGOs had confronted Lacey and others about prostitution associated with Backpage ads; (5) Lacey gave the impression he knew prostitutes had used the website; and (6) Lacey knew from media coverage that some prostitutes or traffickers had placed ads on the website. (2-ER-301-302.) In other words, the Court

38

viewed the not-for-the-truth "notice" evidence, alone, sufficient to deny Lacey acquittal of the conspiracy count. (*Id*.)

The Court found "an insufficiency of trial evidence supporting a direct theory of liability for any of the Travel Act charges brought against [Lacey]," but ruled he could, nonetheless, be held liable under *Pinkerton* because he had been told by NGOs and others that prostitutes had used the website. (2-ER-309-310.) Here, again, the Court justified denying Lacey acquittal of the Travel Act counts based on the not-for-the-truth "notice" evidence.

Nonetheless, the Court acquitted Lacey of Travel Act Counts 19-51, for ads published to the website after the sale of Backpage to Ferrer in 2015, ruling that the conspiracy ended at the sale to Ferrer in 2015 and there was no proof of Travel Act violations (by Lacey or anyone else) after that point. (2-ER-318-19.)

The District Court acknowledged that the "Government made no attempt to trace" funds in any money laundering count to any particular Travel Act violations. (2-ER-334-335.) Consequently, the Court acquitted all charges brought under 18 U.S.C. § 1957 (Counts 69-99) because the government established nothing but "mere speculation" as to those funds being proceeds. (2-ER-335.) Yet the Court upheld all convictions under Section 1956, ruling that, notwithstanding the lack of tracing, the jury could have "infer[red] that the funds were proceeds." (2-ER-323.)

39

The Court did not address the First Amendment problem with "infer[ring]" proceeds in the context of a prosecution of a publisher over its publishing revenues.

The Court upheld Count 100—Becker's January 3, 2017, transfer of funds from the United States to Hungary on Lacey's behalf (2-ER-327-333)—even though that ruling was irreconcilable with other rulings. First, the funds at issue were generated after the sale of Backpage to Ferrer in April 2015, with the first transfer of funds from Ferrer occurring on December 31, 2015. (25-ER-7171.) This was the post-sale period as to which the Court—in the same opinion—had ruled that no Travel Act violations were proven. (2-ER-318-319.)

Second, upholding the conviction for Count 100 was inconsistent with certain Section 1957 acquittals. Critically, the $16.5 million at issue in Count 100 was the subject of three other sets of charges brought under Section 1957, as the $16.5 million was also charged as Counts 88-92 (funds deposited into GRATs), 94-98 (consolidation of GRATs into IOLTA), and 99 (transfer from IOLTA to Hungarian bank account). (25-ER-7165-7169, 7171.) The Court acquitted these funds three times when the Court acquitted all Section 1957 charges on the basis that the government had presented nothing but "mere speculation" that those funds were proceeds. (2-ER-334-335.) It remains unclear how those very same funds—the subjects of three sets of acquittals for failure to establish proceeds—could possibly support the Count 100 conviction, an inconsistency left unaddressed by the Court.

40

The District Court's rulings on the intent-to-conceal element were equally inconsistent. On the one hand, the District Court acknowledged both that it had instructed the jury that "concealment" meant "the act of preventing disclosure or refraining from disclosing" and that the government's "expert testified that he could follow the trail of funds with relevant *ease*." (2-ER-329 (emphasis added).) On the other hand, the Court found that the jury "could possibly have divined" an intent to conceal from Lacey's statement that he wanted to put some funds where "the government 'could not access them.'" (2-ER-330.) The Court acknowledged that the government "had not provided the Court with a case in which a defendant's intent to shield assets from government seizure" was sufficient to establish the requisite intent to conceal (*id.*), and such a finding would have been inconsistent with Lacey's stated intent to pay taxes, his filing of FBARs, and the Court's own jury instruction on "concealment," but the Court nonetheless upheld the conviction. (2-ER-331.)

IV. **The Court sentences Lacey by inconsistently applying her own rulings.**

At the outset of the two-day sentencing, the Court issued several rulings. First, the Court reaffirmed that the purported conspiracy ended with the sale of Backpage to Ferrer in 2015. (1-ER-151.)

Second, consistent with that ruling, the Court ruled that victim information concerning ads published to the website after the conspiracy ended in 2015 would not be considered. (1-ER-151-52.)

Third, the Court initially said it would use the harm allegedly suffered by website users to calculate Lacey's Guidelines range for his money laundering conviction, rather than the loss-table method, even though, as counsel noted, there could be no victims (or harm) from Lacey's act of transferring funds generated after 2015. (1-ER-177-182.) The Court also intended to apply the victim-related enhancements to Lacey. (1-ER-183.) Then, later that day, the Court changed course, announcing that Lacey's Guidelines range for his money laundering conviction would be calculated using the loss-table method, and victim-related enhancements would not be applied because the sentence "must reflect the count of conviction." (1-ER-194-196.) The funds transferred—$16.5 million—would be treated as proceeds and applied to the loss table to increase Lacey's base offense level from 8 to 28 (1-ER-194), even though the Court had previously ruled that no SUA, and thus no proceeds of SUA, were proven for the time period when the funds had been generated. (2-ER-318-319.)[5]

---

[5]     Additionally, the Court had previously acquitted charges relating to those same funds three times because those funds were also charged under Section 1957 and, in dismissing all 1957 charges, the Court ruled that the government failed to prove that those very same funds were proceeds. (2-ER-334-335 (acquitting Lacey of Counts 88-92, 94-98, and 99 because the government had not established at least $10,000 of proceeds "beyond mere speculation").) But at sentencing, the Court said the prior acquittals involving the same funds had no bearing on counting the funds as proceeds on the loss table for Count 100. (1-ER-196.) Further, the Court refused to apply the new Guideline on acquitted conduct because it would not be in effect for two months. (1-ER-149.)

42

The following day, the Court sentenced Lacey to 60 months of incarceration, a $3,000,000 fine, 36 months of supervised release, and other conditions of release. (1-ER-111-114.)

The Court reasoned that incarceration was justified because Lacey "had notice" of incidents where prostitutes or traffickers had used the website, but Lacey did not shut down the website. (1-ER-104; 110 ("You were put on notice….You didn't [shut down].").) The Court found that Lacey had "knowledge that the majority of Backpage's revenue came from the sale of…sex-for-money ads" (1-ER-104), even though the Court had previously ruled that the government, itself, had not traced any of the funds to particular Travel Act violations (charged or uncharged) (2-ER-334-335), the government had not proven proceeds "beyond mere speculation" (*id*.), and no SUA (*i.e.* Travel Act violations) was proven during the time Backpage generated the funds at issue (2-ER-318-319). Moreover, this justification—knowledge of illegality—was impossible to square with the Court's finding, moments later, that Lacey had a "***bona fide held belief that what [he was] doing was not illegal***." (1-ER-110 (emphasis added).)

The Court ruled that the funds that Lacey transferred to Hungary were "illegal proceeds" because of "[a]ll of those Travel Act violations that your colleagues were convicted of." (1-ER-106.) But this finding was incompatible with Spear's actual convictions, which related to ads published years earlier, between September 2013

43

and February 2015 and generating less than two hundred dollars of revenue.  (2-ER-411-420.)  Moreover, the Court had already ruled that, at the time when Lacey's funds at issue were generated (December 2015 to August 2016), no Travel Act violations were proven.  (2-ER-318-319; 1-ER-151.)

Finally, the Court said that the sentence took "into consideration the[] views" of the "victims" who testified at sentencing (1-ER-107), even though just the day before, the Court had ruled that victims would not be considered at Lacey's sentencing.  (1-ER-194-196.)

The District Court denied bail pending appeal.  The Court found that neither Lacey nor his co-Defendants presented any "substantial issues" for appeal.  (1-ER-131-132.)  This ruling was surprising because the Court had previously found the exact opposite:  "[T]here are substantial issues that have to be considered by the Ninth Circuit" that "may change the complexity" of the case.  (5-ER-1295.)

On September 3, 2024, Lacey timely filed his notice of appeal.  (28-ER-8015-8017.) On September 11, 2024, Lacey self-surrendered and began serving his sentence.  (29-ER-8204.)  On November 21, 2024, this Court granted Lacey bail pending appeal.  (Doc. 36.)  The District Court then put Lacey on house arrest.

44

## SUMMARY OF ARGUMENT

This Court should vacate Lacey's sole count of conviction for international concealment money laundering. There are no cases from this Circuit or elsewhere upholding a conviction when the record shows that there was: (1) no concealment of any of the attributes of the funds, but, instead, full disclosure; (2) no intent to conceal, but, instead, an expressed intent to reveal, both before and after the charged transaction occurred; (3) no proceeds proven; (4) no tracing of proceeds to the transaction at issue; and (5) no knowledge that the funds at issue were proceeds.

For an international concealment money laundering conviction, the government must prove beyond a reasonable doubt that the defendant transmitted "funds from a place in the United States to…a place outside the United States…knowing that the…funds involved…represent the proceeds of some form of unlawful activity and knowing that such…transmission…is designed in whole or in part…to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of [SUA]." 18 U.S.C. § 1956(a)(2)(B)(i).

In the lead case on this charge, *Cuellar v. United States*, 553 U.S. 550 (2008), the Supreme Court reversed the defendant's conviction and provided baseline rules for such charges. *See id*. at 561-68. First, the "critical" movement of funds is the movement of funds from inside the United States to a foreign country. *Id*. at 562. Second, the Court defined the term "designed" to mean "purpose or plan, *i.e.* the

45

intended aim of the transportation." *Id*. at 563. Third, in his concurrence, Justice Alito explained that the focus is whether the international movement of funds concealed attributes of the funds *from the government*, meaning "it would have been harder for *law enforcement authorities in this country*" to ascertain the attributes of the funds. *See id*. at 569 (Alito, J., concurring (emphasis added)).

Against this backdrop, Lacey never should have been charged. If his conviction stands, then any person who hires multiple lawyers, talks openly with bankers, holds funds in accounts in their own name, and discloses attributes of funds to the government through tax filings and FBARs can be charged with concealment money laundering. For good reason, no court has ever endorsed such a charge.

## ARGUMENT

### I.     None of the attributes of the funds were concealed from the government.

The "[e]vidence of concealment must be *substantial*." *E.g., United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006). In contrast, this appeal asks a remarkable question: Whether a transaction involving *no concealment whatsoever* is chargeable under Section 1956? Clearly, the answer is no.

There is no known opinion that has ever upheld a concealment money laundering conviction when there was no concealment. Instead, every court that has addressed the issue has rejected the idea that money spending, alone, is chargeable. *See United States v. Caldwell*, 560 F.3d 1214, 1222 (10th Cir. 2009) ("Money

46

laundering requires more than simply writing a check with the proceeds….[Section] 1956 is not a 'money spending statute.'"); *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) ("The money laundering statute…has no application to the transparent division or deposit of…proceeds."); *United States v. Olaniyi-Oke*, 199 F.3d 767, 771 (5th Cir. 1999) ("Money spending is not criminal."); *United States v. Shoff*, 151 F.3d 889, 892 (8th Cir. 1998) ("[T]he money laundering statute may not be so broadly construed that it becomes a 'money spending statute.'").

Here, everything was ***disclosed to the government***. The government knew the source and nature the funds because corporate and stockholder tax filings disclosed that the funds originated from Backpage. (45-ER-12856; 53-ER-15082; 25-ER-7173; 53-ER-15082.) Thai, the government's expert, then followed the flow of the funds with "ease" from Backpage and its affiliates to the bank accounts of the individual Defendants, including Lacey, with all those accounts properly identifying the Defendants as the account holders or beneficiaries. (2-ER-329; 45-ER-12959-46-ER-12963; 25-ER-7138-7171.) On this basis, alone, this Court must vacate Lacey's concealment money laundering conviction (and, indeed, all of Appellants' concealment money laundering convictions). *See, e.g.*, *Johnson*, 440 F.3d at 1290-94 (vacating five convictions because defendant's transfers from accounts he or his company controlled to his mother's bank account in Luxembourg "were simple and

47

straightforward banking transactions, easily discovered through a cursory review" of bank records).

Importantly, Lacey's sole count of conviction included ***yet another level of disclosure to the government***—the timely filing of the FBARs, which disclosed the amount, location, and U.S. owner of the funds located in Hungary (28-ER-7983-7997)—funds that the government already knew originated from Backpage. Through these disclosures (corporate and stockholder tax filings and the FBARs), ***Lacey told the government*** that his funds derived from Backpage and exactly how much and where those funds were.

## II. There was no proof of intent to conceal.

### A. The use of bank accounts with actual names is incompatible with an intent to conceal.

Lacey and his co-Defendants transferred their funds to and from bank accounts bearing the actual corporate or individual names of the account holders (45-ER-12959-46-ER-12963; 25-ER-7138-7171)—actions incompatible with an intent to conceal. Courts have repeatedly held that the transfer of funds into accounts held in the name of a defendant defeats any claim of an intent to conceal. *See United States v. Esterman*, 324 F.3d 565, 571 (7th Cir. 2003) (vacating four convictions and concluding that the "government's proof" of concealment "fell short" because all the defendant did was "simply ma[ke] deposits into other bank accounts that were correctly identified"); *United States v. Enbry,* 644 F. App'x 565, 570 (6th Cir. 2016)

48

(recognizing that there was no proof of "a ploy to disguise the nature, location, source, ownership, or control of the proceeds" when the defendant's "name was on the account"). Similarly, in *United States v. McGahee*, 257 F.3d 520 (6th Cir. 2001), the Sixth Circuit vacated nine concealment money laundering convictions because defendant's issuance of checks from his company's bank account made payable to himself, to cash, or to his mortgage lender—which were easy to trace—did "not evidence a design to conceal the proceeds." *Id*. at 528.

Moreover, as the District Court recognized, Thai, the "Government's expert," "testified that he could follow the trail of funds with [] ease" (2-ER-331; 45-ER-12959), which is an additional ground to vacate every concealment money laundering conviction in this case. *See Esterman*, 324 F.3d at 572 (reversing convictions where "prosecutors easily traced [defendant's] transfers from one account to the other"). Indeed, the D.C. Circuit has vacated concealment money laundering charges because:

> An observer who reads the endorsement on the initial check and studies the names and numbers on the subsequent deposit slips and checks could discern the money trail with ease. ***The record has no suggestion that the prosecutors and law enforcement agents had any difficulty doing so.***

*Adefehinti*, 510 F.3d at 323-24 (emphasis added).

49

The record makes clear that neither Lacey nor any defendant was hiding his money—instead, they openly and conspicuously disclosed their relationship to their funds to the government and the world. To sustain their concealment money laundering convictions would far exceed the bounds of Section 1956.

**B.** **Lacey's stated intent to disclose and his actual disclosure to the government were incompatible with an intent to conceal.**

This conviction is the only known case where a defendant stated his intent to disclose to more than one person (before and after the charged transaction), and then filed disclosures with the government, but, nonetheless, was somehow charged and convicted of intending to conceal that same information from the government. Unsurprisingly, the courts addressing disclosures to the government (of a much lesser quality than what was done here) have uniformly ruled that a defendant's disclosure of his relationship with proceeds (or an asset obtained with proceeds) in a filing or record is incompatible with an intent to conceal. *See, e.g.*, *Rockelman*, 49 F.3d at 422.

In *Rockelman*, the Eighth Circuit reversed a conviction for concealment money laundering on a factual record akin to this record. There, Rockelman purchased a cabin with cash from his drug trafficking. *See id.* at 422. He put title in the name of his company, his ownership of the company was a matter of public record, and "the bills of sale transferring the cabin first to Rockelman's company and then from the company to [his nephew] were on file at the county courthouse."

50

*Id*. The Court found "Rockelman's conspicuous connection with the property" as documented in public records to be incompatible with an intent to conceal, ruling that the "[a]pplication of the money laundering statute to these facts would turn the money laundering statute into a money spending statute," which Congress never intended. *Id*. (quotations omitted).

Here, Lacey's words and actions both were incompatible with an intent to conceal. Both before and after Becker's transfer to Hungary, Lacey expressed an intent to reveal attributes of the funds to the government by filing FBARs and paying taxes. (24-ER-6707; 44-ER-12582.) Just a few weeks after the transaction, he wrote to his attorney asking "***who is reporting to govt?***" (24-ER-6706 (emphasis added).) Lacey then timely submitted to the government his initial FBAR and all subsequent FBARs. (28-ER-7983-7997.) Notably, the FBARs were disclosures on top of corporate and stockholder tax returns reporting Backpage as the source of the funds, as well as the transparent transfer of the funds between accounts in which Lacey was the owner or beneficiary.

Under these circumstances, this Court must vacate Lacey's concealment money laundering conviction. *See Rockelman*, 49 F.3d at 422; *United States v. Stephenson*, 183 F.3d 110, 120-21 (2d. Cir. 1999) (reversing conviction because the title of the car that defendant purchased with proceeds was put in his name and this type of "open and notorious" purchase, as documented in a public record, was

incompatible with an intent to conceal); *United States v. Gotti*, 457 F. Supp. 2d 411, 428 (S.D.N.Y. 2006) ("[I]t strains credulity for the Government to suggest that Gotti is somehow attempting to conceal" the source of the funds when the funds were obtained from the sale of a home and Gotti had previously admitted, as part of plea in a prior case, that the home was purchased with proceeds).

In sum, no court has recognized an intent to conceal under circumstances such as those here. Doing so here would criminalize any transfer of funds regardless of the defendant's stated intent and actions. Congress did not intend Section 1956 to be weaponized this way. *See, e.g.*, *Rockelman*, 49 F.3d at 422.

### C. The only proof regarding Lacey's purpose for the transfer was to stabilize his banking and establish a trust for his sons.

There was no proof that Becker transferred the funds so Lacey could conceal the attributes of the funds from the government. Thai, the government's only witness who testified about the transfer, admitted he did not know the purpose of the transfer. (45-ER-12929, 12938.) In contrast, Becker testified that his "client's motivation" for forming and funding the Hungarian trust was "to place his monies in an account that won't be closed." (49-ER-14018.) The funds were placed in a trust with Lacey's sons as beneficiaries as part of Lacey's ongoing estate planning. (49-ER-13964.) This international transfer was necessary because law enforcement officers had visited Lacey's banks, banks had closed Lacey's accounts, Lacey had five annuities

52

due for distribution, and Becker was concerned Lacey did not have a domestic bank that would accept deposit of the funds. (49-ER-13967.)

Lacey's motivation was corroborated by his own words. Lacey said that he sought to place his funds in an account at a bank where law enforcement could not interfere with his ability to access banking services. (24-ER-6707; 44-ER-12582.) Although the government has consistently claimed that these statements reflected an intent to conceal, the record belies this claim. The intent to prevent the government from interfering with one's ability to access banking services is entirely different from an intent to *conceal* one's banking altogether from the government. More importantly, even if this partial statement could somehow be twisted into an intent to conceal, the full statement defeats any such attribution. In the same breath, Lacey expressed his intent to disclose the transaction to the government through the filing of tax returns, he said he had accountants at the ready to file those tax returns (44-ER-12582; 24-ER-6707), and he timely filed the required disclosures, including a letter indicating that no taxes were due. (28-ER-1983-7997; 7953.) Indeed, Howard, the bank employee who interacted with Lacey, testified that she did not understand Lacey to be asking for help concealing "anything" from the government. (44-ER-12593.) That is because, as even the Court came to understand, Lacey never thought that what he was doing was illegal (1-ER-110), so he had no reason to conceal the attributes of his funds.

53

**III.   There were no proceeds.**

There is no proof that the funds at issue in the money laundering counts (more than $30 million), including the $16.5 million at issue in Count 100, were the proceeds of SUA.  Consequently, this Court must vacate Count 100, as well as every other money laundering conviction.  *See United States v. Lichtenberg*, 309 F. App'x 107, 109 (9th Cir. 2009).

> **A.   The First Amendment required the tracing of publishing revenue to the publication of ads outside of the protections of the First Amendment and in violation of the Travel Act, which did not occur.**

It is undisputed that the funds in this case were generated from Backpage's publication of third-party speech.  (25-ER-7172.)  Unlike funds generated from drug trafficking—an economic activity that is always illegal—the funds at issue here were revenues generated from an economic activity that is presumed to be lawful and constitutionally protected.  *See Bursey*, 466 F.2d at 1081-82.  As a result, the funds in the money laundering counts could not be claimed to be "proceeds" of SUA unless:  (i) the government proved (a) Backpage published specific instances of speech outside the protections of the First Amendment; (b) Backpage's publication of those ads constituted Travel Act violations; and (c) the amount of Backpage's revenues from the publication of those ads; and (ii) the government then traced those funds to the financial transactions at issue in the money laundering counts.  The government failed to do so.

As this Court has recognized, "[a]ll speech, press, and associational relationships are presumptively protected by the First Amendment." *Bursey*, 466 F.2d at 1081-82; *accord Playboy*, 529 U.S. at 817. When the government claims that speech falls outside the First Amendment, "the burden rests on the Government to establish that the particular expressions…are outside [the First Amendment's] reach." *Bursey*, 466 F.2d at 1081-82. Indeed, it is always the case that "the Government bears the burden of proving the constitutionality of its actions." *Playboy*, 529 U.S. at 816.

The Supreme Court has made it clear that "anecdotal evidence" and "conclusory statements" are insufficient as a matter of law. *See Playboy*, 529 U.S. at 819-20 (holding that "the Government must present more than anecdote and supposition"); *Sable Comms. of Cal. v. F.C.C.*, 492 U.S. 115, 129-30 (1989) (holding that "conclusory statements" about the risk of minors accessing "dial-a-porn" messaging was insufficient to support government restriction on phone sex services).

Instead, the First Amendment requires a "careful assessment" of the government's proof. *Playboy*, 529 U.S. at 819. For example, in *Playboy*, the Supreme Court held that a few dozen instances of minors exposed to pornography on television due to signal bleed was insufficient proof for the bald claim that "39 million homes with 29.5 million children had the potential to be exposed" to pornography on television. *See id*. at 820 ("The Government presented no evidence

55

on the number of households actually exposed to signal bleed and thus has not quantified the actual extent of the problem of signal bleed.").

In this case, the government utterly failed to meet its burden.

First, the government's failure to engage in any tracing means it failed to prove the funds in the money laundering counts were generated from Backpage's publication of ads that were both outside the protections of the First Amendment and proven to be Travel Act violations. Backpage earned millions of dollars in the U.S. from ads published in non-adult categories, like "automotive," "jobs," "rentals," "musician," and "real estate," and non-controversial adult categories like "striptease," or "phone sex." (25-ER-7172.) The government made no attempt to prove that any of the ads in these categories fell outside the protections of the First Amendment, which means that none of the revenue associated with those ads could possibly have been designated as "proceeds" of SUA. Backpage also earned millions of dollars of revenues from publishing ads overseas on Backpage.com, as well as in Australia (where prostitution is legal) on the website Crackr. Even if the government had proved that some of those overseas ads were associated with illegal prostitution (and it did not), it failed to prove that any ad associated with unlawful overseas prostitution violated the Travel Act, *i.e.* the publication of the ad facilitated a business enterprise involving prostitution offenses in violation of "the laws of the State in which they are committed or of the United States." 18 U.S.C. § 1952(b)(1).

56

As such, none of the revenue associated with overseas ads could possibly have been designated as "proceeds" of SUA.

Although the government claimed that **all** ads published to the escort, dating, and massage categories fell outside the protection of the First Amendment because those ads were, in reality, for illegal prostitution, its proof was "anecdotal" and "conclusory" at best, which was insufficient as a matter of law to prove that the publication of particular instances of speech were outside the protections of the First Amendment. *Playboy*, 529 U.S. at 819-20; *see Bursey*, 466 F.2d at 1081-82. At trial, Ferrer was shown a couple dozen ads from these categories. He made the "educated guess" that those ads were for illegal prostitution. (40-ER-11261-11262.) That "educated guess" then was used as a springboard to claim that millions of ads—*ads that neither Ferrer nor the jury had ever seen*—were for illegal prostitution. Because Ferrer never saw those millions of "particular expressions," there was no proof that the ads or the act of publishing them fell outside the protections of the First Amendment. Moreover, the government failed to overcome the presumption even with respect to the couple dozen ads Ferrer did review and testify about at trial. There is no case allowing the government to overcome the First Amendment's presumption based on "guesses," educated or otherwise. Consequently, because the government failed to prove that Backpage's publication of the millions of adult ads that were not in evidence at trial fell outside the protections of the First Amendment

57

or constituted Travel Act violations, none of the revenues earned from publishing those ads can be designated as "proceeds" of SUA.

Second, even if the government had established instances of speech that fell outside the protections of the First Amendment that also constituted Travel Act violations, there was no proof that any of the funds in the money laundering counts were generated by publishing those "particular expressions." Critically, even if this Court credits Ferrer's "educated guesses" as sufficient to establish Spear's Travel Act violations, the ads associated with Spear's convictions generated $175.00 in revenue for Backpage. (24-ER-6857-25-ER-6938.) Yet, Thai admitted that he did not trace that revenue, or any of the $30 plus million subject to the money laundering convictions (including Lacey's $16.5 million transferred to Hungary) *to any ads*, let alone the ads associated with Spear's convictions.

Notably, in acquitting all Section 1957 charges, the District Court recognized the government's failure to trace any funds to ads whose publication was outside the protections of the First Amendment and constituted Travel Act violations (2-ER-334-335), but nonetheless upheld the Section 1956 convictions at issue in this appeal on the basis that the jury could "infer" that the more than $30 million at issue in those counts was proceeds. (2-ER-323.) If the jury actually "infer[red]" more than $30 million in criminal proceeds from the $175.00 in revenues associated with Spear's Travel Act convictions, then both the jury and the District Court ignored the

58

First Amendment's requirement that all speech must be presumed lawful unless and until the government proves that *specific instances* of speech are not.

For all these reasons, the government failed to establish that the funds in the money laundering counts were "proceeds" of SUA. There is no known case that allows the government to bypass fundamental First Amendment principles as was permitted here.

**B. There are no proceeds because no Travel Act violations were proven at the time Backpage generated the funds.**

There is a second, independent basis for vacating all the money laundering convictions—no proof of Travel Act violations during the time that the website generated the funds in the money laundering counts. The District Court ruled that the conspiracy to violate the Travel Act ended at the sale of Backpage to Ferrer in April 2015, and that no Travel Act violations were proven after that sale. (2-ER-318-319; 1-ER-151.) Critically, the funds in each of the money laundering convictions, including Count 100, were revenue generated from ads published well *after the sale* (during the time period December 2015-August 2016) (25-ER-7171), meaning the time when no Travel Act violations whatsoever were proven (2-ER-318-319; 1-ER-151). Because no Travel Act violations were proven at the time that these funds were generated, and the purported conspiracy ended roughly a year before, there is no basis to find that the funds were "proceeds" of Travel Act violations. Consequently, Lacey's Count 100, as well as all money laundering

59

convictions, must be vacated. *See, e.g.*, *Lichtenberg*, 309 F. App'x at 109 (vacating money laundering convictions because there was no proof that the funds were proceeds).[6]

## IV.  There was no proof that Lacey knew that the funds were proceeds.

Lacey's lack of knowledge that his funds were proceeds of SUA is yet another independent basis to vacate his conviction. Because the purported conspiracy ended in 2015, and no Travel Act violations were proven at the time that those funds were generated in 2016 (2-ER-318-319), Lacey cannot be said to have knowledge of Travel Act violations that both the Judge and jury have said did not exist.

Instead, the entire case against Lacey was "notice" liability—a theory of liability that is incompatible with the First Amendment and criminal law *mens rea* principles. (*See* Spear Br.)  Lacey was not involved with Backpage's operations or growth strategies because he was purposefully segregated a "layer away" from all business-side activities of VVMH, including Backpage. (28-ER-8012.)  He had no contact with any advertisers or knowledge of any particular ad. In the absence of such proof, the District Court expressly relied on "notice" liability as the basis for both denying Lacey's Rule 29 motion and justifying his sentence (2-ER-301-302,

---

[6]    Moreover, there also were no proceeds because the Travel Act cannot be charged in the way done here. (*See* Spear Br.).

60

309-310; 1-ER-104, 110), even though the Court found Lacey had a "bona fide held belief that what [he was] doing was not illegal." (1-ER-110.)

## V.     Erroneous evidentiary rulings deprived Appellants of a fair trial.

There were several erroneous evidentiary rulings, any one of which, on its own, deprived Appellants of a fair trial. Because the government intends to retry Lacey on his hung counts (29-ER-8189), clear guidance from this Court is critical. Moreover, to the extent that any conviction survives the Appellants' other challenges, it should be reversed because the overall effect of these cumulative errors was unduly prejudicial. *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).

### A.     Certain evidentiary rulings rose to the level of constitutional error.

This Court conducts *de novo* review of whether a district court's evidentiary rulings violated a defendant's constitutional rights. *See United States v. Bahamonde*, 445 F.3d 1225, 1228 n.2 (9th Cir. 2006). Two categories of rulings rose to the level of constitutional errors.

First, Lacey was precluded from testifying or presenting any evidence about the very statements and documents he relied upon when making his subjective determination about the lawfulness of Backpage's operations. He was precluded from doing so even when the government opened the door. As a result, the jury was

61

"provided a one-sided picture of" Lacey that was unduly prejudicial. *See United States v. Waters*, 627 F.3d 345, 357 (9th Cir. 2010).

Indeed, in the zeal to prevent any reference to prior litigation, the Court banned Lacey's counsel from asking Ferrer about an ***admitted exhibit*** that accused Lacey of lawbreaking by referencing Sheriff Arpaio's arrest of Lacey. (11-ER-6728.) The jury heard about this prejudicial hearsay accusation, but not that all charges against Lacey were dismissed. Critically, even if the Court's ban on evidence concerning prior litigation had been somehow permissible (and it was not), Lacey's counsel should have been permitted the opportunity to question Ferrer about the outcome of an arrest discussed in an ***admitted exhibit*** as a matter of fundamental fairness. The preclusion of good faith evidence, including questioning of Ferrer about an accusation in an admitted exhibit, also violated Lacey's rights under the Due Process and Confrontation Clauses. (*See* Brunst Br.)

Second, Ferrer was allowed to opine that millions of instances of speech that neither he nor the jury had ever seen were ads for prostitution, which violated bedrock evidentiary and First Amendment principles. (*See supra* Argument III.A.)

**B.      Other categories of rulings were abuses of discretion.**

This Court reviews "for an abuse of discretion whether the district court erred by admitting or excluding evidence." *Bahamonde*, 445 F.3d at 1228 n.2.

### 1. The admission of speculative testimony was an abuse of discretion.

The District Court abused its discretion in admitting evidence and testimony for which there was no foundational knowledge whatsoever in violation of F.R.E. 602. For example, Ferrer was allowed to testify about private email exchanges between Lacey and his ex-wife, his lawyer, and a journalist, despite having no personal knowledge about those communications. (37-ER-10367-68, 10393; 38-ER-10835.)[7]

Further, Ferrer was allowed to speculate about things for which he had no knowledge such as his opinions about ads he had never seen, the meaning of ads,

---

[7] There is a second, independent reason that the admission of these emails was an abuse of discretion. The judge admitted them as coconspirator admissions (37-ER-10379-10385), but they ***did not include any statements in furtherance of a purported conspiracy***. None of Lacey's statements "induce[d] [the recipient] to join the conspiracy" or "assist[ed] the conspirators in achieving their objectives." *United States v. Eubanks*, 591 F.2d 513, 520-21 (9th Cir. 1979). Consequently, the District Court abused its discretion in admitting them. *See id*. Because the government's case against Lacey was so "attenuated" (2-ER-301), in that there was no basis for a "direct theory of liability for any of the Travel Act charges brought against [Lacey]" (2-ER-309), these rulings were highly prejudicial to Lacey.

In fact, the District Court cited one of these emails—in which Lacey discussed his support for the political movement to decriminalize prostitution—as a basis for denial of his Rule 29 motion. (2-ER-309.) Notably, this Court has expressed "discomfort" with the idea that a defendant's views about a movement would be admitted as probative of the defendant's participation in a crime. *See Waters*, 627 F.3d at 354-55. In any event, if the judge relied on this improperly admitted exhibit as proof of knowledge, there is no reason to think that the jury did otherwise.

63

what ambiguous words meant to the people who wrote them, and the activities of the people posting ads, all based solely on his review of ads about which he had no personal knowledge (35-ER-9691-9692, 9798-9799; 38-ER-10657-10658), even though the Court had excluded similar evidence as "speculation" (35-ER-9692). Clearly, Ferrer's testimony did not satisfy the personal-knowledge requirement of F.R.E. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Moreover, the District Court's stated basis for allowing Ferrer's speculation about ads—the government had sufficiently established that Ferrer knew what prostitution ads "looked like" (35-ER-9866)—was patent error. Speech does not lose its constitutional protections simply because it "looks like" unprotected speech. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ("Protected speech does not become unprotected merely because it resembles the latter.").

### 2. The admission of child-sex trafficking evidence was an abuse of discretion.

Prejudice was built into the trial with the continuous admission of evidence blaming Backpage and/or the Defendants for facilitating child-sex trafficking. Here, no Defendant faced sex-trafficking charges, nor were any of the prostitution offenses underlying the Travel Act charges sex-trafficking offenses (2-ER-393-400)—

64

meaning that evidence was irrelevant under F.R.E. 401. Further, there is no allegation more prejudicial than an allegation of child sex abuse. *See Kennedy v. Louisiana*, 554 U.S. 407, 567 (2008) (Alito, J., dissenting). The nonstop admission of this irrelevant and unduly prejudicial evidence, which had already caused a mistrial, violated F.R.E. 403 and deprived Defendants of a fair trial. *See United States v. Bradley*, 5 F.3d 1317, 1319-22 (9th Cir. 1993) (reversing conspiracy to kill witness conviction because the government's presentation of an uncharged murder was "highly and unfairly prejudicial").

### 3. The admission of notice evidence was an abuse of discretion.

The admission of so-called "notice" evidence was an abuse of discretion. "Notice" was not relevant to the specific intent the government was required to prove concerning Appellants' publication of third-party speech. (*See* Spear Br.)

Even where "notice" evidence is proper, it still must comport with basic evidentiary rules. Here, though, the Court admitted exhibits in which unknown parties posting anonymously on www.change.org and sending a fax to Backpage accused the Defendants of violating federal law (25-ER-7104-7106, 7117-7119)—the precise legal conclusion to be determined by the jury—even though even credentialed experts "cannot give an opinion as to…an ultimate issue of law." *See Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008) (affirming exclusion of report that included "legal conclusions"). The Court also

65

admitted those unduly prejudicial exhibits for "notice" despite there being no evidence that Lacey had ever seen them.

The Court also allowed the government to admit two AIM Group reports (26-ER-7183-7186) "not…for the truth of the content," but then allowed the government to question Ferrer about "the accuracy" of the reports, over objections that the reports were being used for their truth (35-ER-9887-9892). The same was true of the NAAG letters accusing Backpage of publishing ads for prostitution and child-sex trafficking. The Court allowed one such letter because it was "not offered for the truth" (35-ER-9910), but then moments later, stated that the document was relevant to "the knowledge of certain defendants *as to what was going on on Backpage*" (35-ER-9919 (emphasis added)). If a seasoned jurist struggled to apply her own evidentiary rulings consistently, surely the jury was confused.

## C.    These cumulative errors deprived Defendants of a fair trial.

Although any one of the errors discussed above was an abuse of discretion, the cumulative errors in this complex, multi-defendant trial constituted reversible error. As this Court has recognized, "the cumulative effect of errors may support reversal," especially in "cases where the government's case is weak." *United States v. Lloyd*, 807 F.3d 1128, 1168 (9th Cir. 2015). Here, the case against Lacey was "attenuated" (2-ER-301-302), at best. In fact, this verdict is the product of an *Allen* charge. The erroneous rulings were incredibly prejudicial for the above-stated

66

reasons. The record supports a finding that the jury was "swayed by the error[s]," *id*. at 1170, because even the Court misapplied its own limitations on the evidence. Under these circumstances, the cumulative errors were not harmless. *Id*. at 1169-70 (reversing convictions for cumulative error in complex multi-defendant case); *Frederick*, 78 F.3d at 1381 (reversing for cumulative errors when "the evidence against the defendant was not overwhelming").

## VI. Lacey joins in co-Appellants' issues raised on appeal.

Lacey joins in his co-Appellants issues raised on appeal (with the exception of Brunst's sentencing issue) because those issues apply with equal force to Lacey. Lacey incorporates their briefs by reference as if fully stated herein.

## CONCLUSION

Lacey respectfully requests that this Court vacate his conviction and order the District Court to enter an order of acquittal. Every court addressing concealment charges involving transparent money spending, bank accounts titled in the name of a defendant or his entity, or disclosures to the government has ruled that any one of those facts, alone, is fatal to concealment money laundering charges. Each applies here, plus there is more. Lacey repeatedly said he would file all government disclosure forms and pay all required taxes, and then timely filed those forms (FBARs) and tax returns. This conviction, which is an anomaly under the law, should be acquitted.

67

Further, nothing in the record establishes that the funds at issue were proceeds of SUA because the government failed to overcome the First Amendment presumption, made no effort to trace the funds to SUA, and failed to establish SUA at the time that Backpage generated the funds at issue. The failure to establish proceeds provides yet another basis to vacate the conviction.

Finally, there was no proof that Lacey knew his funds were proceeds, nor could there be. Again, the lack of proof on this requisite element warrants acquittal.

To the extent that this conviction is not vacated, it should be reversed. The District Court's shifting and flawed evidentiary rulings distorted the evidence to such a degree that there can be no confidence in the jury's verdict.

Dated:  July 14, 2025                    **MAURICE WUTSCHER LLP**

By:  /s/ Erin McCampbell Paris
Erin McCampbell Paris

*Attorneys for Defendant-Appellant*
*Michael Lacey*

68

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-5374, 24-5375, 24-5376

I am the attorney or self-represented party.

**This brief contains** 14,950 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated July 1, 2025.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Erin McCampbell Paris **Date** July 14, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 24-5374, 24-5375, 24-5376

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

United States v. John Brunst, 24-5374; United States v. Scott Spear, 24-5375

**Signature** | /s/ Erin McCampbell Paris    **Date** | July 14, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/2018*