Nos. 24-5374, 24-5375, 24-5376

———————

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

———————

UNITED STATES OF AMERICA

*Plaintiff-Appellee,*

v.

JOHN ("JED") BRUNST,

*Defendant-Appellant.*

On Appeal from the United States District Court
For the District of Arizona, the Honorable Diane J. Humetewa, Presiding
District Court Case No. 2:18-cr-00422-DJH

———————

**DEFENDANT-APPELLANT JOHN BRUNST'S OPENING BRIEF**

———————

GARY S. LINCENBERG – STATE BAR NO. 123058
GOPI K. PANCHAPAKESAN – STATE BAR NO. 279586
MICHAEL C. LANDMAN – STATE BAR NO. 343327
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM, LLP
1875 CENTURY PARK EAST, 23RD FLOOR
LOS ANGELES, CALIFORNIA 90067-2561
TELEPHONE: (310) 201-2100

*Attorneys for Defendant-Appellant John ("Jed") Brunst*

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION....................................................6

STATUTORY AUTHORITY ...............................................................6

DETENTION STATUS..........................................................................6

ISSUES PRESENTED............................................................................7

STATEMENT OF FACTS ....................................................................8

I.    Brunst Served as CFO of a Media Holding Company. ....................8

      A.    Brunst's Duties Focused on Financial Transactions. ............8

      B.    Brunst Relied on Federal Court Decisions That Affirmed the
            Legality of Backpage's Operations. ......................................9

            1.    Backpage Won Challenges to State Law Statutes That
                  Sought to Criminalize the Publishing of Adult
                  Advertising. ..........................................................10

            2.    Backpage Won a Federal Injunction Against a Sheriff
                  Whose Threats Led to the Termination of Its Credit Card
                  Relationships....................................................... 11

II.   Two Prior District Court Judges and This Court Defined the Scope of
      the Indictment and Set Guardrails for this Prosecution.................. 12

      A.    Judge Brnovich Ruled That the Travel Act Conspiracy Was
            Bounded by the 50 Charged Ads. .........................................13

      B.    The Government Violated an Order from Judge Logan Not to
            Invade the Attorney-Client Privilege. ..................................15

III.  In the Retrial, the District Court Precluded Brunst from Responding to
      the Government's Theory of the Case............................................. 18

      A.    The Government Tried to Prove Brunst's Intent Through
            a Barrage of Anti-Backpage Hearsay Statements. ............... 18

      B.    The District Court Allowed the Government to Hide the
            Counter-Notice Evidence from the Jury. ............................. 19

            1.    The District Court Precluded Any References to Prior
                  Court Opinions Upon Which Brunst Relied. ............................20

2.      The District Court Admitted Letters from State AGs But Precluded the Responsive Letters. .............................................23

3.      The District Court Precluded References to the CDA.............25

4.      The District Court Precluded Evidence of Attorney Communications, Including Non-Privileged Communications Shared with Financial Institutions................27

C.    The District Court Precluded Brunst from Impeaching Ferrer with Prior Statements. ...........................................................29

D.    The District Court Precluded Brunst from Testifying in His Own Defense. ...................................................................31

IV.    The Only Witness Against Brunst Made Key Admissions Regarding Brunst's Lack of Involvement. ..........................................................34

V.    The Government's Money Laundering Case Was Predicated on Loan Payments Ferrer Made in Connection with the April 2015 Seller-Financed Sale of Backpage...............................................................36

VI.    The *Allen* Charge and Compromise Verdict ...............................38

VII.   The District Court Largely Denied Brunst's Motion for Acquittal..............38

VIII.  The Court Relied on Uncharged and Acquitted Conduct at Sentencing.......42

SUMMARY OF ARGUMENT ............................................................42

STANDARD OF REVIEW ................................................................44

ARGUMENT ..................................................................................45

I.    The District Court Committed Constitutional Error by Depriving Brunst of His Rights to Confront the Only Witness Against Him and to Testify in His Own Defense. ..................................................45

A.    Brunst Was Deprived of His Constitutional Right to Confront the Only Witness Against Him..............................................45

B.    Brunst Was Deprived of His Constitutional Right to Testify in His Own Defense..............................................................51

II.    The Court Should Reverse Brunst's Travel Act and Money Laundering Convictions and Remand for Entry of a Judgment of Acquittal......................................................................54

A.    The Travel Act Conspiracy Conviction Should Be Reversed for Insufficiency of the Evidence and Constitutional Error.....................54

B.    The Evidence Was Insufficient to Support the Money Laundering Convictions Against Brunst. ............................................57

    1.    There Was Insufficient Evidence of SUA. .............................57

    2.    There Was Insufficient Evidence of an Intent to Conceal. ........59

    3.    There Was Insufficient Evidence of an Intent to Promote. ......62

III.    The Court Should Dismiss the Indictment for Government Misconduct. ..............................................................................63

IV.    The District Court Erroneously Used Acquitted Conduct to Calculate the Applicable Base Offense Level Under the Sentencing Guidelines. ........67

V.    Brunst Joins in His Co-Appellants' Arguments. ...........................................70

CONCLUSION ................................................................................70

CERTIFICATE OF RELATED CASES ..................................................72

CERTIFICATE OF COMPLIANCE .......................................................73

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Backpage.com, LLC v. Cooper*
939 F. Supp. 2d 805 (M.D. Tenn. 2013) ...........................................................11

*Backpage.com, LLC v. Dart*
807 F.3d 229 (7th Cir. 2015) ...................................................................*passim*

*Backpage.com, LLC v. Hoffman*
No. 13-CV-03952 DMC JAD, 2013 WL 4502097 (D.N.J. Aug. 20,
2013) ...........................................................................................................10, 11

*Backpage.com, LLC v. McKenna*
881 F. Supp. 2d 1262 (W.D. Wash. 2012) ......................................10, 11, 23, 52

*Banks v. Dretke*
540 U.S. 668 (2004)...........................................................................................46

*Cuellar v. United States*
553 U.S. 550 (2008)...........................................................................................60

*Holley v. Yarborough*
568 F.3d 1091 (9th Cir. 2009) ...........................................................................51

*Howard v. S.E.C.*
376 F.3d 1136 (D.C. Cir. 2004).........................................................................48

*Joo Heun Lee v. Small*
419 F. App'x 763 (9th Cir. 2011).......................................................................56

*Kotteakos v. United States*
328 U.S. 750 (1946)..............................................................................43, 55, 56

*Molina-Martinez v. United States*
578 U.S. 189 (2016)...........................................................................................69

*Murdoch v. Castro*
365 F.3d 699 (9th Cir. 2004) .............................................................................50

iv

*Rock v. Arkansas*
   483 U.S. 44 (1987)......................................................................51, 52, 53

*United States v. Adamson*
   291 F.3d 606 (9th Cir. 2002) ...............................................56, 57

*United States v. Adefehinti*
   510 F.3d 319 (D.C. Cir. 2007)...........................................43, 59, 60

*United States v. Baker*
   63 F.3d 1478 (9th Cir. 1995) .....................................................44, 62

*United States v. Beardslee*
   197 F.3d 378 (9th Cir. 1999) ...........................................................46

*United States v. Biaggi*
   909 F.2d 662 (2d Cir. 1990) ...............................................42, 45, 54

*United States v. Chapman*
   524 F.3d 1073 (9th Cir. 2008) .........................................................66

*United States v. Del Toro Barboza*
   673 F.3d 1136 (9th Cir. 2012) .........................................................49

*United States v. Espinoza-Valdez*
   889 F.3d 654 (9th Cir. 2018) ...........................................................54

*United States v. Fallon*
   61 F.4th 95 (3d Cir. 2023) ...............................................................61

*United States v. Garro*
   517 F.3d 1163 (9th Cir. 2008) .........................................................67

*United States v. Greene*
   No. 23-4097, 2025 WL 1479677 (9th Cir. May 23, 2025) ...................67, 68, 69

*United States v. Haischer*
   780 F.3d 1277 (9th Cir. 2015) ...................................................45, 54

*United States v. James*
   139 F.3d 709 (9th Cir. 1998) ...........................................................47

*United States v. Kohring*
637 F.3d 895 (9th Cir. 2011) ................................................................50

*United States v. Kojayan*
8 F.3d 1315 (9th Cir. 1993) ...........................................................65, 66

*United States v. Larson*
495 F.3d 1094 (9th Cir. 2007) ..................................................44, 45, 63

*United States v. McEnry*
659 F.3d 893 (9th Cir. 2011) ...........................................................67, 68

*United States v. Moreno*
102 F.3d 994 (9th Cir. 1996) ...............................................................45

*United States v. Nevils*
598 F.3d 1158 (9th Cir. 2010) ........................................................54, 57

*United States v. Orduno-Aguilera*
183 F.3d 1138 (9th Cir. 1999) .............................................................44

*United States v. Restrepo*
930 F.2d 705 (9th Cir. 1991) ...............................................................63

*United States v. Stephenson*
183 F.3d 110 (2d Cir. 1999) ..........................................................43, 59

*United States v. Tsinhnahijinnie*
112 F.3d 988 (9th Cir. 1997) .........................................................43, 55

*United States v. Waters*
627 F.3d 345 (9th Cir. 2010) ...............................................................49

*United States v. Way*
2018 WL 3062159 (E.D. Cal. 2018).......................................................48

*Valle Del Sol Inc. v. Whiting*
709 F.3d 808 (9th Cir. 2013) ...............................................................57

*Williams v. Woodford*
384 F.3d 567 (9th Cir. 2004) ........................................................44, 63

**Statutes**

18 U.S.C.
§ 371 ................................................................................6, 67
§ 1952 ...............................................................................*passim*
§ 1956 ...............................................................6, 57, 62, 69
§ 3231 ................................................................................6
§ 3742 ................................................................................6

28 U.S.C. § 1291 ...................................................................6

47 U.S.C. § 230 ....................................................................*passim*

USSG
§ 1B1.2 ..............................................................................67
§ 2E1.2 ..............................................................................67, 69
§ 2G1.1 ..............................................................................42, 68
§ 2G1.3 ..............................................................................42, 68
§ 2S1.1 ..............................................................................69
§ 2X1.1 ..............................................................................67
§ 3B1.1 ..............................................................................69
§ 3D1.2 ..............................................................................69

**Other Authorities**

Fed. R. App. P. 28 .................................................................70

Fed. R. Crim. P. 29 ...............................................................*passim*

Fed. R. Evid. 403 ..................................................................18, 52

U.S. Const. amend. I .............................................................*passim*

U.S. Const. amend. V ............................................................51

U.S. Const. amend. VI ..........................................................50, 51, 63

## **INTRODUCTION**

During a 10-week trial where the Government called 21 witnesses, only one witness testified against Appellant John ("Jed") Brunst: Carl Ferrer, the former CEO and operator of Backpage.com. Yet despite Ferrer being the sole witness against Brunst, the district court denied Brunst the right to (i) impeach Ferrer with his prior inconsistent statements; (ii) confront Ferrer with evidence that showed that Brunst was proceeding with a good faith belief in the legality of Backpage's business; and (iii) testify in his own defense to the key facts that would have rebutted Ferrer's testimony. As a result of this atrociously unfair trial, a 73-year-old innocent man now rots away in prison, crying out for justice.

Jed Brunst, an accountant, served as the CFO of a media holding company. The company owned 17 newspapers and a classified ads website called Backpage.com. Brunst's main role was to review financials of the subsidiaries, interact with banks and institutional investors, and assist in corporate transactions. Backpage.com had an adult section, which the Government claimed hosted ads for prostitution. Brunst had no role with regard to Backpage's marketing activities, nor did he review the content of any ads.

The Superseding Indictment ("Indictment") charged: (1) a Travel Act conspiracy bounded by 50 specific ads posted on Backpage's website; (2) 50 Travel Act counts relating to those 50 ads; and (3) various money laundering

1

counts primarily tied to loan payments Ferrer made in connection with his
April 2015 acquisition of Backpage, which the holding company financed.  Brunst
was acquitted of all 50 Travel Act counts.  But in a compromise verdict reached
following an *Allen* charge, Brunst was convicted of the Travel Act conspiracy and
of several money laundering counts.

      The crux of the Government's case was that Appellants intended to facilitate
prostitution because they had been put "on notice" that Backpage was publishing
ads that resulted in prostitution, and continued to do so despite public calls for the
website to shut down its adult section.  Mainly through Ferrer's 12 days of
testimony, the jury heard about attacks on Backpage from journalists, politicians,
state and local law enforcement officials, celebrities, and religious seminaries.  No
witness testified that Brunst had any interaction with any of these persons or
entities.  The district court nevertheless admitted these hearsay statements based on
the theory that they were not being offered for the truth, but rather to show the
notice they gave to Brunst.

      Brunst sought to rebut this supposed "notice" evidence with "counter-
notice" evidence.  This counter-notice evidence included: (i) prior federal court
cases that affirmed the legality of Backpage's business model and rejected the
same liability-by-notice framework that undergirded the Government's prosecution
here; (ii) Backpage's contemporaneous responses to the notice evidence;

(iii) Backpage's attorney-approved compliance efforts regarding its ad moderation policies; and (iv) statements from executives, operators of Backpage, and attorneys that the company was operating lawfully. However, the district court refused to let the jury hear the complete story. During the first trial in 2021, however, when the defense laid out this counter-notice evidence in opening statements, Judge Brnovich (then the presiding district judge) overruled the Government's objection. Indeed, at that time, it was *the Government* who argued that if the defense introduced part of what formed their state of mind, then the prosecution should be able to complete the story, telling the district court: "[I]t's what's good for the goose is good for the gander." 30-ER-8499.

But the district judge who presided over the retrial, Judge Humetewa, refused to permit Brunst to (i) use the proffered counter-notice evidence on cross-examination of Ferrer and (ii) testify regarding this evidence. Brunst's good faith—which was rooted in the counter-noticed evidence—was a defense to all charges. 2-ER-409; 7-ER-1802. The district court's evidentiary handcuffs eviscerated Brunst's ability to defend himself.

Separate and apart from these constitutional errors, Brunst's convictions should be reversed for legal and factual insufficiency. As to the Travel Act conspiracy conviction, the Government failed to prove a conspiracy tied to the 50 charged ads. In its post-verdict ruling ("Rule 29 Order"), the district court

conceded this evidentiary failure. To save the convictions, however, the district court impermissibly expanded the scope of the conspiracy to every adult ad Backpage hosted over a 14-year time period. 2-ER-298. This constructive amendment to the Indictment contradicted both Judge Brnovich's pre-trial ruling limiting the scope of the Travel Act conspiracy to the "fifty distinct" charged ads and the jury instructions delivered by Judge Humetewa—both of which Brunst relied upon at trial. 2-ER-386, 574. In changing the rules after the game had ended, the district court committed reversible error.

The Rule 29 Order also highlights why the money laundering convictions should be reversed. First, there was no specified unlawful activity ("SUA") underlying the money laundering convictions. In acquitting Brunst of transactional money laundering, the district court observed that the Government did not prove "that every ad sold on Backpage.com" was a Travel Act violation that would form the basis for SUA. 2-ER-334. The district court nevertheless sustained the concealment and promotional money laundering convictions even though they were based on the same defective proof.

Further, the district court found that the April 2015 seller-financed sale of Backpage to Ferrer terminated the Travel Act conspiracy. 2-ER-319. All of the money laundering convictions, however, involved wire transfers occurring *over*

*a year after* the termination of the conspiracy; there was no evidence that these wires involved SUA, *i.e.*, money earned from any such conspiracy.

Second, Appellants' receipt of transparent loan payments in connection with the financed sale of their ownership interests in Backpage does not amount to concealment or promotional money laundering.

This Court should also dismiss the Indictment or fashion a remedy in connection with the Government's invasions of the attorney-client privilege. Prior to trial, Judge Logan (the first presiding judge) denied a Government motion seeking permission to review privileged communications between Backpage and its attorneys, finding that Ferrer—the Government's star cooperating witness— could not waive the privilege because it was jointly held by Appellants. The defense later learned that the Government had repeatedly invaded the privilege during its pre-trial interviews of Ferrer. Brunst moved to dismiss, but the district court (then Judge Brnovich) denied the motion and request for an evidentiary hearing, finding that the information disclosed by Ferrer was not privileged. On re-trial, however, Judge Humetewa permitted the Government to use these attorney communications it learned from Ferrer to inculpate Appellants, while precluding the defense from cross-examining Ferrer using the exculpatory attorney advice he disclosed to the Government.

Therefore, for the reasons set forth in this brief and the briefs of co-Appellants and amici, this Court should remand for entry of a judgment of acquittal. At a minimum, given the grave constitutional errors committed by the district court, Brunst is entitled to a new trial.[1]

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291, and 18 U.S.C. § 3742.

## STATUTORY AUTHORITY

Pursuant to Circuit Rule 28-2.7, the complete text of 18 U.S.C. § 1952, 18 U.S.C. § 1956, 18 U.S.C. § 371, and the applicable Sentencing Guidelines ("Guideline" or "Guidelines") are set forth in an addendum to this brief.

## DETENTION STATUS

Brunst is in the custody of the Bureau of Prisons serving a 10-year sentence. His projected release date is December 15, 2032.[2]

---

[1] In addition, the district court erroneously calculated the base level offense under the Sentencing Guidelines.

[2] *See* https://www.bop.gov/inmateloc/ (*last visited* July 10, 2025). Brunst will be over 80 years old by the time he is expected to be released.

## ISSUES PRESENTED

1.       Whether the district court erroneously denied Brunst the right to confront the only witness against him and the right to testify on matters central to his good faith defense?

2.       Whether there was sufficient evidence to convict Brunst of conspiracy to violate the Travel Act?

3.       Whether the district court's post-trial treatment of the Travel Act conspiracy as boundless violated Brunst's due process rights?

4.       Whether there was sufficient evidence of SUA, particularly where the underlying conspiracy terminated over a year before the subject transfers?

5.       Whether transparent payments to purchase a corporation established an intent to conceal or promote SUA?

6.       Whether the Government can invade a defendant's attorney-client privilege and then use that information to assist its prosecution?

7.       Whether the district court erroneously calculated the applicable Sentencing Guidelines by using a base offense level tied to acquitted conduct?

8.       Whether, as set forth in co-Appellants' briefs, (a) the First Amendment and established principles of aiding and abetting liability bar Brunst's Travel Act conviction; (b) funds earned from an economic activity that are presumed to be lawful under the First Amendment and that were not traced to any

SUA are "proceeds" under the money laundering statutes; (c) funds disclosed to the Government can form the basis for a concealment money laundering charge; (d) the district court's specific intent and First Amendment jury instructions were erroneous; and (e) the district court erroneously admitted evidence of sex trafficking?

## STATEMENT OF FACTS

### I.    Brunst Served as CFO of a Media Holding Company.

#### A.    Brunst's Duties Focused on Financial Transactions.

Brunst was hired in 1992 as the Chief Financial Officer of New Times, Inc. ("New Times"), a media holding company in Phoenix.  His primary job responsibilities concerned reviewing financial statements prepared by subsidiaries, overseeing acquisitions and divestitures of various newspaper companies, investor relations, tax planning matters, managing relationships with financial institutions, and coordinating with auditors and outside lawyers to carry out these duties.  40-ER-11392-93, 11245-46; 41-ER-11667; 1-BER-97.[3]

In 2006, New Times purchased the *Village Voice* newspaper, forming Village Voice Media Holdings, LLC ("VVMH"), which held 17 alternative newspapers around the country.  28-ER-8012; 40-ER-11392-93.  Goldman Sachs,

---

[3]    "BER" refers to Brunst's Excerpts of Record.  Dkts. 72.2, 72.3.

Alta Equity Partners, and other institutional investors held significant ownership stakes in VVMH. 41-ER-11597. In 2013, New Times was renamed Medalist Holdings, Inc. ("Medalist"). 27-ER-7522. Beginning in 2013, Backpage's CFO was Nathan Kopecky and then Michael Gage. 40-ER-11421-22.

In April 2015, Backpage was sold to Ferrer in a seller-financed transaction, and another Medalist subsidiary, Cereus Properties, LLC ("Cereus Properties"), collected Ferrer's loan payments. 38-ER-10699-700, 10837-40. New Times/Medalist CEO James Larkin and co-Appellant Lacey collectively owned about 90 percent of the holding company; Brunst and Spear collectively owned the remaining roughly 10 percent. 42-ER-12047. As Cereus Properties' CFO, Brunst managed its receipt of loan payments from Ferrer. 38-ER-10699-700, 10837-40.

## B. Brunst Relied on Federal Court Decisions That Affirmed the Legality of Backpage's Operations.

As set forth in the amicus brief of the Foundation for Individual Rights and Expression (FIRE), from 2012 to 2015, federal courts across the country affirmed the First Amendment and CDA protections afforded to Backpage's publication of adult advertising. Dkt. 80.1 at 7-14. As CFO of the holding company, these decisions gave Brunst comfort that the Backpage subsidiary was operating lawfully. 11-ER-2760-73.

1.      **Backpage Won Challenges to State Law Statutes That Sought to Criminalize the Publishing of Adult Advertising.**

In *Backpage.com, LLC v. McKenna*, Backpage sought an injunction against the Attorney General of the State of Washington with regard to a state law that would have "criminalize[d] the offense of advertising commercial sexual abuse of a minor." *McKenna*, 881 F. Supp. 2d 1262, 1265 (W.D. Wash. 2012).[4] Finding that the statute violated the First Amendment, the court presciently observed:

> Nor is this [chilling] effect dissipated in a regime in which criminal liability is triggered only by notification or knowledge that "illegal" content is available on an actor's website. Liability upon notice reinforces service providers' incentives to restrict speech and abstain from self-regulation. This is because a publisher who receives notice that content *might* be illegal would have no incentive to ensure that such content is *in fact* illegal. Rather, the rational choice in such a scenario is to remove the content as quickly as possible, whether or not it constitutes protected speech.

*Id.* at 1278 (emphasis in original).

Rejecting the misguided theory that the Government has pursued *in this case*, the court reasoned that "where an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that." *Id*. at 1279.

---

[4]   Unless otherwise noted, internal citations and quotation marks have been omitted.

In *Backpage.com, LLC v. Cooper*, Backpage challenged a Tennessee statute, similar to that in *McKenna*, which sought to criminalize the sale or the offer to sell "an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act . . . with a minor." *Cooper*, 939 F. Supp. 2d 805, 816 (M.D. Tenn. 2013). The *Cooper* court enjoined the enforcement of the Tennessee statute under the First Amendment and CDA. *Id*. at 813.

In *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097 (D.N.J. Aug. 20, 2013), the court likewise granted Backpage's request for a preliminary injunction because the New Jersey statute was unconstitutionally vague and overbroad insofar as it targeted "implicit" ads for sex. *Id*. at *10-11.

## 2. Backpage Won a Federal Injunction Against a Sheriff Whose Threats Led to the Termination of Its Credit Card Relationships.

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) concerned a "campaign intended to crush Backpage's adult section" waged by the Sheriff of Cook County, Illinois, who "demand[ed] that firms such as Visa and MasterCard prohibit the use of their credit cards to purchase any ads on Backpage, since the ads might be for illegal sex-related products or services, such as prostitution." *Id*. at 230. In enjoining Dart from issuing further threats to Backpage's financial

11

institutions, the Seventh Circuit sent a clear message: "[A] public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Id.*

The *Dart* case centered on a June 29, 2015 cease-and-desist letter that Dart sent to MasterCard's and Visa's CEOs and Boards of Directors, after which both companies promptly cut ties with Backpage. *Id.* at 232-33. Writing for the court, Judge Posner observed that the credit card companies were the "victims of government coercion aimed at shutting up or shutting down Backpage's adult section . . . ." *Id.* Judge Posner observed that the credit card companies had known about the nature of the advertising on Backpage for years, but that it was Dart's unconstitutional actions alone that caused them to cut ties with Backpage. *Id.* at 237.

## II. Two Prior District Court Judges and This Court Defined the Scope of the Indictment and Set Guardrails for this Prosecution.

In the Indictment, the Government charged Brunst with (i) one count of conspiracy to violate the Travel Act, (ii) 50 substantive Travel Act counts tied to 50 specific advertisements Backpage published on its website, (iii) one count of conspiracy to commit money laundering, and (iv) 33 substantive counts of

concealment, promotional, and transactional money laundering predicated on alleged Travel Act violations.  20-ER-5554-67.

Three different district court judges presided over the case:  Judge Logan (who recused himself on March 1, 2019), Judge Brnovich (who—after declaring a mistrial—recused herself on October 29, 2021), and Judge Humetewa, who presided over the retrial.

### A.    Judge Brnovich Ruled That the Travel Act Conspiracy Was Bounded by the 50 Charged Ads.

In 2019, Brunst moved to dismiss the Travel Act charges and related money laundering counts (all of which were based on purported Travel Act violations), arguing that the Government had indicted a "boundless conspiracy to facilitate prostitution, not to facilitate a business enterprise involved in prostitution," which raised due process and double jeopardy concerns.  18-ER-5088-5091, 5023-25. The Government responded that the Travel Act conspiracy encompassed "scores of illegal prostitution enterprises," "numerous prostitutes, pimps, and traffickers," and that "nearly every prostitute who advertised on Backpage was controlled by a pimp or trafficker;" and thus, each qualifies as a "business enterprise."  18-ER-5063-64. Rejecting the Government's sweeping characterization of the Indictment, Judge Brnovich denied Brunst's motion, holding that the Travel Act conspiracy charge was bounded by the 50 charged ads:

Defendants' suggestion that the SI improperly indicts a "boundless conspiracy to facilitate prostitution in general," . . . however, mischaracterizes the charges against them. Such a claim is simply untrue. They were not indicted for facilitating the amorphous notion of "prostitution." They were indicted for facilitating (via publishing ads) on *fifty distinct occasions* where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution.

2-ER-574 (emphasis added); 2-ER-579 (Judge Brnovich also holding that "[t]hese *targeted instances* enable each Defendant to plead an acquittal or conviction in future similar prosecutions and prepare to defend themselves at trial.") (emphasis added); 2-ER-576-77 (Judge Brnovich stating: "[t]o answer Defendants' question posed to the Court: one cannot intend to promote/facilitate a business enterprise one does not know exists.").

Brunst prepared for trial and tried the case based on this clear ruling. 52-ER-14676; 40-ER-11386-87. Indeed, Judge Humetewa measured whether to permit certain defenses based on whether those defenses related to the 50 charged ads. *See, e.g.*, 2-ER-536 (requiring Brunst to meet the prerequisites of an advice-of-counsel defense as to "an ad listed in Counts 2-51 (or similar ad described in the SI)").

14

**B.** **The Government Violated an Order from Judge Logan Not to Invade the Attorney-Client Privilege.**

Over the years, the various companies, Appellants, and Ferrer had been jointly represented by several law firms in civil and criminal matters.[5] In April 2018, just prior to the filing of the Indictment, Ferrer and Backpage cut a leniency deal with the Government. 41-ER-11672. Shortly after indictment, defense counsel advised the Government that Ferrer could not unilaterally waive any jointly-held attorney-client privileges. 54-ER-15424-28. The Government confirmed that it would avoid invading those privileges. 54-ER-15434-46.

The Government then filed two motions, in April and June 2018. The first sought to disqualify two law firms from representing Lacey and Larkin because they also had represented Ferrer. 19-ER-5340-49. The second sought an order permitting the prosecution team to access privileged communications on the basis that Ferrer had caused Backpage to waive its attorney-client privilege. 19-ER-5332-39. These included privileged communications with: (1) Elizabeth McDougall (Backpage's general counsel); (2) Steve Suskin (in-house counsel); (3) Hemanshu Nigam (a former federal internet sex crimes prosecutor who provided legal counsel regarding Backpage's ad moderation practices); (4) Don

---

[5] These firms include Perkins Coie, Davis Wright Tremaine, Dentons, and Paul Hastings.

Moon (outside counsel and board member); (5) Davis Wright Tremaine, LLP; and (6) Rusing Lopez & Lizardi, PLLC. 20-ER-5622.

Judge Logan denied both Government motions. Ruling on the first motion, the district court found that Ferrer had waived any right to seek to disqualify Lacey and Larkin's lawyers pursuant to valid and enforceable joint defense and joint representation agreements. 19-ER-5340-49. Ruling on the second motion, the district court held that—based on these agreements—Ferrer could not unilaterally waive Backpage's attorney-client privilege. 19-ER-5332-39. The Government, however, withheld from Judge Logan and from defense counsel that the Government *already had* interviewed Ferrer about privileged communications. And *even after* Judge Logan's order, the Government continued to do so.

The defense first learned of this Government misconduct in 2019 when the Government finally turned over in discovery memoranda of its interviews of Ferrer. 19-ER-5263-64. The memoranda on their face revealed that the Government repeatedly interviewed Ferrer about privileged conversations with, and legal advice from, several attorneys, including the specific attorneys whose communications Judge Logan barred the Government from viewing. This advice addressed, among other things, First Amendment protections afforded to the company, the legality of Backpage's moderation practices, legal strategies in dealing with law enforcement officials, and the legality of certain forms of

payment processing.  54-ER-15481-83, 15488; 55-ER-15497-98, 15503, 15507, 15509-10, 15517, 15519, 15522, 15546-47, 15566-67, 15579, 15584-85, 15594, 96.

Brunst moved to dismiss the Indictment for outrageous Government conduct and/or for an evidentiary hearing to examine Ferrer about the privileged nature of the communications.  2-ER-538-56.  Judge Brnovich denied the motion, ruling— without an evidentiary hearing—that Brunst had not established the privileged nature of the communications.  *Id.*; 54-ER-15275-76, 15281-82, 15352, 15354.

Given her ruling that the communications were not privileged, during opening statements in the first trial, Judge Brnovich allowed defense counsel to preview for the jury that Ferrer would testify:  "[W]e had lawyers the whole time telling us that our moderation practices were legal, that we were protected by the First Amendment."  30-ER-8354.  Judge Brnovich overruled the Government's continuing objection to this and other similar statements.  *Id.*; *see also* 30-ER-8334-35, 8348-49, 8352, 8354-64, 8380, 8382.

In the retrial, however, Judge Humetewa disregarded Judge' Brnovich's ruling and precluded the defense from making any reference to communications with counsel.  2-ER-536-37.

**III.   In the Retrial, the District Court Precluded Brunst from Responding to the Government's Theory of the Case.**

In the retrial, Brunst was barred from (i) confronting Ferrer with counter-notice evidence that would have rebutted the hearsay notice evidence introduced through him and (ii) testifying about this counter-notice evidence.

**A.   The Government Tried to Prove Brunst's Intent Through a Barrage of Anti-Backpage Hearsay Statements.**

On an almost daily basis during a 10-week trial, the district court admitted hearsay statements from journalists, state attorneys general ("State AGs"), theological seminaries, politicians, celebrities, and non-profit activists calling for Backpage to shut down its adult section.  34-ER-9407-09; 35-ER-9830-32, 9893-95, 9897-99, 9926-28; 36-ER-9999-10000, 10063-64, 10114-16, 10241-43, 10254-56, 10274-80; 37-ER-10341-53, 10358-59, 10371-72, 10374-75; 38-ER-10716, 10847-53; 43-ER-12307-08, 12316-17, 12333-34; 47-ER-13280, 13296-97, 13302-03, 13304.  These hearsay statements included opinions based on moral, policy, and religious grounds.  *Id.*  The Government argued that these opinions were admissible *not* for the truth, but rather because they put Appellants on "notice" that the site was being misused.  2-BER-235-36, 286, 292-93, 295-96, 304-05.  None of these hearsay statements addressed any of the 50 charged ads. Nonetheless, the district court overruled hearsay and Federal Rule of Evidence 403

objections on the grounds that the statements showed that Appellants were on notice of third-party wrongdoing and "what Mr. Ferrer and others did . . . in response" to hearing the statements. *See, e.g.*, 35-ER-9897-99, 9907-9911, 9917-18.

In closing, however, the Government asked the jury to convict based on the truth of these "notice" statements. 51-ER-14494 (arguing that the receipt of subpoenas was "evidence enough . . . that [defendants] were running a criminal enterprise that was facilitating and promoting prostitution"); 51-ER-14495 ("The National Attorney Generals Association. There's blatant prostitution ads [that] are rampant"); 51-ER-14496 ("[T]he Seattle Mayor, Backpage is an accelerant of underage prostitution").

## B. The District Court Allowed the Government to Hide the Counter-Notice Evidence from the Jury.

The Government was permitted to create an atmosphere in the courtroom where Senators, State AGs, media icons, Hollywood stars, and churches were all on the Government's side. Meanwhile, the district judge firmly precluded the jury from hearing the contemporaneous responses to these attacks. The district court precluded Brunst from showing the jury: (a) Backpage's favorable court decisions; (b) Backpage's responses to threatening letters from State AGs; (c) the role the Communications Decency Act (CDA) played in Backpage's moderation function;

19

and (d) attorney advice, including non-privileged communications with banks disclosing Backpage's legal challenges. In each of these instances, the district court allowed the Government to put before the jury one-sided hearsay opinions, while precluding the defense from completing the story.

### 1. The District Court Precluded Any References to Prior Court Opinions Upon Which Brunst Relied.

While the Government was filling the jurors' ears with cherry-picked public statements calling for a shutdown of the website, the jurors were left clueless that—at that same time—federal courts were holding that these attacks on Backpage were unconstitutional. However, despite stating that she would not revisit Judge Brnovich's rulings that had been "decided either expressly or by necessary implication," Judge Humetewa did just that by precluding counter-notice evidence Judge Brnovich allowed in the first trial. 12-ER-3165; 30-ER-8354-64. The district court reasoned that these were civil cases, brought by different parties, involving different facts. 2-ER-535. Yet the hearsay statements critical of Backpage that the Government introduced were untethered to any legal standard, involved different parties, and were not tied to any of the charged ads. 39-ER-10906-09; 2-BER-341-73; 35-ER-9811-12, 9725. This double standard allowed the Government to peddle a false narrative that Backpage was bombarded with successful lawsuits and investigations, when in fact Backpage won every major

lawsuit it faced and successfully litigated suits against three State AGs. And unlike these successful lawsuits—which led to permanent injunctions and federal precedents—*none* of the proceedings the Government injected into the trial resulted in any binding, adverse notice to Brunst.

As a result, Brunst could not effectively rebut the Government's "credit card Armageddon" narrative, which the Government tied to Brunst because, as CFO of the holding company, he was involved with financial transactions. 34-ER-9612, 9615, 9395; 11-ER-2822-23, 2805-14; 2-BER-341-48. Even though the Government asked Ferrer on direct examination what the company did "when the major credit card companies blocked [Backpage] in July of 2015," the district court precluded the defense from completing the story. The district court did not allow the jury to hear that Backpage pursued lawful recourse, namely, that it presented the issue to a court, with the Seventh Circuit ultimately enjoining Sheriff Dart from unconstitutionally coercing the credit card companies to stop doing business with Backpage. 34-ER-9612, 9615; 2-BER-341-48; 41-ER-11507-08, 11511-12, 11516. Further, as part of its theme that Brunst should have inferred from the politically-charged environment surrounding Backpage that the company's publication of adult ads was illegal, the Government elicited from Ferrer that "[t]here was pressure" put on the credit card companies. 38-ER-10716. But the

district court precluded the defense from showing that this political pressure itself illegally infringed on protected speech. 41-ER-11507-08, 11511-12, 11516.

The *Dart* victory gave Brunst comfort that the credit card terminations did *not* serve as notice that Backpage was unlawfully facilitating prostitution. In fact, it gave Brunst notice of the opposite. Critically, all of the money laundering counts of conviction concerned wire transfers that took place after the *Dart* decision. 20-ER-5561-63. Indeed, Ferrer himself viewed the *Dart* decision the same way Brunst did, as reflected in his nearly 40 references to the *Dart* ruling during interviews with the Government. 55-ER-15498-11526.

But the district court barred Brunst from questioning Ferrer about the effect of the *Dart* case on Ferrer's and the company's actions, thereby leading to a distorted impression of Ferrer's credibility and state of mind. 2-BER-341-48; 41-ER-11507-08, 11511-12, 11516; 41-ER-11525-26. Given the district court's penchant for letting in even the most far-flung op-eds and wayward criticisms of Backpage, had the *Dart* court ruled *against* Backpage, the district court undoubtedly would have allowed the prosecutors to put it into evidence.

Likewise, the district court allowed the Government to elicit from Ferrer that Seattle's mayor demanded that Backpage implement age verification on its website, but that "the owners" refused. 42-ER-12060-61. Putting aside that age verification had nothing to do with this case (and was raised merely to inflame the

22

jury), the district court precluded the defense from introducing the *McKenna* decision, which held that Washington's proposed age verification law violated the First Amendment. 36-ER-10063-65; 36-ER-10242-46, 10272-76; 25-ER-7084, 7098-100; 37-ER-10358-59; 2-BER-348-52; *McKenna*, 881 F. Supp. 2d at 1282 ("Thus, a website that contains a section for postings for escort services that chooses to either shut down that section or require age verification will likely chill protected speech in the course of doing so."). Like *Dart*, the *McKenna* decision gave Brunst notice that a federal court *disagreed* with the claim that Backpage was operating unlawfully.[6] In the face of the Government repeatedly opening the door to Brunst's counter-notice evidence, the district court repeatedly closed it on Brunst.

> **2.    The District Court Admitted Letters from State AGs But Precluded the Responsive Letters.**

The Government introduced letters from State AGs claiming that minors were being trafficked on the website. The district court overruled defense objections, finding as to each State AG letter that "the content of the letter is not

---

[6]    The *McKenna* decision followed (i) the Seattle Mayor's letter to Backpage demanding the implementation of age verification (which the Government introduced into evidence), (ii) the state's subsequent adoption of age verification legislation with the mayor's support, and (iii) Ferrer testimony regarding AG McKenna's "attack[s]" on Backpage. 25-ER-7084, 37-ER-10358-59.

offered for the truth of the matter, [but] rather what Mr. Ferrer and others did as a result . . . in a response to that letter." 35-ER-9918; 24-ER-6745-47, 6763-6769; 25-ER-7101-03.[7] The district court then permitted the Government to elicit testimony from Ferrer characterizing Backpage's responses to these letters as being "deceptive," "highly misleading," and "cosmetic and superficial," all as part of a "slow dance" strategy. 34-ER-9409; 35-ER-9822, 9831-32, 9932; 36-ER-10041-42. But the district court barred the defense from introducing the actual responsive letters on cross-examination to rebut Ferrer's inculpatory characterizations. 40-ER-11182-83; 1-BER-45-54, 61-65 (offered; not admitted).

Some of the responses to the State AG letters were written by one of the country's leading First Amendment attorneys, Samuel Fifer. These responses detailed Backpage's moderation and compliance policies to screen ads proposing illegal transactions, as well as the company's extensive cooperation with law enforcement to "track and eliminate illegal activity by third parties using the adult services section" of the website. 40-ER-11180-83; 1-BER-45-54, 61-65 (offered; not admitted) ("[I]t is our view that any prosecution or threatened prosecution of Backpage.com would infringe free speech rights under the First Amendment since a government attempt to shut down all or part of a perfectly lawful website would

---

[7]    The district court admitted the State AG letters despite initially sustaining the defense's hearsay objections to their content. 34-ER-9590-91.

silence vast amounts of constitutionally protected speech."). But when the defense offered this responsive letter into evidence, even though the letter was on the *Government's exhibit list* (8-ER-1975), the district court refused.

If the State AG letters were somehow proof of "notice" to Brunst, then surely the jury was entitled to hear the complete story as to all of the "notice," including the counter-notice, that contemporaneously influenced Brunst's innocent state of mind.

### 3. The District Court Precluded References to the CDA.

Brunst understood that, along with the First Amendment, the CDA's incentives and protections informed Backpage's moderation practices. 55-ER-15596. Appellants argued that the defense "must be permitted to present evidence tending to negate unlawful intent, including by showing that Backpage.com's moderation and aggregation processes were driven by factors other than facilitating crime," such as the CDA. 11-ER-3023. Despite Judge Brnovich permitting "[t]estimony that Section 230 was meant to incentivize internet providers to engage in moderation practices" (18-ER-4993),[8] Judge Humetewa reversed course and barred any references at trial to the CDA because it does not "immunize[] criminal activity like that alleged here." 2-ER-534-35.

---

[8]  Judge Brnovich's ruling was made in connection with the defense's proffered moderation expert.

But the CDA *did immunize* Backpage from prosecution by State AGs, a fact Appellants were precluded from telling the jury. *See* 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."). If the jury had been allowed to see the reasons why the State AG's attacks were baseless under the CDA, then they likely would have given no credence to these attacks (and would have understood why Brunst maintained the good faith belief that Backpage was operating lawfully). *See* 1-BER-52-54 (offered; not admitted).

The district court even redacted references to the CDA within the *Government's own exhibits*, thereby distorting the jury's impression of the "notice" the Government claimed that Brunst actually received at the time. *See* 2-BER-313-19; 2-ER-533-34. For example, in connection with two Government exhibits— (1) Backpage's counsel's response to a CNN media inquiry and (2) a Backpage PowerPoint presentation to prospective buyers of the company—the Court required all references to the CDA to be redacted, *despite the fact* that the CDA references were critical to understanding the exhibits. 35-ER-9964-68; 25-ER-7111-16; 1-BER-55-60 (offered; not admitted) (redacting from the exhibit the following statement, among others: "Section 230 of the Communications Decency Act of 1996 recognized that the very nature of the Internet meant that vast traffic depended on the ability of citizens to post directly onto websites like

Backpage.com . . . . The responsibility, under the law, rests with the person supplying the post."); 37-ER-10335-41, 10377-79, 10386; 24-ER-6770-6811, 1-BER-14 (offered; not admitted) (informing potential buyers of Backpage of the protections afforded by the CDA, noting that "[t]o the extent Backpage is essentially editing or deleting inappropriate ads (or notifying users what will be edited or deleted), and those edits and policies do not contribute to the illegality of any posting, it should not be held liable for doing so").

The district court rulings paved the way for the Government to use these exhibits to suggest that Brunst had notice that Backpage's publication of adult ads was unlawful, even though their exculpatory portions suggested the opposite. 52-ER-14873-74.

### 4. The District Court Precluded Evidence of Attorney Communications, Including Non-Privileged Communications Shared with Financial Institutions.

Brunst learned of attorney advice through the holding company's CEO Jim Larkin and others. 11-ER-2761. If a financial institution like the Bank of Montreal (BMO) asked about legal risks, Brunst would then pass on what he had learned to the bank. 11-ER-2765.

For example, Ferrer testified on direct examination that Brunst acted deceptively toward BMO regarding the risks facing Backpage. 38-ER-10729-31.

In response to this testimony—to show his transparent dealings with the bank—Brunst sought to introduce his communication to a BMO representative attaching a non-privileged legal memorandum discussing both the civil and criminal risks facing Backpage. 1-BER-66-97 (offered; not admitted). The district court precluded the communication, stating that the legal memo was not "a correct statement of the law." 2-BER-370.

This ruling again left the jurors with a distorted impression of the "notice" Brunst actually received and the matters that formed his state of mind. Nor was it consistent with the district court permitting the Government to freely introduce communications involving Backpage attorneys and evidence regarding the company's legal strategies when offered to impugn the motives of Appellants. 2-BER-371-72; 36-ER-10040-41 (Ferrer testifying that a response from attorney Steve Suskin to CNN was a "sham," and that the retention of Hemu Nigam, a former federal prosecutor, to oversee the company's moderation function was part of a "slow dance"); 42-ER-12069 (Ferrer testifying that the company "sideline[d]" its general counsel, Elizabeth McDougall, and rejected some of her advice as "too destructive" to the company's business model); 36-ER-10279-80 (Ferrer reading into evidence a hearsay statement from State AGs that attorney Don Moon made certain admissions regarding the content on the site).

Accordingly, the jury received Ferrer's testimony that (1) Brunst somehow misled financial institutions, (2) the company's attorneys misled outsiders like the State AGs and CNN, and (3) the advice of company attorneys was ignored. Yet the jury was barred from hearing any of the evidence that would have refuted this testimony. 2-ER-536-37.

## C. The District Court Precluded Brunst from Impeaching Ferrer with Prior Statements.

Ferrer testified that Backpage used shell companies to funnel money through payment processors, thereby disguising the true nature of Backpage's adult ads and deceiving financial institutions. 38-ER-10836; 41-ER-11582-83. Before Ferrer began cooperating with the Government, however, he said the opposite. Brunst sought to impeach Ferrer's testimony with a May 18, 2017 e-mail where Ferrer stated:

> Where's the bank fraud . . . . We are not a gambling site masquerading as a flower shop. We process classified ads for our sites and for our media / newspaper partners . . . . You are not disguising your transaction when you fill out a contract, spend months getting contracts vetted by the acquiring bank/processor and attorneys. You cannot get a bank account without KYC. They have no evidence of fraudulent merchant bank applications. This is really an attempt to "legislate by prosecution" via payment service providers which is the weak link the government pressures to cut off unpopular speech (Posner / wikileaks).

1-BER-98-99.

29

The Government did not and could not refute that Ferrer's statements directly contradicted his trial testimony. *Compare* 40-ER-11462; 41-ER-11495; 11582-83; 34-ER-9614-15; 38-ER-10836. But the district court nevertheless refused to allow the impeachment. With no basis to do so, the district court questioned the authenticity of the document, and said it was unclear whether the statements were Ferrer's and whether Ferrer's e-mail constituted work product. The district court ignored that (1) Ferrer waived any claims of privilege in his personal capacity as part of his plea deal and (2) Ferrer's personal attorneys (who were present at trial) did not object to the use of the e-mail on the basis of a purported privilege. 54-ER-15444-46. Brunst's counsel responded that the court's questions could easily be answered by Ferrer (if necessary, outside the presence of the jury). 41-ER-11476-82, 11637-40. But the district court refused the request. *Id.*

The district court also precluded Brunst from using Ferrer's other statements in the e-mail that contradicted his testimony and the Government's central theories. For example, inconsistent with his trial testimony, Ferrer wrote: "Website Technologies was created in 2012, to have its employees create and maintain websites. It is not a shell company. Shell company means: an inactive company used as a vehicle for various financial maneuvers." 1-BER-101; *compare* 38-ER-10836 (Ferrer testifying: "Posting Solutions was another shell company similar to,

30

like, Website Technologies, very generic sounding company that we could open bank accounts with."); 41-ER-11582-83 (Ferrer testifying: "Website Technologies is just a shell company that's -- Backpage.com is depositing funds into the Website Technologies company.").

### D.     The District Court Precluded Brunst from Testifying in His Own Defense.

Prior to the defense case, Brunst moved for permission to testify to his state of mind.  11-ER-2760-74.  Brunst sought to testify to the following facts, which gave him notice that Backpage was operating lawfully:

- Court decisions gave him comfort that he could continue serving as CFO of the holding company.  11-ER-2762; *see supra* Statement of Facts, Sections I(B), III(B)(1).  Brunst knew that Ferrer submitted sworn statements in these cases detailing how and why Backpage was operating lawfully.  11-ER-2764-65.

- No State AG "ever succeeded in [its] legal threats or actions."  *Id*.

- After the United States Attorney for the Western District of Washington investigated Backpage in 2012, the United States Attorney declined to file criminal charges.  11-ER-2762-63.

- When the California Attorney General filed criminal charges against Backpage, Ferrer, Larkin, and Lacey in 2016-2017, a California state court dismissed the charges.  11-ER-2763.

- Backpage hired Hemu Nigam (a former federal prosecutor) and Elizabeth McDougall (Craigslist's former outside counsel) to oversee the compliance aspects of moderation.  *Id.*

- CEO Larkin and others at Backpage told Brunst that the company regularly employed counsel who advised that Backpage was operating lawfully.  11-ER-2761, 2765.  In response to Ferrer's testimony that Brunst acted deceptively toward financial institutions, Brunst proffered that he not only shared with BMO advice from Backpage's outside counsel regarding the company's legal issues, but also encouraged BMO to speak directly with Backpage's outside counsel.  *See* 1-BER-66-97 (offered; not admitted); 11-ER-2761-63, 2765.

The district court denied Brunst's motion for permission to testify to his state of mind.  *See* 49-ER-13844-75.[9]  Though this testimony would have advanced Brunst's good faith defense, the district court nevertheless held that Brunst would

---

[9]    The district court ruled that Brunst could testify only that he was aware Backpage paid money to lawyers and that no auditor told Brunst that Backpage was engaged in unlawful activity (but precluded the non-privileged information the lawyers provided to the auditors in this regard).  49-ER-13849-50.

first need to satisfy the elements of an advice-of-counsel defense that he was not asserting. *Id.* In making its ruling, the district court did not address, among other things, that (1) the Government had opened the door to all of Brunst's proffered testimony; (2) Judge Brnovich ruled that the attorney advice Ferrer disclosed to the Government was not privileged; and (3) the legal memorandum Brunst shared with BMO was not privileged. *Id.*

Further, the district court reasoned that the State AG's "legal threats or actions are not relevant to the allegations here, the indicted Travel Act violations," 49-ER-13850, directly contradicting its admission of Government exhibits and testimony concerning these very same State AG "threats" and "actions." 35-ER-9918, 9822, 9830-32; 24-ER-6745-47, 6763-69; 25-ER-7101-03; 34-ER-9409; 36-ER-10000, 10041-42.

Brunst also proffered expert testimony from University of Chicago professor Dennis Chookaszian.[10] The expert would have testified regarding the role of a CFO, including "what is and what is not required of a CFO in assessing allegations that a company or one of its subsidiaries has engaged in unlawful conduct." 19-ER-5268-69. Professor Chookaszian would have opined on the ways in which a CFO gains comfort with the legality of a business, and that CFOs

---

[10] Brunst's original expert, Professor Roman Weil, passed away after the mistrial.

are better served by relying on court opinions and the advice of attorneys, rather than comments made by the media, politicians, and others. 11-ER-2766. Judge Brnovich had earlier ruled that such expert testimony was probative and admissible. 18-ER-4992. But by choking off Brunst's right to testify about what he *actually did* in assessing allegations of illegality, Judge Humetewa neutered the expert's anticipated testimony, thereby negating the reason for Brunst to call the expert.

Thus, while the jury was instructed that good faith was a complete defense to the Government's charges, the jury was barred from receiving evidence of Brunst's good faith. 2-ER-409; 7-ER-1802. This allowed the Government to tell the jury in closing argument: "What evidence do you have of each of the defendants' honestly-held belief or opinion? I submit to you, you don't have any evidence." 52-ER-14883.

## IV. The Only Witness Against Brunst Made Key Admissions Regarding Brunst's Lack of Involvement.

The Government broadly focused on Backpage's marketing practices. *See* 34-ER-9393-94. The Government put on evidence regarding Backpage's (1) relationship with The Erotic Review (TER)—a website the Government characterized as a prostitution review website, (2) ad moderation practices, and (3) scraping of ads from other websites (referred to as "aggregation"). *See id.*

But Ferrer, who founded and ran the website, admitted the following:

- Brunst was not part of the discussions to form Backpage.com;

- Brunst did not communicate with TER;

- Brunst was not part of Backpage's marketing department;

- Ferrer had no knowledge of whether Brunst ever had contact with anyone who advertised on Backpage.com;

- Ferrer had no knowledge of Brunst reviewing any ads about which Ferrer testified;

- Brunst did not communicate with any so-called "super posters";

- Brunst was not part of discussions with NCMEC;

- Brunst was not involved in the U.S. Senate Permanent Subcommittee on Investigations' (PSI) investigation and hearing;

- Brunst was not involved in responses to law enforcement subpoenas;

- Ferrer never consulted with Brunst on responses to the State AGs;

- Ferrer never consulted with Brunst on press inquiries; and

- Ferrer never spoke with Brunst about responding to politicians.

40-ER-11383-89.

Ferrer's testimony that attempted to inculpate Brunst was vague and did not prove the charges against Brunst. For example, when asked on direct examination how Brunst would address criticism of Backpage in the press, Ferrer obfuscated

that he "knew Brunst dealt with investors like CFOs would normally do." 37-ER-10400. And while Ferrer testified on direct that Brunst approved Backpage budgets, Ferrer admitted on cross that the "main discussion" with Brunst regarding budgets concerned employee salaries. 40-ER-11428.

The only other company witnesses to testify, Daniel Hyer and Jess Adams, had nothing negative to say about Brunst. Jess Adams, who served as Backpage's accountant and later as its business manager, mentioned that Brunst and many others (including several individuals who were not indicted) were typically present at a year-end budget meeting. 43-ER-12097-98, 12105-06, 12108. He offered no incriminating testimony. *Id.* The other company witness, cooperator Dan Hyer—who worked at Backpage (or its parent company) for 20 years as its sales and marketing director until the day the site was seized by the Government—said nothing about Brunst. 47-ER-13415-16, 13427-28.

## V. The Government's Money Laundering Case Was Predicated on Loan Payments Ferrer Made in Connection with the April 2015 Seller-Financed Sale of Backpage.

The media holding company sold Backpage to Ferrer on April 22, 2015. 38-ER-10714. The former owners lent Ferrer the funds to buy the business. 41-ER11645-46; *see also* 27-ER-7520-7779; 28-ER-7782-7924; 41-ER-11655-58 (purchase and loan agreements). The sale was structured by BDO, a Big 5

accounting firm.  27-ER-7520-30.  Both sides were represented by sophisticated counsel.  27-ER-7713; 41-ER-11652-54.  Ferrer's payments on the two loans (one loan for the company's foreign assets and one for its domestic assets) were made to Cereus Properties (owned by Appellants).  38-ER-10837-40.  On behalf of Cereus Properties, Brunst dealt with Backpage's CFO (Michael Gage) regarding the loan payments.  38-ER-10818-19.

Each of the money laundering counts of conviction against Brunst (Counts 53 to 62 and 64 to 68)[11] concerned a post-sale loan payment from one of Ferrer's entities to Cereus Properties.  20-ER-5561-63; 38-ER-10837-40.

Ferrer testified generally that the source of the loan payments was money from both U.S. and foreign postings in the escort section of Backpage.  38-ER-10837-40.  No foreign ad postings were introduced at trial.  Nor was there evidence that these foreign postings were illegal.  The Government had a summary witness, case agent Quoc Thai, testify that from October 2010 to November 2012 (two-and-a-half to four-and-a-half years before the subject wires), 94 percent of Backpage's worldwide revenue came from the site's adult section.  25-ER-7172; 45-ER-12843-49.  Thai, however, did not analyze the purpose of any of the post-

---

[11]  Brunst was acquitted of the one pre-sale promotional money laundering Count (Count 63).  2-ER-442.  And while the jury convicted him of various transactional money laundering counts, the district court entered a judgment of acquittal as to those counts.  2-ER-333-335; 5-ER-1285.

April 2015 wire transfers. 45-ER-12929. Nor was there testimony or evidence regarding any ad that created the revenue for any of the loan payments.

## VI.  The *Allen* Charge and Compromise Verdict

During the second day of jury deliberations, the jury indicated it was on the verge of deadlocking. 53-ER-14973-80; 7-ER-1798. On the fourth day of deliberations, the jury confirmed that it was deadlocked. 53-ER-15042-46, 15053-54; 7-ER-1801. Over Brunst's objection, the court gave an *Allen* instruction, which appears to have led to a compromise verdict. *Id.* On the sixth day of deliberations, the jury returned a verdict that acquitted Brunst of all 50 substantive Travel Act counts, while convicting him of the Travel Act conspiracy count along with 33 money laundering counts, specifically, money laundering conspiracy, 10 counts of concealment money laundering, five counts of international promotional money laundering, and 17 counts of transactional money laundering. 2-ER-411-54.

## VII.  The District Court Largely Denied Brunst's Motion for Acquittal.

Brunst moved for acquittal under Federal Rule of Criminal Procedure 29 at the close of the Government's case, but the district court reserved its ruling on the motion. 48-ER-13710-43, 13792. Post-verdict, the district court affirmed Brunst's Travel Act conspiracy conviction, stating:

> Defendants' proffered standard for a specific, detailed agreement tied
> to the 50 ads is too stringent. The Superseding Indictment alleged that

38

the Defendants conspired to facilitate prostitution in violation of the Travel Act. Unlike the substantive Travel Act counts, the conspiracy allegations were not specifically tied to the 50 ads.

2-ER-298.

The district court's reasoning effectively reversed Judge Brnovich's pre-trial ruling that the Travel Act conspiracy was tied to the 50 charged ads. 2-ER-574, 577, 579. Brunst therefore was convicted of conspiring to violate the Travel Act based on what Judge Brnovich had called "facilitating the amorphous notion of prostitution," rather than any agreement tied to the 50 charged ads. *Id.*; 2-ER-298. The district court's reasoning also cannot be squared with its own Travel Act conspiracy jury instruction, which provided that the objects of the Travel Act conspiracy were "to commit at least one Travel Act offense ***as charged in Counts 2-51***." 2-ER-386 (emphasis added). The Rule 29 Order tacitly concedes that the Government did not prove a 50-ad conspiracy.

The district court, however, found that the alleged Travel Act conspiracy *ended upon the sale of Backpage* to Ferrer in April 2015:

> Considering the evidence and testimony, the Court finds that there is an insufficiency of evidence showing any acts by Mr. Ferrer, or any other co-conspirator, taken *after* the sale of Backpage was a reasonably foreseeably consequence of the unlawful agreement. The evidence accords with the Jury's likely conclusion that the sale of Backpage to Mr. Ferrer was a break in the conspiracy's agreement to violate the Travel Act. At best, the Government's evidence showed that Mr. Ferrer used Backpage's profits after the sale of Backpage to satisfy the loans he assumed for Backpage's purchase.

2-ER-319 (emphasis in original).

The district court also granted Brunst's Rule 29 motion for acquittal as to the 17 transactional money laundering counts of conviction due to the Government's failure to trace the underlying wire transfers to SUA.  The Court found:

> The Government did not, however, provide sufficient evidence at trial that every ad sold on Backpage.com prior to these transfers was a Travel Act violation such that a rational jury could have traced the funds back to a criminally-derived source.  Even the fact that the Government offered evidence showing that the majority of Backpage's revenue—at times up to 96%—stemmed from sales of ads posted in the Adult Escort section of Backpage is insufficient to sustain these convictions.

2-ER-334.

Despite these findings regarding the lack of SUA and termination of the Travel Act conspiracy, the district court nevertheless upheld the concealment and promotional money laundering counts of conviction, each of which indisputably were predicated on May 2016 to November 2016 loan payments from Ferrer to Appellants *following* the April 2015 sale of Backpage.  2-ER-291-93, 320-22, 325-26.

Specifically, the district court affirmed the concealment money laundering convictions, despite the undisputed fact that the purpose of the subject transfers was for Ferrer to make loan payments tied to his purchase of Backpage.  2-ER-324-25.

As to the promotional money laundering counts, the district court found that the underlying loan payments showed an intent to promote Travel Act violations, despite the fact that these loan payments moved money *out* of Backpage, not into Backpage. 2-ER-326. The Government argued that Cereus Properties contributed to payroll for Backpage (and therefore promoted Backpage's activities) based on the testimony of a case agent, Quoc Thai. 45-ER-12858, 51-ER-14547. But neither Ferrer nor any percipient witness testified to that. *After* closing arguments and while the jury was still deliberating, the Government produced an investigation report from Thai that confirmed the inaccuracy of his testimony. 10-ER-2553-2645. The report stated that another bank account held by a different entity was used for Backpage payroll. 10-ER-2572-73 (noting that a Prosperity Bank account held by Posting Solutions made payroll wire transfers).

Brunst moved to dismiss the indictment, or alternatively to strike the agent's testimony. 9-ER-2303-16. Following the close of evidence, Thai then testified outside the presence of the jury that the basis for his "payroll" testimony was that he merely saw "incoming transfers from Website Tech" to Cereus Properties (what Ferrer testified were loan payments) in financial records. 53-ER-15081-82. The district court denied the motion. 2-ER-352-62. However, in a footnote in its Rule 29 Order, the district court tacitly agreed that Thai's testimony was false, but nevertheless upheld the promotional money laundering convictions. 2-ER-326.

41

## VIII.  The Court Relied on Uncharged and Acquitted Conduct at Sentencing.

The U.S. Probation Office ("Probation") issued a Presentence Investigation Report ("PSR") applying the base level offense provided for by Guideline § 2G1.3 (promotion of a sex act with a minor), as opposed to Guideline § 2G1.1 (promotion of a sex act with an adult), creating "pseudo counts."  PSR at ¶¶ 167-205.  Brunst objected to this calculation.  4-ER-1041-44.  Despite the fact that no offenses against minors were charged here and Brunst was acquitted of the substantive Travel Act counts, the district court adopted the PSR's use of "pseudo counts" for several individuals who were minors when their ads were posted on Backpage.com.  1-ER-168-69.  The district court used Guideline § 2G1.3 in order to calculate a disproportionately high offense level.  1-ER-164-73, 274-75.  Also, contrary to even the Government's position, the district court double-counted the "role in the offense" leadership enhancement.  1-ER-170-72.  The district court then sentenced Brunst to 10 years in prison.  1-ER-95.

## SUMMARY OF ARGUMENT

In addition to the reasons set forth in the briefs of co-Appellants and amici, all of Brunst's convictions should be reversed because Brunst was denied (1) the constitutional right to confront Carl Ferrer and (2) the constitutional right to testify in his own defense regarding matters central to his good faith defense.  *See United States v. Biaggi*, 909 F.2d 662, 692 (2d Cir. 1990) ("Where evidence of

a defendant's innocent state of mind, critical to a fair adjudication of criminal charges, is excluded, we have not hesitated to order a new trial.").

Further, Brunst's Travel Act conspiracy and money laundering convictions should be reversed for legal insufficiency and factual insufficiency of the evidence; the district court erred in denying Brunst's Rule 29 motion. The Government did not prove Brunst was part of a 50-ad conspiracy; to hold otherwise would endorse the district court's erroneous post-trial constructive amendment of the Indictment rendering the conspiracy boundless. *See Kotteakos v. United States*, 328 U.S. 750, 775-76 (1946); *United States v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir. 1997).

As to Brunst's money laundering convictions, there was no proof of SUA, *i.e.*, Travel Act violations. As set forth in the briefs of amici and co-Appellants, Ferrer's testimony regarding the nature of the advertising on the site does not withstand scrutiny under the First Amendment. Further, the Government failed to prove an intent to conceal, as the subject transfers were undisputed loan payments Ferrer made in connection with the "open and notorious" sale of Backpage. *United States v. Stephenson*, 183 F.3d 110, 121 (2d Cir. 1999); *see also United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007). Likewise, the Government failed to prove an intent to promote. The subject loan payments moved money *out of* Backpage. And the Government failed to prove Travel Act violations "could not

have continued" without these loan payments. *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir. 1995).

This Court should also dismiss the Indictment, given the Government's privilege invasions that directly violated a court order and allowed the Government to gain an "unfair advantage" at trial. *Williams v. Woodford*, 384 F.3d 567, 584-85 (9th Cir. 2004).

Lastly, the district court erroneously relied on acquitted conduct in determining Brunst's base offense level under the Guidelines, which resulted in a substantially higher sentencing range.

## STANDARD OF REVIEW

This Court reviews *de novo* the denial of a motion for acquittal based on insufficiency of the evidence. *See United States v. Orduno-Aguilera*, 183 F.3d 1138, 1139-40 (9th Cir. 1999). "There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 1139.

Further, "[i]f the defendant raises a Confrontation Clause challenge based on the exclusion of an area of inquiry," this Court reviews that challenge *de novo*. *United States v. Larson*, 495 F.3d 1094, 1101 (9th Cir. 2007). And "whether a trial court's suppression of a defendant's testimony violates the constitutional right to

testify" also is reviewed *de novo*. *United States v. Moreno*, 102 F.3d 994, 998 (9th Cir. 1996).

## ARGUMENT

I. **The District Court Committed Constitutional Error by Depriving Brunst of His Rights to Confront the Only Witness Against Him and to Testify in His Own Defense.**

The district court committed constitutional error by preventing Brunst from presenting evidence to support a good faith defense. "An evidentiary error violates a defendant's due process rights when it excludes: (1) the main piece of evidence, (2) for the defendant's main defense, to (3) a critical element of the government's case." *United States v. Haischer*, 780 F.3d 1277, 1284 (9th Cir. 2015); *see also Biaggi*, 909 F.2d at 692.

### A. **Brunst Was Deprived of His Constitutional Right to Confront the Only Witness Against Him.**

An effective cross-examination is "critical to a fair trial because cross-examination is the principal means by which the believability of a witness and the truth of his testimony is tested." *Larson*, 495 F.3d at 1101–02 (cleaned up). The Ninth Circuit has "emphasized the policy favoring expansive witness cross-examination in criminal trials." *Id.* Given the "serious questions of credibility" that cooperating witnesses pose, defendants must be provided "broad latitude to

probe [informants'] credibility by cross-examination." *Banks v. Dretke*, 540 U.S. 668, 701-02 (2004).

To determine if a defendant's right to confront a witness was unconstitutionally infringed, the Ninth Circuit must consider whether:

(1)    the excluded evidence was relevant;

(2)    there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and

(3)    the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness.

*United States v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999).

Here, each of these factors is easily met. First, the excluded evidence was plainly relevant. Ferrer was the only percipient witness to offer potentially inculpatory testimony against Brunst.

Brunst was barred from confronting Ferrer with:

- Responsive letters to State AGs that Ferrer claimed on direct were "deceptive," "highly misleading," and "cosmetic and superficial." 34-ER-9409; 35-ER-9822, 9831-32, 9932; 36-ER-10041-42; 49-ER-13850, 40-ER-11182-83; 1-BER-45-54, 61-65 (offered; not admitted).

- Statements the district court redacted regarding regulatory and legal compliance under the CDA in Backpage PowerPoints and other

46

exhibits the Government admitted through Ferrer.  2-BER-313-19; 2-ER-533-34; 35-ER-9964-68, 9976-77; 25-ER-7111-16; 1-BER-55-60 (offered; not admitted); 37-ER-10335-41, 10377-79, 10386; 24-ER-6770-6811; 1-BER-14 (offered; not admitted); 34-ER-9619-20; 36-ER-10147-48, 10210.

- Court opinions that Ferrer knew affirmed the legality of Backpage's business model, including opinions that represented the completion of events that the Government introduced in its case in chief.  2-ER-535; 2-BER-341-52; 34-ER-9395, 9612, 9615; 11-ER-2805-14; 41-ER-11507-08, 11511-17, 11525-26; 36-ER-10063-64, 10242-45, 10272-76; 25-ER-7084, 7098-100.

- Attorney advice the Government previously elicited from Ferrer during its interviews of him.  2-ER-536-37; *see supra* Statement of Facts, Section II(B).

- Ferrer's prior inconsistent statements undermining the Government's money laundering charges.  *See supra* Statement of Facts, Section III(C).

Second, there were no other legitimate interests that outweighed Brunst's interest in presenting the evidence. *See United States v. James*, 139 F.3d 709, 713 (9th Cir. 1998).  The district court generally barred the evidence on the basis that

(1) Brunst had not met the prerequisites of an advice-of-counsel defense,[12] or

(2) the evidence was not relevant to the charges. *See, e.g.*, 2-ER-533-37; 2-BER-341-52.

As to the first justification, Judge Humetewa ignored Judge Brnovich's *pre-trial* ruling that the attorney communications at issue were not privileged and *trial* ruling regarding the admissibility of this evidence. 2-ER-546-49; 30-ER-8454, 8334-35, 8348-49, 8352, 8354-64, 8380, 8382. This was evidence of Brunst's good faith, regardless of whether or not an advice-of-counsel jury instruction ultimately was appropriate. *See United States v. Way*, 2018 WL 3062159, at *8 (E.D. Cal. 2018) ("[T]he court concludes that evidence regarding this [attorney opinion] letter and defendant's awareness of its content are admissible on the question of whether defendant acted with a culpable state of mind. Whether defendant is entitled to an advice-of-counsel jury instruction will be resolved at the appropriate time during the course of trial"); *Howard v. S.E.C.*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) ("[R]eliance on the advice of counsel need

---

[12] In this respect, the district court required Brunst to meet the prerequisites of an advice-of-counsel defense as to "an ad listed in Counts 2-51 (or similar ad described in the SI)," 2-ER-536, while (as discussed above) permitting the Government to introduce scores of hearsay "notice" statements untethered to any particular ad. *See supra* Statement of Facts, Section III(A).

not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter.").

With respect to the district court's second justification for the exclusion of this evidence, because the Government "open[ed] the door" to these areas of inquiry, it was "fair advocacy"—indeed essential—for Brunst "to enter." *United States v. Del Toro Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012); *see also United States v. Waters*, 627 F.3d 345, 357 (9th Cir. 2010) (overturning conviction where district court precluded defendant's responsive evidence, holding that the district court's "rulings, in combination, assured that the jury would be provided with a one-sided picture of [the defendant]. The jury saw her connected to violent anarchist propaganda that it may have had a visceral reaction to, while it was prevented from viewing evidence that would paint a contrasting picture of [the defendant] as a person," noting "the imbalance in the evidence that resulted from the district court's rulings"); 11-ER-2789-98 (setting forth for the district court each instance in which the Government opened the door to these areas of inquiry).

Here, for example, the Government directly put at issue Backpage's responses to the State AG letters, "credit card Armageddon," and Brunst's openness with banks. *See supra* Statement of Facts, Sections III(A), (B)(1)-(4). Brunst therefore should have been permitted to confront Ferrer with the responsive

State AG letters, the *Dart* opinion and how it informed Ferrer's and the company's conduct thereafter, and Brunst's conveying of attorney advice to BMO.

As to the precluded impeachment, the district court's concerns that Ferrer's prior statements constituted work product or may not have been his statements were clearly unfounded, and the district court denied Brunst's request for an evidentiary hearing to demonstrate that. 41-ER-11476-82, 11637-40. Moreover, in the Ninth Circuit, where the "Confrontation Clause and attorney-client privilege are potentially at odds[,] . . . evidentiary privileges or other state laws must yield if necessary to ensure the level of cross-examination demanded by the Sixth Amendment." *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004). Here, the jury "might have received a significantly different impression of [Ferrer's] credibility had [Brunst's] counsel been permitted to pursue his proposed line of cross-examination" regarding Ferrer's prior statements that directly contradicted his key trial testimony. *Id*. at 705 (proposed cross-examination would have involved a privileged letter containing prior inconsistent statements).

Third, the exclusion of this good faith evidence left the jury with insufficient information to assess Ferrer's credibility. Brunst and his co-Appellants' collective cross-examinations of the "prosecution's star witness" were gutted.[13] *United*

---

[13]  Because the district court precluded certain areas of inquiry during co-Appellant Spear's cross-examination of Ferrer, regarding, for example, the

*States v. Kohring*, 637 F.3d 895, 905 (9th Cir. 2011) ("Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case."). This is particularly the case here, where the verdict against Brunst depended upon the credibility of one witness, the jury was deadlocked, and it appears that a compromise verdict was reached following an *Allen* charge.

This was not a one-off line of questioning that was limited by the district court. Rather, the district court precluded Brunst from putting in the heart of his good faith defense. This allowed the Government in rebuttal argument to tell the jury that he had put on no such evidence. 52-ER-14883. This error requires a new trial. *Holley v. Yarborough*, 568 F.3d 1091, 1100 (9th Cir. 2009) ("Precluding cross-examination of a central, indeed crucial witness to the prosecution's case is not harmless error.").

## B. Brunst Was Deprived of His Constitutional Right to Testify in His Own Defense.

A criminal defendant's constitutional right to testify is "essential to due process of law in a fair adversary process" under the Fifth and Sixth Amendments. *Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987). The "most important witness for the

---

responsive letters to the State AGs, Brunst could not address these areas in his cross-examination. *See, e.g.*, 40-ER-11182-83.

defense in many criminal cases is the defendant himself," and the right to testify includes the "right to present his own version of events in his own words." *Id.* "[R]estrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 55-56.

The district court barred virtually the entirety of Brunst's proffered testimony. First, in precluding Brunst's anticipated testimony that the State AG threats were unfounded, the district court's finding that those threats "are not relevant" here cannot possibly be squared with its allowing the Government to introduce those same threats in its case. 11-ER-2762; 49-ER-13850; 35-ER-9918, 9822, 9830-32, 9932; 24-ER-6745-47, 6763-69; 25-ER-7101-03; 34-ER-9409; 36-ER-10000, 10041-42.

Second, the district court's preclusion of Brunst's anticipated testimony that he relied on various legal opinions was "arbitrary" and "disproportionate" to any Rule 403 concerns, as (1) the Government directly put at issue the *McKenna* and *Dart* cases by virtue of Ferrer's testimony regarding Backpage's refusal to implement age verification and Backpage's response to the credit card terminations, and (2) *conversely*, the district court allowed the Government to introduce evidence of legal and quasi-legal proceedings, including State AG investigations, other prostitution investigations, law enforcement subpoenas, and a U.S. Senate investigation (even though none were tethered to any particular

charged ad or resulted in any kind of binding, adverse finding against the company). *Rock*, 483 U.S. at 55-56; 11-ER-2762; 35-ER-9811-12, 9725; 36-ER-10000; 37-ER-10375, 10358-59; 38-ER-10847-53; 39-ER-10906-09; 49-13853-59; 2-BER-341-59.

Third, the district court's preclusion of attorney advice, such as the non-privileged memorandum that Brunst shared with BMO, was improper because Brunst did not need to make out the elements of an advice-of-counsel defense before testifying to *non-privileged* material he shared with a third party. 11-ER-2765; 1-BER-66-97; 2-BER-368-73; 49-ER-13844-48. Regardless, Brunst could not testify to what disclosures were made to those attorneys because he did not make those disclosures himself. 11-ER-2761. Rather, the assurances Brunst received from executives and counsel formed Brunst's good faith belief that Backpage was operating lawfully, rebutting Ferrer's claims that Brunst deceived BMO. 11-ER-2761-62; 38-ER-10729-31; *see supra* Statement of Facts, Section III(B)(4).

Fourth, Brunst should have been permitted to testify that he was aware lawyers (like Hemu Nigam and Elizabeth McDougall) oversaw the company's moderation function. 11-ER-2763. The Government put these individuals and their roles at Backpage at issue in their case. The jury was entitled to hear that

Brunst trusted their work because they were experienced lawyers. 2-BER-371-72; 36-ER-10040-41, 10279-80; 42-ER-12069.

Fifth, Brunst should have been permitted to testify regarding his awareness that in 2013, an investigation by the U.S. Attorney's Office for the Western District of Washington was defeated when the district court quashed a subpoena based on First Amendment grounds. 11-ER-2762-63. Not only did this result inform Brunst's state of mind, but it also responded to Ferrer's testimony that the existence of that investigation created an inference of illegality. 35-ER-9725.

This evidence collectively was central to Brunst's good faith defense, and its exclusion was constitutional error that requires a new trial. *See Haischer*, 780 F.3d at 1284; *Biaggi*, 909 F.2d at 692.

## II. The Court Should Reverse Brunst's Travel Act and Money Laundering Convictions and Remand for Entry of a Judgment of Acquittal.

### A. The Travel Act Conspiracy Conviction Should Be Reversed for Insufficiency of the Evidence and Constitutional Error.

As to the Travel Act conspiracy conviction (Count 1), there was a "total failure of proof of [a] requisite element" of the conspiracy, specifically, "an agreement between two or more persons to commit at least one Travel Act offense as charged in Counts 2-51 of the indictment," *i.e.*, the 50 charged ads. *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010); *see also United States v.*

54

*Espinoza-Valdez*, 889 F.3d 654, 656 (9th Cir. 2018); 2-ER-386. There was no evidence that Brunst ever knew of any of the 50 ads, or knew or interacted with any of the individuals who posted the ads or were the subjects of the posts. 40-ER-11386-87.

Indeed, the district court tacitly conceded the lack of proof as to a 50-ad conspiracy by constructively amending the Indictment *after* trial in its Rule 29 Order to render the conspiracy boundless. 2-ER-298. But in doing so, the district court acted contrary to Judge Brnovich's pre-trial ruling, its own evidentiary rulings, and the ultimate jury instructions. 2-ER-298, 386, 536, 574, 579. The district court's error therefore allowed Brunst to be convicted of an impermissible boundless conspiracy of which he lacked notice in violation of his due process rights.

A defendant is entitled to know what he is accused of "so that he can prepare his defense, and be protected against another prosecution for the same offense." *Tsinhnahijinnie*, 112 F.3d at 991; *Kotteakos*, 328 U.S. at 775-76 (defendant has a right "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others"). The *Kotteakos* court reasoned that as a conspiracy charge "is broadened to include more and more, in varying degrees of attachment to the confederation, the possibilities for miscarriage of justice to particular individuals becomes greater and greater." *Kotteakos*, 328 U.S. at 758, 776

(reversing conspiracy conviction where "one conspiracy only [wa]s charged . . . [but] at least eight [conspiracies] having separate, though similar objects, [we]re made out by the evidence").

At trial, consistent with Judge Brnovich's ruling confining the conspiracy to the 50 charged ads, Brunst focused on the lack of any evidence of his involvement in, knowledge of, or agreement to promote any of the 50 ads or related business enterprises. 40-ER-11386-87; 52-ER-14678; 2-ER-574, 579. The Government in closing, however, asked the jury to convict Brunst of potentially millions of conspiracies involving pimps and prostitutes across the country unknown to Brunst, arguing: *"[E]very pimp* who posted on Backpage.com and used the money to run their . . . small criminal enterprise of prostitution, *they are your conspirators*." 51-ER-14527; *see Kotteakos*, 328 U.S. at 774 (observing that the "dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to a substantial right has not taken place.").

By adopting the Government's boundless conspiracy theory in its Rule 29 Order, the district court "endorsed the prosecution's different interpretation after the case went to the jury" and "ambushed" Brunst. *Joo Heun Lee v. Small*, 419 F. App'x 763, 765 (9th Cir. 2011) (granting petition for writ of habeas corpus); *see United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002), *holding modified on*

*other grounds by Larson*, 495 F.3d at 1100 (a post-trial constructive amendment to the indictment "always requires reversal.").[14]

The fundamental mismatch between the Government's proof and the scope of the charged Travel Act conspiracy requires reversal.

## B.     The Evidence Was Insufficient to Support the Money Laundering Convictions Against Brunst.

### 1.     There Was Insufficient Evidence of SUA.

There was a "total failure of proof" as to the SUA element of all the money laundering counts of conviction. *Nevils*, 598 F.3d at 1167; 18 U.S.C. § 1956(a)(1), (a)(2)(A). As an initial matter, as set forth in the briefs of co-Appellants and amici, the Government's claim that all adult ads equated to unlawful sex-for-money ads violated the First Amendment. *See Dart*, 807 F.3d at 234 ("[N]ot all advertisements for sex are advertisements for illegal sex."); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013) (speech that "proposes an illegal transaction," not speech merely "associated with unlawful activity," is excluded from the First Amendment's protections). Nor did the Government offer the jury

---

[14]   This Court reviews *de novo* whether the Indictment was constructively amended. *United States v. Adamson*, 291 F.3d 606, 612 (9th Cir. 2002).

any concrete evidence of facially unlawful ads during the post-Backpage-sale time period of the wire transfers.[15]

Further, there was insufficient evidence supporting a finding that the particular loan payments underlying the concealment and international promotional money laundering counts of conviction involved proceeds of SUA. There is no dispute that (i) the subject transfers were each loan payments Ferrer made between May 2016 to November 2016; (ii) Appellants were all acquitted of all Travel Act counts following the April 2015 sale of Backpage; (iii) the district court found that the Travel Act conspiracy ended upon the sale of Backpage; (iv) the Government offered no proof that any funds from pre-sale ads formed the basis for transfers years later; and (v) the Government's case agent focused solely on Backpage's revenue from 2010 to 2012, failing to show that even those irrelevant revenues were tied to Travel Act violations. 20-ER-5561-63; 2-ER-319, 420-36; 38-ER-10699-700, 10837-40; 25-ER-7172; 45-ER-12843-49.

In short, the Government did not prove that the subject wire transfers involved proceeds of SUA, which the district court essentially conceded, finding:

---

[15] Only one of the post-sale alleged Travel Act violations (Count 23) related to an ad that, on its face, arguably proposed an illegal transaction. But all Appellants were acquitted of that count (and all post-sale Travel Act counts). 2-ER-420-36, 319. Further, even that ad was posted in August 2015, nearly a year before the first charged money laundering transfer. 20-ER-5557.

58

"The Government did not, however, provide sufficient evidence at trial that every ad sold on Backpage.com prior to these transfers was a Travel Act violation . . . ." 2-ER-334.

### 2. There Was Insufficient Evidence of an Intent to Conceal.

"The money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds." *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007). *Adefehinti* is instructive. There, the D.C. Circuit reversed concealment money laundering convictions where "the transactions amount[ed] to no more than divvying up the joint venture's gains, albeit illegally obtained." *Adefehinti*, 510 F.3d at 322.

Here, even beyond the lack of SUA, there is no dispute that the concealment money laundering counts of conviction each concern (i) a loan payment from Ferrer to Appellants that (ii) related to a sale that was "open and notorious" in that the sale, loans, and transaction-related documents made unmistakably clear that Backpage was being sold. *United States v. Stephenson*, 183 F.3d 110, 121 (2d Cir. 1999) (vacating concealment money laundering conviction); 38-ER-10714, 10837-40; 41-ER-11645-46, 11652-54; 20-ER-5561-63; 27-ER-7520-30, 7713; *see also* 27-ER-7520-7779, 28-ER-7782-7924; 41-ER-11655-58 (purchase and loan agreements). Here, it cannot be said that there was concealment where the buyer

59

of a business undisputedly made loan payments to the seller using proceeds from the business he purchased.

In this way, the central tenet of the Government's case—that *everyone*, including financial institutions, knew about the nature of the ads on the Backpage site—contradicts a finding of concealment. *See supra* Statement of Facts, Section III(A). If that was the case, then an open sale of Backpage financed by Backpage's advertising proceeds did not "mask[]" anything that was not already apparent. *Adefehinti*, 510 F.3d at 322; *see Dart*, 807 F.3d at 237 (Judge Posner observing that Sheriff Dart's threats alone caused the credit card companies to terminate processing for Backpage, because "of course they knew about the nature of the advertising on Backpage—everyone does—without having to be told by Sheriff Dart.").[16]

It is not enough for the Government to hang its hat on the fact that the loan payments were funded by Backpage proceeds. That is because the "purpose" of the charged transfers must be to "conceal or disguise." *Cuellar v. United States*, 553 U.S. 550, 567 (2008) (interpreting the term "design" under the transportation provision of the money laundering statute; this term also circumscribes

---

[16] Further, as set forth in co-Appellant Lacey's brief, there was no intent to conceal here, as the income Brunst received from Cereus Properties via Ferrer's loan payments was fully disclosed to the Government in tax filings. 25-ER-7173; 45-ER-12849-56.

concealment provision). Here, the undisputed "purpose" of the subject transfers was "to make interest and principal payments" to "the sellers" on the loans. 38-ER-10839-40; 2-ER-319 (district court finding that "[a]t best, the Government's evidence showed that Mr. Ferrer used Backpage's profits after the sale of Backpage to satisfy the loans he assumed for Backpage's purchase.").

Nor did Ferrer's testimony establish concealment. Ferrer testified that an entity called "Website Technologies" was formed in or around 2014 to reputationally distance the business from Backpage. 38-ER-10584-85. Then, following the sale of Backpage in April 2015, Website Technologies made loan payments to Cereus Properties, owned by Appellants. 38-ER-10839-40. But evidence of a purported intent to further the Backpage business through the creation of Website Technologies is not evidence that loan payments from Website Technologies to Appellants made years later were intended to conceal the source of those funds. In this way, there is a disconnect between the Government's proof as to Website Technologies and the actual transfers underlying concealment money laundering convictions. *See United States v. Fallon*, 61 F.4th 95, 118 (3d Cir. 2023) (reversing concealment money laundering conviction because "a defendant's mere receipt of funds as a result of a fraudulent transaction cannot itself constitute money laundering," pointing to the lack of evidence of an "intent to conceal illicit proceeds separate from their intent to commit the underlying fraud scheme").

### 3. There Was Insufficient Evidence of an Intent to Promote.

The international promotional money laundering statute requires the Government to show the defendant had "the intent to promote the carrying on of specified unlawful activity" through the subject transaction. 18 U.S.C. § 1956(a)(2)(A). Judge Brnovich found that "one cannot intend to promote/facilitate a business enterprise one does not know exists." 2-ER-576-77. That prescient finding explains why the promotional money laundering counts fail: there was no evidence that Brunst intended to promote a particular pimp's business. And certainly, there was no evidence that moving money *out* of Backpage via loan payments following its sale did in fact *promote* a particular pimp's business.

Further, to find an intent to promote requires one to find that the alleged Travel Act violations "could not have continued" without the loan payments from Ferrer to Appellants. *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir. 1995). But there was a lack of evidence that individuals could not continue to post ads to Backpage or elsewhere *absent* these loan payments.

Finally, the Government's weak contention that Cereus Properties was a post-sale payroll company for Backpage (and therefore promoted Backpage's activities) was entirely unsupported. 51-ER-14547. The case agent who made this statement effectively retracted it during an evidentiary hearing regarding the

Government's post-trial disclosure of an investigation report contradicting the claim. 10-ER-2553, 2572, 2630 ER; 53-ER-15081-82.[17] Brunst's promotional money laundering convictions cannot be affirmed based on a payroll theory that is demonstrably false and that relies on testimony Brunst lacked an opportunity to confront. *See Larson*, 495 F.3d at 1101–02.

## III. The Court Should Dismiss the Indictment for Government Misconduct.

This court reviews *de novo* a denial of a motion to dismiss an indictment on due process grounds. *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991). Deliberate interference with "the confidential relationship between a criminal defendant and defense counsel" violates the Sixth Amendment right to counsel "if it substantially prejudices the criminal defendant." *Williams v. Woodford*, 384 F.3d 567, 584-85 (9th Cir. 2004). "Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *Id.* at 585.

---

[17] The district court erred in refusing to strike the case agent's testimony in this regard, reasoning that the report was not Thai's statement. 2-ER-352-62. But this finding was directly contradicted by the fact that it was Thai who emailed the report to the prosecutors after trial, saying, "I wanted to share with you the latest draft of the tracing document that Lyndon and ***I put together*** . . . ."). 10-ER-2553 (emphasis added).

Here, Judge Logan ruled that Brunst, his co-Appellants, and Ferrer jointly held attorney-client privileges pursuant to valid joint defense and joint representation agreements.  19-ER-5335, 5346-47.  In violation of this ruling, the Government repeatedly questioned Ferrer about communications that were privileged on their face.  54-ER-15481-83, 15488; 55-ER-15497, 15503, 15507, 15509-10, 15517, 15519, 15522, 15546-47, 15566-67, 15579, 15584-85, 15594, 96.  Denying an evidentiary hearing, Judge Brnovich incorrectly found that there was no privilege protecting these communications.  2-ER-548.

The Government gained an "unfair advantage" from the erroneous pre-trial ruling in several ways.  First, the Government freely discussed Backpage attorney communications with Ferrer as part of its trial preparation, but successfully moved *in limine* to preclude Appellants from referencing those same communications during trial because Appellants had not waived the privilege.  12-ER-3048-53, 3080-83; 2-ER-536-37.  Put simply, the district court allowed the Government to have its cake and eat it too.

Second, the Government used the privileged information it learned from Ferrer at trial.  For example, the Government elicited from Ferrer that Appellants employed a "slow dance" legal strategy with respect to the State AGs, which was a central prosecution them at trial.  34-ER-9408, 9410; 35-ER-9830-31, 9846; 36-ER-10000, 10040-41; 52-ER-14885 (referencing the phrase in opening statements,

closing arguments, and repeatedly eliciting testimony from Ferrer on the subject).
The Government learned of this supposed legal strategy during its interviews of
Ferrer, which included a discussion of a Backpage PowerPoint that referenced
"Legal Strategy" (that was originally redacted as privileged). 25-ER-7058, 2-
BER-273-78; 55-ER-15565-66 (Ferrer referencing the PowerPoint during his
interviews with the Government and noting that the company's legal strategy was
to "[m]ove slowly but deliberately" with the State AGs). When this exhibit—and
the notion of the "slow dance" strategy—was addressed with the district court
during trial, the lead prosecutor claimed: "I don't know what's redacted here . . .
I presume they were acting in good faith and redacted information that they
thought fell within the purview of some type of privilege." 2-BER-273-78. The
prosecutor's answer was disingenuous, given that he had already interviewed
Ferrer about the privileged (and redacted) portions of the document. 55-ER-
15565-66.

Third, this court "must consider the government's willfulness in committing
the misconduct and its willingness to own up to it" in fashioning a remedy. *United
States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993). The Government's
willfulness cannot reasonably be disputed—the Government invaded jointly-held
privileges both before and after Judge Logan barred them from doing so, took the
position that the material Ferrer disclosed was not privileged, and then objected to

Appellants' use of that same material at trial because they had not waived the privilege. 12-ER-3081, 54-ER-15377, 15379-84. The Government incredulously defended its invasions by claiming that the attorney advice informed Backpage's public legal filings. 54-ER-15377, 15386-87; *see Kojayan*, 8 F.3d at 1323 ("Such hard-bitten litigation tactics are unbecoming a prosecutor.").

This Court has previously found that dismissal of an indictment is an appropriate remedy for prosecutorial misconduct. *See, e.g.*, *United States v. Chapman*, 524 F.3d 1073, 1088 (9th Cir. 2008) (affirming dismissal of indictment, where district court was "concerned that any lesser sanction would be like endorsing the AUSA's conduct") (cleaned up); *Kojayan*, 8 F.3d at 1324-25 (dismissing indictment pursuant to court's "supervisory power" where "prosecutorial misconduct . . . deprived the defendants of due process of law . . . to make it clear that the misconduct was serious . . . and that steps must be taken to avoid a recurrence of this chain of events.").[18]

---

[18] While dismissal is the appropriate sanction given the nature of the conduct here, the district court did not even consider the range of possible sanctions. Alternatively, this Court should remand for the evidentiary hearing that was requested by Brunst to prove the Government's privilege invasions, the intent of the prosecutors to violate Judge Logan's order, and the resulting prejudice.

**IV.     The District Court Erroneously Used Acquitted Conduct to Calculate the Applicable Base Offense Level Under the Sentencing Guidelines.**

This Court "review[s] the district court's interpretation of the Sentencing Guidelines *de novo*, the district court's application of the Guidelines to the facts for abuse of discretion, and the district court's factual findings for clear error."  *United States v. Garro*, 517 F.3d 1163, 1167 (9th Cir. 2008).

Under the Guidelines, a defendant's base offense level is determined by the "offense of conviction."  Guideline § 1B1.2; *United States v. Greene*, No. 23-4097, 2025 WL 1479677, at *4 (9th Cir. May 23, 2025) ("When calculating a Sentencing Guidelines range, courts must start with the crime of conviction."); *United States v. McEnry*, 659 F.3d 893, 897 (9th Cir. 2011) ("[I]t is not the defendant's underlying relevant conduct, but the crime of conviction, that governs the selection of the appropriate guideline section.").

Here, the offense of conviction was conspiracy to violate the Travel Act under 18 U.S.C. § 371.  20-ER-5554.  The base offense level therefore corresponds to the "base offense level from the guideline for the substantive offense . . . ."  Guideline § 2X1.1(a).  Under Guideline § 2E1.2 (Travel Act), the district court was correct to look to the "offense level applicable to the . . . other unlawful activity in respect to which the travel or transportation was undertaken."  Guideline § 2E1.2(a)(2); *id.*, Application Note 2 ("If the underlying conduct violates state

67

law, the offense level corresponding to the most analogous federal offense is to be used.").  However, consideration of relevant but uncharged conduct is impermissible at this stage of the Guidelines analysis.  Any "factual inquiry" is "extremely limited" and "to the extent the court is required to look to the facts to select a guideline, the court is limited to the conduct charged in the indictment." *McEnry*, 659 F.3d at 897, 899

The district court therefore erred in applying Guideline § 2G1.3 to calculate the base offense level, because (1) the Travel Act conspiracy was indicted as a conspiracy to facilitate prostitution, not to facilitate the promotion of sex with minors and (2) Brunst was acquitted of all of the substantive Travel Act offenses that formed the basis for the pseudo-counts.  1-ER-95, 164-173, 274-75; 2-ER-412-36, 402 ("[N]o defendant is charged with crimes of "human trafficking," "sex trafficking," or "child sex trafficking" or with facilitating those crimes")).

The district court's erroneous reliance on Guideline § 2G1.3, rather than § 2G1.1, resulted in (1) an increase in the base offense level by 10 points, (2) the addition of four points of enhancements contained only in § 2G1.3, and (3) the impermissible creation of "pseudo-counts" tied to counts of acquittal that added three points to the Guideline calculation.  PSR at ¶¶ 167-205; 1-ER-95, 164-173, 274-75; *see Greene*, 2025 WL 1479677 at *6 (reversing district court's use of pseudo-counts as part of defendant's sentence, noting that the Guidelines "make

68

clear that the crime used to calculate the base offense level" is "the crime of conviction."). Further, as the Government admitted at the sentencing hearing, the district court also erred in double-counting the § 3B1.1 four-point leadership enhancement by including it *both* in the underlying offense calculation for each erroneous "pseudo-count" and then again after the counts had been grouped. 1-ER-170-73.

Therefore, rather than an offense level of 43, the offense level should have been 22,[19] which correlates to a Guideline sentence of 41 to 51 months (not the 10-year sentence imposed by the district court).[20] This error affected Brunst's substantial rights. *See Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016) ("When a defendant is sentenced under an incorrect Guidelines range . . . the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error."); *Greene*, 2025 WL 1479677 at *7 (holding

---

[19] The underlying offense level under Guideline § 2E1.2 is 14. Two points are added for a conviction under 18 U.S.C. § 1956. Guideline § 2S1.1(b)(2). Two points are added for sophisticated money laundering. *Id*. And four points are added for having a leadership role in the offense. *Id*. at § 3B1.1.

[20] Because the money laundering guideline looks to the "underlying offense," the same base offense level would be applicable to those counts of conviction, all of which are grouped with the Travel Act conspiracy conviction under the Guidelines. *See* Guidelines §§ 2S1.1(a), 3D1.2.

that a two-level error in the Guideline calculation affected defendant's substantial rights).

## V. Brunst Joins in His Co-Appellants' Arguments.

Pursuant to Federal Rule of Appellate Procedure 28(i), Brunst joins in co-Appellants Spear's and Lacey's opening briefs and adopts their arguments by reference.

For the reasons stated therein, the Court should enter a judgment of acquittal on Brunst's Travel Act conspiracy conviction because: (i) the objects of the conspiracy, alleged Travel Act violations, are based on a legally invalid facilitation theory and (ii) the conviction violates Brunst's First Amendment rights. The Court should also enter a judgment of acquittal on all of Brunst's money laundering convictions because (i) those convictions, including the conspiracy charge, are premised on legally invalid Travel Act violations and (ii) the Government failed to prove SUA tied to unprotected speech.

At a minimum, this Court should order a new trial because: (i) the district court's First Amendment and specific intent instructions were erroneous, and (ii) the district court erroneously admitted sex trafficking evidence.

## <u>CONCLUSION</u>

For these reasons—both individually and cumulatively—Brunst's convictions must be reversed and the case should be remanded for entry of

a judgment of acquittal on all counts of conviction.  At a minimum, Brunst is

entitled to a new trial on all counts of conviction.


DATED:  July 14, 2025                    Respectfully submitted,

                                         Gary S. Lincenberg
                                         Gopi K. Panchapakesan
                                         Michael C. Landman
                                         Bird, Marella, Rhow,
                                         Lincenberg, Drooks & Nessim, LLP


                                         By:     */s/ Gary S. Lincenberg*
                                                  Gary S. Lincenberg
                                                  Attorneys for Defendant-Appellant John
                                                  ("Jed") Brunst

## <u>CERTIFICATE OF RELATED CASES</u>

The following related cases are pending, and have been consolidated with

Brunst's appeal, before this Court: *United States v. Scott Spear*, 24-5375; *United*

*States v. Michael Lacey*, 24-5376. Appellant is aware of no other pending, related

cases.

DATED: July 14, 2025       Gary S. Lincenberg
Gopi K. Panchapakesan
Michael C. Landman
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM, LLP


By:       */s/ Gary S. Lincenberg*
             Gary S. Lincenberg
Attorneys for Defendant-Appellant John
Brunst

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1,

I certify that this opening brief is proportionally spaced, has a typeface of

14 points, and contains approximately 14,839 words per this Court's Order

(Dkt. 90.1).

DATED:  July 14, 2025        BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM, LLP


By:      */s/ Gary S. Lincenberg*
Gary S. Lincenberg
Attorneys for Defendant-Appellant John
Brunst

4043374.9

73

# STATUTORY ADDENDUM

# CIRCUIT RULE 28-2.7 ADDENDUM
# TABLE OF CONTENTS

## STATUTES AND RULES

18 U.S.C. § 371 ............................................................................................. 1

18 U.S.C. § 1952 ........................................................................................... 1

18 U.S.C. § 1956 ........................................................................................... 2

U.S. Sent'g Comm'n, Guidelines Manual § 1B1.2 (Nov. 2023) ........................... 10

USSG § 2E1.2 .............................................................................................. 13

USSG § 2G1.1 .............................................................................................. 13

USSG § 2G1.3 .............................................................................................. 15

USSG § 2S1.1 .............................................................................................. 20

USSG § 2X1.1 .............................................................................................. 23

USSG § 3D1.2 .............................................................................................. 26

# STATUTES

## 18 U.S.C. § 371

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both. If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

## 18 U.S.C. § 1952

**(a)** Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to--
**(1)** distribute the proceeds of any unlawful activity; or
**(2)** commit any crime of violence to further any unlawful activity; or
**(3)** otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform--
**(A)** an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or
**(B)** an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if
death results shall be imprisoned for any term of years or for life.
**(b)** As used in this section (i) "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title and (ii) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.
**(c)** Investigations of violations under this section involving liquor shall be conducted under the supervision of the Attorney General.
**(d)** If the offense under this section involves an act described in paragraph (1) or (3) of subsection (a) and also involves a preretail medical product (as defined in section 670), the punishment for the offense shall be the same as the punishment

for an offense under section 670 unless the punishment under subsection (a) is greater.

**(e)(1)** This section shall not apply to a savings promotion raffle conducted by an insured depository institution or an insured credit union.

**(2)** In this subsection--

**(A)** the term "insured credit union" shall have the meaning given the term in section 101 of the Federal Credit Union Act

(12 U.S.C. 1752);

**(B)** the term "insured depository institution" shall have the meaning given the term in section 3 of the Federal Deposit

Insurance Act (12 U.S.C. 1813); and

**(C)** the term "savings promotion raffle" means a contest in which the sole consideration required for a chance for chance of winning designated prizes is obtained by the deposit of a specified amount of money in a savings account or other savings program, where each ticket or entry has an equal chance of being drawn, such contest being subject to regulations that may from time to time be promulgated by the appropriate prudential regulator (as defined in section 1002 of the Consumer Financial Protection Act of 2010 (12 U.S.C. 5481)).

## 18 U.S.C. § 1956

**(a)(1)** Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

**(A)(i)** with the intent to promote the carrying on of specified unlawful activity; or

**(ii)** with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

**(B)** knowing that the transaction is designed in whole or in part--

**(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

**(ii)** to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

**(2)** Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

**(A)** with the intent to promote the carrying on of specified unlawful activity; or

**(B)** knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part--

**(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

**(ii)** to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

**(3)** Whoever, with the intent--

**(A)** to promote the carrying on of specified unlawful activity;

**(B)** to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

**(C)** to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

**(b)** Penalties.--

**(1)** In general.--Whoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of--

**(A)** the value of the property, funds, or monetary instruments involved in the transaction; or

**(B)** $10,000.

**(2)** Jurisdiction over foreign persons.--For purposes of adjudicating an action filed or enforcing a penalty ordered under this section, the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and--

**(A)** the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;

**(B)** the foreign person converts, to his or her own use, property in which the United States has an ownership interest by virtue of the entry of an order of forfeiture by a court of the United States; or

**(C)** the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.

**(3)** Court authority over assets.--A court may issue a pretrial restraining order or take any other action necessary to ensure that any bank account or other property held by the defendant in the United States is available to satisfy a judgment under this section.

**(4)** Federal receiver.--

**(A)** In general.--A court may appoint a Federal Receiver, in accordance with subparagraph (B) of this paragraph, to collect, marshal, and take custody, control, and possession of all assets of the defendant, wherever located, to satisfy a civil judgment under this subsection, a forfeiture judgment under section 981 or 982, or a criminal sentence under section 1957 or subsection (a) of this section, including an order of restitution to any victim of a specified unlawful activity.

**(B)** Appointment and authority.--A Federal Receiver described in subparagraph (A)--

**(i)** may be appointed upon application of a Federal prosecutor or a Federal or State regulator, by the court having jurisdiction over the defendant in the case;

**(ii)** shall be an officer of the court, and the powers of the Federal Receiver shall include the powers set out in section 754 of title 28, United States Code; and

**(iii)** shall have standing equivalent to that of a Federal prosecutor for the purpose of submitting requests to obtain information regarding the assets of the defendant--

**(I)** from the Financial Crimes Enforcement Network of the Department of the Treasury; or

**(II)** from a foreign country pursuant to a mutual legal assistance treaty, multilateral agreement, or other arrangement for international law enforcement assistance, provided that such requests are in accordance with the policies and procedures of the Attorney General.

**(c)** As used in this section--

**(1)** the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

**(2)** the term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction;

**(3)** the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

**(4)** the term "financial transaction" means

**(A)** a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or

**(B)** a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

**(5)** the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery;

**(6)** the term "financial institution" includes--

**(A)** any financial institution, as defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder; and

**(B)** any foreign bank, as defined in section 11 of the International Banking Act of 1978 (12 U.S.C. 3101);

**(7)** the term "specified unlawful activity" means--

**(A)** any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

**(B)** with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving—

**(i)** the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act);

**(ii)** murder, kidnapping, robbery, extortion, destruction of property by means of explosive or fire, or a crime of violence (as defined in section 16);

**(iii)** fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978));2
**(iv)** bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official;
**(v)** smuggling or export control violations involving--
**(I)** an item controlled on the United States Munitions List established under section 38 of the Arms Export Control Act (22 U.S.C. 2778); or
**(II)** an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730-774);
**(vi)** an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States; or
**(vii)** trafficking in persons, selling or buying of children, sexual exploitation of children, or transporting, recruiting or
harboring a person, including a child, for commercial sex acts;
**(C)** any act or acts constituting a continuing criminal enterprise, as that term is defined in section 408 of the Controlled Substances Act (21 U.S.C. 848);
**(D)** an offense under section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member), section 152 (relating to concealment of assets; false oaths and claims; bribery), section 175c (relating to the variola virus), section 215 (relating to commissions or gifts for procuring loans), section 351 (relating to congressional or Cabinet officer assassination), any of sections 500 through 503 (relating to certain counterfeiting offenses), section 513 (relating to securities of States and private entities), section 541 (relating to goods falsely classified), section 542 (relating to entry of goods by means of false statements), section 545 (relating to smuggling goods into the United States), section 549 (relating to removing goods from Customs custody), section 554 (relating to smuggling goods from the United States), section 555 (relating to border tunnels), section 641 (relating to public money, property, or records), section 656 (relating to theft, embezzlement, or misapplication by bank officer or employee), section 657 (relating to lending, credit, and insurance institutions), section 658 (relating to property mortgaged or pledged to farm credit agencies), section 666 (relating to theft or bribery concerning programs receiving Federal funds), section 793, 794, or 798 (relating to espionage), section 831 (relating to prohibited transactions involving nuclear materials), section 844(f) or (i) (relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce), section 875 (relating to interstate communications), section 922(l) (relating to the unlawful importation of firearms), section 924(n), 932, or 933 (relating to firearms

trafficking), section 956 (relating to conspiracy to kill, kidnap, maim, or injure certain property in a foreign country), section 1005 (relating to fraudulent bank entries), 10063 (relating to fraudulent Federal credit institution entries), 10073 (relating to Federal Deposit Insurance transactions), 10143 (relating to fraudulent loan or credit applications), section 1030 (relating to computer fraud and abuse), 10323 (relating to concealment of assets from conservator, receiver, or liquidating agent of financial institution), section 1111 (relating to murder), section 1114 (relating to murder of United States law enforcement officials), section 1116 (relating to murder of foreign officials, official guests, or internationally protected persons), section 1201 (relating to kidnaping), section 1203 (relating to hostage taking), section 1361 (relating to willful injury of Government property), section 1363 (relating to destruction of property within the special maritime and territorial jurisdiction), section 1708 (theft from the mail), section 1751 (relating to Presidential assassination), section 2113 or 2114 (relating to bank and postal robbery and theft), section 2252A (relating to child pornography) where the child pornography contains a visual depiction of an actual minor engaging in sexually explicit conduct, section 2260 (production of certain child pornography for importation into the United States), section 2280 (relating to violence against maritime navigation), section 2281 (relating to violence against maritime fixed platforms), section 2319 (relating to copyright infringement), section 2320 (relating to trafficking in counterfeit goods and services), section 2332 (relating to terrorist acts abroad against United States nationals), section 2332a (relating to use of weapons of mass destruction), section 2332b (relating to international terrorist acts transcending national boundaries), section 2332g (relating to missile systems designed to destroy aircraft), section 2332h (relating to radiological dispersal devices), section 2339A or 2339B (relating to providing material support to terrorists), section 2339C (relating to financing of terrorism), or section 2339D (relating to receiving military-type training from a foreign terrorist organization) of this title, section 46502 of title 49, United States Code, a felony violation of the Chemical Diversion and Trafficking Act of 1988 (relating to precursor and essential chemicals), section 590 of the Tariff Act of 1930 (19 U.S.C. 1590) (relating to aviation smuggling), section 422 of the Controlled Substances Act (relating to transportation of drug paraphernalia), section 38(c) (relating to criminal violations) of the Arms Export Control Act, section 11 (relating to violations) of the Export Administration Act of 1979, section 206 (relating to penalties) of the International Emergency Economic Powers Act, section 16 (relating to offenses and punishment) of the Trading with the Enemy Act, any felony violation of section 15 of the Food and Nutrition Act of 2008 (relating to supplemental nutrition assistance program benefits fraud) involving a quantity of benefits having a value of not less than $5,000, any violation of section 543(a)(1) of the Housing

Act of 1949 (relating to equity skimming), any felony violation of the Foreign Agents Registration Act of 1938, any felony violation of the Foreign Corrupt Practices Act, section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122) (relating to prohibitions governing atomic weapons), or section 104(a) of the North Korea Sanctions Enforcement Act of 2016 (relating to prohibited activities with respect to North Korea);

**ENVIRONMENTAL CRIMES**

**(E)** a felony violation of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Ocean Dumping Act (33 U.S.C. 1401 et seq.), the Act to Prevent Pollution from Ships (33 U.S.C. 1901 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), or the Resources Conservation and Recovery Act (42 U.S.C. 6901 et seq.);

**(F)** any act or activity constituting an offense involving a Federal health care offense; or

**(G)** any act that is a criminal violation of subparagraph (A), (B), (C), (D), (E), or (F) of paragraph (1) of section 9(a) of the Endangered Species Act of 1973 (16 U.S.C. 1538(a)(1)), section 2203 of the African Elephant Conservation Act (16 U.S.C. 4223), or section 7(a) of the Rhinoceros and Tiger Conservation Act of 1994 (16 U.S.C. 5305a(a)), if the endangered or threatened species of fish or wildlife, products, items, or substances involved in the violation and relevant conduct, as applicable, have a total value of more than $10,000;

**(8)** the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

**(9)** the term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.

**(d)** Nothing in this section shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

**(e)** Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the Department of Homeland Security has jurisdiction, by such components of the Department of Homeland Security as the Secretary of Homeland Security may direct, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury, the Secretary of Homeland Security, and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal Service, and the Attorney General.

Violations of this section involving offenses described in paragraph (c)(7)(E) may be investigated by such components of the Department of Justice as the Attorney General may direct, and the National Enforcement Investigations Center of the Environmental Protection Agency.

**(f)** There is extraterritorial jurisdiction over the conduct prohibited by this section if--

**(1)** the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

**(2)** the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

**(g)** Notice of conviction of financial institutions.--If any financial institution or any officer, director, or employee of any financial institution has been found guilty of an offense under this section, section 1957 or 1960 of this title, or section 5322 or 5324 of title 31, the Attorney General shall provide written notice of such fact to the appropriate regulatory agency for the financial institution.

**(h)** Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

**(i)** Venue.--(1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in--

**(A)** any district in which the financial or monetary transaction is conducted; or

**(B)** any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

**(2)** A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

**(3)** For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.

**(j)** Seven-year limitation.--Notwithstanding section 3282, no person shall be prosecuted, tried, or punished for a violation of this section or section 1957 if the specified unlawful activity constituting the violation is the activity defined in subsection (c) (7)(B) of this section, unless the indictment is found or the information is instituted not later than 7 years after the date on which the offense was committed.

**USSG § 1B1.2**

**(a)** Determine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information of which the defendant was convicted). However, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two applicable to the stipulated offense. Refer to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index for the offense of conviction. If the offense involved a conspiracy, attempt, or solicitation, refer to §2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense. For statutory provisions not listed in the Statutory Index, use the most analogous guideline. See §2X5.1 (Other Offenses). The guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction. See §1B1.9 (Class B or C Misdemeanors and Infractions).

**(b)** After determining the appropriate offense guideline section pursuant to subsection (a) of this section, determine the applicable guideline range in accordance with §1B1.3 (Relevant Conduct).

**(c)** A plea agreement (written or made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offense(s).

**(d)** A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.

**Application Notes:**

**1.** This section provides the basic rules for determining the guidelines applicable to the offense conduct under Chapter Two (Offense Conduct). The court is to use the Chapter Two guideline section referenced in the Statutory Index (Appendix A) for the offense of conviction. However, (A) in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, the Chapter Two offense guideline section applicable to the stipulated offense is to be used; and (B) for statutory provisions not listed in the Statutory Index, the most analogous guideline, determined pursuant to §2X5.1 (Other Offenses), is to be used. In the case of a particular statute that proscribes only a single type of criminal conduct, the offense of conviction and the conduct proscribed by the statute will coincide, and the Statutory Index will specify only one offense guideline for that offense of conviction. In the case of a particular statute that proscribes a variety of conduct

that might constitute the subject of different offense guidelines, the Statutory Index may specify more than one offense guideline for that particular statute, and the court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted. If the offense involved a conspiracy, attempt, or solicitation, refer to §2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense. For statutory provisions not listed in the Statutory Index, the most analogous guideline is to be used. See §2X5.1 (Other Offenses). As set forth in the first paragraph of this note, an exception to this general rule is that if a plea agreement (written or made orally on the record) contains a stipulation that establishes a more serious offense than the offense of conviction, the guideline section applicable to the stipulated offense is to be used. A factual statement or a stipulation contained in a plea agreement (written or made orally on the record) is a stipulation for purposes of subsection (a) only if both the defendant and the government explicitly agree that the factual statement or stipulation is a stipulation for such purposes. However, a factual statement or stipulation made after the plea agreement has been entered, or after any modification to the plea agreement has been made, is not a stipulation for purposes of subsection (a). The sentence that shall be imposed is limited, however, to the maximum authorized by the statute under which the defendant is convicted. See Chapter Five, Part G (Implementing the Total Sentence of Imprisonment). For example, if the defendant pleads guilty to theft, but admits the elements of robbery as part of the plea agreement, the robbery guideline is to be applied. The sentence, however, may not exceed the maximum sentence for theft. See H. Rep. 98-1017, 98th Cong., 2d Sess. 99 (1984). The exception to the general rule has a practical basis. In a case in which the elements of an offense more serious than the offense of conviction are established by a plea agreement, it may unduly complicate the sentencing process if the applicable guideline does not reflect the seriousness of the defendant's actual conduct. Without this exception, the court would be forced to use an artificial guideline and then depart from it to the degree the court found necessary based upon the more serious conduct established by the plea agreement. The probation officer would first be required to calculate the guideline for the offense of conviction. However, this guideline might even contain characteristics that are difficult to establish or not very important in the context of the actual offense conduct. As a simple example, §2B1.1 (Theft, Property Destruction, and Fraud) contains monetary distinctions which are more significant and more detailed than the monetary distinctions in §2B3.1 (Robbery). Then, the probation officer might need to calculate the robbery guideline to assist the court in determining the appropriate degree of departure in a case in which the defendant pled guilty to theft but admitted committing robbery. This cumbersome, artificial

procedure is avoided by using the exception rule in guilty or nolo contendere plea cases where it is applicable. As with any plea agreement, the court must first determine that the agreement is acceptable, in accordance with the policies stated in Chapter Six, Part B (Plea Agreements). The limited exception provided here applies only after the court has determined that a plea, otherwise fitting the exception, is acceptable.

**2.** Section 1B1.2(b) directs the court, once it has determined the applicable guideline (i.e., the applicable guideline section from Chapter Two) under §1B1.2(a) to determine any applicable specific offense characteristics (under that guideline), and any other applicable sentencing factors pursuant to the relevant conduct definition in §1B1.3. Where there is more than one base offense level within a particular guideline, the determination of the applicable base offense level is treated in the same manner as a determination of a specific offense characteristic. Accordingly, the "relevant conduct" criteria of §1B1.3 are to be used, unless conviction under a specific statute is expressly required.

**3.** Subsections (c) and (d) address circumstances in which the provisions of Chapter Three, Part D (Multiple Counts) are to be applied although there may be only one count of conviction. Subsection (c) provides that in the case of a stipulation to the commission of additional offense(s), the guidelines are to be applied as if the defendant had been convicted of an additional count for each of the offenses stipulated. For example, if the defendant is convicted of one count of robbery but, as part of a plea agreement, admits to having committed two additional robberies, the guidelines are to be applied as if the defendant had been convicted of three counts of robbery. Subsection (d) provides that a conviction on a conspiracy count charging conspiracy to commit more than one offense is treated as if the defendant had been convicted of a separate conspiracy count for each offense that he conspired to commit. For example, where a conviction on a single count of conspiracy establishes that the defendant conspired to commit three robberies, the guidelines are to be applied as if the defendant had been convicted on one count of conspiracy to commit the first robbery, one count of conspiracy to commit the second robbery, and one count of conspiracy to commit the third robbery.

**4.** Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense. Note, however, if the object offenses specified in the conspiracy count would be grouped together under §3D1.2(d) (e.g., a conspiracy to steal three

government checks) it is not necessary to engage in the foregoing analysis, because §1B1.3(a)(2) governs consideration of the defendant's conduct.

**USSG § 2E1.2**
**(a)** Base Offense Level (Apply the greater):
**(1) 6**; or
**(2)** the offense level applicable to the underlying crime of violence or other unlawful activity in respect to which the travel or transportation was undertaken
**Statutory Provision:** 18 U.S.C. § 1952.
**Application Notes:**
**1.** Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2). Use whichever subsection results in the greater offense level.
**2.** If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used.
**3.** If the offense level for the underlying conduct is less than the alternative minimum base offense level specified (i.e., 6), the alternative minimum base offense level is to be used.

**USSG § 2G1.1**
**(a)** Base Offense Level:
**(1) 34**, if the offense of conviction is 18 U.S.C. § 1591(b)(1); or
**(2) 14**, otherwise.
**(b)** Specific Offense Characteristic
**(1)** If (A) subsection (a)(2) applies; and (B)(i) the offense involved fraud or coercion; or (ii) the offense of conviction is 18 U.S.C. § 2421A(b)(2), increase by 4 levels.
**(c)** Cross Reference
**(1)** If the offense involved conduct described in 18 U.S.C. § 2241(a) or (b) or 18 U.S.C. § 2242, apply §2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse).
**(d)** Special Instruction
**(1)** If the offense involved more than one victim, Chapter Three, Part D (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction.

**Statutory Provisions:** 8 U.S.C. § 1328 (only if the offense involved a victim other than a minor); 18 U.S.C. §§ 1591 (only if the offense involved a victim other than a minor), 2421 (only if the offense involved a victim other than a minor), 2421A (only if the offense involved a victim other than a minor), 2422(a) (only if the offense involved a victim other than a minor). For additional statutory provision(s), *see* Appendix A (Statutory Index).

**Application Notes:**

**1. Definitions.—For purposes of this guideline:**

"*Commercial sex act*" has the meaning given that term in 18 U.S.C. § 1591(e)(3).

"*Prohibited sexual conduct*" has the meaning given that term in Application Note 1 of §2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse).

"*Promoting a commercial sex act*" means persuading, inducing, enticing, or coercing a person to engage in a commercial sex act, or to travel to engage in, a commercial sex act.

"*Victim*" means a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of engaging in, a commercial sex act or prohibited sexual conduct, whether or not the person consented to the commercial sex act or prohibited sexual conduct. Accordingly, "victim" may include an undercover law enforcement officer.

**2. Application of Subsection (b)(1).**—Subsection (b)(1) provides an enhancement for fraud or coercion that occurs as part of the offense and anticipates no bodily injury. If bodily injury results, an upward departure may be warranted. *See* Chapter Five, Part K (Departures). For purposes of subsection (b)(1), "*coercion*" includes any form of conduct that negates the voluntariness of the victim. This enhancement would apply, for example, in a case in which the ability of the victim to appraise or control conduct was substantially impaired by drugs or alcohol. This characteristic generally will not apply if the drug or alcohol was voluntarily taken.

**3. Application of Chapter Three Adjustment.**—For the purposes of §3B1.1 (Aggravating Role), a victim, as defined in this guideline, is considered a participant only if that victim assisted in the promoting of a commercial sex act or prohibited sexual conduct in respect to another victim.

**4. Application of Subsection (c)(1).**—

**(A) Conduct Described in 18 U.S.C. § 2241(a) or (b).**—For purposes of subsection (c)(1), conduct described in 18 U.S.C. § 2241(a) or (b) is engaging in, or causing another person to engage in, a sexual act with another person by: (i) using force against the victim; (ii) threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping; (iii) rendering the victim unconscious; or (iv) administering by force or threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance and thereby substantially impairing the ability of the victim to appraise

or control conduct. This provision would apply, for example, if any dangerous weapon was used or brandished, or in a case in which the ability of the victim to appraise or control conduct was substantially impaired by drugs or alcohol.

**(B) Conduct Described in 18 U.S.C. § 2242.**—For purposes of subsection (c)(1), conduct described in 18 U.S.C. § 2242 is: (i) engaging in, or causing another person to engage in, a sexual act with another person by threatening or placing the victim in fear (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping); or (ii) engaging in, or causing another person to engage in, a sexual act with a victim who is incapable of appraising the nature of the conduct or who is physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act.

**5. Special Instruction at Subsection (d)(1).**—For the purposes of Chapter Three, Part D (Multiple Counts), each person transported, persuaded, induced, enticed, or coerced to engage in, or travel to engage in, a commercial sex act or prohibited sexual conduct is to be treated as a separate victim. Consequently, multiple counts involving more than one victim are not to be grouped together under §3D1.2 (Groups of Closely Related Counts). In addition, subsection (d)(1) directs that if the relevant conduct of an offense of conviction includes the promoting of a commercial sex act or prohibited sexual conduct in respect to more than one victim, whether specifically cited in the count of conviction, each such victim shall be treated as if contained in a separate count of conviction.

**6. Upward Departure Provision.**—If the offense involved more than ten victims, an upward departure may be warranted.

**USSG § 2G1.3**

**(a)** Base Offense Level:

**(1) 34**, if the defendant was convicted under 18 U.S.C. § 1591(b)(1);

**(2) 30**, if the defendant was convicted under 18 U.S.C. § 1591(b)(2);

**(3) 28**, if the defendant was convicted under 18 U.S.C. § 2422(b) or § 2423(a); or

**(4) 24**, otherwise.

**(b)** Specific Offense Characteristics

**(1)** If (A) the defendant was a parent, relative, or legal guardian of the minor; or **(B)** the minor was otherwise in the custody, care, or supervisory control of the defendant, increase by **2** levels.

**(2)** If (A) the offense involved the knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in prohibited sexual conduct; or (B) a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct, increase by **2** levels.

**(3)** If the offense involved the use of a computer or an interactive computer service to (A) persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct; or (B) entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor, increase by **2** levels. ***Provided***, however, that subsection (b)(3)(B) shall not apply if the offense of conviction is 18 U.S.C. § 2421A.

**(4)** (Apply the greater):

**(A)** If (i) the offense involved the commission of a sex act or sexual contact; or (ii) subsection (a)(3) or (a)(4) applies and the offense involved a commercial sex act, increase by **2** levels.

**(B)** If (i) subsection (a)(4) applies; and (ii) the offense of conviction is 18 U.S.C. § 2421A(b)(2), increase by **4** levels.

**(5)** If (A) subsection (a)(3) or (a)(4) applies; and (B) the offense involved a minor who had not attained the age of 12 years, increase by **8** levels.

**(c)** Cross References

**(1)** If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, apply §2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above.

**(2)** If a minor was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply §2A1.1 (First Degree Murder), if the resulting offense level is greater than that determined above.

**(3)** If the offense involved conduct described in 18 U.S.C. § 2241 or § 2242, apply §2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse), if the resulting offense level is greater than that determined above. If the offense involved interstate travel with intent to engage in a sexual act with a minor who had not attained the age of 12 years, or knowingly engaging in a sexual act with a minor who had not attained the age of 12 years, §2A3.1 shall apply, regardless of the "consent" of the minor.

**(d)** Special Instruction

**(1)** If the offense involved more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the persuasion, enticement, coercion, travel, or transportation to engage in a commercial sex act or prohibited sexual conduct of each victim had been contained in a separate count of conviction.

**Statutory Provisions:** 8 U.S.C. § 1328 (only if the offense involved a minor); 18 U.S.C. §§ 1591 (only if the offense involved a minor), 2421 (only if the offense

involved a minor), 2421A (only if the offense involved a minor), 2422 (only if the offense involved a minor), 2423, 2425. For additional statutory provision(s), *see* Appendix A (Statutory Index).

**Application Notes:**

**1. Definitions.**—For purposes of this guideline:

"*Commercial sex act*" has the meaning given that term in 18 U.S.C. § 1591(e)(3).

"*Computer*" has the meaning given that term in 18 U.S.C. § 1030(e)(1).

"*Illicit sexual conduct*" has the meaning given that term in 18 U.S.C. § 2423(f).

"*Interactive computer service*" has the meaning given that term in section 230(e)(2) of the Communications Act of 1934 (47 U.S.C. § 230(f)(2)).

"*Minor*" means (A) an individual who had not attained the age of 18 years; (B) an individual, whether fictitious or not, who a law enforcement officer represented to a participant (i) had not attained the age of 18 years, and (ii) could be provided for the purposes of engaging in sexually explicit conduct; or (C) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years.

"*Participant*" has the meaning given that term in Application Note 1 of the Commentary to §3B1.1 (Aggravating Role).

"*Prohibited sexual conduct*" has the meaning given that term in Application Note 1 of the Commentary to §2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse).

"*Sexual act*" has the meaning given that term in 18 U.S.C. § 2246(2).

"*Sexual contact*" has the meaning given that term in 18 U.S.C. § 2246(3).

**2. Application of Subsection (b)(1).—**

**(A) Custody, Care, or Supervisory Control.**—Subsection (b)(1) is intended to have broad application and includes offenses involving a victim less than 18 years of age entrusted to the defendant, whether temporarily or permanently. For example, teachers, day care providers, babysitters, or other temporary caretakers are among those who would be subject to this enhancement. In determining whether to apply this enhancement, the court should look to the actual relationship that existed between the defendant and the minor and not simply to the legal status of the defendant-minor relationship.

**(B) Inapplicability of Chapter Three Adjustment.**—If the enhancement under subsection (b)(1) applies, do not apply §3B1.3 (Abuse of Position of Trust or Use of Special Skill).

**3. Application of Subsection (b)(2).—**

**(A) Misrepresentation of Participant's Identity.**—The enhancement in subsection (b)(2)(A) applies in cases involving the misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in prohibited sexual conduct. Subsection (b)(2)(A) is intended to

apply only to misrepresentations made directly to a minor or to a person who exercises custody, care, or supervisory control of the minor. Accordingly, the enhancement in subsection (b)(2)(A) would not apply to a misrepresentation made by a participant to an airline representative in the course of making travel arrangements for the minor. The misrepresentation to which the enhancement in subsection (b)(2)(A) may apply includes misrepresentation of a participant's name, age, occupation, gender, or status, as long as the misrepresentation was made with the intent to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in prohibited sexual conduct. Accordingly, use of a computer screen name, without such intent, would not be a sufficient basis for application of the enhancement.

**(B) Undue Influence**.—In determining whether subsection (b)(2)(B) applies, the court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior. The voluntariness of the minor's behavior may be compromised without prohibited sexual conduct occurring. However, subsection (b)(2)(B) does not apply in a case in which the only "minor" (as defined in Application Note 1) involved in the offense is an undercover law enforcement officer. In a case in which a participant is at least 10 years older than the minor, there shall be a rebuttable presumption that subsection (b)(2)(B) applies. In such a case, some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor.

**4. Application of Subsection (b)(3)(A).**—Subsection (b)(3)(A) is intended to apply only to the use of a computer or an interactive computer service to communicate directly with a minor or with a person who exercises custody, care, or supervisory control of the minor. Accordingly, the enhancement in subsection (b)(3)(A) would not apply to the use of a computer or an interactive computer service to obtain airline tickets for the minor from an airline's Internet site.

**5. Application of Subsection (c).**—

**(A) Application of Subsection (c)(1).**—The cross reference in subsection (c)(1) is to be construed broadly and includes all instances in which the offense involved employing, using, persuading, inducing, enticing, coercing, transporting, permitting, or offering or seeking by notice, advertisement or other method, a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct. For purposes of subsection (c)(1), *"sexually explicit conduct"* has the meaning given that term in 18 U.S.C. § 2256(2).

**(B) Application of Subsection (c)(3).**—For purposes of subsection (c)(3), conduct described in 18 U.S.C. § 2241 means conduct described in 18 U.S.C. § 2241(a), (b), or (c). Accordingly, for purposes of subsection (c)(3):

**(i)** Conduct described in 18 U.S.C. § 2241(a) or (b) is engaging in, or causing another person to engage in, a sexual act with another person: (I) using force against the minor; (II) threatening or placing the minor in fear that any person will be subject to death, serious bodily injury, or kidnapping; (III) rendering the minor unconscious; or (IV) administering by force or threat of force, or without the knowledge or permission of the minor, a drug, intoxicant, or other similar substance and thereby substantially impairing the ability of the minor to appraise or control conduct. This provision would apply, for example, if any dangerous weapon was used or brandished, or in a case in which the ability of the minor to appraise or control conduct was substantially impaired by drugs or alcohol.

**(ii)** Conduct described in 18 U.S.C. § 2241(c) is: (I) interstate travel with intent to engage in a sexual act with a minor who has not attained the age of 12 years; (II) knowingly engaging in a sexual act with a minor who has not attained the age of 12 years; or (III) knowingly engaging in a sexual act under the circumstances described in 18 U.S.C. § 2241(a) and (b) with a minor who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than the person so engaging).

**(iii)** Conduct described in 18 U.S.C. § 2242 is: (I) engaging in, or causing another person to engage in, a sexual act with another person by threatening or placing the minor in fear (other than by threatening or placing the minor in fear that any person will be subject to death, serious bodily injury, or kidnapping); or (II) engaging in, or causing another person to engage in, a sexual act with a minor who is incapable of appraising the nature of the conduct or who is physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act.

**6. Application of Subsection (d)(1).**—For the purposes of Chapter Three, Part D (Multiple Counts), each minor transported, persuaded, induced, enticed, or coerced to engage in, or travel to engage in, a commercial sex act or prohibited sexual conduct is to be treated as a separate minor. Consequently, multiple counts involving more than one minor are not to be grouped together under §3D1.2 (Groups of Closely Related Counts). In addition, subsection (d)(1) directs that if the relevant conduct of an offense of conviction includes travel or transportation to engage in a commercial sex act or prohibited sexual conduct in respect to more than one minor, whether specifically cited in the count of conviction, each such minor shall be treated as if contained in a separate count of conviction.

**7. Upward Departure Provision.**—If the offense involved more than ten minors, an upward departure may be warranted.

**USSG § 2S1.1**

**(a)** Base Offense Level:

**(1)** The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or

**(2) 8** plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

**(b)** Specific Offense Characteristics

**(1)** If (A) subsection (a)(2) applies; and (B) the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical; (ii) a crime of violence; or (iii) an offense involving firearms, explosives, national security, or the sexual exploitation of a minor, increase by 6 levels.

**(2)** (Apply the Greatest):

**(A)** If the defendant was convicted under 18 U.S.C. § 1957, increase by **1** level.

**(B)** If the defendant was convicted under 18 U.S.C. § 1956, increase by **2** levels.

**(C)** If (i) subsection (a)(2) applies; and (ii) the defendant was in the business of laundering funds, increase by **4** levels.

**(3)** If (A) subsection (b)(2)(B) applies; and (B) the offense involved sophisticated laundering, increase by **2** levels.

**Statutory Provisions:** 18 U.S.C. §§ 1956, 1957, 1960 (but only with respect to unlicensed money transmitting businesses as defined in 18 U.S.C. § 1960(b)(1)(C)). For additional statutory provision(s), *see* Appendix A (Statutory Index).

**Application Notes:**

**1. Definitions.—For purposes of this guideline:**

"*Crime of violence*" has the meaning given that term in subsection (a)(1) of §4B1.2 (Definitions of Terms Used in Section 4B1.1).

"*Criminally derived funds*" means any funds derived, or represented by a law enforcement officer, or by another person at the direction or approval of an authorized Federal official, to be derived from conduct constituting a criminal offense.

"*Laundered funds*" means the property, funds, or monetary instrument involved in the trans-action, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957.

"*Laundering funds*" means making a transaction, financial transaction, monetary transaction, or transmission, or transporting or transferring property, funds, or a monetary instrument in violation of 18 U.S.C. § 1956 or § 1957.

"*Sexual exploitation of a minor*" means an offense involving (A) promoting prostitution by a minor; (B) sexually exploiting a minor by production of sexually explicit visual or printed material; (C) distribution of material involving the sexual exploitation of a minor, or possession of material involving the sexual exploitation of a minor with intent to distribute; or (D) aggravated sexual abuse, sexual abuse, or abusive sexual contact involving a minor. "Minor" means an individual under the age of 18 years.

**2. Application of Subsection (a)(1).—**

**(A) Multiple Underlying Offenses.**—In cases in which subsection (a)(1) applies and there is more than one underlying offense, the offense level for the underlying offense is to be determined under the procedures set forth in Application Note 3 of the Commentary to §1B1.5 (Interpretation of References to Other Offense Guidelines).

**(B) Defendants Accountable for Underlying Offense.**—In order for subsection (a)(1) to apply, the defendant must have committed the underlying offense or be accountable for the underlying offense under §1B1.3(a)(1)(A). The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the underlying offense.

**(C) Application of Chapter Three Adjustments.**—Notwithstanding §1B1.5(c), in cases in which subsection (a)(1) applies, application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (*i.e.*, the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived.

**3. Application of Subsection (a)(2).—**

**(A) In General.**—Subsection (a)(2) applies to any case in which (i) the defendant did not commit the underlying offense; or (ii) the defendant committed the underlying offense (or would be accountable for the underlying offense under §1B1.3(a)(1)(A)), but the offense level for the underlying offense is impossible or impracticable to determine.

**(B) Commingled Funds.**—In a case in which a transaction, financial transaction, monetary transaction, transportation, transfer, or transmission results in the commingling of legitimately derived funds with criminally derived funds, the value of the laundered funds, for purposes of subsection (a)(2), is the amount of the criminally derived funds, not the total amount of the commingled funds, if the

defendant provides sufficient information to determine the amount of criminally derived funds without unduly complicating or prolonging the sentencing process. If the amount of the criminally derived funds is difficult or impracticable to determine, the value of the laundered funds, for purposes of subsection (a)(2), is the total amount of the commingled funds.

**(C) Non-Applicability of Enhancement.**—Subsection (b)(2)(B) shall not apply if the defendant was convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957.

**4. Enhancement for Business of Laundering Funds.**—

**(A) In General.**—The court shall consider the totality of the circumstances to determine whether a defendant who did not commit the underlying offense was in the business of laundering funds, for purposes of subsection (b)(2)(C).

**(B) Factors to Consider.**—The following is a non-exhaustive list of factors that may indicate the defendant was in the business of laundering funds for purposes of subsection (b)(2)(C):

**(i)** The defendant regularly engaged in laundering funds.

**(ii)** The defendant engaged in laundering funds during an extended period of time.

**(iii)** The defendant engaged in laundering funds from multiple sources.

**(iv)** The defendant generated a substantial amount of revenue in return for laundering funds.

**(v)** At the time the defendant committed the instant offense, the defendant had one or more prior convictions for an offense under 18 U.S.C. § 1956 or § 1957, or under 31 U.S.C. § 5313, § 5314, § 5316, § 5324 or § 5326, or any similar offense under state law, or an attempt or conspiracy to commit any such federal or state offense. A conviction taken into account under subsection (b)(2)(C) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A (Criminal History).

**(vi)** During the course of an undercover government investigation, the defendant made statements that the defendant engaged in any of the conduct described in subdivisions (i) through (iv).

**5. (A) Sophisticated Laundering under Subsection (b)(3).**—For purposes of subsection (b)(3), "*sophisticated laundering*" means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense.

Sophisticated laundering typically involves the use of—

**(i)** fictitious entities;

**(ii)** shell corporations;

**(iii)** two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or

**(iv)** offshore financial accounts.

**(B) Non-Applicability of Enhancement.**—If subsection (b)(3) applies, and the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection (b)(3) of this guideline, do not apply subsection (b)(3) of this guideline.

**6. Grouping of Multiple Counts.**—In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of §3D1.2 (Groups of Closely-Related Counts).

**USSG § 2X1.1**

**(a)** Base Offense Level: The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.

**(b)** Specific Offense Characteristics

**(1)** If an attempt, decrease by **3** levels, unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control.

**(2)** If a conspiracy, decrease by **3** levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control.

**(3)(A)** If a solicitation, decrease by **3** levels unless the person solicited to commit or aid the substantive offense completed all the acts he believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the person was about to complete all such acts but for apprehension or interruption by some similar event beyond such person's control.

**(B)** If the statute treats solicitation of the substantive offense identically with the substantive offense, do not apply subdivision (A) above; *i.e.*, the offense level for solicitation is the same as that for the substantive offense.

**(c)** Cross Reference

**(1)** When an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section.

**(d)** Special Instruction

**(1)** Subsection (b) shall not apply to:

**(A)** Any of the following offenses, if such offense involved, or was intended to promote, a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5):

18 U.S.C. § 81;

18 U.S.C. § 930(c);

18 U.S.C. § 1362;

18 U.S.C. § 1363;

18 U.S.C. § 1992(a)(1)–(a)(7), (a)(9), (a)(10);

18 U.S.C. § 2339A;

18 U.S.C. § 2340A;

49 U.S.C. § 46504;

49 U.S.C. § 46505; and

49 U.S.C. § 60123(b).

**(B)** Any of the following offenses:

18 U.S.C. § 32; and

18 U.S.C. § 2332a.

**Statutory Provisions:** 18 U.S.C. §§ 371, 372, 2271, 2282A, 2282B. For additional statutory provision(s), *see* Appendix A (Statutory Index).

**Application Notes:**

**1.** Certain attempts, conspiracies, and solicitations are expressly covered by other offense guidelines.

Offense guidelines that expressly cover attempts include:

§§2A2.1, 2A3.1, 2A3.2, 2A3.3, 2A3.4, 2A4.2, 2A5.1;

§§2C1.1, 2C1.2;

§§2D1.1, 2D1.2, 2D1.5, 2D1.6, 2D1.7, 2D1.8, 2D1.9, 2D1.10, 2D1.11, 2D1.12, 2D1.13, 2D2.1, 2D2.2, 2D3.1, 2D3.2;

§2E5.1;

§2M6.1;

§2N1.1;

§2Q1.4.

Offense guidelines that expressly cover conspiracies include:

§2A1.5;

§§2D1.1, 2D1.2, 2D1.5, 2D1.6, 2D1.7, 2D1.8, 2D1.9, 2D1.10, 2D1.11, 2D1.12, 2D1.13, 2D2.1, 2D2.2, 2D3.1, 2D3.2;

§2H1.1;

§2M6.1;

§2T1.9.

Offense guidelines that expressly cover solicitations include:

§2A1.5;

§§2C1.1, 2C1.2;

§2E5.1.

**2.** "***Substantive offense***," as used in this guideline, means the offense that the defendant was convicted of soliciting, attempting, or conspiring to commit. Under §2X1.1(a), the base offense level will be the same as that for the substantive offense. But the only specific offense characteristics from the guideline for the substantive offense that apply are those that are determined to have been specifically intended or actually occurred. Speculative specific offense characteristics will not be applied. For example, if two defendants are arrested during the conspiratorial stage of planning an armed bank robbery, the offense level ordinarily would not include aggravating factors regarding possible injury to others, hostage taking, discharge of a weapon, or obtaining a large sum of money, because such factors would be speculative. The offense level would simply reflect the level applicable to robbery of a financial institution, with the enhancement for possession of a weapon. If it was established that the defendants actually intended to physically restrain the teller, the specific offense characteristic for physical restraint would be added. In an attempted theft, the value of the items that the defendant attempted to steal would be considered.

**3.** If the substantive offense is not covered by a specific guideline, *see* §2X5.1 (Other Offenses).

**4.** In certain cases, the participants may have completed (or have been about to complete but for apprehension or interruption) all of the acts necessary for the successful completion of part, but not all, of the intended offense. In such cases, the offense level for the count (or group of closely related multiple counts) is whichever of the following is greater: the offense level for the intended offense minus 3 levels (under §2X1.1(b)(1), (b)(2), or (b)(3)(A)), or the offense level for the part of the offense for which the necessary acts were completed (or about to be completed but for apprehension or interruption). For example, where the intended offense was the theft of $800,000 but the participants completed (or were about to complete) only the acts necessary to steal $30,000, the offense level is the offense level for the theft of $800,000 minus 3 levels, or the offense level for the theft of $30,000, whichever is greater. In the case of multiple counts that are not closely related counts, whether the 3-level reduction under §2X1.1(b)(1), (b)(2), or (b)(3)(A) applies is determined separately for each count.

**Background:** In most prosecutions for conspiracies or attempts, the substantive offense was substantially completed or was interrupted or prevented on the verge of completion by the intercession of law enforcement authorities or the victim. In such cases, no reduction of the offense level is warranted. Sometimes, however, the arrest occurs well before the defendant or any co-conspirator has completed the acts necessary for the substantive offense. Under such circumstances, a reduction of 3 levels is provided under §2X1.1(b)(1) or (2).

**USSG § 3D1.2**

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

**(a)** When counts involve the same victim and the same act or transaction.

**(b)** When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

**(c)** When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

**(d)** When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Offenses covered by the following guidelines are to be grouped under this subsection:

§2A3.5;

§§2B1.1, 2B1.4, 2B1.5, 2B4.1, 2B5.1, 2B5.3, 2B6.1;

§§2C1.1, 2C1.2, 2C1.8;

§§2D1.1, 2D1.2, 2D1.5, 2D1.11, 2D1.13;

§§2E4.1, 2E5.1;

§§2G2.2, 2G3.1;

§2K2.1;

§§2L1.1, 2L2.1;

§2N3.1;

§2Q2.1;

§2R1.1;

§§2S1.1, 2S1.3;

§§2T1.1, 2T1.4, 2T1.6, 2T1.7, 2T1.9, 2T2.1, 2T3.1.

Specifically excluded from the operation of this subsection are:

all offenses in Chapter Two, Part A (except §2A3.5);

§§2B2.1, 2B2.3, 2B3.1, 2B3.2, 2B3.3;

§2C1.5;

§§2D2.1, 2D2.2, 2D2.3;

§§2E1.3, 2E1.4, 2E2.1;

§§2G1.1, 2G1.3, 2G2.1;

§§2H1.1, 2H2.1, 2H4.1;

§§2L2.2, 2L2.5;

§§2M2.1, 2M2.3, 2M3.1, 2M3.2, 2M3.3, 2M3.4, 2M3.5, 2M3.9;

§§2P1.1, 2P1.2, 2P1.3;

§2X6.1.

For multiple counts of offenses that are not listed, grouping under this subsection may or may not be appropriate; a case-by-case determination must be made based upon the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level. Exclusion of an offense from grouping under this subsection does not necessarily preclude grouping under another subsection.

**Application Notes:**

**1.** Subsections (a)–(d) set forth circumstances in which counts are to be grouped together into a single Group. Counts are to be grouped together into a single Group if any one or more of the subsections provide for such grouping. Counts for which the statute (A) specifies a term of imprisonment to be imposed; and (B) requires that such term of imprisonment be imposed to run consecutively to any other term of imprisonment are excepted from application of the multiple count rules. *See* §3D1.1(b)(1); *id.*, comment. (n.1).

**2.** The term "*victim*" is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (*e.g.*, drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related. Where one count, for example, involves unlawfully entering the United States and the other involves possession of fraudulent evidence of citizenship, the counts are grouped together because the societal interests harmed (the interests protected by laws governing immigration) are closely related. In contrast, where one count involves the sale of controlled substances and the other involves an immigration law violation, the counts are not grouped together because different societal interests are harmed. Ambiguities should be resolved in accordance with the purpose of this section as stated in the lead paragraph, *i.e.*, to identify and group "counts involving substantially the same harm."

**3.** Under subsection (a), counts are to be grouped together when they represent essentially a single injury or are part of a single criminal episode or transaction involving the same victim.

When one count charges an attempt to commit an offense and the other charges the commission of that offense, or when one count charges an offense based on a general prohibition and the other charges violation of a specific prohibition encompassed in the general prohibition, the counts will be grouped together under subsection (a).

**Examples:** (1) The defendant is convicted of forging and uttering the same check. The counts are to be grouped together. (2) The defendant is convicted of kidnapping and assaulting the victim during the course of the kidnapping. The counts are to be grouped together. (3) The defendant is convicted of bid rigging (an antitrust offense) and of mail fraud for signing and mailing a false statement that the bid was competitive. The counts are to be grouped together. (4) The defendant is convicted of two counts of assault on a federal officer for shooting at the same officer twice while attempting to prevent apprehension as part of a single criminal episode. The counts are to be grouped together. (5) The defendant is convicted of three counts of unlawfully bringing aliens into the United States, all counts arising out of a single incident. The three counts are to be grouped together. *But*: (6) The defendant is convicted of two counts of assault on a federal officer for shooting at the officer on two separate days. The counts *are not* to be grouped together.

**4.** Subsection (b) provides that counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, even if they constitute legally distinct offenses occurring at different times. This provision does not authorize the grouping of offenses that cannot be considered to represent essentially one composite harm (*e.g.*, robbery of the same victim on different occasions involves multiple, separate instances of fear and risk of harm, not one composite harm). When one count charges a conspiracy or solicitation and the other charges a substantive offense that was the sole object of the conspiracy or solicitation, the counts will be grouped together under subsection (b).

**Examples:** (1) The defendant is convicted of one count of conspiracy to commit extortion and one count of extortion for the offense he conspired to commit. The counts are to be grouped together. (2) The defendant is convicted of two counts of mail fraud and one count of wire fraud, each in furtherance of a single fraudulent scheme. The counts are to be grouped together, even if the mailings and telephone call occurred on different days. (3) The defendant is convicted of one count of auto theft and one count of altering the vehicle identification number of the car he stole. The counts are to be grouped together. (4) The defendant is convicted of two counts of distributing a controlled substance, each count involving a separate sale of 10 grams of cocaine that is part of a common scheme or plan. In addition, a finding is made that there are two other sales, also part of the common scheme or plan, each involving 10 grams of cocaine. The total amount of all four sales (40 grams of cocaine) will be used to determine the offense level for each count under §1B1.3(a)(2). The two counts will then be grouped together under either this subsection or subsection (d) to avoid double counting. *But*: (5) The defendant is convicted of two counts of rape for raping the same person on different days. The counts *are not* to be grouped together.

**5.** Subsection (c) provides that when conduct that represents a separate count, *e.g.*, bodily injury or obstruction of justice, is also a specific offense characteristic in or other adjustment to another count, the count represented by that conduct is to be grouped with the count to which it constitutes an aggravating factor. This provision prevents "double counting" of offense behavior. Of course, this rule applies only if the offenses are closely related. It is not, for example, the intent of this rule that (assuming they could be joined together) a bank robbery on one occasion and an assault resulting in bodily injury on another occasion be grouped together. The bodily injury (the harm from the assault) would not be a specific offense characteristic to the robbery and would represent a different harm. On the other hand, use of a firearm in a bank robbery and unlawful possession of that firearm are sufficiently related to warrant grouping of counts under this subsection. Frequently, this provision will overlap subsection (a), at least with respect to specific offense characteristics. However, a count such as obstruction of justice, which represents a Chapter Three adjustment and involves a different harm or societal interest than the underlying offense, is covered by subsection (c) even though it is not covered by subsection (a).

Sometimes there may be several counts, each of which could be treated as an aggravating factor to another more serious count, but the guideline for the more serious count provides an adjustment for only one occurrence of that factor. In such cases, only the count representing the most serious of those factors is to be grouped with the other count. For example, if in a robbery of a credit union on a military base the defendant is also convicted of assaulting two employees, one of whom is injured seriously, the assault with serious bodily injury would be grouped with the robbery count, while the remaining assault conviction would be treated separately.

A cross reference to another offense guideline does not constitute "a specific offense characteristic . . . or other adjustment" within the meaning of subsection (c). For example, the guideline for bribery of a public official contains a cross reference to the guideline for a conspiracy to commit the offense that the bribe was to facilitate. Nonetheless, if the defendant were convicted of one count of securities fraud and one count of bribing a public official to facilitate the fraud, the two counts would not be grouped together by virtue of the cross reference. If, however, the bribe was given for the purpose of hampering a criminal investigation into the offense, it would constitute obstruction and under §3C1.1 would result in a 2-level enhancement to the offense level for the fraud. Under the latter circumstances, the counts would be grouped together.

**6.** Subsection (d) likely will be used with the greatest frequency. It provides that most property crimes (except robbery, burglary, extortion and the like), drug offenses, firearms offenses, and other crimes where the guidelines are based

primarily on quantity or contemplate continuing behavior are to be grouped together. The list of instances in which this subsection should be applied is not exhaustive. Note, however, that certain guidelines are specifically excluded from the operation of subsection (d). A conspiracy, attempt, or solicitation to commit an offense is covered under subsection (d) if the offense that is the object of the conspiracy, attempt, or solicitation is covered under subsection (d). Counts involving offenses to which different offense guidelines apply are grouped together under subsection (d) if the offenses are of the same general type and otherwise meet the criteria for grouping under this subsection. In such cases, the offense guideline that results in the highest offense level is used; *see* §3D1.3(b). The "same general type" of offense is to be construed broadly.

**Examples:** (1) The defendant is convicted of five counts of embezzling money from a bank. The five counts are to be grouped together. (2) The defendant is convicted of two counts of theft of social security checks and three counts of theft from the mail, each from a different victim. All five counts are to be grouped together. (3) The defendant is convicted of five counts of mail fraud and ten counts of wire fraud. Although the counts arise from various schemes, each involves a monetary objective. All fifteen counts are to be grouped together. (4) The defendant is convicted of three counts of unlicensed dealing in firearms. All three counts are to be grouped together. (5) The defendant is convicted of one count of selling heroin, one count of selling PCP, and one count of selling cocaine. The counts are to be grouped together. The Commentary to §2D1.1 provides rules for combining (adding) quantities of different drugs to determine a single combined offense level. (6) The defendant is convicted of three counts of tax evasion. The counts are to be grouped together. (7) The defendant is convicted of three counts of discharging toxic substances from a single facility. The counts are to be grouped together. (8) The defendant is convicted on two counts of check forgery and one count of uttering the first of the forged checks. All three counts are to be grouped together. Note, however, that the uttering count is first grouped with the first forgery count under subsection (a) of this guideline, so that the monetary amount of that check counts only once when the rule in §3D1.3(b) is applied. *But*: (9) The defendant is convicted of three counts of bank robbery. The counts *are not* to be grouped together, nor are the amounts of money involved to be added.

**7.** A single case may result in application of several of the rules in this section. Thus, for example, example (8) in the discussion of subsection (d) involves an application of §3D1.2(a) followed by an application of §3D1.2(d). Note also that a Group may consist of a single count; conversely, all counts may form a single Group.

**8.** A defendant may be convicted of conspiring to commit several substantive offenses and also of committing one or more of the substantive offenses. In such

cases, treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses. *See* §1B1.2(d) and accompanying commentary. Then apply the ordinary grouping rules to determine the combined offense level based upon the substantive counts of which the defendant is convicted and the various acts cited by the conspiracy count that would constitute behavior of a substantive nature. **Example:** The defendant is convicted of two counts: conspiring to commit offenses A, B, and C, and committing offense A. Treat this as if the defendant was convicted of (1) committing offense A; (2) conspiracy to commit offense A; (3) conspiracy to commit offense B; and (4) conspiracy to commit offense C. Count (1) and count (2) are grouped together under §3D1.2(b). Group the remaining counts, including the various acts cited by the conspiracy count that would constitute behavior of a substantive nature, according to the rules in this section.

**Background:** Ordinarily, the first step in determining the combined offense level in a case involving multiple counts is to identify those counts that are sufficiently related to be placed in the same Group of Closely Related Counts ("Group"). This section specifies four situations in which counts are to be grouped together. Although it appears last for conceptual reasons, subsection (d) probably will be used most frequently.

A primary consideration in this section is whether the offenses involve different victims. For example, a defendant may stab three prison guards in a single escape attempt. Some would argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior. Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together. Counts involving different victims (or societal harms in the case of "victimless" crimes) are grouped together only as provided in subsection (c) or (d).

Even if counts involve a single victim, the decision as to whether to group them together may not always be clear cut. For example, how contemporaneous must two assaults on the same victim be in order to warrant grouping together as constituting a single transaction or occurrence? Existing case law may provide some guidance as to what constitutes distinct offenses, but such decisions often turn on the technical language of the statute and cannot be controlling. In interpreting this part and resolving ambiguities, the court should look to the underlying policy of this part as stated in the Introductory Commentary.