**Nos. 24-5374, 24-5375, 24-5376**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MICHAEL LACEY, SCOTT SPEAR, and JOHN ("JED") BRUNST,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Arizona, The Honorable Diane J. Humetewa, Presiding.
Nos. 2:18-cr-00422-DJH-4, 2:18-cr-00422-DJH-3, 2:18-cr-00422-DJH-1

# BRIEF OF *AMICI CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, REASON FOUNDATION, WOODHULL FREEDOM FOUNDATION, ELECTRONIC FRONTIER FOUNDATION, AND FLOOR64, INC. IN SUPPORT OF APPELLANTS (CORRECTED)

Robert Corn-Revere
James C. Grant
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org
jim.grant@thefire.org

Counsel for *Amici Curiae*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTERESTS OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 4

BACKGROUND .......... 6

Failed Efforts to Shutter Backpage.com and Court Decisions Upholding First Amendment Protections. .......... 6

ARGUMENT .......... 14

I. Fundamental First Amendment Principles Should Have Controlled This Case. .......... 15

A. The First Amendment Presumptively Protects Speech. .......... 15

B. Noting that Prostitution Is Illegal Does Not Vitiate a Publisher's First Amendment Rights. .......... 17

C. Constitutional and Statutory Rules Prohibit Punishing Speech Absent Proof of Specific Intent. .......... 20

1. First Amendment Requirement for Scienter .......... 21

2. Statutory and Common Law Scienter Requirements .......... 23

II. The District Court's Disregard of the First Amendment Raises Serious Concerns for Free Speech Rights. .......... 27

A. The District Court's Conduct of the Trial Was Riddled With Errors. .......... 27

B. The Government's Approach Approved by the District Court Will Chill Speech Online. .......... 32

CONCLUSION .......... 35

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) .................................................................. 17

*Backpage.com, LLC v. Cooper*,
939 F. Supp. 2d 805 (M.D. Tenn. 2013)..................................... 8, 9, 34

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) .............................................. 14, 17

*Backpage.com, LLC v. Hoffman*,
2013 WL 4502097 (D.N.J. Aug. 20, 2013) ..................................... 7, 8, 9

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012)...................................... 7, 8, 9

*Bigelow v. Virginia*,
421 U.S. 809 (1975) .................................................................. 16

*Bursey v. United States*,
466 F.2d 1059 (9th Cir. 1972) ................................................... 17

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942) .................................................................... 8

*Counterman v. Colorado*,
600 U.S. 66 (2023) ........................................................ 21, 22, 32

*Doe ex rel. Roe v. Backpage.com, LLC*,
104 F. Supp. 3d 149 (D. Mass. 2015) ........................................... 13

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003) ........................................................ 14

*Elonis v. United States*,
575 U.S. 723 (2015) .................................................................. 21

*IMDb.com Inc. v. Becerra*,
962 F.3d 1111 (9th Cir. 2020) ...................................................... 20

*Jane Doe No. 1 v. Backpage.com, LLC*,
817 F.3d 12 (1st Cir. 2016)........................................................................ 13

*M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*,
809 F. Supp. 2d 1041 (E.D. Mo. 2011)................................................. 13

*Mishkin v. State of New York*,
383 U.S. 502 (1966) ..................................................................................... 21

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ..................................................................................... 35

*People v. Ferrer*,
No. 16FE019224, 2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016)...................................................................................... 11, 12

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Relations*,
413 U.S. 376 (1973) ............................................................... 18, 19, 20

*Reno v. ACLU*,
521 U.S. 844 (1997). ............................................................... 16, 23, 32

*Sable Commc'ns of Cal., Inc. v. FCC*,
492 U.S. 115 (1989) ..................................................................................... 16

*Smith & Wesson Brands v. Mexico*,
No. 23-1141, 2025 WL 1583281 (U.S. June 5, 2025) ..................... 26, 32

*Smith v. California*,
361 U.S. 147 (1959) ................................................... 9, 21, 22, 33, 34

*Snyder v. Phelps*,
562 U.S. 443 (2011) ..................................................................................... 16

*Speiser v. Randall*,
357 U.S. 513 (1958) ..................................................................................... 34

*Texas v. Johnson*,
491 U.S. 397 (1989) ..................................................................................... 16

*Twitter v. Taamneh*,
598 U.S. 471 (2023). ............................................... 21, 23, 25, 26, 32

*United States v. Alvarez*,
617 F.3d 1198 (9th Cir. 2010) ........................................................... 15

*United States v. Gibson Specialty Co.*,
507 F.2d 446 (9th Cir. 1974) ............................................................. 24

*United States v. Hansen*,
599 U.S. 762 (2023) ............................................................... 24, 25

*United States v. Playboy Ent. Grp.*,
529 U.S. 803 (2000) ............................................................... 15, 16

*United States v. Stevens*,
559 U.S. 460 (2010) ..................................................................... 16

*United States v. Williams*,
553 U.S. 285 (2008) .......................................................... 18, 19, 20

*United States v. X-Citement Video, Inc.*,
513 U.S. 64 (1994) ................................................................... 9, 21

*Valle Del Sole Inc. v. Whiting*,
709 F.3d 808 (9th Cir. 2013) ............................................................. 20

*Vance v. Universal Amusement Co.*,
445 U.S. 308 (1980) ..................................................................... 23

*Woodhull Freedom Foundation v. United States*,
72 F.4th 1286 (D.C. Cir. 2023)................................................... 26, 27

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ............................................................. 35

**Statutes**

18 U.S.C. § 1952 ............................................................................. 23

18 U.S.C. § 1952(a)(3)........................................................................ 24

18 U.S.C. § 1952(b) ........................................................................... 24

18 U.S.C. § 2 ................................................................................... 13

18 U.S.C. § 2252A(a)(3)(B) .......................................................... 18

18 U.S.C. § 2255 .......................................................................... 13

18 U.S.C. § 2421A ........................................................................ 26

47 U.S.C. § 230 ........................................................................ 7, 12

8 U.S.C. § 1324(a)(1)(A)(iv) ........................................................ 24

**Other Authorities**

Elizabeth Nolan Brown,
*Backpage: A Blueprint for Squelching Speech*, REASON (Apr. 29 2024) ........................................................................ 33, 34

Elizabeth Nolan Brown,
*Secret Memos Show the Government Has Been Lying About Backpage All Along*, Reason (Aug. 26, 2019) ...................................... 11

## INTERESTS OF *AMICI CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended individual rights through public advocacy, strategic litigation, and participation as *amicus curiae* filings in cases that implicate expressive rights under the First Amendment without regard to the speakers' views.

Reason Foundation (Reason) is a nonpartisan and nonprofit public policy think tank, founded in 1978. Reason's mission is to promote free markets, individual liberty, equality of rights, and the rule of law. Reason advances its mission by publishing the critically acclaimed Reason magazine, as well as commentary on its websites, www.reason.com and www.reason.org. To further Reason's commitment to "Free Minds and Free Markets," Reason has participated as *amicus curiae* in numerous

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission. All parties consent to the filing of this brief.

cases raising significant legal and constitutional issues, including cases implicating free expression online.

The Woodhull Freedom Foundation ("Woodhull") is a non-profit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. The organization works to improve the well-being, rights, and autonomy of every individual through advocacy, education, and action. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. Woodhull is concerned with governmental attempts to censor or punish online speech, as sexual expression is often a target of such efforts. Woodhull believes that affirmance of the conviction on appeal will create a chilling effect on speech which threatens the ability of its members to effectively advocate for sexual freedom and communicate about human sexuality online.

The Electronic Frontier Foundation (EFF) is a nonprofit civil liberties organization with more than 30,000 active donors that has worked since 1990 to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for both in courts and legislatures across the country. For example, EFF

represented the Internet Archive in challenges to criminal laws that violated online services' First Amendment rights. *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1212 (W.D. Wash. 2012); *Backpage.com, LLC v. Hoffman*, 2012 WL 4502097 (D.N.J. Aug. 20, 2013).

*Amicus curiae* Floor64, Inc. d/b/a The Copia Institute, is a privately held small business behind Techdirt.com ("Techdirt"). Techdirt is an online publication that has chronicled technology law and policy for more than 25 years in over 80,000 articles, with a particular focus on the intersection of free speech and innovation. The company's think tank arm, the Copia Institute, also produces substantive research and analysis as well as ventures such as games and simulations all designed to better educate the public about these topics. All of these efforts fulfill the company's overall expressive goal to influence policy that promotes and sustains innovation and expression.

## INTRODUCTION

This case is the culmination of a years-long campaign to censor online classified adult advertising. Government officials, including state attorneys general and ultimately the federal government, joined by various advocacy groups and others, made demands to shut down online adult advertising based on blanket assertions that all ads for escort services or sex work are necessarily ads for prostitution, and publishers that permit such ads should face criminal or civil liability merely for providing a platform.

But these campaigns ran headlong into well-established First Amendment principles. A series of cases, most involving Backpage.com, established that the First Amendment protects publication of adult classified ads, the government cannot presume escort ads are ads for illegal conduct, and, most pertinent here, the government cannot hold publishers responsible for third-party ads posted by others absent knowledge of the specific posters' criminal purpose and specific intent to assist them.

The prosecution in this case proceeded not by addressing and overcoming these constitutional barriers but by evading them. The

Government's strategy was to obscure the constitutional issues and prevent the jury from considering the Government's allegations in light of controlling First Amendment principles. The district court acquiesced in this approach. It gave the Government wide latitude to put into evidence its cooperating witnesses' opinions and guesses that all adult ads are for prostitution. It allowed the Government to use public accusations against Backpage.com in the guise of "notice" evidence. At the same time, the court prevented Defendants from introducing key information in their defense—in particular any mention of the cases upholding Backpage.com's established First Amendment rights and Defendants' good faith in following the law. Ultimately, the court allowed the Government to argue its theory without making any showing that any Defendant ever even saw any given ad, much less did anything to facilitate or promote a business venture of prostitution related to any of the charged ads.

The district court's deeply flawed handling of this case presents profound threats for speech and the Internet. No court has ever before allowed the novel theory of vicarious liability for third-party speech that the Government advanced and the district court permitted here. If

allowed to stand, the district court's rulings would serve as a wide-ranging blueprint for online censorship. Publishers and intermediaries across the Internet would face the threat of criminal liability contrary to bedrock First Amendment law.

## BACKGROUND

### Failed Efforts to Shutter Backpage.com and Court Decisions Upholding First Amendment Protections.

The historic context of this case (which the district court would not allow to be mentioned at trial) is crucial to understanding both the Government's case and the errors below.

Beginning in 2008, various state attorneys general began a crusade against online adult-oriented classified ads, making blanket demands that online services cease publishing them. They first targeted Craigslist, which by 2010 caved to the pressure and eliminated its adult services category. *See* Appellant's Opening Brief (Michael Lacey), Doc. 92.1, at 9 ("Lacey Br."). The AGs then turned to Backpage.com, demanding it likewise eliminate all adult-oriented classified ads. Appellant's Opening Brief (Scott Spear), Doc. 91.1, at 13-14 ("Spear Br."). Other politicians, public interest organizations, religious groups, and some press outlets joined in the attacks, likewise demanding closure of the site. *Id.*

For seven years before the indictment in this case, Backpage.com brought and defended a series of cases to strike down efforts of state and local governments, federal authorities, and others seeking to censor the website or impose liability.

***Trilogy of State Statutes Targeting Backpage.com.*** Washington, Tennessee, and New Jersey passed laws seeking to target Backpage.com, and all were held to be unconstitutional under the First Amendment and preempted by 47 U.S.C. § 230 ("Section 230").

Washington's law made it a felony to publish, disseminate, or display online content containing a "'depiction of a minor' and any 'explicit or implicit offer' of sex for 'something of value.'" *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268 (W.D. Wash. 2012). New Jersey's law, patterned on Washington's statute, created a similar criminal offense. *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *3 (D.N.J. Aug. 20, 2013). Tennessee's law created a felony "offense for the sale or the offer to sell 'an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act ... with a minor.'" *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 816 (M.D. Tenn. 2013). Federal courts in each state

preliminarily enjoined the laws, and the states subsequently repealed them.

The courts uniformly rejected the states' contentions that escort ads on Backpage.com were just "thinly veiled offers of prostitution" and that their laws "regulate[d] only unprotected speech, *i.e.*, "offers to engage in illegal conduct." *McKenna*, 881 F. Supp. 2d at 1280, 1282; *see Cooper*, 939 F. Supp. 2d at 833; *Hoffman*, 2013 WL 4502097, at *8. As the *Cooper* court observed, adult-oriented ads could involve "numerous legal activities" "from 'phone sex services, nude dancing, online chat services, [and] adult pay-for-view websites [to] other legal sexually oriented material.'" 939 F. Supp. 2d at 834 (revisions in original; citation omitted); *see also McKenna*, 881 F. Supp. 2d at 1282. *McKenna* correctly noted that "third-party publication of offers to engage in illegal transactions does not fall within [the] 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection." 881 F. Supp. 2d at 1281 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)).

The courts in these cases similarly rejected state arguments that they could impose criminal liability because escort ads "implicitly" offer commercial sex by use of coded and suggestive terms. As the *McKenna*

court said, "where an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that." *Id.* at 1279.

The courts also found the statutes unconstitutional because they lacked scienter, as the First Amendment requires. *Cooper*, 939 F. Supp. 2d at 829–30 (citing *Smith v. California*, 361 U.S. 147 (1959); *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994)); *Hoffman*, 2013 WL 4502097 at *7 ("While a state can bar unprotected speech, it cannot do so without a scienter requirement."). The *Cooper* court noted, for example, that it was of "particular concern" the Tennessee statute sought to impose a "'reasonable person' standard," as it raised "the hazards of self-censorship." 939 F. Supp. 2d at 829–30; *see also McKenna*, 881 F. Supp. 2d at 1277–78.

***DOJ Investigation and Grand Jury Subpoenas.*** The Department of Justice ("DOJ") conducted a grand jury investigation of Backpage.com and Village Voice Media Holdings, LLC ("VVMH") in 2012 and pursued the investigation until it was effectively shut down by court rulings in 2013. Through the USAO for the Western District of

Washington, DOJ obtained grand jury subpoenas making extensive demands for documents from Backpage.com and VVMH. DOJ also reviewed tens of thousands of documents, subpoenaed third parties, interviewed numerous witnesses, and called Backpage.com employees to testify before the grand jury.

Backpage.com and VVMH sued to quash the document subpoenas issued to the companies, challenging them on First Amendment and other grounds. The Government was advancing a novel theory of vicarious liability—that Backpage.com could be liable for facilitating its users' violations of laws prohibiting sexual commerce—for which no entity had ever faced criminal liability before, and the district court quashed the subpoenas.[2]

DOJ shut down its pursuit of Backpage.com through the Washington grand jury after the district court's rulings. As has been publicly reported since, DOJ concluded based on its investigation that it did not have grounds to bring charges because Backpage.com actively

[2] The district court's order was submitted and referenced in the district court below. The order was filed under seal, Order, *In re Grand Jury Subpoenas to Backpage.Com, LLC & Village Voice Media Holdings, LLC*, No. GJ12-172RAJ (W.D. Wash. Jan. 17, 2013); *see* Doc. 562-4, 564, although presumably it is available for this Court's review.

worked to bar improper ads from the site and cooperated with law enforcement, many adult-oriented ads are for legal services, and the Government could not plausibly allege Backpage.com acted to facilitate any specific users' illegal acts. [3]

***People v. Ferrer.*** The California Attorney General's Office then picked up the pursuit. In October 2016, California authorities arrested Mike Lacey, James Larkin, and Carl Ferrer and charged them with pimping and money laundering. The defendants filed a demurrer which the superior court granted, dismissing all charges related to pimping or prostitution. *People v. Ferrer*, No. 16FE019224, 2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016).

The court rejected the State's "overall theory" that Backpage.com could be liable because it "knew prostitution ads were placed on its main site," holding "online publishers are not subject to notice liability," or liability on an "encouragement theory." *Id.* at *7. The court applied

[3] Amicus Reason.org has reported about DOJ's investigation and its explanations for why the Government did not have grounds to pursue charges against Backpage.com as reflected in DOJ memos. *See* Elizabeth Nolan Brown, *Secret Memos Show the Government Has Been Lying About Backpage All Along*, Reason (Aug. 26, 2019), https://reason.com/2019/08/26/secret-memos-show-the-government-has-been-lying-about-backpage/.

Section 230, observing its protections reflect "the interests and protections of the First Amendment." *Id.* at *1. The court also held the State's prosecution was invalid under California's pimping laws: "Providing a forum for online publishing is a recognized legal purpose" and cannot be charged as pimping even if given users' ads were for prostitution. *Id.* at *10. The court granted the State leave to amend, but when the AG instead filed a new complaint mirroring the first, a second judge dismissed the pimping-related charges again. *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017) (slip op.).[4]

***Civil Cases Against Backpage.com.*** Courts in civil cases also rejected accusations that Backpage.com's website and practices amounted to participation in illegal prostitution or sex trafficking. Dismissing claims against Backpage.com under Section 230, the District of Massachusetts held that "[s]ingly or in the aggregate" Backpage's practices "amount to neither affirmative participation in an illegal venture nor active web content creation." *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 157 (D. Mass. 2015) ("The existence of an

[4] Certain charges of money laundering (unrelated to the content of ads on Backpage.com) remained after the demurrer rulings, but the California AG never pursued these charges.

escorts section in a classified ad service, whatever its social merits, is not illegal."), *aff'd sub nom. Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016).

The District of Missouri similarly dismissed claims alleging Backpage.com was liable under the federal criminal aiding and abetting statute, 18 U.S.C. § 2 (as applied through 18 U.S.C. § 2255). The court held the plaintiff's allegations (*e.g.*, that Backpage.com had knowledge "postings on [the] website were advertisements for prostitution" and its posting rules were intended to aid in "veiling of illegal sex services ads") did "not describe the specific intent required for aiding and abetting under § 2." *M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1044, 1054 (E.D. Mo. 2011).

***Prior Restraint Imposed by Cook County Sheriff.*** Backpage.com also challenged a county sheriff's threatening letters to VISA and MasterCard that sought to "crush Backpage" by cutting off its revenues. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015). In an opinion by Judge Posner, the Seventh Circuit held the sheriff's actions were an unconstitutional prior restraint. *Id.* at 231. The court harkened to its earlier opinion in *Doe v. GTE Corp.*, 347 F.3d 655, 661

(7th Cir. 2003), which asked rhetorically: "Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity?" Rejecting Sheriff Dart's arguments, Judge Posner wrote: "Sounds like our case." *Dart*, 807 F.3d at 234. And, like many courts before, the Seventh Circuit rejected arguments that all ads in Backpage.com's adult section were criminal or unprotected. *Id.* The court entered an injunction because the sheriff's actions represented "lawless government coercion." *Id.* at 237-38.

****

In sum, by the time the Government brought its prosecution in this case, there was an extensive body of law holding Backpage.com's publication of third-party ads was protected under the First Amendment and rejecting the many, varied efforts of government officials to pursue claims, prosecute, or shutter Backpage.com.

## ARGUMENT

In this case, the Government's strategy from the beginning was to conceal the background of cases upholding First Amendment rights of Backpage.com and its users, and, indeed, to disregard the First

Amendment altogether. The district court acquiesced in the Government's tactic. In so doing, it overlooked central pillars of First Amendment law that should have controlled the case. The court's misapplications of the law not only resulted in improper convictions of Appellants, but if allowed to stand would gravely threaten online publishers and free speech rights.

## I. Fundamental First Amendment Principles Should Have Controlled This Case.

### A. The First Amendment Presumptively Protects Speech.

The First Amendment presumptively protects speech, and it is always the government's burden to prove otherwise. *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 816, 818 (2000); *United States v. Alvarez*, 617 F.3d 1198, 1205 (9th Cir. 2010), *aff'd*, 567 U.S. 709 (2012). The government may restrict speech only in certain narrowly defined categories based on history and tradition "including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct," and courts have no "authority to declare new categories of speech outside the scope of the First Amendment." *United States v. Stevens*, 559 U.S. 460, 468–69, 472 (2010) (internal quotations and citations omitted). This is especially important where, as here, the Government seeks to impose

content-based criminal sanctions. *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997).

The First Amendment's protections extend to speech many people (if not most) may find offensive, *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (flag burning as a form of protest), or outrageous, *see Snyder v. Phelps*, 562 U.S. 443, 454, 458 (2011) ("God Hates Fags" picketing at soldier's funeral). Freedom of speech encompasses adult-oriented speech. *Playboy Ent. Grp.*, 529 U.S. at 826; *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 125 (1989); *Reno*, 521 U.S. at 874. And it applies to paid advertisements and their publication as well. *Bigelow v. Virginia*, 421 U.S. 809, 826 (1975). And, more to the point here, Backpage.com's publication of adult-oriented ads was protected under the First Amendment, as the cases discussed above held. *See* discussion, *supra*, at 6–14.

Nor may the Government preclude or punish speech based on claims that it *looks like* unprotected speech. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) (striking down federal criminal statute regarding virtual child pornography). "The Government may not suppress lawful speech as the means to suppress unlawful speech.

Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Id.* Accordingly, the Government cannot claim ads for escort services or legal sex work are unprotected because they may be hard to distinguish from prostitution ads.

Similarly, the Government may not presume speech is unprotected and punish based on those presumptions. As this Court said over fifty years ago, the Government cannot "take[] as its premise the conclusion to be proved," *i.e.*, that "the expressions … in issue are not protected by the First Amendment." *Bursey v. United States*, 466 F.2d 1059, 1082 (9th Cir. 1972). Such an approach "has it backwards." *Id.* That was a central error underlying all the Backpage.com cases discussed above, *see, e.g.*, *Dart*, 807 F.3d at 234 ("not all advertisements for sex are advertisements for illegal sex"), *and* the prosecution's fundamental error in this case—its assumption that all adult-oriented ads are prostitution ads.

### B. Noting that Prostitution Is Illegal Does Not Vitiate a Publisher's First Amendment Rights.

The Government has contended throughout this case that the First Amendment does not apply at all, on the theory that because prostitution is illegal, any ads that may be for or about prostitution are unprotected.

The Government bases its argument on a statement from *United States v. Williams*, 553 U.S. 285 (2008), that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection," *id.* at 297, and on *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Relations*, 413 U.S. 376 (1973). The Government's interpretation of these cases is simply wrong.

*Williams* and *Pittsburgh Press* involved "speech integral to criminal conduct." Speech uttered to commit a crime (*e.g.*, a robber's demand at gunpoint that someone hand over his money) is not protected, nor is extortion or solicitation to commit a specific offense. Thus, in *Williams*, the Supreme Court upheld the defendant's conviction under 18 U.S.C. § 2252A(a)(3)(B), prohibiting pandering or soliciting child pornography. As the Court explained, the statute proscribed speech only as a component of the unlawful transaction, *i.e.*, speech that "accompan[ies] or seek[s] to induce the transfer of child pornography." *Williams*, 553 U.S. at 288, 295.

*Pittsburgh Press* dealt with advertisements that proposed illegal transactions on their face. 413 U.S. at 388. There, the Court held a newspaper's use of sex-designated categories for employment ads and

publication of ads as "male" or "female" was itself "illegal commercial activity" under the city's anti-discrimination law. *Id*.

Properly understood, *Williams*, *Pittsburgh Press*, and the "speech integral" principle have nothing to do with this case. The Government did not pursue charges against individuals who posted on Backpage.com to solicit prostitution. Instead, it prosecuted executives and owners of companies affiliated with Backpage.com on the theory the website allegedly facilitated prostitution by third-party users of the site. In the context of seeking to hold a publisher liable for third parties' speech, the fundamental applicable First Amendment principles center on the requirement for scienter, as discussed below. *See* Section III.C, *infra.*

This Court has recognized that "*Pittsburgh Press* implicates only those instances when the state restricts speech that itself proposes an illegal transaction." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) (citing *Pittsburgh Press*, 413 U.S. at 388 and *Williams*, 553 U.S. at 297). The test is not whether speech is or may be "associated with unlawful activity," but rather whether speech on its face "proposes an illegal transaction." *Valle Del Sole Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013). It is a misinterpretation of *Pittsburgh Press* to suggest it

permits government restriction or punishment "not only of speech that proposes an illegal activity but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct." *IMDb.com*, 962 F.3d at 1123.

Unfortunately, the district court adopted the Government's misreading of *Williams* and *Pittsburgh Press*, an error that permeated and infected the trial court proceedings throughout.

### C. Constitutional and Statutory Rules Prohibit Punishing Speech Absent Proof of Specific Intent.

The Supreme Court has long held that when governments seek to criminalize speech proof of scienter is required, and especially so for publishing or disseminating speech. While scienter is an essential requirement for any criminal prosecution, it takes on heightened importance when the government seeks to punish speech.[5] The prosecution ignored this, and the district court allowed it to do so.

---

[5] The Supreme Court has recognized scienter requirements for speech-related proscriptions in various ways—in some cases as a First Amendment requirement, *see, e.g.*, *Counterman v. Colorado*, 600 U.S. 66 (2023); *Smith v. California*, 361 U.S. 147 (1959), in others as a matter of statutory construction, *e.g.*, *X-Citement Video*, 513 U.S. at 78 ( "a statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts"), and in still others as a matter of fundamental common law principles, *Twitter v. Taamneh*, 598 U.S.

### 1. *First Amendment Requirement for Scienter*

"The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material." *Mishkin v. State of New York*, 383 U.S. 502, 511 (1966). This "presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." *X-Citement Video*, 513 U.S. at 72; *accord Elonis v. United States*, 575 U.S. 723, 737 (2015).

In *Smith v. California*, for example, the Supreme Court struck down a Los Angeles ordinance that made it a strict liability crime for booksellers to possess obscene books: "By dispensing with any requirement of knowledge of the contents of the book on the part of the seller, the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter." 361 U.S. at 153.

Recently, in *Counterman v. Colorado*, the Supreme Court reinforced the importance of requisite scienter for speech-related prosecutions by reversing a conviction under a Colorado harassment

---

471, 488–93 (2023). Whatever the approach, the import is the same: a defendant cannot be liable for disseminating or publishing speech absent proof of scienter that the specific speech at issue was illegal or unprotected.

statute that allowed liability based on how a "reasonable person" might interpret communications without requiring any "subjective intent to threaten." 600 U.S. 66, 69–71 (2023). Surveying its precedents, the Court noted that in all areas—including as to unprotected speech—proof of a defendant's "culpable mental state" is required to avoid "chilling fully protected expression." *Id.* at 75, 76–78 (discussing the Court's cases enforcing *mens rea* for alleged false statements, defamation, obscenity, incitement of imminent unlawful conduct, and true threats).

In any prosecution for disseminating speech, the Government must identify the specific speech at issue, prove that speech is unprotected, and prove the requisite scienter of each defendant as to that speech. The Government cannot speak in generalities. It may not simply level general accusations that books in a bookstore may be obscene or that a theater might show obscene movies in the future. *See Vance v. Universal Amusement Co.*, 445 U.S. 308, 311, 316 (1980).

These principles underlie the Supreme Court's recent holding in *Twitter, Inc. v. Taamneh* that liability of an online platform cannot be founded on allegations it knew users had used the platform for illegal acts. 598 U.S. at 503. Any "contrary holding would effectively hold any

sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them." *Id*. Nor may criminal liability rest on accusations by others that a website or third-party content it hosts is unlawful or offensive. *Reno*, 521 U.S. at 880 (permitting this "would confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech").

### *2. Statutory and Common Law Scienter Requirements*

In this case, proof of each Defendant's scienter about the specific speech at issue is required not only under First Amendment principles, but also under the specific statutes the government charged.

The Government charged Defendants under the Travel Act, 18 U.S.C. § 1952, for allegedly "facilitat[ing] the promotion, management, establishment, or carrying on, of [some] business enterprise involving … prostitution offenses in violation of [State] laws." §§ 1952(a)(3), (b). The Travel Act is a specific intent statute; "intent to facilitate a criminal venture is expressly part of the offense." *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449–50 (9th Cir. 1974). The Government thus had to prove each defendant "in some significant manner associated

himself with [a] criminal venture for the purpose of its advancement." *Id.* at 449; *see also* Spear Br. at 33–40.

Under long-standing tenets of the common law and criminal law, "facilitation" means "aiding and abetting—[] the provision of assistance to a wrongdoer with the intent to further an offense's commission." *United States v. Hansen*, 599 U.S. 762, 771 (2023). In *Hansen*, the Supreme Court construed the prohibition in 8 U.S.C. § 1324(a)(1)(A)(iv) prohibiting acts to "encourage or induce an alien to come to, enter, or reside in the United States, knowing or in reckless disregard" that doing so "is or will be a violation of law." The Court interpreted "encourage or induce" in "its specialized criminal-law sense," meaning "facilitation" and carrying with it "the traditional intent" or *mens rea* required. 599 U.S. at 774, 778–79. That is, a defendant must "*intend* to bring about a specific result," the principal's commission of a particular crime. *Id.* at 782.

*Twitter v. Taamneh* likewise underscored the necessity of adhering to aiding and abetting principles. Liability of a website publisher must be based on the "conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" 598 U.S.

at 493 (citation omitted). Providing a platform "is not culpable" even if individual users employ it for "illicit ends." *Id.* at 499–501. To hold a website liable for users' acts, there must be "a strong showing of assistance and scienter" to establish culpability as traditionally understood in the law. *Id.* at 500. Based on these principles, the Court held plaintiffs' allegations that Twitter, Google, and Facebook knew for years that ISIS members used their platforms to recruit, fundraise, and promote terrorism was a "far cry" from the type of participation and culpable assistance needed to prove aiding and abetting liability. *Id.* at 502.

The Court reinforced the scienter requirements for aiding and abetting liability just two weeks ago in *Smith & Wesson Brands v. Mexico*, No. 23-1141, 2025 WL 1583281 (U.S. June 5, 2025). It rejected claims by the Mexican government that American gun manufacturers were complicit in unlawful marketing and sale of firearms, holding a merchant can be liable only if, beyond providing a good or service, "he takes steps to 'promote' the resulting crime and 'make it his own.'" *Id.* at *6 (internal quotation omitted). Following on *Taamneh*, the Court stressed that "[w]hen a company merely knows that 'some bad actors' are

taking 'advantage' of its products for criminal purposes, it does not aid and abet." *Id*. (citing *Taamneh*, 598 U.S. at 503).

In this case, there should be no dispute the Travel Act requires proof of aiding and abetting with requisite evidence of specific intent. In *Woodhull Freedom Foundation v. United States*, the Government defended against First Amendment vagueness and overbreadth challenges to 18 U.S.C. § 2421A, a then newly enacted statute imposing criminal liability for owning, managing, or operating a website "with the intent to promote or facilitate the prostitution of another person." 72 F.4th 1286, 1292 (D.C. Cir. 2023) (quoting 18 U.S.C. 2421A(a)). The Government argued that the law's challenged references to "facilitating" prostitution tracked the term's use in the Travel Act, *i.e.* meaning "aiding and abetting" and incorporating "traditional principles of accomplice liability." *See Woodhull Freedom Found. v. United States*, No. 22-5105 (D.C. Cir.), Doc. 1971878, at 28–29 (Nov. 2, 2022); *see generally* Spear Br. at 34-35. The D.C. Circuit accepted and agreed with the Government's interpretation to avoid First Amendment invalidation. *Woodhull*, 72 F.4th at 1302 (any more expansive approach to intermediary liability "could raise grave constitutional concerns").

## II. The District Court's Disregard of the First Amendment Raises Serious Concerns for Free Speech Rights.

The district court erred in approving the Government's approach throughout this case in allowing it to assume all ads on Backpage.com were for prostitution, that it did not have to show any Defendant had any knowledge of the fifty charged ads, or that Defendants ever did anything to aid and abet any specific criminal venture. Allowing the court's errors to stand would threaten the First Amendment's protection of online speech on websites, in social media, and across the Internet.

### A. The District Court's Conduct of the Trial Was Riddled With Errors.

Appellants' briefs describe the trial rulings that gave the Government undue latitude for its evidence while barring Defendants from presenting key evidence, particularly that involving prior cases which upheld First Amendment protections for Backpage.com. Because the district court's rulings and conduct of the trial underscore its misunderstanding of First Amendment principles and the law, a brief summary here is useful.

- It was undisputed at trial that no one could know whether facially lawful escort ads were in fact for prostitution, without responding to the ad. *See* Spear Br.

at 19–21 (recounting testimony of Ferrer and police officers).

- The court nevertheless allowed Ferrer to testify that escort ads *were* prostitution ads, simply by looking at them and offering his opinion or making "educated guess[es]." *Id.* at 21.

- The Government did not even allege, much less show, that any of the Defendants ever saw any of the fifty charged ads before they appeared on Backpage.com or had any contact with or knowledge of any of the individuals who posted the ads. *See* Spear Br. at 10.

- While the prior judge in the case (Judge Brnovich) had ruled that the Government's proof regarding its Travel Act conspiracy charge would have to be cabined to address the fifty charged ads, Judge Humetewa abandoned that. *See* Defendant-Appellant John Brunst's Opening Brief, Doc. 93.1 ("Brunst Br.), at 15-16.

- The Government could thus argue there was no requirement of specific intent as to any Defendant for any specific ad. 52-ER-14879 (Government's closing argument: "[W]hat I am not going to show you is a jury instruction that says we must prove that any defendant has specific knowledge of these particular ads because it isn't in there. We don't have to do that."); *see* Spear Br. at 48-49.

- The court allowed the Government to put into evidence letters and testimony from state AGs, public interest organizations, religious groups, and others attacking Backpage.com and asserting the website was complicit

in sex trafficking—for the ostensible purpose of showing "notice" to Backpage.com that "prostitution is on the website," 47-ER-13308; *see also* Lacey Br. at 28-31, but precluded Defendants from presenting Backpage.com's responses,[6] *see* Brunst Br. at 23-25; Spear Br. at 22–23.

- The court barred Defendants from even mentioning prior decisions upholding the First Amendment rights of Backpage.com and its users as "irrelevant," because the decisions were from "civil adjudications" with "no relation to this case" and "would confuse the jury" and "prejudice the Government." 2-ER-535; *see* Brunst Br. at 25–27.

- And the court permitted the Government to argue the theme that every prior case had rejected, *i.e.*, that *all* escort ads on the Backpage.com website were for prostitution. 33-ER-9384-85; 34-ER-9390, 9392 ("when the word 'escort' was used on the website, that was not what it meant"; "when they say escorts, they mean prostitution"); Spear Br. at 10.

The district court's misapplication of the First Amendment and the law extended to the jury instructions. The court's instruction concerning the First Amendment alluded to speech being presumptively protected but then devoted four sentences to say how the First Amendment does

[6] In the first trial, Judge Brnovich declared a mistrial because the Government elicited testimony about child sex trafficking even though the indictment alleges no such charges. Lacey Br. at 19. Judge Humetewa allowed Government evidence referencing child sex trafficking and denied mistrial motions on this basis. *Id.* at 31-34.

not apply.[7] It told the jury "[p]rostitution is illegal," that the government's only burden was to "establish that each of the ads alleged in this case [was] an ad for prostitution," and that, if so, the speech "was not protected." Doc. 1998, at 48. This allowed the Government to argue First Amendment protections were irrelevant because its witnesses said their ads, though facially lawful, were *actually* for prostitution, or, more generally, because its cooperating witnesses repeatedly said that *all* adult ads on Backpage.com were for prostitution.

The court did not instruct that website publishers are protected unless the Government proves the specific speech at issue is facially illegal or that each Defendant knew the speech was for a criminal venture and acted to aid and abet that venture. By instead allowing guilty

[7] The court's instruction stated:

> All speech is presumptively protected by the First Amendment to the United States Constitution. However, the First Amendment does not protect speech that proposes an illegal transaction. Prostitution is illegal in 49 states and most of Nevada. It is the government's burden to establish that each of the ads alleged in the case is an ad for prostitution and not for another purpose such as an ad for an escort, dating, or massage service. If you find that an ad proposes an illegal transaction, it is not protected by the First Amendment.

Doc. 1998, at 48.

verdicts based solely on whether it *turned out* ads concerned prostitution—regardless of whether any Defendant had any knowledge or even saw the ad—the court cut out scienter.

The court then compounded this error in instructing as to specific intent under the Travel Act,[8] once again failing to make clear the Government must prove each Defendant knew of and acted to promote or facilitate the business enterprise for prostitution in each charged ad. The instruction instead said the jury could convict the Defendants if it found they promoted or facilitated "*any* business enterprise involving prostitution." Doc. 1998 (emphasis added).

The court's rulings and instructions thus violated First Amendment and scienter principles in many ways. It allowed the Government to advance arguments that the jury should convict because the Defendants were aware the Backpage.com website had been used for prostitution,

---

[8] The court's instruction on specific intent stated:

> To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.

Doc. 1998, at 30.

despite that being contrary to requirements for aiding and abetting. *See Taamneh*, 598 U.S. at 503. The rulings allowing accusatory letters as "notice" were not only clearly prejudicial, but they also violated First Amendment principles that publisher liability cannot be based on "notice" evidence or hecklers' vetoes. *See Reno*, 521 U.S. at 880; *c.f. Smith & Wesson*, 2025 WL 1583281, at *5–6. And the court allowed the Government to argue it did not have to show any scienter of any Defendant as to any of the charged ads, even though the First Amendment requires for criminal punishment of speech proof of scienter establishing a truly "culpable mental state." *Counterman*, 600 U.S. at 75; *see Taamneh*, 598 U.S. at 489. The convictions accordingly cannot stand.

### B. The Government's Approach Approved by the District Court Will Chill Speech Online.

This prosecution and the district court's approach chart a chilling course for imposing vicarious liability on websites and precluding speech the Government disfavors.[9] If the Government can criminally punish a website publisher because third parties use the site for illegal purposes—

[9] *See* Elizabeth Nolan Brown, *Backpage: A Blueprint for Squelching Speech*, REASON (Apr. 29 2024), https://reason.com/2024/04/29/backpage-a-blueprint-for-squelching-speech/.

without having to prove scienter or aiding and abetting requirements for specific speech—platforms would face the impossible task of reviewing millions or billions of user posts to try to weed out anything that might propose or suggest illegal activity. The Supreme Court's concern sixty-five years ago in *Smith* that a bookseller would face an impossible burden to review every book in his store to ensure none might be considered obscene, 361 U.S. at 153, would be exponentially dwarfed by burdens to online services with hundreds of millions of user submissions every day.

And, as the *Smith* Court noted, "the bookseller's burden would become the public's burden" because the natural result of amorphous potential vicarious liability for third-party speech is self-censorship. *Id.* at 153–54. To avoid the prospect of criminal liability for adult-oriented content, an online publisher likely would either impose rules to broadly block or remove user submissions, *i.e.*, "steer far wider of the unlawful zone," *Speiser v. Randall*, 357 U.S. 513, 526 (1958), or eliminate adult-oriented speech altogether, *see Cooper*, 939 F. Supp. 2d at 830. Either way, the lower court's ruling serves to "restrict the public's access to forms of the printed word [now, online content] which the State could not constitutionally suppress directly." *Smith*, 361 U.S. at 154.

The Government's and the district court's approach threaten First Amendment rights for another reason. At trial the Government attacked Backpage.com's posting rules and moderation practices to prevent or filter improper ads (*e.g.*, blocking all ads offering sex for money) as allegedly showing Defendants meant to encourage and "coach" users to post such ads. In other words, "in a truly Orwellian fashion, the government argue[d] that the very act of *forbidding* explicit prostitution ads was a way of *encouraging* prostitution ads." *See* Brown*, Backpage: A Blueprint for Squelching Speech*, *supra* n.9. The First Amendment does not permit this perverse Catch-22. Online publishers' actions for allowing, curating, and moderating third-party content are editorial decisions the First Amendment protects, as the Supreme Court recently reaffirmed. *Moody v. NetChoice, LLC*, 603 U.S. 707, 731-40 (2024).

The Government's theory, allowed by the district court, would conversely mean website review and moderation efforts are not protected but are instead evidence of guilt. If a website filters, bars, or removes improper content, the Government can say that merely shows that it (and its managers) knew the site was used for illegal activities. While federal law has long aimed to encourage self-regulation by online platforms, *see*

*Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997), the district court's approach would make such efforts grounds for punishment. What Congress thought to be laudable would now become criminal by the reasoning applied in this case. The resulting chilling effect for online speech is apparent and profound.

## CONCLUSION

Until now, no case has held secondary liability lies for website owners or executives for third-party users' activities without a showing of specific intent or any of the requisites of aiding and abetting. The district court's rulings in this case reflect a startling disregard of First Amendment law. It countenanced a one-way street at trial by allowing the Government to put into evidence characterizations, speculation, and accusations, while disallowing Defendants from showing they acted in good faith or that numerous prior cases had held the First Amendment protected Backpage.com's operations.

This Court should reverse and vacate Defendants' convictions not only because they reflect numerous errors and the district court's fundamental misunderstanding of First Amendment law, but also because affirming would threaten publishers and intermediaries across

the Internet who should not have to fear they may be the next target of such a misapplication of the law.

Dated: August 1, 2025

/s/ *Robert Corn-Revere*
Robert Corn-Revere
James C. Grant
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org
jim.grant@thefire.org

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6934 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: August 1, 2025

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 1, 2025, an electronic copy of the foregoing was filed with the Clerk of this Court using the CM/ECF system, and that all parties will be served through that system.

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION