**Case Nos. 24-5374, 24-5375, 24-5376**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MICHAEL LACEY,
*Defendant-Appellant.*

_____

*On Appeal from the United States District Court for the District of Arizona (Phoenix),
Case No. 2:18-cr-00422-DJH-1 • The Honorable Diane J. Humetewa, District Judge*

## APPELLANT'S REPLY BRIEF

ERIN MCCAMPBELL PARIS
**MAURICE WUTSCHER LLP**
50 Fountain Plaza Downtown, Suite 1400
Buffalo, NY 14202
Telephone: (716) 261-4703
eparis@mauricewutscher.com

*Attorneys for Defendant-Appellant,
Michael Lacey*





**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................. 6

    I.    Disclosures and transparency require acquittal of Count 100 .............. 6

        A.    Initial disclosures identify Backpage as the source of the funds ................................................................... 7

        B.    Transparent banking disclosed attributes of the funds .............. 9

        C.    Lacey repeatedly expressed an intent to disclose .................... 11

        D.    Lacey made additional disclosures by filing timely and complete FBARs concerning his foreign trust ......................... 12

        E.    The government overplays irrelevant testimony ...................... 15

        F.    The government's authority is easily distinguished ................ 17

    II.    The government's failure to prove "proceeds" of SUA requires acquittal ...................................................................... 20

        A.    There was insufficient proof of SUA ..................................... 20

        B.    The government failed to connect proceeds to any Backpage account, much less Appellants' personal accounts ............................................................................. 24

        C.    The First Amendment precludes punishment for transfers of publishing revenue unless the government ties transferred funds to "proceeds" of SUA which did not occur here ................................................................... 26

    III.    There is no proof Lacey knew that the funds were "proceeds" of SUA ................................................................................... 30

CONCLUSION ............................................................................. 33

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bursey v. United States*,
 466 F.2d 1059 (9th Cir. 1972)............................................................... 1, 3, 22

*Chiles v. Salazar*,
 ___ U.S. ___, 146 S. Ct. 1010 (2026) ................................................................27

*Citizens United v. F.E.C.*,
 558 U.S. 310 (2010) ............................................................................. 1, 3, 28

*Cohen v. Cal.*,
 403 U.S. 15 (1971) ................................................................................27

*Cuellar v. United States*,
 553 U.S. 550 (2008) ................................................................................16

*P.E.T.A. v. N.C. Farm Bureau Fed'n, Inc.*,
 60 F.4th 815 (4th Cir. 2023) ................................................................................26

*Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations*,
 413 U.S. 376 (1973) ................................................................................21

*Sable Comms. of Cal. v. F.C.C.*,
 492 U.S. 115 (1989)................................................................................22

*Sawyer v. Sandstrom*,
 615 F.2d 311 (5th Cir. 1980)................................................................................27

*Simon & Schuster, Inc. v. Members of N.Y.S. Crime Bd.*,
 502 U.S. 105 (1991) ................................................................................28

*Thunder Studios, Inc. v. Kazal*,
 13 F.4th 736 (9th Cir. 2021) ................................................................................5, 23

*United States v. Al-Timimi*,
 164 F.4th 292 (4th Cir. 2026) ................................................................................23

*United States v. Arias*,
 784 F. App'x 485 (9th Cir. 2019) ................................................................................25

*United States v. Bala*,
 489 F.3d 334 (8th Cir. 2007)................................................................................24

*United States v. Choy*,
309 F.3d 602 (9th Cir. 2002)......................................................24

*United States v. Kellum*,
119 F. App'x 32 (9th Cir. 2004)....................................................8

*United States v. Marcavage*,
609 F.3d 264 (3d Cir. 2010)......................................................27

*United States v. McIntosh*,
124 F.3d 1330 (10th Cir. 1997)...................................................25

*United States v. Naranjo*,
634 F.3d 1198 (11th Cir. 2011)...................................................19

*United States v. Rockelman*,
49 F.3d 418 (8th Cir. 1995).......................................................14

*United States v. Sanders*,
928 F.2d 940 (10th Cir. 1991)....................................................10

*United States v. Singh*,
995 F.3d 1069 (9th Cir. 2021)................................................. 18-19

*United States v. Sun*,
673 F. App'x 729 (9th Cir. 2016) ..................................................8

*United States v. Tekle*,
329 F.3d 1108 (9th Cir. 2003).....................................................19

*United States v. Wilkes*,
662 F.3d 524 (9th Cir. 2011)................................................. 6, 7, 17, 18

*United States v. Williams*,
553 U.S. 285 (2008) ..............................................................21

*Virginia v. Black*,
538 U.S. 343 (2003) ..............................................................22

**Statutes & Other Authorities:**

U.S. Const. amend. I .......................................................... *passim*

## **INTRODUCTION**

This Court should reverse Michael Lacey's sole count of conviction for international concealment money laundering and remand for a judgment of acquittal. There are several insurmountable problems with this conviction.

First, the record is one of affirmative disclosures—not concealment. The government's money laundering expert, Quoc Thai, said so. His testimony and exhibits show that Lacey (and his co-Appellants) disclosed every attribute of their funds to the government, including Backpage as the source, and then used transparent banking to move their funds from corporate to personal accounts bearing their names or otherwise associated with them. Courts throughout the country are unanimous in holding that both affirmative acts of disclosure and transparent banking are incompatible with an intent to conceal. (Appellant Lacey's Opening Brief "AOB" at 46-53.)

Lacey's conviction, concerning the formation and funding of an offshore trust, involved even greater disclosure and transparency. It is undisputed that Lacey sought the advice of two lawyers concerning the formation of his trust, spoke openly with bankers, deposited his funds in an account bearing his name, retained lawyers and accountants to file government disclosure forms, sent an email asking which lawyer would handle "the ***reporting to govt on money that was moved***" (24-ER-6706 (emphasis added)), and then filed another disclosure with the government.

1

There is no known case—anywhere—affirming concealment charges on a record like this one.

Second, the government failed to establish SUA,[1] *i.e.* Travel Act violations, for the relevant period, which means the funds at issue are not "proceeds" of SUA. Thai's exhibit shows that the funds at issue involve the transfer of revenues earned by Backpage from ads published to the website after its sale to Ferrer in April 2015. (25-ER-7171.) But each defendant was acquitted of every post-sale Travel Act charge, the District Court ruled that the purported Travel Act conspiracy ended at the sale to Ferrer in 2015, and there was no proof that Backpage or its employees committed other Travel Act violations. (2-ER-318-319, 420-436; 1-ER-151.) Moreover, the Travel Act cannot be charged in the way done here, pre-sale or post-sale. (*See generally* Spear Br.; Spear Repl. Br., Amicus Curiae Brief of Foundation for Individual Rights and Expression, *et al.* ("FIRE Am. Br."); Amicus Curiae Brief of National Association of Criminal Defense Lawyers, *et al.* ("NACDL Am. Br.").)

Third, the government failed to prove that a single dollar of "proceeds" from an ad claimed to be a Travel Act violation was deposited into any particular Backpage account, much less Lacey's accounts. Thai testified he did not trace ad revenue to any bank accounts, Backpage or otherwise. (45-ER-12940-12945.) The

---

[1]     All terms defined in the AOB will be used herein.

2

lack of proof on this basic evidentiary requirement is fatal to Lacey's conviction (and every other money laundering conviction in the case).

Fourth, the lack of tracing also means the money laundering convictions violate the First Amendment. Those convictions (and corresponding sentences) constitute a punishment of publishers (Appellants/Backpage) for their transfers of revenue earned from fees charged for publishing instances of third-party speech (ads created by website users). Both publishing and publishing revenue are presumptively protected by the First Amendment because government action targeting any "stage[] of the speech process"—including efforts to criminalize transfers of publishing revenue—must comply with the First Amendment. *Citizens United v. F.E.C.*, 558 U.S. 310, 336-37 (2010). Further, instances of speech, like online ads, are presumed protected unless proven otherwise. *See*, *e.g.*, *Bursey v. United States*, 466 F.2d 1059, 1081-82 (9th Cir. 1972).

Consequently, regardless of any statutory requirements, the First Amendment required the jury to presume that Backpage's revenues were generated from publishing instances of protected expression, unless the government: (1) proved Backpage's publication of specific ads fell outside the protections of the First Amendment; (2) proved Backpage's publication of those specific ads constituted Travel Act violations; and (3) traced the revenues from any such ads to charged transactions. (AOB 54-59.) But that did not happen. The government failed to

3

prove the first two requirements and admitted it did not even try to prove the third—tracing. (45-ER-12940-12945.).

Fifth, Lacey had no knowledge that his funds were "proceeds" of SUA because he did not understand Backpage's operation of a website that published third-party speech to be criminal conduct. Lacey was not involved with Backpage's operations. He was segregated a "layer away" from all business-side activities to protect the integrity of his journalism. (40-ER-11307.) In assessing the record, the District Court's ultimate conclusion was that he had a "***bona fide held belief that what [he was] doing was not illegal***." (1-ER-110 (emphasis added).)

The Government's Answering Brief ("GAB") has no serious answers for these problems. Instead, the GAB is an effort at distraction. The GAB repeatedly suggests that this Court should affirm because the verdict was "careful and nuanced." (*E.g.*, GAB 155.) But this argument ignores significant problems with the verdict. For example, ***the District Court acquitted Lacey of fifty hung counts***, finding insufficient proof as a matter of law. (2-ER-318-319, 333-335.) Moreover, the verdict was internally inconsistent. As just one example, the jury convicted Appellants of post-sale money laundering but found no Travel Act violations, meaning no SUA, during that time. No amount of nuance could salvage the verdict under these circumstances.

4

Additionally, the GAB primarily relies on the District Court's characterizations of evidence, rather than the actual testimony and exhibits of government witnesses. That approach is misguided for two reasons. First, when a defendant raises a First Amendment challenge to a conviction, like here, this Court must conduct "an independent examination of the whole record," reviewing "constitutional facts *de novo*." *E.g.*, *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021). The actual proof adduced at trial, rather than characterizations of it, is what this Court must review.

Second, the District Court's findings were contradictory on key points. For example, the Court found—within the same ruling—both that the government failed to establish beyond "mere speculation" that the funds at issue in Counts 94-98 were proceeds of SUA (2-ER-334-335), *and* that the government proved that those *very same funds* charged differently—as Count 100—were proceeds of "violations of the Travel Act" (2-ER-332-33). Likewise, the GAB fails to grapple with the most striking inconsistency: the District Court's denial of Lacey's motion for acquittal notwithstanding the District Court's own conclusion that Lacey had the "*bona fide held belief that what [he was] doing was not illegal*." (1-ER-110 (emphasis added).)

The government's "attenuated" case against Lacey (2-ER-301) is insufficient as a matter of law. Acquittal is required here.

## <u>ARGUMENT</u>

### I.    Disclosures and transparency require acquittal of Count 100.

Acquittal is required because the trial record shows:  (1) an initial disclosure of every attribute of the funds to the government; (2) the use of transparent banking with accounts bearing Lacey's name or known by all to be associated with him; (3) Lacey's expressed intent to disclose; (4) subsequent timely and complete disclosures to the government; and (5) open conversations with lawyers and bankers.  This case involves a corporation's straightforward distribution of revenue to its shareholders as their income, and the shareholders' subsequent investment of their income in personal bank accounts bearing their names or known to be held for their benefit. The government's efforts to turn these transparent and well-documented transfers into concealment money laundering is contradicted by Thai's testimony and exhibits, among other things.

Moreover, no court has blessed a concealment money laundering conviction on a record like this one.  Instead, courts have uniformly held that disclosures and transparent banking are incompatible with concealment charges.  (AOB 46-53.)  This Court, too, has recognized the general principle that transparency is incompatible with concealment.  For example, in *United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011), this Court explained that "where a defendant takes no steps to disguise or conceal the source or destination of the funds, leaving an easy-to-follow trail in

6

moving money around, those transactions conspicuously lack the convoluted character associated with money laundering." *Id*. at 545 (cleaned up). As the record shows, this appeal does not involve a defendant who merely "[took] no steps" to conceal his funds. Instead, Lacey took affirmative steps to ***disclose*** the attributes of his funds to the government.

### A. Initial disclosures identify Backpage as the source of the funds.

Every attribute of the funds was disclosed to the government—not concealed—as Thai's testimony and exhibits established.

In 2015, companies owned by Larkin, Spear, Brunst, and Lacey sold Backpage to Ferrer through seller-provided loans. (45-ER-12930-12931.) All parties had counsel and signed loan documents. (27-ER-7531-7779; 41-ER-11652-11654.) After the sale, Ferrer collected revenue from Backpage's operations in various bank accounts with "U.S. banks and European banks," including an account held by an entity he transparently controlled, Website Technologies. (38-ER-10838; 45-ER-12851-12852.) Website Technologies wired loan payments to an entity transparently owned by Appellants, Cereus Properties. (38-ER-10838.) Nothing about the structure of these transactions was unduly complex. Appellants sold the website to Ferrer, collected his loan payments through a corporation, and the corporation then distributed the funds to them individually. (*E.g.*, 25-ER-7171.)

The government is keen on claiming that the loan was an effort at concealing Backpage as the source of Appellants' funds, but Thai's testimony belies that claim. Notably, Thai testified that, in their corporate and officer tax filings, Appellants *declared that the loan payments received from Website Technologies originated from Backpage*. (45-ER-12849-12856; 46-ER-12976-12977; 53-ER-15082 ("[T]he records show that the funds come from Backpage.com.").) An exhibit Thai prepared shows the "*Reported Income*" of Lacey, Brunst, and Spear being the declared Backpage revenue. (25-ER-7173 (emphasis added).) In summarizing their "Reported Income," Thai testified that he reviewed "K-1" and "W-2" filings which "traced back to businesses" that he knew "dr[ew] their income primarily from the Backpage.com website." (46-ER-12976-12977.) Consequently, no reasonable trier of fact could have found an intent to conceal (in full or part) because Thai proved that every attribute of the funds, including Backpage as the source, was disclosed to and known by the government—not concealed.

The GAB's authorities are readily distinguishable because they do not involve disclosures of the source, but, instead, involved affirmative steps to hide that attribute from the government. *See United States v. Sun*, 673 F. App'x 729, 733 (9th Cir. 2016) (Defendant told investigators he deposited funds in his personal, rather than corporate account, to "avoid reporting [the funds] to the IRS."); *United States v. Kellum*, 119 F. App'x 32, 34 (9th Cir. 2004) (Defendant used proceeds to purchase

a cashier's check which "ma[de] it harder for federal investigators to discover" the source of the funds.).

Because Lacey affirmatively disclosed every attribute of the funds to the government (as did his co-Appellants), acquittal is required.

### B.    Transparent banking disclosed attributes of the funds.

Thai testified he followed the flow of the funds from Backpage to Appellants with "ease" because the funds were transferred to bank accounts either bearing Appellants' names or transparently associated with them. (2-ER-331; 45-ER-12856-12857.) This testimony is fatal to every concealment conviction. (AOB 49.)

Concerning Count 100, Thai's exhibit shows that Lacey transparently held the funds in accounts known to be owned by or associated with him. Initially, he held the funds in GRATs that identified "Michael G. Lacey" as the owner and his attorney, John Becker ("J.B") as "Trustee." (25-ER-7171.) When the GRATs matured, Becker, as the known and declared "Trustee" of the funds, consolidated the funds into the IOLTA account of his law firm, which Thai knew to be "Becker & House PLLC." (*Id*.) Becker then transferred the funds to a Hungarian bank account "for the benefit of LACEY" to fund a trust formed by Jacob Stein, another lawyer. (*Id*.)

The government's claims of concealment are unfounded. For example, the GAB repeatedly claims that *Lacey*, himself, "made five wire transfers…from his [GRATs] to an IOLTA account held by Becker's law firm." (GAB 137; 146-47; 148

9

n.18.) The undisputed evidence at trial, however, established that Lacey was not involved with and had no knowledge of the consolidation. Critically, government counsel even questioned Becker why "Lacey didn't…wire this money…himself." (49-ER-14028.) Becker explained that the GRATs were due for distributions. (*Id*.) As "Trustee," ***Becker*** made the ***independent*** decision to consolidate the funds and did ***not*** tell Lacey he was consolidating the funds. (49-ER-13995.) The consolidation was not done to conceal the funds in full or part, but, instead, for efficiency. Becker wanted to make one international wire transfer rather than five. (*Id*.) ***Becker's*** independent decision to consolidate was irrelevant to whether ***Lacey*** had specific intent to conceal because Lacey had no knowledge of the consolidation.

Moreover, the consolidation of the GRATs into Becker's IOLTA in no way confused, or concealed, anything from the government. Becker was known to the world as the "Trustee" of the funds held in the GRATs. (25-ER-7171.) Thai testified he knew that an IOLTA account was "an account held in the name of a client" and that he was able to easily follow the funds from the GRATs to Becker's IOLTA and then the IOLTA to Hungary. (46-ER-12964-12965.) Thai also knew that Becker was Lacey's attorney and knew that the IOLTA was Becker's firm's bank account. (45-ER-12926-12927.) The use of the IOLTA provides no basis for affirmance because it concealed nothing. *See United States v. Sanders*, 928 F.2d 940, 944-47 (10th Cir. 1991) (reversing concealment money laundering convictions of drug-

10

trafficking and racketeering defendant because, although defendant used cash from his trafficking to purchase a car, and titled the car in his daughter's name, she had the same last name which meant that his purchase was not designed to conceal attributes of the funds).

Finally, Becker did not deposit the funds into the account of a person unknown to the government. He transferred the funds into a bank account known by all to be "for the benefit of LACEY." (25-ER-7171.)

Acquittal is required because Lacey's transparent association with his funds defeats any claim of concealment.

### C.     Lacey repeatedly expressed an intent to disclose.

The undisputed record is that Lacey repeatedly expressed an intent to disclose his transferred funds to the government and that he made those statements long before his arrest in this case. For example, Lacey expressed an intent to disclose the attributes of the funds to the government in 2016 before the funds were transferred to Hungary. (24-ER-6707; *see also* 44-ER-12582.) Then, just a few weeks after Becker transferred the funds in early 2017, Lacey wrote to Becker asking which lawyer would handle "the *reporting to govt on money that was moved*?" (24-ER-6505-6706 (emphasis added).) Lacey had even engaged lawyers and accountants to ensure that the forthcoming disclosure, known as an FBAR, was done properly. (*Id*.; 44-ER-12582.) On March 7, 2018, five weeks before the deadline to file the first

11

FBAR, Becker filed an automatic extension of the FBAR deadline, informing the government that Lacey's FBAR concerning a foreign account would be filed by October 15, 2018. (28-ER-7960-7962.)

In an effort to distract this Court from Lacey's well-documented intent to disclose, the government suggests that Lacey's FBAR is meaningless because it was inspired by his April 2018 arrest and he would not have otherwise filed one. But that claim ignores Lacey's words and actions, as well as Becker's filing of the FBAR extension, discussed above, all of which occurred *before* his arrest. Moreover, the government has not provided a single case, nor is one known, supporting concealment charges when the defendant repeatedly expressed an intent to disclose, as Lacey did here.

Acquittal is required because Lacey's statements expressing his intent to disclose the funds to the government are incompatible with an intent to conceal.

### D. Lacey made additional disclosures by filing timely and complete FBARs concerning his foreign trust.

It is undisputed that Lacey's accountant filed Lacey's first FBAR for his foreign trust on August 9, 2018 (28-ER-7983-7997), more than two months before the October 15, 2018, deadline. Becker then advised Lacey that "all the legal procedures had been followed." (49-ER-13987-13988.) Thai testified that FBARs are used "[t]o *report* the existence of a foreign bank account by the owner" (46-ER-12963 (emphasis added)), which is exactly what Lacey did.

12

The government's attacks on the FBAR are nothing but red herrings.[2] Contrary to government claims, the FBAR unquestionably was timely filed. The government's own rules state that FBARs are:

> …due April 15 ***following the calendar year reported***. You're allowed an automatic extension to October 15 if you fail to meet the FBAR annual due date….***You don't need to request an extension to file the FBAR***.

Report of FBAR; IRS (Apr. 10, 2025), available at: www.irs.gov/businesses/small-businesses-self-employed/report-of-foreign-bank-and-financial-accounts-fbar (emphasis added). Lacey's accountant filed the FBAR on August 9, 2018, well before the October 15, 2018, deadline. Moreover, Becker filed for an extension of the original deadline ***even though filing such a request was not required***.

The government's suggestion that the FBAR was meaningless because it did not disclose Backpage as the source of the funds is nonsense. Thai testified that Backpage was disclosed as the source of Lacey's funds through initial corporate and officer tax filings (45-ER-12849-12856, 12927-12928; 46-ER-12976-12977; 53-

---

[2] So, too, is the government's claim that a money launderer cannot escape charges by paying taxes on laundered funds. (GAB 146.) This is not a case where a criminal hid the source of his funds, while paying taxes on them, such as a drug dealer laundering cash proceeds through a bar or laundromat that then pays taxes. Appellants' initial tax filings both ***reported the income received*** and ***identified Backpage as the source*** of the funds. Consequently, the government knew every attribute of the funds at the outset. Reversing Lacey's conviction will in no way hamstring the government in future money laundering prosecutions because no one should be charged on a record like this one.

13

ER-15082; 25-ER-7173), so no further disclosure was needed for the government to know that Backpage was the source. Moreover, Lacey's initial and subsequent FBARs provided **all** requested information. (28-ER-7983-7997.) FBARs do not request any information about the source of declared funds. (*Id*.)

The government's effort to distinguish *United States v. Rockelman*, 49 F.3d 418 (8th Cir. 1995)—an opinion reversing a concealment conviction because the defendant's disclosures (of much lesser caliber) were found to be incompatible with concealment—falls flat. The government did nothing more than mischaracterize the record in *Rockelman*. (GAB 148.) While Rockelman's real estate transaction was found to have been "straightforward," the record shows he used cash from narcotics sales to purchase a cabin, never declared the source of the cash, titled the cabin in the name of a company he owned, and then transferred the title to his nephew. *See Rockelman*, 49 F.3d at 422. Nonetheless, the Eighth Circuit reversed Rockelman's concealment money laundering conviction because his ownership of the company was a matter of public record and the title transfers were "on file at the county courthouse." *Id*.

Acquittal is required because Lacey's multiple disclosures, transparency, and expressed intent to disclose far exceed the transparency requiring acquittal in *Rockelman*. Indeed, unlike in *Rockelman*, the government did not need to search

14

county or state records to find Lacey's disclosures because Lacey submitted them *directly to* the federal government.

### E. The government overplays irrelevant testimony.

The government also seeks to distract from Lacey's disclosures with irrelevant testimony, such as that of Lin Howard, a retail banker, who said she was shocked by Lacey's discussion of offshore assets. (GAB 136.) Howard's testimony is irrelevant.

First, Howard's testimony cannot undercut the fact that Lacey engaged in transparent banking and affirmatively disclosed every attribute of the funds to the government. Second, Howard, who may have been shocked merely because she had *no* experience with international estate planning or investments, testified that an offshore trust would be lawful if properly formed. (44-ER-12588.) Third, Howard testified that she did not understand Lacey to be seeking to "conceal anything." (44-ER-12587, 12593.) Fourth, Howard's testimony that Lacey was "turned away" by Howard's bank (GAB 137) is immaterial. Long before Lacey's conversation with Howard, he had sought advice from Becker, who referred him to Stein, a lawyer who specialized in international estate planning. Stein was the only person asked to form the trust because he, not Howard, had expertise in international estate planning. (49-ER-13964-13967.)

Contrary to the government's claim, Lacey did not meet with Howard "[i]n pursuit of" formation of his offshore trust. (GAB 136.) Instead, as Howard testified,

15

Lacey met with her that day for the "purpose" of "open[ing] two bill pay" or "checking accounts" for paying his bills. (44-ER-12580.)

Likewise, there is no merit to the government's suggestion that Becker's transfer of funds to Hungary was somehow improper because Becker had never sent such a large international wire before. (GAB 137.) The size of a transfer has no bearing on its lawfulness. Becker testified that the transfer of Lacey's funds to Hungary was a "solid transaction" and "absolutely legal." (49-ER-14029.) Moreover, Becker was no novice to large international transfers. Previously, Becker made some transfers in the "seven figures." (49-ER-14013.)

Finally, Lacey stating that he did not want the government to "access [his] accounts" (24-ER-6707), meaning interfere with his banking as the government had done before, and which prompted the need for consideration of an offshore trust in the first place (49-ER-13964), is irrelevant. Proof of Lacey's intent to conceal, meaning ***hide***, the attributes of his funds from the government is what matters. *See Cuellar v. United States*, 553 U.S. 550, 569 (2008) (Alito, J., concurring). On this point, the record is clear: Lacey both intended and implemented the complete disclosure of every attribute of his funds to the government.

In sum, the evidence that actually matters—Lacey's disclosures, expressed intent to disclose, and transparent banking—require reversal.

16

### F. The government's authority is easily distinguished.

The government is wrong to claim that *Wilkes* provides the basis to affirm Appellants' concealment money laundering convictions. Even a cursory review of *Wilkes* reveals that very different facts drove its outcome. First, Wilkes's deceit started with his underlying SUA—wire fraud and bribery—charges grounded in deception. Wilkes paid bribes to a congressman to win a government contract and then billed the government for "work never done." *Wilkes*, 662 F.3d at 530-31. In contrast, the alleged SUA here involved Backpage's publication of ads that no Appellant saw, created by people about whom Appellants knew nothing.

Second, Wilkes made no disclosures to the government and structured his transactions to conceal the source and ownership of the proceeds of his bribery scheme. Rather than pay the bribe directly to the congressman, Wilkes first transferred the funds to two different companies that he owned. *Id*. at 547. Then, he transferred the funds from those two companies to a company in which he had no ownership interest or known association, Parkview Financial. At that point, nothing tied the funds to Wilkes. *Id*. Wilkes then had Parkview transfer the funds, not to the congressman, but to the holder of the congressman's mortgage, Coastal Capital. Parkview Financial and Coastal Capital also had already undertaken a "series of transactions of their own, which provided additional buffers between the corrupt contract and the payoff." *Id*. The "dominant, if not the only, purpose" of those

17

transfers was to conceal the funds' connection to Wilkes, to the corrupt contract, and to the congressman as the ultimate owner of the funds. *Id*.

The record here stands in sharp contrast. Because of the disclosures and transparent banking, Thai testified that he knew Lacey's relationship to the funds, that Backpage was the source of the funds, and that Lacey was the ultimate owner of the funds (on top of the location and amount of the funds).

Moreover, unlike in *Wilkes*, each transaction here was necessary and served a non-concealment purpose in that the transfers were necessary to comply with legal formalities: A website buyer (Ferrer's company) made loan payments to the website seller (Appellants' company); Appellants' company distributed those funds to its stockholders by transferring their portion of the funds to personal investment accounts (*e.g.*, the "Michael G. Lacey" GRATs); and the "Trustee" of the GRATs (Becker or "J.B.") consolidated the funds into his law firm's IOLTA account, and then transferred them to a foreign trust (held "for the benefit of LACEY"). (25-ER-7171.) The supposed complexities here were a legal necessity—not designed to conceal. Further, offshore trusts not only are legal, but the government has a method for tracking them—the filing of FBARs, like Lacey did here.

The government claims that three other cases support the conviction. (GAB 147.) Not so. In each case, the most important factor was the secretive use of cash, rather than transparent banking transactions. First, in *United States v. Singh*, 995

18

F.3d 1069 (9th Cir. 2021), the defendant moved his cash narcotics proceeds internationally through "a private system" of hawala brokers "that involved informality, confidentiality," and person-to-person transfers with "minimal record keeping and no governmental regulation, oversight or reporting." *Id.* at 1076. This Court found that the hawala system was used to conceal and that the defendants could "have saved themselves a good deal of time and effort by using wire transfers," *id.*, which is what Appellants did here—as each charged transfer was a transparent wire transfer.

Second, in *United States v. Naranjo*, 634 F.3d 1198 (11th Cir. 2011), the defendant concealed the source and ownership of his proceeds of wire and mail fraud by "hid[ing] his connection to the relevant bank accounts" by, among other things, "omitting his name on corporate records and license applications." *Id.* at 1208-09. He then "made three large cash withdrawals" from the accounts, leaving "no paper trail." *Id.* at 1209-10.

Finally, in *United States v. Tekle*, 329 F.3d 1108 (9th Cir. 2003), the defendants deposited cash from heroin smuggling into eight different bank accounts, always depositing less than $10,000 (including by unlawfully structuring deposits into multiple banks on the same day). They then used the cash to purchase a home, financed with a loan they obtained by providing "false information" about both their incomes and the source of the funds for their down payment. *Id.* at 1114.

19

The government's authorities are inapplicable because no such factors are present here.

*    *    *

The concealment money laundering statute was not intended to be used to prosecute people for their lawful, open, and transparent transfers of funds. Here, every attribute of the funds was disclosed to the government in initial disclosures, two lawyers advised on the charged transaction, which fell within a category of transactions permitted and regulated by federal law, Lacey openly discussed his plans with bankers, repeatedly expressed his intent to "***report[] to govt on money that was moved***" (24-ER-6706 (emphasis added)), and made subsequent government disclosures. No court has ever embraced such a use of the concealment money laundering statute. This Court should decline to be the first.

## II. The government's failure to prove "proceeds" of SUA requires acquittal.

### A. There was insufficient proof of SUA.

The government utterly defaulted on its obligation to prove that the funds at issue in the money laundering counts were "proceeds" of SUA because the government failed to establish the only charged SUA—Travel Act violations.

First, the government failed to establish Travel Act violations for the relevant period of time. Throughout its existence, Backpage generated its revenue by charging website users small fees to publish their ads to the website. It is undisputed

20

that the funds at issue in the money laundering counts were earned by Backpage after Ferrer purchased the website in April 2015. (*E.g.*, 25-ER-7171.) But the government failed to establish any Travel Act violations after April 2015. Critically, every defendant was acquitted of every post-sale Travel Act count (*i.e.*, Counts 19-51). (2-ER-318-319, 420-436; 1-ER-151.) Further, the District Court ruled that the purported Travel Act conspiracy ended with the April 2015 sale to Ferrer. (2-ER-318-319.) The government did not challenge this ruling, but, instead, acknowledged that the "conspiracy end[ed]…at the last Travel Act violation before the sale" to Ferrer. (1-ER-198.) Because a critical element—SUA—was not established for the post-sale period, the funds at issue are not "proceeds" of SUA.

Second, the government failed to establish that anyone had the requisite knowledge and intent as to the publication of any particular ads (*see generally* Spear Br.; Spear Repl. Br.; FIRE Am. Br.; NACDL Am. Br.)—pre-sale or post-sale—which is another reason why the government failed to establish Travel Act violations. Contrary to the government's claims (GAB 143), *Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations*, 413 U.S. 376 (1973), and *United States v. Williams*, 553 U.S. 285 (2008), do not support the convictions. Neither of those opinions addressed the liability of a publisher when the publisher has never seen the speech at issue and knows nothing about the speaker, and they certainly do not stand for the

21

proposition that a publisher could be prosecuted without proof of the publisher's intent as to the speech at issue.

Third, Ferrer's "guess" that a couple dozen post-sale ads he was shown looked like ads associated with prostitution (39-ER-10945-11002; 40-ER-11261-11262) was not proof that publication of those ads constituted Travel Act violations. The Supreme Court has already ruled that "guess[es]" like Ferrer's are insufficient proof in First Amendment cases. *See Sable Comms. of Cal. v. F.C.C.*, 492 U.S. 115, 129-30 (1989) ("[C]onclusory statements" are insufficient.).

Fourth, the government's reliance on Ferrer's "guess[es]" as the springboard to claim that Backpage's publication of tens of millions of ads never put before Ferrer or the jury constituted tens of millions of Travel Act violations (48-ER-13765) flips basic First Amendment principles on their heads. Here again, the Supreme Court has already ruled that "anecdotal evidence" like that is insufficient proof for the claim that a topic of speech is unprotected in general. (AOB 55-56.)

Moreover, the government is not permitted to presume that speech falls outside the protections of the First Amendment, but instead, must prove it. *See Virginia v. Black*, 538 U.S. 343, 367 (2003). "The First Amendment does not permit such a shortcut." *Id*. This Court, too, has explained that "the burden rests on the Government to establish that the ***particular expressions***…are outside [the First Amendment's] reach." *Bursey*, 466 F.2d at 1081-82 (emphasis added).

Consequently, the government proved ***nothing*** about ads that Ferrer and the jury never saw which means those unseen ads are not SUA and their associated revenue is not "proceeds" of SUA.

The government's attempts to invert these principles also invites this Court to abdicate its obligation to conduct "an independent examination of the whole record" to determine whether the government established that the particular instances of speech at issue fell outside the protections of the First Amendment and constituted Travel Act violations. *Thunder Studios*, 13 F.4th at 742; *see also United States v. Al-Timimi*, 164 F.4th 292, 303 (4th Cir. 2026) (explaining courts must conduct an "independent examination of allegedly unprotected material"). This Court cannot meet its obligation to conduct de novo review of the core constitutional facts in this case if, as the government suggests, this Court merely defers to the findings of the jury or District Court or simply accepts the speculations of witnesses as to whether the First Amendment protected Backpage's publication of particular adult ads.[3]

---

[3] Notably, the government's burden to prove that specific expressions of speech fall outside the First Amendment, and a reviewing court's obligation to independently review each expression of speech for constitutional protection, were recently addressed in *Al-Timimi*, 164 F.4th at 297. There, the Fourth Circuit reversed a Muslim defendant's convictions based on "inflammatory, disturbing, and deeply offensive" statements he made days after the September 11 attacks to fellow members of his mosque. *Id*. After a dispassionate review of each statement, the Fourth Circuit concluded that none fell "within any of [the] limited categories of expression unprotected by the First Amendment," and reversed. *Id*. at 304-11.

Here, because the government utterly defaulted on its burden to establish SUA, the cases upon which the government relies to claim that it established proceeds (GAB 113-15) are irrelevant. Those cases affirmed money laundering convictions even though the government failed to connect the defendant to particular SUA or the defendant was acquitted of SUA because there was proof that *someone* had committed the SUA. In contrast, this record presents a rare instance where the government *failed to prove SUA altogether*, which means the money laundering convictions cannot stand. *See United States v. Bala*, 489 F.3d 334, 342 (8th Cir. 2007) (reversing rulings that gambling operation was illegal and that "$99 million of account wagers were the proceeds of [defendant's] illegal gambling business," because the government "proved no violation" of the gambling statutes, which was fatal to its money laundering charges); *United States v. Choy*, 309 F.3d 602, 605 (9th Cir. 2002) (reversing conviction because the government conceded that it failed to establish proceeds when "it failed to introduce sufficient evidence that the money paid by [the defendant] came from illegal activity").

Acquittal is required because the government failed to establish SUA which means that the funds at issue are not "proceeds" of SUA.

**B.  The government failed to connect proceeds to any Backpage account, much less Appellants' personal accounts.**

Even if the government had established SUA, the money laundering convictions should be reversed for an independent reason—the government failed to

24

prove that "proceeds" of SUA were deposited into any particular Backpage bank account, much less Lacey's personal accounts.

For most ads presented at trial, the government failed to establish any corresponding revenue. But even for the limited ads that appear to have generated revenue, the government did not establish a single instance where payment from an ad claimed to be a Travel Act violation was deposited into a particular Backpage bank account that then transferred funds into Lacey's accounts. This proof was necessary to establish that Lacey's funds were "proceeds" of SUA. Notably, Thai admitted he did not trace revenue from any ads to any bank accounts, Backpage or otherwise (45-ER-12940-12946), and Ferrer testified that Backpage used "multiple banks" (37-ER-10548, 10553).

As a result, there was no way for the jury to find that "proceeds" of SUA were deposited into a particular Backpage bank account that then made deposits into Lacey's (or Co-Appellants') bank accounts. Under these circumstances, acquittal is required. *See United States v. Arias*, 784 F. App'x 485, 487 (9th Cir. 2019) (reversing conviction because the government "failed to prove the money came from drug proceeds"); *see also United States v. McIntosh*, 124 F.3d 1330, 1335-36 (10th Cir. 1997) (reversing money laundering convictions because "the funds involved in the transaction were not the proceeds of bankruptcy fraud").

**C.** **The First Amendment precludes punishment for transfers of publishing revenue unless the government ties transferred funds to "proceeds" of SUA which did not occur here.**

Because the funds at issue are publishing revenue, and publishing and transfers of publishing revenue are economic activities presumed to be lawful, First Amendment principles required tracing, regardless of any statutory requirements, which did not occur here. (AOB 54-59.) The government asks this Court to treat Appellants' publishing revenue like revenue from activities that are per se unlawful, such as narcotics trafficking, illegal gambling, or bank fraud claiming that tracing is not needed for transfers of funds from those activities, so it should not be required here. (GAB 142-43.) But that contention does not account for the distinction between presumptively protected economic activities and those that are not. It also runs afoul of basic First Amendment principles.

First, the government cannot side-step its First Amendment obligations simply because it has never previously prosecuted a publisher for transferring publishing revenue and, thus, there is no First Amendment precedent addressing the requirements for such charges.

Second, prosecuting First Amendment activities like publishing under a statute of general application like the money laundering statute does not relieve the government of its First Amendment obligations. *See P.E.T.A. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 827-29 (4th Cir. 2023) ("Laws cast in broad terms can

26

restrict speech as much as laws that single it out."). First Amendment rights "cannot be renamed away or their protections nullified" by claims the government is targeting conduct, rather than speech. *Chiles v. Salazar*, ___ U.S. ___, 146 S. Ct. 1010, 1023-24 (2026) ("The First Amendment is no word game….What matters is whether, in fact, the law regulates speech in the case in hand.").

To the contrary, courts do not hesitate to reverse convictions when a statute is applied in a manner that violates a defendant's First Amendment rights. *Id.*; *Cohen v. Cal.*, 403 U.S. 15, 15-17, 24-26 (1971) (reversing conviction for "willfully disturbing the peace…by…offensive conduct" because, as applied to prosecuting the defendant for wearing a "F--- the Draft" jacket, the statute violated the First Amendment); *United States v. Marcavage*, 609 F.3d 264, 273-91 (3d Cir. 2010) (reversing defendant's conviction for interference with governmental functions under First Amendment); *Sawyer v. Sandstrom*, 615 F.2d 311, 316-18 (5th Cir. 1980) (vacating conviction for loitering where narcotics were known to be sold because the defendant was not involved in drug sales, and was charged solely on his association with drug dealers on a sidewalk, which violated the First Amendment).

Third, government action targeting publishing revenue is no different from government action targeting the act of publishing. Government actions must comply with the First Amendment at "different points in the speech process," including when "imposing a burden by impounding proceeds on receipts or royalties" of publishing.

27

*Citizens United*, 558 U.S. at 336-37; *Simon & Schuster, Inc. v. Members of N.Y.S. Crime Bd.*, 502 U.S. 105, 116-23 (1991) (invalidating law creating a financial disincentive to publish works authored by defendants about their crimes despite assuming the income at issue "represent[ed] the fruits of crime").

Here, it is unbelievable that the government contends that it proved "in fact" that the funds at issue in the sixteen money laundering convictions—$45,000,000—are proceeds of Travel Act violations.  (GAB 114, 141-44.)  The proof at trial was fatally deficient for several reasons.  The government brought charges as to just fifty ads, leaving the jury and this Court in the dark about tens of millions of ads.  Even then, it failed to prove that most of the charged ads were actually associated with prostitution.  However, even as to the subset of ads that it established had been associated with prostitution, that proof is not sufficient to establish that Backpage's publication of those ads constituted Travel Act violations.[4]  The government failed to prove that most of those ads earned revenue of any kind, much less that the revenue earned from publication of millions of other ads, not presented to the jury, were "in fact" proceeds of Travel Act violations.

---

[4] Proof that an ad was associated with prostitution is not proof of a Travel Act violation.  The government was required, and failed, to establish Appellants' scienter as to the third-party ads it showed the jury.  (Spear Br. 32-59; Spear Repl. Br. 4-31; FIRE Am. Br. 15-26; NACDL Am. Br. 16-33.)

As if these problems were not enough, the government's own proof contradicts its claim that all of Backpage's revenue was "proceeds" of Travel Act violations. The government established that Backpage earned millions of dollars from ads published in non-adult ad categories. (25-ER-7172; 2-ER-334-335.) Further, Ferrer testified that his loan payments to Appellants included revenue Backpage earned from publishing ads abroad (38-ER-10614, 10838-10839), which could not be designated as "proceeds" of Travel Act violations because the Travel Act does not apply to the conduct of advertisers in foreign countries. (AOB 27.)

Finally, Thai admitted he did not trace revenue from any Travel Act violations to any accounts, corporate or personal. (45-ER-12940-12944.)

Against this record—which makes it impossible to know beyond a reasonable doubt whether a single dollar of the $45,000,000 was generated from publishing an ad claimed to be a Travel Act violation—the government insists that tracing is not required. However, without tracing, the government will have succeeded in punishing Appellants for their participation in a stage of the speech process when there is no proof that the underlying speech (and associated revenue) at issue fell outside the protections of the First Amendment and constituted a Travel Act violation, which the government cannot do.

Fourth, the District Court's inclusion of a First Amendment jury instruction in no way remedied this constitutional error because the instruction was erroneous as a matter of law. (Spear Br. 59-67; Spear Repl. Br. 32-33; FIRE Am. Br. 29-32.)

This Court should reverse the money laundering convictions because by failing to trace, the government failed to satisfy its First Amendment obligations.

\* \* \*

The government's insufficient proof of "proceeds" of SUA is yet another basis for acquittal of Lacey's conviction (and Co-Appellants' convictions).

## III. There is no proof Lacey knew that the funds were "proceeds" of SUA.

There is no proof that Lacey knew that his funds were "proceeds" of Travel Act violations. The government failed to establish Lacey's intent as to any ad. (*See generally* Spear Br.; Spear Repl. Br.; FIRE Am. Br.; NACDL Am. Br.)

But, even if charges like these could be brought, the District Court's finding that Lacey had a "***bona fide held belief that what [he was] doing was not illegal***" (1-ER-110 (emphasis added)) is incompatible with Lacey knowing his funds were "proceeds" of crime or having the specific intent to conceal criminal "proceeds." The record supports this finding. (AOB 7-9, 28, 60-61.)

To get around its deficient proof as to Lacey's knowledge, the GAB relies on gimmicks like referring generally to "Backpage's leadership," "Defendants," "owners," or "sellers" to try to attribute a fact to Lacey when there is no basis in the

30

record for any such attribution. For example, on the first page, the GAB claims that "Backpage's leadership"—including Lacey—"developed, implemented, and refined" "various business strategies" and "financial strategies" to build its "prostitution advertising" business. (GAB at 1.) This charade continues throughout the GAB. But, the government's witnesses and exhibits proved otherwise.

Ferrer testified that Lacey was a "layer away" from Backpage's operations. (40-ER-11307.) A corporate organization chart, admitted through Ferrer, shows Lacey was not involved with any business-side activities relating to Backpage or other entities. (28-ER-8012.). Instead, he oversaw a Pulitzer Prize winning journalism department. (3-ER-809-857.)

There was no testimony that Lacey had any knowledge about Backpage's marketing strategies (arrangements with super posters, reciprocal links with TER, or aggregation). Backpage's top executive in charge of marketing—Daniel Hyer— never met Lacey in the decades that he worked for the newspaper company, including his thirteen years at Backpage. (48-ER-13680.)

The government's proof established that Lacey had nothing to do with business meetings. Ferrer testified that Lacey did not attend quarterly or banker meetings. (40-ER-11307-11308.) Lacey was not invited to and did not attend "Principals' Meeting[s]." (26-ER-7232-7233.) Lacey was not given "business plan[s]." (38-ER-10709-10710.)

31

Lacey was not involved with moderation. There was no proof that Lacey understood moderation to be anything other than what Ferrer told him it was—a department with "100 staff members…making the site as safe as possible" (25-ER-7090), whose "priorities" were to "deter, remove, and report bad postings" (25-ER-7085)—all of which is perfectly lawful.

Tellingly, when the GAB discusses the specific details of Backpage's business strategies, Lacey is not mentioned. There was no proof of direct knowledge. Instead, the record shows that Lacey's knowledge of Backpage's operations was provided by Larkin and Ferrer, and that Larkin assured Lacey that lawyers of the highest caliber had advised him that Backpage's operations were lawful, notwithstanding calls to shut down the site. (AOB 7-12; 11-ER-2753-2754.) The record shows Lacey understood that some criminals had used Backpage, just like they had used Craigslist, and believed that anecdotal proof that criminals used the site should not silence the speech of law-abiding website users. At his core, he was guided by the principle that censorship was not a solution for crime prevention. (AOB 9-12.)

*　　*　　*

In sum, the record does not establish that Lacey had any knowledge that his funds were "proceeds" of SUA.

32

**CONCLUSION**

Lacey's conviction should not stand. The government has no serious answer for its fatally deficient proof. First, the undisputed record shows that Lacey's transaction involved disclosure—not concealment:

- Lacey's initial disclosure of every attribute of the funds to the government, including Backpage as the source (45-ER-12849-12856; 46-ER-12976-12977; 53-ER-15082; 25-ER-7173);

- Lacey's expressed intent to disclose his funds to the government by ensuring disclosure forms were filed (24-ER-6706);

- Lacey's hiring of two lawyers to form a trust that identified Lacey by name (28-ER-7964-7982; AOB 14-15);

- Lacey's open conversations with bankers (44-ER-12582);

- Lacey's retention of lawyers and accountants to file his disclosures with the government (24-ER-6505-6706; 44-ER-12582);

- Lacey's use of bank accounts in his own name or accounts known by all, including Thai, to be associated with Lacey (25-ER-7171; 46-ER-12964-12965);

- Lacey's funds ultimately deposited into a bank account known to all as "for the benefit of LACEY" (25-ER-7171);

33

- Lacey's filing of timely and complete annual disclosures of his funds to the government, known as FBARs (28-ER-7983-7997); and

- Thai's ability to follow the transferred funds with "ease" (2-ER-331; 45-ER-12856-12857, 12959).

There is no plausible way to claim that Lacey's funds were concealed in full or part from the government. No case supports such a finding.

Second, there was no path for the jury to have found that Lacey's (or his Co-Appellants') funds were "proceeds" of SUA. The government did not prove SUA. (2-ER-318-319, 420-436; 1-ER-151.) The government did not trace a single dollar earned from an ad claimed to be a Travel Act violation to a Backpage bank account, much less Lacey's bank accounts. (45-ER-12940-12944.) And, the record flatly contradicts any claim that all of Backpage's revenue was generated from Travel Act violations because Backpage earned millions of dollars from publishing ads in non-adult ad categories (25-ER-7172; 2-ER-334-335), as well as revenue from publishing ads abroad (38-ER-10614, 10838-10839), neither of which can serve as the basis of Travel Act violations.

Third, there is nothing in the record to show that Lacey knew his funds were "proceeds" because he did not understand Backpage's publication of third-party ads to be criminal conduct.

34

For all these reasons, Lacey respectfully requests that this Court reverse his sole count of conviction and remand for the entry of a judgment of acquittal.

DATED:    Buffalo, New York        Respectfully submitted,
            June 11, 2026

                                */s/ Erin McCampbell Paris*
                                Erin McCampbell Paris
                                **MAURICE WUTSCHER, LLP**
                                50 Fountain Plaza, Suite 1400
                                Buffalo, New York 14202
                                716-261-4703
                                eparis@mauricewutscher.com

                                *Counsel for Michael G. Lacey*

35

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-5374, 24-5375, 24-5376

I am the attorney or self-represented party.

**This brief contains** 7,680 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

◉ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Erin McCampbell Paris **Date** June 11, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*